## Case Description

Case ID: 250303655
Case Caption: LA HART ETAL VS SUNOCO PIPELINE, LP ETAL
Filing Date: Thursday , March 27th, 2025
Location: CH - CITY HALL
Case Type: C1 - CLASS ACTION
Status: CLWCM - WAITING TO LIST CASE MGMT CONF
Cross Reference: DC 2025CV02072

## Related Cases

*No related cases were found.*

## Case Event Schedule

*No case events were found.*

## Case Motions

| Motion | Assign/Date | Control No | Date/Received | Judge |
|---|---|---|---|---|
| MOTION TO STAY PROCEEDINGS | *pending* | 25064738 | 24-JUN-2025 | PATRICK, PAULA |
| MOTION TO TRANSFER | *pending* | 25065679 | 27-JUN-2025 | PATRICK, PAULA |
| PRELIMINARY INJUNCTION | *pending* | 25072040 | 10-JUL-2025 | PATRICK, PAULA |
| MOT-FOR ADMISSION PRO HAC VICE | *pending* | 26023499 | 13-FEB-2026 | |
| MOT-FOR ADMISSION PRO HAC VICE | *pending* | 26023501 | 13-FEB-2026 | |

## Case Parties

| Seq # | Assoc | Expn Date | Type | ID | Name |
|---|---|---|---|---|---|
| 1 | | | ATTORNEY FOR PLAINTIFF | A85957 | CARSON ESQ, SHANON J |
| **Address:** BERGER MONTAGUE PC<br>1818 MARKET ST<br>SUITE 3600<br>PHILADELPHIA PA 19103<br>(215)875-3000<br>(215)875-4604 - FAX<br>scarson@bm.net | | | **Aliases:** | *none* | |

**Exhibit A_ Page 1 of 336**

| 2 | 1 | | PLAINTIFF | @12187193 | LAHART, DANIEL |
|---|---|---|---|---|---|
| **Address:** | 1818 MARKET ST SUITE 3600 PHILADELPHIA PA 19103 | | **Aliases:** | *none* | |
| | | | | | |
| 3 | 1 | | PLAINTIFF | @12187196 | LAHART, KATHERINE |
| **Address:** | 1818 MARKET ST SUITE 3600 PHILADELPHIA PA 19103 | | **Aliases:** | *none* | |
| | | | | | |
| 4 | | | DEFENDANT | @12187203 | SUNOCO PIPELINE LP |
| **Address:** | 525 FRITZTOWN RD SINKING SPRING PA 19608 | | **Aliases:** | *none* | |
| | | | | | |
| 5 | | | DEFENDANT | @12187206 | ENERGY TRANSFER LP |
| **Address:** | 8111 WESTCHESTER DR DALLAS TX 75225 | | **Aliases:** | *none* | |
| | | | | | |
| 6 | | | DEFENDANT | @12187209 | ENERGY TRANSFER (R&M) LLC |
| **Address:** | 1735 MARKET ST PHILADELPHIA PA 19103 | | **Aliases:** | *none* | |
| | | | | | |
| 7 | | | TEAM LEADER | J519 | PATRICK, PAULA |
| **Address:** | CITY HALL RM 510 PHILADELPHIA PA 19107 (215)686-8338 (215)686-8395 - FAX | | **Aliases:** | *none* | |
| | | | | | |
| 8 | 1 | | ATTORNEY FOR PLAINTIFF | A327645 | SAMUEL JR, JOSEPH E |

| **Address:** | BERGER MONTAGUE PC<br>1818 MARKET STREET<br>SUITE 3600<br>PHILADELPHIA PA 19103<br>(215)875-3020<br>jsamuel@bergermontague.com | | | **Aliases:** | *none* | |

| 9 | 1 | | ATTORNEY FOR PLAINTIFF | A312411 | TWERSKY, YECHIEL M |
|---|---|---|---|---|---|
| **Address:** | 1818 MARKET STREET, SUITE 3600<br>PHILADELPHIA PA 19103<br>(215)875-3000<br>mitwersky@bm.net | | **Aliases:** | *none* | |

| 10 | | | ATTORNEY FOR DEFENDANT | A310658 | MCNALLY, LAURA H |
|---|---|---|---|---|---|
| **Address:** | 2222 MARKET STREET<br>PHILADELPHIA PA 19103<br>(215)963-5257<br>(215)963-5001 - FAX<br>laura.mcnally@morganlewis.com | | **Aliases:** | *none* | |

| 11 | | 21-NOV-2025 | ATTORNEY FOR DEFENDANT | A329145 | JIANG, YUNICA |
|---|---|---|---|---|---|
| **Address:** | 2222 MARKET STREET<br>PHILADELPHIA PA 19103<br>(215)963-5000<br>(215)963-5001 - FAX<br>yunica.jiang@morganlewis.com | | **Aliases:** | *none* | |

| 12 | | | ATTORNEY FOR DEFENDANT | A44322 | FOX, ROBERT D |
|---|---|---|---|---|---|
| **Address:** | THREE BALA PLAZA EAST<br>SUITE 700<br>BALA CYNWYD PA 19004<br>(484)430-2312<br>(484)430-5711 - FAX<br>rfox@mankogold.com | | **Aliases:** | *none* | |

| 13 | 10 | | ATTORNEY FOR DEFENDANT | A311083 | SILVA, DIANA A |
|---|---|---|---|---|---|

| **Address:** | THREE BALA PLAZA EAST SUITE 700 BALA CYNWYD PA 19004 (484)430-2347 (484)430-5711 - FAX dsilva@mankogold.com | | **Aliases:** | *none* | |
|---|---|---|---|---|---|
| | | | | | |
| 14 | | | DEFENDANT | @12461199 | ENERGY TRANSFER MARKETING & TERMINALS LP |
| **Address:** | 100 GREEN STREET MARCUS HOOK PA 19061 | | **Aliases:** | *none* | |
| | | | | | |
| 15 | 38 | | DEFENDANT | @12461200 | SHAW PIPELINE SERVICES INC |
| **Address:** | 1735 W RENO STREET BROKEN ARROW OK 74012 | | **Aliases:** | ROSEN USA | |
| | | | | | |
| 16 | | | DEFENDANT | @12461201 | CORRPRO COMAPNIES INC |
| **Address:** | 470 LAPP ROAD MALVERN PA 19355 | | **Aliases:** | *none* | |
| | | | | | |
| 17 | | | DEFENDANT | @12461202 | AZURIA WATER SOLUTIONS INC |
| **Address:** | 17988 EDISON AVENUE ST. LOUIS MO 63005 | | **Aliases:** | *none* | |
| | | | | | |
| 18 | 38 | | DEFENDANT | @12461203 | BARR AIR PATROL LLC |
| **Address:** | 1442 AIRPORT BOULEVARD SUITE 11 MESQUITE TX 75181 | | **Aliases:** | *none* | |
| | | | | | |
| 19 | 33 | | DEFENDANT | @12461204 | BAKER HUGHES COMPANY |
| **Address:** | 301 SAVILLE AVENUE EDDYSTONE PA 19022 | | **Aliases:** | *none* | |

| 20 | 42 | | DEFENDANT | @12461205 | ROSEN SWISS A G |
|---|---|---|---|---|---|
| **Address:** | 14120 INTERDRIVE EAST HOUSTON TX 77032 | | **Aliases:** | *none* | |

| 21 | 44 | | DEFENDANT | @12461206 | DELTA AIR LINES INC |
|---|---|---|---|---|---|
| **Address:** | 1030 DELTA BLVD DEPARTMENT 982 ATLANTA GA 30354 | | **Aliases:** | *none* | |

| 22 | 44 | | DEFENDANT | @12461207 | EPSILON TRADING LLC |
|---|---|---|---|---|---|
| **Address:** | 1030 DELTA BLVD DEPARTMENT 982 ATLANTA GA 30354 | | **Aliases:** | *none* | |

| 23 | 44 | | DEFENDANT | @12461208 | MONROE ENERGY LLC |
|---|---|---|---|---|---|
| **Address:** | 4101 POST ROAD TRAINER PA 19061 | | **Aliases:** | *none* | |

| 24 | 34 | | DEFENDANT | @12461209 | PBF ENERGY INC |
|---|---|---|---|---|---|
| **Address:** | 1 SYLVAN WAY PARSIPPANY NJ 07054 | | **Aliases:** | *none* | |

| 25 | 34 | | DEFENDANT | @12461210 | PBF HOLDING COMPANY LLC |
|---|---|---|---|---|---|
| **Address:** | 1 SYLVAN WAY PARSIPPANY NJ 07054 | | **Aliases:** | *none* | |

| 26 | 36 | | DEFENDANT | @12461211 | PRECISION PIPELINE LLC |
|---|---|---|---|---|---|
| **Address:** | 3314 56TH STREET EAU CLAIRE WI 54703 | | **Aliases:** | *none* | |

| 27 | 36 | | DEFENDANT | @12461212 | MASTEC INC |
|---|---|---|---|---|---|
| **Address:** | 800 S DOUGLAS ROAD 10TH FLOOR CORAL GABLES FL 33134 | | **Aliases:** | *none* | |

| | | | | | |
|---|---|---|---|---|---|
| 28 | 40 | | DEFENDANT | @12461213 | NATURAL ENERGY FIELD SERVICES LLC |
| **Address:** | 4101 TATES CREEK CENTER DRIVE SUITE 150 LEXINGTON KY 40517 | | **Aliases:** | *none* | |
| 29 | | | PLAINTIFF | @12461214 | ZACHARATOS, JERRY |
| **Address:** | 1818 MARKET STREET SUITE 3600 PHILADELPHIA PA 19103 | | **Aliases:** | *none* | |
| 30 | | | PLAINTIFF | @12461215 | ZACHARATOS, JUSTINE |
| **Address:** | 1818 MARKET STREET SUTIE 3600 PHILADELPHIA PA 19103 | | **Aliases:** | *none* | |
| 31 | | | PLAINTIFF | @12461216 | GROVER, CHRISTOPHER |
| **Address:** | 1818 MARKET STREET SUITE 3600 PHILADELPHIA PA 19103 | | **Aliases:** | *none* | |
| 32 | | | PLAINTIFF | @12461222 | GOVER, ANDREA |
| **Address:** | 18180 MARKET STREET SUITE 3600 PHILADELPHIA PA 19103 | | **Aliases:** | *none* | |
| 33 | | | ATTORNEY FOR DEFENDANT | A331320 | DIESA, NICOLE |
| **Address:** | 328 Newman Springs Road RED BANK NJ 07701 (732)852-4400 (732)852-4401 - FAX nicole.diesa@formanwatkins.com | | **Aliases:** | *none* | |

| 34 | | | ATTORNEY FOR DEFENDANT | A60184 | SCOTT, JEFFREY M |
|---|---|---|---|---|---|
| **Address:** | ARCHER & GREINER<br>THREE LOGAN SQUARE<br>1717 ARCH STREET, SUITE 3500<br>PHILADELPHIA PA 19103<br>(215)963-3300<br>(215)963-9999 - FAX<br>jscott@archerlaw.com | | **Aliases:** | *none* | |
| | | | | | |
| 35 | 34 | | ATTORNEY FOR DEFENDANT | A204461 | CONLEY, MATTHEW |
| **Address:** | 1025 LAUREL OAK ROAD<br>VOORHEES NJ 08043<br>(856)673-3901<br>mconley@archerlaw.com | | **Aliases:** | *none* | |
| | | | | | |
| 36 | | | ATTORNEY FOR DEFENDANT | A53371 | PAYNE, WESLEY R |
| **Address:** | WHITE & WILLIAMS LCP<br>1800 ONE LIBERTY PLACE<br>PHILADELPHIA PA 19103<br>(215)864-7076<br>(215)789-7573 - FAX<br>paynew@whiteandwilliams.com | | **Aliases:** | *none* | |
| | | | | | |
| 37 | 36 | | ATTORNEY FOR DEFENDANT | A324202 | HUTCHINSON, LAURA ELIZABETH |
| **Address:** | WHITE & WILLIAMS LLP<br>1650 MARKET ST<br>ONE LIBERTY PLACE SUITE 1800<br>PHILADELPHIA PA 19103<br>(215)864-6231<br>(215)789-7688 - FAX<br>Hutchinsonl@whiteandwilliams.com | | **Aliases:** | *none* | |
| | | | | | |
| 38 | | | ATTORNEY FOR DEFENDANT | A316225 | LUCCA, CHRISTOPHER M |
| **Address:** | CLARK HILL PLC<br>TWO COMMERCE SQUARE<br>2001 MARKET STREET, SUITE 2620<br>PHILADELPHIA PA 19103 | | **Aliases:** | *none* | |

| | | | | | |
|---|---|---|---|---|---|
| | | | | (215)864-8600<br>clucca@clarkhill.com | |

| | | | | | |
|---|---|---|---|---|---|
| 39 | 38 | | ATTORNEY<br>FOR<br>DEFENDANT | A329105 | HUBER,<br>VANESSA L |
| **Address:** | TWO COMMERCE SQUARE<br>2001 MARKET STREET<br>SUITE 2620<br>PHILADELPHIA PA 19103<br>(215)422-4428<br>(215)523-9727 - FAX<br>vhuber@ClarkHill.com | | **Aliases:** | *none* | |

| | | | | | |
|---|---|---|---|---|---|
| 40 | | | ATTORNEY<br>FOR<br>DEFENDANT | A336438 | GEORGE,<br>ALEXANDRA M |
| **Address:** | 1650 MARKET ST SUITE 1800<br>PHILADELPHIA PA 19103<br>(215)864-7099<br>(215)864-7123 - FAX<br>GEORGEAL@WHITEANDWILLIAMS.COM | | **Aliases:** | *none* | |

| | | | | | |
|---|---|---|---|---|---|
| 41 | 40 | | ATTORNEY<br>FOR<br>DEFENDANT | A319358 | BIRCH,<br>MORGAN<br>SHAE |
| **Address:** | WHITE AND WILLIAMS LLP<br>1650 MARKET ST<br>ONE LIBERTY PL SUITE 1800<br>PHILADELPHIA PA 19103<br>(215)864-7188<br>(215)789-7517 - FAX<br>birchm@whiteandwilliams.com | | **Aliases:** | *none* | |

| | | | | | |
|---|---|---|---|---|---|
| 42 | | | ATTORNEY<br>FOR<br>DEFENDANT | A56476 | KAVULICH,<br>LAURI A |
| **Address:** | CLARK HILL PLC<br>2001 MARKET ST<br>SUITE 2620<br>PHILADELPHIA PA 19103<br>(215)640-8500<br>(215)640-8501 - FAX<br>lkavulich@clarkhill.com | | **Aliases:** | *none* | |

| | | | | | |
|---|---|---|---|---|---|
| 43 | 42 | | ATTORNEY<br>FOR<br>DEFENDANT | A312071 | WEISS, ROBIN<br>S |

| Address: | CLARK HILL PLC<br>TWO COMMERCE SQUARE<br>2001 MARKET STREET, SUITE 2620<br>PHILADELPHIA PA 19103<br>(215)864-8086<br>(215)523-9714 - FAX<br>rsweiss@clarkhill.com | | | Aliases: | *none* |
|---|---|---|---|---|---|
| | | | | | |
| 44 | | | ATTORNEY FOR DEFENDANT | A55742 | YOUNG, A CHRISTOPHER |
| Address: | TROUTMAN PEPPER LOCKE LLP<br>3000 TWO LOGAN SQUARE<br>18TH AND ARCH STREETS<br>PHILADELPHIA PA 19103<br>(215)981-4000<br>Christopher.Young@troutman.com | | | Aliases: | *none* |
| | | | | | |
| 45 | 44 | | ATTORNEY FOR DEFENDANT | A322851 | BROLLEY, CHRISTOPHER M |
| Address: | TROUTMAN PEPPER LOCKE LLP<br>3000 TWO LOGAN SQ<br>18TH & ARCH STREETS<br>PHILADELPHIA PA 19103<br>(215)981-4798<br>christopher.brolley@troutman.com | | | Aliases: | *none* |
| | | | | | |
| 46 | 44 | | ATTORNEY FOR DEFENDANT | A336148 | DESABATO, ANTHONY PATRICK |
| Address: | 3000 TWO LOGAN SQUARE<br>PHILADELPHIA PA 19103<br>(215)981-4995<br>patrick.desabato@troutman.com | | | Aliases: | *none* |

## Docket Entries

|  |  |  | ☐ **Check for Threaded Docket**<br>This feature will reduce the docket<br>to motion related entries only. |
|---|---|---|---|
| **Filing Date/Time** | **Docket Type** | **Filing Party** | **Disposition Amount** |
| 27-MAR-2025 10:09 AM | ACTIV - ACTIVE CASE | | |
| **Docket Entry:** | *none.* | | |

| 27-MAR-2025 10:12 AM | CIVIL - COMMENCEMENT OF CIVIL ACTION | | |
|---|---|---|---|
| **Docket Entry:** | *none.* | | |

| 27-MAR-2025 10:16 AM | CMPLC - COMPLAINT FILED NOTICE GIVEN | CARSON ESQ, SHANON J | |
|---|---|---|---|
| **Documents:** | CMPLC_3.pdf | | |
| **Docket Entry:** | COMPLAINT WITH NOTICE TO DEFEND WITHIN TWENTY (20) DAYS AFTER SERVICE IN ACCORDANCE WITH RULE 1018.1 FILED. NOTE A FLASH DRIVE WAS FILED WITH THE COMPLAINT. | | |

| 27-MAR-2025 10:17 AM | JURYT - JURY TRIAL PERFECTED | CARSON ESQ, SHANON J | |
|---|---|---|---|
| **Docket Entry:** | JURY TRIAL DEMANDED. | | |

| 27-MAR-2025 10:17 AM | CLWCM - WAITING TO LIST CASE MGMT CONF | | |
|---|---|---|---|
| **Docket Entry:** | *none.* | | |

| 27-MAR-2025 04:24 PM | AFDVT - AFFIDAVIT OF SERVICE FILED | CARSON ESQ, SHANON J | |
|---|---|---|---|
| **Documents:** | AFFIDAVIT OF SERVICE (5).pdf | | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF PLAINTIFF'S COMPLAINT UPON SUNOCO PIPELINE LP AND ENERGRY TRANSFER (R&M) LLC BY PERSONAL SERVICE ON 03/27/2025 FILED. (FILED ON BEHALF OF KATHERINE LA HART AND DANIEL LA HART) | | |

| 27-MAR-2025 04:45 PM | AFDVT - AFFIDAVIT OF SERVICE FILED | CARSON ESQ, SHANON J | |
|---|---|---|---|
| **Documents:** | AOS_Energy Transfer LP.pdf | | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF PLAINTIFF'S COMPLAINT UPON ENERGY TRANSFER LP BY PERSONAL SERVICE ON 03/27/2025 FILED. (FILED ON BEHALF OF KATHERINE LA HART AND DANIEL LA HART) | | |

| 28-MAR-2025 01:14 PM | ENAPC - ENTRY OF APPEARANCE-CO COUNSEL | SAMUEL JR, JOSEPH E | |
|---|---|---|---|
| **Documents:** | EOA - Joseph Samuel(20461654.2).pdf | | |

| Docket Entry: | ENTRY OF APPEARANCE OF JOSEPH E SAMUEL AS CO-COUNSEL FILED. (FILED ON BEHALF OF KATHERINE LA HART AND DANIEL LA HART) | | |
|---|---|---|---|
| | | | |
| 31-MAR-2025 03:21 PM | ENAPC - ENTRY OF APPEARANCE-CO COUNSEL | TWERSKY, YECHIEL M | |
| Documents: | EOA - Michael Twersky(20461323.2).pdf | | |
| Docket Entry: | ENTRY OF APPEARANCE OF YECHIEL M TWERSKY AS CO-COUNSEL FILED. (FILED ON BEHALF OF KATHERINE LA HART AND DANIEL LA HART) | | |
| | | | |
| 01-APR-2025 04:48 PM | ENAPP - ENTRY OF APPEARANCE | MCNALLY, LAURA H | |
| Documents: | Entry of Appearance - Laura McNally.pdf | | |
| Docket Entry: | ENTRY OF APPEARANCE OF LAURA H MCNALLY FILED. (FILED ON BEHALF OF ENERGRY TRANSFER (R&M) LLC, ENERGY TRANSFER LP AND SUNOCO PIPELINE LP) | | |
| | | | |
| 01-APR-2025 05:02 PM | ENAPP - ENTRY OF APPEARANCE | JIANG, YUNICA | |
| Documents: | Entry of Appearance - Yunica Jiang.pdf | | |
| Docket Entry: | ENTRY OF APPEARANCE OF YUNICA JIANG FILED. (FILED ON BEHALF OF ENERGRY TRANSFER (R&M) LLC, ENERGY TRANSFER LP AND SUNOCO PIPELINE LP) | | |
| | | | |
| 02-APR-2025 11:58 AM | ENAPC - ENTRY OF APPEARANCE-CO COUNSEL | FOX, ROBERT D | |
| Documents: | Entry of Appearance for RDF and DAS in CCP Phila.(2982129.1).pdf | | |
| Docket Entry: | ENTRY OF APPEARANCE OF ROBERT D FOX AND DIANA A SILVA AS CO-COUNSEL FILED. (FILED ON BEHALF OF ENERGRY TRANSFER (R&M) LLC, ENERGY TRANSFER LP AND SUNOCO PIPELINE LP) | | |
| | | | |
| 07-APR-2025 08:36 AM | MTPHV - MOT-FOR ADMISSION PRO HAC VICE | MCNALLY, LAURA H | |
| Documents: | Motion for Pro Hac Vice Admission of Duke K. McCall, III.pdf<br>Motion CoverSheet Form | | |
| Docket Entry: | 43-25041343 RESPONSE DATE 04/28/2025. (FILED ON BEHALF OF ENERGRY TRANSFER (R&M) LLC, ENERGY TRANSFER LP AND SUNOCO PIPELINE LP) | | |
| | | | |
| 07-APR-2025 10:50 AM | MTPHV - MOT-FOR ADMISSION PRO HAC VICE | MCNALLY, LAURA H | |
| Documents: | Motion for Pro Hac Vice Admission of Drew Cleary Jordan.pdf<br>Motion CoverSheet Form | | |

| Docket Entry: | 44-25041344 RESPONSE DATE 04/28/2025. (FILED ON BEHALF OF ENERGY TRANSFER (R&M) LLC, ENERGY TRANSFER LP AND SUNOCO PIPELINE LP) | | |
|---|---|---|---|
| | | | |
| 14-APR-2025 10:03 AM | CLLCM - LISTED FOR CASE MGMT CONF | | |
| Docket Entry: | *none.* | | |
| | | | |
| 14-APR-2025 10:03 AM | CLCDS - CONFERENCE DATE SET | | |
| Documents: | CLCDS_16.pdf | | |
| Docket Entry: | *none.* | | |
| | | | |
| 14-APR-2025 10:03 AM | ZR236 - NOTICE GIVEN UNDER RULE 236 | | |
| Docket Entry: | NOTICE GIVEN ON 14-APR-2025 OF CONFERENCE DATE SET ENTERED ON 14-APR-2025. | | |
| | | | |
| 23-APR-2025 08:56 PM | PRSUB - PRAECIPE-SUBSTITUTE/ATTACH | SAMUEL JR, JOSEPH E | |
| Documents: | La Hart - Praecipe to Attach Exhibits to Class Action Complaint(20502643.1).pdf<br>Exhibit A.pdf<br>Exhibit B.pdf<br>Exhibit C.pdf<br>Exhibit D.pdf<br>Exhibit E.pdf<br>Exhibit F.pdf<br>Exhibit G.pdf | | |
| Docket Entry: | PRAECIPE TO SUBSTITUTE/ATTACH FILED. (FILED ON BEHALF OF KATHERINE LAHART AND DANIEL LAHART) | | |
| | | | |
| 24-APR-2025 02:59 PM | RMEDC - NOT OF REMOVAL TO US DIST CT | MCNALLY, LAURA H | |
| Documents: | State Court Notice of Filing (Part 1).pdf<br>State Court Notice of Filing (Part 2).pdf<br>State Court Notice of Filing (Part 3).pdf<br>State Court Notice of Filing (Part 4).pdf<br>State Court Notice of Filing (Part 5).pdf<br>State Court Notice of Filing (Part 6).pdf | | |
| Docket Entry: | NOTICE OF REMOVAL TO THE U.S. (EASTERN) DISTRICT COURT UNDER 2025-CV-02072. (FILED ON BEHALF OF ENERGY TRANSFER (R&M) LLC, ENERGY TRANSFER LP AND SUNOCO PIPELINE LP) | | |
| | | | |
| 25-APR-2025 03:14 PM | RCDML - RECORD MAILED/TRANSMITTED | | |

| Docket Entry: | RECORD ELECTRONICALLY SENT TO U.S DISTRICT COURT VIA PACER ON 25-APR-2025, SENT UNDER DC# 2:25-cv-02072-MRP | | |
|---|---|---|---|
| | | | |
| 13-JUN-2025 11:27 AM | RMUSC - REMANDED BY US DISTRICT COURT | | |
| Documents: | RMUSC_21.pdf<br>RMUSC_21_001.pdf | | |
| Docket Entry: | IN RE: 25 CV 2072 ORDER ENTERED - THIS MATTER IS HEREBY REMANDED TO THE PHILADELPHIA COUNTY COURT OF COMMON PLEAS. 06/13/25 | | |
| | | | |
| 24-JUN-2025 11:29 AM | MTSPR - MOTION TO STAY PROCEEDINGS | MCNALLY, LAURA H | |
| Documents: | 01-Motion cover sheet.pdf<br>02-State Court Motion to Stay.pdf<br>03-State Court MOL ISO Motion to Stay.pdf<br>Ex. 01 - Apr. 30, 2025 Consent Agreement.pdf<br>Ex. 02 - 2025.02.13 Sunoco Notice of Intent to Remediate.pdf<br>Ex. 03 - 2025.03.31 Sunoco Response to PADEP Administrative Order.pdf<br>Ex. 04 - 2025-06-13 Order Granting Motion to Remand.pdf<br>Ex. 05-2025-06-16 Court Remand Opinion.pdf<br>Ex. 06 - Notice of Appeal.pdf<br>Ex. 07-Application to Appeal re 28 USC 1453.pdf<br>State Court Proposed Order Granting Stay.pdf<br>Motion CoverSheet Form | | |
| Docket Entry: | 38-25064738 RESPONSE DATE 07/14/2025. (FILED ON BEHALF OF ENERGRY TRANSFER (R&M) LLC, ENERGY TRANSFER LP AND SUNOCO PIPELINE LP) | | |
| | | | |
| 24-JUN-2025 04:16 PM | PROBJ - PRELIMINARY OBJECTIONS | MCNALLY, LAURA H | |
| Documents: | Preliminary Objections to Complaint.pdf<br>Brief ISO Preliminary Objections to Complaint.pdf<br>Stambaugh Affidavit.pdf<br>Proposed Order 1.pdf<br>Proposed Order 2.pdf<br>Ex. A - Amended Complaint (Part 1).pdf<br>Ex. A - Amended Complaint (Part 2).pdf<br>Ex. A - Amended Complaint (Part 3).pdf<br>Ex. A - Amended Complaint (Part 4).pdf<br>Ex. A - Amended Complaint (Part 5).pdf<br>Ex. 01-2025.04.08 Vanni Complaint.pdf<br>Ex. 02-2025.04.16 Wojnovich Complaint.pdf<br>Ex. 03-2025.04.16 Geltch Complaint.pdf<br>Ex. 04-2025-05-20 Complaint (Mela).pdf<br>Ex. 05-2025-05-20 Miller Complaint.pdf<br>Ex. 06-2025-06-18 Rule to Show Cause.pdf<br>Ex. 07-2025-02-13 Sunoco Notice of Intent to Remediate.pdf<br>Ex. 08-2025-03-05 Sunoco Response to PADEP NOV.pdf<br>Ex. 09-2025-03-06 PADEP Administrative Order.pdf<br>Ex. 10-2025-03-31 Sunoco Response to PADEP AO.pdf<br>Ex. 11-2025-03-19 Sunoco Interim Remedial Action Plan.pdf<br>Ex. 12-2025-04-10 Sunoco Response to PADEP Letter of Deficiency re Proposed Implementation Schedule.pdf<br>Ex. 13-2025-04-29 Revised Public Involvement Plan.pdf<br>Ex. 14-2025-04-14 PADEP Approval of Proposed Implementation Schedule.pdf<br>Ex. 15-2025-05-09 PADEP Approval of Interim Remedial Action Plan.pdf<br>Ex. 16-2025-06-06 - Approval of Public Involvement Plan.pdf | | |

| | | | |
|---|---|---|---|
| | Ex. 17-2025-06-10 Daily Summary.pdf<br>Ex. 18-2025-03-27 Original Complaint.pdf | | |
| **Docket Entry:** | 53-25064953 PRELIMINARY OBJECTIONS TO PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT FILED. RESPONSE DATE: 07/15/2025 (FILED ON BEHALF OF ENERGY TRANSFER (R&M) LLC, ENERGY TRANSFER LP AND SUNOCO PIPELINE LP) | | |
| | | | |
| 27-JUN-2025 01:19 PM | MTTFR - MOTION TO TRANSFER | MCNALLY, LAURA H | |
| **Documents:** | La Hart - Cover Sheet.pdf<br>La Hart_ Motion to Transfer.pdf<br>La Hart - Brief in Support.pdf<br>La Hart - Proposed Order on FNC.pdf<br>Stambaugh Affidavit.pdf<br>Ex. 01-June 18 Order.pdf<br>Ex. 02-2025.04.08 Vanni Complaint.pdf<br>Ex. 03-2025.04.16 Wojnovich Complaint.pdf<br>Ex. 04-2025.04.16 Geltch Complaint.pdf<br>Ex. 05-2025-05-20 Complaint (Mela).pdf<br>Ex. 06-2025-05-20 Miller Complaint.pdf<br>Ex. 07-2025-03-06 PADEP Administrative Order.pdf<br>Ex. 08-2025-03-31 Sunoco Response to PADEP AO.pdf<br>Ex. 09-First Letter.pdf<br>Ex. 10-Second Letter.pdf<br>Ex. 11-2025-03-27 Original Complaint.pdf<br>Motion CoverSheet Form | | |
| **Docket Entry:** | 79-25065679 RESPONSE DATE 07/17/2025. (FILED ON BEHALF OF ENERGY TRANSFER (R&M) LLC, ENERGY TRANSFER LP AND SUNOCO PIPELINE LP) | | |
| | | | |
| 09-JUL-2025 05:56 PM | PRINJ - PRELIMINARY INJUNCTION | SAMUEL JR, JOSEPH E | |
| **Documents:** | 2025.07.09 - Motion for Preliminary Injunction.pdf<br>2025.07.09 - Proposed Order on Motion for PI.pdf<br>2025.07.09 - Memo of Law ISO Motion for Preliminary Injunction.pdf<br>EX 01 - ECF 021 AMENDED COMPLAINT.pdf<br>EX 02 - 06-25-2025-Response-to-Senator-Santarsieros-Letter.pdf<br>EX 03 - Poet Offer Letter.pdf<br>Ex 04 - 7-8-25 Cohen Declaration_CLEAN0235pmSigned(20633360.1).pdf<br>EX 05 - 7-9-25 Petersen Declaration - Final_signed.pdf<br>EX 06 - NOPSO.pdf<br>EX 07 - Sunoco Response to NOPSO.pdf<br>EX 08 - PHMSA Consent Agreement.pdf<br>EX 09 - Site Characterization Work Plan.pdf<br>EX 10 - Site Characterization Work Plan June 27.pdf<br>EX 11 - Lab Report - 128 Glenwood Drive.pdf<br>EX 12 - 6 Fraser Road_L2537750.pdf<br>EX 13 - 101 Spencer Road_L2535232.pdf<br>EX 14 - 113 Spencer Road_L2540762.pdf<br>EX 15 - 128 Walker Road Bailing an Gauging.pdf<br>EX 16 - Potable-Water-SAP-v1.3.pdf<br>EX 17 - Blough Declaration.pdf<br>EX 18 - NOV-Washington-Crossing-LNAPL_02182025_FINAL-4.pdf<br>Motion CoverSheet Form | | |
| **Docket Entry:** | 40-25072040 PRELIMINARY INJUNCTION (FILED ON BEHALF OF KATHERINE LAHART AND DANIEL LAHART) | | |
| | | | |

| 10-JUL-2025 10:36 AM | MTASN - MOTION ASSIGNED | | |
|---|---|---|---|
| **Docket Entry:** | 40-25072040 PRELIMINARY INJUNCTION ASSIGNED TO JUDGE: PATRICK, PAULA . ON DATE: JULY 10, 2025 | | |
| | | | |
| 11-JUL-2025 08:53 AM | ORDER - ORDER ENTERED/236 NOTICE GIVEN | PATRICK, PAULA | |
| **Documents:** | ORDER_27.pdf | | |
| **Docket Entry:** | 38-25064738, 53-25064953, 79-25065679, 40-25072040 AND NOW, THIS 10TH DAY OF JULY, 2025, UPON CONSIDERATION OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION, DEFENDANTS' MOTION TO STAY THESE PROCEEDINGS DUE TO A PENDING APPEAL IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT, DEFENDANTS' PRELIMINARY OBJECTIONS TO THE AMENDED CLASS ACTION COMPLAINT FILED IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA, AND DEFENDANTS' MOTION TO TRANSFER THIS CASE TO THE COURT OF COMMON PLEAS FOR BUCKS COUNTY, PENNSYLVANIA, BASED ON FORUM NON CONVENIENS, IT IS ORDERED AS FOLLOWS: 1. DEFENDANTS SHALL FILE THEIR RESPONSE(S) TO THE MOTION FOR PRELIMINARY INJUNCTION ON OR BEFORE JULY 21, 2025; 2. PLAINTIFFS SHALL FILE THEIR RESPONSE(S) TO THE PRELIMINARY OBJECTIONS, THE MOTION TO STAY, AND THE MOTION TO TRANSFER ON OR BEFORE JULY 21, 2025; AND 3. A HEARING MAY BE SCHEDULED IN THE COURT'S DISCRETION. BY THE COURT: JUDGE PATRICK, S.J., 7/10/25. | | |
| | | | |
| 11-JUL-2025 08:53 AM | ZR236 - NOTICE GIVEN UNDER RULE 236 | | |
| **Docket Entry:** | NOTICE GIVEN ON 11-JUL-2025 OF ORDER ENTERED/236 NOTICE GIVEN ENTERED ON 11-JUL-2025. | | |
| | | | |
| 11-JUL-2025 09:02 AM | MRDUD - MOTION RESPONSE DATE UPDATED | | |
| **Docket Entry:** | 38-25064738 MOTION TO STAY PROCEEDINGS MOTION RESPONSE DATE UPDATED TO 07/21/2025. | | |
| | | | |
| 11-JUL-2025 09:02 AM | PODUD - PREL OBJECT-RESP DATE UPDATED | | |
| **Docket Entry:** | 53-25064953 PRELIMINARY OBJECTIONS MOTION RESPONSE DATE UPDATED TO 07/21/2025. | | |
| | | | |
| 11-JUL-2025 09:02 AM | MRDUD - MOTION RESPONSE DATE UPDATED | | |
| **Docket Entry:** | 79-25065679 MOTION TO TRANSFER MOTION RESPONSE DATE UPDATED TO 07/21/2025. | | |
| | | | |

| 11-JUL-2025 09:03 AM | MRDUD - MOTION RESPONSE DATE UPDATED | | |
|---|---|---|---|
| **Docket Entry:** | 40-25072040 PRELIMINARY INJUNCTION MOTION RESPONSE DATE UPDATED TO 07/21/2025. | | |
| | | | |
| 18-JUL-2025 02:43 PM | MTANS - ANSWER (MOTION/PETITION) FILED | CARSON ESQ, SHANON J | |
| **Documents:** | 2025.07.18 - Plaintiffs Response to Defendants Motion to Stay Proceedings.pdf<br>2025.07.18 - Plaintiffs Memorandum of Law in Response to Defendants Motion to Stay.pdf<br>Motion to Stay Proposed Order.pdf<br>Motion CoverSheet Form | | |
| **Docket Entry:** | 38-25064738 ANSWER IN OPPOSITION OF MOTION TO STAY PROCEEDINGS FILED. (FILED ON BEHALF OF KATHERINE LAHART AND DANIEL LAHART) | | |
| | | | |
| 21-JUL-2025 08:10 PM | MTANS - ANSWER (MOTION/PETITION) FILED | CARSON ESQ, SHANON J | |
| **Documents:** | 2025.07.21 - La Hart Response to Venue Motion.pdf<br>2025.07.21 - La Hart Proposed Order in Opp to Venue Motion.pdf<br>2025.07.21 - La Hart Memorandum of Law in Opp to Venue Motion.pdf<br>FNC Response Exhibit A.pdf<br>FNC Response Exhibit B.pdf<br>FNC Response Exhibit C.pdf<br>FNC Response Ex D - SPLP_FERC_197.10.0.pdf<br>FNC Response Ex E - Gas Stations in Philadelphia.pdf<br>FNC Response Ex F - Five Years After Philadelphia Refinerys Closure Pollution Concerns Persist.pdf<br>FNC Response Ex G - R_M Business Search, Pennsylvania Department of State.pdf<br>FNC Response Ex H - 6_inf_ft_belmont_notices.pdf<br>FNC Response Ex I Terraphase October 2024 Report Bellwether District.pdf<br>FNC Response Ex J - Massaro LinkedIn.pdf<br>FNC Response Ex K - McGinn Linkedin.pdf<br>FNC Response Ex L - March-6-2025-DEP-Order20250306-UMT-Pipeline-release.pdf<br>Ex M - Order Denying TRO.pdf<br>Ex N - 2025.07.14 - PADEP Ltr to Matt Gordon of Energy Transfer.pdf<br>Motion CoverSheet Form | | |
| **Docket Entry:** | 79-25065679 ANSWER IN OPPOSITION OF MOTION TO TRANSFER FILED. (FILED ON BEHALF OF KATHERINE LAHART AND DANIEL LAHART) | | |
| | | | |
| 21-JUL-2025 09:48 PM | ANPRO - ANSWER TO PRELIMINARY OBJCTNS | CARSON ESQ, SHANON J | |
| **Documents:** | 2025.07.21 - La Hart Answer to POs.pdf<br>2025.07.21 - Proposed Order Denying POs.pdf<br>2025.07.21 - La Hart Memorandum of Law in Response to POs.pdf<br>Ex 1 - Operative Amended Complaint.pdf<br>Ex 2 - Order Denying TRO.pdf<br>POs Answer Ex 3 - Five Years After Philadelphia Refinerys Closure Pollution Concerns Persist.pdf<br>POs Answer Ex 4 - 6_inf_ft_belmont_notices.pdf<br>POs Answer Ex 5 Terraphase October 2024 Report Bellwether District.pdf<br>Ex 6 - 2025.07.14 - PADEP Ltr to Matt Gordon of Energy Transfer.pdf<br>POs Answer Ex 7 - R_M Business Search, Pennsylvania Department of State.pdf<br>POs Answer Ex 8.pdf<br>POs Answer Ex 9 - SPLP_FERC_197.10.0.pdf<br>POs Answer Ex 10 - Gas Stations in Philadelphia.pdf<br>POs Answer Ex 11 - March-6-2025-DEP-Order20250306-UMT-Pipeline-release.pdf<br>POs Answer Ex 12 - DEP Ltr.pdf | | |

| Docket Entry: | 53-25064953 ANSWER IN OPPOSITION OF PRELIMINARY OBJECTIONS FILED. (FILED ON BEHALF OF KATHERINE LAHART AND DANIEL LAHART) | | |
|---|---|---|---|
| | | | |
| 21-JUL-2025 10:16 PM | MTANS - ANSWER (MOTION/PETITION) FILED | MCNALLY, LAURA H | |
| Documents: | Opposition to Preliminary Injunction.pdf<br>Appendix A.pdf<br>Proposed Order.pdf<br>01-SPLP Response Letter.pdf<br>02-Neil Ketchum Expert Affidavit with Exhibits.pdf<br>03-Affidavit of Timothy Bechtel with Exhibit.pdf<br>04-2025-02-13 - PHMSA NOPSO.pdf<br>05-Affidavit of Matthew Gordon.pdf<br>06-2025.03.06 PADEP Administrative Order.pdf<br>07-2025.03.31 Sunoco Response to PADEP AO.pdf<br>08-Community-Letter-POET-System-Maintenance.pdf<br>09-2025.02.19 Sunoco Response to PHMSA Notice of Proposed Safety Order.pdf<br>10-Consent Agreement.pdf<br>11-2025.05.02 PHMSA Consent Order - Sunoco Pipeline LP.pdf<br>12-2025.02.13 Sunoco Notice of Intent to Remediate.pdf<br>13-2025.02.19 PADEP Response.pdf<br>14-2025.02.18 PADEP Notice of Violation.pdf<br>15-2025.03.05 Sunoco Response to PADEP NOV.pdf<br>16-PADEP Approval of Interim Remedial Action Plan.pdf<br>17-PADEP Approval of Proposed Implementation Schedule.pdf<br>18 - Approval of Public Involvement Plan.pdf<br>19-July 9, 2025 DEP Letter to SPLP.pdf<br>20-Response to PADEP 7-9-25 Letter (Part 1).pdf<br>20-Response to PADEP 7-9-25 Letter (Part 2).pdf<br>21-2025.06.12 Remedial Action Progress Report (Part 1).pdf<br>21-2025.06.12 Remedial Action Progress Report (Part 2).pdf<br>22-2025.04.07 Email re Twin Oaks Pipeline Leak.pdf<br>23-2025.06.01 email re UM Township Sampling Activities.pdf<br>24-2025.06.04 email re Sampling Data and Results.pdf<br>25-2025.05.07 Letter from D. McCall to M. Twersky with Attachments.pdf<br>26-2025.05.06 Recover Well Work Plan (Part 1).pdf<br>26-Part 2.pdf<br>26-Part 3.pdf<br>26-Part 4.pdf<br>26-Part 5.pdf<br>26-Part 6.pdf<br>27-2025.05.18 Sunoco - BMPC Letter to DEP.pdf<br>28-06-25-2025-Response-to-Senator-Santarsieros-Letter.pdf<br>29-Federal Docket.pdf<br>30-2025.02.07 SPLP Update.pdf<br>31-2025.04.02 Vapor Intrusion Progress Report.pdf<br>32-2025.06.13 - SPLP Revised Vapor Intrusion Report.pdf<br>Motion CoverSheet Form | | |
| Docket Entry: | 40-25072040 ANSWER IN OPPOSITION OF PRELIMINARY INJUNCTION FILED. (FILED ON BEHALF OF ENERGY TRANSFER (R&M) LLC, ENERGY TRANSFER LP AND SUNOCO PIPELINE LP) | | |
| | | | |
| 22-JUL-2025 06:31 PM | REPLM - MOTION/PETITION REPLY FILED | MCNALLY, LAURA H | |
| Documents: | State Court Reply Motion to Stay.pdf<br>Motion CoverSheet Form | | |
| Docket Entry: | 38-25064738 REPLY IN SUPPORT OF MOTION TO STAY PROCEEDINGS FILED. (FILED ON BEHALF OF ENERGRY TRANSFER (R&M) LLC, ENERGY TRANSFER LP AND SUNOCO PIPELINE LP) | | |

| | | | |
|---|---|---|---|
| 23-JUL-2025 04:02 PM | POASN - PRELIM OBJECTIONS ASSIGNED | | |
| **Docket Entry:** | 53-25064953 PRELIMINARY OBJECTIONS ASSIGNED TO JUDGE: PATRICK, PAULA . ON DATE: JULY 23, 2025 | | |
| | | | |
| 23-JUL-2025 04:14 PM | MTASN - MOTION ASSIGNED | | |
| **Docket Entry:** | 40-25072040 PRELIMINARY INJUNCTION ASSIGNED TO JUDGE: PATRICK, PAULA . ON DATE: JULY 23, 2025 | | |
| | | | |
| 23-JUL-2025 04:24 PM | MTASN - MOTION ASSIGNED | | |
| **Docket Entry:** | 79-25065679 MOTION TO TRANSFER ASSIGNED TO JUDGE: PATRICK, PAULA . ON DATE: JULY 23, 2025 | | |
| | | | |
| 23-JUL-2025 04:25 PM | MTASN - MOTION ASSIGNED | | |
| **Docket Entry:** | 38-25064738 MOTION TO STAY PROCEEDINGS ASSIGNED TO JUDGE: PATRICK, PAULA . ON DATE: JULY 23, 2025 | | |
| | | | |
| 25-JUL-2025 11:12 AM | MRDUD - MOTION RESPONSE DATE UPDATED | | |
| **Docket Entry:** | 79-25065679 MOTION TO TRANSFER MOTION RESPONSE DATE UPDATED TO 08/01/2025. | | |
| | | | |
| 25-JUL-2025 11:12 AM | MRDUD - MOTION RESPONSE DATE UPDATED | | |
| **Docket Entry:** | 38-25064738 MOTION TO STAY PROCEEDINGS MOTION RESPONSE DATE UPDATED TO 08/01/2025. | | |
| | | | |
| 25-JUL-2025 11:13 AM | MRDUD - MOTION RESPONSE DATE UPDATED | | |
| **Docket Entry:** | 40-25072040 PRELIMINARY INJUNCTION MOTION RESPONSE DATE UPDATED TO 08/01/2025. | | |
| | | | |
| 25-JUL-2025 11:13 AM | PODUD - PREL OBJECT-RESP DATE UPDATED | | |
| **Docket Entry:** | 53-25064953 PRELIMINARY OBJECTIONS MOTION RESPONSE DATE UPDATED TO 08/01/2025. | | |
| | | | |

| 01-AUG-2025 02:31 PM | REPLM - MOTION/PETITION REPLY FILED | MCNALLY, LAURA H | |
|---|---|---|---|
| **Documents:** | La Hart - Reply in Support of FNC.pdf<br>Ex. 1 - Email Chain.pdf<br>Motion CoverSheet Form | | |
| **Docket Entry:** | 79-25065679 REPLY IN SUPPORT OF MOTION TO TRANSFER FILED. (FILED ON BEHALF OF ENERGRY TRANSFER (R&M) LLC, ENERGY TRANSFER LP AND SUNOCO PIPELINE LP) | | |
| | | | |
| 01-AUG-2025 07:49 PM | REPPO - REPLY-PRELIM. OBJECT. FILED | MCNALLY, LAURA H | |
| **Documents:** | Reply Brief ISO Preliminary Objections to Complaint.pdf<br>M Gordon Affidavit.pdf<br>Ex. A to Gordon Affidavit.pdf<br>Ex. 1 to Reply - Test Results.pdf<br>Ex. 2 to Reply - June 18, 2025 Letter.pdf | | |
| **Docket Entry:** | 53-25064953 REPLY IN SUPPORT OF PRELIMINARY OBJECTIONS FILED. (FILED ON BEHALF OF ENERGRY TRANSFER (R&M) LLC, ENERGY TRANSFER LP AND SUNOCO PIPELINE LP) | | |
| | | | |
| 01-AUG-2025 09:53 PM | REPLM - MOTION/PETITION REPLY FILED | CARSON ESQ, SHANON J | |
| **Documents:** | 2025.08.01 - Plaintiffs Reply in Support of Motion for Preliminary Injunction.pdf<br>PI Reply Ex 1.pdf<br>PI Reply Ex 2.pdf<br>PI Reply Ex 3.pdf<br>PI Reply Ex 4.pdf<br>PI Reply Ex 5.pdf<br>PI Reply Ex 6.pdf<br>PI Reply Ex 7.pdf<br>PI Reply Ex 8.pdf<br>PI Reply Ex 9.pdf<br>PI Reply Ex 10.pdf<br>PI Reply Ex 11.pdf<br>PI Reply Ex 12.pdf<br>PI Reply Ex 13.pdf<br>PI Reply Ex 14.pdf<br>Motion CoverSheet Form | | |
| **Docket Entry:** | 40-25072040 REPLY IN SUPPORT OF PRELIMINARY INJUNCTION FILED. (FILED ON BEHALF OF KATHERINE LAHART AND DANIEL LAHART) | | |
| | | | |
| 04-AUG-2025 02:05 PM | CLLCM - LISTED FOR CASE MGMT CONF | | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 04-AUG-2025 02:05 PM | CLCDS - CONFERENCE DATE SET | | |
| **Documents:** | CLCDS_48.pdf | | |

| Docket Entry: | CLASS ACTION INITIATION ORDER - PLAINTIFFS HAVING COMMENCED A CLASS ACTION WHICH HAS BEEN ASSIGNED TO THE HONORABLE PAULA PATRICK, IT IS HEREBY ORDERED AS FOLLOWS: 1. ALL PARTIES ARE DIRECTED TO APPEAR VIA ZOOM FOR A CASE MANAGEMENT CONFERENCE ON Friday, September 19, 2025 AT 11:30 AM. THE COMMERCE CASE MANAGEMENT ZOOM LINK IS AVAILABLE ON THE COURT'S WEBSITE AT: HTTP://WWW.COURTS.PHILA.GOV/REMOTE-HEARINGS/ 2. FIVE (5) DAYS PRIOR TO THE ZOOM CONFERENCE, ALL PARTIES ARE REQUIRED TO ELECTRONICALLY FILE WITH THE COURT, AND TO SERVE UPON ALL OPPOSING COUNSEL AND OPPOSING PARTIES WHO CANNOT BE ELECTRONICALLY SERVED BY THE COURT, A FULLY COMPLETED COMMERCE CASE MANAGEMENT MEMORANDUM. A COPY OF THE COMMERCE CASE MANAGEMENT MEMORANDUM FORM MAY BE FOUND AT: HTTPS://WWW.COURTS.PHILA.GOV/PDF/FORMS/CIVIL/01-111-CASE-MANAGEMENT-CONFERENCE-MEMORANDUM-COMMERCE.PDF 3. TO ELECTRONICALLY FILE THE COMMERCE CASE MANAGEMENT MEMORANDUM, ACCESS THE "EXISTING CASE" SECTION OF THE COURT'S ELECTRONIC FILING SYSTEM. SELECT "CONFERENCE SUBMISSIONS" AS THE FILING CATEGORY. SELECT "MANAGEMENT MEMORANDUM" AS THE FILING TYPE. 4. IN THE CASE MANAGEMENT MEMORANDUM, COUNSEL SHOULD DESCRIBE IN DETAIL: THE SUBSTANCE OF PLAINTIFFS' CLAIMS AND DEFENDANTS' DEFENSES; WHETHER CERTIFICATION OR MERITS DISCOVERY SHOULD OCCUR FIRST; ANY PROCEDURAL COMPLICATIONS THE PARTIES ANTICIPATE MAY OCCUR, SUCH AS VENUE OR JURISDICTIONAL DISPUTES, JOINDER OF ADDITIONAL PARTIES, REQUESTS FOR BIFURCATION, ETC.; AND ANY OTHER INFORMATION THAT WILL ASSIST THE CASE MANAGER TO DETERMINE HOW MUCH TIME THE PARTIES NEED TO CONDUCT DISCOVERY DURING THE CERTIFICATION AND/OR MERITS PORTION OF THE CASE. 5. COUNSEL SHALL ALSO BE PREPARED TO DISCUSS WITH THE CASE MANAGER AT THE ZOOM CONFERENCE ALL OF THE ISSUES LISTED IN PARAGRAPH 4 ABOVE. 6. PLAINTIFFS' COUNSEL SHALL SERVE A COPY OF THIS ORDER UPON ALL UNREPRESENTED PARTIES AND ANY ATTORNEY ENTERING AN APPEARANCE SUBSEQUENT TO THE DATE OF ISSUANCE OF THIS ORDER. ...BY THE COURT: PAULA PATRICK, J. 04-AUG-2025 |
|---|---|
| | |
| 04-AUG-2025 02:06 PM | ZR236 - NOTICE GIVEN UNDER RULE 236 | | |
| Docket Entry: | NOTICE GIVEN ON 05-AUG-2025 OF CONFERENCE DATE SET ENTERED ON 04-AUG-2025. |
| | |
| 05-AUG-2025 08:51 AM | POASN - PRELIM OBJECTIONS ASSIGNED | | |
| Docket Entry: | 53-25064953 PRELIMINARY OBJECTIONS ASSIGNED TO JUDGE: PATRICK, PAULA . ON DATE: AUGUST 05, 2025 |
| | |
| 05-AUG-2025 08:56 AM | MTASN - MOTION ASSIGNED | | |
| Docket Entry: | 40-25072040 PRELIMINARY INJUNCTION ASSIGNED TO JUDGE: PATRICK, PAULA . ON DATE: AUGUST 05, 2025 |
| | |

| 05-AUG-2025 08:56 AM | MTASN - MOTION ASSIGNED | | |
|---|---|---|---|
| **Docket Entry:** | 38-25064738 MOTION TO STAY PROCEEDINGS ASSIGNED TO JUDGE: PATRICK, PAULA . ON DATE: AUGUST 05, 2025 | | |
| | | | |
| 05-AUG-2025 08:57 AM | MTASN - MOTION ASSIGNED | | |
| **Docket Entry:** | 79-25065679 MOTION TO TRANSFER ASSIGNED TO JUDGE: PATRICK, PAULA . ON DATE: AUGUST 05, 2025 | | |
| | | | |
| 08-AUG-2025 05:25 PM | PRATT - PRAECIPE TO SUPPL/ATTACH FILED | SAMUEL JR, JOSEPH E | |
| **Documents:** | 2025.08.08 - Praecipe to Supplement Preliminary Injunction With New Exhibit.pdf <br> Ex 1 - WDO-to-Energy-Transfer-and-PHMSA.-8.7.25.pdf | | |
| **Docket Entry:** | 40-25072040 PRAECIPE TO SUPPLEMENT/ATTACH RE: PRELIMINARY INJUNCTION FILED. (FILED ON BEHALF OF KATHERINE LAHART AND DANIEL LAHART) | | |
| | | | |
| 11-AUG-2025 09:48 PM | REPPO - REPLY-PRELIM. OBJECT. FILED | SAMUEL JR, JOSEPH E | |
| **Documents:** | 2025.08.11 - La Hart - Sur-Reply in Opposition to POs.pdf <br> Ex 1 - VENUE_DISCOVERY - 00000001.pdf <br> Ex 2 - VENUE_DISCOVERY - 00000004.pdf <br> Ex 3 - Property Tax Records - SPLP - 6460 W Passyunk Ave.pdf <br> Ex 4 - SPLP Point Breeze Pump Station.pdf <br> Ex 5 - SPLP Point Breeze Pump Station 2.pdf <br> Ex 6 - The Water Cleaner Results.pdf | | |
| **Docket Entry:** | 53-25064953 REPLY IN OPPOSITION OF PRELIMINARY OBJECTIONS FILED. (FILED ON BEHALF OF KATHERINE LAHART AND DANIEL LAHART) | | |
| | | | |
| 13-AUG-2025 03:23 PM | PRATT - PRAECIPE TO SUPPL/ATTACH FILED | MCNALLY, LAURA H | |
| **Documents:** | 2025.08.13 - Praecipe to Supplement Opposition to Plaintiffs Prelim Injunction.pdf <br> Ex. 1 - 08-08-25 - Letter Response to Upper Makefield Township.pdf | | |
| **Docket Entry:** | 40-25072040 PRAECIPE TO SUPPLEMENT/ATTACH RE: PRELIMINARY INJUNCTION FILED. (FILED ON BEHALF OF ENERGRY TRANSFER (R&M) LLC, ENERGY TRANSFER LP AND SUNOCO PIPELINE LP) | | |
| | | | |
| 18-AUG-2025 05:28 PM | REPPO - REPLY-PRELIM. OBJECT. FILED | MCNALLY, LAURA H | |
| **Documents:** | Sursurreply Brief ISO Preliminary Objections to Complaint.pdf <br> Ex. A - April 30, 2025 email.pdf <br> Ex. B - May 6 and June 4, 2025 emails.pdf | | |
| **Docket Entry:** | 53-25064953 REPLY IN SUPPORT OF PRELIMINARY OBJECTIONS FILED. (FILED ON BEHALF OF ENERGY TRANSFER (R&M) LLC, ENERGY TRANSFER LP AND SUNOCO PIPELINE LP) | | |

| 04-SEP-2025 07:10 PM | ORDER - ORDER ENTERED/236 NOTICE GIVEN | PATRICK, PAULA | |
|---|---|---|---|
| **Documents:** | ORDER_60.pdf | | |
| **Docket Entry:** | 53-25064953 & 79-25065679 AND NOW, THIS 4TH DAY OF SEPTEMBER, 2025, UPON CONSIDERATION OF DEFENDANTS' PRELIMINARY OBJECTIONS TO THE AMENDED CLASS ACTION COMPLAINT FILED IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA, AND DEFENDANTS' MOTION TO TRANSFER THIS CASE TO THE COURT OF COMMON PLEAS FOR BUCKS COUNTY, PENNSYLVANIA, BASED ON FORUM NON CONVENIENS, IT IS HEREBY ORDERED AND DECREED AS FOLLOWS: 1. THE PARTIES HAVE THIRTY (30) DAYS TO TAKE DISCOVERY ON THE VENUE ISSUES RAISED IN THE MOTIONS, INCLUDING, BUT NOT LIMITED TO, WHETHER DEFENDANTS, ESPECIALLY ENERGY TRANSFER (R&M)LLC, CONDUCT ANY BUSINESS IN PHILADELPHIA COUNTY, IN BUCKS COUNTY, AND/OR IN CONNETION WITH THE PIPELINE THAT HAS APPARENTLY LEAKED IN BUCKS COUNTY; 2. ON OR BEFORE OCTOBER 10, 2025, THE PARTIES MAY FILE SUPPLEMENTAL BRIEFS WITH RESPECT TO VENUE UNDER CONTROL NO. 25064953 AND/OR WITH RESPECT TO FORUM NON CONVENIENS UNDER CONTROL NO. 25065679; 3. ALL OTHER PRELIMINARY OBJECTIONS AND MOTIONS SHALL BE HELD UNDER ADVISEMENT UNTIL THE VENUE ISSUES ARE RESOLVED; 4. A HEARING MAY BE SCHEDULED IN THE COURT'S DISCRETION. BY THE COURT: JUDGE PATRICK, 9/4/25. | | |
| 04-SEP-2025 07:10 PM | ZR236 - NOTICE GIVEN UNDER RULE 236 | | |
| **Docket Entry:** | NOTICE GIVEN ON 05-SEP-2025 OF ORDER ENTERED/236 NOTICE GIVEN ENTERED ON 04-SEP-2025. | | |
| 04-SEP-2025 07:24 PM | CLOEC - OTHER EVENT CANCELLED | | |
| **Docket Entry:** | *none.* | | |
| 04-SEP-2025 07:24 PM | CLOEC - OTHER EVENT CANCELLED | | |
| **Docket Entry:** | *none.* | | |
| 04-SEP-2025 07:25 PM | PODUD - PREL OBJECT-RESP DATE UPDATED | | |
| **Docket Entry:** | 53-25064953 PRELIMINARY OBJECTIONS MOTION RESPONSE DATE UPDATED TO 10/10/2025. | | |
| 04-SEP-2025 07:25 PM | MRDUD - MOTION RESPONSE DATE UPDATED | | |

| Docket Entry: | 79-25065679 MOTION TO TRANSFER MOTION RESPONSE DATE UPDATED TO 10/10/2025. | | |
|---|---|---|---|
| | | | |
| 08-SEP-2025 03:56 PM | MRDUD - MOTION RESPONSE DATE UPDATED | | |
| Docket Entry: | 40-25072040 PRELIMINARY INJUNCTION MOTION RESPONSE DATE UPDATED TO 10/10/2025. | | |
| | | | |
| 08-SEP-2025 03:57 PM | MRDUD - MOTION RESPONSE DATE UPDATED | | |
| Docket Entry: | 38-25064738 MOTION TO STAY PROCEEDINGS MOTION RESPONSE DATE UPDATED TO 10/10/2025. | | |
| | | | |
| 22-SEP-2025 02:18 PM | CLOEC - OTHER EVENT CANCELLED | PATRICK, PAULA | |
| Docket Entry: | 79-25065679 | | |
| | | | |
| 22-SEP-2025 02:21 PM | ORDER - ORDER ENTERED/236 NOTICE GIVEN | PATRICK, PAULA | |
| Documents: | ORDER_69.pdf | | |
| Docket Entry: | 53-25064953/79-25065679 AND NOW, THIS 22ND DAY OF SEPTEMBER, 2025, AFTER A CASE MANAGEMENT CONFERENCE WITH COUNSEL, IT IS HEREBY ORDERED AND DECREED AS FOLLOWS: 1. THE DEADLINES SET FORTH IN THE COURT'S ORDER ARE MODIFIED AS FOLLOWS: A. ADDITIONAL VENUE DISCOVERY INCLUDING DISCOVERY AS TO OTHER POTENTIAL DEFENDANTS SHALL BE COMPLETED ON OR BEFORE NOVEMBER 3, 2025. (SEE ORDER) THE PARTIES SHALL APPEAR FOR ANOTHER CASE MANAGEMENT CONFERENCE IN THIS MATTER ON NOVEMBER 20, 2025, AT 1:00 PM, OR AS SOON AS THEY COMPLETE THEIR STATUS CONFERENCE ON THE SAME DATE IN THE RELATED MAJOR JURY CASES. BY THE COURT: JUDGE PATRICK, S.J., 9/22/25. | | |
| | | | |
| 22-SEP-2025 02:21 PM | ZR236 - NOTICE GIVEN UNDER RULE 236 | | |
| Docket Entry: | NOTICE GIVEN ON 22-SEP-2025 OF ORDER ENTERED/236 NOTICE GIVEN ENTERED ON 22-SEP-2025. | | |
| | | | |
| 22-SEP-2025 02:23 PM | CLWCM - WAITING TO LIST CASE MGMT CONF | | |
| Docket Entry: | *none.* | | |
| | | | |

| 22-SEP-2025 02:24 PM | CLLCM - LISTED FOR CASE MGMT CONF | | |
|---|---|---|---|
| **Docket Entry:** | *none.* | | |
| | | | |
| 22-SEP-2025 02:24 PM | CLCDS - CONFERENCE DATE SET | | |
| **Documents:** | CLCDS_72.pdf | | |
| **Docket Entry:** | CLASS ACTION INITIATION ORDER - PLAINTIFFS HAVING COMMENCED A CLASS ACTION WHICH HAS BEEN ASSIGNED TO THE HONORABLE PAULA PATRICK, IT IS HEREBY ORDERED AS FOLLOWS: 1. ALL PARTIES ARE DIRECTED TO APPEAR VIA ZOOM FOR A CASE MANAGEMENT CONFERENCE ON Thursday, November 20, 2025 AT 01:00 PM. THE COMMERCE CASE MANAGEMENT ZOOM LINK IS AVAILABLE ON THE COURT'S WEBSITE AT: HTTP://WWW.COURTS.PHILA.GOV/REMOTE-HEARINGS/ 2. FIVE (5) DAYS PRIOR TO THE ZOOM CONFERENCE, ALL PARTIES ARE REQUIRED TO ELECTRONICALLY FILE WITH THE COURT, AND TO SERVE UPON ALL OPPOSING COUNSEL AND OPPOSING PARTIES WHO CANNOT BE ELECTRONICALLY SERVED BY THE COURT, A FULLY COMPLETED COMMERCE CASE MANAGEMENT MEMORANDUM. A COPY OF THE COMMERCE CASE MANAGEMENT MEMORANDUM FORM MAY BE FOUND AT: HTTPS://WWW.COURTS.PHILA.GOV/PDF/FORMS/CIVIL/01-111-CASE-MANAGEMENT-CONFERENCE-MEMORANDUM-COMMERCE.PDF 3. TO ELECTRONICALLY FILE THE COMMERCE CASE MANAGEMENT MEMORANDUM, ACCESS THE "EXISTING CASE" SECTION OF THE COURT'S ELECTRONIC FILING SYSTEM. SELECT "CONFERENCE SUBMISSIONS" AS THE FILING CATEGORY. SELECT "MANAGEMENT MEMORANDUM" AS THE FILING TYPE. 4. IN THE CASE MANAGEMENT MEMORANDUM, COUNSEL SHOULD DESCRIBE IN DETAIL: THE SUBSTANCE OF PLAINTIFFS' CLAIMS AND DEFENDANTS' DEFENSES; WHETHER CERTIFICATION OR MERITS DISCOVERY SHOULD OCCUR FIRST; ANY PROCEDURAL COMPLICATIONS THE PARTIES ANTICIPATE MAY OCCUR, SUCH AS VENUE OR JURISDICTIONAL DISPUTES, JOINDER OF ADDITIONAL PARTIES, REQUESTS FOR BIFURCATION, ETC.; AND ANY OTHER INFORMATION THAT WILL ASSIST THE CASE MANAGER TO DETERMINE HOW MUCH TIME THE PARTIES NEED TO CONDUCT DISCOVERY DURING THE CERTIFICATION AND/OR MERITS PORTION OF THE CASE. 5. COUNSEL SHALL ALSO BE PREPARED TO DISCUSS WITH THE CASE MANAGER AT THE ZOOM CONFERENCE ALL OF THE ISSUES LISTED IN PARAGRAPH 4 ABOVE. 6. PLAINTIFFS' COUNSEL SHALL SERVE A COPY OF THIS ORDER UPON ALL UNREPRESENTED PARTIES AND ANY ATTORNEY ENTERING AN APPEARANCE SUBSEQUENT TO THE DATE OF ISSUANCE OF THIS ORDER. ...BY THE COURT: PAULA PATRICK, J. 22-SEP-2025 | | |
| | | | |
| 22-SEP-2025 02:24 PM | ZR236 - NOTICE GIVEN UNDER RULE 236 | | |
| **Docket Entry:** | NOTICE GIVEN ON 22-SEP-2025 OF CONFERENCE DATE SET ENTERED ON 22-SEP-2025. | | |
| | | | |
| 22-SEP-2025 02:26 PM | PODUD - PREL OBJECT-RESP DATE UPDATED | | |

| Docket Entry: | 53-25064953 PRELIMINARY OBJECTIONS MOTION RESPONSE DATE UPDATED TO 11/18/2025. | | |
|---|---|---|---|
| | | | |
| 22-SEP-2025 02:26 PM | MRDUD - MOTION RESPONSE DATE UPDATED | | |
| Docket Entry: | 79-25065679 MOTION TO TRANSFER MOTION RESPONSE DATE UPDATED TO 11/18/2025. | | |
| | | | |
| 24-SEP-2025 01:10 PM | CLOEC - OTHER EVENT CANCELLED | PATRICK, PAULA | |
| Docket Entry: | 53-25064953 | | |
| | | | |
| 08-OCT-2025 08:21 AM | REPPO - REPLY-PRELIM. OBJECT. FILED | MCNALLY, LAURA H | |
| Documents: | La Hart - Sur-sur-sur-Reply ISO Preliminary Objections to Complaint.pdf<br>La Hart - Sur-sur-sur Reply ex. 1.pdf<br>La Hart - Sur-sur-sur Reply ex. 2.pdf<br>La Hart - Sur-sur-sur Reply ex. 3.pdf | | |
| Docket Entry: | 53-25064953 REPLY IN SUPPORT OF PRELIMINARY OBJECTIONS FILED. (FILED ON BEHALF OF ENERGY TRANSFER (R&M) LLC, ENERGY TRANSFER LP AND SUNOCO PIPELINE LP) | | |
| | | | |
| 14-OCT-2025 10:10 AM | MTASN - MOTION ASSIGNED | | |
| Docket Entry: | 38-25064738 MOTION TO STAY PROCEEDINGS ASSIGNED TO JUDGE: PATRICK, PAULA . ON DATE: OCTOBER 14, 2025 | | |
| | | | |
| 14-OCT-2025 10:10 AM | MTASN - MOTION ASSIGNED | | |
| Docket Entry: | 40-25072040 PRELIMINARY INJUNCTION ASSIGNED TO JUDGE: PATRICK, PAULA . ON DATE: OCTOBER 14, 2025 | | |
| | | | |
| 15-OCT-2025 10:10 PM | BRFPO - BRIEF-PRELIM. OBJECT. FILED | SAMUEL JR, JOSEPH E | |
| Documents: | 2025.10.15 - Supplemental Brief in Response to Sur-Sur-Sur-Reply.pdf<br>Ex A - L2546657.pdf<br>Ex B - L2559112.pdf<br>Ex C - MW-11S MW-11D_(2025.09.30)_L2561635.pdf<br>Ex D - MW-12 through MW-13 series_(2025.09.30)_L2561635.pdf | | |
| Docket Entry: | 53-25064953 BRIEF IN OPPOSITION OF PRELIMINARY OBJECTIONS FILED. (FILED ON BEHALF OF KATHERINE LAHART AND DANIEL LAHART) | | |
| | | | |

| 17-OCT-2025 09:32 AM | POASN - PRELIM OBJECTIONS ASSIGNED | | |
|---|---|---|---|
| **Docket Entry:** | 53-25064953 PRELIMINARY OBJECTIONS ASSIGNED TO JUDGE: PATRICK, PAULA . ON DATE: OCTOBER 17, 2025 | | |
| | | | |
| 17-OCT-2025 01:36 PM | MRDUD - MOTION RESPONSE DATE UPDATED | | |
| **Docket Entry:** | 40-25072040 PRELIMINARY INJUNCTION MOTION RESPONSE DATE UPDATED TO 11/17/2025. | | |
| | | | |
| 17-OCT-2025 01:36 PM | MRDUD - MOTION RESPONSE DATE UPDATED | | |
| **Docket Entry:** | 38-25064738 MOTION TO STAY PROCEEDINGS MOTION RESPONSE DATE UPDATED TO 11/17/2025. | | |
| | | | |
| 17-OCT-2025 01:39 PM | PODUD - PREL OBJECT-RESP DATE UPDATED | | |
| **Docket Entry:** | 53-25064953 PRELIMINARY OBJECTIONS MOTION RESPONSE DATE UPDATED TO 11/17/2025. | | |
| | | | |
| 21-OCT-2025 11:25 AM | MTASN - MOTION ASSIGNED | | |
| **Docket Entry:** | 79-25065679 MOTION TO TRANSFER ASSIGNED TO JUDGE: PATRICK, PAULA . ON DATE: OCTOBER 21, 2025 | | |
| | | | |
| 24-OCT-2025 01:28 PM | MRDUD - MOTION RESPONSE DATE UPDATED | | |
| **Docket Entry:** | 79-25065679 MOTION TO TRANSFER MOTION RESPONSE DATE UPDATED TO 11/17/2025. | | |
| | | | |
| 19-NOV-2025 09:51 AM | POASN - PRELIM OBJECTIONS ASSIGNED | | |
| **Docket Entry:** | 53-25064953 PRELIMINARY OBJECTIONS ASSIGNED TO JUDGE: PATRICK, PAULA . ON DATE: NOVEMBER 19, 2025 | | |
| | | | |
| 19-NOV-2025 10:21 AM | MTASN - MOTION ASSIGNED | | |
| **Docket Entry:** | 40-25072040 PRELIMINARY INJUNCTION ASSIGNED TO JUDGE: PATRICK, PAULA . ON DATE: NOVEMBER 19, 2025 | | |
| | | | |

| 19-NOV-2025 10:21 AM | MTASN - MOTION ASSIGNED | | |
|---|---|---|---|
| **Docket Entry:** | 38-25064738 MOTION TO STAY PROCEEDINGS ASSIGNED TO JUDGE: PATRICK, PAULA . ON DATE: NOVEMBER 19, 2025 | | |
| | | | |
| 19-NOV-2025 10:42 AM | MTASN - MOTION ASSIGNED | | |
| **Docket Entry:** | 79-25065679 MOTION TO TRANSFER ASSIGNED TO JUDGE: PATRICK, PAULA . ON DATE: NOVEMBER 19, 2025 | | |
| | | | |
| 21-NOV-2025 05:37 AM | WTAPO - WITHDRAWAL OF APPEARANCE | JIANG, YUNICA | |
| **Documents:** | Withdrawal of Appearance - Yunica Jiang (La Hart).pdf | | |
| **Docket Entry:** | WITHDRAWAL OF APPEARANCE OF YUNICA JIANG FILED. (FILED ON BEHALF OF ENERGY TRANSFER (R&M) LLC, ENERGY TRANSFER LP AND SUNOCO PIPELINE LP) | | |
| | | | |
| 25-NOV-2025 02:59 PM | CLOEC - OTHER EVENT CANCELLED | PATRICK, PAULA | |
| **Docket Entry:** | 79-25065679 | | |
| | | | |
| 25-NOV-2025 03:05 PM | ORDER - ORDER ENTERED/236 NOTICE GIVEN | PATRICK, PAULA | |
| **Documents:** | ORDER_94.pdf | | |
| **Docket Entry:** | 53-25064953 &79-25065679 AND NOW, THIS 25TH DAY OF NOVEMBER, 2025, AFTER A CASE MANAGEMENT CONFERENCE WITH COUNSEL, IT IS ORDERED AS FOLLOWS: 1. THE DEADLINES SET FORTH IN THE COURT'S ORDERS DOCKETED ON SEPTEMBER 4, 2025, AND SEPTEMBER 22, 2025, ARE MODIFIED AS FOLLOWS: A. ADDITIONAL VENUE DISCOVERY, INCLUDING DISCOVERY AS TO OTHER POTENTIAL DEFENDANTS AKA THE JOHN DOE CONTRACTOR AND SUBCONTRACTOR DEFENDANTS, SHALL BE COMPLETED ON OR BEFORE DECEMBER 22, 2025; AND B. PLAINTIFFS MAY FILE AN AMENDED COMPLAINT IN THIS ACTION ON OR BEFORE JANUARY 15, 2026. 2. ALL OTHER PRELIMINARY OBJECTIONS AND MOTIONS SHALL BE HELD UNDER ADVISEMENT UNTIL THE VENUE ISSUES ARE RESOLVED. BY THE COURT: JUDGE PATRICK, 11/25/25. | | |
| | | | |
| 25-NOV-2025 03:05 PM | ZR236 - NOTICE GIVEN UNDER RULE 236 | | |
| **Docket Entry:** | NOTICE GIVEN ON 26-NOV-2025 OF ORDER ENTERED/236 NOTICE GIVEN ENTERED ON 25-NOV-2025. | | |
| | | | |
| 26-NOV-2025 01:25 PM | MRDUD - MOTION RESPONSE DATE UPDATED | | |

| Docket Entry: | 40-25072040 PRELIMINARY INJUNCTION MOTION RESPONSE DATE UPDATED TO 01/15/2026. | | |
|---|---|---|---|
| | | | |
| 26-NOV-2025 01:26 PM | MRDUD - MOTION RESPONSE DATE UPDATED | | |
| Docket Entry: | 38-25064738 MOTION TO STAY PROCEEDINGS MOTION RESPONSE DATE UPDATED TO 01/15/2026. | | |
| | | | |
| 26-NOV-2025 01:27 PM | POASN - PRELIM OBJECTIONS ASSIGNED | | |
| Docket Entry: | 53-25064953 PRELIMINARY OBJECTIONS ASSIGNED TO JUDGE: PATRICK, PAULA . ON DATE: NOVEMBER 26, 2025 | | |
| | | | |
| 26-NOV-2025 04:10 PM | MTASN - MOTION ASSIGNED | | |
| Docket Entry: | 79-25065679 MOTION TO TRANSFER ASSIGNED TO JUDGE: PATRICK, PAULA . ON DATE: NOVEMBER 26, 2025 | | |
| | | | |
| 01-DEC-2025 01:39 PM | MRDUD - MOTION RESPONSE DATE UPDATED | | |
| Docket Entry: | 79-25065679 MOTION TO TRANSFER MOTION RESPONSE DATE UPDATED TO 01/15/2026. | | |
| | | | |
| 01-DEC-2025 01:40 PM | PODUD - PREL OBJECT-RESP DATE UPDATED | | |
| Docket Entry: | 53-25064953 PRELIMINARY OBJECTIONS MOTION RESPONSE DATE UPDATED TO 01/15/2026. | | |
| | | | |
| 01-DEC-2025 02:12 PM | CLWCM - WAITING TO LIST CASE MGMT CONF | | |
| Docket Entry: | *none.* | | |
| | | | |
| 15-DEC-2025 10:48 AM | CLLCM - LISTED FOR CASE MGMT CONF | | |
| Docket Entry: | *none.* | | |
| | | | |
| 15-DEC-2025 10:48 AM | CLCDS - CONFERENCE DATE SET | | |
| Documents: | CLCDS_104.pdf | | |

| | |
|---|---|
| **Docket Entry:** | CLASS ACTION INITIATION ORDER - PLAINTIFFS HAVING COMMENCED A CLASS ACTION WHICH HAS BEEN ASSIGNED TO THE HONORABLE PAULA PATRICK, IT IS HEREBY ORDERED AS FOLLOWS: 1. ALL PARTIES ARE DIRECTED TO APPEAR VIA ZOOM FOR A CASE MANAGEMENT CONFERENCE ON Tuesday, February 17, 2026 AT 11:30 AM. THE COMMERCE CASE MANAGEMENT ZOOM LINK IS AVAILABLE ON THE COURT'S WEBSITE AT: HTTP://WWW.COURTS.PHILA.GOV/REMOTE-HEARINGS/ 2. FIVE (5) DAYS PRIOR TO THE ZOOM CONFERENCE, ALL PARTIES ARE REQUIRED TO ELECTRONICALLY FILE WITH THE COURT, AND TO SERVE UPON ALL OPPOSING COUNSEL AND OPPOSING PARTIES WHO CANNOT BE ELECTRONICALLY SERVED BY THE COURT, A FULLY COMPLETED COMMERCE CASE MANAGEMENT MEMORANDUM. A COPY OF THE COMMERCE CASE MANAGEMENT MEMORANDUM FORM MAY BE FOUND AT: HTTPS://WWW.COURTS.PHILA.GOV/PDF/FORMS/CIVIL/01-111-CASE-MANAGEMENT-CONFERENCE-MEMORANDUM-COMMERCE.PDF 3. TO ELECTRONICALLY FILE THE COMMERCE CASE MANAGEMENT MEMORANDUM, ACCESS THE "EXISTING CASE" SECTION OF THE COURT'S ELECTRONIC FILING SYSTEM. SELECT "CONFERENCE SUBMISSIONS" AS THE FILING CATEGORY. SELECT "MANAGEMENT MEMORANDUM" AS THE FILING TYPE. 4. IN THE CASE MANAGEMENT MEMORANDUM, COUNSEL SHOULD DESCRIBE IN DETAIL: THE SUBSTANCE OF PLAINTIFFS' CLAIMS AND DEFENDANTS' DEFENSES; WHETHER CERTIFICATION OR MERITS DISCOVERY SHOULD OCCUR FIRST; ANY PROCEDURAL COMPLICATIONS THE PARTIES ANTICIPATE MAY OCCUR, SUCH AS VENUE OR JURISDICTIONAL DISPUTES, JOINDER OF ADDITIONAL PARTIES, REQUESTS FOR BIFURCATION, ETC.; AND ANY OTHER INFORMATION THAT WILL ASSIST THE CASE MANAGER TO DETERMINE HOW MUCH TIME THE PARTIES NEED TO CONDUCT DISCOVERY DURING THE CERTIFICATION AND/OR MERITS PORTION OF THE CASE. 5. COUNSEL SHALL ALSO BE PREPARED TO DISCUSS WITH THE CASE MANAGER AT THE ZOOM CONFERENCE ALL OF THE ISSUES LISTED IN PARAGRAPH 4 ABOVE. 6. PLAINTIFFS' COUNSEL SHALL SERVE A COPY OF THIS ORDER UPON ALL UNREPRESENTED PARTIES AND ANY ATTORNEY ENTERING AN APPEARANCE SUBSEQUENT TO THE DATE OF ISSUANCE OF THIS ORDER. ...BY THE COURT: PAULA PATRICK, J. 15-DEC-2025 |

| 15-DEC-2025 10:48 AM | ZR236 - NOTICE GIVEN UNDER RULE 236 | | |
|---|---|---|---|
| **Docket Entry:** | NOTICE GIVEN ON 16-DEC-2025 OF CONFERENCE DATE SET ENTERED ON 15-DEC-2025. | | |

| 18-DEC-2025 03:44 PM | MAILR - RETURNED MAIL RECEIVED | | |
|---|---|---|---|
| **Documents:** | MAILR_106.pdf | | |
| **Docket Entry:** | RETURN MAIL ORDER DATED 25-NOV-2025 AS UNDELIVERABLE AT THE ADDRESS ON FILE WITH THE COURT TO THE FOLLOWING PARTY: ENERGY TRANSFER (R&M) LLC | | |

| 15-JAN-2026 03:01 PM | CMAMD - AMENDED COMPLAINT FILED | CARSON ESQ, SHANON J | |
|---|---|---|---|
| **Documents:** | 1-15-26 Sunoco-Second Amended Class Action Complaint.pdf | | |

| Docket Entry: | AMENDED COMPLAINT WITH NOTICE TO DEFEND WITHIN TWENTY(20) DAYS AFTER SERVICE IN ACCORDANCE WITH RULE 1018.1 FILED. (FILED ON BEHALF OF ANDREA GROVER, CHRISTOPHER GROVER, JUSTINE ZACHARATOS, JERRY ZACHARATOS, KATHERINE LAHART AND DANIEL LAHART) ENTRY OF APPEARANCE FILED ON BEHALF OF ANDREA GROVER, CHRISTOPHER GROVER, JUSTINE ZACHARATOS AND JERRY ZACHARATOS. | | |
|---|---|---|---|
| 15-JAN-2026 03:01 PM | JURYS - JURY TRIAL PERFECTED | CARSON ESQ, SHANON J | |
| Docket Entry: | 8 JURORS REQUESTED. | | |
| 20-JAN-2026 09:34 AM | MTASN - MOTION ASSIGNED | | |
| Docket Entry: | 40-25072040 PRELIMINARY INJUNCTION ASSIGNED TO JUDGE: PATRICK, PAULA . ON DATE: JANUARY 20, 2026 | | |
| 20-JAN-2026 09:34 AM | MTASN - MOTION ASSIGNED | | |
| Docket Entry: | 79-25065679 MOTION TO TRANSFER ASSIGNED TO JUDGE: PATRICK, PAULA . ON DATE: JANUARY 20, 2026 | | |
| 20-JAN-2026 09:34 AM | MTASN - MOTION ASSIGNED | | |
| Docket Entry: | 38-25064738 MOTION TO STAY PROCEEDINGS ASSIGNED TO JUDGE: PATRICK, PAULA . ON DATE: JANUARY 20, 2026 | | |
| 21-JAN-2026 12:07 PM | PODAM - PRELIM OBJECTIONS-MARKED MOOT | | |
| Docket Entry: | 53-25064953 AMENDED COMPLAINT FILED 01/15/2026 | | |
| 22-JAN-2026 11:53 PM | AFDVT - AFFIDAVIT OF SERVICE FILED | SAMUEL JR, JOSEPH E | |
| Documents: | 2026.01.21 - La Hart - Affidavits of Service.pdf | | |
| Docket Entry: | AFFIDAVIT OF SERVICE OF SECOND AMENDED CLASS ACTION COMPLAINT AND NOTICE TO DEFEND UPON PBF HOLDING COMPANY LLC, PBF ENERGY INC, MONROE ENERGY LLC, MASTEC INC, EPSILON TRADING LLC, DELTA AIR LINES INC, BARR AIR PATROL LLC, BAKER HUGHES COMPANY AND AZURIA WATER SOLUTIONS INC BY PERSONAL SERVICE ON 01/21/2026 FILED. (FILED ON BEHALF OF ANDREA GOVER, CHRISTOPHER GROVER, JUSTINE ZACHARATOS, JERRY ZACHARATOS, KATHERINE LAHART AND DANIEL LAHART) | | |

| 26-JAN-2026 12:49 PM | AFDVT - AFFIDAVIT OF SERVICE FILED | SAMUEL JR, JOSEPH E | |
|---|---|---|---|
| **Documents:** | La Hart Aff of Service - CorrPro and Precision.pdf | | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF SECOND AMENDED CLASS ACTION COMPLAINT AND NOTICE TO DEFEND UPON PRECISION PIPELINE LLC AND CORRPRO COMAPNIES INC BY PERSONAL SERVICE ON 01/23/2026 FILED. (FILED ON BEHALF OF ANDREA GOVER, CHRISTOPHER GROVER, JUSTINE ZACHARATOS, JERRY ZACHARATOS, KATHERINE LAHART AND DANIEL LAHART) | | |
| | | | |
| 28-JAN-2026 12:54 PM | AFDVT - AFFIDAVIT OF SERVICE FILED | SAMUEL JR, JOSEPH E | |
| **Documents:** | Shaw Pipeline Services Inc.-LAHART.pdf | | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF SECOND AMENDED CLASS ACTION COMPLAINT AND NOTICE TO DEFEND UPON SHAW PIPELINE SERVICES INC BY PERSONAL SERVICE ON 01/21/2026 FILED. (FILED ON BEHALF OF ANDREA GOVER, CHRISTOPHER GROVER, JUSTINE ZACHARATOS, JERRY ZACHARATOS, KATHERINE LAHART AND DANIEL LAHART) | | |
| | | | |
| 30-JAN-2026 01:43 PM | ENAPP - ENTRY OF APPEARANCE | DIESA, NICOLE | |
| **Documents:** | Entry of Appearance in La Hart-Zacharatos-Grover - Nicole Diesa 1.30.2026.pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF NICOLE DIESA FILED. (FILED ON BEHALF OF BAKER HUGHES COMPANY) | | |
| | | | |
| 30-JAN-2026 02:14 PM | AFDVT - AFFIDAVIT OF SERVICE FILED | SAMUEL JR, JOSEPH E | |
| **Documents:** | NATURAL ENERGY FIELD SERVICES, LLC - La Hart.pdf | | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF SECOND AMENDED CLASS ACTION COMPLAINT AND NOTICE TO DEFEND UPON NATURAL ENERGY FIELD SERVICES LLC BY PERSONAL SERVICE ON 01/22/2026 FILED. (FILED ON BEHALF OF ANDREA GOVER, CHRISTOPHER GROVER, JUSTINE ZACHARATOS, JERRY ZACHARATOS, KATHERINE LAHART AND DANIEL LAHART) | | |
| | | | |
| 30-JAN-2026 02:56 PM | MAILR - RETURNED MAIL RECEIVED | | |
| **Documents:** | MAILR_116.pdf | | |
| **Docket Entry:** | RETURN MAIL CLASS ACTION INITIATION DATED 15-DEC-2025 AS UNDELIVERABLE AT THE ADDRESS ON FILE WITH THE COURT TO THE FOLLOWING PARTY: ENERGY TRANSFER (R&M) LLC | | |
| | | | |
| 03-FEB-2026 04:49 PM | AFDVT - AFFIDAVIT OF SERVICE FILED | SAMUEL JR, JOSEPH E | |
| **Documents:** | La Hart Affidavit of service.pdf | | |

| | | | |
|---|---|---|---|
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF SECOND AMENDED CLASS ACTION COMPLAINT AND NOTICE TO DEFEND UPON ROSEN SWISS A G BY PERSONAL SERVICE ON 01/27/2026 FILED. (FILED ON BEHALF OF ANDREA GOVER, CHRISTOPHER GROVER, JUSTINE ZACHARATOS, JERRY ZACHARATOS, KATHERINE LAHART AND DANIEL LAHART) | | |

| | | | |
|---|---|---|---|
| 03-FEB-2026 04:59 PM | AFDVT - AFFIDAVIT OF SERVICE FILED | SAMUEL JR, JOSEPH E | |
| **Documents:** | ETMT Affidavit La Hart.pdf | | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF SECOND AMENDED CLASS ACTION COMPLAINT AND NOTICE TO DEFEND UPON ENERGY TRANSFER MARKETING & TERMINALS LP BY PERSONAL SERVICE ON 01/30/2026 FILED. (FILED ON BEHALF OF ANDREA GOVER, CHRISTOPHER GROVER, JUSTINE ZACHARATOS, JERRY ZACHARATOS, KATHERINE LAHART AND DANIEL LAHART) | | |

| | | | |
|---|---|---|---|
| 04-FEB-2026 12:04 PM | MTEXR - MOT-FOR EXTRAORDINARY RELIEF | MCNALLY, LAURA H | |
| **Documents:** | 2026.02.03 - Joint Motion for Extraordinary Relief to Amend Schedules.pdf<br>Proposed Order on Case Schedule.pdf<br>La Hart Extraordinary Relief Form.pdf<br>Motion CoverSheet Form | | |
| **Docket Entry:** | 92-26021292 MOT-FOR EXTRAORDINARY RELIEF MOTION SUBMITTED JOINTLY (FILED ON BEHALF OF ENERGY TRANSFER (R&M) LLC, ENERGY TRANSFER LP AND SUNOCO PIPELINE LP) | | |

| | | | |
|---|---|---|---|
| 04-FEB-2026 02:34 PM | MTASN - MOTION ASSIGNED | | |
| **Docket Entry:** | 92-26021292 MOT-FOR EXTRAORDINARY RELIEF ASSIGNED TO JUDGE: PATRICK, PAULA . ON DATE: FEBRUARY 04, 2026 | | |

| | | | |
|---|---|---|---|
| 05-FEB-2026 01:30 PM | DSCIM - DISCOVERY MOTION FILED | MCNALLY, LAURA H | |
| **Documents:** | 2026.02.05 - Joint Motion for Stipulated Protective Order (Class Action).pdf<br>2026.02.05 - Proposed Protective Order (Class Action).pdf | | |
| **Docket Entry:** | 08-26021608 MOTION FOR PROTECTION ORDER. CERTIFICATION DUE DATE: 02/12/2026. RESPONSE DATE: 02/19/2026. (FILED ON BEHALF OF SUNOCO PIPELINE LP, ENERGY TRANSFER LP AND ENERGY TRANSFER (R&M) LLC) | | |

| | | | |
|---|---|---|---|
| 06-FEB-2026 12:18 PM | ORDER - ORDER ENTERED/236 NOTICE GIVEN | PATRICK, PAULA | |
| **Documents:** | ORDER_124.pdf | | |
| **Docket Entry:** | 92-26021292 AND NOW, THIS 6TH DAY OF FEBRUARY, 2026 UPON CONSIDERATION OF THE JOINT MOTION FOR EXTRAORDINARY RELIEF TO AMEND SCHEDULES, IT IS ORDERED THAT THE JOINT MOTION IS GRANTED, AND IT IS FURTHER ORDERED AS FOLLOWS: 1. PLAINTIFFS SHALL SERVE THIS ORDER ON ALL OF THE NEWLY ADDED DEFENDANTS. 2. THE PARTIES SHALL | | |

CONDUCT DISCOVERY ON THE ISSUE OF VENUE WITHIN 60 DAYS OF SERVICE OF THIS ORDER ON ALL OF THE NEWLY ADDED DEFENDANTS NAMED IN PLAINTIFFSS' SECOND AMENDED COMPLAINT. 3. ANY DEFENDANT THAT SEEKS TO FILE A PRELIMINARY OBJECTION ON THE ISSUE OF VENUE SHALL DO SO WITHIN 30 DAYS OF THE DATE OF COMPLETION OF VENUE DISCOVERY PURSUANT TO THIS SCHEDULING ORDER. 4. DEFENDANTS SHALL HOLD IN ABEYANCE PRELIMINARY OBJECTIONS OTHER THAN VENUE AND SHALL NOT RAISE THEM AT THE SAME TIME AS ANY PRELIMINARY OBJECTION TO VENUE, WHICH ISSUE THE COURT SHALL DECIDE FIRST. 5. PLAINTIFFS SHALL RESPOND TO ANY PRELIMINARY OBJECTIONS ON THE ISSUE OF VENUE WITHIN 30 DAYS OF THE FILING OF SUCH OBJECTIONS IN A CONSOLIDATED OPPOSITION BRIEF, ADDRESSING ALL VENUE OBJECTIONS BY ANY DEFENDANT. 6. ANY DEFENDANT WISHING TO FILE A REPLY BRIEF IN FURTHER SUPPORT OF A PRELIMINARY OBJECTION ON THE ISSUE OF VENUE SHALL DO SO WITHIN 15 DAYS OF PLAINTIFFS? RESPONSE BRIEF. 7. EXCEPT AS PROVIDED ABOVE, THIS SCHEDULING ORDER DOES NOT ALTER OR AMEND THE COURT'S PRIOR ORDERS AND/OR THE PARTIES' OBLIGATIONS UNDER THE PENNSYLVANIA RULES OF CIVIL PROCEDURE, INCLUDING IN CONNECTION WITH MERITS DISCOVERY. BY THE COURT: JUDGE PATRICK, 2/6/26.

| | | | |
|---|---|---|---|
| 06-FEB-2026 12:18 PM | ZR236 - NOTICE GIVEN UNDER RULE 236 | | |
| **Docket Entry:** | NOTICE GIVEN ON 06-FEB-2026 OF ORDER ENTERED/236 NOTICE GIVEN ENTERED ON 06-FEB-2026. | | |
| | | | |
| 09-FEB-2026 02:51 PM | MRDUD - MOTION RESPONSE DATE UPDATED | | |
| **Docket Entry:** | 38-25064738 MOTION TO STAY PROCEEDINGS MOTION RESPONSE DATE UPDATED TO 06/30/2026. | | |
| | | | |
| 09-FEB-2026 02:52 PM | MRDUD - MOTION RESPONSE DATE UPDATED | | |
| **Docket Entry:** | 79-25065679 MOTION TO TRANSFER MOTION RESPONSE DATE UPDATED TO 06/30/2026. | | |
| | | | |
| 09-FEB-2026 02:52 PM | MRDUD - MOTION RESPONSE DATE UPDATED | | |
| **Docket Entry:** | 40-25072040 PRELIMINARY INJUNCTION MOTION RESPONSE DATE UPDATED TO 06/30/2026. | | |
| | | | |
| 09-FEB-2026 04:21 PM | AFDVT - AFFIDAVIT OF SERVICE FILED | SAMUEL JR, JOSEPH E | |
| **Documents:** | 2026.02.09 - Certificate of Service of Order on Case Schedule (Class Action).pdf | | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF ORDER DATED FEBRUARY 6, 2026 UPON SHAW PIPELINE SERVICES INC, ROSEN SWISS A G, PRECISION PIPELINE LLC, PBF HOLDING COMPANY LLC, PBF ENERGY INC, NICOLE DIESA, NATURAL ENERGY FIELD SERVICES LLC, MONROE ENERGY LLC, MASTEC INC, EPSILON TRADING | | |

LLC, ENERGY TRANSFER MARKETING & TERMINALS LP, DELTA AIR LINES INC, CORRPRO COMAPNIES INC, BARR AIR PATROL LLC, BAKER HUGHES COMPANY AND AZURIA WATER SOLUTIONS INC BY CERTIFIED MAIL ON 02/09/2026 FILED. (FILED ON BEHALF OF ANDREA GOVER, CHRISTOPHER GROVER, JUSTINE ZACHARATOS, JERRY ZACHARATOS, KATHERINE LAHART AND DANIEL LAHART)

| 10-FEB-2026 01:08 PM | ENAPP - ENTRY OF APPEARANCE | SCOTT, JEFFREY M | |
|---|---|---|---|
| **Documents:** | La Hart - Entry.pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF JEFFREY M SCOTT AND MATTHEW CONLEY FILED. (FILED ON BEHALF OF PBF HOLDING COMPANY LLC AND PBF ENERGY INC) | | |

| 10-FEB-2026 07:23 PM | CLWCM - WAITING TO LIST CASE MGMT CONF | | |
|---|---|---|---|
| **Docket Entry:** | *none.* | | |

| 11-FEB-2026 09:14 AM | ENAPP - ENTRY OF APPEARANCE | PAYNE, WESLEY R | |
|---|---|---|---|
| **Documents:** | La Hart EOA and Jury Demand.pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF WESLEY R PAYNE AND LAURA ELIZABETH HUTCHINSON FILED. (FILED ON BEHALF OF MASTEC INC AND PRECISION PIPELINE LLC) | | |

| 11-FEB-2026 09:14 AM | JURYT - JURY TRIAL PERFECTED | PAYNE, WESLEY R | |
|---|---|---|---|
| **Docket Entry:** | 12 JURORS REQUESTED. | | |

| 12-FEB-2026 02:53 PM | MTPHV - MOT-FOR ADMISSION PRO HAC VICE | DIESA, NICOLE | |
|---|---|---|---|
| **Documents:** | Motion for PHV of Will Brand_La Hart.pdf<br>Motion CoverSheet Form | | |
| **Docket Entry:** | 99-26023499 RESPONSE DATE 03/05/2026. (FILED ON BEHALF OF BAKER HUGHES COMPANY) | | |

| 12-FEB-2026 03:19 PM | MTPHV - MOT-FOR ADMISSION PRO HAC VICE | DIESA, NICOLE | |
|---|---|---|---|
| **Documents:** | Motion for PHV of Win Gualt_La Hart.pdf<br>Motion CoverSheet Form | | |
| **Docket Entry:** | 01-26023501 RESPONSE DATE 03/05/2026. (FILED ON BEHALF OF BAKER HUGHES COMPANY) | | |

| 12-FEB-2026 04:39 PM | DISCU - CERT MOTION IS UNCONTESTED | SAMUEL JR, JOSEPH E | |
|---|---|---|---|
| Documents: | 2026.02.12 - La Hart - Praecipe to Enter Uncontested Discovery Order.pdf<br>Ex. A - Stipulated Protective Order.pdf | | |
| Docket Entry: | 08-26021608 MOTION IS UNCONTESTED. (FILED ON BEHALF OF KATHERINE LAHART, JUSTINE ZACHARATOS, JERRY ZACHARATOS, DANIEL LAHART, CHRISTOPHER GROVER AND ANDREA GOVER) | | |
| | | | |
| 13-FEB-2026 11:13 AM | ENAPP - ENTRY OF APPEARANCE | LUCCA, CHRISTOPHER M | |
| Documents: | EOA - CML, VLH - Lahart.pdf | | |
| Docket Entry: | ENTRY OF APPEARANCE OF VANESSA L HUBER AND CHRISTOPHER M LUCCA FILED. (FILED ON BEHALF OF BARR AIR PATROL LLC AND SHAW PIPELINE SERVICES INC) | | |
| | | | |
| 16-FEB-2026 04:21 PM | ENAPP - ENTRY OF APPEARANCE | GEORGE, ALEXANDRA M | |
| Documents: | La Hart et al. v. Sunoco Pipeline L.P. et al. - EOA of Morgan Birch and Alexandra George on Behalf of Natural Energy Field Services.pdf | | |
| Docket Entry: | ENTRY OF APPEARANCE OF ALEXANDRA M GEORGE, ALEXANDRA M GEORGE AND MORGAN SHAE BIRCH FILED. (FILED ON BEHALF OF NATURAL ENERGY FIELD SERVICES LLC) | | |
| | | | |
| 18-FEB-2026 03:11 PM | ENAPP - ENTRY OF APPEARANCE | KAVULICH, LAURI A | |
| Documents: | LAK RSW EOA - La Hart.pdf | | |
| Docket Entry: | ENTRY OF APPEARANCE OF LAURI A KAVULICH AND ROBIN S WEISS FILED. (FILED ON BEHALF OF ROSEN SWISS A G) | | |
| | | | |
| 18-FEB-2026 03:24 PM | MAILR - RETURNED MAIL RECEIVED | | |
| Documents: | MAILR_139.pdf | | |
| Docket Entry: | RETURN MAIL SCHEDULING ORDER DATED 06-FEB-2026 AS UNDELIVERABLE AT THE ADDRESS ON FILE WITH THE COURT TO THE FOLLOWING PARTY: AZURIA WATER SOLUTIONS INC | | |
| | | | |
| 19-FEB-2026 10:11 AM | ORDER - ORDER ENTERED/236 NOTICE GIVEN | PATRICK, PAULA | |
| Documents: | ORDER_140.pdf | | |
| Docket Entry: | STIPULATED PROTECTIVE ORDER IS ENTERED. .....BY THE COURT: PATRICK, J. 02/19/26 | | |
| | | | |

| 19-FEB-2026 10:11 AM | ZR236 - NOTICE GIVEN UNDER RULE 236 | | |
|---|---|---|---|
| **Docket Entry:** | NOTICE GIVEN ON 20-FEB-2026 OF ORDER ENTERED/236 NOTICE GIVEN ENTERED ON 19-FEB-2026. | | |
| | | | |
| 19-FEB-2026 02:47 PM | ENAPP - ENTRY OF APPEARANCE | YOUNG, A CHRISTOPHER | |
| **Documents:** | 2026.02.19 ACY CB APD Twin Oaks Entry of Appearance.pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF A CHRISTOPHER YOUNG, ANTHONY PATRICK DESABATO AND CHRISTOPHER M BROLLEY FILED. (FILED ON BEHALF OF MONROE ENERGY LLC, EPSILON TRADING LLC AND DELTA AIR LINES INC) | | |

*Filed and Attested by the Office of Judicial Records 03/27/2025 10:16 am S. MACGREGOR*

Court of Common Pleas of Philadelphia
County Trial Division

## Civil Cover Sheet

For Office of Judicial Records Only (Docket Number)

250303655

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| Daniel La Hart | Sunoco Pipeline L.P. |
| **PLAINTIFF'S ADDRESS** | **DEFENDANT'S ADDRESS** |
| c/o Berger Montague PC, 1818 Market St., Philadelphia, PA 19103 | 525 Fritztown Road Sinking Spring, Pennsylvania 19608 |
| **PLAINTIFF'S NAME** | **DEFENDANT'S NAME** |
| Katherine La Hart | Energy Transfer LP |
| **PLAINTIFF'S ADDRESS** | **DEFENDANT'S ADDRESS** |
| c/o Berger Montague PC, 1818 Market St., Philadelphia, PA 19103 | 8111 Westchester Drive Dallas, Texas 75225 |
| **PLAINTIFF'S NAME** | **DEFENDANT'S NAME** |
|  | Energy Transfer (R&M) LLC |
| **PLAINTIFF'S ADDRESS** | **DEFENDANT'S ADDRESS** |
|  | 1735 Market Street, Philadelphia, Pennsylvania 19103 |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NO. OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 2 | 3 | ☑ Complaint ☐ Petition Action ☐ Notice of Appeal<br>☐ Writ of Summons ☐ Transfer From Other Jurisdictions |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | | |
|---|---|---|---|---|
| ☐ $50,000.00 or less | ☐ Arbitration | ☐ Mass Tort | ☐ Minor Court Appeal | ☐ Settlement |
| ☑ More than $50,000.00 | ☐ Jury | ☐ Savings Action | ☐ Statutory Appeals | ☐ Minors |
|  | ☐ Non-Jury | ☐ Petition | ☐ Commerce (Completion of Addendum Required) | ☐ W/D/Survival |
|  | ☑ Other Class Action | | | |

**CASE TYPE AND CODE (SEE INSTRUCTIONS)**

3E ToxicWaste (Negligence)

**STATUTORY BASIS FOR CAUSE OF ACTION (SEE INSTRUCTIONS)**

35 P.S. § 691.401 (Pennsylvania Clean Streams Law); 49 U.S.C. § 60101 et seq. (Pipeline Safety Act); 49 C.F.R. § 195 (Transportation of Hazardous Liquids by Pipeline)

| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) | IS CASE SUBJECT TO COORDINATION ORDER? |
|---|---|
| N/A | Yes ☐     No ☐ |

CMPLC-Hart Etal Vs Sunoco Pipeline, Lp Etal [SPG]

TO THE OFFICE OF JUDICIAL RECORDS:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant:
Papers may be served at the address set forth below.

25030365500003

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS (SEE INSTRUCTIONS) |
|---|---|
| Shanon Carson | Berger Montague PC<br>1818 Market Street, Suite 3600<br>Philadelphia, PA 19103 |
| **PHONE NUMBER** 215-875-4656 | **FAX NUMBER** 215-875-4604 | |
| **SUPREME COURT IDENTIFICATION NO.** 85957 | **E-MAIL ADDRESS** scarson@bm.net |
| **SIGNATURE** | **DATE** 3/27/2025 |

01-101 (Rev. 8/2014)

Case ID: 250303655

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CIVIL TRIAL DIVISION**

**BERGER MONTAGUE PC**
Shanon Carson (Bar No. 85957)
Y. Michael Twersky (Bar No. 312411)
Joseph E. Samuel, Jr. (Bar No. 327645)
1818 Market Street, Suite 3600
Philadelphia, PA 19103

*Counsel for Plaintiffs and the Proposed Class*

| | |
|---|---|
| **DANIEL LA HART** and **KATHERINE LA HART** c/o Berger Montague PC 1818 Market Street, Suite 3600 Philadelphia, PA 19103<br><br>Plaintiffs,<br><br>v.<br><br>**SUNOCO PIPELINE L.P.** 525 Fritztown Road Sinking Spring, Pennsylvania 19608;<br><br>**ENERGY TRANSFER LP** 8111 Westchester Drive Dallas, Texas 75225; and<br><br>**ENERGY TRANSFER (R&M) LLC** 1735 Market Street, Philadelphia, Pennsylvania 19103,<br><br>Defendants. | **PHILADELPHIA COUNTY COURT OF COMMON PLEAS TRIAL DIVISION**<br><br>MARCH TERM, 2025<br><br>CASE NO. ___3655___<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1

Case ID: 250303655

## NOTICE TO DEFEND

| NOTICE | AVISO |
|---|---|
| You have been sued in court.   If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.<br><br>*You should take this paper to your lawyer at once.  If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.*<br><br>Philadelphia Bar Association<br>Lawyer Referral and Information Service<br>One Reading Center Philadelphia, Pennsylvania  19107<br>(215) 238-6333 TTY<br>(215) 451-6197 | Le han demandado a usted en la corte.  Si usted quiere defenderse de estas demandas expuestas en las páginas siguientes, usted tiene veinte (20) días de plazo al partir de la fecha de la demanda y la notificación.  Hace falta asentar una comparecencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona.  Sea avisado que, si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificación.  Además, la corte puede decidir a favor del demandante y requerir que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.<br><br>Lleve esta demanda a un abogado inmediatamente.  Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio.  Vaya en persona o llame por teléfono a la oficina cuya dirección se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.<br>Asociación De Licenciados De Filadelfia<br>Servicio De Referencia E Información Legal<br>One Reading Center<br>Philadelphia, Pennsylvania 19107<br>(215) 238-6333<br>TTY (215) 451-6197 |

2

Case ID: 250303655

## CLASS ACTION COMPLAINT

### I.    INTRODUCTION

1.    Plaintiffs Daniel La Hart and Katherine La Hart ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Class" as further defined below), bring this Class Action Complaint against Defendants Sunoco Pipeline L.P. ("Sunoco"), Energy Transfer LP, and Energy Transfer (R&M), LLC (collectively, "Defendants"), alleging that Defendants' reckless, negligent, and irresponsible ownership, oversight, operation, supervision, maintenance, and control of a hazardous petroleum pipeline – the Twin Oaks Pipeline – has resulted in a massive and still unquantified leak of jet fuel and petroleum products, and resulting toxins, pollutants, and contaminants, in Upper Makefield Township, Pennsylvania.

2.    Defendants' conduct in permitting and allowing the pipeline leak to occur has unleashed a catastrophic environmental disaster on a previously idyllic Bucks County, Pennsylvania community, including the Mt. Eyre Manor community and surrounding neighborhoods that are subject to the plume caused by the leak.

3.    Defendants' pipeline leak has caused severe harm and poses a serious ongoing and current danger to affected residents' physical health and mental and emotional wellbeing, the community's groundwater, soil, air quality, and ecosystem, and to property values. The pipeline leak has uprooted the affected community and has already caused certain residences within the community to be unlivable, amounting to an effective taking of family homes by Defendants.

4.    Defendants have already purchased one home in the residential Mt. Eyre Manor neighborhood for the purpose of drilling monitoring and/or recovery wells, right in the middle of the neighborhood, and seek to drill more wells and conduct more disruptive activities in the neighborhood for remediation purposes.

3

Case ID: 250303655

5. Testing shows that Defendants' released jet fuel and related pollutants has contaminated private wells that provide water for drinking, bathing, cooking, and washing, in the affected community.

6. Testing shows elevated levels of toxins in the air as well.

7. Defendants' conduct has caused an exigent threat to the health and well-being of the community and has contaminated the environment and underground aquifer in the community.

8. It has been reported that Defendants already have the worst record for fuel spills in the United States even before this latest disaster.

9. This case arises from a crack in Defendants' Twin Oaks Pipeline (the "Twin Oaks Pipeline" or "Pipeline") in the Mt. Eyre Manor community in Upper Makefield Township, Bucks County, Pennsylvania, which caused a discharge into the underlying bedrock and groundwater of petroleum, jet fuel, gasoline, and hazardous and toxic chemicals that the Pipeline was used to transport (the "Pipeline Leak" or "Leak"). These toxins include kerosene, benzene, ethylbenzene, isopropylbenzene, dichloroethane, trimethylbenzene ("TMB"), toluene, naphthalene, methyl tertiary-butyl ether ("MTBE"), and lead. These are substances so dangerous that their presence in the soil and water presents a direct and immediate threat to Plaintiffs' and Class members' health and wellbeing.

10. The Mt. Eyre Manor community and surrounding neighborhoods, as with the area that includes and surrounds Upper Makefield Township generally, has long been a highly desirable residential neighborhood that had strong property values and has been sought-after as an idyllic and wonderful place to live and raise a family.

11. One of the notable features of Mt. Eyre Manor and the surrounding neighborhoods in Upper Makefield Township is that the residences located there use and rely on private well water

4

Case ID: 250303655

for domestic water needs, including for drinking water, cooking, bathing, washing clothes and dishes, and watering lawns and gardens.

12.    Indeed, Mt. Eyre Manor and other Upper Makefield residents have long believed that they had the best tasting water one could find because it contains naturally occurring minerals that give it a fresher taste and, typically, is free of the added chemicals that can be found in municipal water, such as chlorine and fluoride.

13.    As a result of Defendants' Pipeline Leak, however, this is no longer the case. Defendants' conduct as alleged herein has devastated the community and caused significant contamination to the groundwater under the neighborhood, creating critical health and safety risks to the residents who live there, and causing other consequential harms as detailed herein.

14.    Defendants control and operate the Twin Oaks Pipeline and are responsible for maintaining the Pipeline and ensuring its safety.

15.    Defendants' Pipeline Leak was confirmed on January 31, 2025.

16.    Defendants, however, first received odor complaints from residents living in Mt. Eyre Manor as early as September 2023 – 16 months earlier – but failed at that time to properly investigate, and as such failed to identify the Pipeline Leak at an early stage when more harm could have been prevented.

17.    Despite receiving numerous complaints from alarmed residents about strange odors in the air since at least September 2023, Defendants failed to properly act for at least over 16 months. Defendants failed to properly investigate the Pipeline Leak, failed to identify and contain the Pipeline Leak, and have still not disclosed the full extent of the disaster.

18.    The magnitude of the Pipeline Leak remains unknown and undisclosed to this day. Defendants still cannot account for or are choosing not to publicly state how much toxic petroleum

5

Case ID: 250303655

product has spilled or where it is moving, nor can they guarantee that the Twin Oaks Pipeline is safe, leaving Plaintiffs and Class members in constant and reasonable fear for their health and property.

19. Numerous residents already have confirmed contamination within their private wells and well water, which contamination is not disputed by Defendants who have already publicly stated that the Pipeline Leak is their fault.

20. One household across the street from where the Pipeline Leak was eventually discovered had approximately *twelve feet* of free jet fuel product found flowing on top of the water in their private well. Similarly, other residents of Mt. Eyre Manor also had significant amounts of jet fuel in their private wells.

21. As Defendants have not yet identified the size, scope, direction, or speed of the contamination plume, even residents whose well water currently does not show contamination yet are and remain within a zone of danger where contamination could be mere weeks or days away, and therefore are forced to take appropriate precautions and incur time and expenses to attempt to mitigate their risk.

22. Recent testing has confirmed that vapors from the contaminated groundwater has invaded homes in the neighborhood placing residents at potential risk to these toxic chemicals in both the water they drink and the air that they breathe.

23. With no clear answers, no relief in sight, water in the underground aquifer and bedrock, private wells that have been contaminated, soil that has been contaminated, air that has been contaminated, property values plummeting, odors of jet fuel contamination within homes and in the neighborhood, and the prospect of having ingested, bathed, and used contaminated well water, the residents of Mt. Eyre Manor and the surrounding neighborhoods are left to grapple with

6

Case ID: 250303655

the terror of irreparable environmental harm, uncertain whether they can trust the very air they breathe and the water they drink, and concerned for their future safety from disease.

24.    This is not just an environmental tragedy caused by corporate malfeasance; it is a life-altering crisis for Plaintiffs and Class members for which Defendants must be held accountable.

## II.    PARTIES

25.    Plaintiffs Daniel La Hart and Katherine La Hart reside in the Mt. Eyre Manor neighborhood at 114 Spencer Road, Washington Crossing, Pennsylvania, 18977.

26.    Defendant Sunoco Pipeline L.P. is a limited partnership formed under the laws of Texas with a principal place of business located at 8111 Westchester Drive, Dallas, Texas 75225. Sunoco Pipeline, L.P. maintains an address at 535 Fritztown Road, Sinking Spring, PA 19608.

27.    Defendant Energy Transfer LP is a limited partnership formed under the laws of Delaware with a principal place of business located at 8111 Westchester Drive, Dallas, Texas 75225.

28.    Defendant Energy Transfer (R&M), LLC is a limited liability company formed under the laws of Pennsylvania with a principal place of business located at 1735 Market Street, Philadelphia, Pennsylvania 19103.

29.    Defendants John Does 1-100 (the "John Doe Defendants"), are persons or entities that are responsible for the conduct and/or injuries alleged in this Complaint, and accordingly are liable for the relief sought. Their identities are currently unknown to Plaintiffs, who consequently sue the John Doe Defendants by their fictitious names, but the John Doe Defendants will be ascertained through investigation and discovery. Plaintiffs will seek leave to amend this Complaint

7

Case ID: 250303655

to state the true names and capacities of the fictitiously named John Doe Defendants when they have been ascertained.

30.    At all times material hereto, Defendants purposefully established significant contacts in Pennsylvania and Philadelphia County, and carried out, and continue to carry out, substantial, continuous, and systematic business activities in Pennsylvania and Philadelphia County.

## III.    JURISDICTION AND VENUE

31.    This Court has subject matter jurisdiction pursuant to 42 Pa. C.S. § 931.

32.    This Court has personal jurisdiction over each of the Defendants under 42 Pa. C.S. § 5301, *et seq.*, because Defendants purposefully availed themselves of the privilege of conducting business in Pennsylvania and Plaintiffs' causes of action arise out of the business that Defendants conduct in Pennsylvania; namely, the Pipeline Leak from Defendants' Pipeline which occurred in Upper Makefield Township, Pennsylvania.

33.    Venue is proper under Pennsylvania Rules of Civil Procedure 1006 and 2179 because Defendants regularly conduct business in Philadelphia County.

## IV.    FACTUAL ALLEGATIONS

### A. Defendants' History of Leaking Pipelines and Failures to Report

34.    Defendant Energy Transfer LP, through its complex network of subsidiaries, limited partnerships, and joint ventures, including Defendant Sunoco and Defendant Energy Transfer (R&M), LLC, owns one of the nation's largest networks of natural gas, crude oil, and petroleum product pipelines.

35.    Energy Transfer LP primarily operated in the natural gas sector prior to its acquisition of Sunoco, and Sunoco's significant oil and petroleum product assets, in 2012.

8

Case ID: 250303655

Together, Defendants now own and operate over 125,000 miles of pipelines across the United States.

36.    Defendants' network of pipelines is not only among the largest in the country; it is also among the leakiest.

37.    According to the Pipeline and Hazardous Materials Safety Administration ("PHMSA")'s database, between 2002 and 2017, Defendants experienced at least 527 leakage incidents—approximately one incident from an existing facility every eleven days in the pipelines that they own and operate.[1]

38.    Those incidents accounted for reported releases of over 3.6 million gallons of petroleum product. That figure likely substantially underestimates the true number of incidents and amount of product lost, as it primarily relies on self-reported incidents and estimates.

39.    Between 2002 and 2017, PHMSA issued 106 safety violations to Defendants for failing to comply with federal regulations designed to ensure the safe operation of hazardous liquid pipelines.[2]

40.    These violations included failures to notify PHMSA of spills, failures to repair identified unsafe pipes for five years, failures to perform regular corrosion inspections, failures to report known unsafe operating conditions, and failures to properly notify emergency responders and the public in the event of a leak.

41.    Federal regulators have not deterred Defendants' egregious conduct in failing to properly maintain their pipelines transporting hazardous petroleum products to make them safe. In Pennsylvania in 2022, Defendants Sunoco Pipeline L.P. and Energy Transfer LP were convicted

---

[1] Exhibit A, Oil and Water: ETP & Sunoco's History of Pipeline Spills, Greenpeace USA and Waterkeeper Alliance (Apr. 17, 2018).
[2] Exhibit A (summarizing PHMSA records).

9

Case ID: 250303655

of *57 charges* of criminal conduct associated with the construction and operation of two pipelines in nearby Chester County, Pennsylvania. The Commonwealth of Pennsylvania convicted Defendants on counts involving multiple instances of failure to report discharges of hazardous substances into the surrounding environment, the use of unapproved additives and release of those additives into drinking water, and failure to implement legally required safety measures. The use of unapproved additives is potentially relevant here as one of the chemicals found in recent testing in the Mt. Eyre Manor neighborhood is MTBE, which was supposed to have been phased out of use in the early 2000s.

42. In February 2025, Bloomberg reported that the Twin Oaks Pipeline Leak in Upper Makefield Township "highlight[ed]" Energy Transfer's "worst fuel spill record" in the United States. The Bloomberg article reported that Sunoco Pipeline LP was responsible for spilling over 1,400 barrels of fuel in 2024 alone,[3] and this is only accounting for the volume of fuel spills that Defendants were both aware of *and* willing to publicly report. A copy of the Bloomberg article is attached hereto as Exhibit B.

43. The Twin Oaks Pipeline leak demonstrates that Defendants are not forthcoming about the volume of or even the existence of fuel spills into residential neighborhoods.

44. Defendants' conduct, as alleged herein, is reflective of and consistent with their history of failing to safely operate and maintain pipelines, as well as their failing to detect and report leaks from their pipelines, and appropriately respond to and remediate leaks with the expediency and transparency that such incidents require.

---

[3] Bloomberg, *Energy Transfer Leak Highlights Worst Fuel Spill Record in US* (Feb. 18, 2025), available at https://www.bloomberg.com/news/articles/2025-02-18/energy-transfer-leak-highlights-worst-fuel-spill-record-in-us?embedded-checkout=true (last accessed Mar. 14, 2025).

Case ID: 250303655

**B.    Defendants' Twin Oaks Pipeline That Runs Through Upper Makefield, PA**

45.    Defendants own and operate the Twin Oaks Pipeline ("the Pipeline"), a 14-inch diameter pipeline that transports petroleum products, including but not limited to jet fuel (JP-8), diesel, and gasoline, from the Twin Oaks Terminal in Aston, Pennsylvania to the Newark Terminal in Newark, New Jersey. The Pipeline is considered a "hazardous liquid pipeline facility" under federal law. 49 U.S.C. § 60101(a).

46.    The Twin Oaks Pipeline was originally installed in 1956 and has operated as a hazardous liquid pipeline facility now for close to 70 years.

47.    The Twin Oaks Pipeline was manufactured by National Tube Supply Company.

48.    On November 18, 2024, PHMSA issued an Advisory Bulletin notifying pipeline owners and operators of potential threats to the integrity of the body of certain pipelines.[4] The Advisory Bulletin stated that pipes constructed by National Tube Supply Company before 1970, like the Twin Oaks Pipeline, were particularly susceptible to hard spots. Hard spots are defects created during the pipe manufacturing process because of localized cooling and hardening. Hard spots can become unstable over time due to changes in their conditions, including degradation and erosion of the coating surrounding the hard spot, and result in cracking of the pipe. PHMSA provided in its Advisory Bulletin six recommended safety actions for pipeline operators to take in order to identify potential hard spots.

49.    Despite this Advisory Bulletin, Defendants' representatives have stated that they were unaware of any safety actions recommended by PHMSA related to the Twin Oaks Pipeline.[5]

---

[4] Pipeline and Hazardous Materials Safety Administration, Pipeline Safety: Identification and Evaluation of Potential Hard Spots—In-Line Inspection Tools and Analysis, 89 Fed. Reg. 90827 (Nov. 18, 2024).
[5] Exhibit C, Letter from U.S. Representative Brian K. Fitzpatrick to Acting Administrator Ben Kochman (March 11, 2025).

11

Case ID: 250303655

50. Furthermore, it is well known that the inner walls of a petroleum pipeline can erode over time due to the corrosive environment created by the materials and chemicals transported through it. The exterior of a petroleum pipeline is also subject to external corrosion, due to the presence of moisture and chemicals in the surrounding soil. While several factors can influence the rate and extent of both internal and external corrosion, corrosion of a petroleum pipeline over time is inevitable, and again, well-known. Consequently, proper care, maintenance, supervision, and oversight of pipelines is critical, including, without limitation, to public safety.

51. Despite this knowledge, Defendants have made several incredulous statements to members of the affected community in Upper Makefield, Pennsylvania, including Plaintiffs, that the lifespan of the Twin Oaks Pipeline is "indefinite."

52. The Twin Oaks Pipeline specifically has experienced reported failures in Pennsylvania on at least two prior occasions, and these are only instances that Defendants have reported to the public. It is possible that the Twin Oaks Pipeline has experienced additional unreported failures.

53. On October 7, 1986, a crack in the Twin Oaks Pipeline caused the release of at least 5,260 barrels of refined product in Montgomery County, Pennsylvania.

54. On March 19, 2004, external corrosion caused a leak in the Twin Oaks Pipeline, resulting in the release of at least 50 barrels of refined product in Delaware County, Pennsylvania.

**C.     The Geographic Area Affected by the Twin Oaks Pipeline Leak**

55. The Twin Oaks Pipeline Leak occurred at a section of the Pipeline that runs directly under the residential Mt. Eyre Manor neighborhood in Washington Crossing, Bucks County, Pennsylvania.

12

Case ID: 250303655

56.     The Mt. Eyre Manor neighborhood is located in Upper Makefield Township, a municipality within Bucks County, Pennsylvania and covers the residential homes on Glenwood Drive, Walker Road, Spencer Road, Crestwood Road and Bruce Road.

57.     Figure 1 below shows the geographic location of the Twin Oaks Pipeline within a portion of Upper Makefield Township. The red line in Figure 1 shows the Pipeline.



Fig. 1: location of the Pipeline within Upper Makefield Township, retrieved from the National     Pipeline     Mapping     System     Public     Viewer.     *See* pvnpms.phmsa.dot.gov/PublicViewer (last accessed Feb. 26, 2025).

58.     Figure 2 below shows the location of the Twin Oaks Pipeline as it runs through and along a portion of the Mt. Eyre Manor neighborhood in Upper Makefield Township, Pennsylvania.

13

Case ID: 250303655

Fig. 2: The Mt. Eyre Manor neighborhood, retrieved from Google Maps, with the approximate location of the Twin Oaks Pipeline overlaid, running parallel to Glenwood Drive.

59.    There is no gas station or other potential source of petroleum byproduct contamination within two miles of the Mt. Eyre Manor neighborhood.

60.    Residents of the Mt. Eyre Manor neighborhood rely on private well water for their water supply, including water used for drinking, bathing, cooking, washing, and gardening, among other uses.

61.    An underground aquifer, which the Twin Oaks Pipeline Leak has now polluted, supplies the water used by residents of the neighborhood.

62.    The same is true for residents of the immediately surrounding area, including, but not limited to, residences on Valley View Drive, Mt. Eyre Road, Taylorsville Road, River Road, Oakdale Avenue, and Maple Shade Avenue, which are other nearby Upper Makefield Township neighborhoods that the Twin Oaks Pipeline also runs underneath.

14

Case ID: 250303655

63. Upper Makefield Township sits in a floodplain, and the Mt. Eyre Manor neighborhood is surrounded on three sides by "Flood Hazard Areas" as defined by the Federal Emergency Management Agency ("FEMA").

64. The Mt. Eyre Manor neighborhood is considered a High Consequence Area ("HCA") pursuant to 49 C.F.R. § 195.450, due to its concentrated population, its proximity to a commercially navigable waterway (the Delaware River), the lack of an adequate alternative drinking water source to the underlying aquifer, and its proximity to ecological resources.

**D.    Known and Reported Odor Complaints Started in September 2023**

   *i.      September 2023 Odor Complaint*

65. On September 25, 2023, PHMSA notified Defendants of an odor complaint referred by the Pennsylvania Department of Environmental Protection ("PADEP"). The original complainants were residents of 128 Walker Road in the Mt. Eyre Manor neighborhood who detected an overwhelming smell that they reported distinctly resembled the smell of gasoline.

66. The residents of 128 Walker Road live directly across the street from the site where the Twin Oaks Pipeline Leak occurred and was eventually discovered though Defendants did not discover the leak until 16 months later.

67. Plaintiffs live at 114 Spencer Road, approximately only 500 feet to the approximate northeast of 128 Walker Road.

68. In the two months prior to the odor complaint, Upper Makefield Township had experienced multiple severe weather events. These weather events included severe flash flooding that occurred in July 2023 and that resulted in the deaths of seven people and forced month-long road closures near the Mt. Eyre Manor neighborhood.

15

Case ID: 250303655

69. The weather events also included substantial rains and heavy winds from Tropical Storm Ophelia that hit Bucks County, Pennsylvania on September 23, 2023.

70. Each of these severe weather events should have triggered proper inspections of the Twin Oaks Pipeline by Defendants pursuant to 49 C.F.R. § 195.414. Defendants, however, did not conduct inspections sufficient to discover any resulting leaks as required by law, nor did Defendants notify PHMSA about their failure to conduct such inspections, which was reckless and negligent.

71. Defendants investigated the September 2023 odor complaint by simply dispatching a technician and a contractor to test for indications of a leak, but the investigation that was conducted was improperly performed in a lackadaisical fashion.

72. Specifically, Defendants' investigation included only testing of the well water of the complainant's residence and three nearby residences, probing the immediately adjacent segment of the pipeline with a photoionization ("PID") gas detector, excavating a single 25-foot segment of nearby pipeline that ran through nearby 121 Glenwood Drive, testing the excavated soil, and performing a static pressure test.

73. Sadly, the excavation stopped short of uncovering the portion of the Pipeline mere feet away where the Pipeline Leak was eventually discovered.

74. When the initial investigation did not result in evidence of a leak, Defendants simply and improperly ceased their investigative efforts. Defendants did not ascertain the source of the odor, and did not conduct any continued monitoring or observation of the area.

75. As history bears out, the Pipeline Leak would eventually be discovered 16 months later across the street from the complainants' home.

*ii.* **June 2024 Odor Complaint**

16

Case ID: 250303655

76. On June 28, 2024, Defendants received yet another odor complaint from a different resident at 108 Spencer Road in the Mt. Eyre Manor neighborhood.

77. In response to the odor complaint, Defendants responded in an even more lackadaisical manner than it did to the first complaint when, in fact, the response should have been more robust since a prior complaint had already been received. Defendants dispatched a single technician to examine the site using a portable 4-gas detector. The technician's equipment did not record a gas detection and the technician did not observe dead vegetation above the Pipeline.

78. Based on the technician's report and nothing else, Defendants ceased their investigative efforts. Defendants did not ascertain the source of the odor, and did not conduct any continued monitoring or observation of the area.

79. Inexplicably, Defendants also neglected to report this odor complaint to PHMSA.

### iii. July 2024 Odor Complaint

80. The following month, on or about July 21, 2024, Defendants received a third odor complaint from a resident at 121 Glenwood Drive in the Mt. Eyre Manor neighborhood, which is immediately across the street from the complainants who lived at 128 Walker Road and made the first complaint detailed above, *and* the precise address where Defendants had excavated a segment of the Twin Oaks Pipeline in September 2023.

81. The complainants from 121 Glenwood Drive reported not only a smell of gasoline or kerosene in their water but also noted a visual change in how their water looked.

82. Again, Defendants' response was improper and lackadaisical, especially accounting for the fact that this was now the third complaint received in a short period of time.

83. In response to this July 2024 odor complaint, Defendants again dispatched only a single technician to examine the site using a portable 4-gas detector. The technician's equipment

17

Case ID: 250303655

did not record a gas detection and the technician did not observe dead vegetation above the pipeline.

84.     Based on the technician's report, Defendants ceased their investigative efforts. Defendants did not ascertain the source of the odor and again failed to implement or conduct any continued monitoring or observation of the area.

85.     Moreover, yet again, Defendants did not report this odor complaint to PHMSA.

86.     Furthermore, Defendants told the residents at 121 Glenwood Drive at the time that there was no petroleum in their water, without conducting proper tests to ascertain this as a fact.

87.     Defendants also claimed to the PADEP that "iron bacteria" was the likely explanation for the smell of gasoline or kerosene and this information was then passed on by PADEP to the residents at 121 Glenwood Drive.

*iv.*     ***November 2024 Odor Complaint***

88.     Four months later, on November 21, 2024, Defendants received a fourth known odor complaint from a resident of 107 Spencer Road in the Mt. Eyre Manor neighborhood, immediately across the street from the prior complainants that lived at 108 Spencer Road.

89.     The homeowners at 107 Spencer Road, who bought their home in 1978, raised their family in the Mt. Eyre Manor community, and lived in the neighborhood for over 45 years, complained that they smelled gasoline in their water. They also noticed that their brand-new drinking glasses had a sheen resembling oil or gasoline after taking them out of the dishwasher.

90.     Startled by this discovery, the homeowners at 107 Spencer Road asked their well company, Bucks County Well Drilling Co., to take samples and send them to an independent laboratory. The samples came back *positive* for gasoline and kerosene.

18

Case ID: 250303655

91.     Nonetheless, once again, Defendants' response was more than insufficient and neglectful.

92.     In response to the fourth known odor complaint received from a neighbor in the direct vicinity of where the Pipeline Leak was eventually discovered, Defendants again dispatched a single technician to examine the site using a portable 4-gas detector. The technician's equipment did not record a gas detection and the technician did not observe dead vegetation above the pipeline.

93.     Defendants performed a four-hour static pressure test to check for lowering pressure indicative of a pipeline leak. The operator reported to Defendants that the results were within acceptable limits although the operator did not report the acceptance criteria used or the results of the pressure test.

94.     Based on the reports of the technician and operator, Defendants ceased their investigative efforts, notwithstanding that there had now been at least four complaints reported since September 2023. Defendants did not ascertain the source of the odor, and did not conduct any continued monitoring, observation, or testing of the neighborhood.

95.     In what was now clearly a systemic pattern, Defendants again did not report this odor complaint to PHMSA.

96.     Discovery and expert testimony will show that Defendants' responses to all of the odor complaints detailed above were far below the standard of care and duties that Defendants owed to the residents of Mt. Eyre Manor and the surrounding neighborhoods, both with respect to the urgency of the situation, the actions that were taken, and the lack of any substantive follow-up., monitoring, and testing.

19

Case ID: 250303655

97. Because of Defendants' lack of a proper response, Defendants never identified a cause of the odor complaints, that is, until the Twin Oaks Pipeline Leak was discovered in January 2025.

**E.    The Twin Oaks Pipeline Leak is Discovered in January 2025**

98. On January 21, 2025, PADEP informed PHMSA that samples obtained from a well at 107 Spencer Road had indicated the presence of kerosene, a major component of JP-8 jet fuel. PHMSA notified Defendants of the test results and directed Defendants to investigate the origin of the kerosene.

99. On or about January 22, 2025, a representative of Defendants, Wassim Saad, parked in Plaintiffs Daniel and Katherine La Hart's driveway in an unmarked truck with a New Jersey license plate and knocked on their door to offer "free well testing" with no explanation why. Shockingly, Mr. Saad did not identify himself to Plaintiffs at this time as a representative of Defendants or tell Plaintiffs about the presence of kerosene at 107 Spencer Road.

100. Plaintiffs declined the offer for "free well testing" because they thought, based upon the lack of information and material omissions provided, that Mr. Saad was a door-to-door salesman offering unneeded services.

101. Shortly thereafter, Plaintiffs noticed that trucks labeled "Energy Transfer" were present in the neighborhood, and Plaintiffs then realized that their community was likely facing a significant issue, although at this time the scope of the issue was unknown.

102. Plaintiffs then contacted Mr. Saad and Defendants took a purported test of Plaintiffs' water on January 24, 2025 by collecting water only from Plaintiffs' faucet.

20

Case ID: 250303655

103.    At this time, the neighbors in the Mt. Eyre Manor neighborhood began to talk with each other about the activity involving Defendants, and Plaintiffs encouraged other residents to get their water tested.

104.    From January 22, 2025 through January 31, 2025, Defendants had a contractor, Groundwater & Environmental Services, Inc. ("GES"), acting on behalf of and as an agent of Defendants, sample the private wells of approximately twenty-five other nearby residences in the neighborhood.

105.    GES confirmed the presence of hydrocarbons in well water at certain properties in the neighborhood including 107 Spencer Road, 108 Spencer Road, and 128 Glenwood Drive.

106.    From January 22, 2025 through January 31, 2025, Defendants proceeded to probe the length of the Twin Oaks Pipeline between 121 Glenwood Drive and 155 Glenwood Drive (approximately 0.7 miles) with a PID gas detector. As with Defendants' prior investigations, the gas detector results were reported as "non-detect."

107.    Despite the failure of Defendants' PID gas detector to identify a leak, on January 31, 2025, Defendants visually observed and confirmed a substantial leak in the Twin Oaks Pipeline when they finally excavated a portion of the Pipeline located on the property at 121 Glenwood Drive, in the backyard of the residents who live there, next to the swimming pool where the residents' family swam prior to the discovery of the leak.

108.    The Pipeline Leak was discovered at 121 Glenwood Drive, the residence directly across the street from 128 Walker Road in the Mt. Eyre Manor neighborhood, where the residents lived who reported the first odor complaint – *16 months prior* – detailed above as the smell of gasoline.

21

Case ID: 250303655

109.   Defendants had finally decided to excavate a portion of the Twin Oaks Pipeline located on the property at 121 Glenwood Drive after they went back and reviewed old maintenance records that had long been available to them. It is not currently known why Defendants did not take this step earlier, or what else these old maintenance records might show once they are produced in this litigation.

110.   Video of the pipeline leak was recorded by one of the residents at 121 Glenwood Drive.

111.   The Pipeline Leak would later be characterized as a "slow drip" from a Type A sleeve installed in 1995, and that had not been properly maintained since.

112.   Type A sleeves are typically used to reinforce pipeline segments or areas of a pipeline that exhibit non-leaking defects such as corrosion or observable dents.

113.   The Twin Oaks Pipeline is reinforced in at least 44 other segments by Type A sleeves installed during the late 1980s and early 1990s, and which are also all at risk of failing, especially if they are not continually and properly monitored and maintained. Defendants failed to continually and properly monitor and maintain the Type A sleeve that was underground at 121 Glenwood Drive in the Mt. Eyre Manor residential neighborhood in Upper Makefield Township, Pennsylvania.

114.   The pipeline industry views Type A sleeves as ineffective at preventing leaks and an insufficient mechanism to reinforce an aging pipeline in danger of leaking. The corrosive nature of petroleum products moving at high pressure inside a pipeline means that dents over time can become cracks through which product can escape, and a sleeve reinforcing the exterior of the pipeline will not prevent leaks in such a scenario.

Case ID: 250303655

115.    For example, in August 2020, a dent in the Colonial Pipeline near Huntersville, North Carolina, which had been previously reinforced in 2004 with a Type A sleeve, developed into an approximately five-foot crack. As here, the operators of the Colonial Pipeline failed to properly monitor and maintain the pipeline and Type A sleeve, and its detection systems failed to detect the crack or the release of any product.

116.    In that instance, an estimated 2,000,000 gallons of product were discharged into the surrounding environment before the pipeline's operators, alerted to the leak by local residents, were able to identify and repair the crack.

117.    In light of this and other similar incidents and their own knowledge and experience as to pipelines and the advantages and drawbacks of certain standard operating procedures and repair equipment, Defendants here knew or should have known that the approximately thirty year-old Type A sleeve situated on the residential property at 121 Glenwood Drive in the Mt. Eyre Manor neighborhood, a community where residents rely on well water for their water needs, was insufficient reinforcement to prevent a discharge from occurring from the Pipeline and especially under or near a residential property and neighborhood.

118.    On January 31, 2025, Defendants notified the National Response Center ("NRC") of the Twin Oaks Pipeline Leak and inexplicably and falsely reported a release of 156 barrels of jet fuel, which is 6,552 gallons.

119.    Despite this initial report that there were 6,552 gallons of jet fuel spilled into a residential neighborhood in Bucks County, Pennsylvania that relies on well water, Defendants have maintained in statements made to residents and regulatory authorities after January 31, 2025, that in fact, Defendants do not know how much product has been released into the environment.

23

Case ID: 250303655

120.    It is highly likely because of the amount of time that the leak was occurring, the size of the leak, the pressure utilized for the Twin Oaks Pipeline, the odor complaints dating back to September 2023, and other evidence, that significantly more than 6,552 gallons of jet fuel and petroleum products was released by Defendants into the environment.

121.    Due to Defendants insufficient, improper, negligent, and reckless conduct alleged herein with respect to their oversight, operation, supervision, maintenance, monitoring, and testing of the Twin Oaks Pipeline, Defendants have no idea when the Pipeline began leaking. It is highly probable that the Pipeline began leaking long before the first odor complaints were reported in September 2023, for the odors to have even been detectable at that time.

122.    The Twin Oaks Pipeline's maximum operating pressure is 1,200 psig (pounds per square inch gauge). On January 31, 2025, when Defendants discovered the leak at 121 Glenwood Drive in the Mt. Eyre Manor neighborhood, it was reported that the Pipeline was operating at 1,100 psig, *i.e.*, approximately 91.6% operating pressure.

123.    PHMSA conducted a preliminary investigation of the Pipeline Leak after it was reported. Based on its investigation, PHMSA concluded that "the Pipeline experienced a leak in a high consequence area for at least 16 months, resulting in the release of jet fuel that has migrated into several adjacent water wells and caused additional impacts to property and the environment."[6]

124.    Defendants have stated repeatedly, in statements to both residents and regulatory authorities, that despite their investigation since discovering the leak, they still do not know when the Pipeline Leak began.

---

[6] Exhibit D, Notice of Proposed Safety Order, Pipeline and Hazardous Materials Safety Administration, CPF No. 4-2025-054-NOPSO (Feb. 13, 2025).

24

Case ID: 250303655

125.    It is probable that the Twin Oaks Pipeline was leaking for a significant period of time prior to the first known odor complaint being made to Defendants in September 2023.

126.    Defendants have stated repeatedly in statements to both residents and regulatory authorities that they do not know whether the Twin Oaks Pipeline is still leaking.

127.    Defendants have not excavated the entire Twin Oaks Pipeline to conduct a visual examination of the Pipeline to determine that it is not leaking, or even excavated the Pipeline sufficient to examine all the Type A sleeves along the Pipeline.

**F.    Defendants' Response and Actions Following Discovery of the Pipeline Leak**

128.    On January 31, 2025, Defendants cut off the segment of the Pipeline where the Leak had been discovered and submitted a repair plan to PHMSA. Defendants had their workers arrive and remove the leaking segment in the middle of the night, without giving notice to residents or to local, state, or federal regulators.

129.    Plaintiffs and the Class members demand immediate access to review and examine the leaking segment of the Twin Oaks Pipeline.

130.    On February 1, 2025, Energy Transfer's Lead Specialist for Public Affairs, Joseph Massaro, issued a written statement confirming they had discovered "product loss" and claiming that the Pipeline was "inactive" at the time the leak was discovered.

131.    This statement means, among other things, that the video of the Pipeline that shows that Pipeline Leak is not indicative of the Pipeline Leak under full pressure conditions.

132.    On February 2, 2025, after receiving approval from PHMSA's Southwest Region Director, Defendants replaced the removed segment of the Pipeline and, without conducting further work to ensure that no other parts of the Pipeline are currently leaking, shockingly rushed to return the Pipeline to service.

25

Case ID: 250303655

**Exhibit A_ Page 62 of 336**

133.   Defendants subsequently began an inadequate and neglectful investigation of the effects of the known Pipeline Leak in a high consequence, residential area.

134.   Defendants began conducting "exposure" testing for the water of nearby residences. But rather than testing the tops of all residents' wells to determine whether any free product – also known as light non-aqueous phase liquid or "LNAPL" – was present, Defendants' exposure testing relied on samples taken from faucets inside the residences post-treatment, and inadequate PID readings.

135.   In at least one instance, when Defendants' retained testing agents, hired by and working on behalf of Defendants, discovered that they had taken a sample directly from a well for testing by mistake, *they threw out the sample and erased the results*.

136.   Defendants' method of exposure testing deviated from the standard protocols for testing groundwater, which universally require testing pre-treatment, and was seemingly designed to limit Defendants' ability to identify the scope and location of the contamination plume resulting from the Pipeline Leak.

137.   Defendants failed to test samples directly from residents' wells for the presence of free product. This is true even though Defendants recently have, at the behest of Plaintiffs and other residents who have retained the undersigned counsel, finally begun to conduct bailer tests of residents' wells to screen for the presence of LNAPL.

138.   Even in situations where Defendants' agents have *visually observed* the presence of LNAPL, they have not universally retained the water from the bailer and have instead in instances deposited it back into the well.

139.   Defendants, moreover, despite being well-aware that their conduct as alleged herein would give rise to residents' legal claims, have failed to properly preserve all evidence of

26

Case ID: 250303655

environmental contamination that they have found during their activities, including by, for example, failing to properly catalog and store all physical materials and things that they have inserted into or withdrawn from residents' wells.

140.    Defendants have not ensured that they and their agents have properly preserved all evidence gathered as a result of Defendants' and GES's activities in the neighborhood following the discovery of the Pipeline Leak. Therefore, Plaintiffs and Class members are entitled to all reasonable adverse inferences that may arise as the result of any failure to properly preserve evidence.

141.    On February 4, 2025, Energy Transfer's Joseph Massaro appeared at the regularly scheduled Upper Makefield Township Board of Supervisors meeting, along with Defendants' other representatives Carl Borkland, Susan Ericson, David Kerwood, and Rahn Monreal. Massaro confirmed the product release and purported to provide an "update" on Defendants' remedial efforts.

142.    On February 6, 2025, at 7:30 p.m., a townhall meeting was held at the Upper Makefield Township Office, where affected residents who live in Mt. Eyre Manor and the surrounding neighborhoods, including Plaintiffs, representatives from Defendants, and representatives from PHMSA, were present.

143.    At this townhall meeting, Defendants provided an update on their efforts to monitor and contain the Pipeline Leak, in which they admitted that their exposure testing had detected hydrocarbons in six neighborhood wells so far.

144.    Defendants also admitted during the meeting that they did not know how much product had been lost or when the Pipeline Leak had begun.

27

Case ID: 250303655

145. Defendants further stated that because the release occurred "in the headwaters" of the Delaware River, it would make sense for any groundwater carrying spilled product to be moving in a northeasterly direction toward the Delaware River. This was the Defendants' best estimation at the time concerning the plume caused by the Pipeline Leak of unknown quantities of jet fuel.

146. At the town hall meeting, Defendants offered only to pay for the installation of carbon filtration systems for any wells where their product was detected, and to pay for the maintenance of such a system for as long as the product is detected in the well.

147. During this townhall meeting, officials from PHMSA stated that they had no confidence in Defendants' ability to identify leaks in the Twin Oaks Pipeline, considering the circumstances surrounding the Pipeline Leak. Residents of the Mt. Eyre Manor neighborhood, including Plaintiffs, called on Defendants to shut down the Pipeline.

148. Defendants refused to shut down the Pipeline.

149. On February 7, 2025, the day after the town hall meeting, Defendants provided a written public update on the Upper Makefield Township website in which they stated that, rather than shutting down operations, they would reduce the Twin Oaks Pipeline's operating pressure to 80%.

150. On February 13, 2025, PHMSA issued a Notice of Proposed Safety Order ("NOPSO") to Defendants. In the NOPSO, PHMSA wrote:

> After evaluating the foregoing preliminary findings of fact, and having considered the characteristics of the pipeline, including prior Type-A sleeve repairs involving dents and other defects; the prior failures of the pipeline; the hazardous nature of the petroleum products, including jet fuel, transported; the uncertainty as to the root cause(s) of the failure; the proximity of the pipeline to residential dwellings and water wells; the existing and potential additional impacts to property, the environment, and wildlife; and the possibility that the same condition(s) that may have caused

28

Case ID: 250303655

the failure remain present in the pipeline and could lead to additional failures; it appears that the continued operation of the Twin Oaks Discharge pipeline system without corrective measures would pose a pipeline integrity risk to public safety, property, or the environment. The conditions and threats described above potentially exist throughout the Twin 7 Oaks Pipeline. Further, Sunoco's apparent inability to effectively detect the leak has potentially exacerbated the impacts of the release over an extended period of time. Accordingly, corrective measures are necessary to mitigate the pipeline integrity risk of the pipeline system to protect public safety, property, and the environment.

151.    PHMSA thereafter issued proposed remedial requirements including reducing operating pressure, implementing plans to assess the integrity of the pipe and of the Type A sleeves along it, conducting a leakage survey, and conducting a root cause failure analysis.

152.    On the evening of February 13, 2025, a second town hall meeting was held at Sol Feinstone Elementary School, Newtown, PA at 7:30 p.m. Affected residents including Plaintiffs, representatives from Defendants, and representatives from PHMSA and state regulators attended the meeting.

153.    During this meeting, residents, including Plaintiffs, demanded that the Twin Oaks Pipeline be shut down. Plaintiff Daniel La Hart provided an opening statement on behalf of Mt. Eyre Manor residents at this meeting.

154.    Defendants then showed residents a map of what they considered to be the geographic area affected by the Pipeline Leak. This map included a line of arrows pointing in the northeastern direction, which were labeled as the "*inferred* groundwater flow direction." (emphasis added).

155.    Defendants stated that areas west and south of the Pipeline Leak were not of concern based on the flow of the groundwater toward the Delaware River. Defendants, however, then admitted that they had not yet installed a single monitoring well or taken any steps to identify the accurate directional flow of groundwater in the area.

29

Case ID: 250303655

156. Defendants' affirmative statements to residents about the identified affected geographic area resulting from the Pipeline Leak at the town hall meetings on February 6 and February 13 were misleading. At the time Defendants made these statements, in fact, Defendants had no idea when the Pipeline Leak first occurred, how long the Pipeline had been leaking into the residential neighborhood, how much product had been discharged into the surrounding underground aquifer and bedrock, whether additional points along the Pipeline were continuing to leak, or the direction or flow rate of the groundwater underlying the point or points of discharge.

157. Defendants intended their statements to induce a false sense of security and confidence in residents, particularly for residents whose homes were not within Defendants' arbitrarily delineated affected geographic area that was not based on adequate investigation or evidence.

158. During the February 13, 2025, town hall meeting, one resident who resided at 128 Walker Road in the affected area and across the street from where the Pipeline Leak was discovered described her experience with her well. Since 2023, she had repeatedly complained to Defendants about her concerns of contamination resulting from the Twin Oaks Pipeline, and Defendants' representatives had repeatedly stated that any oil could not have been coming from the Twin Oaks Pipeline.

159. After the discovery of the Pipeline Leak, when Defendants finally sent a contractor to inspect her well, they discovered *over **twelve feet of jet fuel** on top of the water in her well*, and after pumping the water, *estimated that **fifteen feet of jet fuel** had been accumulating in the well since 2023*. The resident stated that according to Defendants' contractor, *over 22 inches of jet fuel had accumulated in her well **in the past week alone***.

30

Case ID: 250303655

160.    Residents asked Defendants for a guarantee during the February 13, 2025 town hall meeting that the Twin Oaks Pipeline was not still leaking. Defendants responded that they were not able to provide such a guaranty at that time.

161.    On February 18, 2025, PADEP sent Defendants a Notice of Violation.[7] In the Notice, PADEP stated that the release identified on January 31, 2025, has "caused free product and dissolved concentrations of petroleum-related chemicals in potable wells in the neighborhood, with some properties having contamination exceeding DEP's Statewide health standard medium specific concentrations in their drinking water." The Notice advised that the discharge constitutes a violation of the Pennsylvania Clean Streams Law, 35 P.S. § 691.401, and that such a violation amounts to unlawful conduct within the definition of the law and is subject to civil enforcement.

162.    On February 19, 2025, counsel for Defendants responded to the NOPSO issued by PHMSA.[8] Defendants denied and disputed several of the preliminary factual findings contained in the NOPSO. In doing so, Defendants admitted that "there is not sufficient evidence at this time to conclude how long the Affected Pipeline was leaking." Defendants stated that it did not have evidence of an ongoing leak, but also that its investigation was ongoing. Defendants did not state that it had sufficient information to rule out a continuing release of aviation fuel and other contaminants from the Pipeline into the local environment.

163.    On February 27, 2025, a third town hall meeting was held again at the Sol Feinstone Elementary School at 7:30 p.m. Affected residents including Plaintiffs, regulators, local officials, and representatives of the Defendants were present at the meeting.

---

[7] Exhibit E, Notice of Violation, Pa. Dep't Envt'l Protection (Feb. 18, 2025).
[8] Exhibit F, Letter from Haley O'Neill to Bryan Lethcoe (Feb. 19, 2025).

Case ID: 250303655

164.    During the February 27 town hall meeting, Defendant Energy Transfer's Joe McGinn, Vice President of Public Affairs, stated: **"This release happened, and it's our fault that it happened. This was not a third-party damage issue. We recognize that. We apologize for it."** He further stated that Energy Transfer's **"focus and goal is to restore the community to its original state."**

165.    Defendants' representatives also stated during the February 27 town hall meeting that they provided their initial estimate of 156 barrels of product lost based on their understanding that federal law required a reporting of the amount of product lost within 48 hours of discovery of a leak. Defendants *admitted* that at the time they made the representation to PHMSA, they had no factual basis upon which to assert the amount of product lost, and that they continue to lack an evidence-based estimate of the amount of product that has been discharged into the underlying bedrock and aquifer beneath the Mt. Eyre Manor neighborhood, in Upper Makefield Township.

166.    This signifies and demonstrates that Defendants do not maintain proper and adequate leak detection and monitoring systems with respect to the Twin Oaks Pipeline.

167.    On February 28, 2025, Pennsylvania Governor Josh Shapiro wrote a letter to U.S. Transportation Secretary Sean Duffy, requesting expedited action from PHMSA in response to the Pipeline leak.[9] In his letter, Governor Shapiro noted that "Sunoco has not demonstrated adequate ability to detect leaks and take appropriate actions, given what appears to have been a significant delay between the initial indications of a leak and the response."

168.    Governor Shapiro further described the leak as "the latest incident in a long pattern of safety concerns with Sunoco and Energy Transfer pipelines in Pennsylvania."

---

[9] Exhibit G, Letter from Governor Josh Shapiro to Secretary Sean Duffy (Feb. 28, 2025).

Case ID: 250303655

169.    On March 6, 2025, PADEP issued an Administrative Order to Defendants Energy Transfer (R&M), LLC and Sunoco Pipeline, L.P., directing Defendants to respond to the Pipeline Leak and implement certain remedial actions, including the supply of bottled water and the installation of point-of-entry treatment ("POET") systems for certain residents in Upper Makefield Township, Pennsylvania.

170.    PADEP's Order limited the requirement to supply bottled water to only those properties with potable groundwater wells within the Mt. Eyre Manor neighborhood topographic watershed, plus a minimum 500-foot buffer, that have concentrations of VOCs above background concentrations in the area, and limited the requirement to install POET systems to only those properties with potable groundwater wells within the Mt. Eyre Manor neighborhood topographic watershed, plus a minimum 500-foot buffer, that have concentrations of VOCs exceeding the Maximum Contaminant Levels ("MCLs") under Pennsylvania state regulations.

171.    The harm caused by Defendants' actions as alleged herein and the Pipeline Leak is not limited to the contamination of certain residences above MCLs under Pennsylvania state regulations. To the contrary, Plaintiffs and every Class member have the right to clean drinking water and clean soil that are completely free of any contaminant that is found in jet fuel, or at least to background concentrations. Equally, the 500-foot buffer is insufficient to remedy the damages and injuries that Defendants have caused as a result of the Pipeline Leak, as contamination has already been detected beyond this 500-foot buffer.

172.    Judicial intervention is necessary to impose appropriate and reasonable full remedial measures and obligations on Defendants beyond the regulatory measures ordered by the PADEP.

33

Case ID: 250303655

173. According to Defendants' own contracted testing firm, GES, hydrocarbons have been detected in the wells of numerous residences in the Mt. Eyre Manor neighborhood in addition to the six residences that were initially reported.

174. At least five residences have already shown detectable amounts of hydrocarbons above background conditions but below the MCLs for a given hydrocarbon. Defendants' investigation is ongoing, and the number of wells that Defendants know to be impacted continues to increase.

175. Despite this knowledge, to date Defendants have not admitted publicly to the discovery of hydrocarbons in more than six wells in the Mt. Eyre Manor neighborhood.

176. In multiple incidences, residents have requested that GES technicians taking post-treatment samples from their faucets also take pre-treatment samples from their wells for testing. GES technicians repeatedly have responded that they had strict instructions from Defendants not to conduct any testing of well water pre-treatment, and to only take samples from faucets in the residents' homes.

**G.    Environmental Contamination Resulting from the Pipeline Leak**

177. The Pipeline Leak has resulted in the dispersion of multiple known toxic chemicals into the surrounding environment. The full extent and make-up of the contamination is presently unknown.

178. Free standing petroleum or jet-fuel product has been found on the top of the water in some residents' wells.

179. Over twelve feet of free product was found on top of the water in the well at 128 Walker Road, directly across the street from the location of the Pipeline Leak. Defendants' contractors estimated that over fifteen feet of jet fuel had accumulated in the well since 2023.

34

Case ID: 250303655

Moreover, product is still continuing to accumulate in this well despite Defendants' efforts to remove it. Every day since the contamination was initially discovered by Defendants' contractors, more of Defendants' hazardous product has seeped into the well.

180. Free-standing petroleum or jet fuel product was found accumulated on top of the water in several other wells near the site of the leak, including nearly six feet of product in the well at 121 Glenwood Drive and over three feet of product at 107 Spencer Road. Product has been observed on top of the water in the wells of at least fifteen other nearby residences to date.

181. In addition to direct observation of product in their wells, residents continue to report detecting the odor of gasoline in their wells and in their tap water, which, at the very least, is a substantial nuisance that interferes with the residents' enjoyment and use of their properties.

182. For example, the residents at 105 Spencer Road have been smelling gasoline on their property since June of 2024, and at times have been able to taste gasoline in their water.

183. The owner of the residence at 103 Spencer Road also reports having smelled gasoline on his property for a long time and has been able to smell and taste gasoline in his water at various points in the water he uses to drink, cook, and shower.

184. Residents in the affected community feel the stress and anxiety associated with having detectable levels of gasoline taste and odor on their properties and their neighbors' properties. As one resident stated, "every morning, when I turn on my water, it's a concern of mine. Is it my turn to smell fuel and taste it in my water?"[10]

---

[10] Energy Transfer Begins Drilling Recovery Wells on Pennsylvania Street After Fuel Leak Sparked Water, Air Safety Concerns, CBS News (Mar. 19, 2025) (available at https://www.cbsnews.com/amp/philadelphia/news/sunoco-fuel-leak-upper-makefield-pennsylvania/).

35

Case ID: 250303655

185. Other indicia of contamination, including the presence of chemicals and particulates known to be byproducts of petroleum and jet fuel, have been found in the well water and tap water of more residences in the neighborhood.

186. Toxic chemicals and particulates resulting from Defendants' Pipeline Leak have infiltrated the aquifer and bedrock in sufficient quantities to be detected in the water of neighborhood residences, including but not limited to kerosene, benzene, ethylbenzene, isopropylbenzene, dichloroethane, trimethylbenzene ("TMB"), toluene, naphthalene, methyl tertiary-butyl ether ("MTBE"), and lead.

187. There is no potential source of these substances in the surrounding area other than the Twin Oaks Pipeline.

188. Kerosene is one of the most common fuel oils and a major component of jet fuel. Exposure to kerosene can lead to a wide variety of human health consequences, including respiratory issues, vision loss, liver failure, gastrointestinal issues, heart collapse, and skin burning and irritation. Kerosene exposure can also affect the central nervous system, resulting in seizures, comas, migraines, depressions, and other neurological impacts. The International Agency for Research on Cancer ("IARC") considers kerosene a possible carcinogen.

189. Benzene is natural and a highly toxic constituent of petroleum. Due to its high odor recognition threshold, people can be exposed to excessive amounts of benzene in the air or in tap water without knowledge of the exposure. Benzene is a known human carcinogen according to both IARC and the U.S. Environmental Protection Agency ("EPA"). In addition to cancer, benzene exposure can result in the disruption of hematopoiesis (the body's production of blood), suppression of the immune system, and result in both skeletal and neurodevelopmental defects.

36

Case ID: 250303655

190. TMB isomers are produced during the petroleum refining processes and are used as a fuel additive in gasoline. TMB is a neurotoxin and is readily absorbed into the human bloodstream following exposure. TMB exposure can negatively impact a person's short-term memory and motor skills, induce vertigo, and cause nervousness and anxiety. TMB exposure can also cause issues with blood clotting and respiratory function.

191. MTBE, in contrast to other fuel and gasoline constituents, has a strong affinity for water. MTBE dissolves easily into groundwater and can migrate rapidly a great distance from the source of release, meaning it is likely to have a distinct contamination plume from other toxic chemicals released from the Twin Oaks Pipeline. MTBE does not readily biodegrade in water and will persist in the environment until remediated. MTBE at very low concentrations can affect the taste and odor of water and IARC considers it a likely carcinogen. MTBE as a fuel additive was phased out of gasoline in the United States by 2006, due to its associated environmental and health concerns.

192. Lead is a neurotoxin that easily permeates the blood-brain barrier after exposure, and often is difficult to detect in a person until dangerous amounts have accumulated. In adults, lead exposure through drinking water can cause reduced memory, headaches, mood disorders, joint and muscle pains, abdominal pains, and high blood pressure. Lead exposure also negatively affects the reproductive organs and can cause reduced or abnormal sperm counts and increase the risk of miscarriage, stillbirth, or premature births in pregnant women.

193. Symptoms resulting from exposure to these toxic chemicals and other harmful chemicals released from the Twin Oaks Pipeline can take a long time to manifest. Residents of the Mt. Eyre Manor neighborhood and surrounding communities will have to closely monitor their health, potentially indefinitely, and have and will continue to experience the accompanying fear

37

Case ID: 250303655

and anxiety that comes from not being able to trust the safety of the water they drink or the air that they breathe because of Defendants' Pipeline Leak.

**H.    Defendants' Messaging Since the Pipeline Leak Has Not Matched Reality**

194.    Defendants have been engaged in a multifaceted public relations campaign to downplay the severity of the Pipeline Leak and its actual and potential harms. Defendants' messaging, however, has not matched reality.

195.    For example, Defendants have now suggested that the Pipeline Leak may have happened right before it was discovered in January 2025, despite residents smelling and reporting the odor of gasoline since at least September 2023, 16 months earlier.

196.    Defendants have also now suggested that the Pipeline Leak was a "pinhole" and that it spilled 156 barrels or less. In reality, Defendants have admitted that they lacked a valid basis for their initial estimate of 156 barrels and have conceded that they rushed to provide a number to the government without the applicable information necessary to determine the actual volume of lost aviation fuel and other petroleum products.

197.    Because of Defendants' failure, negligence, and recklessness in failing to have a proper leak detection and monitoring system in place for the Twin Oaks Pipeline, Defendants have no way to measure the amount of product that spilled into the environment from the Twin Oaks Pipeline in the Mt. Eyre Manor neighborhood.

198.    Moreover, the Pipeline Leak, when discovered, showed visibly that the Leak did not result from a "pinhole" as Defendants suggested, but rather, evidenced a leak such as from a water fountain, and that was with substantially reduced or no pressure applied to the Pipeline at the time.

38

Case ID: 250303655

199.    Defendants further represented to residents in the Mt. Eyre Manor neighborhood when they were purchasing their homes that Defendants had instituted state of the art leak detection equipment with respect to the Pipeline, such that a leak like the Pipeline Leak here could never occur. These representations by Defendants to residents were false and misleading as demonstrated by the occurrence of the Pipeline Leak and Defendants' actions and follow up (or lack thereof) in response to multiple odor complaints that began at least as early as September 2023.

200.    In fact, Defendants failed to have proper leak detection and monitoring systems in place with respect to the Twin Oaks Pipeline.

201.    Defendants claimed that their leak detection systems for the Pipeline were functional, but in reality, and despite residents pointing out an issue for 16 months, making numerous odor complaints, no computer system or ground testing employed by Defendants detected any leak, and the Pipeline Leak was only detected and located when Defendants went back to review old maintenance records and then happened to excavate the portion of the Twin Oaks Pipeline where the leak occurred. Defendants would not have identified the Pipeline Leak except by actually digging up the Pipeline, which facts do not suggest or support that Defendants had an adequate leak detection and monitoring system in place.

202.    Defendants have claimed that Type A sleeves are structurally sound and that they visually inspected six such sleeves, but at least 44 Type A sleeves exist on the Twin Oaks Pipeline, and many more are believed to have not been physically inspected by way of excavation.

203.    Crucially, Defendants also claimed to make a commitment to future public engagement, community, outreach, and continued participation in public meetings in Upper Makefield Township. In reality, Defendants have invoked "confidentiality" and vague "national security" concerns to deny affected residents with access to information and facts about the

39

Case ID: 250303655

Pipeline Leak. Defendant failure to engage has only increased since the residents have hired legal counsel to protect their interests.

204.   Defendants' conflict between its public representations and its internal policy or preference to withhold information came to a head at the latest town hall meeting that took place on March 11, 2025. At this meeting, Defendants shut down any attempt to receive questions from the public, claiming that Defendants could no longer continue to provide information because some residents had retained legal counsel. Defendants went so far as to offer one-on-one meetings only with residents that were *not* represented by counsel. This was a transparent scare tactic to discourage unrepresented residents from retaining legal counsel, and further reflects Defendants' insensitivity to the crisis unfolding in the affected community, and the failure to take responsibility.

205.   The breach in the Pipeline and resulting Pipeline Leak is the direct consequence of Defendants' reckless and negligent actions with respect to the oversight, operation, supervision, maintenance, monitoring, and testing of the Twin Oaks Pipeline.

206.   Moreover, Defendants have continued to transport highly corrosive and toxic products at extremely high pressures through the Twin Oaks Pipeline – which when installed was not designed for those pressures – in spite of their knowledge that (a) the Pipeline is nearly 70 years old and had a history of cracks; (b) that there was a previously identified dent in the Pipeline at the location of the crack which was reinforced only by an approximately 30-year-old exterior sleeve which has been known to have problems from past experience; and (c) that did not have a proper monitoring and leak detection system.

207.   *For over 16 months*, despite their knowledge that the Pipeline was in danger of corrosion and cracking, Defendants failed to properly respond to nearby odor complaints (meaning within hundreds of feet) in a manner reasonably likely to detect a leak and had no sophisticated

40

Case ID: 250303655

leak detection equipment in place to do so, notwithstanding that Defendants were operating the Twin Oaks Pipeline in a residential neighborhood.

208. In response to multiple odor complaints, Defendants presumed that no breach in their Pipeline existed based solely on a lack of abnormal dead vegetation around the Pipeline and the failure of a portable gas monitor to detect fuels in the surrounding air.

209. Facts, however, confirm the neglectful inadequacy of Defendants' leak-detection measures as they employed the above insufficient measures and concluded a non-detect based on them immediately prior to excavating the Twin Oaks Pipeline in the Mt. Eyre Manor neighborhood and visually confirming the crack and Pipeline Leak.

210. Since discovering the Pipeline Leak in January 2025, Defendants have failed to take proper and reasonable actions to facilitate an understanding of the extent and nature of the discharge and resulting contamination. For example, Defendants, who have vast and virtually unlimited resources, failed to test samples of water taken directly from the wells of nearby residents for the presence of hazardous substances.

211. Defendants have further directed their contractors to avoid taking full and broad testing measures, despite knowing that such measures are reasonably necessary to identify the scope of the contamination plume and to ultimately protect the health, safety, and welfare of nearby residents.

212. Despite failing to determine whether any ongoing leaks persist in the Pipeline, Defendants restarted operation of the Twin Oaks Pipeline on February 2, 2025, and have continuously operated the Pipeline since that date.

41

Case ID: 250303655

## I.    Harm to Plaintiffs and Class Members

213.    Plaintiffs and Class members have been severely and negatively impacted and harmed by Defendants' conduct.

214.    The impacted community relies on well water drawn from the underlying aquifer for their water needs. Numerous residents have found Defendants' product, jet fuel, or other petroleum products, floating on top of and contaminating their private wells, with multiple residents having significant amounts of jet fuel accumulated in their wells.

215.    Preliminary testing has shown that water samples collected from nearby homes have tested positive for petroleum hydrocarbons and/or other chemicals commonly found in jet fuel and petroleum products.

216.    The Pipeline Leak has and will continue to cause financial harms to Plaintiffs and Class members, including the expenditure of all out-of-pocket costs resulting from the Pipeline Leak that must be reimbursed by Defendants.

217.    Examples of these out-of-pocket costs include, without limitation:

    a.    the costs to engage and pay contractors, testing companies, and inspectors;

    b.    the costs of installation of remedial or additional water treatment systems;

    c.    the costs of purchasing filters associated with water treatment systems;

    d.    the costs of damage and remediation to private wells;

    e.    the costs of remediation of soil;

    f.    the costs of remediating other damages caused by the Pipeline Leak;

    g.    the costs of remediating and/or replacing pipes and fixtures that have been contaminated as a result of the Pipeline Leak;

    h.    the costs of temporary housing;

42

Case ID: 250303655

i. the costs of commuting to other locations for the purpose of showering or doing laundry;

j. reimbursement of mileage associated with attending meetings concerning the Pipeline Leak;

k. the cost of any increased insurance premiums;

l. the cost of lost time-value from having to take off work due to the Pipeline Leak;

m. the cost of childcare while attending meetings related to the Pipeline Leak; and

n. the cost of any medical costs incurred by Plaintiffs related to the Pipeline Leak.

218. Defendants are responsible to pay all past and future costs associated with complete environmental restoration and remediation of all contamination caused by their Pipeline Leak, and to all property, water, and air, including, without limitation, to the environment, to Plaintiffs' and Class members' real and personal property, to wells that have been contaminated, to pipes that have been contaminated and need to be replaced, to fixtures that have been contaminated and need to be replaced, to soil that has been contaminated, to gardens that have been contaminated, and to all other property belonging to Plaintiffs and Class members that has been affected by the Pipeline Leak.

219. Plaintiffs and Class members who own their homes have also suffered from diminution of the value of their residences caused by the Pipeline Leak.

220. Some Class members have already had potential buyers walk away from a potential sale as a result of the Pipeline Leak.

43

Case ID: 250303655

221. Plaintiffs and Class members have suffered from the loss of use and enjoyment of their real and personal property caused by the Pipeline Leak.

222. Plaintiffs and Class members have suffered increased anxiety caused by the Pipeline Leak.

223. Exposure to the substances released from the Pipeline, whether through ingestion, inhalation, or dermal exposure, places all affected residents at increased risk of severe health impacts, including cancer, thus necessitating medical monitoring.

**J.    Harm Suffered by Plaintiffs Daniel and Katherine La Hart**

224. Plaintiffs Daniel La Hart and Katherine La Hart moved to the Mt. Eyre Manor neighborhood in 2016 and live in their home with their two young children.

225. As such, Plaintiffs are Pennsylvania residents.

226. Plaintiff Daniel La Hart, in addition to being Katherine's husband and father to their children, is a highly educated individual who works in the intelligence community, serving as an Intelligence Superintendent (Chief Master Sergeant rank) for the New Jersey Air National Guard and as a director of data science for a company in the private sector. Daniel is also a former member of the U.S. Air Force Reserve and a former firefighter.

227. Plaintiff Katherine La Hart, in addition to being Daniel's wife and mother to their children, has a Ph.D. in business administration and works in sales recruitment and onboarding at a Fortune 500 insurance and financial services company.

228. Prior to learning of the Pipeline Leak, Plaintiffs were in love with their community and felt that their home located at 114 Spencer Road was their "forever home" where they would live for a lifetime.

44

Case ID: 250303655

229.    Plaintiffs used their well water for everything including drinking, cooking, washing dishes and clothes, showering (indoors and outdoors), baths for their children and animals, watering their gardens, cleaning the cars, filling their pool, letting their children run in the hose water and down their water slide, and providing water to their dog, cat, and chickens to drink.

230.    In late 2024, Plaintiffs invested approximately $150,000.00 to pay for a series of renovations to their home that they scheduled to start in April 2025, including the installation of new windows, siding, doors, replastering the pool, and more, because they wanted to invest in their forever home and their community that they loved.

231.    The Pipeline Leak has caused Plaintiffs to suffer out-of-pocket economic losses including, among other things, significant childcare costs, mileage associated with attending meetings concerning the Pipeline Leak, and significant lost time-value from having to take off work to attend meetings, be present for testing, and to perform community outreach due to the Pipeline Leak.

232.    The Pipeline Leak has caused Plaintiffs to suffer diminution to the value of their real property. The presence of the Pipeline Leak and resulting environmental contamination has placed a stigma on the Mt. Eyre Manor and surrounding affected communities that has decreased the value of their property.

233.    It is likely that Plaintiffs (and Class members) are now overpaying property taxes as a direct result of the diminution of value to their property caused by Defendants' conduct.

234.    The Pipeline Leak has caused 114 Spencer Road to go from being Plaintiffs' idyllic forever home to an albatross that Plaintiffs will struggle to sell for close to its fair market value, which was over $1 million prior to Defendants' Pipeline Leak. Plaintiffs estimate that they have suffered diminution of value of their home in the tens of thousands or hundreds of thousands of

45

Case ID: 250303655

dollars. Who would want to purchase a home in the Mt. Eyre Manor neighborhood given the known existence of the Pipeline Leak and resulting contamination?

235. But at the same time, as a direct result of the Pipeline Leak, Plaintiffs, like other Class members, have been forced to consider the possibility of selling what they thought was their forever home and moving to another location that has not experienced the type of harms that have devastated Mt. Eyre Manor. Plaintiffs do not want to confront or deal with the risk that the water in their neighborhood and their home is dangerous and putting them and their family, children, and guests at risk, and have been unfairly forced by Defendants to think about this every day, which is causing Plaintiffs severe mental anguish.

236. Moving would cause significant hardship to Plaintiffs and their young children. Plaintiffs would also incur significant expenses by having to uproot themselves and move to a comparable home in a comparable community.

237. With respect to Plaintiffs' private well, the Pipeline Leak has caused irreparable damage to Plaintiffs' faith in their ability to fully use and enjoy their water.

238. Plaintiffs' well water has already tested positive for MTBE and lead above background concentration levels and Plaintiffs are awaiting additional testing results.

239. It will always be on the forefront of Plaintiffs' minds that the plume of the Pipeline Leak could affect their property at any time, or that the Pipeline could leak again at any point in time, and/or that the Pipeline could have additional undiscovered leaks, and so Plaintiffs could be putting the health of their family, children, friends, guests, and pets at risk merely by continuing to live at 114 Spencer Road.

240. Worsening the situation, Defendants have begun buying residential homes in the Mt. Eyre Manor neighborhood, starting with 108 Spencer Road which is only two houses away

46

Case ID: 250303655

from Plaintiffs' home, for the purpose of drilling additional monitoring and/or recovery wells as a direct result of the Pipeline Leak. These activities by Defendants are a nuisance to Plaintiffs and Class members in the neighborhood and are interfering with their use and enjoyment of their property, as well as further depreciating the affected geographic area.

241.    Defendants' activities at 108 Spencer Road will soon become the epicenter for noisy, odorous, and highly bothersome activity that will disturb and disrupt the daily lives of the Plaintiffs and Class members, all as a result of Defendants' Pipeline Leak.

242.    Defendants are currently attempting to purchase additional homes in the Mt. Eyre Manor neighborhood to conduct monitoring and recovery activities with respect to the Pipeline Leak, which will further cause nuisance and further diminish the value of the neighborhood.

243.    Plaintiffs are fearful that Defendants will continue to buy additional nearby homes and that any home bought by Defendants will eventually lay vacant and be a nuisance to the community, further driving down property values.

244.    For the reasons alleged herein, Defendants' Pipeline Leak has devastated the Mt. Eyre Manor neighborhood and surrounding affected communities. While Defendants have publicly accepted responsibility for the Pipeline Leak, they have not accepted their corresponding responsibilities to compensate Plaintiffs and Class members for all the harms that they have suffered as a direct result of Defendants' conduct.

## CLASS ACTION ALLEGATIONS

245.    Plaintiffs bring the class action allegations in this Complaint for all environmental restoration and remediation, economic losses suffered by Plaintiffs and Class members, medical monitoring, injunctive relief, and declaratory relief.

47

Case ID: 250303655

246.     Plaintiffs bring this action on behalf of themselves and on behalf of the following

Class pursuant to Pennsylvania Rules of Civil Procedure 1702, 1708 and 1709:

> All Pennsylvania citizens who owned rented, and/or resided in real
> properties in Pennsylvania within a one mile radius of 121
> Glenwood Drive, Washington Crossing, Pennsylvania (40.271265,
> -74.876153), as represented in Figure 3 below, during the time
> period from September 1, 2023 to the present (the "Class").



Figure 3.

247.     Excluded from the Class are Defendants and their subsidiaries or affiliated entities,

as well as any individuals who resided at the following addresses in Upper Makefield Township

since September 1, 2023: 121 Glenwood Drive; 128 Glenwood Drive; 128 Walker Road; 105

Spencer Road; 107 Spencer Road; and 108 Spencer Road.

248.     Plaintiffs reserve the right to further define and modify the definition of the Class

following further factual investigation and discovery.

48

Case ID: 250303655

249.    **Numerosity.** Members of the Class are so numerous that joinder is impracticable. Plaintiffs estimate there are at least one thousand members of the Class. As such, a class action is superior to other methods of adjudication due to its capacity for efficiency and judicial economy.

250.    **Typicality.** Plaintiffs' claims for environmental restoration and remediation, economic damages, medical monitoring, injunctive relief, and declaratory relief are typical of the claims of the Class members. Plaintiffs and all Class members have been damaged by the same wrongful conduct by Defendants.

251.    Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiffs coincide with, and are not antagonistic to, those of the Class. Accordingly, and by proving their own claims, Plaintiffs will prove other Class members' claims as well.

252.    **Adequacy of Representation.** Plaintiffs are members of the Class. Plaintiffs are represented by the undersigned counsel who are experienced and competent in the prosecution of class actions involving chemical/toxin contamination. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiffs can and will fairly and adequately represent the interests of the Class and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

253.    **Commonality and Predominance.** There are numerous questions of law and fact common to the Class that predominate over any individual issue, including, but not limited to:

a.    Whether Defendants' conduct as alleged herein violates the law as stated in the Causes of Action set forth below that are applicable to the Plaintiffs and the Class;

b.    Whether Defendants owed a duty to the Class;

c.    Whether Defendants breached any duties owed to the Class;

49

Case ID: 250303655

d.    Whether Defendants were negligent and/or reckless in failing to properly and safely oversee the operation, supervision, maintenance, monitoring, and testing of the Pipeline;

e.    Whether Defendants allowed a release of toxic and hazardous substances from the Pipeline into the underlying bedrock and aquifer under where the Pipeline Leak occurred or within the plume area of the Pipeline Leak;

f.    Whether the release or threat of release of toxic and hazardous substances from Defendants' Twin Oaks Pipeline reduced or diminished the value of the Class members' real property;

g.    Whether the release or threat of release of toxic and hazardous substances from Defendants' Twin Oaks Pipeline deprived the Class of the rights to use and benefit from their real property interest, free of interference; and

h.    The appropriate measure of restitution and/or measure of damages to the Class members.

254.    The questions of law and fact common to the Class predominate over any questions of law that may affect only individual class members, because Defendants acted on grounds generally applicable to the entire Class.

255.    **Superiority.** Class treatment is a superior method for the fair and efficient adjudication of the economic damages associated with this controversy because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a similar forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense. The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on

50

Case ID: 250303655

claims that likely would be impracticable to pursue individually, substantially outweigh any difficulties that may arise in the management of the class aspects of this action.

## CAUSES OF ACTION

256.    All of Plaintiffs' causes of action, whether asserted individually or on behalf of the Class, are brought against all Defendants.

### COUNT I
### NEGLIGENCE
### (Individually and on Behalf of the Class)

257.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

258.    Defendants' actions as alleged herein were negligent.

259.    Defendants are responsible for owning, overseeing, operating, supervising, and maintaining the Twin Oaks Pipeline, and are responsible for its safe operations, including, without limitation, by incorporating an appropriate monitoring and leak detection system.

260.    Defendants failed to use reasonable care in the oversight, operation, maintenance, hiring, monitoring, and repair of the Twin Oaks Pipeline and continued to transport hazardous and toxic substances through the Pipeline without ensuring that it was operating in a safe condition.

261.    Defendants failed to use reasonable care in responding to multiple odor complaints over a period of at least 16 months and detecting whether a leak in the Pipeline had occurred.

262.    Defendants failed to use reasonable care in identifying the scope of the leak or of the resulting pollution plume once the Pipeline Leak had been identified.

263.    Defendants failed to use reasonable care to contain the plume and resulting damages caused by the Pipeline Leak.

264.    Defendants failed to use reasonable care in employing a safe and reliable monitoring and leak detection system with respect to the Pipeline.

51

Case ID: 250303655

265. Defendants knew or should have known that their failure to properly operate, maintain, and repair the Pipeline, and to respond to the Pipeline Leak, would allow the release of dangerous and toxic substances into the environment in a residential neighborhood, and, as a result, contaminate the environment and cause the residents of the affected geographic area to suffer damages as alleged herein.

266. Defendants knew or should have known that their failure to exercise reasonable care in responding to the Pipeline Leak would impede the ability of regulators and affected residents to understand the scope of the danger and to effectively mitigate its impacts.

267. Defendants' negligence was a substantial factor in bringing about real and personal property damage, environmental contamination, economic losses, and diminution of property values, to Plaintiffs and the Class members.

268. Defendants' negligence was a substantial factor in bringing about physical personal injury and emotional distress and anxiety to Plaintiffs individually. Plaintiffs' claims for emotional distress damages are brought individually on behalf of Plaintiffs.

269. Defendants' negligence was a substantial factor in bringing about the need for medical monitoring for residents affected by the Pipeline Leak.

270. As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs and the Class members have suffered damages as alleged herein.

**COUNT II**
**GROSS NEGLIGENCE**
**(Individually and on Behalf of the Class)**

271. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

272. Defendants owed a legal duty to Plaintiffs and the Class, and Defendants breached that duty.

52

Case ID: 250303655

**Exhibit A_ Page 89 of 336**

273. Defendants' breaches as described herein demonstrate an extreme departure from the standard of care for ensuring the safe operation of a hazardous liquids pipeline.

274. Defendants' efforts to prevent the Pipeline Leak and to respond to the Pipeline Leak once identified, as alleged herein, including but not limited to Defendants' misrepresentations as to the amount of product lost and the continuing safety of the Pipeline, demonstrate a gross failure to exercise even scant care with respect to the safety of nearby residents and their property.

275. As a result, Plaintiffs and the Class have been damaged as alleged herein.

## COUNT III
## NEGLIGENCE PER SE
### (Individually and on Behalf of the Class)

276. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

277. The actions of Defendants as set forth herein constitute negligence per se.

278. Defendants had a duty to comply with numerous statutes and regulations designed to prevent a public harm and failed to do so. The statutes that Defendants did not comply with include, without limitation, 35 P.S. § 691.401 (Clean Streams Law), and 49 U.S.C. § 60101 *et seq.* (Pipeline Safety Act).

279. The purpose of the Pennsylvania Clean Streams Law is the "prevention and elimination of water pollution" in order to promote the "economic future of the Commonwealth." 35 P.S. § 691.4.

280. Defendants breached their duty under the Clean Streams Law when they allowed the discharge of toxic substances from the Pipeline into the waters of the Commonwealth. 35 P.S. § 691.401.

281. The purpose of the Pipeline Safety Act, and of regulations promulgated pursuant to the Act, is to "provide adequate protection against risks to life and property posed by pipeline

53

Case ID: 250303655

transportation and pipeline facilities." 49 U.S.C. § 601012(a). The Secretary of Transportation promulgates minimum safety standards pursuant to the Act, which apply to any and all owners and operators of pipeline facilities. *Id.*

282. Defendants breached their duties under the Pipeline Safety Act when they failed to comply with the minimum safety standards proscribed by the Secretary of Transportation pursuant to the Act. Specifically, Defendants' breaches include, without limitation, the fact that they: (a) failed to maintain an effective system for detecting leaks in violation of 49 C.F. R. § 195.444; (b) failed to take measures necessary to prevent and mitigate the consequences of a pipeline failure that could affect a high consequence area in violation of 49 C.F.R. § 195.452; and (c) failed to detect conditions that could adversely affect the safe operation of the Pipeline within 72 hours of an extreme weather event in violation of 49 C.F.R. § 195.414.

283. The purposes of the aforementioned statutes are to protect the interests of Plaintiffs and the Class.

284. As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs and the Class have suffered damages as alleged herein.

**COUNT IV**
**STRICT LIABILITY – ABNORMALLY DANGEROUS**
**OR ULTRAHAZARDOUS ACTIVITY**
**(Individually and on Behalf of the Class)**

285. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

286. Defendants' actions as alleged herein constitute an abnormally dangerous and/or ultrahazardous activity.

287. Defendants' transportation of petroleum products through a pipeline that was poorly reinforced by thirty-year old A sleeves involves a high degree of risk and the exercise of reasonable care cannot eliminate the risk inherent in operating the Pipeline.

54

Case ID: 250303655

288.  Defendants' transportation of petroleum products was solely for Defendants' business purposes.

289.  Defendants knew and understood that there was a high risk that their petroleum products and other chemicals, toxins, and particulates could contaminate the environment of the nearby neighborhoods, including the risk of contaminating the only source of clean water for residents, and, thereby, cause residents to suffer personal injuries, property damage, environmental contamination, economic losses, diminution of property value, the need for medical monitoring, and other harms as fully alleged herein.

290.  Defendants' transportation of petroleum products, toxins, and particulates through a pipeline that was poorly reinforced by thirty-year old A sleeves caused serious harm to Plaintiffs' and Class members' persons, chattel, and property, including both real and personal property, as alleged herein.

291.  As such, Defendants are strictly liable to Plaintiffs and the members of the Class.

292.  As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff and the Class have suffered damages as alleged herein.

**COUNT V**
**PUBLIC NUISANCE**
**(Individually and on Behalf of the Class)**

293.  Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

294.  Defendants' conduct constitutes a public nuisance pursuant to 35 P.S. 691.401.

295.  Specifically, the discharge of toxic substances, odors, and gases from the Twin Oaks Pipeline as alleged herein into underlying bedrock and aquifer, as well as to groundwater, air, soil, private wells, homes, and other property, have caused particular injuries to Plaintiff and the Class as alleged herein.

55

Case ID: 250303655

296. Plaintiffs and the Class are entitled to damages as a result thereof.

## COUNT VI
### PRIVATE NUISANCE
### (Individually and on Behalf of the Class)

297. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

298. Defendants' conduct allowed toxic substances to invade the private use and enjoyment of Plaintiffs' land and property.

299. Defendants' conduct allowed offensive odors and gases to invade and disrupt the private use of Plaintiffs' land and property.

300. The invasion of Plaintiffs' land by Defendants' product, toxic substances, and resulting odors was the foreseeable and proximate result of Defendants' negligent and reckless conduct.

301. Plaintiffs have suffered injury to the use and enjoyment of their home due to the presence of toxic substances in the water and soil on Plaintiffs' land and the substantial risk of the future presence of such substances.

302. Plaintiffs are entitled to damages as a result thereof.

## COUNT VII
### TRESPASS
### (Individually and on Behalf of the Class)

303. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

304. Defendants' conduct caused their hazardous and toxic product to intrude into the water and onto the land of Plaintiffs' property. Defendants further failed to take actions to identify the scope of the intrusion and to remove their product from Plaintiffs' property.

56

Case ID: 250303655

305.   Defendants knew or should have known that their failure to maintain safe operations of the Twin Oaks Pipeline and to effectively investigate odor complaints for possible leaks would result in the intrusion of their product on Plaintiffs' property.

306.   Defendants' failure to identify and remove their product from Plaintiffs' property after being made aware of the intrusion constitutes a separate and continuing trespass.

307.   Plaintiffs are entitled to damages as a result thereof.

## COUNT VII
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Individually)

308.   Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

309.   Defendants' conduct negligently inflicted emotional distress on Plaintiffs.

310.   Defendants owed Plaintiffs a duty of care to ensure that they did not suffer from serious emotional distress and mental anguish.

311.   Defendants breached their duty to Plaintiffs by both their actions and inactions.

312.   As a direct and proximate result of Defendants' breach, Plaintiffs have suffered severe emotional injury.

313.   As a result, Plaintiffs have been damaged as alleged herein.

## COUNT IX
## MEDICAL MONITORING
### (Individually and on behalf of the Class)

314.   Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

315.   Plaintiffs and their children were significantly exposed to toxic and hazardous substances, and they bear a substantial risk of future exposure to such substances because of Defendants' repeated failures to prevent the discharge of the same substances into Plaintiffs' soil, water, and property (both real property and personal property).

57

Case ID: 250303655

316.    The exposure to these dangerous substances is such that Plaintiffs and their children have been placed at an increased risk of contracting latent illness and disease, including but not limited to cancer and other serious diseases and illnesses, and as such requires medical monitoring which Defendants are responsible for providing and paying for.

317.    Monitoring and testing procedures exist for cancer and other diseases and illnesses associated with exposure to the aforementioned hazardous substances, making the early detection and treatment of the diseases possible and beneficial.

318.    As a result, the Court should establish a Court-supervised and administered trust fund and medical monitoring regime to compensate Plaintiffs for their economic damages.

## PRAYER FOR RELIEF

319.    Plaintiffs and Class members seek the following relief:

a.    All compensatory damages and other damages as alleged herein;

b.    Medical monitoring for Plaintiffs and the Class members;

c.    Punitive damages where allowable;

d.    Pre- and post-judgment interest as allowed by law;

e.    A declaratory judgment that Defendants are responsible for the Pipeline Leak, and responsible for all past and future costs to fully restore and remediate all environmental and other harms caused by Defendants to Plaintiffs and the Class;

f.    Attorneys' fees and costs pursuant to any applicable statutes and/or regulations;

g.    Equitable and injunctive relief including:

i.    Notice to all affected persons of the Pipeline Leak and potential dangers and risks presented by the Pipeline Leak;

58

Case ID: 250303655

ii. The enjoinment of further operations of the Twin Oaks Pipeline until Defendants are able to fully guarantee its safe operation;

iii. Provision of full water supply for all homes in the Class;

iv. Provision of temporary housing and all associated costs to those who reasonably request it as a result of the Pipeline Leak;

v. Installation of a best-in-class leak detection system for the Twin Oaks Pipeline that can actually detect – and guarantee that it will detect – problems in real time;

vi. Full restoration and remediation of all environmental contamination including but not limited to groundwater, soil, and air, to background concentrations; and

h. All other relief this Court deems necessary, just and proper.

## DEMAND FOR TRIAL BY JURY

320. Plaintiffs hereby demand a jury trial for all claims so triable.

Dated: March 27, 2025

Respectfully submitted,

Shanon J. Carson (Bar No. 85957)
Y. Michael Twersky (Bar No. 312411)
Joseph E. Samuel, Jr. (Bar No. 327645)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: 215-875-4656
Email: scarson@bm.net
Email: mitwersky@bm.net
Email: jsamuel@bm.net

59

Case ID: 250303655

Docusign Envelope ID: F1ECD0CA-7CE0-4A36-ACC4-E894C321F063

## VERIFICATION

The undersigned plaintiff, DANIEL LA HART, herein avers that the statements of fact contained in the foregoing CLASS ACTION COMPLAINT are true and correct to the best of his information, knowledge, and belief, and are made subject to the penalties of 18 Pa. C.S.A. § 4904, relating to unsworn falsification to authorities.

Dated: 3/26/2025

DocuSigned by:

*Daniel La Hart*

DANIEL LA HART

Case ID: 250303655

Docusign Envelope ID: F1ECD0CA-7CE0-4A36-ACC4-E894C321F063

## VERIFICATION

The undersigned plaintiff, KATHERINE LA HART, herein avers that the statements of

fact contained in the foregoing CLASS ACTION COMPLAINT are true and correct to the best

of her information, knowledge, and belief, and are made subject to the penalties of 18 Pa.

C.S.A. § 4904, relating to unsworn falsification to authorities.

Dated: 3/26/2025

DocuSigned by:

KATHERINE LA HART

Case ID: 250303655

**Exhibit A_ Page 98 of 336**

IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

*Filed and Attested by the
Office of Judicial Records
27 MAR 2025 04:24 pm
S. GILLIAM*

La Harte et al
_____
Plaintiff(s)

Case Number: 250303655 _____

v.

Control Number: _____

Sunoco Pipeline, LP et al
_____
Defendant(s)

**AFFIDAVIT OF SERVICE**

I, _Michael A DiPalo_ , hereby certify that on _3/27/2025_ ,
(Print Name)                                     (Date)

I served a copy of the following documents: **(select all that apply)**

[✔] Complaint / Statement of Claim              [ ] Notice of Appeal

[ ] Rule to File Complaint                      [ ] Rule to Show Cause

[ ] Motion/Petition: _____
    Civil Cover Sheet
[✔] Other: _____

upon the following parties:

Plaintiff(s): _____
              Sunoco Pipeline LP  and Energy Transfer (R&M) LLC
Defendant(s): _____

Other: _____

by: **(select the type of service used to serve the documents)**

[ ] Certified Mail                  [ ] Posting

[ ] Regular Mail                    [ ] Other: _____

[✔] Personal Delivery  By delivering a copy of the Complaint and Cover Sheet to their agent,
    Corporation Service Company, 5235 N Front St., Harrisburg, PA 17110

3/27/2025
_____          _____
Date                                        Signature

(Affidavit of Service Form 2/27/2023)

Case ID: 250303655

Docusign Envelope ID: 4C6E9D41-D4CD-4E22-AD4B-08F05747CCD2

**IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION - CIVIL**

*Filed and Attested by the Office of Judicial Records 27 MAR 2025 04:45 pm S. GILLIAM*

La Hart et al
_____
**Plaintiff(s)**

v.

Sunoco Pipeline, LP et al
_____
**Defendant(s)**

**Case Number:** 250303655 _____

**Control Number:** _____

**AFFIDAVIT OF SERVICE**

I, _____Jill Ceresini_____, hereby certify that on _____3/27/2025_____,
　　　*(Print Name)*　　　　　　　　　　　　　　　*(Date)*

I served a copy of the following documents: **(select all that apply)**

[✓] Complaint / Statement of Claim　　　　[ ] Notice of Appeal

[ ] Rule to File Complaint　　　　　　　　[ ] Rule to Show Cause

[ ] Motion/Petition: _____

[✓] Other: Civil Cover Sheet _____

upon the following parties:

Plaintiff(s): _____

Defendant(s): Energy Transfer. LP _____

Other: _____

by: **(select the type of service used to serve the documents)**

[ ] Certified Mail　　　　　　　　　　[ ] 　Posting

[ ] Regular Mail　　　　　　　　　　　[ ] Other: _____

[✓] Personal Delivery　By delivering a copy of the Complaint and Cover Sheet to its agent,

Corporation Service Company, 5251 Little Falls Drive, Wilmington, DE 19808

3/27/2025
_____
**Date**

Signed by:
*Jill Ceresini*
D950DF47D615... **Signature**

*(Affidavit of Service Form 2/27/2023)*

Case ID: 250303655

**Exhibit A_ Page 100 of 336**

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CIVIL TRIAL DIVISION**

| | |
|---|---|
| LA HART ETAL | March Term 2025 |
| VS | No. 03655 |
| SUNOCO PIPELINE, LP ETAL | |

DOCKETED

APR 1 4 2025

R. PORTELL
COMMERCE PROGRAM

## *CLASS ACTION INITIATION ORDER*

*AND NOW*, Monday, April 14, 2025, plaintiffs having commenced a Class Action which has been assigned to the Honorable PAULA PATRICK, it is hereby **ORDERED** as follows:

1. All parties are directed to appear via Zoom for a Case Management Conference on 16-JUN-2025 at 01:30 PM.  The Commerce Case Management Zoom link is available on the Court's Website at: https://www.courts.phila.gov/remote-hearings/

2. Five (5) days prior to the Zoom Conference, all parties are required to electronically file with the court, and to serve upon all opposing counsel and opposing parties who cannot be electronically served by the court, a fully completed Commerce Case Management Memorandum.  A copy of the Commerce Case Management Memorandum form may be found at:

    https://www.courts.phila.gov/pdf/forms/civil/01-111-Case-Management-Conference-Memorandum-Commerce.pdf

3. To electronically file the Commerce Case Management Memorandum, access the "Existing Case" section of the court's electronic filing system.  Select "Conference

CLCDS-La Hart Etal Vs Sunoco Pipeline, Lp Etal [RCP]

RCP78402RCP78402N (Rev 7/15/21)

25030365500016

Submissions" as the filing category. Select "Management Memorandum" as the filing type.

4.   In the Case Management Memorandum, counsel should describe in detail: the substance of plaintiffs' claims and defendants' defenses; whether certification or merits discovery should occur first; any procedural complications the parties anticipate may occur, such as venue or jurisdictional disputes, joinder of additional parties, requests for bifurcation, etc.; and any other information that will assist the Case Manager to determine how much time the parties need to conduct discovery during the certification and/or merits portion of the case.

5.   Counsel shall also be prepared to discuss with the Case Manager at the Zoom Conference all of the issues listed in Paragraph 4 above.

6.   Plaintiffs' counsel shall serve a copy of this Order upon all unrepresented parties and any attorney entering an appearance subsequent to the date of issuance of this Order.

*BY THE COURT:*

*PAULA PATRICK, J.*
*TEAM LEADER*
*CLASS ACTION PROGRAM*

RCP78402RCP78402ii (Rev 7/15/21)

**BERGER MONTAGUE PC**
Shanon J. Carson (Bar No. 85957)
Y. Michael Twersky (Bar No. 312411)
Joseph E. Samuel, Jr. (Bar No. 327645)
1818 Market Street, Suite 3600
Philadelphia, PA 19103

*Counsel for Plaintiffs and the Proposed Class*



*Filed and Attested by the Office of Judicial Records 23 APR 2025 08:56 pm G. SMITH*

| | |
|---|---|
| DANIEL LA HART and KATHERINE LA HART, <br><br> Plaintiffs, <br><br> v. <br><br> SUNOCO PIPELINE L.P.; ENERGY TRANSFER LP; and ENERGY TRANSFER (R&M) LLC, <br><br> Defendants | **PHILADELPHIA COUNTY COURT OF COMMON PLEAS CIVIL TRIAL DIVISION** <br><br> CLASS ACTION <br><br> MARCH TERM, 2025 <br><br> CASE NO. 250303655 |

<u>**PRAECIPE TO ATTACH EXHIBITS**</u>

TO THE OFFICE OF JUDICIAL RECORDS:

Kindly attach Exhibits A to G, included as attachments hereto, to Plaintiffs' Class Action Complaint filed on March 27, 2025. Exhibits A to G were referenced in Plaintiffs' Class Action Complaint but inadvertently omitted from that filing.

Dated:  April 23, 2025

**BERGER MONTAGUE PC**
*Attorneys for Plaintiffs*

*/s/ Joseph E. Samuel, Jr.*
Joseph E. Samuel, Jr., Bar No. 327645

Case ID: 250303655

**Exhibit A_ Page 103 of 336**

## CERTIFICATE OF SERVICE

I hereby certify that on this day the foregoing Praecipe to Attach Exhibits was served on all counsel of record via the Court's electronic filing system.

Dated:  April 23, 2025

**BERGER MONTAGUE PC**
*Attorneys for Plaintiffs*

*/s/ Joseph E. Samuel, Jr.*
Joseph E. Samuel, Jr., Bar No. 327645



Filed and Attested by the
Office of Judicial Records
23 APR 2025 08:56 pm
G. SMITH

# EXHIBIT A



Photo by Ohio EPA

GREENPEACE
Reports

WATERKEEPER® ALLIANCE

# Oil and Water: ETP & Sunoco's History of Pipeline Spills

**Greenpeace USA and Waterkeeper Alliance**

Case ID: 250303655

**Exhibit A_ Page 106 of 336**

# Contents

○ Summary Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

○ Energy Transfer Partners and Sunoco Have a History of Spills from Existing Pipelines . . . 4

  + Company History and Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

  + Leaky Pipes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

  + Dakota Access Pipeline & Bakken Project  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

  + Federal Violations and Fines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

  + Consequences of Pipeline Spills . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

○ Energy Transfer Partners and Sunoco Spills, Fines and Stop Work Orders
During Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

  + Rover  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

  + Mariner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

○ U.S. Pipeline Spill Trends  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

○ Future Threats to Water . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

  + Bayou Bridge Pipeline  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

  + Permian Express  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

○ Acknowledgments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

○ Endnotes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

○ Appendix A: Research Methods  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

○ Appendix B: ETP & Sunoco, PHMSA Violations & Penalties  . . . . . . . . . . . . . . . . . . . . . 18

○ Appendix C: Energy Transfer Partners' Rover Pipeline Violations &
Spills in Michigan, Ohio & West Virginia, February 2017–March 2018 . . . . . . . . . . . . . . . 18

## List of Figures

○ Number of pipeline incidents, by year and corporate entity . . . . . . . . . . . . . . . . . . . . . . . . 5

○ The spill sizes and locations of ETP's ten largest hazardous liquids
pipeline spills from 2002 to present  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

○ Timeline of ETP spills impacting water, soil, wildlife or high-consequence areas  . . . . . . . . 7

○ Ten year trends for significant U.S. pipeline incidents involving crude oil,
refined petroleum products, and highly-volatile liquids  . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**AUTHORS**

Timothy Donaghy,
*Greenpeace USA*

Donna Lisenby,
*Waterkeeper Alliance*

**DESIGNED BY**

Jacob Hardbower

Alyssa Hardbower

**COVER PHOTO**

Workers at a spill site on Rover
Pipeline in Stark County, Ohio.
April 2017. Photo courtesy
of the Ohio EPA.

**PUBLISHED**

April 17, 2018



Reports

**Greenpeace Inc.**

**702 H Street, NW, STE 300,
Washington, D.C. 20001**



**Waterkeeper Alliance**

**180 Maiden Lane, Suite 603,
New York, NY 10038**

Published online at www.greenpeace.org/usa/reports/oil-and-water/

Case ID: 250303655

# Summary Results

- From 2002 to the end of 2017, ETP, Sunoco and their subsidiaries and joint ventures reported **527 hazardous liquids pipeline incidents** to federal regulators — approximately one incident from existing facilities every eleven days.

- Those incidents, reported by the Pipeline Hazardous Material Safety Administration (PHMSA), released a **total of 87,273 barrels** (3.6 million gallons, or about five-and-a-half Olympic-sized swimming pools) of hazardous liquids, including 66,515 barrels (2.8 million gallons) of crude oil.

- In addition, state regulatory agencies have documented spills totaling at least 2.4 million gallons of drilling fluids, sediment and industrial waste during the construction of just two ETP pipelines in Michigan, Ohio, Pennsylvania and West Virginia.

- Crude oil spills made up 408 of the PHMSA incidents, along with 92 refined petroleum product spills and 27 highly-volatile liquid (HVL), flammable or toxic spills.

- Of the hazardous liquid spills from existing facilities **101 incidents** were of 50 barrels or more (2100 gallons, a volume which is considered "significant" by the federal regulator).

- 67 of the hazardous liquid incidents were reported to have contaminated water, of which **18 incidents contaminated groundwater.**

- These spills caused an estimated **$115 million in property damage**, and led to 106 Notices of Probable Violations, and **$5,675,870 in penalties from PHMSA alone**.

- The largest spills in the PHMSA database were crude oil spills of 436,000, 361,000, 290,000, 189,000, 153,000, 143,000, 139,000, and 105,000 gallons, and 2 HVL spills of 168,000 and 121,000 gallons.

- In addition, state agencies and the Federal Energy Regulatory Commission (FERC) have issued over 100 notices of violation and/or non-compliance for the construction of the Rover and Mariner pipelines. In 2017–18 alone, ETP and Sunoco were issued six stop work orders by state agencies and FERC because their construction operations violated permit requirements and/or rules and regulations designed to protect streams, rivers, wetlands, drinking water, historic sites and public safety.

- The Dakota Access Pipeline (DAPL) and its southern component only began operations in 2017, but have already reported 7 incidents.

- Assuming the U.S. system-wide rate for significant crude oil spills of 0.001 per year per mile, we estimate that the Bakken Pipeline would suffer 96 significant spills and the Bayou Bridge Pipeline would suffer eight significant spills, during a 50-year nominal lifetime.

- There is no failsafe way to transport fossil fuels and pipeline spills remain a direct and seemingly unavoidable consequence of oil and gas activity.

- Rapid transition to renewable energy could dramatically reduce spills from pipelines and pollution of drinking water sources.



Pipeline for the Bayou Bridge project in Louisiana. April 2018. Photo by ©Julie Dermansky/Greenpeace

Case ID: 250303655

Exhibit A_ Page 108 of 336

# Energy Transfer Partners and Sunoco Have a History of Spills from Existing Pipelines

Energy Transfer Partners and its complex network of subsidiaries and joint ventures owns one of the nation's largest networks of natural gas, crude oil and petroleum products pipelines. Data collected from the U.S. Pipeline and Hazardous Materials Safety Administration (PHMSA) shows that the ETP family of hazardous liquids pipelines experienced 527 incidents from 2002 to the end of 2017, spilling ~87,000 barrels, and causing an estimated $115 million in property damage.

We have mapped these incidents, spread across numerous states and regions in the U.S. where ETP operates.[1]



**View online at:** *https://greenpeace.carto.com/maps*

## Company History and Structure

Energy Transfer Partners, L.P. (ETP) was founded in 1995 by Ray Davis and Kelcy Warren (who is still its current Chairman and CEO) and became a publicly traded partnership in 2004. ETP is in turn controlled by a master limited partnership called Energy Transfer Equity (ETE), of which Warren is also the Chairman.[2]

The company's national profile was fairly small until the massive grassroots resistance to its Dakota Access Pipeline (DAPL) led by the Standing Rock Sioux Tribe was splashed across the headlines in 2016. That same year, Warren donated $100,000 to Donald Trump's presidential campaign[3] and later cut a check for $250,000 for Trump's inauguration.[4] Trump made the approval of DAPL's final permits one of his administration's first priorities upon becoming U.S. President.[5]

ETP's corporate structure is famously complicated.[6] In October 2012, ETP merged with Sunoco, Inc.,[7] a fuel refining, distribution and retail company that had been founded in 1886.[8] Prior to the merger, ETP and ETE were primarily focused on the natural gas sector, and the merger with Sunoco allowed them to diversify into "liquids" pipelines due to Sunoco's significant crude oil and refined petroleum product assets.[9] Part of this business operated as Sunoco Logistics Partners (SXL) until it fully merged with ETP in April 2017.[10] Sunoco LP (SUN) continues to exist as a downstream distributor of motor fuel.

Currently three of these entities — ETP, ETE and SUN — are publicly traded on the New York Stock Exchange. The company also boasts a number of subsidiaries and joint ventures as part of its "family" which we have attempted to reflect in this report. Including both liquids and natural gas, ETP operates more than 71,000 miles of pipelines in the U.S. — nearly long enough to encircle the earth three times.[11]

## Leaky Pipes

The PHMSA database of all U.S. hazardous liquids pipeline incidents from 2002 to present contains 6,102 reported incidents.[12] Of those incidents, 527 were associated with ETP, Sunoco, or one of their subsidiaries or joint ventures[13] — a rate of one incident occurring approximately every eleven days. These 527 incidents released a total of 87,273 barrels of hazardous liquids, of which 66,515 barrels were crude oil, and led to over $115 million in property damages according to PHMSA's records. Of the total volume spilled, 36,862 barrels (42%) were never recovered by the company. Since 2002, spills from ETP, Sunoco and subsidiaries led to proposed penalties of $5,675,870.[14]

Other reports have noted the company's poor safety reputation,[15, 16] and have analyzed PHMSA data to conclude that ETP and Sunoco's pipeline network is among the leakiest in the nation.[17, 18] In addition, Sunoco's Pennsylvania refineries were subject to a comprehensive Clean Air Act settlement, that included a $3 million civil penalty and $285 million to install emissions controls.[19]

Case ID: 250303655

Figure 1 shows a timeline of the 527 liquids spills, broken down by corporate entity. As can be seen from the figure, several entities in the ETP family have reported significant numbers of hazardous liquids pipeline spills, both before and after the 2012 merger. Sunoco Pipelines LP has reported 337 incidents since 2002. Also included are spills from joint ventures that Sunoco brought into the merger, notably the Mid-Valley Pipeline (76 incidents), the West Texas Gulf Pipeline (46 incidents), and the Wolverine Pipeline (11 incidents). We include all incidents from Sunoco and its subsidiaries and joint ventures in this analysis, both before and after 2012, because Sunoco brought most of the hazardous liquids assets into the merger and remains part of ETP's current pipeline network.



**Figure 1:** Number of pipeline incidents, by year and corporate entity.

Energy Transfer has reported 23 hazardous liquids incidents, all occurring after the 2012 merger. The Dakota Access Pipeline (DAPL) and its southern component (ETCO) only began operations in 2017, but have already reported 7 incidents. For full details on the incident analysis, including more information on the subsidiaries and joint ventures that were included, see Appendix A: Research Methods.

The ten largest incidents in this analysis are the following (in chronological order):

- In January 2005, the Mid-Valley Pipeline (originally constructed in the 1950s[20]) spilled **6,909 barrels** (290,000 gallons) of crude oil into the Kentucky and Ohio Rivers, leading to an oil slick 17 miles long and harming hundreds of migratory birds. The federal government later reached a $2.57 million settlement with Sunoco.[21]

- In November 2005, operator error led to a **10,380 barrel** (436,000 gallon) crude oil overflow at Sunoco Pipeline LP's Darby Creek Tank Farm in Sharon Hill, Pennsylvania. The spilled oil was contained by a dike, and PHMSA later fined Sunoco $150,000.[22]

- In October 2008, the Mid-Valley Pipeline spilled again, this time releasing **3,650 barrels** (153,000 gallons) into "the sanitary sewer system and nearby Gunpowder Creek" in Florence, Kentucky.[23]

- In June 2009, a portion of the West Texas Gulf Pipeline near Colorado City, Texas caught fire and spilled **3,416 barrels** (143,000 gallons) of crude oil. PHMSA later fined Sunoco Pipeline LP $415,000.[24]

- In August 2009, Sunoco Pipelines spilled **2,500 barrels** (105,000 gallons) of crude from a station near Mont Belvieu, Texas. The U.S. EPA eventually reached a $850,000 settlement for Clean Water Act violations related to this spill and a later 2011 spill of 1,742 barrels (73,000 gallons) in Cromwell, Oklahoma.[25]

- In October 2014, the Mid-Valley Pipeline experienced yet another major incident, spilling **4,509 barrels** (189,000 gallons) and contaminating a ten-mile section of Tete Bayou near Mooringsport, Louisiana.[26]

- In June 2015, a "gasket failure" on the West Texas Gulf Pipeline near Wortham, Texas led to a release of **3,300 barrels** (139,000 gallons) of crude that was contained in two retention ponds on company property.

- In August and September 2016, Sunoco's Permian II Express pipeline leaked **8,600 barrels** (361,000 gallons) near Sweetwater, Texas. The incident led to a Corrective Action Order, and followed a fine from federal regulators for welding violations on the same project.[27]

- In addition to crude oil spills, ETP pipelines suffered large spills of highly-volatile liquids (HVL)[28] of **2,880 barrels** (121,000 gallons) in 2012 near Midland, Texas and **3,992 barrels** (168,000 gallons) in 2014 near Ira, Texas.



**Figure 2:** The spill sizes and locations of ETP's ten largest hazardous liquids pipeline spills from 2002 to present. Gray represents crude oil spills, while yellow are HVL spills. (Data: PHMSA)

Further details on other ETP/Sunoco pipeline incidents can be found in a report by Waterkeeper Alliance, including information on worker lawsuits, failure to report problems, and additional significant pipeline incidents in Pennsylvania, Ohio, and Texas.[29]

Case ID: 250303655

Although it is not the main focus on this report, PHMSA also maintains data regarding ruptures and leaks from natural gas gathering, transmission and distribution pipelines. ETP and its subsidiaries reported **58 natural gas incidents** to PHMSA from 2002 to present. Natural gas pipeline leaks present a different range of risks from hazardous liquids leaks, including the risk of an explosion. Methane leaking from the U.S.'s rapidly growing natural gas infrastructure is also a significant climate change risk.[30]

## Dakota Access Pipeline & Bakken Project

The Bakken Pipeline consists of the 1,172 mile, 30-inch diameter Dakota Access Pipeline (DAPL), which runs from the Bakken oil fields in North Dakota to a hub in Patoka, Illinois, and the Energy Transfer Crude Oil Pipeline (ETCO), which runs 743 miles south from Patoka to Nederland, Texas.[31] The DAPL segment was built across Sioux lands designated under the 1851 Fort Laramie Treaty and crosses the Missouri River near Lake Oahe, just north of the Standing Rock Reservation.[32]

The project is a joint venture between ETP, MarEn Bakken Company LLC (Enbridge) and Phillips 66, with ETP holding a 38.25% interest.

Violations of Indigenous sovereignty, lack of adequate consultation and threats to water supplies from pipeline spills led Indigenous Water Protectors and their allies to set-up pipeline opposition camps near the river crossing. The organized pipeline opposition and the disproportional response from authorities and private security forces garnered international media attention, leading the Army Corps of Engineers to deny the needed permits in December 2016. However, the Trump Administration approved the permits and DAPL went into operation in June 2017.

Evidence suggests that environmental racism may have played a part in selecting the pipeline route. The 2015 Environmental Assessment discussed an alternate route that was rejected in part due to concerns about contamination of "wellhead sourcewater protection areas" north of Bismarck, North Dakota (a mostly white community).[33] Yet the approval of the route passing near the reservation led the Standing Rock Sioux Tribe to file a lawsuit alleging violations of the National Historic Preservation Act, the Clean Water Act, and the National Environmental Policy Act.[34]

In addition to the risk of pipeline spills into water, the EA identified impacts from horizontal directional drilling (HDD) used to tunnel the pipeline under rivers, including the risk of "inadvertent release of drilling fluid directly or indirectly into the waterbody" — a risk that has been realized during the construction phases of other ETP/Sunoco projects.

Although the pipeline only became fully operational in 2017, DAPL-ETCO has already reported 7 pipeline incidents to PHMSA, of which 4 occurred along the DAPL portion, and the largest of which was a significant 119 barrel (4,998 gallon) spill from the ETCO segment near Dyersburg, Tennessee. A related eighth incident occurred in March 2017 on a DAPL feeder line owned by Caliber Midstream, but is not included in this analysis.[35]

Assuming the U.S. system-wide rate for significant crude oil spills of 0.001 per year per mile, we estimate that the Bakken Pipeline would suffer 96 significant spills during a 50-year nominal lifetime.

## Federal Violations and Fines

PHMSA conducts annual inspections to determine whether pipeline operators are in compliance with federal rules designed to protect the public, drinking water sources and ensure safe operation of pipelines and their associated infrastructure. These routine inspections find violations that could lead to a spill or a safety problem. When federal inspectors find serious issues, they issue Notices of Proposed Violations, Proposed Compliance Orders and/or Proposed Civil Penalties. Since 2002, PHMSA has issued Energy Transfer Partners and Sunoco 106 violations and fined them $5,675,870.[36] Their safety violations include:

- Failures to inspect crossings under waterways, valves and pipeline rights of way.
- Failures to notify PHMSA of a spill, fire, injuries requiring hospitalization.
- Failure to repair unsafe pipe for 5 years.
- Failures to maintain pipeline integrity in high consequence areas.
- Failure to report unsafe conditions.
- Failure to do corrosion inspection.
- Repeated failures to properly notify emergency responders and the public.[37]

## Consequences of Pipeline Spills

Depending on their characteristics, oil spills can cause significant acute and chronic impacts on ecosystems ranging over "a range of time scales, from days to years, or even decades for certain spills."[38] PHMSA collects information on whether pipeline spills have contaminated soil or water resources, impacted wildlife, or occurred in "high-consequence areas" (HCAs) such as population centers or navigable waterways (see Figure 3).

Case ID: 250303655

Of the 527 incidents attributed to ETP, Sunoco, their subsidiaries or joint ventures:

- **67 incidents** (12.7%) were reported to have contaminated water resources. Across the entire PHMSA database, 615 incidents (10.0%) contaminated water resources.

- Of those incidents, **18 incidents** (3.4%) were found to contaminate groundwater. Nationally, there were 207 pipeline spills contaminating groundwater (3.4%).

- And **3 incidents** (0.6%) were found to contaminate drinking water resources specifically. Nationally, there were 8 total incidents (0.1%) contaminating drinking water.

- **275 incidents** (52.5%) contaminated soils.

- **189 incidents** occurred in or reached "high consequence areas."

- From 2010–present, there were **6 incidents** that impacted wildlife. One of these was a spill of 450 barrels in March 2014, from the Mid-Valley Pipeline, that contaminated the Oak Glen Nature Preserve near Colerain, Ohio,[39] closing the preserve and leaving at least 36 animals in need of treatment for contamination.[40]

- From 2002 to 2009, there were **3 incidents** that impacted fish and **2 incidents** that impacted birds.



**Figure 3:** Timeline of ETP spills impacting water, soil, wildlife or high-consequence areas.

A 2010 editorial from a Philadelphia-area newspaper lamented the consequences of Sunoco's local safety record and noted that repeated violations "will only be stopped when the nation's environmental protection laws finally grow some teeth. In the meantime, Delaware County residents must be satisfied with apologies and the prospect of ill health or injury from another industrial disaster."[41]

Pipeline construction for Bayou Bridge continues near homes in Louisiana. April 2018. Photo by ©Julie Dermansky/Greenpeace

Case ID: 250303655

# Energy Transfer Partners and Sunoco Spills, Fines & Stop Work Orders During Construction

In addition to past spills from existing pipelines, ETP/Sunoco pipeline projects currently under development have been plagued with environmental violations. The construction of the Mariner and Rover pipelines in Michigan, Ohio, Pennsylvania and West Virginia has resulted in over 2.4 million gallons of spills, over 100 notices of violations and other non-compliance issues, and 6 stop work orders. These new pipelines have faced growing resistance from local communities and decision makers concerned about the long history of non-compliance and pollution of drinking water sources, trout streams, wetlands and rivers.

## Rover

ETP's Rover Pipeline is a 713-mile natural gas pipeline designed to transport 3.25 billion cubic feet of gas per day from the Utica and Marcellus shale production areas in West Virginia, eastern Ohio, and western Pennsylvania westward through Ohio and into Michigan.[42] In an ominous foreshadowing, ETP started getting into trouble before construction even started. Despite promising to "avoid adverse effects," ETP destroyed the historic 170-year old Stoneman House in Dennison, Ohio that was eligible for listing in the National List of Historic places. The Federal Energy Regulatory Commission used the demolition of the historically significant site as a basis for denying Rover a blanket construction permit, saying "Rover could not be relied upon to comply with the environmental regulations."[43]

With that restriction, FERC approved the project in February 2017, and Energy Transfer began an aggressive effort to construct the pipeline as quickly as possible. In its haste, ETP repeatedly contaminated waterways across Michigan, Ohio and West Virginia. One August 2017 analysis concluded that Rover had "racked up more environmental violations than other major interstate natural gas pipelines built in the last two years" – a total of 104 non-compliance incidents while the second highest company only had 26 non-compliance incidents. [44]

By March 2018, after only 13 months of construction, Rover had spilled more than 2.2 million gallons of drilling fluids, industrial waste and/or sediment, amassing more than 100 violations/ non-compliance incidents and 4 stop work orders for their failure to comply with environmental regulations designed to protect streams, rivers wetlands, drinking water, historic sites and public safety (see pages 9–10 for a selection of these violations, citations for these incidents are listed in Appendix C).



Horses play in a field near construction of the Bayou Bridge pipeline in Louisiana. April 2018. Photo by ©Julie Dermansky/Greenpeace

Case ID: 250303655

## Worst Rover Pipeline Violations/Spills/Stop Work Orders April 2017–March 2018

1.  **April 5, 2017:** Unauthorized pollution release impacting tributaries of Woodfield Reservoir in Monroe County, OH; failure to control stormwater

2.  **April 8, 2017:** 1,000 gallons of drilling fluid pollution released into wetland near Indian Fork River, in Tuscarawas County, OH; covered 2500 square foot area of wetland

3.  **April 10, 2017:** 600 gallons of drilling fluid pollution released into stream, wetland and pond in Richland Township, Belmont County, OH

4.  **April 10, 2017:** unauthorized pollution release impacting tributaries of Woodfield Reservoir in Monroe County, OH; failure to control stormwater

5.  **April 11, 2017:** unauthorized pollution release from failure to manage stormwater in Bloomdale, Wood County, OH

6.  **April 11, 2017:** Clean Air Act violation, open burning of site preparation material near a home in Toronto, Ohio

7.  **April 11, 2017:** Stormwater violations in Wood, Richland, and Crawford Counties, OH because of failure to manage vehicle tracking of drilling materials onto public roadways

8.  **April 12, 2017:** unauthorized pollution release into Bull Creek in Wood County, OH; failure to control stormwater

9.  **April 13, 2017:** 2 million gallons of drilling fluid pollution accumulating in high quality wetland adjacent to Tuscarawas River in Navarre Township, Stark County; covered 500,000 sq foot area of the category 3 wetland

10. **April 14, 2017:** 50,000 gallons of drilling fluid pollution released into wetland in Mifflin Township, Richland County, OH

11. **April 17, 2017:** 200 gallons of drilling fluid pollution released into a pond in Monroe Township, Harrison County, OH

12. **April 22, 2017:** 200 gallons of drilling fluid pollution released into stream in Wooster Township, Wayne County, OH

13. **April 26, 2017:** During a West Virginia DEP inspection, 7 violations are found related to Storm Water Pollution Prevention Plan (SWPPP) and stream sediment deposits.

14. **May 2, 2017:** unauthorized pollution release from failure to manage stormwater in Bloomdale, Wood County, OH

15. **May 3, 2017:** unauthorized pollution release into Brushy Fork Creek, Cadiz, Harrison County, OH - failure to control stormwater

16. **May 8, 2017:** approx. 10,000 gallons of bentonite slurry released during a pipeline installation. The drilling fluids surfaced in a pond and stream in Monroe Township, Harrison County and affected water quality.

17. **May 8, 2017:** The Ohio EPA fines ETP $431,000 for "18 incidents involving mud spills from drilling, stormwater pollution and open burning at Rover pipeline construction sites have been reported between late March and Monday."

18. **May 10, 2017:** FERC bans ETP from starting new horizontal directional drilling under waterways and roads.

19. **May 19, 2017:** ETP acknowledges heavy rain causing pipeline trenches and work spaces to fill with water and spill onto fields of Ohio farmers.

20. **May 24, 2017:** During a West Virginia DEP inspection, 6 violations are found related to Storm Water Pollution Prevention Plan (SWPPP), erosion control and stream sediment deposits.

21. **May 25, 2017:** FERC rejects ETP request to resume drilling in Captina Creek and Middle Island Creek.

22. **June 2 & 6, 2017:** During a West Virginia DEP inspection, 5 violations are found related to silt fences, erosion control and stream sediment deposits.

23. **July 2, 2017:** 5,000 more gallons of drill slurry released into a Stark County area where the company was working on a five-foot borehole that would go under the Tuscarawas River. Work was already underway to deal with a previous spill in that area.

24. **July 3, 2017:** 1,500 to 2,500 gallons of drilling mud took place at a nearby area ten feet from Tuscarawas River.

25. **July 7, 2017:** Rover Pipeline LLC pays $1.5 million to the Ohio History Connection Foundation in an effort to mitigate harm after demolishing a building they had promised not to.

Case ID: 250303655

**WORST ROVER PIPELINE VIOLATIONS/SPILLS/STOP WORK ORDERS APRIL 2017–MARCH 2018 (CONTINUED)**

26. **July 12, 2017:** During a West Virginia DEP inspection, 8 violations are found including sediment laden water depositing in nearby creeks and runs.

27. **July 13, 2017**: FERC also issues a notice of violation claiming that ETP "did not fully and forthrightly disclose all relevant information" before demolishing a historic home.

28. **July 17, 2017:** West Virginia's DEP issues a cease-and-desist order to stop work in the WV segment of the pipeline.

29. **July 28, 2017:** Pipeline drilling causes landslides in Jefferson County, Ohio. According to township trustees, it's a result of drilling near old underground mines.

30. **July 31, 2017:** Inspectors find failure to properly control erosion and incorrectly-installed sediment control devices in Hancock County, WV.

31. **August 3, 2017:** Inspectors find failure to properly control erosion and incorrectly-installed sediment control devices in Marshall County, WV.

32. **September 21, 2017:** Soap wastewater used in boring operations and soil/sediment discharged into approximately 500 feet of waterway requiring 6,000 gallons of water to be recovered by vacuum truck. OH

33. **September 26, 2017:** Approximately 30 gallons of drilling fluids discharged into waters, wetlands in Washington Township, Belmont County, Ohio.

34. **October 11, 2017:** Approx. 1200 gallons of drilling fluids discharged to waters, wetlands in Washington Township, Belmont County, Ohio.

35. **October 14, 2017:** Rover Pipeline Spills Water Allegedly Containing Gasoline Into Michigan Wetlands

36. **November 9, 2017:** Approx. 60 gallons of drilling fluids discharged to waters, wetlands in Ashland Township, Ashland County.

37. **November 14, 2017:** Approx. 30 gallons of drilling fluids discharged to waters, wetlands in Milton Township, Ashland County, Ohio.

38. **November 16, 2017:** Approx. 200 gallons of drilling fluids discharged into Black Fork Mohican River in Milton Township, Ashland County.

39. **January 17, 2018:** Rover Pipeline Spills Another 150,000 Gallons of Drilling Fluid Into Ohio Wetlands at same 4/14/2017 site.

40. **January 24, 2018:** FERC again orders ETP to halt horizontal directional drilling under the Tuscarawas River in Ohio.

41. **February 21, 2018:** Ohio EPA files a letter with FERC claiming the presence of toxic chemical tetrachloroethene at Rover's underground drilling site at the Tuscarawas River in southern Stark County.

42. **March 5, 2018:** West Virginia Department of Environmental Protection orders a second halt to construction after finding multiple water pollution violations.



Workers at a spill site on the Rover Pipeline in Stark County, Ohio. April 2017. Photo courtesy of the Ohio EPA.

Case ID: 250303655

# Mariner

The Mariner East Project is designed to transport natural gas liquids from the same Utica and Marcellus shale production areas, this time eastward across Pennsylvania, including to the Marcus Hook terminal on the Delaware River.[45] The first phase of the Mariner project began operations in 2014, while Mariner East 2 is scheduled to be completed in 2018. Construction of the pipeline has led to 108 "inadvertent" releases in numerous locations along the route, leading the Pennsylvania DEP to issue more than 40 violations,[46] and several reports of private water wells being impacted by construction activities.[47] Those spills have released a total of at least 200,000 gallons of drilling fluids and other liquids.[48] The Mariner 1 and Mariner 2 pipelines have been shut down twice as a result of spills, violations, sink holes and contamination of drinking water and trout streams.

The Pennsylvania DEP Administrative Order shutting down construction on January 3, 2018 itemized unpermitted and unlawful activities impacting the following trout streams classified as Class A wild trout waters, wild trout (natural reproduction) water, high quality trout stocking and designated as exceptional value waters and/or migratory fishes:

1. Hay Creek in Berks County
2. Cacoosing Creek in Berks County
3. Allegheny Creek in Berks County
4. Clover Creek in Blair County
5. Mingo Creek in Washington County
6. Shaeffer Creek in Dauphin County



Cows stand in a field near construction of the Bayou Bridge pipeline in Louisiana. April 2018. Photo by ©Julie Dermansky/Greenpeace

The 24-page order also required Sunoco to address the private water wells contaminated in Silver Lake Township "to the satisfaction of the private well owners." The order concluded by saying:

> "Sunoco's unlawful conduct… demonstrates a lack of ability or intention on the part of Sunoco to comply with the Clean Streams Law, the Dam Safety and Encroachments Act, and the permits issued thereunder. Suspension of the permits… is necessary to correct the egregious and willful violations described herein."[49]

On February 8, 2018 the Pennsylvania DEP and Sunoco executed a Consent Order and Agreement requiring the payment of a $12.6 million penalty and that Sunoco provide detailed plans to prevent future violations.[50] It was one of the largest fines ever levied by the State of Pennsylvania for violations of environmental laws.

Less than 30 days later, Mariner was shut down again in Pennsylvania due to problems during construction. On March 7, 2018, the Pennsylvania Public Utility Commission (PUC) issued an emergency order shutting down the Mariner 1 pipeline during construction of the adjacent Mariner 2 pipeline.[51] The emergency order said that allowing the continued transport of hazardous liquids through the Mariner 1 pipeline "could have catastrophic results impacting the public."[52] The PUC estimated the pipeline would be shut down 10-14 days, possibly longer if ETP/Sunoco failed to address serious safety concerns that the pipeline could be "hazardous to life, property and the environment."[53] Among the safety issues that triggered the rare emergency shut down were the formation of three large sinkholes in a densely populated area defined by PHMSA as a "high consequence area". One sinkhole was located 300 feet from rail lines carrying Amtrak and Septa passengers. Another sink hole was created 10 feet from the foundation of a house.

Case ID: 250303655

# U.S. Pipeline Spill Trends

Over the past several years, spills of crude oil and liquid petroleum products from pipelines have increased, reversing earlier improvements.[54] This trend reached its maximum in 2015 with a total of 454 reported incidents, of which 176 were classified as significant by PHMSA. These numbers dropped slightly in 2017 to 404 reported incidents (153 significant) but remained at an elevated level compared to earlier years (see Figure 4).

Similarly, a recent review by oil industry trade organizations found that pipeline incidents "impacting the public or environment" (IPE) have increased in the past 4 years.[55]



**Figure 4:** Ten year trends for significant U.S. pipeline incidents involving crude oil, refined petroleum products, and highly-volatile liquids (HVL). Data: PHMSA

The key takeaway from these statistics is that despite industry rhetoric to the contrary, there is no failsafe way to transport fossil fuels. Industry safety initiatives and an overmatched regulatory agency have been unable to eliminate the risk of spills, which remain a direct and seemingly unavoidable consequence of oil and gas activity. PHMSA employs a mere 208 inspectors who, along with 345 state inspectors, are responsible "for regulating nearly 3,000 companies that operate 2.7 million miles of pipelines, 148 liquefied natural gas plants, and 7,571 hazardous liquid breakout tanks."[56] The oil industry also has one of the highest rates of severe workplace injury among its workers.[57]

Over the past decade, hazardous liquid pipeline spills in the U.S. have led to 16 fatalities, 30 injuries, $2.7 billion in costs, and over 825,000 total barrels spilled (34.7 million gallons, or around 9,500 gallons every day).[58] Common causes of pipeline spills include equipment failures, corrosion, operator error, material or welding failures, and excavation damage.[59]

Significant pipeline spills in recent years include Enbridge's 2010 spill into the Kalamazoo River,[60] Exxon's 2013 Pegasus pipeline spill in Mayflower, Arkansas, two spills into the Yellowstone River in 2011 and 2015,[61] and the 2015 pipeline rupture that closed a Santa Barbara beach.

These pipeline spills are in addition to spills from oil wells, disposal sites, and other oil and gas infrastructure, both onshore and offshore.[62] Of total spills from all sources in 2015, a recent analysis found that 640 spills affected groundwater or surface water in some way.[63]

From 2007 to 2016, U.S. crude oil pipelines have averaged 0.001 significant incidents and 0.57 barrels spilled per year per mile of pipeline. Refined petroleum product pipelines have averaged 0.0007 significant incidents and 0.24 barrels spilled per year per mile, and HVL pipelines have averaged 0.0005 significant incidents and 0.53 barrels spilled per year per mile.



Activists make their "People Over Pipelines" message known at a march in Washington, DC. Photo by ©Jordan Hetrick/Greenpeace

Case ID: 250303655

# Future Threats to Water

## Bayou Bridge Pipeline

Oil and pipeline companies have devastated the Gulf coast and the Atchafalaya Basin, harming some of the most amazing ecosystems on Earth, putting millions of people at greater risk of flooding.[64] The Bayou Bridge pipeline is a great example of what is wrong with pipeline construction in Louisiana. It will traverse over, under or through the Calcasieu River, Mermentau River, Vermilion River, Bayou Teche, West Atchafalaya Basin Levee, Atchafalaya River Basin and multiple bayous that provide unique habitat for many rare species. There is pending litigation arguing that the existing corridor being used to place the Bayou Bridge Pipeline is already out-of-compliance with permits issued for prior pipeline projects. In the same litigation, opponents argue that another existing pipeline in the Atchafalaya Basin co-owned by Energy Transfer Partners is also out of compliance with a previously-issued permit.[65] Disposal of dredged material during the construction of these earlier pipelines led to the creation of spoil banks which have been found to cause serious disturbances of water flow and impact the distribution of sediments in the Basin.[66] Historically there has been little enforcement of permit violations.[67]

The Bayou Bridge pipeline is a joint venture between ETP and Phillips 66[68] (two of the participants in DAPL) that will transport up to 480,000 barrels of crude oil a day across Louisiana, from Nederland, Texas (the southern terminus of the Bakken pipeline) to refineries in St. James, Louisiana (about 50 miles up the Mississippi River from New Orleans).[69] Phase I of the Bayou Bridge Pipeline, from Nederland, Texas to Lake Charles, Louisiana, is already operational. However, Phase II, the proposed 163-mile portion from Lake Charles to St. James, is under construction and multiple lawsuits have been filed to challenge the permits issued in 2017.[70]

As detailed in a U.S. Army Corps of Engineers Environmental Assessment, Bayou Bridge Pipeline LLC plans to use horizontal directional drilling (HDD) to run pipe under 8 federal projects and 14 federal easements (mostly crossings of rivers, waterways and levees).[71] As is typical, PHMSA conducted a "worst case" analysis for spills occurring at those crossings, but details of that analysis have not been made public.

Analysis by FracTracker Alliance found that the pipeline would cross "700 acres of fragile wetlands, and watersheds that supply drinking water for up to 300,000 people" and noted that "essential ecosystem services that the wetlands provide, absorbing floodwaters, could be compromised, leading to increased erosion and sedimentation downstream. Impacts to these wetlands could be greatly magnified into the already environmentally stressed Gulf."[72]

Assuming the U.S. system-wide rate for significant crude oil spills of 0.001 per year per mile, we estimate that the Bayou Bridge Pipeline would suffer eight significant spills during a 50-year nominal lifetime. In February 2018, a federal court issued an injunction stopping construction while the court considers environmental challenges to the project.[73] But that injunction was stayed by the 5th Circuit Court of Appeals in March with an expedited hearing on the injunction appeal scheduled before a merits panel on April 30, 2018.[74]

Bayou Bridge Pipeline began clearing for construction in the Atchafalaya Basin in January 2018.[75] Despite the elevated annual rise of water in the Basin, Bayou Bridge intends to continue construction in the Basin during high water season.[76] Construction during high water could exacerbate the damage to wetlands, channeling sediment-laden water into the interior swamps through pipeline canals, causing increased sedimentation and filling of wetlands which reduce their future capability to protect millions of people from Mississippi River floods.[77]

## Permian Express

In late 2017, ETP brought its Permian Express 3 pipeline online, transporting crude oil from the Permian basin (a major oil and gas producing basin located in West Texas and parts of New Mexico) to facilities in Nederland, Texas, and is "aggressively" evaluating a further expansion of that line.[78]

Case ID: 250303655

# Acknowledgments

**Greenpeace USA and Waterkeeper Alliance are grateful to the following organizations for endorsing this report, and for their continued action in defense of water and the communities that depend on it.**

**Atchafalaya Basinkeeper**
www.basinkeeper.org

**Oil Change International**
www.priceofoil.org

**Earthworks**
www.earthworks.org

**Louisiana Crawfish Producers Association – West**
www.lcpawest.com

**Louisiana Bucket Brigade**
www.labucketbrigade.org

**Thunder Valley Community Development Corporation**
www.thundervalley.org

**International Indigenous Youth Council**
www.indigenousyouth.org

**Pipeline Safety Coalition**
www.pscoalition.org

**350.org New Orleans**
www.350.org

**Indigenous Peoples Power Project**
www.ip3action.org

**Seeding Sovereignty**
www.seedingsovereignty.org

**NDN Collective**
www.ndnaction.org

**West Virginia Headwaters Waterkeeper**
www.wvrivers.org

**Rainforest Action Network**
www.ran.org

**The Standing Rock Community Development Corporation**
www.standingrockcdc.org

**Michigan Residents Against ET Rover**

**Big Bend Defense Coalition of West Texas**

**HELP Association of Saint James**



Protest March in Washington D.C. Photo by ©Amanda J. Mason/Greenpeace

Case ID: 250303655

**Exhibit A_ Page 119 of 336**

# Endnotes

1    Interactive map shows a total of 517 incidents due to 10 incidents in the PHMSA data with missing or unusable geolocation data. Shapefiles of the U.S. crude oil, petroleum product, and natural gas liquids pipeline network are compiled by the U.S. Energy Information Administration (EIA) [www.eia.gov/maps/layer_info-m.php].

2    Energy Transfer. Ownership Overview. www.energytransfer.com/ownership_overview.aspx

3    Hampton, L. & V. Volcovici. 2016. Top executive behind Dakota Access has donated more than $100,000 to Trump. Reuters, October 26. www.reuters.com/article/us-usa-election-trump-dakota-access/top-executive-behind-dakota-access-has-donated-more-than-100000-to-trump-idUSKCN12Q2P2

4    Cama, T. 2017. Energy companies donated millions to Trump's inauguration. *The Hill*, April 19. http://thehill.com/policy/energy-environment/329587-energy-companies-donate-millions-to-trumps-inauguration

5    Memorandum of January 24, 2017. Construction of the Dakota Access Pipeline. 82 FR 11129. www.federalregister.gov/documents/2017/02/17/R1-2017-02032/construction-of-the-dakota-access-pipeline

6    Energy Transfer. Recent History. www.energytransfer.com/company_history.aspx

7    Energy Transfer. 2012. Energy Transfer Partners and Sunoco Announce Successful Completion of Merger. October 5. http://ir.energytransfer.com/phoenix.zhtml?c=106094&p=irol-newsArticle&ID=1742166

8    Sunoco. About Us: A Legacy of Innovation. www.sunoco.com/about-us/heritage/

9    Energy Transfer. 2012. Energy Transfer Partners to Acquire Sunoco in $5.3 Billion Transaction. April 30. http://ir.energytransfer.com/phoenix.zhtml?c=106094&p=irol-newsArticle&ID=1688772

10   Energy Transfer. 2017. Sunoco Logistics Partners and Energy Transfer Partners Announce Successful Completion of Merger. April 28. http://ir.energytransfer.com/phoenix.zhtml?c=106094&p=irol-newsArticle&ID=2267001

11   Energy Transfer. Corporate Overview. www.energytransfer.com/company_overview.aspx

12   This quantity excludes a small number of biofuels and CO2 incidents. For this report we consider hazardous liquids spills from crude oil, refined petroleum products, and HVL pipelines. PHMSA reporting requirements changed in 2010, and this analysis merges PHMSA's 2002-2009 and 2010-present datasets.

13   ETP or Sunoco must hold at least a 25% stake in a joint venture for it to be included in this analysis.

14   See Appendix B.

15   Waterkeeper Alliance. 2017. *Sunoco Logistics and Energy Transfer Partners Pipeline Incident Summary.* http://stopetp.org/wp-content/uploads/2017/12/ETP-Violation-History-12-15-17.pdf

16   National Wildlife Federation. 2010. *Assault on America: A Decade of Petroleum Company Disaster, Pollution, and Profit.* www.motherjones.com/wp-content/uploads/NWF_OilSpillsExplosions_pages.pdf

17   Hampton, L. 2016. Sunoco, behind protested Dakota pipeline, tops U.S. crude spill charts. *Reuters*, September 23. www.reuters.com/article/us-usa-pipeline-nativeamericans-safety-i/sunoco-behind-protested-dakota-pipeline-tops-u-s-crude-spill-charts-idUSKCN11T1UW

18   Higgins, T. 2017. Energy Transfer's Pipeline Spill Problem Is Causing It Another Headache. *The Street*, June 22. www.thestreet.com/story/14178469/1/energy-transfer-has-a-problem-that-keeps-rearing

19   U.S. Department of Justice. 2005. United States Announces Clean Air Agreements With Valero and Sunoco. June 16. www.justice.gov/archive/opa/pr/2005/June/05_enrd_323.htm

20   Welborn, V. 2014. Pipeline breaks have cost Sunoco millions. *Shreveport Times*, November 1. www.shreveporttimes.com/story/news/local/louisiana/2014/11/01/pipeline-breaks-cost-sunoco-millions/18340559/

21   U.S. Department of Justice. 2006. Federal Government Reaches Settlement with Pipeline Companies Regarding Crude Oil Spills. August 15. www.justice.gov/archive/opa/pr/2006/August/06_enrd_534.html

22   U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration. 2007. Notice of Probable Violation and Proposed Civil Penalty. May 15. https://primis.phmsa.dot.gov/comm/reports/enforce/documents/120075001/120075001_notice%20letter_05152007.pdf

23   U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration. 2014. Corrective Action Order. March 25. p.3. https://primis.phmsa.dot.gov/comm/reports/enforce/documents/320145002H/320145002H_Corrective%20Action%20Order_03252014_text.pdf

24   U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration. 2010. Notice of Probable Violation, Proposed Civil Penalty and Proposed Compliance Order. March 11. https://primis.phmsa.dot.gov/comm/reports/enforce/documents/420105010/420105010_NOPV%20PCP%20PCO_03112010_text.pdf

25   U.S. Environmental Protection Agency. 2016. Sunoco Pipeline, L.P. Clean Water Act Settlement. July 11. www.epa.gov/enforcement/sunoco-pipeline-lp-clean-water-act-settlement

26   U.S. Environmental Protection Agency. E15601 - Mid Valley Pipeline Oil Spill. https://response.epa.gov/site/site_profile.aspx?site_id=9578

27   Reuters Staff. 2016. U.S. regulator orders inquiry, repairs after Sunoco's Permian leak. *Reuters*, September 15. www.reuters.com/article/us-pipeline-sunoco-logistics/u-s-regulator-orders-inquiry-repairs-after-sunocos-permian-leak-idUSKCN11L2CM

28   PHMSA classifies together highly-volatile liquids (HVL) or other flammable or toxic fluids which are a gas at ambient conditions (i.e. when spilled). Examples include ethane, propane and butylene.

29   Waterkeeper Alliance 2017.

30   Greenpeace USA. Natural Gas: Methane's contributions to global warming. www.greenpeace.org/usa/global-warming/issues/natural-gas/

31   Energy Transfer. Bakken. www.energytransfer.com/ops_bakken.aspx

32   Sack, C. 2016. A #NoDAPL Map. Huffington Post, November 2. www.huffingtonpost.com/entry/a-nodapl-map_us_581a0623e4b014443087af35

33   Dakota Access LLC. 2015. *Draft Environmental Assessment Dakota Access Pipeline Project Crossings of Flowage Easements and Federal Lands.* November. www.nwo.usace.army.mil/Missions/Civil-Works/Planning/Project-Reports/Article/633496/dakota-access-pipeline-environmental-assessment/

34   Earthjustice. Updates & Frequently Asked Questions: The Standing Rock Sioux Tribe's Litigation on the Dakota Access Pipeline. https://earthjustice.org/features/faq-standing-rock-litigation

Case ID: 250303655

**Exhibit A_ Page 120 of 336**

35    Brown, A. 2018. Five Spills, Six Months in Operation: Dakota Access Track Record Highlights Unavoidable Reality — Pipelines Leak. *The Intercept*, January 9. https://theintercept.com/2018/01/09/dakota-access-pipeline-leak-energy-transfer-partners/

36    See Appendix B

37    Ibid.

38    Ramseur, J. 2017. *Oil Spills: Background and Governance.* Congressional Research Service. https://fas.org/sgp/crs/misc/RL33705.pdf

39    Perry, K. 2015. 2014 oil spill still mars nature preserve. *Cincinnati.com*, May 16. www.cincinnati.com/story/news/2015/05/16/sunoco-pipelineoak-glen-nature-preserve-hebron-colerain-township-oil-spill-crude-gallons/27399019/

40    PHMSA 2014.

41    Delaware County Daily Times. 2010. Editorial: Penalty for Sunoco has a foul smell. January 6. www.delcotimes.com/general-news/20100106/editorial-penalty-for-sunoco-has-a-foul-smell. Quoted in NWF 2010.

42    Rover Pipeline. The Facts on Rover Pipeline Project. www.roverpipelinefacts.com

43    FERC. 2017. Order On Clarification and Denying Rehearing. November 3. www.ferc.gov/CalendarFiles/20171130161519-CP15-93-002.pdf

44    Malik, N.S. & C. Traywick. 2017. Blackstone's New Pipeline Asset Is Wreaking Environmental Havoc, *Bloomberg News*, August 17. www.bloomberg.com/news/articles/2017-08-17/blackstone-s-new-pipeline-asset-is-wreaking-environmental-havoc

45    Sunoco Pipeline. Mariner East. https://marinerpipelinefacts.com/mariner-east/

46    Reuters Staff. 2018. ETP Mariner East liquids pipe spills more fluid in Pennsylvania. *Reuters*, March 27. www.reuters.com/article/us-energy-transf-sunoco-marinereast/etp-mariner-east-liquids-pipe-spills-more-fluid-in-pennsylvania-idUSKBN1H321A; see also Pennsylvania DEP. Pennsylvania Pipeline Portal: Mariner East Pipeline II www.dep.pa.gov/Business/ProgramIntegration/Pennsylvania-Pipeline-Portal/Pages/Mariner-East-II.aspx

47    Hurdle, J. 2017. Water problems persist along Mariner East pipeline route despite court intervention. State Impact (NPR). October 12. https://stateimpact.npr.org/pennsylvania/2017/10/12/water-problems-persist-along-mariner-east-pipeline-route-despite-court-intervention/

48    Jalbert, K. 2017. Mariner East 2 Drilling Fluid Spills – Updated Map and Analysis. FracTracker, July 26. www.fractracker.org/2017/07/me2-drilling-fluid-spills/; see also Pennsylvania DEP. 2018. Sunoco Mariner East II - Pipeline Construction Inadvertent Returns - Waters of the Commonwealth. Revised on March 30, 2018. http://files.dep.state.pa.us/ProgramIntegration/PA%20Pipeline%20Portal/MarinerEastII/Sunoco_Mariner_East_II-Pipeline_Construction_Inadvertent_Returns-Waters_of_the_Commonwealth_Revised.pdf

49    Pennsylvania DEP. 2018. Administrative Order. January 3. http://files.dep.state.pa.us/ProgramIntegration/PA%20Pipeline%20Portal/MarinerEastII/OrderSuspendingConstructionActivities010318.pdf

50    Cusick, M. 2018. Sunoco to resume work, pay $12.6 million for Mariner East 2 pipeline violations. *State Impact* (NPR), February 8. [ https://stateimpact.npr.org/pennsylvania/2018/02/08/sunoco-to-resume-work-pay-12-6-million-for-mariner-east-2-pipeline-violations/

51    Pennsylvania PUC. 2018. Emergency Order. March 7. www.puc.state.pa.us/pcdocs/1556680.pdf

52    Pennsylvania PUC. 2018. Petition of the Bureau of Investigation and Enforcement of the Pennsylvania Public Utility Commissions for the Issuance of an *Ex Parte* Emergency Order. March 7. www.puc.state.pa.us//pcdocs/1556676.pdf

53    Ibid.

54    U.S. Pipeline and Hazardous Materials Safety Administration. Pipeline Incident 20 Year Trends. www.phmsa.dot.gov/pipeline/library/data-stats/pipelineincidenttrends; see also Lee, M. 2016. Number of leaks and spills continued to grow in 2015. EnergyWire, August 22. www.eenews.net/energywire/2016/08/22/stories/1060041856

55    API & AOPL. 2017. Pipeline Safety Excellence: Performance Report & Strategic Plan 2017-2019. www.energyinfrastructure.org/~/media/energyinfrastructure/images/pipeline/related-docs/api-aopl-pipeline-safety-report-high.pdf; see also Mandel, J. 2017. Safety incidents on the rise after decade of decline. EnergyWire, April 26. www.eenews.net/energywire/stories/1060053574

56    U.S. Pipeline and Hazardous Materials Safety Administration. Inspections Overview. https://www.phmsa.dot.gov/pipeline/inspections/inspections-overview

57    Soraghan, M. 2017. Oil and gas industry leads in severe injuries. *EnergyWire*. May 2. www.eenews.net/energywire/2017/05/02/stories/1060053892

58    PHMSA. Pipeline Incident 20 Year Trends.

59    Stover, R. America's Dangerous Pipelines. Center for Biological Diversity. www.biologicaldiversity.org/campaigns/americas_dangerous_pipelines/

60    McGowan, E. & L. Song. 2012. The Dilbit Disaster: Inside The Biggest Oil Spill You've Never Heard Of, Part 1. *InsideClimate News*, June 26. https://insideclimatenews.org/news/20120626/dilbit-diluted-bitumen-enbridge-kalamazoo-river-marshall-michigan-oil-spill-6b-pipeline-epa

61    Douglas, E. 2015. Yellowstone Oil Spills Expose Threat to Pipelines Under Rivers Nationwide. *InsideClimate News*, February 6. https://insideclimatenews.org/news/06022015/yellowstone-oil-spills-expose-threat-pipelines-under-rivers-nationwide

62    There is no comprehensive database of all hazardous material spills in the U.S. with data scattered across numerous federal and state agencies, and lacking consistent reporting rules; see also King, P. & M. Soraghan. 2016. Spills dropped 8% in 2015 as new drilling slowed. *EnergyWire*, July 21. www.eenews.net/energywire/2016/07/21/stories/1060040567

63    Soraghan, M. & P. King. 2016. Drilling mishaps damage water in hundreds of cases. *EnergyWire*, August 8. www.eenews.net/energywire/stories/1060041279

64    Louisiana's Disappearing Wetlands, Louisiana's Oil, Understanding the Environmental and Economic Impact, southeastern.edu, July 12, 2010 www2.southeastern.edu/orgs/oilspill/wetlands.html; see also Atchafalaya Basin Floodway System, Louisiana Project, State Master Plan, at 3-2. www.dnr.louisiana.gov/assets/docs/Atchafalaya_Basin/StateMasterPlan.pdf

65    Permit for Wanda Petroleum, Inc., Aug. 21, 1969; Permit for Sorrento Pipeline Co., Sept. 4, 2001. The Bayou Bridge right-of-way follows a path of these two existing pipelines for which both permits prohibited the miles-long spoil banks that were created during construction and that remain today. Permits for Florida Gas Transmission, Dec. 14, 1962 & Feb. 13, 1963. The permits for this 5,325-mile interstate natural gas pipeline jointly owned by Energy Transfer Partners and Kinder Morgan running from Texas, through the Atchafalaya Basin, to south Florida, require the removal of dredged material that could interfere with navigation; see also Atchafalaya Basinkeeper, et al. 2018. Complaint for Declaratory and Injunctive Relief, at 60. https://earthjustice.org/sites/default/files/files/3430-Complaint.pdf

66    State of Louisiana Department of Natural Resources. 2018. Final Report: Senate Resolution No. 154 of the 2017 Regular Session. January. http://www.dnr.louisiana.gov/assets/OCM/ABP/SR154.Study.Final.pdf

Case ID: 250303655



Stakes mark the path of part of the Bayou Bridge pipeline through wetlands in Louisiana. Photo by ©Julie Dermansky/Greenpeace

67    Riegel, S. 2017. Swamp tale: A landman's long-running environmental whistleblower suit against the state speaks to larger issues about conflict, controversy and trust in the Atchafalaya Basin. *Business Report*, March 1. *www.businessreport.com/business/swamp-tale-local-landmans-long-running-environmental-whistleblower-suit-state-speaks-larger-issues-conflict-controversy-trust-atchafalaya-basin*

68    Public Accountability Initiative. 2018. The Power Behind the Pipelines: Bayou Bridge Pipeline. *https://public-accountability.org/2018/01/the-power-behind-the-pipelines-bayou-bridge-pipeline/*

69    Bayou Bridge Pipeline. Bayou Bridge Facts. *https://bayoubridge.com/*

70    Kunzelman, M. 2018. Judge hears testimony in request to halt Bayou Bridge pipeline. *Associated Press*, February 9. *www.nola.com/environment/index.ssf/2018/02/judge_hears_testimony_in_reque.html*

71    U.S. Army Corp of Engineers. 2017. Environmental Assessment: Section 408 Evaluation of Bayou Bridge Pipeline Project. *www.mvn.usace.army.mil/Portals/56/docs/Section%20408/BBP/Bayou%20Bridge%20408%20EA%2010-17-2017%20HL.pdf?ver=2018-01-29-122020-020*

72    Fractracker Alliance. 2017. Pipeline Under Debate in Louisiana Bayou. January 3. *www.fractracker.org/2017/01/pipeline-debate-louisiana-bayou/*

73    Gilmer, E. 2018. In rare move, court halts ETP oil pipeline. *EnergyWire*, February 26. *www.eenews.net/energywire/2018/02/26/stories/1060074731*

74    Hardy, S. 2018. Federal Appeals Court lifts stay blocking pipeline construction through Atchafalaya Basin. *The Advocate*, March 15. *www.theadvocate.com/baton_rouge/news/environment/article_6d0b7800-2898-11e8-95c0-cf0328d5178b.html*

75    Baurick, T. 2018. Bayou Bridge Pipeline's controversial construction begins. *The Times-Picayune*, January 29. *www.nola.com/environment/index.ssf/2018/01/bayou_bridge_pipeline_construc.html*

76    Bayou Bridge Pipeline, LLC's *Reply in Support of Emergency Motion for Stay Pending Appeal*, at 1-2 (discussing water level influence on construction) filed on Mar. 6, 2018, Case No. 18-30257, Fifth Cir. Court of Appeals.

77    Declaration of Dr. Ivor van Heerden, at Paragraph 4.

78    Reuters staff. 2018. ETP eyes new crude pipeline from Permian basin to Nederland, Texas. Reuters, February 22 *www.reuters.com/article/energy-transf-pipeline-oil/etp-eyes-new-crude-pipeline-from-permian-basin-to-nederland-texas-idUSL2N1QC0RC*

Case ID: 250303655

# Appendix A-C

## Appendix A: Research Methods

Available for download online at:
https://www.greenpeace.org/usa/wp-content/uploads/2018/04/Appendix-A-Research-Methods.pdf

## Appendix B: ETP & Sunoco, PHMSA Violations & Penalties

Available for download online at:
https://www.greenpeace.org/usa/wp-content/uploads/2018/04/Appendix-B-ETP-Sunoco-PHMSA-Violations-Penalties.pdf

## Appendix C: Energy Transfer Partners' Rover Pipeline Violations & Spills in Michigan, Ohio & West Virginia, February 2017-March 2018

Available for download online at:
https://www.greenpeace.org/usa/wp-content/uploads/2018/04/Appendix-C-Rover-Timeline-Violations.pdf

Construction work on the Bayou Bridge project continues in Louisiana. April 2018. Photo by ©Julie Dermansky/Greenpeace



**GREENPEACE** Reports

**WATERKEEPER® ALLIANCE**

**OIL AND WATER: ETP & SUNOCO'S HISTORY OF PIPELINE SPILLS**

APRIL 17, 2018

Case ID: 250303655

**Exhibit A_ Page 123 of 336**

**Appendix A: Research Methods**

From the PHMSA website, we downloaded the Excel files "Hazardous Liquid Accident Data - January 2010 to present (ZIP)" and "Hazardous Liquid Accident Data - January 2002 to December 2009 (ZIP)" [link to both datasets] on 2/26/18. Full analysis conducted using pandas in a jupyter notebook, available upon request.

The 2010-present dataset contained 3212 records, of which 49 represented biofuels or CO2 spills, and were excluded. The remaining 3163 records were comprised of 1605 crude oil spills, 1063 refined petroleum product spills, and 495 HVL spills. The 2002-2009 dataset contained 3030 records, from which we excluded biofuels and CO2 spills, and any records where the 'SPILLED' field was 'NO.' Of the remaining 2962 records, 1360 were crude oil spills, 1172 were refined petroleum products spills, and 419 were HVL spills.

Using the PHMSA operator database [link] and the incidents databases, we identified 41 subsidiaries or joint ventures that were associated with ETP/Sunoco. These entities were identified by:
- Searching the incident file for reports submitted via email from the domains energytransfer.com, sunocologistics.com, and sunocoinc.com.
- Searching the operator database for operators containing the phrases "transfer", "ETP", "ETC", "ETE, "sunoco", "DAPL", "Dakota Access", etc.
- Cross-referencing lists of subsidiaries found in Form 10-K Ex 21.1 documents against the operator database. Lists of subsidiaries are available from the latest 10-K submissions for ETP, ETE, and Sunoco Logistics Partners.

Although ETP and Sunoco merged in 2012, we include all spills in the database starting in 2010 for both of those entities and subsidiaries that existed at that time. For other subsidiaries acquired after 2012, we only include spills that occurred after the acquisition.

The full list of hazardous liquid subsidiaries included in this analysis is as follows:
- **ENERGY TRANSFER COMPANY** [Operator ID 32099, link to PHMSA operator page, **23 incidents**] This exact name isn't a listed subsidiary but it does refer to the ETP/ETE family of companies. All records were submitted from energytransfer.com emails, all after June 2012. No records for this operator ID were found in the 2002-2009 data. This operator ID also has 16 incidents in PHMSA's 2002-present natural gas gathering/transmission database, all submitted form energytransfer.com emails.
- **DAPL-ETCO OPERATIONS MANAGEMENT, LLC** [Operator ID 39205, no PHMSA operator page, **7 incidents**] This entity is listed on Form 10-K as a subsidiary of Energy Transfer Partners, L.P. Collectively DAPL and ETCO make up the Bakken Pipeline. The project is a joint venture with MarEn Bakken Company LLC (Enbridge) and Phillips 66, with ETP holding a 38.25% interest. All spill records are from 2017. Submitted via energytransfer.com emails, except the first record submitted from sunocologistics.com. No records for this operator ID were found in the 2002-2009 data. This operator ID and company name appear in the incident database, but do not appear in the operator database.
- **SUNOCO PIPELINE L.P.** [Operator IDs 18718 and 31623, link to PHMSA operator page, **337 incidents**] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P., with more information at links here and here. In the 2002-2009 data we find 136 incidents under this operator ID plus an additional six from 2002-03 with similar names under ID 31623. (We exclude one record with SPILLED=NO). Date ranges for the two IDs overlap, and some early records were submitted from sunoil.com emails. ID 31623 does not appear in 2010-present data, but we find 195 records under ID 18718 in that data for a total of 337.
- **MID - VALLEY PIPELINE CO** [Operator IDs 12470, 12471, 30871, link to PHMSA operator page, **76 incidents**] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. which has a "controlling financial interest." Sunoco's interest in this pipeline has been 55.3% since at least the 2002 10-K, therefore we include all incidents in our analysis. In 2002-2009 data, we find 37 incidents under this ID, plus an additional 7 incidents dating from 2002-03 under two other IDs with similar names. The other IDs do not appear in the 2010-present data, but we do find 32 records under ID 12470 in that data for a total of 76. All records submitted via sunocologistics.com emails.
- **WEST TEXAS GULF PIPELINE CO** [Operator ID 22442, link to PHMSA operator page, **46 incidents**] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. which obtained 100% interest in the pipeline in 2015. As of 2006, the interest in the pipeline was 43.8%, therefore we include these incidents, which are all 2006 or later, in our analysis. In the 2002-2009 data, we find 13 incidents under this ID, while in the 2010-present data we find 33 incidents, all from sunocologistics.com emails. (We exclude one record with SPILLED=NO).
- **INLAND CORPORATION** [Operator ID 32683, link to PHMSA operator page, **7 incidents**] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. which acquired a "controlling

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

<span style="color:red">Case ID: 250303655</span>

**Exhibit A_ Page 124 of 336**

interest" in 2011. All spills in the database for this ID post-date this acquisition. No records for this operator ID were found in the 2002-2009 data.

- **PERMIAN EXPRESS TERMINAL LLC** (formerly **SUNVIT PIPELINE LLC**) [Operator ID 39131, link to PHMSA operator page, **2 incidents**] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. Sunoco Logistics purchased a 50% interest in the SunVit Pipeline from Vitol Group in September 2016, increasing their interest to 100% at that time. The project was renamed in December 2016. All spills in the database post-date this acquisition. No records for this operator ID were found in the 2002-2009 data.

- **SUNOCO MIDLAND GATHERING LLC** [Operator ID 39307, link to PHMSA operator page, **1 incident**] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. This is the same operator ID as **VITOL MIDSTREAM, LLC** [4 records, see this 2011 announcement for more information] which was acquired by Sunoco Logistics in November 2016. The four spills tallied under Vitol Midstream pre-date the closing of the acquisition, were submitted from vitol.com email addresses (except one, which seems to have been submitted a year later), and are therefore excluded from our analysis. The one post-acquisition spill is retained. No records for this operator ID were found in the 2002-2009 data.

- **PERMIAN EXPRESS PARTNERS LLC** [Operator ID 39596, no PHMSA operator page, **1 incident**] Listed in 10-K as a subsidiary of Sunoco Logistics Partners L.P. This is a joint venture with ExxonMobil, announced in November 2016, where Sunoco Logistics has an 85% stake. The only spill post-dates the partnership. No records for this operator ID were found in the 2002-2009 data. This operator ID and company name appear in the incident database, but do not appear in the operator database.

- **SUNOCO PARTNERS MARKETING & TERMINALS LP** [Operator ID 39706, no PHMSA operator page, **3 incidents**] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. All reports submitted from energytransfer.com emails, and all were in 2017. No records for this operator ID were found in the 2002-2009 data. This operator ID and company name appear in the incident database, but do not appear in the operator database.

- **WOLVERINE PIPELINE CO** [Operator ID 22830, link to PHMSA operator page, **11 incidents**] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. As of 2004, Sunoco Logistics held a 31.5% interest in this joint venture, the same percentage as today. In the 2002-2009 dataset, we find 7 incidents under this ID, and 4 incidents in the 2010-present data. (We exclude one record with SPILLED=NO). Since all incidents are 2004 or later we include all in our analysis.

- **HARBOR PIPELINE CO** [Operator ID 7063, link to PHMSA operator page, **6 incidents**] This entity is not listed in the latest 10-K as a subsidiary, however it does appear on this website as an asset of Sunoco Logistics Partners. The spill records in the database are from 2004-2012, were submitted from sunocologistics.com emails, and the Harbor Pipeline is mentioned in the 2004 10-K. In the 2002-2009 data, we find 3 incidents under this ID, one of which has the Sunoco Pipeline L.P name, submitted via sunocologistics.com emails.

- **SUNOCO, INC (R&M)** [Operator IDs 18779 and 31676, link to PHMSA operator page, **6 incidents**] Sunoco, Inc is the name of the pre-merger entity that was acquired by ETP. In the 2010-present data we find two spills date from 2010 and were submitted via sunocoinc.com emails. In 2002-2009 data, we find 2 incidents under ID 18779 plus 2 more under ID 31676. The names vary somewhat, but we cluster them here. (We exclude one record with SPILLED=NO)

- **WYNNEWOOD REFINERY COMPANY** [Operator ID 32096, link to PHMSA operator page, **1 incident**] This ID does not appear in the 2010-present data, but shows one incident in 2009 submitted from a sunocologistics.com email. The 2011 10-K notes that Sunoco Logistics acquired 100% interest in Excel in September 2009, which included a pipeline and a refinery in Wynnewood, OK. This incident is from July 2009, but the 10-K notes that Sunoco was "the operator of the pipeline prior to the acquisition" and so we include this incident.

The following hazardous liquids entities are excluded from this analysis:
- **EXPLORER PIPELINE CO** [Operator ID 4805, link to PHMSA operator page, **49 incidents**] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. This is a JV with Phillips 66, Marathon, and Shell, operated by Explorer. Sunoco Logistics holds a 15% stake. We exclude joint ventures where ETP/Sunoco has less than a 25% stake and is not the pipeline operator.

- **WEST SHORE PIPELINE CO** [Operator ID 22430, link to PHMSA operator page, **16 incidents**] THis entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. Sunoco Logistics holds a 17.1% stake in this JV, which is operated by Buckeye Partners. We exclude joint ventures where ETP/Sunoco has less than a 25% stake and is not the pipeline operator.

- **LONE STAR NGL REFINERY SERVICES LLC** [Operator ID 31673, link to PHMSA operator page, **2 incidents**] This entity is listed on Form 10-K as a subsidiary of Energy Transfer Partners L.P. This operator ID is inactive. In 2011 ETP purchased LDH Energy Asset Holdings LLC. In the 2002-2009 data, two records are found for this ID under the name **LOUIS DREYFUS OLEFINS, LLC**. The records are

submitted from louisdreyfus.com and ldhenergy.com emails. We exclude these 2006 incidents because they pre-date the acquisition. One additional spill record in the 2010-present data was submitted by an energytransfer.com email address for **LDH ENERGY PIPELINE L.P.** [Operator ID 32035, link to PHMSA operator page, **10 incidents**], which is likely the result of the same merger. Possibly the event was noticed and reported by an ETP contractor or possibly it was reported by ETP post-merger, but we do not include it in this assessment since it occurred in 2010 and pre-dates the merger.

- **REGENCY FIELD SERVICES LLC** [Operator ID 31852, link to PHMSA operator page, **1 incident**] This exact name does not appear in the most recent 10-K, but ETP seems to have acquired Regency Energy Partners in 2010 and then merged in 2015. This opid does not appear in the 2010-present data and is currently inactive, but 2002-09 data shows one incident HVL/liquid natural gas incident in 2007, submitted from a regencygas.com email. However, this incident pre-dates the acquisition and so is excluded.

The following are hazardous liquid subsidiaries that have a PHMSA operator ID, but did not record any incidents from 2010-present:

- **BAYOU BRIDGE PIPELINE, LLC** [Operator ID 39462, link to PHMSA operator page, 0 incidents] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. This is a joint venture in which both ETP and Sunoco Logistics hold a 30% stake.
- **PHILADELPHIA ENERGY SOLUTIONS REFINING AND MARKETING, LLC** [Operator ID 38964, link to PHMSA operator page, 0 incidents] This entity is listed on Form 10-K as a subsidiary of Energy Transfer Partners L.P.
- **LIBERTY PIPELINE GROUP, LLC** [Operator ID 32582, link to PHMSA operator page, 0 incidents] This entity is listed on Form 10-K as a subsidiary of Energy Transfer Partners L.P. This operator ID is inactive.
- **REGENCY LIQUIDS PIPELINE LLC** [Operator ID 32355, link to PHMSA operator page, 0 incidents] This entity is listed on Form 10-K as a subsidiary of Energy Transfer Partners L.P. This operator ID is inactive.

The following are natural gas subsidiaries with PHMSA operator IDs that reported incidents from natural gas transmission pipelines:

- **ENERGY TRANSFER COMPANY** [Operator ID 32099, link to PHMSA operator page, **16 incidents**] This operator ID has 10 incidents in the 2010-present data, and 6 incidents in the 2002-2009 data, all submitted form energytransfer.com emails.
- **PANHANDLE EASTERN PIPELINE CO** [Operator ID 15105, link to PHMSA operator page, **11 incidents**] 11 incidents were found in the 2010-present dataset, all from energytransfer.com emails.
- **FLORIDA GAS TRANSMISSION CO** [Operator ID 5304, link to PHMSA operator page, **11 incidents**] 11 incidents were found in the 2010-present dataset, all from energytransfer.com emails.
- **SEA ROBIN PIPELINE CO** [Operator ID 18152, link to PHMSA operator page, **9 incidents**] 9 incidents were found in the 2010-present dataset, all from energytransfer.com emails.
- **TRUNKLINE GAS CO** [Operator ID 19730, link to PHMSA operator page, **5 incidents**] 4 incidents were found in the 2010-present dataset, and one incident was found in the 2002-2009 dataset, all submitted from energytransfer.com emails.
- **TRANSWESTERN PIPELINE COMPANY LLC** [Operator ID 19610, link to PHMSA operator page, **4 incidents**] 3 incidents were found in the 2010-present dataset, and one incident was found in the 2002-2009 dataset, all submitted from energytransfer.com emails.
- **REGENCY INTRASTATE GAS LP** [Operator ID 32335, link to PHMSA operator page, **1 incident**] 1 incident was found in the 2010-present dataset, submitted from an energytransfer.com email. Currently inactive ID.
- **HOUSTON PIPELINE CO** [Operator ID 7605, no PHMSA operator page, **1 incident**] 1 incident from 2003 was found in the 2002-2009 dataset, submitted from an energytransfer.com email. This operator ID and company name appear in the incident database, but do not appear in the operator database.

The following are natural gas operator IDs that are listed as ETP or Sunoco subsidiaries, but did not report any incidents or are otherwise excluded from the analysis:

- **MIDCONTINENT EXPRESS PIPELINE LLC** [Operator ID 32436, link to PHMSA operator page, 1 incident] This entity is listed as a subsidiary on the latest 10-K, but the incident dates to 2009 and was submitted from a kindermorgan.com email, and so is excluded.
- **ETC TIGER PIPELINE, LLC** [Operator ID 32467, link to PHMSA operator page, 0 incidents] See this link for more information.

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

Case ID: 250303655

- **PENNTEX MIDSTREAM PARTNERS, LLC** [Operator ID 39173, link to PHMSA operator page, 0 incidents] Inactive operator ID. This ID reports both natural gas and hazardous liquids mileage, but no incidents.
- **SOUTHERN UNION GAS SERVICES, LTD** [Operator ID 18526, link to PHMSA operator page, 0 incidents] Inactive operator ID. This ID reports both natural gas and hazardous liquids mileage, but no incidents.
- **CHALKEY TRANSMISSION COMPANY, LTD** [Operator ID 31211, link to PHMSA operator page, 0 incidents] Inactive operator ID.
- **FAYETTEVILLE EXPRESS PIPELINE, LLC** [Operator ID 32469, link to PHMSA operator page, 0 incidents]
- **GULF STATES TRANSMISSION CORPORATION** [Operator ID 32323, link to PHMSA operator page, 0 incidents]
- **LEE 8 STORAGE PARTNERSHIP** [Operator ID 30786, link to PHMSA operator page]
- **LOBO PIPELINE LP** [Operator ID 31735, link to PHMSA operator page, 0 incidents] Inactive operator ID.
- **PEI POWER CORP** [Operator ID 31453, link to PHMSA operator page, 0 incidents] Inactive operator ID.
- **PENNTEX PERMIAN, LLC** [Operator ID 39432, link to PHMSA operator page, 0 incidents] Inactive operator ID.
- **SOUTHERN UNION INTRASTATE GAS PIPELINE** [Operator ID 32256, link to PHMSA operator page, 0 incidents] Inactive operator ID.
- **WGP-KHC, LLC** [Operator ID 31730, link to PHMSA operator page, 0 incidents]

No incidents from ETP or its subsidiaries were found in PHMSA natural gas distribution incident data.

**Mapping the Data**

An interactive map of the ETP/Sunoco spill dataset was created in carto. The 2010-present PHMSA data is standardized with latitude and longitude expressed in decimal degrees. However, the 2002-2009 PHMSA data does not have a standard format for lon-lat data, particularly for the early years. Latitude and longitude were presented in a variety of formats, including D.d, DM.m and DMS. We converted all of these values to the standard D.d format. For a number of incidents, we changed the reported longitude from positive to negative values, under the assumption that the spills occurred in the western hemisphere. For 7 spills, no latitude-longitude was reported, and for 3 more spills, the data was reported in unknown formats. These 10 incidents are not shown on the map.

For comparison purposes, we display U.S. liquids pipelines using shapefiles compiled by the U.S. Energy Information Agency (EIA) [link], plus one shapefile of the Dakota Access Pipeline obtained from public sources. Where EIA identified ETP, Sunoco or one of their corporate entities as the pipeline operator we colored the pipeline red; all other pipelines are colored grey. The shapefiles used were 'Crude Oil Pipelines', 'Petroleum Product Pipelines' and 'HGL (hydrocarbon gas liquids) Pipelines.' EIA describes these files as being based on "publicly available data from a variety of sources with varying scales and levels of accuracy." This EIA pipeline dataset is likely not a complete set of U.S. liquids pipelines and may not fully reflect ETP/Sunoco's current or past pipeline assets.

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

Case ID: 250303655

Appendix B: ETP & Sunoco, PHMSA Violations & Penalties

| Date | Operator | # of Probable Violations | Proposed or Assessed Civil Penalty | Case Status | Summary of Violations | PHMSA Citation |
|------|----------|-------------------------|-----------------------------------|-------------|----------------------|----------------|
| 01/11/2018 | SUNOCO PIPELINE L.P. | 1 | $0 | Open | 1 failure to insepct field bending pipe during construction | link |
| 01/18/2018 | SUNOCO PIPELINE L.P. | 3 | $163,700 | Open | 117 failures to inpect crosssings under waterways, valves and pipelines | link |
| 01/18/2018 | SUNOCO PIPELINE L.P. | 2 | $127,000 | Open | 6 failures to inspect pressure transmitters, pipelines | link |
| 08/14/2017 | SUNOCO PIPELINE L.P. | 8 | $129,800 | Open | Failure to repair unsafe pipe for 5 years, failures to maintain pipeline integrity in high consequence areas, failure to report unsafe condition, failure to do corrosion inspection | link |
| 05/04/2017 | SUNOCO PIPELINE L.P. | 1 | $25,900 | Closed | 1 failure to test pipeline using proper procedures | link |
| 05/03/2017 | MID - VALLEY PIPELINE CO | 1 | $88,400 | Open | 1 failure to inpect crosssings under waterways | link |
| 04/06/2017 | SUNOCO PIPELINE L.P. | 2 | $0 | Open | 2 failures to notifiy PHMSA of a spill, fire, injuries requiring hospitalization. | link |
| 02/06/2017 | INLAND CORPORATION | 1 | $55,220 | Open | Failure to cover pipe. | link |
| 12/09/2016 | MID - VALLEY PIPELINE CO | 2 | $0 | Open | Failure to properly notify emergency responders, public. | link |
| 10/27/2016 | WEST TEXAS GULF PIPELINE CO | 2 | $251,800 | Open | 2 failures to follow safety procedures causing 5 people to be injured. | link |
| 10/04/2016 | PERMIAN EXPRESS TERMINAL LLC | 1 | $0 | Open | Failure to follow procedures. | link |
| 07/07/2016 | WEST TEXAS GULF PIPELINE CO | 15 | $1,539,800 | Open | 15 violations of maintenace rules after a spill, fire and injuries requiring hosptilization. | link |
| 06/02/2016 | SUNOCO PIPELINE L.P. | 5 | $141,700 | Closed | 5 violations of safety, inspection, repair rules | link |
| 04/28/2016 | SUNOCO PIPELINE L.P. | 5 | $1,278,100 | Open | 5 violations of welding procedues and failure to use of qualified welders during constrution | link |
| 04/11/2016 | ENERGY TRANSFER COMPANY | 2 | $24,400 | Closed | Failure to insure qualified personal performed inspections, failure to maintain records | link |
| 04/27/2015 | WEST TEXAS GULF PIPELINE CO | 2 | $207,300 | Closed | Spill and failure to repair damaged pipeline. | link |
| 04/08/2015 | WEST TEXAS GULF PIPELINE CO | 2 | $141,000 | Closed | Failures to provide notice of a spill, fire and injury requiring hospitilation. | link |
| 10/02/2014 | SUNOCO PIPELINE L.P. | 1 | $22,300 | Closed | Failure to maintain corrosion protection. | link |
| 09/30/2013 | SUNOCO PIPELINE L.P. | 1 | $25,900 | Closed | Control room management failure. | link |
| 12/03/2012 | SUNOCO PIPELINE L.P. | 1 | $0 | Closed | Failure to update public notice procedures. | link |
| 11/06/2012 | SUNOCO PIPELINE L.P. | 1 | $22,500 | Closed | Failure to files supplemental spill report. | link |
| 07/16/2012 | HARBOR PIPELINE CO | 1 | $100,000 | Closed | Failure to follow procedures for cutting a pipeline and atmospheric monitoring. | link |
| 11/23/2010 | MID-VALLEY PIPELINE CO | 1 | $48,700 | Closed | Failure to correct deficiencies in corrosion control. | link |
| 03/11/2010 | WEST TEXAS GULF PIPELINE CO | 7 | $405,000 | Closed | Failure to follow procedures related to large spill, fire. | link |
| 09/17/2009 | SUNOCO INC (R&M) | 2 | $32,500 | Closed | Operating pressure and corrsion control violations. | link |
| 08/14/2009 | SUNOCO PIPELINE L.P. | 5 | $232,900 | Closed | Large gasoline spill into Turtle Creek, evacuation of homes, businesses, public road closure. | link |
| 03/11/2008 | SUNOCO PIPELINE L.P. | 1 | $34,000 | Closed | Failures to inpect right of ways and crosssings under waterways. | link |
| 11/19/2007 | SUNOCO PIPELINE L.P. | 2 | $200,000 | Closed | Failure to follow review procedures to ensure proper equipment use. | link |
| 11/13/2007 | SUNOCO PIPELINE L.P. | 12 | $119,000 | Closed | Failure to inspect ROWs, crossings under navigable waters, tanks, do valve maintenance, provide records, secure facilities, etc. | link |
| 05/15/2007 | SUNOCO PIPELINE L.P. | 1 | $150,000 | Closed | Failure to prevent and respond to a spill. | link |
| 02/12/2007 | SUNOCO PIPELINE L.P. | 2 | $0 | Closed | Leak detection and high consequence area monitoring failures. | link |
| 02/09/2006 | SUNOCO PIPELINE L.P. | 1 | $0 | Closed | Failure to install equipment. | link |
| 06/02/2005 | WOLVERINE PIPELINE CO | 2 | $11,750 | Closed | Failure to meet operator qualificaton requirements. | link |
| 03/30/2005 | SUNOCO PIPELINE L.P. | 2 | $40,000 | Closed | Failure to complete risk analysis requirements. | link |
| 02/24/2005 | SUNOCO PIPELINE L.P. | 1 | $11,000 | Closed | Failure to follow procedures. | link |
| 09/22/2004 | SUNOCO PIPELINE L.P. | 3 | $6,200 | Closed | Failure to inspect, maintain maps and mark pipelines. | |
| 08/26/2003 | MID - VALLEY PIPELINE CO | 3 | $35,000 | Closed | Failure to follow procedures to notify the public. | link |
| 07/03/2002 | SUNOCO PIPELINE LP | 1 | $5,000 | Closed | Failure to identfiy pipeline segments in high consequence areas. | |
| Totals: | | 106 | $5,675,870 | | | |

Case ID: 250303655

**Exhibit A_ Page 128 of 336**

**Appendix C: Energy Transfer Partners' Rover Pipeline Violations & Spills in Michigan, Ohio & West Virginia, February 2017-March 2018[1]**

**February 3, 2017:** FERC gives final approval for the Rover Pipeline, must clear trees before March 31st bat roosting. FERC denied ET a blanket certificate for Rover after demolishing a house that was under consideration for a national registry of historic homes, without first telling FERC.[2]

**March 2, 2017:** FERC approves the start of pipeline construction.[3]

**April 5, 2017:** unauthorized pollution release impacting tributaries of Woodfield Reservoir in Monroe County, OH failure to control stormwater [4]

**April 8, 2017:** ,000 gallons of drilling fluid pollution released into wetland near Indian Fork River, in Tuscarawas County, OH; covered 2500 square foot area of wetland [5]

**April 10, 2017:** 600 gallons of drilling fluid pollution released into stream, wetland and pond in Richland Township, Belmont County, OH [6]

**April 10, 2017:** unauthorized pollution release impacting tributaries of Woodfield Reservoir in Monroe County, OH failure to control stormwater [7]

**April 11, 2017:** unauthorized pollution release from failure to manage stormwater in Bloomdale, Wood County, OH [8]

**April 11, 2017:** Clean Air Act violation, open burning of site preparation material near a home in Toronto, Ohio [9]

**April 11, 2017:** Stormwater violations in Wood, Richland, and Crawford Counties, OH because of failure to manage vehicle tracking of drilling materials onto public roadways [10]

**April 12, 2017:** unauthorized pollution release into Bull Creek in Wood County, OH - failure to control stormwater [11]

---

[1] Much of this information was compiled and previously published as Sierra Club. 2017. Energy Transfer's Fracked Gas Pipeline Spills Six Times in Two Weeks, Has Seven Additional Violations. May 8. [link . ]
[2] U.S. Federal Energy Regulatory Commission (FERC). 2017. Order Issuing Certificates. February 2. [link    ]
[3] 2017. FERC Green Lights Rover Pipeline Construction. *Marcellus Drilling News*, March 6. [link    ]
[4] Ohio Environmental Protection Agency (EPA). 2017. Director's Final Findings and Orders. July 7. [link    ]
[5] Ohio EPA. 2017, p. 3.
[6] Ohio EPA. 2017, p. 3-4.
[7] Ohio EPA. 2017, p. 6.
[8] Ohio EPA. 2017, p. 7.
[9] Ohio EPA. 2017, p. 12.
[10] Ohio EPA. 2017, p. 7.
[11] Ohio EPA. 2017, p. 7.

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

Case ID: 250303655

**April 13, 2017:** 2 million gallons of drilling fluid pollution accumulating in high quality wetland adjacent to Tuscarawas River in Navarre Township, Stark County; covered 500,000 sq foot area of the category 3 wetland [12]

**April 14, 2017:** 50,000 gallons of drilling fluid pollution released into wetland in Mifflin Township, Richland County, OH [13]

**April 17, 2017:** 200 gallons of drilling fluid pollution released into a pond in Monroe Township, Harrison County, OH [14]

**April 22, 2017:** 200 gallons of drilling fluid pollution released into stream in Wooster Township, Wayne County, OH [15]

**April 26, 2017:** During a West Virginia DEP inspection, 6 violations are found related to Storm Water Pollution Prevention Plan (SWPPP)  and stream sediment deposits. [16]

**May 2, 2017:** unauthorized pollution release from failure to manage stormwater in Bloomdale, Wood County, OH [17]

**May 3, 2017:** unauthorized pollution release into Brushy Fork Creek, Cadiz, Harrison County, OH - failure to control stormwater [18]

**May 8, 2017:** approx. 10,000 gallons of bentonite slurry released during a pipeline installation. The drilling fluids surfaced in a pond and stream in Monroe Township, Harrison County and affected water quality. [19]

**May 8, 2017:** The Ohio EPA fines ETP $431,000 for "18 incidents involving mud spills from drilling, stormwater pollution and open burning at Rover pipeline construction sites have been reported between late March and Monday." [20]

**May 10, 2017:** FERC bans ETP from starting new horizontal directional drilling under waterways and roads. [21]

---

[12] Ohio EPA. 2017, p. 4.
[13] Ohio EPA. 2017, p. 5.
[14] Ohio EPA. 2017, p. 5.
[15] Ohio EPA. 2017, p. 5.
[16] West Virginia Department of Environmental Protection (DEP). 2017. Order Issued Under the Water Pollution Control Act, West Virginia Code, Chapter 22, Article 11. July 17. [link   ]
[17] Ohio EPA. 2017, p. 7.
[18] Ohio EPA. 2017, p. 7.
[19] Ohio EPA. 2017 p. 5.
[20] Renault, M. 2017. Ohio EPA orders Rover pipeline builder to pay $431,000 for violations. *The Columbus Dispatch*, May 8. [link   ]
[21] DiSavino, S. 2017. ETP's $4 billion Rover line hits another snag, this time in West Virginia.   *Reuters*, July 24. [link   ]

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

Case ID: 250303655

**May 19, 2017:** ETP acknowledges heavy rain causing pipeline trenches and work spaces to fill with water and spill onto fields of Ohio farmers.[22]

**May 24, 2017:** During a West Virginia DEP inspection, 6 violations are found related to Storm Water Pollution Prevention Plan (SWPPP), erosion control and stream sediment deposits.[23]

**May 25, 2017:** FERC rejects ETP request to resume drilling in Captina Creek and Middle Island Creek.[24]

**June 2 & 6, 2017:** During a West Virginia DEP inspection, 5 violations are found related to silt fences, erosion control and stream sediment deposits.[25]

**July 2, 2017:** 5,000 more gallons of drill slurry released into a Stark County area where the company was working on a five-foot borehole that would go under the Tuscarawas River. Work was already underway to deal with a previous spill in that area.[26]

**July 3, 2017:** 500 to 2,500 gallons of drilling mud took place at a nearby area ten feet from Tuscarawas River.[27]

**July 7, 2017:** Rover Pipeline LLC pays $1.5 million to the Ohio History Connection Foundation in an effort to mitigate harm after demolishing a building they had promised not to.[28]

**July 12, 2017:** During a West Virginia DEP inspection, 8 violations are found including sediment laden water depositing in nearby creeks and runs.[29]

**July 13, 2017:** FERC also issues a notice of violation claiming that ETP "did not fully and forthrightly disclose all relevant information" before demolishing a historic home.[30]

**July 17, 2017:** West Virginia's DEP issues a cease-and-desist order to stop work in the WV segment of the pipeline.[31]

---

[22] Hendrix, S. & M. Renault. 2017. Stormwater overflow from Rover pipeline construction affecting farms. *The Columbus Dispatch*, May 20. [link    ]

[23] West Virginia DEP. 2017.

[24] Henry, M. 2017. Rover Pipeline: Feds reject company's bid to restart drilling. *The Columbus Dispatch*, May 26. [link    ]

[25] West Virginia DEP. 2017.

[26] Ohio EPA. 2017, p. 6.

[27] Ohio EPA. 2017, p. 6.

[28] Gatehouse Ohio Media. 2017. Rover Pipeline settles dispute with state historical foundation for $1.5 million. *The Columbus Dispatch*, June 16. [link    ]

[29] West Virginia DEP. 2017.

[30] U.S. Federal Energy Regulatory Commission. 2017. Staff Notice of Alleged Violations, July 13. [link    ]

[31] West Virginia DEP. 2017; Ward Jr., K. 2017. DEP orders halt to Rover Pipeline construction. *Charleston Gazette-Mail*, July 25. [link    ]

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

Case ID: 250303655

**July 18, 2017:** ETP pushes stage-1 deadline from July to "late summer."[32]

**July 28, 2017:** Pipeline drilling causes landslides in Jefferson County, Ohio. According to township trustees, it's a result of drilling near old underground mines.[33]

**July 31, 2017:** Inspectors find failure to properly control erosion and incorrectly-installed sediment control devices in Hancock County, WV.[34]

**August 3, 2017:** Inspectors find failure to properly control erosion and incorrectly-installed sediment control devices in Marshall County, WV.[35]

**August 9, 2017:** West Virginia DEP lifts 7/17/17 cease and desist order.[36]

**August 31, 2017:** FERC approves ETP request to put Phase 1A of Rover Pipeline into service.[37]

**September 18, 2017:** Rover Pipeline, LLC receives permission from the Federal Energy Regulatory Commission to resume drilling construction.[38]

**September 20, 2017** The Ohio EPA asked the state Attorney General to "hold pipeline officials financially responsible for $2.3 million in fines related to numerous environmental violations."[39]

**September 21, 2017:** Soap wastewater used in boring operations and soil/sediment discharged into approximately 500 feet of waterway requiring 6,000 gallons of water to be recovered by vacuum truck. OH [40]

**September 26, 2017:** Appox 30 gallons of drilling fluids discharged into waters, wetlands in Washington Township, Belmont County, Ohio.[41]

---

[32] 2017. Rover Pipeline's Phase 1 In-Service Date Slips to "Late Summer". *Marcellus Drilling News*, July 18. [link ]

[33] Conn, A. 2017. Pipeline drilling causing landslides in Jefferson County. WTOV9, July 31. [link ]

[34] West Virginia DEP, Environmental Enforcement. 2017. Notice of Violation. July 31. [link ]

[35] West Virginia DEP, Environmental Enforcement. 2017. Notice of Violation. August 3. [link ]

[36] West Virginia DEP. 2017. August 9. [link ] Ward Jr., K. 2017. More water violations found on Rover Pipeline construction sites. *Charleston Gazette-Mail*, August 19. [link ]

[37] Energy Transfer Partners. 2017. Energy Transfer Announces FERC Approval to Put Phase 1A of the Rover Pipeline in Service. August 31. [link ]

[38] Ohio EPA. 2017b. Rover Pipeline Resumes Construction, Immediately Spills Contaminants in Ohio Stream. September 22. [link ]

[39] Renault, M. 2017. Ohio agency wants troubled Rover Pipeline to pay $2.3 million in fines. *The Columbus Dispatch*, September 20. [link ]

[40] Ohio EPA. 2017b.

[41] Ohio EPA. 2017c. Subject: Violations from Inadvertent Returns by Rover Pipeline LLC Since September 8, 2017. November 22. [link ]

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

Case ID: 250303655

**October 11, 2017:** Approx. 1200 gallons of drilling fluids discharged to waters, wetlands in Washington Township, Belmont County, Ohio.[42]

**October 14, 2017:** Rover Pipeline Spills Water Allegedly Containing Gasoline Into Michigan Wetlands[43]

**November 3, 2017**  Ohio Attorney General Mike DeWine files a lawsuit against Rover Pipeline LLC seeking "a court order requiring Rover to apply for state permits, to comply with environmental plans approved and ordered by the Ohio EPA, and to pay civil penalties of $10,000 per day per violation."[44]

**November 9, 2017:**    Approx. 60 gallons of drilling fluids discharged to waters, wetlands in Ashland Township, Ashland County.[45]

**November 14, 2017:**    Approx. 30 gallons of drilling fluids discharged to waters, wetlands in Milton Township, Ashland County, Ohio.[46]

**November 16, 2017:**    Approx. 200 gallons of drilling fluids discharged into Black Fork Mohican River in Milton Township, Ashland County.[47]

**December 14, 2017:** FERC Gives Rover clearance to restart all outstanding underground horizontal directional drilling (HDD) projects, including the location at Tuscarawas River.[48]

**January 17, 2018:** Rover Pipeline Spills Another 150,000 Gallons of Drilling Fluid Into Ohio Wetlands **at same 4/14/2017 site.**[49]

**January 24, 2018:** FERC again orders ETP to halt horizontal directional drilling under the Tuscarawas River in Ohio.[50]

---

[42] Ohio EPA. 2017c.

[43] Chow, L. 2017. Rover Pipeline Spills Water Containing Gasoline Into Michigan Wetlands. *EcoWatch*, October 14. [link    ]

[44] Ohio Attorney General. 2017. Ohio Files Lawsuit Against Rover Pipeline for Environmental Violations. November 3. [link    ]

[45] Ohio EPA. 2017c.

[46] Ohio EPA. 2017c.

[47] Ohio EPA. 2017c.

[48] 2017. FERC Gives Rover OK to Resume All HDD Work, Incl. Tuscarawas River. *Marcellus Drilling News*, December 15. [link    ]

[49] Chow, L. 2018. Rover Pipeline Spills Another 150,000 Gallons of Drilling Fluid Into Ohio Wetlands. *EcoWatch*, January 17. [link    ]

[50] Chow, L. 2018. FERC Again Orders Drilling Halt on Rover Pipeline Site After Another Spill. EcoWatch, January 25. [link    ] Kooistra, R. & J. Hites. 2018. FERC Staff Directs Rover Pipeline to Cease HDD Activity at the Tuscarawas River Site. *Washington Energy Report*, January 29. [link    ]

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

Case ID: 250303655

**January 29, 2018:** "Rover **is frustrated** by the inaccurate central premise underlying the letter received from the Federal Energy Regulatory Commission (FERC) ... directing operations to cease at the Tuscarawas River."[51]

**February 6, 2018:** FERC Gives Rover Pipeline permission to Restart Drilling Under Tuscarawas River[52]

**February 14, 2018:** Sen. Maria E. Cantwell (D-Wash.) and Rep. Frank Pallone Jr. (D-NJ) ask FERC for a briefing on the Rover Pipeline project **no later than 2/28/18.** [53]

**February 21, 2018:** Ohio EPA files a letter with FERC claiming the presence of toxic chemical tetrachloroethene at Rover's underground drilling site at the Tuscarawas River in southern Stark County.[54]

**March 5, 2018:** West Virginia Department of Environmental Protection orders a halt to construction after finding multiple water pollution violations.[55]

---

[51] Reuters staff. 2018. ETP says frustrated by order to stop Rover pipeline drilling in Ohio. *Reuters*, January 29. [link]
[52] 2018. FERC Gives Rover Pipe OK to Restart Drilling Under Tuscarawas River. *Marcellus Drilling News*, February 7. [link]
[53] Snow, N. 2018. US Congressional committees request FERC for Rover gas line briefing. Oil & Gas Journal, February 16. [link] Pallone, F. & M. Cantwell. 2018. Letter to Kevin J. McIntyre. February 14. [link]
[54] 2018. Ohio EPA Continues to Target Rover Pipe in New FERC Letter. *Marcellus Drilling News*, February 21. [link]
[55] Mishkin, K. 2018. WV DEP orders Rover Pipeline to stop construction, citing multiple violations. *Charleston Gazette-Mail*, March 13. [link] West Virginia DEP. 2018. Order Issued Under the Water Pollution Control Act, West Virginia Code, Chapter 22, Article 11. March 5. [link]

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

Case ID: 250303655



Filed and Attested by the
Office of Judicial Records
23 APR 2025 03:56 pm
C. SMITH

# EXHIBIT B

Bloomberg Law
Feb. 18, 2025, 3:42 PM EST
**Energy Transfer Leak Highlights Worst Fuel Spill Record in US**

- Firm's Sunoco Pipeline LP unit spilled 1,400 barrels in 2024
- Pennsylvania line leaked for 16 months, regulators say

**Energy Transfer** LP's Sunoco Pipeline LP unit, the operator of a Pennsylvania pipeline that regulators say leaked jet **fuel** for more than 16 months, spilled more refined fuels than any other operator **in** 2024, according to data compiled by Bloomberg.

The unit leaked about 1,400 barrels of refined **fuel** products from pipelines across the country last year, according to Pipeline and Hazardous Materials Safety Administration figures analyzed by Bloomberg. That's more than twice the amount spilled by any other operator. Pipelines operated by **Energy Transfer** Co. also leaked about 213 barrels.



Representatives of Dallas-based **Energy Transfer** didn't immediately respond to requests for comment.

**Energy Transfer** and its subsidiaries have been involved **in** other high-profile incidents, including a September fire **in** which an SUV crashed into an above-ground valve **in** Deer Park, Texas, and a pipeline construction project that spilled more than 80,000 gallons of fluid **in** Pennsylvania over three years starting **in** 2017.

To contact the reporters on this story:
**Jacob Wendler in** New York at jwendler5@bloomberg.net;
**Robert Tuttle in** Calgary at rtuttle@bloomberg.net

To contact the editors responsible for this story:
**Catherine Traywick** at ctraywick@bloomberg.net

Kevin Orland

© 2025 Bloomberg L.P. All rights reserved. Used with permission.

Case ID: 250303655

**Exhibit A_ Page 136 of 336**

Energy Transfer Leak Highlights Worst Fuel Spill Record in US

© 2025 Bloomberg Industry Group, Inc.   All Rights Reserved

Case ID: 250303655



Filed and Attested by the
Office of Judicial Records
23 APR 2025 03:56 pm
C. SMITH

# EXHIBIT C



**BRIAN K. FITZPATRICK**
1ST DISTRICT, PENNSYLVANIA

**PROBLEM SOLVERS CAUCUS**
CO-CHAIRMAN

271 CANNON HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
(202) 225-4276

1717 LANGHORNE-NEWTOWN RD.
SUITE 225
LANGHORNE, PA 19047
(215) 579-8102

**Congress of the United States**

**House of Representatives**

**Washington, DC 20515**

**COMMITTEES**

**INTELLIGENCE**
NATIONAL INTELLIGENCE
CHAIRMAN
DEFENSE INTELLIGENCE

**WAYS AND MEANS**
OVERSIGHT AND INVESTIGATIONS
HEALTH

**FOREIGN AFFAIRS**
INTELLIGENCE LIAISON

**NATO PARLIAMENTARY ASSEMBLY**

March 11, 2025

Acting Administrator Ben Kochman
Pipeline and Hazardous Materials Safety Administration
U.S. Department of Transportation
1200 New Jersey Ave, SE
Washington, DC 20590

Dear Acting Administrator Kochman,

I am writing to continue our ongoing dialogue concerning the Sunoco Pipeline that runs through Upper Makefield Township, which is operated by Energy Transfer. With each passing day, new evidence continues to surface, yet the questions raised months ago remain unanswered. Last week, I had the opportunity to meet in person with the resident Task Force that has been leading the advocacy efforts in the wake of the pipeline leak. As reflected in these persistent letters, the direct comments from constituents to your staff, and the shared anecdotes, it is clear that the community needs answers. Our community seeks assurances that the pipeline beneath their homes poses no threat to their safety or the environment. During our meeting, the Task Force presented several questions directed at both Energy Transfer and PHMSA, which I am passing along and hope you will consider addressing with urgency and providing all documentation requested in the below questions. I believe these questions are crucial for the continued protection of our residents and the environment.

**Questions for PHMSA regarding Energy Transfer:**

1. What event or series of events triggered Sunoco to install Type A sleeves in the 1990s on the Twin Oaks pipeline?

2. What loss tolerance thresholds were established for the Twin Oaks pipeline before January 2025? Specifically, at what volumetric discrepancy levels does your agency's protocol mandate investigation until the cause is identified and remediated? What is the documented discrepancy between shipped and received petroleum volumes on the Twin Oaks pipeline since 2015, especially concerning volumetric losses not officially reported as releases to PHMSA?

3. Can PHMSA provide evidence that Sunoco has comprehensive and effective emergency response plans to adequately protect densely populated residential areas and critical natural resources in the event of a major pipeline failure? What enhanced preventative measures have been specifically implemented in the Mt. Eyre Manor neighborhood compared to lower-risk sections of the Twin Oaks pipeline? Please provide details on community engagement, inspection methodologies (internal and external), and specialized training for personnel responsible for this segment.

4. According to capital investment plans made before January 2025, what is the projected timeline for the complete replacement or major rehabilitation of the Twin Oaks pipeline infrastructure?

5. Can PHMSA provide the size, geographic location, and specific location on the pipe of any known dents on the Twin Oaks to Newark pipeline? Does the most recent inspection data indicate any metal loss, cracking, or stress risers at these dent locations, including the bottom dent associated with the leak in Upper Makefield?

6. Has Sunoco determined the age of the petroleum products recovered thus far? Please provide a chronological list of all hazardous liquids transported through the Twin Oaks to Newark pipeline from 2017 (the last known crack tool date) to present, including material safety data sheets and any additives such as corrosion inhibitors.

Case ID: 250303655

7. Can PHMSA provide the maintenance records and inspection data for inspections conducted after the earthquake on April 5th, 2024, and flooding on July 15th, 2023? How many near-miss incidents have been documented on the Twin Oaks pipeline system since 1980, according to your internal records maintained under API 1173 standards?

8. Many pipeline markers have been found missing, damaged, or decayed. What is Sunoco's plan for maintaining proper safety markers to ensure that residents and emergency response personnel have the necessary information? It has been years since emergency services in Upper Makefield have received pertinent pipeline information from Sunoco.

## General Questions for PHMSA:

1. What threshold of evidence or severity of incidents must be met for PHMSA to recommend or mandate the immediate shutdown of a hazardous liquids pipeline, and how close is Sunoco's pipeline to reaching that threshold?

2. PHMSA has previously mandated pipeline shutdowns due to Type A sleeve failures and related integrity concerns. Given Sunoco's pipeline has experienced similar or equally serious issues, why has PHMSA not enforced the same action and mandated an immediate shutdown?

3. Has PHMSA independently verified Sunoco's pipeline inspection data and confirmed the absence of similar conditions to those that led to prior shutdowns, or has PHMSA primarily relied on self-reporting by Sunoco?

4. What specific criteria does PHMSA use to determine when a pipeline poses an unacceptable risk and must be immediately shut down, considering Sunoco's documented history of spills, leaks, regulatory violations, and ongoing safety concerns?

5. Can PHMSA provide full transparency regarding how it evaluates and compares pipeline integrity violations, such as Type A sleeve failures, to ensure fair and consistent application of pipeline safety enforcement, including decisions around shutdowns or continued operation?

As of 2023, 40.2% of hazardous liquid pipeline miles and 54.4% of gas transmission miles were installed before 1970. In November 2024, PHMSA issued an Advisory Bulletin identifying 9 pre-1970 pipe manufacturers, including National Tube Supply, whose pipes may have issues with hard spots that lead to cracks. Despite offering 6 safety actions for pipeline operators, Energy Transfer representatives were unaware of National Tube Supply's inclusion on PHMSA's list or any related safety actions. Given the high percentage of older pipelines, the final question to the agency is: Why are PHMSA's actions not mandatory?

Our community deserves to know that safety is a priority, and their concerns are being addressed with the urgency and seriousness they warrant. I respectfully ask that these questions raised by our constituents receive full and fair consideration as I believe this information is necessary information to protect our community.

Thank you for your prompt attention to this matter and I eagerly look forward to your response.

Sincerely,

Brian K. Fitzpatrick (PA-1)
*Member of Congress*

Case ID: 250303655



Filed and Attested by the
Office of Judicial Records
23 APR 2025 08:56 pm
C. SMITH

# EXHIBIT D



U.S. Department of Transportation
**Pipeline and Hazardous Materials
Safety Administration**

8701 S. Gessner, Suite 630
Houston TX 77074

**VIA ELECTRONIC MAIL TO: tom.long@energytransfer.com**

February 13, 2025

Thomas Long
Chief Executive Officer
Energy Transfer LP
8111 Westchester Drive
Dallas, TX 75225

**CPF No. 4-2025-054-NOPSO**

Dear Mr. Long:

Enclosed is a Notice of Proposed Safety Order (Notice) issued in the above-referenced case. The Notice proposes that Sunoco Pipeline, LP, take certain measures with respect to the Sunoco Twin Oaks Discharge pipeline system to ensure pipeline safety. Your options for responding are set forth in the Notice. Service of this Notice by electronic mail is deemed effective upon the date of transmission, or as otherwise provided under 49 CFR § 190.5.

We look forward to a successful resolution to ensure pipeline safety. Please direct any questions on this matter to me at (713) 773-7215.

Sincerely,

BRYAN JEFFERY
LETHCOE

Digitally signed by BRYAN
JEFFERY LETHCOE
Date: 2025.02.13 10:42:22 -06'00'

Bryan Lethcoe
Director, Southwest Region, Office of Pipeline Safety
Pipeline and Hazardous Materials Safety Administration

Enclosure:    Notice of Proposed Safety Order
              Copy of 49 C.F.R. § 190.239

Cc:           Ms. Linda Daugherty, Deputy Associate Administrator for Field Operations, OPS
              Greg McIlwain, Executive Vice President, Operations, Energy Transfer LP
              Eric Amundsen, Senior Vice President, Operations, Energy Transfer LP
              Todd Stamm, Senior Vice President, Operations, Energy Transfer LP
              Jennifer Street, Senior Vice President, Operations Services, Energy Transfer LP
              Keegan Pieper, Assistant General Counsel, Energy Transfer LP
              Mr. Matthew Stork, Vice President, Technical Services, Energy Transfer LP

Case ID: 250303655

Mr. Todd Nardozzi, Director – DOT Compliance, Energy Transfer LP
Ms. Susie Sjulin, Director – DOT Compliance, Energy Transfer LP
Mr. Vince Murchison, Murchison O'Neill PLLC

**DEPARTMENT OF TRANSPORTATION**
**PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION**
**OFFICE OF PIPELINE SAFETY**
**SOUTHWEST REGION**
**HOUSTON, TEXAS**

|  |  |  |
|---|---|---|
| | ) | |
| **In the Matter of** | ) | |
| | ) | |
| **Sunoco Pipeline LP,** | ) | **CPF No. 4-2025-054-NOPSO** |
| | ) | |
| **Respondent** | ) | |
| | ) | |

### NOTICE OF PROPOSED SAFETY ORDER

### Introduction and Purpose

The Pipeline and Hazardous Materials Safety Administration (PHMSA), Office of Pipeline Safety (OPS), is issuing this Notice of Proposed Safety Order (NOPSO or Notice) to Sunoco Pipeline LP (Sunoco or Respondent)[1] pursuant to the authority provided in 49 U.S.C. § 60117 and 49 CFR § 190.239. As explained in more detail below, PHMSA has initiated an investigation of the safety of Sunoco's Twin Oaks Discharge pipeline system (Twin Oaks Pipeline or Pipeline) in Upper Makefield Township, Bucks County, Pennsylvania. PHMSA initiated the investigation in response to a release on the Twin Oaks Pipeline that Sunoco discovered on January 31, 2025 (Failure).[2] The Twin Oaks Pipeline is a hazardous liquid pipeline facility that is subject to PHMSA's jurisdiction pursuant to the Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.*, and Pipeline Safety Regulations, 49 CFR Parts 190 to 199.

PHMSA's ongoing investigation indicates that conditions may exist on the Twin Oaks Pipeline that pose a pipeline integrity risk to public safety, property, or the environment. Specifically, PHMSA's preliminary investigation indicates that the Pipeline experienced a leak in a high consequence area for at least 16 months, resulting in the release of jet fuel that has migrated into several adjacent water wells and caused additional impacts to property and the environment. PHMSA's preliminary investigation also indicates that the leak originated at a sleeve installed in the mid-1990s, that there are at least 44 other sleeves of a similar vintage installed at other locations on the Pipeline, and that these locations may be at risk of experiencing a similar leak in the future. For these reasons, it appears that the continued operation of the Twin Oaks Pipeline without corrective measures would pose a pipeline integrity risk to public safety, property, or the environment.

---

[1] Sunoco is a subsidiary of Energy Transfer LP.

[2] Sunoco became aware of the release on January 31, 2025, however, the first day of the release is unknown.

Case ID: 250303655

2

This NOPSO notifies Sunoco of the preliminary findings of the investigation and proposes that Sunoco take measures to ensure that the public, property, and the environment are protected from the potential risk.

## Background

On September 25, 2023, the Pennsylvania Public Utilities Commission (PAPUC) notified PHMSA of an odor complaint that a resident at 128 Walker Road, Upper Makefield Township, Pennsylvania, previously reported to the Pennsylvania Department of Environmental Protection (PADEP).  The resident's report indicated that there was a strange taste and the smell of gasoline in their well water.

After being notified of the odor complaint, PHMSA directed Sunoco to conduct an investigation. Sunoco responded by testing additional local wells, performing soil testing, and excavating a 25-foot section of the Twin Oaks Pipeline.  Sunoco did not discover a leak at that time, and all samples indicated a negative result for hydrocarbons.

On January 21, 2025, PADEP informed PHMSA that samples obtained from a well at the property located at 107 Spencer Road, Upper Makefield Township, Pennsylvania, indicated the presence of kerosene (a major component of JP-8 jet fuel).  PHMSA Accident Investigation Division (AID) notified Sunoco of these results and directed Sunoco to conduct another investigation.

On January 31, 2025, Sunoco identified a leak on the Twin Oaks Pipeline after excavating a previously repaired location adjacent to 121 Glenwood Drive, at pipeline station 52/4170 (2787+30).  The leak appeared to be a slow drip from a sleeved portion of the pipeline.  The sleeve had been installed in 1995 to reinforce a dent.

After locating the leak, Sunoco shut-in a segment of the Twin Oaks Pipeline by closing valves at Bucks pump Station, Delaware River (West), Delaware River (East), and Hopewell. High and low point vent and extraction vent thread-o-ring fittings (TORs) were installed to drain the jet fuel product to vacuum trucks and tankers at the extraction points.  Sunoco cut out the failed section without removing the Type A sleeve and transported that section to Columbus, Ohio, for inspection and metallurgical analysis by a third party, DNV.

Sunoco notified the National Response Center (NRC) of the release on the Twin Oaks Pipeline at 16:25 Eastern Time on January 31, 2025.  Sunoco made a second report to the NRC on February 2, 2025, at 16:03 Eastern Time and  provided an estimated release amount of 156 barrels.  Sunoco also notified PADEP.

On February 2, 2025, Sunoco completed its repair of the failed section and returned the Twin Oaks Pipeline to service.  The Twin Oaks Pipeline is currently operating at a reduced pressure of 880 pounds per square inch gauge (psig), which is 20 percent below the operating pressure at the time Sunoco discovered the failure.

The preliminary findings of PHMSA's ongoing investigation are as follows:

3

**Preliminary Findings:**

- The Twin Oaks Pipeline is a 14-inch diameter pipeline that transports petroleum products, including jet fuel, diesel, and gasoline, from the Twin Oaks Terminal in Aston, Pennsylvania, to the Newark Terminal in Newark, New Jersey. The Twin Oaks Pipeline includes one break out tank in the Newark Terminal, and one pump station in Bucks County, Pennsylvania.

- The Twin Oaks Pipeline was originally constructed in 1958. The pipe at the failure location is 0.25 inches thick, API 5L grade X-52, seamless, and was manufactured by National Tube Supply Company. The pipeline has a somastic (asphalt mastic) coating and cathodic protection. The maximum operating pressure (MOP) of the Twin Oaks Pipeline is 1200 psig. When Sunoco discovered the failure, the operating pressure was 1100 psig.

- On September 25, 2023, PHMSA notified Sunoco of an odor complaint that PADEP received from a resident at 128 Walker Road. Sunoco investigated the complaint as follows:

  o Respondent dispatched a pipeline technician to probe with a photoionization detector (PID) Gas detector along the pipeline behind 121 Glenwood and in front of 128 Walker and 123 Glenwood; all results were reported as non-detect.

  o Respondent hired a contractor to test the well water at 128 Walker Road; results were reported as non-detect. The contractor also tested the well water for 121 and 123 Glenwood Drive, and 126 Walker Road; all results were reported as non-detect.

  o Respondent excavated about 25 feet of the pipeline located behind 121 Glenwood Drive with no issues or concerns detected. Respondent performed soil testing in the excavation and those results were reported as non-detect.

  o The operator performed a 4-hour static pressure test to check for lowering pressure indicative of a pipeline leak; Respondent has indicated that the results were reported to be within acceptable limits.

- On June 28, 2024, Respondent received an odor complaint from 108 Spencer Road. Respondent investigated the complaint as follows:

  o Respondent dispatched a pipeline technician with a 4 - Gas detector to the site; all results were reported as non-detect. No dead vegetation or anything out of the ordinary was observed above the pipeline.

  o Respondent did not report this odor complaint to PHMSA.

4

- On July 21, 2024, Respondent received an odor complaint from 121 Glenwood Drive. Respondent investigated the complaint as follows:

  o Respondent dispatched a pipeline technician to the site and probed with a 4 - Gas detector; all results were reported as non-detect. No dead vegetation or anything out of the ordinary was observed above the pipeline.

  o Respondent did not report this odor complaint to PHMSA.

- On November 21, 2024, Respondent received an odor complaint from 107 Spencer Road. Respondent investigated the complaint as follows:

  o Respondent dispatched a pipeline technician and probed with a 4 - Gas detector to the site; all results were reported as non-detect. No dead vegetation or anything out of the ordinary was observed above the pipeline.

  o Respondent performed a 4-hour static pressure test to check for lowering pressure indicative of a pipeline leak; the results were reported to be within acceptable limits (although acceptance criteria were not reported by the operator).

  o Respondent did not report this odor complaint to PHMSA.

- On January 21, 2025, PADEP informed PHMSA that samples obtained from a well at 107 Spencer Road indicated the presence of kerosene (a major component of JP-8 jet fuel). PHMSA AID notified Sunoco of the test results and directed Sunoco to investigate.

- From January 22 through January 31, 2025, Respondent proceeded to probe the entire pipeline from 121 Glenwood Drive to 155 Glenwood Drive using a PID Gas detector; all results were non-detect. Respondent had a contractor sample about twenty-five (25) landowners' well water for hydrocarbons. Three (3) landowners' wells were identified as having positive results for hydrocarbons at 107 Spencer Road, 108 Spencer Road, and 128 Glenwood Drive.

- On January 31, 2025, Respondent identified the leak location after excavating a previously repaired location on the pipeline adjacent to 121 Glenwood Drive, at station 52/4170 (2787+30). Visual inspection revealed that the leak was a slow drip from a Type A sleeve originally installed in 1995. Type A sleeves are used to reinforce a portion of pipe with a non-leaking defect, with the goal of restoring the pipeline's original strength.

- The Failure occurred adjacent to 126 Walker Rd, Upper Makefield Township, Bucks County, Pennsylvania. The exact start date of the Failure is unknown. The failure occurred in a High Consequence Area (HCA) as defined in 49 CFR § 195.450, located in a residential subdivision just to the west of the Delaware River. The Twin Oaks

5

Pipeline runs through mostly suburban areas. It travels in a northeast direction from Philadelphia, Pennsylvania, to Newark, New Jersey. The pipeline crosses numerous rivers and waterways and runs adjacent to numerous state and local parks.

- Sunoco notified the National Response Center (NRC) of the Failure at 16:25 Eastern Time on January 31, 2025, and reported a release of 156 barrels of jet fuel.

- After locating the leak, Sunoco shut in a segment of the Twin Oaks Pipeline, closing valves at Bucks pump Station, Delaware River (West), Delaware River (East), and Hopewell. High and low point vent and extraction vent thread-o-ring fittings (TORs) were installed to drain the jet fuel product to vacuum trucks and tankers at the extraction points.

- Sunoco cut out the failed section of the Twin Oaks Pipeline without removing the Type A sleeve and transported the pipe to DNV in Columbus, Ohio, for inspection and metallurgical analysis.

- On February 2, 2025, PHMSA Southwest Region Director by email informed Sunoco he did not object to the repair plan and return to service plan for the pipeline.

- Sunoco completed the repairs and returned the pipeline to service on February 2, 2025.

- Local drinking water wells are contaminated with JP-8 jet fuel to varying degrees. Jet fuel apparently has entered the aquafer and is detected in various quantities in surrounding drinking water wells to the east of the Failure location.

- The release of jet fuel poses a risk to public safety, property, or the environment. Jet fuel is a colorless flammable liquid that ignites at certain temperatures; jet fuel exposure can lead to skin irritation and drowsiness or dizziness in affected populations; and jet fuel ingestion may cause harm to the respiratory tract, gastrointestinal tract, and nervous systems.[3]

- During a public meeting held on February 6, 2025, residents of other neighborhoods located in the vicinity of the Failure reported a gasoline smell in their water.

- On February 8 and February 10, 2025, Sunoco excavated five (5) locations immediately upstream of the Failure location to evaluate the condition of six (6) Type A sleeves that had been installed in 1989 to reinforce a variety of defect types. These excavations discovered no additional leaks and no abnormal conditions were noted.

- On February 12, 2025, PHMSA investigators witnessed the preliminary phase of the metallurgical testing of the portion of the pipeline that Sunoco sent to DNV for further

---

[3] "Public Health Statement: JP-5, JP-8, and Jet A Fuels," Agency for Toxic Substances and Disease Registry, Division of Toxicology and Human Health Services, March 2017, https://www.atsdr.cdc.gov/ToxProfiles/tp121-c1-b.pdf. These hazards are confirmed by the Safety Data Sheets (SDS) for the JP-8 jet fuel transported in the Twin Oaks Pipeline.

6

analysis. The preliminary testing indicates that the failure occurred as a result of a 2.5-inch axial crack associated with a bottom-side dent.

- Sunoco has advised PHMSA that there are at least forty-four (44) other Type A sleeves on the Twin Oaks Pipeline that were installed in the late 1980s and early 1990s. PHMSA understands some of those Type A sleeves were installed to reinforce dents.

- PHMSA is aware of a gasoline release in Huntersville, North Carolina, discovered on August 14, 2020, in which 28,571 barrels were released through a through-wall crack which developed in a shallow dent reinforced with a Type A sleeve. The release was also not detected by the pipeline operator's leak detection system.

- Prior to this Failure, there have been two (2) reportable failures on the Twin Oaks Pipeline since 1986.

    o On October 7, 1986, a failure occurred in Montgomery County, Pennsylvania, which was caused by a crack in the pipeline, resulting in the release of 5260 barrels of refined product.

    o On March 19, 2004, a failure occurred in Delaware County, Pennsylvania, which was caused by external corrosion, resulting in the release of 50 barrels of refined product.

- The investigation of the Failure is on-going, and information could change. These preliminary findings may be amended based on further findings during the investigation.

**Proposed Issuance of Safety Order**

Section 60117(m) of Title 49, United States Code, provides for the issuance of a safety order, after reasonable notice and the opportunity for a hearing, requiring corrective measures, which may include physical inspection, testing, repair, or other action, as appropriate. The basis for making the determination that a pipeline facility has a condition or conditions that pose a pipeline integrity risk to public safety, property, or the environment is set forth both in the above-referenced statute and 49 CFR § 190.239, a copy of which is enclosed.

After evaluating the foregoing preliminary findings of fact, and having considered the characteristics of the pipeline, including prior Type-A sleeve repairs involving dents and other defects; the prior failures of the pipeline; the hazardous nature of the petroleum products, including jet fuel, transported; the uncertainty as to the root cause(s) of the failure; the proximity of the pipeline to residential dwellings and water wells; the existing and potential additional impacts to property, the environment, and wildlife; and the possibility that the same condition(s) that may have caused the failure remain present in the pipeline and could lead to additional failures; it appears that the continued operation of the Twin Oaks Discharge pipeline system without corrective measures would pose a pipeline integrity risk to public safety, property, or the environment. The conditions and threats described above potentially exist throughout the Twin

Oaks Pipeline. Further, Sunoco's apparent inability to effectively detect the leak has potentially exacerbated the impacts of the release over an extended period of time. Accordingly, corrective measures are necessary to mitigate the pipeline integrity risk of the pipeline system to protect public safety, property, and the environment.

Accordingly, PHMSA issues this Notice of Proposed Safety Order to notify Respondent of the proposed issuance of a safety order and to propose that Respondent take measures specified herein to address the potential risk.

**Proposed Corrective Measures**

Pursuant to 49 U.S.C. § 60117(m) and 49 CFR § 190.239, PHMSA proposes to issue to Sunoco a safety order incorporating the following remedial requirements with respect to the affected pipeline.

For the purposes of this Notice, "Director" means the Director, PHMSA, Office of Pipeline Safety, Southwest Region. "*Affected Pipeline*" refers to the entire Twin Oaks Pipeline, which is approximately 105.5 miles in length from the Twin Oaks Terminal in Aston, Pennsylvania, to the Newark Terminal in Newark, New Jersey.

1. **Operating Pressure Restriction.** Sunoco must reduce and maintain a twenty percent (20%) pressure reduction in the actual operating pressure along the entire length of the *Affected Pipeline*, such that the operating pressure does not exceed eighty percent (80%) of the actual operating pressure in effect immediately prior to the Failure discovered on January 31, 2025.

   a. This pressure restriction is to remain in effect until written approval to increase the pressure or return the pipeline to its pre-Failure operating pressure is obtained from the Director.

   b. Within 15 days of receipt of the Safety Order, Sunoco must provide the Director the actual operating pressures of each pump station and each main line pressure regulating station on the *Affected Pipeline* at the time of the Failure discovered on January 31, 2025, and the reduced pressure restriction set-points at these same locations.

   c. This pressure restriction requires any relevant remote or local alarm limits, software programming set-points or control points, and mechanical over-pressure devices to be adjusted accordingly.

   d. When determining the pressure restriction set-points, Sunoco must take into account any in-line inspection (ILI) features or anomalies present in the *Affected Pipeline* to provide for continued safe operation while further corrective actions are completed.

   e. Sunoco must review the pressure restriction monthly by analyzing the operating pressure data, taking into account any ILI features or anomalies present in the *Affected Pipeline*. Sunoco must immediately reduce the operating pressure to maintain the safe operations of the *Affected Pipeline*, if warranted by the monthly review. Further, Sunoco must submit the results of the monthly review to the Director including, at a

8

minimum, the current discharge set-points (including any additional pressure reductions), and any pressure exceedance at discharge set-points.

2. **Type A Sleeve Integrity Plan**. Within 90 days of receipt of the Safety Order, Sunoco must provide to the Director for approval a plan to evaluate the integrity of each Type A sleeve on the *Affected Pipeline*. In preparing that plan, Sunoco must consider type, characteristics (size, depth, orientation), and other integrity considerations of the anomaly(ies) or defect(s) reinforced by the sleeve; sleeve characteristics (age, grade, length, thickness, coating, wrap, use of epoxy); cathodic protection; inline inspection results; nondestructive evaluation or testing records; and any other relevant factors in evaluating the integrity of a Type A sleeve. The plan must also provide for the removal of each Type A sleeve on the *Affected Pipeline* whose integrity cannot be reasonably assured. The plan must be part of the Remedial Work Plan developed in Item 3 below. For any sleeve not removed, the plan must provide a technical justification for the Type A Sleeve remaining on the *Affected Pipeline* and describe the additional pipeline integrity management measures to be implemented to ensure the safety and integrity of the *Affected Pipeline* in light of any integrity risk related to the sleeve.

3. **Remedial Work Plan (RWP).**

   a. Within 90 days of receipt of the Safety Order, Sunoco must submit a Remedial Work Plan (RWP) to the Director for prior approval.

   b. The Director may approve the RWP incrementally without approving the entire RWP.

   c. Upon approval by the Director, the RWP becomes incorporated by reference into the Safety Order.

   d. The RWP must specify the tests, inspections, assessments, evaluations, and remedial measures Respondent will use to verify the integrity of the *Affected Pipeline*. It must address all known or suspected factors and causes of the Failure discovered on January 31, 2025. Sunoco must consider the risks and consequences of another failure to develop a prioritized schedule for RWP-related work along the *Affected Pipeline*.

   e. The RWP must include a procedure or process to:

      i. Identify pipe in the *Affected Pipeline* with characteristics similar to the contributing factors identified for the Failure discovered on January 31, 2025.

      ii. Gather all data necessary to review the failure history (in service and pressure test failures) of the *Affected Pipeline* and to prepare a written report containing all the available information such as the locations, dates, and causes of leaks and failures.

      iii. Integrate the results of the metallurgical testing, root cause failure analysis, and other corrective actions required by this Order with all relevant pre-existing operational and assessment data for the *Affected Pipeline*. Pre-existing operational data includes, but is not limited to, design, construction, operations, maintenance, testing, repairs, prior metallurgical analyses, and any third-party consultation information. Pre-existing assessment data includes, but is not limited to, ILI tool runs, hydrostatic pressure testing, direct assessments, close interval surveys, and

DCVG/ACVG surveys.

iv. Determine if conditions similar to those contributing to the Failure discovered on January 31, 2025, are likely to exist elsewhere on the *Affected Pipeline.*

v. Conduct additional field tests, inspections, assessments, and evaluations to determine whether, and to what extent, the conditions associated with the Failure discovered on January 31, 2025, and other failures from the failure history (see (e)(ii) above) or any other integrity threats are present elsewhere on the *Affected Pipeline*.   At a minimum, this process must consider all failure causes and specify the use of one or more of the following:

   1) ILI tools that are technically appropriate for assessing the pipeline system based on the cause of Failure discovered on January 31, 2025, and that can reliably detect and identify anomalies,

   2) Hydrostatic pressure testing,

   3) Close-interval surveys,

   4) Cathodic protection surveys, to include interference surveys in coordination with other utilities (e.g., underground utilities, overhead power lines, etc.) in the area,

   5) Coating surveys,

   6) Stress corrosion cracking surveys,

   7) Selective seam corrosion surveys; and

   8) Other tests, inspections, assessments, and evaluations appropriate for the failure causes.

   Note: Sunoco may use the results of previous tests, inspections, assessments, and evaluations if approved by the Director, provided the results of the tests, inspections, assessments, and evaluations are analyzed with regard to the factors known or suspected to have caused the January 31, 2025 Failure.

vi. Describe the inspection and repair criteria Sunoco will use to prioritize, excavate, evaluate, and repair anomalies, imperfections, and other identified integrity threats. Include a description of how any defects will be graded and a schedule for repairs or replacement.

vii. Based on the known history and condition of the *Affected Pipeline,* describe the methods Sunoco will use to repair, replace, or take other corrective measures to remediate the conditions associated with the pipeline failure on January 31, 2025, and to address other known integrity threats along the *Affected Pipeline*.  The repair, replacement, or other corrective measures must meet the criteria specified in (e)(vi) above.

viii. Evaluate the effectiveness and capability of Sunoco's leak detection system on the *Affected Pipeline*, including main lines, stub lines, and delivery lines.  At a minimum, Sunoco's evaluation must consider the following factors—length and size of the pipeline, type of product carried, the swiftness of leak detection, limitations on detectable quantities, location of nearest response personnel, and

leak history.  This evaluation must also consider maximum operating pressure (MOP), normal operating pressures, flow rates (or throughput), and impacts from any pressure cycles or operational changes.  For mainline segments that could affect high consequence areas (HCAs), Sunoco's evaluation must consider the pipeline's proximity to the HCA and risk assessment results.

ix. Based on the findings of the evaluation pursuant to paragraph viii of this subparagraph, determine corrective measures to improve the effectiveness of Sunoco's leak detection system. Sunoco must consider latest advancements in technology that present the potential to improve the capability of its leak detection system to detect the type of leak that occurred.  The corrective measures must result in improving the capability of the leak detection system to detect leaks that could potentially affect public safety, property, or the environment, similar to (but not limited to) leaks with characteristics common to those referenced above.

x. Evaluate Sunoco's written plans and procedures for inspection and maintenance that address leak detection, right-of-way inspection and repairs and determine the extent to which the written plans contribute to the elimination of hazardous leaks. Based on the findings, determine appropriate amendments to improve the extent to which the plans contribute to the elimination of hazardous leaks.

xi. Evaluate the effectiveness of Sunoco's ROW inspection program as it pertains to leak detection.  This evaluation must consider any geographic regions or features (i.e., HCAs and other sensitive areas) that may require specific or additional means of patrol. Based on the findings, determine corrective measures to improve the effectiveness of Sunoco's ROW inspection program relative to leak detection.

xii. Implement continuing long-term periodic testing and integrity verification measures  to ensure the ongoing safe operation of the *Affected Pipeline* considering the results of the analyses, inspections, evaluations, and corrective measures undertaken pursuant to the Order.

f. Include a proposed schedule for completion of the RWP.

g. Sunoco must revise the RWP as necessary to incorporate new information obtained during the failure investigation and remedial activities, to incorporate the results of actions undertaken pursuant to the Safety Order, and/or to incorporate modifications required by the Director.

i. Submit any plan revisions to the Director for prior approval.

ii. The Director may approve plan revisions incrementally.

h. Implement the RWP as it is approved by the Director, including any revisions to the plan.

4. **Third-Party Facilitator**. Paragraphs (e)(viii) through (e)(xi) of the Work Plan must be facilitated by an independent third-party with relevant expertise approved by the Director.

Case ID: 250303655

Any documentation from the third-party facilitator must be included in each required submission to the Director.

5. **Instrumented Leakage Survey.**  Within 30 days after the Safety Order is issued, Sunoco must perform a ground instrument leakage survey of the *Affected Pipeline*.  Sunoco must investigate all leak indications and remedy all leaks discovered.  Sunoco must submit documentation of this survey to the Director within 45 after the Safety Order is issued.

6. **Review of Prior In-line Inspection (ILI) Results.**

   a.  Within 30 days after the Safety Order is issued, Respondent must conduct a review of any previous ILI results of the *Affected Pipeline*.  In its review, Sunoco must re-evaluate all ILI results from the past 10 calendar years, including a review of the ILI vendors' raw data and analysis.  Sunoco must determine whether any features were present in the failed pipe joint and any other pipe removed.  Also, Respondent must determine if any features with similar characteristics are present elsewhere on the *Affected Pipeline*.  Sunoco must submit documentation of this ILI review to the Director within 45 days after the Safety Order is issued as follows:

      i.   List all ILI tool runs, tool types, and the calendar years of the tool runs.

      ii.  List, describe (type, size, wall loss, etc.), and identify the specific location of all ILI features present in the failed joint and other pipe removed.

      iii. List, describe (type, size, wall loss, etc.), and identify the specific location of all ILI features with similar characteristics present elsewhere on the *Affected Pipeline*.

      iv.  Explain the process used to review the ILI results and the results of the reevaluation.

7. **Mechanical and Metallurgical Testing**. Within 45 days after the Safety Order is issued, Sunoco must complete mechanical and metallurgical testing and failure analysis of the failed pipe, including an analysis of soil samples and any foreign materials.  Mechanical and metallurgical testing must be conducted by an independent third-party acceptable to the Director and must document the decision-making process and all factors contributing to the failure.  Respondent must complete the testing and analysis as follows:

   a.  Document the chain-of-custody when handling and transporting the failed pipe section and other evidence from the Failure site.

   b.  Within 10 days of receipt of this Order, develop and submit the testing protocol and the proposed testing laboratory to the Director for prior approval.

   c.  Prior to beginning the mechanical and metallurgical testing, provide the Director with the scheduled date, time, and location of the testing to allow for an OPS representative to witness the testing.

   d.  Ensure the testing laboratory distributes all reports whether draft or final in their entirety to the Director at the same time they are made available to Respondent.

8. **Root Cause Failure Analysis.** Within 90 days after the Safety Order is issued, complete a root cause failure analysis (RCFA) and submit a final report of this RCFA to the

12

Director.  The RCFA must be supplemented or facilitated by an independent third-party acceptable to the Director and must document the decision-making process and all factors contributing to the Failure.  The final report must include findings and any lessons learned and whether the findings and lessons learned are applicable to other locations within Sunoco's pipeline system.

9. **Leak Detection Plan.** Within 90 days after the Safety Order is issued, Sunoco must perform a review and submit to the Director a written plan to improve the leak detection capability on the *Affected Pipeline*.  This review must include a comprehensive analysis of any SCADA, leak detection, surveillance, and other monitoring systems on the *Affected Pipeline*.  The written plan must include a schedule for improving the leak detection capability of the *Affected Pipeline* through additional instrumentation, updated hardware or software, installation of a computational pipeline monitoring system and associated software programming, additional surveillance, pipeline control staffing, ongoing leak surveys, and any other appropriate measures.

10. **Emergency Response Plan and Training Review.** Within 90 of receipt of the Safety Order, Sunoco must review and assess the effectiveness of its emergency response plan with regards to the Failure.  Sunoco must include in the review and assessment the on-scene response and support, coordination, and communication with emergency responders and public officials.  Sunoco must also include a review and assessment of the effectiveness of its emergency training program. Sunoco must amend its emergency response plan and emergency training, if necessary, to reflect the results of this review. The documentation of this *Emergency Response Plan and Training Review* must be available for inspection by OPS or provided to the Director, if requested.

11. **Public Awareness Program Review.**  Sunoco must review and assess the effectiveness of its Public Awareness program with regards to the Failure. Sunoco must amend its Public Awareness Program, if necessary, to reflect the results of this review.  The documentation of this *Public Awareness Plan Program Review* must be available for inspection by OPS or provided to the Director, if requested.

**Other Requirements:**

12. **Approvals.** With respect to each submission under the Safety Order that requires the approval of the   Director, the Director may: (a) approve, in whole or part, the submission; (b) approve the submission on specified conditions; (c) modify the submission to cure any deficiencies; (d) disapprove in whole or in part, the submission, directing that Respondent modify the submission, or (e) any combination of the above. In the event of approval, approval upon conditions, or modification by the Director, Respondent shall proceed to take all action required by the submission as approved or modified by the Director. If the Director disapproves all or any portion of the submission, Respondent must correct all deficiencies within the time specified by the Director and resubmit it for approval.

13. **Extensions of Time.**  The Director may grant an extension of time for compliance with any of the terms of the Safety Order upon a written request timely submitted

demonstrating good cause for an extension.

14. **Reporting.** Submit quarterly reports to the Director that: (1) include all available data and results of the testing and evaluations required by this Order; and (2) describe the progress of the repairs or other remedial actions being undertaken. The first quarterly report is due on April 1, 2025. The Director may change the interval for the submission of these reports.

15. **Documentation of the Costs.** It is requested that Respondent maintain documentation of the costs associated with implementation of the Safety Order. Include in each monthly report submitted, the to-date total costs associated with: (1) preparation and revision of procedures, studies and analyses; (2) physical changes to pipeline infrastructure, including repairs, replacements and other modifications; and (3) environmental remediation.

The actions proposed by this Notice of Proposed Safety Order are in addition to and do not waive any requirements that apply to Respondent's pipeline system under 49 CFR Parts 190 through 199, under any other order issued to Respondent under authority of 49 U.S.C. § 60101 *et seq.*, or under any other provision of Federal or state law.

After receiving and analyzing additional data in the course of this proceeding and implementation of the corrective measures, PHMSA may identify other safety measures that need to be taken. In that event, Respondent will be notified of any proposed additional measures and, if necessary, amendments to the Safety Order.

**Response to this Notice**

In accordance with § 190.239, you have 30 days following receipt of this Notice to submit a written response to the official who issued the Notice. If you do not respond within 30 days, this constitutes a waiver of your right to contest this Notice and authorizes the Associate Administrator for Pipeline Safety to find facts as alleged in this Notice without further notice to you and to issue a Safety Order. In your response, you may notify that official that you intend to comply with the terms of the Notice as proposed, or you may request that an informal consultation be scheduled (you will also have the opportunity to request an administrative hearing before a safety order is issued). Informal consultation provides you with the opportunity to explain the circumstances associated with the risk condition(s) alleged in the notice and, as appropriate, to present a proposal for a work plan or other remedial measures, without prejudice to your position in any subsequent hearing.

If you and PHMSA agree within 30 days of informal consultation on a plan and schedule for you to address each identified risk condition, we may enter into a written consent agreement (PHMSA would then issue an administrative consent order incorporating the terms of the agreement). If a consent agreement is not reached, or if you have elected not to request informal consultation, you may request an administrative hearing in writing within 30 days following receipt of the Notice or within 10 days following the conclusion of an informal consultation that did not result in a consent agreement, as applicable. Following a hearing, if the Associate Administrator finds the facility to

14

have a condition that poses a pipeline integrity risk to the public, property, or the environment in accordance with § 190.239, the Associate Administrator may issue a safety order.

Be advised that all material you submit in response to this enforcement action is subject to being made publicly available. If you believe that any portion of your responsive material qualifies for confidential treatment under 5 U.S.C. 552(b), along with the complete original document you must provide a second copy of the document with the portions you believe qualify for confidential treatment redacted and an explanation of why you believe the redacted information qualifies for confidential treatment under 5 U.S.C. 552(b).

In your correspondence on this matter, please refer to **CPF No. 4-2025-054-NOPSO** and for each document you submit, please provide a copy in electronic format whenever possible.

BRYAN JEFFERY LETHCOE
Digitally signed by BRYAN JEFFERY LETHCOE
Date: 2025.02.13 14:32:28 -06'00'

February 13, 2025

Bryan Lethcoe                                                                     Date issued
Director, Southwest Region, Office of Pipeline Safety
Pipeline and Hazardous Materials Safety Administration

Case ID: 250303655

**Exhibit A_ Page 157 of 336**



*Filed and Attested by the
Office of Judicial Records
23 APR 2025 08:56 pm
C. SMITH*

# EXHIBIT E


**Pennsylvania
Department of
Environmental Protection**

**SENT VIA ELECTRONIC MAIL ONLY**

February 18, 2025

<u>**NOTICE OF VIOLATION**</u>

To:     Matthew Gordon, Vice President Operations
        Energy Transfer
        535 Fritztown Road
        Sinking Springs, PA 19333
        matthew.gordon@energytransfer.com

Re:     Mount Eyre Neighborhood
        Washington Crossing LNAPL Incident and Investigation
        Pennsylvania Pipeline (a.k.a. Twin Oaks–Newark Pipeline)
        Upper Makefield Township
        Bucks County

Dear Mr. Gordon:

On January 31, 2025, Energy Transfer notified the Department of Environmental Protection (DEP) of a discharge from their 14" pipeline located in the Mt. Eyre neighborhood in Washington Crossing, Bucks County.

This discovery came after investigation by DEP and Energy Transfer and after both organizations communicated with residents and Upper Makefield Township regarding ongoing reports of petroleum odors in residential wells.

Energy Transfer has described the discharge as emanating from the sleeved portion of the 14" Jet Fuel Line. To date this release has caused free product and dissolved concentrations of petroleum-related chemicals in potable wells in the neighborhood, with some properties having contamination exceeding DEP's Statewide health standard medium specific concentrations in their drinking water.

The above referenced discharge to Waters of the Commonwealth constitutes a violation of Section 401 of the Clean Streams Law, 35 P.S. § 691.401 (Clean Streams Law). Such violation also constitutes unlawful conduct under Section 611 of the Clean Streams Law, 35 P.S. § 691.611, and is subject to the enforcement provisions of Section 605 of the Clean Streams Law, 35 P.S, § 691.605, which includes the assessment of civil penalties.

Matthew Gordon

2                                         February 18, 2025

DEP requests the following information be provided within 15 days of the date of this letter at a minimum:

1.    A description of the circumstances causing the incident and how the circumstances were determined, including historical investigations of the pipeline in this area.

2.    Description and estimated quantity, by weight, volume, or measurement of materials or wastes involved.

3.    An assessment of any contamination of land, surface water, groundwater, or air that has occurred since January 1, 2023.

4.    Estimated quantity and disposition of all recovered materials or wastes that resulted from the incident and plans for ultimate disposal.

5.    A detailed description of response actions, and remedial actions that were taken or are intended to be implemented (date and time of implementation), and how these actions will prevent a similar occurrence in the future.

6.    A copy of any geotechnical, potholing, vapor monitoring, exploratory excavations, soil sampling, or other investigations done since January 1, 2023.

7.    Any and all soil, groundwater, surface water or other sample or screening data collected in the impacted area. This data should be provided from January 1, 2023.

8.    An outline of the steps Energy Transfer will take, including action items, if an actual or suspected pollution event was to happen in the future.

This Notice of Violation is neither an order nor any other final action of DEP.  It neither imposes nor waives any enforcement action available to DEP under any of its statutes.  If DEP determines that an enforcement action is appropriate, you will be notified of the action.

If you have any questions, please contact me at tmagge@pa.gov or 484.250.5136.

Sincerely,

*Thomas L. Magge*

Thomas L. Magge
Environmental Program Manager
Clean Water Program

Case ID: 250303655

**Exhibit A_ Page 160 of 336**

Matthew Gordon

3                                        February 18, 2025


cc:     Bradford L Fish, Energy Transfer (via email) bradford.fish@energytransfer.com
        Carl G. Borkland, Energy Transfer (via email) carl.borkland@energytransfer.com
        Yvette Taylor, Upper Makefield Township (via email) ytaylor@uppermakefield.org
        David Nymnan, Upper Makefield Township (via email) manager@uppermakefield.org
        Bryan Lethcoe, (PHMSA); bryan.lethcoe@dot.gov
        DEP Environmental Cleanup and Brownfields
        File

Case ID: 250303655



*Filed and Attested by the*
*Office of Judicial Records*
*23 APR 2025 08:56 pm*
*C. SMITH*

# EXHIBIT F



325 North St. Paul Street    214-716-1923    PipelineLegal.com
Suite 2700
Dallas, Texas 75201

February 19, 2025

Mr. Bryan Lethcoe          Via Email: bryan.lethcoe@dot.gov
Director, Southwest Region
Pipeline and Hazardous Materials Safety Administration
Office of Pipeline Safety
US Department of Transportation
8701 South Gessner, Suite 630
Houston, Texas 77074

**Re:    CPF No. 4-2025-054-NOPSO**
       **Notice of Proposed Safety Order**

Dear Mr. Lethcoe:

The Pipeline and Hazardous Materials Safety Administration's (PHMSA) Notice of Proposed Safety Order (Notice) dated February 13, 2025, was received by Sunoco Pipeline, L.P. (Sunoco) via electronic mail on the same date. This letter constitutes Sunoco's initial response to the Notice and, in addition, clarifies a number of Preliminary Findings presented in the Notice. Capitalized terms not defined herein shall take the meanings ascribed to them by the Notice.

The Notice contained a list of Preliminary Findings and numerous Proposed Corrective Measures to be applied to the Affected Pipeline. The Affected Pipeline is the entirety of the Twin Oaks to Newark 14-inch refined products pipeline. Sunoco contests all of the Preliminary Findings and Proposed Corrective Measures. While Sunoco desires a positive relationship with PHMSA, Sunoco also does not agree with certain alleged factual statements, certain "rush to judgment" conclusions, and the recitation of alleged events involving other operators. Sunoco offers the following initial clarifications:

1.  PHMSA alleges in the Notice, Introduction and Purpose, that "the Pipeline experienced a leak in a high consequence area for at least 16 months."

    **Sunoco Clarification:  There is not sufficient evidence at this time to conclude how long the Affected Pipeline was leaking. Therefore, it cannot be stated with any degree of certainty that the "Pipeline experienced a leak in a high consequence area for at least 16 months". It may turn out, through the investigation and analysis that Sunoco is undertaking, that the leak was effectively detected shortly after it began.**

    **In September 2023, Sunoco responded to an odor complaint in the vicinity of the pipeline, probed the location with a PID gas detector, tested the well water at multiple locations in the area, performed excavations and initiated and completed a static pressure test on the pipeline, which was inclusive of the excavated sections of the pipeline.  No leak was identified.  Subsequent investigations and testing were performed in June, July, and November 2024, following additional odor complaints,**

THE PIPELINE AUTHORITY

Case ID: 250303655

811
Know what's below.
Call before you dig.

**Exhibit A_ Page 163 of 336**



Mr. Bryan Lethcoe
February 19, 2025
Page 2 of 4

but likewise no leak was identified.  This most recent event will be fully investigated, and subsequent reporting and expert analysis will be conducted as part of Sunoco's evaluation, including, where possible and appropriate, the cause and duration of any leak.

2.  PHMSA alleges in the Notice, Introduction and Purpose, that "it appears that the continued operation of the Twin Oaks Pipeline without corrective measures would pose a pipeline integrity risk to public safety, property, or the environment."

**Sunoco Clarification: On January 31, 2025, Sunoco discovered a leak on the Affected Pipeline.  Sunoco cut out the affected section of the pipeline. On February 2, 2025, after receiving approval from PHMSA's Southwest Region Director of its repair plan and intent to return the pipeline to service, Sunoco replaced that affected section of pipe and returned the pipeline to service. There is no evidence of an ongoing leak on the Affected Pipeline.**

3.  PHMSA alleges in the Notice, Preliminary Findings, that "PHMSA is aware of a gasoline release in Huntersville, North Carolina, discovered on August 14, 2020, in which 28,571 barrels were released through a through-wall crack which developed in a shallow dent reinforced with a Type A sleeve.  The release also not detected by the pipeline operator's leak detection system."

**Sunoco Clarification: The gasoline release in Huntersville, North Carolina discovered on August 14, 2020 did not involve a Sunoco pipeline.  This 2020 release involved a third-party operator wholly unrelated to Sunoco or Energy Transfer.**

4.  PHMSA alleges in the Notice, Proposed Issuance of Safety Order, that "Sunoco's apparent inability to effectively detect the leak has potentially exacerbated the impacts of the release over an extended period of time."

**Sunoco Clarification:  As noted above, there is not sufficient evidence at this time to conclude how long the Affected Pipeline was leaking. Therefore, it cannot be stated with certainty that there was an "apparent inability to effectively detect the leak"; it may turn out, through investigation and analysis, that the leak was effectively detected shortly after it began.**

**It cannot reasonably be asserted that Energy Transfer and Sunoco have an "apparent inability to effectively detect" the leak.  Energy Transfer and Sunoco maintain robust leak detection programs on their pipelines as part of their O&M and Integrity Management Plan that surpasses regulatory requirements in various critical aspects,**

Case ID: 250303655



PipelineLegal.com

Mr. Bryan Lethcoe
February 19, 2025
Page 3 of 4

**including the general practice to inspect pipelines even when inspection may not be required by regulation. Further, Energy Transfer maintains a Company-wide Organizational Excellence ("OE") Program, that applies to Sunoco, which is an initiative aimed at continuous improvement of corporate culture and practices, with an emphasis on safety and compliance. The OE Program, which incorporates the ten elements of American Petroleum Institute's Recommended Practice 1173, has fostered a Company culture that emphasizes identifying and addressing areas for improvement and applying lessons learned from one project to future projects Company-wide. These ongoing compliance-focused efforts have resulted in quantifiable benefits. For example, the total release frequency history for Energy Transfer-owned pipelines is better than the industry average for U.S. crude oil pipelines.**

5. PHMSA alleges in the Notice, Preliminary Findings, Pages 3 and 4, certain limited descriptions of Sunoco's response and investigation efforts related to this incident.

   **Sunoco Clarification:    The description of Sunoco's investigations is materially understated in the Notice. A true and accurate description and summary of Sunoco's investigations will be provided to PHMSA.**

As provided by 49 C.F.R. § 190.239(b)(2), Sunoco hereby seeks to promptly engage with PHMSA in informal consultation meetings toward ultimately resolving this matter by way of a Consent Agreement. Although the informal consultation process shall commence within 30 days of the Operator's request for same, Sunoco requests that a meeting be set as soon as possible. Additionally, 49 C.F.R. § 190.239(b)(2) provides that PHMSA may extend the 30-day informal consultation period by request or otherwise for good cause. Sunoco requests that PHMSA exercise its discretion to extend this period as may be needed during the course of the informal consultation process.

Sunoco hereby reserves its right to request a hearing within 10 days following the conclusion of the informal consultation process, as provided by 49 C.F.R. § 190.239(b)(3), should the parties be unable to reach a conclusion that results in a Consent Agreement.

Finally, pursuant to 49 U.S.C. § 60117(b)(1)(C) and 49 C.F.R. § 190.209(a), Respondent hereby requests all materials in the case file, which shall include all agency records pertinent to the matters of fact or law asserted in the Notice.

Case ID: 250303655

**Exhibit A_ Page 165 of 336**



Sunoco looks forward to working towards a Consent Agreement that would appropriately ensure the safe operation of the Affected Pipeline.  Please address any questions or requests for further information to the undersigned.

Sincerely,

Haley O'Neill
Counsel for Sunoco

cc:    Keith Coyle, Chief Counsel, PHMSA
       Benjamin Fred, Assistant Chief Counsel, Pipeline Safety Law Division, PHMSA
       Timothy O'Shea, Attorney Advisor Southwest Region, PHMSA
       Todd Stamm, Senior Vice President, Operations, Energy Transfer, LP
       Eric Amundsen, Senior Vice President, Operations, Energy Transfer, LP
       Curtis Stambaugh, Assistant General Counsel, Energy Transfer, LP
       Keegan Pieper, Deputy General Counsel, Energy Transfer, LP
       Todd Nardozzi, Director DOT Compliance, Energy Transfer, LP
       Vince Murchison, Murchison O'Neill, PLLC
       Roina Baker, Murchison O'Neill, PLLC

Case ID: 250303655



*Filed and Attested by the Office of Judicial Records 23 APR 2025 08:56 pm G. SMITH*

# EXHIBIT G



# GOVERNOR JOSH SHAPIRO

February 28, 2025

Secretary Sean Duffy
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590

Dear Secretary Duffy:

I am writing to request expedited action from the federal government and your agency to ensure public safety following the jet fuel leak from the Twin Oaks Pipeline in the Mount Eyre neighborhood of Upper Makefield Township, Bucks County. Reports show the leak was caused by a sleeve installed over 30 years ago and went undetected by pipeline operators for 16 months, resulting in a jet fuel leak affecting Pennsylvanians' homes and businesses and contaminating local water sources. According to pipeline operator Energy Transfer, there are several dozen similar sleeves at other locations along the pipeline, raising questions about the integrity of the entire pipeline.

This is the latest incident in a long pattern of safety concerns with Sunoco and Energy Transfer pipelines in Pennsylvania — a pattern including activity I brought criminal charges against while serving as Attorney General of Pennsylvania.

As you know, the Pipeline Safety Act puts interstate hazardous liquid pipeline facilities under federal jurisdiction through PHMSA. In your role as Acting Administrator, I urge you to exercise every authority within your discretion to expedite the process of thoroughly testing the Twin Oaks pipeline and confirming it to be safe for continued operation.

I understand that PHMSA has directed Sunoco to reduce the pipeline's pressure by 20 percent, and that Sunoco has also completed a series of excavations under PHMSA's supervision in order to visually inspect other sleeves in the vicinity of the leak. I encourage you to push Sunoco to immediately conduct additional testing and inspection — including inspecting the other sleeves that are present elsewhere on the pipeline — to identify any threats to the integrity of the pipeline which you directed in your February 13, 2025, Proposed Safety Order.

I also request that your agency be stringent in your review of Sunoco's Remedial Work Plan, which was also directed in your Proposed Safety Order. The steps required in the Work Plan — including root cause analysis, further repair activities, and assessments of Sunoco's leak detection, inspection and maintenance programs — are critical to providing both near term confidence in the safety of the line, and assurances that similar incidents will be avoided in the future.

**Office of the Governor | Harrisburg, PA | www.pa.gov**

Case ID: 250303655

**Exhibit A_ Page 168 of 336**

Secretary Duffy
U.S. Department of Transportation
Page 2

Pennsylvanians are rightfully concerned about the integrity of the pipeline and Sunoco has not demonstrated adequate ability to detect leaks and take appropriate actions, given what appears to have been a significant delay between the initial indications of a leak and the response. We need the federal government, and your agency, to partner with us and work quickly to alleviate those concerns.

As you are aware, the federal government has primary jurisdiction related to the operation of interstate pipelines under the Pipeline Safety Act. That said, my Administration, particularly the Pennsylvania Department of Environmental Protection, has been closely involved with the site investigation, characterization, and remediation process and will continue to stand with residents until the cleanup is complete. At my direction, DEP has ensured every residence with elevated testing levels in their water are being provided with water treatment systems.

To date, third party environmental consultants working under the oversight of DEP have conducted over 332 water tests at residences in the affected area and treatment systems have been installed at any residences at which results have indicated constituents above statewide health standards. DEP is also overseeing hydrology testing to characterize the subsurface affected area and better understand groundwater flow, which will help inform the longer-term remediation plan.

As you continue your agency's response to this incident, I also urge you to continue to be transparent with impacted residents, who deserve to know how this leak occurred, why it went undetected for so long, and how they can feel safe in their community moving forward.

Please don't hesitate to reach out if my Administration can assist further — we offer you every resource at our disposal to ensure this does not happen again.

Thank you,

Governor Josh Shapiro

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

DANIEL LA HART, *et al.*, individually
and on behalf of all others similarly situated,     :

        Plaintiffs,     :       CIVIL ACTION

        v.     :

SUNOCO PIPELINE L.P., *et al.*,     :       NO. 25-2072

        Defendants.     :

## ORDER

**AND NOW**, this 13th day of June, 2025, upon consideration of Plaintiffs' Motion to Remand to State Court (ECF No. 19) and Defendants' Response in Opposition (ECF No. 24), it is hereby **ORDERED** that the motion is **GRANTED**. Accordingly, it is further **ORDERED** as follows:

1. This matter is hereby remanded to the Philadelphia County Court of Common Pleas pursuant to the local controversy exception under the Class Action Fairness Act of 2005 ("CAFA"). *See* 28 U.S.C. § 1332(d)(4).

2. Plaintiffs' alternative request for limited jurisdictional discovery is **DENIED** as Moot.

3. The order scheduling this matter for a preliminary injunction hearing on June 16, 2025 (ECF No. 23) is hereby **VACATED** and the hearing is canceled.

Opinion to follow.

BY THE COURT:

CLERK'S OFFICE
TRUE COPY CERTIFIED FROM THE RECORD

Jun/ 2025

BY: s/

Deputy Clerk, U.S. District Court
Eastern District of Pennsylvania

_____
Hon. Mia R. Perez

RMUSC-La Hart Etal Vs Sunoco Pipeline, Lp Etal [JDW]



25030365500021

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DANIEL LA HART, *et al.*, individually and on behalf of all others similarly situated, | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| SUNOCO PIPELINE L.P., *et al.*, | : | NO. 25-2072 |
| | : | |
| Defendants. | : | |

## <u>MEMORANDUM</u>

**Perez, J.**                                                                **June 16, 2025**

Plaintiffs filed this environmental class action in the Philadelphia County Court of Common Pleas, alleging injuries from a petroleum pipeline leak in Bucks County, Pennsylvania. Defendants Sunoco Pipeline L.P. ("Sunoco"), Energy Transfer LP ("Energy Transfer"), and Energy Transfer (R&M) LLC ("R&M") removed the action under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d). Plaintiffs now move to remand, invoking the local controversy exception to CAFA and disputing Defendants' claim that Defendant Energy Transfer (R&M) LLC ("R&M"), a Pennsylvania entity, was fraudulently joined. The Court concludes that Defendants have not met their burden to show fraudulent joinder, and that Plaintiffs have satisfied the criteria for the local controversy exception. Accordingly, the Court grants the motion to remand.

### I.    CASE BACKGROUND

This case arises from a breach of Defendants' Twin Oaks Pipeline ("Pipeline") in the Mount Eyre Manor residential community in Upper Makefield Township, in Bucks County Pennsylvania.[1] Plaintiffs filed a putative class action on March 27, 2025, in the Philadelphia

---

[1] ECF No. 1-1 at ¶ 9.

RMUSC-La Hart Etal Vs Sunoco Pipeline, Lp Etal [JDW]



25030365500021

County Court of Common Pleas asserting claims for negligence, nuisance, trespass, and strict liability against Defendants Sunoco Pipeline L.P. ("Sunoco"), Energy Transfer LP ("Energy Transfer"), and Energy Transfer (R&M) LLC ("R&M"). Plaintiffs allege that Defendant Energy Transfer, "through its complex network of subsidiaries, limited partnerships, and joint ventures, including [Defendants Sunoco and R&M] owns one of the nation's largest networks of natural gas, crude oil, and petroleum product pipelines."[2] The pipeline leak at issue here has contaminated groundwater, private drinking wells, soil, and air in the community, causing damage to the environment, property values, and health of the residents.[3] Defendants publicly accepted responsibility for the leak and are remediating the affected area.[4] Below is a concise timeline of the events leading to this action and relevant procedural history.

On January 31, 2025, Sunoco identified and reported the pipeline leak to the Pennsylvania Department of Environmental Protection ("PADEP");[5] however, Plaintiffs assert that Defendants had received odor complaints from residents as early as September 2023.[6] On February 1, 2025, Energy Transfer issued a written statement confirming the discovery of the leak.[7] Following confirmation of the leak, Defendants removed and replaced the leaking segment, returned the pipeline to service, and began conducting testing of the water of nearby residences.[8] On February 13, 2025, the Pipeline and Hazardous Materials Safety Administration (PHMSA) issued a Notice of Proposed Safety Order and proposed remedial requirements to Defendants.[9] Defendants

---

[2] *Id.* at ¶ 34.
[3] *Id.* at ¶¶ 3, 5-6, 18-24.
[4] *Id.* at ¶ 244.
[5] ECF No. 24-5 at 2.
[6] ECF No. 1-1 at ¶ 16.
[7] *Id.* at ¶ 132.
[8] *Id.* at ¶¶ 128, 132, 134.
[9] ECF No. 21-3.

submitted a Notice of Intent to Remediate to PADEP on February 13 and, on the same day, formally notified the Township Manager of their remediation efforts.[10]

On February 18, 2025, the PADEP issued a Notice of Violation to Defendants.[11] During a town hall meeting on February 27, an Energy Transfer representative claimed responsibility for the release and apologized.[12] On March 6, 2025, PADEP issued an administrative order to Defendants R&M and Sunoco, requiring a response to the leak and the implementation of certain remedial efforts, including installing point-of-entry treatment systems, preparing daily reports, and providing bottled water.[13] In its administrative order, PADEP "found and determined" that "Energy Transfer (R&M), LLC is a Pennsylvania Business Corporation and . . . is a parent entity of Sunoco," and that R&M, along with [Sunoco] owns and operates the Pipeline at issue in this case.[14] The PADEP Administrative Order required Defendants to file an appeal within 30 days with the Environmental Hearing Board.[15] Defendants declined to file an appeal, but on March 31, a representative of Energy Transfer responded to the administrative order via email, asserting that R&M is not a proper party to the order since R&M does not own or operate the pipeline and has no ownership interest in Sunoco.[16]

On April 24, 2025, Defendants timely removed the action to this Court under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d), asserting minimal diversity, a putative class exceeding 100 members, and an amount in controversy exceeding $5 million.[17] Defendants also

---

[10] ECF No. 24-2.
[11] ECF No. 21-4.
[12] ECF No. 1-1 at ¶ 164.
[13] Ex. 4, ECF 24-5.
[14] ECF No. 1-1 at ¶ 5.
[15] Ex. 4, ECF 24-5.
[16] Ex. 5, ECF No. 1.
[17] ECF No. 1 at ¶ 22.

assert that R&M was fraudulently joined and should be disregarded for jurisdictional purposes.[18] On May 27, 2025, Plaintiffs filed the instant Motion to Remand, arguing that (1) R&M is a properly joined Pennsylvania defendant,[19] and (2) the case qualifies for the mandatory local controversy exception under CAFA.[20] Plaintiffs alternatively requested limited jurisdictional discovery if the Court determined that factual development was necessary to resolve jurisdiction.[21]

Defendants filed a consolidated opposition brief to the motion to remand on June 10, 2025, along with a declaration asserting that R&M had no operational role in the Pipeline or its breach, and that its inclusion in a PADEP administrative order was erroneous.[22] This matter is now ripe for disposition.[23]

## II.    LEGAL STANDARD

Removal of a civil action from state to federal court is proper only if the action initially could have been brought in federal court. 28 U.S.C. §1441(a). The removal statutes "are to be strictly construed against removal and all doubts should be resolved in favor of remand." *Boyer v. Snap-On Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990). To ascertain jurisdiction, individuals are deemed to be citizens of the state wherein they reside, *Swiger v. Allegheny Energy, Inc.*, 540

---

[18] *Id.* at ¶ 55.

[19] ECF No. 19-1 at 11.

[20] *Id.; see also* 28 U.S.C. § 1332(d)(4)(A).

[21] ECF No. 19 at 1.

[22] ECF No. 24.

[23] Plaintiffs filed a Motion for Preliminary Injunction on June 9, 2025, for which this Court promptly scheduled an evidentiary hearing. *See* ECF No. 22. However, before proceeding to the merits, this Court must assess subject matter jurisdiction because "[w]ithout jurisdiction the court cannot proceed at all in any cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) (quoting *Ex parte McCardle*, 74 U.S. 506, 514 (1869) (internal quotations omitted)). It is a fundamental principle of American jurisprudence that jurisdiction is the first and foremost question resolved by the court. *Id.* at 94. As set forth in this memorandum, the Court lacks subject matter jurisdiction. The evidentiary hearing was therefore cancelled.

F.3d 179, 181 (3d Cir. 2008), while a corporation is deemed a citizen of every state in which it has been incorporated and where it has its principal place of business. 28 U.S.C. §1332(c)(1).

A district court must remand a case "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction." 28 U.S.C. § 1447(c); *see Liberty Mut. Ins. Co. v. Ward Trucking Corp.*, 48 F.3d 742, 750 (3d Cir. 1995). The removing party carries the "heavy burden of persuasion," and courts must resolve all doubts in favor of remand. *Steel Valley Auth. v. Union Switch and Signal Div.*, 809 F.2d 1006, 1010, 1012 n.6 (3d Cir. 1987) (citation omitted).

## IV.　FRAUDULENT JOINDER

Defendants, who removed this action pursuant to CAFA, argue that Defendant R&M, a Pennsylvania entity, was fraudulently joined by Plaintiffs in their initial state action in an effort to purposely destroy federal diversity jurisdiction. There is no dispute here over the actual citizenship of any of the parties for purposes of federal jurisdiction. Rather, the disagreement centers on whether R&M's Pennsylvania citizenship should even be considered at all—which hinges on the issue of fraudulent joinder rather that its underlying state of citizenship.

Fraudulent joinder is an exception to the complete diversity requirement for removal, allowing federal courts to assume jurisdiction over cases containing nondiverse defendants where it can be shown that they were joined "solely to defeat diversity jurisdiction." *In re Briscoe*, 448 F.3d 201, 215–16 (3d Cir. 2006). Joinder is fraudulent "if there is no reasonable basis in fact or colorable ground supporting the claim against the joined defendant, or no real intention in good faith to prosecute the action against the defendant or seek a joint judgment." *Id.* at 216 (quotations omitted). A claim is colorable if it is not "wholly insubstantial and frivolous." *Batoff v. State Farm Ins. Co.*, 977 F.2d 848, 852 (3d Cir. 1992). The removing party asserting fraudulent joinder has a "heavy burden of persuasion." *Bate v. State Farm Ins. Co.*, 977 F.2d 848, 851 (3d Cir. 1992). In

deciding whether a defendant has demonstrated fraud, district courts must "focus on the plaintiff's complaint at the time the petition for removal was filed," accept the complaint's factual allegations as true, and resolve uncertainties about the controlling substantive law in the plaintiff's favor. *Id.* at 851–52 (quotations omitted). Joinder is proper "[i]f there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants." *Id.* at 851 (quotations omitted).

A court should not find a joinder fraudulent "[s]imply because [it] come[s] to believe that, at the end of the day, a state court would dismiss the allegations against a defendant for failure to state a cause of action." *Kallman v. Aronchick*, 2013 WL 5964444, at *5 (E.D. Pa. Nov. 8, 2013) (quoting *Lyall v. Airtran Airlines, Inc.*, 109 F. Supp. 2d 365, 367–68 (E.D. Pa. 2000)). Rather, a finding of fraudulent joinder is usually reserved for situations where recovery from the non-diverse defendant is a clear legal impossibility. *West v. Marriott Hotel Servs., Inc.*, 2010 WL 4343540, *3 (E.D. Pa. Nov. 2, 2010) (quotations omitted). "Fraudulent joinder should not be found simply because plaintiff has a weak case against a non-diverse defendant." *Id.*; *see Boyer*, 913 F.2d at 111.

Defendants argue that Plaintiffs joined R&M solely to defeat diversity and that R&M's inclusion in the PADEP Administrative Order was a "scrivener's error."[24] They support this assertion with a declaration stating R&M has no involvement with the Pipeline. However, the PADEP's March 2025 Administrative Order—issued to Sunoco and R&M—explicitly directed both companies to remediate the pipeline release, identifying R&M as a parent of Sunoco. That Order became final under Pennsylvania law after R&M and Sunoco declined to appeal it. *See* 35 P.S. § 7514(c). Defendants' characterization of the PADEP's findings as a clerical mistake is not

---

[24] ECF No. 24 at 5.

dispositive at this stage. Even if disputed, the order and the absence of appeal create a plausible basis for the claim that R&M was legally responsible or operationally involved in the events surrounding this litigation. The Court must resolve all doubts in favor of remand when evaluating fraudulent joinder. *See Batoff v. State Farm Ins. Co.*, 977 F.2d 848, 851–52 (3d Cir. 1992). Because there is a reasonable basis in fact and law for Plaintiffs' claims against R&M, the Court finds that R&M was not fraudulently joined.

## V.    THE LOCAL CONTROVERSY EXCEPTION TO CAFA

Having found that R&M was not fraudulently joined, the Court turns to whether an exception to CAFA applies. CAFA provides a broader avenue for removal of a case than traditional diversity jurisdiction. Relaxing the diversity of citizenship requirement to allow minimal diversity to suffice, CAFA grants federal courts subject-matter jurisdiction over state-filed class action suits where: (1) the putative class exceeds 100 members; (2) the amount in controversy exceeds $5 million, and (3) any class member is a citizen of a different state than any defendant. *See* 28 U.S.C. § 1332(d)(2); *Vodenichar v. Halcon Energy Properties*, 733 F.3d 497 (3d Cir. 2013). There is no dispute here that this matter fits the above criteria. However, CAFA jurisdiction is subject to the local controversy exception, under which federal district courts must decline jurisdiction if:

(I)    greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;

(II)    at least 1 defendant is a defendant—

(aa)    from whom significant relief is sought by members of the plaintiff class;

(bb)    whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and

(cc)    who is a citizen of the State in which the action was originally filed; and

(III)    principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and

(ii)    during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons[.]

28 U.S.C. § 1332(d)(4)(A).

A party seeking to invoke this exception must show, therefore, that:

(1) greater than two-thirds of the putative class are citizens of the state in which the action was originally filed; (2) at least one defendant is a citizen of the state in which the action was originally filed (the "local defendant"); (3) the local defendant's conduct forms a significant basis for the claims asserted; (4) plaintiffs are seeking significant relief from the local defendant; (5) the principal injuries occurred in the state in which the action was originally filed; and (6) no other class action asserting the same or similar allegations against any of the defendants had been filed in the preceding three years.

*Vodenichar*, 733 F.3d at 506–07. As the moving party, Plaintiffs must demonstrate that the exception applies by a preponderance of the evidence. *Id.* at 503. "Even if a federal court has jurisdiction under CAFA, it must decline to exercise that jurisdiction if the class action involves a local controversy." *McLaren v. UPS Store Inc,* 32 F.4th 232, 241 (3d Cir. 2022). The local controversy exception "applies only where at least one defendant" is a citizen of the State in which the action was originally filed." *Erie Ins. Exch. by Stephenson v. Erie Indem. Co.,* 68 F.4th 815, 822 (3d Cir. 2023).

Here, there is no dispute that: the entire putative class is comprised of citizens of Pennsylvania; Defendant R&M is a citizen of Pennsylvania; Plaintiffs are seeking significant relief from R&M; the injuries caused by the pipeline leak occurred in Pennsylvania; and no other class actions asserting the same have been filed in the past three years. The question for the Court is whether Plaintiffs have shown that R&M forms a "significant basis" for their claims.

The Third Circuit has held that satisfying the "significant basis" provision, 28 U.S.C. § 1332(d)(4)(A)(i)(II), requires a "substantive analysis comparing the local defendant's conduct alleged to the alleged conduct of all defendants." *Kaufman v. Allstate N.J. Ins. Co.*, 561 F.3d 144, 156 (3d Cir. 2009).

This Court finds that, in the absence of any formal appeal by Defendants, the PADEP Administrative Order, which explicitly names R&M and directs it to undertake remedial action for the leak, satisfies the significant basis provision. The PADEP's directive to R&M to take active steps to correct the leak, not merely informational or reporting duties, suggests that PADEP viewed it as operationally or corporately responsible and not some nominal party. R&M was given notice of its right to appeal or challenge the administrative order, and its failure to do so renders it final and binding under Pennsylvania law. Defendants' arguments do nothing more than raise a factual dispute, not a jurisdictional bar. This Court cannot resolve factual disputes in Defendants' favor at the remand stage.

## VI.    CONCLUSION

This action involves a local environmental incident affecting only Bucks County, Pennsylvania residents, against at least one in-state defendant who was plausibly alleged to have played a significant role. CAFA's local controversy exception was designed for cases like this. *See Kaufman*, 561 F.3d at 149. Plaintiffs have met their burden, and Defendants have not shown fraudulent joinder. Accordingly, the Court lacks subject matter jurisdiction under CAFA, and this case will be remanded to Philadelphia County Court of Common Pleas.



BY THE COURT:

Hon. Mia R. Perez

RECEIVED

JUL 1 1 2025

ROOM 521

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION - CIVIL**

DANIEL LA HART and KATHERINE   :   MARCH TERM, 2025
LA HART,                           :
                                    :   NO. 03655
                Plaintiffs,   :
                                  :   CLASS ACTION
        v.                         :
                                  :   Control Nos.: 25064738, 25064953,
SUNOCO PIPELINE L.P., ENERGY   :                 25065679, 25072040
TRANSFER LP, and ENERGY       :
TRANSFER (R&M) LLC,           :
                                  :
            Defendants.   :

DOCKETED

JUL 1 1 2025

R. POSTELL
COMMERCE PROGRAM

## ORDER

**AND NOW**, this 10th day of July, 2025, upon consideration of plaintiffs' Motion for Preliminary Injunction, defendants' Motion to Stay these proceedings due to a pending appeal in the United States Court of Appeals for the Third Circuit, defendants' Preliminary Objections to the Amended Class Action Complaint filed in the United States District Court for the Eastern District of Pennsylvania, and defendants' Motion to Transfer this case to the Court of Common Pleas for Bucks County, Pennsylvania, based on *forum non conveniens*, it is **ORDERED** as follows:

1. Defendants shall file their response(s) to the Motion for Preliminary Injunction on or before July 21, 2025;

2. Plaintiffs shall file their response(s) to the Preliminary Objections, the Motion to Stay, and the Motion to Transfer on or before July 21, 2025; and

ORDER-La Hart Etal Vs Sunoco Pipeline, Lp Etal [RCP]



25030365500027

3. A hearing may be scheduled in the Court's discretion.

BY THE COURT:

PAULA A. PATRICK, J.

2

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CIVIL TRIAL DIVISION**

| | |
|---|---|
| LA HART ETAL | March Term 2025 |
| VS | No. 03655 |
| SUNOCO PIPELINE, LP ETAL | |

DOCKETED

AUG – 4 2025

R. POSTELL
COMMERCE PROGRAM

*CLASS ACTION INITIATION ORDER*

*AND NOW*, Monday, August 04, 2025, plaintiffs having commenced a Class Action which has been assigned to the Honorable PAULA PATRICK, it is hereby **ORDERED** as follows:

1. All parties are directed to appear via Zoom for a Case Management Conference on 19-SEP-2025 at 11:30 AM.  The Commerce Case Management Zoom link is available on the Court's Website at: https://www.courts.phila.gov/remote-hearings/

2. Five (5) days prior to the Zoom Conference, all parties are required to electronically file with the court, and to serve upon all opposing counsel and opposing parties who cannot be electronically served by the court, a fully completed Commerce Case Management Memorandum.  A copy of the Commerce Case Management Memorandum form may be found at:

   https://www.courts.phila.gov/pdf/forms/civil/01-111-Case-Management-Conference-Memorandum-Commerce.pdf

3. To electronically file the Commerce Case Management Memorandum, access the "Existing Case" section of the court's electronic filing system.  Select "Conference

RCP35533RCP35533II (Rev 7/15/21)

CLCDS-La Hart Etal Vs Sunoco Pipeline, Lp Etal [RCP]



25030365500048

**Exhibit A_ Page 182 of 336**

Submissions" as the filing category. Select "Management Memorandum" as the filing type.

4.  In the Case Management Memorandum, counsel should describe in detail: the substance of plaintiffs' claims and defendants' defenses; whether certification or merits discovery should occur first; any procedural complications the parties anticipate may occur, such as venue or jurisdictional disputes, joinder of additional parties, requests for bifurcation, etc.; and any other information that will assist the Case Manager to determine how much time the parties need to conduct discovery during the certification and/or merits portion of the case.

5.  Counsel shall also be prepared to discuss with the Case Manager at the Zoom Conference all of the issues listed in Paragraph 4 above.

6.  Plaintiffs' counsel shall serve a copy of this Order upon all unrepresented parties and any attorney entering an appearance subsequent to the date of issuance of this Order.

*BY THE COURT:*

*PAULA PATRICK, J.*
*TEAM LEADER*
*CLASS ACTION PROGRAM*

RCP35533RCP35533/l (Rev 7/15/21)



RECEIVED
SEP - 4 2025
ROOM 521

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL**

DANIEL LA HART and KATHERINE : 
LA HART, :
                         :
                Plaintiffs, :
                         :
             v. :
                         :
SUNOCO PIPELINE L.P., ENERGY :
TRANSFER LP, and ENERGY :
TRANSFER (R&M) LLC, :
                         :
                Defendants. :

MARCH TERM, 2025

NO. 03655

CLASS ACTION

Control Nos.: 25064953, 25065679

**DOCKETED**

SEP - 4 2025

R. POSTELL
COMMERCE PROGRAM

**ORDER**

**AND NOW**, this 4th day of September, 2025, upon consideration of Defendants' Preliminary Objections to the Amended Class Action Complaint filed in the United States District Court for the Eastern District of Pennsylvania, and defendants' Motion to Transfer this case to the Court of Common Pleas for Bucks County, Pennsylvania, based on *forum non conveniens*, it is hereby **ORDERED AND DECREED** as follows:

1. The parties have thirty (30) days to take discovery on the venue issues raised in the motions, including, but not limited to, whether defendants, especially Energy Transfer (R&M) LLC, conduct any business in Philadelphia County, in Bucks County, and/or in connection with the pipeline that has apparently leaked in Bucks County;

2. On or before October 10, 2025, the parties may file supplemental briefs with respect to venue under control no. 25064953 and/or with respect to *forum non conveniens* under control no. 25065679;

3. All other preliminary objections and motions shall be held under advisement until the venue issues are resolved;

ORDER-La Hart Etal Vs Sunoco Pipeline, Lp Etal [RCP]



25030365500060

COPIES SENT PURSUANT TO Pa.R.C.P. 236(b) R. POSTELL 09/05/2025

4. A hearing may be scheduled in the Court's discretion.

BY THE COURT:

_____
PAULA A. PATRICK, S. J.

**2**

RECEIVED

SEP 2 2 2025

ROOM 521

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL**

DANIEL LA HART and KATHERINE : MARCH TERM, 2025          **DOCKETED**
LA HART, :
                                  : NO. 03655          SEP 2 2 2025
             Plaintiffs, :
                                    : CLASS ACTION          R. POSTELL
            v. :          COMMERCE PROGRAM
                                    : Control Nos.: 25064953, 25065679
SUNOCO PIPELINE L.P., ENERGY :
TRANSFER LP, and ENERGY :
TRANSFER (R&M) LLC, :
                              :
           Defendants. :

**ORDER**

**AND NOW**, this 22nd day of September, 2025, after a case management conference with

counsel, it is hereby **ORDERED and DECREED** as follows:

1.  The deadlines set forth in the court's September 4, 2025 Order are modified as follows:

    a.  Additional venue discovery including discovery as to other potential defendants

        shall be completed on or before November 3, 2025;

    b.  If plaintiffs intend to amend their complaint, then they shall so notify defendants

        on or before November 10, 2025;

    c.  If plaintiffs do not intend to amend their complaint, then on or before November

        18, 2025, any party may file supplemental briefs with respect to the venue issues

        under control no. 25064953 and/or with respect to *forum non conveniens* issues

        under control no. 25065679; and

    d.  Counsel may agree to modify, within reason, the above dates by stipulation

        submitted to the court;

ORDER-La Hart Etal Vs Sunoco Pipeline, Lp Etal [RCP]



25030365500069

COPIES SENT PURSUANT TO Pa.R.C.P. 236(b) E. HAURIN 09/22/2025

**Exhibit A_ Page 186 of 336**

2. All other preliminary objections and motions shall be held under advisement until the venue issues are resolved; and

3. The parties shall appear for another case management conference in this matter on November 20, 2025, at 1:00 pm, or as soon as they complete their status conference on that same date in the related Major Jury cases.

**BY THE COURT:**

PAULA A. PATRICK, S. J.

2

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CIVIL TRIAL DIVISION**

| | |
|---|---|
| LA HART ETAL | March Term 2025 |
| VS | No. 03655 |
| SUNOCO PIPELINE, LP ETAL | |

DOCKETED

SEP 2 2 2025

R. POSTELL
COMMERCE PROGRAM

### *CLASS ACTION INITIATION ORDER*

*AND NOW*, Monday, September 22, 2025, plaintiffs having commenced a Class Action which has been assigned to the Honorable PAULA PATRICK, it is hereby **ORDERED** as follows:

1. All parties are directed to appear via Zoom for a Case Management Conference on 20-NOV-2025 at 01:00 PM. The Commerce Case Management Zoom link is available on the Court's Website at: https://www.courts.phila.gov/remote-hearings/

2. Five (5) days prior to the Zoom Conference, all parties are required to electronically file with the court, and to serve upon all opposing counsel and opposing parties who cannot be electronically served by the court, a fully completed Commerce Case Management Memorandum. A copy of the Commerce Case Management Memorandum form may be found at:

    https://www.courts.phila.gov/pdf/forms/civil/01-111-Case-Management-Conference-Memorandum-Commerce.pdf

3. To electronically file the Commerce Case Management Memorandum, access the "Existing Case" section of the court's electronic filing system. Select "Conference

CLCDS-La Hart Etal Vs Sunoco Pipeline, Lp Etal [RCP]

RCP51412RCP51412\(Rev 7/15/21)



25030365500072

**Exhibit A_ Page 188 of 336**

Submissions" as the filing category. Select "Management Memorandum" as the filing type.

4.  In the Case Management Memorandum, counsel should describe in detail: the substance of plaintiffs' claims and defendants' defenses; whether certification or merits discovery should occur first; any procedural complications the parties anticipate may occur, such as venue or jurisdictional disputes, joinder of additional parties, requests for bifurcation, etc.; and any other information that will assist the Case Manager to determine how much time the parties need to conduct discovery during the certification and/or merits portion of the case.

5.  Counsel shall also be prepared to discuss with the Case Manager at the Zoom Conference all of the issues listed in Paragraph 4 above.

6.  Plaintiffs' counsel shall serve a copy of this Order upon all unrepresented parties and any attorney entering an appearance subsequent to the date of issuance of this Order.

*BY THE COURT:*

*PAULA PATRICK, J.*
*TEAM LEADER*
*CLASS ACTION PROGRAM*

RCP51412RCP51412\\ (Rev 7/15/21)

RECEIVED
NOV 2 5 2024
ROOM 521

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION - CIVIL**

| | | |
|---|---|---|
| DANIEL LA HART and KATHERINE LA HART, | : | MARCH TERM, 2025 |
| | : | |
| | : | NO. 03655 |
| Plaintiffs, | : | |
| | : | CLASS ACTION |
| v. | : | |
| | : | Control Nos.: 25064953, 25065679 |
| SUNOCO PIPELINE L.P., ENERGY TRANSFER LP, and ENERGY TRANSFER (R&M) LLC, | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

DOCKETED

NOV 2 5 2025

R. POSTELL
COMMERCE PROGRAM

**ORDER**

**AND NOW**, this 25th day of November, 2025, after a case management conference with counsel, it is **ORDERED** as follows:

1. The deadlines set forth in the court's Orders docketed on September 4, 2025, and September 22, 2025, are modified as follows:

   a. Additional venue discovery, including discovery as to other potential defendants aka the John Doe contactor and subcontractor defendants, shall be completed on or before December 22, 2025; and

   b. Plaintiffs may file an amended complaint in this action on or before January 15, 2026.

2. All other preliminary objections and motions shall be held under advisement until the venue issues are resolved.

ORDER-La Hart Etal Vs Sunoco Pipeline, Lp Etal [RCP]

25030365500094

BY THE COURT:

_____
PAULA A. PATRICK, J.

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CIVIL TRIAL DIVISION**

| | |
|---|---|
| LA HART ETAL | March Term 2025 |
| VS | No. 03655 |
| SUNOCO PIPELINE, LP ETAL | |

**DOCKETED**

DEC 1 5 2025

R. POSTELL
COMMERCE PROGRAM

*CLASS ACTION INITIATION ORDER*

*AND NOW*, Monday, December 15, 2025, plaintiffs having commenced a Class Action which has been assigned to the Honorable PAULA PATRICK, it is hereby **ORDERED** as follows:

1. All parties are directed to appear via Zoom for a Case Management Conference on 17-FEB-2026 at 11:30 AM.  The Commerce Case Management Zoom link is available on the Court's Website at: https://www.courts.phila.gov/remote-hearings/

2. Five (5) days prior to the Zoom Conference, all parties are required to electronically file with the court, and to serve upon all opposing counsel and opposing parties who cannot be electronically served by the court, a fully completed Commerce Case Management Memorandum.  A copy of the Commerce Case Management Memorandum form may be found at:

   https://www.courts.phila.gov/pdf/forms/civil/01-111-Case-Management-Conference-Memorandum-Commerce.pdf

3. To electronically file the Commerce Case Management Memorandum, access the "Existing Case" section of the court's electronic filing system.  Select "Conference

CLCDS-La Hart Etal Vs Sunoco Pipeline, Lp Etal [RCP]

RCP465560RCP465560L(Rev 7/15/21)



25030365500104

**Exhibit A_ Page 191 of 336**

Submissions" as the filing category.  Select "Management Memorandum" as the filing type.

4.  In the Case Management Memorandum, counsel should describe in detail: the substance of plaintiffs' claims and defendants' defenses; whether certification or merits discovery should occur first; any procedural complications the parties anticipate may occur, such as venue or jurisdictional disputes, joinder of additional parties, requests for bifurcation, etc.; and any other information that will assist the Case Manager to determine how much time the parties need to conduct discovery during the certification and/or merits portion of the case.

5.  Counsel shall also be prepared to discuss with the Case Manager at the Zoom Conference all of the issues listed in Paragraph 4 above.

6.  Plaintiffs' counsel shall serve a copy of this Order upon all unrepresented parties and any attorney entering an appearance subsequent to the date of issuance of this Order.

*BY THE COURT:*

*PAULA PATRICK, J.*
*TEAM LEADER*
*CLASS ACTION PROGRAM*

RCP48560RCP48560A (Rev 7/15/21)

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CIVIL TRIAL DIVISION**

*Filed and Attested by the Office of Judicial Records 15 JAN 2026 03:01 pm S. GILLIAM*

**BERGER MONTAGUE PC**
Shanon Carson (Bar No. 85957)
Y. Michael Twersky (Bar No. 312411)
Joseph E. Samuel, Jr. (Bar No. 327645)
1818 Market Street, Suite 3600
Philadelphia, PA 19103

*Counsel for Plaintiffs and the Proposed Class*

|  |  |
|---|---|
| **DANIEL LA HART** and **KATHERINE LA HART** c/o Berger Montague PC 1818 Market Street, Suite 3600 Philadelphia, PA 19103; <br><br> **JERRY ZACHARATOS** and **JUSTINE ZACHARATOS** c/o Berger Montague PC 1818 Market Street, Suite 3600 Philadelphia, PA 19103; <br><br> **CHRISTOPHER GROVER** and **ANDREA GROVER** c/o Berger Montague PC 1818 Market Street, Suite 3600 Philadelphia, PA 19103, <br><br> Plaintiffs, <br> v. <br><br> **SUNOCO PIPELINE L.P.** 525 Fritztown Road Sinking Spring, Pennsylvania 19608; <br><br> **ENERGY TRANSFER LP** 8111 Westchester Drive Dallas, Texas 75225; | **PHILADELPHIA COUNTY COURT OF COMMON PLEAS TRIAL DIVISION** <br><br> MARCH TERM, 2025 <br><br> CASE NO.  250303655 |

Case ID: 250303655

Exhibit A_ Page 193 of 336

**ENERGY TRANSFER (R&M) LLC**
1735 Market Street,
Philadelphia, Pennsylvania 19103;

**ENERGY TRANSFER MARKETING
& TERMINALS L.P.**
100 Green Street
Marcus Hook, Pennsylvania 19061;

**DELTA AIR LINES, INC.**
1030 Delta Blvd, Dept 982
Atlanta, Georgia 30354;

**EPSILON TRADING, LLC**
1030 Delta Blvd, Dept 982
Atlanta, Georgia 30354;

**MONROE ENERGY, LLC**
4101 Post Road
Trainer, Pennsylvania 19061;

**PBF ENERGY INC.**
1 Sylvan Way
Parsippany, New Jersey 07054;

**PBF HOLDING COMPANY LLC**
1 Sylvan Way
Parsippany, New Jersey 07054;

**PRECISION PIPELINE LLC**
3314 56th Street
Eau Claire, Wisconsin 54703;

**MASTEC, INC.**
800 S Douglas Road, 10th Floor
Coral Gables, Florida 33134;

**NATURAL ENERGY FIELD
SERVICES, LLC**
4101 Tates Creek Center Drive
Suite 150
Lexington, Kentucky 40517;

**SHAW PIPELINE SERVICES INC.**
1735 W Reno Street
Broken Arrow, Oklahoma 74012;

Case ID: 250303655

**CORRPRO COMPANIES, INC.**
470 Lapp Road
Malvern, Pennsylvania 19355;

**AZURIA WATER SOLUTIONS, INC.**
17988 Edison Avenue
St. Louis, Missouri 63005;

**BARR AIR PATROL, LLC**
1442 Airport Boulevard, Suite 11
Mesquite, Texas 75181;

**BAKER HUGHES COMPANY**
301 Saville Avenue
Eddystone, Pennsylvania 19022;

and

**ROSEN SWISS A.G. d/b/a**
**ROSEN USA**
14120 Interdrive East
Houston, Texas 77032,

Defendants.

Case ID: 250303655

## NOTICE TO DEFEND

| NOTICE | AVISO |
|---|---|
| You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.<br><br>*You should take this paper to your lawyer at once.  If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.*<br><br>Philadelphia Bar Association<br>Lawyer Referral and Information Service<br>One Reading Center Philadelphia, Pennsylvania  19107<br>(215) 238-6333 TTY<br>(215) 451-6197 | Le han demandado a usted en la corte.  Si usted quiere defenderse de estas demandas expuestas en las páginas siguientes, usted tiene veinte (20) días de plazo al partir de la fecha de la demanda y la notificación.  Hace falta asentar una comparecencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona.  Sea avisado que, si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificación.  Además, la corte puede decidir a favor del demandante y requerir que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.<br><br>Lleve esta demanda a un abogado inmediatamente.  Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio.  Vaya en persona o llame por teléfono a la oficina cuya dirección se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.<br>Asociación De Licenciados De Filadelfia<br>Servicio De Referencia E Información Legal<br>One Reading Center<br>Philadelphia, Pennsylvania 19107<br>(215) 238-6333<br>TTY (215) 451-6197 |

Case ID: 250303655

**SECOND AMENDED CLASS ACTION COMPLAINT**

## I.    INTRODUCTION

1.    Plaintiffs Daniel La Hart, Katherine La Hart, Jerry Zacharatos, Justine Zacharatos, Christopher Grover, and Andrea Grover ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Class" as further defined below), bring this Second Amended Class Action Complaint against Defendants Sunoco Pipeline L.P., Energy Transfer LP, Energy Transfer (R&M), LLC, Energy Transfer Marketing & Terminals, L.P. (collectively, the "Energy Transfer Defendants"), Delta Air Lines, Inc., Epsilon Trading LLC, Monroe Energy LLC (collectively, the "Delta Defendants"), PBF Energy Inc., PBF Holding Company LLC (collectively, the "PBF Defendants"), Precision Pipeline LLC, MasTec, Inc., Natural Energy Field Services, LLC, Shaw Pipeline Services, Inc., CorrPro Companies, Inc., Azuria Water Solutions, Inc., Barr Air Patrol, LLC, Baker Hughes Company, and Rosen Swiss A.G. d/b/a ROSEN USA (collectively, the "Contractor Defendants"), alleging that Defendants' reckless, negligent, and irresponsible use, ownership, oversight, operation, supervision, maintenance, and/or control of a hazardous petroleum pipeline (the "Twin Oaks Pipeline" or the "Pipeline") resulted in a massive and still unquantified leak of jet fuel and other petroleum products in a residential neighborhood, along with resulting toxins, pollutants, and contaminants (the "Pipeline Leak" or "Leak"), in Upper Makefield Township, Pennsylvania.[1]

---

[1] "Defendants" as used herein refers collectively to each of the Energy Transfer Defendants (Sunoco Pipeline L.P., Energy Transfer LP, Energy Transfer (R&M), LLC, Energy Transfer Marketing & Terminals, L.P.), Delta Defendants (Delta Air Lines, Inc., Epsilon Trading LLC, Monroe Energy LLC), PBF Defendants (PBF Energy Inc., PBF Holding Company LLC), and Contractor Defendants (Precision Pipeline LLC, MasTec, Inc., Natural Energy Field Services, LLC, Shaw Pipeline Services, Inc., CorrPro Companies, Inc., Azuria Water Solutions, Inc., Barr Air Patrol, LLC, Baker Hughes Company, Rosen Swiss A.G.), unless otherwise specified.

1

Case ID: 250303655

Exhibit A_ Page 197 of 336

2.    Defendants' conduct in causing and/or allowing the Pipeline Leak to occur has unleashed a catastrophic environmental disaster on a previously idyllic Bucks County, Pennsylvania community, including the Mt. Eyre Manor community and surrounding neighborhoods that are subject to the plume caused by the Leak.

3.    It has been reported that the Energy Transfer Defendants already have the worst record for fuel spills in the United States before this latest disaster. That record is now even worse, as the Energy Transfer Defendants have caused serious physical and financial harm to a beautiful suburban neighborhood.

4.    The Delta Defendants and the PBF Defendants also bear responsibility for the Pipeline Leak, as it was these Defendants' petroleum products that contributed to the corrosion of the Pipeline and leaked into Plaintiffs' neighborhood and aquifer, causing substantial harm and a risk of ongoing injury.

5.    The Contractor Defendants undertook monitoring and/or maintenance obligations regarding the Pipeline and their failure to properly carry out these obligations was a substantial contributing factor in causing the Leak.

6.    The Leak arises from at least one crack in the Pipeline, causing a discharge into the underlying bedrock and groundwater of jet fuel, other unidentified petroleum products, and other hazardous and toxic chemicals that were transported through the Pipeline.

7.    Testing has identified various toxins in the local soil, air, and groundwater, including kerosene, benzene, ethylbenzene, isopropylbenzene, dichloroethane, trimethylbenzene ("TMB"), toluene, naphthalene, 1,2-dichloroethane ("EDC"), methyl tertiary-butyl ether ("MTBE"), and lead. These are substances so dangerous that their presence in the soil, water, and air presents a direct and immediate threat to Plaintiffs' and Class members' health and wellbeing.

2

Case ID: 250303655

Exhibit A_ Page 198 of 336

8.    The Pipeline Leak has caused severe harm and poses a serious ongoing and current danger to affected residents' physical health and mental and emotional wellbeing, the community's groundwater, soil, air quality, and ecosystem, and to property values. The Pipeline Leak has uprooted the affected community and has already rendered certain residences within the community unlivable, amounting to an effective taking of family homes.

9.    The physical harm to persons and property that has been wrought by the Leak is palpable and concrete. As a direct result of the Leak, Plaintiffs now live on contaminated property and above a contaminated aquifer that provides them and the proposed Class with their drinking and potable water. This existing contamination, coupled with the significant risk that further contamination will continue to accrue on Plaintiffs' property, has ruined enjoyment of their property, has damaged the property's value, and some of the damage is permanent.

10.    In the months after the Energy Transfer Defendants finally revealed the Leak, home values throughout the Mt. Eyre Manor community and surrounding neighborhoods plummeted. To date, few home sales have closed in the Mt. Eyre Manor community since the Leak was disclosed, despite the community previously being a highly sought-after neighborhood. The few homeowners who have sold their houses have been forced to accept significantly lower list prices and make other concessions after the existence of the Leak devastated interest from prospective home buyers who do not want to live in an area with environmental contamination from jet fuel.

11.    Confirming that significant diminution in property values has occurred throughout the Mt. Eyre Manor community, local taxing authorities (including without limitation Upper Makefield Township) have reassessed the taxable value of numerous homes downwards by 10 to 15 percent.

Case ID: 250303655

**Exhibit A_ Page 199 of 336**

12.     One home in the Mt. Eyre Manor community was so contaminated that the Energy Transfer Defendants themselves purchased it for the purpose of drilling monitoring and/or recovery wells, right in the middle of the neighborhood. This highly contaminated suburban residential home that the Energy Transfer Defendants now own (despite being for-profit oil companies) is in the middle of Plaintiffs' neighborhood. The Energy Transfer Defendants have also executed other contracts in connection with potential or actual residential home sales in the neighborhood.

13.     Environmental sampling and testing have confirmed that the Energy Transfer Defendants released jet fuel and unidentified other petroleum products, along with other and related pollutants, that contaminated private, residential wells in the affected community that provide water for drinking, bathing, cooking, and washing. Samples also show elevated levels of toxins in the air in certain houses in the impacted community, including with benzene multiple times higher than the statewide health standards.

14.     Defendants' conduct collectively has caused an exigent threat to the health and well-being of the community and has contaminated the environment and underground aquifer in the community.

15.     Defendants' conduct has also led to a constant and ongoing nuisance in this once peaceful and idyllic neighborhood for Plaintiffs and the Class. The Energy Transfer Defendants' purported remediation efforts have imposed a persistent, continuing, and significant disruption on the immediate neighborhood which has substantially violated Plaintiffs' and Class member's rights. After a long initial delay, the Energy Transfer Defendants have now dug *twenty-six* monitoring wells in the residential neighborhood, including two on the Zacharatos' owned property. The Energy Transfer Defendants' remediation efforts have also included the operation of

4

Case ID: 250303655

heavy machinery throughout the neighborhood, including at night, resulting in increases of dust, noise, odor, and light pollution on and within Plaintiffs' properties. These activities by the Energy Transfer Defendants have further infringed on Plaintiffs' peaceful enjoyment of their property and are the direct and proximate result of the Pipeline Leak.

16.    The Mt. Eyre Manor community and surrounding neighborhoods, as with the area that includes and surrounds Upper Makefield Township generally, has long been a highly desirable residential neighborhood. The area had enjoyed strong property values and individuals have long sought to purchase homes in this idyllic and wonderful place to live and raise a family.

17.    A notable feature of Mt. Eyre Manor and the surrounding neighborhoods in Upper Makefield Township is that the residences located there use and rely on private well water for domestic water needs, including for drinking water, cooking, bathing, washing clothes and dishes, and watering lawns and gardens.

18.    Indeed, residents of Mt. Eyre Manor and other Upper Makefield neighborhoods have long believed that they had the best tasting water one could find because it contains naturally occurring minerals that give it a fresher taste and, typically, is free of the added chemicals that can be found in municipal water, such as chlorine and fluoride.

19.    As a result of Defendants' Pipeline Leak, however, this is no longer the case. Defendants' conduct as alleged herein has devastated the community and caused significant contamination to the aquifers under the Mt. Eyre Manor community and surrounding neighborhoods. Defendants have created critical health and safety risks to the residents who live there and caused other consequential harms as detailed herein. Residents cannot safely rely on private well water without burdensome filtration systems that will require years of constant and expensive maintenance.

Case ID: 250303655

Exhibit A_ Page 201 of 336

20.    The Energy Transfer Defendants control and operate the Twin Oaks Pipeline and, together with the Contractor Defendants, are responsible for maintaining the Pipeline and ensuring its safety. The Energy Transfer Defendants and the Contractor Defendants failed to uphold that responsibility, and violated their duties owed to residents.

21.    The Delta Defendants and the PBF Defendants regularly ship jet fuel and other petroleum products through the Pipeline. The Energy Transfer Defendants—specifically, Energy Transfer Marketing & Terminals LP—also, on occasion, ship gasoline through the Pipeline. On information and belief, these products over time contributed to the corrosion of the Pipeline, which was a substantial factor in causing the Leak to occur. These petroleum products then contaminated the air, soil and groundwater in Plaintiffs' neighborhood.

22.    The Delta Defendants, PBF Defendants, and Energy Transfer Defendants contracted to ship hazardous liquid products including jet fuel through the Pipeline knowing (or having reasonable cause to know) that the Pipeline was unsafe and that the Energy Transfer Defendants have an extensive and widely documented history of pipeline leaks and fuel spills. Despite this knowledge, the Delta Defendants, PBF Defendants, and Energy Transfer Defendants did not impose or require safeguards necessary to ensure that their products shipped through the Pipeline would arrive safely at their intended destination and appear to have either not detected or ignored the loss of their product from the Pipeline Leak.

23.    Another substantial factor in causing the Leak is that the Contractor Defendants, who undertake monitoring and/or maintenance duties for the Pipeline, failed to properly perform these duties. These duties include, but are not limited to, inspection, testing, evaluation, internal surveying, and right-of-way inspections.

6

24.    Defendants' Pipeline Leak was confirmed on January 31, 2025. The Energy Transfer Defendants, however, first received odor complaints from residents living in Mt. Eyre Manor as early as September 2023 – *16 months* earlier – but failed at that time to properly investigate, and as such failed to identify the Pipeline Leak at an early stage when more harm could have been prevented.

25.    Despite receiving numerous complaints from alarmed residents about strange odors since at least September 2023, thus indicating that the leak began at some time substantially prior to September 2023, Defendants failed to properly act for at least over 16 months after receiving actual notice of the problem through the odor complaint. The Energy Transfer Defendants failed to properly investigate the Pipeline Leak, failed to identify and contain the Pipeline Leak, and still to this day have not disclosed the full extent of the disaster, even after almost a year from actual discovery.

26.    Indeed, further evidencing the Energy Transfer Defendants' disregard for the Pipeline Leak, they have publicly asserted—despite the evidence demonstrating that the leak began at least as early as September 2023—that "the earliest the release from the pipeline could have begun was May or June 2024." Notably, if residents first smelled the Leak in September 2023, the Leak likely began far earlier. Defendants' statements are simply spin.

27.    The Delta Defendants and PBF Defendants, who each ship petroleum products through the Pipeline, were (or should have been) on notice of the Leak, given that they seemingly did not receive the expected volume of petroleum that they would have received if the Pipeline were not leaking. However, the Delta Defendants and PBF Defendants took no action to identify, investigate, or remediate the Leak.

Case ID: 250303655

**Exhibit A_ Page 203 of 336**

28.    The full magnitude of the Pipeline Leak remains unknown and undisclosed. Defendants still cannot account for, or are choosing not to fully, accurately and publicly state, how much toxic petroleum product has spilled, exactly what leaked, or where it is moving, leaving Plaintiffs and Class members in constant and reasonable fear for their health and property.

29.    Numerous residents, including Plaintiffs, already have confirmed contamination within their private wells, well water, or monitoring wells on their property. The Energy Transfer Defendants do not dispute this and have publicly acknowledged that the Pipeline Leak is their fault. The test results confirming contamination of Plaintiffs' water include the sampling performed by the Energy Transfer Defendants' own agents.

30.    One household across the street from where the Pipeline Leak was discovered had approximately *fifteen gallons* of free jet fuel product found floating on top of the water in their private well, and petroleum product continues to significantly accrue at this home, even though it has been almost a year since the discovery of the Leak. Similarly, other residents of Mt. Eyre Manor also had significant amounts of jet fuel, and/or other petroleum products and constituents in their private wells.

31.    As Defendants have not yet identified the size, scope, direction, or speed of the contamination plume, even residents whose well water currently does not show contamination are within, and will remain within, a zone of danger where contamination could be weeks or days away. Residents, accordingly, are forced to take appropriate precautions and incur time and expenses to attempt to mitigate their risk.

32.    Other sampling has confirmed the presence of toxic contaminants in the very air within some Plaintiffs' homes.

8

Case ID: 250303655

33.     Recent sampling has now also confirmed that vapors from the contaminated groundwater and soil have invaded homes in the neighborhood, placing residents at potential risk to these toxic chemicals in both the water they drink and the air that they breathe.

34.     With no clear answers or relief in sight, extensive contamination of the water, soil, and air in and around their homes, and property values plummeting, the residents of Mt. Eyre Manor and the surrounding neighborhoods have been left to grapple with the terror of irreparable environmental harm, uncertain whether they can trust the very air they breathe and the water they drink and concerned for their future safety from toxic exposures.

35.     This is not just an environmental tragedy caused by corporate malfeasance; it is a life-altering crisis for Plaintiffs and Class members that impacts them every day, and, for which, Defendants must be held accountable.

## II.    PARTIES

36.     Plaintiffs Daniel La Hart and Katherine La Hart (the "La Harts") reside at 114 Spencer Road, Washington Crossing, Pennsylvania, 18977.

37.     Plaintiffs Jerry Zacharatos and Justine Zacharatos (the "Zacharatos") reside at 126 Walker Road, Washington Crossing, Pennsylvania 18977.

38.     Plaintiffs Christoper Grover and Andrea Grover (the "Grovers") reside at 1004 Swayze Avenue, Washington Crossing, Pennsylvania 18977.

39.     Defendant Sunoco Pipeline L.P. ("SPLP") is a limited partnership formed under the laws of Texas. SPLP contends that it maintains a principal place of business located at 8111 Westchester Drive, Dallas, Texas 75225. SPLP, however, also maintains addresses at 535 Fritztown Road, Sinking Spring, PA 19608 and 3807 West Chester Pike, Newtown Square, PA 19073, conducting substantial business and making corporate decisions from these locations in

9

Case ID: 250303655

Exhibit A_ Page 205 of 336

Pennsylvania. The Sinking Springs address is among SPLP's principal locations from where its corporate officers make high-level decisions and direct, control, and coordinate its activities.

40. Defendant Energy Transfer LP ("ETLP") is a limited partnership formed under the laws of Delaware with a principal place of business located at 8111 Westchester Drive, Dallas, Texas 75225.

41. Defendant Energy Transfer (R&M), LLC ("R&M") is a limited liability company formed under the laws of Pennsylvania. Until recently, R&M listed its principal place of business at 1735 Market Street, Philadelphia, Pennsylvania 19103, and this is still the address it has on file with the Pennsylvania Department of Environmental Protection ("PADEP"). R&M was previously known as Sunoco (R&M), LLC.

42. Energy Transfer Marketing & Terminals L.P. ("ETMT") is a limited partnership formed under the laws of Texas. ETMT conducts substantial business and makes high-level corporate decisions at the Marcus Hook Terminal, 100 Green Street, Marcus Hook, Pennsylvania 19061.

43. SPLP, ETLP, R&M, and ETMT, collectively, are referred to as the Energy Transfer Defendants. SPLP, R&M, and ETMT are wholly owned subsidiaries of ETLP.

44. SPLP owns and operates the Pipeline, has been deemed administratively responsible for the Leak and, with ETLP, has publicly accepted responsibility for the Leak.

45. R&M, which prior to 2011 was one of the largest independent refiners and fuel marketers in the country, owned and operated multiple refineries, including the Philadelphia Refinery at Point Breeze and the Marcus Hook Refinery, from which petroleum product was shipped through the Twin Oaks Pipeline. R&M has been deemed administratively responsible for the Pipeline Leak.

Case ID: 250303655

**Exhibit A_ Page 206 of 336**

46.    ETMT now owns and operates the Marcus Hook facility previously operated by R&M (now known as the Marcus Hook Industrial Complex) and, during the relevant time period, shipped petroleum product through the Twin Oaks Pipeline. ETMT's petroleum product has contaminated Plaintiffs' properties and neighborhood.

47.    Delta Air Lines, Inc. ("Delta") is a publicly traded corporation formed under the laws of Delaware with its principal place of business at 1030 Delta Boulevard, Department 982, Atlanta, Georgia 30354.

48.    Epsilon Trading, LLC ("Epsilon") is a limited liability company formed under the laws of Delaware with its principal place of business at 1030 Delta Boulevard, Department 982, Atlanta, Georgia 30354.

49.    Monroe Energy, LLC ("Monroe") is a limited liability company formed under the laws of Delaware with its principal place of business at 4101 Post Road, Trainer, Pennsylvania 19061.

50.    Delta, Epsilon, and Monroe, collectively, are referred to as the Delta Defendants. Epsilon and Monroe are wholly owned subsidiaries of Delta. During the relevant time period, the Delta Defendants shipped petroleum product through the Twin Oaks Pipeline. The Delta Defendants' petroleum product has contaminated Plaintiffs' properties and neighborhood.

51.    PBF Energy Inc. ("PBF") is a publicly traded corporation formed under the laws of Delaware with its principal place of business at 1 Sylvan Way, Parsippany, New Jersey 07054.

52.    PBF Holding Company LLC ("PBFHC") is a limited liability company formed under the laws of Delaware with its principal place of business at 1 Sylvan Way, Parsippany, New Jersey 07054.

11

Case ID: 250303655

Exhibit A_ Page 207 of 336

53.     PBF and PBFHC, collectively, are referred to as the PBF Defendants. PBFHC is a wholly owned subsidiary of PBF. During the relevant time period, the PBF Defendants shipped petroleum product through the Twin Oaks Pipeline. The PBF Defendants' petroleum product has contaminated Plaintiffs' properties and neighborhood.

54.     Precision Pipeline LLC ("Precision Pipeline") is a limited liability company formed under the laws of Wisconsin with its principal place of business at 3314 56th Street, Eau Claire, Wisconsin 54703.

55.     MasTec, Inc. ("MasTec") is a publicly traded corporation formed under the laws of Florida with its principal place of business at 800 S Douglas Road, Suite 1200, Coral Gables, Florida 33134. MasTec is the corporate parent of and actively exercises dominion and control over Precision Pipeline.

56.     Natural Energy Field Services, LLC ("NEFS") is a limited liability company formed under the laws of Kentucky with its principal place of business at 4101 Tates Creek Center Drive, Suite 150, Lexington, Kentucky 40517.

57.     Shaw Pipeline Services Inc. ("Shaw Pipeline") is a privately held corporation formed under the laws of Texas with its principal place of business at 1735 W Reno Street, Broken Arrow, Oklahoma 74012.

58.     CorrPro Companies, Inc. ("CorrPro") is a privately held corporation formed under the laws of Ohio. On information and belief, CorrPro maintains a regular place of business at 470 Lapp Road, Malvern, Pennsylvania 19355.

59.     Azuria Water Solutions, Inc. ("Azuria") is a privately held corporation formed under the laws of Delaware with its principal place of business at 17988 Edison Avenue, St. Louis,

12

Missouri 63005. Azuria is the corporate parent of and actively exercises dominion and control over CorrPro.

60.   Barr Air Patrol, LLC ("Barr") is a limited liability company formed under the laws of Delaware with its principal place of business at 1442 Airport Boulevard, Mesquite, Texas 75181.

61.   Baker Hughes Company ("Baker Hughes") is a publicly traded corporation formed under the laws of Delaware with its principal place of business at 301 Saville Avenue, Eddystone, Pennsylvania 19022.

62.   Rosen Swiss A.G. d/b/a ROSEN USA ("ROSEN") is a Swiss joint-stock company (*aktiengesellschaft*) formed under the laws of Switzerland with a principal place of business at 14120 Interdrive East, Houston, Texas 77032.

63.   Precision Pipeline, MasTec, NEFS, Shaw Pipeline, CorrPro, Azuria, Barr, Baker Hughes, and ROSEN, collectively, are referred to as the Contractor Defendants. During the relevant time period, the Contractor Defendants undertook monitoring and/or maintenance obligations regarding the Pipeline.

## III.   JURISDICTION AND VENUE

64.   This Court has subject matter jurisdiction pursuant to 42 Pa. C.S. § 931. The Energy Transfer Defendants removed this civil action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), and the federal district court remanded the case based on the "local controversy" exception to CAFA. No federal court has authority to exercise subject matter jurisdiction over this case.

65.   This Court has personal jurisdiction over each of the Defendants because they purposefully availed themselves of the privilege of conducting business in Pennsylvania and

Case ID: 250303655

Exhibit A_ Page 209 of 336

Plaintiffs' causes of action arise out of the business that Defendants conduct in Pennsylvania; namely, the Pipeline Leak which occurred in Upper Makefield Township, Pennsylvania.

66.     Venue is proper under the Pennsylvania Rules of Civil Procedure because one or more Defendants regularly conduct business in Philadelphia, including but not limited to each of the following:

   a. SPLP owns and operates one or more pipelines and regularly transports petroleum in and through Philadelphia.

   b. SPLP supplies petroleum product to the Philadelphia International Airport.

   c. SPLP operates the Point Breeze Pump Station in Philadelphia that is necessary to SPLP's pipeline operations.

   d. SPLP owns and pays (or is obligated to pay[2]) Philadelphia property taxes on the property on which the Point Breeze Pump Station is situated.

   e. SPLP calculates tariffs for the petroleum products using multiple locations in Philadelphia as the point of origin or point of destination and publicly indicates to the Federal Energy Regulatory Commission that it delivers product to and from Philadelphia.

   f. SPLP earns revenue on the shipment of petroleum products to and from several locations in Philadelphia (including Point Breeze and Philadelphia Junction).

   g. ETLP employees perform work in Philadelphia, including at the Point Breeze Pump Station.

---

[2] On January 13, 2026, the City of Philadelphia filed a real estate tax lien pursuant to 53 P.S. § 7101 against Defendant SPLP for failure to pay property taxes on the 6460 W Passyunk Avenue location where the Point Breeze Pump Station is located. *See* No. 2601R25007913 (Phila. Muni.).

14

Case ID: 250303655

**Exhibit A_ Page 210 of 336**

h. ETLP has direct supervisory control over a robust business providing gasoline and other petroleum products to consumers at Sunoco-branded retail locations in Philadelphia.

i. ETLP is the ultimate owner of SPLP and closely directs its operations through individuals who run SPLP's business but are also employed by ETLP; as such, all of SPLP's regularly conducted business in Philadelphia is also ETLP's business.

j. ETLP facilitates the delivery of jet fuel to the Philadelphia International Airport.

k. ETLP oversees and/or conducts cleanup and remediation efforts at polluted areas within Philadelphia.

l. Historically, R&M jointly has owned with SPLP various right-of-way easements for pipelines operated by SPLP in Philadelphia.

m. R&M formerly operated a refinery in Philadelphia and bears financial and legal responsibility for cleanup and remediation efforts at polluted areas within Philadelphia, and R&M funds these efforts through another wholly owned ETLP subsidiary, Evergreen Resources Group, LLC.

n. R&M is party to treasury services agreements with the Sunoco family of companies whereby R&M manages consolidated bank accounts and advances cash to the affiliates and provides other internal administrative and support services, in connection with these Sunoco entities' Philadelphia operations.

o. ETMT distributes petroleum products in Philadelphia and contracts for the use of pipelines to ship petroleum products through Philadelphia.

15

p. Delta conducts substantial operations at the Philadelphia International Airport, primarily through Terminal D, which is situated in Philadelphia.

q. Delta contracts for the use of pipelines to ship petroleum products through Philadelphia.

r. Epsilon contracts for the use of pipelines to ship petroleum products through Philadelphia.

s. Monroe owns and operates one or more pipelines in and regularly transports petroleum in and through Philadelphia.

t. Monroe earns revenue on the shipment of petroleum products to and from several locations in Philadelphia.

u. The PBF Defendants contract for the use of pipelines to ship petroleum product through Philadelphia.

v. Until September 2025, the PBF Defendants owned and operated facilities in Philadelphia.

w. On information and belief, Precision Pipeline performs general pipeline contractor work in Philadelphia.

x. Precision Pipeline and MasTec are members and/or sponsors of the Philadelphia chapter of the Association for Materials Protection and Performance.

y. MasTec operates in Philadelphia and regularly advertises that it is hiring for roles in communications, power, and energy infrastructure in Philadelphia.

z. On information and belief, NEFS performs inspection and non-destructive testing on pipelines in Philadelphia.

16

Case ID: 250303655

aa. On information and belief, Shaw Pipeline performs non-destructive evaluation work on pipelines in Philadelphia.

bb. On information and belief, CorrPro performs close-internal survey work on pipelines in Philadelphia.

cc. CorrPro regularly contracts with Philadelphia Gas Works ("PGW") to perform work and earn revenue in Philadelphia.

dd. CorrPro is a member and/or sponsor of the Philadelphia chapter of the Association for Materials Protection and Performance.

ee. Azuria regularly performs or contracts to perform water infrastructure services in Philadelphia.

ff. On information and belief, Barr performs aerial right-of-way inspections relating to pipelines in Philadelphia, including from the Northeast Philadelphia Airport.

gg. On information and belief, Baker Hughes performs in-line inspections on pipelines in Philadelphia.

hh. On information and belief, ROSEN performs in-line inspections on pipelines in Philadelphia.

## IV.  FACTUAL ALLEGATIONS

### A. The Energy Transfer Defendants' History of Leaking Pipelines and Failures to Report

67.    Defendant ETLP, through its complex network of subsidiaries, limited partnerships, and joint ventures, including Defendants SPLP, R&M, and ETMT, owns one of the nation's largest networks of natural gas, crude oil, and petroleum product pipelines.

17

68.     ETLP primarily operated in the natural gas sector prior to its acquisition of the Sunoco family of entities' significant oil and petroleum product assets in 2012. Together, the Energy Transfer Defendants now own and operate over 125,000 miles of pipelines across the United States.

69.     The Energy Transfer Defendants' network of pipelines is not only among the largest in the country; it is also among the leakiest.

70.     According to the Pipeline and Hazardous Materials Safety Administration ("PHMSA")'s database, between 2002 and 2017, the Energy Transfer Defendants experienced at least 527 leakage incidents—approximately one incident from an existing facility every eleven days in the pipelines that they own and operate.

71.     Those incidents accounted for reported releases of over 3.6 million gallons of petroleum product. That figure likely substantially underestimates the true number of incidents and amount of product lost, as it primarily relies on self-reported incidents and estimates.

72.     Between 2002 and 2017, PHMSA issued 106 safety violations to the Energy Transfer Defendants for failing to comply with federal regulations designed to ensure the safe operation of hazardous liquid pipelines.

73.     These violations included failures to notify PHMSA of spills, failures to repair identified unsafe pipes for five years, failures to perform regular corrosion inspections, failures to report known unsafe operating conditions, and failures to properly notify emergency responders and the public in the event of a leak.

74.     Federal regulators have not deterred the Energy Transfer Defendants' egregious conduct in failing to properly maintain their pipelines transporting hazardous petroleum products to make them safe.

75.    In 2022, SPLP and affiliate ETC Northeast Pipeline LLC were convicted by the Commonwealth of Pennsylvania of *57 charges* of criminal conduct associated with the construction and operation of two other pipelines Pennsylvania. The Commonwealth of Pennsylvania convicted SPLP on counts involving multiple instances of failure to report discharges of hazardous substances into the surrounding environment, the use of unapproved additives and release of those additives into drinking water, and failure to implement legally required safety measures. The use of unapproved additives is potentially relevant here as one of the chemicals found in recent sampling in the Mt. Eyre Manor neighborhood is MTBE, which was supposed to have been phased out of use in the early 2000s.

76.    48 of the 57 criminal charges related to SPLP's conduct during the construction of the Mariner East 2 Pipeline, which crosses 17 counties in the southern tier of Pennsylvania, while the other 9 charges related to SPLP's conduct during the construction of the Revolution Pipeline, a 42.5 mile pipeline that starts in Butler County, is routed through Beaver and Allegheny counties, and connects to a gas processing plant in Washington County.

77.    In February 2025, Bloomberg reported that the Twin Oaks Pipeline Leak in Upper Makefield Township "highlight[ed]" Energy Transfer's "worst fuel spill record" in the United States. The Bloomberg article reported that SPLP was responsible for spilling over 1,400 barrels of fuel in 2024 alone, and this is only accounting for the volume of fuel spills that Defendants were both aware of *and* willing to publicly report.[3]

---

[3] Bloomberg, *Energy Transfer Leak Highlights Worst Fuel Spill Record in US* (Feb. 18, 2025), available at https://www.bloomberg.com/news/articles/2025-02-18/energy-transfer-leak-highlights-worst-fuel-spill-record-in-us?embedded-checkout=true (last accessed Mar. 14, 2025).

19

Case ID: 250303655

78.    The Twin Oaks Pipeline Leak further demonstrates that the Energy Transfer Defendants are not fully forthcoming about the volume of or even the existence of fuel spills into residential neighborhoods.

79.    The Energy Transfer Defendants' conduct, as alleged herein, is reflective of and consistent with their history of failing to safely operate and maintain pipelines, as well as their failing to detect and report leaks from their pipelines and appropriately respond to and remediate leaks with the expediency and transparency that such incidents require.

**B.    The Energy Transfer Defendants' Twin Oaks Pipeline That Runs Through Upper Makefield, PA**

80.    The Energy Transfer Defendants own and operate the Twin Oaks Pipeline, a 14-inch diameter pipeline that transports petroleum products, including but not limited to jet fuel (JP-8), diesel, and gasoline, from the Twin Oaks Terminal in Aston, Pennsylvania to the Newark Terminal in Newark, New Jersey. The Pipeline is considered a "hazardous liquid pipeline facility" under federal law. 49 U.S.C. § 60101(a).

81.    The Twin Oaks Pipeline was originally installed in 1956 and has operated as a hazardous liquid pipeline facility now for close to 70 years.

82.    National Tube Supply Company manufactured the Pipeline.

83.    As originally installed, the Twin Oaks Pipeline was 8 inches in diameter and ran through a different trench than its current pathway under the Mt. Eyre Manor neighborhood. At the time, this 8-inch pipeline ran under farmland that existed prior to the development of the neighborhood.

20

Case ID: 250303655

Exhibit A_ Page 216 of 336



84.    The above photo (Figure 1) is taken from the Energy Transfer Defendants' Interim Remedial Action Plan submitted to the PADEP on March 19, 2025. It depicts both the original 8-inch pipeline trench with its more directly diagonal northeasterly pathway and the more recent 14-inch pipeline trench, which abruptly turns north as it reaches the Mt. Eyre Manor neighborhood, then curves east, before ultimately resuming its diagonal northeasterly pathway.

85.    This alternate trench path around what is now the Mt. Eyre Manor neighborhood closely follows modern Glenwood Drive, as depicted below, and the abrupt northward turn onto Glenwood Drive corresponds precisely with the location where the Leak was detected at 121 Glenwood Drive.

21

Case ID: 250303655



Fig. 2: The Mt. Eyre Manor neighborhood, retrieved from Google Maps, with the approximate location of the Twin Oaks Pipeline overlaid, running parallel to Glenwood Drive, and the later-discovered Leak location indicated with a blue star.

86. On a daily basis, the Energy Transfer Defendants transport massive quantities of petroleum products through the Pipeline at high pressure under the Mt. Eyre Manor community and surrounding neighborhoods.

87. This product, which ETMT, the Delta Defendants, and the PBF Defendants supplied during the relevant time period, is forced through an abrupt northward turn at 121 Glenwood Drive, subjecting the Pipeline at that location to significant pressure and mechanical stress.

88. The Energy Transfer Defendants contract with the Contractor Defendants to perform monitoring and/or maintenance work on the Pipeline.

89. Specifically, Precision Pipeline serves or served as a general contractor for the Pipeline.

22

Case ID: 250303655

**Exhibit A_ Page 218 of 336**

90. NEFS performs or performed inspection and non-destructive testing work on the Pipeline.

91. Shaw Pipeline performs or performed non-destructive evaluation work on the Pipeline.

92. CorrPro performs or performed close-internal survey work on the Pipeline.

93. Barr performs or performed aerial right-of-way inspections on the Pipeline.

94. Baker Hughes and ROSEN perform or performed in-line inspections on the Pipeline.

95. Despite the Contractor Defendants' responsibility to perform each of these roles, the Pipeline leaked, and the Leak was not detected until months or years after its initial occurrence.

96. On November 18, 2024, PHMSA issued an Advisory Bulletin notifying pipeline owners and operators of potential threats to the integrity of the body of certain pipelines.[4] The Advisory Bulletin stated that pipes constructed by National Tube Supply Company before 1970, like the Twin Oaks Pipeline, were particularly susceptible to hard spots. Hard spots are defects created during the pipe manufacturing process because of localized cooling and hardening. Hard spots can become unstable over time due to changes in their conditions, including degradation and erosion of the coating surrounding the hard spot, and result in cracking of the pipe.

97. PHMSA provided in its Advisory Bulletin six recommended safety actions for pipeline operators to take in order to identify potential hard spots. Despite this Advisory Bulletin, and their own independent knowledge and experience concerning these issues, the Energy Transfer

---

[4] Pipeline and Hazardous Materials Safety Administration, Pipeline Safety: Identification and Evaluation of Potential Hard Spots—In-Line Inspection Tools and Analysis, 89 Fed. Reg. 90827 (Nov. 18, 2024).

Case ID: 250303655

Exhibit A_ Page 219 of 336

Defendants' representatives have stated that they were unaware of any safety actions recommended by PHMSA related to the Twin Oaks Pipeline.

98.    Furthermore, the inner walls of a petroleum pipeline can erode over time due to the corrosive environment created by the materials and chemicals transported through it. The exterior of a petroleum pipeline is also subject to external corrosion, due to the presence of moisture and chemicals in the surrounding soil. While several factors can influence the rate and extent of both internal and external corrosion, corrosion of a petroleum pipeline over time is inevitable, and again, well-known. Consequently, proper care, maintenance, supervision, and oversight of pipelines is critical to public safety.

99.    Despite this knowledge, the Energy Transfer Defendants have made several incredulous statements to members of the affected community in Upper Makefield, Pennsylvania, including Plaintiffs, that the lifespan of the Twin Oaks Pipeline is "indefinite."

100.    The Contractor Defendants were responsible, in part, for monitoring and/or maintenance of the Pipeline in light of these known corrosion risks, but they failed to adequately perform these duties as evidenced by the Leak, and their failure to timely prevent and detect it.

101.    The Twin Oaks Pipeline specifically has experienced reported failures in Pennsylvania on at least two prior occasions, and these are only instances that the Energy Transfer Defendants have reported to the public. It is possible that the Twin Oaks Pipeline has experienced additional unreported failures that the Energy Transfer Defendants did not report to the public.

102.    On October 7, 1986, a crack in the Twin Oaks Pipeline caused the release of at least 5,260 barrels of refined product in Montgomery County, Pennsylvania.

103.    On March 19, 2004, external corrosion caused a leak in the Twin Oaks Pipeline, resulting in the release of at least 50 barrels of refined product in Delaware County, Pennsylvania.

24

104.    The Energy Transfer Defendants also renovated a major portion of the Twin Oaks Pipeline—the portion that crosses the Delaware River, right next to the residential Mt. Eyre Manor neighborhood—in June and July 2023. The Energy Transfer Defendants installed approximately 2,500 feet of new pipeline underneath the Delaware River using the process of horizontal directional drilling and tied this new stretch of pipeline into the existing Twin Oaks Pipeline at a location on Oakdale Avenue near the Mt. Eyre Manor neighborhood.

**C.      The Geographic Area Affected by the Twin Oaks Pipeline Leak**

105.    The Twin Oaks Pipeline Leak occurred at a section of the Pipeline that runs directly under the residential Mt. Eyre Manor neighborhood in Washington Crossing, Bucks County, Pennsylvania.

106.    The Mt. Eyre Manor neighborhood is located in Upper Makefield Township, a municipality within Bucks County, Pennsylvania and covers the residential homes on Glenwood Drive, Walker Road, Spencer Road, Crestwood Road, Beechwood Drive, and Bruce Road.

107.    Figure 3 below shows the geographic location of the Twin Oaks Pipeline within a portion of Upper Makefield Township. The red line in Figure 3 shows the Pipeline.

Case ID: 250303655

**Exhibit A_ Page 221 of 336**



Fig. 3: Location of the Pipeline within Upper Makefield Township, retrieved from the National Pipeline Mapping System Public Viewer. *See* pvnpms.phmsa.dot.gov/PublicViewer (last accessed Feb. 26, 2025).

108.     There is no gas station or other potential source of petroleum byproduct contamination within two miles of the Mt. Eyre Manor neighborhood. Yet constituents—including EDC and MTBE—that the Energy Transfer Defendants have stated have not been present in gasoline for decades, and, in the case of EDC, not present in leaded jet fuel since 2018, have nevertheless been detected via testing since the Leak.

109.     Residents of the Mt. Eyre Manor neighborhood rely on private well water for their water supply, including water used for drinking, bathing, cooking, washing, and gardening, among other uses.

110.     An underground aquifer, which the Energy Transfer Defendants, Delta Defendants, and PBF Defendants have now permanently polluted, supplies the water used by residents of the neighborhood, including Plaintiffs.

26

111.    The same is true for residents of the immediately surrounding area, including, but not limited to, residences on Mt. Eyre Road, Valley View Drive, Old Barn Court, Taylorsville Road, River Road, Oakdale Avenue, Maple Shade Avenue, West Street, Cross Street, Swayze Avenue, Pondview Drive, Heron Court, Belamour Drive, Aqueduct Road, and additional surrounding roads, which run through other nearby Upper Makefield Township neighborhoods that the Twin Oaks Pipeline also runs underneath.

112.    Upper Makefield Township sits in a floodplain, and the Mt. Eyre Manor neighborhood is surrounded on three sides by "Flood Hazard Areas" as defined by the Federal Emergency Management Agency ("FEMA").

113.    The Mt. Eyre Manor neighborhood is considered a High Consequence Area ("HCA") pursuant to 49 C.F.R. § 195.450, due to its concentrated population, its proximity to a commercially navigable waterway (the Delaware River), the lack of an adequate alternative drinking water source to the underlying aquifer, and its proximity to ecological resources.

**D.    Known and Reported Odor Complaints Started in September 2023**

**i.    *September 2023 Odor Complaint***

114.    On September 20, 2023, the Energy Transfer Defendants were notified directly by the owner-residents of 128 Walker Road of an overwhelming smell and taste of gasoline in their water. The Energy Transfer Defendants were also notified of this complaint separately on September 25, 2023, when PHMSA notified the Energy Transfer Defendants of an odor complaint referred by the PADEP.

115.    The residents of 128 Walker Road live directly across the street from the site where the Twin Oaks Pipeline Leak occurred and was eventually discovered (121 Glenwood Drive),

Case ID: 250303655

though the Energy Transfer Defendants did not confirm discovery of the Leak until *16 months later* after this complaint.

116.    The La Hart Plaintiffs and the Zacharatos Plaintiffs each live less than 500 feet of 128 Walker Road, downgradient of the Leak's release point. Only one property sits between 128 Walker and the La Hart residence, while the Zacharatos are the next-door neighbors of the residents of 128 Walker Road.

117.    In the two months prior to the above first odor complaint in September 2023, Upper Makefield Township had experienced multiple severe weather events. These weather events included severe flash flooding that occurred in July 2023 and that resulted in the deaths of seven people and forced month-long road closures near the Mt. Eyre Manor neighborhood.

118.    The weather events also included substantial rains and heavy winds from Tropical Storm Ophelia that hit Bucks County, Pennsylvania on September 23, 2023.

119.    Each of these severe weather events should have triggered full proper inspections of the Twin Oaks Pipeline by the Energy Transfer Defendants pursuant to 49 C.F.R. § 195.414. The Energy Transfer Defendants, however, did not conduct inspections sufficient to discover any resulting leaks as required by law, nor did the Energy Transfer Defendants notify PHMSA about their failure to conduct such inspections, which was reckless and negligent.

120.    The Energy Transfer Defendants investigated the September 2023 odor complaint by simply dispatching a technician and a contractor to test for indications of a leak, but the investigation was improperly performed and conducted without reasonable care or diligence.

121.    Specifically, the Energy Transfer Defendants' investigation included only testing of the well water of the complainant's residence and three nearby residences, probing the immediately adjacent segment of the pipeline with a photoionization ("PID") gas detector, excavating a single

28

25-foot segment of nearby pipeline that ran through nearby 121 Glenwood Drive, testing the excavated soil, and performing a static pressure test.

122. Sadly, the excavation stopped short of uncovering the portion of the Pipeline mere feet away where the Pipeline Leak was eventually discovered many months later.

123. When the Energy Transfer Defendants did not immediately uncover evidence of a leak based on this initial deficient investigation, Defendants simply and improperly ceased their investigative efforts. The Energy Transfer Defendants recklessly and negligently did not ascertain the source of the odor, and did not conduct any continued monitoring or observation of the area.

124. The Energy Transfer Defendants then contacted the owners of 128 Walker Road and falsely told them they were "happy to report" that there was no oil or gas contamination in their water.

125. When the owners of 128 Walker Road stated to Defendants' representative that this finding was impossible, the Energy Transfer Defendants' representative claimed that "it was probably some bacteria."

126. As history bears out, the Pipeline Leak would eventually be discovered 16 months later across the street from the complainants' home.

127. Starting at least as early as this September 2023 time frame when evidence of the Leak was first observed by residents, the Delta Defendants and PBF Defendants were or should have been on notice that the expected volume of product that they contracted to ship through the Twin Oaks Pipeline was not in fact being delivered at the point of destination of their shipment, because a portion of the pipeline's volume was instead leaking into Plaintiffs' neighborhood. Neither the Delta Defendants nor PBF Defendants took any action to identify, investigate, or remedy the Leak despite being on reasonable notice that the Leak had begun.

29

128.    Moreover, the Contractor Defendants, including but not limited to Precision Pipeline and Barr, were performing work on the Pipeline and should have, but did not, take action with respect to the Leak.

### ii.    *June 2024 Odor Complaint*

129.    On June 28, 2024, the Energy Transfer Defendants received yet another odor complaint from a different resident, this time at 108 Spencer Road in the Mt. Eyre Manor neighborhood.  The resident called the Energy Transfer Defendants' so-called "emergency" phone number to alert the Energy Transfer Defendants about the petroleum smell.

130.    108 Spencer Road is just two properties to the east from the La Harts' home. Indeed, the La Harts are located *in between* 108 Spencer Road and the location where the Leak was ultimately detected at 121 Glenwood Drive.

131.    The Energy Transfer Defendants responded to this second odor complaint in an even more careless manner than they did to the first complaint when, in fact, their response should have been more robust since they had already received the prior complaint. The Energy Transfer Defendants dispatched a single technician to examine the site using a portable 4-gas detector. The technician's equipment did not record a gas detection, and the technician did not observe dead vegetation above the Pipeline.

132.    Based on the technician's report and limited inspection, and nothing else, the Energy Transfer Defendants recklessly and negligently ceased their investigative efforts. The Energy Transfer Defendants did not ascertain the source of the odor and did not conduct any continued monitoring or observation of the area.

133.    Inexplicably, the Energy Transfer Defendants also failed to report this odor complaint to PHMSA.

Case ID: 250303655

Exhibit A_ Page 226 of 336

134. The Energy Transfer Defendants also sent an individual to speak with the residents of 108 Spencer Road at their home in response to this odor complaint. This representative stated that there was no leak and that the Energy Transfer Defendants would know immediately if a leak ever occurred because they would detect either a pressure drop or a loss of product in the Pipeline—a fact that, absent negligence, should reasonably have been known to the Delta Defendants and the PBF Defendants as well.

135. Unsatisfied with this limited response (which of course turned out to be incorrect), the residents of 108 Spencer Road also contacted Sue Erickson, a right-of-way specialist and public-facing representative for the Energy Transfer Defendants. Erickson assured these residents that there was no issue with the Pipeline, that it had been "probed," and that there was no loss of pressure indicating any leak. This response further demonstrates the unreliability and defective nature of the Energy Transfer Defendants' leak-monitoring and detection methods.

### iii. *July 2024 Odor Complaint*

136. The following month, on or about July 21, 2024, the Energy Transfer Defendants received a third odor complaint from a resident at 121 Glenwood Drive in the Mt. Eyre Manor neighborhood, which is immediately across the street from the complainants who lived at 128 Walker Road who made the first complaint detailed above, *and* the precise address where the Energy Transfer Defendants had excavated a segment of the Twin Oaks Pipeline in September 2023.

137. The complainants from 121 Glenwood Drive reported not only a smell of gasoline or kerosene in their water but also noted a visual change in how their water looked.

Case ID: 250303655

**Exhibit A_ Page 227 of 336**

138.    Again, the Energy Transfer Defendants' response was improper and lackadaisical, especially accounting for the fact that this was now the third complaint received in a short period of time.

139.    In response to this July 2024 odor complaint, the Energy Transfer Defendants again dispatched only a single technician to examine the site using a portable 4-gas detector. The technician's equipment did not record a gas detection, and the technician did not observe dead vegetation above the pipeline.

140.    Based on the technician's report, the Energy Transfer Defendants recklessly and negligently ceased their investigative efforts. The Energy Transfer Defendants did not ascertain the source of the odor and again failed to implement or conduct any proper continued monitoring or observation of the area.

141.    Moreover, yet again, the Energy Transfer Defendants failed to report this odor complaint to PHMSA.

142.    Furthermore, the Energy Transfer Defendants represented to the residents of 121 Glenwood Drive that there was no petroleum in their water, notwithstanding the absence of proper testing to verify that claim.

143.    The Energy Transfer Defendants also claimed to the PADEP that "iron bacteria" was the likely explanation for the smell of gasoline or kerosene and this information was then passed on by PADEP to the residents at 121 Glenwood Drive.

*iv.*        *November 2024 Odor Complaint*

144.    Four months later, on November 21, 2024, the Energy Transfer Defendants received a fourth known odor complaint from a resident of 107 Spencer Road in the Mt. Eyre Manor

32

neighborhood, immediately across the street from the prior complainants that lived at 108 Spencer Road.

145.    The homeowners at 107 Spencer Road, who bought their home in 1978, raised their family in the Mt. Eyre Manor community, and lived in the neighborhood for over 45 years, complained that they smelled gasoline in their water. They also noticed that their brand-new drinking glasses had a sheen resembling oil or gasoline after taking them out of the dishwasher.

146.    The residents at 107 Spencer Road asked their well company, Bucks County Well Drilling Co. ("BCWD"), to investigate. BCWD and the residents of 107 Spencer Road observed a sheen in the well water.

147.    Disturbed by this discovery, the residents at 107 Spencer Road had samples taken and sent them to an independent laboratory. The samples came back *positive* on October 24, 2024, for diesel range organics (C10-C28) at 3,920 milligrams per liter and gasoline range organics at 573 milligrams per liter.

148.    The residents at 107 Spencer Road notified the Energy Transfer Defendants of this result. Once again, and despite these now positive test results, the Energy Transfer Defendants' response was insufficient and neglectful.

149.    Soon after receiving this alarming test result, in November 2024, an individual purporting to be an agent of the Energy Transfer Defendants appeared at 107 Spencer Road in the evening after dark, and denied that the Energy Transfer Defendants were responsible for the petroleum product present in the water at 107 Spencer Road, but agreed to continue monitoring the situation.

150.    Despite this now being the fourth known odor complaint by a resident in the direct vicinity of where the Pipeline Leak was eventually discovered, the Energy Transfer Defendants

33

again dispatched a single technician to examine the site using a portable 4-gas detector. The technician's equipment did not record a gas detection, and the technician did not observe dead vegetation above the pipeline.

151.    The Energy Transfer Defendants performed a four-hour static pressure test to check for lowering pressure indicative of a pipeline leak. The operator reported to the Energy Transfer Defendants that the results were within acceptable limits, although the operator did not report the acceptance criteria used or the results of the pressure test.

152.    Based on the reports of the technician and operator, the Energy Transfer Defendants ceased their investigative efforts, notwithstanding that there had now been at least four similar complaints reported since September 2023. The Energy Transfer Defendants did not ascertain the source of the odor, and did not conduct any continued monitoring, observation, or testing of the neighborhood.

153.    In what was now clearly a systemic pattern, the Energy Transfer Defendants again did not report this odor complaint to PHMSA.

154.    Unlike the Energy Transfer Defendants, the owners at 107 Spencer Road continued to investigate their disturbing test results. They alerted their homeowners' insurance company, who retained environmental firm Phoenix Consulting, LLC.

155.    Phoenix began interfacing directly with PADEP, which stated that it had received multiple complaints from concerned residents over the last year, but that the water at 107 Spencer Road was the first instance of failing laboratory results.

156.    Phoenix collected samples directly from the well at 107 Spencer Road on December 17, 2024. These samples contained a very observable yellow petroleum product in the well water:

34





157.    Phoenix had the water from these jars tested and communicated the results of those tests to the PADEP, whose representative Richard Staron indicated that a jet fuel release from the Twin Oaks Pipeline was a likely source. In other words, the Delta Defendants' and PBF

Case ID: 250303655
**Exhibit A_ Page 231 of 336**

Defendants' jet fuel product had contaminated a property that was further downgradient from the Leak location than the La Harts' property.

158. These results indicated the presence of benzene, toluene, ethylbenzene, isopropylbenzene, chloroform, naphthalene, xylenes, 1,2,4-trimethylbenzene, 1,3,5-trimethylbenzene, and lead.

159. Subsequently, the Energy Transfer Defendants finally performed testing of the well at 107 Spencer Road themselves on January 24, 2025, through a contractor, Groundwater & Environmental Services, Inc. ("GES"), as described in more detail below.

160. The Energy Transfer Defendants' responses to the odor complaints described above fell far below the applicable standard of care and the duties owed to residents of Mt. Eyre Manor and the surrounding communities, including with respect to the urgency of the situation, the actions taken or not taken, and the failure to conduct meaningful follow-up, monitoring, and testing to determine whether the Pipeline was leaking and contaminating the community, including the aquifer relied upon by Plaintiffs and other members of the proposed Class.

161. Because of each of the Defendants' lack of a proper response, Defendants never timely identified a cause of the taste and odor complaints, until the Twin Oaks Pipeline Leak was discovered only much later in January 2025. In short, Defendants failed to prevent and detect the Leak.

**E.     The Twin Oaks Pipeline Leak is Discovered in January 2025**

162. On January 21, 2025, PADEP informed PHMSA that samples obtained from a well at 107 Spencer Road had indicated the presence of kerosene, a major component of JP-8 jet fuel. The Delta Defendants and PBF Defendants were the primary entities shipping jet fuel through the Pipeline during the relevant time period.

36

Case ID: 250303655

**Exhibit A_ Page 232 of 336**

163.    PHMSA notified the Energy Transfer Defendants of the test results and directed the Energy Transfer Defendants to investigate the origin of the kerosene.

164.    On or about January 22, 2025, a representative of the Energy Transfer Defendants, Wassim Saad, parked in the La Harts' driveway in an unmarked truck with a New Jersey license plate, and knocked on their door to offer "free water testing" with no explanation why. Shockingly, Mr. Saad did not identify himself to the La Harts at this time as a representative of the Energy Transfer Defendants or tell the La Harts about the presence of kerosene at 107 Spencer Road, even though that property's well is mere feet from the La Harts' property line. Indeed Mr. Saad's, business card indicated that he worked for a company called "Wood PLC."

165.    The La Harts declined the offer for "free water testing" because they thought, based upon the lack of information and material omissions provided, that Mr. Saad was a door-to-door salesman offering unneeded services.

166.    Shortly thereafter, the La Harts noticed that trucks labeled "Energy Transfer" were present in the neighborhood, and the La Harts then realized that their community was likely facing a significant issue, although at this time the scope of the issue was unknown to them.

167.    The La Harts then contacted Mr. Saad and the Energy Transfer Defendants took a purported test of the La Harts' water on January 24, 2025, but only by sampling water taken from the La Harts' faucet and not, as should have been done, also from their well.

168.    At this time, the neighbors in the Mt. Eyre Manor neighborhood began to talk with each other about the activity involving the Energy Transfer Defendants, and the La Harts encouraged other residents to get their water tested.

37

Case ID: 250303655

Exhibit A_ Page 233 of 336

169. From January 22, 2025, through January 31, 2025, the Energy Transfer Defendants had GES, acting on behalf of and as an agent of the Energy Transfer Defendants, sample the private wells of approximately twenty-five other nearby residences in the neighborhood.

170. GES confirmed the presence of hydrocarbons in well water at multiple properties in the neighborhood including 107 Spencer Road, 108 Spencer Road, and 128 Glenwood Drive, each of which surround the La Hart property.

171. From January 22, 2025, through January 31, 2025, the Energy Transfer Defendants proceeded to probe the length of the Twin Oaks Pipeline between 121 Glenwood Drive and 155 Glenwood Drive (approximately 0.7 miles) with a PID gas detector. As with the Energy Transfer Defendants' prior investigations, the gas detector results were reported as "non-detect."

172. Despite the repeated failures of the Energy Transfer Defendants' PID gas detector to identify a leak, eventually on January 31, 2025, the Energy Transfer Defendants visually observed and finally confirmed a substantial leak in the Twin Oaks Pipeline when they excavated a portion of the Pipeline located on the property at 121 Glenwood Drive, in the backyard of the home, next to the swimming pool where the residents' family swam prior to the discovery of the Leak.

173. The Pipeline Leak was discovered at 121 Glenwood Drive, the residence directly across the street from 128 Walker Road in the Mt. Eyre Manor neighborhood, where the residents lived who reported the first odor complaint – *16 months prior* – detailed above as the smell of gasoline.

174. The Energy Transfer Defendants had finally decided to excavate a portion of the Twin Oaks Pipeline located on the property at 121 Glenwood Drive after they went back and reviewed old maintenance records that had long been available to them. It is currently still not

38

Case ID: 250303655

Exhibit A_ Page 234 of 336

known why the Energy Transfer Defendants did not take this step earlier, or what else these old maintenance records might show once they are produced in this litigation.

175. Video of the Pipeline Leak was recorded by one of the residents at 121 Glenwood Drive.

176. The Pipeline Leak would later be characterized as a "slow drip" from a Type A sleeve installed in 1995, and that had not been properly maintained since.

177. Type A sleeves are typically used to reinforce pipeline segments or areas of a pipeline that exhibit non-leaking defects such as corrosion or observable dents.

178. The Twin Oaks Pipeline is reinforced in at least 44 other segments by Type A sleeves installed during the late 1980s and early 1990s, and which are also all at risk of failing, especially if they are not continually and properly monitored and maintained.

179. Defendants failed to continually and properly monitor and maintain the Type A sleeve that was underground at 121 Glenwood Drive in the Mt. Eyre Manor residential neighborhood in Upper Makefield Township, Pennsylvania.

180. The Energy Transfer Defendants, Delta Defendants, and PBF Defendants all knew or should have known that Type A sleeves have a propensity to fail, and yet they shipped petroleum product through the Twin Oaks Pipeline anyway.

181. Similarly, the Contractor Defendants were or should have been aware of the risks of Type A sleeves—several of the Contractor Defendants' specific expertise is in pipeline corrosion—yet they failed to properly monitor or maintain the Pipeline.

182. The pipeline industry knows or should know that Type A sleeves are ineffective at preventing leaks and an insufficient mechanism to reinforce an aging pipeline in danger of leaking. The corrosive nature of petroleum products moving at high pressure inside a pipeline means that

39

dents over time can become cracks through which product can escape, and a sleeve reinforcing the exterior of the pipeline will not prevent leaks in such a scenario.

183.    For example, in August 2020, a dent in the Colonial Pipeline near Huntersville, North Carolina, which had been previously reinforced in 2004 with a Type A sleeve, developed into an approximately five-foot crack. As here, the operators of the Colonial Pipeline failed to properly monitor and maintain the pipeline and Type A sleeve and its detection systems failed to detect the crack or the release of any product.

184.    In that instance, an estimated 2,000,000 gallons of product were discharged into the surrounding environment before the pipeline's operators, alerted to the Leak by local residents, were able to identify and repair the crack. That pipeline's operator initially reported the release as involving 63,000 gallons (3 percent of the actual volume lost).

185.    Based on this and other similar incidents, together with their specialized knowledge and experience concerning pipeline operations and the strengths and limitations of standard operating procedures and repair equipment, the Energy Transfer Defendants knew or should have known that the approximately thirty-year-old Type A sleeve installed at the residential property at 121 Glenwood Drive was inadequate to prevent a discharge from the Pipeline, especially given its location beneath or adjacent to a residential neighborhood.

186.    On January 31, 2025, the Energy Transfer Defendants notified the National Response Center ("NRC") of the Twin Oaks Pipeline Leak and inexplicably and without good basis reported a release of 156 barrels of jet fuel, which is 6,552 gallons.

187.    Despite this initial report that there were 6,552 gallons of jet fuel spilled into a residential neighborhood in Bucks County, Pennsylvania that relies on well water, the Energy Transfer Defendants have since maintained in statements made to residents and regulatory

40

Case ID: 250303655

authorities after January 31, 2025, that in fact, the Energy Transfer Defendants do not know how much product has been released into the environment.

188. Still, the Energy Transfer Defendants have continued to repeat the 6,552 gallons figure at other times to regulatory authorities, including to the PADEP on April 18, 2025.

189. It is highly likely because of the amount of time that the Leak was occurring, the size of the Leak, the pressure utilized for the Twin Oaks Pipeline, the odor complaints dating back to September 2023, and other evidence, that significantly more than 6,552 gallons of jet fuel and petroleum products was released by Defendants into the environment.

190. As a result of Defendants' insufficient, improper, negligent, and reckless conduct alleged herein with respect to their use, oversight, operation, supervision, maintenance, monitoring, and testing of the Twin Oaks Pipeline—and despite now claiming that "the earliest the release from the Pipeline could have begun was May or June 2024" (despite the prior odor complaints as detailed above), Defendants appear to have no reliable knowledge of when the Pipeline began leaking.

191. The Twin Oaks Pipeline's maximum operating pressure is 1,200 psig (pounds per square inch gauge). On January 31, 2025, when the Energy Transfer Defendants discovered the Leak at 121 Glenwood Drive in the Mt. Eyre Manor neighborhood, it was reported that the Pipeline had been operating at 1,100 psig, *i.e.*, approximately 91.6% operating pressure.

192. PHMSA conducted a preliminary investigation of the Pipeline Leak after it was reported. Based on its investigation, PHMSA concluded that "the Pipeline experienced a leak in a high consequence area for at least 16 months, resulting in the release of jet fuel that has migrated into several adjacent water wells and caused additional impacts to property and the environment."

Case ID: 250303655

**Exhibit A_ Page 237 of 336**

193. It is probable that the Twin Oaks Pipeline was leaking for a significant period of time prior to the first known odor complaint being made to the Energy Transfer Defendants in September 2023.

194. Indeed, Defendants appear to have operated the Twin Oaks Pipeline under a run-to-failure business model, continuously pumping petroleum products through the Pipeline with disregard for the foreseeable consequences as alleged herein, and taking action only after it became unmistakably clear that a leak had occurred or that the Pipeline had otherwise suffered a complete loss of integrity at a particular location.

195. As indicated by the facts set forth in this Complaint, Defendants' methods for detecting leaks are woefully inadequate. For example, Defendants rely on Defendant Barr to perform *aerial* inspections of an *underground* pipeline to determine whether it is leaking. Barr performed monthly patrols of the Pipeline, sometimes as many as three or four patrols per month, but never discovered any evidence of the Leak.

196. For several months after confirming the Leak, the Energy Transfer Defendants repeatedly advised both residents and regulatory authorities that they did not know whether the Twin Oaks Pipeline was still leaking.

197. The Energy Transfer Defendants have still not excavated the entire Twin Oaks Pipeline to conduct a visual examination of the Pipeline to determine that it is not leaking, or even excavated the Pipeline sufficient to examine all the Type A sleeves along the Pipeline. However, the Energy Transfer Defendants have discovered additional "anomalies" along the Pipeline since the Leak and have been forced to conduct excavation digs to inspect and remedy these anomalies.

**F.    The Energy Transfer Defendants' Response and Actions Following Discovery of the Pipeline Leak**

42

Case ID: 250303655

**Exhibit A_ Page 238 of 336**

198.    On January 31, 2025, the Energy Transfer Defendants shut down the segment of the Pipeline where the Leak had been identified and submitted a repair plan to PHMSA. They then removed the leaking segment in the middle of the night without notice to residents or regulators, notwithstanding their repeated assertions that shutting down the Pipeline would cause significant economic damage.

199.    Plaintiffs and the Class members demand, and have demanded, immediate access to review and examine the leaking segment of the Twin Oaks Pipeline and expect Defendants to preserve all aspects of the Pipeline that they have removed.

200.    On February 1, 2025, Energy Transfer's Lead Specialist for Public Affairs, Joseph Massaro, issued a written statement confirming the Energy Transfer Defendants had discovered "product loss" and stating that the Pipeline was "inactive" at the time the Leak was discovered.

201.    This statement means, among other things, that the video of the Pipeline that shows the Pipeline Leak is not indicative of the actual full Pipeline Leak under usual operating pressure conditions.

202.    On February 2, 2025, after receiving approval from PHMSA's Southwest Region Director, the Energy Transfer Defendants replaced the removed segment of the Pipeline and, without conducting further work to ensure that no other parts of the Pipeline were currently leaking, shockingly rushed to return the Pipeline to service.

203.    The Energy Transfer Defendants subsequently began an inadequate and neglectful investigation of the effects of the known Pipeline Leak in a high consequence, residential area.

204.    The Energy Transfer Defendants began conducting "exposure" testing for the water of nearby residences. But rather than testing the actual tops of all residents' wells to determine whether any free product – also known as light non-aqueous phase liquid or "LNAPL" – was

43

present, the Energy Transfer Defendants' exposure testing relied on inadequate PID readings and samples taken from faucets inside the residences post-treatment.

205.    In at least one instance, when the Energy Transfer Defendants' retained testing agents, discovered that they had taken a sample directly from a well for testing by mistake, ***they threw out the sample and erased the results***.

206.    The Energy Transfer Defendants' method of exposure testing thus often deviated from the standard protocols for testing groundwater, which require testing pre-treatment, and was seemingly designed to limit the Energy Transfer Defendants' ability to identify the scope and location of the contamination plume resulting from the Pipeline Leak.

207.    The Energy Transfer Defendants failed to test samples directly from residents' wells for the presence of free product. This is true even though the Energy Transfer Defendants later began, at the behest of Plaintiffs and other residents, to conduct bailer tests of residents' wells to screen for the presence of LNAPL.

208.    Indeed, even in situations where the Energy Transfer Defendants' agents *visually observed* the presence of LNAPL, they did not consistently retain the water from the bailer for testing and have instead in instances deposited this contaminated water back into the well.

209.    Since the discovery of the Pipeline Leak, and following the institution of this litigation, Defendants have undertaken various environmental assessment and remediation activities in the neighborhood. Based on information presently available, it is not clear that all physical materials, samples, or other evidence generated or handled during those activities—including materials inserted into or removed from residents' wells—were fully cataloged and/or preserved. Plaintiffs and members of the proposed Class therefore reserve their rights with respect to any evidentiary issues that may arise from the preservation of such materials.

Case ID: 250303655

**Exhibit A_ Page 240 of 336**

210.    On February 4, 2025, Energy Transfer's Joseph Massaro appeared at the regularly scheduled Upper Makefield Township Board of Supervisors meeting, along with the Energy Transfer Defendants' other representatives including Carl Borkland, Susan Ericson, David Kerwood, and Rahn Monreal. Massaro confirmed the product release and purported to provide an "update" on Defendants' remedial efforts.

211.    On February 6, 2025, at 7:30 p.m., a townhall meeting was held at the Upper Makefield Township Office, where affected residents who live in Mt. Eyre Manor and the surrounding neighborhoods, including Plaintiffs, representatives from PHMSA and the Defendants also were present.

212.    At this townhall meeting, the Energy Transfer Defendants provided an update on their efforts to monitor and contain the Pipeline Leak, in which they admitted that their exposure testing had detected hydrocarbons in six neighborhood wells as of that time.

213.    The Energy Transfer Defendants admitted during the meeting that they did not know how much product had been lost or when the Pipeline Leak had begun.

214.    The Energy Transfer Defendants further stated that because the release occurred "in the headwaters" of the Delaware River, it would make sense for any groundwater carrying spilled product to be moving in a northeasterly direction toward the Delaware River. This was the Energy Transfer Defendants' best estimation at the time concerning the direction of the plume caused by the Pipeline Leak of unknown quantities of jet fuel and other petroleum products.

215.    At the town hall meeting, the Energy Transfer Defendants offered only to pay for the installation of carbon filtration systems for any wells where their product was detected, and to pay for the maintenance of such a system for as long as the product is detected in the well.

45

Case ID: 250303655

216.    However, even this promise has not been properly fulfilled by the Energy Transfer Defendants. For example, even though petroleum product has been found in the Grovers' well, the Energy Transfer Defendants refuse to pay for the installation of a carbon filtration system for the Grover residence. The Grovers are just one of multiple families in the affected area for whom the Energy Transfer Defendants have refused to install a carbon filtration system, despite their private well water having tested positive for contaminants associated with the Leak.

217.    During this townhall meeting, officials from PHMSA stated that they had no confidence in the Energy Transfer Defendants' ability to identify leaks in the Twin Oaks Pipeline, considering the circumstances surrounding the Pipeline Leak. Residents of the Mt. Eyre Manor neighborhood, including the La Harts, called on the Energy Transfer Defendants to shut down the Pipeline, or to do so for a period of time sufficient to examine the Pipeline and make all reasonable repairs.

218.    The Energy Transfer Defendants refused (and still refuse) to even temporarily shut down the Pipeline.

219.    On February 7, 2025, the day after the town hall meeting, the Energy Transfer Defendants provided a written public update on the Upper Makefield Township website in which they stated that, rather than shutting down operations, they would reduce the Twin Oaks Pipeline's operating pressure to 80%.

220.    On February 13, 2025, PHMSA issued a Notice of Proposed Safety Order ("NOPSO") to the Energy Transfer Defendants. In the NOPSO, PHMSA wrote:

> After evaluating the foregoing preliminary findings of fact, and having considered the characteristics of the pipeline, including prior Type-A sleeve repairs involving dents and other defects; the prior failures of the pipeline; the hazardous nature of the petroleum products, including jet fuel, transported; the uncertainty as to the root cause(s) of the failure; the proximity of the pipeline to residential dwellings and water wells; the existing and potential additional impacts to property, the

Case ID: 250303655

environment, and wildlife; and the possibility that the same condition(s) that may have caused the failure remain present in the pipeline and could lead to additional failures; it appears that the continued operation of the Twin Oaks Discharge pipeline system without corrective measures would pose a pipeline integrity risk to public safety, property, or the environment. The conditions and threats described above potentially exist throughout the Twin 7 Oaks Pipeline. Further, Sunoco's apparent inability to effectively detect the leak has potentially exacerbated the impacts of the release over an extended period of time. Accordingly, corrective measures are necessary to mitigate the pipeline integrity risk of the pipeline system to protect public safety, property, and the environment.

221.    PHMSA, thereafter, issued proposed remedial requirements including reducing operating pressure, implementing plans to assess the integrity of the pipe and of the Type A sleeves along it, conducting a leakage survey and conducting a root cause failure analysis.

222.    On the evening of February 13, 2025, a second town hall meeting was held at Sol Feinstone Elementary School, Newtown, PA at 7:30 p.m. Affected residents including several Plaintiffs, representatives from the Energy Transfer Defendants, and representatives from PHMSA and state regulators attended the meeting.

223.    During this meeting, residents, including the La Harts, demanded that the Twin Oaks Pipeline be shut down. Plaintiff Daniel La Hart provided an opening statement on behalf of Mt. Eyre Manor residents at this meeting.

224.    The Energy Transfer Defendants then showed residents a map of what they considered to be the geographic area affected by the Pipeline Leak. This map included a line of arrows pointing in the northeastern direction, which were labeled as the "*inferred* groundwater flow direction." (emphasis added).

225.    The Energy Transfer Defendants stated that areas west and south of the Pipeline Leak were not of concern based on the flow of the groundwater toward the Delaware River. The Energy Transfer Defendants, however, then admitted that (at the time) they had not yet installed a

47

single monitoring well or taken any steps to identify the accurate directional flow of groundwater in the area.

226. The Energy Transfer Defendants' affirmative statements to residents about the identified affected geographic area resulting from the Pipeline Leak at the town hall meetings on February 6 and February 13 were at best misleading. At the time the Energy Transfer Defendants made these statements, in fact, the Energy Transfer Defendants had no idea when the Pipeline Leak first occurred, how long the Pipeline had been leaking into the residential neighborhood, how much product had been discharged into the surrounding underground aquifer and bedrock, whether additional points along the Pipeline were continuing to leak, or the actual direction or flow rate of the groundwater underlying the point or points of discharge.

227. The Energy Transfer Defendants intended their statements to induce a false sense of security and confidence in residents, particularly for residents whose homes were not within Defendants' arbitrarily delineated affected geographic area that was not based on adequate investigation or evidence.

228. During the February 13, 2025, town hall meeting, one resident who resided at 128 Walker Road in the affected area and across the street from where the Pipeline Leak was discovered described her experience with her well. Since 2023, she had repeatedly complained to the Energy Transfer Defendants about her concerns of contamination resulting from the Twin Oaks Pipeline, and the Energy Transfer Defendants' representatives had repeatedly stated that any oil could not have been coming from the Twin Oaks Pipeline.

229. After the discovery of the Pipeline Leak, when the Energy Transfer Defendants finally sent a contractor to inspect her well, they discovered ***over twelve feet of jet fuel on top of the water in her well, and after pumping the water, estimated that fifteen feet of jet fuel had been***

48

*accumulating in the well since 2023*. The resident stated that according to the Energy Transfer Defendants' contractor, over 22 inches of jet fuel had accumulated in her well in the past week alone. Indeed, significant product continues to accrue daily in this well.

230.    Residents asked the Energy Transfer Defendants for a guarantee during the February 13, 2025, town hall meeting that the Twin Oaks Pipeline was not still leaking. The Energy Transfer Defendants responded that they were not able to provide such a guaranty at that time.

231.    The Energy Transfer Defendants did make one guarantee at the February 13 town hall: they confirmed that they would provide medical monitoring to the Mt. Eyre Manor community and surrounding neighborhoods as a result of the Leak. The Energy Transfer Defendants' representative, Matt Gordon—a Vice President of Operations and the individual whom the Energy Transfer Defendants put forward as the authority figure speaking on their behalf at the town hall—confirmed the Energy Transfer Defendants' commitment to medical monitoring. This admission is recorded on video, but to Plaintiffs' knowledge, no such medical monitoring has been conducted or offered to residents.

232.    On February 18, 2025, PADEP sent the Energy Transfer Defendants a Notice of Violation. In the Notice, PADEP stated that the release identified on January 31, 2025, has "caused free product and dissolved concentrations of petroleum-related chemicals in potable wells in the neighborhood, with some properties having contamination exceeding DEP's Statewide health standard medium specific concentrations in their drinking water." The Notice advised that the discharge constitutes a violation of the Pennsylvania Clean Streams Law, 35 P.S. § 691.401, and that such a violation amounts to unlawful conduct within the definition of the law and is subject to civil enforcement.

Case ID: 250303655

**Exhibit A_ Page 245 of 336**

233. On February 19, 2025, counsel for the Energy Transfer Defendants responded to the NOPSO issued by PHMSA. The Energy Transfer Defendants denied and disputed several of the preliminary factual findings contained in the NOPSO. In doing so, the Energy Transfer Defendants admitted that "there is not sufficient evidence at this time to conclude how long the Affected Pipeline was leaking." The Energy Transfer Defendants stated that they did not have evidence of an ongoing leak, but also that their investigation was ongoing. The Energy Transfer Defendants did *not* state that they had sufficient information to rule out a continuing release of aviation fuel and other contaminants from the Pipeline into the local environment.

234. On February 27, 2025, a third town hall meeting was held again at the Sol Feinstone Elementary School at 7:30 p.m. Affected residents including Plaintiffs, regulators, local officials, and representatives of the Energy Transfer Defendants were present at the meeting.

235. During the February 27 town hall meeting, Defendant Energy Transfer's Joe McGinn, Vice President of Public Affairs, stated: "**This release happened, and it's our fault that it happened. This was not a third-party damage issue. We recognize that. We apologize for it.**" He further stated that Energy Transfer's "**focus and goal is to restore the community to its original state**."

236. The Energy Transfer Defendants' representatives stated at the February 27 town hall meeting that their initial estimate of 156 barrels lost was based on their understanding that federal law required reporting within 48 hours of discovering a leak. They admitted that, at the time of their representation to PHMSA, they had no evidence-based factual basis for the reported amount and that they still lacked a reliable estimate of the volume discharged into the bedrock and aquifer beneath the Mt. Eyre Manor neighborhood in Upper Makefield Township.

Case ID: 250303655

237.    This demonstrates that Defendants—including the Delta Defendants and PBF Defendants—fail to maintain proper and adequate leak detection and monitoring systems for the Twin Oaks Pipeline and the petroleum products transported through it.

238.    On February 28, 2025, Pennsylvania Governor Josh Shapiro wrote a letter to U.S. Transportation Secretary Sean Duffy, requesting expedited action from PHMSA in response to the Pipeline Leak. In his letter, Governor Shapiro noted that "Sunoco has not demonstrated adequate ability to detect leaks and take appropriate actions, given what appears to have been a significant delay between the initial indications of a leak and the response."

239.    Governor Shapiro further described the Leak as "the latest incident in a long pattern of safety concerns with Sunoco and Energy Transfer pipelines in Pennsylvania."

240.    On March 4, 2025, the Energy Transfer Defendants also sent to the PADEP a revised Notice of Intent to Remediate indicating that they intended only to remediate "Jet Fuel and unleaded gasoline parameters (benzene, toluene, ethylbenzene, total xylenes, methyl tertbutyl ether, isopropylbenzene, naphthalene, 1,2,4-trimethylbenzene, 1,3,5-trimethylbenzene, 1,2-dichloroethane, 1,2-dibromoethane, and lead) for Residential Statewide Health Standards in soil and groundwater." By selecting the Statewide Health Standards as their chosen cleanup standard, the Energy Transfer Defendants have confirmed that their plan is to leave their contamination in place to continue polluting Plaintiffs' and the neighborhood's water, soil, and air.

241.    The Energy Transfer Defendants, accordingly, were already backtracking from their express promise and representation to the community that it is Energy Transfer's "focus and goal is to restore the community to its original state."

242.    On March 5, 2025, the Energy Transfer Defendants responded to the Notice of Violation previously issued by the PADEP. Despite having been told by the PADEP to describe

51

"the circumstances causing the incident and how the circumstances were determined, including historical investigations of the pipeline in this area," Defendants' response was devoid of any of this information.

243.    Instead, the Energy Transfer Defendants simply recited the same limited history of inadequate responses to resident complaints that are described herein, starting in September 2023. The response did not in any meaningful way describe "the circumstances causing the incident" and has no information regarding "historical investigation of the pipeline in this area." *Id.*

244.    On March 6, 2025 (the next day), PADEP issued an Administrative Order to Defendants R&M and SPLP, directing them to respond to the Pipeline Leak and implement certain remedial actions, including the supply of bottled water and the installation of point-of-entry treatment ("POET") systems for certain residents in Upper Makefield Township, Pennsylvania.

245.    PADEP addressed its correspondence attaching the Administrative Order to Mr. Matthew Gordon, whom PADEP identified as SPLP's Vice President of Operations, and Mr. C. Gus Borkland, whom PADEP identified as Senior Director for Environmental Compliance, Emergency Planning & Asset Security at R&M. These individuals' roles and responsibilities at the respective Defendants were apparently gleaned from PADEP's prior dealings with the Energy Transfer Defendants, including prior remediation efforts in which Mr. Borkland was identified as being affiliated with R&M.

246.    PADEP's Order limited the requirement to supply bottled water to only those properties with potable groundwater wells within the Mt. Eyre Manor neighborhood topographic watershed, plus a minimum 500-foot buffer, that have concentrations of VOCs above background concentrations in the area, and limited the requirement to install POET systems to only those properties with potable groundwater wells within the Mt. Eyre Manor neighborhood topographic

Case ID: 250303655

**Exhibit A_ Page 248 of 336**

watershed, plus a minimum 500-foot buffer, that have concentrations of VOCs exceeding the Maximum Contaminant Levels ("MCLs") under Pennsylvania state regulations.

247.   On March 19, 2025, the Energy Transfer Defendants submitted an Interim Remedial Action Plan ("IRAP") to the PADEP. The IRAP contained numerous exhibits with test results and other characterizations of the state of the neighborhood in the weeks following the Leak, including but not limited to the following:

    a.  Soil testing at 121 Glenwood Drive, the property where the Leak was detected, confirmed the presence of many dangerous constituents of jet fuel and other harmful contaminants, including toluene, ethylbenzene, isopropylbenzene, xylenes, phenanthrene, naphthalene, arsenic, barium, beryllium, and lead; the results were also positive for significant quantities of total hydrocarbons in the diesel range (C10-C28). *See* IRAP Attachment 4.

    b.  A summary table indicated that: at least six (6) residences had tested positive for volatile organic compounds ("VOCs") above statewide health standards or positive for the presence of LNAPL, and an additional nineteen (19) residences had tested positive for VOCs but were below the statewide health standards or had "J-value" results indicating the presence of VOCs.[5]

248.   The IRAP also included an attachment indicating the inferred general trend of bedrock features based on the Energy Transfer Defendants' analysis to date:

---

[5] In environmental testing, a "J-value" indicates that a result, while positively detected, is an estimated value.

Case ID: 250303655



IRAP, Attachment 14.

249.    The diagram identifies five residential properties, highlighted with a surrounding yellow box, where LNAPL was discovered in the private wells.

250.    As this figure demonstrates, Plaintiffs and their neighbors are directly within the zone of danger to experience ongoing and future contamination because of the Leak. Indeed, as indicated by the red lines, one of the bedrock features runs directly from 121 Glenwood Drive (the Leak location) through 114 Spencer Road, which is the La Harts' property.

251.    This bedrock trend figure also publicly revealed for the first time that LNAPL had been detected at 110 Spencer Road adjacent to the La Hart property.

252.    In the IRAP, SPLP indicated that "SPLP has installed POET systems or reimbursed landowners for the installation of POET systems throughout the Mt. Eyre neighborhood topographic watershed plus 500-foot buffer, and beyond, even though to date there are no

54

additional properties with sample results reflecting VOCs above the MSCs." Significantly, despite this representation, SPLP has refused to provide the Grovers with a POET.

253. On April 18, 2025, the Energy Transfer Defendants submitted a Site Characterization Work Plan ("SCWP") to the PADEP.

254. The SCWP confirmed that the Pipeline transports not just jet fuel but also "occasionally transports unleaded gasoline and diesel fuel." *Id.* at 2.

255. In the SCWP, the Energy Transfer Defendants again "estimate[d]" without factual basis that the extent of the Leak's volume was 156 barrels but did not classify what petroleum product this constituted. *Id.*

256. Defendants revealed that in addition to jet fuel LNAPL being observed at several homes in the community, additional LNAPL that "appears to be a different petroleum product" was observed at "an additional property on Spencer Road," where the La Harts reside.

257. While the Energy Transfer Defendants referenced figures and maps that purportedly revealed the locations of LNAPL observations and other important data, Defendants inexplicably redacted most of the relevant information from the SCWP, and its exhibits.

258. After receiving a Letter of Deficiency from the DEP, the Energy Transfer Defendants ultimately submitted a revised SCWP, which was not approved by the DEP until August 29, 2025.

259. On May 2, 2025, PHMSA executed a Consent Order and Consent Agreement with Defendant SPLP, directing SPLP to take specific corrective actions following PHMSA's investigation into to the Leak. These corrective actions include: (i) verification of the integrity of every Type A sleeve installed on the Twin Oaks Pipeline; (ii) submission to PHSMA within 90 days of a comprehensive plan for identifying, evaluating, and removing any Type-A sleeves whose

55

Case ID: 250303655

integrity cannot be assured, as well as a technical justification for any Type-A sleeves that remain on the line and a plan to implement additional integrity management measures to minimize any risks associated with their continued use; (iii) continuation of an imposed pressure restriction prohibiting SPLP from operating the Pipeline at a pressure greater than 880 psig without express written approval from PHMSA; (iv) submission within 45 days of mechanical and metallurgical testing results; submission within 120 days of a failure history evaluation and a root cause failure analysis; and (v) evaluation and improvement of the effectiveness and capabilities of Defendants' leak detection system to ensure that any future leaks of this nature are identified immediately.

260.    On May 9, 2025, the Energy Transfer Defendants updated their summary table of results of the water testing performed, up to that time, in Mt. Eyre Manor and the surrounding neighborhoods. This updated table indicated at least 7 residences had tested positive for volatile organic compounds ("VOCs") above statewide health standards or positive for the presence of LNAPL, up from 6 in the March 19th version of the table. *Id.* An additional 36 residences also tested positive for VOCs but were below the statewide health standards or had "J-value" results indicating the presence of VOCs. The number of impacted residential wells was almost double the 19 residences in these categories in the March 19th IRAP. *Id.* The increasing number of impacted homes in just seven weeks demonstrates that the magnitude and scope of contamination is only getting worse.

261.    On May 13, 2025, the PADEP responded to the Energy Transfer Defendants' SCWP and found that the submission was "deficient." PADEP requested more information on the LNAPL believed to be a different petroleum product and otherwise requested more complete information from Defendants. PADEP also faulted the Energy Transfer Defendants for their excessive and improper redaction of the figures and attachments to the SCWP.

Case ID: 250303655

Exhibit A_ Page 252 of 336

262.    On June 27, 2025, the Energy Transfer Defendants issued a revised SCWP. The revised SCWP failed to take into account that water table drawdowns that have been observed in residential wells in Plaintiffs' neighborhood—potentially induced by the pumping of the Energy Transfer Defendants' recovery wells—have the potential to move LNAPL from shallow to deeper levels within fractured bedrock. Instead, the revised SCWP claims that LNAPL will always only "float on the top of the water column as the well recovers from any draw down."

263.    Since that time, the evidence confirms that the contamination continues to spread and has not been delineated. The most recent summary table from PADEP, dated December 26, 2025, indicates that there are now eight properties that have had their drinking water exceed statewide health standards or have had positive LNAPL detections. Moreover, now 50 residences (beyond those eight) have tested positive for VOCs within their well water, although the levels were below statewide health standards or had J-value results. As such, the magnitude and scope of contamination is only getting worse, and not better.

264.    Significantly, the information produced to date confirms that Defendants' actions have inflicted harm on Plaintiffs and their community beyond the contamination of certain limited residences above MCLs under Pennsylvania state regulations.

265.    Plaintiffs and every Class member have the right to clean drinking water and clean soil that are completely free of any contaminant that is found in jet fuel or the other petroleum products. Further, the 500-foot buffer, *see supra* at ¶ 246, is insufficient to safeguard Class members from injuries that Defendants have caused, as contamination has already been detected beyond this 500-foot buffer.

Case ID: 250303655

Exhibit A_ Page 253 of 336

266.    It is also unclear whether the figures reported on by PADEP are limited geographically by the so-called "buffer zone" to which the Energy Transfer Defendants have limited their investigation.

267.    Specifically, testing has confirmed petroleum product in the Grovers' well, even though the Grovers live outside the buffer zone. Samples collected on September 11, 2025, and tested on September 20, 2025, had positive results for diesel range organics in the C10-C44 range. Sample results collected from the Grovers' residence by contractors for the Energy Transfer Defendants also had positive results for toluene.

268.    There is no other plausible source for the presence of these petroleum products and constituents than the Pipeline (and, specifically, the product shipped by the Delta Defendants and/or the PBF Defendants). Indeed, the Grovers live on Swayze Road, which is to the northeast of the Leak location, in the same direction that the Energy Transfer Defendants have suggested the plume is moving.

269.    Judicial intervention is necessary to impose appropriate and reasonable full protective measures and obligations on Defendants beyond the regulatory measures ordered by the PADEP, including beyond the arbitrary buffer zone.

270.    Testing has now indicated that *over 50 residences*, including Plaintiffs' residences, have already been affected and demonstrably contaminated by the Leak. The Energy Transfer Defendants' investigation is ongoing, and the number of wells that the Energy Transfer Defendants know to be impacted continues to only increase.

271.    Despite this knowledge, to date, the Energy Transfer Defendants have not admitted publicly to the full scope of contamination in the Mt. Eyre Manor neighborhood and instead continue to attempt to only minimize it.

Case ID: 250303655

Exhibit A_ Page 254 of 336

272.    Notably, the Energy Transfer Defendants' agents have been collecting sample in a manner which diminishes the validity of their results, and calls into question how comprehensive the testing has been.

273.    In multiple known incidences, for example, residents have requested that GES technicians taking post-treatment samples from their faucets also take samples from their wells for testing. GES technicians have responded to residents that they had instructions from the Energy Transfer Defendants not to conduct any testing of well water.

274.    On multiple occasions, water samples have tested positive for contamination, only for the Energy Transfer Defendants to dispute those results because they conflict with its narrative. For example, after sampling on November 6, 2025 indicated that multiple monitoring wells contained benzene and lead above Medium Specific Concentrations, the Energy Transfer Defendants refused to acknowledge the issue and instead conducted resampling. Following that resampling, they asserted that "the November 6, 2025 sampling results were not indicative of actual site conditions and were the result of elevated turbidity observed by the field team during the November 6, 2025 sampling event." *See* https://uppermakefield.incidentupdates.com/wp-content/uploads/sites/2/2025/12/Dec2025_RAPR_3_AUM_12-19-2025_NFT-Redacted.pdf.

275.    This repeated downplaying of positive contamination results reflects a clear and troubling pattern in the Energy Transfer Defendants' remediation approach.

**G.    Environmental Contamination Resulting from the Pipeline Leak**

276.    The Pipeline Leak has resulted in the dispersion of multiple known toxic chemicals into the surrounding environment. The full extent and make-up of the contamination is presently unknown but appear to only be increasing.

59

Case ID: 250303655

277. Free standing petroleum or jet-fuel product has been found on the top of the water in some residents' private wells and, as the Energy Transfer Defendants recently revealed, a petroleum product other than jet fuel was found in at least one well on Spencer Road.

278. Over twelve feet of free product was found on top of the water in the well at 128 Walker Road, directly across the street from the location of the Pipeline Leak. The Energy Transfer Defendants' contractors estimated that over fifteen feet of jet fuel had accumulated in the well since 2023. Moreover, product continues to accumulate in this well—up to the present day—despite the Energy Transfer Defendants' efforts to remove it.

279. Free-standing petroleum or jet fuel product manufactured and/or shipped by the Delta Defendants and/or the PBF Defendants was also found accumulated on top of the water in several other wells near the site of the Leak, including nearly six feet of product in the well at 121 Glenwood Drive and over three feet of product at 107 Spencer Road.

280. In addition to direct observation of product in their wells, residents continue to report detecting the odor of gasoline in their wells and in their tap water, which is a substantial nuisance that interferes with the residents' enjoyment and use of their properties.

281. For example, the residents at 105 Spencer Road smelled gasoline on their property since June 2024 and have tasted gasoline in their water.

282. The owner of the residence at 103 Spencer Road also reports having smelled gasoline on his property for a long time and has been able to smell and taste gasoline in his water used to drink, cook, and shower.

283. Residents in the affected community acutely feel the stress and anxiety associated with having detectable levels of gasoline taste and odor on their properties and their neighbors'

Case ID: 250303655

Exhibit A_ Page 256 of 336

properties. As one resident stated, "every morning, when I turn on my water, it's a concern of mine. Is it my turn to smell fuel and taste it in my water?"[6]

284. Other indicia of contamination, including the presence of chemicals and particulates known to be byproducts of petroleum and jet fuel, have been found in the well water and tap water of many residences in the neighborhood.

285. Toxic chemicals and particulates resulting from Defendants' Pipeline Leak have infiltrated the aquifer and bedrock in sufficient quantities to be detected in the water of neighborhood residences, including but not limited to kerosene, benzene, ethylbenzene, isopropylbenzene, dichloroethane, trimethylbenzene ("TMB"), toluene, naphthalene, methyl tertiary-butyl ether ("MTBE"), and lead.

286. The Twin Oaks Pipeline and the product shipped through it by the Energy Transfer, PBF, and Delta Defendants is the only potential source of these substances in the surrounding area.

287. Kerosene is one of the most common fuel oils and a major component of jet fuel. Exposure to kerosene can lead to a wide variety of human health consequences, including respiratory issues, vision loss, liver failure, gastrointestinal issues, heart collapse, and skin burning and irritation. Kerosene exposure can also affect the central nervous system, resulting in seizures, comas, migraines, depressions, and other neurological impacts. The International Agency for Research on Cancer ("IARC") considers kerosene a possible carcinogen.

288. Benzene is natural and a highly toxic constituent of petroleum. Due to its high odor recognition threshold, people can be exposed to excessive amounts of benzene in the air or in tap

---

[6] Energy Transfer Begins Drilling Recovery Wells on Pennsylvania Street After Fuel Leak Sparked Water, Air Safety Concerns, CBS News (Mar. 19, 2025) (available at https://www.cbsnews.com/amp/philadelphia/news/sunoco-fuel-leak-upper-makefield-pennsylvania/).

Case ID: 250303655

**Exhibit A_ Page 257 of 336**

water without knowledge of the exposure. Benzene is a known human carcinogen according to both IARC and the U.S. Environmental Protection Agency ("EPA"). In addition to cancer, benzene exposure can result in the disruption of hematopoiesis (the body's production of blood), suppression of the immune system, and result in both skeletal and neurodevelopmental defects.

289.   TMB isomers are produced during petroleum refining processes and are used as a fuel additive in gasoline. TMB is a neurotoxin and is readily absorbed into the human bloodstream following exposure. TMB exposure can negatively impact a person's short-term memory and motor skills, induce vertigo, and cause nervousness and anxiety. TMB exposure can also cause issues with blood clotting and respiratory function.

290.   Toluene is a natural and highly toxic constituent of crude oil of products made from crude oil, including petroleum and gasoline. People can be exposed to toluene via air, water, or soil. Regardless of the exposure pathway, toluene easily passes through skin and lung barriers into the bloodstream, and can accumulate in fat tissue in the body. Toluene exposure can cause permanent nervous system damage, including incoordination, cognitive impairment, and loss of vision and hearing. Toluene exposure can also cause permanent damage to the immune system, kidneys, liver, and reproductive organs.

291.   MTBE, in contrast to other fuel and gasoline constituents, has a strong affinity for water. MTBE dissolves easily into groundwater and can migrate rapidly a great distance from the source of release, meaning it is likely to have a distinct contamination plume from other toxic chemicals released from the Twin Oaks Pipeline. MTBE does not readily biodegrade in water and will persist in the environment until remediated. MTBE at very low concentrations can affect the taste and odor of water and IARC considers it a likely carcinogen. MTBE as a fuel additive was

Case ID: 250303655

Exhibit A_ Page 258 of 336

phased out of gasoline in the United States by 2006, due to its associated environmental and health concerns, and as such it is not clear why wells are testing positive after the Pipeline Leak.

292.    Lead is a neurotoxin that easily permeates the blood-brain barrier after exposure and often is difficult to detect in a person until dangerous amounts have accumulated. In adults, lead exposure through drinking water can cause reduced memory, headaches, mood disorders, joint and muscle pains, abdominal pains, and high blood pressure. Lead exposure also negatively affects the reproductive organs and can cause reduced or abnormal sperm counts and increase the risk of miscarriage, stillbirth, or premature births in pregnant women.

293.    The Energy Transfer Defendants have publicly admitted that the product shipped through the Pipeline contained lead.

294.    Symptoms and ailments resulting from exposure to these toxic chemicals and other harmful chemicals released from the Twin Oaks Pipeline can take a long time to manifest. Residents of the Mt. Eyre Manor neighborhood and surrounding communities will have to closely monitor their health, potentially indefinitely, and have and will continue to experience the accompanying fear and anxiety that comes from not being able to trust the safety of the water they drink or the air that they breathe because of Defendants' Pipeline Leak.

**H.      The Energy Transfer Defendants' Messaging Since the Pipeline Leak Has Not Matched Reality**

295.    The Energy Transfer Defendants have been engaged in a multifaceted public relations campaign to downplay the severity of the Pipeline Leak and its actual and potential harms. The Energy Transfer Defendants' messaging, however, has not matched reality.

296.    For example, the Energy Transfer Defendants have now suggested that the Pipeline Leak happened in June 2024, despite residents smelling and reporting the odor of gasoline since at least September 2023.

Case ID: 250303655

297. The Energy Transfer Defendants have also suggested that the Pipeline Leak was a "pinhole" and that it spilled 156 barrels or less. In reality, the Energy Transfer Defendants have admitted that they lacked a valid basis for their initial estimate of 156 barrels and have conceded that they rushed to provide a number to the government without the applicable information necessary to determine the actual volume of lost aviation fuel and other petroleum products.

298. Because of Defendants' failure, negligence, and recklessness in failing to have a proper leak detection and monitoring system in place for the Twin Oaks Pipeline, Defendants seemingly have no known way to accurately measure the amount of product that spilled into the environment from the Twin Oaks Pipeline in the Mt. Eyre Manor neighborhood or means to determine when the Leak started.

299. Moreover, the Pipeline Leak, when discovered, showed visibly that the Leak did not result from a "pinhole" as the Energy Transfer Defendants suggested, but rather, evidenced a leak such as from a water fountain, and that was with substantially reduced or no pressure applied to the Pipeline at the time indicating it was likely much stronger when the Pipeline was operated with full pressure.

300. The Energy Transfer Defendants further represented to residents in the Mt. Eyre Manor neighborhood when they purchased their homes that the Energy Transfer Defendants had instituted state-of-the-art leak detection equipment with respect to the Pipeline, such that a leak like the Pipeline Leak here could never occur. These representations by the Energy Transfer Defendants to residents were false and misleading as demonstrated by the occurrence of the Pipeline Leak and the Energy Transfer Defendants' actions and follow up (or lack thereof) in response to multiple odor complaints that began at least as early as September 2023.

Case ID: 250303655

**Exhibit A_ Page 260 of 336**

301. In fact, the Defendants responsible for leak detection failed to have proper leak detection and monitoring systems in place or otherwise failed to ensure that one was present, with respect to the Twin Oaks Pipeline.

302. The Energy Transfer Defendants claimed that their leak detection systems for the Pipeline were functional; but, despite residents pointing out an issue for 16 months and making numerous odor complaints, no computer system or ground testing employed by Defendants detected any leak.

303. The Energy Transfer Defendants only finally detected and located the Pipeline Leak when they went back to review old maintenance records and then happened to excavate the portion of the Twin Oaks Pipeline where the leak occurred.

304. The Energy Transfer Defendants have claimed that Type A sleeves are structurally sound and that they visually inspected six such sleeves, but at least 44 Type A sleeves exist on the Twin Oaks Pipeline. The Energy Transfer Defendants have still yet to physically inspect, through excavation, many of these patches on the Pipeline.

305. Crucially, the Energy Transfer Defendants also claimed to have made a commitment to future public engagement, community, outreach, and continued participation in public meetings in Upper Makefield Township. The Energy Transfer Defendants, however, have disingenuously invoked "confidentiality" and vague "national security" concerns to deny affected residents with access to basic information and facts about the Pipeline Leak and the proposed remediation plans. The Energy Transfer Defendants' failure to engage has only increased since the residents have hired legal counsel to protect their interests, and public meetings are now only through "tele-townhalls" during which the Energy Transfer Defendants tightly control the questions presented.

Case ID: 250303655
**Exhibit A_ Page 261 of 336**

306. The Energy Transfer Defendants' conflict between its public representations and its internal policy or preference to withhold information came to a head at the town hall meeting that took place on March 11, 2025. At this meeting, the Energy Transfer Defendants shut down any attempt to receive questions from the public, claiming that they could no longer continue to provide information merely because some residents had retained legal counsel. The Energy Transfer Defendants went so far as to offer one-on-one meetings only with residents that were *not* represented by counsel. This was a transparent scare tactic to discourage unrepresented residents from retaining legal counsel and further reflects the Energy Transfer Defendants' insensitivity to the crisis unfolding in the affected community, and their failure to take responsibility.

307. The breach in the Pipeline and resulting Pipeline Leak is the direct consequence of Defendants' reckless and negligent actions with respect to the use, oversight, operation, supervision, maintenance, monitoring, and testing of the Twin Oaks Pipeline.

308. Moreover, the Energy Transfer Defendants have continued to transport the Delta Defendants' and PBF Defendants' highly corrosive and toxic products at extremely high pressures through the Twin Oaks Pipeline. The Energy Transfer Defendants adherence to this approach, despite their knowledge that: (a) the Pipeline is nearly 70 years old and had a history of cracks; (b) there was a previously identified dent in the Pipeline at the location of the crack which was reinforced only by an approximately 30-year-old exterior sleeve which has been known to have problems from past experience; and (c) they did not have a proper monitoring and leak detection system, was a direct and proximate cause of the Pipeline Leak.

309. *For over 16 months*, despite their knowledge that the Pipeline faced a danger of corrosion and cracking, the Energy Transfer Defendants failed to properly respond to nearby odor complaints in a manner reasonably likely to detect a leak and had no sophisticated leak detection

66

equipment in place to do so, notwithstanding that the Energy Transfer Defendants were operating the Twin Oaks Pipeline in a residential neighborhood and the other Defendants were shipping petroleum products through it.

310.    In response to multiple odor complaints, the Energy Transfer Defendants presumed that no breach in their Pipeline existed based solely on a lack of abnormal dead vegetation around the Pipeline and the failure of portable gas monitors to detect fuels in the surrounding air.

311.    Facts, however, confirm the neglectful inadequacy of Defendants' leak-detection measures as they employed the above insufficient measures and concluded a non-detect based on them immediately prior to excavating the Twin Oaks Pipeline in the Mt. Eyre Manor neighborhood and visually confirming the crack and Pipeline Leak.

312.    Since discovering the Pipeline Leak in January 2025, Defendants have failed to take proper and reasonable actions to facilitate an understanding of the extent and nature of the discharge and resulting contamination. For example, Defendants, who have vast resources, failed generally to test samples of water taken directly from the wells of nearby residents for the presence of hazardous substances, and waited months to install monitoring wells.

313.    The Energy Transfer Defendants directed their contractors, generally, to avoid taking full and broad testing measures, despite knowing that such measures are reasonably necessary to identify the scope of the contamination plume and to ultimately protect the health, safety, and welfare of nearby residents.

314.    Despite failing to determine whether any ongoing leaks persist in the Pipeline, the Energy Transfer Defendants restarted operation of the Twin Oaks Pipeline on February 2, 2025, and have continuously operated the Pipeline since that date.

I.    **Recent Events and Public Statements by the Energy Transfer Defendants**

67

315. The situation in Plaintiffs' neighborhood has continued to deteriorate since the La Harts filed their First Amended Complaint in June 2025.

316. Starting in early June 2025, after drilling and installing three recovery wells directly in the middle of Mt. Eyre Manor, the Energy Transfer Defendants routinely performed work on these recovery wells, including geophysical logging and imaging, as well as routine bailing of petroleum out of the wells. This work, along with the other necessary remediation work by the Energy Transfer Defendants, has caused a significant, ongoing, and continuing nuisance to Plaintiffs and the Class.

317. In July and August 2025, the Energy Transfer Defendants installed numerous monitoring wells throughout the Mt. Eyre Manor community.

318. In September 2025, the Energy Transfer Defendants selected two additional properties for the installation of additional monitoring wells. The owners of one of the two residences were then shocked to learn that testing results from the newly installed wells revealed measurable values of benzene, xylenes, and naphthalene, confirming that the property is contaminated as a result of the Leak.

319. The Energy Transfer Defendants' activities in Plaintiffs' neighborhood, including the installation of these recovery and monitoring wells, has substantially disrupted the soil, groundwater, and other conditions in Plaintiffs' neighborhood.

320. Notably, after the recent rounds of monitoring well installations and continued operation of recovery wells, Plaintiffs and Class members have reported a substantial loss in water pressure in their homes.

Case ID: 250303655

**Exhibit A_ Page 264 of 336**

321.    Indeed, due to a severe loss in water pressure, the La Harts were required to replace their water tank. Upon replacing the tank, the La Harts discovered the tank was contaminated with green and black materials:



322.    Subsequent water tests have revealed significant levels of Manganese contamination, which was not present before, and 1,3,5-trimethylbenzene. Additionally, the PADEP has suggested that this observed "dark particulate" is the same as that found in water and drill cuttings during the installation of monitoring wells by the Energy Transfer Defendants.

323.    Since June 2025, the La Hart residence has also been selected for sub-slab testing to determine whether any VOCs are present in the soil gas under these Plaintiffs' residences.

324.    This sub-slab testing revealed that the La Hart home had positive values for VOCs that are intruding the air in their homes in the form of soil vapors. The La Harts have also experienced increased radon levels since this soil gas testing was performed.

325.    The Energy Transfer Defendants have publicly revealed that one or more additional "anomalies" exist on the Twin Oaks Pipeline, including within the radius of the proposed Class as

69

Case ID: 250303655

alleged herein. Specifically, during a July 31, 2025, meeting with Upper Makefield Township, Energy Transfer's Matt Gordon revealed that certain anomalies would require *excavation* of the Pipeline but initially suggested that he did not believe that any excavations would occur within Upper Makefield Township. However, on August 5, 2025, the Energy Transfer Defendants revealed that they needed to undertake multiple "dig sites" in Upper Makefield.

326.    On August 6, 2025, PHMSA confirmed that there would be *twelve* excavations east of the Energy Transfer Defendants' Bucks pump station, including several in Upper Makefield.

327.    Some of this excavation work was performed near Taylorsville Road, towards the direction of the Delaware River. A dig lasting several days was performed in October, resulting in a temporary shutdown of the Pipeline. The excavation work was completed, with the Pipeline then reactivated, in early to mid-November 2025.

328.    Much of the excavation work near Taylorsville Road, including the operation of heavy machinery and removal of segments of the pipeline, was performed at night.

329.    These excavations are close to the Grover residence where petroleum product was found around the time the excavation work was performed.

330.    The Grovers suspect a link between the "anomalies" that required excavation and repair, and the petroleum product found at their property.

331.    Meanwhile, on September 2, 2025, the Energy Transfer Defendants issued their Interim Site Characterization Report ("ISCR").

332.    The ISCR does not answer several critical questions, much like the Energy Transfer Defendants' other conduct throughout this entire episode. These issues include at least the following:

Case ID: 250303655

a.  The ISCR does not indicate full horizontal delineation of the Leak's impact or provide any timeline for this delineation to be completed.

b.  The ISCR does not provide any indication of the full horizontal or vertical extent of dissolved VOCs.

c.  The ISCR does not provide any map of the known plume or identify its rate of movement.

d.  The ISCR does not provide a revised spill volume.

e.  The ISCR does not describe the means, methods, and procedures used to determine the volume of the release.

f.  The ISCR does not identify an estimated actual start date of the Leak.

g.  The ISCR does not identify the amount of product put into the Pipeline prior to the Leak or the amount retrieved after the Leak.

h.  The ISCR does not include a forensic hydrocarbon analysis of the Light, Non-Aqueous Phase Liquids, LNAPL, obtained from recovery wells adjacent to the release area or from residential wells.

i.  The ISCR does not evaluate the impact of pumping domestic wells on the extent, direction, and rate of movement of the regulated substances released into the environment from the pipeline release.

j.  The ISCR does not address the worsening water pressure issues that are plaguing the community.

k.  The ISCR appears to cherry pick data regarding how much petroleum product is being bailed from the well at 128 Walker Road, isolating certain dates of recovery data to artificially suggest that no more product is present.

71

Case ID: 250303655

333. And while the Energy Transfer Defendants' have provided a Comment-Response Document, this document also does little other than deflect and delay fulsome responses to the above issues.

334. On November 21, 2025, the PADEP issued a Letter of Deficiency in response to the ISCR. The Letter indicated the agency's concerns that, among other things:

  a. SPLP still has yet to share its assessment of the date the Leak began.

  b. Despite SPLP's representations, "SPLP does not yet have an adequate data set to determine the lateral extent of LNAPL is shrinking, as the full lateral extent of LNAPL is not known."

  c. "The existing monitoring well network is insufficient to characterize the nature and extent of dissolved-phase VOC contamination related to the pipeline release."

  d. The ISCR does not sufficiently characterize the horizontal extent of groundwater contamination.

  e. SPLP's assumptions of the groundwater flow direction are based on an insufficient and contradictory data set, and "SPLP has not generated an adequate dataset to make informed interpretations" as to the flow of groundwater in and around the affected area.

335. These severe gaps in the ISCR confirm that the Energy Transfer Defendants are not and have not adequately and fully remediated Plaintiffs' properties and neighborhood. Indeed, now almost a year since confirming the presence of the Leak, the Energy Transfer Defendants still do not know when the Leak began, the size and scope of the contamination plume, or the direction or migration routes of the plume.

72

Case ID: 250303655

Exhibit A_ Page 268 of 336

336.     Confirming these gaps exist, on January 5, 2026, the Energy Transfer Defendants issued a response to the PADEP's Letter of Deficiency, wherein the Energy Transfer Defendants stated it would perform additional testing to laterally delineate the scope of the Leak, including through forthcoming "mise-a-la-masse" geophysical testing and installation of additional wells. However, this January 5 response largely fails to remedy the many deficiencies in the ISCR. The Energy Transfer Defendants' January 5 response also acknowledges that "the hydrogeological flow conditions in the area of the Mt. Eyre Manor neighborhood are complex" and that therefore the Energy Transfer Defendants still do not understand the full scope of how the Leak has migrated.

## J.      Harm to Plaintiffs and Class Members

337.     As described throughout this Complaint, Plaintiffs and Class members have been severely and negatively impacted and harmed by Defendants' conduct.

338.     The entire impacted community relies on well water drawn from the underlying aquifer for their water needs. This aquifer is now contaminated. As such, the entire community, including Plaintiffs, has suffered tangible, physical environmental injury as a result of the Pipeline Leak, for which damages, including punitive damages, are owed.

339.     Confirming that the aquifer is contaminated, numerous residents have found Defendants' product, jet fuel, or other petroleum products, floating on top of and contaminating their private wells, with multiple residents having significant amounts of jet fuel accumulated in their wells, and other houses testing positive for contamination related to jet fuel, petroleum products, and/or cleanup efforts.

340.     Indeed, the Energy Transfer Defendants have admitted to being responsible for the Leak and the resulting release of jet fuel and other petroleum products into the environment and represented that they would restore the local environment back to its original condition. In fact,

Case ID: 250303655

**Exhibit A_ Page 269 of 336**

given the extent and circumstances of the Leak, it is likely not possible for Defendants to restore the environment back to its original condition.

341.    Testing has shown that water samples collected from Plaintiffs' homes or monitoring wells on their property, and from nearby homes, have tested positive for petroleum hydrocarbons and/or other chemicals commonly found in jet fuel and petroleum products.

342.    The Pipeline Leak has and will continue to cause financial harms to Plaintiffs and Class members, including the expenditure of out-of-pocket costs resulting from the Pipeline Leak that must be reimbursed by Defendants.

343.    Examples of these out-of-pocket costs include, without limitation:

a.    the costs to engage and pay contractors, testing companies, and inspectors;

b.    the costs of installation of remedial or additional water treatment systems;

c.    the costs of maintenance of water treatment systems, including purchasing and maintaining filters associated with water treatment systems;

d.    the costs of damage and remediation to private wells;

e.    the costs of remediation of soil;

f.    the costs of remediating other damages caused by the Pipeline Leak;

g.    the costs of remediating and/or replacing pipes and fixtures that have been contaminated as a result of the Pipeline Leak;

h.    the costs of temporary housing;

i.    the costs of commuting to other locations for the purpose of showering or doing laundry;

j.    reimbursement of mileage associated with attending meetings concerning the Pipeline Leak;

74

k.    the cost of any increased insurance premiums;

l.    the cost of lost time-value from having to take off work due to the Pipeline Leak;

m.    the cost of childcare while attending meetings related to the Pipeline Leak; and

n.    the cost of any medical costs incurred by Plaintiffs related to the Pipeline Leak.

344.    Defendants are responsible to pay all past and future costs associated with complete environmental restoration and remediation of all contamination caused by the Leak to the greatest extent possible, and to all property, water, and air, including, without limitation, to the environment, to Plaintiffs' and Class members' real and personal property, to wells that have been contaminated, to pipes that have been contaminated and need to be replaced, to fixtures that have been contaminated and need to be replaced, to soil that has been contaminated, to gardens that have been contaminated, and to all other property belonging to Plaintiffs and Class members that has been affected by the Pipeline Leak.

345.    While the Energy Transfer Defendants have paid for some carbon filtration systems for some residential wells, it has not been sufficient.

346.    Indeed, there has been positive detection of petroleum at the Grover residence, yet Defendants refuse to reimburse them for a carbon filtration system based on an arbitrary "buffer zone" that has no valid basis.

347.    All three of Plaintiffs' properties have suffered from contamination that has been confirmed by testing results.

75

348.   Plaintiffs and Class members have also suffered additional contamination and nuisance from Defendants' remediation activities, evidenced in part by the La Harts' and other Class members' water pressure issues, and contaminated water tank.

349.   The contamination of the aquifer and private wells throughout Mt. Eyre Manor and the surrounding area is to such a significant degree that relevant governmental authorities, including Upper Makefield Township, have begun exploring options for the long-term replacement of private wells by an alternative water source.

350.   This feasibility study, released to residents during a meeting on December 15, 2025, indicated that a municipal well and distribution system was estimated to cost approximately $9 million, with that cost directly passed on to roughly 150 households in the community (whose residents are all members of the proposed Class), for a total cost of approximately $60,000 each. Even if this cost was financed and annualized over 30 years through municipal bonds or some similar funding source, an approximate annual cost to these households would be $3,921 or more.

351.   Even the more affordable options investigated by the feasibility study, such as a connection to an existing water source or the extension of a franchise held by a private water company, would still result in annual costs to each household of at least $1,000.

352.   These costs are directly attributable to the conduct of Defendants, who should be liable to these households and directly pay the cost of this alternative water source. Indeed, while a range of options were explored, Upper Makefield Township officials explained at the December 15, 2025 meeting that the least expensive option (extension of a private water company's PUC franchise) runs the risk that the application will be denied because an alternative funding source exists to provide safe drinking water to the community. As Upper Makefield Township officials indicated at the meeting, Defendants are that alternative funding source.

76

Case ID: 250303655

353. Plaintiffs' and Class members' properties have also suffered from offensive and disagreeable odors and noise that have pervaded the neighborhood and permeated their properties.

354. Plaintiffs and Class members have also suffered from the invasive and near constant sound and light pollution that attends Defendants' remediation efforts. The Energy Transfer Defendants' contractors operate heavy machine equipment throughout the neighborhood, including at night and during weekends. The constant presence of these contractors, and the lights and sounds of their machinery, materially disrupt Plaintiffs' and Class members privacy and ability to enjoy their homes in peace.

355. Plaintiffs and Class members have suffered loss of sleep, disrupted daily routines, loss of privacy, and increased stress and anxiety as a direct result of Defendants' ongoing remediation activities, none of which would be necessary but for Defendants' negligence that resulted in the Pipeline Leak.

356. Plaintiffs and Class members' properties have also consistently experienced a loss of water pressure in their homes since the Energy Transfer Defendants' contractors began installing and operating dozens of new wells throughout the neighborhood.

357. Plaintiffs and Class members who own their homes have also suffered from diminution of the value of their residences caused by the Pipeline Leak.

358. Certain Class members who have attempted to sell their properties have already had potential buyers walk away from a potential sale because of the Pipeline Leak and, as a result, have had to substantially lower the list prices of homes currently on the market.

359. Plaintiffs and Class members have suffered from the loss of use and enjoyment of their real and personal property caused by the Pipeline Leak. Plaintiffs and Class members cannot enjoy their property in the same manner as prior to the Pipeline Leak.

Case ID: 250303655

360.     As a direct and proximate result of Defendants' negligent, reckless, and willful conduct in causing and/or failing to prevent the Leak of jet fuel into the ground and groundwater supply, Plaintiffs and the proposed Class members have suffered and continue to suffer ongoing severe emotional distress. Plaintiffs reside in a community that is entirely dependent on well water drawn from a shared aquifer, which is now contaminated by toxic substances including hydrocarbons, volatile organic compounds, and known carcinogens present in jet fuel.

361.     Since the revelation of the Leak and subsequent confirmation of groundwater contamination, Plaintiffs and the proposed Class members have experienced profound anxiety, fear, and uncertainty regarding the safety of their homes, their health, and the wellbeing of their families. Some residents have reported symptoms potentially linked to exposure to contaminated water, further exacerbating psychological distress. Plaintiffs live with the daily trauma of having to use bottled water (or water they are not confident is safe) for drinking, cooking, and hygiene, and the persistent fear that they or their loved ones may suffer long-term health consequences due to ingestion or exposure to toxic chemicals.

362.     In addition to the tangible disruption of daily life, Plaintiffs experience ongoing emotional harm from the loss of security, trust, and peace of mind in their environment. The knowledge that their community has been poisoned — and that this contamination may persist for years or decades — has caused deep emotional anguish. Plaintiffs and members of the proposed Class report symptoms of depression, sleeplessness, and post-traumatic stress, as they previously viewed their homes as safe havens now rendered unsafe by Defendants' conduct.

363.     The La Harts live less than 500 feet from the location where the Leak was detected and are in between that location and the confirmed highly contaminated homes on Spencer Road. Indeed, Plaintiffs themselves each live on contaminated property that sits above a contaminated

Case ID: 250303655

aquifer. As such, Plaintiffs are at immediate risk of physical injury and are clearly within the zone of danger presented by the Pipeline Leak.

364.    Exposure to the substances released from the Pipeline, whether through ingestion, inhalation, or dermal exposure, places all affected residents at increased risk of severe health impacts, including cancer, thus necessitating medical monitoring.

**K.    Harm Suffered by Named Plaintiffs**

365.    Plaintiffs Daniel La Hart and Katherine La Hart moved to the Mt. Eyre Manor neighborhood in 2016 and live in their home with their two young children.

366.    Plaintiff Daniel La Hart, in addition to being Katherine's husband and father to their children, is a highly educated individual who works in the intelligence community, serving as an Intelligence Superintendent (Chief Master Sergeant rank) for the New Jersey Air National Guard and as a director of data science for a company in the private sector. Daniel is also a former member of the U.S. Air Force Reserve and a former firefighter.

367.    Plaintiff Katherine La Hart, in addition to being Daniel's wife and mother to their children, has a Ph.D. in business administration and works in sales recruitment and onboarding at a Fortune 500 insurance and financial services company.

368.    Prior to learning of the Pipeline Leak, the La Harts were in love with their community and felt that their home located at 114 Spencer Road was their "forever home" where they would live for a lifetime.

369.    The La Harts and their young children used their well water for everything including drinking, cooking, washing dishes and clothes, showering (indoors and outdoors), baths for their children and animals, watering their gardens, cleaning the cars, filling their pool, letting

Case ID: 250303655

Exhibit A_ Page 275 of 336

their children run in the hose water and down their water slide, and providing water to their dog, cat, and chickens to drink.

370.    In late 2024, the La Harts invested approximately $150,000.00 to pay for a series of renovations to their home that they scheduled to start in April 2025, including the installation of new windows, siding, doors, replastering the pool, and more, because they wanted to invest in their forever home and their community that they loved.

371.    The La Harts, like many residents of the Mt. Eyre community, have experienced a significant loss in water pressure as a result of the Leak, to the extent that the La Harts now need to replace their submersible well pump. The cost estimate for this replacement is nearly $15,000.

372.    Plaintiffs Jerry and Justine Zacharatos have lived in the Mt. Eyre Manor neighborhood since 2019.

373.    The Zacharatos moved to Mt. Eyre Manor with the expectation they could raise young children in what they thought was an ideal residential community and on an ideal property. They similarly felt that their home located at 126 Walker Road was their "forever home" where they would live for a lifetime.

374.    Two of the Zacharatos' three children were born during the time that the Zacharatos have lived in Mt. Eyre Manor.

375.    However, with no firm information on the extent of the plume or the scope of potential contamination, the Zacharatos live in constant fear that the water they drink, cook with, and bathe in or the air they breathe is contaminated. The Zacharatos also fear for any health effects they may have suffered, especially their young children. The Zacharatos used their private well water for all of their daily water needs, including making baby formula for their young children and filling up an inflatable pool during summers.

Case ID: 250303655

Exhibit A_ Page 276 of 336

376. The Zacharatos' fear increased when the Energy Transfer Defendants contacted them in order to install two monitoring wells on the Zacharatos' property (in addition to other monitoring wells the Energy Transfer Defendants had already installed in the street adjacent to the Zacharatos' property).

377. These monitoring wells have confirmed that the Zacharatos' property is contaminated.

378. The Grovers have lived in their home on Swayze Avenue since 2001; the home is by the Delaware River, approximately a mile from the release point of the Leak. The Grovers only learned of the petroleum product present on their property recently, around the same time that the Energy Transfer Defendants were performing excavation work to investigate so-called "anomalies" in the late summer and early fall of 2025.

379. The Grovers contacted the Energy Transfer Defendants immediately after learning that their water had tested positive for the presence of petroleum products. Fearing for their health and safety, the Grovers asked the Energy Transfer Defendants to install a POET carbon filtration system for their residential water, or to at least provide them with consistent access to bottled water.

380. On November 6, 2025, one of the Energy Transfer Defendants' employees called Christopher Grover to inform him that the request for a POET system and bottled water, inexplicably, had been denied, and that any measures the Grovers took to protect themselves from their contaminated water would have to be at their own expense.

381. The Pipeline Leak has caused these Plaintiffs and the proposed Class to suffer out-of-pocket economic losses including, among other things, significant childcare costs, mileage associated with attending meetings concerning the Pipeline Leak, and significant lost time-value

Case ID: 250303655

**Exhibit A_ Page 277 of 336**

from having to take off work to attend meetings, be present for testing, and to perform community outreach due to the Pipeline Leak.

382.    The Pipeline Leak and resulting contamination has caused Plaintiffs to suffer diminution to the value of their real property. The presence of the Pipeline Leak and resulting environmental contamination has tangibly decreased the value of Plaintiffs' property and that of the surrounding affected community.

383.    It is likely that Plaintiffs and the Class are now overpaying property taxes as a direct result of the diminution of value to their property caused by Defendants' conduct.

384.    Confirming that significant diminution in property values has occurred throughout the Mt. Eyre Manor community, local taxing authorities (including without limitation Upper Makefield Township) have reassessed the taxable value of numerous homes downwards by 10 to 15 percent.

385.    The Pipeline Leak has caused Plaintiffs' properties to go from being Plaintiffs' idyllic forever homes to albatrosses that Plaintiffs will struggle to sell for close to their fair market values but for the Leak. Plaintiffs estimate that they each have suffered diminution of value of their home in the hundreds of thousands of dollars. Who would want to purchase a home in the Mt. Eyre Manor neighborhood given the known existence of the Pipeline Leak and resulting contamination?

386.    But at the same time, as a direct result of the Pipeline Leak, Plaintiffs, like other Class members, have been forced to consider the possibility of leaving what they thought was their forever home and moving to another location that has not experienced the type of harms that have devastated Mt. Eyre Manor. Plaintiffs do not want to confront or deal with the risk that the water in their neighborhood and their home is dangerous and putting them and their family, children, and

82

guests at risk, and have been unfairly forced by Defendants to think about this every day, which is causing Plaintiffs severe mental anguish.

387. Moving would cause significant hardship to Plaintiffs, including the La Harts and Zacharatos who have young children. Plaintiffs would also incur significant expenses by having to uproot themselves and move to a comparable home of comparable square footage, acreage, amenities, neighborhood, and school district, all of which is exceedingly difficult to replicate for what was previously an idyllic, much desired community.

388. With respect to Plaintiffs' private wells, the Pipeline Leak has caused irreparable damage to Plaintiffs' faith in their ability to fully use and enjoy their water.

389. The La Harts' property, like several other members of the proposed Class, has already tested positive for MTBE and lead above background concentration levels, while the Zacharatos' property has tested positive for MTBE, lead, benzene, toluene, and other hydrocarbons. The Grovers' well water has also tested positive for petroleum hydrocarbons.

390. Like each of the other residents throughout Mt. Eyre Manor, Plaintiffs now also live above a contaminated aquifer that continues to migrate and further contaminate the groundwater, soil, and air. This contaminated aquifer constitutes a presently existing physical harm to Plaintiffs' real property.

391. Defendants' own inferences about the composition of the fractured bedrock beneath Plaintiffs' properties indicate that a pathway for groundwater flow exists that runs from 121 Glenwood Drive, the site of the Leak, directly through the La Harts' property.

392. The Zacharatos and La Harts are directly within the zone of danger presented by the Leak given that their properties are located directly in between properties with confirmed free petroleum product or LNAPL found in wells (such as 110 and 108 Spencer).

Case ID: 250303655

**Exhibit A_ Page 279 of 336**

393.    Indeed, it is difficult to reach any inference other than that Defendants' petroleum product contaminated and traveled through or below Plaintiffs' land to reach these other contaminated properties.

394.    The Grovers are also within the zone of danger based on the Energy Transfer Defendants' inferences about the pathway for plume movement, which would lead directly towards the Grover residence, and that residence has now indeed tested positive for petroleum.

395.    Additionally, the La Harts and their neighbors on Spencer Road live directly above the trench for the former 8-inch version of the Pipeline. To the extent the existence of this alternate trench has contributed to the direction the plume has traveled, Defendants' petroleum product traveled directly through Plaintiffs' land.

396.    It will always be on the forefront of Plaintiffs' minds that the plume of the Pipeline Leak could affect (or is affecting) their property at any time, or that the Pipeline could leak again at any point in time, and/or that the Pipeline could have additional undiscovered leaks, and so Plaintiffs could be putting the health of their family, children, friends, guests, and pets at risk merely by continuing to live at their current residences.

397.    Worsening the situation, the Energy Transfer Defendants have bought residential homes in the Mt. Eyre Manor neighborhood, starting with 108 Spencer Road, which is only two houses away from the La Harts, for the purpose of drilling additional monitoring and/or recovery wells as a direct result of the Pipeline Leak.

398.    Plaintiffs and the Class are concerned that the Energy Transfer Defendants will continue to buy additional homes in the community and that any home bought by the Energy Transfer Defendants will eventually lay vacant and be a further nuisance, further driving down property values.

84

399.    The Energy Transfer Defendants' activities at 108 Spencer Road (one of the homes they purchased) became an epicenter for noisy, odorous, and highly bothersome activity that continuously disturb and disrupt the daily lives of the Plaintiffs and Class members, all as a result of Defendants' Pipeline Leak:



400.    Confirming that Plaintiffs and the proposed Class have suffered concrete, particularized, and significant loss of property value, the Energy Transfer Defendants have also taken affirmative steps to obscure the market impact of the diminution of value Defendants have caused. With respect to at least one property in Mt. Eyre Manor that sold, the Energy Transfer Defendants acquired a "right of first option and right of rejection" over the property, defined as follows:

> This property is subject to a right of first option and right of rejection held by Sunoco Pipeline L.P. ("SPLP"). Under this agreement, if the Seller receives a bona fide offer to purchase the property, the Seller must notify SPLP of the terms of the offer. If the offer is below a certain price SPLP shall then have the right to (i) direct the Seller to reject the offer; or (ii) make an offer to purchase the Property for an amount greater than the amount contained in the offer. If the offer is above a certain price, SPLP shall only have the right to make an offer to purchase the Property for

85

an amount greater than the amount contained in the offer. SPLP has two (2) business days from receipt of the offer or any counter-offer to exercise its rights. SPLP's rights under this agreement are valid until January 19, 2026. Note that nothing in the agreement prevents a counter-offer(s) from the original offeror.

While the full contours of the agreement are unclear because they reference an unspecified "certain price" against which offers are compared, the Energy Transfer Defendants' right to *unilaterally* "direct the Seller to reject" any offer below that price—a right the Energy Transfer Defendants undoubtedly paid the subject homeowner for—could be used by the Energy Transfer Defendants in an attempt to mask the true current market value of the property. That the Energy Transfer Defendants were willing to pay to acquire this right confirms that significant, quantifiable diminution of value has taken place throughout Mt. Eyre Manor and the surrounding neighborhoods.

401.     Additionally, the Energy Transfer Defendants have installed recovery wells and monitoring wells on the street on Glenwood Drive and elsewhere throughout the neighborhood (in addition to on the Zacharatos property). The installation and use of these wells have created yet more epicenters for noisy, odorous, and highly bothersome activity that will and have disturbed and disrupted the daily lives of the Plaintiffs and Class members, as the Energy Transfer Defendants use heavy machinery, like sonic and air rotary drill rigs, producing sound levels up to 99 decibels:

86

Case ID: 250303655



402.    While installation of some monitoring and recovery wells may be necessary given the magnitude of the Leak, the Energy Transfer Defendants have inexplicably chosen to drill such wells to a depth of only approximately 70 feet, even though the contamination to date suggests that petroleum product exists far deeper underground.

403.    Even after their installation, the Energy Transfer Defendants have not properly maintained the recovery and monitoring wells they installed in Plaintiffs' neighborhood. They frequently leave the wells uncapped, causing a significant annoyance and dangerous eyesore and to Plaintiffs and Class members:

Case ID: 250303655



404.    Moreover, the Energy Transfer Defendants, to date, have still failed to delineate the scope and direction of the plume, even though they have now installed over 20 monitoring wells, including two on the Zacharatos property. The locations of the monitoring wells confirm that even Defendants understand there is contamination and a grave risk of ongoing contamination to Plaintiffs' properties.

405.    The Energy Transfer Defendants have also relied heavily on electrical resistivity imaging ("ERI") to determine where the contamination may be by identifying inferred fractures. However, the validity of the inferred fractures is highly questionable. Interpretation of fractures within bedrock from ERI models are commonly based on low resistivity features in the bedrock

88

(because fractures within bedrock typically contain more water than surrounding rock and, therefore, conduct electricity relatively better). Interpreting low resistivity zones in bedrock as fractures may be appropriate if data quality is good and there is no infrastructure (such as buried metallic pipes) distorting the data. However, as is common in urban or suburban settings, the ERI models collected in the Mt. Eyre Manor neighborhood show numerous "low resistivity anomalies" that are consistent with the anomalies produced by buried metallic pipes or electrically grounded equipment/powerlines. Based on the limited public data available, a number of these anomalies have wrongly been interpreted as inferred fractures based on utility interference.

406.    For the reasons alleged herein, the Pipeline Leak has devastated the Mt. Eyre Manor neighborhood and surrounding affected communities.

## CLASS ACTION ALLEGATIONS

407.    Plaintiffs bring the class action allegations in this Complaint for all environmental restoration and remediation, economic losses suffered by Plaintiffs and Class members, medical monitoring, injunctive relief, and declaratory relief.

408.    Plaintiffs bring this action on behalf of themselves and on behalf of the following Class pursuant to Pennsylvania Rules of Civil Procedure 1702, 1708 and 1709:

> **All Pennsylvania citizens who owned, rented, and/or resided in real properties in Pennsylvania within the following boundaries in Upper Makefield Township and Lower Makefield Township: West of Delaware River; East of Dolington Acres Road or Dolington Road; South of Aqueduct Road or Wilkes Street; and North of Dyers Creek or Kimbles Road, during the time period from September 1, 2023 to the present, as represented in Figure 3 below (the "Class").**

89



409.    Additionally, all Plaintiffs seek to represent a subclass (the "Contamination Subclass") defined as follows:

**All members of the Class whose property has tested positive for the presence of LNAPL or for any volatile organic compounds, lead, or other constituents of any petroleum product (including J-value results) since January 1, 2025.**

410.    Additionally, the La Harts and Zacharatos seek to represent a subclass (the "Public Water Subclass") defined as follows:

**All members of the Class whose property was deemed by the Upper Makefield Township Mt. Eyre Water Alternatives Study as a "ratepayer" that would bear a portion of the cost of an alternative water source to be installed in Mt. Eyre Manor.**

411.    Excluded from the Class are Defendants and their subsidiaries or affiliated entities. Also excluded from the Class is any judge or magistrate assigned to this case, along with their family members and the members of their respective staffs.

Case ID: 250303655

**Exhibit A_ Page 286 of 336**

412.    Plaintiffs reserve the right to further define and modify the definition of the Class following further factual investigation and discovery.

413.    **Numerosity.** Members of the Class and each Subclass are so numerous that joinder is impracticable. Plaintiffs estimate there are at least one thousand members of the Class and several hundred members of each Subclass. As such, a class action is superior to other methods of adjudication due to its capacity for efficiency and judicial economy.

414.    **Typicality.** Plaintiffs' claims for environmental restoration and remediation, economic damages, medical monitoring, injunctive relief, and declaratory relief are typical of the claims of the Class members. Plaintiffs and all Class members have been damaged by the same wrongful conduct by Defendants.

415.    Plaintiffs will fairly and adequately protect and represent the interests of the Class and the proposed Subclasses. The interests of Plaintiffs coincide with, and are not antagonistic to, those of the Class. Accordingly, and by proving their own claims, Plaintiffs will prove other Class members' claims as well.

416.    **Adequacy of Representation.** Plaintiffs are members of the Class and Subclass they seek to represent. Plaintiffs are represented by the undersigned counsel who are experienced and competent in the prosecution of class actions involving chemical/toxin contamination. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiffs can and will fairly and adequately represent the interests of the Class and have no interests that are averse to, conflict with, or are antagonistic to the interests of the Class.

417.    **Commonality and Predominance.** There are numerous questions of law and fact common to the Class that predominate over any individual issue, including, but not limited to:

91

Case ID: 250303655

a.   Whether Defendants' conduct as alleged herein violates the law as stated in the Causes of Action set forth below that are applicable to the Plaintiffs and the Class;

b.   Whether Defendants owed a duty to the Class;

c.   Whether Defendants breached any duties owed to the Class;

d.   Whether Defendants were negligent and/or reckless in failing to properly and safely oversee the operation, supervision, maintenance, monitoring, and testing of the Pipeline;

e.   Whether Defendants allowed a release of toxic and hazardous substances from the Pipeline into the underlying bedrock and aquifer under where the Pipeline Leak occurred or within the plume area of the Pipeline Leak;

f.   Whether the release or threat of release of toxic and hazardous substances from Defendants' Twin Oaks Pipeline reduced or diminished the value of the Class members' real property;

g.   Whether the release or threat of release of toxic and hazardous substances from Defendants' Twin Oaks Pipeline deprived the Class of the rights to use and benefit from their real property interest, free of interference; and

h.   The appropriate measure of restitution and/or measure of damages to the Class members.

418.   The questions of law and fact common to the Class predominate over any questions of law that may affect only individual class members, because Defendants acted on grounds generally applicable to the entire Class.

419.   **Superiority**. Class treatment is a superior method for the fair and efficient adjudication of the economic damages associated with this controversy because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their

Case ID: 250303655

common claims in a similar forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense. The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that likely would be impracticable to pursue individually, substantially outweigh any difficulties that may arise in the management of the class aspects of this action.

## CAUSES OF ACTION

420.    All of Plaintiffs' causes of action, whether asserted individually or on behalf of the Class, are brought against all Defendants.

### COUNT I
### NEGLIGENCE
### Against All Defendants
### (Individually and on Behalf of the Class)

421.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

422.    Defendants' actions as alleged herein were negligent.

423.    The Energy Transfer Defendants, including through the Contractor Defendants, are responsible for owning, overseeing, operating, supervising, and maintaining the Twin Oaks Pipeline, and are responsible for its safe operations, including, without limitation, by incorporating an appropriate monitoring and leak detection system.

424.    The Energy Transfer Defendants and Contractor Defendants failed to use reasonable care in the oversight, operation, maintenance, hiring, monitoring, and repair of the Twin Oaks Pipeline and continued to transport their own and other Defendants' hazardous and toxic substances through the Pipeline without ensuring that it was operating in a safe condition.

425.    The Energy Transfer Defendants failed to use reasonable care in responding to multiple odor complaints over a period of at least 16 months and detecting whether a leak in the Pipeline had occurred.

93

Case ID: 250303655

Exhibit A_ Page 289 of 336

426.    The Energy Transfer Defendants and Contractor Defendants failed to use reasonable care in identifying the scope of the Leak or of the resulting pollution plume once the Pipeline Leak had been identified.

427.    The Energy Transfer Defendants failed to use reasonable care to contain the plume and resulting damages caused by the Pipeline Leak.

428.    The Energy Transfer Defendants and Contractor Defendants failed to use reasonable care in employing a safe and reliable monitoring and leak detection system with respect to the Pipeline.

429.    The Energy Transfer Defendants and Contractor Defendants knew or should have known that their failure to properly operate, maintain, and repair the Pipeline, and to respond to the Pipeline Leak, would allow the release of dangerous and toxic substances into the environment in a residential neighborhood, and, as a result, contaminate the environment and cause the residents of the affected geographic area to suffer damages as alleged herein.

430.    The Energy Transfer Defendants and Contractor Defendants knew or should have known that their failure to exercise reasonable care in responding to the Pipeline Leak would impede the ability of regulators and affected residents to understand the scope of the danger and to effectively mitigate its impacts.

431.    The Delta Defendants and the PBF Defendants owed a duty to Plaintiffs and the Class to exercise reasonable care in the handling, shipment, batching, scheduling, and transportation of their petroleum products through the pipeline.

432.    The Delta Defendants and the PBF Defendants owed a duty to evaluate and mitigate risks associated with the chemical, physical, and corrosive properties of its petroleum products when transported under expected pipeline conditions, including the use of Type A sleeves.

94

433. The Delta Defendants and the PBF Defendants breached their duties by, *inter alia*, failing to exercise reasonable care in the shipment, handling, batching, and transportation of petroleum products; failing to evaluate or control the foreseeable risks associated with the interaction of its products and the Pipeline; and failing to take reasonable steps to prevent product releases.

434. The Delta Defendants' and the PBF Defendants' breaches of duty were a direct and proximate cause of the release of petroleum product and the resulting contamination of Plaintiffs' properties.

435. As a direct and proximate result of the Delta Defendants' and the PBF Defendants' negligence, Plaintiffs suffered property damage, loss of use and enjoyment, diminution in property value, and other harms.

436. Defendants' negligence was a substantial factor in bringing about real and personal property damage, environmental contamination, economic losses, and diminution of property values, to Plaintiffs and the Class members.

437. Defendants' negligence was a substantial factor in bringing about physical personal injury and emotional distress and anxiety to Plaintiffs individually.

438. Defendants' negligence was a substantial factor in bringing about the need for medical monitoring for residents affected by the Pipeline Leak.

439. Defendants' breaches as described herein demonstrate an extreme departure from the standard of care for ensuring the safe operation of a hazardous liquids pipeline.

440. Defendants' efforts to prevent the Pipeline Leak and to respond to the Pipeline Leak once identified, as alleged herein, including but not limited to the Energy Transfer Defendants' misrepresentations as to the amount of product lost and the continuing safety of the Pipeline,

95

demonstrate a gross failure to exercise even scant care with respect to the safety of nearby residents and their property.

441.    The actions of Defendants as set forth herein also constitute negligence per se.

442.    Defendants had a duty to comply with numerous statutes and regulations designed to prevent a public harm and failed to do so. The statutes that Defendants did not comply with include, without limitation, 35 P.S. § 691.401 (Clean Streams Law), and 49 U.S.C. § 60101 *et seq*. (Pipeline Safety Act).

443.    The purpose of the Pennsylvania Clean Streams Law is the "prevention and elimination of water pollution" in order to promote the "economic future of the Commonwealth." 35 P.S. § 691.4.

444.    Defendants breached their duty under the Clean Streams Law when they allowed the discharge of toxic substances from the Pipeline into the waters of the Commonwealth. 35 P.S. § 691.401.

445.    The purpose of the Pipeline Safety Act, and of regulations promulgated pursuant to the Act, is to "provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities." 49 U.S.C. § 60102(a). The Secretary of Transportation promulgates minimum safety standards pursuant to the Act, which apply to any and all owners and operators of pipeline facilities. *Id*.

446.    The Energy Transfer Defendants and Contractor Defendants breached their duties under the Pipeline Safety Act when they failed to comply with the minimum safety standards proscribed by the Secretary of Transportation pursuant to the Act. Specifically, the Energy Transfer Defendants' and Contractor Defendants' breaches include, without limitation, the fact that they: (a) failed to maintain an effective system for detecting leaks in violation of 49 C.F.R. § 195.444;

Case ID: 250303655
Exhibit A_ Page 292 of 336

(b) failed to take measures necessary to prevent and mitigate the consequences of a pipeline failure that could affect a high consequence area in violation of 49 C.F.R. § 195.452; and (c) failed to detect conditions that could adversely affect the safe operation of the Pipeline within 72 hours of an extreme weather event in violation of 49 C.F.R. § 195.414.

447.    The purposes of the aforementioned statutes are to protect the interests of Plaintiffs and the Class.

448.    As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs and the Class members have suffered damages as alleged herein.

**COUNT II**
**STRICT LIABILITY – ABNORMALLY DANGEROUS**
**OR ULTRAHAZARDOUS ACTIVITY**
**Against the Energy Transfer Defendants, Delta Defendants, and PBF Defendants**
**(Individually and on Behalf of the Class)**

449.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

450.    Defendants' actions as alleged herein constitute an abnormally dangerous and/or ultrahazardous activity.

451.    Defendants' transportation of petroleum products through a pipeline that was poorly reinforced by thirty-year old A sleeves involves a high degree of risk and the exercise of reasonable care cannot eliminate the risk inherent in operating the Pipeline.

452.    Defendants' transportation of petroleum products was solely for Defendants' business purposes.

453.    Defendants knew and understood (or should have) that there was a high risk that their petroleum products and other chemicals, toxins, and particulates could contaminate the environment of the nearby neighborhoods, including the risk of contaminating the only source of clean water for residents, and, thereby, cause residents to suffer personal injuries, property damage,

97

Case ID: 250303655
**Exhibit A_ Page 293 of 336**

environmental contamination, economic losses, diminution of property value, the need for medical monitoring, and other harms as fully alleged herein.

454.    Defendants' transportation of petroleum products, toxins, and particulates through a pipeline that was poorly reinforced by thirty-year old A sleeves caused serious harm to Plaintiffs' and Class members' persons, chattel, and property, including both real and personal property, as alleged herein.

455.    As such, Defendants are strictly liable to Plaintiffs and the members of the Class.

456.    As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff and the Class have suffered damages as alleged herein.

**COUNT III**
**PUBLIC NUISANCE**
**Against All Defendants**
**(Individually and on Behalf of the Class)**

457.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

458.    Defendants' conduct constitutes a public nuisance pursuant to Pennsylvania common law.

459.    Specifically, the discharge of toxic substances, odors, and gases from the Twin Oaks Pipeline as alleged herein into underlying bedrock and aquifer, as well as to groundwater, air, soil, private wells, homes, and other property, have caused particular injuries to Plaintiffs and the Class as alleged herein.

460.    Plaintiffs and the Class are entitled to damages as a result thereof.

**COUNT IV**
**PRIVATE NUISANCE**
**Against All Defendants**
**(Individually and on Behalf of the Class)**

461.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

Case ID: 250303655

Exhibit A_ Page 294 of 336

462. Defendants' conduct allowed toxic substances to invade the private use and enjoyment of Plaintiffs' land and property.

463. Defendants' conduct allowed offensive odors and gases to invade and disrupt the private use of Plaintiffs' land and property.

464. Defendants' conduct allowed intrusive lights, sounds, and sediments to invade and disrupt the private use of Plaintiffs' land and property.

465. The invasion of Plaintiffs' land by Defendants' product, toxic substances, and resulting odors was the foreseeable and proximate result of Defendants' negligent and reckless conduct.

466. The invasion of Plaintiffs' land by lights, sounds, sediments, and odors attendant to Defendants' remediation activities was an additional foreseeable and proximate result of Defendants' negligent and reckless conduct.

467. Plaintiffs have suffered injury to the use and enjoyment of their home due to the presence of toxic substances in the water and soil on Plaintiffs' land and the substantial risk of the future presence of such substances.

468. Plaintiffs are entitled to damages as a result thereof.

<u>**COUNT V**</u>
**TRESPASS**
**Against the Energy Transfer Defendants, PBF Defendants, and Delta Defendants**
**(Individually and on Behalf of the Class)**

469. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

470. Defendants' conduct caused their hazardous and toxic product to intrude into the water and onto the land of Plaintiffs' property. Defendants further failed to take actions to identify the scope of the intrusion and to remove their product from Plaintiffs' property.

99

471. Defendants knew or should have known that their shipment of petroleum product, but failure to maintain safe operations of the Twin Oaks Pipeline and to effectively investigate odor complaints for possible leaks, would result in the intrusion of their product on Plaintiffs' property.

472. The entry of petroleum and/or its constituents constitutes an unauthorized physical invasion of land.

473. Defendants' failure to identify and remove their product from Plaintiffs' property after being made aware of the intrusion constitutes a separate and continuing trespass.

474. Plaintiffs are entitled to damages as a result thereof.

## COUNT VI
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### Against All Defendants
### (Individually and on Behalf of the Class)

475. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

476. Defendants' conduct negligently inflicted emotional distress on Plaintiffs.

477. Defendants owed Plaintiffs a duty of care to ensure that they did not suffer from serious emotional distress and mental anguish.

478. Defendants breached their duty to Plaintiffs by both their actions and inactions.

479. As a direct and proximate result of Defendants' breach, Plaintiffs have suffered severe emotional injury.

480. As a result, Plaintiffs have been damaged as alleged herein.

## COUNT VII
## MEDICAL MONITORING
### Against All Defendants
### (Individually and on behalf of the Class)

481. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

100

482.     Plaintiffs and their children were significantly exposed to toxic and hazardous substances, and they bear a substantial risk of future exposure to such substances because of Defendants' repeated failures to prevent the discharge of the same substances into Plaintiffs' soil, water, and property (both real property and personal property).

483.     The exposure to these dangerous substances is such that Plaintiffs and their children have been placed at an increased risk of contracting latent illness and disease, including but not limited to cancer and other serious diseases and illnesses, and as such requires medical monitoring which Defendants are responsible for providing and paying for.

484.     Monitoring and testing procedures exist for cancer and other diseases and illnesses associated with exposure to the aforementioned hazardous substances, making the early detection and treatment of the diseases possible and beneficial.

485.     Additionally, the Energy Transfer Defendants have publicly admitted that they are liable for medical monitoring and have committed to providing medical monitoring in response to the Leak.

486.     As a result, the Court should establish a Court-supervised and administered trust fund and medical monitoring regime to compensate Plaintiffs for their economic damages.

## PRAYER FOR RELIEF

487.     Plaintiffs and Class members seek the following relief:

    a.     All compensatory damages and other damages as alleged herein;

    b.     Medical monitoring for Plaintiffs and the Class members;

    c.     Punitive damages where allowable;

    d.     Pre- and post-judgment interest as allowed by law;

Case ID: 250303655

**Exhibit A_ Page 297 of 336**

e.     A declaratory judgment that Defendants are responsible for the Pipeline Leak, and responsible for all past and future costs to fully restore and remediate all environmental and other harms caused by Defendants to Plaintiffs and the Class;

f.     Attorneys' fees and costs pursuant to any applicable statutes and/or regulations;

g.     Equitable and injunctive relief including:

i.     Notice to all affected persons of the Pipeline Leak and potential dangers and risks presented by the Pipeline Leak;

ii.     The enjoinment of further operations of the Twin Oaks Pipeline until Defendants are able to fully guarantee its safe operation;

iii.     Provision of full water supply for all homes in the Class;

iv.     Provision of temporary housing and all associated costs to those who reasonably request it as a result of the Pipeline Leak;

v.     Installation of a best-in-class leak detection system for the Twin Oaks Pipeline that can actually detect – and guarantee that it will detect – problems in real time;

vi.     Full restoration and remediation of all environmental contamination including but not limited to groundwater, soil, and air, to background concentrations; and

h.     All other relief this Court deems necessary, just and proper.

**DEMAND FOR TRIAL BY JURY**

488.    Plaintiffs hereby demand a jury trial for all claims so triable.

Case ID: 250303655

**Exhibit A_ Page 298 of 336**

Dated: January 15, 2026                    Respectfully submitted,


                                           */s/ Shanon J. Carson*
                                           Shanon J. Carson (Bar No. 85957)
                                           Y. Michael Twersky (Bar No. 312411)
                                           Joseph E. Samuel, Jr. (Bar No. 327645)
                                           **BERGER MONTAGUE PC**
                                           1818 Market Street, Suite 3600
                                           Philadelphia, PA 19103
                                           Telephone: 215-875-4656
                                           Email: scarson@bergermontague.com
                                           Email: mitwersky@bergermontague.com
                                           Email: jsamuel@bergermontague.com


103

Case ID: 250303655

Docusign Envelope ID: 2E294E43-9B55-4DE6-AFFC-EFA4CFFA7B99

## <u>VERIFICATION</u>

The undersigned plaintiff, KATHERINE LA HART, herein avers that the statements of fact contained in the foregoing SECOND AMENDED CLASS ACTION COMPLAINT are true and correct to the best of her information, knowledge, and belief, and are made subject to the penalties of 18 Pa. C.S.A. § 4904, relating to unsworn falsification to authorities.

Dated: 1/15/2026

DocuSigned by:

_____

KATHERINE LA HART

Case ID: 250303655

**Exhibit A_ Page 300 of 336**

Docusign Envelope ID: 30C76F4D-E14C-4AFF-B0CC-0A3909A59002

## VERIFICATION

The undersigned plaintiff, JUSTINE ZACHARATOS, herein avers that the statements of fact contained in the foregoing SECOND AMENDED CLASS ACTION COMPLAINT are true and correct to the best of her information, knowledge, and belief, and are made subject to the penalties of 18 Pa. C.S.A. § 4904, relating to unsworn falsification to authorities.

Dated: 1/15/2026_____

Signed by:

*Justine Zacharatos*
7015F3D8D2574FB...
JUSTINE ZACHARATOS

Case ID: 250303655

**Exhibit A_ Page 301 of 336**

Docusign Envelope ID: A7EACEA5-1CD0-4D63-949E-8D9F0EA4F904

## VERIFICATION

The undersigned plaintiff, CHRISTOPHER GROVER, herein avers that the statements of fact contained in the foregoing SECOND AMENDED CLASS ACTION COMPLAINT are true and correct to the best of his information, knowledge, and belief, and are made subject to the penalties of 18 Pa. C.S.A. § 4904, relating to unsworn falsification to authorities.

Dated: 1/15/2026 _____

Signed by:
_Christopher L. Grover_
359742488CA941D...
CHRISTOPHER GROVER

Case ID: 250303655

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Second Amended Class Action Complaint was filed with the Court's electronic filing system, which then served all current counsel of record for the Energy Transfer Defendants. The additional Defendants will be served with original process in accordance with the Pennsylvania Rules of Civil Procedure.

Dated: January 15, 2026

/s/ Joseph E. Samuel, Jr.
Joseph E. Samuel, Jr.

IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

*Filed and Attested by the Office of Judicial Records 22 JAN 2026 11:51 pm B. BALILONIS*

Daniel La Hart, et al
_____
**Plaintiff(s)**

v.

Sunoco Pipeline, L.P.
_____
**Defendant(s)**

**Case Number:** 250303655

**Control Number:** _____

## AFFIDAVIT OF SERVICE

I, __GILBERT DEL VALLE__ , hereby certify that on __01/21/2026__ ,
    *(Print Name)*                                         *(Date)*

I served a copy of the following documents: **(select all that apply)**

- [ ] Complaint / Statement of Claim
- [ ] Rule to File Complaint
- [ ] Motion/Petition: _____
- [x] Other: Second Amended Complaint and Notice to Defend
- [ ] Notice of Appeal
- [ ] Rule to Show Cause

upon the following parties:

Plaintiff(s): _____

Defendant(s): PBF Energy, Inc. _____

Other: _____

by: **(select the type of service used to serve the documents)**

- [ ] Certified Mail
- [ ] Regular Mail
- [x] Personal Delivery   Upon its agent, The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801.
- [ ] Posting
- [ ] Other: _____

01/21/2026
_____
**Date**

_____
**Signature**

*(Affidavit of Service Form 2/27/2023)*

KEVIN STEWART DUNN
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires OCTOBER 8, 2027

Case ID: 250303655

**IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION - CIVIL**

Daniel La Hart, et al
_____
                    **Plaintiff(s)**

              v.

Sunoco Pipeline, L.P.
_____
                    **Defendant(s)**

**Case Number:** 250303655 _____

**Control Number:** _____

**AFFIDAVIT OF SERVICE**

I, GILBERT DEL VALLE
   _____ , hereby certify that on 01/21/2026 _____ ,
              *(Print Name)*                                              *(Date)*

I served a copy of the following documents: **(select all that apply)**

[ ] Complaint / Statement of Claim            [ ] Notice of Appeal

[ ] Rule to File Complaint                    [ ] Rule to Show Cause

[ ] Motion/Petition: _____

[✓] Other:  Second Amended Complaint and Notice to Defend _____

upon the following parties:

Plaintiff(s): _____

Defendant(s): PBF Holding Company LLC _____

Other:_____

by: **(select the type of service used to serve the documents)**

[ ] Certified Mail                            [ ] Posting

[ ] Regular Mail                              [ ] Other:_____

[✓] Personal Delivery   Upon its agent, The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801.

01/21/2026
_____
          **Date**

_____
          **Signature**

*(Affidavit of Service Form 2/27/2023)*

KEVIN STEWART DUNN
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires OCTOBER 8, 2027

<span style="color:red">Case ID: 250303655</span>

**Exhibit A_ Page 305 of 336**

IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

Daniel La Hart, et al
_____
**Plaintiff(s)**

v.

Sunoco Pipeline, L.P.
_____
**Defendant(s)**

Case Number: 250303655

Control Number: _____

## AFFIDAVIT OF SERVICE

I, GILBERT DEL VALLE
_____ , hereby certify that on 01/21/2026 ,
*(Print Name)*                                                    *(Date)*

I served a copy of the following documents: **(select all that apply)**

☐ Complaint / Statement of Claim                    ☐ Notice of Appeal

☐ Rule to File Complaint                             ☐ Rule to Show Cause

☐ Motion/Petition: _____

☑ Other:  Second Amended Complaint and Notice to Defend
_____

upon the following parties:

Plaintiff(s): _____

Defendant(s): MONROE ENERGY, LLC
_____

Other:_____

by: **(select the type of service used to serve the documents)**

☐ Certified Mail                                     ☐ Posting

☐ Regular Mail                                       ☐ Other:_____

☑ Personal Delivery   Upon its agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE, 19808.

01/21/2026
_____
**Date**

_____
**Signature**

KEVIN STEWART DUNN
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires OCTOBER 8, 2027

*(Affidavit of Service Form 2/27/2023)*

Case ID: 250303655

**Exhibit A_ Page 306 of 336**

IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

Daniel La Hart, et al
_____
**Plaintiff(s)**

v.

Sunoco Pipeline, L.P.
_____
**Defendant(s)**

Case Number: 250303655

Control Number: _____

## AFFIDAVIT OF SERVICE

I, __GILBERT DEL VALLE__ , hereby certify that on __01/21/2026__ ,
  *(Print Name)*                                             *(Date)*

I served a copy of the following documents: **(select all that apply)**

☐ Complaint / Statement of Claim          ☐ Notice of Appeal

☐ Rule to File Complaint                  ☐ Rule to Show Cause

☐ Motion/Petition: _____

☑ Other: Second Amended Complaint and Notice to Defend _____

upon the following parties:

Plaintiff(s): _____

Defendant(s): EPSILON TRADING, LLC _____

Other:_____

by: **(select the type of service used to serve the documents)**

☐ Certified Mail          ☐ Posting

☐ Regular Mail            ☐ Other:_____

☑ Personal Delivery    Upon its agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE, 19808.

01/21/2026
_____
**Date**

_____
**Signature**

*(Affidavit of Service Form 2/27/2023)*

KEVIN STEWART DUNN
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires OCTOBER 8, 2027

Case ID: 250303655

**Exhibit A_ Page 307 of 336**

**IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL**

Daniel La Hart, et al
_____
                    **Plaintiff(s)**

                                          **Case Number:** 250303655
                v.
                                          **Control Number:** _____

Sunoco Pipeline, L.P.
_____
                    **Defendant(s)**

**AFFIDAVIT OF SERVICE**

I, ___GILBERT DEL VALLE___, hereby certify that on ___01/21/2026___,
         *(Print Name)*                                      *(Date)*

I served a copy of the following documents: **(select all that apply)**

☐ Complaint / Statement of Claim          ☐ Notice of Appeal

☐ Rule to File Complaint                  ☐ Rule to Show Cause

☐ Motion/Petition: _____

☑ Other: Second Amended Complaint and Notice to Defend _____

upon the following parties:

Plaintiff(s): _____

Defendant(s): MASTEC, INC. _____

Other:_____

by: **(select the type of service used to serve the documents)**

☐ Certified Mail                          ☐ Posting

☐ Regular Mail                            ☐ Other:_____

☑ Personal Delivery   Upon its agent, The Corporation Trust Company, 1209 Orange St, Wilmington,
                      DE 19801.

01/21/2026                                                    _____
_____                                      **Signature**
        **Date**

*(Affidavit of Service Form 2/27/2023)*

KEVIN STEWART DUNN
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires OCTOBER 8, 2027

Case ID: 250303655

**Exhibit A_ Page 308 of 336**

IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

Daniel La Hart, et al
_____
**Plaintiff(s)**

v.

Sunoco Pipeline, L.P.
_____
**Defendant(s)**

**Case Number:** 250303655 _____

**Control Number:** _____

### AFFIDAVIT OF SERVICE

I, GILBERT DEL VALLE _____, hereby certify that on 01/21/2026 _____,
    *(Print Name)*                                              *(Date)*

I served a copy of the following documents: **(select all that apply)**

☐ Complaint / Statement of Claim            ☐ Notice of Appeal

☐ Rule to File Complaint                    ☐ Rule to Show Cause

☐ Motion/Petition: _____

☑ Other: Second Amended Complaint and Notice to Defend _____

upon the following parties:

Plaintiff(s): _____

Defendant(s): DELTA AIR LINES, INC. _____

Other: _____

by: **(select the type of service used to serve the documents)**

☐ Certified Mail                            ☐ Posting

☐ Regular Mail                              ☐ Other: _____

☑ Personal Delivery    Upon its agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE, 19808.

01/21/2026
_____                          _____
**Date**                                              **Signature**

*(Affidavit of Service Form 2/27/2023)*

KEVIN STEWART DUNN
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires OCTOBER 8, 2027

Case ID: 250303655

**Exhibit A_ Page 309 of 336**

IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

Daniel La Hart, et al
_____
                        **Plaintiff(s)**

                                        **Case Number:** 250303655 _____

        v.

                                        **Control Number:** _____

Sunoco Pipeline, L.P.
_____
                        **Defendant(s)**

**AFFIDAVIT OF SERVICE**

I, __GILBERT DEL VALLE_____ , hereby certify that on __01/21/2026_____ ,
         *(Print Name)*                                              *(Date)*

I served a copy of the following documents: **(select all that apply)**

☐ Complaint / Statement of Claim          ☐ Notice of Appeal

☐ Rule to File Complaint                  ☐ Rule to Show Cause

☐ Motion/Petition: _____

☑ Other:  Second Amended Complaint and Notice to Defend
_____

upon the following parties:

Plaintiff(s): _____

Defendant(s): BARR AIR PATROL, LLC
_____

Other: _____

by: **(select the type of service used to serve the documents)**

☐ Certified Mail                          ☐ Posting

☐ Regular Mail                            ☐ Other: _____

☑ Personal Delivery   Upon its agent, Corporation Service Company, 251 Little Falls Drive,
                      Wilmington, DE, 19808.

01/21/2026
_____                          _____
        **Date**                                          **Signature**

*(Affidavit of Service Form 2/27/2023)*

KEVIN STEWART DUNN
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires OCTOBER 8, 2027

Case ID: 250303655

**Exhibit A_ Page 310 of 336**

IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

Daniel La Hart, et al
_____

**Plaintiff(s)**

v.

Sunoco Pipeline, L.P.
_____

**Defendant(s)**

**Case Number:** 250303655

**Control Number:** _____

### AFFIDAVIT OF SERVICE

I, GILBERT DEL VALLE
_____, hereby certify that on 01/21/2026
    *(Print Name)*                                      *(Date)*

I served a copy of the following documents: **(select all that apply)**

☐ Complaint / Statement of Claim          ☐ Notice of Appeal

☐ Rule to File Complaint                  ☐ Rule to Show Cause

☐ Motion/Petition: _____

☑ Other: Second Amended Complaint and Notice to Defend _____

upon the following parties:

Plaintiff(s): _____

Defendant(s): Azuria Water Solutions, Inc. _____

Other: _____

by: **(select the type of service used to serve the documents)**

☐ Certified Mail          ☐ Posting

☐ Regular Mail            ☐ Other: _____

☑ Personal Delivery    Upon its agent, The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801.

01/21/2026
_____            _____
**Date**                                          **Signature**

*(Affidavit of Service Form 2/27/2023)*

KEVIN STEWART DUNN
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires OCTOBER 8, 2027

Case ID: 250303655

**Exhibit A_ Page 311 of 336**

IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

Daniel La Hart et al
_____
                    **Plaintiff(s)**

                                            Case Number: 250303655
                                            _____
              v.
                                            Control Number: _____

Sunoco Pipeline, L.P.
_____
                    **Defendant(s)**

**AFFIDAVIT OF SERVICE**

I, ___GILBERT DEL VALLE___, hereby certify that on __01/21/2026__,
     *(Print Name)*                                        *(Date)*

I served a copy of the following documents: **(select all that apply)**

☐ Complaint / Statement of Claim          ☐ Notice of Appeal

☐ Rule to File Complaint                  ☐ Rule to Show Cause

☐ Motion/Petition: _____

☑ Other: Second Amended Complaint and Notice to Defend _____

upon the following parties:

   Plaintiff(s): _____

   Defendant(s): Baker Hughes Company _____

   Other: _____

by: **(select the type of service used to serve the documents)**

☐ Certified Mail                ☐ Posting

☐ Regular Mail                  ☐ Other: _____

☑ Personal Delivery   Upon its agent, The Corporation Trust Company, 1209 Orange St, Wilmington, DE 19801.

01/21/2026
_____                    _____
        **Date**                                   **Signature**

*(Affidavit of Service Form 2/27/2023)*

KEVIN STEWART DUNN
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires OCTOBER 8, 2027

Case ID: 250303655

**IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION - CIVIL**

*Filed and Attested by the Office of Judicial Records 26 JAN 2026 12:49 pm B. MERCEDES*

Daniel La Hart et al
_____
**Plaintiff(s)**

Case Number: 250303655 _____

v.

Control Number: _____

Sunoco Pipeline, L.P.
_____
**Defendant(s)**

### AFFIDAVIT OF SERVICE

I, _Roger Williams_ , hereby certify that on _1/23/26_ ,
　　(Print Name)　　　　　　　　　　　　　　　(Date)

I served a copy of the following documents: **(select all that apply)**

☐ Complaint / Statement of Claim　　　☐ Notice of Appeal

☐ Rule to File Complaint　　　　　　　☐ Rule to Show Cause

☐ Motion/Petition: _____

☑ Other: Second Amended Complaint and Notice to Defend _____

upon the following parties:

Plaintiff(s): _____

Defendant(s): CORRPRO COMPANIES, INC. _____

Other: _____

by: **(select the type of service used to serve the documents)**

☐ Certified Mail　　　　　　　　☐ Posting

☐ Regular Mail　　　　　　　　　☐ Other: _____

☑ Personal Delivery　　Upon its agent, CT Corporation System, 600 North 2nd Street, Suite 401, Harrisburg, PA 17101

_1/24/26_
**Date**

_____
**Signature**

(Affidavit of Service Form 2/27/2023)

Case ID: 250303655

IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

Daniel La Hart et al
_____
**Plaintiff(s)**

v.

Sunoco Pipeline, L.P.
_____
**Defendant(s)**

Case Number: 250303655 _____

Control Number: _____

## AFFIDAVIT OF SERVICE

I, _Roger Williams_ , hereby certify that on ___1/23/26___ ,
(Print Name)                                                        (Date)

I served a copy of the following documents: **(select all that apply)**

☐ Complaint / Statement of Claim          ☐ Notice of Appeal

☐ Rule to File Complaint                  ☐ Rule to Show Cause

☐ Motion/Petition: _____

☑ Other:  Second Amended Complaint and Notice to Defend _____

upon the following parties:

Plaintiff(s): _____

Defendant(s): PRECISION PIPELINE LLC _____

Other:_____

by: **(select the type of service used to serve the documents)**

☐ Certified Mail                          ☐ Posting

☐ Regular Mail                            ☐ Other:_____

☑ Personal Delivery   Upon its agent, Corporation Service Company 5235 North Front Street, Harrisburg, PA 17110.

___1/24/26___                             _____
Date                                       Signature

*(Affidavit of Service Form 2/27/2023)*

Case ID: 250303655

**Exhibit A_ Page 314 of 336**

COURT OF COMMON PLEAS, PHILADELPHIA COUNTY, PENNSYLVANIA

**DANIEL LA HART and KATHERINE LA HART et al.**

*Plaintiff(s) / Petitioner(s)*

v.

**SUNOCO PIPELINE L.P. et al.**

*Defendant(s) / Respondent(s)*

Case No. 250303655

*Filed and Attested by the Office of Judicial Records 28 JAN 2026 12:54 pm L. BREWINGTON*

## AFFIDAVIT OF SERVICE

I, Briana Pearson, state:

I am 18 years or older and not a party to this action or a member of a corporation or organization that is a party to this action.

I served the following documents to Shaw Pipeline Services Inc. in Dallas County, TX on January 21, 2026 at 12:07 pm at 1999 Bryan St, Ste 900, Dallas, TX 75201-3140 by leaving the following documents with Alexshondra Willis who as Intake Specialist at CT Corporation System is authorized by appointment or by law to receive service of process for Shaw Pipeline Services Inc..

SECOND AMENDED CLASS ACTION COMPLAINT, NOTICE TO DEFEND, CERTIFICATE OF SERVICE

Additional Description:
.
Race: Black or African American, Sex: Female, Est. Age: 45-54, Hair: Black, Glasses: Y, Est. Weight: 180 lbs to 200 lbs, Est. Height: 5' 6" to 5' 9".
Geolocation of Serve: https://google.com/maps?q=32.784745817,-96.7971594973
Photograph: See Exhibit 1


Total Cost: $69.00
I DECLARE UNDER PENALTY OF PERJURY THAT THE FACTS HEREIN ARE TRUE AND CORRECT.


Executed in

Dallas County ,

TX    on    1/28/2026    .

/s/ *Briana Pearson*

Signature
Briana Pearson
+1 (469) 986-5925

Case ID: 250303655



Exhibit 1a)

COURT OF COMMON PLEAS IN THE COMMONWEALTH OF PENNSYLVANIA, COUNTY OF PHILADELPHIA

**DANIEL LA HART and KATHERINE LA HART c/o Berger Montague PC 1818 Market Street, Suite 3600 Philadelphia, PA 19103; JERRY ZACHARATOS and JUSTINE ZACHARATOS c/o Berger Montague PC 1818 Market Street, Suite 3600 Philadelphia, PA 19103; CHRISTOPHER GROVER and ANDREA GROVER c/o Berger Montague PC 1818 Market Street, Suite 3600 Philadelphia, PA 19103,**

*Plaintiff(s) / Petitioner(s)*

Case No.: 250303655

v.

**SUNOCO PIPELINE L.P. 525 Fritztown Road Sinking Spring, Pennsylvania 19608; ENERGY TRANSFER LP 8111 Westchester Drive Dallas, Texas 75225;**

*Defendant(s) / Respondent(s)*

*Filed and Attested by the Office of Judicial Records 30 JAN 2026 02:14 pm S. GILLIAM*

### AFFIDAVIT OF SERVICE

I, Brian Wright, state:

I am 18 years or older and not a party to this action or a member of a corporation or organization that is a party to this action.

I served the following documents to NATURAL ENERGY FIELD SERVICES, LLC in Fayette County, KY on January 22, 2026 at 1:11 pm at 828 Lane Allen Rd, Ste 219, Lexington, KY 40504-3659 by leaving the following documents with Daen Osborne who as MANAGER_ADMIN is authorized by appointment or by law to receive service of process for NATURAL ENERGY FIELD SERVICES, LLC.

SECOND AMENDED CLASS ACTION COMPLAINT
Race: White, Sex: Female, Est. Age: 35-44, Hair: Red, Glasses: Y, Est. Weight: 100 lbs to 120 lbs, Est. Height: 5' 6" to 5' 9".
Geolocation of Serve: https://google.com/maps?q=38.0290861667,-84.5414283333
Photograph: See Exhibit 1

Total Cost: $289.75
I DECLARE UNDER PENALTY OF PERJURY THAT THE FACTS HEREIN ARE TRUE AND CORRECT.

Executed in

Fayette County                                   ,

KY         on    1/30/2026              .

/s/ *Brian Wright*
_____
Signature
Brian Wright
+1 (859) 699-8183

Case ID: 250303655



Exhibit 1a)

**IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION - CIVIL**

*Filed and Attested by the*
*Office of Judicial Records*
*03 FEB 2025 04:49 pm*
*G. IMPERATO*

Daniel La Hart et al
_____
                    **Plaintiff(s)**

v.

Sunoco Pipeline, L.P.
_____
                    **Defendant(s)**

**Case Number:** 250303655

**Control Number:** _____

### AFFIDAVIT OF SERVICE

I, ___Oleg A. Molchanov___, hereby certify that on ___01/29/2026___,
          *(Print Name)*                                          *(Date)*

I served a copy of the following documents: **(select all that apply)**

☐ Complaint / Statement of Claim                 ☐ Notice of Appeal

☐ Rule to File Complaint                         ☐ Rule to Show Cause

☐ Motion/Petition: _____

☑ Other: ___Second Amended Complaint and Notice to Defend___

upon the following parties:

Plaintiff(s): _____

Defendant(s): ___ROSEN SWISS A.G. d/b/a ROSEN USA___

Other: _____

by: **(select the type of service used to serve the documents)**

☐ Certified Mail                   ☐ Posting

☐ Regular Mail                     ☐ Other: _____

☑ Personal Delivery

01/29/2026
_____
     **Date**

ZOYA GRIFFIN
Notary Public, State of Texas
Comm. Expires 06-21-2027
Notary ID 134418307

*Oleg Molchanov*
**Signature**

PSC-15465; EXP 08/31/2026

*(Affidavit of Service Form 2/27/2023)*

Case ID: 250303655

## AFFIDAVIT OF SERVICE

| Case:<br>250303655 | Court:<br>IN THE COURT OF COMMON PLEAS OF PHILADELPHIA<br>COUNTY. FIRST JUDICIAL DISTRICT OF PENNSYLVANIA. CIVIL<br>TRIAL DIVISION | County:<br>PHILADELPHIA | Job:<br>15089256 (6-012212826550/7) |
|---|---|---|---|
| Plaintiff / Petitioner:<br>DANIEL LA HART and KATHERINE LA HART;<br>JERRY ZACHARATOS and JUSTINE ZACHARATOS;<br>CHRISTOPHER GROVER and ANDREA GROVER | | Defendant / Respondent:<br>SUNOCO PIPELINE L.P.; ENERGY TRANSFER LP; ENERGY<br>TRANSFER (R&M) LLC; ENERGY TRANSFER MARKETING &<br>TERMINALS L.P.; DELTA AIR LINES, INC.; EPSILON TRADING,<br>LLC; MONROE ENERGY, LLC; PBF ENERGY INC.; PBF<br>HOLDING COMPANY LLC; PRECISION PIPELINE LLC; MASTEC,<br>INC; NATURAL ENERGY FIELD SERVICES, LLC; SHAW PIPELINE<br>SERVICES INC.; CORRPRO COMPANIES, INC.; AZURIA WATER<br>SOLUTIONS, INC.; BARR AIR PATROL, LLC; BAKER HUGHES<br>COMPANY; ROSEN SWISS A.G. d/b/a ROSEN USA | |
| Received by:<br>HOUSTON PROCESS SERVERS, LLC | | For:<br>BERGER MONTAGUE | |
| To be served upon:<br>ROSEN SWISS A.G. d/b/a ROSEN USA | | | |

I, Oleg A. Molchanov, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

Recipient Name / Address:    ROSEN SWISS A.G. d/b/a ROSEN USA, COMPANY: 14120 INTERDRIVE EAST, HOUSTON, TX 77032

Manner of Service:    AUTHORIZED, Jan 29, 2026, 2:48 pm CST

Documents:    SECOND AMENDED COMPLAINT AND NOTICE TO DEFEND (Received Jan 27, 2026 at 10:58am CST)

Additional Comments:
1) Successful Attempt: Jan 29, 2026, 2:48 pm CST at COMPANY: **14120 INTERDRIVE EAST, HOUSTON, TX 77032** received by **KAWAI COCHRAN/ROSEN SWISS A.G. d/b/a ROSEN USA**. Age: ~40; Ethnicity: Caucasian; Gender: Male; Weight: ~220; Height: 5'8"; Hair: Black; Eyes: Glasses.

_Oleg Molchanov_    01/29/2026

Oleg A. Molchanov    Date
PSC-15465; EXP. 08/31/2026

HOUSTON PROCESS SERVERS, LLC
processserversofhouston.com
2401 Fountain View Dr 461
Houston, TX 77057
(832) 947-3106

ZOYA GRIFFIN
Notary Public, State of Texas
Comm. Expires 06-21-2027
Notary ID 134418307

Subscribed and sworn to before me by the affiant who is personally known to me.

Notary Public

01/29/2026

Date    Commission Expires

**IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION - CIVIL**

*Filed and Attested by the Office of Judicial Records 03 FEB 2026 04:59 pm G. IMPERATO*

Daniel La Hart et al
_____
                    **Plaintiff(s)**

**Case Number:** 250303655

                    v.

**Control Number:** _____

Sunoco Pipeline, L.P.
_____
                    **Defendant(s)**

### AFFIDAVIT OF SERVICE

I, _Roger Williams_ , hereby certify that on _1/30/26_ ,
          *(Print Name)*                                    *(Date)*

I served a copy of the following documents: **(select all that apply)**

☐ Complaint / Statement of Claim          ☐ Notice of Appeal

☐ Rule to File Complaint                  ☐ Rule to Show Cause

☐ Motion/Petition: _____

☑ Other:  Second Amended Complaint and Notice to Defend
_____

upon the following parties:

Plaintiff(s): _____

Defendant(s): ENERGY TRANSFER MARKETING & TERMINALS L.P.
_____

Other:_____

by: **(select the type of service used to serve the documents)**

☐ Certified Mail          ☐ Posting

☐ Regular Mail            ☐ Other:_____

☑ Personal Delivery   Upon its agent, Corporation Service Company 5235 North Front Street, Harrisburg, PA 17110.

_1/31/26_____
        **Date**

_____
        **Signature**

*(Affidavit of Service Form 2/27/2023)*

Case ID: 250303655

RECEIVED

FEB - 6 2026

ROOM 521

| | |
|---|---|
| DANIEL LA HART and KATHERINE LA HART; JERRY ZACHARATOS and JUSTINE ZACHARATOS; CHRISTOPHER GROVER and ANDREA GROVER, | ) ) ) ) ) |
| *Plaintiffs,* | ) ) |
| v. | ) ) |
| SUNOCO PIPELINE LP; ENERGY TRANSFER LP; ENERGY TRANSFER (R&M) LLC; ENERGY TRANSFER MARKETING & TERMINALS L.P.; DELTA AIR LINES, INC.; EPSILON TRADING, LLC; MONROE ENERGY, LLC; PBF ENERGY INC.; PBF HOLDING COMPANY LLC; PRECISION PIPELINE LLC; MASTEC, INC.; NATURAL ENERGY FIELD SERVICES, LLC; SHAW PIPELINE SERVICES INC.; CORRPRO COMPANIES, INC.; AZURIA WATER SOLUTIONS, INC.; BARR AIR PATROL, LLC; BAKER HUGHES COMPANY; ROSEN SWISS A.G. d/b/a ROSEN USA | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| *Defendants.* | ) ) |

PHILADELPHIA COUNTY
COURT OF COMMON PLEAS
TRIAL DIVISION

March Term, 2025

CASE NO. 250303655

2621292

DOCKETED

FEB - 6 2026

R. POSTELL
COMMERCE PROGRAM

## SCHEDULING ORDER ON VENUE DISCOVERY
## AND PRELIMINARY OBJECTIONS

AND NOW this 6th day of February, 2026, upon consideration of the Joint Motion for Extraordinary Relief to Amend Schedules, IT IS ORDERED that the Joint Motion is GRANTED, and IT IS FURTHER ORDERED as follows:

1.    Plaintiffs shall serve this Order on all of the newly added Defendants.

2.    The parties shall conduct discovery on the issue of venue within 60 days of service of this Order on all of the newly added Defendants named in Plaintiffs' Second Amended Complaint.

ORDER-La Hart Etal Vs Sunoco Pipeline, Lp Etal [RCP]

1

25030365500124

3.      Any Defendant that seeks to file a preliminary objection on the issue of venue shall do so within 30 days of the date of completion of venue discovery pursuant to this Scheduling Order.

4.      Defendants shall hold in abeyance preliminary objections other than venue and shall not raise them at the same time as any preliminary objection to venue, which issue the Court shall decide first.

5.      Plaintiffs shall respond to any preliminary objections on the issue of venue within 30 days of the filing of such objections in a consolidated opposition brief, addressing all venue objections by any Defendant.

6.      Any Defendant wishing to file a reply brief in further support of a preliminary objection on the issue of venue shall do so within 15 days of Plaintiffs' response brief.

7.      Except as provided above, this Scheduling Order does not alter or amend the Court's prior Orders and/or the parties' obligations under the Pennsylvania Rules of Civil Procedure, including in connection with merits discovery.

BY THE COURT,

_____
PATRICK, J.

2

| | |
|---|---|
| DANIEL LA HART and KATHERINE LA HART; JERRY ZACHARATOS and JUSTINE ZACHARATOS; CHRISTOPHER GROVER and ANDREA GROVER, | ) ) ) ) ) |

PHILADELPHIA Filed and Attested by the COURT OF COMMON PLEAS Records TRIAL DIVISION  05 FEB 2026 01:10 pm

*Plaintiffs,*

March Term, 2025

v.

CASE NO. 250303655

SUNOCO PIPELINE L.P.; ENERGY TRANSFER LP; ENERGY TRANSFER (R&M) LLC; ENERGY TRANSFER MARKETING & TERMINALS L.P.; DELTA AIR LINES, INC.; EPSILON TRADING, LLC; MONROE ENERGY, LLC; PBF ENERGY INC.; PBF HOLDING COMPANY LLC; PRECISION PIPELINE LLC; MASTEC, INC.; NATURAL ENERGY FIELD SERVICES, LLC; SHAW PIPELINE SERVICES INC.; CORRPRO COMPANIES, INC.; AZURIA WATER SOLUTIONS, INC.; BARR AIR PATROL, LLC; BAKER HUGHES COMPANY; ROSEN SWISS A.G. d/b/a ROSEN USA

*Defendants.*

ORDER-La Hart Etal Vs Sunoco Pipeline, Lp Etal [NAS]



25030365500140

## STIPULATED PROTECTIVE ORDER

**THIS MATTER** having come before this Court on application of the parties, and it appearing that discovery in the above-captioned action will involve the disclosure of information that one or more parties contends is confidential, and the parties having stipulated to the entry of this order, and for good cause shown, it is hereby **ORDERED** as follows:

1. Any party or third-party required to produce information, documents, or other things in this litigation (the "Producing Party") has the right to designate as "Confidential" any such information, document, or thing, or portion of any such document or thing that the party in good faith believes:

Certification Due Date: 02/12/2026
Response Date: 02/19/2026
Case ID: 250303655
Control No.: 26021608

a.  Contains confidential research or development, or confidential commercial information that the Producing Party maintains as private and that is not available in the public domain, except as the result of an unauthorized or inadvertent disclosure that the Producing Party takes or has taken reasonable steps to address;

b.  Contains information that is deemed confidential under court rules;

c.  Contains personal information, such as birthdate or social security number, or medical records, that is not available in the public domain, except as the result of an unauthorized or inadvertent disclosure that the Producing Party takes or has taken reasonable steps to address, *see* 204 Pa. Code § 213.81; or

d.  Contains information entitled to protection under Pennsylvania Rule of Civil Procedure 4012.

Any Producing Party who produces or discloses any such Confidential material shall mark the same with the foregoing or similar legend: "CONFIDENTIAL–SUBJECT TO PROTECTIVE ORDER" (hereinafter "Confidential").  For the sake of clarity, a Producing Party can only designate its own information as Confidential.

2.  Information shall not be "Confidential" under this Order: (a) if it becomes available to the public or the party(ies) receiving such material ("Receiving Party") other than as a result of disclosure by the Producing Party or an unauthorized disclosure in violation of applicable laws, (b) if the parties agree that the information is no longer deemed "confidential," or (c) if it is independently developed by the Receiving Party without the use of the alleged Confidential material.

2

3.    Any Producing Party has the right to designate as "Highly Confidential–Attorneys' Eyes Only" and subject to this Order any information, document, or thing, or portion of any document or thing that contains highly-sensitive business or personal information, the disclosure of which is highly likely to cause significant harm to an individual or to the business or competitive position of the Producing Party, including the following:

a.  "Confidential security information" subject to the Public Utility Confidential Security Information Disclosure Protection Act, 35 P.S. §§ 2141.1 to 2141.6, and related regulations, 52 Pa. Code §§ 102.1-102.4, "the disclosure of which would compromise security against sabotage or criminal or terrorist acts and the nondisclosure of which is necessary for the protection of life, safety, public property or public utility facilities," 35 P.S. § 2141.2;

b.  A "Trade Secret" as defined in the Uniform Trade Secrets Act and/or the Economic Espionage Act of 1996, *see* 18 U.S.C. § 1839(3); or

c.  Other highly-sensitive business or personal information, the disclosure of which the Producing Party believes in good faith is highly likely to cause significant harm.

Any party who believes that a Producing Party is not acting in good faith in the designation of material as Highly Confidential–Attorneys' Eyes Only may challenge the designation pursuant to paragraph 10 of this Order and seek further relief from the Court, including modification of this Order and/or an award of attorneys' fees and costs incurred if the Court determines that the Producing Party improperly designated material as Highly Confidential–Attorneys' Eyes Only and failed to act in good faith in designating the material as Highly Confidential–Attorneys' Eyes Only. Any Producing Party who produces or discloses any Highly Confidential–Attorneys' Eyes Only material shall mark the same with the foregoing or similar legend: "HIGHLY CONFIDENTIAL–

3

Certification Due Date: 02/12/2026
Response Date: 02/19/2026
Case ID: 250303655
Control No.: 26021608

ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL– ATTORNEYS' EYES ONLY– SUBJECT TO PROTECTIVE ORDER" (hereinafter "Highly Confidential–Attorneys' Eyes Only").

4.      All Confidential or Highly Confidential–Attorneys' Eyes Only material shall be used by the Receiving Party solely for purposes of the prosecution or defense of this action, and shall not be used by any Receiving Party for any other purpose, and shall not be disclosed by any Receiving Party to anyone other than those set forth in Paragraphs 5-7 in accordance with the provisions of those paragraphs, unless and until the restrictions herein are removed by written agreement of counsel for the parties or by order of the Court.  It is, however, understood, acknowledged, and agreed that counsel for a party may give advice and opinions to his or her client(s) relating to the above-captioned action based on his or her evaluation of Confidential or Highly Confidential–Attorneys' Eyes Only material, provided that such advice and opinions shall not reveal the content of such Confidential or Highly Confidential–Attorneys' Eyes Only material except (a) by prior written agreement of counsel for the parties, (b) by order of the Court, or (c) in the case of Confidential material, by disclosure in accordance with Paragraph 5(a) of this Protective Order.

5.      Information designated Confidential may be disclosed only to the individuals identified in this paragraph.  Additionally, for those categories below (and only those categories) that are "subject to signing Exhibit A," disclosure is subject to the execution of a non-disclosure agreement in the form attached as Exhibit A:

    a.  The parties to the litigation (in the case of parties that are corporations or other business entities, "party" shall mean individuals who are required to participate in decisions with reference to this lawsuit), subject to signing Exhibit A;

4

Certification Due Date: 02/12/2026
Response Date: 02/19/2026
Case ID: 250303655
Control No.: 26021608

**Exhibit A_ Page 327 of 336**

b.  Outside experts or consultants who are employed, retained or consulted by counsel for purposes of this action, subject to signing Exhibit A;

c.  Any deponent who is not a party, subject to signing Exhibit A; and

d.  Witnesses and potential witnesses in this litigation as determined by the parties, subject to signing Exhibit A.

Confidential material may also be disclosed to the following individuals without the requirement that the individuals execute a non-disclosure agreement prior to any disclosure:

e.  Any deponent who is a party, or an employee of a party;

f.  Any mediators and their staff;

g.  Counsel for the parties in this litigation, including any attorney or staff member at the parties' outside law firms and relevant in-house counsel for the parties;

h.  Secretarial, paralegal, clerical, duplicating and data processing personnel working for outside counsel, whose duties and responsibilities require access to confidential material to support outside counsel;

i.  Vendors retained by outside counsel to assist in preparing for pretrial discovery, trial, and/or hearings including, but not limited to, court reporters, videographers, litigation support personnel, jury consultants, individuals to prepare demonstrative and audiovisual aids for use in the courtroom or in depositions or mock jury sessions, as well as their respective staff whose duties and responsibilities require access to such materials; and

j.  The Court and court personnel.

6.  Confidential material shall be used only by individuals permitted access to it under Paragraph 5. Confidential material, copies thereof, and the information contained therein, shall

5

Certification Due Date: 02/12/2026
Response Date: 02/19/2026
Case ID: 250303655
Control No.: 26021608

not be disclosed in any manner to any other individual, until and unless (a) outside counsel for the Producing Party affirmatively waives, in writing, the claim of confidentiality, or (b) the Court permits such disclosure.

7.      Material produced and marked as Highly Confidential–Attorneys' Eyes Only may be disclosed only to individuals in Paragraphs 5.b. (subject to signing Exhibit A) and individuals in Paragraphs 5.f., 5.g., 5.h., 5.i., 5.j. (who are provided a copy of this Protective Order and/or are otherwise made aware of the prohibitions on disclosing such material), and to such other persons as counsel for the producing party agrees in advance or as ordered by the Court. Material produced and marked as Highly Confidential–Attorneys' Eyes Only by any Producing Party may also be disclosed in the deposition of any employee of such Producing Party.

8.      Whenever Confidential material is to be discussed or disclosed in a deposition, the Producing Party who produced the Confidential material may require the exclusion from the room of any person who is required to, but has not executed Exhibit A hereto.

9.      Where Confidential material is used during a deposition, the Producing Party may designate only that portion of the deposition and/or exhibits thereto as Confidential and subject to the terms of this Order, and must do so within thirty (30) days of the deposition.

10. If counsel for Receiving Party objects to the designation of material as Confidential or Highly Confidential–Attorneys' Eyes Only, the following procedure shall apply:

   a.   Counsel for the Receiving Party shall serve on the Producing Party a written objection to such designation, which shall describe with particularity the documents or information at issue and shall state the grounds for objection. The Producing Party shall respond in writing to such objection within seven (7) days, and shall state with particularity the grounds for asserting that the document or information

6

is Confidential or Highly Confidential-Attorneys' Eyes Only. If no timely written response is made to the objection, the challenged designation will be deemed to be void and the document or thing at issue will no longer be considered as confidential. If the Producing Party makes a timely response to such objection, counsel for the Receiving Party and counsel for the Producing Party shall then confer in good faith for a period of seven (7) days ("Conferral Period") in an effort to resolve the dispute.

b. If a dispute as to a Confidential or Highly Confidential-Attorneys' Eyes Only designation of a document or item of information cannot be resolved by agreement, the Producing Party shall file a motion for an order regarding the challenged designation within fourteen (14) days of the end of the Conferral Period. If no timely motion is made, the challenged designation will be deemed to be void and the document or thing at issue will no longer be considered as confidential. The Producing Party bears the burden of demonstrating the propriety of a Confidential or Highly Confidential—Attorneys' Eyes Only designation. The document or information that is the subject of the filing shall be treated as originally designated pending resolution of the dispute.

11. All requests to seal documents filed with the Court shall comply with the applicable Pennsylvania Rules of Civil Procedure and the Civil Local Rules for the Philadelphia Court of Common Pleas Trial Division.

12. This Order does not apply to use of Confidential information at trial. The Parties shall meet and confer prior to trial concerning the use of Confidential information at trial and bring any issues to the Court at that time.

7

Certification Due Date: 02/12/2026
Response Date: 02/19/2026
Case ID: 250303655
Control No.: 26021608

13. To the extent consistent with applicable law, the inadvertent or unintentional disclosure of Confidential or Highly Confidential–Attorneys' Eyes Only material that should have been designated as such, regardless of whether the information, document or thing was so designated at the time of disclosure, shall not be deemed a waiver in whole or in part of a party's claim of confidentiality, either as to the specific information, document or thing disclosed or as to any other material or information concerning the same or related subject matter. Such inadvertent or unintentional disclosure may be rectified by notifying in writing counsel for all parties to whom the material was disclosed that the material should have been designated Confidential or Highly Confidential–Attorneys' Eyes Only within a reasonable time after disclosure. The Producing Party shall provide replacement copies of such materials with the appropriate confidentiality designation within ten (10) days of providing notice, and the Receiving Party shall return, destroy, or apply the appropriate confidentiality designation to the inadvertent or unintentionally produced materials within ten (10) days of receipt of the replacement copies. Notwithstanding the above, a Receiving Party's disclosure of inadvertent or unintentionally produced materials prior to receiving notice from the Producing Party that such materials were inadvertently or unintentionally produced without a confidentiality designation shall not be deemed a violation of this Order by the Receiving Party.

14.    This Order shall not deprive any party of its right to object to discovery by any other party or on any otherwise permitted ground. This Order is being entered without prejudice to the right of any party to move the Court for modification or for relief from any of its terms.

15.    This Order shall survive the termination of this action and shall remain in full force and effect unless modified by an order of this Court or by the written stipulation of the parties filed with the Court.

8

Certification Due Date: 02/12/2026
Response Date: 02/19/2026
Case ID: 250303655
Control No.: 26021608

16.    Within ninety (90) days after the final conclusion of this litigation, each party or other individual subject to the terms hereof shall be under an obligation, absent agreement of the Producing Party to the contrary, to:

a. Either assemble and return to the Producing Party, or at the election of the Receiving Party, destroy all originals and unmarked copies of Confidential or Highly Confidential–Attorneys' Eyes Only material, and

b. destroy such materials that contain excerpts, summaries, and digests containing Confidential or Highly Confidential–Attorneys' Eyes Only material; provided, however, that counsel may retain complete copies of all transcripts, expert reports, pleadings, briefs, and attorney work product that is maintained digitally, including any exhibits attached thereto for archival purposes, subject to the provisions of this Order.

17.    This Court retains jurisdiction over the parties, their respective attorneys, experts, employees, and any other persons receiving protected Confidential material, for enforcement of the provisions of this Order following termination of this litigation.

9

Certification Due Date: 02/12/2026
Response Date: 02/19/2026
Case ID: 250303655
Control No.: 26021608

So **STIPULATED** this 5th day of February, 2026.

| *Attorneys for Plaintiffs* | *Attorneys for Defendants Sunoco Pipeline L.P., Energy Transfer LP, and Energy Transfer (R&M) LLC* |
|---|---|
| By: */s/ Y. Michael Twersky*<br>Shanon Carson (PA ID 85957)<br>Joseph E Samuel, Jr.<br>Yechiel Michael Twersky<br>Berger Montague PC<br>1818 Market Street<br>Suite 3600<br>Philadelphia, PA 19103<br>Tel: 215-875-4656<br>scarson@bm.net<br>jsamuel@bm.net<br>mitwersky@bm.net | By: */s/ Laura Hughes McNally*<br>Laura Hughes McNally (PA ID 310658)<br>Morgan, Lewis & Bockius, LLP<br>2222 Market Street<br>Philadelphia, PA 19103<br>Tel: 215-963-5000; Fax: 215-963-5001<br>laura.mcnally@morganlewis.com<br><br>Duke K. McCall III, *admitted pro hac vice*<br>Morgan, Lewis & Bockius, LLP<br>1111 Pennsylvania Avenue, NW<br>Washington, DC 20004<br>Tel: 202-373-6607<br>duke.mccall@morganlewis.com<br><br>Robert D. Fox (PA ID No. 44322)<br>Diana A. Silva (PA ID No. 311083)<br>Manko, Gold, Katcher & Fox, LLP<br>Three Bala Plaza East, Suite 700<br>Bala Cynwyd, PA 19004<br>Tel: 484-430-5700; Fax: 484-430-5711<br>rfox@mankogold.com<br>dsilva@mankogold.com |

So **ORDERED** this __19th__ day of __February__, 2026.

BY THE COURT:

_____
Hon. Paula Patrick, J.

DOCKETED
FEB 19 2026
N. SWEENEY
JUDICIAL RECORDS

10

Certification Due Date: 02/12/2026
Response Date: 02/19/2026
Case ID: 250303655
Control No.: 26021608

**Exhibit A_ Page 333 of 336**

# EXHIBIT A

Certification Due Date: 02/12/2026
Response Date: 02/19/2026
Case ID: 250303655
Control No.: 26021608

| | |
|---|---|
| DANIEL LA HART and KATHERINE LA HART; JERRY ZACHARATOS and JUSTINE ZACHARATOS; CHRISTOPHER GROVER and ANDREA GROVER,<br><br>_Plaintiffs_,<br><br>v.<br><br>SUNOCO PIPELINE L.P.; ENERGY TRANSFER LP; ENERGY TRANSFER (R&M) LLC; ENERGY TRANSFER MARKETING & TERMINALS L.P.; DELTA AIR LINES, INC.; EPSILON TRADING, LLC; MONROE ENERGY, LLC; PBF ENERGY INC.; PBF HOLDING COMPANY LLC; PRECISION PIPELINE LLC; MASTEC, INC.; NATURAL ENERGY FIELD SERVICES, LLC; SHAW PIPELINE SERVICES INC.; CORRPRO COMPANIES, INC.; AZURIA WATER SOLUTIONS, INC.; BARR AIR PATROL, LLC; BAKER HUGHES COMPANY; ROSEN SWISS A.G. d/b/a ROSEN USA<br><br>_Defendants._ | PHILADELPHIA COUNTY<br>COURT OF COMMON PLEAS<br>TRIAL DIVISION<br><br>March Term, 2025<br><br>CASE NO. 250303655 |

## NON-DISCLOSURE AGREEMENT

My name is _____. My address is

_____.

1.  I have read and received a copy of the Stipulated Protective Order (the "Order") entered in the above-captioned matter. I understand the provisions of the Order and I agree to comply with and to be bound by its provisions.

2.  I agree to submit to the jurisdiction of the above-named Court for adjudication of any dispute regarding my compliance with the terms of the Order.

1

Certification Due Date: 02/12/2026<br>Response Date: 02/19/2026<br>Case ID: 250303655<br>Control No.: 26021608

3. I declare under penalty of perjury under the laws of the Commonwealth of Pennsylvania that the foregoing is true and correct.

Dated: _____          Signed: _____

2

Certification Due Date: 02/12/2026
Response Date: 02/19/2026
Case ID: 250303655
Control No.: 26021608

**Exhibit A_ Page 336 of 336**