# Exhibit B

CLOSED,APPEAL

# United States District Court
## Eastern District of Pennsylvania (Philadelphia)
### CIVIL DOCKET FOR CASE #: 2:25-cv-02072-MRP

LA HART et al v. SUNOCO PIPELINE L.P. et al
Assigned to: DISTRICT JUDGE MIA ROBERTS PEREZ
related Case:  2:25-cv-03694-MRP
Case in other court:  USCA FOR THE THIRD CIRCUIT, 25-
02152
Court of Common Pleas of Philadelphia
County, 250303655
Cause: 28:1332(d)(5)(B) Diversity of Citizenship under CAFA

Date Filed: 04/24/2025
Date Terminated: 06/20/2025
Jury Demand: Plaintiff
Nature of Suit: 240 Real Property: Torts to
Land
Jurisdiction: Diversity

**Plaintiff**

**DANIEL LA HART**                              represented by  **Jordan Hughes**
Berger Montague PC
1229 Tyler Steet NE, Suite 205
Minneapolis, MN 55413
763-340-0285
Email: jhughes@bm.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**SHANON J. CARSON**
BERGER MONTAGUE PC
1818 Market St.
Suite 3600
Philadelphia, PA 19103
215-875-4656
Fax: 215-875-4674
Email: scarson@bergermontague.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Walsh**
Berger Montague PC
1818 Market Street. Suite 3600
Philadelphia. PA 19103
215-875-3036
Email: wwalsh@bm.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph E Samuel , Jr**
Berger Montague PC
1818 Market Street
Suite 3600

**Exhibit B_Page 1 of 583**

Philadelphia, PA 19103
215-875-3020
Email: jsamuel@bergermontague.com
*ATTORNEY TO BE NOTICED*

**YECHIEL MICHAEL TWERSKY**
Berger Montague PC
1818 Market Street
Suite 3600
Philadelphia, PA 19103
United Sta
215-875-3052
Fax: 215-875-4604
Email: mitwersky@bergermontague.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**KATHERINE LA HART**                    represented by **Jordan Hughes**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**SHANON J. CARSON**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Walsh**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph E Samuel , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**YECHIEL MICHAEL TWERSKY**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**SUNOCO PIPELINE L.P.**                    represented by **DREW CLEARY JORDAN**
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
202-739-5962
Email: drew.jordan@morganlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**DIANA AMARAL SILVA**

Manko, Gold, Katcher & Fox, LLP
Three Bala Plaza East
Suite 700
Bala Cynwyd, PA 19004
484-430-2347
Fax: 484-430-5711
Email: dsilva@mankogold.com
*ATTORNEY TO BE NOTICED*

**DUKE K. MCCALL , III**
MORGAN, LEWIS & BOCKIUS, LLP
1111 PENNSYLVANIA AVE., NW
WASHINGTON, DC 20004
202-373-6607
Email: duke.mccall@morganlewis.com
*ATTORNEY TO BE NOTICED*

**ROBERT D. FOX**
Manko, Gold, Katcher & Fox, LLP
Three Bala Plaza East
Suite 700
Bala Cynwyd, PA 19004
484-430-5700
Fax: 484-430-5711
Email: rfox@mankogold.com
*ATTORNEY TO BE NOTICED*

**LAURA H. MCNALLY**
Morgan, Lewis & Bockius LLP
2222 Market Street
Philadelphia, PA 19103
215-963-5000
Fax: 215-963-5001
Email: laura.mcnally@morganlewis.com
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**ENERGY TRANSFER LP**                    represented by **DREW CLEARY JORDAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**DIANA AMARAL SILVA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DUKE K. MCCALL , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ROBERT D. FOX**
(See above for address)
*ATTORNEY TO BE NOTICED*

LAURA H. MCNALLY
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**ENERGY TRANSFER (R&M) LLC**　　　represented by　**DREW CLEARY JORDAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**DIANA AMARAL SILVA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DUKE K. MCCALL , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ROBERT D. FOX**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LAURA H. MCNALLY**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/24/2025 | 1 | NOTICE OF REMOVAL by ENERGY TRANSFER LP, SUNOCO PIPELINE L.P., ENERGY TRANSFER (R&M) LLC (Filing fee $ 405 receipt number APAEDC-18241430), filed by ENERGY TRANSFER LP, SUNOCO PIPELINE L.P., ENERGY TRANSFER (R&M) LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Civil Cover Sheet, # 8 Designation Form) (MCNALLY, LAURA) (Entered: 04/24/2025) |
| 04/24/2025 | 2 | Disclosure Statement Form pursuant to FRCP 7.1 including Energy Transfer Operations GP LLC; ET CC Holdings LLC; LE GP LLC; Energy Transfer LP by ENERGY TRANSFER (R&M) LLC, ENERGY TRANSFER LP, SUNOCO PIPELINE L.P.. (MCNALLY, LAURA) (Entered: 04/24/2025) |
| 04/24/2025 | 3 | Disclosure Statement Form pursuant to FRCP 7.1 including LE GP LLC by ENERGY TRANSFER (R&M) LLC, ENERGY TRANSFER LP, SUNOCO PIPELINE L.P.. (MCNALLY, LAURA) (Entered: 04/24/2025) |
| 04/24/2025 | 4 | Disclosure Statement Form pursuant to FRCP 7.1 including ETC Sunoco Holdings LLC; ET C&D Holdco LLC; ETE Services Company, LLC; LE GP LLC; Energy Transfer LP by ENERGY TRANSFER (R&M) LLC, ENERGY TRANSFER LP, SUNOCO PIPELINE L.P..(MCNALLY, LAURA) (Entered: 04/24/2025) |
| 04/24/2025 | 5 | Opt In Notice of Procedure to Consent to Random Magistrate Judge Assignment (Attachments: # 1 Consent)(sbt) (Entered: 04/24/2025) |
| 04/24/2025 | 6 | ORDER THAT COUNSEL CONTEMPLATING FILING A MOTION UNDER FED. R. CIV. P. 12(B)(6), (E), OR (F), SHALL FIRST CONTACT OPPOSING COUNSEL TO DISCUSS THE SUBSTANCE OF THE CONTEMPLATED MOTION AND TO |

| | | |
|---|---|---|
| | | PROVIDE AN OPPORTUNITY TO CURE ANY ALLEGED PLEADING DEFICIENCIES OR STRIKE CERTAIN MATTER. THIS CONFERENCE SHALL TAKE PLACE AT LEAST SEVEN (7) DAYS BEFORE THE FILING OF THE MOTION. SIGNED BY DISTRICT JUDGE MIA ROBERTS PEREZ ON 4/24/25. 4/24/25 ENTERED AND COPIES E-MAILED. (va) (Entered: 04/24/2025) |
| 04/24/2025 | 7 | CERTIFICATE OF SERVICE by ENERGY TRANSFER (R&M) LLC, ENERGY TRANSFER LP, SUNOCO PIPELINE L.P. re 1 Notice of Removal (Attorney), *(File-Stamped copy served by email and U.S. Mail)* (MCNALLY, LAURA) (Entered: 04/24/2025) |
| 04/25/2025 | 8 | State Court record received from Court of Common Pleas of Philadelphia County. (CCP - Philadelphia County cv, ) (Entered: 04/25/2025) |
| 04/28/2025 | 9 | NOTICE of Appearance by YECHIEL MICHAEL TWERSKY on behalf of DANIEL LA HART, KATHERINE LA HART with Certificate of Service(TWERSKY, YECHIEL) (Entered: 04/28/2025) |
| 04/28/2025 | 10 | NOTICE of Appearance by Joseph E Samuel, Jr on behalf of DANIEL LA HART, KATHERINE LA HART with Certificate of Service(Samuel, Joseph) (Entered: 04/28/2025) |
| 05/01/2025 | 11 | NOTICE of Appearance by ROBERT D. FOX on behalf of ENERGY TRANSFER (R&M) LLC, ENERGY TRANSFER LP, SUNOCO PIPELINE L.P. with Certificate of Service(FOX, ROBERT) (Entered: 05/01/2025) |
| 05/01/2025 | 12 | NOTICE of Appearance by DIANA AMARAL SILVA on behalf of ENERGY TRANSFER (R&M) LLC, ENERGY TRANSFER LP, SUNOCO PIPELINE L.P. with Certificate of Service(SILVA, DIANA) (Entered: 05/01/2025) |
| 05/07/2025 | 13 | MOTION for Pro Hac Vice *Admission of Drew Cleary Jordan* ( Filing fee $ 75 receipt number APAEDC-18273381.) filed by ENERGY TRANSFER (R&M) LLC, ENERGY TRANSFER LP, SUNOCO PIPELINE L.P..Certificate of Service.(MCNALLY, LAURA) (Entered: 05/07/2025) |
| 05/07/2025 | 14 | ORDER THAT DREW CLEARY JORDAN MOTION TO APPEAR PRO HAC VICE IS GRANTED; ETC.. SIGNED BY DISTRICT JUDGE MIA ROBERTS PEREZ ON 5/7/25.5/7/25 ENTERED AND E-MAILED.(JL) (Entered: 05/07/2025) |
| 05/08/2025 | 15 | MOTION for Pro Hac Vice *Admission of Duke K. McCall III* ( Filing fee $ 75 receipt number APAEDC-18275391.) filed by ENERGY TRANSFER (R&M) LLC, ENERGY TRANSFER LP, SUNOCO PIPELINE L.P..Certificate of Service.(MCNALLY, LAURA) (Entered: 05/08/2025) |
| 05/08/2025 | 16 | ORDER THAT DEFENDANTS' 15 MOTION FOR THE PRO HAC VICE ADMISSION OF DUKE K. MCCALL, III, ESQ. IS GRANTED. SIGNED BY DISTRICT JUDGE MIA ROBERTS PEREZ ON 5/8/25.5/8/25 ENTERED & E-MAILED.(fdc) (Entered: 05/08/2025) |
| 05/14/2025 | 17 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by ENERGY TRANSFER LP, SUNOCO PIPELINE L.P..Memorandum, Certificate of Conference, Certificate of Service. (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Conference, # 3 Memorandum in Support of Motion to Dismiss, # 4 Exhibit 1-Notice of Intent, # 5 Exhibit 2-Response, # 6 Exhibit 3-Admin Order, # 7 Exhibit 4-Response, # 8 Exhibit 5-Interim Remedial Action Plan, # 9 Exhibit 6-Revised Schedule, # 10 Exhibit 7-Revised Plan, # 11 Exhibit 8-Approval, # 12 Exhibit 9-Vanni Compl., # 13 Exhibit 10-Geltch Compl., # 14 Exhibit 11-Wojnovich Compl.)(MCNALLY, LAURA) (Entered: 05/14/2025) |

| | | |
|---|---|---|
| 05/14/2025 | 18 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by ENERGY TRANSFER (R&M) LLC.Memorandum, Declaration, Certificate of Meet & Confer, Certificate of Service. (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Conference, # 3 Declaration of Curtis Stambaugh, # 4 Memorandum of Law in Support of Motion to Dismiss, # 5 Exhibit 1-Response to Notice, # 6 Exhibit 2-Admin Order, # 7 Exhibit 3-Sunoco Response, # 8 Exhibit 4-Vanni Compl., # 9 Exhibit 5-Geltch Compl., # 10 Exhibit 6-Wojnovich Compl., # 11 Exhibit 7-McCall Letter)(MCNALLY, LAURA) (Entered: 05/14/2025) |
| 05/27/2025 | 19 | MOTION to Remand to State Court *or in the Alternative for Jurisdictional Discovery* filed by DANIEL LA HART, KATHERINE LA HART.Memorandum, Proposed Order, and Certificate of Service. (Attachments: # 1 Memorandum, # 2 Text of Proposed Order, # 3 Certificate of Service)(CARSON, SHANON) (Entered: 05/27/2025) |
| 05/28/2025 | 20 | RESPONSE to Motion re 18 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 17 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *PLAINTIFFS' NOTICE OF INTENT TO AMEND COMPLAINT PURSUANT TO LOCAL RULE 7.1(c)* filed by DANIEL LA HART, KATHERINE LA HART. (Samuel, Joseph) (Entered: 05/28/2025) |
| 06/04/2025 | 21 | AMENDED COMPLAINT against All Defendants All Defendants., filed by DANIEL LA HART, KATHERINE LA HART. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Supplement Redline to Original Complaint)(CARSON, SHANON) (Entered: 06/04/2025) |
| 06/09/2025 | 22 | MOTION for Preliminary Injunction filed by DANIEL LA HART, KATHERINE LA HART.Memorandum, Declaration of Harvey A. Cohen, Ph.D., Declaration of Benjamin B. Petersen, Certificate of Service. (Attachments: # 1 Text of Proposed Order, # 2 Memorandum, # 3 Declaration Declaration of Harvey A. Cohen, Ph.D., # 4 Declaration Declaration of Benjamin B. Petersen, # 5 Exhibit 1, # 6 Exhibit 2, # 7 Exhibit 3, # 8 Exhibit 4, # 9 Exhibit 5, # 10 Exhibit 6, # 11 Exhibit 7, # 12 Certificate of Service)(CARSON, SHANON) (Entered: 06/09/2025) |
| 06/10/2025 | 23 | ORDER THAT A PRELIMINARY INJUNCTION HEARING IS SCHEDULED FOR MONDAY, JUNE 16, 2025 AT 10:30 A.M. IN COURTROOM 6-A, DEFENDANTS SHALL FILE THEIR RESPONSE(S) TO PLAINTIFFS 22 MOTION NO LATER THAN THURSDAY, JUNE12, 2025 END OF DAY. SIGNED BY DISTRICT JUDGE MIA ROBERTS PEREZ ON 6/10/25. 6/10/25 ENTERED AND COPIES E-MAILED.(va) (VACATED AS PER 30 ORDER). (va) (Entered: 06/10/2025) |
| 06/10/2025 | 24 | RESPONSE in Opposition re 19 MOTION to Remand to State Court *or in the Alternative for Jurisdictional Discovery* filed by ENERGY TRANSFER (R&M) LLC, ENERGY TRANSFER LP, SUNOCO PIPELINE L.P.. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit 1-Notice of Intent to Remediate, # 3 Exhibit 2-PADEP Response, # 4 Exhibit 3-Sunoco Response, # 5 Exhibit 4-PADEP Administrative Order, # 6 Exhibit 5-Sunoco Response to Order)(MCNALLY, LAURA) (Entered: 06/10/2025) |
| 06/11/2025 | 25 | MOTION for Pro Hac Vice *of Jordan Hughes* ( Filing fee $ 75 receipt number APAEDC-18358803.) filed by DANIEL LA HART, KATHERINE LA HART.Certificate of Service. (TWERSKY, YECHIEL) (Entered: 06/11/2025) |
| 06/11/2025 | 26 | MOTION for Pro Hac Vice *of William Walsh* ( Filing fee $ 75 receipt number APAEDC-18358840.) filed by DANIEL LA HART, KATHERINE LA HART.Certificate of Service. (TWERSKY, YECHIEL) (Entered: 06/11/2025) |

| 06/12/2025 | 27 | ORDER GRANTING 25 MOTION FOR PRO HAC VICE ADMISSION OF JORDAN HUGHES. SIGNED BY DISTRICT JUDGE MIA ROBERTS PEREZ ON 6/12/25. 6/12/25 ENTERED AND COPIES E-MAILED.(va) (Entered: 06/12/2025) |
|---|---|---|
| 06/12/2025 | 28 | ORDER GRANTING 26 MOTION FOR PRO HAC VICE ADMISSION OF WILLIAM WALSH. SIGNED BY DISTRICT JUDGE MIA ROBERTS PEREZ ON 6/12/25. 6/12/25 ENTERED AND COPIES E-MAILED. (va) (Entered: 06/12/2025) |
| 06/12/2025 | 29 | RESPONSE in Opposition re 22 MOTION for Preliminary Injunction filed by ENERGY TRANSFER (R&M) LLC, ENERGY TRANSFER LP, SUNOCO PIPELINE L.P.. (Attachments: # 1 Text of Proposed Order, # 2 Appendix A, # 3 Declaration of Matthew Gordon in Support of Opposition, # 4 Exhibit 1-Daily Summary, # 5 Exhibit 2-PHMSA Notice, # 6 Exhibit 3-Response to Notice, # 7 Exhibit 4-Consent Agreement, # 8 Exhibit 5-Sunoco Notice of Intent, # 9 Exhibit 6-PADEP Response, # 10 Exhibit 7-PADEP Notice, # 11 Exhibit 8-Sunoco Response, # 12 Exhibit 9-Administrative Order, # 13 Exhibit 10-Remedial Action Progress Report, # 14 Exhibit 11-Sunoco Response, # 15 Exhibit 12-PADEP Approval, # 16 Exhibit 13-PADEP Approval, # 17 Exhibit 14-Approval of Public Involvement Plan, # 18 Exhibit 15-April 7, 2025 Email, # 19 Exhibit 16-June 1, 2025 Email, # 20 Exhibit 17-June 4, 2025 Email, # 21 Exhibit 18-May 7, 2025 Letter, # 22 Exhibit 19-Recover Well Work Plan, # 23 Exhibit 20-May 18, 205 Letter, # 24 Exhibit 21-SPLP Update, # 25 Exhibit 22-SPLP Update, # 26 Exhibit 23-SPLP Update, # 27 Exhibit 24-Vapor Intrusion Progress Report)(MCNALLY, LAURA) (Entered: 06/12/2025) |
| 06/13/2025 | 30 | ORDER GRANTING 19 MOTION TO REMAND TO STATE COURT. THIS MATTER IS HEREBY REMANDED TO THE PHILADELPHIA COUNTY COURT OF COMMON PLEAS PURSUANT TO THE LOCAL CONTROVERSY EXCEPTION UNDER THE CLASS ACTION FAIRNESS ACT OF 2005(CAFA). SEE 28 U.S.C. § 1332(D)(4). PLAINTIFFS ALTERNATIVE REQUEST FOR LIMITED JURISDICTIONAL DISCOVERY IS DENIED AS MOOT. THE ORDER SCHEDULING THIS MATTER FOR A PRELIMINARY INJUNCTION HEARING ON JUNE 16, 2025(ECF NO. 23 ) IS HEREBY VACATED AND THE HEARING IS CANCELED. SIGNED BY DISTRICT JUDGE MIA ROBERTS PEREZ ON 6/13/25. 6/13/25 ENTERED AND COPIES E-MAILED.(va) (Additional attachment(s) added on 6/13/2025: # 1 Certified Copy) (va). (Entered: 06/13/2025) |
| 06/13/2025 | 31 | Emergency MOTION to Stay re 30 Order on Motion to Remand to State Court,, *(Motion to Stay Mailing of Court Order Granting Remand)* filed by ENERGY TRANSFER (R&M) LLC, ENERGY TRANSFER LP, SUNOCO PIPELINE L.P..Memorandum, Certificate of Service, Certificate of Counsel. (Attachments: # 1 Memorandum of Law in Support of Emergency Motion, # 2 Text of Proposed Order)(MCNALLY, LAURA) (Entered: 06/13/2025) |
| 06/13/2025 | 32 | RESPONSE in Opposition re 31 Emergency MOTION to Stay re 30 Order on Motion to Remand to State Court,, *(Motion to Stay Mailing of Court Order Granting Remand)* filed by DANIEL LA HART, KATHERINE LA HART. (Attachments: # 1 Text of Proposed Order)(CARSON, SHANON) (Entered: 06/13/2025) |
| 06/16/2025 | 33 | REPLY to Response to Motion re 31 Emergency MOTION to Stay re 30 Order on Motion to Remand to State Court,, *(Motion to Stay Mailing of Court Order Granting Remand)* filed by ENERGY TRANSFER (R&M) LLC, ENERGY TRANSFER LP, SUNOCO PIPELINE L.P.. (MCNALLY, LAURA) (Entered: 06/16/2025) |
| 06/16/2025 | 34 | MEMORANDUM: THE COURT LACKS SUBJECT MATTER JURISDICTION UNDER CAFA, AND THIS CASE WILL BE REMANDED TO PHILADELPHIA COUNTY COURT OF COMMON PLEAS. SIGNED BY DISTRICT JUDGE MIA ROBERTS PEREZ ON 6/16/25. 6/16/25 ENTERED AND COPIES E-MAILED. (va) (Additional |

| | | attachment(s) added on 6/17/2025: # 1 Certified Copy of Order) (md). (Entered: 06/16/2025) |
|---|---|---|
| 06/18/2025 | 35 | NOTICE OF APPEAL as to 30 Order on Motion to Remand to State Court,, 34 Memorandum and/or Opinion,, Order (Memorandum and/or Opinion), by ENERGY TRANSFER (R&M) LLC, ENERGY TRANSFER LP, SUNOCO PIPELINE L.P.. Filing fee $ 605, receipt number APAEDC-18377477. (Attachments: # 1 Exhibit A: Order, Dkt. 30, # 2 Exhibit B: Order, Dkt. 34)(MCNALLY, LAURA) (Entered: 06/18/2025) |
| 06/20/2025 | 36 | ORDER THAT EMERGENCY MOTION (DOC. 31) IS DENIED. SIGNED BY DISTRICT JUDGE MIA ROBERTS PEREZ ON 6/17/25. 6/20/25 ENTERED AND COPIES E-MAILED.(rf, ) (Entered: 06/20/2025) |
| 06/20/2025 | 37 | NOTICE of Docketing Record on Appeal from USCA re 35 Notice of Appeal (Credit Card Payment), filed by ENERGY TRANSFER LP, ENERGY TRANSFER (R&M) LLC, SUNOCO PIPELINE L.P., Energy Transfer LP. USCA Case Number 25-2152 (rf, ) (Entered: 06/20/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/09/2026 06:04:31 | | |
| **PACER Login:** CaroleSGrif | **Client Code:** | |
| **Description:** Docket Report | **Search Criteria:** 2:25-cv-02072-MRP | |
| **Billable Pages:** 8 | **Cost:** 0.80 | |

**Exhibit B_Page 8 of 583**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| DANIEL LA HART and<br>KATHERINE LA HART<br><br>*Plaintiffs*,<br><br>v.<br><br>SUNOCO PIPELINE L.P.; ENERGY<br>TRANSFER LP; and ENERGY TRANSFER<br>(R&M) LLC,<br><br>*Defendants*. | Civil Action No. _____ |

**NOTICE OF REMOVAL**

Pursuant to 28 U.S.C. §§ 1332, 1441, 1453 and 1446, Defendants Energy Transfer LP, Sunoco Pipeline LP, and Energy Transfer (R&M) LLC ("Energy Transfer" or "Defendants"), by and through their undersigned counsel, respectfully submit this Notice of Removal of this action from the Court of Common Pleas of Philadelphia County, Pennsylvania, where it is now pending as Case No. 250303655 ("Underlying State Court Action") to the United States District Court for the Eastern District of Pennsylvania.

This removal is based on the following grounds:

**INTRODUCTION**

1.    On March 27, 2025, Plaintiffs Daniel La Hart and Katherine La Hart ("Plaintiffs") filed a putative class action complaint in the Court of Common Pleas of Philadelphia County,

1

**Exhibit B_Page 9 of 583**

Pennsylvania, Case No. 250303655 (the "Complaint"). A true and correct copy of the Complaint is attached hereto as Exhibit A.[1]

2.     Pursuant to 28 U.S.C. § 1446(a), a copy of the Docket Sheet and copies of all process, pleadings, and orders served to date upon Defendants in the Underlying State Court Action are attached as Exhibit B.

3.     By filing this Notice of Removal, Energy Transfer does not waive, and expressly reserves, its right to object to service of process, the sufficiency of process, jurisdiction over the parties, or venue, and to assert any defenses and objections to which it is entitled.

**<u>REMOVAL IS TIMELY</u>**

4.     Plaintiffs filed an Affidavit of Service stating that they served Sunoco Pipeline LP with Plaintiffs' Complaint on March 27, 2025. A true and correct copy of the Affidavit of Service is contained in Exhibit B at page 72.

5.     Plaintiffs filed an Affidavit of Service stating that they served Energy Transfer (R&M) LLC with Plaintiffs' Complaint on March 27, 2025. A true and correct copy of the Affidavit of Service is contained in Exhibit B at page 72.

6.     Plaintiffs filed an Affidavit of Service stating that they served Energy Transfer LP with Plaintiffs' Complaint on March 27, 2025. A true and correct copy of the Affidavit of Service is contained in Exhibit B at page 71.

7.     The last day to file this Notice of Removal is thirty (30) days after receipt of the action by Defendants, which is April 28, 2025. 28 U.S.C. § 1446(b)(1).

---

[1] The exhibits to the Complaint were not filed along with the Complaint but rather were filed separately on April 23, 2025. Per 28 U.S.C. § 1446(a), the exhibits to the Complaint are contained in Exhibit B at 111-175.

8.     This Notice of Removal is timely because it is filed within thirty (30) days of the date Plaintiffs served their Complaint on Defendants in this action.  28 U.S.C. § 1446(b)(2).

9.     Additionally, this Notice is timely because it is filed within one year after commencement of the Underlying State Court Action.  *See* 28 U.S.C. § 1446(c)(1).

10.     No previous Notice of Removal has been filed or made with the Court for the relief sought herein.

## **FACTUAL BACKGROUND**

11.     Plaintiffs allege that "this case arises from a crack in Defendant's Twin Oaks Pipeline (the 'Twin Oaks Pipeline' or 'Pipeline') in the Mt. Eyre Manor community in Upper Makefield Township, Bucks County, Pennsylvania, which caused a discharge into the underlying bedrock and groundwater of petroleum, jet fuel, gasoline, and hazardous and toxic chemicals that the Pipeline was used to transport (the 'Pipeline Leak' or 'Leak')."  Ex. A, Compl. ¶ 9.

12.     Plaintiffs contend that as a result of this Leak, discovered in January 2025, there has been a "massive and unqualified leak of jet fuel and petroleum products, and resulting toxins, pollutants, and contaminants" that has contaminated the private drinking water wells, groundwater, soil, and air of the surrounding community.  *Id.* ¶¶ 3, 5-6, 18-24. Plaintiffs allege that the Leak has caused "severe harm and poses a serious ongoing and current danger to affected residents' physical health and mental and emotional wellbeing, the community's groundwater, soil, air quality, and ecosystem, and to property values."  *Id.* ¶ 3; *see also id.* ¶¶ 231-44 (alleging that plaintiffs have exposure to health risks, property damage, loss of enjoyment of property, loss of property value, and disruption of daily life).  Notably, Plaintiffs do not allege that the Leak has actually resulted in any product being found on their property or within their drinking water wells.

13.    Plaintiffs attempt to plead claims for: (i) negligence; (ii) gross negligence; (iii) negligence per se; (iv) strict liability – abnormally dangerous or ultrahazardous activity; (v) public nuisance; (vi) private nuisance; (vii) trespass; (viii) negligent infliction of emotional distress; and (ix) medical monitoring. *See generally id.* ¶¶ 257-318.

14.    Plaintiffs seek to pursue these claims on behalf of themselves and a purported class consisting of all Pennsylvania citizens who owned, rented, and/or resided in real properties in Pennsylvania within a one-mile radius of 121 Glenwood Drive, Washington Crossing, Pennsylvania from September 1, 2023 to present, with the owners of certain specific addresses carved out of the class definition. *Id.* ¶¶ 246-47.

15.    Plaintiffs seek damages consisting of compensatory damages, medical monitoring, punitive damages, pre- and post-judgement interest, as well as declaratory judgment "that Defendants are responsible for the [Leak], and responsible for all past and future costs to fully restore and remediate all environmental and other harms caused by Defendants to Plaintiffs and the Class," attorneys' fees and costs, and equitable and injunctive relief including notice to all affected persons of the Leak and potential dangers and risks of the Leak, enjoinment of the Pipeline until Defendants are able to fully guarantee its safe operation, provision of full water supply for all class members, provision of temporary housing and requested costs, installation of a "best-in-class" leak detection system for the Pipeline, "full restoration and remediation of all environmental contamination including but not limited to groundwater, soil, and air to background concentrations," and all other relief the Court deems necessary and proper. *See Id.* ¶ 319.

16.    Pursuant to 231 Pa. Stat. § 1026, Defendants' deadline to respond to the Complaint was originally April 16, 2025; however, by agreement under 231 Pa. Stat. § 1003, the parties extended Defendants' deadline to May 14, 2025.

## REMOVAL STANDARD AND GROUNDS FOR REMOVAL UNDER CAFA

17.     This action is removable, and this Court has original subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d)(2) and 1453, which requires only minimal diversity.

18.     As provided in 28 U.S.C. § 1441(a), "any civil action brought in a state court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."

19.     The Underlying State Court Action is removable to the United States District Court for the Eastern District of Pennsylvania because this Court (i) has original jurisdiction over this putative class action under CAFA, 28 U.S.C. §§ 1332(d)(2) and 1453, and (ii) encompasses the district where the Underlying State Court Action is pending.

20.     Plaintiffs seek to bring the Underlying State Court Action as a putative class action, asserting that they have met numerosity, typicality, adequacy, commonality, predominance, and superiority requirements with respect to the putative class. *See* Ex. A, Compl. ¶¶ 249-55.  Plaintiffs seeks to certify the proposed class under Pennsylvania Rules of Civil Procedure 1701, *et seq.*, the state's analog to Rule 23 of the Federal Rules of Civil Procedure.  *Id.* ¶ 246.

21.     CAFA permits the removal of a class action where: (1) the proposed class includes at least 100 members; (2) any class member is a citizen of a state different from any defendant; and (3) the amount in controversy exceeds $5,000,000 in the aggregate. *See* 28 U.S.C. §§ 1332(d)(2), (5)(B).

22.     This case satisfies each of these requirements and removal based on CAFA is proper here because: (i) the aggregate number of putative class members is 100 or greater,

(ii) minimal diversity of citizenship between Plaintiffs and Defendants Sunoco Pipeline LP and Energy Transfer LP exists,[2] and (iii) the amount the Complaint places in controversy exceeds, in the aggregate, $5,000,000, exclusive of interest and costs. *See* 28 U.S.C. §§ 1332(d)(2), 1332(d)(5)(B), and 1453.

23.    Defendants deny Plaintiffs' factual allegations and deny that Plaintiffs, or the class they purport to represent, is entitled to the relief requested and that the proposed class is certifiable. However, based on Plaintiffs' allegations in the Complaint and their prayers for relief, all requirements for jurisdiction under CAFA have been met.  Accordingly, diversity of citizenship exists under CAFA and this Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2).

### A. The Putative Class Has More Than 100 Members.

24.    Plaintiffs assert claims on behalf of a putative class comprised of: "All Pennsylvania citizens who owned[,] rented, and/or resided in real properties in Pennsylvania within a one mile radius of 121 Glenwood Drive, Washington Crossing, Pennsylvania . . . during the time period from September 1, 2023 to the present (the "Class")." *See* Ex. A, Compl. ¶ 246. Plaintiffs' proposed class only excludes the residents of six homes. *Id.* ¶ 247.

25.    Plaintiffs estimate that there are at least one thousand members of the proposed Class. *Id.* ¶ 249.

---

[2] Energy Transfer (R&M), LLC is not a proper party to this lawsuit.  Regardless, Energy Transfer (R&M), LLC's citizenship under CAFA would not impact the CAFA analysis, as only minimal diversity is required.

**Exhibit B_Page 14 of 583**

26.     Plaintiffs' counsel  represented to Defendants that, as of April 11, 2025, they represent 200 residents of about 106 separate addresses.  *See* April 11, 2025 Email from E. Magnus with Excel, attached hereto as Exhibit C.[3]

27.     Thus, upon information and belief and based on Plaintiffs' own averments, the putative class Plaintiffs purport to represent has more than 100 members.

### B. Minimal Diversity of Citizenship Under CAFA Exists.

28.     To satisfy CAFA's diversity requirement, a party seeking removal need only show that minimal diversity exists—i.e., that one putative class member is a citizen of a state different from that of one defendant. 28 U.S.C. § 1332(d)(2); *see also W. Virginia ex rel. McGraw v. Comcast Corp.*, 705 F. Supp. 2d 441, 445 (E.D. Pa. 2010) ("For CAFA's minimal diversity requirements to be met, 'only one member of the plaintiff class—named or unnamed—must be diverse from any one defendant.'" (citation omitted)).

#### i.   *Plaintiffs Daniel and Katherine La Hart Are Citizens of Pennsylvania.*

29.     An individual is a citizen of the state in which he or she is domiciled.  *See Freidrich v. Davis*, 767 F.3d 374, 377 (3d Cir. 2014).

30.     Although residence alone is not the equivalent of citizenship, the place of residence is prima facie evidence of domicile there.  *See Broderick v. Dellasandro*, 859 F. Supp. 176, 177 n.1 (E.D. Pa. 1994) ("[R]esidence is prima facie evidence of citizenship.").

31.     Plaintiffs allege that they "moved to the Mt. Eyre Manor neighborhood in 2016 and live in their home with their two young children.  As such, Plaintiffs are Pennsylvania residents." *See* Ex. A, Compl. ¶¶ 224-25.

---

[3] Defendants do not concede that all represented parties are members of the Class, and the Complaint expressly carves out six of these addresses.  The names on Exhibit C were redacted in an abundance of caution to the extent that any of the individuals listed are minors.

32.    Thus, Plaintiffs are citizens of Pennsylvania, both now and at the time of the commencement of this action.

### ii. Defendants Sunoco Pipeline LP and Energy Transfer LP are Not Citizens of Pennsylvania under CAFA.

33.    For CAFA purposes, the citizenship of both unincorporated entities and corporations is determined based on the entity's state of organization and principal place of business. 28 U.S.C. § 1332(d)(10) ("[A]n unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized."); *see also Vodenichar v. Halcon Energy Props., Inc.*, 733 F.3d 497, 504 n.3 (3d Cir. 2013) ("As an unincorporated association, CAFA deems [entity] 'to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized[.]'") (citation omitted).

34.    The "principal place of business" refers to "the place where a corporation's officers direct, control, and coordinate the corporation's activities." *Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010).

35.    Neither Defendant Sunoco Pipeline LP nor Energy Transfer LP is a citizen of Pennsylvania for CAFA removal purposes. *See* 28 U.S.C. § 1332(c)(1).

36.    Sunoco Pipeline LP is a limited partnership organized under the laws of the State of Texas whose principal place of business is located in Texas. Ex. A, Compl. ¶ 26. Accordingly, for purposes of CAFA removal, Sunoco Pipeline LP was at the time of the commencement of this action, and is now, a citizen of Texas.

37.    Energy Transfer LP is a master limited partnership organized under the laws of the State of Delaware whose principal place of business is located in Texas. *See* Ex. A, Compl. ¶ 27.

Accordingly, for purposes of CAFA removal, Energy Transfer LP was at the time of the commencement of this action, and is now, a citizen of Delaware and Texas.

38.    As a result, minimal diversity is satisfied, and diversity jurisdiction exists under CAFA.  *See* 28 U.S.C. § 1332(d)(2)(A) (requiring only minimal diversity under which "any member of a class of plaintiffs is a citizen of a State different from any defendant"); *see also Myers v. Jani-King of Phila., Inc.*, No. 09-1738, 2009 WL 2394362, at *2 (E.D. Pa. Aug. 4, 2009) (holding that minimal CAFA diversity was met where one defendant was a Texas corporation with its principal place of business in Pennsylvania, two defendants were Texas corporations with their principal places of business in Texas, named plaintiffs were Pennsylvania residents and the group of potential class members consisted of about 185 individuals with addresses in Pennsylvania and 61 with addresses outside of Pennsylvania).

### C. The Amount in Controversy Exceeds $5 Million.

39.    Pursuant to CAFA, the claims of the individual members in a class action are aggregated to determine if the amount in controversy exceeds $5,000,000, exclusive of interest and costs.  *See* 28 U.S.C. § 1332(d)(6).

40.    To determine whether the amount in controversy requirement is satisfied, district courts aggregate the claims of all named or unnamed persons who "fall within the definition of the proposed or certified class." *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592 (2013) (quoting 28 U.S.C. § 1332(d)(1)(D)). "A district court's determination as to the amount in controversy must be based on the 'plaintiff's complaint at the time the petition for removal was filed.'" *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 666 (3d Cir. 2002) (citation omitted), *abrogated on other grounds by Earl v. NVR, Inc.*, 990 F.3d 310 (3d Cir. 2021).

41.    "Where, as here, the plaintiff's complaint does not include a specific monetary demand, the removing defendant need only plausibly allege the amount in controversy." *Yucis v. Sears Outlet Stores, LLC*, 813 F. App'x 780, 783 n.2 (3d Cir. 2020) (internal quotation marks and alteration omitted); *see also Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014) ("[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."). Additionally, for purposes of removal, "[t]he question is not what damages plaintiff will recover, but what amount is 'in controversy' between the parties." *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 448 (7th Cir. 2005) ("That the plaintiff may fail in its proof, and the judgment be less than the threshold . . . does not prevent removal.").

42.    Although Defendants deny Plaintiffs' factual allegations and deny that Plaintiffs or the class they purport to represent are entitled to the relief Plaintiffs request, as detailed below, Plaintiffs' allegations and prayer for relief more likely than not put into controversy an amount that exceeds the $5 million threshold when aggregating the claims of the putative class members under 28 U.S.C. § 1332(d)(6).[4]

43.    Plaintiffs seek to recover compensatory damages relating to their property and for the remediation of the alleged contamination of their water, soil, and air, medical monitoring

---

[4] This Notice of Removal discusses the nature and amount of damages placed at issue by Plaintiffs' Complaint. Defendants' references to specific damage amounts and citation to cases supporting removal are provided solely for establishing that the amount in controversy more likely than not exceeds the jurisdictional minimum. Defendants maintain that each of Plaintiffs' claims is without merit, and Defendants are not liable to Plaintiffs or any putative class member. Defendants expressly deny that Plaintiffs or any putative class member is entitled to recover any of the damages or other relief sought in the Complaint. In addition, Defendants deny that liability or damages can be established on a class-wide basis. No statement or reference contained in this Notice shall constitute an admission of liability or a suggestion that Plaintiffs will or could actually recover any damages based upon the allegations contained in the Complaint or otherwise.

**Exhibit B_Page 18 of 583**

damages, attorneys' fees, costs, punitive damages, pre- and post-judgement interest, and equitable and injunctive relief.  *Id.* ¶ 319.

44.    Plaintiffs allege that, as a result of the Leak, these damages include but are not limited to the financial harms associated with the out of pocket costs to engage and pay contractors, testing companies, and inspectors, costs for the installation of remedial water systems, to buy new and replacement filters for the water systems, replacement of contaminated pipes and fixtures, temporary housing, commuting to other locations for the purpose of showering or doing laundry, reimbursement of mileage to attend meetings about the Leak and for childcare during those meetings, increased insurance premiums, lost time-value for time away from work, medical costs incurred because of the leak.  *Id.* ¶¶ 217-18, 319.  Plaintiffs also seek to recover and hold Defendants responsible for all past and future costs associated with the complete restoration and remediation of all contamination caused by the Leak to all property, soil, water, and air, diminution in value of their real property, loss of enjoyment of their property, and damages for emotional distress. *Id.* ¶¶ 219-22, 319.  Plaintiffs also contend they should recover damages for medical monitoring resulting from their alleged exposure to chemicals from the Leak. *Id.* ¶¶ 223, 319.

45.    Plaintiffs allege that the fair value of a single home in the class is "over $1 million prior to Defendants' Pipeline Leak. Plaintiffs estimate that they have suffered diminution of value of their home[s] in the tens of thousands or hundreds of thousands of dollars."  *Id.* ¶ 234. According to Plaintiffs' counsel's most recent disclosure, there are at least 106 residences that are specifically impacted.  *See* Ex. E.

46.    Thus, given the nature and extent of Plaintiffs' alleged injuries and damages (including compensatory, medical monitoring, punitive damages, and attorneys' fees), claims, the

size of the class, and purported class duration period, the amount in controversy in this matter well exceeds the threshold $5 million required for removal under CAFA.

### D. No Exceptions to CAFA Jurisdiction Apply.

47.     Under CAFA, there are two primary exceptions to the exercise of federal jurisdiction: **(1)** the **"local controversy" exception**, and **(2)** the **"home-state controversy" exception**. *See* 28 U.S.C. §§ 1332(d)(3)(A)-(B).

48.     *Plaintiffs* bear the burden of proof as to the applicability of both these exceptions. *Jani-King*, 2009 WL 2394362, at *2. Plaintiffs cannot meet that burden here.

49.     **First**, under the mandatory local controversy exception, CAFA requires federal courts to decline to exercise jurisdiction where two-thirds or more of the members of all proposed plaintiff classes in the aggregate and at least one defendant "is a defendant from whom significant relief is sought by members of the plaintiff class; whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and who is a citizen of the state in which the action was originally filed." 28 U.S.C. § 1332(d)(4)(A).

50.     As explained above, Plaintiffs and the putative class are all Pennsylvania citizens. *See supra* ¶¶ 14, 24.

51.     Energy Transfer (R&M), LLC is a limited liability company organized under the laws of the Commonwealth of Pennsylvania whose principal place of business is located in Texas. *See* Ex. A, Compl. ¶ 28; April 9, 2025 Letter from D. McCall to S. Carson (Plaintiffs' counsel) (explaining that Energy Transfer (R&M), LLC's principal place of business is Texas), attached hereto as Exhibit D. Accordingly, for purposes of CAFA removal, Energy Transfer (R&M), LLC was at the time of the commencement of this action, and is now, a citizen of Pennsylvania and Texas.

52.    Although Defendant Energy Transfer (R&M), LLC is considered a Pennsylvania citizen for purposes of CAFA, Plaintiffs have not alleged that it engaged in any conduct that forms a basis, let alone the requisite *significant* basis, for the claims asserted in the Complaint. *See Kaufman v. Allstate N.J. Ins. Co.*, 561 F.3d 144, 156 (3d Cir. 2009) ("[T]he significant basis provision effectively calls for comparing the local defendant's alleged conduct to the alleged conduct of all the Defendants. . . . If the local defendant's alleged conduct is a significant part of the alleged conduct of all the Defendants, then the significant basis provision is satisfied.").

53.    There are only four paragraphs within Plaintiffs' Complaint that mention Energy Transfer (R&M), LLC. Three of those four paragraphs only reference Energy Transfer (R&M), LLC to describe the parties, and the remaining paragraph simply references Energy Transfer (R&M), LLC with respect to the Pennsylvania Department of Environmental Protection's ("PADEP") March 6, 2025 Administrative Order.[5] *See* Ex. A, Compl. ¶¶ 1, 28, 34, and 169. *See Kelly v. Verizon Pa., LLC*, No. 16-5672, 2019 WL 558100, at *11-12 (E.D. Pa. Feb. 12, 2019) (denying plaintiff's motion for remand because the Pennsylvania defendant did not "engage[] in

---

[5] PADEP's March 6, 2025 Administrative Order incorrectly identified Energy Transfer (R&M), LLC as the owner and operator of the Pipeline and parent entity of Sunoco Pipeline LP. March 6, 2025 Order in the Matter of Sunoco Pipeline, LP and Energy Transfer (R&M) LLC, attached hereto as Exhibit E. As Defendants made clear in their March 31, 2025 Response to PADEP, Energy Transfer (R&M), LLC has no ownership or operational interest in the Pipeline and is not the parent entity of Defendant Sunoco Pipeline LP. March 31, 2025 Letter from Matthew Gordon to the Pennsylvania Department of Environmental Protection, available at https://files.dep.state.pa.us/RegionalResources/SERO/SEROPortalFiles/Community%20Info/UpperMakefield/2025-04-09/03-31-2025%20-%20SPLP%20Response%20to%20Administrative%20Order.pdf and attached hereto as Exhibit F ("These statements are not accurate. Energy Transfer (R&M) LLC is a Pennsylvania limited liability company, its corporate headquarters is located at 8111 Westchester Drive, Dallas, TX 75225, and Energy Transfer (R&M) LLC is not a parent entity of SPLP."). As such, no conduct by Energy Transfer (R&M), LLC could constitute a significant basis for the claims asserted by Plaintiffs.

any conduct that constitutes a significant basis of the claims set forth in the Complaint" compared to the non-Pennsylvania defendant).

54.    Because Plaintiffs have failed to plead that any alleged conduct of Energy Transfer (R&M), LLC is a significant basis of their claims (and indeed they cannot), the local controversy exception does not apply.

55.    Even more, Energy Transfer (R&M) LLC was fraudulently joined as a party and, therefore, should be disregarded from the Court's jurisdictional analysis.  Fraudulent joinder "permits district courts to assume jurisdiction over cases containing nondiverse defendants where it can be shown that they were joined 'solely to defeat diversity jurisdiction.'"  *Avenatti v. Fox News Network LLC*, 41 F.4th 125, 133 (3d Cir. 2022) (citation omitted).  Energy Transfer (R&M) LLC has no ownership interest, control, or operational interest of the pipeline, nor is it involved with the response to the leak.  *See supra* ¶¶ 51-52; *see also Atlas Data Priv. Corp. v. Blackbaud, Inc.*, -- F. Supp. 3d. --, 2024 WL 4858891, at *8-9 (D.N.J. Nov. 20, 2024) (finding fraudulent joinder of a defendant who "does not own, control, or otherwise operate" the subject at issue in the complaint).  Therefore, the court should disregard Energy Transfer (R&M) LLC's citizenship for the purposes of determining diversity jurisdiction as it has been fraudulently joined.

56.    **Second**, under the home-state controversy exception, CAFA requires federal courts to decline to exercise jurisdiction where two-thirds or more of the members of all proposed plaintiff classes in the aggregate and *all* of the primary defendants are citizens of the state where the class action was originally filed.  28 U.S.C. § 1332(d)(4)(B).

57.    Primary defendants are "parties that are allegedly directly liable to the plaintiffs, while 'secondary' defendants are . . . those parties sued under theories of vicarious liability or joined for purposes of contribution or indemnification."  *Jani-King*, 2009 WL 2394362, at *3

14

**Exhibit B_Page 22 of 583**

(alteration in original) (citations and internal quotation marks omitted). "[C]ourts tasked with determining whether a defendant is a 'primary defendant' under CAFA should assume liability will be found and determine whether the defendant is the 'real target' of the plaintiffs' accusations. . . . Also, courts should ask whether, given the claims asserted against the defendant, it has potential exposure to a significant portion of the class and would sustain a substantial loss as compared to other defendants if found liable." *Vodenichar*, 733 F.3d at 505-06 (3d Cir. 2013).

58. Under this definition, the primary defendants here are Sunoco Pipeline LP and Energy Transfer LP, neither of which are citizens of Pennsylvania for CAFA purposes. *Anthony v. Small Tube Mfg. Corp.*, 535 F. Supp. 2d 506, 518 (E.D. Pa. 2007) (denying plaintiff's motion to remand because the primary defendants are not citizens of Pennsylvania).

59. Thus, Plaintiffs cannot meet their burden of proving that either CAFA exception applies.

## THIS COURT IS THE PROPER VENUE

60. Venue is proper in this District under 28 U.S.C. § 1441(a) because the court in which the Underlying State Court Action was filed, the Court of Common Pleas of Philadelphia County, Pennsylvania, is located within this judicial district, so this district embraces the place where the action was filed and is pending. *See* 28 U.S.C. § 118(a). Had Plaintiffs filed the Complaint in the Court of Common Pleas of Bucks County, where the events alleged in the Complaint occurred, venue would likewise be proper because the Court of Common Pleas of Bucks County is also located within this judicial district.

61. Pursuant to 28 U.S.C. § 1446(d), Defendants are filing a written notice of this removal with the Clerk of the Philadelphia Court of Common Pleas which, along with this notice, is being served upon Plaintiff's counsel as required by 28 U.S.C. § 1446(d).

62.    Pursuant to 28 U.S.C. § 1446(a), copies of all process, pleadings, and orders served upon Defendants are attached as Exhibit B.

WHEREFORE, Defendants respectfully give notice that this action has been removed from the Court of Common Pleas of Philadelphia County, Pennsylvania to the United States District Court for the Eastern District of Pennsylvania.


Date: April 24, 2025                                    Respectfully submitted,

                                                        */s/ Laura Hughes McNally*
                                                        Laura Hughes McNally (I.D. No. 310658)
                                                        MORGAN, LEWIS & BOCKIUS LLP
                                                        2222 Market Street
                                                        Philadelphia, Pennsylvania 19103
                                                        Telephone: 215-963-5000
                                                        Facsimile: 215-963-5001
                                                        laura.mcnally@morganlewis.com

                                                        *Counsel for Defendants Sunoco Pipeline L.P.,*
                                                        *Energy Transfer LP, and Energy Transfer (R&M)*
                                                        *LLC*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on the 24th day of April, 2025, a copy of the foregoing

Notice of Removal was served on the following counsel of record by email and U.S. mail, postage

prepaid:

Shanon J. Carson
Berger Montague PC
1818 Market Street
Suite 3600
Philadelphia, PA 19103
scarson@bm.net

Joseph E. Samuel, Jr.
Berger Montague PC
1818 Market Street
Suite 3600
Philadelphia, PA 19103
jsamuel@bm.net

Yechiel Michael Twersky
Berger Montague PC
1818 Market Street
Suite 3600
Philadelphia, PA 19103
mitwersky@bm.net

*/s/ Laura Hughes McNally*
Laura Hughes McNally

17

**Exhibit B_Page 25 of 583**

# Exhibit A

*Filed and Attested by the Office of Judicial Records 03/27/2025 10:16 am S. MACGREGOR*

Court of Common Pleas of Philadelphia
County Trial Division

# Civil Cover Sheet

For Office of Judicial Records Use Only (Docket Number)

250303655

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| Daniel La Hart | Sunoco Pipeline L.P. |
| **PLAINTIFF'S ADDRESS** | **DEFENDANT'S ADDRESS** |
| c/o Berger Montague PC, 1818 Market St., Philadelphia, PA 19103 | 525 Fritztown Road Sinking Spring, Pennsylvania 19608 |
| **PLAINTIFF'S NAME** | **DEFENDANT'S NAME** |
| Katherine La Hart | Energy Transfer LP |
| **PLAINTIFF'S ADDRESS** | **DEFENDANT'S ADDRESS** |
| c/o Berger Montague PC, 1818 Market St., Philadelphia, PA 19103 | 8111 Westchester Drive Dallas, Texas 75225 |
| **PLAINTIFF'S NAME** | **DEFENDANT'S NAME** |
| | Energy Transfer (R&M) LLC |
| **PLAINTIFF'S ADDRESS** | **DEFENDANT'S ADDRESS** |
| | 1735 Market Street, Philadelphia, Pennsylvania 19103 |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NO. OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 2 | 3 | ☑ Complaint ☐ Petition Action ☐ Notice of Appeal<br>☐ Writ of Summons ☐ Transfer From Other Jurisdictions |

**AMOUNT IN CONTROVERSY**
☐ $50,000.00 or less
☑ More than $50,000.00

**COURT PROGRAMS**
☐ Arbitration ☐ Mass Tort ☐ Minor Court Appeal ☐ Settlement
☐ Jury ☐ Savings Action ☐ Statutory Appeals ☐ Minors
☐ Non-Jury ☐ Petition ☐ Commerce (Completion of Addendum Required) ☐ W/D/Survival
☑ Other Class Action

**CASE TYPE AND CODE (SEE INSTRUCTIONS)**
3E ToxicWaste (Negligence)

**STATUTORY BASIS FOR CAUSE OF ACTION (SEE INSTRUCTIONS)**
35 P.S. § 691.401 (Pennsylvania Clean Streams Law); 49 U.S.C. § 60101 et seq. (Pipeline Safety Act); 49 C.F.R. § 195 (Transportation of Hazardous Liquids by Pipeline)

**RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER)**
N/A

**IS CASE SUBJECT TO COORDINATION ORDER?**
Yes ☐    No ☐

CMPLC-Hart Etal Vs Sunoco Pipeline, Lp Etal [SPG]

25030365500003

TO THE OFFICE OF JUDICIAL RECORDS:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant:
Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS (SEE INSTRUCTIONS) |
|---|---|
| Shanon Carson | Berger Montague PC<br>1818 Market Street, Suite 3600<br>Philadelphia, PA 19103 |
| **PHONE NUMBER** 215-875-4656 **FAX NUMBER** 215-875-4604 | |
| **SUPREME COURT IDENTIFICATION NO.** 85957 | **E-MAIL ADDRESS** scarson@bm.net |
| **SIGNATURE** | **DATE** 3/27/2025 |

01-101 (Rev. 8/2014)

Case ID: 250303655

**Exhibit B_Page 27 of 583**

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

**BERGER MONTAGUE PC**
Shanon Carson (Bar No. 85957)
Y. Michael Twersky (Bar No. 312411)
Joseph E. Samuel, Jr. (Bar No. 327645)
1818 Market Street, Suite 3600
Philadelphia, PA 19103

*Counsel for Plaintiffs and the Proposed Class*

| | |
|---|---|
| **DANIEL LA HART** and<br>**KATHERINE LA HART**<br>c/o Berger Montague PC<br>1818 Market Street, Suite 3600<br>Philadelphia, PA 19103<br><br>                    Plaintiffs,<br><br>             v.<br><br>**SUNOCO PIPELINE L.P.**<br>525 Fritztown Road<br>Sinking Spring, Pennsylvania 19608;<br><br>**ENERGY TRANSFER LP**<br>8111 Westchester Drive<br>Dallas, Texas 75225; and<br><br>**ENERGY TRANSFER (R&M) LLC**<br>1735 Market Street,<br>Philadelphia, Pennsylvania 19103,<br><br>                    Defendants. | **PHILADELPHIA COUNTY<br>COURT OF COMMON PLEAS<br>TRIAL DIVISION**<br><br>MARCH TERM, 2025<br><br>CASE NO. ___3655___<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1

Case ID: 250303655

**Exhibit B_Page 28 of 583**

## NOTICE TO DEFEND

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.<br><br>*You should take this paper to your lawyer at once. If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.*<br><br>Philadelphia Bar Association<br>Lawyer Referral and Information Service<br>One Reading Center Philadelphia, Pennsylvania 19107<br>(215) 238-6333 TTY<br>(215) 451-6197 | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las páginas siguientes, usted tiene veinte (20) días de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparecencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que, si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requerir que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.<br><br>Lleve esta demanda a un abogado inmediatamente. Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio. Vaya en persona o llame por teléfono a la oficina cuya dirección se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.<br>Asociación De Licenciados De Filadelfia<br>Servicio De Referencia E Información Legal<br>One Reading Center<br>Philadelphia, Pennsylvania 19107<br>(215) 238-6333<br>TTY (215) 451-6197 |

2

Case ID: 250303655

## CLASS ACTION COMPLAINT

### I.    INTRODUCTION

1.    Plaintiffs Daniel La Hart and Katherine La Hart ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Class" as further defined below), bring this Class Action Complaint against Defendants Sunoco Pipeline L.P. ("Sunoco"), Energy Transfer LP, and Energy Transfer (R&M), LLC (collectively, "Defendants"), alleging that Defendants' reckless, negligent, and irresponsible ownership, oversight, operation, supervision, maintenance, and control of a hazardous petroleum pipeline – the Twin Oaks Pipeline – has resulted in a massive and still unquantified leak of jet fuel and petroleum products, and resulting toxins, pollutants, and contaminants, in Upper Makefield Township, Pennsylvania.

2.    Defendants' conduct in permitting and allowing the pipeline leak to occur has unleashed a catastrophic environmental disaster on a previously idyllic Bucks County, Pennsylvania community, including the Mt. Eyre Manor community and surrounding neighborhoods that are subject to the plume caused by the leak.

3.    Defendants' pipeline leak has caused severe harm and poses a serious ongoing and current danger to affected residents' physical health and mental and emotional wellbeing, the community's groundwater, soil, air quality, and ecosystem, and to property values. The pipeline leak has uprooted the affected community and has already caused certain residences within the community to be unlivable, amounting to an effective taking of family homes by Defendants.

4.    Defendants have already purchased one home in the residential Mt. Eyre Manor neighborhood for the purpose of drilling monitoring and/or recovery wells, right in the middle of the neighborhood, and seek to drill more wells and conduct more disruptive activities in the neighborhood for remediation purposes.

3

Case ID: 250303655

5.    Testing shows that Defendants' released jet fuel and related pollutants has contaminated private wells that provide water for drinking, bathing, cooking, and washing, in the affected community.

6.    Testing shows elevated levels of toxins in the air as well.

7.    Defendants' conduct has caused an exigent threat to the health and well-being of the community and has contaminated the environment and underground aquifer in the community.

8.    It has been reported that Defendants already have the worst record for fuel spills in the United States even before this latest disaster.

9.    This case arises from a crack in Defendants' Twin Oaks Pipeline (the "Twin Oaks Pipeline" or "Pipeline") in the Mt. Eyre Manor community in Upper Makefield Township, Bucks County, Pennsylvania, which caused a discharge into the underlying bedrock and groundwater of petroleum, jet fuel, gasoline, and hazardous and toxic chemicals that the Pipeline was used to transport (the "Pipeline Leak" or "Leak"). These toxins include kerosene, benzene, ethylbenzene, isopropylbenzene, dichloroethane, trimethylbenzene ("TMB"), toluene, naphthalene, methyl tertiary-butyl ether ("MTBE"), and lead. These are substances so dangerous that their presence in the soil and water presents a direct and immediate threat to Plaintiffs' and Class members' health and wellbeing.

10.    The Mt. Eyre Manor community and surrounding neighborhoods, as with the area that includes and surrounds Upper Makefield Township generally, has long been a highly desirable residential neighborhood that had strong property values and has been sought-after as an idyllic and wonderful place to live and raise a family.

11.    One of the notable features of Mt. Eyre Manor and the surrounding neighborhoods in Upper Makefield Township is that the residences located there use and rely on private well water

4

Case ID: 250303655

for domestic water needs, including for drinking water, cooking, bathing, washing clothes and dishes, and watering lawns and gardens.

12. Indeed, Mt. Eyre Manor and other Upper Makefield residents have long believed that they had the best tasting water one could find because it contains naturally occurring minerals that give it a fresher taste and, typically, is free of the added chemicals that can be found in municipal water, such as chlorine and fluoride.

13. As a result of Defendants' Pipeline Leak, however, this is no longer the case. Defendants' conduct as alleged herein has devastated the community and caused significant contamination to the groundwater under the neighborhood, creating critical health and safety risks to the residents who live there, and causing other consequential harms as detailed herein.

14. Defendants control and operate the Twin Oaks Pipeline and are responsible for maintaining the Pipeline and ensuring its safety.

15. Defendants' Pipeline Leak was confirmed on January 31, 2025.

16. Defendants, however, first received odor complaints from residents living in Mt. Eyre Manor as early as September 2023 – 16 months earlier – but failed at that time to properly investigate, and as such failed to identify the Pipeline Leak at an early stage when more harm could have been prevented.

17. Despite receiving numerous complaints from alarmed residents about strange odors in the air since at least September 2023, Defendants failed to properly act for at least over 16 months. Defendants failed to properly investigate the Pipeline Leak, failed to identify and contain the Pipeline Leak, and have still not disclosed the full extent of the disaster.

18. The magnitude of the Pipeline Leak remains unknown and undisclosed to this day. Defendants still cannot account for or are choosing not to publicly state how much toxic petroleum

Case ID: 250303655

product has spilled or where it is moving, nor can they guarantee that the Twin Oaks Pipeline is safe, leaving Plaintiffs and Class members in constant and reasonable fear for their health and property.

19.    Numerous residents already have confirmed contamination within their private wells and well water, which contamination is not disputed by Defendants who have already publicly stated that the Pipeline Leak is their fault.

20.    One household across the street from where the Pipeline Leak was eventually discovered had approximately *twelve feet* of free jet fuel product found flowing on top of the water in their private well. Similarly, other residents of Mt. Eyre Manor also had significant amounts of jet fuel in their private wells.

21.    As Defendants have not yet identified the size, scope, direction, or speed of the contamination plume, even residents whose well water currently does not show contamination yet are and remain within a zone of danger where contamination could be mere weeks or days away, and therefore are forced to take appropriate precautions and incur time and expenses to attempt to mitigate their risk.

22.    Recent testing has confirmed that vapors from the contaminated groundwater has invaded homes in the neighborhood placing residents at potential risk to these toxic chemicals in both the water they drink and the air that they breathe.

23.    With no clear answers, no relief in sight, water in the underground aquifer and bedrock, private wells that have been contaminated, soil that has been contaminated, air that has been contaminated, property values plummeting, odors of jet fuel contamination within homes and in the neighborhood, and the prospect of having ingested, bathed, and used contaminated well water, the residents of Mt. Eyre Manor and the surrounding neighborhoods are left to grapple with

6

Case ID: 250303655

the terror of irreparable environmental harm, uncertain whether they can trust the very air they breathe and the water they drink, and concerned for their future safety from disease.

24.     This is not just an environmental tragedy caused by corporate malfeasance; it is a life-altering crisis for Plaintiffs and Class members for which Defendants must be held accountable.

## II.    PARTIES

25.     Plaintiffs Daniel La Hart and Katherine La Hart reside in the Mt. Eyre Manor neighborhood at 114 Spencer Road, Washington Crossing, Pennsylvania, 18977.

26.     Defendant Sunoco Pipeline L.P. is a limited partnership formed under the laws of Texas with a principal place of business located at 8111 Westchester Drive, Dallas, Texas 75225. Sunoco Pipeline, L.P. maintains an address at 535 Fritztown Road, Sinking Spring, PA 19608.

27.     Defendant Energy Transfer LP is a limited partnership formed under the laws of Delaware with a principal place of business located at 8111 Westchester Drive, Dallas, Texas 75225.

28.     Defendant Energy Transfer (R&M), LLC is a limited liability company formed under the laws of Pennsylvania with a principal place of business located at 1735 Market Street, Philadelphia, Pennsylvania 19103.

29.     Defendants John Does 1-100 (the "John Doe Defendants"), are persons or entities that are responsible for the conduct and/or injuries alleged in this Complaint, and accordingly are liable for the relief sought. Their identities are currently unknown to Plaintiffs, who consequently sue the John Doe Defendants by their fictitious names, but the John Doe Defendants will be ascertained through investigation and discovery. Plaintiffs will seek leave to amend this Complaint

Case ID: 250303655

to state the true names and capacities of the fictitiously named John Doe Defendants when they have been ascertained.

30.    At all times material hereto, Defendants purposefully established significant contacts in Pennsylvania and Philadelphia County, and carried out, and continue to carry out, substantial, continuous, and systematic business activities in Pennsylvania and Philadelphia County.

### III.    JURISDICTION AND VENUE

31.    This Court has subject matter jurisdiction pursuant to 42 Pa. C.S. § 931.

32.    This Court has personal jurisdiction over each of the Defendants under 42 Pa. C.S. § 5301, *et seq.*, because Defendants purposefully availed themselves of the privilege of conducting business in Pennsylvania and Plaintiffs' causes of action arise out of the business that Defendants conduct in Pennsylvania; namely, the Pipeline Leak from Defendants' Pipeline which occurred in Upper Makefield Township, Pennsylvania.

33.    Venue is proper under Pennsylvania Rules of Civil Procedure 1006 and 2179 because Defendants regularly conduct business in Philadelphia County.

### IV.    FACTUAL ALLEGATIONS

#### A. Defendants' History of Leaking Pipelines and Failures to Report

34.    Defendant Energy Transfer LP, through its complex network of subsidiaries, limited partnerships, and joint ventures, including Defendant Sunoco and Defendant Energy Transfer (R&M), LLC, owns one of the nation's largest networks of natural gas, crude oil, and petroleum product pipelines.

35.    Energy Transfer LP primarily operated in the natural gas sector prior to its acquisition of Sunoco, and Sunoco's significant oil and petroleum product assets, in 2012.

8

Case ID: 250303655

Together, Defendants now own and operate over 125,000 miles of pipelines across the United States.

36.     Defendants' network of pipelines is not only among the largest in the country; it is also among the leakiest.

37.     According to the Pipeline and Hazardous Materials Safety Administration ("PHMSA")'s database, between 2002 and 2017, Defendants experienced at least 527 leakage incidents—approximately one incident from an existing facility every eleven days in the pipelines that they own and operate.[1]

38.     Those incidents accounted for reported releases of over 3.6 million gallons of petroleum product. That figure likely substantially underestimates the true number of incidents and amount of product lost, as it primarily relies on self-reported incidents and estimates.

39.     Between 2002 and 2017, PHMSA issued 106 safety violations to Defendants for failing to comply with federal regulations designed to ensure the safe operation of hazardous liquid pipelines.[2]

40.     These violations included failures to notify PHMSA of spills, failures to repair identified unsafe pipes for five years, failures to perform regular corrosion inspections, failures to report known unsafe operating conditions, and failures to properly notify emergency responders and the public in the event of a leak.

41.     Federal regulators have not deterred Defendants' egregious conduct in failing to properly maintain their pipelines transporting hazardous petroleum products to make them safe. In Pennsylvania in 2022, Defendants Sunoco Pipeline L.P. and Energy Transfer LP were convicted

---

[1] Exhibit A, Oil and Water: ETP & Sunoco's History of Pipeline Spills, Greenpeace USA and Waterkeeper Alliance (Apr. 17, 2018).
[2] Exhibit A (summarizing PHMSA records).

Case ID: 250303655

of *57 charges* of criminal conduct associated with the construction and operation of two pipelines in nearby Chester County, Pennsylvania. The Commonwealth of Pennsylvania convicted Defendants on counts involving multiple instances of failure to report discharges of hazardous substances into the surrounding environment, the use of unapproved additives and release of those additives into drinking water, and failure to implement legally required safety measures. The use of unapproved additives is potentially relevant here as one of the chemicals found in recent testing in the Mt. Eyre Manor neighborhood is MTBE, which was supposed to have been phased out of use in the early 2000s.

42.    In February 2025, Bloomberg reported that the Twin Oaks Pipeline Leak in Upper Makefield Township "highlight[ed]" Energy Transfer's "worst fuel spill record" in the United States. The Bloomberg article reported that Sunoco Pipeline LP was responsible for spilling over 1,400 barrels of fuel in 2024 alone,[3] and this is only accounting for the volume of fuel spills that Defendants were both aware of *and* willing to publicly report. A copy of the Bloomberg article is attached hereto as Exhibit B.

43.    The Twin Oaks Pipeline leak demonstrates that Defendants are not forthcoming about the volume of or even the existence of fuel spills into residential neighborhoods.

44.    Defendants' conduct, as alleged herein, is reflective of and consistent with their history of failing to safely operate and maintain pipelines, as well as their failing to detect and report leaks from their pipelines, and appropriately respond to and remediate leaks with the expediency and transparency that such incidents require.

---

[3] Bloomberg, *Energy Transfer Leak Highlights Worst Fuel Spill Record in US* (Feb. 18, 2025), available    at    https://www.bloomberg.com/news/articles/2025-02-18/energy-transfer-leak-highlights-worst-fuel-spill-record-in-us?embedded-checkout=true (last accessed Mar. 14, 2025).

10

Case ID: 250303655

**B.      Defendants' Twin Oaks Pipeline That Runs Through Upper Makefield, PA**

45.      Defendants own and operate the Twin Oaks Pipeline ("the Pipeline"), a 14-inch diameter pipeline that transports petroleum products, including but not limited to jet fuel (JP-8), diesel, and gasoline, from the Twin Oaks Terminal in Aston, Pennsylvania to the Newark Terminal in Newark, New Jersey. The Pipeline is considered a "hazardous liquid pipeline facility" under federal law. 49 U.S.C. § 60101(a).

46.      The Twin Oaks Pipeline was originally installed in 1956 and has operated as a hazardous liquid pipeline facility now for close to 70 years.

47.      The Twin Oaks Pipeline was manufactured by National Tube Supply Company.

48.      On November 18, 2024, PHMSA issued an Advisory Bulletin notifying pipeline owners and operators of potential threats to the integrity of the body of certain pipelines.[4] The Advisory Bulletin stated that pipes constructed by National Tube Supply Company before 1970, like the Twin Oaks Pipeline, were particularly susceptible to hard spots. Hard spots are defects created during the pipe manufacturing process because of localized cooling and hardening. Hard spots can become unstable over time due to changes in their conditions, including degradation and erosion of the coating surrounding the hard spot, and result in cracking of the pipe. PHMSA provided in its Advisory Bulletin six recommended safety actions for pipeline operators to take in order to identify potential hard spots.

49.      Despite this Advisory Bulletin, Defendants' representatives have stated that they were unaware of any safety actions recommended by PHMSA related to the Twin Oaks Pipeline.[5]

---

[4] Pipeline and Hazardous Materials Safety Administration, Pipeline Safety: Identification and Evaluation of Potential Hard Spots—In-Line Inspection Tools and Analysis, 89 Fed. Reg. 90827 (Nov. 18, 2024).
[5] Exhibit C, Letter from U.S. Representative Brian K. Fitzpatrick to Acting Administrator Ben Kochman (March 11, 2025).

11

Case ID: 250303655

50.     Furthermore, it is well known that the inner walls of a petroleum pipeline can erode over time due to the corrosive environment created by the materials and chemicals transported through it. The exterior of a petroleum pipeline is also subject to external corrosion, due to the presence of moisture and chemicals in the surrounding soil. While several factors can influence the rate and extent of both internal and external corrosion, corrosion of a petroleum pipeline over time is inevitable, and again, well-known. Consequently, proper care, maintenance, supervision, and oversight of pipelines is critical, including, without limitation, to public safety.

51.     Despite this knowledge, Defendants have made several incredulous statements to members of the affected community in Upper Makefield, Pennsylvania, including Plaintiffs, that the lifespan of the Twin Oaks Pipeline is "indefinite."

52.     The Twin Oaks Pipeline specifically has experienced reported failures in Pennsylvania on at least two prior occasions, and these are only instances that Defendants have reported to the public. It is possible that the Twin Oaks Pipeline has experienced additional unreported failures.

53.     On October 7, 1986, a crack in the Twin Oaks Pipeline caused the release of at least 5,260 barrels of refined product in Montgomery County, Pennsylvania.

54.     On March 19, 2004, external corrosion caused a leak in the Twin Oaks Pipeline, resulting in the release of at least 50 barrels of refined product in Delaware County, Pennsylvania.

C.     **The Geographic Area Affected by the Twin Oaks Pipeline Leak**

55.     The Twin Oaks Pipeline Leak occurred at a section of the Pipeline that runs directly under the residential Mt. Eyre Manor neighborhood in Washington Crossing, Bucks County, Pennsylvania.

12

Case ID: 250303655

56.     The Mt. Eyre Manor neighborhood is located in Upper Makefield Township, a municipality within Bucks County, Pennsylvania and covers the residential homes on Glenwood Drive, Walker Road, Spencer Road, Crestwood Road and Bruce Road.

57.     Figure 1 below shows the geographic location of the Twin Oaks Pipeline within a portion of Upper Makefield Township. The red line in Figure 1 shows the Pipeline.



Fig. 1: location of the Pipeline within Upper Makefield Township, retrieved from the National     Pipeline     Mapping     System     Public     Viewer.     *See* pvnpms.phmsa.dot.gov/PublicViewer (last accessed Feb. 26, 2025).

58.     Figure 2 below shows the location of the Twin Oaks Pipeline as it runs through and along a portion of the Mt. Eyre Manor neighborhood in Upper Makefield Township, Pennsylvania.

13

Case ID: 250303655



Fig. 2: The Mt. Eyre Manor neighborhood, retrieved from Google Maps, with the approximate location of the Twin Oaks Pipeline overlaid, running parallel to Glenwood Drive.

59.     There is no gas station or other potential source of petroleum byproduct contamination within two miles of the Mt. Eyre Manor neighborhood.

60.     Residents of the Mt. Eyre Manor neighborhood rely on private well water for their water supply, including water used for drinking, bathing, cooking, washing, and gardening, among other uses.

61.     An underground aquifer, which the Twin Oaks Pipeline Leak has now polluted, supplies the water used by residents of the neighborhood.

62.     The same is true for residents of the immediately surrounding area, including, but not limited to, residences on Valley View Drive, Mt. Eyre Road, Taylorsville Road, River Road, Oakdale Avenue, and Maple Shade Avenue, which are other nearby Upper Makefield Township neighborhoods that the Twin Oaks Pipeline also runs underneath.

14

Case ID: 250303655

63. Upper Makefield Township sits in a floodplain, and the Mt. Eyre Manor neighborhood is surrounded on three sides by "Flood Hazard Areas" as defined by the Federal Emergency Management Agency ("FEMA").

64. The Mt. Eyre Manor neighborhood is considered a High Consequence Area ("HCA") pursuant to 49 C.F.R. § 195.450, due to its concentrated population, its proximity to a commercially navigable waterway (the Delaware River), the lack of an adequate alternative drinking water source to the underlying aquifer, and its proximity to ecological resources.

**D. Known and Reported Odor Complaints Started in September 2023**

***i. September 2023 Odor Complaint***

65. On September 25, 2023, PHMSA notified Defendants of an odor complaint referred by the Pennsylvania Department of Environmental Protection ("PADEP"). The original complainants were residents of 128 Walker Road in the Mt. Eyre Manor neighborhood who detected an overwhelming smell that they reported distinctly resembled the smell of gasoline.

66. The residents of 128 Walker Road live directly across the street from the site where the Twin Oaks Pipeline Leak occurred and was eventually discovered though Defendants did not discover the leak until 16 months later.

67. Plaintiffs live at 114 Spencer Road, approximately only 500 feet to the approximate northeast of 128 Walker Road.

68. In the two months prior to the odor complaint, Upper Makefield Township had experienced multiple severe weather events. These weather events included severe flash flooding that occurred in July 2023 and that resulted in the deaths of seven people and forced month-long road closures near the Mt. Eyre Manor neighborhood.

15

Case ID: 250303655

69.     The weather events also included substantial rains and heavy winds from Tropical Storm Ophelia that hit Bucks County, Pennsylvania on September 23, 2023.

70.     Each of these severe weather events should have triggered proper inspections of the Twin Oaks Pipeline by Defendants pursuant to 49 C.F.R. § 195.414. Defendants, however, did not conduct inspections sufficient to discover any resulting leaks as required by law, nor did Defendants notify PHMSA about their failure to conduct such inspections, which was reckless and negligent.

71.     Defendants investigated the September 2023 odor complaint by simply dispatching a technician and a contractor to test for indications of a leak, but the investigation that was conducted was improperly performed in a lackadaisical fashion.

72.     Specifically, Defendants' investigation included only testing of the well water of the complainant's residence and three nearby residences, probing the immediately adjacent segment of the pipeline with a photoionization ("PID") gas detector, excavating a single 25-foot segment of nearby pipeline that ran through nearby 121 Glenwood Drive, testing the excavated soil, and performing a static pressure test.

73.     Sadly, the excavation stopped short of uncovering the portion of the Pipeline mere feet away where the Pipeline Leak was eventually discovered.

74.     When the initial investigation did not result in evidence of a leak, Defendants simply and improperly ceased their investigative efforts. Defendants did not ascertain the source of the odor, and did not conduct any continued monitoring or observation of the area.

75.     As history bears out, the Pipeline Leak would eventually be discovered 16 months later across the street from the complainants' home.

*ii.*    ***June 2024 Odor Complaint***

16

Case ID: 250303655

76.     On June 28, 2024, Defendants received yet another odor complaint from a different resident at 108 Spencer Road in the Mt. Eyre Manor neighborhood.

77.     In response to the odor complaint, Defendants responded in an even more lackadaisical manner than it did to the first complaint when, in fact, the response should have been more robust since a prior complaint had already been received. Defendants dispatched a single technician to examine the site using a portable 4-gas detector. The technician's equipment did not record a gas detection and the technician did not observe dead vegetation above the Pipeline.

78.     Based on the technician's report and nothing else, Defendants ceased their investigative efforts. Defendants did not ascertain the source of the odor, and did not conduct any continued monitoring or observation of the area.

79.     Inexplicably, Defendants also neglected to report this odor complaint to PHMSA.

### iii.     July 2024 Odor Complaint

80.     The following month, on or about July 21, 2024, Defendants received a third odor complaint from a resident at 121 Glenwood Drive in the Mt. Eyre Manor neighborhood, which is immediately across the street from the complainants who lived at 128 Walker Road and made the first complaint detailed above, *and* the precise address where Defendants had excavated a segment of the Twin Oaks Pipeline in September 2023.

81.     The complainants from 121 Glenwood Drive reported not only a smell of gasoline or kerosene in their water but also noted a visual change in how their water looked.

82.     Again, Defendants' response was improper and lackadaisical, especially accounting for the fact that this was now the third complaint received in a short period of time.

83.     In response to this July 2024 odor complaint, Defendants again dispatched only a single technician to examine the site using a portable 4-gas detector. The technician's equipment

17

Case ID: 250303655

did not record a gas detection and the technician did not observe dead vegetation above the pipeline.

84.     Based on the technician's report, Defendants ceased their investigative efforts. Defendants did not ascertain the source of the odor and again failed to implement or conduct any continued monitoring or observation of the area.

85.     Moreover, yet again, Defendants did not report this odor complaint to PHMSA.

86.     Furthermore, Defendants told the residents at 121 Glenwood Drive at the time that there was no petroleum in their water, without conducting proper tests to ascertain this as a fact.

87.     Defendants also claimed to the PADEP that "iron bacteria" was the likely explanation for the smell of gasoline or kerosene and this information was then passed on by PADEP to the residents at 121 Glenwood Drive.

### iv.     November 2024 Odor Complaint

88.     Four months later, on November 21, 2024, Defendants received a fourth known odor complaint from a resident of 107 Spencer Road in the Mt. Eyre Manor neighborhood, immediately across the street from the prior complainants that lived at 108 Spencer Road.

89.     The homeowners at 107 Spencer Road, who bought their home in 1978, raised their family in the Mt. Eyre Manor community, and lived in the neighborhood for over 45 years, complained that they smelled gasoline in their water. They also noticed that their brand-new drinking glasses had a sheen resembling oil or gasoline after taking them out of the dishwasher.

90.     Startled by this discovery, the homeowners at 107 Spencer Road asked their well company, Bucks County Well Drilling Co., to take samples and send them to an independent laboratory. The samples came back *positive* for gasoline and kerosene.

18

Case ID: 250303655

91.     Nonetheless, once again, Defendants' response was more than insufficient and neglectful.

92.     In response to the fourth known odor complaint received from a neighbor in the direct vicinity of where the Pipeline Leak was eventually discovered, Defendants again dispatched a single technician to examine the site using a portable 4-gas detector. The technician's equipment did not record a gas detection and the technician did not observe dead vegetation above the pipeline.

93.     Defendants performed a four-hour static pressure test to check for lowering pressure indicative of a pipeline leak. The operator reported to Defendants that the results were within acceptable limits although the operator did not report the acceptance criteria used or the results of the pressure test.

94.     Based on the reports of the technician and operator, Defendants ceased their investigative efforts, notwithstanding that there had now been at least four complaints reported since September 2023. Defendants did not ascertain the source of the odor, and did not conduct any continued monitoring, observation, or testing of the neighborhood.

95.     In what was now clearly a systemic pattern, Defendants again did not report this odor complaint to PHMSA.

96.     Discovery and expert testimony will show that Defendants' responses to all of the odor complaints detailed above were far below the standard of care and duties that Defendants owed to the residents of Mt. Eyre Manor and the surrounding neighborhoods, both with respect to the urgency of the situation, the actions that were taken, and the lack of any substantive follow-up, monitoring, and testing.

19

Case ID: 250303655

97.     Because of Defendants' lack of a proper response, Defendants never identified a cause of the odor complaints, that is, until the Twin Oaks Pipeline Leak was discovered in January 2025.

**E.     The Twin Oaks Pipeline Leak is Discovered in January 2025**

98.     On January 21, 2025, PADEP informed PHMSA that samples obtained from a well at 107 Spencer Road had indicated the presence of kerosene, a major component of JP-8 jet fuel. PHMSA notified Defendants of the test results and directed Defendants to investigate the origin of the kerosene.

99.     On or about January 22, 2025, a representative of Defendants, Wassim Saad, parked in Plaintiffs Daniel and Katherine La Hart's driveway in an unmarked truck with a New Jersey license plate and knocked on their door to offer "free well testing" with no explanation why. Shockingly, Mr. Saad did not identify himself to Plaintiffs at this time as a representative of Defendants or tell Plaintiffs about the presence of kerosene at 107 Spencer Road.

100.    Plaintiffs declined the offer for "free well testing" because they thought, based upon the lack of information and material omissions provided, that Mr. Saad was a door-to-door salesman offering unneeded services.

101.    Shortly thereafter, Plaintiffs noticed that trucks labeled "Energy Transfer" were present in the neighborhood, and Plaintiffs then realized that their community was likely facing a significant issue, although at this time the scope of the issue was unknown.

102.    Plaintiffs then contacted Mr. Saad and Defendants took a purported test of Plaintiffs' water on January 24, 2025 by collecting water only from Plaintiffs' faucet.

20

Case ID: 250303655

**Exhibit B_Page 47 of 583**

103. At this time, the neighbors in the Mt. Eyre Manor neighborhood began to talk with each other about the activity involving Defendants, and Plaintiffs encouraged other residents to get their water tested.

104. From January 22, 2025 through January 31, 2025, Defendants had a contractor, Groundwater & Environmental Services, Inc. ("GES"), acting on behalf of and as an agent of Defendants, sample the private wells of approximately twenty-five other nearby residences in the neighborhood.

105. GES confirmed the presence of hydrocarbons in well water at certain properties in the neighborhood including 107 Spencer Road, 108 Spencer Road, and 128 Glenwood Drive.

106. From January 22, 2025 through January 31, 2025, Defendants proceeded to probe the length of the Twin Oaks Pipeline between 121 Glenwood Drive and 155 Glenwood Drive (approximately 0.7 miles) with a PID gas detector. As with Defendants' prior investigations, the gas detector results were reported as "non-detect."

107. Despite the failure of Defendants' PID gas detector to identify a leak, on January 31, 2025, Defendants visually observed and confirmed a substantial leak in the Twin Oaks Pipeline when they finally excavated a portion of the Pipeline located on the property at 121 Glenwood Drive, in the backyard of the residents who live there, next to the swimming pool where the residents' family swam prior to the discovery of the leak.

108. The Pipeline Leak was discovered at 121 Glenwood Drive, the residence directly across the street from 128 Walker Road in the Mt. Eyre Manor neighborhood, where the residents lived who reported the first odor complaint – *16 months prior* – detailed above as the smell of gasoline.

21

Case ID: 250303655

**Exhibit B_Page 48 of 583**

109.    Defendants had finally decided to excavate a portion of the Twin Oaks Pipeline located on the property at 121 Glenwood Drive after they went back and reviewed old maintenance records that had long been available to them. It is not currently known why Defendants did not take this step earlier, or what else these old maintenance records might show once they are produced in this litigation.

110.    Video of the pipeline leak was recorded by one of the residents at 121 Glenwood Drive.

111.    The Pipeline Leak would later be characterized as a "slow drip" from a Type A sleeve installed in 1995, and that had not been properly maintained since.

112.    Type A sleeves are typically used to reinforce pipeline segments or areas of a pipeline that exhibit non-leaking defects such as corrosion or observable dents.

113.    The Twin Oaks Pipeline is reinforced in at least 44 other segments by Type A sleeves installed during the late 1980s and early 1990s, and which are also all at risk of failing, especially if they are not continually and properly monitored and maintained. Defendants failed to continually and properly monitor and maintain the Type A sleeve that was underground at 121 Glenwood Drive in the Mt. Eyre Manor residential neighborhood in Upper Makefield Township, Pennsylvania.

114.    The pipeline industry views Type A sleeves as ineffective at preventing leaks and an insufficient mechanism to reinforce an aging pipeline in danger of leaking. The corrosive nature of petroleum products moving at high pressure inside a pipeline means that dents over time can become cracks through which product can escape, and a sleeve reinforcing the exterior of the pipeline will not prevent leaks in such a scenario.

22

Case ID: 250303655

115.    For example, in August 2020, a dent in the Colonial Pipeline near Huntersville, North Carolina, which had been previously reinforced in 2004 with a Type A sleeve, developed into an approximately five-foot crack. As here, the operators of the Colonial Pipeline failed to properly monitor and maintain the pipeline and Type A sleeve, and its detection systems failed to detect the crack or the release of any product.

116.    In that instance, an estimated 2,000,000 gallons of product were discharged into the surrounding environment before the pipeline's operators, alerted to the leak by local residents, were able to identify and repair the crack.

117.    In light of this and other similar incidents and their own knowledge and experience as to pipelines and the advantages and drawbacks of certain standard operating procedures and repair equipment, Defendants here knew or should have known that the approximately thirty year-old Type A sleeve situated on the residential property at 121 Glenwood Drive in the Mt. Eyre Manor neighborhood, a community where residents rely on well water for their water needs, was insufficient reinforcement to prevent a discharge from occurring from the Pipeline and especially under or near a residential property and neighborhood.

118.    On January 31, 2025, Defendants notified the National Response Center ("NRC") of the Twin Oaks Pipeline Leak and inexplicably and falsely reported a release of 156 barrels of jet fuel, which is 6,552 gallons.

119.    Despite this initial report that there were 6,552 gallons of jet fuel spilled into a residential neighborhood in Bucks County, Pennsylvania that relies on well water, Defendants have maintained in statements made to residents and regulatory authorities after January 31, 2025, that in fact, Defendants do not know how much product has been released into the environment.

23

Case ID: 250303655

120.    It is highly likely because of the amount of time that the leak was occurring, the size of the leak, the pressure utilized for the Twin Oaks Pipeline, the odor complaints dating back to September 2023, and other evidence, that significantly more than 6,552 gallons of jet fuel and petroleum products was released by Defendants into the environment.

121.    Due to Defendants insufficient, improper, negligent, and reckless conduct alleged herein with respect to their oversight, operation, supervision, maintenance, monitoring, and testing of the Twin Oaks Pipeline, Defendants have no idea when the Pipeline began leaking. It is highly probable that the Pipeline began leaking long before the first odor complaints were reported in September 2023, for the odors to have even been detectable at that time.

122.    The Twin Oaks Pipeline's maximum operating pressure is 1,200 psig (pounds per square inch gauge). On January 31, 2025, when Defendants discovered the leak at 121 Glenwood Drive in the Mt. Eyre Manor neighborhood, it was reported that the Pipeline was operating at 1,100 psig, *i.e.*, approximately 91.6% operating pressure.

123.    PHMSA conducted a preliminary investigation of the Pipeline Leak after it was reported. Based on its investigation, PHMSA concluded that "the Pipeline experienced a leak in a high consequence area for at least 16 months, resulting in the release of jet fuel that has migrated into several adjacent water wells and caused additional impacts to property and the environment."[6]

124.    Defendants have stated repeatedly, in statements to both residents and regulatory authorities, that despite their investigation since discovering the leak, they still do not know when the Pipeline Leak began.

---

[6] Exhibit D, Notice of Proposed Safety Order, Pipeline and Hazardous Materials Safety Administration, CPF No. 4-2025-054-NOPSO (Feb. 13, 2025).

24

Case ID: 250303655

125.    It is probable that the Twin Oaks Pipeline was leaking for a significant period of time prior to the first known odor complaint being made to Defendants in September 2023.

126.    Defendants have stated repeatedly in statements to both residents and regulatory authorities that they do not know whether the Twin Oaks Pipeline is still leaking.

127.    Defendants have not excavated the entire Twin Oaks Pipeline to conduct a visual examination of the Pipeline to determine that it is not leaking, or even excavated the Pipeline sufficient to examine all the Type A sleeves along the Pipeline.

**F.    Defendants' Response and Actions Following Discovery of the Pipeline Leak**

128.    On January 31, 2025, Defendants cut off the segment of the Pipeline where the Leak had been discovered and submitted a repair plan to PHMSA. Defendants had their workers arrive and remove the leaking segment in the middle of the night, without giving notice to residents or to local, state, or federal regulators.

129.    Plaintiffs and the Class members demand immediate access to review and examine the leaking segment of the Twin Oaks Pipeline.

130.    On February 1, 2025, Energy Transfer's Lead Specialist for Public Affairs, Joseph Massaro, issued a written statement confirming they had discovered "product loss" and claiming that the Pipeline was "inactive" at the time the leak was discovered.

131.    This statement means, among other things, that the video of the Pipeline that shows that Pipeline Leak is not indicative of the Pipeline Leak under full pressure conditions.

132.    On February 2, 2025, after receiving approval from PHMSA's Southwest Region Director, Defendants replaced the removed segment of the Pipeline and, without conducting further work to ensure that no other parts of the Pipeline are currently leaking, shockingly rushed to return the Pipeline to service.

25

Case ID: 250303655

133.     Defendants subsequently began an inadequate and neglectful investigation of the effects of the known Pipeline Leak in a high consequence, residential area.

134.     Defendants began conducting "exposure" testing for the water of nearby residences. But rather than testing the tops of all residents' wells to determine whether any free product – also known as light non-aqueous phase liquid or "LNAPL" – was present, Defendants' exposure testing relied on samples taken from faucets inside the residences post-treatment, and inadequate PID readings.

135.     In at least one instance, when Defendants' retained testing agents, hired by and working on behalf of Defendants, discovered that they had taken a sample directly from a well for testing by mistake, *they threw out the sample and erased the results*.

136.     Defendants' method of exposure testing deviated from the standard protocols for testing groundwater, which universally require testing pre-treatment, and was seemingly designed to limit Defendants' ability to identify the scope and location of the contamination plume resulting from the Pipeline Leak.

137.     Defendants failed to test samples directly from residents' wells for the presence of free product. This is true even though Defendants recently have, at the behest of Plaintiffs and other residents who have retained the undersigned counsel, finally begun to conduct bailer tests of residents' wells to screen for the presence of LNAPL.

138.     Even in situations where Defendants' agents have *visually observed* the presence of LNAPL, they have not universally retained the water from the bailer and have instead in instances deposited it back into the well.

139.     Defendants, moreover, despite being well-aware that their conduct as alleged herein would give rise to residents' legal claims, have failed to properly preserve all evidence of

26

Case ID: 250303655

environmental contamination that they have found during their activities, including by, for example, failing to properly catalog and store all physical materials and things that they have inserted into or withdrawn from residents' wells.

140. Defendants have not ensured that they and their agents have properly preserved all evidence gathered as a result of Defendants' and GES's activities in the neighborhood following the discovery of the Pipeline Leak. Therefore, Plaintiffs and Class members are entitled to all reasonable adverse inferences that may arise as the result of any failure to properly preserve evidence.

141. On February 4, 2025, Energy Transfer's Joseph Massaro appeared at the regularly scheduled Upper Makefield Township Board of Supervisors meeting, along with Defendants' other representatives Carl Borkland, Susan Ericson, David Kerwood, and Rahn Monreal. Massaro confirmed the product release and purported to provide an "update" on Defendants' remedial efforts.

142. On February 6, 2025, at 7:30 p.m., a townhall meeting was held at the Upper Makefield Township Office, where affected residents who live in Mt. Eyre Manor and the surrounding neighborhoods, including Plaintiffs, representatives from Defendants, and representatives from PHMSA, were present.

143. At this townhall meeting, Defendants provided an update on their efforts to monitor and contain the Pipeline Leak, in which they admitted that their exposure testing had detected hydrocarbons in six neighborhood wells so far.

144. Defendants also admitted during the meeting that they did not know how much product had been lost or when the Pipeline Leak had begun.

27

Case ID: 250303655

145. Defendants further stated that because the release occurred "in the headwaters" of the Delaware River, it would make sense for any groundwater carrying spilled product to be moving in a northeasterly direction toward the Delaware River. This was the Defendants' best estimation at the time concerning the plume caused by the Pipeline Leak of unknown quantities of jet fuel.

146. At the town hall meeting, Defendants offered only to pay for the installation of carbon filtration systems for any wells where their product was detected, and to pay for the maintenance of such a system for as long as the product is detected in the well.

147. During this townhall meeting, officials from PHMSA stated that they had no confidence in Defendants' ability to identify leaks in the Twin Oaks Pipeline, considering the circumstances surrounding the Pipeline Leak. Residents of the Mt. Eyre Manor neighborhood, including Plaintiffs, called on Defendants to shut down the Pipeline.

148. Defendants refused to shut down the Pipeline.

149. On February 7, 2025, the day after the town hall meeting, Defendants provided a written public update on the Upper Makefield Township website in which they stated that, rather than shutting down operations, they would reduce the Twin Oaks Pipeline's operating pressure to 80%.

150. On February 13, 2025, PHMSA issued a Notice of Proposed Safety Order ("NOPSO") to Defendants. In the NOPSO, PHMSA wrote:

> After evaluating the foregoing preliminary findings of fact, and having considered the characteristics of the pipeline, including prior Type-A sleeve repairs involving dents and other defects; the prior failures of the pipeline; the hazardous nature of the petroleum products, including jet fuel, transported; the uncertainty as to the root cause(s) of the failure; the proximity of the pipeline to residential dwellings and water wells; the existing and potential additional impacts to property, the environment, and wildlife; and the possibility that the same condition(s) that may have caused

28

Case ID: 250303655

the failure remain present in the pipeline and could lead to additional failures; it appears that the continued operation of the Twin Oaks Discharge pipeline system without corrective measures would pose a pipeline integrity risk to public safety, property, or the environment. The conditions and threats described above potentially exist throughout the Twin 7 Oaks Pipeline. Further, Sunoco's apparent inability to effectively detect the leak has potentially exacerbated the impacts of the release over an extended period of time. Accordingly, corrective measures are necessary to mitigate the pipeline integrity risk of the pipeline system to protect public safety, property, and the environment.

151.    PHMSA thereafter issued proposed remedial requirements including reducing operating pressure, implementing plans to assess the integrity of the pipe and of the Type A sleeves along it, conducting a leakage survey, and conducting a root cause failure analysis.

152.    On the evening of February 13, 2025, a second town hall meeting was held at Sol Feinstone Elementary School, Newtown, PA at 7:30 p.m. Affected residents including Plaintiffs, representatives from Defendants, and representatives from PHMSA and state regulators attended the meeting.

153.    During this meeting, residents, including Plaintiffs, demanded that the Twin Oaks Pipeline be shut down. Plaintiff Daniel La Hart provided an opening statement on behalf of Mt. Eyre Manor residents at this meeting.

154.    Defendants then showed residents a map of what they considered to be the geographic area affected by the Pipeline Leak. This map included a line of arrows pointing in the northeastern direction, which were labeled as the "*inferred* groundwater flow direction." (emphasis added).

155.    Defendants stated that areas west and south of the Pipeline Leak were not of concern based on the flow of the groundwater toward the Delaware River. Defendants, however, then admitted that they had not yet installed a single monitoring well or taken any steps to identify the accurate directional flow of groundwater in the area.

29

Case ID: 250303655

156.    Defendants' affirmative statements to residents about the identified affected geographic area resulting from the Pipeline Leak at the town hall meetings on February 6 and February 13 were misleading. At the time Defendants made these statements, in fact, Defendants had no idea when the Pipeline Leak first occurred, how long the Pipeline had been leaking into the residential neighborhood, how much product had been discharged into the surrounding underground aquifer and bedrock, whether additional points along the Pipeline were continuing to leak, or the direction or flow rate of the groundwater underlying the point or points of discharge.

157.    Defendants intended their statements to induce a false sense of security and confidence in residents, particularly for residents whose homes were not within Defendants' arbitrarily delineated affected geographic area that was not based on adequate investigation or evidence.

158.    During the February 13, 2025, town hall meeting, one resident who resided at 128 Walker Road in the affected area and across the street from where the Pipeline Leak was discovered described her experience with her well. Since 2023, she had repeatedly complained to Defendants about her concerns of contamination resulting from the Twin Oaks Pipeline, and Defendants' representatives had repeatedly stated that any oil could not have been coming from the Twin Oaks Pipeline.

159.    After the discovery of the Pipeline Leak, when Defendants finally sent a contractor to inspect her well, they discovered *over **twelve feet of jet fuel** on top of the water in her well*, and after pumping the water, *estimated that **fifteen feet of jet fuel** had been accumulating in the well since 2023*. The resident stated that according to Defendants' contractor, *over 22 inches of jet fuel had accumulated in her well **in the past week alone***.

30

Case ID: 250303655

160. Residents asked Defendants for a guarantee during the February 13, 2025 town hall meeting that the Twin Oaks Pipeline was not still leaking. Defendants responded that they were not able to provide such a guaranty at that time.

161. On February 18, 2025, PADEP sent Defendants a Notice of Violation.[7] In the Notice, PADEP stated that the release identified on January 31, 2025, has "caused free product and dissolved concentrations of petroleum-related chemicals in potable wells in the neighborhood, with some properties having contamination exceeding DEP's Statewide health standard medium specific concentrations in their drinking water." The Notice advised that the discharge constitutes a violation of the Pennsylvania Clean Streams Law, 35 P.S. § 691.401, and that such a violation amounts to unlawful conduct within the definition of the law and is subject to civil enforcement.

162. On February 19, 2025, counsel for Defendants responded to the NOPSO issued by PHMSA.[8] Defendants denied and disputed several of the preliminary factual findings contained in the NOPSO. In doing so, Defendants admitted that "there is not sufficient evidence at this time to conclude how long the Affected Pipeline was leaking." Defendants stated that it did not have evidence of an ongoing leak, but also that its investigation was ongoing. Defendants did not state that it had sufficient information to rule out a continuing release of aviation fuel and other contaminants from the Pipeline into the local environment.

163. On February 27, 2025, a third town hall meeting was held again at the Sol Feinstone Elementary School at 7:30 p.m. Affected residents including Plaintiffs, regulators, local officials, and representatives of the Defendants were present at the meeting.

---

[7] Exhibit E, Notice of Violation, Pa. Dep't Envt'l Protection (Feb. 18, 2025).
[8] Exhibit F, Letter from Haley O'Neill to Bryan Lethcoe (Feb. 19, 2025).

31

Case ID: 250303655

164.    During the February 27 town hall meeting, Defendant Energy Transfer's Joe McGinn, Vice President of Public Affairs, stated: **"This release happened, and it's our fault that it happened. This was not a third-party damage issue. We recognize that. We apologize for it."** He further stated that Energy Transfer's **"focus and goal is to restore the community to its original state."**

165.    Defendants' representatives also stated during the February 27 town hall meeting that they provided their initial estimate of 156 barrels of product lost based on their understanding that federal law required a reporting of the amount of product lost within 48 hours of discovery of a leak. Defendants *admitted* that at the time they made the representation to PHMSA, they had no factual basis upon which to assert the amount of product lost, and that they continue to lack an evidence-based estimate of the amount of product that has been discharged into the underlying bedrock and aquifer beneath the Mt. Eyre Manor neighborhood, in Upper Makefield Township.

166.    This signifies and demonstrates that Defendants do not maintain proper and adequate leak detection and monitoring systems with respect to the Twin Oaks Pipeline.

167.    On February 28, 2025, Pennsylvania Governor Josh Shapiro wrote a letter to U.S. Transportation Secretary Sean Duffy, requesting expedited action from PHMSA in response to the Pipeline leak.[9] In his letter, Governor Shapiro noted that "Sunoco has not demonstrated adequate ability to detect leaks and take appropriate actions, given what appears to have been a significant delay between the initial indications of a leak and the response."

168.    Governor Shapiro further described the leak as "the latest incident in a long pattern of safety concerns with Sunoco and Energy Transfer pipelines in Pennsylvania."

---

[9] Exhibit G, Letter from Governor Josh Shapiro to Secretary Sean Duffy (Feb. 28, 2025).

Case ID: 250303655

169.    On March 6, 2025, PADEP issued an Administrative Order to Defendants Energy Transfer (R&M), LLC and Sunoco Pipeline, L.P., directing Defendants to respond to the Pipeline Leak and implement certain remedial actions, including the supply of bottled water and the installation of point-of-entry treatment ("POET") systems for certain residents in Upper Makefield Township, Pennsylvania.

170.    PADEP's Order limited the requirement to supply bottled water to only those properties with potable groundwater wells within the Mt. Eyre Manor neighborhood topographic watershed, plus a minimum 500-foot buffer, that have concentrations of VOCs above background concentrations in the area, and limited the requirement to install POET systems to only those properties with potable groundwater wells within the Mt. Eyre Manor neighborhood topographic watershed, plus a minimum 500-foot buffer, that have concentrations of VOCs exceeding the Maximum Contaminant Levels ("MCLs") under Pennsylvania state regulations.

171.    The harm caused by Defendants' actions as alleged herein and the Pipeline Leak is not limited to the contamination of certain residences above MCLs under Pennsylvania state regulations. To the contrary, Plaintiffs and every Class member have the right to clean drinking water and clean soil that are completely free of any contaminant that is found in jet fuel, or at least to background concentrations. Equally, the 500-foot buffer is insufficient to remedy the damages and injuries that Defendants have caused as a result of the Pipeline Leak, as contamination has already been detected beyond this 500-foot buffer.

172.    Judicial intervention is necessary to impose appropriate and reasonable full remedial measures and obligations on Defendants beyond the regulatory measures ordered by the PADEP.

33

Case ID: 250303655

173. According to Defendants' own contracted testing firm, GES, hydrocarbons have been detected in the wells of numerous residences in the Mt. Eyre Manor neighborhood in addition to the six residences that were initially reported.

174. At least five residences have already shown detectable amounts of hydrocarbons above background conditions but below the MCLs for a given hydrocarbon. Defendants' investigation is ongoing, and the number of wells that Defendants know to be impacted continues to increase.

175. Despite this knowledge, to date Defendants have not admitted publicly to the discovery of hydrocarbons in more than six wells in the Mt. Eyre Manor neighborhood.

176. In multiple incidences, residents have requested that GES technicians taking post-treatment samples from their faucets also take pre-treatment samples from their wells for testing. GES technicians repeatedly have responded that they had strict instructions from Defendants not to conduct any testing of well water pre-treatment, and to only take samples from faucets in the residents' homes.

### G.    Environmental Contamination Resulting from the Pipeline Leak

177. The Pipeline Leak has resulted in the dispersion of multiple known toxic chemicals into the surrounding environment. The full extent and make-up of the contamination is presently unknown.

178. Free standing petroleum or jet-fuel product has been found on the top of the water in some residents' wells.

179. Over twelve feet of free product was found on top of the water in the well at 128 Walker Road, directly across the street from the location of the Pipeline Leak. Defendants' contractors estimated that over fifteen feet of jet fuel had accumulated in the well since 2023.

34

Case ID: 250303655

Moreover, product is still continuing to accumulate in this well despite Defendants' efforts to remove it. Every day since the contamination was initially discovered by Defendants' contractors, more of Defendants' hazardous product has seeped into the well.

180.   Free-standing petroleum or jet fuel product was found accumulated on top of the water in several other wells near the site of the leak, including nearly six feet of product in the well at 121 Glenwood Drive and over three feet of product at 107 Spencer Road. Product has been observed on top of the water in the wells of at least fifteen other nearby residences to date.

181.   In addition to direct observation of product in their wells, residents continue to report detecting the odor of gasoline in their wells and in their tap water, which, at the very least, is a substantial nuisance that interferes with the residents' enjoyment and use of their properties.

182.   For example, the residents at 105 Spencer Road have been smelling gasoline on their property since June of 2024, and at times have been able to taste gasoline in their water.

183.   The owner of the residence at 103 Spencer Road also reports having smelled gasoline on his property for a long time and has been able to smell and taste gasoline in his water at various points in the water he uses to drink, cook, and shower.

184.   Residents in the affected community feel the stress and anxiety associated with having detectable levels of gasoline taste and odor on their properties and their neighbors' properties. As one resident stated, "every morning, when I turn on my water, it's a concern of mine. Is it my turn to smell fuel and taste it in my water?"[10]

---

[10] Energy Transfer Begins Drilling Recovery Wells on Pennsylvania Street After Fuel Leak Sparked Water, Air Safety Concerns, CBS News (Mar. 19, 2025) (available at https://www.cbsnews.com/amp/philadelphia/news/sunoco-fuel-leak-upper-makefield-pennsylvania/).

Case ID: 250303655

**Exhibit B_Page 62 of 583**

185.    Other indicia of contamination, including the presence of chemicals and particulates known to be byproducts of petroleum and jet fuel, have been found in the well water and tap water of more residences in the neighborhood.

186.    Toxic chemicals and particulates resulting from Defendants' Pipeline Leak have infiltrated the aquifer and bedrock in sufficient quantities to be detected in the water of neighborhood residences, including but not limited to kerosene, benzene, ethylbenzene, isopropylbenzene, dichloroethane, trimethylbenzene ("TMB"), toluene, naphthalene, methyl tertiary-butyl ether ("MTBE"), and lead.

187.    There is no potential source of these substances in the surrounding area other than the Twin Oaks Pipeline.

188.    Kerosene is one of the most common fuel oils and a major component of jet fuel. Exposure to kerosene can lead to a wide variety of human health consequences, including respiratory issues, vision loss, liver failure, gastrointestinal issues, heart collapse, and skin burning and irritation. Kerosene exposure can also affect the central nervous system, resulting in seizures, comas, migraines, depressions, and other neurological impacts. The International Agency for Research on Cancer ("IARC") considers kerosene a possible carcinogen.

189.    Benzene is natural and a highly toxic constituent of petroleum. Due to its high odor recognition threshold, people can be exposed to excessive amounts of benzene in the air or in tap water without knowledge of the exposure. Benzene is a known human carcinogen according to both IARC and the U.S. Environmental Protection Agency ("EPA"). In addition to cancer, benzene exposure can result in the disruption of hematopoiesis (the body's production of blood), suppression of the immune system, and result in both skeletal and neurodevelopmental defects.

36

Case ID: 250303655

190.    TMB isomers are produced during the petroleum refining processes and are used as a fuel additive in gasoline. TMB is a neurotoxin and is readily absorbed into the human bloodstream following exposure. TMB exposure can negatively impact a person's short-term memory and motor skills, induce vertigo, and cause nervousness and anxiety. TMB exposure can also cause issues with blood clotting and respiratory function.

191.    MTBE, in contrast to other fuel and gasoline constituents, has a strong affinity for water. MTBE dissolves easily into groundwater and can migrate rapidly a great distance from the source of release, meaning it is likely to have a distinct contamination plume from other toxic chemicals released from the Twin Oaks Pipeline. MTBE does not readily biodegrade in water and will persist in the environment until remediated. MTBE at very low concentrations can affect the taste and odor of water and IARC considers it a likely carcinogen. MTBE as a fuel additive was phased out of gasoline in the United States by 2006, due to its associated environmental and health concerns.

192.    Lead is a neurotoxin that easily permeates the blood-brain barrier after exposure, and often is difficult to detect in a person until dangerous amounts have accumulated. In adults, lead exposure through drinking water can cause reduced memory, headaches, mood disorders, joint and muscle pains, abdominal pains, and high blood pressure. Lead exposure also negatively affects the reproductive organs and can cause reduced or abnormal sperm counts and increase the risk of miscarriage, stillbirth, or premature births in pregnant women.

193.    Symptoms resulting from exposure to these toxic chemicals and other harmful chemicals released from the Twin Oaks Pipeline can take a long time to manifest. Residents of the Mt. Eyre Manor neighborhood and surrounding communities will have to closely monitor their health, potentially indefinitely, and have and will continue to experience the accompanying fear

Case ID: 250303655

and anxiety that comes from not being able to trust the safety of the water they drink or the air that they breathe because of Defendants' Pipeline Leak.

**H.    Defendants' Messaging Since the Pipeline Leak Has Not Matched Reality**

194.    Defendants have been engaged in a multifaceted public relations campaign to downplay the severity of the Pipeline Leak and its actual and potential harms. Defendants' messaging, however, has not matched reality.

195.    For example, Defendants have now suggested that the Pipeline Leak may have happened right before it was discovered in January 2025, despite residents smelling and reporting the odor of gasoline since at least September 2023, 16 months earlier.

196.    Defendants have also now suggested that the Pipeline Leak was a "pinhole" and that it spilled 156 barrels or less. In reality, Defendants have admitted that they lacked a valid basis for their initial estimate of 156 barrels and have conceded that they rushed to provide a number to the government without the applicable information necessary to determine the actual volume of lost aviation fuel and other petroleum products.

197.    Because of Defendants' failure, negligence, and recklessness in failing to have a proper leak detection and monitoring system in place for the Twin Oaks Pipeline, Defendants have no way to measure the amount of product that spilled into the environment from the Twin Oaks Pipeline in the Mt. Eyre Manor neighborhood.

198.    Moreover, the Pipeline Leak, when discovered, showed visibly that the Leak did not result from a "pinhole" as Defendants suggested, but rather, evidenced a leak such as from a water fountain, and that was with substantially reduced or no pressure applied to the Pipeline at the time.

Case ID: 250303655

199.    Defendants further represented to residents in the Mt. Eyre Manor neighborhood when they were purchasing their homes that Defendants had instituted state of the art leak detection equipment with respect to the Pipeline, such that a leak like the Pipeline Leak here could never occur. These representations by Defendants to residents were false and misleading as demonstrated by the occurrence of the Pipeline Leak and Defendants' actions and follow up (or lack thereof) in response to multiple odor complaints that began at least as early as September 2023.

200.    In fact, Defendants failed to have proper leak detection and monitoring systems in place with respect to the Twin Oaks Pipeline.

201.    Defendants claimed that their leak detection systems for the Pipeline were functional, but in reality, and despite residents pointing out an issue for 16 months, making numerous odor complaints, no computer system or ground testing employed by Defendants detected any leak, and the Pipeline Leak was only detected and located when Defendants went back to review old maintenance records and then happened to excavate the portion of the Twin Oaks Pipeline where the leak occurred. Defendants would not have identified the Pipeline Leak except by actually digging up the Pipeline, which facts do not suggest or support that Defendants had an adequate leak detection and monitoring system in place.

202.    Defendants have claimed that Type A sleeves are structurally sound and that they visually inspected six such sleeves, but at least 44 Type A sleeves exist on the Twin Oaks Pipeline, and many more are believed to have not been physically inspected by way of excavation.

203.    Crucially, Defendants also claimed to make a commitment to future public engagement, community, outreach, and continued participation in public meetings in Upper Makefield Township. In reality, Defendants have invoked "confidentiality" and vague "national security" concerns to deny affected residents with access to information and facts about the

39

Case ID: 250303655

Pipeline Leak. Defendant failure to engage has only increased since the residents have hired legal counsel to protect their interests.

204.    Defendants' conflict between its public representations and its internal policy or preference to withhold information came to a head at the latest town hall meeting that took place on March 11, 2025. At this meeting, Defendants shut down any attempt to receive questions from the public, claiming that Defendants could no longer continue to provide information because some residents had retained legal counsel. Defendants went so far as to offer one-on-one meetings only with residents that were *not* represented by counsel. This was a transparent scare tactic to discourage unrepresented residents from retaining legal counsel, and further reflects Defendants' insensitivity to the crisis unfolding in the affected community, and the failure to take responsibility.

205.    The breach in the Pipeline and resulting Pipeline Leak is the direct consequence of Defendants' reckless and negligent actions with respect to the oversight, operation, supervision, maintenance, monitoring, and testing of the Twin Oaks Pipeline.

206.    Moreover, Defendants have continued to transport highly corrosive and toxic products at extremely high pressures through the Twin Oaks Pipeline – which when installed was not designed for those pressures – in spite of their knowledge that (a) the Pipeline is nearly 70 years old and had a history of cracks; (b) that there was a previously identified dent in the Pipeline at the location of the crack which was reinforced only by an approximately 30-year-old exterior sleeve which has been known to have problems from past experience; and (c) that did not have a proper monitoring and leak detection system.

207.    *For over 16 months*, despite their knowledge that the Pipeline was in danger of corrosion and cracking, Defendants failed to properly respond to nearby odor complaints (meaning within hundreds of feet) in a manner reasonably likely to detect a leak and had no sophisticated

Case ID: 250303655

**Exhibit B_Page 67 of 583**

leak detection equipment in place to do so, notwithstanding that Defendants were operating the Twin Oaks Pipeline in a residential neighborhood.

208.    In response to multiple odor complaints, Defendants presumed that no breach in their Pipeline existed based solely on a lack of abnormal dead vegetation around the Pipeline and the failure of a portable gas monitor to detect fuels in the surrounding air.

209.    Facts, however, confirm the neglectful inadequacy of Defendants' leak-detection measures as they employed the above insufficient measures and concluded a non-detect based on them immediately prior to excavating the Twin Oaks Pipeline in the Mt. Eyre Manor neighborhood and visually confirming the crack and Pipeline Leak.

210.    Since discovering the Pipeline Leak in January 2025, Defendants have failed to take proper and reasonable actions to facilitate an understanding of the extent and nature of the discharge and resulting contamination. For example, Defendants, who have vast and virtually unlimited resources, failed to test samples of water taken directly from the wells of nearby residents for the presence of hazardous substances.

211.    Defendants have further directed their contractors to avoid taking full and broad testing measures, despite knowing that such measures are reasonably necessary to identify the scope of the contamination plume and to ultimately protect the health, safety, and welfare of nearby residents.

212.    Despite failing to determine whether any ongoing leaks persist in the Pipeline, Defendants restarted operation of the Twin Oaks Pipeline on February 2, 2025, and have continuously operated the Pipeline since that date.

41

Case ID: 250303655

**I.     Harm to Plaintiffs and Class Members**

213.     Plaintiffs and Class members have been severely and negatively impacted and harmed by Defendants' conduct.

214.     The impacted community relies on well water drawn from the underlying aquifer for their water needs. Numerous residents have found Defendants' product, jet fuel, or other petroleum products, floating on top of and contaminating their private wells, with multiple residents having significant amounts of jet fuel accumulated in their wells.

215.     Preliminary testing has shown that water samples collected from nearby homes have tested positive for petroleum hydrocarbons and/or other chemicals commonly found in jet fuel and petroleum products.

216.     The Pipeline Leak has and will continue to cause financial harms to Plaintiffs and Class members, including the expenditure of all out-of-pocket costs resulting from the Pipeline Leak that must be reimbursed by Defendants.

217.     Examples of these out-of-pocket costs include, without limitation:

      a.     the costs to engage and pay contractors, testing companies, and inspectors;

      b.     the costs of installation of remedial or additional water treatment systems;

      c.     the costs of purchasing filters associated with water treatment systems;

      d.     the costs of damage and remediation to private wells;

      e.     the costs of remediation of soil;

      f.     the costs of remediating other damages caused by the Pipeline Leak;

      g.     the costs of remediating and/or replacing pipes and fixtures that have been contaminated as a result of the Pipeline Leak;

      h.     the costs of temporary housing;

42

Case ID: 250303655

    i.    the costs of commuting to other locations for the purpose of showering or doing laundry;

    j.    reimbursement of mileage associated with attending meetings concerning the Pipeline Leak;

    k.    the cost of any increased insurance premiums;

    l.    the cost of lost time-value from having to take off work due to the Pipeline Leak;

    m.    the cost of childcare while attending meetings related to the Pipeline Leak; and

    n.    the cost of any medical costs incurred by Plaintiffs related to the Pipeline Leak.

218.    Defendants are responsible to pay all past and future costs associated with complete environmental restoration and remediation of all contamination caused by their Pipeline Leak, and to all property, water, and air, including, without limitation, to the environment, to Plaintiffs' and Class members' real and personal property, to wells that have been contaminated, to pipes that have been contaminated and need to be replaced, to fixtures that have been contaminated and need to be replaced, to soil that has been contaminated, to gardens that have been contaminated, and to all other property belonging to Plaintiffs and Class members that has been affected by the Pipeline Leak.

219.    Plaintiffs and Class members who own their homes have also suffered from diminution of the value of their residences caused by the Pipeline Leak.

220.    Some Class members have already had potential buyers walk away from a potential sale as a result of the Pipeline Leak.

43

Case ID: 250303655

221. Plaintiffs and Class members have suffered from the loss of use and enjoyment of their real and personal property caused by the Pipeline Leak.

222. Plaintiffs and Class members have suffered increased anxiety caused by the Pipeline Leak.

223. Exposure to the substances released from the Pipeline, whether through ingestion, inhalation, or dermal exposure, places all affected residents at increased risk of severe health impacts, including cancer, thus necessitating medical monitoring.

### J.   Harm Suffered by Plaintiffs Daniel and Katherine La Hart

224. Plaintiffs Daniel La Hart and Katherine La Hart moved to the Mt. Eyre Manor neighborhood in 2016 and live in their home with their two young children.

225. As such, Plaintiffs are Pennsylvania residents.

226. Plaintiff Daniel La Hart, in addition to being Katherine's husband and father to their children, is a highly educated individual who works in the intelligence community, serving as an Intelligence Superintendent (Chief Master Sergeant rank) for the New Jersey Air National Guard and as a director of data science for a company in the private sector. Daniel is also a former member of the U.S. Air Force Reserve and a former firefighter.

227. Plaintiff Katherine La Hart, in addition to being Daniel's wife and mother to their children, has a Ph.D. in business administration and works in sales recruitment and onboarding at a Fortune 500 insurance and financial services company.

228. Prior to learning of the Pipeline Leak, Plaintiffs were in love with their community and felt that their home located at 114 Spencer Road was their "forever home" where they would live for a lifetime.

44

Case ID: 250303655

229. Plaintiffs used their well water for everything including drinking, cooking, washing dishes and clothes, showering (indoors and outdoors), baths for their children and animals, watering their gardens, cleaning the cars, filling their pool, letting their children run in the hose water and down their water slide, and providing water to their dog, cat, and chickens to drink.

230. In late 2024, Plaintiffs invested approximately $150,000.00 to pay for a series of renovations to their home that they scheduled to start in April 2025, including the installation of new windows, siding, doors, replastering the pool, and more, because they wanted to invest in their forever home and their community that they loved.

231. The Pipeline Leak has caused Plaintiffs to suffer out-of-pocket economic losses including, among other things, significant childcare costs, mileage associated with attending meetings concerning the Pipeline Leak, and significant lost time-value from having to take off work to attend meetings, be present for testing, and to perform community outreach due to the Pipeline Leak.

232. The Pipeline Leak has caused Plaintiffs to suffer diminution to the value of their real property. The presence of the Pipeline Leak and resulting environmental contamination has placed a stigma on the Mt. Eyre Manor and surrounding affected communities that has decreased the value of their property.

233. It is likely that Plaintiffs (and Class members) are now overpaying property taxes as a direct result of the diminution of value to their property caused by Defendants' conduct.

234. The Pipeline Leak has caused 114 Spencer Road to go from being Plaintiffs' idyllic forever home to an albatross that Plaintiffs will struggle to sell for close to its fair market value, which was over $1 million prior to Defendants' Pipeline Leak. Plaintiffs estimate that they have suffered diminution of value of their home in the tens of thousands or hundreds of thousands of

45

Case ID: 250303655

dollars. Who would want to purchase a home in the Mt. Eyre Manor neighborhood given the known existence of the Pipeline Leak and resulting contamination?

235.    But at the same time, as a direct result of the Pipeline Leak, Plaintiffs, like other Class members, have been forced to consider the possibility of selling what they thought was their forever home and moving to another location that has not experienced the type of harms that have devastated Mt. Eyre Manor. Plaintiffs do not want to confront or deal with the risk that the water in their neighborhood and their home is dangerous and putting them and their family, children, and guests at risk, and have been unfairly forced by Defendants to think about this every day, which is causing Plaintiffs severe mental anguish.

236.    Moving would cause significant hardship to Plaintiffs and their young children. Plaintiffs would also incur significant expenses by having to uproot themselves and move to a comparable home in a comparable community.

237.    With respect to Plaintiffs' private well, the Pipeline Leak has caused irreparable damage to Plaintiffs' faith in their ability to fully use and enjoy their water.

238.    Plaintiffs' well water has already tested positive for MTBE and lead above background concentration levels and Plaintiffs are awaiting additional testing results.

239.    It will always be on the forefront of Plaintiffs' minds that the plume of the Pipeline Leak could affect their property at any time, or that the Pipeline could leak again at any point in time, and/or that the Pipeline could have additional undiscovered leaks, and so Plaintiffs could be putting the health of their family, children, friends, guests, and pets at risk merely by continuing to live at 114 Spencer Road.

240.    Worsening the situation, Defendants have begun buying residential homes in the Mt. Eyre Manor neighborhood, starting with 108 Spencer Road which is only two houses away

46

Case ID: 250303655

from Plaintiffs' home, for the purpose of drilling additional monitoring and/or recovery wells as a direct result of the Pipeline Leak. These activities by Defendants are a nuisance to Plaintiffs and Class members in the neighborhood and are interfering with their use and enjoyment of their property, as well as further depreciating the affected geographic area.

241.    Defendants' activities at 108 Spencer Road will soon become the epicenter for noisy, odorous, and highly bothersome activity that will disturb and disrupt the daily lives of the Plaintiffs and Class members, all as a result of Defendants' Pipeline Leak.

242.    Defendants are currently attempting to purchase additional homes in the Mt. Eyre Manor neighborhood to conduct monitoring and recovery activities with respect to the Pipeline Leak, which will further cause nuisance and further diminish the value of the neighborhood.

243.    Plaintiffs are fearful that Defendants will continue to buy additional nearby homes and that any home bought by Defendants will eventually lay vacant and be a nuisance to the community, further driving down property values.

244.    For the reasons alleged herein, Defendants' Pipeline Leak has devastated the Mt. Eyre Manor neighborhood and surrounding affected communities. While Defendants have publicly accepted responsibility for the Pipeline Leak, they have not accepted their corresponding responsibilities to compensate Plaintiffs and Class members for all the harms that they have suffered as a direct result of Defendants' conduct.

## CLASS ACTION ALLEGATIONS

245.    Plaintiffs bring the class action allegations in this Complaint for all environmental restoration and remediation, economic losses suffered by Plaintiffs and Class members, medical monitoring, injunctive relief, and declaratory relief.

Case ID: 250303655

246. Plaintiffs bring this action on behalf of themselves and on behalf of the following Class pursuant to Pennsylvania Rules of Civil Procedure 1702, 1708 and 1709:

> All Pennsylvania citizens who owned rented, and/or resided in real properties in Pennsylvania within a one mile radius of 121 Glenwood Drive, Washington Crossing, Pennsylvania (40.271265, -74.876153), as represented in Figure 3 below, during the time period from September 1, 2023 to the present (the "Class").



Figure 3.

247. Excluded from the Class are Defendants and their subsidiaries or affiliated entities, as well as any individuals who resided at the following addresses in Upper Makefield Township since September 1, 2023: 121 Glenwood Drive; 128 Glenwood Drive; 128 Walker Road; 105 Spencer Road; 107 Spencer Road; and 108 Spencer Road.

248. Plaintiffs reserve the right to further define and modify the definition of the Class following further factual investigation and discovery.

48

Case ID: 250303655

249.    **Numerosity.** Members of the Class are so numerous that joinder is impracticable. Plaintiffs estimate there are at least one thousand members of the Class. As such, a class action is superior to other methods of adjudication due to its capacity for efficiency and judicial economy.

250.    **Typicality.** Plaintiffs' claims for environmental restoration and remediation, economic damages, medical monitoring, injunctive relief, and declaratory relief are typical of the claims of the Class members. Plaintiffs and all Class members have been damaged by the same wrongful conduct by Defendants.

251.    Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiffs coincide with, and are not antagonistic to, those of the Class. Accordingly, and by proving their own claims, Plaintiffs will prove other Class members' claims as well.

252.    **Adequacy of Representation.** Plaintiffs are members of the Class. Plaintiffs are represented by the undersigned counsel who are experienced and competent in the prosecution of class actions involving chemical/toxin contamination. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiffs can and will fairly and adequately represent the interests of the Class and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

253.    **Commonality and Predominance.** There are numerous questions of law and fact common to the Class that predominate over any individual issue, including, but not limited to:

a.    Whether Defendants' conduct as alleged herein violates the law as stated in the Causes of Action set forth below that are applicable to the Plaintiffs and the Class;

b.    Whether Defendants owed a duty to the Class;

c.    Whether Defendants breached any duties owed to the Class;

49

Case ID: 250303655

d.    Whether Defendants were negligent and/or reckless in failing to properly and safely oversee the operation, supervision, maintenance, monitoring, and testing of the Pipeline;

e.    Whether Defendants allowed a release of toxic and hazardous substances from the Pipeline into the underlying bedrock and aquifer under where the Pipeline Leak occurred or within the plume area of the Pipeline Leak;

f.    Whether the release or threat of release of toxic and hazardous substances from Defendants' Twin Oaks Pipeline reduced or diminished the value of the Class members' real property;

g.    Whether the release or threat of release of toxic and hazardous substances from Defendants' Twin Oaks Pipeline deprived the Class of the rights to use and benefit from their real property interest, free of interference; and

h.    The appropriate measure of restitution and/or measure of damages to the Class members.

254.    The questions of law and fact common to the Class predominate over any questions of law that may affect only individual class members, because Defendants acted on grounds generally applicable to the entire Class.

255.    **Superiority**. Class treatment is a superior method for the fair and efficient adjudication of the economic damages associated with this controversy because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a similar forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense. The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on

50

Case ID: 250303655

claims that likely would be impracticable to pursue individually, substantially outweigh any difficulties that may arise in the management of the class aspects of this action.

## CAUSES OF ACTION

256.    All of Plaintiffs' causes of action, whether asserted individually or on behalf of the Class, are brought against all Defendants.

## COUNT I
## NEGLIGENCE
### (Individually and on Behalf of the Class)

257.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

258.    Defendants' actions as alleged herein were negligent.

259.    Defendants are responsible for owning, overseeing, operating, supervising, and maintaining the Twin Oaks Pipeline, and are responsible for its safe operations, including, without limitation, by incorporating an appropriate monitoring and leak detection system.

260.    Defendants failed to use reasonable care in the oversight, operation, maintenance, hiring, monitoring, and repair of the Twin Oaks Pipeline and continued to transport hazardous and toxic substances through the Pipeline without ensuring that it was operating in a safe condition.

261.    Defendants failed to use reasonable care in responding to multiple odor complaints over a period of at least 16 months and detecting whether a leak in the Pipeline had occurred.

262.    Defendants failed to use reasonable care in identifying the scope of the leak or of the resulting pollution plume once the Pipeline Leak had been identified.

263.    Defendants failed to use reasonable care to contain the plume and resulting damages caused by the Pipeline Leak.

264.    Defendants failed to use reasonable care in employing a safe and reliable monitoring and leak detection system with respect to the Pipeline.

51

Case ID: 250303655

265.    Defendants knew or should have known that their failure to properly operate, maintain, and repair the Pipeline, and to respond to the Pipeline Leak, would allow the release of dangerous and toxic substances into the environment in a residential neighborhood, and, as a result, contaminate the environment and cause the residents of the affected geographic area to suffer damages as alleged herein.

266.    Defendants knew or should have known that their failure to exercise reasonable care in responding to the Pipeline Leak would impede the ability of regulators and affected residents to understand the scope of the danger and to effectively mitigate its impacts.

267.    Defendants' negligence was a substantial factor in bringing about real and personal property damage, environmental contamination, economic losses, and diminution of property values, to Plaintiffs and the Class members.

268.    Defendants' negligence was a substantial factor in bringing about physical personal injury and emotional distress and anxiety to Plaintiffs individually. Plaintiffs' claims for emotional distress damages are brought individually on behalf of Plaintiffs.

269.    Defendants' negligence was a substantial factor in bringing about the need for medical monitoring for residents affected by the Pipeline Leak.

270.    As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs and the Class members have suffered damages as alleged herein.

## COUNT II
### GROSS NEGLIGENCE
#### (Individually and on Behalf of the Class)

271.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

272.    Defendants owed a legal duty to Plaintiffs and the Class, and Defendants breached that duty.

52

Case ID: 250303655

273. Defendants' breaches as described herein demonstrate an extreme departure from the standard of care for ensuring the safe operation of a hazardous liquids pipeline.

274. Defendants' efforts to prevent the Pipeline Leak and to respond to the Pipeline Leak once identified, as alleged herein, including but not limited to Defendants' misrepresentations as to the amount of product lost and the continuing safety of the Pipeline, demonstrate a gross failure to exercise even scant care with respect to the safety of nearby residents and their property.

275. As a result, Plaintiffs and the Class have been damaged as alleged herein.

## COUNT III
## NEGLIGENCE PER SE
### (Individually and on Behalf of the Class)

276. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

277. The actions of Defendants as set forth herein constitute negligence per se.

278. Defendants had a duty to comply with numerous statutes and regulations designed to prevent a public harm and failed to do so. The statutes that Defendants did not comply with include, without limitation, 35 P.S. § 691.401 (Clean Streams Law), and 49 U.S.C. § 60101 *et seq.* (Pipeline Safety Act).

279. The purpose of the Pennsylvania Clean Streams Law is the "prevention and elimination of water pollution" in order to promote the "economic future of the Commonwealth." 35 P.S. § 691.4.

280. Defendants breached their duty under the Clean Streams Law when they allowed the discharge of toxic substances from the Pipeline into the waters of the Commonwealth. 35 P.S. § 691.401.

281. The purpose of the Pipeline Safety Act, and of regulations promulgated pursuant to the Act, is to "provide adequate protection against risks to life and property posed by pipeline

53

Case ID: 250303655

transportation and pipeline facilities." 49 U.S.C. § 601012(a). The Secretary of Transportation promulgates minimum safety standards pursuant to the Act, which apply to any and all owners and operators of pipeline facilities. *Id.*

282. Defendants breached their duties under the Pipeline Safety Act when they failed to comply with the minimum safety standards proscribed by the Secretary of Transportation pursuant to the Act. Specifically, Defendants' breaches include, without limitation, the fact that they: (a) failed to maintain an effective system for detecting leaks in violation of 49 C.F. R. § 195.444; (b) failed to take measures necessary to prevent and mitigate the consequences of a pipeline failure that could affect a high consequence area in violation of 49 C.F.R. § 195.452; and (c) failed to detect conditions that could adversely affect the safe operation of the Pipeline within 72 hours of an extreme weather event in violation of 49 C.F.R. § 195.414.

283. The purposes of the aforementioned statutes are to protect the interests of Plaintiffs and the Class.

284. As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs and the Class have suffered damages as alleged herein.

<div align="center">

**COUNT IV**
**STRICT LIABILITY – ABNORMALLY DANGEROUS**
**OR ULTRAHAZARDOUS ACTIVITY**
**(Individually and on Behalf of the Class)**

</div>

285. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

286. Defendants' actions as alleged herein constitute an abnormally dangerous and/or ultrahazardous activity.

287. Defendants' transportation of petroleum products through a pipeline that was poorly reinforced by thirty-year old A sleeves involves a high degree of risk and the exercise of reasonable care cannot eliminate the risk inherent in operating the Pipeline.

<div align="center">54</div>

Case ID: 250303655

288.     Defendants' transportation of petroleum products was solely for Defendants' business purposes.

289.     Defendants knew and understood that there was a high risk that their petroleum products and other chemicals, toxins, and particulates could contaminate the environment of the nearby neighborhoods, including the risk of contaminating the only source of clean water for residents, and, thereby, cause residents to suffer personal injuries, property damage, environmental contamination, economic losses, diminution of property value, the need for medical monitoring, and other harms as fully alleged herein.

290.     Defendants' transportation of petroleum products, toxins, and particulates through a pipeline that was poorly reinforced by thirty-year old A sleeves caused serious harm to Plaintiffs' and Class members' persons, chattel, and property, including both real and personal property, as alleged herein.

291.     As such, Defendants are strictly liable to Plaintiffs and the members of the Class.

292.     As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff and the Class have suffered damages as alleged herein.

<div align="center">

**COUNT V**
**PUBLIC NUISANCE**
**(Individually and on Behalf of the Class)**

</div>

293.     Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

294.     Defendants' conduct constitutes a public nuisance pursuant to 35 P.S. 691.401.

295.     Specifically, the discharge of toxic substances, odors, and gases from the Twin Oaks Pipeline as alleged herein into underlying bedrock and aquifer, as well as to groundwater, air, soil, private wells, homes, and other property, have caused particular injuries to Plaintiff and the Class as alleged herein.

<div align="center">55</div>

Case ID: 250303655

**Exhibit B_Page 82 of 583**

296.    Plaintiffs and the Class are entitled to damages as a result thereof.

## COUNT VI
## PRIVATE NUISANCE
### (Individually and on Behalf of the Class)

297.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

298.    Defendants' conduct allowed toxic substances to invade the private use and enjoyment of Plaintiffs' land and property.

299.    Defendants' conduct allowed offensive odors and gases to invade and disrupt the private use of Plaintiffs' land and property.

300.    The invasion of Plaintiffs' land by Defendants' product, toxic substances, and resulting odors was the foreseeable and proximate result of Defendants' negligent and reckless conduct.

301.    Plaintiffs have suffered injury to the use and enjoyment of their home due to the presence of toxic substances in the water and soil on Plaintiffs' land and the substantial risk of the future presence of such substances.

302.    Plaintiffs are entitled to damages as a result thereof.

## COUNT VII
## TRESPASS
### (Individually and on Behalf of the Class)

303.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

304.    Defendants' conduct caused their hazardous and toxic product to intrude into the water and onto the land of Plaintiffs' property. Defendants further failed to take actions to identify the scope of the intrusion and to remove their product from Plaintiffs' property.

56

Case ID: 250303655

305.    Defendants knew or should have known that their failure to maintain safe operations of the Twin Oaks Pipeline and to effectively investigate odor complaints for possible leaks would result in the intrusion of their product on Plaintiffs' property.

306.    Defendants' failure to identify and remove their product from Plaintiffs' property after being made aware of the intrusion constitutes a separate and continuing trespass.

307.    Plaintiffs are entitled to damages as a result thereof.

## COUNT VII
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
(Individually)

308.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

309.    Defendants' conduct negligently inflicted emotional distress on Plaintiffs.

310.    Defendants owed Plaintiffs a duty of care to ensure that they did not suffer from serious emotional distress and mental anguish.

311.    Defendants breached their duty to Plaintiffs by both their actions and inactions.

312.    As a direct and proximate result of Defendants' breach, Plaintiffs have suffered severe emotional injury.

313.    As a result, Plaintiffs have been damaged as alleged herein.

## COUNT IX
### MEDICAL MONITORING
(Individually and on behalf of the Class)

314.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

315.    Plaintiffs and their children were significantly exposed to toxic and hazardous substances, and they bear a substantial risk of future exposure to such substances because of Defendants' repeated failures to prevent the discharge of the same substances into Plaintiffs' soil, water, and property (both real property and personal property).

57

Case ID: 250303655

316.    The exposure to these dangerous substances is such that Plaintiffs and their children have been placed at an increased risk of contracting latent illness and disease, including but not limited to cancer and other serious diseases and illnesses, and as such requires medical monitoring which Defendants are responsible for providing and paying for.

317.    Monitoring and testing procedures exist for cancer and other diseases and illnesses associated with exposure to the aforementioned hazardous substances, making the early detection and treatment of the diseases possible and beneficial.

318.    As a result, the Court should establish a Court-supervised and administered trust fund and medical monitoring regime to compensate Plaintiffs for their economic damages.

## PRAYER FOR RELIEF

319.    Plaintiffs and Class members seek the following relief:

     a.    All compensatory damages and other damages as alleged herein;

     b.    Medical monitoring for Plaintiffs and the Class members;

     c.    Punitive damages where allowable;

     d.    Pre- and post-judgment interest as allowed by law;

     e.    A declaratory judgment that Defendants are responsible for the Pipeline Leak, and responsible for all past and future costs to fully restore and remediate all environmental and other harms caused by Defendants to Plaintiffs and the Class;

     f.    Attorneys' fees and costs pursuant to any applicable statutes and/or regulations;

     g.    Equitable and injunctive relief including:

          i.    Notice to all affected persons of the Pipeline Leak and potential dangers and risks presented by the Pipeline Leak;

58

Case ID: 250303655

ii.    The enjoinment of further operations of the Twin Oaks Pipeline until Defendants are able to fully guarantee its safe operation;

iii.    Provision of full water supply for all homes in the Class;

iv.    Provision of temporary housing and all associated costs to those who reasonably request it as a result of the Pipeline Leak;

v.    Installation of a best-in-class leak detection system for the Twin Oaks Pipeline that can actually detect – and guarantee that it will detect – problems in real time;

vi.    Full restoration and remediation of all environmental contamination including but not limited to groundwater, soil, and air, to background concentrations; and

h.    All other relief this Court deems necessary, just and proper.

## DEMAND FOR TRIAL BY JURY

320.    Plaintiffs hereby demand a jury trial for all claims so triable.

Dated: March 27, 2025

Respectfully submitted,

Shanon J. Carson (Bar No. 85957)
Y. Michael Twersky (Bar No. 312411)
Joseph E. Samuel, Jr. (Bar No. 327645)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: 215-875-4656
Email: scarson@bm.net
Email: mitwersky@bm.net
Email: jsamuel@bm.net

59

Case ID: 250303655

**Exhibit B_Page 86 of 583**

Docusign Envelope ID: F1ECD0CA-7CE0-4A36-ACC4-E894C321F063

## VERIFICATION

The undersigned plaintiff, DANIEL LA HART, herein avers that the statements of fact contained in the foregoing CLASS ACTION COMPLAINT are true and correct to the best of his information, knowledge, and belief, and are made subject to the penalties of 18 Pa. C.S.A. § 4904, relating to unsworn falsification to authorities.

Dated: 3/26/2025

DocuSigned by:

Daniel La Hart

DANIEL LA HART

Case ID: 250303655

Docusign Envelope ID: F1ECD0CA-7CE0-4A36-ACC4-E894C321F063

## VERIFICATION

The undersigned plaintiff, KATHERINE LA HART, herein avers that the statements of fact contained in the foregoing CLASS ACTION COMPLAINT are true and correct to the best of her information, knowledge, and belief, and are made subject to the penalties of 18 Pa. C.S.A. § 4904, relating to unsworn falsification to authorities.

Dated: 3/26/2025

DocuSigned by:

KATHERINE LA HART

Case ID: 250303655

# Exhibit B

## Case Description

| | |
|---|---|
| **Case ID:** | 250303655 |
| **Case Caption:** | LA HART ETAL VS SUNOCO PIPELINE, LP ETAL |
| **Filing Date:** | Thursday , March 27th, 2025 |
| **Location:** | CH - CITY HALL |
| **Case Type:** | C1 - CLASS ACTION |
| **Status:** | CLLCM - LISTED FOR CASE MGMT CONF |

## Related Cases

*No related cases were found.*

## Case Event Schedule

| Event | Date/Time | Room | Location | Judge |
|---|---|---|---|---|
| CASE MGMT CONF CLASS ACTION | 16-JUN-2025 01:30 PM | VIA ADVANCED COMMUN. TECH. | REMOTE HEARING | COMMERCE CASE MANAGER |

## Case Motions

| Motion | Assign/Date | Control No | Date/Received | Judge |
|---|---|---|---|---|
| MOT-FOR ADMISSION PRO HAC VICE | *pending* | 25041343 | 07-APR-2025 | |
| MOT-FOR ADMISSION PRO HAC VICE | *pending* | 25041344 | 07-APR-2025 | |

## Case Parties

| Seq # | Assoc | Expn Date | Type | ID | Name |
|---|---|---|---|---|---|
| 1 | | | ATTORNEY FOR PLAINTIFF | A85957 | CARSON ESQ, SHANON J |
| **Address:** BERGER MONTAGUE PC 1818 MARKET ST SUITE 3600 PHILADELPHIA PA 19103 (215)875-3000 (215)875-4604 - FAX scarson@bm.net | | | **Aliases:** | *none* | |
| | | | | | |
| 2 | 1 | | PLAINTIFF | @12187193 | LAHART, DANIEL |
| **Address:** 1818 MARKET ST SUITE 3600 PHILADELPHIA PA 19103 | | | **Aliases:** | *none* | |

| 3 | 1 | | PLAINTIFF | @12187196 | LAHART, KATHERINE |
|---|---|---|---|---|---|
| **Address:** | 1818 MARKET ST<br>SUITE 3600<br>PHILADELPHIA PA 19103 | | **Aliases:** | *none* | |
| 4 | 10 | | DEFENDANT | @12187203 | SUNOCO PIPELINE LP |
| **Address:** | 525 FRITZTOWN RD<br>SINKING SPRING PA 19608 | | **Aliases:** | *none* | |
| 5 | 10 | | DEFENDANT | @12187206 | ENERGY TRANSFER LP |
| **Address:** | 8111 WESTCHESTER DR<br>DALLAS TX 75225 | | **Aliases:** | *none* | |
| 6 | 10 | | DEFENDANT | @12187209 | ENERGRY TRANSFER (R&M) LLC |
| **Address:** | 1735 MARKET ST<br>PHILADELPHIA PA 19103 | | **Aliases:** | *none* | |
| 7 | | | TEAM LEADER | J519 | PATRICK, PAULA |
| **Address:** | CITY HALL<br>RM 510<br>PHILADELPHIA PA 19107<br>(215)686-8338<br>(215)686-8395 - FAX | | **Aliases:** | *none* | |
| 8 | 1 | | ATTORNEY FOR PLAINTIFF | A327645 | SAMUEL JR, JOSEPH E |
| **Address:** | BERGER MONTAGUE PC<br>1818 MARKET STREET<br>SUITE 3600<br>PHILADELPHIA PA 19103<br>(215)875-3020<br>jsamuel@bm.net | | **Aliases:** | *none* | |
| 9 | 1 | | ATTORNEY FOR PLAINTIFF | A312411 | TWERSKY, YECHIEL M |

| **Address:** | 1818 MARKET STREET, SUITE 3600<br>PHILADELPHIA PA 19103<br>(215)875-3000<br>mitwersky@bm.net | | **Aliases:** | *none* | |
|---|---|---|---|---|---|
| | | | | | |
| 10 | | | ATTORNEY FOR DEFENDANT | A310658 | MCNALLY, LAURA H |
| **Address:** | 2222 MARKET STREET<br>PHILADELPHIA PA 19103<br>(215)963-5257<br>(215)963-5001 - FAX<br>laura.mcnally@morganlewis.com | | **Aliases:** | *none* | |
| | | | | | |
| 11 | 10 | | ATTORNEY FOR DEFENDANT | A329145 | JIANG, YUNICA |
| **Address:** | 2222 MARKET STREET<br>PHILADELPHIA PA 19103<br>(215)963-5000<br>(215)963-5001 - FAX<br>yunica.jiang@morganlewis.com | | **Aliases:** | *none* | |
| | | | | | |
| 12 | | | ATTORNEY FOR DEFENDANT | A44322 | FOX, ROBERT D |
| **Address:** | THREE BALA PLAZA EAST SUITE 700<br>BALA CYNWYD PA 19004<br>(484)430-2312<br>(484)430-5711 - FAX<br>rfox@mankogold.com | | **Aliases:** | *none* | |
| | | | | | |
| 13 | 10 | | ATTORNEY FOR DEFENDANT | A311083 | SILVA, DIANA A |
| **Address:** | THREE BALA PLAZA EAST SUITE 700<br>BALA CYNWYD PA 19004<br>(484)430-2347<br>(484)430-5711 - FAX<br>dsilva@mankogold.com | | **Aliases:** | *none* | |

**Docket Entries**

|  | ☐ **Check for Threaded Docket** This feature will reduce the docket to motion related entries only. |
|---|---|

| Filing Date/Time | Docket Type | Filing Party | Disposition Amount |
|---|---|---|---|
| 27-MAR-2025 10:09 AM | ACTIV - ACTIVE CASE | | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 27-MAR-2025 10:12 AM | CIVIL - COMMENCEMENT OF CIVIL ACTION | | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 27-MAR-2025 10:16 AM | CMPLC - COMPLAINT FILED NOTICE GIVEN | CARSON ESQ, SHANON J | |
| **Documents:** | CMPLC_3.pdf | | |
| **Docket Entry:** | COMPLAINT WITH NOTICE TO DEFEND WITHIN TWENTY (20) DAYS AFTER SERVICE IN ACCORDANCE WITH RULE 1018.1 FILED. NOTE A FLASH DRIVE WAS FILED WITH THE COMPLAINT. | | |
| | | | |
| 27-MAR-2025 10:17 AM | JURYT - JURY TRIAL PERFECTED | CARSON ESQ, SHANON J | |
| **Docket Entry:** | JURY TRIAL DEMANDED. | | |
| | | | |
| 27-MAR-2025 10:17 AM | CLWCM - WAITING TO LIST CASE MGMT CONF | | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 27-MAR-2025 04:24 PM | AFDVT - AFFIDAVIT OF SERVICE FILED | CARSON ESQ, SHANON J | |
| **Documents:** | AFFIDAVIT OF SERVICE (5).pdf | | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF PLAINTIFF'S COMPLAINT UPON SUNOCO PIPELINE LP AND ENERGRY TRANSFER (R&M) LLC BY PERSONAL SERVICE ON 03/27/2025 FILED. (FILED ON BEHALF OF KATHERINE LA HART AND DANIEL LA HART) | | |
| | | | |

| 27-MAR-2025 04:45 PM | AFDVT - AFFIDAVIT OF SERVICE FILED | CARSON ESQ, SHANON J | |
|---|---|---|---|
| **Documents:** | AOS_Energy Transfer LP.pdf | | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF PLAINTIFF'S COMPLAINT UPON ENERGY TRANSFER LP BY PERSONAL SERVICE ON 03/27/2025 FILED. (FILED ON BEHALF OF KATHERINE LA HART AND DANIEL LA HART) | | |
| | | | |
| 28-MAR-2025 01:14 PM | ENAPC - ENTRY OF APPEARANCE-CO COUNSEL | SAMUEL JR, JOSEPH E | |
| **Documents:** | EOA - Joseph Samuel(20461654.2).pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF JOSEPH E SAMUEL AS CO-COUNSEL FILED. (FILED ON BEHALF OF KATHERINE LA HART AND DANIEL LA HART) | | |
| | | | |
| 31-MAR-2025 03:21 PM | ENAPC - ENTRY OF APPEARANCE-CO COUNSEL | TWERSKY, YECHIEL M | |
| **Documents:** | EOA - Michael Twersky(20461323.2).pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF YECHIEL M TWERSKY AS CO-COUNSEL FILED. (FILED ON BEHALF OF KATHERINE LA HART AND DANIEL LA HART) | | |
| | | | |
| 01-APR-2025 04:48 PM | ENAPP - ENTRY OF APPEARANCE | MCNALLY, LAURA H | |
| **Documents:** | Entry of Appearance - Laura McNally.pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF LAURA H MCNALLY FILED. (FILED ON BEHALF OF ENERGRY TRANSFER (R&M) LLC, ENERGY TRANSFER LP AND SUNOCO PIPELINE LP) | | |
| | | | |
| 01-APR-2025 05:02 PM | ENAPP - ENTRY OF APPEARANCE | JIANG, YUNICA | |
| **Documents:** | Entry of Appearance - Yunica Jiang.pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF YUNICA JIANG FILED. (FILED ON BEHALF OF ENERGRY TRANSFER (R&M) LLC, ENERGY TRANSFER LP AND SUNOCO PIPELINE LP) | | |
| | | | |
| 02-APR-2025 11:58 AM | ENAPC - ENTRY OF APPEARANCE-CO COUNSEL | FOX, ROBERT D | |
| **Documents:** | Entry of Appearance for RDF and DAS in CCP Phila.(2982129.1).pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF ROBERT D FOX AND DIANA A SILVA AS CO-COUNSEL FILED. (FILED ON BEHALF OF ENERGRY TRANSFER (R&M) LLC, ENERGY TRANSFER LP AND SUNOCO PIPELINE LP) | | |

| 07-APR-2025 08:36 AM | MTPHV - MOT-FOR ADMISSION PRO HAC VICE | MCNALLY, LAURA H | |
|---|---|---|---|
| **Documents:** | Motion for Pro Hac Vice Admission of Duke K. McCall, III.pdf<br>Motion CoverSheet Form | | |
| **Docket Entry:** | 43-25041343 RESPONSE DATE 04/28/2025. (FILED ON BEHALF OF ENERGY TRANSFER (R&M) LLC, ENERGY TRANSFER LP AND SUNOCO PIPELINE LP) | | |
| | | | |
| 07-APR-2025 10:50 AM | MTPHV - MOT-FOR ADMISSION PRO HAC VICE | MCNALLY, LAURA H | |
| **Documents:** | Motion for Pro Hac Vice Admission of Drew Cleary Jordan.pdf<br>Motion CoverSheet Form | | |
| **Docket Entry:** | 44-25041344 RESPONSE DATE 04/28/2025. (FILED ON BEHALF OF ENERGY TRANSFER (R&M) LLC, ENERGY TRANSFER LP AND SUNOCO PIPELINE LP) | | |
| | | | |
| 14-APR-2025 10:03 AM | CLLCM - LISTED FOR CASE MGMT CONF | | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 14-APR-2025 10:03 AM | CLCDS - CONFERENCE DATE SET | | |
| **Documents:** | CLCDS_16.pdf | | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 14-APR-2025 10:03 AM | ZR236 - NOTICE GIVEN UNDER RULE 236 | | |
| **Docket Entry:** | NOTICE GIVEN ON 14-APR-2025 OF CONFERENCE DATE SET ENTERED ON 14-APR-2025. | | |
| | | | |
| 23-APR-2025 08:56 PM | PRSUB - PRAECIPE-SUBSTITUTE/ATTACH | SAMUEL JR, JOSEPH E | |
| **Documents:** | La Hart - Praecipe to Attach Exhibits to Class Action Complaint(20502643.1).pdf<br>Exhibit A.pdf<br>Exhibit B.pdf<br>Exhibit C.pdf<br>Exhibit D.pdf<br>Exhibit E.pdf<br>Exhibit F.pdf<br>Exhibit G.pdf | | |

| | |
|---|---|
| **Docket Entry:** | PRAECIPE TO SUBSTITUTE/ATTACH FILED. (FILED ON BEHALF OF KATHERINE LAHART AND DANIEL LAHART) |

*Filed and Attested by the
Office of Judicial Records
03/27/2025 10:16 am
S. MACGREGOR*

Court of Common Pleas of Philadelphia
County  Trial Division

## Civil Cover Sheet

For Office of Judicial Records Use Only (Docket Number)

250303655

| | |
|---|---|
| **PLAINTIFF'S NAME**<br>Daniel La Hart | **DEFENDANT'S NAME**<br>Sunoco Pipeline L.P. |
| **PLAINTIFF'S ADDRESS**<br>c/o Berger Montague PC, 1818 Market St., Philadelphia, PA 19103 | **DEFENDANT'S ADDRESS**<br>525 Fritztown Road Sinking Spring, Pennsylvania 19608 |
| **PLAINTIFF'S NAME**<br>Katherine La Hart | **DEFENDANT'S NAME**<br>Energy Transfer LP |
| **PLAINTIFF'S ADDRESS**<br>c/o Berger Montague PC, 1818 Market St., Philadelphia, PA 19103 | **DEFENDANT'S ADDRESS**<br>8111 Westchester Drive Dallas, Texas 75225 |
| **PLAINTIFF'S NAME** | **DEFENDANT'S NAME**<br>Energy Transfer (R&M) LLC |
| **PLAINTIFF'S ADDRESS** | **DEFENDANT'S ADDRESS**<br>1735 Market Street, Philadelphia, Pennsylvania 19103 |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NO. OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 2 | 3 | ☑ Complaint   ☐ Petition Action   ☐ Notice of Appeal<br>☐ Writ of Summons   ☐ Transfer From Other Jurisdictions |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | | |
|---|---|---|---|---|
| ☐ $50,000.00 or less<br>☑ More than $50,000.00 | ☐ Arbitration<br>☐ Jury<br>☐ Non-Jury<br>☑ Other Class Action | ☐ Mass Tort<br>☐ Savings Action<br>☐ Petition | ☐ Minor Court Appeal<br>☐ Statutory Appeals<br>☐ Commerce (Completion of Addendum Required) | ☐ Settlement<br>☐ Minors<br>☐ W/D/Survival |

**CASE TYPE AND CODE (SEE INSTRUCTIONS)**
3E ToxicWaste (Negligence)

**STATUTORY BASIS FOR CAUSE OF ACTION (SEE INSTRUCTIONS)**
35 P.S. § 691.401 (Pennsylvania Clean Streams Law); 49 U.S.C. § 60101 et seq. (Pipeline Safety Act); 49 C.F.R. § 195 (Transportation of Hazardous Liquids by Pipeline)

**RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER)**
N/A

**IS CASE SUBJECT TO COORDINATION ORDER?**
☐ Yes   ☐ No

CMPLC-Hart Etal Vs Sunoco Pipeline, Lp Etal [SPG]

25030365500003

TO THE OFFICE OF JUDICIAL RECORDS:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant:
Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY<br>Shanon Carson | ADDRESS (SEE INSTRUCTIONS)<br>Berger Montague PC<br>1818 Market Street, Suite 3600<br>Philadelphia, PA 19103 |
|---|---|
| **PHONE NUMBER**<br>215-875-4656 | **FAX NUMBER**<br>215-875-4604 | |
| **SUPREME COURT IDENTIFICATION NO.**<br>85957 | **E-MAIL ADDRESS**<br>scarson@bm.net |
| **SIGNATURE** | **DATE**<br>3/27/2025 |

01-101 (Rev. 8/2014)

Case ID: 250303655

**Exhibit B_Page 97 of 583**

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

**BERGER MONTAGUE PC**
Shanon Carson (Bar No. 85957)
Y. Michael Twersky (Bar No. 312411)
Joseph E. Samuel, Jr. (Bar No. 327645)
1818 Market Street, Suite 3600
Philadelphia, PA 19103

*Counsel for Plaintiffs and the Proposed Class*

| | |
|---|---|
| **DANIEL LA HART** and **KATHERINE LA HART** c/o Berger Montague PC 1818 Market Street, Suite 3600 Philadelphia, PA 19103<br><br>          Plaintiffs,<br><br>    v.<br><br>**SUNOCO PIPELINE L.P.** 525 Fritztown Road Sinking Spring, Pennsylvania 19608;<br><br>**ENERGY TRANSFER LP** 8111 Westchester Drive Dallas, Texas 75225; and<br><br>**ENERGY TRANSFER (R&M) LLC** 1735 Market Street, Philadelphia, Pennsylvania 19103,<br><br>          Defendants. | **PHILADELPHIA COUNTY COURT OF COMMON PLEAS TRIAL DIVISION**<br><br>MARCH TERM, 2025<br><br>CASE NO.   **3655**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1

Case ID: 250303655

## NOTICE TO DEFEND

| NOTICE | AVISO |
|---|---|
| You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.<br><br>*You should take this paper to your lawyer at once.  If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.*<br><br><div align="center">Philadelphia Bar Association<br>Lawyer Referral and Information Service<br>One Reading Center Philadelphia, Pennsylvania  19107<br>(215) 238-6333 TTY<br>(215) 451-6197</div> | Le han demandado a usted en la corte.  Si usted quiere defenderse de estas demandas expuestas en las páginas siguientes, usted tiene veinte (20) días de plazo al partir de la fecha de la demanda y la notificación.  Hace falta asentar una comparecencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona.  Sea avisado que, si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificación.  Además, la corte puede decidir a favor del demandante y requerir que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.<br><br>Lleve esta demanda a un abogado inmediatamente.  Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio.  Vaya en persona o llame por teléfono a la oficina cuya dirección se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.<br><div align="center">Asociación De Licenciados De Filadelfia<br>Servicio De Referencia E Información Legal<br>One Reading Center<br>Philadelphia, Pennsylvania 19107<br>(215) 238-6333<br>TTY (215) 451-6197</div> |

2

Case ID: 250303655

## CLASS ACTION COMPLAINT

### I.    INTRODUCTION

1.    Plaintiffs Daniel La Hart and Katherine La Hart ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Class" as further defined below), bring this Class Action Complaint against Defendants Sunoco Pipeline L.P. ("Sunoco"), Energy Transfer LP, and Energy Transfer (R&M), LLC (collectively, "Defendants"), alleging that Defendants' reckless, negligent, and irresponsible ownership, oversight, operation, supervision, maintenance, and control of a hazardous petroleum pipeline – the Twin Oaks Pipeline – has resulted in a massive and still unquantified leak of jet fuel and petroleum products, and resulting toxins, pollutants, and contaminants, in Upper Makefield Township, Pennsylvania.

2.    Defendants' conduct in permitting and allowing the pipeline leak to occur has unleashed a catastrophic environmental disaster on a previously idyllic Bucks County, Pennsylvania community, including the Mt. Eyre Manor community and surrounding neighborhoods that are subject to the plume caused by the leak.

3.    Defendants' pipeline leak has caused severe harm and poses a serious ongoing and current danger to affected residents' physical health and mental and emotional wellbeing, the community's groundwater, soil, air quality, and ecosystem, and to property values. The pipeline leak has uprooted the affected community and has already caused certain residences within the community to be unlivable, amounting to an effective taking of family homes by Defendants.

4.    Defendants have already purchased one home in the residential Mt. Eyre Manor neighborhood for the purpose of drilling monitoring and/or recovery wells, right in the middle of the neighborhood, and seek to drill more wells and conduct more disruptive activities in the neighborhood for remediation purposes.

3

Case ID: 250303655

5.    Testing shows that Defendants' released jet fuel and related pollutants has contaminated private wells that provide water for drinking, bathing, cooking, and washing, in the affected community.

6.    Testing shows elevated levels of toxins in the air as well.

7.    Defendants' conduct has caused an exigent threat to the health and well-being of the community and has contaminated the environment and underground aquifer in the community.

8.    It has been reported that Defendants already have the worst record for fuel spills in the United States even before this latest disaster.

9.    This case arises from a crack in Defendants' Twin Oaks Pipeline (the "Twin Oaks Pipeline" or "Pipeline") in the Mt. Eyre Manor community in Upper Makefield Township, Bucks County, Pennsylvania, which caused a discharge into the underlying bedrock and groundwater of petroleum, jet fuel, gasoline, and hazardous and toxic chemicals that the Pipeline was used to transport (the "Pipeline Leak" or "Leak"). These toxins include kerosene, benzene, ethylbenzene, isopropylbenzene, dichloroethane, trimethylbenzene ("TMB"), toluene, naphthalene, methyl tertiary-butyl ether ("MTBE"), and lead. These are substances so dangerous that their presence in the soil and water presents a direct and immediate threat to Plaintiffs' and Class members' health and wellbeing.

10.    The Mt. Eyre Manor community and surrounding neighborhoods, as with the area that includes and surrounds Upper Makefield Township generally, has long been a highly desirable residential neighborhood that had strong property values and has been sought-after as an idyllic and wonderful place to live and raise a family.

11.    One of the notable features of Mt. Eyre Manor and the surrounding neighborhoods in Upper Makefield Township is that the residences located there use and rely on private well water

4

Case ID: 250303655

for domestic water needs, including for drinking water, cooking, bathing, washing clothes and dishes, and watering lawns and gardens.

12.    Indeed, Mt. Eyre Manor and other Upper Makefield residents have long believed that they had the best tasting water one could find because it contains naturally occurring minerals that give it a fresher taste and, typically, is free of the added chemicals that can be found in municipal water, such as chlorine and fluoride.

13.    As a result of Defendants' Pipeline Leak, however, this is no longer the case. Defendants' conduct as alleged herein has devastated the community and caused significant contamination to the groundwater under the neighborhood, creating critical health and safety risks to the residents who live there, and causing other consequential harms as detailed herein.

14.    Defendants control and operate the Twin Oaks Pipeline and are responsible for maintaining the Pipeline and ensuring its safety.

15.    Defendants' Pipeline Leak was confirmed on January 31, 2025.

16.    Defendants, however, first received odor complaints from residents living in Mt. Eyre Manor as early as September 2023 – 16 months earlier – but failed at that time to properly investigate, and as such failed to identify the Pipeline Leak at an early stage when more harm could have been prevented.

17.    Despite receiving numerous complaints from alarmed residents about strange odors in the air since at least September 2023, Defendants failed to properly act for at least over 16 months. Defendants failed to properly investigate the Pipeline Leak, failed to identify and contain the Pipeline Leak, and have still not disclosed the full extent of the disaster.

18.    The magnitude of the Pipeline Leak remains unknown and undisclosed to this day. Defendants still cannot account for or are choosing not to publicly state how much toxic petroleum

5

Case ID: 250303655

product has spilled or where it is moving, nor can they guarantee that the Twin Oaks Pipeline is safe, leaving Plaintiffs and Class members in constant and reasonable fear for their health and property.

19.    Numerous residents already have confirmed contamination within their private wells and well water, which contamination is not disputed by Defendants who have already publicly stated that the Pipeline Leak is their fault.

20.    One household across the street from where the Pipeline Leak was eventually discovered had approximately *twelve feet* of free jet fuel product found flowing on top of the water in their private well. Similarly, other residents of Mt. Eyre Manor also had significant amounts of jet fuel in their private wells.

21.    As Defendants have not yet identified the size, scope, direction, or speed of the contamination plume, even residents whose well water currently does not show contamination yet are and remain within a zone of danger where contamination could be mere weeks or days away, and therefore are forced to take appropriate precautions and incur time and expenses to attempt to mitigate their risk.

22.    Recent testing has confirmed that vapors from the contaminated groundwater has invaded homes in the neighborhood placing residents at potential risk to these toxic chemicals in both the water they drink and the air that they breathe.

23.    With no clear answers, no relief in sight, water in the underground aquifer and bedrock, private wells that have been contaminated, soil that has been contaminated, air that has been contaminated, property values plummeting, odors of jet fuel contamination within homes and in the neighborhood, and the prospect of having ingested, bathed, and used contaminated well water, the residents of Mt. Eyre Manor and the surrounding neighborhoods are left to grapple with

6

Case ID: 250303655

the terror of irreparable environmental harm, uncertain whether they can trust the very air they breathe and the water they drink, and concerned for their future safety from disease.

24.    This is not just an environmental tragedy caused by corporate malfeasance; it is a life-altering crisis for Plaintiffs and Class members for which Defendants must be held accountable.

## II.    PARTIES

25.    Plaintiffs Daniel La Hart and Katherine La Hart reside in the Mt. Eyre Manor neighborhood at 114 Spencer Road, Washington Crossing, Pennsylvania, 18977.

26.    Defendant Sunoco Pipeline L.P. is a limited partnership formed under the laws of Texas with a principal place of business located at 8111 Westchester Drive, Dallas, Texas 75225. Sunoco Pipeline, L.P. maintains an address at 535 Fritztown Road, Sinking Spring, PA 19608.

27.    Defendant Energy Transfer LP is a limited partnership formed under the laws of Delaware with a principal place of business located at 8111 Westchester Drive, Dallas, Texas 75225.

28.    Defendant Energy Transfer (R&M), LLC is a limited liability company formed under the laws of Pennsylvania with a principal place of business located at 1735 Market Street, Philadelphia, Pennsylvania 19103.

29.    Defendants John Does 1-100 (the "John Doe Defendants"), are persons or entities that are responsible for the conduct and/or injuries alleged in this Complaint, and accordingly are liable for the relief sought. Their identities are currently unknown to Plaintiffs, who consequently sue the John Doe Defendants by their fictitious names, but the John Doe Defendants will be ascertained through investigation and discovery. Plaintiffs will seek leave to amend this Complaint

Case ID: 250303655

Exhibit B_Page 104 of 583

to state the true names and capacities of the fictitiously named John Doe Defendants when they have been ascertained.

30.    At all times material hereto, Defendants purposefully established significant contacts in Pennsylvania and Philadelphia County, and carried out, and continue to carry out, substantial, continuous, and systematic business activities in Pennsylvania and Philadelphia County.

## III.    JURISDICTION AND VENUE

31.    This Court has subject matter jurisdiction pursuant to 42 Pa. C.S. § 931.

32.    This Court has personal jurisdiction over each of the Defendants under 42 Pa. C.S. § 5301, *et seq.*, because Defendants purposefully availed themselves of the privilege of conducting business in Pennsylvania and Plaintiffs' causes of action arise out of the business that Defendants conduct in Pennsylvania; namely, the Pipeline Leak from Defendants' Pipeline which occurred in Upper Makefield Township, Pennsylvania.

33.    Venue is proper under Pennsylvania Rules of Civil Procedure 1006 and 2179 because Defendants regularly conduct business in Philadelphia County.

## IV.    FACTUAL ALLEGATIONS

### A. Defendants' History of Leaking Pipelines and Failures to Report

34.    Defendant Energy Transfer LP, through its complex network of subsidiaries, limited partnerships, and joint ventures, including Defendant Sunoco and Defendant Energy Transfer (R&M), LLC, owns one of the nation's largest networks of natural gas, crude oil, and petroleum product pipelines.

35.    Energy Transfer LP primarily operated in the natural gas sector prior to its acquisition of Sunoco, and Sunoco's significant oil and petroleum product assets, in 2012.

8

Case ID: 250303655

Together, Defendants now own and operate over 125,000 miles of pipelines across the United States.

36.    Defendants' network of pipelines is not only among the largest in the country; it is also among the leakiest.

37.    According to the Pipeline and Hazardous Materials Safety Administration ("PHMSA")'s database, between 2002 and 2017, Defendants experienced at least 527 leakage incidents—approximately one incident from an existing facility every eleven days in the pipelines that they own and operate.[1]

38.    Those incidents accounted for reported releases of over 3.6 million gallons of petroleum product. That figure likely substantially underestimates the true number of incidents and amount of product lost, as it primarily relies on self-reported incidents and estimates.

39.    Between 2002 and 2017, PHMSA issued 106 safety violations to Defendants for failing to comply with federal regulations designed to ensure the safe operation of hazardous liquid pipelines.[2]

40.    These violations included failures to notify PHMSA of spills, failures to repair identified unsafe pipes for five years, failures to perform regular corrosion inspections, failures to report known unsafe operating conditions, and failures to properly notify emergency responders and the public in the event of a leak.

41.    Federal regulators have not deterred Defendants' egregious conduct in failing to properly maintain their pipelines transporting hazardous petroleum products to make them safe. In Pennsylvania in 2022, Defendants Sunoco Pipeline L.P. and Energy Transfer LP were convicted

---

[1] Exhibit A, Oil and Water: ETP & Sunoco's History of Pipeline Spills, Greenpeace USA and Waterkeeper Alliance (Apr. 17, 2018).
[2] Exhibit A (summarizing PHMSA records).

9

Case ID: 250303655

of *57 charges* of criminal conduct associated with the construction and operation of two pipelines in nearby Chester County, Pennsylvania. The Commonwealth of Pennsylvania convicted Defendants on counts involving multiple instances of failure to report discharges of hazardous substances into the surrounding environment, the use of unapproved additives and release of those additives into drinking water, and failure to implement legally required safety measures. The use of unapproved additives is potentially relevant here as one of the chemicals found in recent testing in the Mt. Eyre Manor neighborhood is MTBE, which was supposed to have been phased out of use in the early 2000s.

42.    In February 2025, Bloomberg reported that the Twin Oaks Pipeline Leak in Upper Makefield Township "highlight[ed]" Energy Transfer's "worst fuel spill record" in the United States. The Bloomberg article reported that Sunoco Pipeline LP was responsible for spilling over 1,400 barrels of fuel in 2024 alone,[3] and this is only accounting for the volume of fuel spills that Defendants were both aware of *and* willing to publicly report. A copy of the Bloomberg article is attached hereto as Exhibit B.

43.    The Twin Oaks Pipeline leak demonstrates that Defendants are not forthcoming about the volume of or even the existence of fuel spills into residential neighborhoods.

44.    Defendants' conduct, as alleged herein, is reflective of and consistent with their history of failing to safely operate and maintain pipelines, as well as their failing to detect and report leaks from their pipelines, and appropriately respond to and remediate leaks with the expediency and transparency that such incidents require.

---

[3] Bloomberg, *Energy Transfer Leak Highlights Worst Fuel Spill Record in US* (Feb. 18, 2025), available at https://www.bloomberg.com/news/articles/2025-02-18/energy-transfer-leak-highlights-worst-fuel-spill-record-in-us?embedded-checkout=true (last accessed Mar. 14, 2025).

Case ID: 250303655

**B.      Defendants' Twin Oaks Pipeline That Runs Through Upper Makefield, PA**

45.      Defendants own and operate the Twin Oaks Pipeline ("the Pipeline"), a 14-inch diameter pipeline that transports petroleum products, including but not limited to jet fuel (JP-8), diesel, and gasoline, from the Twin Oaks Terminal in Aston, Pennsylvania to the Newark Terminal in Newark, New Jersey. The Pipeline is considered a "hazardous liquid pipeline facility" under federal law. 49 U.S.C. § 60101(a).

46.      The Twin Oaks Pipeline was originally installed in 1956 and has operated as a hazardous liquid pipeline facility now for close to 70 years.

47.      The Twin Oaks Pipeline was manufactured by National Tube Supply Company.

48.      On November 18, 2024, PHMSA issued an Advisory Bulletin notifying pipeline owners and operators of potential threats to the integrity of the body of certain pipelines.[4] The Advisory Bulletin stated that pipes constructed by National Tube Supply Company before 1970, like the Twin Oaks Pipeline, were particularly susceptible to hard spots. Hard spots are defects created during the pipe manufacturing process because of localized cooling and hardening. Hard spots can become unstable over time due to changes in their conditions, including degradation and erosion of the coating surrounding the hard spot, and result in cracking of the pipe. PHMSA provided in its Advisory Bulletin six recommended safety actions for pipeline operators to take in order to identify potential hard spots.

49.      Despite this Advisory Bulletin, Defendants' representatives have stated that they were unaware of any safety actions recommended by PHMSA related to the Twin Oaks Pipeline.[5]

---

[4] Pipeline and Hazardous Materials Safety Administration, Pipeline Safety: Identification and Evaluation of Potential Hard Spots—In-Line Inspection Tools and Analysis, 89 Fed. Reg. 90827 (Nov. 18, 2024).
[5] Exhibit C, Letter from U.S. Representative Brian K. Fitzpatrick to Acting Administrator Ben Kochman (March 11, 2025).

11

Case ID: 250303655

50.     Furthermore, it is well known that the inner walls of a petroleum pipeline can erode over time due to the corrosive environment created by the materials and chemicals transported through it. The exterior of a petroleum pipeline is also subject to external corrosion, due to the presence of moisture and chemicals in the surrounding soil. While several factors can influence the rate and extent of both internal and external corrosion, corrosion of a petroleum pipeline over time is inevitable, and again, well-known. Consequently, proper care, maintenance, supervision, and oversight of pipelines is critical, including, without limitation, to public safety.

51.     Despite this knowledge, Defendants have made several incredulous statements to members of the affected community in Upper Makefield, Pennsylvania, including Plaintiffs, that the lifespan of the Twin Oaks Pipeline is "indefinite."

52.     The Twin Oaks Pipeline specifically has experienced reported failures in Pennsylvania on at least two prior occasions, and these are only instances that Defendants have reported to the public. It is possible that the Twin Oaks Pipeline has experienced additional unreported failures.

53.     On October 7, 1986, a crack in the Twin Oaks Pipeline caused the release of at least 5,260 barrels of refined product in Montgomery County, Pennsylvania.

54.     On March 19, 2004, external corrosion caused a leak in the Twin Oaks Pipeline, resulting in the release of at least 50 barrels of refined product in Delaware County, Pennsylvania.

C.      **The Geographic Area Affected by the Twin Oaks Pipeline Leak**

55.     The Twin Oaks Pipeline Leak occurred at a section of the Pipeline that runs directly under the residential Mt. Eyre Manor neighborhood in Washington Crossing, Bucks County, Pennsylvania.

12

Case ID: 250303655

56. The Mt. Eyre Manor neighborhood is located in Upper Makefield Township, a municipality within Bucks County, Pennsylvania and covers the residential homes on Glenwood Drive, Walker Road, Spencer Road, Crestwood Road and Bruce Road.

57. Figure 1 below shows the geographic location of the Twin Oaks Pipeline within a portion of Upper Makefield Township. The red line in Figure 1 shows the Pipeline.



Fig. 1: location of the Pipeline within Upper Makefield Township, retrieved from the National Pipeline Mapping System Public Viewer. *See* pvnpms.phmsa.dot.gov/PublicViewer (last accessed Feb. 26, 2025).

58. Figure 2 below shows the location of the Twin Oaks Pipeline as it runs through and along a portion of the Mt. Eyre Manor neighborhood in Upper Makefield Township, Pennsylvania.

13

Case ID: 250303655



Fig. 2: The Mt. Eyre Manor neighborhood, retrieved from Google Maps, with the approximate location of the Twin Oaks Pipeline overlaid, running parallel to Glenwood Drive.

59.    There is no gas station or other potential source of petroleum byproduct contamination within two miles of the Mt. Eyre Manor neighborhood.

60.    Residents of the Mt. Eyre Manor neighborhood rely on private well water for their water supply, including water used for drinking, bathing, cooking, washing, and gardening, among other uses.

61.    An underground aquifer, which the Twin Oaks Pipeline Leak has now polluted, supplies the water used by residents of the neighborhood.

62.    The same is true for residents of the immediately surrounding area, including, but not limited to, residences on Valley View Drive, Mt. Eyre Road, Taylorsville Road, River Road, Oakdale Avenue, and Maple Shade Avenue, which are other nearby Upper Makefield Township neighborhoods that the Twin Oaks Pipeline also runs underneath.

14

Case ID: 250303655

63.    Upper Makefield Township sits in a floodplain, and the Mt. Eyre Manor neighborhood is surrounded on three sides by "Flood Hazard Areas" as defined by the Federal Emergency Management Agency ("FEMA").

64.    The Mt. Eyre Manor neighborhood is considered a High Consequence Area ("HCA") pursuant to 49 C.F.R. § 195.450, due to its concentrated population, its proximity to a commercially navigable waterway (the Delaware River), the lack of an adequate alternative drinking water source to the underlying aquifer, and its proximity to ecological resources.

**D.    Known and Reported Odor Complaints Started in September 2023**

*i.    September 2023 Odor Complaint*

65.    On September 25, 2023, PHMSA notified Defendants of an odor complaint referred by the Pennsylvania Department of Environmental Protection ("PADEP"). The original complainants were residents of 128 Walker Road in the Mt. Eyre Manor neighborhood who detected an overwhelming smell that they reported distinctly resembled the smell of gasoline.

66.    The residents of 128 Walker Road live directly across the street from the site where the Twin Oaks Pipeline Leak occurred and was eventually discovered though Defendants did not discover the leak until 16 months later.

67.    Plaintiffs live at 114 Spencer Road, approximately only 500 feet to the approximate northeast of 128 Walker Road.

68.    In the two months prior to the odor complaint, Upper Makefield Township had experienced multiple severe weather events. These weather events included severe flash flooding that occurred in July 2023 and that resulted in the deaths of seven people and forced month-long road closures near the Mt. Eyre Manor neighborhood.

15

Case ID: 250303655

69.    The weather events also included substantial rains and heavy winds from Tropical Storm Ophelia that hit Bucks County, Pennsylvania on September 23, 2023.

70.    Each of these severe weather events should have triggered proper inspections of the Twin Oaks Pipeline by Defendants pursuant to 49 C.F.R. § 195.414. Defendants, however, did not conduct inspections sufficient to discover any resulting leaks as required by law, nor did Defendants notify PHMSA about their failure to conduct such inspections, which was reckless and negligent.

71.    Defendants investigated the September 2023 odor complaint by simply dispatching a technician and a contractor to test for indications of a leak, but the investigation that was conducted was improperly performed in a lackadaisical fashion.

72.    Specifically, Defendants' investigation included only testing of the well water of the complainant's residence and three nearby residences, probing the immediately adjacent segment of the pipeline with a photoionization ("PID") gas detector, excavating a single 25-foot segment of nearby pipeline that ran through nearby 121 Glenwood Drive, testing the excavated soil, and performing a static pressure test.

73.    Sadly, the excavation stopped short of uncovering the portion of the Pipeline mere feet away where the Pipeline Leak was eventually discovered.

74.    When the initial investigation did not result in evidence of a leak, Defendants simply and improperly ceased their investigative efforts. Defendants did not ascertain the source of the odor, and did not conduct any continued monitoring or observation of the area.

75.    As history bears out, the Pipeline Leak would eventually be discovered 16 months later across the street from the complainants' home.

ii.    *June 2024 Odor Complaint*

16

Case ID: 250303655

76.     On June 28, 2024, Defendants received yet another odor complaint from a different resident at 108 Spencer Road in the Mt. Eyre Manor neighborhood.

77.     In response to the odor complaint, Defendants responded in an even more lackadaisical manner than it did to the first complaint when, in fact, the response should have been more robust since a prior complaint had already been received. Defendants dispatched a single technician to examine the site using a portable 4-gas detector. The technician's equipment did not record a gas detection and the technician did not observe dead vegetation above the Pipeline.

78.     Based on the technician's report and nothing else, Defendants ceased their investigative efforts. Defendants did not ascertain the source of the odor, and did not conduct any continued monitoring or observation of the area.

79.     Inexplicably, Defendants also neglected to report this odor complaint to PHMSA.

### iii.     July 2024 Odor Complaint

80.     The following month, on or about July 21, 2024, Defendants received a third odor complaint from a resident at 121 Glenwood Drive in the Mt. Eyre Manor neighborhood, which is immediately across the street from the complainants who lived at 128 Walker Road and made the first complaint detailed above, *and* the precise address where Defendants had excavated a segment of the Twin Oaks Pipeline in September 2023.

81.     The complainants from 121 Glenwood Drive reported not only a smell of gasoline or kerosene in their water but also noted a visual change in how their water looked.

82.     Again, Defendants' response was improper and lackadaisical, especially accounting for the fact that this was now the third complaint received in a short period of time.

83.     In response to this July 2024 odor complaint, Defendants again dispatched only a single technician to examine the site using a portable 4-gas detector. The technician's equipment

17

Case ID: 250303655

did not record a gas detection and the technician did not observe dead vegetation above the pipeline.

84.    Based on the technician's report, Defendants ceased their investigative efforts. Defendants did not ascertain the source of the odor and again failed to implement or conduct any continued monitoring or observation of the area.

85.    Moreover, yet again, Defendants did not report this odor complaint to PHMSA.

86.    Furthermore, Defendants told the residents at 121 Glenwood Drive at the time that there was no petroleum in their water, without conducting proper tests to ascertain this as a fact.

87.    Defendants also claimed to the PADEP that "iron bacteria" was the likely explanation for the smell of gasoline or kerosene and this information was then passed on by PADEP to the residents at 121 Glenwood Drive.

### iv.    November 2024 Odor Complaint

88.    Four months later, on November 21, 2024, Defendants received a fourth known odor complaint from a resident of 107 Spencer Road in the Mt. Eyre Manor neighborhood, immediately across the street from the prior complainants that lived at 108 Spencer Road.

89.    The homeowners at 107 Spencer Road, who bought their home in 1978, raised their family in the Mt. Eyre Manor community, and lived in the neighborhood for over 45 years, complained that they smelled gasoline in their water. They also noticed that their brand-new drinking glasses had a sheen resembling oil or gasoline after taking them out of the dishwasher.

90.    Startled by this discovery, the homeowners at 107 Spencer Road asked their well company, Bucks County Well Drilling Co., to take samples and send them to an independent laboratory. The samples came back *positive* for gasoline and kerosene.

18

Case ID: 250303655

91.    Nonetheless, once again, Defendants' response was more than insufficient and neglectful.

92.    In response to the fourth known odor complaint received from a neighbor in the direct vicinity of where the Pipeline Leak was eventually discovered, Defendants again dispatched a single technician to examine the site using a portable 4-gas detector. The technician's equipment did not record a gas detection and the technician did not observe dead vegetation above the pipeline.

93.    Defendants performed a four-hour static pressure test to check for lowering pressure indicative of a pipeline leak. The operator reported to Defendants that the results were within acceptable limits although the operator did not report the acceptance criteria used or the results of the pressure test.

94.    Based on the reports of the technician and operator, Defendants ceased their investigative efforts, notwithstanding that there had now been at least four complaints reported since September 2023. Defendants did not ascertain the source of the odor, and did not conduct any continued monitoring, observation, or testing of the neighborhood.

95.    In what was now clearly a systemic pattern, Defendants again did not report this odor complaint to PHMSA.

96.    Discovery and expert testimony will show that Defendants' responses to all of the odor complaints detailed above were far below the standard of care and duties that Defendants owed to the residents of Mt. Eyre Manor and the surrounding neighborhoods, both with respect to the urgency of the situation, the actions that were taken, and the lack of any substantive follow-up, monitoring, and testing.

19

Case ID: 250303655

97.    Because of Defendants' lack of a proper response, Defendants never identified a cause of the odor complaints, that is, until the Twin Oaks Pipeline Leak was discovered in January 2025.

**E.    The Twin Oaks Pipeline Leak is Discovered in January 2025**

98.    On January 21, 2025, PADEP informed PHMSA that samples obtained from a well at 107 Spencer Road had indicated the presence of kerosene, a major component of JP-8 jet fuel. PHMSA notified Defendants of the test results and directed Defendants to investigate the origin of the kerosene.

99.    On or about January 22, 2025, a representative of Defendants, Wassim Saad, parked in Plaintiffs Daniel and Katherine La Hart's driveway in an unmarked truck with a New Jersey license plate and knocked on their door to offer "free well testing" with no explanation why. Shockingly, Mr. Saad did not identify himself to Plaintiffs at this time as a representative of Defendants or tell Plaintiffs about the presence of kerosene at 107 Spencer Road.

100.    Plaintiffs declined the offer for "free well testing" because they thought, based upon the lack of information and material omissions provided, that Mr. Saad was a door-to-door salesman offering unneeded services.

101.    Shortly thereafter, Plaintiffs noticed that trucks labeled "Energy Transfer" were present in the neighborhood, and Plaintiffs then realized that their community was likely facing a significant issue, although at this time the scope of the issue was unknown.

102.    Plaintiffs then contacted Mr. Saad and Defendants took a purported test of Plaintiffs' water on January 24, 2025 by collecting water only from Plaintiffs' faucet.

20

Case ID: 250303655

103. At this time, the neighbors in the Mt. Eyre Manor neighborhood began to talk with each other about the activity involving Defendants, and Plaintiffs encouraged other residents to get their water tested.

104. From January 22, 2025 through January 31, 2025, Defendants had a contractor, Groundwater & Environmental Services, Inc. ("GES"), acting on behalf of and as an agent of Defendants, sample the private wells of approximately twenty-five other nearby residences in the neighborhood.

105. GES confirmed the presence of hydrocarbons in well water at certain properties in the neighborhood including 107 Spencer Road, 108 Spencer Road, and 128 Glenwood Drive.

106. From January 22, 2025 through January 31, 2025, Defendants proceeded to probe the length of the Twin Oaks Pipeline between 121 Glenwood Drive and 155 Glenwood Drive (approximately 0.7 miles) with a PID gas detector. As with Defendants' prior investigations, the gas detector results were reported as "non-detect."

107. Despite the failure of Defendants' PID gas detector to identify a leak, on January 31, 2025, Defendants visually observed and confirmed a substantial leak in the Twin Oaks Pipeline when they finally excavated a portion of the Pipeline located on the property at 121 Glenwood Drive, in the backyard of the residents who live there, next to the swimming pool where the residents' family swam prior to the discovery of the leak.

108. The Pipeline Leak was discovered at 121 Glenwood Drive, the residence directly across the street from 128 Walker Road in the Mt. Eyre Manor neighborhood, where the residents lived who reported the first odor complaint – *16 months prior* – detailed above as the smell of gasoline.

21

Case ID: 250303655

109. Defendants had finally decided to excavate a portion of the Twin Oaks Pipeline located on the property at 121 Glenwood Drive after they went back and reviewed old maintenance records that had long been available to them. It is not currently known why Defendants did not take this step earlier, or what else these old maintenance records might show once they are produced in this litigation.

110. Video of the pipeline leak was recorded by one of the residents at 121 Glenwood Drive.

111. The Pipeline Leak would later be characterized as a "slow drip" from a Type A sleeve installed in 1995, and that had not been properly maintained since.

112. Type A sleeves are typically used to reinforce pipeline segments or areas of a pipeline that exhibit non-leaking defects such as corrosion or observable dents.

113. The Twin Oaks Pipeline is reinforced in at least 44 other segments by Type A sleeves installed during the late 1980s and early 1990s, and which are also all at risk of failing, especially if they are not continually and properly monitored and maintained. Defendants failed to continually and properly monitor and maintain the Type A sleeve that was underground at 121 Glenwood Drive in the Mt. Eyre Manor residential neighborhood in Upper Makefield Township, Pennsylvania.

114. The pipeline industry views Type A sleeves as ineffective at preventing leaks and an insufficient mechanism to reinforce an aging pipeline in danger of leaking. The corrosive nature of petroleum products moving at high pressure inside a pipeline means that dents over time can become cracks through which product can escape, and a sleeve reinforcing the exterior of the pipeline will not prevent leaks in such a scenario.

22

Case ID: 250303655

115. For example, in August 2020, a dent in the Colonial Pipeline near Huntersville, North Carolina, which had been previously reinforced in 2004 with a Type A sleeve, developed into an approximately five-foot crack. As here, the operators of the Colonial Pipeline failed to properly monitor and maintain the pipeline and Type A sleeve, and its detection systems failed to detect the crack or the release of any product.

116. In that instance, an estimated 2,000,000 gallons of product were discharged into the surrounding environment before the pipeline's operators, alerted to the leak by local residents, were able to identify and repair the crack.

117. In light of this and other similar incidents and their own knowledge and experience as to pipelines and the advantages and drawbacks of certain standard operating procedures and repair equipment, Defendants here knew or should have known that the approximately thirty year-old Type A sleeve situated on the residential property at 121 Glenwood Drive in the Mt. Eyre Manor neighborhood, a community where residents rely on well water for their water needs, was insufficient reinforcement to prevent a discharge from occurring from the Pipeline and especially under or near a residential property and neighborhood.

118. On January 31, 2025, Defendants notified the National Response Center ("NRC") of the Twin Oaks Pipeline Leak and inexplicably and falsely reported a release of 156 barrels of jet fuel, which is 6,552 gallons.

119. Despite this initial report that there were 6,552 gallons of jet fuel spilled into a residential neighborhood in Bucks County, Pennsylvania that relies on well water, Defendants have maintained in statements made to residents and regulatory authorities after January 31, 2025, that in fact, Defendants do not know how much product has been released into the environment.

23

Case ID: 250303655

120.    It is highly likely because of the amount of time that the leak was occurring, the size of the leak, the pressure utilized for the Twin Oaks Pipeline, the odor complaints dating back to September 2023, and other evidence, that significantly more than 6,552 gallons of jet fuel and petroleum products was released by Defendants into the environment.

121.    Due to Defendants insufficient, improper, negligent, and reckless conduct alleged herein with respect to their oversight, operation, supervision, maintenance, monitoring, and testing of the Twin Oaks Pipeline, Defendants have no idea when the Pipeline began leaking. It is highly probable that the Pipeline began leaking long before the first odor complaints were reported in September 2023, for the odors to have even been detectable at that time.

122.    The Twin Oaks Pipeline's maximum operating pressure is 1,200 psig (pounds per square inch gauge). On January 31, 2025, when Defendants discovered the leak at 121 Glenwood Drive in the Mt. Eyre Manor neighborhood, it was reported that the Pipeline was operating at 1,100 psig, *i.e.*, approximately 91.6% operating pressure.

123.    PHMSA conducted a preliminary investigation of the Pipeline Leak after it was reported. Based on its investigation, PHMSA concluded that "the Pipeline experienced a leak in a high consequence area for at least 16 months, resulting in the release of jet fuel that has migrated into several adjacent water wells and caused additional impacts to property and the environment."[6]

124.    Defendants have stated repeatedly, in statements to both residents and regulatory authorities, that despite their investigation since discovering the leak, they still do not know when the Pipeline Leak began.

---

[6] Exhibit D, Notice of Proposed Safety Order, Pipeline and Hazardous Materials Safety Administration, CPF No. 4-2025-054-NOPSO (Feb. 13, 2025).

Case ID: 250303655

125.    It is probable that the Twin Oaks Pipeline was leaking for a significant period of time prior to the first known odor complaint being made to Defendants in September 2023.

126.    Defendants have stated repeatedly in statements to both residents and regulatory authorities that they do not know whether the Twin Oaks Pipeline is still leaking.

127.    Defendants have not excavated the entire Twin Oaks Pipeline to conduct a visual examination of the Pipeline to determine that it is not leaking, or even excavated the Pipeline sufficient to examine all the Type A sleeves along the Pipeline.

F.     **Defendants' Response and Actions Following Discovery of the Pipeline Leak**

128.    On January 31, 2025, Defendants cut off the segment of the Pipeline where the Leak had been discovered and submitted a repair plan to PHMSA. Defendants had their workers arrive and remove the leaking segment in the middle of the night, without giving notice to residents or to local, state, or federal regulators.

129.    Plaintiffs and the Class members demand immediate access to review and examine the leaking segment of the Twin Oaks Pipeline.

130.    On February 1, 2025, Energy Transfer's Lead Specialist for Public Affairs, Joseph Massaro, issued a written statement confirming they had discovered "product loss" and claiming that the Pipeline was "inactive" at the time the leak was discovered.

131.    This statement means, among other things, that the video of the Pipeline that shows that Pipeline Leak is not indicative of the Pipeline Leak under full pressure conditions.

132.    On February 2, 2025, after receiving approval from PHMSA's Southwest Region Director, Defendants replaced the removed segment of the Pipeline and, without conducting further work to ensure that no other parts of the Pipeline are currently leaking, shockingly rushed to return the Pipeline to service.

25

Case ID: 250303655

133.   Defendants subsequently began an inadequate and neglectful investigation of the effects of the known Pipeline Leak in a high consequence, residential area.

134.   Defendants began conducting "exposure" testing for the water of nearby residences. But rather than testing the tops of all residents' wells to determine whether any free product – also known as light non-aqueous phase liquid or "LNAPL" – was present, Defendants' exposure testing relied on samples taken from faucets inside the residences post-treatment, and inadequate PID readings.

135.   In at least one instance, when Defendants' retained testing agents, hired by and working on behalf of Defendants, discovered that they had taken a sample directly from a well for testing by mistake, *they threw out the sample and erased the results*.

136.   Defendants' method of exposure testing deviated from the standard protocols for testing groundwater, which universally require testing pre-treatment, and was seemingly designed to limit Defendants' ability to identify the scope and location of the contamination plume resulting from the Pipeline Leak.

137.   Defendants failed to test samples directly from residents' wells for the presence of free product. This is true even though Defendants recently have, at the behest of Plaintiffs and other residents who have retained the undersigned counsel, finally begun to conduct bailer tests of residents' wells to screen for the presence of LNAPL.

138.   Even in situations where Defendants' agents have *visually observed* the presence of LNAPL, they have not universally retained the water from the bailer and have instead in instances deposited it back into the well.

139.   Defendants, moreover, despite being well-aware that their conduct as alleged herein would give rise to residents' legal claims, have failed to properly preserve all evidence of

26

Case ID: 250303655

environmental contamination that they have found during their activities, including by, for example, failing to properly catalog and store all physical materials and things that they have inserted into or withdrawn from residents' wells.

140.    Defendants have not ensured that they and their agents have properly preserved all evidence gathered as a result of Defendants' and GES's activities in the neighborhood following the discovery of the Pipeline Leak. Therefore, Plaintiffs and Class members are entitled to all reasonable adverse inferences that may arise as the result of any failure to properly preserve evidence.

141.    On February 4, 2025, Energy Transfer's Joseph Massaro appeared at the regularly scheduled Upper Makefield Township Board of Supervisors meeting, along with Defendants' other representatives Carl Borkland, Susan Ericson, David Kerwood, and Rahn Monreal. Massaro confirmed the product release and purported to provide an "update" on Defendants' remedial efforts.

142.    On February 6, 2025, at 7:30 p.m., a townhall meeting was held at the Upper Makefield Township Office, where affected residents who live in Mt. Eyre Manor and the surrounding neighborhoods, including Plaintiffs, representatives from Defendants, and representatives from PHMSA, were present.

143.    At this townhall meeting, Defendants provided an update on their efforts to monitor and contain the Pipeline Leak, in which they admitted that their exposure testing had detected hydrocarbons in six neighborhood wells so far.

144.    Defendants also admitted during the meeting that they did not know how much product had been lost or when the Pipeline Leak had begun.

27

Case ID: 250303655

145.    Defendants further stated that because the release occurred "in the headwaters" of the Delaware River, it would make sense for any groundwater carrying spilled product to be moving in a northeasterly direction toward the Delaware River. This was the Defendants' best estimation at the time concerning the plume caused by the Pipeline Leak of unknown quantities of jet fuel.

146.    At the town hall meeting, Defendants offered only to pay for the installation of carbon filtration systems for any wells where their product was detected, and to pay for the maintenance of such a system for as long as the product is detected in the well.

147.    During this townhall meeting, officials from PHMSA stated that they had no confidence in Defendants' ability to identify leaks in the Twin Oaks Pipeline, considering the circumstances surrounding the Pipeline Leak. Residents of the Mt. Eyre Manor neighborhood, including Plaintiffs, called on Defendants to shut down the Pipeline.

148.    Defendants refused to shut down the Pipeline.

149.    On February 7, 2025, the day after the town hall meeting, Defendants provided a written public update on the Upper Makefield Township website in which they stated that, rather than shutting down operations, they would reduce the Twin Oaks Pipeline's operating pressure to 80%.

150.    On February 13, 2025, PHMSA issued a Notice of Proposed Safety Order ("NOPSO") to Defendants. In the NOPSO, PHMSA wrote:

> After evaluating the foregoing preliminary findings of fact, and having considered the characteristics of the pipeline, including prior Type-A sleeve repairs involving dents and other defects; the prior failures of the pipeline; the hazardous nature of the petroleum products, including jet fuel, transported; the uncertainty as to the root cause(s) of the failure; the proximity of the pipeline to residential dwellings and water wells; the existing and potential additional impacts to property, the environment, and wildlife; and the possibility that the same condition(s) that may have caused

28

Case ID: 250303655

the failure remain present in the pipeline and could lead to additional failures; it appears that the continued operation of the Twin Oaks Discharge pipeline system without corrective measures would pose a pipeline integrity risk to public safety, property, or the environment. The conditions and threats described above potentially exist throughout the Twin 7 Oaks Pipeline. Further, Sunoco's apparent inability to effectively detect the leak has potentially exacerbated the impacts of the release over an extended period of time. Accordingly, corrective measures are necessary to mitigate the pipeline integrity risk of the pipeline system to protect public safety, property, and the environment.

151.    PHMSA thereafter issued proposed remedial requirements including reducing operating pressure, implementing plans to assess the integrity of the pipe and of the Type A sleeves along it, conducting a leakage survey, and conducting a root cause failure analysis.

152.    On the evening of February 13, 2025, a second town hall meeting was held at Sol Feinstone Elementary School, Newtown, PA at 7:30 p.m. Affected residents including Plaintiffs, representatives from Defendants, and representatives from PHMSA and state regulators attended the meeting.

153.    During this meeting, residents, including Plaintiffs, demanded that the Twin Oaks Pipeline be shut down. Plaintiff Daniel La Hart provided an opening statement on behalf of Mt. Eyre Manor residents at this meeting.

154.    Defendants then showed residents a map of what they considered to be the geographic area affected by the Pipeline Leak. This map included a line of arrows pointing in the northeastern direction, which were labeled as the "*inferred* groundwater flow direction." (emphasis added).

155.    Defendants stated that areas west and south of the Pipeline Leak were not of concern based on the flow of the groundwater toward the Delaware River. Defendants, however, then admitted that they had not yet installed a single monitoring well or taken any steps to identify the accurate directional flow of groundwater in the area.

29

Case ID: 250303655

156.    Defendants' affirmative statements to residents about the identified affected geographic area resulting from the Pipeline Leak at the town hall meetings on February 6 and February 13 were misleading. At the time Defendants made these statements, in fact, Defendants had no idea when the Pipeline Leak first occurred, how long the Pipeline had been leaking into the residential neighborhood, how much product had been discharged into the surrounding underground aquifer and bedrock, whether additional points along the Pipeline were continuing to leak, or the direction or flow rate of the groundwater underlying the point or points of discharge.

157.    Defendants intended their statements to induce a false sense of security and confidence in residents, particularly for residents whose homes were not within Defendants' arbitrarily delineated affected geographic area that was not based on adequate investigation or evidence.

158.    During the February 13, 2025, town hall meeting, one resident who resided at 128 Walker Road in the affected area and across the street from where the Pipeline Leak was discovered described her experience with her well. Since 2023, she had repeatedly complained to Defendants about her concerns of contamination resulting from the Twin Oaks Pipeline, and Defendants' representatives had repeatedly stated that any oil could not have been coming from the Twin Oaks Pipeline.

159.    After the discovery of the Pipeline Leak, when Defendants finally sent a contractor to inspect her well, they discovered *over **twelve feet of jet fuel** on top of the water in her well*, and after pumping the water, *estimated that **fifteen feet of jet fuel** had been accumulating in the well since 2023*. The resident stated that according to Defendants' contractor, *over 22 inches of jet fuel had accumulated in her well **in the past week alone***.

30

Case ID: 250303655

160.    Residents asked Defendants for a guarantee during the February 13, 2025 town hall meeting that the Twin Oaks Pipeline was not still leaking. Defendants responded that they were not able to provide such a guaranty at that time.

161.    On February 18, 2025, PADEP sent Defendants a Notice of Violation.[7] In the Notice, PADEP stated that the release identified on January 31, 2025, has "caused free product and dissolved concentrations of petroleum-related chemicals in potable wells in the neighborhood, with some properties having contamination exceeding DEP's Statewide health standard medium specific concentrations in their drinking water." The Notice advised that the discharge constitutes a violation of the Pennsylvania Clean Streams Law, 35 P.S. § 691.401, and that such a violation amounts to unlawful conduct within the definition of the law and is subject to civil enforcement.

162.    On February 19, 2025, counsel for Defendants responded to the NOPSO issued by PHMSA.[8] Defendants denied and disputed several of the preliminary factual findings contained in the NOPSO. In doing so, Defendants admitted that "there is not sufficient evidence at this time to conclude how long the Affected Pipeline was leaking." Defendants stated that it did not have evidence of an ongoing leak, but also that its investigation was ongoing. Defendants did not state that it had sufficient information to rule out a continuing release of aviation fuel and other contaminants from the Pipeline into the local environment.

163.    On February 27, 2025, a third town hall meeting was held again at the Sol Feinstone Elementary School at 7:30 p.m. Affected residents including Plaintiffs, regulators, local officials, and representatives of the Defendants were present at the meeting.

---

[7] Exhibit E, Notice of Violation, Pa. Dep't Envt'l Protection (Feb. 18, 2025).
[8] Exhibit F, Letter from Haley O'Neill to Bryan Lethcoe (Feb. 19, 2025).

Case ID: 250303655

Exhibit B_Page 128 of 583

164.    During the February 27 town hall meeting, Defendant Energy Transfer's Joe McGinn, Vice President of Public Affairs, stated: **"This release happened, and it's our fault that it happened. This was not a third-party damage issue. We recognize that. We apologize for it."** He further stated that Energy Transfer's **"focus and goal is to restore the community to its original state."**

165.    Defendants' representatives also stated during the February 27 town hall meeting that they provided their initial estimate of 156 barrels of product lost based on their understanding that federal law required a reporting of the amount of product lost within 48 hours of discovery of a leak. Defendants *admitted* that at the time they made the representation to PHMSA, they had no factual basis upon which to assert the amount of product lost, and that they continue to lack an evidence-based estimate of the amount of product that has been discharged into the underlying bedrock and aquifer beneath the Mt. Eyre Manor neighborhood, in Upper Makefield Township.

166.    This signifies and demonstrates that Defendants do not maintain proper and adequate leak detection and monitoring systems with respect to the Twin Oaks Pipeline.

167.    On February 28, 2025, Pennsylvania Governor Josh Shapiro wrote a letter to U.S. Transportation Secretary Sean Duffy, requesting expedited action from PHMSA in response to the Pipeline leak.[9] In his letter, Governor Shapiro noted that "Sunoco has not demonstrated adequate ability to detect leaks and take appropriate actions, given what appears to have been a significant delay between the initial indications of a leak and the response."

168.    Governor Shapiro further described the leak as "the latest incident in a long pattern of safety concerns with Sunoco and Energy Transfer pipelines in Pennsylvania."

---

[9] Exhibit G, Letter from Governor Josh Shapiro to Secretary Sean Duffy (Feb. 28, 2025).

Case ID: 250303655

169. On March 6, 2025, PADEP issued an Administrative Order to Defendants Energy Transfer (R&M), LLC and Sunoco Pipeline, L.P., directing Defendants to respond to the Pipeline Leak and implement certain remedial actions, including the supply of bottled water and the installation of point-of-entry treatment ("POET") systems for certain residents in Upper Makefield Township, Pennsylvania.

170. PADEP's Order limited the requirement to supply bottled water to only those properties with potable groundwater wells within the Mt. Eyre Manor neighborhood topographic watershed, plus a minimum 500-foot buffer, that have concentrations of VOCs above background concentrations in the area, and limited the requirement to install POET systems to only those properties with potable groundwater wells within the Mt. Eyre Manor neighborhood topographic watershed, plus a minimum 500-foot buffer, that have concentrations of VOCs exceeding the Maximum Contaminant Levels ("MCLs") under Pennsylvania state regulations.

171. The harm caused by Defendants' actions as alleged herein and the Pipeline Leak is not limited to the contamination of certain residences above MCLs under Pennsylvania state regulations. To the contrary, Plaintiffs and every Class member have the right to clean drinking water and clean soil that are completely free of any contaminant that is found in jet fuel, or at least to background concentrations. Equally, the 500-foot buffer is insufficient to remedy the damages and injuries that Defendants have caused as a result of the Pipeline Leak, as contamination has already been detected beyond this 500-foot buffer.

172. Judicial intervention is necessary to impose appropriate and reasonable full remedial measures and obligations on Defendants beyond the regulatory measures ordered by the PADEP.

33

Case ID: 250303655

173. According to Defendants' own contracted testing firm, GES, hydrocarbons have been detected in the wells of numerous residences in the Mt. Eyre Manor neighborhood in addition to the six residences that were initially reported.

174. At least five residences have already shown detectable amounts of hydrocarbons above background conditions but below the MCLs for a given hydrocarbon. Defendants' investigation is ongoing, and the number of wells that Defendants know to be impacted continues to increase.

175. Despite this knowledge, to date Defendants have not admitted publicly to the discovery of hydrocarbons in more than six wells in the Mt. Eyre Manor neighborhood.

176. In multiple incidences, residents have requested that GES technicians taking post-treatment samples from their faucets also take pre-treatment samples from their wells for testing. GES technicians repeatedly have responded that they had strict instructions from Defendants not to conduct any testing of well water pre-treatment, and to only take samples from faucets in the residents' homes.

### G.    Environmental Contamination Resulting from the Pipeline Leak

177. The Pipeline Leak has resulted in the dispersion of multiple known toxic chemicals into the surrounding environment. The full extent and make-up of the contamination is presently unknown.

178. Free standing petroleum or jet-fuel product has been found on the top of the water in some residents' wells.

179. Over twelve feet of free product was found on top of the water in the well at 128 Walker Road, directly across the street from the location of the Pipeline Leak. Defendants' contractors estimated that over fifteen feet of jet fuel had accumulated in the well since 2023.

34

Case ID: 250303655

Moreover, product is still continuing to accumulate in this well despite Defendants' efforts to remove it. Every day since the contamination was initially discovered by Defendants' contractors, more of Defendants' hazardous product has seeped into the well.

180.    Free-standing petroleum or jet fuel product was found accumulated on top of the water in several other wells near the site of the leak, including nearly six feet of product in the well at 121 Glenwood Drive and over three feet of product at 107 Spencer Road. Product has been observed on top of the water in the wells of at least fifteen other nearby residences to date.

181.    In addition to direct observation of product in their wells, residents continue to report detecting the odor of gasoline in their wells and in their tap water, which, at the very least, is a substantial nuisance that interferes with the residents' enjoyment and use of their properties.

182.    For example, the residents at 105 Spencer Road have been smelling gasoline on their property since June of 2024, and at times have been able to taste gasoline in their water.

183.    The owner of the residence at 103 Spencer Road also reports having smelled gasoline on his property for a long time and has been able to smell and taste gasoline in his water at various points in the water he uses to drink, cook, and shower.

184.    Residents in the affected community feel the stress and anxiety associated with having detectable levels of gasoline taste and odor on their properties and their neighbors' properties. As one resident stated, "every morning, when I turn on my water, it's a concern of mine. Is it my turn to smell fuel and taste it in my water?"[10]

---

[10] Energy Transfer Begins Drilling Recovery Wells on Pennsylvania Street After Fuel Leak Sparked Water, Air Safety Concerns, CBS News (Mar. 19, 2025) (available at https://www.cbsnews.com/amp/philadelphia/news/sunoco-fuel-leak-upper-makefield-pennsylvania/).

35

Case ID: 250303655

185. Other indicia of contamination, including the presence of chemicals and particulates known to be byproducts of petroleum and jet fuel, have been found in the well water and tap water of more residences in the neighborhood.

186. Toxic chemicals and particulates resulting from Defendants' Pipeline Leak have infiltrated the aquifer and bedrock in sufficient quantities to be detected in the water of neighborhood residences, including but not limited to kerosene, benzene, ethylbenzene, isopropylbenzene, dichloroethane, trimethylbenzene ("TMB"), toluene, naphthalene, methyl tertiary-butyl ether ("MTBE"), and lead.

187. There is no potential source of these substances in the surrounding area other than the Twin Oaks Pipeline.

188. Kerosene is one of the most common fuel oils and a major component of jet fuel. Exposure to kerosene can lead to a wide variety of human health consequences, including respiratory issues, vision loss, liver failure, gastrointestinal issues, heart collapse, and skin burning and irritation. Kerosene exposure can also affect the central nervous system, resulting in seizures, comas, migraines, depressions, and other neurological impacts. The International Agency for Research on Cancer ("IARC") considers kerosene a possible carcinogen.

189. Benzene is natural and a highly toxic constituent of petroleum. Due to its high odor recognition threshold, people can be exposed to excessive amounts of benzene in the air or in tap water without knowledge of the exposure. Benzene is a known human carcinogen according to both IARC and the U.S. Environmental Protection Agency ("EPA"). In addition to cancer, benzene exposure can result in the disruption of hematopoiesis (the body's production of blood), suppression of the immune system, and result in both skeletal and neurodevelopmental defects.

36

Case ID: 250303655

190. TMB isomers are produced during the petroleum refining processes and are used as a fuel additive in gasoline. TMB is a neurotoxin and is readily absorbed into the human bloodstream following exposure. TMB exposure can negatively impact a person's short-term memory and motor skills, induce vertigo, and cause nervousness and anxiety. TMB exposure can also cause issues with blood clotting and respiratory function.

191. MTBE, in contrast to other fuel and gasoline constituents, has a strong affinity for water. MTBE dissolves easily into groundwater and can migrate rapidly a great distance from the source of release, meaning it is likely to have a distinct contamination plume from other toxic chemicals released from the Twin Oaks Pipeline. MTBE does not readily biodegrade in water and will persist in the environment until remediated. MTBE at very low concentrations can affect the taste and odor of water and IARC considers it a likely carcinogen. MTBE as a fuel additive was phased out of gasoline in the United States by 2006, due to its associated environmental and health concerns.

192. Lead is a neurotoxin that easily permeates the blood-brain barrier after exposure, and often is difficult to detect in a person until dangerous amounts have accumulated. In adults, lead exposure through drinking water can cause reduced memory, headaches, mood disorders, joint and muscle pains, abdominal pains, and high blood pressure. Lead exposure also negatively affects the reproductive organs and can cause reduced or abnormal sperm counts and increase the risk of miscarriage, stillbirth, or premature births in pregnant women.

193. Symptoms resulting from exposure to these toxic chemicals and other harmful chemicals released from the Twin Oaks Pipeline can take a long time to manifest. Residents of the Mt. Eyre Manor neighborhood and surrounding communities will have to closely monitor their health, potentially indefinitely, and have and will continue to experience the accompanying fear

37

Case ID: 250303655

and anxiety that comes from not being able to trust the safety of the water they drink or the air that they breathe because of Defendants' Pipeline Leak.

**H.    Defendants' Messaging Since the Pipeline Leak Has Not Matched Reality**

194.    Defendants have been engaged in a multifaceted public relations campaign to downplay the severity of the Pipeline Leak and its actual and potential harms. Defendants' messaging, however, has not matched reality.

195.    For example, Defendants have now suggested that the Pipeline Leak may have happened right before it was discovered in January 2025, despite residents smelling and reporting the odor of gasoline since at least September 2023, 16 months earlier.

196.    Defendants have also now suggested that the Pipeline Leak was a "pinhole" and that it spilled 156 barrels or less. In reality, Defendants have admitted that they lacked a valid basis for their initial estimate of 156 barrels and have conceded that they rushed to provide a number to the government without the applicable information necessary to determine the actual volume of lost aviation fuel and other petroleum products.

197.    Because of Defendants' failure, negligence, and recklessness in failing to have a proper leak detection and monitoring system in place for the Twin Oaks Pipeline, Defendants have no way to measure the amount of product that spilled into the environment from the Twin Oaks Pipeline in the Mt. Eyre Manor neighborhood.

198.    Moreover, the Pipeline Leak, when discovered, showed visibly that the Leak did not result from a "pinhole" as Defendants suggested, but rather, evidenced a leak such as from a water fountain, and that was with substantially reduced or no pressure applied to the Pipeline at the time.

38

Case ID: 250303655

199. Defendants further represented to residents in the Mt. Eyre Manor neighborhood when they were purchasing their homes that Defendants had instituted state of the art leak detection equipment with respect to the Pipeline, such that a leak like the Pipeline Leak here could never occur. These representations by Defendants to residents were false and misleading as demonstrated by the occurrence of the Pipeline Leak and Defendants' actions and follow up (or lack thereof) in response to multiple odor complaints that began at least as early as September 2023.

200. In fact, Defendants failed to have proper leak detection and monitoring systems in place with respect to the Twin Oaks Pipeline.

201. Defendants claimed that their leak detection systems for the Pipeline were functional, but in reality, and despite residents pointing out an issue for 16 months, making numerous odor complaints, no computer system or ground testing employed by Defendants detected any leak, and the Pipeline Leak was only detected and located when Defendants went back to review old maintenance records and then happened to excavate the portion of the Twin Oaks Pipeline where the leak occurred. Defendants would not have identified the Pipeline Leak except by actually digging up the Pipeline, which facts do not suggest or support that Defendants had an adequate leak detection and monitoring system in place.

202. Defendants have claimed that Type A sleeves are structurally sound and that they visually inspected six such sleeves, but at least 44 Type A sleeves exist on the Twin Oaks Pipeline, and many more are believed to have not been physically inspected by way of excavation.

203. Crucially, Defendants also claimed to make a commitment to future public engagement, community, outreach, and continued participation in public meetings in Upper Makefield Township. In reality, Defendants have invoked "confidentiality" and vague "national security" concerns to deny affected residents with access to information and facts about the

39

Case ID: 250303655

Pipeline Leak. Defendant failure to engage has only increased since the residents have hired legal counsel to protect their interests.

204.    Defendants' conflict between its public representations and its internal policy or preference to withhold information came to a head at the latest town hall meeting that took place on March 11, 2025. At this meeting, Defendants shut down any attempt to receive questions from the public, claiming that Defendants could no longer continue to provide information because some residents had retained legal counsel. Defendants went so far as to offer one-on-one meetings only with residents that were *not* represented by counsel. This was a transparent scare tactic to discourage unrepresented residents from retaining legal counsel, and further reflects Defendants' insensitivity to the crisis unfolding in the affected community, and the failure to take responsibility.

205.    The breach in the Pipeline and resulting Pipeline Leak is the direct consequence of Defendants' reckless and negligent actions with respect to the oversight, operation, supervision, maintenance, monitoring, and testing of the Twin Oaks Pipeline.

206.    Moreover, Defendants have continued to transport highly corrosive and toxic products at extremely high pressures through the Twin Oaks Pipeline – which when installed was not designed for those pressures – in spite of their knowledge that (a) the Pipeline is nearly 70 years old and had a history of cracks; (b) that there was a previously identified dent in the Pipeline at the location of the crack which was reinforced only by an approximately 30-year-old exterior sleeve which has been known to have problems from past experience; and (c) that did not have a proper monitoring and leak detection system.

207.    *For over 16 months*, despite their knowledge that the Pipeline was in danger of corrosion and cracking, Defendants failed to properly respond to nearby odor complaints (meaning within hundreds of feet) in a manner reasonably likely to detect a leak and had no sophisticated

40

Case ID: 250303655

leak detection equipment in place to do so, notwithstanding that Defendants were operating the Twin Oaks Pipeline in a residential neighborhood.

208.    In response to multiple odor complaints, Defendants presumed that no breach in their Pipeline existed based solely on a lack of abnormal dead vegetation around the Pipeline and the failure of a portable gas monitor to detect fuels in the surrounding air.

209.    Facts, however, confirm the neglectful inadequacy of Defendants' leak-detection measures as they employed the above insufficient measures and concluded a non-detect based on them immediately prior to excavating the Twin Oaks Pipeline in the Mt. Eyre Manor neighborhood and visually confirming the crack and Pipeline Leak.

210.    Since discovering the Pipeline Leak in January 2025, Defendants have failed to take proper and reasonable actions to facilitate an understanding of the extent and nature of the discharge and resulting contamination. For example, Defendants, who have vast and virtually unlimited resources, failed to test samples of water taken directly from the wells of nearby residents for the presence of hazardous substances.

211.    Defendants have further directed their contractors to avoid taking full and broad testing measures, despite knowing that such measures are reasonably necessary to identify the scope of the contamination plume and to ultimately protect the health, safety, and welfare of nearby residents.

212.    Despite failing to determine whether any ongoing leaks persist in the Pipeline, Defendants restarted operation of the Twin Oaks Pipeline on February 2, 2025, and have continuously operated the Pipeline since that date.

41

Case ID: 250303655

## I.    Harm to Plaintiffs and Class Members

213.    Plaintiffs and Class members have been severely and negatively impacted and harmed by Defendants' conduct.

214.    The impacted community relies on well water drawn from the underlying aquifer for their water needs. Numerous residents have found Defendants' product, jet fuel, or other petroleum products, floating on top of and contaminating their private wells, with multiple residents having significant amounts of jet fuel accumulated in their wells.

215.    Preliminary testing has shown that water samples collected from nearby homes have tested positive for petroleum hydrocarbons and/or other chemicals commonly found in jet fuel and petroleum products.

216.    The Pipeline Leak has and will continue to cause financial harms to Plaintiffs and Class members, including the expenditure of all out-of-pocket costs resulting from the Pipeline Leak that must be reimbursed by Defendants.

217.    Examples of these out-of-pocket costs include, without limitation:

      a.    the costs to engage and pay contractors, testing companies, and inspectors;

      b.    the costs of installation of remedial or additional water treatment systems;

      c.    the costs of purchasing filters associated with water treatment systems;

      d.    the costs of damage and remediation to private wells;

      e.    the costs of remediation of soil;

      f.    the costs of remediating other damages caused by the Pipeline Leak;

      g.    the costs of remediating and/or replacing pipes and fixtures that have been contaminated as a result of the Pipeline Leak;

      h.    the costs of temporary housing;

42

Case ID: 250303655

**Exhibit B_Page 139 of 583**

i.    the costs of commuting to other locations for the purpose of showering or doing laundry;

j.    reimbursement of mileage associated with attending meetings concerning the Pipeline Leak;

k.    the cost of any increased insurance premiums;

l.    the cost of lost time-value from having to take off work due to the Pipeline Leak;

m.    the cost of childcare while attending meetings related to the Pipeline Leak; and

n.    the cost of any medical costs incurred by Plaintiffs related to the Pipeline Leak.

218.    Defendants are responsible to pay all past and future costs associated with complete environmental restoration and remediation of all contamination caused by their Pipeline Leak, and to all property, water, and air, including, without limitation, to the environment, to Plaintiffs' and Class members' real and personal property, to wells that have been contaminated, to pipes that have been contaminated and need to be replaced, to fixtures that have been contaminated and need to be replaced, to soil that has been contaminated, to gardens that have been contaminated, and to all other property belonging to Plaintiffs and Class members that has been affected by the Pipeline Leak.

219.    Plaintiffs and Class members who own their homes have also suffered from diminution of the value of their residences caused by the Pipeline Leak.

220.    Some Class members have already had potential buyers walk away from a potential sale as a result of the Pipeline Leak.

43

Case ID: 250303655

221. Plaintiffs and Class members have suffered from the loss of use and enjoyment of their real and personal property caused by the Pipeline Leak.

222. Plaintiffs and Class members have suffered increased anxiety caused by the Pipeline Leak.

223. Exposure to the substances released from the Pipeline, whether through ingestion, inhalation, or dermal exposure, places all affected residents at increased risk of severe health impacts, including cancer, thus necessitating medical monitoring.

**J.     Harm Suffered by Plaintiffs Daniel and Katherine La Hart**

224. Plaintiffs Daniel La Hart and Katherine La Hart moved to the Mt. Eyre Manor neighborhood in 2016 and live in their home with their two young children.

225. As such, Plaintiffs are Pennsylvania residents.

226. Plaintiff Daniel La Hart, in addition to being Katherine's husband and father to their children, is a highly educated individual who works in the intelligence community, serving as an Intelligence Superintendent (Chief Master Sergeant rank) for the New Jersey Air National Guard and as a director of data science for a company in the private sector. Daniel is also a former member of the U.S. Air Force Reserve and a former firefighter.

227. Plaintiff Katherine La Hart, in addition to being Daniel's wife and mother to their children, has a Ph.D. in business administration and works in sales recruitment and onboarding at a Fortune 500 insurance and financial services company.

228. Prior to learning of the Pipeline Leak, Plaintiffs were in love with their community and felt that their home located at 114 Spencer Road was their "forever home" where they would live for a lifetime.

44

Case ID: 250303655

229. Plaintiffs used their well water for everything including drinking, cooking, washing dishes and clothes, showering (indoors and outdoors), baths for their children and animals, watering their gardens, cleaning the cars, filling their pool, letting their children run in the hose water and down their water slide, and providing water to their dog, cat, and chickens to drink.

230. In late 2024, Plaintiffs invested approximately $150,000.00 to pay for a series of renovations to their home that they scheduled to start in April 2025, including the installation of new windows, siding, doors, replastering the pool, and more, because they wanted to invest in their forever home and their community that they loved.

231. The Pipeline Leak has caused Plaintiffs to suffer out-of-pocket economic losses including, among other things, significant childcare costs, mileage associated with attending meetings concerning the Pipeline Leak, and significant lost time-value from having to take off work to attend meetings, be present for testing, and to perform community outreach due to the Pipeline Leak.

232. The Pipeline Leak has caused Plaintiffs to suffer diminution to the value of their real property. The presence of the Pipeline Leak and resulting environmental contamination has placed a stigma on the Mt. Eyre Manor and surrounding affected communities that has decreased the value of their property.

233. It is likely that Plaintiffs (and Class members) are now overpaying property taxes as a direct result of the diminution of value to their property caused by Defendants' conduct.

234. The Pipeline Leak has caused 114 Spencer Road to go from being Plaintiffs' idyllic forever home to an albatross that Plaintiffs will struggle to sell for close to its fair market value, which was over $1 million prior to Defendants' Pipeline Leak. Plaintiffs estimate that they have suffered diminution of value of their home in the tens of thousands or hundreds of thousands of

45

Case ID: 250303655

dollars. Who would want to purchase a home in the Mt. Eyre Manor neighborhood given the known existence of the Pipeline Leak and resulting contamination?

235. But at the same time, as a direct result of the Pipeline Leak, Plaintiffs, like other Class members, have been forced to consider the possibility of selling what they thought was their forever home and moving to another location that has not experienced the type of harms that have devastated Mt. Eyre Manor. Plaintiffs do not want to confront or deal with the risk that the water in their neighborhood and their home is dangerous and putting them and their family, children, and guests at risk, and have been unfairly forced by Defendants to think about this every day, which is causing Plaintiffs severe mental anguish.

236. Moving would cause significant hardship to Plaintiffs and their young children. Plaintiffs would also incur significant expenses by having to uproot themselves and move to a comparable home in a comparable community.

237. With respect to Plaintiffs' private well, the Pipeline Leak has caused irreparable damage to Plaintiffs' faith in their ability to fully use and enjoy their water.

238. Plaintiffs' well water has already tested positive for MTBE and lead above background concentration levels and Plaintiffs are awaiting additional testing results.

239. It will always be on the forefront of Plaintiffs' minds that the plume of the Pipeline Leak could affect their property at any time, or that the Pipeline could leak again at any point in time, and/or that the Pipeline could have additional undiscovered leaks, and so Plaintiffs could be putting the health of their family, children, friends, guests, and pets at risk merely by continuing to live at 114 Spencer Road.

240. Worsening the situation, Defendants have begun buying residential homes in the Mt. Eyre Manor neighborhood, starting with 108 Spencer Road which is only two houses away

46

Case ID: 250303655

from Plaintiffs' home, for the purpose of drilling additional monitoring and/or recovery wells as a direct result of the Pipeline Leak. These activities by Defendants are a nuisance to Plaintiffs and Class members in the neighborhood and are interfering with their use and enjoyment of their property, as well as further depreciating the affected geographic area.

241. Defendants' activities at 108 Spencer Road will soon become the epicenter for noisy, odorous, and highly bothersome activity that will disturb and disrupt the daily lives of the Plaintiffs and Class members, all as a result of Defendants' Pipeline Leak.

242. Defendants are currently attempting to purchase additional homes in the Mt. Eyre Manor neighborhood to conduct monitoring and recovery activities with respect to the Pipeline Leak, which will further cause nuisance and further diminish the value of the neighborhood.

243. Plaintiffs are fearful that Defendants will continue to buy additional nearby homes and that any home bought by Defendants will eventually lay vacant and be a nuisance to the community, further driving down property values.

244. For the reasons alleged herein, Defendants' Pipeline Leak has devastated the Mt. Eyre Manor neighborhood and surrounding affected communities. While Defendants have publicly accepted responsibility for the Pipeline Leak, they have not accepted their corresponding responsibilities to compensate Plaintiffs and Class members for all the harms that they have suffered as a direct result of Defendants' conduct.

## CLASS ACTION ALLEGATIONS

245. Plaintiffs bring the class action allegations in this Complaint for all environmental restoration and remediation, economic losses suffered by Plaintiffs and Class members, medical monitoring, injunctive relief, and declaratory relief.

47

Case ID: 250303655

246. Plaintiffs bring this action on behalf of themselves and on behalf of the following

Class pursuant to Pennsylvania Rules of Civil Procedure 1702, 1708 and 1709:

> All Pennsylvania citizens who owned rented, and/or resided in real properties in Pennsylvania within a one mile radius of 121 Glenwood Drive, Washington Crossing, Pennsylvania (40.271265, -74.876153), as represented in Figure 3 below, during the time period from September 1, 2023 to the present (the "Class").



Figure 3.

247. Excluded from the Class are Defendants and their subsidiaries or affiliated entities,

as well as any individuals who resided at the following addresses in Upper Makefield Township

since September 1, 2023: 121 Glenwood Drive; 128 Glenwood Drive; 128 Walker Road; 105

Spencer Road; 107 Spencer Road; and 108 Spencer Road.

248. Plaintiffs reserve the right to further define and modify the definition of the Class

following further factual investigation and discovery.

48

Case ID: 250303655

249.    **Numerosity.** Members of the Class are so numerous that joinder is impracticable. Plaintiffs estimate there are at least one thousand members of the Class. As such, a class action is superior to other methods of adjudication due to its capacity for efficiency and judicial economy.

250.    **Typicality.** Plaintiffs' claims for environmental restoration and remediation, economic damages, medical monitoring, injunctive relief, and declaratory relief are typical of the claims of the Class members. Plaintiffs and all Class members have been damaged by the same wrongful conduct by Defendants.

251.    Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiffs coincide with, and are not antagonistic to, those of the Class. Accordingly, and by proving their own claims, Plaintiffs will prove other Class members' claims as well.

252.    **Adequacy of Representation.** Plaintiffs are members of the Class. Plaintiffs are represented by the undersigned counsel who are experienced and competent in the prosecution of class actions involving chemical/toxin contamination. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiffs can and will fairly and adequately represent the interests of the Class and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

253.    **Commonality and Predominance.** There are numerous questions of law and fact common to the Class that predominate over any individual issue, including, but not limited to:

a.    Whether Defendants' conduct as alleged herein violates the law as stated in the Causes of Action set forth below that are applicable to the Plaintiffs and the Class;

b.    Whether Defendants owed a duty to the Class;

c.    Whether Defendants breached any duties owed to the Class;

49

Case ID: 250303655

d.    Whether Defendants were negligent and/or reckless in failing to properly and safely oversee the operation, supervision, maintenance, monitoring, and testing of the Pipeline;

e.    Whether Defendants allowed a release of toxic and hazardous substances from the Pipeline into the underlying bedrock and aquifer under where the Pipeline Leak occurred or within the plume area of the Pipeline Leak;

f.    Whether the release or threat of release of toxic and hazardous substances from Defendants' Twin Oaks Pipeline reduced or diminished the value of the Class members' real property;

g.    Whether the release or threat of release of toxic and hazardous substances from Defendants' Twin Oaks Pipeline deprived the Class of the rights to use and benefit from their real property interest, free of interference; and

h.    The appropriate measure of restitution and/or measure of damages to the Class members.

254.    The questions of law and fact common to the Class predominate over any questions of law that may affect only individual class members, because Defendants acted on grounds generally applicable to the entire Class.

255.    **Superiority**. Class treatment is a superior method for the fair and efficient adjudication of the economic damages associated with this controversy because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a similar forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense. The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on

50

Case ID: 250303655

claims that likely would be impracticable to pursue individually, substantially outweigh any difficulties that may arise in the management of the class aspects of this action.

## CAUSES OF ACTION

256.    All of Plaintiffs' causes of action, whether asserted individually or on behalf of the Class, are brought against all Defendants.

## COUNT I
## NEGLIGENCE
### (Individually and on Behalf of the Class)

257.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

258.    Defendants' actions as alleged herein were negligent.

259.    Defendants are responsible for owning, overseeing, operating, supervising, and maintaining the Twin Oaks Pipeline, and are responsible for its safe operations, including, without limitation, by incorporating an appropriate monitoring and leak detection system.

260.    Defendants failed to use reasonable care in the oversight, operation, maintenance, hiring, monitoring, and repair of the Twin Oaks Pipeline and continued to transport hazardous and toxic substances through the Pipeline without ensuring that it was operating in a safe condition.

261.    Defendants failed to use reasonable care in responding to multiple odor complaints over a period of at least 16 months and detecting whether a leak in the Pipeline had occurred.

262.    Defendants failed to use reasonable care in identifying the scope of the leak or of the resulting pollution plume once the Pipeline Leak had been identified.

263.    Defendants failed to use reasonable care to contain the plume and resulting damages caused by the Pipeline Leak.

264.    Defendants failed to use reasonable care in employing a safe and reliable monitoring and leak detection system with respect to the Pipeline.

51

Case ID: 250303655

265. Defendants knew or should have known that their failure to properly operate, maintain, and repair the Pipeline, and to respond to the Pipeline Leak, would allow the release of dangerous and toxic substances into the environment in a residential neighborhood, and, as a result, contaminate the environment and cause the residents of the affected geographic area to suffer damages as alleged herein.

266. Defendants knew or should have known that their failure to exercise reasonable care in responding to the Pipeline Leak would impede the ability of regulators and affected residents to understand the scope of the danger and to effectively mitigate its impacts.

267. Defendants' negligence was a substantial factor in bringing about real and personal property damage, environmental contamination, economic losses, and diminution of property values, to Plaintiffs and the Class members.

268. Defendants' negligence was a substantial factor in bringing about physical personal injury and emotional distress and anxiety to Plaintiffs individually. Plaintiffs' claims for emotional distress damages are brought individually on behalf of Plaintiffs.

269. Defendants' negligence was a substantial factor in bringing about the need for medical monitoring for residents affected by the Pipeline Leak.

270. As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs and the Class members have suffered damages as alleged herein.

## COUNT II
### GROSS NEGLIGENCE
#### (Individually and on Behalf of the Class)

271. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

272. Defendants owed a legal duty to Plaintiffs and the Class, and Defendants breached that duty.

52

Case ID: 250303655

273.    Defendants' breaches as described herein demonstrate an extreme departure from the standard of care for ensuring the safe operation of a hazardous liquids pipeline.

274.    Defendants' efforts to prevent the Pipeline Leak and to respond to the Pipeline Leak once identified, as alleged herein, including but not limited to Defendants' misrepresentations as to the amount of product lost and the continuing safety of the Pipeline, demonstrate a gross failure to exercise even scant care with respect to the safety of nearby residents and their property.

275.    As a result, Plaintiffs and the Class have been damaged as alleged herein.

## COUNT III
## NEGLIGENCE PER SE
### (Individually and on Behalf of the Class)

276.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

277.    The actions of Defendants as set forth herein constitute negligence per se.

278.    Defendants had a duty to comply with numerous statutes and regulations designed to prevent a public harm and failed to do so. The statutes that Defendants did not comply with include, without limitation, 35 P.S. § 691.401 (Clean Streams Law), and 49 U.S.C. § 60101 *et seq.* (Pipeline Safety Act).

279.    The purpose of the Pennsylvania Clean Streams Law is the "prevention and elimination of water pollution" in order to promote the "economic future of the Commonwealth." 35 P.S. § 691.4.

280.    Defendants breached their duty under the Clean Streams Law when they allowed the discharge of toxic substances from the Pipeline into the waters of the Commonwealth. 35 P.S. § 691.401.

281.    The purpose of the Pipeline Safety Act, and of regulations promulgated pursuant to the Act, is to "provide adequate protection against risks to life and property posed by pipeline

53

Case ID: 250303655

transportation and pipeline facilities." 49 U.S.C. § 601012(a). The Secretary of Transportation promulgates minimum safety standards pursuant to the Act, which apply to any and all owners and operators of pipeline facilities. *Id.*

282. Defendants breached their duties under the Pipeline Safety Act when they failed to comply with the minimum safety standards proscribed by the Secretary of Transportation pursuant to the Act. Specifically, Defendants' breaches include, without limitation, the fact that they: (a) failed to maintain an effective system for detecting leaks in violation of 49 C.F. R. § 195.444; (b) failed to take measures necessary to prevent and mitigate the consequences of a pipeline failure that could affect a high consequence area in violation of 49 C.F.R. § 195.452; and (c) failed to detect conditions that could adversely affect the safe operation of the Pipeline within 72 hours of an extreme weather event in violation of 49 C.F.R. § 195.414.

283. The purposes of the aforementioned statutes are to protect the interests of Plaintiffs and the Class.

284. As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs and the Class have suffered damages as alleged herein.

## COUNT IV
### STRICT LIABILITY – ABNORMALLY DANGEROUS OR ULTRAHAZARDOUS ACTIVITY
#### (Individually and on Behalf of the Class)

285. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

286. Defendants' actions as alleged herein constitute an abnormally dangerous and/or ultrahazardous activity.

287. Defendants' transportation of petroleum products through a pipeline that was poorly reinforced by thirty-year old A sleeves involves a high degree of risk and the exercise of reasonable care cannot eliminate the risk inherent in operating the Pipeline.

54

Case ID: 250303655

288. Defendants' transportation of petroleum products was solely for Defendants' business purposes.

289. Defendants knew and understood that there was a high risk that their petroleum products and other chemicals, toxins, and particulates could contaminate the environment of the nearby neighborhoods, including the risk of contaminating the only source of clean water for residents, and, thereby, cause residents to suffer personal injuries, property damage, environmental contamination, economic losses, diminution of property value, the need for medical monitoring, and other harms as fully alleged herein.

290. Defendants' transportation of petroleum products, toxins, and particulates through a pipeline that was poorly reinforced by thirty-year old A sleeves caused serious harm to Plaintiffs' and Class members' persons, chattel, and property, including both real and personal property, as alleged herein.

291. As such, Defendants are strictly liable to Plaintiffs and the members of the Class.

292. As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff and the Class have suffered damages as alleged herein.

<div align="center">

**COUNT V**
**PUBLIC NUISANCE**
**(Individually and on Behalf of the Class)**

</div>

293. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

294. Defendants' conduct constitutes a public nuisance pursuant to 35 P.S. 691.401.

295. Specifically, the discharge of toxic substances, odors, and gases from the Twin Oaks Pipeline as alleged herein into underlying bedrock and aquifer, as well as to groundwater, air, soil, private wells, homes, and other property, have caused particular injuries to Plaintiff and the Class as alleged herein.

<div align="center">

55

</div>

Case ID: 250303655

296.    Plaintiffs and the Class are entitled to damages as a result thereof.

## COUNT VI
### PRIVATE NUISANCE
**(Individually and on Behalf of the Class)**

297.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

298.    Defendants' conduct allowed toxic substances to invade the private use and enjoyment of Plaintiffs' land and property.

299.    Defendants' conduct allowed offensive odors and gases to invade and disrupt the private use of Plaintiffs' land and property.

300.    The invasion of Plaintiffs' land by Defendants' product, toxic substances, and resulting odors was the foreseeable and proximate result of Defendants' negligent and reckless conduct.

301.    Plaintiffs have suffered injury to the use and enjoyment of their home due to the presence of toxic substances in the water and soil on Plaintiffs' land and the substantial risk of the future presence of such substances.

302.    Plaintiffs are entitled to damages as a result thereof.

## COUNT VII
### TRESPASS
**(Individually and on Behalf of the Class)**

303.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

304.    Defendants' conduct caused their hazardous and toxic product to intrude into the water and onto the land of Plaintiffs' property. Defendants further failed to take actions to identify the scope of the intrusion and to remove their product from Plaintiffs' property.

56

Case ID: 250303655

305.    Defendants knew or should have known that their failure to maintain safe operations of the Twin Oaks Pipeline and to effectively investigate odor complaints for possible leaks would result in the intrusion of their product on Plaintiffs' property.

306.    Defendants' failure to identify and remove their product from Plaintiffs' property after being made aware of the intrusion constitutes a separate and continuing trespass.

307.    Plaintiffs are entitled to damages as a result thereof.

## COUNT VII
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Individually)

308.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

309.    Defendants' conduct negligently inflicted emotional distress on Plaintiffs.

310.    Defendants owed Plaintiffs a duty of care to ensure that they did not suffer from serious emotional distress and mental anguish.

311.    Defendants breached their duty to Plaintiffs by both their actions and inactions.

312.    As a direct and proximate result of Defendants' breach, Plaintiffs have suffered severe emotional injury.

313.    As a result, Plaintiffs have been damaged as alleged herein.

## COUNT IX
## MEDICAL MONITORING
### (Individually and on behalf of the Class)

314.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

315.    Plaintiffs and their children were significantly exposed to toxic and hazardous substances, and they bear a substantial risk of future exposure to such substances because of Defendants' repeated failures to prevent the discharge of the same substances into Plaintiffs' soil, water, and property (both real property and personal property).

57

Case ID: 250303655

Exhibit B_Page 154 of 583

316. The exposure to these dangerous substances is such that Plaintiffs and their children have been placed at an increased risk of contracting latent illness and disease, including but not limited to cancer and other serious diseases and illnesses, and as such requires medical monitoring which Defendants are responsible for providing and paying for.

317. Monitoring and testing procedures exist for cancer and other diseases and illnesses associated with exposure to the aforementioned hazardous substances, making the early detection and treatment of the diseases possible and beneficial.

318. As a result, the Court should establish a Court-supervised and administered trust fund and medical monitoring regime to compensate Plaintiffs for their economic damages.

## PRAYER FOR RELIEF

319. Plaintiffs and Class members seek the following relief:

    a.    All compensatory damages and other damages as alleged herein;

    b.    Medical monitoring for Plaintiffs and the Class members;

    c.    Punitive damages where allowable;

    d.    Pre- and post-judgment interest as allowed by law;

    e.    A declaratory judgment that Defendants are responsible for the Pipeline Leak, and responsible for all past and future costs to fully restore and remediate all environmental and other harms caused by Defendants to Plaintiffs and the Class;

    f.    Attorneys' fees and costs pursuant to any applicable statutes and/or regulations;

    g.    Equitable and injunctive relief including:

        i.    Notice to all affected persons of the Pipeline Leak and potential dangers and risks presented by the Pipeline Leak;

58

Case ID: 250303655

ii.  The enjoinment of further operations of the Twin Oaks Pipeline until Defendants are able to fully guarantee its safe operation;

iii.  Provision of full water supply for all homes in the Class;

iv.  Provision of temporary housing and all associated costs to those who reasonably request it as a result of the Pipeline Leak;

v.  Installation of a best-in-class leak detection system for the Twin Oaks Pipeline that can actually detect – and guarantee that it will detect – problems in real time;

vi.  Full restoration and remediation of all environmental contamination including but not limited to groundwater, soil, and air, to background concentrations; and

h.  All other relief this Court deems necessary, just and proper.

### DEMAND FOR TRIAL BY JURY

320.  Plaintiffs hereby demand a jury trial for all claims so triable.

Dated: March 27, 2025                Respectfully submitted,

Shanon J. Carson (Bar No. 85957)
Y. Michael Twersky (Bar No. 312411)
Joseph E. Samuel, Jr. (Bar No. 327645)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: 215-875-4656
Email: scarson@bm.net
Email: mitwersky@bm.net
Email: jsamuel@bm.net

Case ID: 250303655

Exhibit B_Page 156 of 583

Docusign Envelope ID: F1ECD0CA-7CE0-4A36-ACC4-E894C321F063

## VERIFICATION

The undersigned plaintiff, DANIEL LA HART, herein avers that the statements of fact contained in the foregoing CLASS ACTION COMPLAINT are true and correct to the best of his information, knowledge, and belief, and are made subject to the penalties of 18 Pa. C.S.A. § 4904, relating to unsworn falsification to authorities.

Dated: 3/26/2025

DocuSigned by:

*Daniel La Hart*

DANIEL LA HART

Case ID: 250303655

Docusign Envelope ID: F1ECD0CA-7CE0-4A36-ACC4-E894C321F063

## VERIFICATION

The undersigned plaintiff, KATHERINE LA HART, herein avers that the statements of

fact contained in the foregoing CLASS ACTION COMPLAINT are true and correct to the best

of her information, knowledge, and belief, and are made subject to the penalties of 18 Pa.

C.S.A. § 4904, relating to unsworn falsification to authorities.


Dated: 3/26/2025

DocuSigned by:

KATHERINE LA HART

Case ID: 250303655

**IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION - CIVIL**

*Filed and Attested by the Office of Judicial Records 27 MAR 2025 04:45 pm S. GILLIAM*

La Hart et al
_____
                    **Plaintiff(s)**

                v.

Sunoco Pipeline, LP et al
_____
                    **Defendant(s)**

**Case Number:** 250303655 _____

**Control Number:** _____

**AFFIDAVIT OF SERVICE**

I, _____Jill Ceresini_____, hereby certify that on __3/27/2025__,
          *(Print Name)*                                          *(Date)*

I served a copy of the following documents: **(select all that apply)**

[✓] Complaint / Statement of Claim          [ ] Notice of Appeal

[ ] Rule to File Complaint                  [ ] Rule to Show Cause

[ ] Motion/Petition: _____

[✓] Other: _____Civil Cover Sheet_____

upon the following parties:

Plaintiff(s): _____

Defendant(s): __Energy Transfer. LP_____

Other: _____

by: **(select the type of service used to serve the documents)**

[ ] Certified Mail                          [ ] Posting

[ ] Regular Mail                            [ ] Other:_____

[✓] Personal Delivery    By delivering a copy of the Complaint and Cover Sheet to its agent,
Corporation Service Company, 5251 Little Falls Drive, Wilmington, DE 19808

__3/27/2025__
        **Date**

Signed by:
*Jill Ceresini*
D950DF47D615... **Signature**

*(Affidavit of Service Form 2/27/2023)*

Case ID: 250303655

IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

*Filed and Attested by the*
*Office of Judicial Records*
*27 MAR 2025 04:24 pm*
*S. GILLIAM*

La Harte et al

_____
**Plaintiff(s)**

v.

Sunoco Pipeline, LP et al

_____
**Defendant(s)**

Case Number: _____250303655_____

Control Number: _____

**AFFIDAVIT OF SERVICE**

I, _Michael A Dipalo_ , hereby certify that on ___3/27/2025___ ,
     (Print Name)                                              (Date)

I served a copy of the following documents: **(select all that apply)**

[✔] Complaint / Statement of Claim          [ ] Notice of Appeal

[ ] Rule to File Complaint                  [ ] Rule to Show Cause

[ ] Motion/Petition: _____

[✔] Other: __Civil Cover Sheet_____

upon the following parties:

Plaintiff(s): _____

Defendant(s): __Sunoco Pipeline LP  and Energy Transfer (R&M) LLC__

Other: _____

by: **(select the type of service used to serve the documents)**

[ ] Certified Mail                          [ ] Posting

[ ] Regular Mail                            [ ] Other: _____

[✔] Personal Delivery By delivering a copy of the Complaint and Cover Sheet to their agent, Corporation Service Company, 5235 N Front St., Harrisburg, PA 17110

__3/27/2025__
     Date

_[signature]_
     Signature

(Affidavit of Service Form 2/27/2023)

Case ID: 250303655

**Exhibit B_Page 160 of 583**

**BERGER MONTAGUE PC**
Shanon J. Carson (Bar No. 85957)
Y. Michael Twersky (Bar No. 312411)
Joseph E. Samuel, Jr. (Bar No. 327645)
1818 Market Street, Suite 3600
Philadelphia, PA 19103



*Filed and Attested by the Office of Judicial Records 28 MAR 2025 01:14 pm S. GILLIAM*

*Counsel for Plaintiffs and the Proposed Class*

| | |
|---|---|
| DANIEL LA HART and KATHERINE LA HART,<br><br>Plaintiffs,<br><br>v.<br><br>SUNOCO PIPELINE L.P.; ENERGY TRANSFER LP; and ENERGY TRANSFER (R&M) LLC,<br><br>Defendants | **PHILADELPHIA COUNTY COURT OF COMMON PLEAS CIVIL TRIAL DIVISION**<br><br>CLASS ACTION<br><br>MARCH TERM, 2025<br><br>CASE NO. 250303655 |

## ENTRY OF APPEARANCE OF JOSEPH E. SAMUEL, JR.

TO THE OFFICE OF JUDICIAL RECORDS:

Kindly enter my appearance as co-counsel on behalf of the Plaintiffs in the above-referenced matter.

Dated: March 28, 2025

**BERGER MONTAGUE PC**
*Attorneys for Plaintiffs*

/s/ *Joseph E. Samuel, Jr.*
Joseph E. Samuel, Jr., Bar No. 327645

Case ID: 250303655

**Exhibit B_Page 161 of 583**

## CERTIFICATE OF SERVICE

I hereby certify that on this day the foregoing Entry of Appearance was served on

Defendants by sending a copy to the following addresses by first class U.S. mail:

Sunoco Pipeline LP
525 Fritztown Road
Sinking Spring, PA 19608

Energy Transfer LP
8111 Westchester Drive
Dallas, TX 75225

Energy Transfer (R&M) LLC
1735 Market Street
Philadelphia, PA 19103

Dated:  March 28, 2025                           **BERGER MONTAGUE PC**
                                                 *Attorneys for Plaintiffs*

                                                 */s/ Joseph E. Samuel, Jr.*
                                                 Joseph E. Samuel, Jr., Bar No. 327645

Case ID: 250303655

**Exhibit B_Page 162 of 583**

**BERGER MONTAGUE PC**
Shanon J. Carson (Bar No. 85957)
Y. Michael Twersky (Bar No. 312411)
Joseph E. Samuel, Jr. (Bar No. 327645)
1818 Market Street, Suite 3600
Philadelphia, PA 19103

*Counsel for Plaintiffs and the Proposed Class*

*Filed and Attested by the Office of Judicial Records 31 MAR 2025 03:21 pm @ IMPERATO*

| | |
|---|---|
| DANIEL LA HART and KATHERINE LA HART,<br><br>                Plaintiffs,<br><br>        v.<br><br>SUNOCO PIPELINE L.P.; ENERGY TRANSFER LP; and ENERGY TRANSFER (R&M) LLC,<br><br>                Defendants | **PHILADELPHIA COUNTY COURT OF COMMON PLEAS CIVIL TRIAL DIVISION**<br><br>CLASS ACTION<br><br>MARCH TERM, 2025<br><br>CASE NO. 250303655 |

## ENTRY OF APPEARANCE OF Y. MICHAEL TWERSKY

TO THE OFFICE OF JUDICIAL RECORDS:

Kindly enter my appearance as co-counsel on behalf of the Plaintiffs in the above-referenced matter.

Dated:  March 31, 2025

**BERGER MONTAGUE PC**
*Attorneys for Plaintiffs*

*/s/ Y. Michael Twersky*
Y. Michael Twersky, Bar No. 312411

Case ID: 250303655

**Exhibit B_Page 163 of 583**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this day the foregoing Entry of Appearance was served on

Defendants by sending a copy to the following addresses by first class U.S. mail:

Sunoco Pipeline LP
525 Fritztown Road
Sinking Spring, PA 19608

Energy Transfer LP
8111 Westchester Drive
Dallas, TX 75225

Energy Transfer (R&M) LLC
1735 Market Street
Philadelphia, PA 19103

Dated:  March 31, 2025                                          **BERGER MONTAGUE PC**
                                                                                     *Attorneys for Plaintiffs*

                                                                                     <u>*/s/ Y. Michael Twersky*</u>
                                                                                     Y. Michael Twersky, Bar No. 312411

Case ID: 250303655

**MORGAN, LEWIS & BOCKIUS LLP**
Laura Hughes McNally (Pa. ID No. 310658)
2222 Market Street
Philadelphia, Pennsylvania 19103-3007
(215) 963-5000
laura.mcnally@morganlewis.com

*Attorney for Defendants Sunoco Pipeline L.P.,*
*Energy Transfer LP, and Energy Transfer (R&M) LLC*



*Filed and Attested by the*
*Office of Judicial Records*
*01 APR 2025 04:48 pm*
*L. BREWINGTON*

| | |
|---|---|
| DANIEL LA HART and<br>KATHERINE LA HART | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY, |
| *Plaintiffs*, | CIVIL TRIAL DIVISION |
| v. | March Term, 2025 |
| SUNOCO PIPELINE L.P.; ENERGY<br>TRANSFER LP; and ENERGY TRANSFER<br>(R&M) LLC, | No. 03655 |
| *Defendants.* | |

## ENTRY OF APPEARANCE

**To the Office of Judicial Records**:

Kindly enter the appearance of Laura Hughes McNally of Morgan, Lewis & Bockius

LLP as counsel on behalf of Defendants Sunoco Pipeline L.P., Energy Transfer LP, and Energy

Transfer (R&M) LLC.

Respectfully submitted,

Date:  April 1, 2025

/s/ Laura Hughes McNally
Laura Hughes McNally (ID No. 310658)
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103-3007
(215) 963-5000
laura.mcnally@morganlewis.com
*Counsel for Defendants Sunoco Pipeline L.P.,*
*Energy Transfer LP, and Energy Transfer (R&M)*
*LLC*

## CERTIFICATE OF SERVICE

I, Laura Hughes McNally, hereby certify that on April 1, 2025, I caused a true and correct copy of the foregoing Entry of Appearance to be served via the Court's electronic filing system upon all counsel of record.


<div align="right">

*/s/ Laura Hughes McNally*
Laura Hughes McNally

</div>

**MORGAN, LEWIS & BOCKIUS LLP**
Yunica Jiang (Pa. ID No. 329145)
2222 Market Street
Philadelphia, Pennsylvania 19103-3007
(215) 963-5000
yunica.jiang@morganlewis.com



*Filed and Attested by the Office of Judicial Records 01 APR 2025 05:02 pm D. BREWINGTON*

*Attorney for Defendants Sunoco Pipeline L.P.,*
*Energy Transfer LP, and Energy Transfer (R&M) LLC*

| | |
|---|---|
| DANIEL LA HART and<br>KATHERINE LA HART<br><br>    *Plaintiffs,*<br><br>    v.<br><br>SUNOCO PIPELINE L.P.; ENERGY<br>TRANSFER LP; and ENERGY TRANSFER<br>(R&M) LLC,<br><br>    *Defendants.* | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY<br><br>CIVIL TRIAL DIVISION<br><br>March Term, 2025<br><br>No. 03655 |

## ENTRY OF APPEARANCE

**To the Office of Judicial Records**:

Kindly enter the appearance of Yunica Jiang of Morgan, Lewis & Bockius LLP as

counsel on behalf of Defendants Sunoco Pipeline L.P., Energy Transfer LP, and Energy Transfer

(R&M) LLC.

Respectfully submitted,

Date:  April 1, 2025

        */s/ Yunica Jiang*
        Yunica Jiang (ID No. 329145)
        MORGAN, LEWIS & BOCKIUS LLP
        2222 Market Street
        Philadelphia, PA 19103-3007
        (215) 963-5000
        yunica.jiang@morganlewis.com
        *Counsel for Defendants Sunoco Pipeline L.P.,*
        *Energy Transfer LP, and Energy Transfer (R&M)*
        *LLC*

Case ID: 250303655

**Exhibit B_Page 167 of 583**

<u>**CERTIFICATE OF SERVICE**</u>

I, Yunica Jiang, hereby certify that on April 1, 2025, I caused a true and correct copy of the foregoing Entry of Appearance to be served via the Court's electronic filing system upon all counsel of record.

<div align="right">

*/s/ Yunica Jiang*
Yunica Jiang

</div>

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CIVIL TRAIL DIVISION**

Filed and Attested by the
Office of Judicial Records
02 APR 2025 11:58 am
S. GILLIAM

| | | |
|---|---|---|
| Daniel La Hart and Katherine La Hart, | : | March Term, 2025 |
| | : | |
| Plaintiffs, | : | No. 03655 |
| | : | |
| v. | : | |
| | : | |
| Sunoco Pipeline L.P., et al, | : | |
| | : | |
| Defendants. | : | |

**ENTRY OF APPEARANCE**

**To the Office of Judicial Records:**

Kindly enter the appearances of Robert D. Fox, Esq. and Diana A. Silva, Esq. as co-counsel of record for Defendants, Sunoco Pipeline L.P., Energy Transfer LP and Energy Transfer (R&M) LLC in the above-captioned matter, without waiver of any objections, including, but not limited to, objections to service of process.

BY: _____
Robert D. Fox, Esquire (PA Bar No. 44322)

BY: _____
Diana A. Silva, Esquire (PA Bar No. 311083)

MANKO, GOLD, KATCHER & FOX, LLP
Three Bala Plaza East, Suite 700
Bala Cynwyd, PA 19004
Telephone: (484) 430-5700
Fax: (484) 430-5711
rfox@mankogold.com
dsilva@mankogold.com

Dated: April 2, 2025

*Attorneys for Defendants*
*Sunoco Pipeline L.P., Energy Transfer LP and*
*Energy Transfer (R&M) LLC*

## CERTIFICATE OF SERVICE

Robert D. Fox hereby certifies that on the date set forth below he caused a true and correct copy of the foregoing Entry of Appearance to be served on all counsel of record via the Court's electronic filing system.

/s/ Robert D. Fox
Robert D. Fox, Esquire

Dated:  April 2, 2025

2982129_1

Case ID: 250303655

**Exhibit B_Page 170 of 583**

PHILADELPHIA COURT OF COMMON PLEAS
**PETITION/MOTION COVER SHEET**

| **CONTROL NUMBER:** |
|---|
| 25041344 |
| **(RESPONDING PARTIES MUST INCLUDE THIS NUMBER ON ALL FILINGS)** |

| **FOR COURT USE ONLY** | |
|---|---|
| ASSIGNED TO JUDGE: | ANSWER/RESPONSE DATE: 04/28/2025 |

*Do not send Judge courtesy copy of Petition/Motion/Answer/Response. Status may be obtained online at http://courts.phila.gov*

_____ March _____ Term, 2025
  *Month*                                    *Year*
No. _____ 03655 _____

Name of Filing Party:
ENERGRY TRANSFER (R&M) LLC-DFT
ENERGY TRANSFER LP-DFT
SUNOCO PIPELINE LP-DFT

LA HART ETAL VS SUNOCO PIPELINE, LP ETAL

**INDICATE NATURE OF DOCUMENT FILED:**
☐ Petition *(Attach Rule to Show Cause)*   ☒ Motion
☐ Answer to Petition   ☐ Response to Motion

**Has another petition/motion been decided in this case?** ☐ Yes ☒ No
**Is another petition/motion pending?** ☐ Yes ☒ No

*If the answer to either question is yes, you must identify the judge(s):*

_____

| TYPE OF PETITION/MOTION (see list on reverse side) | PETITION/MOTION CODE (see list on reverse side) |
|---|---|
| MOT-FOR ADMISSION PRO HAC VICE | MTPHV |

ANSWER / RESPONSE FILED TO (Please insert the title of the corresponding petition/motion to which you are responding):

| **I. CASE PROGRAM** | **II. PARTIES** *(required for proof of service)* |
|---|---|
| OTHER PROGRAM | (Name, address and **telephone number** of all counsel of record and unrepresented parties. Attach a stamped addressed envelope for each attorney of record and unrepresented party.) |
| Court Type: CLASS ACTION | SHANON J CARSON |
| Case Type: CLASS ACTION | BERGER MONTAGUE PC 1818 MARKET ST SUITE 3600 , PHILADELPHIA PA 19103 |
| | LAURA H MCNALLY 2222 MARKET STREET , PHILADELPHIA PA 19103 |
| | ROBERT D FOX THREE BALA PLAZA EAST SUITE 700 , BALA CYNWYD PA 19004 |

**III. OTHER**

By filing this document and signing below, the moving party certifies that this motion, petition, answer or response along with all documents filed, will be served upon all counsel and unrepresented parties as required by rules of Court (see PA. R.C.P. 206.6, Note to 208.2(a), and 440). Furthermore, moving party verifies that the answers made herein are true and correct and understands that sanctions may be imposed for inaccurate or incomplete answers.

| _____ | April 7, 2025 | LAURA H. MCNALLY | _____ |
|---|---|---|---|
| *(Attorney Signature/Unrepresented Party)* | *(Date)* | *(Print Name)* | *(Attorney I.D. No.)* |

**The Petition, Motion and Answer or Response, if any, will be forwarded to the Court after the Answer/Response Date.**
**No extension of the Answer/Response Date will be granted even if the parties so stipulate.**

30-1061B E-File# 2504013814
07-APR-25 08:39:34

**FILED**
**07 APR 2025 10:50 am**
**Civil Administration**
**E. DOHONY**

MORGAN, LEWIS & BOCKIUS LLP
Laura Hughes McNally (Pa. ID No. 310658)
Yunica Jiang (Pa. ID No. 329145)
2222 Market Street
Philadelphia, Pennsylvania 19103-3007
(215) 963-5000
laura.mcnally@morganlewis.com
yunica.jiang@morganlewis.com

*Attorneys for Defendants Sunoco Pipeline L.P.,*
*Energy Transfer LP, and Energy Transfer (R&M) LLC*

| | |
|---|---|
| DANIEL LA HART and KATHERINE LA HART | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| *Plaintiffs*, | CIVIL TRIAL DIVISION |
| v. | March Term, 2025 |
| SUNOCO PIPELINE L.P.; ENERGY TRANSFER LP; and ENERGY TRANSFER (R&M) LLC, | No. 03655 |
| *Defendants*. | |

**MOTION FOR *PRO HAC VICE* ADMISSION OF ATTORNEY DREW CLEARY JORDAN**

Defendants Sunoco Pipeline L.P., Energy Transfer LP, and Energy Transfer (R&M) LLC ("Defendants"), by and through their undersigned counsel, hereby files this Motion for *Pro Hac Vice* Admission of Attorney Drew Cleary Jordan, and in support thereof avers as follows:

1. Defendants have retained the undersigned counsel to act as counsel of record with respect to the above-captioned matter.

2. Drew Cleary Jordan is an associate with the law firm of Morgan, Lewis & Bockius LLP. Defendants wish to have Mr. Jordan as co-counsel in this matter with the undersigned.

3. Mr. Jordan is a member in good standing of the Bar of the District of Columbia and the Bar of New Jersey.

Case ID: 250303655
Control No.: 25041344

**Exhibit B_Page 172 of 583**

4.    I am a member in good standing of the Bar of the Commonwealth of Pennsylvania. Attached hereto as **Exhibit A** is my verified statement as required by Pennsylvania Rule of Civil Procedure 1012.1(d)(2).

5.    Attached hereto as **Exhibit B** is the verified statement of Drew Cleary Jordan as required by Pennsylvania Rule of Civil Procedure 1012.1(c).

6.    Attached hereto as **Exhibit C** is a true and correct copy of the acknowledgement from the Pennsylvania IOLTA Board for *Pro Hac Vice* Admission, required by Section 81.505(a) of the IOLTA regulations.

7.    As is more fully set forth in my Verified Statement, I am acquainted with Drew Cleary Jordan, and can attest to his fitness for admission *pro hac vice*.

8.    Good cause exists for admitting Drew Cleary Jordan on a *pro hac vice* basis, because Defendants have requested that Mr. Jordan represent them in this case.

WHEREFORE, Defendant and the undersigned counsel respectfully request that this Honorable Court grant this motion and grant admission *pro hac vice* to Drew Cleary Jordan.

Respectfully Submitted,


Dated: April 7, 2025                */s/ Laura Hughes McNally*
                                     Laura Hughes McNally (ID No.: 310658)
                                     MORGAN, LEWIS & BOCKIUS LLP
                                     2222 Market Street
                                     Philadelphia, PA 19103
                                     Phone: (215) 963-5000
                                     laura.mcnally@morganlewis.com

Case ID: 250303655
Control No.: 25041344
**Exhibit B_Page 173 of 583**

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of April 2025, I caused a true and correct copy of the foregoing Motion for *Pro Hac Vice* Admission of Attorney Dew Cleary Jordan and attached exhibits to be served via the Court's electronic filing system upon all counsel of record.

/s/ *Laura Hughes McNally*
Laura Hughes McNally

Case ID: 250303655
Control No.: 25041344
**Exhibit B_Page 174 of 583**

| | |
|---|---|
| DANIEL LA HART and KATHERINE LA HART<br><br>    *Plaintiffs*,<br><br>    v.<br><br>SUNOCO PIPELINE L.P.; ENERGY TRANSFER LP; and ENERGY TRANSFER (R&M) LLC,<br><br>    *Defendants*. | COURT OF COMMON PLEAS PHILADELPHIA COUNTY<br><br>CIVIL TRIAL DIVISION<br><br>March Term, 2025<br><br>No. 03655 |

## PROPOSED ORDER

**AND NOW**, this _____ day of _____, 2025, **IT IS ORDERED** that the Motion for *Pro Hac Vice* Admission of Attorney Drew Cleary Jordan is **GRANTED**, and Mr. Jordan with the law firm of Morgan, Lewis & Bockius LLP, 1111 Pennsylvania Avenue, NW, Washington, DC 20004, is hereby admitted *pro hac vice* for purposes of this matter after obtaining the appropriate City of Philadelphia Business Privilege Tax License pursuant to 19-2602 of the Philadelphia Code. *Pro hac vice* counsel shall pay all city business and wage tax as required.

                    **BY THIS COURT:**

                    _____
                                              **J.**

Case ID: 250303655
Control No.: 25041344
**Exhibit B_Page 175 of 583**

# EXHIBIT A

Case ID: 250303655
Control No.: 25041344
Exhibit B_Page 176 of 583

| | |
|---|---|
| DANIEL LA HART and KATHERINE LA HART<br><br>    *Plaintiffs*,<br><br>    v.<br><br>SUNOCO PIPELINE L.P.; ENERGY TRANSFER LP; and ENERGY TRANSFER (R&M) LLC,<br><br>    *Defendants*. | COURT OF COMMON PLEAS PHILADELPHIA COUNTY<br><br>CIVIL TRIAL DIVISION<br><br>March Term, 2025<br><br>No. 03655 |

## VERIFIED STATEMENT OF LAURA HUGHES MCNALLY

Pursuant to Pennsylvania Rule of Civil Procedure 1012.1(d)(2), I declare that the following facts are true to the best of my knowledge, information and belief:

1.    I am a member in good standing of the Bar of the Commonwealth of Pennsylvania, and I am admitted to practice law in this court.

2.    After reasonable investigation, I believe that Drew Cleary Jordan is a reputable and competent attorney, and I am in a position to recommend Mr. Jordan's admission *pro hac vice*.

3.    I am seeking to sponsor Drew Cleary Jordan and Duke K. McCall, III, in this case and am not otherwise acting as the sponsor of a candidate for *pro hac vice* admission in any other state court of record in this Commonwealth.

4.    I aver that any proceeds from the settlement of this matter, in which Mr. Jordan is granted admission *pro hac vice*, shall be received, held, distributed, and accounted for in accordance with Rule 1.15 of the Pennsylvania Rules of Professional Conduct, including the IOLTA provisions thereof, if applicable.

5.    I understand that the statements herein are subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities.

*/s/ Laura Hughes McNally*
Laura Hughes McNally

Case ID: 250303655
Control No.: 25041344

**Exhibit B_Page 177 of 583**

# EXHIBIT B

Case ID: 250303655
Control No.: 25041344
**Exhibit B_Page 178 of 583**

| | |
|---|---|
| DANIEL LA HART and KATHERINE LA HART<br><br>    *Plaintiffs*,<br><br>    v.<br><br>SUNOCO PIPELINE L.P.; ENERGY TRANSFER LP; and ENERGY TRANSFER (R&M) LLC,<br><br>    *Defendants*. | COURT OF COMMON PLEAS PHILADELPHIA COUNTY<br><br>CIVIL TRIAL DIVISION<br><br>March Term, 2025<br><br>No. 03655 |

## VERIFIED STATEMENT OF DREW CLEARY JORDAN

Pursuant to Pennsylvania Rule of Civil Procedure 1012.1(c), I declare that the following facts are true to the best of my knowledge information, and belief:

1. I, Drew Cleary Jordan, am an associate with the law firm of Morgan, Lewis & Bockius LLP, located at 1111 Pennsylvania Avenue, NW, Washington, DC 20004.

2. I seek to appear as counsel for Defendants Sunoco Pipeline L.P., Energy Transfer LP, and Energy Transfer (R&M) LLC, in the above-captioned matter.

3. I am an active member in good standing of the Bar of the District of Columbia, ID No. 1011856 and the Bar of New Jersey, ID No. 900492012.

4. No disciplinary proceedings are pending against me in any jurisdiction.

5. No disciplinary proceedings have been previously filed against me in any jurisdiction.

6. No suspension proceedings have been previously filed against me in any jurisdiction.

7. No disbarment proceedings have been previously filed against me in any jurisdiction.

8.     There are no other pending actions in any court of record in Pennsylvania in which I have applied for admission *pro hac vice*.

9.     I have not been denied admission *pro hac vice* or had such admission revoked by any court in any jurisdiction.

10.     I shall comply with and be bound by the applicable statutes, case law, and procedural rules of the Commonwealth of Pennsylvania, including the Pennsylvania Rules of Professional Conduct.

11.     I shall submit to the jurisdiction of Pennsylvania courts and the Pennsylvania Disciplinary Board with respect to acts and omissions occurring during the appearance in the above-captioned matter.

12.     I consent to the appointment of Laura Hughes McNally as the agent upon whom service of process shall be made for all actions, including disciplinary actions, that may arise out of the practice of law in the above captioned matter.

13.     I have filed the Pennsylvania IOLTA Board Form for *Pro Hac Vice* Admission, provided the information required by Section 81.504 of the IOLTA regulations, and paid the $375.00 fee required by Section 81.504(a) of the IOLTA regulations.

14.     I understand that the statements herein are subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities.

*/s/ Drew Cleary Jordan*
Drew Cleary Jordan

Case ID: 250303655
Control No.: 25041344
**Exhibit B_Page 180 of 583**

# EXHIBIT C

Case ID: 250303655
Control No.: 25041344

**Exhibit B_Page 181 of 583**



SUPREME COURT OF PENNSYLVANIA
PENNSYLVANIA INTEREST ON
LAWYERS TRUST ACCOUNT BOARD

April 04, 2025


DREW CLEARY JORDAN, Esq.
MORGAN, LEWIS & BOCKIUS LLP
1111 PENNSYLVANIA AVE., NW
WASHINGTON, DC 20004


SENT TO DREW CLEARY JORDAN VIA Email: DREW.JORDAN@MORGANLEWIS.COM


Dear Attorney JORDAN:


This letter serves as the fee payment certification referenced in 204 Pa Code §81.503 and acknowledges receipt of the $375.00 fee paid by Online Payment on this date related to your pursuit for admission *pro hac vice* in the case identified as La Hart v. Sunoco Pipeline L.P., Energy Transfer LP, and Energy Transfer (R&M) LLC, no. 250303655, filed in Court of Common Pleas of Philadelphia County.

You should refer to Pa Rule of Civil Procedure 1012.1, local court rules, and other regulations of 204 Pa Code §81.501 et. seq. concerning additional requirements related to seeking *pro hac vice* admission.

Sincerely,

Stephanie S. Libhart
Executive Director

cc:  LAURA HUGHES MCNALLY, Esq.

    laura.mcnally@morganlewis.com

Pennsylvania Judicial Center
601 Commonwealth Ave., Ste. 2400
PO Box 62445, Harrisburg, PA 17106-2445
717/238-2001 · 888/PA-IOLTA (724-6582) · 717/238-2003 FAX
paiolta@pacourts.us · www.paiolta.org

Administering Pennsylvania's Interest On Lawyers Trust Account (IOLTA) Program

Case ID: 250303655
Control No.: 25041344

**Exhibit B_Page 182 of 583**

## PHILADELPHIA COURT OF COMMON PLEAS
## PETITION/MOTION COVER SHEET

| CONTROL NUMBER: |
|---|
| 25041343 |
| **(RESPONDING PARTIES MUST INCLUDE THIS NUMBER ON ALL FILINGS)** |

**FOR COURT USE ONLY**

| ASSIGNED TO JUDGE: | ANSWER/RESPONSE DATE: |
|---|---|
|  | 04/28/2025 |

*Do not send Judge courtesy copy of Petition/Motion/Answer/Response. Status may be obtained online at http://courts.phila.gov*

_____March_____ Term,_2025_
*Month*                      *Year*

No. _____03655_____

Name of Filing Party:

ENERGRY TRANSFER (R&M) LLC-DFT
ENERGY TRANSFER LP-DFT
SUNOCO PIPELINE LP-DFT

LA HART ETAL VS SUNOCO PIPELINE, LP ETAL

**INDICATE NATURE OF DOCUMENT FILED:**

☐ Petition *(Attach Rule to Show Cause)*   ☒ Motion
☐ Answer to Petition   ☐ Response to Motion

**Has another petition/motion been decided in this case?**   ☐ Yes   ☒ No
**Is another petition/motion pending?**   ☐ Yes   ☒ No

*If the answer to either question is yes, you must identify the judge(s):*

_____

| TYPE OF PETITION/MOTION (see list on reverse side) | PETITION/MOTION CODE (see list on reverse side) |
|---|---|
| MOT-FOR ADMISSION PRO HAC VICE | MTPHV |

ANSWER / RESPONSE FILED TO (Please insert the title of the corresponding petition/motion to which you are responding):

**I. CASE PROGRAM**

OTHER PROGRAM

Court Type: CLASS ACTION
Case Type: CLASS ACTION

**II. PARTIES** *(required for proof of service)*
(Name, address and **telephone number** of all counsel of record and unrepresented parties. Attach a stamped addressed envelope for each attorney of record and unrepresented party.)

SHANON J CARSON
  BERGER MONTAGUE PC 1818 MARKET ST
  SUITE 3600 , PHILADELPHIA PA 19103
LAURA H MCNALLY
  2222 MARKET STREET , PHILADELPHIA PA
  19103
ROBERT D FOX
  THREE BALA PLAZA EAST SUITE 700 ,
  BALA CYNWYD PA 19004

**III. OTHER**

By filing this document and signing below, the moving party certifies that this motion, petition, answer or response along with all documents filed, will be served upon all counsel and unrepresented parties as required by rules of Court (see PA. R.C.P. 206.6, Note to 208.2(a), and 440). Furthermore, moving party verifies that the answers made herein are true and correct and understands that sanctions may be imposed for inaccurate or incomplete answers.

|  | April 7, 2025 | LAURA H. MCNALLY |  |
|---|---|---|---|
| *(Attorney Signature/Unrepresented Party)* | *(Date)* | *(Print Name)* | *(Attorney I.D. No.)* |

**The Petition, Motion and Answer or Response, if any, will be forwarded to the Court after the Answer/Response Date.**
**No extension of the Answer/Response Date will be granted even if the parties so stipulate.**

30-1061B E-File# 2504013791
07-APR-25 08:38:11

FILED
07 APR 2025 08:36 am
Civil Administration
E. DOHONY

MORGAN, LEWIS & BOCKIUS LLP
Laura Hughes McNally (Pa. ID No. 310658)
Yunica Jiang (Pa. ID No. 329145)
2222 Market Street
Philadelphia, Pennsylvania 19103-3007
(215) 963-5000
laura.mcnally@morganlewis.com
yunica.jiang@morganlewis.com

*Attorneys for Defendants Sunoco Pipeline L.P.,*
*Energy Transfer LP, and Energy Transfer (R&M) LLC*

| | |
|---|---|
| DANIEL LA HART and KATHERINE LA HART | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| *Plaintiffs*, | CIVIL TRIAL DIVISION |
| v. | March Term, 2025 |
| SUNOCO PIPELINE L.P.; ENERGY TRANSFER LP; and ENERGY TRANSFER (R&M) LLC, | No. 03655 |
| *Defendants.* | |

**MOTION FOR *PRO HAC VICE* ADMISSION OF ATTORNEY DUKE K. MCCALL, III**

Defendants Sunoco Pipeline L.P., Energy Transfer LP, and Energy Transfer (R&M) LLC ("Defendants"), by and through their undersigned counsel, hereby files this Motion for *Pro Hac Vice* Admission of Attorney Duke K. McCall, III, and in support thereof avers as follows:

1. Defendants have retained the undersigned counsel to act as counsel of record with respect to the above-captioned matter.

2. Duke K. McCall, III is a partner with the law firm of Morgan, Lewis & Bockius LLP. Defendants wish to have Mr. McCall as co-counsel in this matter with the undersigned.

3. Mr. McCall is a member in good standing of the Bar of the District of Columbia and the Bar of South Carolina.

4. I am a member in good standing of the Bar of the Commonwealth of Pennsylvania. Attached hereto as **Exhibit A** is my verified statement as required by Pennsylvania Rule of Civil Procedure 1012.1(d)(2).

5.    Attached hereto as **Exhibit B** is the verified statement of Duke K. McCall, III as required by Pennsylvania Rule of Civil Procedure 1012.1(c).

6.    Attached hereto as **Exhibit C** is a true and correct copy of the acknowledgement from the Pennsylvania IOLTA Board for *Pro Hac Vice* Admission, required by Section 81.505(a) of the IOLTA regulations.

7.    As is more fully set forth in my Verified Statement, I am acquainted with Duke K. McCall, III, and can attest to his fitness for admission *pro hac vice*.

8.    Good cause exists for admitting Duke K. McCall, III on a *pro hac vice* basis, because Defendants have requested that Mr. McCall represent them in this case.

WHEREFORE, Defendant and the undersigned counsel respectfully request that this Honorable Court grant this motion and grant admission *pro hac vice* to Duke K. McCall, III.

Respectfully Submitted,


Dated: April 7, 2025                    */s/ Laura Hughes McNally*
                                        Laura Hughes McNally (ID No.: 310658)
                                        MORGAN, LEWIS & BOCKIUS LLP
                                        2222 Market Street
                                        Philadelphia, PA 19103
                                        Phone: (215) 963-5000
                                        laura.mcnally@morganlewis.com

Case ID: 250303655
Control No.: 25041343
**Exhibit B_Page 185 of 583**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of April 2025, I caused a true and correct copy of the foregoing Motion for *Pro Hac Vice* Admission of Attorney Duke K. McCall, III and attached exhibits to be served via the Court's electronic filing system upon all counsel of record.


<u>*/s/ Laura HughesMcNally*</u>
Laura Hughes McNally

Case ID: 250303655
Control No.: 25041343
**Exhibit B_Page 186 of 583**

| DANIEL LA HART and KATHERINE LA HART<br><br>*Plaintiffs,*<br><br>v.<br><br>SUNOCO PIPELINE L.P.; ENERGY TRANSFER LP; and ENERGY TRANSFER (R&M) LLC,<br><br>*Defendants.* | COURT OF COMMON PLEAS PHILADELPHIA COUNTY<br><br>CIVIL TRIAL DIVISION<br><br>March Term, 2025<br><br>No. 03655 |

## PROPOSED ORDER

**AND NOW**, this _____ day of _____, 2025, **IT IS ORDERED** that the Motion for *Pro Hac Vice* Admission of Attorney Duke K. McCall, III is **GRANTED**, and Mr. McCall with the law firm of Morgan, Lewis & Bockius LLP, 1111 Pennsylvania Avenue, NW, Washington, DC 20004, is hereby admitted *pro hac vice* for purposes of this matter after obtaining the appropriate City of Philadelphia Business Privilege Tax License pursuant to 19-2602 of the Philadelphia Code. *Pro hac vice* counsel shall pay all city business and wage tax as required.

**BY THIS COURT:**

_____
                                                    **J.**

Case ID: 250303655
Control No.: 25041343

**Exhibit B_Page 187 of 583**

# EXHIBIT A

Case ID: 250303655
Control No.: 25041343

**Exhibit B_Page 188 of 583**

| | |
|---|---|
| DANIEL LA HART and KATHERINE LA HART<br><br>*Plaintiffs*,<br><br>v.<br><br>SUNOCO PIPELINE L.P.; ENERGY TRANSFER LP; and ENERGY TRANSFER (R&M) LLC,<br><br>*Defendants.* | COURT OF COMMON PLEAS PHILADELPHIA COUNTY<br><br>CIVIL TRIAL DIVISION<br><br>March Term, 2025<br><br>No. 03655 |

## VERIFIED STATEMENT OF LAURA HUGHES MCNALLY

Pursuant to Pennsylvania Rule of Civil Procedure 1012.1(d)(2), I declare that the following facts are true to the best of my knowledge, information and belief:

1.      I am a member in good standing of the Bar of the Commonwealth of Pennsylvania, and I am admitted to practice law in this court.

*2.*      After reasonable investigation, I believe that Duke K. McCall, III is a reputable and competent attorney, and I am in a position to recommend Mr. McCall's admission *pro hac vice.*

3.      I am seeking to sponsor Duke K. McCall, III, and Drew Cleary Jordan in this case and am not otherwise acting as the sponsor of a candidate for *pro hac vice* admission in any other state court of record in this Commonwealth.

4.      I aver that any proceeds from the settlement of this matter, in which Mr. McCall is granted admission *pro hac vice*, shall be received, held, distributed, and accounted for in accordance with Rule 1.15 of the Pennsylvania Rules of Professional Conduct, including the IOLTA provisions thereof, if applicable.

5.      I understand that the statements herein are subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities.

*/s/ Laura Hughes McNally*
Laura Hughes McNally

Case ID: 250303655
Control No.: 25041343

# EXHIBIT B

Case ID: 250303655
Control No.: 25041343
Exhibit B_Page 190 of 583

| DANIEL LA HART and KATHERINE LA HART *Plaintiffs*, v. SUNOCO PIPELINE L.P.; ENERGY TRANSFER LP; and ENERGY TRANSFER (R&M) LLC, *Defendants*. | COURT OF COMMON PLEAS PHILADELPHIA COUNTY CIVIL TRIAL DIVISION March Term, 2025 No. 03655 |
|---|---|

## VERIFIED STATEMENT OF DUKE K. MCCALL, III

Pursuant to Pennsylvania Rule of Civil Procedure 1012.1(c), I declare that the following facts are true to the best of my knowledge information, and belief:

1.      I, Duke K. McCall, III, am a partner with the law firm of Morgan, Lewis & Bockius LLP, located at 1111 Pennsylvania Avenue, NW, Washington, DC 20004.

2.      I seek to appear as counsel for Defendants Sunoco Pipeline L.P., Energy Transfer LP, and Energy Transfer (R&M) LLC, in the above-captioned matter.

3.      I am an active member in good standing of the Bar of the District of Columbia, ID No. 456847 and the Bar of South Carolina, ID No. 066466.

4.      No disciplinary proceedings are pending against me in any jurisdiction.

5.      No disciplinary proceedings have been previously filed against me in any jurisdiction.

6.      No suspension proceedings have been previously filed against me in any jurisdiction.

7.      No disbarment proceedings have been previously filed against me in any jurisdiction.

8.      There are no other pending actions in any court of record in Pennsylvania in which I have applied for admission *pro hac vice*.

Case ID: 250303655
Control No.: 25041343

**Exhibit B_Page 191 of 583**

9.    I have not been denied admission *pro hac vice* or had such admission revoked by any court in any jurisdiction.

10.    I shall comply with and be bound by the applicable statutes, case law, and procedural rules of the Commonwealth of Pennsylvania, including the Pennsylvania Rules of Professional Conduct.

11.    I shall submit to the jurisdiction of Pennsylvania courts and the Pennsylvania Disciplinary Board with respect to acts and omissions occurring during the appearance in the above-captioned matter.

12.    I consent to the appointment of Laura Hughes McNally as the agent upon whom service of process shall be made for all actions, including disciplinary actions, that may arise out of the practice of law in the above captioned matter.

13.    I have filed the Pennsylvania IOLTA Board Form for *Pro Hac Vice* Admission, provided the information required by Section 81.504 of the IOLTA regulations, and paid the $375.00 fee required by Section 81.504(a) of the IOLTA regulations.

14.    I understand that the statements herein are subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities.

/s/ Duke K. McCall, III
Duke K. McCall, III

Case ID: 250303655
Control No.: 25041343
**Exhibit B_Page 192 of 583**

# EXHIBIT C

Case ID: 250303655
Control No.: 25041343
**Exhibit B_Page 193 of 583**



SUPREME COURT OF PENNSYLVANIA
PENNSYLVANIA INTEREST ON
LAWYERS TRUST ACCOUNT BOARD

April 04, 2025

DUKE K. MCCALL III, Esq.
MORGAN, LEWIS & BOCKIUS LLP
1111 PENNSYLVANIA AVE., NW
WASHINGTON, DC 20004

SENT TO DUKE K. MCCALL, III VIA Email: DUKE.MCCALL@MORGANLEWIS.COM

Dear Attorney MCCALL III:

This letter serves as the fee payment certification referenced in 204 Pa Code §81.503 and acknowledges receipt of the $375.00 fee paid by Online Payment on this date related to your pursuit for admission *pro hac vice* in the case identified as La Hart v. Sunoco Pipeline L.P., Energy Transfer LP, and Energy Transfer (R&M) LLC, no. 250303655, filed in Court of Common Pleas of Philadelphia County.

You should refer to Pa Rule of Civil Procedure 1012.1, local court rules, and other regulations of 204 Pa Code §81.501 et. seq. concerning additional requirements related to seeking *pro hac vice* admission.

Sincerely,

Stephanie S. Libhart
Executive Director

cc:  LAURA HUGHES MCNALLY, Esq.

    laura.mcnally@morganlewis.com

Pennsylvania Judicial Center
601 Commonwealth Ave., Ste. 2400
PO Box 62445, Harrisburg, PA 17106-2445
717/238-2001 · 888/PA-IOLTA (724-6582) · 717/238-2003 FAX
paiolta@pacourts.us · www.paiolta.org

Administering Pennsylvania's Interest On Lawyers Trust Account (IOLTA) Program

Case ID: 250303655
Control No.: 25041343

**Exhibit B_Page 194 of 583**

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CIVIL TRIAL DIVISION**

| | |
|---|---|
| LA HART ETAL | March Term 2025 |
| VS | No. 03655 |
| SUNOCO PIPELINE, LP ETAL | DOCKETED |

APR 1 4 2025

R. PORTELL
COMMERCE PROGRAM

### *CLASS ACTION INITIATION ORDER*

*AND NOW*, Monday, April 14, 2025, plaintiffs having commenced a Class Action which has been assigned to the Honorable PAULA PATRICK, it is hereby *ORDERED* as follows:

1. All parties are directed to appear via Zoom for a Case Management Conference on 16-JUN-2025 at 01:30 PM. The Commerce Case Management Zoom link is available on the Court's Website at: https://www.courts.phila.gov/remote-hearings/

2. Five (5) days prior to the Zoom Conference, all parties are required to electronically file with the court, and to serve upon all opposing counsel and opposing parties who cannot be electronically served by the court, a fully completed Commerce Case Management Memorandum. A copy of the Commerce Case Management Memorandum form may be found at:

   https://www.courts.phila.gov/pdf/forms/civil/01-111-Case-Management-Conference-Memorandum-Commerce.pdf

3. To electronically file the Commerce Case Management Memorandum, access the "Existing Case" section of the court's electronic filing system. Select "Conference

CLCDS-La Hart Etal Vs Sunoco Pipeline, Lp Etal [RCP]

RCP78402RCP78402N (Rev 7/15/21)

25030365500016

**Exhibit B_Page 195 of 583**

Submissions" as the filing category. Select "Management Memorandum" as the filing type.

4. In the Case Management Memorandum, counsel should describe in detail: the substance of plaintiffs' claims and defendants' defenses; whether certification or merits discovery should occur first; any procedural complications the parties anticipate may occur, such as venue or jurisdictional disputes, joinder of additional parties, requests for bifurcation, etc.; and any other information that will assist the Case Manager to determine how much time the parties need to conduct discovery during the certification and/or merits portion of the case.

5. Counsel shall also be prepared to discuss with the Case Manager at the Zoom Conference all of the issues listed in Paragraph 4 above.

6. Plaintiffs' counsel shall serve a copy of this Order upon all unrepresented parties and any attorney entering an appearance subsequent to the date of issuance of this Order.

*BY THE COURT:*

*PAULA PATRICK, J.*
*TEAM LEADER*
*CLASS ACTION PROGRAM*

RCP78402RCP78402N (Rev 7/15/21)



*Filed and Attested by the Office of Judicial Records 23 APR 2025 08:56 pm C. SMITH*

**BERGER MONTAGUE PC**
Shanon J. Carson (Bar No. 85957)
Y. Michael Twersky (Bar No. 312411)
Joseph E. Samuel, Jr. (Bar No. 327645)
1818 Market Street, Suite 3600
Philadelphia, PA 19103

*Counsel for Plaintiffs and the Proposed Class*

| | |
|---|---|
| DANIEL LA HART and KATHERINE LA HART,<br><br>      Plaintiffs,<br><br>      v.<br><br>SUNOCO PIPELINE L.P.; ENERGY TRANSFER LP; and ENERGY TRANSFER (R&M) LLC,<br><br>      Defendants | **PHILADELPHIA COUNTY COURT OF COMMON PLEAS CIVIL TRIAL DIVISION**<br><br>CLASS ACTION<br><br>MARCH TERM, 2025<br><br>CASE NO. 250303655 |

<u>**PRAECIPE TO ATTACH EXHIBITS**</u>

TO THE OFFICE OF JUDICIAL RECORDS:

Kindly attach Exhibits A to G, included as attachments hereto, to Plaintiffs' Class Action Complaint filed on March 27, 2025. Exhibits A to G were referenced in Plaintiffs' Class Action Complaint but inadvertently omitted from that filing.

Dated:  April 23, 2025

**BERGER MONTAGUE PC**
*Attorneys for Plaintiffs*

*/s/ Joseph E. Samuel, Jr.*
Joseph E. Samuel, Jr., Bar No. 327645

Case ID: 250303655

**Exhibit B_Page 197 of 583**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day the foregoing Praecipe to Attach Exhibits was served on

all counsel of record via the Court's electronic filing system.

Dated:  April 23, 2025                                    **BERGER MONTAGUE PC**
                                                         *Attorneys for Plaintiffs*

                                                         */s/ Joseph E. Samuel, Jr.*
                                                         Joseph E. Samuel, Jr., Bar No. 327645



*Filed and Attested by the*
*Office of Judicial Records*
*23 APR 2025 08:56 pm*
*G. SMITH*

# EXHIBIT A

Case ID: 250303655

**Exhibit B_Page 199 of 583**

Case 2:25-cv-02072-MRP    Document 1-2    Filed 04/24/25    Page 112 of 175



Photo by Ohio EPA

# Oil and Water: ETP & Sunoco's History of Pipeline Spills

**Greenpeace USA and Waterkeeper Alliance**

Case ID: 250303655

Exhibit B_Page 200 of 583

# Contents

○ Summary Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

○ Energy Transfer Partners and Sunoco Have a History of Spills from Existing Pipelines . . . 4

   + Company History and Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   + Leaky Pipes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   + Dakota Access Pipeline & Bakken Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   + Federal Violations and Fines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   + Consequences of Pipeline Spills . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

○ Energy Transfer Partners and Sunoco Spills, Fines and Stop Work Orders
During Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

   + Rover . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

   + Mariner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

○ U.S. Pipeline Spill Trends . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

○ Future Threats to Water . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

   + Bayou Bridge Pipeline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

   + Permian Express . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

○ Acknowledgments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

○ Endnotes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

○ Appendix A: Research Methods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

○ Appendix B: ETP & Sunoco, PHMSA Violations & Penalties . . . . . . . . . . . . . . . . . . . . . . . 18

○ Appendix C: Energy Transfer Partners' Rover Pipeline Violations &
Spills in Michigan, Ohio & West Virginia, February 2017–March 2018 . . . . . . . . . . . . . . . . 18

## List of Figures

○ Number of pipeline incidents, by year and corporate entity . . . . . . . . . . . . . . . . . . . . . . . . . 5

○ The spill sizes and locations of ETP's ten largest hazardous liquids
pipeline spills from 2002 to present . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

○ Timeline of ETP spills impacting water, soil, wildlife or high-consequence areas . . . . . . . . 7

○ Ten year trends for significant U.S. pipeline incidents involving crude oil,
refined petroleum products, and highly-volatile liquids . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## AUTHORS

Timothy Donaghy,
*Greenpeace USA*

Donna Lisenby,
*Waterkeeper Alliance*

## DESIGNED BY

Jacob Hardbower

Alyssa Hardbower

## COVER PHOTO

Workers at a spill site on Rover Pipeline in Stark County, Ohio. April 2017. Photo courtesy of the Ohio EPA.

## PUBLISHED

April 17, 2018



Reports

Greenpeace Inc.

702 H Street, NW, STE 300,
Washington, D.C. 20001



Waterkeeper Alliance

180 Maiden Lane, Suite 603,
New York, NY 10038

Published online at www.greenpeace.org/usa/reports/oil-and-water/

Case ID: 250303655

# Summary Results

- From 2002 to the end of 2017, ETP, Sunoco and their subsidiaries and joint ventures reported **527 hazardous liquids pipeline incidents** to federal regulators — approximately one incident from existing facilities every eleven days.

- Those incidents, reported by the Pipeline Hazardous Material Safety Administration (PHMSA), released a **total of 87,273 barrels** (3.6 million gallons, or about five-and-a-half Olympic-sized swimming pools) of hazardous liquids, including 66,515 barrels (2.8 million gallons) of crude oil.

- In addition, state regulatory agencies have documented spills totaling at least 2.4 million gallons of drilling fluids, sediment and industrial waste during the construction of just two ETP pipelines in Michigan, Ohio, Pennsylvania and West Virginia.

- Crude oil spills made up 408 of the PHMSA incidents, along with 92 refined petroleum product spills and 27 highly-volatile liquid (HVL), flammable or toxic spills.

- Of the hazardous liquid spills from existing facilities **101 incidents** were of 50 barrels or more (2100 gallons, a volume which is considered "significant" by the federal regulator).

- 67 of the hazardous liquid incidents were reported to have contaminated water, of which **18 incidents contaminated groundwater.**

- These spills caused an estimated **$115 million in property damage**, and led to 106 Notices of Probable Violations, and **$5,675,870 in penalties from PHMSA alone**.

- The largest spills in the PHMSA database were crude oil spills of 436,000, 361,000, 290,000, 189,000, 153,000, 143,000, 139,000, and 105,000 gallons, and 2 HVL spills of 168,000 and 121,000 gallons.

- In addition, state agencies and the Federal Energy Regulatory Commission (FERC) have issued over 100 notices of violation and/or non-compliance for the construction of the Rover and Mariner pipelines. In 2017–18 alone, ETP and Sunoco were issued six stop work orders by state agencies and FERC because their construction operations violated permit requirements and/or rules and regulations designed to protect streams, rivers, wetlands, drinking water, historic sites and public safety.

- The Dakota Access Pipeline (DAPL) and its southern component only began operations in 2017, but have already reported 7 incidents.

- Assuming the U.S. system-wide rate for significant crude oil spills of 0.001 per year per mile, we estimate that the Bakken Pipeline would suffer 96 significant spills and the Bayou Bridge Pipeline would suffer eight significant spills, during a 50-year nominal lifetime.

- There is no failsafe way to transport fossil fuels and pipeline spills remain a direct and seemingly unavoidable consequence of oil and gas activity.

- Rapid transition to renewable energy could dramatically reduce spills from pipelines and pollution of drinking water sources.



Pipeline for the Bayou Bridge project in Louisiana. April 2018. Photo by ©Julie Dermansky/Greenpeace

Case ID: 250303655

# Energy Transfer Partners and Sunoco Have a History of Spills from Existing Pipelines

Energy Transfer Partners and its complex network of subsidiaries and joint ventures owns one of the nation's largest networks of natural gas, crude oil and petroleum products pipelines. Data collected from the U.S. Pipeline and Hazardous Materials Safety Administration (PHMSA) shows that the ETP family of hazardous liquids pipelines experienced 527 incidents from 2002 to the end of 2017, spilling ~87,000 barrels, and causing an estimated $115 million in property damage.

We have mapped these incidents, spread across numerous states and regions in the U.S. where ETP operates.[1]



**View online at:** *https://greenpeace.carto.com/maps*

## Company History and Structure

Energy Transfer Partners, L.P. (ETP) was founded in 1995 by Ray Davis and Kelcy Warren (who is still its current Chairman and CEO) and became a publicly traded partnership in 2004. ETP is in turn controlled by a master limited partnership called Energy Transfer Equity (ETE), of which Warren is also the Chairman.[2]

The company's national profile was fairly small until the massive grassroots resistance to its Dakota Access Pipeline (DAPL) led by the Standing Rock Sioux Tribe was splashed across the headlines in 2016. That same year, Warren donated $100,000 to Donald Trump's presidential campaign[3] and later cut a check for $250,000 for Trump's inauguration.[4] Trump made the approval of DAPL's final permits one of his administration's first priorities upon becoming U.S. President.[5]

ETP's corporate structure is famously complicated.[6] In October 2012, ETP merged with Sunoco, Inc.,[7] a fuel refining, distribution and retail company that had been founded in 1886.[8] Prior to the merger, ETP and ETE were primarily focused on the natural gas sector, and the merger with Sunoco allowed them to diversify into "liquids" pipelines due to Sunoco's significant crude oil and refined petroleum product assets.[9] Part of this business operated as Sunoco Logistics Partners (SXL) until it fully merged with ETP in April 2017.[10] Sunoco LP (SUN) continues to exist as a downstream distributor of motor fuel.

Currently three of these entities — ETP, ETE and SUN — are publicly traded on the New York Stock Exchange. The company also boasts a number of subsidiaries and joint ventures as part of its "family" which we have attempted to reflect in this report. Including both liquids and natural gas, ETP operates more than 71,000 miles of pipelines in the U.S. — nearly long enough to encircle the earth three times.[11]

## Leaky Pipes

The PHMSA database of all U.S. hazardous liquids pipeline incidents from 2002 to present contains 6,102 reported incidents.[12] Of those incidents, 527 were associated with ETP, Sunoco, or one of their subsidiaries or joint ventures[13] — a rate of one incident occurring approximately every eleven days. These 527 incidents released a total of 87,273 barrels of hazardous liquids, of which 66,515 barrels were crude oil, and led to over $115 million in property damages according to PHMSA's records. Of the total volume spilled, 36,862 barrels (42%) were never recovered by the company. Since 2002, spills from ETP, Sunoco and subsidiaries led to proposed penalties of $5,675,870.[14]

Other reports have noted the company's poor safety reputation,[15, 16] and have analyzed PHMSA data to conclude that ETP and Sunoco's pipeline network is among the leakiest in the nation.[17, 18] In addition, Sunoco's Pennsylvania refineries were subject to a comprehensive Clean Air Act settlement, that included a $3 million civil penalty and $285 million to install emissions controls.[19]

Case ID: 250303655

Figure 1 shows a timeline of the 527 liquids spills, broken down by corporate entity. As can be seen from the figure, several entities in the ETP family have reported significant numbers of hazardous liquids pipeline spills, both before and after the 2012 merger. Sunoco Pipelines LP has reported 337 incidents since 2002. Also included are spills from joint ventures that Sunoco brought into the merger, notably the Mid-Valley Pipeline (76 incidents), the West Texas Gulf Pipeline (46 incidents), and the Wolverine Pipeline (11 incidents). We include all incidents from Sunoco and its subsidiaries and joint ventures in this analysis, both before and after 2012, because Sunoco brought most of the hazardous liquids assets into the merger and remains part of ETP's current pipeline network.



**Figure 1:** Number of pipeline incidents, by year and corporate entity.

Energy Transfer has reported 23 hazardous liquids incidents, all occurring after the 2012 merger. The Dakota Access Pipeline (DAPL) and its southern component (ETCO) only began operations in 2017, but have already reported 7 incidents. For full details on the incident analysis, including more information on the subsidiaries and joint ventures that were included, see Appendix A: Research Methods.

The ten largest incidents in this analysis are the following (in chronological order):

- In January 2005, the Mid-Valley Pipeline (originally constructed in the 1950s[20]) spilled **6,909 barrels** (290,000 gallons) of crude oil into the Kentucky and Ohio Rivers, leading to an oil slick 17 miles long and harming hundreds of migratory birds. The federal government later reached a $2.57 million settlement with Sunoco.[21]

- In November 2005, operator error led to a **10,380 barrel** (436,000 gallon) crude oil overflow at Sunoco Pipeline LP's Darby Creek Tank Farm in Sharon Hill, Pennsylvania. The spilled oil was contained by a dike, and PHMSA later fined Sunoco $150,000.[22]

- In October 2008, the Mid-Valley Pipeline spilled again, this time releasing **3,650 barrels** (153,000 gallons) into "the sanitary sewer system and nearby Gunpowder Creek" in Florence, Kentucky.[23]

- In June 2009, a portion of the West Texas Gulf Pipeline near Colorado City, Texas caught fire and spilled **3,416 barrels** (143,000 gallons) of crude oil. PHMSA later fined Sunoco Pipeline LP $415,000.[24]

- In August 2009, Sunoco Pipelines spilled **2,500 barrels** (105,000 gallons) of crude from a station near Mont Belvieu, Texas. The U.S. EPA eventually reached a $850,000 settlement for Clean Water Act violations related to this spill and a later 2011 spill of 1,742 barrels (73,000 gallons) in Cromwell, Oklahoma.[25]

- In October 2014, the Mid-Valley Pipeline experienced yet another major incident, spilling **4,509 barrels** (189,000 gallons) and contaminating a ten-mile section of Tete Bayou near Mooringsport, Louisiana.[26]

- In June 2015, a "gasket failure" on the West Texas Gulf Pipeline near Wortham, Texas led to a release of **3,300 barrels** (139,000 gallons) of crude that was contained in two retention ponds on company property.

- In August and September 2016, Sunoco's Permian II Express pipeline leaked **8,600 barrels** (361,000 gallons) near Sweetwater, Texas. The incident led to a Corrective Action Order, and followed a fine from federal regulators for welding violations on the same project.[27]

- In addition to crude oil spills, ETP pipelines suffered large spills of highly-volatile liquids (HVL)[28] of **2,880 barrels** (121,000 gallons) in 2012 near Midland, Texas and **3,992 barrels** (168,000 gallons) in 2014 near Ira, Texas.



**Figure 2:** The spill sizes and locations of ETP's ten largest hazardous liquids pipeline spills from 2002 to present. Gray represents crude oil spills, while yellow are HVL spills. (Data: PHMSA)

Further details on other ETP/Sunoco pipeline incidents can be found in a report by Waterkeeper Alliance, including information on worker lawsuits, failure to report problems, and additional significant pipeline incidents in Pennsylvania, Ohio, and Texas.[29]

Case ID: 250303655

Although it is not the main focus on this report, PHMSA also maintains data regarding ruptures and leaks from natural gas gathering, transmission and distribution pipelines. ETP and its subsidiaries reported **58 natural gas incidents** to PHMSA from 2002 to present. Natural gas pipeline leaks present a different range of risks from hazardous liquids leaks, including the risk of an explosion. Methane leaking from the U.S.'s rapidly growing natural gas infrastructure is also a significant climate change risk.[30]

## Dakota Access Pipeline & Bakken Project

The Bakken Pipeline consists of the 1,172 mile, 30-inch diameter Dakota Access Pipeline (DAPL), which runs from the Bakken oil fields in North Dakota to a hub in Patoka, Illinois, and the Energy Transfer Crude Oil Pipeline (ETCO), which runs 743 miles south from Patoka to Nederland, Texas.[31] The DAPL segment was built across Sioux lands designated under the 1851 Fort Laramie Treaty and crosses the Missouri River near Lake Oahe, just north of the Standing Rock Reservation.[32]

The project is a joint venture between ETP, MarEn Bakken Company LLC (Enbridge) and Phillips 66, with ETP holding a 38.25% interest.

Violations of Indigenous sovereignty, lack of adequate consultation and threats to water supplies from pipeline spills led Indigenous Water Protectors and their allies to set-up pipeline opposition camps near the river crossing. The organized pipeline opposition and the disproportional response from authorities and private security forces garnered international media attention, leading the Army Corps of Engineers to deny the needed permits in December 2016. However, the Trump Administration approved the permits and DAPL went into operation in June 2017.

Evidence suggests that environmental racism may have played a part in selecting the pipeline route. The 2015 Environmental Assessment discussed an alternate route that was rejected in part due to concerns about contamination of "wellhead sourcewater protection areas" north of Bismarck, North Dakota (a mostly white community).[33] Yet the approval of the route passing near the reservation led the Standing Rock Sioux Tribe to file a lawsuit alleging violations of the National Historic Preservation Act, the Clean Water Act, and the National Environmental Policy Act.[34]

In addition to the risk of pipeline spills into water, the EA identified impacts from horizontal directional drilling (HDD) used to tunnel the pipeline under rivers, including the risk of "inadvertent release of drilling fluid directly or indirectly into the waterbody" — a risk that has been realized during the construction phases of other ETP/Sunoco projects.

Although the pipeline only became fully operational in 2017, DAPL-ETCO has already reported 7 pipeline incidents to PHMSA, of which 4 occurred along the DAPL portion, and the largest of which was a significant 119 barrel (4,998 gallon) spill from the ETCO segment near Dyersburg, Tennessee. A related eighth incident occurred in March 2017 on a DAPL feeder line owned by Caliber Midstream, but is not included in this analysis.[35]

Assuming the U.S. system-wide rate for significant crude oil spills of 0.001 per year per mile, we estimate that the Bakken Pipeline would suffer 96 significant spills during a 50-year nominal lifetime.

## Federal Violations and Fines

PHMSA conducts annual inspections to determine whether pipeline operators are in compliance with federal rules designed to protect the public, drinking water sources and ensure safe operation of pipelines and their associated infrastructure. These routine inspections find violations that could lead to a spill or a safety problem. When federal inspectors find serious issues, they issue Notices of Proposed Violations, Proposed Compliance Orders and/or Proposed Civil Penalties. Since 2002, PHMSA has issued Energy Transfer Partners and Sunoco 106 violations and fined them $5,675,870.[36] Their safety violations include:

- Failures to inspect crossings under waterways, valves and pipeline rights of way.

- Failures to notify PHMSA of a spill, fire, injuries requiring hospitalization.

- Failure to repair unsafe pipe for 5 years.

- Failures to maintain pipeline integrity in high consequence areas.

- Failure to report unsafe conditions.

- Failure to do corrosion inspection.

- Repeated failures to properly notify emergency responders and the public.[37]

## Consequences of Pipeline Spills

Depending on their characteristics, oil spills can cause significant acute and chronic impacts on ecosystems ranging over "a range of time scales, from days to years, or even decades for certain spills."[38] PHMSA collects information on whether pipeline spills have contaminated soil or water resources, impacted wildlife, or occurred in "high-consequence areas" (HCAs) such as population centers or navigable waterways (see Figure 3).

Case ID: 250303655

Of the 527 incidents attributed to ETP, Sunoco, their subsidiaries or joint ventures:

- **67 incidents** (12.7%) were reported to have contaminated water resources. Across the entire PHMSA database, 615 incidents (10.0%) contaminated water resources.

- Of those incidents, **18 incidents** (3.4%) were found to contaminate groundwater. Nationally, there were 207 pipeline spills contaminating groundwater (3.4%).

- And **3 incidents** (0.6%) were found to contaminate drinking water resources specifically. Nationally, there were 8 total incidents (0.1%) contaminating drinking water.

- **275 incidents** (52.5%) contaminated soils.

- **189 incidents** occurred in or reached "high consequence areas."

- From 2010–present, there were **6 incidents** that impacted wildlife. One of these was a spill of 450 barrels in March 2014, from the Mid-Valley Pipeline, that contaminated the Oak Glen Nature Preserve near Colerain, Ohio,[39] closing the preserve and leaving at least 36 animals in need of treatment for contamination.[40]

- From 2002 to 2009, there were **3 incidents** that impacted fish and **2 incidents** that impacted birds.



**Figure 3:** Timeline of ETP spills impacting water, soil, wildlife or high-consequence areas.

A 2010 editorial from a Philadelphia-area newspaper lamented the consequences of Sunoco's local safety record and noted that repeated violations "will only be stopped when the nation's environmental protection laws finally grow some teeth. In the meantime, Delaware County residents must be satisfied with apologies and the prospect of ill health or injury from another industrial disaster."[41]



Pipeline construction for Bayou Bridge continues near homes in Louisiana. April 2018. Photo by ©Julie Dermansky/Greenpeace

Case ID: 250303655

# Energy Transfer Partners and Sunoco Spills, Fines & Stop Work Orders During Construction

In addition to past spills from existing pipelines, ETP/Sunoco pipeline projects currently under development have been plagued with environmental violations. The construction of the Mariner and Rover pipelines in Michigan, Ohio, Pennsylvania and West Virginia has resulted in over 2.4 million gallons of spills, over 100 notices of violations and other non-compliance issues, and 6 stop work orders. These new pipelines have faced growing resistance from local communities and decision makers concerned about the long history of non-compliance and pollution of drinking water sources, trout streams, wetlands and rivers.

## Rover

ETP's Rover Pipeline is a 713-mile natural gas pipeline designed to transport 3.25 billion cubic feet of gas per day from the Utica and Marcellus shale production areas in West Virginia, eastern Ohio, and western Pennsylvania westward through Ohio and into Michigan.[42] In an ominous foreshadowing, ETP started getting into trouble before construction even started. Despite promising to "avoid adverse effects," ETP destroyed the historic 170-year old Stoneman House in Dennison, Ohio that was eligible for listing in the National List of Historic places. The

Federal Energy Regulatory Commission used the demolition of the historically significant site as a basis for denying Rover a blanket construction permit, saying "Rover could not be relied upon to comply with the environmental regulations."[43]

With that restriction, FERC approved the project in February 2017, and Energy Transfer began an aggressive effort to construct the pipeline as quickly as possible. In its haste, ETP repeatedly contaminated waterways across Michigan, Ohio and West Virginia. One August 2017 analysis concluded that Rover had "racked up more environmental violations than other major interstate natural gas pipelines built in the last two years" – a total of 104 non-compliance incidents while the second highest company only had 26 non-compliance incidents. [44]

By March 2018, after only 13 months of construction, Rover had spilled more than 2.2 million gallons of drilling fluids, industrial waste and/or sediment, amassing more than 100 violations/non-compliance incidents and 4 stop work orders for their failure to comply with environmental regulations designed to protect streams, rivers wetlands, drinking water, historic sites and public safety (see pages 9–10 for a selection of these violations, citations for these incidents are listed in Appendix C).



Horses play in a field near construction of the Bayou Bridge pipeline in Louisiana. April 2018. Photo by ©Julie Dermansky/Greenpeace

Case ID: 250303655

## Worst Rover Pipeline Violations/Spills/Stop Work Orders April 2017–March 2018

1. **April 5, 2017:** Unauthorized pollution release impacting tributaries of Woodfield Reservoir in Monroe County, OH; failure to control stormwater

2. **April 8, 2017:** 1,000 gallons of drilling fluid pollution released into wetland near Indian Fork River, in Tuscarawas County, OH; covered 2500 square foot area of wetland

3. **April 10, 2017:** 600 gallons of drilling fluid pollution released into stream, wetland and pond in Richland Township, Belmont County, OH

4. **April 10, 2017:** unauthorized pollution release impacting tributaries of Woodfield Reservoir in Monroe County, OH; failure to control stormwater

5. **April 11, 2017:** unauthorized pollution release from failure to manage stormwater in Bloomdale, Wood County, OH

6. **April 11, 2017:** Clean Air Act violation, open burning of site preparation material near a home in Toronto, Ohio

7. **April 11, 2017:** Stormwater violations in Wood, Richland, and Crawford Counties, OH because of failure to manage vehicle tracking of drilling materials onto public roadways

8. **April 12, 2017:** unauthorized pollution release into Bull Creek in Wood County, OH; failure to control stormwater

9. **April 13, 2017:** 2 million gallons of drilling fluid pollution accumulating in high quality wetland adjacent to Tuscarawas River in Navarre Township, Stark County; covered 500,000 sq foot area of the category 3 wetland

10. **April 14, 2017:** 50,000 gallons of drilling fluid pollution released into wetland in Mifflin Township, Richland County, OH

11. **April 17, 2017:** 200 gallons of drilling fluid pollution released into a pond in Monroe Township, Harrison County, OH

12. **April 22, 2017:** 200 gallons of drilling fluid pollution released into stream in Wooster Township, Wayne County, OH

13. **April 26, 2017:** During a West Virginia DEP inspection, 7 violations are found related to Storm Water Pollution Prevention Plan (SWPPP) and stream sediment deposits.

14. **May 2, 2017:** unauthorized pollution release from failure to manage stormwater in Bloomdale, Wood County, OH

15. **May 3, 2017:** unauthorized pollution release into Brushy Fork Creek, Cadiz, Harrison County, OH - failure to control stormwater

16. **May 8, 2017:** approx. 10,000 gallons of bentonite slurry released during a pipeline installation. The drilling fluids surfaced in a pond and stream in Monroe Township, Harrison County and affected water quality.

17. **May 8, 2017:** The Ohio EPA fines ETP $431,000 for "18 incidents involving mud spills from drilling, stormwater pollution and open burning at Rover pipeline construction sites have been reported between late March and Monday."

18. **May 10, 2017:** FERC bans ETP from starting new horizontal directional drilling under waterways and roads.

19. **May 19, 2017:** ETP acknowledges heavy rain causing pipeline trenches and work spaces to fill with water and spill onto fields of Ohio farmers.

20. **May 24, 2017:** During a West Virginia DEP inspection, 6 violations are found related to Storm Water Pollution Prevention Plan (SWPPP), erosion control and stream sediment deposits.

21. **May 25, 2017:** FERC rejects ETP request to resume drilling in Captina Creek and Middle Island Creek.

22. **June 2 & 6, 2017:** During a West Virginia DEP inspection, 5 violations are found related to silt fences, erosion control and stream sediment deposits.

23. **July 2, 2017:** 5,000 more gallons of drill slurry released into a Stark County area where the company was working on a five-foot borehole that would go under the Tuscarawas River. Work was already underway to deal with a previous spill in that area.

24. **July 3, 2017:** 1,500 to 2,500 gallons of drilling mud took place at a nearby area ten feet from Tuscarawas River.

25. **July 7, 2017:** Rover Pipeline LLC pays $1.5 million to the Ohio History Connection Foundation in an effort to mitigate harm after demolishing a building they had promised not to.

Case ID: 250303655

WORST ROVER PIPELINE VIOLATIONS/SPILLS/STOP WORK ORDERS APRIL 2017–MARCH 2018 (CONTINUED)

26. **July 12, 2017:** During a West Virginia DEP inspection, 8 violations are found including sediment laden water depositing in nearby creeks and runs.

27. **July 13, 2017**: FERC also issues a notice of violation claiming that ETP "did not fully and forthrightly disclose all relevant information" before demolishing a historic home.

28. **July 17, 2017:** West Virginia's DEP issues a cease-and-desist order to stop work in the WV segment of the pipeline.

29. **July 28, 2017:** Pipeline drilling causes landslides in Jefferson County, Ohio. According to township trustees, it's a result of drilling near old underground mines.

30. **July 31, 2017:** Inspectors find failure to properly control erosion and incorrectly-installed sediment control devices in Hancock County, WV.

31. **August 3, 2017:** Inspectors find failure to properly control erosion and incorrectly-installed sediment control devices in Marshall County, WV.

32. **September 21, 2017:** Soap wastewater used in boring operations and soil/sediment discharged into approximately 500 feet of waterway requiring 6,000 gallons of water to be recovered by vacuum truck. OH

33. **September 26, 2017:** Approximately 30 gallons of drilling fluids discharged into waters, wetlands in Washington Township, Belmont County, Ohio.

34. **October 11, 2017:** Approx. 1200 gallons of drilling fluids discharged to waters, wetlands in Washington Township, Belmont County, Ohio.

35. **October 14, 2017:** Rover Pipeline Spills Water Allegedly Containing Gasoline Into Michigan Wetlands

36. **November 9, 2017:** Approx. 60 gallons of drilling fluids discharged to waters, wetlands in Ashland Township, Ashland County.

37. **November 14, 2017:** Approx. 30 gallons of drilling fluids discharged to waters, wetlands in Milton Township, Ashland County, Ohio.

38. **November 16, 2017:** Approx. 200 gallons of drilling fluids discharged into Black Fork Mohican River in Milton Township, Ashland County.

39. **January 17, 2018:** Rover Pipeline Spills Another 150,000 Gallons of Drilling Fluid Into Ohio Wetlands at same 4/14/2017 site.

40. **January 24, 2018:** FERC again orders ETP to halt horizontal directional drilling under the Tuscarawas River in Ohio.

41. **February 21, 2018:** Ohio EPA files a letter with FERC claiming the presence of toxic chemical tetrachloroethene at Rover's underground drilling site at the Tuscarawas River in southern Stark County.

42. **March 5, 2018:** West Virginia Department of Environmental Protection orders a second halt to construction after finding multiple water pollution violations.



Photo by Ohio EPA

Workers at a spill site on the Rover Pipeline in Stark County, Ohio. April 2017. Photo courtesy of the Ohio EPA.

Case ID: 250303655

## Mariner

The Mariner East Project is designed to transport natural gas liquids from the same Utica and Marcellus shale production areas, this time eastward across Pennsylvania, including to the Marcus Hook terminal on the Delaware River.[45] The first phase of the Mariner project began operations in 2014, while Mariner East 2 is scheduled to be completed in 2018. Construction of the pipeline has led to 108 "inadvertent" releases in numerous locations along the route, leading the Pennsylvania DEP to issue more than 40 violations,[46] and several reports of private water wells being impacted by construction activities.[47] Those spills have released a total of at least 200,000 gallons of drilling fluids and other liquids.[48] The Mariner 1 and Mariner 2 pipelines have been shut down twice as a result of spills, violations, sink holes and contamination of drinking water and trout streams.

The Pennsylvania DEP Administrative Order shutting down construction on January 3, 2018 itemized unpermitted and unlawful activities impacting the following trout streams classified as Class A wild trout waters, wild trout (natural reproduction) water, high quality trout stocking and designated as exceptional value waters and/or migratory fishes:

1.  Hay Creek in Berks County
2.  Cacoosing Creek in Berks County
3.  Allegheny Creek in Berks County
4.  Clover Creek in Blair County
5.  Mingo Creek in Washington County
6.  Shaeffer Creek in Dauphin County



Cows stand in a field near construction of the Bayou Bridge pipeline in Louisiana. April 2018. Photo by ©Julie Dermansky/Greenpeace

The 24-page order also required Sunoco to address the private water wells contaminated in Silver Lake Township "to the satisfaction of the private well owners." The order concluded by saying:

> "Sunoco's unlawful conduct… demonstrates a lack of ability or intention on the part of Sunoco to comply with the Clean Streams Law, the Dam Safety and Encroachments Act, and the permits issued thereunder. Suspension of the permits… is necessary to correct the egregious and willful violations described herein."[49]

On February 8, 2018 the Pennsylvania DEP and Sunoco executed a Consent Order and Agreement requiring the payment of a $12.6 million penalty and that Sunoco provide detailed plans to prevent future violations.[50] It was one of the largest fines ever levied by the State of Pennsylvania for violations of environmental laws.

Less than 30 days later, Mariner was shut down again in Pennsylvania due to problems during construction. On March 7, 2018, the Pennsylvania Public Utility Commission (PUC) issued an emergency order shutting down the Mariner 1 pipeline during construction of the adjacent Mariner 2 pipeline.[51] The emergency order said that allowing the continued transport of hazardous liquids through the Mariner 1 pipeline "could have catastrophic results impacting the public."[52] The PUC estimated the pipeline would be shut down 10-14 days, possibly longer if ETP/Sunoco failed to address serious safety concerns that the pipeline could be "hazardous to life, property and the environment."[53] Among the safety issues that triggered the rare emergency shut down were the formation of three large sinkholes in a densely populated area defined by PHMSA as a "high consequence area". One sinkhole was located 300 feet from rail lines carrying Amtrak and Septa passengers. Another sink hole was created 10 feet from the foundation of a house.

Case ID: 250303655

# U.S. Pipeline Spill Trends

Over the past several years, spills of crude oil and liquid petroleum products from pipelines have increased, reversing earlier improvements.[54] This trend reached its maximum in 2015 with a total of 454 reported incidents, of which 176 were classified as significant by PHMSA. These numbers dropped slightly in 2017 to 404 reported incidents (153 significant) but remained at an elevated level compared to earlier years (see Figure 4).

Similarly, a recent review by oil industry trade organizations found that pipeline incidents "impacting the public or environment" (IPE) have increased in the past 4 years.[55]



**Figure 4:** Ten year trends for significant U.S. pipeline incidents involving crude oil, refined petroleum products, and highly-volatile liquids (HVL). Data: PHMSA

The key takeaway from these statistics is that despite industry rhetoric to the contrary, there is no failsafe way to transport fossil fuels. Industry safety initiatives and an overmatched regulatory agency have been unable to eliminate the risk of spills, which remain a direct and seemingly unavoidable consequence of oil and gas activity. PHMSA employs a mere 208 inspectors who, along with 345 state inspectors, are responsible "for regulating nearly 3,000 companies that operate 2.7 million miles of pipelines, 148 liquefied natural gas plants, and 7,571 hazardous liquid breakout tanks."[56] The oil industry also has one of the highest rates of severe workplace injury among its workers.[57]

Over the past decade, hazardous liquid pipeline spills in the U.S. have led to 16 fatalities, 30 injuries, $2.7 billion in costs, and over 825,000 total barrels spilled (34.7 million gallons, or around 9,500 gallons every day).[58] Common causes of pipeline spills include equipment failures, corrosion, operator error, material or welding failures, and excavation damage.[59]

Significant pipeline spills in recent years include Enbridge's 2010 spill into the Kalamazoo River,[60] Exxon's 2013 Pegasus pipeline spill in Mayflower, Arkansas, two spills into the Yellowstone River in 2011 and 2015,[61] and the 2015 pipeline rupture that closed a Santa Barbara beach.

These pipeline spills are in addition to spills from oil wells, disposal sites, and other oil and gas infrastructure, both onshore and offshore.[62] Of total spills from all sources in 2015, a recent analysis found that 640 spills affected groundwater or surface water in some way.[63]

From 2007 to 2016, U.S. crude oil pipelines have averaged 0.001 significant incidents and 0.57 barrels spilled per year per mile of pipeline. Refined petroleum product pipelines have averaged 0.0007 significant incidents and 0.24 barrels spilled per year per mile, and HVL pipelines have averaged 0.0005 significant incidents and 0.53 barrels spilled per year per mile.



Activists make their "People Over Pipelines" message known at a march in Washington, DC. Photo by ©Jordan Hetrick/Greenpeace

Case ID: 250303655

# Future Threats to Water

## Bayou Bridge Pipeline

Oil and pipeline companies have devastated the Gulf coast and the Atchafalaya Basin, harming some of the most amazing ecosystems on Earth, putting millions of people at greater risk of flooding.[64] The Bayou Bridge pipeline is a great example of what is wrong with pipeline construction in Louisiana. It will traverse over, under or through the Calcasieu River, Mermentau River, Vermilion River, Bayou Teche, West Atchafalaya Basin Levee, Atchafalaya River Basin and multiple bayous that provide unique habitat for many rare species. There is pending litigation arguing that the existing corridor being used to place the Bayou Bridge Pipeline is already out-of-compliance with permits issued for prior pipeline projects. In the same litigation, opponents argue that another existing pipeline in the Atchafalaya Basin co-owned by Energy Transfer Partners is also out of compliance with a previously-issued permit.[65] Disposal of dredged material during the construction of these earlier pipelines led to the creation of spoil banks which have been found to cause serious disturbances of water flow and impact the distribution of sediments in the Basin.[66] Historically there has been little enforcement of permit violations.[67]

The Bayou Bridge pipeline is a joint venture between ETP and Phillips 66[68] (two of the participants in DAPL) that will transport up to 480,000 barrels of crude oil a day across Louisiana, from Nederland, Texas (the southern terminus of the Bakken pipeline) to refineries in St. James, Louisiana (about 50 miles up the Mississippi River from New Orleans).[69] Phase I of the Bayou Bridge Pipeline, from Nederland, Texas to Lake Charles, Louisiana, is already operational. However, Phase II, the proposed 163-mile portion from Lake Charles to St. James, is under construction and multiple lawsuits have been filed to challenge the permits issued in 2017.[70]

As detailed in a U.S. Army Corps of Engineers Environmental Assessment, Bayou Bridge Pipeline LLC plans to use horizontal directional drilling (HDD) to run pipe under 8 federal projects and 14 federal easements (mostly crossings of rivers, waterways and levees).[71] As is typical, PHMSA conducted a "worst case" analysis for spills occurring at those crossings, but details of that analysis have not been made public.

Analysis by FracTracker Alliance found that the pipeline would cross "700 acres of fragile wetlands, and watersheds that supply drinking water for up to 300,000 people" and noted that "essential ecosystem services that the wetlands provide, absorbing floodwaters, could be compromised, leading to increased erosion and sedimentation downstream. Impacts to these wetlands could be greatly magnified into the already environmentally stressed Gulf."[72]

Assuming the U.S. system-wide rate for significant crude oil spills of 0.001 per year per mile, we estimate that the Bayou Bridge Pipeline would suffer eight significant spills during a 50-year nominal lifetime. In February 2018, a federal court issued an injunction stopping construction while the court considers environmental challenges to the project.[73] But that injunction was stayed by the 5th Circuit Court of Appeals in March with an expedited hearing on the injunction appeal scheduled before a merits panel on April 30, 2018.[74]

Bayou Bridge Pipeline began clearing for construction in the Atchafalaya Basin in January 2018.[75] Despite the elevated annual rise of water in the Basin, Bayou Bridge intends to continue construction in the Basin during high water season.[76] Construction during high water could exacerbate the damage to wetlands, channeling sediment-laden water into the interior swamps through pipeline canals, causing increased sedimentation and filling of wetlands which reduce their future capability to protect millions of people from Mississippi River floods.[77]

## Permian Express

In late 2017, ETP brought its Permian Express 3 pipeline online, transporting crude oil from the Permian basin (a major oil and gas producing basin located in West Texas and parts of New Mexico) to facilities in Nederland, Texas, and is "aggressively" evaluating a further expansion of that line.[78]

Case ID: 250303655

# Acknowledgments

Greenpeace USA and Waterkeeper Alliance are grateful to the following organizations for endorsing this report, and for their continued action in defense of water and the communities that depend on it.

**Atchafalaya Basinkeeper**
www.basinkeeper.org

**Oil Change International**
www.priceofoil.org

**Earthworks**
www.earthworks.org

**Louisiana Crawfish Producers Association – West**
www.lcpawest.com

**Louisiana Bucket Brigade**
www.labucketbrigade.org

**Thunder Valley Community Development Corporation**
www.thundervalley.org

**International Indigenous Youth Council**
www.indigenousyouth.org

**Pipeline Safety Coalition**
www.pscoalition.org

**350.org New Orleans**
www.350.org

**Indigenous Peoples Power Project**
www.ip3action.org

**Seeding Sovereignty**
www.seedingsovereignty.org

**NDN Collective**
www.ndnaction.org

**West Virginia Headwaters Waterkeeper**
www.wvrivers.org

**Rainforest Action Network**
www.ran.org

**The Standing Rock Community Development Corporation**
www.standingrockcdc.org

**Michigan Residents Against ET Rover**

**Big Bend Defense Coalition of West Texas**

**HELP Association of Saint James**



Protest March in Washington D.C. Photo by ©Amanda J. Mason/Greenpeace

Case ID: 250303655

Exhibit B_Page 213 of 583

# Endnotes

1    Interactive map shows a total of 517 incidents due to 10 incidents in the PHMSA data with missing or unusable geolocation data. Shapefiles of the U.S. crude oil, petroleum product, and natural gas liquids pipeline network are compiled by the U.S. Energy Information Administration (EIA) [*www.eia.gov/maps/layer_info-m.php*].

2    Energy Transfer. Ownership Overview. *www.energytransfer.com/ownership_overview.aspx*

3    Hampton, L. & V. Volcovici. 2016. Top executive behind Dakota Access has donated more than $100,000 to Trump. Reuters, October 26. *www.reuters.com/article/us-usa-election-trump-dakota-access/top-executive-behind-dakota-access-has-donated-more-than-100000-to-trump-idUSKCN12Q2P2*

4    Cama, T. 2017. Energy companies donated millions to Trump's inauguration. *The Hill*, April 19. *http://thehill.com/policy/energy-environment/329587-energy-companies-donate-millions-to-trumps-inauguration*

5    Memorandum of January 24, 2017. Construction of the Dakota Access Pipeline. 82 FR 11129. *www.federalregister.gov/documents/2017/02/17/R1-2017-02032/construction-of-the-dakota-access-pipeline*

6    Energy Transfer. Recent History. *www.energytransfer.com/company_history.aspx*

7    Energy Transfer. 2012. Energy Transfer Partners and Sunoco Announce Successful Completion of Merger. October 5. *http://ir.energytransfer.com/phoenix.zhtml?c=106094&p=irol-newsArticle&ID=1742166*

8    Sunoco. About Us: A Legacy of Innovation. *www.sunoco.com/about-us/heritage/*

9    Energy Transfer. 2012. Energy Transfer Partners to Acquire Sunoco in $5.3 Billion Transaction. April 30. *http://ir.energytransfer.com/phoenix.zhtml?c=106094&p=irol-newsArticle&ID=1688772*

10    Energy Transfer. 2017. Sunoco Logistics Partners and Energy Transfer Partners Announce Successful Completion of Merger. April 28. *http://ir.energytransfer.com/phoenix.zhtml?c=106094&p=irol-newsArticle&ID=2267001*

11    Energy Transfer. Corporate Overview. *www.energytransfer.com/company_overview.aspx*

12    This quantity excludes a small number of biofuels and CO2 incidents. For this report we consider hazardous liquids spills from crude oil, refined petroleum products, and HVL pipelines. PHMSA reporting requirements changed in 2010, and this analysis merges PHMSA's 2002-2009 and 2010-present datasets.

13    ETP or Sunoco must hold at least a 25% stake in a joint venture for it to be included in this analysis.

14    See Appendix B.

15    Waterkeeper Alliance. 2017. *Sunoco Logistics and Energy Transfer Partners Pipeline Incident Summary. http://stopetp.org/wp-content/uploads/2017/12/ETP-Violation-History-12-15-17.pdf*

16    National Wildlife Federation. 2010. *Assault on America: A Decade of Petroleum Company Disaster, Pollution, and Profit. www.motherjones.com/wp-content/uploads/NWF_OilSpillsExplosions_pages.pdf*

17    Hampton, L. 2016. Sunoco, behind protested Dakota pipeline, tops U.S. crude spill charts. *Reuters*, September 23. *www.reuters.com/article/us-usa-pipeline-nativeamericans-safety-i/sunoco-behind-protested-dakota-pipeline-tops-u-s-crude-spill-charts-idUSKCN11T1UW*

18    Higgins, T. 2017. Energy Transfer's Pipeline Spill Problem Is Causing It Another Headache. *The Street*, June 22. *www.thestreet.com/story/14178469/1/energy-transfer-has-a-problem-that-keeps-rearing*

19    U.S. Department of Justice. 2005. United States Announces Clean Air Agreements With Valero and Sunoco. June 16. *www.justice.gov/archive/opa/pr/2005/June/05_enrd_323.htm*

20    Welborn, V. 2014. Pipeline breaks have cost Sunoco millions. *Shreveport Times*, November 1. *www.shreveporttimes.com/story/news/local/louisiana/2014/11/01/pipeline-breaks-cost-sunoco-millions/18340559/*

21    U.S. Department of Justice. 2006. Federal Government Reaches Settlement with Pipeline Companies Regarding Crude Oil Spills. August 15. *www.justice.gov/archive/opa/pr/2006/August/06_enrd_534.html*

22    U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration. 2007. Notice of Probable Violation and Proposed Civil Penalty. May 15. *https://primis.phmsa.dot.gov/comm/reports/enforce/documents/120075001/120075001_notice%20letter_05152007.pdf*

23    U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration. 2014. Corrective Action Order. March 25. p.3. *https://primis.phmsa.dot.gov/comm/reports/enforce/documents/320145002H/320145002H_Corrective%20Action%20Order_03252014_text.pdf*

24    U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration. 2010. Notice of Probable Violation, Proposed Civil Penalty and Proposed Compliance Order. March 11. *https://primis.phmsa.dot.gov/comm/reports/enforce/documents/420105010/420105010_NOPV%20PCP%20PCO_03112010_text.pdf*

25    U.S. Environmental Protection Agency. 2016. Sunoco Pipeline, L.P. Clean Water Act Settlement. July 11. *www.epa.gov/enforcement/sunoco-pipeline-lp-clean-water-act-settlement*

26    U.S. Environmental Protection Agency. E15601 - Mid Valley Pipeline Oil Spill. *https://response.epa.gov/site/site_profile.aspx?site_id=9578*

27    Reuters Staff. 2016. U.S. regulator orders inquiry, repairs after Sunoco's Permian leak. *Reuters*, September 15. *www.reuters.com/article/us-pipeline-sunoco-logistics/u-s-regulator-orders-inquiry-repairs-after-sunocos-permian-leak-idUSKCN11L2CM*

28    PHMSA classifies together highly-volatile liquids (HVL) or other flammable or toxic fluids which are a gas at ambient conditions (i.e. when spilled). Examples include ethane, propane and butylene.

29    Waterkeeper Alliance 2017.

30    Greenpeace USA. Natural Gas: Methane's contributions to global warming. *www.greenpeace.org/usa/global-warming/issues/natural-gas/*

31    Energy Transfer. Bakken. *www.energytransfer.com/ops_bakken.aspx*

32    Sack, C. 2016. A #NoDAPL Map. Huffington Post, November 2. *www.huffingtonpost.com/entry/a-nodapl-map_us_581a0623e4b014443087af35*

33    Dakota Access LLC. 2015. *Draft Environmental Assessment Dakota Access Pipeline Project Crossings of Flowage Easements and Federal Lands.* November. *www.nwo.usace.army.mil/Missions/Civil-Works/Planning/Project-Reports/Article/633496/dakota-access-pipeline-environmental-assessment/*

34    Earthjustice. Updates & Frequently Asked Questions: The Standing Rock Sioux Tribe's Litigation on the Dakota Access Pipeline. *https://earthjustice.org/features/faq-standing-rock-litigation*

Case ID: 250303655

35  Brown, A. 2018. Five Spills, Six Months in Operation: Dakota Access Track Record Highlights Unavoidable Reality — Pipelines Leak. *The Intercept*, January 9. *https://theintercept.com/2018/01/09/dakota-access-pipeline-leak-energy-transfer-partners/*

36  See Appendix B

37  Ibid.

38  Ramseur, J. 2017. *Oil Spills: Background and Governance.* Congressional Research Service. *https://fas.org/sgp/crs/misc/RL33705.pdf*

39  Perry, K. 2015. 2014 oil spill still mars nature preserve. *Cincinnati.com*, May 16. *www.cincinnati.com/story/news/2015/05/16/sunoco-pipelineoak-glen-nature-preserve-hebron-colerain-township-oil-spill-crude-gallons/27399019/*

40  PHMSA 2014.

41  Delaware County Daily Times. 2010. Editorial: Penalty for Sunoco has a foul smell. January 6. *www.delcotimes.com/general-news/20100106/editorial-penalty-for-sunoco-has-a-foul-smell.* Quoted in NWF 2010.

42  Rover Pipeline. The Facts on Rover Pipeline Project. *www.roverpipelinefacts.com*

43  FERC. 2017. Order On Clarification and Denying Rehearing. November 3. *www.ferc.gov/CalendarFiles/20171130161519-CP15-93-002.pdf*

44  Malik, N.S. & C. Traywick. 2017. Blackstone's New Pipeline Asset Is Wreaking Environmental Havoc, *Bloomberg News*, August 17. *www.bloomberg.com/news/articles/2017-08-17/blackstone-s-new-pipeline-asset-is-wreaking-environmental-havoc*

45  Sunoco Pipeline. Mariner East. *https://marinerpipelinefacts.com/mariner-east/*

46  Reuters Staff. 2018. ETP Mariner East liquids pipe spills more fluid in Pennsylvania. *Reuters*, March 27. *www.reuters.com/article/us-energy-transf-sunoco-marinereast/etp-mariner-east-liquids-pipe-spills-more-fluid-in-pennsylvania-idUSKBN1H321A*; see also Pennsylvania DEP. Pennsylvania Pipeline Portal: Mariner East Pipeline II *www.dep.pa.gov/Business/ProgramIntegration/Pennsylvania-Pipeline-Portal/Pages/Mariner-East-II.aspx*

47  Hurdle, J. 2017. Water problems persist along Mariner East pipeline route despite court intervention. State Impact (NPR). October 12. *https://stateimpact.npr.org/pennsylvania/2017/10/12/water-problems-persist-along-mariner-east-pipeline-route-despite-court-intervention/*

48  Jalbert, K. 2017. Mariner East 2 Drilling Fluid Spills – Updated Map and Analysis. FracTracker, July 26. *www.fractracker.org/2017/07/me2-drilling-fluid-spills/*; see also Pennsylvania DEP. 2018. Sunoco Mariner East II - Pipeline Construction Inadvertent Returns - Waters of the Commonwealth. Revised on March 30, 2018. *http://files.dep.state.pa.us/ProgramIntegration/PA%20Pipeline%20Portal/MarinerEastII/Sunoco_Mariner_East_II-Pipeline_Construction_Inadvertent_Returns-Waters_of_the_Commonwealth_Revised.pdf*

49  Pennsylvania DEP. 2018. Administrative Order. January 3. *http://files.dep.state.pa.us/ProgramIntegration/PA%20Pipeline%20Portal/MarinerEastII/OrderSuspendingConstructionActivities010318.pdf*

50  Cusick, M. 2018. Sunoco to resume work, pay $12.6 million for Mariner East 2 pipeline violations. *State Impact* (NPR), February 8. [ *https://stateimpact.npr.org/pennsylvania/2018/02/08/sunoco-to-resume-work-pay-12-6-million-for-mariner-east-2-pipeline-violations/*

51  Pennsylvania PUC. 2018. Emergency Order. March 7. *www.puc.state.pa.us/pcdocs/1556680.pdf*

52  Pennsylvania PUC. 2018. Petition of the Bureau of Investigation and Enforcement of the Pennsylvania Public Utility Commissions for the Issuance of an *Ex Parte* Emergency Order. March 7. *www.puc.state.pa.us/pcdocs/1556676.pdf*

53  Ibid.

54  U.S. Pipeline and Hazardous Materials Safety Administration. Pipeline Incident 20 Year Trends. *www.phmsa.dot.gov/pipeline/library/data-stats/pipelineincidenttrends*; see also Lee, M. 2016. Number of leaks and spills continued to grow in 2015. EnergyWire, August 22. *www.eenews.net/energywire/2016/08/22/stories/1060041856*

55  API & AOPL. 2017. Pipeline Safety Excellence: Performance Report & Strategic Plan 2017-2019. *www.energyinfrastructure.org/~/media/energyinfrastructure/images/pipeline/related-docs/api-aopl-pipeline-safety-report-high.pdf*; see also Mandel, J. 2017. Safety incidents on the rise after decade of decline. EnergyWire, April 26. *www.eenews.net/energywire/stories/1060053574*

56  U.S. Pipeline and Hazardous Materials Safety Administration. Inspections Overview. *https://www.phmsa.dot.gov/pipeline/inspections/inspections-overview*

57  Soraghan, M. 2017. Oil and gas industry leads in severe injuries. *EnergyWire*. May 2. *www.eenews.net/energywire/2017/05/02/stories/1060053892*

58  PHMSA. Pipeline Incident 20 Year Trends.

59  Stover, R. America's Dangerous Pipelines. Center for Biological Diversity. *www.biologicaldiversity.org/campaigns/americas_dangerous_pipelines/*

60  McGowan, E. & L. Song. 2012. The Dilbit Disaster: Inside The Biggest Oil Spill You've Never Heard Of, Part 1. *InsideClimate News*, June 26. *https://insideclimatenews.org/news/20120626/dilbit-diluted-bitumen-enbridge-kalamazoo-river-marshall-michigan-oil-spill-6b-pipeline-epa*

61  Douglas, E. 2015. Yellowstone Oil Spills Expose Threat to Pipelines Under Rivers Nationwide. *InsideClimate News*, February 6. *https://insideclimatenews.org/news/06022015/yellowstone-oil-spills-expose-threat-pipelines-under-rivers-nationwide*

62  There is no comprehensive database of all hazardous material spills in the U.S. with data scattered across numerous federal and state agencies, and lacking consistent reporting rules; see also King, P. & M. Soraghan. 2016. Spills dropped 8% in 2015 as new drilling slowed. *EnergyWire*, July 21. *www.eenews.net/energywire/2016/07/21/stories/1060040567*

63  Soraghan, M. & P. King. 2016. Drilling mishaps damage water in hundreds of cases. *EnergyWire*, August 8. *www.eenews.net/energywire/stories/1060041279*

64  Louisiana's Disappearing Wetlands, Louisiana's Oil, Understanding the Environmental and Economic Impact, southeastern.edu, July 12, 2010 *www2.southeastern.edu/orgs/oilspill/wetlands.html*; see also Atchafalaya Basin Floodway System, Louisiana Project, State Master Plan, at 3-2. *www.dnr.louisiana.gov/assets/docs/Atchafalaya_Basin/StateMasterPlan.pdf*

65  Permit for Wanda Petroleum, Inc., Aug. 21, 1969; Permit for Sorrento Pipeline Co., Sept. 4, 2001. The Bayou Bridge right-of-way follows a path of these two existing pipelines for which both permits prohibited the miles-long spoil banks that were created during construction and that remain today. Permits for Florida Gas Transmission, Dec. 14, 1962 & Feb. 13, 1963. The permits for this 5,325-mile interstate natural gas pipeline jointly owned by Energy Transfer Partners and Kinder Morgan running from Texas, through the Atchafalaya Basin, to south Florida, require the removal of dredged material that could interfere with navigation; see also Atchafalaya Basinkeeper, et al. 2018. Complaint for Declaratory and Injunctive Relief, at 60. *https://earthjustice.org/sites/default/files/files/3430-Complaint.pdf*

66  State of Louisiana Department of Natural Resources. 2018. Final Report: Senate Resolution No. 154 of the 2017 Regular Session. January. *http://www.dnr.louisiana.gov/assets/OCM/ABP/SR154.Study.Final.pdf*

Case ID: 250303655



Stakes mark the path of part of the Bayou Bridge pipeline through wetlands in Louisiana. Photo by ©Julie Dermansky/Greenpeace

67    Riegel, S. 2017. Swamp tale: A landman's long-running environmental whistleblower suit against the state speaks to larger issues about conflict, controversy and trust in the Atchafalaya Basin. *Business Report*, March 1. *www.businessreport.com/business/swamp-tale-local-landmans-long-running-environmental-whistleblower-suit-state-speaks-larger-issues-conflict-controversy-trust-atchafalaya-basin*

68    Public Accountability Initiative. 2018. The Power Behind the Pipelines: Bayou Bridge Pipeline. *https://public-accountability.org/2018/01/the-power-behind-the-pipelines-bayou-bridge-pipeline/*

69    Bayou Bridge Pipeline. Bayou Bridge Facts. *https://bayoubridge.com/*

70    Kunzelman, M. 2018. Judge hears testimony in request to halt Bayou Bridge pipeline. *Associated Press*, February 9. *www.nola.com/environment/index.ssf/2018/02/judge_hears_testimony_in_reque.html*

71    U.S. Army Corp of Engineers. 2017. Environmental Assessment: Section 408 Evaluation of Bayou Bridge Pipeline Project. *www.mvn.usace.army.mil/Portals/56/docs/Section%20408/BBP/Bayou%20Bridge%20408%20EA%2010-17-2017%20HL.pdf?ver=2018-01-29-122020-020*

72    Fractracker Alliance. 2017. Pipeline Under Debate in Louisiana Bayou. January 3. *www.fractracker.org/2017/01/pipeline-debate-louisiana-bayou/*

73    Gilmer, E. 2018. In rare move, court halts ETP oil pipeline. *EnergyWire*, February 26. *www.eenews.net/energywire/2018/02/26/stories/1060074731*

74    Hardy, S. 2018. Federal Appeals Court lifts stay blocking pipeline construction through Atchafalaya Basin. *The Advocate*, March 15. *www.theadvocate.com/baton_rouge/news/environment/article_6d0b7800-2898-11e8-95c0-cf0328d5178b.html*

75    Baurick, T. 2018. Bayou Bridge Pipeline's controversial construction begins. *The Times-Picayune*, January 29. *www.nola.com/environment/index.ssf/2018/01/bayou_bridge_pipeline_construc.html*

76    Bayou Bridge Pipeline, LLC's *Reply in Support of Emergency Motion for Stay Pending Appeal*, at 1-2 (discussing water level influence on construction) filed on Mar. 6, 2018, Case No. 18-30257, Fifth Cir. Court of Appeals.

77    Declaration of Dr. Ivor van Heerden, at Paragraph 4.

78    Reuters staff. 2018. ETP eyes new crude pipeline from Permian basin to Nederland, Texas. Reuters, February 22 *www.reuters.com/article/energy-transf-pipeline-oil/etp-eyes-new-crude-pipeline-from-permian-basin-to-nederland-texas-idUSL2N1QC0RC*

Case ID: 250303655

# Appendix A-C

## Appendix A: Research Methods

Available for download online at:
https://www.greenpeace.org/usa/wp-content/uploads/2018/04/Appendix-A-Research-Methods.pdf

## Appendix B: ETP & Sunoco, PHMSA Violations & Penalties

Available for download online at:
https://www.greenpeace.org/usa/wp-content/uploads/2018/04/Appendix-B-ETP-Sunoco-PHMSA-Violations-Penalties.pdf

## Appendix C: Energy Transfer Partners' Rover Pipeline Violations & Spills in Michigan, Ohio & West Virginia, February 2017-March 2018

Available for download online at:
https://www.greenpeace.org/usa/wp-content/uploads/2018/04/Appendix-C-Rover-Timeline-Violations.pdf

Construction work on the Bayou Bridge project continues in Louisiana. April 2018. Photo by ©Julie Dermansky/Greenpeace



**GREENPEACE** Reports    **WATERKEEPER® ALLIANCE**    OIL AND WATER: ETP & SUNOCO'S HISTORY OF PIPELINE SPILLS

APRIL 17, 2018

Case ID: 250303655

**Appendix A: Research Methods**

From the PHMSA website, we downloaded the Excel files "Hazardous Liquid Accident Data - January 2010 to present (ZIP)" and "Hazardous Liquid Accident Data - January 2002 to December 2009 (ZIP)" [link to both datasets] on 2/26/18. Full analysis conducted using pandas in a jupyter notebook, available upon request.

The 2010-present dataset contained 3212 records, of which 49 represented biofuels or CO2 spills, and were excluded. The remaining 3163 records were comprised of 1605 crude oil spills, 1063 refined petroleum product spills, and 495 HVL spills. The 2002-2009 dataset contained 3030 records, from which we excluded biofuels and CO2 spills, and any records where the 'SPILLED' field was 'NO.' Of the remaining 2962 records, 1360 were crude oil spills, 1172 were refined petroleum products spills, and 419 were HVL spills.

Using the PHMSA operator database [link] and the incidents databases, we identified 41 subsidiaries or joint ventures that were associated with ETP/Sunoco. These entities were identified by:
- Searching the incident file for reports submitted via email from the domains energytransfer.com, sunocologistics.com, and sunocoinc.com.
- Searching the operator database for operators containing the phrases "transfer", "ETP", "ETC", "ETE, "sunoco", "DAPL", "Dakota Access", etc.
- Cross-referencing lists of subsidiaries found in Form 10-K Ex 21.1 documents against the operator database. Lists of subsidiaries are available from the latest 10-K submissions for ETP, ETE, and Sunoco Logistics Partners.

Although ETP and Sunoco merged in 2012, we include all spills in the database starting in 2010 for both of those entities and subsidiaries that existed at that time. For other subsidiaries acquired after 2012, we only include spills that occurred after the acquisition.

The full list of hazardous liquid subsidiaries included in this analysis is as follows:
- **ENERGY TRANSFER COMPANY** [Operator ID 32099, link to PHMSA operator page, **23 incidents**] This exact name isn't a listed subsidiary but it does refer to the ETP/ETE family of companies. All records were submitted from energytransfer.com emails, all after June 2012. No records for this operator ID were found in the 2002-2009 data. This operator ID also has 16 incidents in PHMSA's 2002-present natural gas gathering/transmission database, all submitted form energytransfer.com emails.
- **DAPL-ETCO OPERATIONS MANAGEMENT, LLC** [Operator ID 39205, no PHMSA operator page, **7 incidents**] This entity is listed on Form 10-K as a subsidiary of Energy Transfer Partners, L.P. Collectively DAPL and ETCO make up the Bakken Pipeline. The project is a joint venture with MarEn Bakken Company LLC (Enbridge) and Phillips 66, with ETP holding a 38.25% interest. All spill records are from 2017. Submitted via energytransfer.com emails, except the first record submitted from sunocologistics.com. No records for this operator ID were found in the 2002-2009 data. This operator ID and company name appear in the incident database, but do not appear in the operator database.
- **SUNOCO PIPELINE L.P.** [Operator IDs 18718 and 31623, link to PHMSA operator page, **337 incidents**] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P., with more information at links here and here. In the 2002-2009 data we find 136 incidents under this operator ID plus an additional six from 2002-03 with similar names under ID 31623. (We exclude one record with SPILLED=NO). Date ranges for the two IDs overlap, and some early records were submitted from sunoil.com emails. ID 31623 does not appear in 2010-present data, but we find 195 records under ID 18718 in that data for a total of 337.
- **MID - VALLEY PIPELINE CO** [Operator IDs 12470, 12471, 30871, link to PHMSA operator page, **76 incidents**] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. which has a "controlling financial interest." Sunoco's interest in this pipeline has been 55.3% since at least the 2002 10-K, therefore we include all incidents in our analysis. In 2002-2009 data, we find 37 incidents under this ID, plus an additional 7 incidents dating from 2002-03 under two other IDs with similar names. The other IDs do not appear in the 2010-present data, but we do find 32 records under ID 12470 in that data for a total of 76. All records submitted via sunocologistics.com emails.
- **WEST TEXAS GULF PIPELINE CO** [Operator ID 22442, link to PHMSA operator page, **46 incidents**] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. which obtained 100% interest in the pipeline in 2015. As of 2006, the interest in the pipeline was 43.8%, therefore we include these incidents, which are all 2006 or later, in our analysis. In the 2002-2009 data, we find 13 incidents under this ID, while in the 2010-present data we find 33 incidents, all from sunocologistics.com emails. (We exclude one record with SPILLED=NO).
- **INLAND CORPORATION** [Operator ID 32683, link to PHMSA operator page, **7 incidents**] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. which acquired a "controlling

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

Case ID: 250303655

interest" in 2011. All spills in the database for this ID post-date this acquisition. No records for this operator ID were found in the 2002-2009 data.

- **PERMIAN EXPRESS TERMINAL LLC** (formerly **SUNVIT PIPELINE LLC**) [Operator ID 39131, link to PHMSA operator page, **2 incidents**] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. Sunoco Logistics purchased a 50% interest in the SunVit Pipeline from Vitol Group in September 2016, increasing their interest to 100% at that time. The project was renamed in December 2016. All spills in the database post-date this acquisition. No records for this operator ID were found in the 2002-2009 data.
- **SUNOCO MIDLAND GATHERING LLC** [Operator ID 39307, link to PHMSA operator page, **1 incident**] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. This is the same operator ID as **VITOL MIDSTREAM, LLC** [4 records, see this 2011 announcement for more information] which was acquired by Sunoco Logistics in November 2016. The four spills tallied under Vitol Midstream pre-date the closing of the acquisition, were submitted from vitol.com email addresses (except one, which seems to have been submitted a year later), and are therefore excluded from our analysis. The one post-acquisition spill is retained. No records for this operator ID were found in the 2002-2009 data.
- **PERMIAN EXPRESS PARTNERS LLC** [Operator ID 39596, no PHMSA operator page, **1 incident**] Listed in 10-K as a subsidiary of Sunoco Logistics Partners L.P. This is a joint venture with ExxonMobil, announced in November 2016, where Sunoco Logistics has an 85% stake. The only spill post-dates the partnership. No records for this operator ID were found in the 2002-2009 data. This operator ID and company name appear in the incident database, but do not appear in the operator database.
- **SUNOCO PARTNERS MARKETING & TERMINALS LP** [Operator ID 39706, no PHMSA operator page, **3 incidents**] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. All reports submitted from energytransfer.com emails, and all were in 2017. No records for this operator ID were found in the 2002-2009 data. This operator ID and company name appear in the incident database, but do not appear in the operator database.
- **WOLVERINE PIPELINE CO** [Operator ID 22830, link to PHMSA operator page, **11 incidents**] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. As of 2004, Sunoco Logistics held a 31.5% interest in this joint venture, the same percentage as today. In the 2002-2009 dataset, we find 7 incidents under this ID, and 4 incidents in the 2010-present data. (We exclude one record with SPILLED=NO). Since all incidents are 2004 or later we include all in our analysis.
- **HARBOR PIPELINE CO** [Operator ID 7063, link to PHMSA operator page, **6 incidents**] This entity is not listed in the latest 10-K as a subsidiary, however it does appear on this website as an asset of Sunoco Logistics Partners. The spill records in the database are from 2004-2012, were submitted from sunocologistics.com emails, and the Harbor Pipeline is mentioned in the 2004 10-K. In the 2002-2009 data, we find 3 incidents under this ID, one of which has the Sunoco Pipeline L.P name, submitted via sunocologistics.com emails.
- **SUNOCO, INC (R&M)** [Operator IDs 18779 and 31676, link to PHMSA operator page, **6 incidents**] Sunoco, Inc is the name of the pre-merger entity that was acquired by ETP. In the 2010-present data we find two spills date from 2010 and were submitted via sunocoinc.com emails. In 2002-2009 data, we find 2 incidents under ID 18779 plus 2 more under ID 31676. The names vary somewhat, but we cluster them here. (We exclude one record with SPILLED=NO)
- **WYNNEWOOD REFINERY COMPANY** [Operator ID 32096, link to PHMSA operator page, **1 incident**] This ID does not appear in the 2010-present data, but shows one incident in 2009 submitted from a sunocologistics.com email. The 2011 10-K notes that Sunoco Logistics acquired 100% interest in Excel in September 2009, which included a pipeline and a refinery in Wynnewood, OK. This incident is from July 2009, but the 10-K notes that Sunoco was "the operator of the pipeline prior to the acquisition" and so we include this incident.

The following hazardous liquids entities are excluded from this analysis:
- **EXPLORER PIPELINE CO** [Operator ID 4805, link to PHMSA operator page, **49 incidents**] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. This is a JV with Phillips 66, Marathon, and Shell, operated by Explorer. Sunoco Logistics holds a 15% stake. We exclude joint ventures where ETP/Sunoco has less than a 25% stake and is not the pipeline operator.
- **WEST SHORE PIPELINE CO** [Operator ID 22430, link to PHMSA operator page, **16 incidents**] THis entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. Sunoco Logistics holds a 17.1% stake in this JV, which is operated by Buckeye Partners. We exclude joint ventures where ETP/Sunoco has less than a 25% stake and is not the pipeline operator.
- **LONE STAR NGL REFINERY SERVICES LLC** [Operator ID 31673, link to PHMSA operator page, **2 incidents**] This entity is listed on Form 10-K as a subsidiary of Energy Transfer Partners L.P. This operator ID is inactive. In 2011 ETP purchased LDH Energy Asset Holdings LLC. In the 2002-2009 data, two records are found for this ID under the name **LOUIS DREYFUS OLEFINS, LLC**. The records are

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

Case ID: 250303655

**Exhibit B_Page 219 of 583**

submitted from louisdreyfus.com and ldhenergy.com emails. We exclude these 2006 incidents because they pre-date the acquisition. One additional spill record in the 2010-present data was submitted by an energytransfer.com email address for **LDH ENERGY PIPELINE L.P.** [Operator ID 32035, link to PHMSA operator page, **10 incidents**], which is likely the result of the same merger. Possibly the event was noticed and reported by an ETP contractor or possibly it was reported by ETP post-merger, but we do not include it in this assessment since it occurred in 2010 and pre-dates the merger.

- **REGENCY FIELD SERVICES LLC** [Operator ID 31852, link to PHMSA operator page, **1 incident**] This exact name does not appear in the most recent 10-K, but ETP seems to have acquired Regency Energy Partners in 2010 and then merged in 2015. This opid does not appear in the 2010-present data and is currently inactive, but 2002-09 data shows one incident HVL/liquid natural gas incident in 2007, submitted from a regencygas.com email. However, this incident pre-dates the acquisition and so is excluded.

The following are hazardous liquid subsidiaries that have a PHMSA operator ID, but did not record any incidents from 2010-present:

- **BAYOU BRIDGE PIPELINE, LLC** [Operator ID 39462, link to PHMSA operator page, 0 incidents] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. This is a joint venture in which both ETP and Sunoco Logistics hold a 30% stake.
- **PHILADELPHIA ENERGY SOLUTIONS REFINING AND MARKETING, LLC** [Operator ID 38964, link to PHMSA operator page, 0 incidents] This entity is listed on Form 10-K as a subsidiary of Energy Transfer Partners L.P.
- **LIBERTY PIPELINE GROUP, LLC** [Operator ID 32582, link to PHMSA operator page, 0 incidents] This entity is listed on Form 10-K as a subsidiary of Energy Transfer Partners L.P. This operator ID is inactive.
- **REGENCY LIQUIDS PIPELINE LLC** [Operator ID 32355, link to PHMSA operator page, 0 incidents] This entity is listed on Form 10-K as a subsidiary of Energy Transfer Partners L.P. This operator ID is inactive.

The following are natural gas subsidiaries with PHMSA operator IDs that reported incidents from natural gas transmission pipelines:

- **ENERGY TRANSFER COMPANY** [Operator ID 32099, link to PHMSA operator page, **16 incidents**] This operator ID has 10 incidents in the 2010-present data, and 6 incidents in the 2002-2009 data, all submitted form energytransfer.com emails.
- **PANHANDLE EASTERN PIPELINE CO** [Operator ID 15105, link to PHMSA operator page, **11 incidents**] 11 incidents were found in the 2010-present dataset, all from energytransfer.com emails.
- **FLORIDA GAS TRANSMISSION CO** [Operator ID 5304, link to PHMSA operator page, **11 incidents**] 11 incidents were found in the 2010-present dataset, all from energytransfer.com emails.
- **SEA ROBIN PIPELINE CO** [Operator ID 18152, link to PHMSA operator page, **9 incidents**] 9 incidents were found in the 2010-present dataset, all from energytransfer.com emails.
- **TRUNKLINE GAS CO** [Operator ID 19730, link to PHMSA operator page, **5 incidents**] 4 incidents were found in the 2010-present dataset, and one incident was found in the 2002-2009 dataset, all submitted from energytransfer.com emails.
- **TRANSWESTERN PIPELINE COMPANY LLC** [Operator ID 19610, link to PHMSA operator page, **4 incidents**] 3 incidents were found in the 2010-present dataset, and one incident was found in the 2002-2009 dataset, all submitted from energytransfer.com emails.
- **REGENCY INTRASTATE GAS LP** [Operator ID 32335, link to PHMSA operator page, **1 incident**] 1 incident was found in the 2010-present dataset, submitted from an energytransfer.com email. Currently inactive ID.
- **HOUSTON PIPELINE CO** [Operator ID 7605, no PHMSA operator page, **1 incident**] 1 incident from 2003 was found in the 2002-2009 dataset, submitted from an energytransfer.com email. This operator ID and company name appear in the incident database, but do not appear in the operator database.

The following are natural gas operator IDs that are listed as ETP or Sunoco subsidiaries, but did not report any incidents or are otherwise excluded from the analysis:

- **MIDCONTINENT EXPRESS PIPELINE LLC** [Operator ID 32436, link to PHMSA operator page, 1 incident] This entity is listed as a subsidiary on the latest 10-K, but the incident dates to 2009 and was submitted from a kindermorgan.com email, and so is excluded.
- **ETC TIGER PIPELINE, LLC** [Operator ID 32467, link to PHMSA operator page, 0 incidents] See this link for more information.

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

Case ID: 250303655

- **PENNTEX MIDSTREAM PARTNERS, LLC** [Operator ID 39173, link to PHMSA operator page, 0 incidents] Inactive operator ID. This ID reports both natural gas and hazardous liquids mileage, but no incidents.
- **SOUTHERN UNION GAS SERVICES, LTD** [Operator ID 18526, link to PHMSA operator page, 0 incidents] Inactive operator ID. This ID reports both natural gas and hazardous liquids mileage, but no incidents.
- **CHALKEY TRANSMISSION COMPANY, LTD** [Operator ID 31211, link to PHMSA operator page, 0 incidents] Inactive operator ID.
- **FAYETTEVILLE EXPRESS PIPELINE, LLC** [Operator ID 32469, link to PHMSA operator page, 0 incidents]
- **GULF STATES TRANSMISSION CORPORATION** [Operator ID 32323, link to PHMSA operator page, 0 incidents]
- **LEE 8 STORAGE PARTNERSHIP** [Operator ID 30786, link to PHMSA operator page]
- **LOBO PIPELINE LP** [Operator ID 31735, link to PHMSA operator page, 0 incidents] Inactive operator ID.
- **PEI POWER CORP** [Operator ID 31453, link to PHMSA operator page, 0 incidents] Inactive operator ID.
- **PENNTEX PERMIAN, LLC** [Operator ID 39432, link to PHMSA operator page, 0 incidents] Inactive operator ID.
- **SOUTHERN UNION INTRASTATE GAS PIPELINE** [Operator ID 32256, link to PHMSA operator page, 0 incidents] Inactive operator ID.
- **WGP-KHC, LLC** [Operator ID 31730, link to PHMSA operator page, 0 incidents]

No incidents from ETP or its subsidiaries were found in PHMSA natural gas distribution incident data.

**Mapping the Data**

An interactive map of the ETP/Sunoco spill dataset was created in carto. The 2010-present PHMSA data is standardized with latitude and longitude expressed in decimal degrees. However, the 2002-2009 PHMSA data does not have a standard format for lon-lat data, particularly for the early years. Latitude and longitude were presented in a variety of formats, including D.d, DM.m and DMS. We converted all of these values to the standard D.d format. For a number of incidents, we changed the reported longitude from positive to negative values, under the assumption that the spills occurred in the western hemisphere. For 7 spills, no latitude-longitude was reported, and for 3 more spills, the data was reported in unknown formats. These 10 incidents are not shown on the map.

For comparison purposes, we display U.S. liquids pipelines using shapefiles compiled by the U.S. Energy Information Agency (EIA) [link], plus one shapefile of the Dakota Access Pipeline obtained from public sources. Where EIA identified ETP, Sunoco or one of their corporate entities as the pipeline operator we colored the pipeline red; all other pipelines are colored grey. The shapefiles used were 'Crude Oil Pipelines', 'Petroleum Product Pipelines' and 'HGL (hydrocarbon gas liquids) Pipelines.' EIA describes these files as being based on "publicly available data from a variety of sources with varying scales and levels of accuracy." This EIA pipeline dataset is likely not a complete set of U.S. liquids pipelines and may not fully reflect ETP/Sunoco's current or past pipeline assets.

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

Case ID: 250303655

Appendix B: ETP & Sunoco, PHMSA Violations & Penalties

| Date | Operator | # of Probable Violations | Proposed or Assessed Civil Penalty | Case Status | Summary of Violations | PHMSA Citation |
|---|---|---|---|---|---|---|
| 01/11/2018 | SUNOCO PIPELINE L.P. | 1 | $0 | Open | 1 failure to insepct field bending pipe during construction | link |
| 01/18/2018 | SUNOCO PIPELINE L.P. | 3 | $163,700 | Open | 117 failures to inpect crosssings under waterways, valves and pipelines | link |
| 01/18/2018 | SUNOCO PIPELINE L.P. | 2 | $127,000 | Open | 6 failures to inspect pressure transmitters, pipelines | link |
| 08/14/2017 | SUNOCO PIPELINE L.P. | 8 | $129,800 | Open | Failure to repair unsafe pipe for 5 years, failures to maintain pipeline integrity in high consequence areas, failure to report unsafe condition, failure to do corrosion inspection | link |
| 05/04/2017 | SUNOCO PIPELINE L.P. | 1 | $25,900 | Closed | 1 failure to test pipeline using proper procedures | link |
| 05/03/2017 | MID - VALLEY PIPELINE CO | 1 | $88,400 | Open | 1 failure to inpect crosssings under waterways | link |
| 04/06/2017 | SUNOCO PIPELINE L.P. | 2 | $0 | Open | 2 failures to notifiy PHMSA of a spill, fire, injuries requiring hospitalization. | link |
| 02/06/2017 | INLAND CORPORATION | 1 | $55,220 | Open | Failure to cover pipe. | link |
| 12/09/2016 | MID - VALLEY PIPELINE CO | 2 | $0 | Open | Failure to properly notify emergency responders, public. | link |
| 10/27/2016 | WEST TEXAS GULF PIPELINE CO | 2 | $251,800 | Open | 2 failures to follow safety procedures causing 5 people to be injured. | link |
| 10/04/2016 | PERMIAN EXPRESS TERMINAL LLC | 1 | $0 | Open | Failure to follow procedures. | link |
| 07/07/2016 | WEST TEXAS GULF PIPELINE CO | 15 | $1,539,800 | Open | 15 violations of maintenace rules after a spill, fire and injuries requiring hosptilization. | link |
| 06/02/2016 | SUNOCO PIPELINE L.P. | 5 | $141,700 | Closed | 5 violations of safety, inspection, repair rules | link |
| 04/28/2016 | SUNOCO PIPELINE L.P. | 5 | $1,278,100 | Open | 5 violations of welding procedures and failure to use of qualified welders during constrution | link |
| 04/11/2016 | ENERGY TRANSFER COMPANY | 2 | $24,400 | Closed | Failure to insure qualified personal performed inspections, failure to maintain records | link |
| 04/27/2015 | WEST TEXAS GULF PIPELINE CO | 2 | $207,300 | Closed | Spill and failure to repair damaged pipeline. | link |
| 04/08/2015 | WEST TEXAS GULF PIPELINE CO | 2 | $141,000 | Closed | Failures to provide notice of a spill, fire and injury requiring hospitilation. | link |
| 10/02/2014 | SUNOCO PIPELINE L.P. | 1 | $22,300 | Closed | Failure to maintain corrosion protection. | link |
| 09/30/2013 | SUNOCO PIPELINE L.P. | 1 | $25,900 | Closed | Control room management failure. | link |
| 12/03/2012 | SUNOCO PIPELINE L.P. | 1 | $0 | Closed | Failure to update public notice procedures. | link |
| 11/06/2012 | SUNOCO PIPELINE L.P. | 1 | $22,500 | Closed | Failure to files supplemental spill report. | link |
| 07/16/2012 | HARBOR PIPELINE CO | 1 | $100,000 | Closed | Failure to follow procedures for cutting a pipeline and atmospheric monitoring. | link |
| 11/23/2010 | MID-VALLEY PIPELINE CO | 1 | $48,700 | Closed | Failure to correct deficiencies in corrosion control. | link |
| 03/11/2010 | WEST TEXAS GULF PIPELINE CO | 7 | $405,000 | Closed | Failure to follow procedures related to large spill, fire. | link |
| 09/17/2009 | SUNOCO INC (R&M) | 2 | $32,500 | Closed | Operating pressure and corrsion control violations. | link |
| 08/14/2009 | SUNOCO PIPELINE L.P. | 5 | $232,900 | Closed | Large gasoline spill into Turtle Creek, evacuation of homes, businesses, public road closure. | link |
| 03/11/2008 | SUNOCO PIPELINE L.P. | 1 | $34,000 | Closed | Failures to inpect right of ways and crosssings under waterways. | link |
| 11/19/2007 | SUNOCO PIPELINE L.P. | 2 | $200,000 | Closed | Failure to follow review procedures to ensure proper equipment use. | link |
| 11/13/2007 | SUNOCO PIPELINE L.P. | 12 | $119,000 | Closed | Failure to inspect ROWs, crossings under navigable waters, tanks, do valve maintenance, provide records, secure facilities, etc. | link |
| 05/15/2007 | SUNOCO PIPELINE L.P. | 1 | $150,000 | Closed | Failure to prevent and respond to a spill. | link |
| 02/12/2007 | SUNOCO PIPELINE L.P. | 2 | $0 | Closed | Leak detection and high consequence area monitoring failures. | link |
| 02/09/2006 | SUNOCO PIPELINE L.P. | 1 | $0 | Closed | Failure to install equipment. | link |
| 06/02/2005 | WOLVERINE PIPELINE CO | 2 | $11,750 | Closed | Failure to meet operator qualificaton requirements. | link |
| 03/30/2005 | SUNOCO PIPELINE L.P. | 2 | $40,000 | Closed | Failure to complete risk analysis requirements. | link |
| 02/24/2005 | SUNOCO PIPELINE L.P. | 1 | $11,000 | Closed | Failure to follow procedures. | link |
| 09/22/2004 | SUNOCO PIPELINE L.P. | 3 | $6,200 | Closed | Failure to inspect, maintain maps and mark pipelines. | |
| 08/26/2003 | MID - VALLEY PIPELINE CO | 3 | $35,000 | Closed | Failure to follow procedures to notify the public. | link |
| 07/03/2002 | SUNOCO PIPELINE LP | 1 | $5,000 | Closed | Failure to identfiy pipeline segments in high consequence areas. | |
| Totals: | | 106 | $5,675,870 | | | |

Case ID: 250303655

**Appendix C: Energy Transfer Partners' Rover Pipeline Violations & Spills in Michigan, Ohio & West Virginia, February 2017-March 2018[1]**

**February 3, 2017:** FERC gives final approval for the Rover Pipeline, must clear trees before March 31st bat roosting. FERC denied ET a blanket certificate for Rover after demolishing a house that was under consideration for a national registry of historic homes, without first telling FERC.[2]

**March 2, 2017:** FERC approves the start of pipeline construction.[3]

**April 5, 2017:** unauthorized pollution release impacting tributaries of Woodfield Reservoir in Monroe County, OH failure to control stormwater [4]

**April 8, 2017:** ,000 gallons of drilling fluid pollution released into wetland near Indian Fork River, in Tuscarawas County, OH; covered 2500 square foot area of wetland [5]

**April 10, 2017:** 600 gallons of drilling fluid pollution released into stream, wetland and pond in Richland Township, Belmont County, OH [6]

**April 10, 2017:** unauthorized pollution release impacting tributaries of Woodfield Reservoir in Monroe County, OH failure to control stormwater [7]

**April 11, 2017:** unauthorized pollution release from failure to manage stormwater in Bloomdale, Wood County, OH [8]

**April 11, 2017:** Clean Air Act violation, open burning of site preparation material near a home in Toronto, Ohio [9]

**April 11, 2017:** Stormwater violations in Wood, Richland, and Crawford Counties, OH because of failure to manage vehicle tracking of drilling materials onto public roadways [10]

**April 12, 2017:** unauthorized pollution release into Bull Creek in Wood County, OH - failure to control stormwater [11]

---

[1] Much of this information was compiled and previously published as Sierra Club. 2017. Energy Transfer's Fracked Gas Pipeline Spills Six Times in Two Weeks, Has Seven Additional Violations. May 8. [link . ]
[2] U.S. Federal Energy Regulatory Commission (FERC). 2017. Order Issuing Certificates. February 2. [link   ]
[3] 2017. FERC Green Lights Rover Pipeline Construction. *Marcellus Drilling News*, March 6. [link   ]
[4] Ohio Environmental Protection Agency (EPA). 2017. Director's Final Findings and Orders. July 7. [link   ]
[5] Ohio EPA. 2017, p. 3.
[6] Ohio EPA. 2017, p. 3-4.
[7] Ohio EPA. 2017, p. 6.
[8] Ohio EPA. 2017, p. 7.
[9] Ohio EPA. 2017, p. 12.
[10] Ohio EPA. 2017, p. 7.
[11] Ohio EPA. 2017, p. 7.

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

Case ID: 250303655

**April 13, 2017:** 2 million gallons of drilling fluid pollution accumulating in high quality wetland adjacent to Tuscarawas River in Navarre Township, Stark County; covered 500,000 sq foot area of the category 3 wetland [12]

**April 14, 2017:** 50,000 gallons of drilling fluid pollution released into wetland in Mifflin Township, Richland County, OH [13]

**April 17, 2017:** 200 gallons of drilling fluid pollution released into a pond in Monroe Township, Harrison County, OH [14]

**April 22, 2017:** 200 gallons of drilling fluid pollution released into stream in Wooster Township, Wayne County, OH [15]

**April 26, 2017:** During a West Virginia DEP inspection, 6 violations are found related to Storm Water Pollution Prevention Plan (SWPPP)  and stream sediment deposits.[16]

**May 2, 2017:** unauthorized pollution release from failure to manage stormwater in Bloomdale, Wood County, OH [17]

**May 3, 2017:** unauthorized pollution release into Brushy Fork Creek, Cadiz, Harrison County, OH - failure to control stormwater[18]

**May 8, 2017:** approx. 10,000 gallons of bentonite slurry released during a pipeline installation. The drilling fluids surfaced in a pond and stream in Monroe Township, Harrison County and affected water quality.[19]

**May 8, 2017:** The Ohio EPA fines ETP $431,000 for "18 incidents involving mud spills from drilling, stormwater pollution and open burning at Rover pipeline construction sites have been reported between late March and Monday."[20]

**May 10, 2017:** FERC bans ETP from starting new horizontal directional drilling under waterways and roads.[21]

---

[12] Ohio EPA. 2017, p. 4.
[13] Ohio EPA. 2017, p. 5.
[14] Ohio EPA. 2017, p. 5.
[15] Ohio EPA. 2017, p. 5.
[16] West Virginia Department of Environmental Protection (DEP). 2017. Order Issued Under the Water Pollution Control Act, West Virginia Code, Chapter 22, Article 11. July 17. [link   ]
[17] Ohio EPA. 2017, p. 7.
[18] Ohio EPA. 2017, p. 7.
[19] Ohio EPA. 2017 p. 5.
[20] Renault, M. 2017. Ohio EPA orders Rover pipeline builder to pay $431,000 for violations. *The Columbus Dispatch*, May 8. [link   ]
[21] DiSavino, S. 2017. ETP's $4 billion Rover line hits another snag, this time in West Virginia.   *Reuters*, July 24. [link   ]

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

Case ID: 250303655

**May 19, 2017:** ETP acknowledges heavy rain causing pipeline trenches and work spaces to fill with water and spill onto fields of Ohio farmers.[22]

**May 24, 2017:** During a West Virginia DEP inspection, 6 violations are found related to Storm Water Pollution Prevention Plan (SWPPP), erosion control and stream sediment deposits.[23]

**May 25, 2017:** FERC rejects ETP request to resume drilling in Captina Creek and Middle Island Creek.[24]

**June 2 & 6, 2017:** During a West Virginia DEP inspection, 5 violations are found related to silt fences, erosion control and stream sediment deposits.[25]

**July 2, 2017:** 5,000 more gallons of drill slurry released into a Stark County area where the company was working on a five-foot borehole that would go under the Tuscarawas River. Work was already underway to deal with a previous spill in that area.[26]

**July 3, 2017:** 1,500 to 2,500 gallons of drilling mud took place at a nearby area ten feet from Tuscarawas River.[27]

**July 7, 2017:** Rover Pipeline LLC pays $1.5 million to the Ohio History Connection Foundation in an effort to mitigate harm after demolishing a building they had promised not to.[28]

**July 12, 2017:** During a West Virginia DEP inspection, 8 violations are found including sediment laden water depositing in nearby creeks and runs.[29]

**July 13, 2017:** FERC also issues a notice of violation claiming that ETP "did not fully and forthrightly disclose all relevant information" before demolishing a historic home.[30]

**July 17, 2017:** West Virginia's DEP issues a cease-and-desist order to stop work in the WV segment of the pipeline.[31]

---

[22] Hendrix, S. & M. Renault. 2017. Stormwater overflow from Rover pipeline construction affecting farms. *The Columbus Dispatch*, May 20. [link]
[23] West Virginia DEP. 2017.
[24] Henry, M. 2017. Rover Pipeline: Feds reject company's bid to restart drilling. *The Columbus Dispatch*, May 26. [link]
[25] West Virginia DEP. 2017.
[26] Ohio EPA. 2017, p. 6.
[27] Ohio EPA. 2017, p. 6.
[28] Gatehouse Ohio Media. 2017. Rover Pipeline settles dispute with state historical foundation for $1.5 million. *The Columbus Dispatch*, June 16. [link]
[29] West Virginia DEP. 2017.
[30] U.S. Federal Energy Regulatory Commission. 2017. Staff Notice of Alleged Violations, July 13. [link]
[31] West Virginia DEP. 2017; Ward Jr., K. 2017. DEP orders halt to Rover Pipeline construction. *Charleston Gazette-Mail*, July 25. [link]

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

Case ID: 250303655

**July 18, 2017:** ETP pushes stage-1 deadline from July to "late summer."[32]

**July 28, 2017:** Pipeline drilling causes landslides in Jefferson County, Ohio. According to township trustees, it's a result of drilling near old underground mines.[33]

**July 31, 2017:** Inspectors find failure to properly control erosion and incorrectly-installed sediment control devices in Hancock County, WV.[34]

**August 3, 2017:** Inspectors find failure to properly control erosion and incorrectly-installed sediment control devices in Marshall County, WV.[35]

**August 9, 2017:** West Virginia DEP lifts 7/17/17 cease and desist order.[36]

**August 31, 2017:** FERC approves ETP request to put Phase 1A of Rover Pipeline into service.[37]

**September 18, 2017:** Rover Pipeline, LLC receives permission from the Federal Energy Regulatory Commission to resume drilling construction.[38]

**September 20, 2017** The Ohio EPA asked the state Attorney General to "hold pipeline officials financially responsible for $2.3 million in fines related to numerous environmental violations."[39]

**September 21, 2017:** Soap wastewater used in boring operations and soil/sediment discharged into approximately 500 feet of waterway requiring 6,000 gallons of water to be recovered by vacuum truck. OH [40]

**September 26, 2017:** Appox 30 gallons of drilling fluids discharged into waters, wetlands in Washington Township, Belmont County, Ohio.[41]

---

[32] 2017. Rover Pipeline's Phase 1 In-Service Date Slips to "Late Summer". *Marcellus Drilling News*, July 18. [link   ]

[33] Conn, A. 2017. Pipeline drilling causing landslides in Jefferson County. WTOV9, July 31. [link   ]

[34] West Virginia DEP, Environmental Enforcement. 2017. Notice of Violation. July 31. [link   ]

[35] West Virginia DEP, Environmental Enforcement. 2017. Notice of Violation. August 3. [link   ]

[36] West Virginia DEP. 2017. August 9. [link   ] Ward Jr., K. 2017. More water violations found on Rover Pipeline construction sites. *Charleston Gazette-Mail*, August 19. [link   ]

[37] Energy Transfer Partners. 2017. Energy Transfer Announces FERC Approval to Put Phase 1A of the Rover Pipeline in Service. August 31. [link   ]

[38] Ohio EPA. 2017b. Rover Pipeline Resumes Construction, Immediately Spills Contaminants in Ohio Stream. September 22. [link   ]

[39] Renault, M. 2017. Ohio agency wants troubled Rover Pipeline to pay $2.3 million in fines. *The Columbus Dispatch*, September 20. [link   ]

[40] Ohio EPA. 2017b.

[41] Ohio EPA. 2017c. Subject: Violations from Inadvertent Returns by Rover Pipeline LLC Since September 8, 2017. November 22. [link   ]

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

Case ID: 250303655

**October 11, 2017:** Approx. 1200 gallons of drilling fluids discharged to waters, wetlands in Washington Township, Belmont County, Ohio.[42]

**October 14, 2017:** Rover Pipeline Spills Water Allegedly Containing Gasoline Into Michigan Wetlands[43]

**November 3, 2017**  Ohio Attorney General Mike DeWine files a lawsuit against Rover Pipeline LLC seeking "a court order requiring Rover to apply for state permits, to comply with environmental plans approved and ordered by the Ohio EPA, and to pay civil penalties of $10,000 per day per violation."[44]

**November 9, 2017:**    Approx. 60 gallons of drilling fluids discharged to waters, wetlands in Ashland Township, Ashland County.[45]

**November 14, 2017:**    Approx. 30 gallons of drilling fluids discharged to waters, wetlands in Milton Township, Ashland County, Ohio.[46]

**November 16, 2017:**    Approx. 200 gallons of drilling fluids discharged into Black Fork Mohican River in Milton Township, Ashland County.[47]

**December 14, 2017:** FERC Gives Rover clearance to restart all outstanding underground horizontal directional drilling (HDD) projects, including the location at Tuscarawas River.[48]

**January 17, 2018:** Rover Pipeline Spills Another 150,000 Gallons of Drilling Fluid Into Ohio Wetlands **at same 4/14/2017 site.**[49]

**January 24, 2018:** FERC again orders ETP to halt horizontal directional drilling under the Tuscarawas River in Ohio.[50]

---

[42] Ohio EPA. 2017c.
[43] Chow, L. 2017. Rover Pipeline Spills Water Containing Gasoline Into Michigan Wetlands. *EcoWatch*, October 14. [link   ]
[44] Ohio Attorney General. 2017. Ohio Files Lawsuit Against Rover Pipeline for Environmental Violations. November 3. [link   ]
[45] Ohio EPA. 2017c.
[46] Ohio EPA. 2017c.
[47] Ohio EPA. 2017c.
[48] 2017. FERC Gives Rover OK to Resume All HDD Work, Incl. Tuscarawas River. *Marcellus Drilling News*, December 15. [link   ]
[49] Chow, L. 2018. Rover Pipeline Spills Another 150,000 Gallons of Drilling Fluid Into Ohio Wetlands. *EcoWatch*, January 17. [link   ]
[50] Chow, L. 2018. FERC Again Orders Drilling Halt on Rover Pipeline Site After Another Spill. EcoWatch, January 25. [link   ] Kooistra, R. & J. Hites. 2018. FERC Staff Directs Rover Pipeline to Cease HDD Activity at the Tuscarawas River Site. *Washington Energy Report*, January 29. [link   ]

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

Case ID: 250303655

**January 29, 2018:**   Rover **is frustrated** by the inaccurate central premise underlying the letter received from the Federal Energy Regulatory Commission (FERC) ... directing operations to cease at the Tuscarawas River."[51]

**February 6, 2018:** FERC Gives Rover Pipeline permission to Restart Drilling Under Tuscarawas River[52]

**February 14, 2018:** Sen. Maria E. Cantwell (D-Wash.) and Rep. Frank Pallone Jr. (D-NJ)   ask FERC for a briefing on the Rover Pipeline project   **no later than 2/28/18.** [53]

**February 21, 2018:** Ohio EPA files a letter with FERC claiming the presence of toxic chemical tetrachloroethene at Rover's underground drilling site at the Tuscarawas River in southern Stark County.[54]

**March 5, 2018:** West Virginia Department of Environmental Protection orders a halt to construction after finding multiple water pollution violations.[55]

---

[51] Reuters staff. 2018. ETP says frustrated by order to stop Rover pipeline drilling in Ohio.   *Reuters*, January 29. [link   ]
[52] 2018. FERC Gives Rover Pipe OK to Restart Drilling Under Tuscarawas River. *Marcellus Drilling News*, February 7. [link   ]
[53] Snow, N. 2018. US Congressional committees request FERC for Rover gas line briefing. Oil & Gas Journal, February 16. [link   ]; Pallone, F. & M. Cantwell. 2018. Letter to Kevin J. McIntyre. February 14. [link   ]
[54] 2018. Ohio EPA Continues to Target Rover Pipe in New FERC Letter. *Marcellus Drilling News*, February 21. [link   ]
[55] Mishkin, K. 2018.  WV DEP orders Rover Pipeline to stop construction, citing multiple violations. *Charleston Gazette-Mail*, March 13. [link   ]; West Virginia DEP. 2018. Order Issued Under the Water Pollution Control Act, West Virginia Code, Chapter 22, Article 11. March 5. [link   ]

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

Case ID: 250303655



*Filed and Attested by the Office of Judicial Records 23 APR 2025 08:56 pm G. SMITH*

# EXHIBIT B

Bloomberg Law
Feb. 18, 2025, 3:42 PM EST
**Energy Transfer Leak Highlights Worst Fuel Spill Record in US**

- Firm's Sunoco Pipeline LP unit spilled 1,400 barrels in 2024
- Pennsylvania line leaked for 16 months, regulators say

**Energy Transfer** LP's Sunoco Pipeline LP unit, the operator of a Pennsylvania pipeline that regulators say leaked jet **fuel** for more than 16 months, spilled more refined fuels than any other operator **in** 2024, according to data compiled by Bloomberg.

The unit leaked about 1,400 barrels of refined **fuel** products from pipelines across the country last year, according to Pipeline and Hazardous Materials Safety Administration figures analyzed by Bloomberg. That's more than twice the amount spilled by any other operator. Pipelines operated by **Energy Transfer** Co. also leaked about 213 barrels.



Representatives of Dallas-based **Energy Transfer** didn't immediately respond to requests for comment.

**Energy Transfer** and its subsidiaries have been involved **in** other high-profile incidents, including a September fire **in** which an SUV crashed into an above-ground valve **in** Deer Park, Texas, and a pipeline construction project that spilled more than 80,000 gallons of fluid **in** Pennsylvania over three years starting **in** 2017.

To contact the reporters on this story:
**Jacob Wendler in** New York at jwendler5@bloomberg.net;
**Robert Tuttle in** Calgary at rtuttle@bloomberg.net

To contact the editors responsible for this story:
**Catherine Traywick** at ctraywick@bloomberg.net

Kevin Orland

© 2025 Bloomberg L.P. All rights reserved. Used with permission.

Case ID: 250303655

Exhibit B_Page 230 of 583

© 2025 Bloomberg Industry Group, Inc.   All Rights Reserved

Case ID: 250303655



*Filed and Attested by the Office of Judicial Records 23 APR 2025 08:56 pm G. SMITH*

# EXHIBIT C

Case ID: 250303655

**Exhibit B_Page 232 of 583**



**BRIAN K. FITZPATRICK**
1ST DISTRICT, PENNSYLVANIA

**PROBLEM SOLVERS CAUCUS**
CO-CHAIRMAN

271 CANNON HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
(202) 225-4276

1717 LANGHORNE-NEWTOWN RD.
SUITE 225
LANGHORNE, PA 19047
(215) 579-8102

**Congress of the United States**

**House of Representatives**

**Washington, DC 20515**

**COMMITTEES**

**INTELLIGENCE**
NATIONAL INTELLIGENCE
CHAIRMAN
DEFENSE INTELLIGENCE

**WAYS AND MEANS**
OVERSIGHT AND INVESTIGATIONS
HEALTH

**FOREIGN AFFAIRS**
INTELLIGENCE LIAISON

**NATO PARLIAMENTARY ASSEMBLY**

March 11, 2025

Acting Administrator Ben Kochman
Pipeline and Hazardous Materials Safety Administration
U.S. Department of Transportation
1200 New Jersey Ave, SE
Washington, DC 20590

Dear Acting Administrator Kochman,

I am writing to continue our ongoing dialogue concerning the Sunoco Pipeline that runs through Upper Makefield Township, which is operated by Energy Transfer. With each passing day, new evidence continues to surface, yet the questions raised months ago remain unanswered. Last week, I had the opportunity to meet in person with the resident Task Force that has been leading the advocacy efforts in the wake of the pipeline leak. As reflected in these persistent letters, the direct comments from constituents to your staff, and the shared anecdotes, it is clear that the community needs answers. Our community seeks assurances that the pipeline beneath their homes poses no threat to their safety or the environment. During our meeting, the Task Force presented several questions directed at both Energy Transfer and PHMSA, which I am passing along  and hope you will consider addressing with urgency and providing all documentation requested in the below questions. I believe these questions are crucial for the continued protection of our residents and the environment.

**Questions for PHMSA regarding Energy Transfer:**
1. What event or series of events triggered Sunoco to install Type A sleeves in the 1990s on the Twin Oaks pipeline?
2. What loss tolerance thresholds were established for the Twin Oaks pipeline before January 2025? Specifically, at what volumetric discrepancy levels does your agency's protocol mandate investigation until the cause is identified and remediated? What is the documented discrepancy between shipped and received petroleum volumes on the Twin Oaks pipeline since 2015, especially concerning volumetric losses not officially reported as releases to PHMSA?
3. Can PHMSA provide evidence that Sunoco has comprehensive and effective emergency response plans to adequately protect densely populated residential areas and critical natural resources in the event of a major pipeline failure? What enhanced preventative measures have been specifically implemented in the Mt. Eyre Manor neighborhood compared to lower-risk sections of the Twin Oaks pipeline? Please provide details on community engagement, inspection methodologies (internal and external), and specialized training for personnel responsible for this segment.
4. According to capital investment plans made before January 2025, what is the projected timeline for the complete replacement or major rehabilitation of the Twin Oaks pipeline infrastructure?
5. Can PHMSA provide the size, geographic location, and specific location on the pipe of any known dents on the Twin Oaks to Newark pipeline? Does the most recent inspection data indicate any metal loss, cracking, or stress risers at these dent locations, including the bottom dent associated with the leak in Upper Makefield?
6. Has Sunoco determined the age of the petroleum products recovered thus far? Please provide a chronological list of all hazardous liquids transported through the Twin Oaks to Newark pipeline from 2017 (the last known crack tool date) to present, including material safety data sheets and any additives such as corrosion inhibitors.

Case ID: 250303655

7. Can PHMSA provide the maintenance records and inspection data for inspections conducted after the earthquake on April 5th, 2024, and flooding on July 15th, 2023? How many near-miss incidents have been documented on the Twin Oaks pipeline system since 1980, according to your internal records maintained under API 1173 standards?

8. Many pipeline markers have been found missing, damaged, or decayed. What is Sunoco's plan for maintaining proper safety markers to ensure that residents and emergency response personnel have the necessary information? It has been years since emergency services in Upper Makefield have received pertinent pipeline information from Sunoco.

**General Questions for PHMSA:**

1. What threshold of evidence or severity of incidents must be met for PHMSA to recommend or mandate the immediate shutdown of a hazardous liquids pipeline, and how close is Sunoco's pipeline to reaching that threshold?

2. PHMSA has previously mandated pipeline shutdowns due to Type A sleeve failures and related integrity concerns. Given Sunoco's pipeline has experienced similar or equally serious issues, why has PHMSA not enforced the same action and mandated an immediate shutdown?

3. Has PHMSA independently verified Sunoco's pipeline inspection data and confirmed the absence of similar conditions to those that led to prior shutdowns, or has PHMSA primarily relied on self-reporting by Sunoco?

4. What specific criteria does PHMSA use to determine when a pipeline poses an unacceptable risk and must be immediately shut down, considering Sunoco's documented history of spills, leaks, regulatory violations, and ongoing safety concerns?

5. Can PHMSA provide full transparency regarding how it evaluates and compares pipeline integrity violations, such as Type A sleeve failures, to ensure fair and consistent application of pipeline safety enforcement, including decisions around shutdowns or continued operation?

As of 2023, 40.2% of hazardous liquid pipeline miles and 54.4% of gas transmission miles were installed before 1970. In November 2024, PHMSA issued an Advisory Bulletin identifying 9 pre-1970 pipe manufacturers, including National Tube Supply, whose pipes may have issues with hard spots that lead to cracks. Despite offering 6 safety actions for pipeline operators, Energy Transfer representatives were unaware of National Tube Supply's inclusion on PHMSA's list or any related safety actions. Given the high percentage of older pipelines, the final question to the agency is: Why are PHMSA's actions not mandatory?

Our community deserves to know that safety is a priority, and their concerns are being addressed with the urgency and seriousness they warrant. I respectfully ask that these questions raised by our constituents receive full and fair consideration as I believe this information is necessary information to protect our community.

Thank you for your prompt attention to this matter and I eagerly look forward to your response.

Sincerely,

Brian K. Fitzpatrick (PA-1)
*Member of Congress*



*Filed and Attested by the*
*Office of Judicial Records*
*23 APR 2025 08:56 pm*
*C. SMITH*

# EXHIBIT D



U.S. Department of Transportation
**Pipeline and Hazardous Materials**
**Safety Administration**

8701 S. Gessner, Suite 630
Houston TX 77074

**VIA ELECTRONIC MAIL TO: tom.long@energytransfer.com**

February 13, 2025

Thomas Long
Chief Executive Officer
Energy Transfer LP
8111 Westchester Drive
Dallas, TX 75225

**CPF No. 4-2025-054-NOPSO**

Dear Mr. Long:

Enclosed is a Notice of Proposed Safety Order (Notice) issued in the above-referenced case. The Notice proposes that Sunoco Pipeline, LP, take certain measures with respect to the Sunoco Twin Oaks Discharge pipeline system to ensure pipeline safety. Your options for responding are set forth in the Notice. Service of this Notice by electronic mail is deemed effective upon the date of transmission, or as otherwise provided under 49 CFR § 190.5.

We look forward to a successful resolution to ensure pipeline safety. Please direct any questions on this matter to me at (713) 773-7215.

Sincerely,

BRYAN JEFFERY
LETHCOE

Digitally signed by BRYAN
JEFFERY LETHCOE
Date: 2025.02.13 10:42:22 -06'00'

Bryan Lethcoe
Director, Southwest Region, Office of Pipeline Safety
Pipeline and Hazardous Materials Safety Administration

Enclosure:     Notice of Proposed Safety Order
               Copy of 49 C.F.R. § 190.239

Cc:            Ms. Linda Daugherty, Deputy Associate Administrator for Field Operations, OPS
               Greg McIlwain, Executive Vice President, Operations, Energy Transfer LP
               Eric Amundsen, Senior Vice President, Operations, Energy Transfer LP
               Todd Stamm, Senior Vice President, Operations, Energy Transfer LP
               Jennifer Street, Senior Vice President, Operations Services, Energy Transfer LP
               Keegan Pieper, Assistant General Counsel, Energy Transfer LP
               Mr. Matthew Stork, Vice President, Technical Services, Energy Transfer LP

Case ID: 250303655
**Exhibit B_Page 236 of 583**

Mr. Todd Nardozzi, Director – DOT Compliance, Energy Transfer LP
Ms. Susie Sjulin, Director – DOT Compliance, Energy Transfer LP
Mr. Vince Murchison, Murchison O'Neill PLLC

**DEPARTMENT OF TRANSPORTATION**
**PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION**
**OFFICE OF PIPELINE SAFETY**
**SOUTHWEST REGION**
**HOUSTON, TEXAS**

_____
                                                          )
**In the Matter of**                                      )
                                                          )
**Sunoco Pipeline LP,**                                   )          **CPF No. 4-2025-054-NOPSO**
                                                          )
**Respondent**                                            )
_____)

## NOTICE OF PROPOSED SAFETY ORDER

### Introduction and Purpose

The Pipeline and Hazardous Materials Safety Administration (PHMSA), Office of Pipeline Safety (OPS), is issuing this Notice of Proposed Safety Order (NOPSO or Notice) to Sunoco Pipeline LP (Sunoco or Respondent)[1] pursuant to the authority provided in 49 U.S.C. § 60117 and 49 CFR § 190.239.  As explained in more detail below, PHMSA has initiated an investigation of the safety of Sunoco's Twin Oaks Discharge pipeline system (Twin Oaks Pipeline or Pipeline) in Upper Makefield Township, Bucks County, Pennsylvania.  PHMSA initiated the investigation in response to a release on the Twin Oaks Pipeline that Sunoco discovered on January 31, 2025 (Failure).[2]  The Twin Oaks Pipeline is a hazardous liquid pipeline facility that is subject to PHMSA's jurisdiction pursuant to the Pipeline Safety Act, 49 U.S.C. § 60101 _et seq._, and Pipeline Safety Regulations, 49 CFR Parts 190 to 199.

PHMSA's ongoing investigation indicates that conditions may exist on the Twin Oaks Pipeline that pose a pipeline integrity risk to public safety, property, or the environment.  Specifically, PHMSA's preliminary investigation indicates that the Pipeline experienced a leak in a high consequence area for at least 16 months, resulting in the release of jet fuel that has migrated into several adjacent water wells and caused additional impacts to property and the environment. PHMSA's preliminary investigation also indicates that the leak originated at a sleeve installed in the mid-1990s, that there are at least 44 other sleeves of a similar vintage installed at other locations on the Pipeline, and that these locations may be at risk of experiencing a similar leak in the future. For these reasons, it appears that the continued operation of the Twin Oaks Pipeline without corrective measures would pose a pipeline integrity risk to public safety, property, or the environment.

---

[1] Sunoco is a subsidiary of Energy Transfer LP.
[2] Sunoco became aware of the release on January 31, 2025, however, the first day of the release is unknown.

Case ID: 250303655

**Exhibit B_Page 238 of 583**

2

This NOPSO notifies Sunoco of the preliminary findings of the investigation and proposes that Sunoco take measures to ensure that the public, property, and the environment are protected from the potential risk.

**Background**

On September 25, 2023, the Pennsylvania Public Utilities Commission (PAPUC) notified PHMSA of an odor complaint that a resident at 128 Walker Road, Upper Makefield Township, Pennsylvania, previously reported to the Pennsylvania Department of Environmental Protection (PADEP). The resident's report indicated that there was a strange taste and the smell of gasoline in their well water.

After being notified of the odor complaint, PHMSA directed Sunoco to conduct an investigation. Sunoco responded by testing additional local wells, performing soil testing, and excavating a 25-foot section of the Twin Oaks Pipeline. Sunoco did not discover a leak at that time, and all samples indicated a negative result for hydrocarbons.

On January 21, 2025, PADEP informed PHMSA that samples obtained from a well at the property located at 107 Spencer Road, Upper Makefield Township, Pennsylvania, indicated the presence of kerosene (a major component of JP-8 jet fuel). PHMSA Accident Investigation Division (AID) notified Sunoco of these results and directed Sunoco to conduct another investigation.

On January 31, 2025, Sunoco identified a leak on the Twin Oaks Pipeline after excavating a previously repaired location adjacent to 121 Glenwood Drive, at pipeline station 52/4170 (2787+30). The leak appeared to be a slow drip from a sleeved portion of the pipeline. The sleeve had been installed in 1995 to reinforce a dent.

After locating the leak, Sunoco shut-in a segment of the Twin Oaks Pipeline by closing valves at Bucks pump Station, Delaware River (West), Delaware River (East), and Hopewell. High and low point vent and extraction vent thread-o-ring fittings (TORs) were installed to drain the jet fuel product to vacuum trucks and tankers at the extraction points. Sunoco cut out the failed section without removing the Type A sleeve and transported that section to Columbus, Ohio, for inspection and metallurgical analysis by a third party, DNV.

Sunoco notified the National Response Center (NRC) of the release on the Twin Oaks Pipeline at 16:25 Eastern Time on January 31, 2025. Sunoco made a second report to the NRC on February 2, 2025, at 16:03 Eastern Time and provided an estimated release amount of 156 barrels. Sunoco also notified PADEP.

On February 2, 2025, Sunoco completed its repair of the failed section and returned the Twin Oaks Pipeline to service. The Twin Oaks Pipeline is currently operating at a reduced pressure of 880 pounds per square inch gauge (psig), which is 20 percent below the operating pressure at the time Sunoco discovered the failure.

The preliminary findings of PHMSA's ongoing investigation are as follows:

3

**Preliminary Findings:**

- The Twin Oaks Pipeline is a 14-inch diameter pipeline that transports petroleum products, including jet fuel, diesel, and gasoline, from the Twin Oaks Terminal in Aston, Pennsylvania, to the Newark Terminal in Newark, New Jersey. The Twin Oaks Pipeline includes one break out tank in the Newark Terminal, and one pump station in Bucks County, Pennsylvania.

- The Twin Oaks Pipeline was originally constructed in 1958. The pipe at the failure location is 0.25 inches thick, API 5L grade X-52, seamless, and was manufactured by National Tube Supply Company. The pipeline has a somastic (asphalt mastic) coating and cathodic protection. The maximum operating pressure (MOP) of the Twin Oaks Pipeline is 1200 psig. When Sunoco discovered the failure, the operating pressure was 1100 psig.

- On September 25, 2023, PHMSA notified Sunoco of an odor complaint that PADEP received from a resident at 128 Walker Road. Sunoco investigated the complaint as follows:

  - Respondent dispatched a pipeline technician to probe with a photoionization detector (PID) Gas detector along the pipeline behind 121 Glenwood and in front of 128 Walker and 123 Glenwood; all results were reported as non-detect.

  - Respondent hired a contractor to test the well water at 128 Walker Road; results were reported as non-detect. The contractor also tested the well water for 121 and 123 Glenwood Drive, and 126 Walker Road; all results were reported as non-detect.

  - Respondent excavated about 25 feet of the pipeline located behind 121 Glenwood Drive with no issues or concerns detected. Respondent performed soil testing in the excavation and those results were reported as non-detect.

  - The operator performed a 4-hour static pressure test to check for lowering pressure indicative of a pipeline leak; Respondent has indicated that the results were reported to be within acceptable limits.

- On June 28, 2024, Respondent received an odor complaint from 108 Spencer Road. Respondent investigated the complaint as follows:

  - Respondent dispatched a pipeline technician with a 4 - Gas detector to the site; all results were reported as non-detect. No dead vegetation or anything out of the ordinary was observed above the pipeline.

  - Respondent did not report this odor complaint to PHMSA.

Case ID: 250303655

**Exhibit B_Page 240 of 583**

4

- On July 21, 2024, Respondent received an odor complaint from 121 Glenwood Drive. Respondent investigated the complaint as follows:

  o Respondent dispatched a pipeline technician to the site and probed with a 4 - Gas detector; all results were reported as non-detect.  No dead vegetation or anything out of the ordinary was observed above the pipeline.

  o Respondent did not report this odor complaint to PHMSA.

- On November 21, 2024, Respondent received an odor complaint from 107 Spencer Road.  Respondent investigated the complaint as follows:

  o Respondent dispatched a pipeline technician and probed with a 4 - Gas detector to the site; all results were reported as non-detect.  No dead vegetation or anything out of the ordinary was observed above the pipeline.

  o Respondent performed a 4-hour static pressure test to check for lowering pressure indicative of a pipeline leak; the results were reported to be within acceptable limits (although acceptance criteria were not reported by the operator).

  o Respondent did not report this odor complaint to PHMSA.

- On January 21, 2025, PADEP informed PHMSA that samples obtained from a well at 107 Spencer Road indicated the presence of kerosene (a major component of JP-8 jet fuel).  PHMSA AID notified Sunoco of the test results and directed Sunoco to investigate.

- From January 22 through January 31, 2025, Respondent proceeded to probe the entire pipeline from 121 Glenwood Drive to 155 Glenwood Drive using a PID Gas detector; all results were non-detect.  Respondent had a contractor sample about twenty-five (25) landowners' well water for hydrocarbons.  Three (3) landowners' wells were identified as having positive results for hydrocarbons at 107 Spencer Road, 108 Spencer Road, and 128 Glenwood Drive.

- On January 31, 2025, Respondent identified the leak location after excavating a previously repaired location on the pipeline adjacent to 121 Glenwood Drive, at station 52/4170 (2787+30).  Visual inspection revealed that the leak was a slow drip from a Type A sleeve originally installed in 1995.  Type A sleeves are used to reinforce a portion of pipe with a non-leaking defect, with the goal of restoring the pipeline's original strength.

- The Failure occurred adjacent to 126 Walker Rd, Upper Makefield Township, Bucks County, Pennsylvania.  The exact start date of the Failure is unknown. The failure occurred in a High Consequence Area (HCA) as defined in 49 CFR § 195.450, located in a residential subdivision just to the west of the Delaware River.  The Twin Oaks

Case ID: 250303655

Exhibit B_Page 241 of 583

5

Pipeline runs through mostly suburban areas.  It travels in a northeast direction from Philadelphia, Pennsylvania, to Newark, New Jersey.  The pipeline crosses numerous rivers and waterways and runs adjacent to numerous state and local parks.

- Sunoco notified the National Response Center (NRC) of the Failure at 16:25 Eastern Time on January 31, 2025, and reported a release of 156 barrels of jet fuel.

- After locating the leak, Sunoco shut in a segment of the Twin Oaks Pipeline, closing valves at Bucks pump Station, Delaware River (West), Delaware River (East), and Hopewell.  High and low point vent and extraction vent thread-o-ring fittings (TORs) were installed to drain the jet fuel product to vacuum trucks and tankers at the extraction points.

- Sunoco cut out the failed section of the Twin Oaks Pipeline without removing the Type A sleeve and transported the pipe to DNV in Columbus, Ohio, for inspection and metallurgical analysis.

- On February 2, 2025, PHMSA Southwest Region Director by email informed Sunoco he did not object to the repair plan and return to service plan for the pipeline.

- Sunoco completed the repairs and returned the pipeline to service on February 2, 2025.

- Local drinking water wells are contaminated with JP-8 jet fuel to varying degrees.  Jet fuel apparently has entered the aquafer and is detected in various quantities in surrounding drinking water wells to the east of the Failure location.

- The release of jet fuel poses a risk to public safety, property, or the environment.  Jet fuel is a colorless flammable liquid that ignites at certain temperatures; jet fuel exposure can lead to skin irritation and drowsiness or dizziness in affected populations; and jet fuel ingestion may cause harm to the respiratory tract, gastrointestinal tract, and nervous systems.[3]

- During a public meeting held on February 6, 2025, residents of other neighborhoods located in the vicinity of the Failure reported a gasoline smell in their water.

- On February 8 and February 10, 2025, Sunoco excavated five (5) locations immediately upstream of the Failure location to evaluate the condition of six (6) Type A sleeves that had been installed in 1989 to reinforce a variety of defect types.  These excavations discovered no additional leaks and no abnormal conditions were noted.

- On February 12, 2025, PHMSA investigators witnessed the preliminary phase of the metallurgical testing of the portion of the pipeline that Sunoco sent to DNV for further

_____

[3] "Public Health Statement: JP-5, JP-8, and Jet A Fuels," Agency for Toxic Substances and Disease Registry, Division of Toxicology and Human Health Services, March 2017, https://www.atsdr.cdc.gov/ToxProfiles/tp121-c1-b.pdf. These hazards are confirmed by the Safety Data Sheets (SDS) for the JP-8 jet fuel transported in the Twin Oaks Pipeline.

Case ID: 250303655

**Exhibit B_Page 242 of 583**

6

analysis.  The preliminary testing indicates that the failure occurred as a result of a 2.5-inch axial crack associated with a bottom-side dent.

- Sunoco has advised PHMSA that there are at least forty-four (44) other Type A sleeves on the Twin Oaks Pipeline that were installed in the late 1980s and early 1990s. PHMSA understands some of those Type A sleeves were installed to reinforce dents.

- PHMSA is aware of a gasoline release in Huntersville, North Carolina, discovered on August 14, 2020, in which 28,571 barrels were released through a through-wall crack which developed in a shallow dent reinforced with a Type A sleeve.  The release was also not detected by the pipeline operator's leak detection system.

- Prior to this Failure, there have been two (2) reportable failures on the Twin Oaks Pipeline since 1986.

  o On October 7, 1986, a failure occurred in Montgomery County, Pennsylvania, which was caused by a crack in the pipeline, resulting in the release of 5260 barrels of refined product.

  o On March 19, 2004, a failure occurred in Delaware County, Pennsylvania, which was caused by external corrosion, resulting in the release of 50 barrels of refined product.

- The investigation of the Failure is on-going, and information could change.  These preliminary findings may be amended based on further findings during the investigation.

**Proposed Issuance of Safety Order**

Section 60117(m) of Title 49, United States Code, provides for the issuance of a safety order, after reasonable notice and the opportunity for a hearing, requiring corrective measures, which may include physical inspection, testing, repair, or other action, as appropriate.  The basis for making the determination that a pipeline facility has a condition or conditions that pose a pipeline integrity risk to public safety, property, or the environment is set forth both in the above-referenced statute and 49 CFR § 190.239, a copy of which is enclosed.

After evaluating the foregoing preliminary findings of fact, and having considered the characteristics of the pipeline, including prior Type-A sleeve repairs involving dents and other defects; the prior failures of the pipeline; the hazardous nature of the petroleum products, including jet fuel, transported; the uncertainty as to the root cause(s) of the failure; the proximity of the pipeline to residential dwellings and water wells; the existing and potential additional impacts to property, the environment, and wildlife; and the possibility that the same condition(s) that may have caused the failure remain present in the pipeline and could lead to additional failures; it appears that the continued operation of the Twin Oaks Discharge pipeline system without corrective measures would pose a pipeline integrity risk to public safety, property, or the environment.  The conditions and threats described above potentially exist throughout the Twin

Case ID: 250303655

**Exhibit B_Page 243 of 583**

7

Oaks Pipeline. Further, Sunoco's apparent inability to effectively detect the leak has potentially exacerbated the impacts of the release over an extended period of time. Accordingly, corrective measures are necessary to mitigate the pipeline integrity risk of the pipeline system to protect public safety, property, and the environment.

Accordingly, PHMSA issues this Notice of Proposed Safety Order to notify Respondent of the proposed issuance of a safety order and to propose that Respondent take measures specified herein to address the potential risk.

**Proposed Corrective Measures**

Pursuant to 49 U.S.C. § 60117(m) and 49 CFR § 190.239, PHMSA proposes to issue to Sunoco a safety order incorporating the following remedial requirements with respect to the affected pipeline.

For the purposes of this Notice, "Director" means the Director, PHMSA, Office of Pipeline Safety, Southwest Region. "*Affected Pipeline*" refers to the entire Twin Oaks Pipeline, which is approximately 105.5 miles in length from the Twin Oaks Terminal in Aston, Pennsylvania, to the Newark Terminal in Newark, New Jersey.

1. **Operating Pressure Restriction.** Sunoco must reduce and maintain a twenty percent (20%) pressure reduction in the actual operating pressure along the entire length of the *Affected Pipeline*, such that the operating pressure does not exceed eighty percent (80%) of the actual operating pressure in effect immediately prior to the Failure discovered on January 31, 2025.

   a. This pressure restriction is to remain in effect until written approval to increase the pressure or return the pipeline to its pre-Failure operating pressure is obtained from the Director.

   b. Within 15 days of receipt of the Safety Order, Sunoco must provide the Director the actual operating pressures of each pump station and each main line pressure regulating station on the *Affected Pipeline* at the time of the Failure discovered on January 31, 2025, and the reduced pressure restriction set-points at these same locations.

   c. This pressure restriction requires any relevant remote or local alarm limits, software programming set-points or control points, and mechanical over-pressure devices to be adjusted accordingly.

   d. When determining the pressure restriction set-points, Sunoco must take into account any in-line inspection (ILI) features or anomalies present in the *Affected Pipeline* to provide for continued safe operation while further corrective actions are completed.

   e. Sunoco must review the pressure restriction monthly by analyzing the operating pressure data, taking into account any ILI features or anomalies present in the *Affected Pipeline*. Sunoco must immediately reduce the operating pressure to maintain the safe operations of the *Affected Pipeline*, if warranted by the monthly review. Further, Sunoco must submit the results of the monthly review to the Director including, at a

minimum, the current discharge set-points (including any additional pressure reductions), and any pressure exceedance at discharge set-points.

2. **Type A Sleeve Integrity Plan**.  Within 90 days of receipt of the Safety Order, Sunoco must provide to the Director for approval a plan to evaluate the integrity of each Type A sleeve on the *Affected Pipeline*.  In preparing that plan, Sunoco must consider type, characteristics (size, depth, orientation), and other integrity considerations of the anomaly(ies) or defect(s) reinforced by the sleeve; sleeve characteristics (age, grade, length, thickness, coating, wrap, use of epoxy); cathodic protection; inline inspection results; nondestructive evaluation or testing records; and any other relevant factors in evaluating the integrity of a Type A sleeve.  The plan must also provide for the removal of each Type A sleeve on the *Affected Pipeline* whose integrity cannot be reasonably assured.  The plan must be part of the Remedial Work Plan developed in Item 3 below.  For any sleeve not removed, the plan must provide a technical justification for the Type A Sleeve remaining on the *Affected Pipeline* and describe the additional pipeline integrity management measures to be implemented to ensure the safety and integrity of the *Affected Pipeline* in light of any integrity risk related to the sleeve.

3. **Remedial Work Plan (RWP).**

   a. Within 90 days of receipt of the Safety Order, Sunoco must submit a Remedial Work Plan (RWP) to the Director for prior approval.

   b. The Director may approve the RWP incrementally without approving the entire RWP.

   c. Upon approval by the Director, the RWP becomes incorporated by reference into the Safety Order.

   d. The RWP must specify the tests, inspections, assessments, evaluations, and remedial measures Respondent will use to verify the integrity of the *Affected Pipeline*. It must address all known or suspected factors and causes of the Failure discovered on January 31, 2025.  Sunoco must consider the risks and consequences of another failure to develop a prioritized schedule for RWP-related work along the *Affected Pipeline.*

   e. The RWP must include a procedure or process to:

      i. Identify pipe in the *Affected Pipeline* with characteristics similar to the contributing factors identified for the Failure discovered on January 31, 2025.

      ii. Gather all data necessary to review the failure history (in service and pressure test failures) of the *Affected Pipeline* and to prepare a written report containing all the available information such as the locations, dates, and causes of leaks and failures.

      iii. Integrate the results of the metallurgical testing, root cause failure analysis, and other corrective actions required by this Order with all relevant pre-existing operational and assessment data for the *Affected Pipeline.*  Pre-existing operational data includes, but is not limited to, design, construction, operations, maintenance, testing, repairs, prior metallurgical analyses, and any third-party consultation information.  Pre-existing assessment data includes, but is not limited to, ILI tool runs, hydrostatic pressure testing, direct assessments, close interval surveys, and

Case ID: 250303655

DCVG/ACVG surveys.

iv. Determine if conditions similar to those contributing to the Failure discovered on January 31, 2025, are likely to exist elsewhere on the *Affected Pipeline.*

v. Conduct additional field tests, inspections, assessments, and evaluations to determine whether, and to what extent, the conditions associated with the Failure discovered on January 31, 2025, and other failures from the failure history (see (e)(ii) above) or any other integrity threats are present elsewhere on the *Affected Pipeline*. At a minimum, this process must consider all failure causes and specify the use of one or more of the following:

    1) ILI tools that are technically appropriate for assessing the pipeline system based on the cause of Failure discovered on January 31, 2025, and that can reliably detect and identify anomalies,

    2) Hydrostatic pressure testing,

    3) Close-interval surveys,

    4) Cathodic protection surveys, to include interference surveys in coordination with other utilities (e.g., underground utilities, overhead power lines, etc.) in the area,

    5) Coating surveys,

    6) Stress corrosion cracking surveys,

    7) Selective seam corrosion surveys; and

    8) Other tests, inspections, assessments, and evaluations appropriate for the failure causes.

Note: Sunoco may use the results of previous tests, inspections, assessments, and evaluations if approved by the Director, provided the results of the tests, inspections, assessments, and evaluations are analyzed with regard to the factors known or suspected to have caused the January 31, 2025 Failure.

vi. Describe the inspection and repair criteria Sunoco will use to prioritize, excavate, evaluate, and repair anomalies, imperfections, and other identified integrity threats. Include a description of how any defects will be graded and a schedule for repairs or replacement.

vii. Based on the known history and condition of the *Affected Pipeline,* describe the methods Sunoco will use to repair, replace, or take other corrective measures to remediate the conditions associated with the pipeline failure on January 31, 2025, and to address other known integrity threats along the *Affected Pipeline*. The repair, replacement, or other corrective measures must meet the criteria specified in (e)(vi) above.

viii. Evaluate the effectiveness and capability of Sunoco's leak detection system on the *Affected Pipeline*, including main lines, stub lines, and delivery lines. At a minimum, Sunoco's evaluation must consider the following factors—length and size of the pipeline, type of product carried, the swiftness of leak detection, limitations on detectable quantities, location of nearest response personnel, and

leak history.  This evaluation must also consider maximum operating pressure (MOP), normal operating pressures, flow rates (or throughput), and impacts from any pressure cycles or operational changes.  For mainline segments that could affect high consequence areas (HCAs), Sunoco's evaluation must consider the pipeline's proximity to the HCA and risk assessment results.

ix.  Based on the findings of the evaluation pursuant to paragraph viii of this subparagraph, determine corrective measures to improve the effectiveness of Sunoco's leak detection system. Sunoco must consider latest advancements in technology that present the potential to improve the capability of its leak detection system to detect the type of leak that occurred.  The corrective measures must result in improving the capability of the leak detection system to detect leaks that could potentially affect public safety, property, or the environment, similar to (but not limited to) leaks with characteristics common to those referenced above.

x.  Evaluate Sunoco's written plans and procedures for inspection and maintenance that address leak detection, right-of-way inspection and repairs and determine the extent to which the written plans contribute to the elimination of hazardous leaks. Based on the findings, determine appropriate amendments to improve the extent to which the plans contribute to the elimination of hazardous leaks.

xi.  Evaluate the effectiveness of Sunoco's ROW inspection program as it pertains to leak detection.  This evaluation must consider any geographic regions or features (i.e., HCAs and other sensitive areas) that may require specific or additional means of patrol. Based on the findings, determine corrective measures to improve the effectiveness of Sunoco's ROW inspection program relative to leak detection.

xii.  Implement continuing long-term periodic testing and integrity verification measures  to ensure the ongoing safe operation of the *Affected Pipeline* considering the results of the analyses, inspections, evaluations, and corrective measures undertaken pursuant to the Order.

f.  Include a proposed schedule for completion of the RWP.

g.  Sunoco must revise the RWP as necessary to incorporate new information obtained during the failure investigation and remedial activities, to incorporate the results of actions undertaken pursuant to the Safety Order, and/or to incorporate modifications required by the Director.

i.  Submit any plan revisions to the Director for prior approval.

ii.  The Director may approve plan revisions incrementally.

h.  Implement the RWP as it is approved by the Director, including any revisions to the plan.

4.  **Third-Party Facilitator**. Paragraphs (e)(viii) through (e)(xi) of the Work Plan must be facilitated by an independent third-party with relevant expertise approved by the Director.

Case ID: 250303655

**Exhibit B_Page 247 of 583**

Any documentation from the third-party facilitator must be included in each required submission to the Director.

5. **Instrumented Leakage Survey.**  Within 30 days after the Safety Order is issued, Sunoco must perform a ground instrument leakage survey of the *Affected Pipeline*.  Sunoco must investigate all leak indications and remedy all leaks discovered.  Sunoco must submit documentation of this survey to the Director within 45 after the Safety Order is issued.

6. **Review of Prior In-line Inspection (ILI) Results.**

    a. Within 30 days after the Safety Order is issued, Respondent must conduct a review of any previous ILI results of the *Affected Pipeline*.  In its review, Sunoco must re-evaluate all ILI results from the past 10 calendar years, including a review of the ILI vendors' raw data and analysis.  Sunoco must determine whether any features were present in the failed pipe joint and any other pipe removed.  Also, Respondent must determine if any features with similar characteristics are present elsewhere on the *Affected Pipeline*.  Sunoco must submit documentation of this ILI review to the Director within 45 days after the Safety Order is issued as follows:

        i. List all ILI tool runs, tool types, and the calendar years of the tool runs.

        ii. List, describe (type, size, wall loss, etc.), and identify the specific location of all ILI features present in the failed joint and other pipe removed.

        iii. List, describe (type, size, wall loss, etc.), and identify the specific location of all ILI features with similar characteristics present elsewhere on the *Affected Pipeline*.

        iv. Explain the process used to review the ILI results and the results of the reevaluation.

7. **Mechanical and Metallurgical Testing**. Within 45 days after the Safety Order is issued, Sunoco must complete mechanical and metallurgical testing and failure analysis of the failed pipe, including an analysis of soil samples and any foreign materials.  Mechanical and metallurgical testing must be conducted by an independent third-party acceptable to the Director and must document the decision-making process and all factors contributing to the failure.  Respondent must complete the testing and analysis as follows:

    a. Document the chain-of-custody when handling and transporting the failed pipe section and other evidence from the Failure site.

    b. Within 10 days of receipt of this Order, develop and submit the testing protocol and the proposed testing laboratory to the Director for prior approval.

    c. Prior to beginning the mechanical and metallurgical testing, provide the Director with the scheduled date, time, and location of the testing to allow for an OPS representative to witness the testing.

    d. Ensure the testing laboratory distributes all reports whether draft or final in their entirety to the Director at the same time they are made available to Respondent.

8. **Root Cause Failure Analysis.** Within 90 days after the Safety Order is issued, complete a root cause failure analysis (RCFA) and submit a final report of this RCFA to the

12

Director.  The RCFA must be supplemented or facilitated by an independent third-party acceptable to the Director and must document the decision-making process and all factors contributing to the Failure.  The final report must include findings and any lessons learned and whether the findings and lessons learned are applicable to other locations within Sunoco's pipeline system.

9. **Leak Detection Plan.** Within 90 days after the Safety Order is issued, Sunoco must perform a review and submit to the Director a written plan to improve the leak detection capability on the *Affected Pipeline*.  This review must include a comprehensive analysis of any SCADA, leak detection, surveillance, and other monitoring systems on the *Affected Pipeline*.  The written plan must include a schedule for improving the leak detection capability of the *Affected Pipeline* through additional instrumentation, updated hardware or software, installation of a computational pipeline monitoring system and associated software programming, additional surveillance, pipeline control staffing, ongoing leak surveys, and any other appropriate measures.

10. **Emergency Response Plan and Training Review.** Within 90 of receipt of the Safety Order, Sunoco must review and assess the effectiveness of its emergency response plan with regards to the Failure.  Sunoco must include in the review and assessment the on-scene response and support, coordination, and communication with emergency responders and public officials.  Sunoco must also include a review and assessment of the effectiveness of its emergency training program. Sunoco must amend its emergency response plan and emergency training, if necessary, to reflect the results of this review. The documentation of this *Emergency Response Plan and Training Review* must be available for inspection by OPS or provided to the Director, if requested.

11. **Public Awareness Program Review.**  Sunoco must review and assess the effectiveness of its Public Awareness program with regards to the Failure. Sunoco must amend its Public Awareness Program, if necessary, to reflect the results of this review.  The documentation of this *Public Awareness Plan Program Review* must be available for inspection by OPS or provided to the Director, if requested.

**Other Requirements:**

12. **Approvals.** With respect to each submission under the Safety Order that requires the approval of the  Director, the Director may: (a) approve, in whole or part, the submission; (b) approve the submission on specified conditions; (c) modify the submission to cure any deficiencies; (d) disapprove in whole or in part, the submission, directing that Respondent modify the submission, or (e) any combination of the above. In the event of approval, approval upon conditions, or modification by the Director, Respondent shall proceed to take all action required by the submission as approved or modified by the Director. If the Director disapproves all or any portion of the submission, Respondent must correct all deficiencies within the time specified by the Director and resubmit it for approval.

13. **Extensions of Time.**  The Director may grant an extension of time for compliance with any of the terms of the Safety Order upon a written request timely submitted

Case ID: 250303655

**Exhibit B_Page 249 of 583**

demonstrating good cause for an extension.

14. **Reporting.**  Submit quarterly reports to the Director that: (1) include all available data and results of the testing and evaluations required by this Order; and (2) describe the progress of the repairs or other remedial actions being undertaken.  The first quarterly report is due on April 1, 2025. The Director may change the interval for the submission of these reports.

15. **Documentation of the Costs.** It is requested that Respondent maintain documentation of the costs associated with implementation of the Safety Order.  Include in each monthly report submitted, the to-date total costs associated with: (1) preparation and revision of procedures, studies and analyses; (2) physical changes to pipeline infrastructure, including repairs, replacements and other modifications; and (3) environmental remediation.

The actions proposed by this Notice of Proposed Safety Order are in addition to and do not waive any requirements that apply to Respondent's pipeline system under 49 CFR Parts 190 through 199, under any other order issued to Respondent under authority of 49 U.S.C. § 60101 *et seq.*, or under any other provision of Federal or state law.

After receiving and analyzing additional data in the course of this proceeding and implementation of the corrective measures, PHMSA may identify other safety measures that need to be taken.  In that event, Respondent will be notified of any proposed additional measures and, if necessary, amendments to the Safety Order.

**Response to this Notice**

In accordance with § 190.239, you have 30 days following receipt of this Notice to submit a written response to the official who issued the Notice.  If you do not respond within 30 days, this constitutes a waiver of your right to contest this Notice and authorizes the Associate Administrator for Pipeline Safety to find facts as alleged in this Notice without further notice to you and to issue a Safety Order.  In your response, you may notify that official that you intend to comply with the terms of the Notice as proposed, or you may request that an informal consultation be scheduled (you will also have the opportunity to request an administrative hearing before a safety order is issued).  Informal consultation provides you with the opportunity to explain the circumstances associated with the risk condition(s) alleged in the notice and, as appropriate, to present a proposal for a work plan or other remedial measures, without prejudice to your position in any subsequent hearing.

If you and PHMSA agree within 30 days of informal consultation on a plan and schedule for you to address each identified risk condition, we may enter into a written consent agreement (PHMSA would then issue an administrative consent order incorporating the terms of the agreement).  If a consent agreement is not reached, or if you have elected not to request informal consultation, you may request an administrative hearing in writing within 30 days following receipt of the Notice or within 10 days following the conclusion of an informal consultation that did not result in a consent agreement, as applicable.  Following a hearing, if the Associate Administrator finds the facility to

14

have a condition that poses a pipeline integrity risk to the public, property, or the environment in accordance with § 190.239, the Associate Administrator may issue a safety order.

Be advised that all material you submit in response to this enforcement action is subject to being made publicly available. If you believe that any portion of your responsive material qualifies for confidential treatment under 5 U.S.C. 552(b), along with the complete original document you must provide a second copy of the document with the portions you believe qualify for confidential treatment redacted and an explanation of why you believe the redacted information qualifies for confidential treatment under 5 U.S.C. 552(b).

In your correspondence on this matter, please refer to **CPF No. 4-2025-054-NOPSO** and for each document you submit, please provide a copy in electronic format whenever possible.

BRYAN JEFFERY LETHCOE

Digitally signed by BRYAN JEFFERY LETHCOE
Date: 2025.02.13 14:32:28 -06'00'

February 13, 2025
Date issued

Bryan Lethcoe
Director, Southwest Region, Office of Pipeline Safety
Pipeline and Hazardous Materials Safety Administration

Case ID: 250303655
**Exhibit B_Page 251 of 583**



# EXHIBIT E

Case ID: 250303655

**Exhibit B_Page 252 of 583**



Pennsylvania
**Department of
Environmental Protection**

**SENT VIA ELECTRONIC MAIL ONLY**

February 18, 2025

## NOTICE OF VIOLATION

To:     Matthew Gordon, Vice President Operations
        Energy Transfer
        535 Fritztown Road
        Sinking Springs, PA 19333
        matthew.gordon@energytransfer.com

Re:     Mount Eyre Neighborhood
        Washington Crossing LNAPL Incident and Investigation
        Pennsylvania Pipeline (a.k.a. Twin Oaks–Newark Pipeline)
        Upper Makefield Township
        Bucks County

Dear Mr. Gordon:

On January 31, 2025, Energy Transfer notified the Department of Environmental Protection (DEP) of a discharge from their 14" pipeline located in the Mt. Eyre neighborhood in Washington Crossing, Bucks County.

This discovery came after investigation by DEP and Energy Transfer and after both organizations communicated with residents and Upper Makefield Township regarding ongoing reports of petroleum odors in residential wells.

Energy Transfer has described the discharge as emanating from the sleeved portion of the 14" Jet Fuel Line. To date this release has caused free product and dissolved concentrations of petroleum-related chemicals in potable wells in the neighborhood, with some properties having contamination exceeding DEP's Statewide health standard medium specific concentrations in their drinking water.

The above referenced discharge to Waters of the Commonwealth constitutes a violation of Section 401 of the Clean Streams Law, 35 P.S. § 691.401 (Clean Streams Law). Such violation also constitutes unlawful conduct under Section 611 of the Clean Streams Law, 35 P.S. § 691.611, and is subject to the enforcement provisions of Section 605 of the Clean Streams Law, 35 P.S, § 691.605, which includes the assessment of civil penalties.

Case ID: 250303655

**Exhibit B_Page 253 of 583**

Matthew Gordon

2                                           February 18, 2025

DEP requests the following information be provided within 15 days of the date of this letter at a minimum:

1.    A description of the circumstances causing the incident and how the circumstances were determined, including historical investigations of the pipeline in this area.

2.    Description and estimated quantity, by weight, volume, or measurement of materials or wastes involved.

3.    An assessment of any contamination of land, surface water, groundwater, or air that has occurred since January 1, 2023.

4.    Estimated quantity and disposition of all recovered materials or wastes that resulted from the incident and plans for ultimate disposal.

5.    A detailed description of response actions, and remedial actions that were taken or are intended to be implemented (date and time of implementation), and how these actions will prevent a similar occurrence in the future.

6.    A copy of any geotechnical, potholing, vapor monitoring, exploratory excavations, soil sampling, or other investigations done since January 1, 2023.

7.    Any and all soil, groundwater, surface water or other sample or screening data collected in the impacted area. This data should be provided from January 1, 2023.

8.    An outline of the steps Energy Transfer will take, including action items, if an actual or suspected pollution event was to happen in the future.

This Notice of Violation is neither an order nor any other final action of DEP.  It neither imposes nor waives any enforcement action available to DEP under any of its statutes.  If DEP determines that an enforcement action is appropriate, you will be notified of the action.

If you have any questions, please contact me at tmagge@pa.gov or 484.250.5136.

Sincerely,

*Thomas L. Magge*

Thomas L. Magge
Environmental Program Manager
Clean Water Program

Matthew Gordon

3                                              February 18, 2025


cc:     Bradford L Fish, Energy Transfer (via email) bradford.fish@energytransfer.com
        Carl G. Borkland, Energy Transfer (via email) carl.borkland@energytransfer.com
        Yvette Taylor, Upper Makefield Township (via email) ytaylor@uppermakefield.org
        David Nymnan, Upper Makefield Township (via email) manager@uppermakefield.org
        Bryan Lethcoe, (PHMSA); bryan.lethcoe@dot.gov
        DEP Environmental Cleanup and Brownfields
        File

Case ID: 250303655

**Exhibit B_Page 255 of 583**



Filed and Attested by the
Office of Judicial Records
23 APR 2025 08:56 pm
G. SMITH

# EXHIBIT F

Case ID: 250303655

**Exhibit B_Page 256 of 583**



| | 325 North St. Paul Street | 214-716-1923 | PipelineLegal.com |
|---|---|---|---|
| | Suite 2700 | | |
| | Dallas, Texas 75201 | | |

February 19, 2025

Mr. Bryan Lethcoe
Director, Southwest Region
Pipeline and Hazardous Materials Safety Administration
Office of Pipeline Safety
US Department of Transportation
8701 South Gessner, Suite 630
Houston, Texas 77074

Via Email: bryan.lethcoe@dot.gov

**Re:    CPF No. 4-2025-054-NOPSO**
**Notice of Proposed Safety Order**

Dear Mr. Lethcoe:

The Pipeline and Hazardous Materials Safety Administration's (PHMSA) Notice of Proposed Safety Order (Notice) dated February 13, 2025, was received by Sunoco Pipeline, L.P. (Sunoco) via electronic mail on the same date. This letter constitutes Sunoco's initial response to the Notice and, in addition, clarifies a number of Preliminary Findings presented in the Notice. Capitalized terms not defined herein shall take the meanings ascribed to them by the Notice.

The Notice contained a list of Preliminary Findings and numerous Proposed Corrective Measures to be applied to the Affected Pipeline. The Affected Pipeline is the entirety of the Twin Oaks to Newark 14-inch refined products pipeline. Sunoco contests all of the Preliminary Findings and Proposed Corrective Measures. While Sunoco desires a positive relationship with PHMSA, Sunoco also does not agree with certain alleged factual statements, certain "rush to judgment" conclusions, and the recitation of alleged events involving other operators. Sunoco offers the following initial clarifications:

1.  PHMSA alleges in the Notice, Introduction and Purpose, that "the Pipeline experienced a leak in a high consequence area for at least 16 months."

    **Sunoco Clarification:  There is not sufficient evidence at this time to conclude how long the Affected Pipeline was leaking. Therefore, it cannot be stated with any degree of certainty that the "Pipeline experienced a leak in a high consequence area for at least 16 months". It may turn out, through the investigation and analysis that Sunoco is undertaking, that the leak was effectively detected shortly after it began.**

    **In September 2023, Sunoco responded to an odor complaint in the vicinity of the pipeline, probed the location with a PID gas detector, tested the well water at multiple locations in the area, performed excavations and initiated and completed a static pressure test on the pipeline, which was inclusive of the excavated sections of the pipeline.  No leak was identified.  Subsequent investigations and testing were performed in June, July, and November 2024, following additional odor complaints,**

THE PIPELINE AUTHORITY

Case ID: 250303655

**Exhibit B_Page 257 of 583**



PipelineLegal.com

Mr. Bryan Lethcoe
February 19, 2025
Page 2 of 4

but likewise no leak was identified. This most recent event will be fully investigated, and subsequent reporting and expert analysis will be conducted as part of Sunoco's evaluation, including, where possible and appropriate, the cause and duration of any leak.

2.  PHMSA alleges in the Notice, Introduction and Purpose, that "it appears that the continued operation of the Twin Oaks Pipeline without corrective measures would pose a pipeline integrity risk to public safety, property, or the environment."

    **Sunoco Clarification: On January 31, 2025, Sunoco discovered a leak on the Affected Pipeline. Sunoco cut out the affected section of the pipeline. On February 2, 2025, after receiving approval from PHMSA's Southwest Region Director of its repair plan and intent to return the pipeline to service, Sunoco replaced that affected section of pipe and returned the pipeline to service. There is no evidence of an ongoing leak on the Affected Pipeline.**

3.  PHMSA alleges in the Notice, Preliminary Findings, that "PHMSA is aware of a gasoline release in Huntersville, North Carolina, discovered on August 14, 2020, in which 28,571 barrels were released through a through-wall crack which developed in a shallow dent reinforced with a Type A sleeve. The release also not detected by the pipeline operator's leak detection system."

    **Sunoco Clarification: The gasoline release in Huntersville, North Carolina discovered on August 14, 2020 did not involve a Sunoco pipeline. This 2020 release involved a third-party operator wholly unrelated to Sunoco or Energy Transfer.**

4.  PHMSA alleges in the Notice, Proposed Issuance of Safety Order, that "Sunoco's apparent inability to effectively detect the leak has potentially exacerbated the impacts of the release over an extended period of time."

    **Sunoco Clarification: As noted above, there is not sufficient evidence at this time to conclude how long the Affected Pipeline was leaking. Therefore, it cannot be stated with certainty that there was an "apparent inability to effectively detect the leak"; it may turn out, through investigation and analysis, that the leak was effectively detected shortly after it began.**

    **It cannot reasonably be asserted that Energy Transfer and Sunoco have an "apparent inability to effectively detect" the leak. Energy Transfer and Sunoco maintain robust leak detection programs on their pipelines as part of their O&M and Integrity Management Plan that surpasses regulatory requirements in various critical aspects,**

<span style="color:red">Case ID: 250303655</span>

**Exhibit B_Page 258 of 583**



PipelineLegal.com

Mr. Bryan Lethcoe
February 19, 2025
Page 3 of 4

**including the general practice to inspect pipelines even when inspection may not be required by regulation. Further, Energy Transfer maintains a Company-wide Organizational Excellence ("OE") Program, that applies to Sunoco, which is an initiative aimed at continuous improvement of corporate culture and practices, with an emphasis on safety and compliance. The OE Program, which incorporates the ten elements of American Petroleum Institute's Recommended Practice 1173, has fostered a Company culture that emphasizes identifying and addressing areas for improvement and applying lessons learned from one project to future projects Company-wide. These ongoing compliance-focused efforts have resulted in quantifiable benefits. For example, the total release frequency history for Energy Transfer-owned pipelines is better than the industry average for U.S. crude oil pipelines.**

5. PHMSA alleges in the Notice, Preliminary Findings, Pages 3 and 4, certain limited descriptions of Sunoco's response and investigation efforts related to this incident.

   **Sunoco Clarification: The description of Sunoco's investigations is materially understated in the Notice. A true and accurate description and summary of Sunoco's investigations will be provided to PHMSA.**

As provided by 49 C.F.R. § 190.239(b)(2), Sunoco hereby seeks to promptly engage with PHMSA in informal consultation meetings toward ultimately resolving this matter by way of a Consent Agreement. Although the informal consultation process shall commence within 30 days of the Operator's request for same, Sunoco requests that a meeting be set as soon as possible. Additionally, 49 C.F.R. § 190.239(b)(2) provides that PHMSA may extend the 30-day informal consultation period by request or otherwise for good cause. Sunoco requests that PHMSA exercise its discretion to extend this period as may be needed during the course of the informal consultation process.

Sunoco hereby reserves its right to request a hearing within 10 days following the conclusion of the informal consultation process, as provided by 49 C.F.R. § 190.239(b)(3), should the parties be unable to reach a conclusion that results in a Consent Agreement.

Finally, pursuant to 49 U.S.C. § 60117(b)(1)(C) and 49 C.F.R. § 190.209(a), Respondent hereby requests all materials in the case file, which shall include all agency records pertinent to the matters of fact or law asserted in the Notice.

Case ID: 250303655

**Exhibit B_Page 259 of 583**



Mr. Bryan Lethcoe
February 19, 2025
Page 4 of 4

Sunoco looks forward to working towards a Consent Agreement that would appropriately ensure the safe operation of the Affected Pipeline.  Please address any questions or requests for further information to the undersigned.

Sincerely,

Haley O'Neill
Counsel for Sunoco

cc:    Keith Coyle, Chief Counsel, PHMSA
       Benjamin Fred, Assistant Chief Counsel, Pipeline Safety Law Division, PHMSA
       Timothy O'Shea, Attorney Advisor Southwest Region, PHMSA
       Todd Stamm, Senior Vice President, Operations, Energy Transfer, LP
       Eric Amundsen, Senior Vice President, Operations, Energy Transfer, LP
       Curtis Stambaugh, Assistant General Counsel, Energy Transfer, LP
       Keegan Pieper, Deputy General Counsel, Energy Transfer, LP
       Todd Nardozzi, Director DOT Compliance, Energy Transfer, LP
       Vince Murchison, Murchison O'Neill, PLLC
       Roina Baker, Murchison O'Neill, PLLC

Case ID: 250303655

**Exhibit B_Page 260 of 583**



Filed and Attested by the
Office of Judicial Records
23 APR 2025 08:56 pm
G. SMITH

# EXHIBIT G

Case ID: 250303655

**Exhibit B_Page 261 of 583**



# GOVERNOR JOSH SHAPIRO

February 28, 2025

Secretary Sean Duffy
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590

Dear Secretary Duffy:

I am writing to request expedited action from the federal government and your agency to ensure public safety following the jet fuel leak from the Twin Oaks Pipeline in the Mount Eyre neighborhood of Upper Makefield Township, Bucks County. Reports show the leak was caused by a sleeve installed over 30 years ago and went undetected by pipeline operators for 16 months, resulting in a jet fuel leak affecting Pennsylvanians' homes and businesses and contaminating local water sources. According to pipeline operator Energy Transfer, there are several dozen similar sleeves at other locations along the pipeline, raising questions about the integrity of the entire pipeline.

This is the latest incident in a long pattern of safety concerns with Sunoco and Energy Transfer pipelines in Pennsylvania — a pattern including activity I brought criminal charges against while serving as Attorney General of Pennsylvania.

As you know, the Pipeline Safety Act puts interstate hazardous liquid pipeline facilities under federal jurisdiction through PHMSA. In your role as Acting Administrator, I urge you to exercise every authority within your discretion to expedite the process of thoroughly testing the Twin Oaks pipeline and confirming it to be safe for continued operation.

I understand that PHMSA has directed Sunoco to reduce the pipeline's pressure by 20 percent, and that Sunoco has also completed a series of excavations under PHMSA's supervision in order to visually inspect other sleeves in the vicinity of the leak. I encourage you to push Sunoco to immediately conduct additional testing and inspection — including inspecting the other sleeves that are present elsewhere on the pipeline — to identify any threats to the integrity of the pipeline which you directed in your February 13, 2025, Proposed Safety Order.

I also request that your agency be stringent in your review of Sunoco's Remedial Work Plan, which was also directed in your Proposed Safety Order. The steps required in the Work Plan — including root cause analysis, further repair activities, and assessments of Sunoco's leak detection, inspection and maintenance programs — are critical to providing both near term confidence in the safety of the line, and assurances that similar incidents will be avoided in the future.

Case ID: 250303655

Exhibit B_Page 262 of 583

Secretary Duffy
U.S. Department of Transportation
Page 2

Pennsylvanians are rightfully concerned about the integrity of the pipeline and Sunoco has not demonstrated adequate ability to detect leaks and take appropriate actions, given what appears to have been a significant delay between the initial indications of a leak and the response. We need the federal government, and your agency, to partner with us and work quickly to alleviate those concerns.

As you are aware, the federal government has primary jurisdiction related to the operation of interstate pipelines under the Pipeline Safety Act. That said, my Administration, particularly the Pennsylvania Department of Environmental Protection, has been closely involved with the site investigation, characterization, and remediation process and will continue to stand with residents until the cleanup is complete. At my direction, DEP has ensured every residence with elevated testing levels in their water are being provided with water treatment systems.

To date, third party environmental consultants working under the oversight of DEP have conducted over 332 water tests at residences in the affected area and treatment systems have been installed at any residences at which results have indicated constituents above statewide health standards. DEP is also overseeing hydrology testing to characterize the subsurface affected area and better understand groundwater flow, which will help inform the longer-term remediation plan.

As you continue your agency's response to this incident, I also urge you to continue to be transparent with impacted residents, who deserve to know how this leak occurred, why it went undetected for so long, and how they can feel safe in their community moving forward.

Please don't hesitate to reach out if my Administration can assist further — we offer you every resource at our disposal to ensure this does not happen again.

Thank you,

Governor Josh Shapiro

# Exhibit C

**Exhibit B_Page 264 of 583**

| | |
|---|---|
| **From:** | Eleanor Magnus <emagnus@bm.net> |
| **Sent:** | Friday, April 11, 2025 6:57 PM |
| **To:** | Shanon Carson; Robert Fox; Diana Silva; McCall, III, Duke K.; McNally, Laura Hughes |
| **Cc:** | Michael Twersky; Joseph E. Samuel; Jordan Hughes; William A. Walsh |
| **Subject:** | RE: Twin Oaks-Newark Pipeline - Upper Makefield Township, Bucks County, PA |
| **Attachments:** | Addresses for Retained Clients.xlsx |

[EXTERNAL EMAIL]
Please see attached.

Thank you,

Eleanor

**Eleanor Magnus** / *Legal Assistant*

📞215.875.4617    📱856.803.9588

 

📍1818 MARKET STREET, SUITE 3600
PHILADELPHIA, PA 19103

**From:** Shanon Carson <scarson@bm.net>
**Sent:** Friday, April 11, 2025 5:46 PM
**To:** Robert Fox <RFox@mankogold.com>; Diana Silva <DSilva@mankogold.com>; McCall, III, Duke K. <duke.mccall@morganlewis.com>; McNally, Laura Hughes <laura.mcnally@morganlewis.com>
**Cc:** Michael Twersky <mitwersky@bm.net>; Joseph E. Samuel <jsamuel@bm.net>; Jordan Hughes <jhughes@bm.net>; William A. Walsh <wwalsh@bm.net>; Eleanor Magnus <emagnus@bm.net>; Shanon Carson <scarson@bm.net>
**Subject:** RE: Twin Oaks-Newark Pipeline - Upper Makefield Township, Bucks County, PA

We are writing to let you know that the following additional clients have retained Berger Montague and please deem our Feb. 28 letter sent on their behalf as well:

196.
197.
198.
199.
200.

We will continue to circulate an updated chart of all of our clients' addresses.

Thank you.

**Shanon Carson** / *Executive Shareholder*

1

📞 215.875.4656    📱 215.275.5623





📍 1818 MARKET STREET, SUITE 3600
PHILADELPHIA, PA 19103

**From:** Shanon Carson <scarson@bm.net>
**Sent:** Thursday, April 10, 2025 9:03 PM
**To:** Robert Fox <RFox@mankogold.com>; Diana Silva <DSilva@mankogold.com>; McCall, III, Duke K. <duke.mccall@morganlewis.com>; McNally, Laura Hughes <laura.mcnally@morganlewis.com>
**Cc:** Michael Twersky <mitwersky@bm.net>; Joseph E. Samuel <jsamuel@bm.net>; Jordan Hughes <jhughes@bm.net>; William A. Walsh <wwalsh@bm.net>; Eleanor Magnus <emagnus@bm.net>; Shanon Carson <scarson@bm.net>
**Subject:** RE: Twin Oaks-Newark Pipeline - Upper Makefield Township, Bucks County, PA

We are writing to let you know that the following additional clients have retained Berger Montague and please deem our Feb. 28 letter sent on their behalf as well:

180.
181.
182.
183.
184.
185.
186.
187.
188.
189.
190.
191.
192.
193.
194.
195.



We will continue to circulate an updated chart of all of our clients' addresses.

Thank you.

**Shanon Carson** / *Executive Shareholder*

📞 215.875.4656    📱 215.275.5623



📍 1818 MARKET STREET, SUITE 3600
PHILADELPHIA, PA 19103

**From:** Shanon Carson <scarson@bm.net>
**Sent:** Wednesday, April 2, 2025 6:36 PM

2

**To:** Robert Fox <RFox@mankogold.com>; Diana Silva <DSilva@mankogold.com>; McCall, III, Duke K. <duke.mccall@morganlewis.com>; McNally, Laura Hughes <laura.mcnally@morganlewis.com>
**Cc:** Michael Twersky <mitwersky@bm.net>; Joseph E. Samuel <jsamuel@bm.net>; Jordan Hughes <jhughes@bm.net>; William A. Walsh <wwalsh@bm.net>; Eleanor Magnus <emagnus@bm.net>; Shanon Carson <scarson@bm.net>
**Subject:** RE: Twin Oaks-Newark Pipeline - Upper Makefield Township, Bucks County, PA

We are writing to let you know that the following additional clients have retained Berger Montague and please deem our Feb. 28 letter sent on their behalf as well:

171.
172.
173.
174.
175.
176.
177.
178.
179.

We will continue to circulate an updated chart of all of our clients' addresses.

Thank you.


**Shanon Carson** / *Executive Shareholder*

📞 215.875.4656   📱 215.275.5623

**BERGER|MONTAGUE**

📍 1818 MARKET STREET, SUITE 3600
PHILADELPHIA, PA 19103

**From:** Shanon Carson <scarson@bm.net>
**Sent:** Sunday, March 30, 2025 8:06 PM
**To:** Robert Fox <RFox@mankogold.com>; Diana Silva <DSilva@mankogold.com>; McCall, III, Duke K. <duke.mccall@morganlewis.com>; McNally, Laura Hughes <laura.mcnally@morganlewis.com>
**Cc:** Michael Twersky <mitwersky@bm.net>; Joseph E. Samuel <jsamuel@bm.net>; Jordan Hughes <jhughes@bm.net>; William A. Walsh <wwalsh@bm.net>; Eleanor Magnus <emagnus@bm.net>; Shanon Carson <scarson@bm.net>
**Subject:** RE: Twin Oaks-Newark Pipeline - Upper Makefield Township, Bucks County, PA

We are writing to let you know that the following additional clients have retained Berger Montague and please deem our Feb. 28 letter sent on their behalf as well:

169.
170.

Eleanor will send to everyone here an updated spreadsheet that contains all of our clients' addresses on Monday.

 forwarded to us a Monitoring Wells Easement proposal that was provided to them but we only received a .pdf.  Can you please send this document to us in Microsoft Word and direct all further discussion

3

concerning this proposal to us. I'm sure we will have some questions concerning the proposal that we can forward to you after having a chance to review it, and then we can discuss.

Thank you.

**Shanon Carson** / *Executive Shareholder*

📞 215.875.4656    📱 215.275.5623

 

📍 1818 MARKET STREET, SUITE 3600
PHILADELPHIA, PA 19103

**From:** Shanon Carson <scarson@bm.net>
**Sent:** Saturday, March 29, 2025 11:35 AM
**To:** Robert Fox <RFox@mankogold.com>; Diana Silva <DSilva@mankogold.com>; McCall, III, Duke K. <duke.mccall@morganlewis.com>; McNally, Laura Hughes <laura.mcnally@morganlewis.com>
**Cc:** Michael Twersky <mitwersky@bm.net>; Joseph E. Samuel <jsamuel@bm.net>; Jordan Hughes <jhughes@bm.net>; William A. Walsh <wwalsh@bm.net>; Eleanor Magnus <emagnus@bm.net>; Shanon Carson <scarson@bm.net>
**Subject:** RE: Twin Oaks-Newark Pipeline - Upper Makefield Township, Bucks County, PA

We are writing to let you know that the following additional clients have retained Berger Montague and please deem our Feb. 28 letter sent on their behalf as well:

154.
155.
156.
157.
158.
159.
160.
161.
162.
163.
164.
165.
166.
167.
168.



Eleanor will send to everyone here an updated spreadsheet that contains all of our clients' addresses on Monday.

Thank you.

**Shanon Carson** / *Executive Shareholder*

4

📞 215.875.4656    📱 215.275.5623



📍 1818 MARKET STREET, SUITE 3600
PHILADELPHIA, PA 19103

**From:** Shanon Carson <scarson@bm.net>
**Sent:** Sunday, March 23, 2025 11:43 AM
**To:** Robert Fox <RFox@mankogold.com>; Diana Silva <DSilva@mankogold.com>
**Cc:** Michael Twersky <mitwersky@bm.net>; Joseph E. Samuel <jsamuel@bm.net>; Jordan Hughes <jhughes@bm.net>; William A. Walsh <wwalsh@bm.net>; Eleanor Magnus <emagnus@bm.net>; Shanon Carson <scarson@bm.net>
**Subject:** RE: Twin Oaks-Newark Pipeline - Upper Makefield Township, Bucks County, PA

We are writing to let you know that the following additional clients have retained Berger Montague and please deem our Feb. 28 letter sent on their behalf as well:

147. ███████████
148. ███████████
149. ███████████
150. ███████████
151. ███████████
152. ███████████
153. ███████████

Eleanor will send to everyone here an updated spreadsheet that contains all of our clients' addresses.

Thank you.


**Shanon Carson** / *Executive Shareholder*
📞 215.875.4656    📱 215.275.5623



📍 1818 MARKET STREET, SUITE 3600
PHILADELPHIA, PA 19103

**From:** Shanon Carson <scarson@bm.net>
**Sent:** Thursday, March 20, 2025 10:02 AM
**To:** Robert Fox <RFox@mankogold.com>; Diana Silva <DSilva@mankogold.com>
**Cc:** Michael Twersky <mitwersky@bm.net>; Joseph E. Samuel <jsamuel@bm.net>; Jordan Hughes <jhughes@bm.net>; William A. Walsh <wwalsh@bm.net>; Eleanor Magnus <emagnus@bm.net>; Shanon Carson <scarson@bm.net>
**Subject:** RE: Twin Oaks-Newark Pipeline - Upper Makefield Township, Bucks County, PA

We are writing to let you know that the following additional clients have retained Berger Montague and please deem our Feb. 28 letter sent on their behalf as well:

139. ███████████
140. ███████████

141.
142.
143.
144.
145.
146.

Eleanor will send to everyone here an updated spreadsheet that contains all of our clients' addresses.

Thank you.


**Shanon Carson** / *Executive Shareholder*

📞 215.875.4656    📱 215.275.5623



📍 1818 MARKET STREET, SUITE 3600
PHILADELPHIA, PA 19103

**From:** Shanon Carson <scarson@bm.net>
**Sent:** Tuesday, March 18, 2025 8:05 AM
**To:** Robert Fox <RFox@mankogold.com>; Diana Silva <DSilva@mankogold.com>
**Cc:** Michael Twersky <mitwersky@bm.net>; Joseph E. Samuel <jsamuel@bm.net>; Jordan Hughes <jhughes@bm.net>; William A. Walsh <wwalsh@bm.net>; Eleanor Magnus <emagnus@bm.net>; Shanon Carson <scarson@bm.net>
**Subject:** RE: Twin Oaks-Newark Pipeline - Upper Makefield Township, Bucks County, PA

We are writing to let you know that the following additional clients have retained Berger Montague and please deem our Feb. 28 letter sent on their behalf as well (and correcting the numbering to address the Harmon duplicate issue):

130.
131.
132.
133.
134.
135.
136.
137.
138.

Eleanor will send to everyone here an updated spreadsheet that contains all of our clients' addresses.

Thank you.


**Shanon Carson** / *Executive Shareholder*

**Exhibit B_Page 270 of 583**

📞 215.875.4656    📱 215.275.5623

 

**BERGER | MONTAGUE**

📍 1818 MARKET STREET, SUITE 3600
PHILADELPHIA, PA 19103

**From:** Shanon Carson <scarson@bm.net>
**Sent:** Friday, March 14, 2025 9:02 AM
**To:** Robert Fox <RFox@mankogold.com>; Diana Silva <DSilva@mankogold.com>
**Cc:** Michael Twersky <mitwersky@bm.net>; Joseph E. Samuel <jsamuel@bm.net>; Jordan Hughes <jhughes@bm.net>;
William A. Walsh <wwalsh@bm.net>; Eleanor Magnus <emagnus@bm.net>; Shanon Carson <scarson@bm.net>
**Subject:** RE: Twin Oaks-Newark Pipeline - Upper Makefield Township, Bucks County, PA

We are writing to let you know that the following additional clients have retained Berger Montague and please deem our Feb. 28 letter sent on their behalf as well:



121.
122.
123.
124.
125.
126.
127.
128.
129.
130.
131.

We will provide an updated spreadsheet shortly that contains their addresses.

Thank you.

**Shanon Carson** / *Executive Shareholder*
📞 215.875.4656    📱 215.275.5623

 

**BERGER | MONTAGUE**

📍 1818 MARKET STREET, SUITE 3600
PHILADELPHIA, PA 19103

**From:** Shanon Carson <scarson@bm.net>
**Sent:** Tuesday, March 11, 2025 7:23 PM
**To:** Robert Fox <RFox@mankogold.com>; Diana Silva <DSilva@mankogold.com>
**Cc:** Michael Twersky <mitwersky@bm.net>; Joseph E. Samuel <jsamuel@bm.net>; Jordan Hughes <jhughes@bm.net>;
William A. Walsh <wwalsh@bm.net>; Eleanor Magnus <emagnus@bm.net>; Shanon Carson <scarson@bm.net>
**Subject:** RE: Twin Oaks-Newark Pipeline - Upper Makefield Township, Bucks County, PA

**Exhibit B_Page 271 of 583**

We are writing to let you know that the following additional clients have retained Berger Montague and please deem our Feb. 28 letter sent on their behalf as well:

110.
111.
112.
113.
114.
115.
116.
117.
118.
119.
120.
121.
122.



We will provide an updated spreadsheet shortly that contains their addresses.

Thank you.

**Shanon Carson** / *Executive Shareholder*

215.875.4656    215.275.5623



**BERGER | MONTAGUE**

1818 MARKET STREET, SUITE 3600
PHILADELPHIA, PA 19103

**From:** Shanon Carson <scarson@bm.net>
**Sent:** Monday, March 10, 2025 11:19 AM
**To:** Robert Fox <RFox@mankogold.com>; Diana Silva <DSilva@mankogold.com>
**Cc:** Michael Twersky <mitwersky@bm.net>; Joseph E. Samuel <jsamuel@bm.net>; Jordan Hughes <jhughes@bm.net>; William A. Walsh <wwalsh@bm.net>; Eleanor Magnus <emagnus@bm.net>; Shanon Carson <scarson@bm.net>
**Subject:** RE: Twin Oaks-Newark Pipeline - Upper Makefield Township, Bucks County, PA

We are writing to let you know that the following additional clients have retained Berger Montague and please deem our Feb. 28 letter sent on their behalf as well:

98.
99.
100.
101.
102.
103.
104.
105.
106.
107.
108.

8

109. ███████

We will provide an updated spreadsheet shortly that contains their addresses.

Thank you.


**Shanon Carson** / *Executive Shareholder*

📞 215.875.4656    📱 215.275.5623

 

📍 1818 MARKET STREET, SUITE 3600
PHILADELPHIA, PA 19103

**From:** Shanon Carson <scarson@bm.net>
**Sent:** Wednesday, March 5, 2025 4:48 PM
**To:** Robert Fox <RFox@mankogold.com>; Diana Silva <DSilva@mankogold.com>
**Cc:** Michael Twersky <mitwersky@bm.net>; Joseph E. Samuel <jsamuel@bm.net>; Jordan Hughes <jhughes@bm.net>; William A. Walsh <wwalsh@bm.net>; Shanon Carson <scarson@bm.net>; Eleanor Magnus <emagnus@bm.net>
**Subject:** RE: Twin Oaks-Newark Pipeline - Upper Makefield Township, Bucks County, PA

Robert/Diana,

Please let us know if either 11am ET or 2pm ET tomorrow work for you to talk.

Our letter dated Feb. 28 listed 75 individual clients that had retained Berger Montague as of that date. We are writing to notify that you that the following additional clients have now retained Berger Montague as well and please deem that our Feb. 28 letter was sent on behalf of each of them as well:

76.
77.
78.
79.
80.
81.
82.
83.
84.
85.
86.
87.
88.
89.
90.
91.
92.
93.
94.
95.
96.

9

97.    ████████

We will continue to let you know on a weekly basis of our updated client list in this case.

While we did not hear from you in response to our March 3, 2025 email below, I attended yesterday in person and our team witnessed that there was a lot of testing and sampling activity taking place on behalf of Sunoco/Energy Transfer by its contractors, including GES and others, including on some of our clients' properties.

We need to be apprised and informed in writing of any testing/sampling schedule as it regards our clients' property (and it is ok if such notice pertains to a schedule of collection activities) so that we can attend on behalf of our clients as deemed necessary. Can a complete schedule please be provided to us tomorrow in writing?

In addition, we noticed that there were physical items being collected by contractors on behalf of Sunoco/Energy Transfer such as monitor well absorbent socks that are being drawn back out containing jet fuel and/or petroleum hydrocarbons, as well as water samples, and we ask you to confirm in response to this email that all such socks and samples are being preserved, bagged, and inventoried properly, and stored properly for further potential testing. It did not appear to us that the sock that we witnessed (taking from ████████'s backyard above where the leak occurred) was in the process of being properly preserved. ██████ confirmed to us that this was a regular process that has been taking place. Has every sock that has been used been preserved?

We look forward to discussing this and other exigent issues.

Thank you.

**Shanon Carson /** *Executive Shareholder*

📞 215.875.4656    📱 215.275.5623

 BERGER | MONTAGUE    𝕏 f in

📍 1818 MARKET STREET, SUITE 3600
PHILADELPHIA, PA 19103

**From:** Shanon Carson <scarson@bm.net>
**Sent:** Monday, March 3, 2025 4:28 PM
**To:** Robert Fox <RFox@mankogold.com>
**Cc:** Diana Silva <DSilva@mankogold.com>; Michael Twersky <mitwersky@bm.net>; Joseph E. Samuel <jsamuel@bm.net>; Jordan Hughes <jhughes@bm.net>; Shanon Carson <scarson@bm.net>; William A. Walsh <wwalsh@bm.net>
**Subject:** RE: Twin Oaks-Newark Pipeline - Upper Makefield Township, Bucks County, PA

We will be onsite tomorrow in the affected neighborhood with our consultants/experts and that's what we wanted to talk to you about. There is an exigent need, including for purposes of the safety of our clients, to conduct sampling right away.

It is typical for parties in litigation such as this to discuss and agree upon some form of Joint Stipulated Environmental Management Order ("EMO"), requiring any party conducting a sampling event to provide notice to all parties. We wanted to provide notice of Defendants' right to have their representative(s) attend and observe,

10

**Exhibit B_Page 274 of 583**

and of course, we expect the same notice and right in the other direction as to any future sampling events implemented or conducted by Defendants or on their behalf.

As tomorrow is our first day, our timing is going to be somewhat flexible, and up to the consultants. We are planning on arriving in the neighborhood at 10am, but beginning work at the first home at 11am, and conducting sampling at approximately 5 homes tomorrow (time permitting), and to be there until approximately 5pm. Our folks will also be there conducting additional sampling on Wednesday, Thursday, and Friday this week, likely on a similar time schedule of approximately 10am to 5pm.

The scope and nature of the work tomorrow may include water and soil sampling, including but not limited to from the private wells of our clients, and related activities.

Consistent with our anticipated EMO to be discussed and agreed upon later, Defendants are invited to witness and monitor these activities, though they may not interfere with them or participate in attorney-client communications.

Please let us know if you are going to send someone to participate tomorrow and this week, and if so, we will provide additional details and the addresses of the homes being sampled.

Thank you.

**Shanon Carson** / *Executive Shareholder*

📞 215.875.4656     📱 215.275.5623

 



📍 1818 MARKET STREET, SUITE 3600
PHILADELPHIA, PA 19103

**From:** Robert Fox <RFox@mankogold.com>
**Sent:** Monday, March 3, 2025 3:04 PM
**To:** Shanon Carson <scarson@bm.net>
**Cc:** Diana Silva <DSilva@mankogold.com>; Michael Twersky <mitwersky@bm.net>
**Subject:** Re: Twin Oaks-Newark Pipeline - Upper Makefield Township, Bucks County, PA

I am tied up. Does tomorrow morning work
Sent from my iPhone

> On Mar 3, 2025, at 2:54 PM, Shanon Carson <scarson@bm.net> wrote:
>
>
> Diana/Robb,
>
> My partner Michael Twersky and I are writing to reach out to you to schedule an introductory call, hopefully this afternoon or later today, to say hello and talk about some of the logistical issues in this case.  Please let us know what time works.  Thx.

11

**Exhibit B_Page 275 of 583**

**Shanon Carson** / *Executive Shareholder*
215.875.4656    215.275.5623

1818 MARKET STREET, SUITE 3600
PHILADELPHIA, PA 19103

---

**From:** Diana Silva <DSilva@mankogold.com>
**Sent:** Saturday, March 1, 2025 1:13 PM
**To:** Shanon Carson <scarson@bm.net>; Michael Twersky <mitwersky@bm.net>; Joseph E. Samuel <jsamuel@bm.net>
**Cc:** Robert Fox <RFox@mankogold.com>
**Subject:** RE: Twin Oaks-Newark Pipeline - Upper Makefield Township, Bucks County, PA

Counsel:

Please see attached correspondence and notice to preserve evidence.

Regards,

Diana

**Diana A. Silva, Esquire**
484.430.2347  (office) | 610.504.0761(cell) | 484.430.5711(f)
dsilva@mankogold.com

---

**From:** Diana Silva
**Sent:** Friday, February 28, 2025 4:59 PM
**To:** scarson@bm.net; mitwersky@bm.net; jsamuel@bm.net
**Subject:** Twin Oaks-Newark Pipeline - Upper Makefield Township, Bucks County, PA

Counsel:

Our firm represents Energy Transfer, Sunoco Pipeline L.P., and its affiliated companies regarding the Twin Oaks-Newark pipeline release in Upper Makefield Township, Bucks County. I received a copy of your letter of representation for 75 individuals as well as a putative class.  Your letter noted that Energy Transfer should begin directing any communications regarding the 75 individuals and their minor family members to your office.

As you may be aware, there are communications occurring between non-lawyer representatives, land agents, contractors, and consultants on a day-to-day basis to schedule activities such as water sampling, installation of water treatment systems, communicating daily schedules of work and activity in the neighborhood, etc.  We believe it is imperative that these communications continue so that landowners can get these critical tasks completed.  Please note these communications are not with lawyers, and are therefore not prohibited by the Pennsylvania Rules of Professional Conduct.

Please feel free to reach out to me directly if you would like to further discuss.

Thank you,

Diana

12

**Exhibit B_Page 276 of 583**

**Diana A. Silva, Esquire**
**MANKO | GOLD | KATCHER | FOX** LLP
*An environmental, energy, litigation, safety and land use law practice*
Three Bala Plaza East, Suite 700  |  Bala Cynwyd, PA 19004
484.430.2347 (office) | 610.504.0761(cell) | 484.430.5711(f)
dsilva@mankogold.com   | Bio |  www.mankogold.com

*-\*\*External sender. Please use caution when clicking on any attachments or links\*\* -*

*-\*\*External sender. Please use caution when clicking on any attachments or links\*\* -*

13

**Exhibit B_Page 277 of 583**

| First Name | Last Name | Street Address | City | Zip Code |
|---|---|---|---|---|
| REDACTED | REDACTED | 16 Spring Ct | Washington Crossing | 18977 |
| REDACTED | REDACTED | 109 Oakdale Avenue | Washington Crossing | 18977 |
| REDACTED | REDACTED | 102 Crestwood Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 123 Walker Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 111 Oakdale Avenue | Washington Crossing | 18977 |
| REDACTED | REDACTED | 1023 Mt. Eyre Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 6 Valley View Drive | Newtown | 18940 |
| REDACTED | REDACTED | 111 Walker Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 1079 Mt Eyre Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 135 Walker Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 991 Swayze Avenue | Washington Crossing | 18977 |
| REDACTED | REDACTED | 129 Glenwood Drive | Washington Crossing | 18977 |
| REDACTED | REDACTED | 120 Walker Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 116 Beechwood Drive | Washington Crossing | 18977 |
| REDACTED | REDACTED | 140 Glenwood Drive | Washington Crossing | 18977 |
| REDACTED | REDACTED | 207 Bruce Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 941 Mt. Eyre Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 10 Valley View Drive | Newtown | 18940 |
| REDACTED | REDACTED | 112 Glenwood Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 107 Spencer Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 109 Glenwood Drive | Washington Crossing | 18977 |
| REDACTED | REDACTED | 102 Walker Road | Washington Crossing | 18977 |
| REDACTED | REDACTED |  | Washington Crossing | 18977 |
| REDACTED | REDACTED | 106 Bruce Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 1015 Mt Eye Road | Washington Crossing | 18979 |
| REDACTED | REDACTED | 125 Walker Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 118 Walker Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 135 Glenwood Drive | Washington Crossing | 18977 |
| REDACTED | REDACTED | 104 Beechwood Drive | Washington Crossing | 18977 |
| REDACTED | REDACTED | 101 Beechwood Drive | Washington Crossing | 18977 |
| REDACTED | REDACTED | 204 Bruce Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 106 Oakland Avenue | Washington Crossing | 18977 |

Exhibit B_Page 278 of 583

| First Name | Last Name | Street Address | City | Zip Code |
|---|---|---|---|---|
| REDACTED | REDACTED | 106 Glenwood | Washington Crossing | 18977 |
| REDACTED | REDACTED | 99 Bruce Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 105 Bruce Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 115 Spencer Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 114 Spencer Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 101 Glenwood Drive | Washington Crossing | 18977 |
| REDACTED | REDACTED | 962 West St | Washington Crossing | 18977 |
| REDACTED | REDACTED | 5 Old Barn Court | Newtown | 18940 |
| REDACTED | REDACTED | 5 Valley View Driveive | Newtown | 18940 |
| REDACTED | REDACTED | 103 Beechwood Drive | Washington Crossing | 18977 |
| REDACTED | REDACTED | 947 Mt Eyre Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 3 Valley View | Newtown | 18940 |
| REDACTED | REDACTED | 106 Walker Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 115 Glenwood Drive | Washington Crossing | 18977 |
| REDACTED | REDACTED | 123 Glenwood Drive | Washington Crossing | 18977 |
| REDACTED | REDACTED | 122 Walker Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 105 Spencer Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 148 Glenwood Drive | Washington Crossing | 18977 |
| REDACTED | REDACTED | 105 Crestwood | Washington Crossing | 18977 |
| REDACTED | REDACTED | 119 Glenwood Drive | Washington Crossing | 18977 |
| REDACTED | REDACTED | 103 Spencer Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 947 Mt Eyre Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 960 Cross St | Washington Crossing | 18977 |
| REDACTED | REDACTED | 122 Oakdale Avenue | Washington Crossing | 18977 |
| REDACTED | REDACTED | 124 Walker Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 110 Walker Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 3 Old Barn CT | Newtown | 18940 |
| REDACTED | REDACTED | 101 Spencer Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 149 Glenwood Drive | Washington Crossing | 18977 |
| REDACTED | REDACTED | 121 Walker Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 114 Glenwood Drive | Washington Crossing | 18977 |
| REDACTED | REDACTED | 102 Glenwood Drive | Washington Crossing | 18977 |

Exhibit B_Page 279 of 583

| First Name | Last Name | Street Address | City | Zip Code |
|---|---|---|---|---|
| REDACTED | REDACTED | 2 Valley View Drive. | Newtown | 18940 |
| REDACTED | REDACTED | 102 Spencer Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 115 Walker Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 1629 Thistlewood Drive | Washington Crossing | 18977 |
| REDACTED | REDACTED | 7 Valley Drive. | Washington Crossing | 18977 |
| REDACTED | REDACTED | 113 Spencer Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 103 Bruce Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 217 Bruce Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 128 Glenwood Drive | Washington Crossing | 18977 |
| REDACTED | REDACTED | 116 Walker Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 118 Bruce Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 101 Oakdale Avenue | Washington Crossing | 18977 |
| REDACTED | REDACTED | 69 Mt. Eyre Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 128 Walker Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 126 Walker Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 114 Bruce Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 127 Walker Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 1155 Mt Eyre Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 115 Oakdale Avenue | Washington Crossing | 18977 |
| REDACTED | REDACTED | 881 Mt. Eyre Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 104 Beechwood Drive | Washington Crossing | 18977 |
| REDACTED | REDACTED | 123 Oakdale Avenuenue | Washington Crossing | 18977 |
| REDACTED | REDACTED | 125 Glenwood Driveive | Washington Crossing | 18977 |
| REDACTED | REDACTED | 116 Glenwood Driveive | Washington Crossing | 18977 |
| REDACTED | REDACTED | 104 Spencer Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 110 Bruce Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 119 Walker Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 121 Glenwood Drive | Washington Crossing | 18977 |
| REDACTED | REDACTED | 202 Bruce Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 142 Glenwood Drive | Washington Crossing | 18977 |
| REDACTED | REDACTED | 1 Valley View Drive | Newtown | 18940 |
| REDACTED | REDACTED | 109 Pond View Drive | Washington Crossing | 18977 |

**Exhibit B_Page 280 of 583**

| First Name | Last Name | Street Address | City | Zip Code |
|---|---|---|---|---|
| REDACTED | REDACTED | 134 Glenwood Drive | Washington Crossing | 18977 |
| REDACTED | REDACTED | 208 Bruce Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 949 Taylorsville Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 129 Bruce Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 214 Bruce Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 105 Beechwood Drive | Washington Crossing | 18977 |
| REDACTED | REDACTED | 1087 Mt. Eyre Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 107 Glenwood Drive | Washington Crossing | 18977 |
| REDACTED | REDACTED | 104 Glenwood Drive | Washington Crossing | 18977 |
| REDACTED | REDACTED | 165 Mt. Eyre Road | Washington Crossing | 18977 |
| REDACTED | REDACTED | 128 Bruce Road | Washington Crossing | 18977 |

# Exhibit D

# Morgan Lewis

**Duke K. McCall III**
Partner
+1.202.373.6607
duke.mccall@morganlewis.com

April 9, 2025

**BY ELECTRONIC MAIL**

Shanon Carson
Michael Twersky
Berger Montague
1818 Market Street
Suite 3600
Philadelphia, PA 19103
scarson@bm.net
mitwersky@bm.net

> Re:    ***La Hart v. Sunoco Pipeline LP***, No. 2025-03655 (Pa. Com. Pl.) –
> **Defendant Energy Transfer (R&M) LLC**

Dear Counsel:

We write regarding the naming of Energy Transfer (R&M) LLC ("R&M") as a Defendant in this litigation.  R&M is not a proper party. R&M is not involved with the Twin Oaks-Newark Pipeline or the Twin Oaks-Newark Pipeline Release.  R&M does not own the Twin Oaks-Newark Pipeline, R&M does not operate the Twin Oaks-Newark Pipeline, and R&M does not hold an ownership interest in the company that owns and operates the Twin Oaks-Newark Pipeline.

Defendant Sunoco Pipeline LP ("SPLP") owns and operates the Twin-Oaks-Newark Pipeline. Defendant Energy Transfer LP ("ETLP") is an indirect corporate owner of SPLP.  Separately, ETLP is an indirect corporate owner of R&M.  However, R&M exists in a distinct branch of ETLP's business, unrelated to the Twins Oaks-Newark Pipeline.  R&M has no management relationship with SPLP and no responsibility for the operation of the Twin Oaks-Newark Pipeline.

Plaintiffs appear to recognize R&M's lack of connection to the Twin Oaks-Newark Pipeline Release because Plaintiffs do not include any allegations in their Complaint regarding R&M's purported role in the Twin Oaks-Newark Pipeline Release. We presume Plaintiffs named R&M in the Complaint solely because the Pennsylvania Department of Environmental Protection ("PADEP") named both SPLP and R&M in its March 6, 2025, Order (the "Order") concerning the Twin Oaks-Newark Pipeline Release. However, as SPLP advised the PADEP in its March 31, 2025 response to the Order, the inclusion of R&M as a party to the Order is a mistake, for the reasons explained above.

Also, please note that Plaintiffs incorrectly allege in their Complaint that R&M's principal place of business is 1735 Market Street in Philadelphia, Pennsylvania.  R&M's correct principal place of

**Morgan, Lewis & Bockius** LLP

1111 Pennsylvania Avenue, NW
Washington, DC  20004           **T** +1.202.739.3000
United States                          **F** +1.202.739.3001

**Exhibit B_Page 283 of 583**

Shanon Carson
Michael Twersky
April 9, 2025
Page 2

business is 8111 Westchester Drive in Dallas, Texas.  R&M does not maintain a place of business or have any business operations in Philadelphia County.

Accordingly, R&M requests that Plaintiffs dismiss it from this action.

Sincerely,

Duke K. McCall III

cc:    Laura Hughes McNally
       Diana Silva
       Joseph Samuel
       Jordan Hughes
       William A. Walsh
       Eleanor Magnus

# Exhibit E



**Pennsylvania**
**Department of Environmental Protection**

**SENT VIA U.S. MAIL AND ELECTRONIC MAIL**

March 6, 2025

Mr. Matthew Gordon
Vice President, Operations
Sunoco Pipeline, L.P.
525 Fritztown Road
Sinking Spring, PA 19608

Mr. C. Gus Borkland
Senior Director – Environmental Compliance,
Emergency Planning & Asset Security
Energy Transfer (R&M), LLC
100 Green Street
Marcus Hook, PA 19061

Re:    Administrative Order
        Energy Transfer Pipeline Release
        Upper Makefield Township
        Bucks County

Dear Mr. Gordon and Mr. Borkland:

On January 31, 2025, Energy Transfer informed the Department of Environmental Protection
(DEP) of a release of refined petroleum products from its 14-inch Twin Oaks to Newark pipeline
in the Mt. Eyre neighborhood of Upper Makefield Township, Bucks County. The pipeline is
owned and/or operated by Sunoco Pipeline, L.P. This release has contaminated soil and
groundwater and impacted the water supply of residents in the Mt. Eyre neighborhood.

Pursuant to Section 610 of the Clean Streams Law, 35 P.S. §691.610; Section 1917-A of the
Administrative Code; and the rules and regulations adopted pursuant to each, DEP is issuing the
attached administrative order directing Energy Transfer and Sunoco Pipeline to respond to the
pipeline release and implement remedial actions in accordance with that order.

Any person aggrieved by this action may appeal the action to the Environmental Hearing Board
(Board), pursuant to Section 4 of the Environmental Hearing Board Act, 35 P.S. § 7514, and the
Administrative Agency Law, 2 Pa.C.S. Chapter 5A.  The Board's address is:

> Environmental Hearing Board
> Rachel Carson State Office Building, Second Floor
> 400 Market Street
> P.O. Box 8457
> Harrisburg, PA 17105-8457

TDD users may contact the Environmental Hearing Board through the Pennsylvania Relay
Service, 800.654.5984.

**Exhibit B_Page 286 of 583**

Mr. Matthew Gordon                          - 2 -                          March 6, 2025
Mr. C. Gus Borkland

Appeals must be filed with the Board within 30 days of receipt of notice of this action unless the appropriate statute provides a different time.  This paragraph does not, in and of itself, create any right of appeal beyond that permitted by applicable statutes and decisional law.

A Notice of Appeal form and the Board's rules of practice and procedure may be obtained online at http://www.ehb.pa.gov or by contacting the Secretary to the Board at 717.787.3483. The Notice of Appeal form and the Board's rules are also available in braille and on audiotape from the Secretary to the Board.

IMPORTANT LEGAL RIGHTS ARE AT STAKE.  YOU SHOULD SHOW THIS DOCUMENT TO A LAWYER AT ONCE.  IF YOU CANNOT AFFORD A LAWYER, YOU MAY QUALIFY FOR FREE PRO BONO REPRESENTATION.  CALL THE SECRETARY TO THE BOARD AT 717.787.3483 FOR MORE INFORMATION.  YOU DO NOT NEED A LAWYER TO FILE A NOTICE OF APPEAL WITH THE BOARD.

**IF YOU WANT TO CHALLENGE THIS ACTION, YOUR APPEAL MUST BE FILED WITH AND RECEIVED BY THE BOARD WITHIN 30 DAYS OF RECEIPT OF NOTICE OF THIS ACTION.**

Sincerely,

Patrick L. Patterson
Regional Director

cc:     Mr. Nyman, Upper Makefield Township
        Dr. Damsker, Bucks County Health Department
        Mr. Lethcoe, Pipeline and Hazardous Materials Safety Administration,
            U.S. Department of Transportation
        Dr. Miller, Pennsylvania Department of Health
        Mr. Magge
        Mr. Brown, P.G.
        Mr. Langan, Esq.

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF ENVIRONMENTAL PROTECTION**

**In the Matter of:**

| | | |
|---|---|---|
| Sunoco Pipeline, L.P. | : | Violation of the Clean Streams Law |
| 525 Fritztown Road | : | |
| Sinking Spring, PA 19608 | : | PA Pipeline - Twin Oaks–Newark Pipeline |
| | : | |
| Energy Transfer (R&M), LLC | : | |
| 100 Green Street | : | |
| Marcus Hook, PA 19061 | : | |

**ORDER**

NOW, this 6th day of March 2025, the Commonwealth of Pennsylvania Department

of Environmental Protection ("Department"), has found and determined that:

A.     The Department is the agency with the duty and authority to administer the Land

Recycling and Environmental Remediation Standards Act, the Act of May 19, 1995, P.L. 4, No. 1995-2,

35 P.S. §6026.101 et seq. ("Act 2"); and administer and enforce the Clean Streams Law, the Act of June

22, 1937, P.L. 1987, *as amended*, 35 P.S. §§ 691.1-691.1001 ("Clean Streams Law"); Section 1917-A of

the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S. § 510-17

("Administrative Code"); and the rules and regulations ("rules and regulations") promulgated

thereunder.

B.     Sunoco Pipeline, L.P. is a foreign limited partnership doing business in Pennsylvania and

maintains a mailing address of 525 Fritztown Road, Sinking Spring, PA 19608 ("Sunoco" or "SPLP").

Sunoco Logistics Partners Operations GP LLC (the "General Partner") is the general partner of SPLP.

1

C.      Energy Transfer (R&M), LLC is a Pennsylvania Business Corporation and maintains a headquarters address of 1735 Market St, Philadelphia, PA 19103 and a business address of 100 Green Street, Marcus Hook, PA 19061 ("Energy Transfer").  Energy Transfer is a parent entity of Sunoco.

D.      Energy Transfer and Sunoco (hereinafter, collectively, "Energy Transfer") own and operate numerous pipelines in Pennsylvania used to transport petroleum and natural gas products. Energy Transfer own and/or operate the Twin Oaks–Newark Pipeline that carries petroleum products from the Twin Oaks terminal in Aston, Delaware County, to the Newark terminal in New Jersey ("Twin Oaks-Newark Pipeline").

E.      On September 26, 2023, the Department received a complaint of a petroleum odor in well water at a property adjacent to the pipeline.  The Department responded to the complainant and concerns were communicated to Energy Transfer.  The Department confirmed that Energy Transfer investigated the complaint, including excavating a section of the pipeline and collecting soil and groundwater samples.  Energy Transfer reported that they did not identify a release from the pipeline.

F.      On or about September 30, 2024 the Department received additional complaints of petroleum odors in well water from other property owners in Upper Makefield Township and initiated further investigation.

G.      On January 31, 2025, Energy Transfer notified the Department of an unpermitted discharge of refined petroleum products from a section of the Twin Oaks–Newark Pipeline located in the Mt. Eyre neighborhood in Washington Crossing, Upper Makefield Township, Bucks County that Energy Transfer described as a "sleeved portion of the 14 inch Jet Fuel Line" ("Pipeline Release").

H.      Energy Transfer informed the Department that the section of the Twin Oaks–Newark Pipeline involved in the Pipeline Release had a sleeve that was installed over thirty years ago.

2

I.      The Pipeline Release has contaminated groundwater in the area of the release and separate-phase liquid petroleum, and dissolved concentrations of petroleum-related chemicals have been detected in potable groundwater wells in the Mt. Eyre neighborhood.

J.      Six properties in the Mt. Eyre neighborhood have petroleum separate-phase liquid or concentrations of Volatile Organic Compounds (VOCs) exceeding the Maximum Contaminant Levels ("MCLs").

K.      Five properties in the Mt. Eyre neighborhood have confirmed detections of VOCs that do not exceed MCLs.

L.      On February 13, 2025, Energy Transfer submitted to the Department a Notice of Intent to Remediate for the Pipeline Release indicating its intention to remediate the Pipeline Release using the Statewide health standard under Act 2.

**Applicable Law**

M.      The groundwater contaminated by the Pipeline Release is "waters of the Commonwealth" as that term is defined in Section 1 of the Clean Streams Law, 35 P.S. §691.1.

N.      The refined petroleum products released to the environment by the Pipeline Release are "pollution" and "industrial waste" as those terms are defined in Section 1 of the Clean Streams Law, 35 P.S. §691.1.

O.      Section 301 of the Clean Streams Law, 35 P.S. § 691.301, provides that no person shall place or permit to be placed or discharged or permit to flow, or continue to discharge or permit to flow, into any waters of the Commonwealth any industrial wastes.

P.      Section 307(a) of the Clean Streams Law, 35 P.S. § 691.307(a), provides that no person shall discharge or permit the discharge of industrial wastes in into any waters of the Commonwealth unless authorized by the rules and regulations of the Department or permitted by the Department.

3

Q.    Section 307(c) of the Clean Streams Law, 35 P.S. § 691.307(c), states that it is a nuisance to discharge industrial wastes without a permit or contrary to the rules and regulations of the Department.

R.    Section 401 of the Clean Streams Law, 35 P.S. § 691.401, makes it unlawful for any person or municipality to put or place into any of the waters of the Commonwealth, or allow or permit to be discharged from property owned or occupied by such person or municipality into any of the waters of the Commonwealth, any substance of any kind or character resulting in pollution as herein defined.  Any such discharge is declared to be a nuisance.

S.    Section 402(a) of the Clean Streams Law, 35 P.S. § 691.401(a), provides that whenever the Department finds that any activity, not otherwise requiring a permit under the Clean Streams Law, including but not limited to the impounding, handling, storage, transportation, processing or disposing of materials or substances, creates a danger of pollution of the waters of the Commonwealth or that regulation of the activity is necessary to avoid such pollution, the Department may issue an order to a person regulating a particular activity.

T.    Section 402(b) of the Clean Streams Law, 35 P.S. § 691.402(b), provides, in part, that whenever a permit is required by rules and regulations issued pursuant to this section, it shall be unlawful for a person or municipality to conduct the activity regulated except pursuant to a permit issued by the Department.  Conducting such activity without a permit or conducting an activity contrary to the rules and regulations of the Department is declared to be a nuisance.

U.    Under 25 Pa. Code § 91.34(a), persons engaged in an activity which includes the impoundment, production, processing, transportation, storage, use, application, or disposal of pollutants shall take necessary measures to prevent the substances from directly or indirectly reaching waters of this Commonwealth through accident, carelessness, maliciousness, hazards of weather, or from another cause.

**Exhibit B_Page 291 of 583**

V.    Section 316 of the Clean Streams Law, 35 P.S. § 691.316, provides, in part, that whenever the Department finds that pollution or a danger of pollution is resulting from a condition which exists on land in the Commonwealth, the Department may order the landowner or occupier to correct the condition in a manner satisfactory to the Department.

W.    The release of refined petroleum products from a section of the Twin Oaks–Newark Pipeline as described in Paragraphs E through K, above, is a "release" of "regulated substance" as those terms are defined in Section 103 of Act 2, 35 P.S. § 6026.103.

X.    Section 106 of Act 2, 35 P.S. § 6026.106, provides that the environmental remediation standards established under Act 2 shall be used whenever site remediation is required under, among other laws, the Clean Streams Law and the Solid Waste Management Act, the Act of July 7, 1980, P.L. 380, No. 97, *as amended*, 35 P.S. § 6018.101 et seq.

**Unlawful Conduct**

Y.    Energy Transfer's unpermitted discharge of petroleum products during the Pipeline Release into waters of the Commonwealth as described in Paragraphs E through K, above, violates Sections 301, 307, 401, and 402 of the Clean Streams Law, 35 P.S. §§ 691.301, 691.307, 691.401, 691.402 and 25 Pa. Code § 91.34(a).

Z.    The violations described in Paragraph Y, above are unlawful conduct under Section 611 of the Clean Streams Law, 35 P.S. § 691.611; a statutory nuisance under Section 601 of the Clean Streams Law, 35 P.S. § 691.601; and subject Energy Transfer to civil penalties under Section 605 of the Clean Streams Law, 35 P.S. § 691.605.

<center>**ORDER**</center>

NOW, THEREFORE, pursuant to Section 610 of the Clean Streams Law, 35 P.S. §691.610; Section 1917-A of the Administrative Code; and the rules and regulations adopted pursuant to each, it is hereby ORDERED that:

<center>5</center>

1.    **Interim Remedial Measures.**  Energy Transfer shall:

a.    Bottled Water.  Within five (5) calendar days after the date of this Order, Energy Transfer shall supply bottled water to all properties with potable groundwater wells within at least the Mt. Eyre neighborhood topographic watershed plus a minimum 500-foot buffer, in Upper Makefield Township, Bucks County that have concentrations of VOCs above background concentrations in the area and shall continue supplying bottle water to these properties until Energy Transfer obtains Department approval of the remedial action plan, required by Paragraph 2.b., below.

b.    Point of Entry Treatment Systems.  Within ten (10) calendar days after the date of this Order, Energy Transfer shall supply and install point-of-entry treatment ("POET") systems on the water supply for each property with a potable groundwater well within at least the Mt. Eyre neighborhood topographic watershed plus a minimum 500-foot buffer, in Upper Makefield Township, Bucks County that have concentrations of VOCs exceeding the MCLs and within five (5) days after installation, perform confirmatory sampling of groundwater collected post-treatment from a potable point of use location at the affected property to demonstrate attainment of Statewide health standard medium-specific concentrations (MSCs) for VOCs.

c.    Additional Properties.

i.    Within two (2) calendar days after discovering any additional potable groundwater wells on properties within the Mt. Eyre neighborhood topographic watershed plus a minimum 500-foot buffer, in Upper Makefield Township, Bucks County that contain VOCs above the MCLs and the property does not have a POET capable of treating VOCs to meet the MCLs, notify the property owner/occupant within 24 hours and supply bottled water to the property.

ii.    Within ten (10) calendar days after discovering any additional potable groundwater wells on properties within the Mt. Eyre neighborhood topographic

6

watershed plus a minimum 500-foot buffer, in Upper Makefield Township, Bucks County that contain VOCs above the MCLs and the property does not have a POET capable of treating VOCs to meet Statewide health standard MSCs, supply and install POET systems on the water supply and within five (5) days after installation, perform confirmatory sampling of groundwater collected post-treatment from a potable point of use location at the affected property to demonstrate attainment of Statewide health standard MSCs for VOCs.

d.    Energy Transfer shall sample and maintain the POET, as necessary.  Maintenance of the POET will include quarterly sampling of the inlet, midport and outlet of the POET to determine whether breakthrough of the POET has been detected and, if warranted, the replacement of a carbon filter, until the Department determines that a POET is no longer needed.

e.    Daily Reports.  Beginning one day after the date of this Order and continuing until the Department notifies Energy Transfer in writing that a different period of time is acceptable, Energy Transfer shall submit to the Department an electronic daily summary progress report of the activities performed by Energy Transfer regarding the Pipeline Release.  The report shall include the following:

i.    Numbers to date of potable wells sampled, laboratory results received, and scheduled potable well sampling.

ii.    Numbers to date of tested potable wells exceeding Statewide health standard MSCs for VOCs, and tested potable wells with detections of VOCs that do not exceed MSCs.

iii.    Numbers to date of POET installed by Energy Transfer, POET installed by others that are known by Energy Transfer, and planned POET by Energy Transfer and by others.

7

**Exhibit B_Page 294 of 583**

iv.  A list of properties, to date, known to Energy Transfer with operating POET or other treatment systems for VOCs, a list of properties with VOC detections that do not have POET or other treatment systems, a list of properties with planned POET, and a list of properties with VOC detections where Energy Transfer does not know whether the property has a POET.

v.  Numbers to date of properties that have requested POET from Energy Transfer and where Energy Transfer has declined to install or pay for the installation of POET.

vi.  A list of properties, to date, that have requested POET and where Energy Transfer has declined to install or pay for the installation of POET, and the reasoning for declining.

vii.  Tables of all property well sampling analytical results, property well gauging results, and wellhead field screening results.

viii.  Site characterization activities performed.

ix.  Site remediation activities performed.

f.  By March 14, 2025, Energy Transfer shall submit to the Department all laboratory reports for all property well sampling received by Energy Transfer to that date.

g.  Beginning March 21, 2025 and continuing on a weekly basis, Energy Transfer shall submit to the Department all laboratory reports for all property well sampling received in the preceding 7-day period.

h.  By March 19, 2025, Energy Transfer shall submit to the Department an interim remedial action plan, describing soil, groundwater, surface water, and vapor intrusion remedial measures, and an implementation schedule.  The plan shall describe proposed short-term measures to protect human health and the environment.

**Exhibit B_Page 295 of 583**

i.  By April 2, 2025, Energy Transfer shall submit to the Department a vapor intrusion investigation progress report describing activities to date, results, mitigation measures (if applicable), plans for further evaluation, and a schedule for mitigation and evaluation consistent with the Land Recycling Program Technical Guidance Manual, Section IV (the Department Doc. 261-0300-101).

2.  **Remediation.**

a.  Energy Transfer shall remediate the release of regulated substances from the Pipeline Release in accordance with the remediation standards of Act 2 and the requirements of this Order.

b.  By March 14, 2025, Energy Transfer shall submit to the Department a proposed implementation schedule for the following:

i.  Submission of a work plan for characterization of the nature, extent, direction, rate of movement, volume and composition of regulated substances released into the environment from the Pipeline Release in accordance with Act 2;

ii.  Completing work to characterize the nature, extent, direction, rate of movement, volume and composition of regulated substances released into the environment from the Pipeline Release in accordance with Act 2 and submitting a report describing the interim characterization of the nature, extent, direction, rate of movement, volume and composition of regulated substances released into the environment from the Pipeline Release in accordance with the remediation standard(s) of Act 2

iii.  Submitting a plan addressing all remedial actions to address the release of regulated substances released into the environment from the Pipeline Release to meet the remediation standard(s) of Act 2

9

**Exhibit B_Page 296 of 583**

    iv.  Submitting a final report demonstrating attainment of Act 2 cleanup standard(s) for the regulated substances released into the environment from the Pipeline Release in accordance with the requirements of Act 2

    v.  Submitting to the Department remedial action progress reports once every ninety (90) days describing characterization activities and results, remedial action implementation and results, public involvement activities, planned site characterization work and remedial actions.

    c.      Upon Department approval of the implementation schedule required by Paragraph 2.b., above, Energy Transfer shall implement the work in accordance with the deadlines set forth in the Department-approved implementation schedule.

    d.      By March 21, 2025, Energy Transfer shall submit to the Department and Upper Makefield Township a Public Involvement Plan ("PIP").  The PIP will be subject to review and comment by the Department and the Township.  Energy Transfer shall respond to comments and revise the PIP within 14 days of receipt of comments by the Department or the Township.  The PIP shall include, at a minimum, the following elements:

    i.  Public access at convenient location(s) for document reviews.  Hardcopies of documents shall be available at one or more locations.  Documents shall also be available on an Energy Transfer–hosted website.  Documents available for public review shall include, at a minimum, all site characterization and remedial action plans and reports enumerated by this order, all Act 2 reports and requests, all Department decision and comment letters, and all addendums and responses to Department decision and comment letters.

    ii.  One or more Energy Transfer points of contact to address questions and receive comments from the community and Township.

<div align="center">10</div>

iii.  A description and schedule for public hearings and meetings.

iv.  An outreach plan to inform the community and Township of significant project activities and the availability of documents for public review, as defined in (a) above.

v.  Specifications for submittal of public comments on the documents defined in (a) above, including methods for submitting comments and comment periods.

3.  **Department approval.**  For any document required under this Order, the Department will approve the document or advise Energy Transfer of deficiencies in writing.  If the Department advises Energy Transfer of deficiencies, Energy Transfer shall address the deficiencies in writing within forty-five (45) days after notice from the Department, or within such additional time as determined by the Department and set forth in the notice of deficiency.  Energy Transfer's failure to address any deficiency identified by the Department in writing shall violate this Order.

4.  **Correspondence.** All correspondence with the Department concerning this Order shall be addressed to:

> C. David Brown P.G.
> Environmental Program Manager
> Environmental Cleanup and Brownfields
> Department of Environmental Protection, Southeast Regional Office
> 2 East Main Street
> Norristown, PA 19401
> cdbrown@pa.gov
>
> With copy to:
>
> Alex M. Langan
> Assistant Counsel
> Pennsylvania Department of Environmental Protection
> Southeast Regional Office
> Office of Chief Counsel
> 2 East Main Street
> Norristown, PA 19401
> allangan@pa.gov

and

Upper Makefield Township
1076 Eagle Road
Newtown, PA 18940
manager@uppermakefield.org

Additionally, forms and other submissions submitted to the Department pursuant this Order may be

submitted electronically by using the Department's "Public Upload with Electronic Payment" platform

at the following link: https://www.dep.pa.gov/DataandTools/ElectronicSubmissions/Pages/default.aspx.

Any person aggrieved by this action may appeal the action to the Environmental Hearing Board
(Board), pursuant to Section 4 of the Environmental Hearing Board Act, 35 P.S. § 7514, and the
Administrative Agency Law, 2 Pa.C.S. Chapter 5A. The Board's address is:

Environmental Hearing Board
Rachel Carson State Office Building, Second Floor
400 Market Street
P.O. Box 8457
Harrisburg, PA 17105-8457

TDD users may contact the Environmental Hearing Board through the Pennsylvania Relay
Service, 800-654-5984.

Appeals must be filed with the Board within 30 days of receipt of notice of this action unless the
appropriate statute provides a different time. This paragraph does not, in and of itself, create any
right of appeal beyond that permitted by applicable statutes and decisional law.

A Notice of Appeal form and the Board's rules of practice and procedure may be obtained online
at www.ehb.pa.gov or by contacting the Secretary to the Board at 717-787-3483. The Notice of
Appeal form and the Board's rules are also available in braille and on audiotape from the
Secretary to the Board.

IMPORTANT LEGAL RIGHTS ARE AT STAKE. YOU SHOULD SHOW THIS
DOCUMENT TO A LAWYER AT ONCE. IF YOU CANNOT AFFORD A LAWYER, YOU
MAY QUALIFY FOR FREE PRO BONO REPRESENTATION. CALL THE SECRETARY
TO THE BOARD AT 717-787-3483 FOR MORE INFORMATION. YOU DO NOT NEED A
LAWYER TO FILE A NOTICE OF APPEAL WITH THE BOARD.

Exhibit B_Page 299 of 583

MAY QUALIFY FOR FREE PRO BONO REPRESENTATION. CALL THE SECRETARY

TO THE BOARD AT 717-787-3483 FOR MORE INFORMATION. YOU DO NOT NEED A

LAWYER TO FILE A NOTICE OF APPEAL WITH THE BOARD.

**IF YOU WANT TO CHALLENGE THIS ACTION, YOUR APPEAL MUST BE FILED**

**WITH AND RECEIVED BY THE BOARD WITHIN 30 DAYS OF RECEIPT OF**

**NOTICE OF THIS ACTION.**

FOR THE COMMONWEALTH OF
PENNSYLVANIA
DEPARTMENT OF ENVIRONMENTAL
PROTECTION

Patrick L. Patterson
Regional Director

13

**Exhibit B_Page 300 of 583**

# Exhibit F

**Exhibit B_Page 301 of 583**



March 31, 2025

**Via Electronic Mail**

C. David Brown, P.G.
Environmental Program Manager
Environmental Cleanup and Brownfields
Pennsylvania Department of Environmental Protection
Southeast Regional Office
2 East Main Street
Norristown, PA 19401
cdbrown@pa.gov

**Re:     March 6, 2025 Order**
**Twin Oaks – Newark 14"-Diameter Pipeline**
**Upper Makefield Township, Bucks County**

Dear David:

On March 6, 2025, the Department issued an Order the ("Order") to Sunoco Pipeline L.P. ("SPLP") and Energy Transfer (R&M), LLC, regarding the release of petroleum products from the 14"-diameter Twin Oaks–Newark Pipeline (the "Pipeline"), which is owned and operated by SPLP.  SPLP responds to the Order to address certain factual inaccuracies in the Order, and also to provide the Department with a status update regarding the Interim Remedial Measures and Remediation tasks identified in the Order.

As an initial matter, the Order was issued to SPLP and its affiliate, Energy Transfer (R&M), LLC.  To be clear, SPLP is the owner and operator of the Pipeline.  Energy Transfer (R&M) LLC does not own or operate the Pipeline, and the company does not have an ownership interest in SPLP.  Energy Transfer (R&M), LLC is therefore not a proper party to the Order.[1]

### I.      Response to Paragraphs A-Z

SPLP responds to the statements included in the factual recitals and legal conclusions in Paragraphs A-Z of the Order, as follows:

- **Paragraph B** – identifies "*Sunoco Logistics Partners Operations GP LLC*" as the "*General Partner*" of SPLP.  On March 1, 2022, Sunoco Logistics Partners Operations GP LLC changed its name to Energy Transfer Operations GP LLC.

---

[1] SPLP's response to and compliance with the Order is without waiver of any argument that Energy Transfer (R&M), LLC has been improperly named in the Order.

Twin Oaks-Newark 14"-Diameter Pipeline
Response to Administrative Order
March 31, 2025
Page 2

- **Paragraph C** – even though Energy Transfer (R&M) LLC is not a proper party to the Order, the allegations regarding the company included in Paragraph C of the Order are inaccurate.  Paragraph C of the Order identifies Energy Transfer (R&M) LLC as a *"Pennsylvania Business Corporation and maintains a headquarters address of 1735 Market Street, Philadelphia, PA 19103 and a business address of 100 Green Street, Marcus Hook PA 19061" and that it is "parent entity of [SPLP]."*  These statements are not accurate.  Energy Transfer (R&M) LLC is a Pennsylvania limited liability company, its corporate headquarters is located at 8111 Westchester Drive, Dallas, TX 75225, and Energy Transfer (R&M) LLC is not a parent entity of SPLP.

- **Paragraph D** – collectively defines Energy Transfer (R&M), LLC and SPLP as "*Energy Transfer*," which is a defined term used throughout the remainder of the Order.  For the reasons set forth above, Energy Transfer (R&M), LLC is not a proper party to the Order, and SPLP will therefore interpret the defined term "*Energy Transfer*" as used throughout the Order to mean and refer to **SPLP only**.

- **Paragraph H** – the Department states that the sleeve installed on the Pipeline "*was installed over thirty years ago*."  The sleeve was installed in 1995.

- **Paragraph I** – the Department asserts that the "Pipeline Release has contaminated groundwater in the area of the release and separate-phase liquid petroleum, and dissolved concentrations of petroleum chemicals have been detected in potable groundwater wells in the Mt. Eyre neighborhood."  SPLP is continuing to investigate any impacts to groundwater from the release.

- **Paragraphs J and K** – summarize detections of petroleum separate-phase liquid or concentration of Volatile Organic Compounds ("VOCs") in water samples in the Mt. Eyre neighborhood as of the date of the Order.  As the Department is aware, the detections of VOCs in water samples are dynamic.  Beginning on January 22, 2025, SPLP was communicating to the Department sampling being performed in the neighborhood. SPLP then began providing written reports regarding the sampling to the Department beginning on February 3, 2025.  SPLP will continue to report sampling results to the Department in accordance with the terms of the Order.

- **Paragraph L** – states that the Notice of Intent to Remediate indicates SPLP's intention to remediate using the Statewide health standard under Act 2.  For clarity, the Notice of Intent to Remediate listed that SPLP intends to pursue the residential Statewide health standard for both soils and groundwater.

- **Paragraphs M through Z** – SPLP disputes and does not admit any of the legal conclusions set forth in Paragraphs M through Z of the Order.

Twin Oaks-Newark 14"-Diameter Pipeline
Response to Administrative Order
March 31, 2025
Page 3

## II.    Response to and Summary of Compliance with Paragraph 1

SPLP responds to and summarizes its compliance with each of the Interim Remedial Measures identified in Paragraph 1.a. through 1.i. of the Order as follows:

- **Paragraph 1.a: Bottled Water** – requires that *"[w]ithin five (5) calendar days after the date of this Order, [SPLP] shall supply bottled water to all properties with potable groundwater wells within at least the Mt. Eyre neighborhood topographic watershed plus a minimum 500-foot buffer, in Upper Makefield Township, Bucks County that have concentrations of VOCs above background concentrations in the area and shall continue supplying bottled water to these properties until [SPLP] obtains Department approval of the remedial action plan, required by Paragraph 2.b. below*."

  o As the Department is aware, the "Mt. Eyre neighborhood topographic watershed plus a minimum 500-foot buffer" that is referenced in this paragraph and throughout the Order was established by SPLP to define the area for further investigation of potential impacts.  This area was presented on maps at the public meeting held in Upper Makefield Township on February 13, 2025.

  o As reflected and summarized in the March 11, 2025 email submitted by Gus Borkland to the Department (*see* **Attachment 1**), and also summarized in the Interim Remedial Action Plan submitted to the Department on March 19, 2025 (*see* **Attachment 5**) –  SPLP has been providing bottled water at SPLP's sole cost and expense to residents in the Mt. Eyre neighborhood since January 27, 2025, over a month before the Order was issued (*see* **Attachment 2**).

  o Please also note that SPLP has not restricted bottled water pick-up, delivery, or reimbursement for bottled water to only those residents in the Mt. Eyre neighborhood topographic watershed plus 500-foot buffer, or to only those with water samples with VOC results with concentrations above background.  Rather SPLP has made bottled water available to any resident in the Upper Makefield community upon request.  Through March 28, 2025, SPLP has provided bottled water to residents more than 231 separate times (*see* **Attachment 2**). SPLP will continue to provide bottled water to residents upon request until SPLP obtains the Department's approval of the remedial action plan required by paragraph 2.b of the Order.

- **Paragraph 1.b: Point of Entry Treatment ("POET") Systems** – requires that *"[w]ithin ten (10) calendar days after the date of this Order, [SPLP] shall supply and install point-of-entry treatment ("POET") systems on the water supply for each property with a potable groundwater well within at least the Mt. Eyre neighborhood topographic watershed plus a minimum 500-foot buffer, in Upper Makefield Township, Bucks County that have concentrations of VOCs exceeding the MCLs and within five (5) days after installation, perform confirmatory sampling of groundwater collected post-treatment from a potable*

2971010_1

**Exhibit B_Page 304 of 583**

Twin Oaks-Newark 14"-Diameter Pipeline
Response to Administrative Order
March 31, 2025
Page 4

*point of use location at the affected property to demonstrate attainment of Statewide health standard medium-specific concentrations (MSCs) for VOCs.*"

- As reflected and summarized in the March 16, 2025 email from Gus Borkland to the Department (*see* **Attachment 3**), and also summarized in the Interim Remedial Action Plan submitted to the Department on March 19, 2025 (*see* **Attachment 5**) – SPLP completed the installation or upgrade of POET systems at each of the six (6) properties in the Mt. Eyre neighborhood topographic watershed plus 500-foot buffer area where sampling results either showed a concentration of VOCs above the MCLs or where free product, also referred to as light non-aqueous phase liquid ("LNAPL"), was observed in the well at the property. The POET installations and/or upgrades were completed at each of these 6 properties between February 7-19, 2025 – before the date of the Order. Post-POET installation sampling was completed at each of these 6 properties between 2/12/2025 and 2/20/2025, as reflected in the summary of analytical sampling that is provided to the Department each day. These properties will continue to be re-sampled at minimum on a quarterly basis in accordance with Paragraph 1.d of the Order

- **Paragraph 1.c.i: Additional Properties – Bottled Water** – requires that *"[w]ithin two (2) calendar days after discovering any additional potable groundwater wells on properties within the Mt. Eyre neighborhood topographic watershed plus a minimum 500-foot buffer, in Upper Makefield Township, Bucks County that contain VOCs above the MCLs and the property does not have a POET capable of treating VOCs to meet the MCLs, notify the property owner/occupant within 24 hours and supply bottled water to the property.*"

  - As of the date of this submission, there are no additional properties that have been sampled that fall within the criteria identified in Paragraph 1.c.i of the Order, but if any are discovered in the future, SPLP will comply with the conditions of this paragraph of the Order. Please note that as stated above, SPLP has not restricted bottled water pick-up, delivery, or reimbursement for bottled water to only those residents in the Mt. Eyre neighborhood topographic watershed plus 500-foot buffer, but rather SPLP has made bottled water available to any resident in the Upper Makefield community upon request.

- **Paragraph 1.c.ii: Additional Properties – POET System** – requires that *"[w]ithin ten (10) calendar days after discovering any additional potable groundwater wells on properties within the Mt. Eyre neighborhood topographic watershed plus a minimum 500-foot buffer, in Upper Makefield Township, Bucks County that contain VOCs above the MCLs and the property does not have a POET capable of treating VOCs to meet Statewide health standard MSCs, supply and install POET systems on the water supply and within five (5) days after installation, perform confirmatory sampling of groundwater collected*

2971010_1

**Exhibit B_Page 305 of 583**

Twin Oaks-Newark 14"-Diameter Pipeline
Response to Administrative Order
March 31, 2025
Page 5

*post-treatment from a potable point of use location at the affected property to demonstrate attainment of Statewide health standard MSCs for VOCs.*"

- o  As of the date of this submission, there are no additional properties that have been sampled that fall within the criteria identified in Paragraph 1.c.ii of the Order, but if any are discovered in the future, SPLP will comply with the conditions of this paragraph of the Order.
- o  Please note that beginning February 13, 2025, before the date of the Order, SPLP made offers install POET systems directly to landowners of all properties in the Mt. Eyre neighborhood topographic watershed plus a minimum 500-foot buffer, and to fund the costs of maintenance, servicing, and follow-up sampling of the POET systems at SPLP's sole cost and expense, on at minimum a quarterly basis for a minimum of ten (10) years.  Further, as reflected in the March 16, 2025 email from Gus Borkland to the Department (*see* **Attachment 3**), and also summarized in the Interim Remedial Action Plan submitted to the Department on March 19, 2025 (*see* **Attachment 5**) –  SPLP has installed, upgraded, or reimbursed landowners for the installation of POET systems throughout the Mt. Eyre neighborhood topographic watershed plus 500-foot buffer, regardless of whether the properties have sample results reflecting detectable concentrations of VOCs.  Through March 28, 2025, SPLP has installed, upgraded, or reimbursed landowners for 118 POET systems, with an additional 39 POET systems planned to be installed in the near future.  A list of all properties with POET system installations, upgrades, or reimbursements is being provided to the Department on a daily basis as a component of the daily reporting performed in accordance with Paragraph 1.e of the Order.

- **Paragraph 1.d: POET Quarterly Sampling and Maintenance** – requires that "*[SPLP] shall sample and maintain the POET, as necessary.  Maintenance of the POET will include quarterly sampling of the inlet, midport and outlet of the POET to determine whether breakthrough of the POET has been detected and, if warranted, the replacement of a carbon filter, until the Department determines that a POET is no longer needed.*"

  - o  As noted above, on February 13, 2025, before the date of the Order, SPLP made offers to install POET systems directly to landowners of all properties in the Mt. Eyre neighborhood topographic watershed plus a minimum 500-foot buffer, and to fund the costs of maintenance, servicing, and follow-up sampling of the POET systems at SPLP's sole cost and expense, on at minimum a quarterly basis for a minimum of ten (10) years.  SPLP will continue to perform POET system maintenance, including sampling at least on a quarterly basis, in accordance with this Paragraph 1.d of the Order.

- **Paragraph 1.e: Daily Reports** – requires that *"[b]eginning one day after the date of this Order and continuing until the Department notifies [SPLP] in writing that a different period of time is acceptable, [SPLP] shall submit to the Department an electronic daily*

2971010_1

**Exhibit B_Page 306 of 583**

Twin Oaks-Newark 14"-Diameter Pipeline
Response to Administrative Order
March 31, 2025
Page 6

> *summary progress report of the activities performed by [SPLP] regarding the Pipeline Release. The report shall include the following:*
>
> > *i. Numbers to date of potable wells sampled, laboratory results received, and scheduled potable well sampling.*
> >
> > *ii. Numbers to date of tested potable wells exceeding Statewide health standard MSCs for VOCs, and tested potable wells with detections of VOCs that do not exceed MSCs.*
> >
> > *iii. Numbers to date of POET installed by [SPLP], POET installed by others that are known by [SPLP], and planned POET by [SPLP] and by others.*
> >
> > *iv. A list of properties, to date, known to [SPLP] with operating POET or other treatment systems for VOCs, a list of properties with VOC detections that do not have POET or other treatment systems, a list of properties with planned POET, and a list of properties with VOC detections where [SPLP] does not know whether the property has a POET.*
> >
> > *v. Numbers to date of properties that have requested POET from [SPLP] and where [SPLP] has declined to install or pay for the installation of POET.*
> >
> > *vi. A list of properties, to date, that have requested POET and where [SPLP] has declined to install or pay for the installation of POET, and the reasoning for declining.*
> >
> > *vii. Tables of all property well sampling analytical results, property well gauging results, and wellhead field screening results.*
> >
> > *viii. Site characterization activities performed.*
> >
> > *ix. Site remediation activities performed.*"

- o As the Department is aware, beginning on January 22, 2025, SPLP was communicating to the Department regarding the water sampling being performed in the neighborhood. SPLP then began providing written reports regarding the water sampling to the Department beginning on February 3, 2025, providing updates to the Department summarizing water sampling performed, together with a detailed summary of the laboratory results received, as well as a schedule for additional sampling efforts. Before the date of the Order, SPLP was also communicating with the Department regarding the installation or upgrades of POET systems at each of the six (6) properties in the Mt. Eyre neighborhood topographic watershed plus 500-foot buffer area where sampling results either showed a concentration of VOCs above the MCLs or LNAPL was observed in the well at the property.

- o Also, since January 22, 2025, before the date of the Order, SPLP was providing updates to the Department multiple times per week to describe the site investigation, site characterization, and remediation activities that were being performed.

- o In compliance with the terms of Paragraph 1.e of the Order, since March 7, 2025, SPLP has submitted a daily summary report to the Department which includes each of the items identified in Paragraphs 1.e.i through 1.e.ix of the Order. SPLP will continue to provide the daily summary report to the Department in accordance with the terms of the Order.

Twin Oaks-Newark 14"-Diameter Pipeline
Response to Administrative Order
March 31, 2025
Page 7

- **Paragraph 1.f: Laboratory Reports Received Through 3/14/25** – requires that *"[b]y March 14, 2025, [SPLP] shall submit to the Department all laboratory reports for all property well sampling received by [SPLP] to that date."*

  o As noted above, since February 3, 2025, before the date of the Order, SPLP provided the Department a summary table of all laboratory results for water sampling that was being performed.  On March 14, 2025, in compliance with paragraph 1.f of the Order, SPLP compiled all laboratory reports that had been received to date and transmitted the reports to the Department (*see* **Attachment 4**).

- **Paragraph 1.g: Laboratory Reports Weekly Update** – requires that *"[b]eginning March 21, 2025 and continuing on a weekly basis, [SPLP] shall submit to the Department all laboratory reports for all property well sampling received in the preceding 7-day period."*

  o Beginning on March 21, 2021, SPLP submitted a weekly update of all laboratory reports for sampling performed in the prior 7-day period (*see e.g.*, **Attachment 10**). SPLP will continue to comply with Paragraph 1.g of the Order by providing the Department with copies of additional laboratory results for water sampling that is being performed on a weekly basis each Friday.

- **Paragraph 1.h:  Interim Remedial Action Plan** – requires that *"[b]y March 19, 2025, [SPLP] shall submit to the Department an interim remedial action plan, describing soil, groundwater, surface water, and vapor intrusion remedial measures, and an implementation schedule. The plan shall describe proposed short-term measures to protect human health and the environment."*

  o On March 19, 2025, SPLP submitted an Interim Remedial Action Plan by email from Gus Borkland to the Department (*see* **Attachment 5**).

- **Paragraph 1.i: Vapor Intrusion Investigation Progress Report** – requires that "*[b]y April 2, 2025, [SPLP] shall submit to the Department a vapor intrusion investigation progress report describing activities to date, results, mitigation measures (if applicable), plans for further evaluation, and a schedule for mitigation and evaluation consistent with the Land Recycling Program Technical Guidance Manual, Section IV (the Department Doc. 261-0300-101)."*

  o Prior to the issuance of the Order, SPLP developed an Indoor Air Sampling and Analysis Plan (dated Feb. 21, 2025), and pursuant to that plan performed an initial round of indoor air sampling at five (5) properties in the Mt. Eyre neighborhood on February 25 through 26, 2025.  The results of that sampling were provided directly to each particular landowner on March 15, 2025, with copies provided to the Department via email on March 17, 2025.  Indoor air sampling was also performed at one (1) additional location on March 15-16, and the results for that additional

2971010_1
**Exhibit B_Page 308 of 583**

Twin Oaks-Newark 14"-Diameter Pipeline
Response to Administrative Order
March 31, 2025
Page 8

property are pending, but will be provided to the landowner and the Department. A second round of sampling will be performed at each of the six (6) properties where an initial round of indoor air sampling was taken, within approximately 45 days after the initial sampling event. SPLP will continue to perform indoor air sampling in accordance with the Indoor Air Sampling and Analysis Plan and provide the results of that sampling to landowners and to the Department. SPLP will also prepare and submit the requested vapor intrusion investigation progress report to the Department no later than April 2, 2025.

### III.     Response to and Summary of Compliance with Paragraph 2

SPLP responds to and summarizes its compliance with each of the Remediation components identified in Paragraph 2.a. through 2.d of the Order as follows:

- **Paragraph 2.a: Remediation in Accordance with Act 2** – requires that *"[SPLP] shall remediate the release of regulated substances from the Pipeline Release in accordance with the remediation standards of Act 2 and the requirements of this Order.*"

  o As the Department is aware, SPLP published and submitted a Notice of Intent to Remediate to the Department on February 13, 2025, nearly a month prior to the Department's issuance of the Order (*see* **Attachment 6**). A revised Notice of Intent to Remediate was also submitted (*see* **Attachment 7**). SPLP has selected to perform remediation efforts to attain residential statewide health standards for both soil and groundwater. All investigation, characterization, and remediation efforts will comply with the Act 2 remediation standards and the requirements of the Order.

- **Paragraph 2.b:  Proposed Implementation Schedule** – requires that *"[b]y March 14, 2025, [SPLP] shall submit to the Department a proposed implementation schedule for the following:*
  i. *Submission of a work plan for characterization of the nature, extent, direction, rate of movement, volume and composition of regulated substances released into the environment from the Pipeline Release in accordance with Act 2;*
  ii. *Completing work to characterize the nature, extent, direction, rate of movement, volume and composition of regulated substances released into the environment from the Pipeline Release in accordance with Act 2 and submitting a report describing the interim characterization of the nature, extent, direction, rate of movement, volume and composition of regulated substances released into the environment from the Pipeline Release in accordance with the remediation standard(s) of Act 2*
  iii. *Submitting a plan addressing all remedial actions to address the release of regulated substances released into the environment from the Pipeline Release to meet the remediation standard(s) of Act 2*

2971010_1

Twin Oaks-Newark 14"-Diameter Pipeline
Response to Administrative Order
March 31, 2025
Page 9

> iv. *Submitting a final report demonstrating attainment of Act 2 cleanup standard(s) for the regulated substances released into the environment from the Pipeline Release in accordance with the requirements of Act 2*
> v. *Submitting to the Department remedial action progress reports once every ninety (90) days describing characterization activities and results, remedial action implementation and results, public involvement activities, planned site characterization work and remedial actions.*"

- o On March 14, 2025, SPLP submitted a proposed implementation schedule as required by Paragraph 2.b of the Order (*see* **Attachment 8**).

- **Paragraph 2.c: Implementation of Work in Accordance with Schedule** – requires *"[u]pon approval of the implementation schedule required by Paragraph 2.b., above, [SPLP] shall implement the work in accordance with the deadlines set forth in the Department-approved implementation schedule.*"

  - o SPLP will comply with this requirement of the Order and perform the tasks required to complete the Act 2 process. SPLP is awaiting the Department's approval of the implementation schedule submitted on March 14, 2025.

- **Paragraph 2.d: Public Involvement Plan** – requires that *"[b]y March 21, 2025, [SPLP] shall submit to the Department and Upper Makefield Township a Public Involvement Plan ("PIP"). The PIP will be subject to review and comment by the Department and the Township. [SPLP] shall respond to comments and revise the PIP within 14 days of receipt of comments by the Department or the Township. The PIP shall include, at a minimum, the following elements:*
  > i. *Public access at convenient location(s) for document reviews. Hardcopies of documents shall be available at one or more locations. Documents shall also be available on an [SPLP]–hosted website. Documents available for public review shall include, at a minimum, all site characterization and remedial action plans and reports enumerated by this order, all Act 2 reports and requests, all Department decision and comment letters, and all addendums and responses to Department decision and comment letters.*
  > ii. *One or more [SPLP] points of contact to address questions and receive comments from the community and Township.*
  > iii. *A description and schedule for public hearings and meetings.*
  > iv. *An outreach plan to inform the community and Township of significant project activities and the availability of documents for public review, as defined in (a) above.*
  > v. *Specifications for submittal of public comments on the documents defined in (a) above, including methods for submitting comments and comment periods.*"

  - o On March 21, 2025, SPLP submitted a proposed Public Involvement Plan to the Department and Upper Makefield Township (*see* **Attachment 9**), which includes

Twin Oaks-Newark 14"-Diameter Pipeline
Response to Administrative Order
March 31, 2025
Page 10

the elements identified in Paragraph 2.d of the Order.  SPLP will respond to comments from the Department and Upper Makefield Township once they are received and will make any necessary revisions to the Public Involvement Plan in accordance with Paragraph 2.d of the Order.

*********

Please note that nothing in this response should be construed either as an admission of any of the legal conclusions set forth by the Department in the Order or as a waiver of any legal defenses SPLP may possess.

If you have any questions or need additional information regarding this response and the attached documents, please contact me via email at matthew.gordon@energytransfer.com.

Thank you,

Matthew Gordon
Vice President of Operations
Energy Transfer

**List of Attachments:**
1. March 11, 2025 – Email from Gus Borkland to PADEP – Regarding Bottled Water
2. Updated Tracking Spreadsheets for Bottled Water
3. March 16, 2025 – Email from Gus Borkland to PADEP – Regarding POET Installations
4. March 14, 2025 – Email from Gus Borkland to PADEP – Transmitting Lab Reports
5. March 19, 2025 – Interim Remedial Action Plan
6. February 13, 2025 – Notice of Intent to Remediate
7. March 4, 2025 – Revised Notice of Intent to Remediate
8. March 14, 2025 – Proposed Implementation Schedule
9. March 21, 2025 – Proposed Public Involvement Plan
10. March 21, 2025 and March 28, 2025 – Email from Chris Embry to PADEP – Transmitting Updated Lab Reports

2971010_1
**Exhibit B_Page 311 of 583**

JS 44   (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Daniel La Hart and Katherine La Hart

**DEFENDANTS**

Sunoco Pipeline L.P., Energy Transfer LP, and Energy Transfer (R&M) LLC

**(b)** County of Residence of First Listed Plaintiff   Bucks County, PA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Dallas County, TX
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Berger Montague PC, 1818 Market St. Philadelphia, PA 19103

Attorneys *(If Known)*

Morgan, Lewis & Bockius LLP, 2222 Market St. Philadelphia, PA 19103

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                   *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**    **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane    ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product     Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument |     Liability    ☐ 367 Health Care/ | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &      Pharmaceutical | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
|     & Enforcement of Judgment |     Slander      Personal Injury | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'      Product Liability | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted |     Liability    ☐ 368 Asbestos Personal | |      New Drug Application | ☐ 470 Racketeer Influenced and |
|     Student Loans | ☐ 340 Marine      Injury Product | | ☐ 840 Trademark |     Corrupt Organizations |
|     (Excludes Veterans) | ☐ 345 Marine Product      Liability | | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment |     Liability    **PERSONAL PROPERTY** | **LABOR** |      Act of 2016 |     (15 USC 1681 or 1692) |
|     of Veteran's Benefits | ☐ 350 Motor Vehicle    ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | | ☐ 485 Telephone Consumer |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle    ☐ 371 Truth in Lending |     Act | |     Protection Act |
| ☐ 190 Other Contract |     Product Liability    ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal      Property Damage |     Relations | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| ☐ 196 Franchise |     Injury    ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) |     Exchange |
| | ☐ 362 Personal Injury -      Product Liability | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| |     Medical Malpractice |     Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS**    **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights    **Habeas Corpus:** | ☐ 791 Employee Retirement | | ☐ 895 Freedom of Information |
| ☐ 220 Foreclosure | ☐ 441 Voting    ☐ 463 Alien Detainee |     Income Security Act | **FEDERAL TAX SUITS** |     Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment    ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☒ 240 Torts to Land | ☐ 443 Housing/      Sentence | |     or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 245 Tort Product Liability |     Accommodations    ☐ 530 General | | ☐ 871 IRS—Third Party |     Act/Review or Appeal of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -    ☐ 535 Death Penalty | **IMMIGRATION** |     26 USC 7609 |     Agency Decision |
| |     Employment    **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of |
| | ☐ 446 Amer. w/Disabilities -    ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | |     State Statutes |
| |     Other    ☐ 550 Civil Rights |     Actions | | |
| | ☐ 448 Education    ☐ 555 Prison Condition | | | |
| |    ☐ 560 Civil Detainee - | | | |
| |      Conditions of | | | |
| |      Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer    ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §§ 1332, 1441, 1453 and 1446

Brief description of cause:
This Court has jurisdiction under the Class Action Fairness Act. Complaint alleges negligence torts, strict liability, nuisance, and trespass.

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:    ☒ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____    DOCKET NUMBER _____

DATE
Apr 24, 2025

SIGNATURE OF ATTORNEY OF RECORD
/s/ Laura Hughes McNally

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

**Exhibit B_Page 312 of 583**

10/2024

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**

Place of Accident, Incident, or Transaction:_Upper Makefield Township, Bucks County, Pennsylvania_____

---

***RELATED CASE IF ANY:*** Case Number:_____ Judge:_____

1. Does this case involve property included in an earlier numbered suit?  Yes ☐

2. Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit?  Yes ☐

3. Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit?  Yes ☐

4. Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual?  Yes ☐

5. Is this case related to an earlier numbered suit even though none of the above categories apply? If yes, attach an explanation.  Yes ☐

I certify that, to the best of my knowledge and belief, the within case ☐ **is** / ☒ **is not** related to any pending or previously terminated action in this court.

---

**Civil Litigation Categories**

*A.  Federal Question Cases:*

☐ 1.  Indemnity Contract, Marine Contract, and All Other Contracts)
☐ 2.  FELA
☐ 3.  Jones Act-Personal Injury
☐ 4.  Antitrust
☐ 5.  Wage and Hour Class Action/Collective Action
☐ 6.  Patent
☐ 7.  Copyright/Trademark
☐ 8.  Employment
☐ 9.  Labor-Management Relations
☐ 10.  Civil Rights
☐ 11.  Habeas Corpus
☐ 12.  Securities Cases
☐ 13.  Social Security Review Cases
☐ 14.  Qui Tam Cases
☐ 15.  Cases Seeking Systemic Relief  ***see certification below***
☐ 16.  All Other Federal Question Cases. *(Please specify)*:_____

*B.  Diversity Jurisdiction Cases:*

☐ 1.  Insurance Contract and Other Contracts
☐ 2.  Airplane Personal Injury
☐ 3.  Assault, Defamation
☐ 4.  Marine Personal Injury
☐ 5.  Motor Vehicle Personal Injury
☐ 6.  Other Personal Injury *(Please specify)*:_____
☐ 7.  Products Liability
☒ 8.  All Other Diversity Cases: *(Please specify)* Torts to land
_____

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☒ **does** / ☐ **does not** have implications beyond the parties before the court and ☐ **does** / ☒ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

---

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

☒  Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

☐  None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA**

DANIEL LA HART, et al.,

     *Plaintiffs,*

     v.

SUNOCO PIPELINE L.P., et al.,

     *Defendants.*

:
:
:
:
:
:
:
:
:

**CIVIL ACTION**

**NO.** 25-2072

**<u>ORDER</u>**

    **AND NOW,** this <u>24th</u> day of <u>April, 2025</u>, it is hereby **ORDERED t**hat counsel contemplating filing a motion under <u>Fed. R. Civ. P. 12(b)(6)</u>, <u>(e)</u>, or (f), shall first contact opposing counsel to discuss the substance of the contemplated motion and to provide an opportunity to cure any alleged pleading deficiencies or strike certain matter. This conference shall take place at least **seven (7)** days before the filing of the motion.

    The parties shall conduct <u>substantive verbal communications</u>. Exchanges of letters or e-mails are insufficient. A report that opposing counsel was not available or that the parties made reasonable efforts is likewise insufficient. If the parties cannot reach a resolution that eliminates the need for any of the above-mentioned motions, counsel for the moving party shall include, along with the motion, a certification that the parties met and conferred regarding the alleged pleading deficiencies or matter sought to be stricken.

    **The Court will deny any 12(b)(6), (e) or (f) motion that fails to conform with these requirements.**

    **All Counsel must review Judge Perez's most recent Guidelines which are published on the Eastern District of Pennsylvania's website.**

                                       **BY THE COURT:**

                                  _____

                                  **HON. MIA R. PEREZ**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DANIEL LA HART and KATHERINE LA HART | : | Case Number: 2:25-cv-02072-MRP |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SUNOCO PIPELINE L.P.; ENERGY TRANSFER LP; and ENERGY TRANSFER (R&M) LLC, | : | |
| *Defendants.* | | |

## ORDER

AND NOW, this ___7th___ day of _____May_____ 2025, it is hereby

ORDERED that the motion to practice in this court pursuant to Local Rule of Civil Procedure

83.5.2(b) is

[X] GRANTED. The Clerk is DIRECTED to add __Drew Cleary Jordan__, Esquire as counsel for

__all Defendants__. __Drew Cleary Jordan__ is DIRECTED to request ECF filing access

using their PACER Account[1]

[ ] DENIED.

_____
Mia Roberts Perez , J.

---

[1] Instructions to request electronic filing access can be found on this court's website at For Attorneys | Eastern District of Pennsylvania | United States District Court (uscourts.gov).

**Exhibit B_Page 315 of 583**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

DANIEL LA HART and KATHERINE     :     Case Number: 2:25-cv-02072-MRP
LA HART                          :
    *Plaintiffs*,            :
                              :
    v.                        :
                              :
SUNOCO PIPELINE L.P.; ENERGY     :
TRANSFER LP; AND ENERGY TRANSFER :
(R&M) LLC,                       :
    *Defendants.*

ORDER

AND NOW, this 8th day of May, 2025, it is hereby ORDERED that the  motion to practice in this court

pursuant to Local Rule of Civil Procedure

83.5.2(b) is

    ☒    GRANTED.  The Clerk is DIRECTED to add Duke K. McCall, III_____, Esquire as counsel for

_all Defendants_____.  _Duke K. McCall, III_ is DIRECTED to request ECF filing access

using their PACER Account[1.]

    ☐    DENIED.

_____
        Mia Roberts Perez   , J.

[1] Instructions to request electronic filing access can be found on this court's website at For Attorneys | Eastern District of Pennsylvania | United States District Court (uscourts.gov).

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DANIEL LA HART and<br>KATHERINE LA HART, individually<br>and on behalf of those similarly situated, | ) ) ) | CIVIL ACTION |
| | ) | |
| *Plaintiffs*, | ) | No. 25-2072 |
| | ) | |
| v. | ) | |
| | ) | |
| SUNOCO PIPELINE L.P., | ) | |
| ENERGY TRANSFER LP, and | ) | |
| ENERGY TRANSFER (R&M) LLC | ) | |
| | ) | |
| *Defendants*. | ) | |

**AMENDED CLASS ACTION COMPLAINT**

**Exhibit B_Page 317 of 583**

## I.    INTRODUCTION

1.    Plaintiffs Daniel La Hart and Katherine La Hart ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Class" as further defined below), bring this Class Action Complaint against Defendants Sunoco Pipeline L.P. ("Sunoco"), Energy Transfer LP, and Energy Transfer (R&M), LLC (collectively, "Defendants"), alleging that Defendants' reckless, negligent, and irresponsible ownership, oversight, operation, supervision, maintenance, and control of a hazardous petroleum pipeline (the "Twin Oaks Pipeline" or the "Pipeline") has resulted in a massive and still unquantified leak of jet fuel and other petroleum products, along with resulting toxins, pollutants, and contaminants (the "Pipeline Leak" or "Leak"), in Upper Makefield Township, Pennsylvania.

2.    Defendants' conduct in allowing the Pipeline Leak to occur has unleashed a catastrophic environmental disaster on a previously idyllic Bucks County, Pennsylvania community, including the Mt. Eyre Manor community and surrounding neighborhoods that are subject to the plume caused by the Leak.

3.    It has been reported that Defendants already have the worst record for fuel spills in the United States before this latest disaster. That record is now even worse, as Defendants have caused serious physical and financial harm to a beautiful suburban neighborhood.

4.    The Leak arises from a crack in the Pipeline, causing a discharge into the underlying bedrock and groundwater of jet fuel, other unidentified petroleum products, and other hazardous and toxic chemicals that the Pipeline was used to transport (the "Pipeline Leak" or "Leak"). These toxins include kerosene, benzene, ethylbenzene, isopropylbenzene, dichloroethane, trimethylbenzene ("TMB"), toluene, naphthalene, methyl tertiary-butyl ether ("MTBE"), and lead.

1

These are substances so dangerous that their presence in the soil, water, and air presents a direct and immediate threat to Plaintiffs' and Class members' health and wellbeing.

5.      Defendants' Pipeline Leak has caused severe harm and poses a serious ongoing and current danger to affected residents' physical health and mental and emotional wellbeing, the community's groundwater, soil, air quality, and ecosystem, and to property values. The Pipeline Leak has uprooted the affected community and has already caused certain residences within the community to be unlivable, amounting to an effective taking of family homes by Defendants.

6.      The physical harm to person and property that has been wrought by the Leak is palpable and concrete. As a direct result of the Leak, Plaintiffs now live on contaminated property and above a contaminated aquifer that provides them and the proposed Class with their drinking water. This existing contamination, coupled with the significant risk that further contamination will continue to accrue on Plaintiffs' property, has ruined enjoyment of their property, has damaged the property's value, and at least some and potentially all of that damage is permanent.

7.      In the weeks and months since Defendants finally revealed the Leak, home values throughout the Mt. Eyre Manor community and surrounding neighborhoods have plummeted. To date, not a single public home sale has closed in the Mt. Eyre Manor community since the Leak was disclosed, despite numerous homes being on the market in what was previously a highly sought-after neighborhood. Homeowners have been forced to repeatedly lower list prices and make other concessions after the existence of the Leak utterly devastated any interest from prospective home buyers.

8.      One home in the Mt. Eyre Manor community has been sold since the Leak, but *not* to a prospective home buyer: the residential well was so contaminated that *Defendants themselves* purchased it for the purpose of drilling monitoring and/or recovery wells, right in the middle of

2

the neighborhood. This highly contaminated suburban residential home that Defendants now own (despite being for-profit oil companies) is just two doors down the road from Plaintiffs' home.

9.     Testing has confirmed that Defendants' released jet fuel and unidentified other petroleum products, along with other and related pollutants, has contaminated private wells in the affected community, including Plaintiffs' well, that provide water for drinking, bathing, cooking, and washing. Testing also shows elevated levels of toxins in the air in certain houses in the impacted community, including one with benzene multiple times the statewide health standards.

10.     Defendants' conduct has caused an exigent threat to the health and well-being of the community and has contaminated the environment and underground aquifer in the community.

11.     The Mt. Eyre Manor community and surrounding neighborhoods, as with the area that includes and surrounds Upper Makefield Township generally, has long been a highly desirable residential neighborhood that had strong property values and has been sought-after as an idyllic and wonderful place to live and raise a family.

12.     One of the notable features of Mt. Eyre Manor and the surrounding neighborhoods in Upper Makefield Township is that the residences located there use and rely on private well water for domestic water needs, including for drinking water, cooking, bathing, washing clothes and dishes, and watering lawns and gardens.

13.     Indeed, Mt. Eyre Manor and other Upper Makefield residents have long believed that they had the best tasting water one could find because it contains naturally occurring minerals that give it a fresher taste and, typically, is free of the added chemicals that can be found in municipal water, such as chlorine and fluoride.

14.     As a result of Defendants' Pipeline Leak, however, this is no longer the case. Defendants' conduct as alleged herein has devastated the community and caused significant

3

contamination to the aquifers under the Mt. Eyre Manor community and surrounding neighborhoods, creating critical health and safety risks to the residents who live there, and causing other consequential harms as detailed herein.

15. Defendants control and operate the Twin Oaks Pipeline and are responsible for maintaining the Pipeline and ensuring its safety. Defendants entirely failed to uphold that responsibility.

16. Defendants' Pipeline Leak was confirmed on January 31, 2025. Defendants, however, first received odor complaints from residents living in Mt. Eyre Manor as early as September 2023 – *16 months* earlier – but utterly failed at that time to properly investigate, and as such failed to identify the Pipeline Leak at an early stage when more harm could have been prevented.

17. Despite receiving numerous complaints from alarmed residents about strange odors since at least September 2023, Defendants failed to properly act for at least over 16 months. Defendants failed to properly investigate the Pipeline Leak, failed to identify and contain the Pipeline Leak, and still to this day have not disclosed the full extent of the disaster.

18. The full magnitude of the Pipeline Leak remains unknown and undisclosed. Defendants still cannot account for or are choosing not to publicly state how much toxic petroleum product has spilled, exactly what leaked, or where it is moving, nor can they guarantee that the Twin Oaks Pipeline is safe, leaving Plaintiffs and Class members in constant and reasonable fear for their health and property.

19. Numerous residents already have confirmed contamination within their private wells and well water, including Plaintiffs, which contamination is not disputed by Defendants who

have already publicly stated that the Pipeline Leak is their fault. The test results confirming contamination of Plaintiffs' water come from Defendants' own agents.

20.    One household across the street from where the Pipeline Leak was eventually discovered had approximately *fifteen gallons* of free jet fuel product found flowing on top of the water in their private well, and petroleum product has continued to significantly accrue at this home every day for the past *four months*. Indeed, as recently as today, June 4, 2025, the PADEP noted 0.5 feet of new product in the well. Similarly, other residents of Mt. Eyre Manor also had significant amounts of jet fuel, and/or other petroleum products and constituents in their private wells.

21.    As Defendants have not yet identified the size, scope, direction, or speed of the contamination plume, even residents whose well water currently does not show contamination are within and will remain within a zone of danger where contamination could be mere weeks or days away, and therefore are forced to take appropriate precautions and incur time and expenses to attempt to mitigate their risk.

22.    Recent testing has now also confirmed that vapors from the contaminated groundwater has invaded homes in the neighborhood placing residents at potential risk to these toxic chemicals in both the water they drink and the air that they breathe.

23.    With no clear answers, no relief in sight, water in the underground aquifer and bedrock, private wells that have been contaminated, soil that has been contaminated, air that has been contaminated, property values plummeting, odors of jet fuel contamination within homes and in the neighborhood, and the prospect of having ingested, bathed, and used contaminated well water, the residents of Mt. Eyre Manor and the surrounding neighborhoods are left to grapple with

the terror of irreparable environmental harm, uncertain whether they can trust the very air they breathe and the water they drink, and concerned for their future safety from disease.

24.    This is not just an environmental tragedy caused by corporate malfeasance; it is a life-altering crisis for Plaintiffs and Class members for which Defendants must be held accountable.

## II.    PARTIES

25.    Plaintiffs Daniel La Hart and Katherine La Hart reside in the Mt. Eyre Manor neighborhood at 114 Spencer Road, Washington Crossing, Pennsylvania, 18977.

26.    Defendant Sunoco Pipeline L.P. ("SPLP") is a limited partnership formed under the laws of Texas. SPLP contends that it maintains a principal place of business located at 8111 Westchester Drive, Dallas, Texas 75225. SPLP also maintains addresses at 535 Fritztown Road, Sinking Spring, PA 19608 and 3807 West Chester Pike, Newtown Square, PA 19073.

27.    Defendant Energy Transfer LP is a limited partnership formed under the laws of Delaware with a principal place of business located at 8111 Westchester Drive, Dallas, Texas 75225.

28.    Defendant Energy Transfer (R&M), LLC is a limited liability company formed under the laws of Pennsylvania with a principal place of business located at 1735 Market Street, Philadelphia, Pennsylvania 19103.

29.    Defendants John Does 1-100 (the "John Doe Defendants"), are persons or entities that are responsible for the conduct and/or injuries alleged in this Complaint, and accordingly are liable for the relief sought. Their identities are currently unknown to Plaintiffs, who consequently sue the John Doe Defendants by their fictitious names, but the John Doe Defendants will be ascertained through investigation and discovery. Plaintiffs will seek leave to amend this Complaint

6

to state the true names and capacities of the fictitiously named John Doe Defendants when they have been ascertained.

### III.    JURISDICTION AND VENUE

30.    Defendants removed this civil action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). Plaintiffs have moved to remand the action to the Philadelphia County Court of Common Pleas based on the "local controversy" exception to CAFA.

31.    This Court has personal jurisdiction over each of the Defendants because they purposefully availed themselves of the privilege of conducting business in Pennsylvania and Plaintiffs' causes of action arise out of the business that Defendants conduct in Pennsylvania; namely, the Pipeline Leak from Defendants' Pipeline which occurred in Upper Makefield Township, Pennsylvania.

32.    Defendants contend that venue is proper because a substantial part of the events or omissions giving rise to the claim occurred in this District. Plaintiffs contend that while that is true, venue is proper in Plaintiffs' chosen forum in the Philadelphia County Court of Common Pleas.

### IV.    FACTUAL ALLEGATIONS

#### A. Defendants' History of Leaking Pipelines and Failures to Report

33.    Defendant Energy Transfer LP, through its complex network of subsidiaries, limited partnerships, and joint ventures, including Defendant Sunoco and Defendant Energy Transfer (R&M), LLC, owns one of the nation's largest networks of natural gas, crude oil, and petroleum product pipelines.

34.    Energy Transfer LP primarily operated in the natural gas sector prior to its acquisition of Sunoco, and Sunoco's significant oil and petroleum product assets, in 2012.

**Exhibit B_Page 324 of 583**

Together, Defendants now own and operate over 125,000 miles of pipelines across the United States.

35.    Defendants' network of pipelines is not only among the largest in the country; it is also among the leakiest.

36.    According to the Pipeline and Hazardous Materials Safety Administration ("PHMSA")'s database, between 2002 and 2017, Defendants experienced at least 527 leakage incidents—approximately one incident from an existing facility every eleven days in the pipelines that they own and operate.[1]

37.    Those incidents accounted for reported releases of over 3.6 million gallons of petroleum product. That figure likely substantially underestimates the true number of incidents and amount of product lost, as it primarily relies on self-reported incidents and estimates.

38.    Between 2002 and 2017, PHMSA issued 106 safety violations to Defendants for failing to comply with federal regulations designed to ensure the safe operation of hazardous liquid pipelines.[2]

39.    These violations included failures to notify PHMSA of spills, failures to repair identified unsafe pipes for five years, failures to perform regular corrosion inspections, failures to report known unsafe operating conditions, and failures to properly notify emergency responders and the public in the event of a leak.

40.    Federal regulators have not deterred Defendants' egregious conduct in failing to properly maintain their pipelines transporting hazardous petroleum products to make them safe. In 2022, SPLP and affiliate ETC Northeast Pipeline LLC were convicted by the Commonwealth of

---

[1] Exhibit A, Oil and Water: ETP & Sunoco's History of Pipeline Spills, Greenpeace USA and Waterkeeper Alliance (Apr. 17, 2018).
[2] Exhibit A (summarizing PHMSA records).

Pennsylvania of *57 charges* of criminal conduct associated with the construction and operation of two other pipelines Pennsylvania. The Commonwealth of Pennsylvania convicted Defendants on counts involving multiple instances of failure to report discharges of hazardous substances into the surrounding environment, the use of unapproved additives and release of those additives into drinking water, and failure to implement legally required safety measures. The use of unapproved additives is potentially relevant here as one of the chemicals found in recent testing in the Mt. Eyre Manor neighborhood is MTBE, which was supposed to have been phased out of use in the early 2000s.

41.     48 of the 57 criminal charges related to Defendants' conduct during the construction of the Mariner East 2 Pipeline, which crosses 17 counties in the southern tier of Pennsylvania, while the other 9 charges related to Defendants' conduct during the construction of the Revolution Pipeline, a 42.5 mile pipeline that starts in Butler County, and is routed through Beaver and Allegheny counties, and connects to a gas processing plant in Washington County.

42.     In February 2025, Bloomberg reported that the Twin Oaks Pipeline Leak in Upper Makefield Township "highlight[ed]" Energy Transfer's "worst fuel spill record" in the United States. The Bloomberg article reported that Sunoco Pipeline LP was responsible for spilling over 1,400 barrels of fuel in 2024 alone, and this is only accounting for the volume of fuel spills that Defendants were both aware of *and* willing to publicly report. [3]

43.     The Twin Oaks Pipeline Leak demonstrates that Defendants are not forthcoming about the volume of or even the existence of fuel spills into residential neighborhoods.

---

[3] Bloomberg, *Energy Transfer Leak Highlights Worst Fuel Spill Record in US* (Feb. 18, 2025), available at https://www.bloomberg.com/news/articles/2025-02-18/energy-transfer-leak-highlights-worst-fuel-spill-record-in-us?embedded-checkout=true (last accessed Mar. 14, 2025).

9

44. Defendants' conduct, as alleged herein, is reflective of and consistent with their history of failing to safely operate and maintain pipelines, as well as their failing to detect and report leaks from their pipelines, and appropriately respond to and remediate leaks with the expediency and transparency that such incidents require.

**B.      Defendants' Twin Oaks Pipeline That Runs Through Upper Makefield, PA**

45. Defendants own and operate the Twin Oaks Pipeline, a 14-inch diameter pipeline that transports petroleum products, including but not limited to jet fuel (JP-8), diesel, and gasoline, from the Twin Oaks Terminal in Aston, Pennsylvania to the Newark Terminal in Newark, New Jersey. The Pipeline is considered a "hazardous liquid pipeline facility" under federal law. 49 U.S.C. § 60101(a).

46. The Twin Oaks Pipeline was originally installed in 1956 and has operated as a hazardous liquid pipeline facility now for close to 70 years.

47. National Tube Supply Company manufactured the Pipeline.

48. As originally installed, the Twin Oaks Pipeline was 8 inches in diameter and ran through a different trench than its current pathway under the Mt. Eyre Manor neighborhood. At the time, this 8-inch pipeline ran under farmland that existed prior to the development of the neighborhood:

10

**Exhibit B_Page 327 of 583**



49.    The above photo (Figure 1) is taken from Defendants' Interim Remedial Action Plan submitted to the PADEP on March 19, 2025. It depicts both the original 8-inch pipeline trench with its more directly diagonal northeasterly pathway and the more recent 14-inch pipeline trench, which abruptly turns north as it reaches the Mt. Eyre Manor neighborhood, then curves east, before ultimately resuming its diagonal northeasterly pathway.

50.    This alternate trench path around what is now the Mt. Eyre Manor neighborhood closely tracks the modern Glenwood Drive, as depicted below, and the abrupt turn northwards onto what is now Glenwood Drive matches the exact point at which the Leak was detected at 121 Glenwood Drive:



Fig. 2: The Mt. Eyre Manor neighborhood, retrieved from Google Maps, with the approximate location of the Twin Oaks Pipeline overlaid, running parallel to Glenwood Drive, and the later-discovered Leak location indicated with a blue star.

51.    On a daily basis, Defendants move massive quantities of petroleum products through the Pipeline, at pressures over 1000 psi, under the Mt. Eyre Manor community and surrounding neighborhoods. This product runs up against the abrupt northward turn at 121 Glenwood Drive with significant force.

52.    On November 18, 2024, PHMSA issued an Advisory Bulletin notifying pipeline owners and operators of potential threats to the integrity of the body of certain pipelines.[4] The Advisory Bulletin stated that pipes constructed by National Tube Supply Company before 1970, like the Twin Oaks Pipeline, were particularly susceptible to hard spots. Hard spots are defects

---

[4] Pipeline and Hazardous Materials Safety Administration, Pipeline Safety: Identification and Evaluation of Potential Hard Spots—In-Line Inspection Tools and Analysis, 89 Fed. Reg. 90827 (Nov. 18, 2024).

**Exhibit B_Page 329 of 583**

created during the pipe manufacturing process because of localized cooling and hardening. Hard spots can become unstable over time due to changes in their conditions, including degradation and erosion of the coating surrounding the hard spot, and result in cracking of the pipe. PHMSA provided in its Advisory Bulletin six recommended safety actions for pipeline operators to take in order to identify potential hard spots.

53.    Despite this Advisory Bulletin, Defendants' representatives have stated that they were unaware of any safety actions recommended by PHMSA related to the Twin Oaks Pipeline.[5]

54.    Furthermore, the inner walls of a petroleum pipeline can erode over time due to the corrosive environment created by the materials and chemicals transported through it. The exterior of a petroleum pipeline is also subject to external corrosion, due to the presence of moisture and chemicals in the surrounding soil. While several factors can influence the rate and extent of both internal and external corrosion, corrosion of a petroleum pipeline over time is inevitable, and again, well-known. Consequently, proper care, maintenance, supervision, and oversight of pipelines is critical, without limitation, to public safety.

55.    Despite this knowledge, Defendants have made several incredulous statements to members of the affected community in Upper Makefield, Pennsylvania, including Plaintiffs, that the lifespan of the Twin Oaks Pipeline is "indefinite."

56.    The Twin Oaks Pipeline specifically has experienced reported failures in Pennsylvania on at least two prior occasions, and these are only instances that Defendants have reported to the public. It is possible that the Twin Oaks Pipeline has experienced additional unreported failures.

---

[5] Exhibit B, Letter from U.S. Representative Brian K. Fitzpatrick to Acting Administrator Ben Kochman (March 11, 2025).

57.     On October 7, 1986, a crack in the Twin Oaks Pipeline caused the release of at least 5,260 barrels of refined product in Montgomery County, Pennsylvania.

58.     On March 19, 2004, external corrosion caused a leak in the Twin Oaks Pipeline, resulting in the release of at least 50 barrels of refined product in Delaware County, Pennsylvania.

59.     Defendants also renovated a major portion of the Twin Oaks Pipeline—the portion that crosses the Delaware River, right next to the residential Mt. Eyre Manor neighborhood—in June and July 2023. Defendants installed approximately 2,500 feet of new pipeline underneath the Delaware River using the process of horizontal directional drilling and tied this new stretch of pipeline into the existing Twin Oaks Pipeline at a location on Oakdale Avenue near the Mt. Eyre Manor neighborhood.

**C.     The Geographic Area Affected by the Twin Oaks Pipeline Leak**

60.     The Twin Oaks Pipeline Leak occurred at a section of the Pipeline that runs directly under the residential Mt. Eyre Manor neighborhood in Washington Crossing, Bucks County, Pennsylvania.

61.     The Mt. Eyre Manor neighborhood is located in Upper Makefield Township, a municipality within Bucks County, Pennsylvania and covers the residential homes on Glenwood Drive, Walker Road, Spencer Road, Crestwood Road, Beechwood Drive, and Bruce Road.

62.     Figure 3 below shows the geographic location of the Twin Oaks Pipeline within a portion of Upper Makefield Township. The red line in Figure 3 shows the Pipeline.

14



Fig. 3: location of the Pipeline within Upper Makefield Township, retrieved from the National Pipeline Mapping System Public Viewer. *See* pvnpms.phmsa.dot.gov/PublicViewer (last accessed Feb. 26, 2025).

63. There is no gas station or other potential source of petroleum byproduct contamination within two miles of the Mt. Eyre Manor neighborhood.

64. Residents of the Mt. Eyre Manor neighborhood rely on private well water for their water supply, including water used for drinking, bathing, cooking, washing, and gardening, among other uses.

65. An underground aquifer, which Defendants have now polluted, supplies the water used by residents of the neighborhood, including Plaintiffs.

66. The same is true for residents of the immediately surrounding area, including, but not limited to, residences on Mt. Eyre Road, Valley View Drive, Old Barn Court, Taylorsville Road, River Road, Oakdale Avenue, Maple Shade Avenue, West Street, Cross Street, Swayze Avenue, Pondview Drive, Heron Court, Belamour Drive, Aqueduct Road, and additional

15

surrounding roads, which run through other nearby Upper Makefield Township neighborhoods that the Twin Oaks Pipeline also runs underneath.

67.    Upper Makefield Township sits in a floodplain, and the Mt. Eyre Manor neighborhood is surrounded on three sides by "Flood Hazard Areas" as defined by the Federal Emergency Management Agency ("FEMA").

68.    The Mt. Eyre Manor neighborhood is considered a High Consequence Area ("HCA") pursuant to 49 C.F.R. § 195.450, due to its concentrated population, its proximity to a commercially navigable waterway (the Delaware River), the lack of an adequate alternative drinking water source to the underlying aquifer, and its proximity to ecological resources.

**D.     Known and Reported Odor Complaints Started in September 2023**

*i.       September 2023 Odor Complaint*

69.    On September 20, 2023, Defendants were notified directly by the owner-residents of 128 Walker Road of an overwhelming smell and taste of gasoline in their water. Defendants were also notified of this complaint separately on September 25, 2023, when PHMSA notified Defendants of an odor complaint referred by the Pennsylvania Department of Environmental Protection ("PADEP").

70.    The residents of 128 Walker Road live directly across the street from the site where the Twin Oaks Pipeline Leak occurred and was eventually discovered (121 Glenwood Drive), though Defendants did not confirm discovery of the Leak until 16 months later.

71.    Plaintiffs live at 114 Spencer Road, around only 500 feet to the approximate northeast of 128 Walker Road. The location is downgradient of the Leak's release point.

72.    In the two months prior to the odor complaint, Upper Makefield Township had experienced multiple severe weather events. These weather events included severe flash flooding

that occurred in July 2023 and that resulted in the deaths of seven people and forced month-long road closures near the Mt. Eyre Manor neighborhood.

73.     The weather events also included substantial rains and heavy winds from Tropical Storm Ophelia that hit Bucks County, Pennsylvania on September 23, 2023.

74.     Each of these severe weather events should have triggered full proper inspections of the Twin Oaks Pipeline by Defendants pursuant to 49 C.F.R. § 195.414. Defendants, however, did not conduct inspections sufficient to discover any resulting leaks as required by law, nor did Defendants notify PHMSA about their failure to conduct such inspections, which was reckless and negligent.

75.     Defendants investigated the September 2023 odor complaint by simply dispatching a technician and a contractor to test for indications of a leak, but the investigation that was conducted was improperly performed in a lackadaisical fashion.

76.     Specifically, Defendants' investigation included only testing of the well water of the complainant's residence and three nearby residences, probing the immediately adjacent segment of the pipeline with a photoionization ("PID") gas detector, excavating a single 25-foot segment of nearby pipeline that ran through nearby 121 Glenwood Drive, testing the excavated soil, and performing a static pressure test.

77.     Sadly, the excavation stopped short of uncovering the portion of the Pipeline mere feet away where the Pipeline Leak was eventually discovered.

78.     When the initial investigation did not result in evidence of a leak, Defendants simply and improperly ceased their investigative efforts. Defendants did not ascertain the source of the odor, and did not conduct any continued monitoring or observation of the area.

17

79.    Defendants then contacted the owners of 128 Walker Road and falsely told them they were "happy to report" that there was no oil or gas contamination in their water.

80.    When the owners of 128 Walker Road stated to Defendants' representative that this finding was impossible, Defendants' representative claimed that "it was probably some bacteria."

81.    As history bears out, the Pipeline Leak would eventually be discovered 16 months later across the street from the complainants' home.

### ii.    *June 2024 Odor Complaint*

82.    On June 28, 2024, Defendants received yet another odor complaint from a different resident, this time at 108 Spencer Road in the Mt. Eyre Manor neighborhood, who called Defendants' so-called "emergency" phone number to alert Defendants about the smell.

83.    108 Spencer Road is just two properties to the east from Plaintiffs' home. Indeed, Plaintiffs' property at 114 Spencer Road is located *in between* 108 Spencer Road and the location where the Leak was ultimately detected at 121 Glenwood Drive.

84.    In response to the odor complaint, Defendants responded in an even more careless manner than it did to the first complaint when, in fact, the response should have been more robust since a prior complaint had already been received. Defendants dispatched a single technician to examine the site using a portable 4-gas detector. The technician's equipment did not record a gas detection, and the technician did not observe dead vegetation above the Pipeline.

85.    Based on the technician's report and limited inspection, and nothing else, Defendants ceased their investigative efforts. Defendants did not ascertain the source of the odor, and did not conduct any continued monitoring or observation of the area.

86.    Inexplicably, Defendants also failed to report this odor complaint to PHMSA.

87.     Defendants also sent an individual to speak with the residents at 108 Spencer Road at their home in response to this odor complaint. This representative of Defendants stated that there was no leak, and that Defendants would know right away if there ever was such a leak, because Defendants would notice either a pressure drop or a loss of product in the Pipeline.

88.     Unsatisfied with this limited response (which of course turned out to be incorrect), the residents of 108 Spencer Road also contacted Sue Erickson, a right-of-way specialist and public-facing representative for Defendants. Erickson assured Plaintiffs that there was no issue with the Pipeline, that it had been "probed," and that there was no loss of pressure indicating any leak. This response ultimately demonstrates the unreliability and defective nature of Defendants' methods for monitoring and detecting leaks.

### iii.     July 2024 Odor Complaint

89.     The following month, on or about July 21, 2024, Defendants received a third odor complaint from a resident at 121 Glenwood Drive in the Mt. Eyre Manor neighborhood, which is immediately across the street from the complainants who lived at 128 Walker Road and made the first complaint detailed above, *and* the precise address where Defendants had excavated a segment of the Twin Oaks Pipeline in September 2023.

90.     The complainants from 121 Glenwood Drive reported not only a smell of gasoline or kerosene in their water but also noted a visual change in how their water looked.

91.     Again, Defendants' response was improper and lackadaisical, especially accounting for the fact that this was now the third complaint received in a short period of time.

92.     In response to this July 2024 odor complaint, Defendants again dispatched only a single technician to examine the site using a portable 4-gas detector. The technician's equipment

19

did not record a gas detection, and the technician did not observe dead vegetation above the pipeline.

93.    Based on the technician's report, Defendants ceased their investigative efforts. Defendants did not ascertain the source of the odor and again failed to implement or conduct any proper continued monitoring or observation of the area.

94.    Moreover, yet again, Defendants failed to report this odor complaint to PHMSA.

95.    Furthermore, Defendants told the residents at 121 Glenwood Drive at the time that there was no petroleum in their water, without conducting proper tests to ascertain this as a fact.

96.    Defendants also claimed to the PADEP that "iron bacteria" was the likely explanation for the smell of gasoline or kerosene and this information was then passed on by PADEP to the residents at 121 Glenwood Drive.

*iv.*    ***November 2024 Odor Complaint***

97.    Four months later, on November 21, 2024, Defendants received a fourth known odor complaint from a resident of 107 Spencer Road in the Mt. Eyre Manor neighborhood, immediately across the street from the prior complainants that lived at 108 Spencer Road and only a few houses away from Plaintiffs' home.

98.    The homeowners at 107 Spencer Road, who bought their home in 1978, raised their family in the Mt. Eyre Manor community, and lived in the neighborhood for over 45 years, complained that they smelled gasoline in their water. They also noticed that their brand-new drinking glasses had a sheen resembling oil or gasoline after taking them out of the dishwasher.

99.    The residents at 107 Spencer Road asked their well company, Bucks County Well Drilling Co. ("BCWD"), to investigate. BCWD and the residents of 107 Spencer Road could clearly observe a sheen in the water.

100. Disturbed by this discovery, the residents at 107 Spencer Road had samples taken and them to an independent laboratory. The samples came back ***positive*** on October 24, 2024, for diesel range organics (C10-C28) at 3,920 milligrams per liter and gasoline range organics at 573 milligrams per liter.

101. The residents at 107 Spencer Road notified Defendants of this result. Once again, and despite these now positive test results, Defendants' response was more than insufficient and neglectful.

102. Soon after receiving this alarming test result, in November 2024, an individual purporting to be an agent of Defendants appeared at 107 Spencer Road in the dark at night. He denied that Defendants were responsible for the petroleum product present in the water at 107 Spencer Road but agreed to continue monitoring the situation.

103. Despite this now being the fourth known odor complaint received from a resident in the direct vicinity of where the Pipeline Leak was eventually discovered, Defendants again dispatched a single technician to examine the site using a portable 4-gas detector. The technician's equipment did not record a gas detection, and the technician did not observe dead vegetation above the pipeline.

104. Defendants performed a four-hour static pressure test to check for lowering pressure indicative of a pipeline leak. The operator reported to Defendants that the results were within acceptable limits, although the operator did not report the acceptance criteria used or the results of the pressure test.

105. Based on the reports of the technician and operator, Defendants ceased their investigative efforts, notwithstanding that there had now been at least four complaints reported

**Exhibit B_Page 338 of 583**

since September 2023. Defendants did not ascertain the source of the odor, and did not conduct any continued monitoring, observation, or testing of the neighborhood.

106.    In what was now clearly a systemic pattern, Defendants again did not report this odor complaint to PHMSA.

107.    Unlike Defendants, the owners at 107 Spencer Road continued to investigate their disturbing test results. They alerted their homeowners' insurance company, who retained environmental firm Phoenix Consulting, LLC.

108.    Phoenix began interfacing directly with PADEP, which stated that it had received multiple complaints from concerned residents over the last year but that the water at 107 Spencer Road was the first instance of failing laboratory results.

109.    Phoenix collected samples directly from the well at 107 Spencer Road on December 17, 2024. These samples contained a very clearly observable yellow petroleum product in the groundwater:



22



110.    Phoenix had the water from these jars tested and communicated the results of those tests to the PADEP, whose representative Richard Staron indicated that a jet fuel release from the Twin Oaks Pipeline was a likely source.

111.    These results indicated the presence of benzene, toluene, ethylbenzene, isopropylbenzene, chloroform, naphthalene, xylenes, 1,2,4-trimethylbenzene, 1,3,5-trimethylbenzene, and lead.

112.    Defendants finally performed testing of the well at 107 Spencer Road themselves on January 24, 2025, through a contractor, Groundwater & Environmental Services, Inc. ("GES"), as described in more detail below.

113.    Discovery and expert testimony will show that Defendants' responses to all the odor complaints detailed above were far below the standard of care and duties that Defendants owed to the residents of Mt. Eyre Manor and the surrounding neighborhoods, both with respect to the urgency of the situation, the actions that were taken, and the lack of any substantive follow-up,

23

monitoring, and testing to determine that the Pipeline was leaking and contaminating the community including the aquifer used by Plaintiffs and other members of the proposed Class.

114.    Because of Defendants' lack of a proper response, Defendants never timely identified a cause of the taste and odor complaints, until the Twin Oaks Pipeline Leak was discovered only much later in January 2025.

**E.    The Twin Oaks Pipeline Leak is Discovered in January 2025**

115.    On January 21, 2025, PADEP informed PHMSA that samples obtained from a well at 107 Spencer Road had indicated the presence of kerosene, a major component of JP-8 jet fuel. PHMSA notified Defendants of the test results and directed Defendants to investigate the origin of the kerosene.

116.    On or about January 22, 2025, a representative of Defendants, Wassim Saad, parked in Plaintiffs Daniel and Katherine La Hart's driveway in an unmarked truck with a New Jersey license plate and knocked on their door to offer "free well testing" with no explanation why. Shockingly, Mr. Saad did not identify himself to Plaintiffs at this time as a representative of Defendants or tell Plaintiffs about the presence of kerosene at 107 Spencer Road, even though that property's well is mere feet from Plaintiffs' property line. Indeed Mr. Saad's, business card indicated that he worked for a company called "Wood PLC."

117.    Plaintiffs declined the offer for "free well testing" because they thought, based upon the lack of information and material omissions provided, that Mr. Saad was a door-to-door salesman offering unneeded services.

118.    Shortly thereafter, Plaintiffs noticed that trucks labeled "Energy Transfer" were present in the neighborhood, and Plaintiffs then realized that their community was likely facing a significant issue, although at this time the scope of the issue was unknown.

24

119.    Plaintiffs then contacted Mr. Saad and Defendants took a purported test of Plaintiffs' water on January 24, 2025, but only by collecting water only from Plaintiffs' faucet and not their well.

120.    At this time, the neighbors in the Mt. Eyre Manor neighborhood began to talk with each other about the activity involving Defendants, and Plaintiffs encouraged other residents to get their water tested.

121.    From January 22, 2025, through January 31, 2025, Defendants had a contractor, Groundwater & Environmental Services, Inc. ("GES"), acting on behalf of and as an agent of Defendants, sample the private wells of approximately twenty-five other nearby residences in the neighborhood.

122.    GES confirmed the presence of hydrocarbons in well water at certain properties in the neighborhood including 107 Spencer Road, 108 Spencer Road, and 128 Glenwood Drive, each of which surround Plaintiffs' property.

123.    From January 22, 2025, through January 31, 2025, Defendants proceeded to probe the length of the Twin Oaks Pipeline between 121 Glenwood Drive and 155 Glenwood Drive (approximately 0.7 miles) with a PID gas detector. As with Defendants' prior investigations, the gas detector results were reported as "non-detect."

124.    Despite the repeated failures of Defendants' PID gas detector to identify a leak, eventually on January 31, 2025, Defendants visually observed and finally confirmed a substantial leak in the Twin Oaks Pipeline when they excavated a portion of the Pipeline located on the property at 121 Glenwood Drive, in the backyard of the residents who live there, next to the swimming pool where the residents' family swam prior to the discovery of the Leak.

125. The Pipeline Leak was discovered at 121 Glenwood Drive, the residence directly across the street from 128 Walker Road in the Mt. Eyre Manor neighborhood, where the residents lived who reported the first odor complaint – *16 months prior* – detailed above as the smell of gasoline.

126. Defendants had finally decided to excavate a portion of the Twin Oaks Pipeline located on the property at 121 Glenwood Drive after they went back and reviewed old maintenance records that had long been available to them. It is not currently known why Defendants did not take this step earlier, or what else these old maintenance records might show once they are produced in this litigation.

127. Video of the Pipeline Leak was recorded by one of the residents at 121 Glenwood Drive.

128. The Pipeline Leak would later be characterized as a "slow drip" from a Type A sleeve installed in 1995, and that had not been properly maintained since.

129. Type A sleeves are typically used to reinforce pipeline segments or areas of a pipeline that exhibit non-leaking defects such as corrosion or observable dents.

130. The Twin Oaks Pipeline is reinforced in at least 44 other segments by Type A sleeves installed during the late 1980s and early 1990s, and which are also all at risk of failing, especially if they are not continually and properly monitored and maintained. Defendants failed to continually and properly monitor and maintain the Type A sleeve that was underground at 121 Glenwood Drive in the Mt. Eyre Manor residential neighborhood in Upper Makefield Township, Pennsylvania.

131. The pipeline industry views Type A sleeves as ineffective at preventing leaks and an insufficient mechanism to reinforce an aging pipeline in danger of leaking. The corrosive nature

26

of petroleum products moving at high pressure inside a pipeline means that dents over time can become cracks through which product can escape, and a sleeve reinforcing the exterior of the pipeline will not prevent leaks in such a scenario.

132.    For example, in August 2020, a dent in the Colonial Pipeline near Huntersville, North Carolina, which had been previously reinforced in 2004 with a Type A sleeve, developed into an approximately five-foot crack. As here, the operators of the Colonial Pipeline failed to properly monitor and maintain the pipeline and Type A sleeve, and its detection systems failed to detect the crack or the release of any product.

133.    In that instance, an estimated 2,000,000 gallons of product were discharged into the surrounding environment before the pipeline's operators, alerted to the Leak by local residents, were able to identify and repair the crack. That pipeline's operator initially reported the release as involving 63,000 gallons (3 percent of the actual volume lost).

134.    In light of this and other similar incidents and their own knowledge and experience as to pipelines and the advantages and drawbacks of certain standard operating procedures and repair equipment, Defendants here knew or should have known that the approximately thirty year-old Type A sleeve situated on the residential property at 121 Glenwood Drive in the Mt. Eyre Manor neighborhood, a community where residents rely on well water for their water needs, was insufficient reinforcement to prevent a discharge from occurring from the Pipeline and especially under or near a residential property and neighborhood.

135.    On January 31, 2025, Defendants notified the National Response Center ("NRC") of the Twin Oaks Pipeline Leak and inexplicably and without good basis reported a release of 156 barrels of jet fuel, which is 6,552 gallons.

27

136.    Despite this initial report that there were 6,552 gallons of jet fuel spilled into a residential neighborhood in Bucks County, Pennsylvania that relies on well water, Defendants have maintained in statements made to residents and regulatory authorities after January 31, 2025, that in fact, Defendants do not know how much product has been released into the environment.

137.    Still, Defendants have also repeated the 6,552 gallons figure at other times to regulatory authorities, including to the PADEP on April 18, 2025.

138.    It is highly likely because of the amount of time that the Leak was occurring, the size of the Leak, the pressure utilized for the Twin Oaks Pipeline, the odor complaints dating back to September 2023, and other evidence, that significantly more than 6,552 gallons of jet fuel and petroleum products was released by Defendants into the environment.

139.    Due to Defendants insufficient, improper, negligent, and reckless conduct alleged herein with respect to their oversight, operation, supervision, maintenance, monitoring, and testing of the Twin Oaks Pipeline, Defendants have no idea when the Pipeline began leaking.

140.    The Twin Oaks Pipeline's maximum operating pressure is 1,200 psig (pounds per square inch gauge). On January 31, 2025, when Defendants discovered the Leak at 121 Glenwood Drive in the Mt. Eyre Manor neighborhood, it was reported that the Pipeline was operating at 1,100 psig, *i.e.*, approximately 91.6% operating pressure.

141.    PHMSA conducted a preliminary investigation of the Pipeline Leak after it was reported. Based on its investigation, PHMSA concluded that "the Pipeline experienced a leak in a high consequence area for at least 16 months, resulting in the release of jet fuel that has migrated into several adjacent water wells and caused additional impacts to property and the environment."[6]

---

[6] Exhibit C, Notice of Proposed Safety Order, Pipeline and Hazardous Materials Safety Administration, CPF No. 4-2025-054-NOPSO (Feb. 13, 2025).

142. Defendants have represented repeatedly, in statements to both residents and regulatory authorities, that despite their investigation since discovering the Leak, they still do not know when the Pipeline Leak truly began.

143. It is probable that the Twin Oaks Pipeline was leaking for a significant period of time, even prior to the first known odor complaint being made to Defendants in September 2023.

144. Defendants have stated repeatedly in statements to both residents and regulatory authorities that they do not know whether the Twin Oaks Pipeline is still leaking.

145. Defendants have not excavated the entire Twin Oaks Pipeline to conduct a visual examination of the Pipeline to determine that it is not leaking, or even excavated the Pipeline sufficient to examine all the Type A sleeves along the Pipeline.

**F.     Defendants' Response and Actions Following Discovery of the Pipeline Leak**

146. On January 31, 2025, Defendants cut off the segment of the Pipeline where the Leak had been discovered and submitted a repair plan to PHMSA. Defendants had their workers arrive and remove the leaking segment in the middle of the night, without giving notice to residents or to local, state, or federal regulators.

147. Plaintiffs and the Class members demand immediate access to review and examine the leaking segment of the Twin Oaks Pipeline and expect Defendants to preserve all aspects of the Pipeline which they removed.

148. On February 1, 2025, Energy Transfer's Lead Specialist for Public Affairs, Joseph Massaro, issued a written statement confirming they had discovered "product loss" and claiming that the Pipeline was "inactive" at the time the Leak was discovered.

149.    This statement means, among other things, that the video of the Pipeline that shows that Pipeline Leak is not indicative of the actual full Pipeline Leak under usual operating pressure conditions.

150.    On February 2, 2025, after receiving approval from PHMSA's Southwest Region Director, Defendants replaced the removed segment of the Pipeline and, without conducting further work to ensure that no other parts of the Pipeline were currently leaking, shockingly rushed to return the Pipeline to service.

151.    Defendants subsequently began an inadequate and neglectful investigation of the effects of the known Pipeline Leak in a high consequence, residential area.

152.    Defendants began conducting "exposure" testing for the water of nearby residences. But rather than testing the actual tops of all residents' wells to determine whether any free product – also known as light non-aqueous phase liquid or "LNAPL" – was present, Defendants' exposure testing relied on samples taken from faucets inside the residences post-treatment, and inadequate PID readings.

153.    In at least one instance, when Defendants' retained testing agents, hired by and working on behalf of Defendants, discovered that they had taken a sample directly from a well for testing by mistake, *they threw out the sample and erased the results*.

154.    Defendants' method of exposure testing thus deviated from the standard protocols for testing groundwater, which universally require testing pre-treatment, and was seemingly designed to limit Defendants' ability to identify the scope and location of the contamination plume resulting from the Pipeline Leak.

155.    Defendants failed to test samples directly from residents' wells for the presence of free product. This is true even though Defendants recently have, at the behest of Plaintiffs and

30

other residents who have retained the undersigned counsel, finally begun to conduct bailer tests of residents' wells to screen for the presence of LNAPL.

156.    Indeed, even in situations where Defendants' agents have *visually observed* the presence of LNAPL, they have not universally retained the water from the bailer for testing and have instead in instances deposited this contaminated water back into the well.

157.    Defendants, moreover, despite being well-aware that their conduct as alleged herein would give rise to residents' legal claims, have failed to properly preserve all evidence of environmental contamination that they have found during their activities, including by, for example, failing to properly catalog and store all physical materials and things that they have inserted into or withdrawn from residents' wells.

158.    Defendants have not ensured that they and their agents have properly preserved all evidence gathered as a result of Defendants' and GES's activities in the neighborhood following the discovery of the Pipeline Leak. Therefore, Plaintiffs and Class members are entitled to all reasonable adverse inferences that may arise as the result of any failure to properly preserve evidence.

159.    On February 4, 2025, Energy Transfer's Joseph Massaro appeared at the regularly scheduled Upper Makefield Township Board of Supervisors meeting, along with Defendants' other representatives Carl Borkland, Susan Ericson, David Kerwood, and Rahn Monreal. Massaro confirmed the product release and purported to provide an "update" on Defendants' remedial efforts.

160.    On February 6, 2025, at 7:30 p.m., a townhall meeting was held at the Upper Makefield Township Office, where affected residents who live in Mt. Eyre Manor and the

surrounding neighborhoods, including Plaintiffs. Representatives from PHMSA and the Defendants also were present.

161. At this townhall meeting, Defendants provided an update on their efforts to monitor and contain the Pipeline Leak, in which they admitted that their exposure testing had detected hydrocarbons in six neighborhood wells to that time.

162. Defendants admitted during the meeting that they did not know how much product had been lost or when the Pipeline Leak had begun.

163. Defendants further stated that because the release occurred "in the headwaters" of the Delaware River, it would make sense for any groundwater carrying spilled product to be moving in a northeasterly direction toward the Delaware River. This was the Defendants' best estimation at the time concerning the plume caused by the Pipeline Leak of unknown quantities of jet fuel and other petroleum products.

164. At the town hall meeting, Defendants offered only to pay for the installation of carbon filtration systems for any wells where their product was detected, and to pay for the maintenance of such a system for as long as the product is detected in the well.

165. During this townhall meeting, officials from PHMSA stated that they had no confidence in Defendants' ability to identify leaks in the Twin Oaks Pipeline, considering the circumstances surrounding the Pipeline Leak. Residents of the Mt. Eyre Manor neighborhood, including Plaintiffs, called on Defendants to shut down the Pipeline.

166. Defendants refused (and still refuse) to shut down the Pipeline.

167. On February 7, 2025, the day after the town hall meeting, Defendants provided a written public update on the Upper Makefield Township website in which they stated that, rather

32

than shutting down operations, they would reduce the Twin Oaks Pipeline's operating pressure to 80%.

168.    On February 13, 2025, PHMSA issued a Notice of Proposed Safety Order ("NOPSO") to Defendants. In the NOPSO, PHMSA wrote:

> After evaluating the foregoing preliminary findings of fact, and having considered the characteristics of the pipeline, including prior Type-A sleeve repairs involving dents and other defects; the prior failures of the pipeline; the hazardous nature of the petroleum products, including jet fuel, transported; the uncertainty as to the root cause(s) of the failure; the proximity of the pipeline to residential dwellings and water wells; the existing and potential additional impacts to property, the environment, and wildlife; and the possibility that the same condition(s) that may have caused the failure remain present in the pipeline and could lead to additional failures; it appears that the continued operation of the Twin Oaks Discharge pipeline system without corrective measures would pose a pipeline integrity risk to public safety, property, or the environment. The conditions and threats described above potentially exist throughout the Twin 7 Oaks Pipeline. Further, Sunoco's apparent inability to effectively detect the leak has potentially exacerbated the impacts of the release over an extended period of time. Accordingly, corrective measures are necessary to mitigate the pipeline integrity risk of the pipeline system to protect public safety, property, and the environment.

169.    PHMSA thereafter issued proposed remedial requirements including reducing operating pressure, implementing plans to assess the integrity of the pipe and of the Type A sleeves along it, conducting a leakage survey, and conducting a root cause failure analysis.

170.    On the evening of February 13, 2025, a second town hall meeting was held at Sol Feinstone Elementary School, Newtown, PA at 7:30 p.m. Affected residents including Plaintiffs, representatives from Defendants, and representatives from PHMSA and state regulators attended the meeting.

171.    During this meeting, residents, including Plaintiffs, demanded that the Twin Oaks Pipeline be shut down. Plaintiff Daniel La Hart provided an opening statement on behalf of Mt. Eyre Manor residents at this meeting.

172.    Defendants then showed residents a map of what they considered to be the geographic area affected by the Pipeline Leak. This map included a line of arrows pointing in the northeastern direction, which were labeled as the "*inferred* groundwater flow direction." (emphasis added).

173.    Defendants stated that areas west and south of the Pipeline Leak were not of concern based on the flow of the groundwater toward the Delaware River. Defendants, however, then admitted that they had not yet installed a single monitoring well or taken any steps to identify the accurate directional flow of groundwater in the area.

174.    Defendants' affirmative statements to residents about the identified affected geographic area resulting from the Pipeline Leak at the town hall meetings on February 6 and February 13 were (at best) misleading. At the time Defendants made these statements, in fact, Defendants had no idea when the Pipeline Leak first occurred, how long the Pipeline had been leaking into the residential neighborhood, how much product had been discharged into the surrounding underground aquifer and bedrock, whether additional points along the Pipeline were continuing to leak, or the actual direction or flow rate of the groundwater underlying the point or points of discharge.

175.    Defendants intended their statements to induce a false sense of security and confidence in residents, particularly for residents whose homes were not within Defendants' arbitrarily delineated affected geographic area that was not based on adequate investigation or evidence.

176.    During the February 13, 2025, town hall meeting, one resident who resided at 128 Walker Road in the affected area and across the street from where the Pipeline Leak was discovered described her experience with her well. Since 2023, she had repeatedly complained to Defendants

34

about her concerns of contamination resulting from the Twin Oaks Pipeline, and Defendants' representatives had repeatedly stated that any oil could not have been coming from the Twin Oaks Pipeline.

177.    After the discovery of the Pipeline Leak, when Defendants finally sent a contractor to inspect her well, they discovered *over **twelve feet of jet fuel** on top of the water in her well*, and after pumping the water, *estimated that **fifteen feet of jet fuel** had been accumulating in the well since 2023*. The resident stated that according to Defendants' contractor, *over 22 inches of jet fuel had accumulated in her well **in the past week alone***. Indeed, significant product continues to accrue daily in this well.

178.    Residents asked Defendants for a guarantee during the February 13, 2025, town hall meeting that the Twin Oaks Pipeline was not still leaking. Defendants responded that they were not able to provide such a guaranty at that time.

179.    Defendants did make one guarantee at the February 13 town hall: they confirmed that they would provide medical monitoring to the Mt. Eyre Manor community and surrounding neighborhoods as a result of the Leak. Defendants' representative Matt Gordon, a vice president of operations and the individual who Defendants put forward as the authority figure speaking on Defendants' behalf at the town hall, confirmed Defendants' commitment to medical monitoring. This admission is recorded on video, but to Plaintiff's knowledge no such medical monitoring has been conducted.

180.    On February 18, 2025, PADEP sent Defendants a Notice of Violation.[7] In the Notice, PADEP stated that the release identified on January 31, 2025, has "caused free product and dissolved concentrations of petroleum-related chemicals in potable wells in the neighborhood,

---

[7] Exhibit D, Notice of Violation, Pa. Dep't Envt'l Protection (Feb. 18, 2025).

with some properties having contamination exceeding DEP's Statewide health standard medium specific concentrations in their drinking water." The Notice advised that the discharge constitutes a violation of the Pennsylvania Clean Streams Law, 35 P.S. § 691.401, and that such a violation amounts to unlawful conduct within the definition of the law and is subject to civil enforcement.

181.    On February 19, 2025, counsel for Defendants responded to the NOPSO issued by PHMSA.[8] Defendants denied and disputed several of the preliminary factual findings contained in the NOPSO. In doing so, Defendants admitted that "there is not sufficient evidence at this time to conclude how long the Affected Pipeline was leaking." Defendants stated that it did not have evidence of an ongoing leak, but also that its investigation was ongoing. Defendants did *not* state that it had sufficient information to rule out a continuing release of aviation fuel and other contaminants from the Pipeline into the local environment.

182.    On February 27, 2025, a third town hall meeting was held again at the Sol Feinstone Elementary School at 7:30 p.m. Affected residents including Plaintiffs, regulators, local officials, and representatives of the Defendants were present at the meeting.

183.    During the February 27 town hall meeting, Defendant Energy Transfer's Joe McGinn, Vice President of Public Affairs, stated: "**This release happened, and it's our fault that it happened. This was not a third-party damage issue. We recognize that. We apologize for it.**" He further stated that Energy Transfer's "**focus and goal is to restore the community to its original state.**"

184.    Defendants' representatives also stated during the February 27 town hall meeting that they provided their initial estimate of 156 barrels of product lost based on their understanding that federal law required a reporting of the amount of product lost within 48 hours of discovery of

---

[8] Exhibit E, Letter from Haley O'Neill to Bryan Lethcoe (Feb. 19, 2025).

**Exhibit B_Page 353 of 583**

a leak. Defendants *admitted* that at the time they made the representation to PHMSA, they had no factual basis upon which to assert the amount of product lost, and that they continue to lack an evidence-based estimate of the amount of product that has been discharged into the underlying bedrock and aquifer beneath the Mt. Eyre Manor neighborhood, in Upper Makefield Township.

185.    This signifies and demonstrates that Defendants do not maintain proper and adequate leak detection and monitoring systems with respect to the Twin Oaks Pipeline.

186.    On February 28, 2025, Pennsylvania Governor Josh Shapiro wrote a letter to U.S. Transportation Secretary Sean Duffy, requesting expedited action from PHMSA in response to the Pipeline Leak.[9] In his letter, Governor Shapiro noted that "Sunoco has not demonstrated adequate ability to detect leaks and take appropriate actions, given what appears to have been a significant delay between the initial indications of a leak and the response."

187.    Governor Shapiro further described the Leak as "the latest incident in a long pattern of safety concerns with Sunoco and Energy Transfer pipelines in Pennsylvania."

188.    On March 4, 2025, Defendants also sent to the PADEP a revised Notice of Intent to Remediate indicating that they intended only to remediate "Jet Fuel and unleaded gasoline parameters (benzene, toluene, ethylbenzene, total xylenes, methyl tertbutyl ether, isopropylbenzene, naphthalene, 1,2,4-trimethylbenzene, 1,3,5-trimethylbenzene, 1,2-dichloroethane, 1,2-dibromoethane, and lead) for Residential Statewide Health Standards in soil and groundwater." By selecting the Statewide Health Standards as their chosen cleanup standard, Defendants have confirmed that their plan is to leave their contamination in place to continue polluting Plaintiffs' and the neighborhood's water, soil, and air.

---

[9] Exhibit F, Letter from Governor Josh Shapiro to Secretary Sean Duffy (Feb. 28, 2025).

37

189. On March 5, 2025, Defendants responded to the Notice of Violation previously issued by the PADEP. Despite having been told by the PADEP to describe "the circumstances causing the incident and how the circumstances were determined, including historical investigations of the pipeline in this area," Defendants' response was devoid of any of this information. *See* Exhibit G.

190. Instead, Defendants simply recited the same limited history of inadequate responses to resident complaints that are described herein, starting in September 2023. The response did not in any meaningful way describe "the circumstances causing the incident" and has no information regarding "historical investigation of the pipeline in this area." *Id.*

191. On March 6, 2025 (the next day), PADEP issued an Administrative Order to Defendants Energy Transfer (R&M), LLC and Sunoco Pipeline, L.P., directing Defendants to respond to the Pipeline Leak and implement certain remedial actions, including the supply of bottled water and the installation of point-of-entry treatment ("POET") systems for certain residents in Upper Makefield Township, Pennsylvania.

192. PADEP's Order limited the requirement to supply bottled water to only those properties with potable groundwater wells within the Mt. Eyre Manor neighborhood topographic watershed, plus a minimum 500-foot buffer, that have concentrations of VOCs above background concentrations in the area, and limited the requirement to install POET systems to only those properties with potable groundwater wells within the Mt. Eyre Manor neighborhood topographic watershed, plus a minimum 500-foot buffer, that have concentrations of VOCs exceeding the Maximum Contaminant Levels ("MCLs") under Pennsylvania state regulations.

193. On March 19, 2025, Defendants submitted an Interim Remedial Action Plan ("IRAP") to the PADEP. The IRAP contained numerous exhibits with test results and other

**Exhibit B_Page 355 of 583**

characterizations of the state of the neighborhood in the weeks following the Leak, including but not limited to the following:

> a. Soil testing at 121 Glenwood Drive, the property where the Leak was detected, confirmed the presence of many dangerous constituents of jet fuel and other harmful contaminants, including toluene, ethylbenzene, isopropylbenzene, xylenes, phenanthrene, naphthalene, arsenic, barium, beryllium, and lead; the results were also positive for significant quantities of total hydrocarbons in the diesel range (C10-C28). *See* IRAP Attachment 4.
>
> b. A summary table indicated that: at least 6 residences had tested positive for volatile organic compounds ("VOCs") above statewide health standards or positive for the presence of LNAPL, and an additional 19 residences had tested positive for VOCs but were below the statewide health standards or had "J-value" results indicating the presence of VOCs.[10]

194.    The IRAP also included an attachment indicating the inferred general trend of bedrock features based on Defendants' analysis to date:

---

[10] In environmental testing, a "J-value" indicates that a result is an estimated value.



IRAP, Attachment 14.

195.    As this figure demonstrates, Plaintiffs and their neighbors are directly within the zone of danger to experience ongoing and future contamination because of the Leak. Indeed, as indicated by the red lines, one of the bedrock features runs directly from 121 Glenwood Drive (the Leak location) through 114 Spencer Road, which is Plaintiffs' property.

196.    This bedrock trend figure also publicly revealed for the first time that LNAPL had been detected at 110 Spencer Road, directly next door to Plaintiffs' property.

197.    On April 18, 2025, Defendants submitted a Site Characterization Work Plan ("SCWP") to the PADEP.  *See* Exhibit H.

198.    The SCWP confirmed that the Pipeline transports not just jet fuel but also "occasionally transports unleaded gasoline and diesel fuel." *Id.* at 2.

199.    In the SCWP, Defendants again falsely "estimate[d]" that the extent of the Leak's volume was 156 barrels but did not classify what petroleum product this constituted. *Id.*

200.    Defendants revealed that in addition to jet fuel LNAPL being observed at several homes in the community, additional LNAPL that "appears to be a different petroleum product" was observed at "an additional property on Spencer Road," where Plaintiffs reside.

201.    While Defendants referenced figures and maps that purportedly revealed the locations of LNAPL observations and other important data, Defendants inexplicably redacted most of the relevant information from the SCWP, and its exhibits.

202.    On May 2, 2025, PHMSA executed a Consent Order and Consent Agreement with Defendant SPLP, directing SPLP to take specific corrective actions following PHMSA's investigation into to the Leak. These corrective actions include: (i) verification of the integrity of every Type A sleeve installed on the Twin Oaks Pipeline; (ii) submission to PHMSA within 90 days of a comprehensive plan for identifying, evaluating, and removing any Type-A sleeves whose integrity cannot be assured, as well as a technical justification for any Type-A sleeves that remain on the line and a plan to implement additional integrity management measures to minimize any risks associated with their continued use; (iii) a requirement that the Pipeline continue to operate at a 20 percent reduction in pressure; (iv) submission within 45 days of mechanical and metallurgical testing results; submission within 120 days of a failure history evaluation and a root cause failure analysis; and (v) evaluation and improvement of the effectiveness and capabilities of Defendants' leak detection system to ensure that any future leaks of this nature are identified immediately.

203.    On May 9, 2025, Defendants updated their summary table of results of the water testing performed in Mt. Eyre Manor and the surrounding neighborhoods. *See* Exhibit I. This updated table indicated at least 7 residences had tested positive for volatile organic compounds ("VOCs") above statewide health standards or positive for the presence of LNAPL, up from 6 in

41

the March 19th version of the table. *Id.* An additional ***36 residences*** also tested positive for VOCs but were below the statewide health standards or had "J-value" results indicating the presence of VOCs, almost double the 19 residences in these categories in the March 19th version. *Id.* Clearly the magnitude and scope of contamination is only getting worse, and not better.

204.    On May 13, 2025, the PADEP responded to Defendants' SCWP and found that the submission was "deficient." PADEP requested more information on the LNAPL believed to be a different petroleum product and otherwise requested more complete information from Defendants. PADEP also faulted Defendants for their excessive and improper redaction of the figures and attachments to the SCWP. *See* Exhibit J.

205.    As the results from the March 19 and May 9 tables indicate, the harm caused by Defendants' actions as alleged herein and the Pipeline Leak is not limited to the contamination of certain limited residences above MCLs under Pennsylvania state regulations.

206.    Plaintiffs and every Class member have the right to clean drinking water and clean soil that are completely free of any contaminant that is found in jet fuel. Further, the 500-foot buffer required by the PADEP is insufficient to safeguard Class members from injuries that Defendants have caused as a result of the Pipeline Leak, as contamination has already been detected beyond this 500-foot buffer.

207.    Judicial intervention is necessary to impose appropriate and reasonable full protective measures and obligations on Defendants beyond the regulatory measures ordered by the PADEP.

208.    Testing has indicated that at least ***43 residences***, including Plaintiffs', have already been affected and demonstrably contaminated by the Leak. Defendants' investigation is ongoing, and the number of wells that Defendants know to be impacted continues to increase.

**Exhibit B_Page 359 of 583**

209. Despite this knowledge, to date Defendants have not admitted publicly to the full scope of contamination in the Mt. Eyre Manor neighborhood, and instead continue to attempt to only minimize it.

210. In multiple incidences, residents have requested that GES technicians taking post-treatment samples from their faucets also take pre-treatment samples from their wells for testing. GES technicians repeatedly have responded that they had instructions from Defendants not to conduct any testing of well water pre-treatment, and to only take samples from faucets in the residents' homes.

**G.    Environmental Contamination Resulting from the Pipeline Leak**

211. The Pipeline Leak has resulted in the dispersion of multiple known toxic chemicals into the surrounding environment. The full extent and make-up of the contamination is presently unknown.

212. Free standing petroleum or jet-fuel product has been found on the top of the water in some residents' wells and, as Defendants recently revealed, a petroleum product other than jet fuel was found in at least one well on Spencer Road.

213. Over twelve feet of free product was found on top of the water in the well at 128 Walker Road, directly across the street from the location of the Pipeline Leak. Defendants' contractors estimated that over fifteen feet of jet fuel had accumulated in the well since 2023. Moreover, product is continuing to accumulate in this well despite Defendants' efforts to remove it. Every day since the contamination was initially discovered by Defendants' contractors, more of Defendants' hazardous product has seeped into the well.

214. Free-standing petroleum or jet fuel product was found accumulated on top of the water in several other wells near the site of the Leak, including nearly six feet of product in the

43

well at 121 Glenwood Drive and over three feet of product at 107 Spencer Road. Product has been observed on top of the water in the wells of at least fifteen other nearby residences to date.

215. In addition to direct observation of product in their wells, residents continue to report detecting the odor of gasoline in their wells and in their tap water, which is a substantial nuisance that interferes with the residents' enjoyment and use of their properties.

216. For example, the residents at 105 Spencer Road have been smelling gasoline on their property since June of 2024, and at times have been able to taste gasoline in their water.

217. The owner of the residence at 103 Spencer Road also reports having smelled gasoline on his property for a long time and has been able to smell and taste gasoline in his water at various points in the water he uses to drink, cook, and shower.

218. Residents in the affected community feel the stress and anxiety associated with having detectable levels of gasoline taste and odor on their properties and their neighbors' properties. As one resident stated, "every morning, when I turn on my water, it's a concern of mine. Is it my turn to smell fuel and taste it in my water?"[11]

219. Other indicia of contamination, including the presence of chemicals and particulates known to be byproducts of petroleum and jet fuel, have been found in the well water and tap water of many residences in the neighborhood.

220. Toxic chemicals and particulates resulting from Defendants' Pipeline Leak have infiltrated the aquifer and bedrock in sufficient quantities to be detected in the water of neighborhood residences, including but not limited to kerosene, benzene, ethylbenzene,

---

[11] Energy Transfer Begins Drilling Recovery Wells on Pennsylvania Street After Fuel Leak Sparked Water, Air Safety Concerns, CBS News (Mar. 19, 2025) (available at https://www.cbsnews.com/amp/philadelphia/news/sunoco-fuel-leak-upper-makefield-pennsylvania/).

isopropylbenzene, dichloroethane, trimethylbenzene ("TMB"), toluene, naphthalene, methyl tertiary-butyl ether ("MTBE"), and lead.

221.    There is no potential source of these substances in the surrounding area other than the Twin Oaks Pipeline.

222.    Kerosene is one of the most common fuel oils and a major component of jet fuel. Exposure to kerosene can lead to a wide variety of human health consequences, including respiratory issues, vision loss, liver failure, gastrointestinal issues, heart collapse, and skin burning and irritation. Kerosene exposure can also affect the central nervous system, resulting in seizures, comas, migraines, depressions, and other neurological impacts. The International Agency for Research on Cancer ("IARC") considers kerosene a possible carcinogen.

223.    Benzene is natural and a highly toxic constituent of petroleum. Due to its high odor recognition threshold, people can be exposed to excessive amounts of benzene in the air or in tap water without knowledge of the exposure. Benzene is a known human carcinogen according to both IARC and the U.S. Environmental Protection Agency ("EPA"). In addition to cancer, benzene exposure can result in the disruption of hematopoiesis (the body's production of blood), suppression of the immune system, and result in both skeletal and neurodevelopmental defects.

224.    TMB isomers are produced during the petroleum refining processes and are used as a fuel additive in gasoline. TMB is a neurotoxin and is readily absorbed into the human bloodstream following exposure. TMB exposure can negatively impact a person's short-term memory and motor skills, induce vertigo, and cause nervousness and anxiety. TMB exposure can also cause issues with blood clotting and respiratory function.

225.    MTBE, in contrast to other fuel and gasoline constituents, has a strong affinity for water. MTBE dissolves easily into groundwater and can migrate rapidly a great distance from the

<div align="center">45</div>

source of release, meaning it is likely to have a distinct contamination plume from other toxic chemicals released from the Twin Oaks Pipeline. MTBE does not readily biodegrade in water and will persist in the environment until remediated. MTBE at very low concentrations can affect the taste and odor of water and IARC considers it a likely carcinogen. MTBE as a fuel additive was phased out of gasoline in the United States by 2006, due to its associated environmental and health concerns, and as such it is not clear why wells are testing positive after the Pipeline Leak.

226.    Lead is a neurotoxin that easily permeates the blood-brain barrier after exposure, and often is difficult to detect in a person until dangerous amounts have accumulated. In adults, lead exposure through drinking water can cause reduced memory, headaches, mood disorders, joint and muscle pains, abdominal pains, and high blood pressure. Lead exposure also negatively affects the reproductive organs and can cause reduced or abnormal sperm counts and increase the risk of miscarriage, stillbirth, or premature births in pregnant women.

227.    Symptoms resulting from exposure to these toxic chemicals and other harmful chemicals released from the Twin Oaks Pipeline can take a long time to manifest. Residents of the Mt. Eyre Manor neighborhood and surrounding communities will have to closely monitor their health, potentially indefinitely, and have and will continue to experience the accompanying fear and anxiety that comes from not being able to trust the safety of the water they drink or the air that they breathe because of Defendants' Pipeline Leak.

### H.    Defendants' Messaging Since the Pipeline Leak Has Not Matched Reality

228.    Defendants have been engaged in a multifaceted public relations campaign to downplay the severity of the Pipeline Leak and its actual and potential harms. Defendants' messaging, however, has not matched reality.

**Exhibit B_Page 363 of 583**

229.    For example, Defendants have now suggested that the Pipeline Leak may have happened right before it was discovered in January 2025, despite residents smelling and reporting the odor of gasoline since at least September 2023, 16 months earlier.

230.    Defendants have also now suggested that the Pipeline Leak was a "pinhole" and that it spilled 156 barrels or less. In reality, Defendants have admitted that they lacked a valid basis for their initial estimate of 156 barrels and have conceded that they rushed to provide a number to the government without the applicable information necessary to determine the actual volume of lost aviation fuel and other petroleum products.

231.    Because of Defendants' failure, negligence, and recklessness in failing to have a proper leak detection and monitoring system in place for the Twin Oaks Pipeline, Defendants have no known way to accurately measure the amount of product that spilled into the environment from the Twin Oaks Pipeline in the Mt. Eyre Manor neighborhood or means to determine when the Leak started.

232.    Moreover, the Pipeline Leak, when discovered, showed visibly that the Leak did not result from a "pinhole" as Defendants suggested, but rather, evidenced a leak such as from a water fountain, and that was with substantially reduced or no pressure applied to the Pipeline at the time indicating it was likely much stronger when the Pipeline was operated with full pressure.

233.    Defendants further represented to residents in the Mt. Eyre Manor neighborhood when they were purchasing their homes that Defendants had instituted state-of-the-art, leak detection equipment with respect to the Pipeline, such that a leak like the Pipeline Leak here could never occur. These representations by Defendants to residents were false and misleading as demonstrated by the occurrence of the Pipeline Leak and Defendants' actions and follow up (or

lack thereof) in response to multiple odor complaints that began at least as early as September 2023.

234.    In fact, Defendants failed to have proper leak detection and monitoring systems in place with respect to the Twin Oaks Pipeline.

235.    Defendants claimed that their leak detection systems for the Pipeline were functional, but in reality, and despite residents pointing out an issue for 16 months, making numerous odor complaints, no computer system or ground testing employed by Defendants detected any leak. Defendants only detected and located the Pipeline Leak when they went back to review old maintenance records and then happened to excavate the portion of the Twin Oaks Pipeline where the leak occurred. Defendants would not have identified the Pipeline Leak except by digging up the Pipeline, which facts do not suggest or support that Defendants had an adequate leak detection and monitoring system in place.

236.    Defendants have claimed that Type A sleeves are structurally sound and that they visually inspected six such sleeves, but at least 44 Type A sleeves exist on the Twin Oaks Pipeline, and many more are believed to have not been physically inspected by way of excavation.

237.    Crucially, Defendants also claimed to have made a commitment to future public engagement, community, outreach, and continued participation in public meetings in Upper Makefield Township. Defendants, however, have invoked "confidentiality" and vague "national security" concerns to deny affected residents with access to basic information and facts about the Pipeline Leak and the proposed remediation plans. Defendants' failure to engage has only increased since the residents have hired legal counsel to protect their interests and all public meetings are now only through "tele-townhalls" during which Defendants tightly control the questions presented.

238.    Defendants' conflict between its public representations and its internal policy or preference to withhold information came to a head at the town hall meeting that took place on March 11, 2025. At this meeting, Defendants shut down any attempt to receive questions from the public, claiming that Defendants could no longer continue to provide information because some residents had retained legal counsel. Defendants went so far as to offer one-on-one meetings only with residents that were *not* represented by counsel. This was a transparent scare tactic to discourage unrepresented residents from retaining legal counsel, and further reflects Defendants' insensitivity to the crisis unfolding in the affected community, and the failure to take responsibility.

239.    The breach in the Pipeline and resulting Pipeline Leak is the direct consequence of Defendants' reckless and negligent actions with respect to the oversight, operation, supervision, maintenance, monitoring, and testing of the Twin Oaks Pipeline.

240.    Moreover, Defendants have continued to transport highly corrosive and toxic products at extremely high pressures through the Twin Oaks Pipeline – which when installed was not designed for those pressures – in spite of their knowledge that (a) the Pipeline is nearly 70 years old and had a history of cracks; (b) that there was a previously identified dent in the Pipeline at the location of the crack which was reinforced only by an approximately 30-year-old exterior sleeve which has been known to have problems from past experience; and (c) that did not have a proper monitoring and leak detection system.

241.    *For over 16 months*, despite their knowledge that the Pipeline faced a danger of corrosion and cracking, Defendants failed to properly respond to nearby odor complaints in a manner reasonably likely to detect a leak and had no sophisticated leak detection equipment in place to do so, notwithstanding that Defendants were operating the Twin Oaks Pipeline in a residential neighborhood.

242.    In response to multiple odor complaints, Defendants presumed that no breach in their Pipeline existed based solely on a lack of abnormal dead vegetation around the Pipeline and the failure of portable gas monitors to detect fuels in the surrounding air.

243.    Facts, however, confirm the neglectful inadequacy of Defendants' leak-detection measures as they employed the above insufficient measures and concluded a non-detect based on them immediately prior to excavating the Twin Oaks Pipeline in the Mt. Eyre Manor neighborhood and visually confirming the crack and Pipeline Leak.

244.    Since discovering the Pipeline Leak in January 2025, Defendants have failed to take proper and reasonable actions to facilitate an understanding of the extent and nature of the discharge and resulting contamination. For example, Defendants, who have vast resources, failed to test samples of water taken directly from the wells of nearby residents for the presence of hazardous substances.

245.    Defendants have directed their contractors, generally, to avoid taking full and broad testing measures, despite knowing that such measures are reasonably necessary to identify the scope of the contamination plume and to ultimately protect the health, safety, and welfare of nearby residents.

246.    Despite failing to determine whether any ongoing leaks persist in the Pipeline, Defendants restarted operation of the Twin Oaks Pipeline on February 2, 2025, and have continuously operated the Pipeline since that date.

**I.    Harm to Plaintiffs and Class Members**

247.    Plaintiffs and Class members have been severely and negatively impacted and harmed by Defendants' conduct.

248. The entire impacted community relies on well water drawn from the underlying aquifer for their water needs. This aquifer is now contaminated. As such, the entire community, including Plaintiffs, has suffered tangible, physical injury as a result of the Pipeline Leak.

249. Confirming that the aquifer is contaminated, numerous residents have found Defendants' product, jet fuel, or other petroleum products, floating on top of and contaminating their private wells, with multiple residents having significant amounts of jet fuel accumulated in their wells.

250. Preliminary testing has shown that water samples collected from nearby homes have tested positive for petroleum hydrocarbons and/or other chemicals commonly found in jet fuel and petroleum products.

251. The Pipeline Leak has and will continue to cause financial harms to Plaintiffs and Class members, including the expenditure of all out-of-pocket costs resulting from the Pipeline Leak that must be reimbursed by Defendants.

252. Examples of these out-of-pocket costs include, without limitation:

    a.    the costs to engage and pay contractors, testing companies, and inspectors;

    b.    the costs of installation of remedial or additional water treatment systems;

    c.    the costs of purchasing and maintaining filters associated with water treatment systems;

    d.    the costs of damage and remediation to private wells;

    e.    the costs of remediation of soil;

    f.    the costs of remediating other damages caused by the Pipeline Leak;

    g.    the costs of remediating and/or replacing pipes and fixtures that have been contaminated as a result of the Pipeline Leak;

h.      the costs of temporary housing;

i.      the costs of commuting to other locations for the purpose of showering or doing laundry;

j.      reimbursement of mileage associated with attending meetings concerning the Pipeline Leak;

k.      the cost of any increased insurance premiums;

l.      the cost of lost time-value from having to take off work due to the Pipeline Leak;

m.      the cost of childcare while attending meetings related to the Pipeline Leak; and

n.      the cost of any medical costs incurred by Plaintiffs related to the Pipeline Leak.

253.    Defendants are responsible to pay all past and future costs associated with complete environmental restoration and remediation of all contamination caused by their Pipeline Leak, and to all property, water,  and air, including, without limitation, to the environment, to Plaintiffs' and Class members' real and personal property, to wells that have been contaminated, to pipes that have been contaminated and need to be replaced, to fixtures that have been contaminated and need to be replaced, to soil that has been contaminated, to gardens that have been contaminated, and to all other property belonging to Plaintiffs and Class members that has been affected by the Pipeline Leak.

254.    Plaintiffs and Class members who own their homes have also suffered from diminution of the value of their residences caused by the Pipeline Leak.

**Exhibit B_Page 369 of 583**

255.     Some Class members have already had potential buyers walk away from a potential sale because of the Pipeline Leak and, as a result, have had to substantially lower the list prices of homes currently on the market. Not a single public home sale has closed in Mt. Eyre Manor since the Leak was revealed and the only home sale that has taken place is the purchase of 108 Spencer Road by Defendants.

256.     Plaintiffs and Class members have suffered from the loss of use and enjoyment of their real and personal property caused by the Pipeline Leak. Plaintiffs and Class members cannot enjoy their property in the same manner as prior to the Pipeline Leak.

257.     As a direct and proximate result of Defendants' negligent, reckless, and willful conduct in causing and/or failing to prevent the Leak of jet fuel into the ground and groundwater supply, Plaintiffs and the proposed Class members have suffered and continue to suffer severe emotional distress. Plaintiffs reside in a community that is entirely dependent on well water drawn from a shared aquifer, which is now contaminated by toxic substances including hydrocarbons, volatile organic compounds, and known carcinogens present in jet fuel.

258.     Since the revelation of the Leak and subsequent confirmation of groundwater contamination, Plaintiffs and the proposed Class members have experienced profound anxiety, fear, and uncertainty regarding the safety of their homes, their health, and the wellbeing of their families. Some residents have reported symptoms potentially linked to exposure to contaminated water, further exacerbating psychological distress. Plaintiffs live with the daily trauma of having to use bottled water for drinking, cooking, and hygiene, and the persistent fear that they or their loved ones may suffer long-term health consequences due to ingestion or exposure to toxic chemicals.

259. In addition to the tangible disruption of daily life, Plaintiffs experience ongoing emotional harm from the loss of security, trust, and peace of mind in their environment. The knowledge that their community has been poisoned — and that this contamination may persist for years or decades — has caused deep emotional anguish. Plaintiffs and members of the proposed Class report symptoms of depression, sleeplessness, and post-traumatic stress, as they previously viewed their homes as safe havens now rendered unsafe by Defendants' conduct.

260. Plaintiffs live less than 500 feet from the location where the Leak was detected and are in between that location and the confirmed highly contaminated homes on Spencer Road. Indeed, Plaintiffs themselves live on contaminated property that sits above a contaminated aquifer. As such, Plaintiffs are at immediate risk of physical injury and are clearly within the zone of danger presented by the Pipeline Leak.

261. Exposure to the substances released from the Pipeline, whether through ingestion, inhalation, or dermal exposure, places all affected residents at increased risk of severe health impacts, including cancer, thus necessitating medical monitoring.

**J.      Harm Suffered by Plaintiffs Daniel and Katherine La Hart**

262. Plaintiffs Daniel La Hart and Katherine La Hart moved to the Mt. Eyre Manor neighborhood in 2016 and live in their home with their two young children.

263. As such, Plaintiffs are Pennsylvania residents.

264. Plaintiff Daniel La Hart, in addition to being Katherine's husband and father to their children, is a highly educated individual who works in the intelligence community, serving as an Intelligence Superintendent (Chief Master Sergeant rank) for the New Jersey Air National Guard and as a director of data science for a company in the private sector. Daniel is also a former member of the U.S. Air Force Reserve and a former firefighter.

**Exhibit B_Page 371 of 583**

265.    Plaintiff Katherine La Hart, in addition to being Daniel's wife and mother to their children, has a Ph.D. in business administration and works in sales recruitment and onboarding at a Fortune 500 insurance and financial services company.

266.    Prior to learning of the Pipeline Leak, Plaintiffs were in love with their community and felt that their home located at 114 Spencer Road was their "forever home" where they would live for a lifetime.

267.    Plaintiffs and their young children used their well water for everything including drinking, cooking, washing dishes and clothes, showering (indoors and outdoors), baths for their children and animals, watering their gardens, cleaning the cars, filling their pool, letting their children run in the hose water and down their water slide, and providing water to their dog, cat, and chickens to drink.

268.    In late 2024, Plaintiffs invested approximately $150,000.00 to pay for a series of renovations to their home that they scheduled to start in April 2025, including the installation of new windows, siding, doors, replastering the pool, and more, because they wanted to invest in their forever home and their community that they loved.

269.    The Pipeline Leak has caused Plaintiffs to suffer out-of-pocket economic losses including, among other things, significant childcare costs, mileage associated with attending meetings concerning the Pipeline Leak, and significant lost time-value from having to take off work to attend meetings, be present for testing, and to perform community outreach due to the Pipeline Leak.

270.    The Pipeline Leak and resulting contamination has caused Plaintiffs to suffer diminution to the value of their real property. The presence of the Pipeline Leak and resulting

environmental contamination has tangibly decreased the value of Plaintiffs' property and that of the surrounding affected community.

271.    It is likely that Plaintiffs (and Class members) are now overpaying property taxes as a direct result of the diminution of value to their property caused by Defendants' conduct.

272.    The Pipeline Leak has caused 114 Spencer Road to go from being Plaintiffs' idyllic forever home to an albatross that Plaintiffs will struggle to sell for close to its fair market value, which was over $1 million prior to Defendants' Pipeline Leak. Plaintiffs estimate that they have suffered diminution of value of their home in the tens of thousands or hundreds of thousands of dollars. Who would want to purchase a home in the Mt. Eyre Manor neighborhood given the known existence of the Pipeline Leak and resulting contamination?

273.    But at the same time, as a direct result of the Pipeline Leak, Plaintiffs, like other Class members, have been forced to consider the possibility of selling what they thought was their forever home and moving to another location that has not experienced the type of harms that have devastated Mt. Eyre Manor. Plaintiffs do not want to confront or deal with the risk that the water in their neighborhood and their home is dangerous and putting them and their family, children, and guests at risk, and have been unfairly forced by Defendants to think about this every day, which is causing Plaintiffs severe mental anguish.

274.    Moving would cause significant hardship to Plaintiffs and their young children. Plaintiffs would also incur significant expenses by having to uproot themselves and move to a comparable home in a comparable community.

275.    With respect to Plaintiffs' private well, the Pipeline Leak has caused irreparable damage to Plaintiffs' faith in their ability to fully use and enjoy their water.

**Exhibit B_Page 373 of 583**

276. Plaintiffs' well water has already tested positive for MTBE and lead above background concentration levels and Plaintiffs are awaiting additional testing results.

277. Like each of the other residents throughout Mt. Eyre Manor, Plaintiffs now also live above a contaminated aquifer that continues to migrate and further contaminate the groundwater, soil, and air. This contaminated aquifer constitutes a presently existing physical harm to Plaintiffs' real property.

278. Defendants' own inferences about the composition of the fractured bedrock beneath Plaintiffs' property indicate that a pathway for groundwater flow exists that runs from 121 Glenwood Drive, the site of the Leak, directly through Plaintiffs' property.

279. Plaintiffs are directly within the zone of danger presented by the Leak given that their property at 114 Spencer is located directly in between properties with confirmed free petroleum product or LNAPL found in wells (such as 110 and 108 Spencer). Indeed, it is difficult to reach any inference other than that Defendants' petroleum product contaminated and traveled through or below Plaintiffs' land to reach these other contaminated properties.

280. Additionally, Plaintiffs and their neighbors on Spencer Road live directly above the trench for the former 8-inch version of the Pipeline. To the extent the existence of this alternate trench has contributed to the direction the plume has traveled, Defendants' petroleum product traveled directly through Plaintiffs' land.

281. It will always be on the forefront of Plaintiffs' minds that the plume of the Pipeline Leak could affect their property at any time, or that the Pipeline could leak again at any point in time, and/or that the Pipeline could have additional undiscovered leaks, and so Plaintiffs could be putting the health of their family, children, friends, guests, and pets at risk merely by continuing to live at 114 Spencer Road.

282.　Worsening the situation, Defendants have begun buying residential homes in the Mt. Eyre Manor neighborhood, starting with 108 Spencer Road which is only two houses away from Plaintiffs' home, for the purpose of drilling additional monitoring and/or recovery wells as a direct result of the Pipeline Leak. These activities by Defendants are a nuisance to Plaintiffs and Class members in the neighborhood and are interfering with their use and enjoyment of their property, as well as further depreciating the affected geographic area.

283.　Defendants' activities at 108 Spencer Road became an epicenter for noisy, odorous, and highly bothersome activity that will disturb and disrupt the daily lives of the Plaintiffs and Class members, all as a result of Defendants' Pipeline Leak:



284.　Defendants are currently attempting to purchase additional homes in the Mt. Eyre Manor neighborhood to conduct monitoring and recovery activities with respect to the Pipeline Leak, which (while perhaps necessary) will further cause nuisance and further diminish the value of the neighborhood.

285.    Plaintiffs are fearful that Defendants will continue to buy additional nearby homes and that any home bought by Defendants will eventually lay vacant and be a nuisance to the community, further driving down property values.

286.    Confirming that Plaintiffs and the proposed Class have suffered concrete, particularized, and significant loss of property value, Defendants have recently taken affirmative steps to obscure the market impact of the diminution of value Defendants have caused. With respect to at least one property in Mt. Eyre Manor that is currently for sale, Defendants have acquired a "right of first option and right of rejection" over the property, defined as follows:

> This property is subject to a right of first option and right of rejection held by Sunoco Pipeline L.P. ("SPLP"). Under this agreement, if the Seller receives a bona fide offer to purchase the property, the Seller must notify SPLP of the terms of the offer. If the offer is below a certain price SPLP shall then have the right to (i) direct the Seller to reject the offer; or (ii) make an offer to purchase the Property for an amount greater than the amount contained in the offer. If the offer is above a certain price, SPLP shall only have the right to make an offer to purchase the Property for an amount greater than the amount contained in the offer. SPLP has two (2) business days from receipt of the offer or any counter-offer to exercise its rights. SPLP's rights under this agreement are valid until January 19, 2026. Note that nothing in the agreement prevents a counter-offer(s) from the original offeror.

While the full contours of the agreement are unclear because they reference an unspecified "certain price" against which offers are compared, Defendants' right to *unilaterally* "direct the Seller to reject" any offer below that price—a right Defendants undoubtedly paid the subject homeowner for—could be used by Defendants in an attempt to mask the true current market value of the property. That Defendants were willing to pay to acquire this right confirms that significant, quantifiable diminution of value has taken place throughout Mt. Eyre Manor and the surrounding neighborhoods.

287.    Additionally, Defendants have installed recovery wells in the street on Glenwood Drive, which is one of the roads Plaintiffs use to access their home. The installation and use of

these wells, which are less than 500 feet from Plaintiffs' property, have created yet another epicenter for noisy, odorous, and highly bothersome activity that will disturb and disrupt the daily lives of the Plaintiffs and Class members, as Defendants use heavy machinery, like sonic and air rotary drill rigs, producing sound levels up to 99 decibels:



288.    While installation of some recovery wells is likely necessary given the magnitude of the Leak, Defendants have inexplicably chosen to drill such wells to a depth of only 70 feet, even though the contamination to date suggests that petroleum product exists deeper underground.

289.    Moreover, Defendants have failed to delineate the scope and direction of the plume. While Defendants have now placed these recovery wells in the neighborhood, including in the middle of Glenwood Drive, they have begun these efforts despite not having installed proper monitoring wells. Indeed, while Defendants have stated that they intend to ultimately install eight

60

monitoring wells, they did not reveal their proposed location until yesterday, June 3, 2024, and seemingly plan to inappropriately limit their depths to just 70 feet, despite possible pathways for contaminants to migrate along much deeper fractures. The proposed locations of the monitoring wells confirm that even Defendants understand there is contamination and a grave risk of ongoing contamination both at Plaintiffs' property (114 Spencer Road, next to one of the two proposed well locations on Spencer Road) and throughout the community:



290.    Defendants have also relied heavily on electrical resistivity imaging ("ERI") to determine where the contamination may be by identifying inferred fractures. However, the validity of the inferred fractures is highly questionable. Interpretation of fractures within bedrock from ERI models are commonly based on low resistivity features in the bedrock (because fractures within bedrock typically contain more water than surrounding rock and, therefore, conduct electricity relatively better). Interpreting low resistivity zones in bedrock as fractures may be appropriate if

61

data quality is good and there is no infrastructure (such as buried metallic pipes) distorting the data. However, as is common in urban or suburban settings, the ERI models collected in the Mt. Eyre Manor neighborhood show numerous "low resistivity anomalies" that are consistent with the anomalies produced by buried metallic pipes or electrically grounded equipment/powerlines. Based on the limited public data available, a number of these anomalies have wrongly been interpreted as inferred fractures based on utility interference.

291.    For the reasons alleged herein, Defendants' Pipeline Leak has devastated the Mt. Eyre Manor neighborhood and surrounding affected communities. While Defendants have publicly accepted responsibility for the Pipeline Leak, they have not accepted their corresponding responsibilities to compensate Plaintiffs and Class members for all the harms that they have suffered as a direct result of Defendants' conduct.

## CLASS ACTION ALLEGATIONS

292.    Plaintiffs bring the class action allegations in this Complaint for all environmental restoration and remediation, economic losses suffered by Plaintiffs and Class members, medical monitoring, injunctive relief, and declaratory relief.

293.    Plaintiffs bring this action on behalf of themselves and on behalf of the following Class pursuant to Pennsylvania Rules of Civil Procedure 1702, 1708 and 1709:

> All Pennsylvania citizens who owned, rented, and/or resided in real properties in Pennsylvania within a one mile radius of 121 Glenwood Drive, Washington Crossing, Pennsylvania (40.271265, -74.876153), as represented in Figure 3 below, during the time period from September 1, 2023 to the present (the "Class").

**Exhibit B_Page 379 of 583**



Figure 3.

294.    Excluded from the Class are Defendants and their subsidiaries or affiliated entities, as well as any individuals who resided at the following addresses in Upper Makefield Township since September 1, 2023: 121 Glenwood Drive; 128 Glenwood Drive; 128 Walker Road; 105 Spencer Road; 107 Spencer Road; and 108 Spencer Road.

295.    Plaintiffs reserve the right to further define and modify the definition of the Class following further factual investigation and discovery.

296.    **Numerosity.** Members of the Class are so numerous that joinder is impracticable. Plaintiffs estimate there are at least one thousand members of the Class. As such, a class action is superior to other methods of adjudication due to its capacity for efficiency and judicial economy.

297.    **Typicality.** Plaintiffs' claims for environmental restoration and remediation, economic damages, medical monitoring, injunctive relief, and declaratory relief are typical of the

**Exhibit B_Page 380 of 583**

claims of the Class members. Plaintiffs and all Class members have been damaged by the same wrongful conduct by Defendants.

298.    Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiffs coincide with, and are not antagonistic to, those of the Class. Accordingly, and by proving their own claims, Plaintiffs will prove other Class members' claims as well.

299.    **Adequacy of Representation.** Plaintiffs are members of the Class. Plaintiffs are represented by the undersigned counsel who are experienced and competent in the prosecution of class actions involving chemical/toxin contamination. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiffs can and will fairly and adequately represent the interests of the Class and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

300.    **Commonality and Predominance.** There are numerous questions of law and fact common to the Class that predominate over any individual issue, including, but not limited to:

a.    Whether Defendants' conduct as alleged herein violates the law as stated in the Causes of Action set forth below that are applicable to the Plaintiffs and the Class;

b.    Whether Defendants owed a duty to the Class;

c.    Whether Defendants breached any duties owed to the Class;

d.    Whether Defendants were negligent and/or reckless in failing to properly and safely oversee the operation, supervision, maintenance, monitoring, and testing of the Pipeline;

e.    Whether Defendants allowed a release of toxic and hazardous substances from the Pipeline into the underlying bedrock and aquifer under where the Pipeline Leak occurred or within the plume area of the Pipeline Leak;

f.    Whether the release or threat of release of toxic and hazardous substances from Defendants' Twin Oaks Pipeline reduced or diminished the value of the Class members' real property;

g.    Whether the release or threat of release of toxic and hazardous substances from Defendants' Twin Oaks Pipeline deprived the Class of the rights to use and benefit from their real property interest, free of interference; and

h.    The appropriate measure of restitution and/or measure of damages to the Class members.

301.    The questions of law and fact common to the Class predominate over any questions of law that may affect only individual class members, because Defendants acted on grounds generally applicable to the entire Class.

302.    **Superiority**. Class treatment is a superior method for the fair and efficient adjudication of the economic damages associated with this controversy because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a similar forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense. The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that likely would be impracticable to pursue individually, substantially outweigh any difficulties that may arise in the management of the class aspects of this action.

## CAUSES OF ACTION

303.    All of Plaintiffs' causes of action, whether asserted individually or on behalf of the Class, are brought against all Defendants.

## COUNT I
## NEGLIGENCE
### (Individually and on Behalf of the Class)

304.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

305.    Defendants' actions as alleged herein were negligent.

306.    Defendants are responsible for owning, overseeing, operating, supervising, and maintaining the Twin Oaks Pipeline, and are responsible for its safe operations, including, without limitation, by incorporating an appropriate monitoring and leak detection system.

307.    Defendants failed to use reasonable care in the oversight, operation, maintenance, hiring, monitoring, and repair of the Twin Oaks Pipeline and continued to transport hazardous and toxic substances through the Pipeline without ensuring that it was operating in a safe condition.

308.    Defendants failed to use reasonable care in responding to multiple odor complaints over a period of at least 16 months and detecting whether a leak in the Pipeline had occurred.

309.    Defendants failed to use reasonable care in identifying the scope of the Leak or of the resulting pollution plume once the Pipeline Leak had been identified.

310.    Defendants failed to use reasonable care to contain the plume and resulting damages caused by the Pipeline Leak.

311.    Defendants failed to use reasonable care in employing a safe and reliable monitoring and leak detection system with respect to the Pipeline.

312.    Defendants knew or should have known that their failure to properly operate, maintain, and repair the Pipeline, and to respond to the Pipeline Leak, would allow the release of dangerous and toxic substances into the environment in a residential neighborhood, and, as a result, contaminate the environment and cause the residents of the affected geographic area to suffer damages as alleged herein.

**Exhibit B_Page 383 of 583**

313.    Defendants knew or should have known that their failure to exercise reasonable care in responding to the Pipeline Leak would impede the ability of regulators and affected residents to understand the scope of the danger and to effectively mitigate its impacts.

314.    Defendants' negligence was a substantial factor in bringing about real and personal property damage, environmental contamination, economic losses, and diminution of property values, to Plaintiffs and the Class members.

315.    Defendants' negligence was a substantial factor in bringing about physical personal injury and emotional distress and anxiety to Plaintiffs individually. Plaintiffs' claims for emotional distress damages are brought individually on behalf of Plaintiffs.

316.    Defendants' negligence was a substantial factor in bringing about the need for medical monitoring for residents affected by the Pipeline Leak.

317.    Defendants' breaches as described herein demonstrate an extreme departure from the standard of care for ensuring the safe operation of a hazardous liquids pipeline.

318.    Defendants' efforts to prevent the Pipeline Leak and to respond to the Pipeline Leak once identified, as alleged herein, including but not limited to Defendants' misrepresentations as to the amount of product lost and the continuing safety of the Pipeline, demonstrate a gross failure to exercise even scant care with respect to the safety of nearby residents and their property.

319.    The actions of Defendants as set forth herein also constitute negligence per se.

320.    Defendants had a duty to comply with numerous statutes and regulations designed to prevent a public harm and failed to do so. The statutes that Defendants did not comply with include, without limitation, 35 P.S. § 691.401 (Clean Streams Law), and 49 U.S.C. § 60101 *et seq.* (Pipeline Safety Act).

67

**Exhibit B_Page 384 of 583**

321. The purpose of the Pennsylvania Clean Streams Law is the "prevention and elimination of water pollution" in order to promote the "economic future of the Commonwealth." 35 P.S. § 691.4.

322. Defendants breached their duty under the Clean Streams Law when they allowed the discharge of toxic substances from the Pipeline into the waters of the Commonwealth. 35 P.S. § 691.401.

323. The purpose of the Pipeline Safety Act, and of regulations promulgated pursuant to the Act, is to "provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities." 49 U.S.C. § 601012(a). The Secretary of Transportation promulgates minimum safety standards pursuant to the Act, which apply to any and all owners and operators of pipeline facilities. *Id*.

324. Defendants breached their duties under the Pipeline Safety Act when they failed to comply with the minimum safety standards proscribed by the Secretary of Transportation pursuant to the Act. Specifically, Defendants' breaches include, without limitation, the fact that they: (a) failed to maintain an effective system for detecting leaks in violation of 49 C.F. R. § 195.444; (b) failed to take measures necessary to prevent and mitigate the consequences of a pipeline failure that could affect a high consequence area in violation of 49 C.F.R. § 195.452; and (c) failed to detect conditions that could adversely affect the safe operation of the Pipeline within 72 hours of an extreme weather event in violation of 49 C.F.R. § 195.414.

325. The purposes of the aforementioned statutes are to protect the interests of Plaintiffs and the Class.

326. As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs and the Class members have suffered damages as alleged herein.

68

**Exhibit B_Page 385 of 583**

**COUNT II**
**STRICT LIABILITY – ABNORMALLY DANGEROUS**
**OR ULTRAHAZARDOUS ACTIVITY**
**(Individually and on Behalf of the Class)**

327. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

328. Defendants' actions as alleged herein constitute an abnormally dangerous and/or ultrahazardous activity.

329. Defendants' transportation of petroleum products through a pipeline that was poorly reinforced by thirty-year old A sleeves involves a high degree of risk and the exercise of reasonable care cannot eliminate the risk inherent in operating the Pipeline.

330. Defendants' transportation of petroleum products was solely for Defendants' business purposes.

331. Defendants knew and understood that there was a high risk that their petroleum products and other chemicals, toxins, and particulates could contaminate the environment of the nearby neighborhoods, including the risk of contaminating the only source of clean water for residents, and, thereby, cause residents to suffer personal injuries, property damage, environmental contamination, economic losses, diminution of property value, the need for medical monitoring, and other harms as fully alleged herein.

332. Defendants' transportation of petroleum products, toxins, and particulates through a pipeline that was poorly reinforced by thirty-year old A sleeves caused serious harm to Plaintiffs' and Class members' persons, chattel, and property, including both real and personal property, as alleged herein.

333. As such, Defendants are strictly liable to Plaintiffs and the members of the Class.

334. As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff and the Class have suffered damages as alleged herein.

**Exhibit B_Page 386 of 583**

## COUNT III
### PUBLIC NUISANCE
### (Individually and on Behalf of the Class)

335.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

336.    Defendants' conduct constitutes a public nuisance pursuant to 35 P.S. 691.401.

337.    Specifically, the discharge of toxic substances, odors, and gases from the Twin Oaks Pipeline as alleged herein into underlying bedrock and aquifer, as well as to groundwater, air, soil, private wells, homes, and other property, have caused particular injuries to Plaintiff and the Class as alleged herein.

338.    Plaintiffs and the Class are entitled to damages as a result thereof.

## COUNT IV
### PRIVATE NUISANCE
### (Individually and on Behalf of the Class)

339.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

340.    Defendants' conduct allowed toxic substances to invade the private use and enjoyment of Plaintiffs' land and property.

341.    Defendants' conduct allowed offensive odors and gases to invade and disrupt the private use of Plaintiffs' land and property.

342.    The invasion of Plaintiffs' land by Defendants' product, toxic substances, and resulting odors was the foreseeable and proximate result of Defendants' negligent and reckless conduct.

343.    Plaintiffs have suffered injury to the use and enjoyment of their home due to the presence of toxic substances in the water and soil on Plaintiffs' land and the substantial risk of the future presence of such substances.

344.    Plaintiffs are entitled to damages as a result thereof.

Exhibit B_Page 387 of 583

## COUNT V
## TRESPASS
### (Individually and on Behalf of the Class)

345. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

346. Defendants' conduct caused their hazardous and toxic product to intrude into the water and onto the land of Plaintiffs' property. Defendants further failed to take actions to identify the scope of the intrusion and to remove their product from Plaintiffs' property.

347. Defendants knew or should have known that their failure to maintain safe operations of the Twin Oaks Pipeline and to effectively investigate odor complaints for possible leaks would result in the intrusion of their product on Plaintiffs' property.

348. Defendants' failure to identify and remove their product from Plaintiffs' property after being made aware of the intrusion constitutes a separate and continuing trespass.

349. Plaintiffs are entitled to damages as a result thereof.

## COUNT VI
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Individually)

350. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

351. Defendants' conduct negligently inflicted emotional distress on Plaintiffs.

352. Defendants owed Plaintiffs a duty of care to ensure that they did not suffer from serious emotional distress and mental anguish.

353. Defendants breached their duty to Plaintiffs by both their actions and inactions.

354. As a direct and proximate result of Defendants' breach, Plaintiffs have suffered severe emotional injury.

355. As a result, Plaintiffs have been damaged as alleged herein.

## COUNT VII
## MEDICAL MONITORING
### (Individually and on behalf of the Class)

356.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

357.    Plaintiffs and their children were significantly exposed to toxic and hazardous substances, and they bear a substantial risk of future exposure to such substances because of Defendants' repeated failures to prevent the discharge of the same substances into Plaintiffs' soil, water, and property (both real property and personal property).

358.    The exposure to these dangerous substances is such that Plaintiffs and their children have been placed at an increased risk of contracting latent illness and disease, including but not limited to cancer and other serious diseases and illnesses, and as such requires medical monitoring which Defendants are responsible for providing and paying for.

359.    Monitoring and testing procedures exist for cancer and other diseases and illnesses associated with exposure to the aforementioned hazardous substances, making the early detection and treatment of the diseases possible and beneficial.

360.    Additionally, Defendants have publicly admitted that they are liable for medical monitoring and have committed to providing medical monitoring in response to the Leak.

361.    As a result, the Court should establish a Court-supervised and administered trust fund and medical monitoring regime to compensate Plaintiffs for their economic damages.

### PRAYER FOR RELIEF

362.    Plaintiffs and Class members seek the following relief:

    a.    All compensatory damages and other damages as alleged herein;

    b.    Medical monitoring for Plaintiffs and the Class members;

    c.    Punitive damages where allowable;

72

d.      Pre- and post-judgment interest as allowed by law;

e.      A declaratory judgment that Defendants are responsible for the Pipeline Leak, and responsible for all past and future costs to fully restore and remediate all environmental and other harms caused by Defendants to Plaintiffs and the Class;

f.      Attorneys' fees and costs pursuant to any applicable statutes and/or regulations;

g.      Equitable and injunctive relief including:

i.      Notice to all affected persons of the Pipeline Leak and potential dangers and risks presented by the Pipeline Leak;

ii.      The enjoinment of further operations of the Twin Oaks Pipeline until Defendants are able to fully guarantee its safe operation;

iii.      Provision of full water supply for all homes in the Class;

iv.      Provision of temporary housing and all associated costs to those who reasonably request it as a result of the Pipeline Leak;

v.      Installation of a best-in-class leak detection system for the Twin Oaks Pipeline that can actually detect – and guarantee that it will detect – problems in real time;

vi.      Full restoration and remediation of all environmental contamination including but not limited to groundwater, soil, and air, to background concentrations; and

h.      All other relief this Court deems necessary, just and proper.

**DEMAND FOR TRIAL BY JURY**

363.      Plaintiffs hereby demand a jury trial for all claims so triable.

73

Dated: June 4, 2025

Respectfully submitted,


_/s/ Shanon J. Carson_____
Shanon J. Carson (Bar No. 85957)
Y. Michael Twersky (Bar No. 312411)
Joseph E. Samuel, Jr. (Bar No. 327645)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: 215-875-4656
Email: scarson@bm.net
Email: mitwersky@bm.net
Email: jsamuel@bm.net

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this day a true and correct copy of the foregoing was filed with the Court's ECF system, which served all counsel of record.

Dated: June 4, 2025                         Respectfully submitted,


                                            */s/ Shanon J. Carson*_____
                                            Shanon J. Carson

# EXHIBIT A



Photo by Ohio EPA

GREENPEACE
Reports

WATERKEEPER® ALLIANCE

# Oil and Water: ETP & Sunoco's History of Pipeline Spills

**Greenpeace USA and Waterkeeper Alliance**

# Contents

○ Summary Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

○ Energy Transfer Partners and Sunoco Have a History of Spills from Existing Pipelines . . . 4

   + Company History and Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   + Leaky Pipes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   + Dakota Access Pipeline & Bakken Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   + Federal Violations and Fines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   + Consequences of Pipeline Spills . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

○ Energy Transfer Partners and Sunoco Spills, Fines and Stop Work Orders
During Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

   + Rover . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

   + Mariner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

○ U.S. Pipeline Spill Trends . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

○ Future Threats to Water . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

   + Bayou Bridge Pipeline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

   + Permian Express . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

○ Acknowledgments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

○ Endnotes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

○ Appendix A: Research Methods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

○ Appendix B: ETP & Sunoco, PHMSA Violations & Penalties . . . . . . . . . . . . . . . . . . . . . . 18

○ Appendix C: Energy Transfer Partners' Rover Pipeline Violations &
Spills in Michigan, Ohio & West Virginia, February 2017–March 2018 . . . . . . . . . . . . . . . 18

## List of Figures

○ Number of pipeline incidents, by year and corporate entity . . . . . . . . . . . . . . . . . . . . . . . . 5

○ The spill sizes and locations of ETP's ten largest hazardous liquids
pipeline spills from 2002 to present . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

○ Timeline of ETP spills impacting water, soil, wildlife or high-consequence areas . . . . . . . . 7

○ Ten year trends for significant U.S. pipeline incidents involving crude oil,
refined petroleum products, and highly-volatile liquids . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**AUTHORS**

Timothy Donaghy,
*Greenpeace USA*

Donna Lisenby,
*Waterkeeper Alliance*

**DESIGNED BY**

Jacob Hardbower

Alyssa Hardbower

**COVER PHOTO**

Workers at a spill site on Rover
Pipeline in Stark County, Ohio.
April 2017. Photo courtesy
of the Ohio EPA.

**PUBLISHED**

April 17, 2018



Reports

**Greenpeace Inc.**

**702 H Street, NW, STE 300,
Washington, D.C. 20001**



**Waterkeeper Alliance**

**180 Maiden Lane, Suite 603,
New York, NY 10038**

Published online at www.greenpeace.org/usa/reports/oil-and-water/

# Summary Results

- From 2002 to the end of 2017, ETP, Sunoco and their subsidiaries and joint ventures reported **527 hazardous liquids pipeline incidents** to federal regulators — approximately one incident from existing facilities every eleven days.

- Those incidents, reported by the Pipeline Hazardous Material Safety Administration (PHMSA), released a **total of 87,273 barrels** (3.6 million gallons, or about five-and-a-half Olympic-sized swimming pools) of hazardous liquids, including 66,515 barrels (2.8 million gallons) of crude oil.

- In addition, state regulatory agencies have documented spills totaling at least 2.4 million gallons of drilling fluids, sediment and industrial waste during the construction of just two ETP pipelines in Michigan, Ohio, Pennsylvania and West Virginia.

- Crude oil spills made up 408 of the PHMSA incidents, along with 92 refined petroleum product spills and 27 highly-volatile liquid (HVL), flammable or toxic spills.

- Of the hazardous liquid spills from existing facilities **101 incidents** were of 50 barrels or more (2100 gallons, a volume which is considered "significant" by the federal regulator).

- 67 of the hazardous liquid incidents were reported to have contaminated water, of which **18 incidents contaminated groundwater.**

- These spills caused an estimated **$115 million in property damage**, and led to 106 Notices of Probable Violations, and **$5,675,870 in penalties from PHMSA alone**.

- The largest spills in the PHMSA database were crude oil spills of 436,000, 361,000, 290,000, 189,000, 153,000, 143,000, 139,000, and 105,000 gallons, and 2 HVL spills of 168,000 and 121,000 gallons.

- In addition, state agencies and the Federal Energy Regulatory Commission (FERC) have issued over 100 notices of violation and/or non-compliance for the construction of the Rover and Mariner pipelines. In 2017–18 alone, ETP and Sunoco were issued six stop work orders by state agencies and FERC because their construction operations violated permit requirements and/or rules and regulations designed to protect streams, rivers, wetlands, drinking water, historic sites and public safety.

- The Dakota Access Pipeline (DAPL) and its southern component only began operations in 2017, but have already reported 7 incidents.

- Assuming the U.S. system-wide rate for significant crude oil spills of 0.001 per year per mile, we estimate that the Bakken Pipeline would suffer 96 significant spills and the Bayou Bridge Pipeline would suffer eight significant spills, during a 50-year nominal lifetime.

- There is no failsafe way to transport fossil fuels and pipeline spills remain a direct and seemingly unavoidable consequence of oil and gas activity.

- Rapid transition to renewable energy could dramatically reduce spills from pipelines and pollution of drinking water sources.



Pipeline for the Bayou Bridge project in Louisiana. April 2018. Photo by ©Julie Dermansky/Greenpeace

# Energy Transfer Partners and Sunoco Have a History of Spills from Existing Pipelines

Energy Transfer Partners and its complex network of subsidiaries and joint ventures owns one of the nation's largest networks of natural gas, crude oil and petroleum products pipelines. Data collected from the U.S. Pipeline and Hazardous Materials Safety Administration (PHMSA) shows that the ETP family of hazardous liquids pipelines experienced 527 incidents from 2002 to the end of 2017, spilling ~87,000 barrels, and causing an estimated $115 million in property damage.

We have mapped these incidents, spread across numerous states and regions in the U.S. where ETP operates.[1]



**View online at:** *https://greenpeace.carto.com/maps*

## Company History and Structure

Energy Transfer Partners, L.P. (ETP) was founded in 1995 by Ray Davis and Kelcy Warren (who is still its current Chairman and CEO) and became a publicly traded partnership in 2004. ETP is in turn controlled by a master limited partnership called Energy Transfer Equity (ETE), of which Warren is also the Chairman.[2]

The company's national profile was fairly small until the massive grassroots resistance to its Dakota Access Pipeline (DAPL) led by the Standing Rock Sioux Tribe was splashed across the headlines in 2016. That same year, Warren donated $100,000 to Donald Trump's presidential campaign[3] and later cut a check for $250,000 for Trump's inauguration.[4] Trump made the approval of DAPL's final permits one of his administration's first priorities upon becoming U.S. President.[5]

ETP's corporate structure is famously complicated.[6] In October 2012, ETP merged with Sunoco, Inc.,[7] a fuel refining, distribution and retail company that had been founded in 1886.[8] Prior to the merger, ETP and ETE were primarily focused on the natural gas sector, and the merger with Sunoco allowed them to diversify into "liquids" pipelines due to Sunoco's significant crude oil and refined petroleum product assets.[9] Part of this business operated as Sunoco Logistics Partners (SXL) until it fully merged with ETP in April 2017.[10] Sunoco LP (SUN) continues to exist as a downstream distributor of motor fuel.

Currently three of these entities — ETP, ETE and SUN — are publicly traded on the New York Stock Exchange. The company also boasts a number of subsidiaries and joint ventures as part of its "family" which we have attempted to reflect in this report. Including both liquids and natural gas, ETP operates more than 71,000 miles of pipelines in the U.S. — nearly long enough to encircle the earth three times.[11]

## Leaky Pipes

The PHMSA database of all U.S. hazardous liquids pipeline incidents from 2002 to present contains 6,102 reported incidents.[12] Of those incidents, 527 were associated with ETP, Sunoco, or one of their subsidiaries or joint ventures[13] — a rate of one incident occurring approximately every eleven days. These 527 incidents released a total of 87,273 barrels of hazardous liquids, of which 66,515 barrels were crude oil, and led to over $115 million in property damages according to PHMSA's records. Of the total volume spilled, 36,862 barrels (42%) were never recovered by the company. Since 2002, spills from ETP, Sunoco and subsidiaries led to proposed penalties of $5,675,870.[14]

Other reports have noted the company's poor safety reputation,[15, 16] and have analyzed PHMSA data to conclude that ETP and Sunoco's pipeline network is among the leakiest in the nation.[17, 18] In addition, Sunoco's Pennsylvania refineries were subject to a comprehensive Clean Air Act settlement, that included a $3 million civil penalty and $285 million to install emissions controls.[19]

Exhibit B_Page 397 of 583

Figure 1 shows a timeline of the 527 liquids spills, broken down by corporate entity. As can be seen from the figure, several entities in the ETP family have reported significant numbers of hazardous liquids pipeline spills, both before and after the 2012 merger. Sunoco Pipelines LP has reported 337 incidents since 2002. Also included are spills from joint ventures that Sunoco brought into the merger, notably the Mid-Valley Pipeline (76 incidents), the West Texas Gulf Pipeline (46 incidents), and the Wolverine Pipeline (11 incidents). We include all incidents from Sunoco and its subsidiaries and joint ventures in this analysis, both before and after 2012, because Sunoco brought most of the hazardous liquids assets into the merger and remains part of ETP's current pipeline network.



**Figure 1:** Number of pipeline incidents, by year and corporate entity.

Energy Transfer has reported 23 hazardous liquids incidents, all occurring after the 2012 merger. The Dakota Access Pipeline (DAPL) and its southern component (ETCO) only began operations in 2017, but have already reported 7 incidents. For full details on the incident analysis, including more information on the subsidiaries and joint ventures that were included, see Appendix A: Research Methods.

The ten largest incidents in this analysis are the following (in chronological order):

- In January 2005, the Mid-Valley Pipeline (originally constructed in the 1950s[20]) spilled **6,909 barrels** (290,000 gallons) of crude oil into the Kentucky and Ohio Rivers, leading to an oil slick 17 miles long and harming hundreds of migratory birds. The federal government later reached a $2.57 million settlement with Sunoco.[21]

- In November 2005, operator error led to a **10,380 barrel** (436,000 gallon) crude oil overflow at Sunoco Pipeline LP's Darby Creek Tank Farm in Sharon Hill, Pennsylvania. The spilled oil was contained by a dike, and PHMSA later fined Sunoco $150,000.[22]

- In October 2008, the Mid-Valley Pipeline spilled again, this time releasing **3,650 barrels** (153,000 gallons) into "the sanitary sewer system and nearby Gunpowder Creek" in Florence, Kentucky.[23]

- In June 2009, a portion of the West Texas Gulf Pipeline near Colorado City, Texas caught fire and spilled **3,416 barrels** (143,000 gallons) of crude oil. PHMSA later fined Sunoco Pipeline LP $415,000.[24]

- In August 2009, Sunoco Pipelines spilled **2,500 barrels** (105,000 gallons) of crude from a station near Mont Belvieu, Texas. The U.S. EPA eventually reached a $850,000 settlement for Clean Water Act violations related to this spill and a later 2011 spill of 1,742 barrels (73,000 gallons) in Cromwell, Oklahoma.[25]

- In October 2014, the Mid-Valley Pipeline experienced yet another major incident, spilling **4,509 barrels** (189,000 gallons) and contaminating a ten-mile section of Tete Bayou near Mooringsport, Louisiana.[26]

- In June 2015, a "gasket failure" on the West Texas Gulf Pipeline near Wortham, Texas led to a release of **3,300 barrels** (139,000 gallons) of crude that was contained in two retention ponds on company property.

- In August and September 2016, Sunoco's Permian II Express pipeline leaked **8,600 barrels** (361,000 gallons) near Sweetwater, Texas. The incident led to a Corrective Action Order, and followed a fine from federal regulators for welding violations on the same project.[27]

- In addition to crude oil spills, ETP pipelines suffered large spills of highly-volatile liquids (HVL)[28] of **2,880 barrels** (121,000 gallons) in 2012 near Midland, Texas and **3,992 barrels** (168,000 gallons) in 2014 near Ira, Texas.



**Figure 2:** The spill sizes and locations of ETP's ten largest hazardous liquids pipeline spills from 2002 to present. Gray represents crude oil spills, while yellow are HVL spills. (Data: PHMSA)

Further details on other ETP/Sunoco pipeline incidents can be found in a report by Waterkeeper Alliance, including information on worker lawsuits, failure to report problems, and additional significant pipeline incidents in Pennsylvania, Ohio, and Texas.[29]

**Exhibit B_Page 398 of 583**

Although it is not the main focus on this report, PHMSA also maintains data regarding ruptures and leaks from natural gas gathering, transmission and distribution pipelines. ETP and its subsidiaries reported **58 natural gas incidents** to PHMSA from 2002 to present. Natural gas pipeline leaks present a different range of risks from hazardous liquids leaks, including the risk of an explosion. Methane leaking from the U.S.'s rapidly growing natural gas infrastructure is also a significant climate change risk.[30]

## Dakota Access Pipeline & Bakken Project

The Bakken Pipeline consists of the 1,172 mile, 30-inch diameter Dakota Access Pipeline (DAPL), which runs from the Bakken oil fields in North Dakota to a hub in Patoka, Illinois, and the Energy Transfer Crude Oil Pipeline (ETCO), which runs 743 miles south from Patoka to Nederland, Texas.[31] The DAPL segment was built across Sioux lands designated under the 1851 Fort Laramie Treaty and crosses the Missouri River near Lake Oahe, just north of the Standing Rock Reservation.[32]

The project is a joint venture between ETP, MarEn Bakken Company LLC (Enbridge) and Phillips 66, with ETP holding a 38.25% interest.

Violations of Indigenous sovereignty, lack of adequate consultation and threats to water supplies from pipeline spills led Indigenous Water Protectors and their allies to set-up pipeline opposition camps near the river crossing. The organized pipeline opposition and the disproportional response from authorities and private security forces garnered international media attention, leading the Army Corps of Engineers to deny the needed permits in December 2016. However, the Trump Administration approved the permits and DAPL went into operation in June 2017.

Evidence suggests that environmental racism may have played a part in selecting the pipeline route. The 2015 Environmental Assessment discussed an alternate route that was rejected in part due to concerns about contamination of "wellhead sourcewater protection areas" north of Bismarck, North Dakota (a mostly white community).[33] Yet the approval of the route passing near the reservation led the Standing Rock Sioux Tribe to file a lawsuit alleging violations of the National Historic Preservation Act, the Clean Water Act, and the National Environmental Policy Act.[34]

In addition to the risk of pipeline spills into water, the EA identified impacts from horizontal directional drilling (HDD) used to tunnel the pipeline under rivers, including the risk of "inadvertent release of drilling fluid directly or indirectly into the waterbody" — a risk that has been realized during the construction phases of other ETP/Sunoco projects.

Although the pipeline only became fully operational in 2017, DAPL-ETCO has already reported 7 pipeline incidents to PHMSA, of which 4 occurred along the DAPL portion, and the largest of which was a significant 119 barrel (4,998 gallon) spill from the ETCO segment near Dyersburg, Tennessee. A related eighth incident occurred in March 2017 on a DAPL feeder line owned by Caliber Midstream, but is not included in this analysis.[35]

Assuming the U.S. system-wide rate for significant crude oil spills of 0.001 per year per mile, we estimate that the Bakken Pipeline would suffer 96 significant spills during a 50-year nominal lifetime.

## Federal Violations and Fines

PHMSA conducts annual inspections to determine whether pipeline operators are in compliance with federal rules designed to protect the public, drinking water sources and ensure safe operation of pipelines and their associated infrastructure. These routine inspections find violations that could lead to a spill or a safety problem. When federal inspectors find serious issues, they issue Notices of Proposed Violations, Proposed Compliance Orders and/or Proposed Civil Penalties. Since 2002, PHMSA has issued Energy Transfer Partners and Sunoco 106 violations and fined them $5,675,870.[36] Their safety violations include:

- Failures to inspect crossings under waterways, valves and pipeline rights of way.
- Failures to notify PHMSA of a spill, fire, injuries requiring hospitalization.
- Failure to repair unsafe pipe for 5 years.
- Failures to maintain pipeline integrity in high consequence areas.
- Failure to report unsafe conditions.
- Failure to do corrosion inspection.
- Repeated failures to properly notify emergency responders and the public.[37]

## Consequences of Pipeline Spills

Depending on their characteristics, oil spills can cause significant acute and chronic impacts on ecosystems ranging over "a range of time scales, from days to years, or even decades for certain spills."[38] PHMSA collects information on whether pipeline spills have contaminated soil or water resources, impacted wildlife, or occurred in "high-consequence areas" (HCAs) such as population centers or navigable waterways (see Figure 3).

Of the 527 incidents attributed to ETP, Sunoco, their subsidiaries or joint ventures:

- **67 incidents** (12.7%) were reported to have contaminated water resources. Across the entire PHMSA database, 615 incidents (10.0%) contaminated water resources.

- Of those incidents, **18 incidents** (3.4%) were found to contaminate groundwater. Nationally, there were 207 pipeline spills contaminating groundwater (3.4%).

- And **3 incidents** (0.6%) were found to contaminate drinking water resources specifically. Nationally, there were 8 total incidents (0.1%) contaminating drinking water.

- **275 incidents** (52.5%) contaminated soils.

- **189 incidents** occurred in or reached "high consequence areas."

- From 2010–present, there were **6 incidents** that impacted wildlife. One of these was a spill of 450 barrels in March 2014, from the Mid-Valley Pipeline, that contaminated the Oak Glen Nature Preserve near Colerain, Ohio,[39] closing the preserve and leaving at least 36 animals in need of treatment for contamination.[40]

- From 2002 to 2009, there were **3 incidents** that impacted fish and **2 incidents** that impacted birds.



**Figure 3:** Timeline of ETP spills impacting water, soil, wildlife or high-consequence areas.

A 2010 editorial from a Philadelphia-area newspaper lamented the consequences of Sunoco's local safety record and noted that repeated violations "will only be stopped when the nation's environmental protection laws finally grow some teeth. In the meantime, Delaware County residents must be satisfied with apologies and the prospect of ill health or injury from another industrial disaster."[41]



Pipeline construction for Bayou Bridge continues near homes in Louisiana. April 2018. Photo by ©Julie Dermansky/Greenpeace

Exhibit B_Page 400 of 583

# Energy Transfer Partners and Sunoco Spills, Fines & Stop Work Orders During Construction

In addition to past spills from existing pipelines, ETP/Sunoco pipeline projects currently under development have been plagued with environmental violations. The construction of the Mariner and Rover pipelines in Michigan, Ohio, Pennsylvania and West Virginia has resulted in over 2.4 million gallons of spills, over 100 notices of violations and other non-compliance issues, and 6 stop work orders. These new pipelines have faced growing resistance from local communities and decision makers concerned about the long history of non-compliance and pollution of drinking water sources, trout streams, wetlands and rivers.

## Rover

ETP's Rover Pipeline is a 713-mile natural gas pipeline designed to transport 3.25 billion cubic feet of gas per day from the Utica and Marcellus shale production areas in West Virginia, eastern Ohio, and western Pennsylvania westward through Ohio and into Michigan.[42] In an ominous foreshadowing, ETP started getting into trouble before construction even started. Despite promising to "avoid adverse effects," ETP destroyed the historic 170-year old Stoneman House in Dennison, Ohio that was eligible for listing in the National List of Historic places. The

Federal Energy Regulatory Commission used the demolition of the historically significant site as a basis for denying Rover a blanket construction permit, saying "Rover could not be relied upon to comply with the environmental regulations."[43]

With that restriction, FERC approved the project in February 2017, and Energy Transfer began an aggressive effort to construct the pipeline as quickly as possible. In its haste, ETP repeatedly contaminated waterways across Michigan, Ohio and West Virginia. One August 2017 analysis concluded that Rover had "racked up more environmental violations than other major interstate natural gas pipelines built in the last two years" – a total of 104 non-compliance incidents while the second highest company only had 26 non-compliance incidents. [44]

By March 2018, after only 13 months of construction, Rover had spilled more than 2.2 million gallons of drilling fluids, industrial waste and/or sediment, amassing more than 100 violations/non-compliance incidents and 4 stop work orders for their failure to comply with environmental regulations designed to protect streams, rivers wetlands, drinking water, historic sites and public safety (see pages 9–10 for a selection of these violations, citations for these incidents are listed in Appendix C).



Horses play in a field near construction of the Bayou Bridge pipeline in Louisiana. April 2018. Photo by ©Julie Dermansky/Greenpeace

## Worst Rover Pipeline Violations/Spills/Stop Work Orders April 2017–March 2018

1. **April 5, 2017:** Unauthorized pollution release impacting tributaries of Woodfield Reservoir in Monroe County, OH; failure to control stormwater

2. **April 8, 2017:** 1,000 gallons of drilling fluid pollution released into wetland near Indian Fork River, in Tuscarawas County, OH; covered 2500 square foot area of wetland

3. **April 10, 2017:** 600 gallons of drilling fluid pollution released into stream, wetland and pond in Richland Township, Belmont County, OH

4. **April 10, 2017:** unauthorized pollution release impacting tributaries of Woodfield Reservoir in Monroe County, OH; failure to control stormwater

5. **April 11, 2017:** unauthorized pollution release from failure to manage stormwater in Bloomdale, Wood County, OH

6. **April 11, 2017:** Clean Air Act violation, open burning of site preparation material near a home in Toronto, Ohio

7. **April 11, 2017:** Stormwater violations in Wood, Richland, and Crawford Counties, OH because of failure to manage vehicle tracking of drilling materials onto public roadways

8. **April 12, 2017:** unauthorized pollution release into Bull Creek in Wood County, OH; failure to control stormwater

9. **April 13, 2017:** 2 million gallons of drilling fluid pollution accumulating in high quality wetland adjacent to Tuscarawas River in Navarre Township, Stark County; covered 500,000 sq foot area of the category 3 wetland

10. **April 14, 2017:** 50,000 gallons of drilling fluid pollution released into wetland in Mifflin Township, Richland County, OH

11. **April 17, 2017:** 200 gallons of drilling fluid pollution released into a pond in Monroe Township, Harrison County, OH

12. **April 22, 2017:** 200 gallons of drilling fluid pollution released into stream in Wooster Township, Wayne County, OH

13. **April 26, 2017:** During a West Virginia DEP inspection, 7 violations are found related to Storm Water Pollution Prevention Plan (SWPPP) and stream sediment deposits.

14. **May 2, 2017:** unauthorized pollution release from failure to manage stormwater in Bloomdale, Wood County, OH

15. **May 3, 2017:** unauthorized pollution release into Brushy Fork Creek, Cadiz, Harrison County, OH - failure to control stormwater

16. **May 8, 2017:** approx. 10,000 gallons of bentonite slurry released during a pipeline installation. The drilling fluids surfaced in a pond and stream in Monroe Township, Harrison County and affected water quality.

17. **May 8, 2017:** The Ohio EPA fines ETP $431,000 for "18 incidents involving mud spills from drilling, stormwater pollution and open burning at Rover pipeline construction sites have been reported between late March and Monday."

18. **May 10, 2017:** FERC bans ETP from starting new horizontal directional drilling under waterways and roads.

19. **May 19, 2017:** ETP acknowledges heavy rain causing pipeline trenches and work spaces to fill with water and spill onto fields of Ohio farmers.

20. **May 24, 2017:** During a West Virginia DEP inspection, 6 violations are found related to Storm Water Pollution Prevention Plan (SWPPP), erosion control and stream sediment deposits.

21. **May 25, 2017:** FERC rejects ETP request to resume drilling in Captina Creek and Middle Island Creek.

22. **June 2 & 6, 2017:** During a West Virginia DEP inspection, 5 violations are found related to silt fences, erosion control and stream sediment deposits.

23. **July 2, 2017:** 5,000 more gallons of drill slurry released into a Stark County area where the company was working on a five-foot borehole that would go under the Tuscarawas River. Work was already underway to deal with a previous spill in that area.

24. **July 3, 2017:** 1,500 to 2,500 gallons of drilling mud took place at a nearby area ten feet from Tuscarawas River.

25. **July 7, 2017:** Rover Pipeline LLC pays $1.5 million to the Ohio History Connection Foundation in an effort to mitigate harm after demolishing a building they had promised not to.

**Exhibit B_Page 402 of 583**

**WORST ROVER PIPELINE VIOLATIONS/SPILLS/STOP WORK ORDERS APRIL 2017–MARCH 2018 (CONTINUED)**

26. **July 12, 2017:** During a West Virginia DEP inspection, 8 violations are found including sediment laden water depositing in nearby creeks and runs.

27. **July 13, 2017**: FERC also issues a notice of violation claiming that ETP "did not fully and forthrightly disclose all relevant information" before demolishing a historic home.

28. **July 17, 2017:** West Virginia's DEP issues a cease-and-desist order to stop work in the WV segment of the pipeline.

29. **July 28, 2017:** Pipeline drilling causes landslides in Jefferson County, Ohio. According to township trustees, it's a result of drilling near old underground mines.

30. **July 31, 2017:** Inspectors find failure to properly control erosion and incorrectly-installed sediment control devices in Hancock County, WV.

31. **August 3, 2017:** Inspectors find failure to properly control erosion and incorrectly-installed sediment control devices in Marshall County, WV.

32. **September 21, 2017:** Soap wastewater used in boring operations and soil/sediment discharged into approximately 500 feet of waterway requiring 6,000 gallons of water to be recovered by vacuum truck. OH

33. **September 26, 2017:** Approximately 30 gallons of drilling fluids discharged into waters, wetlands in Washington Township, Belmont County, Ohio.

34. **October 11, 2017:** Approx. 1200 gallons of drilling fluids discharged to waters, wetlands in Washington Township, Belmont County, Ohio.

35. **October 14, 2017:** Rover Pipeline Spills Water Allegedly Containing Gasoline Into Michigan Wetlands

36. **November 9, 2017:** Approx. 60 gallons of drilling fluids discharged to waters, wetlands in Ashland Township, Ashland County.

37. **November 14, 2017:** Approx. 30 gallons of drilling fluids discharged to waters, wetlands in Milton Township, Ashland County, Ohio.

38. **November 16, 2017:** Approx. 200 gallons of drilling fluids discharged into Black Fork Mohican River in Milton Township, Ashland County.

39. **January 17, 2018:** Rover Pipeline Spills Another 150,000 Gallons of Drilling Fluid Into Ohio Wetlands at same 4/14/2017 site.

40. **January 24, 2018:** FERC again orders ETP to halt horizontal directional drilling under the Tuscarawas River in Ohio.

41. **February 21, 2018:** Ohio EPA files a letter with FERC claiming the presence of toxic chemical tetrachloroethene at Rover's underground drilling site at the Tuscarawas River in southern Stark County.

42. **March 5, 2018:** West Virginia Department of Environmental Protection orders a second halt to construction after finding multiple water pollution violations.



Workers at a spill site on the Rover Pipeline in Stark County, Ohio. April 2017. Photo courtesy of the Ohio EPA.

## Mariner

The Mariner East Project is designed to transport natural gas liquids from the same Utica and Marcellus shale production areas, this time eastward across Pennsylvania, including to the Marcus Hook terminal on the Delaware River.[45] The first phase of the Mariner project began operations in 2014, while Mariner East 2 is scheduled to be completed in 2018. Construction of the pipeline has led to 108 "inadvertent" releases in numerous locations along the route, leading the Pennsylvania DEP to issue more than 40 violations,[46] and several reports of private water wells being impacted by construction activities.[47] Those spills have released a total of at least 200,000 gallons of drilling fluids and other liquids.[48] The Mariner 1 and Mariner 2 pipelines have been shut down twice as a result of spills, violations, sink holes and contamination of drinking water and trout streams.

The Pennsylvania DEP Administrative Order shutting down construction on January 3, 2018 itemized unpermitted and unlawful activities impacting the following trout streams classified as Class A wild trout waters, wild trout (natural reproduction) water, high quality trout stocking and designated as exceptional value waters and/or migratory fishes:

1. Hay Creek in Berks County
2. Cacoosing Creek in Berks County
3. Allegheny Creek in Berks County
4. Clover Creek in Blair County
5. Mingo Creek in Washington County
6. Shaeffer Creek in Dauphin County



Cows stand in a field near construction of the Bayou Bridge pipeline in Louisiana. April 2018. Photo by ©Julie Dermansky/Greenpeace

The 24-page order also required Sunoco to address the private water wells contaminated in Silver Lake Township "to the satisfaction of the private well owners." The order concluded by saying:

> "Sunoco's unlawful conduct… demonstrates a lack of ability or intention on the part of Sunoco to comply with the Clean Streams Law, the Dam Safety and Encroachments Act, and the permits issued thereunder. Suspension of the permits… is necessary to correct the egregious and willful violations described herein."[49]

On February 8, 2018 the Pennsylvania DEP and Sunoco executed a Consent Order and Agreement requiring the payment of a $12.6 million penalty and that Sunoco provide detailed plans to prevent future violations.[50] It was one of the largest fines ever levied by the State of Pennsylvania for violations of environmental laws.

Less than 30 days later, Mariner was shut down again in Pennsylvania due to problems during construction. On March 7, 2018, the Pennsylvania Public Utility Commission (PUC) issued an emergency order shutting down the Mariner 1 pipeline during construction of the adjacent Mariner 2 pipeline.[51] The emergency order said that allowing the continued transport of hazardous liquids through the Mariner 1 pipeline "could have catastrophic results impacting the public."[52] The PUC estimated the pipeline would be shut down 10-14 days, possibly longer if ETP/Sunoco failed to address serious safety concerns that the pipeline could be "hazardous to life, property and the environment."[53] Among the safety issues that triggered the rare emergency shut down were the formation of three large sinkholes in a densely populated area defined by PHMSA as a "high consequence area". One sinkhole was located 300 feet from rail lines carrying Amtrak and Septa passengers. Another sink hole was created 10 feet from the foundation of a house.

**Exhibit B_Page 404 of 583**

# U.S. Pipeline Spill Trends

Over the past several years, spills of crude oil and liquid petroleum products from pipelines have increased, reversing earlier improvements.[54] This trend reached its maximum in 2015 with a total of 454 reported incidents, of which 176 were classified as significant by PHMSA. These numbers dropped slightly in 2017 to 404 reported incidents (153 significant) but remained at an elevated level compared to earlier years (see Figure 4).

Similarly, a recent review by oil industry trade organizations found that pipeline incidents "impacting the public or environment" (IPE) have increased in the past 4 years.[55]



**Figure 4:** Ten year trends for significant U.S. pipeline incidents involving crude oil, refined petroleum products, and highly-volatile liquids (HVL). Data: PHMSA

The key takeaway from these statistics is that despite industry rhetoric to the contrary, there is no failsafe way to transport fossil fuels. Industry safety initiatives and an overmatched regulatory agency have been unable to eliminate the risk of spills, which remain a direct and seemingly unavoidable consequence of oil and gas activity. PHMSA employs a mere 208 inspectors who, along with 345 state inspectors, are responsible "for regulating nearly 3,000 companies that operate 2.7 million miles of pipelines, 148 liquefied natural gas plants, and 7,571 hazardous liquid breakout tanks."[56] The oil industry also has one of the highest rates of severe workplace injury among its workers.[57]

Over the past decade, hazardous liquid pipeline spills in the U.S. have led to 16 fatalities, 30 injuries, $2.7 billion in costs, and over 825,000 total barrels spilled (34.7 million gallons, or around 9,500 gallons every day).[58] Common causes of pipeline spills include equipment failures, corrosion, operator error, material or welding failures, and excavation damage.[59]

Significant pipeline spills in recent years include Enbridge's 2010 spill into the Kalamazoo River,[60] Exxon's 2013 Pegasus pipeline spill in Mayflower, Arkansas, two spills into the Yellowstone River in 2011 and 2015,[61] and the 2015 pipeline rupture that closed a Santa Barbara beach.

These pipeline spills are in addition to spills from oil wells, disposal sites, and other oil and gas infrastructure, both onshore and offshore.[62] Of total spills from all sources in 2015, a recent analysis found that 640 spills affected groundwater or surface water in some way.[63]

From 2007 to 2016, U.S. crude oil pipelines have averaged 0.001 significant incidents and 0.57 barrels spilled per year per mile of pipeline. Refined petroleum product pipelines have averaged 0.0007 significant incidents and 0.24 barrels spilled per year per mile, and HVL pipelines have averaged 0.0005 significant incidents and 0.53 barrels spilled per year per mile.



Activists make their "People Over Pipelines" message known at a march in Washington, DC. Photo by ©Jordan Hetrick/Greenpeace

Exhibit B_Page 405 of 583

# Future Threats to Water

## Bayou Bridge Pipeline

Oil and pipeline companies have devastated the Gulf coast and the Atchafalaya Basin, harming some of the most amazing ecosystems on Earth, putting millions of people at greater risk of flooding.[64] The Bayou Bridge pipeline is a great example of what is wrong with pipeline construction in Louisiana. It will traverse over, under or through the Calcasieu River, Mermentau River, Vermilion River, Bayou Teche, West Atchafalaya Basin Levee, Atchafalaya River Basin and multiple bayous that provide unique habitat for many rare species. There is pending litigation arguing that the existing corridor being used to place the Bayou Bridge Pipeline is already out-of-compliance with permits issued for prior pipeline projects. In the same litigation, opponents argue that another existing pipeline in the Atchafalaya Basin co-owned by Energy Transfer Partners is also out of compliance with a previously-issued permit.[65] Disposal of dredged material during the construction of these earlier pipelines led to the creation of spoil banks which have been found to cause serious disturbances of water flow and impact the distribution of sediments in the Basin.[66] Historically there has been little enforcement of permit violations.[67]

The Bayou Bridge pipeline is a joint venture between ETP and Phillips 66[68] (two of the participants in DAPL) that will transport up to 480,000 barrels of crude oil a day across Louisiana, from Nederland, Texas (the southern terminus of the Bakken pipeline) to refineries in St. James, Louisiana (about 50 miles up the Mississippi River from New Orleans).[69] Phase I of the Bayou Bridge Pipeline, from Nederland, Texas to Lake Charles, Louisiana, is already operational. However, Phase II, the proposed 163-mile portion from Lake Charles to St. James, is under construction and multiple lawsuits have been filed to challenge the permits issued in 2017.[70]

As detailed in a U.S. Army Corps of Engineers Environmental Assessment, Bayou Bridge Pipeline LLC plans to use horizontal directional drilling (HDD) to run pipe under 8 federal projects and 14 federal easements (mostly crossings of rivers, waterways and levees).[71] As is typical, PHMSA conducted a "worst case" analysis for spills occurring at those crossings, but details of that analysis have not been made public.

Analysis by FracTracker Alliance found that the pipeline would cross "700 acres of fragile wetlands, and watersheds that supply drinking water for up to 300,000 people" and noted that "essential ecosystem services that the wetlands provide, absorbing floodwaters, could be compromised, leading to increased erosion and sedimentation downstream. Impacts to these wetlands could be greatly magnified into the already environmentally stressed Gulf."[72]

Assuming the U.S. system-wide rate for significant crude oil spills of 0.001 per year per mile, we estimate that the Bayou Bridge Pipeline would suffer eight significant spills during a 50-year nominal lifetime. In February 2018, a federal court issued an injunction stopping construction while the court considers environmental challenges to the project.[73] But that injunction was stayed by the 5th Circuit Court of Appeals in March with an expedited hearing on the injunction appeal scheduled before a merits panel on April 30, 2018.[74]

Bayou Bridge Pipeline began clearing for construction in the Atchafalaya Basin in January 2018.[75] Despite the elevated annual rise of water in the Basin, Bayou Bridge intends to continue construction in the Basin during high water season.[76] Construction during high water could exacerbate the damage to wetlands, channeling sediment-laden water into the interior swamps through pipeline canals, causing increased sedimentation and filling of wetlands which reduce their future capability to protect millions of people from Mississippi River floods.[77]

## Permian Express

In late 2017, ETP brought its Permian Express 3 pipeline online, transporting crude oil from the Permian basin (a major oil and gas producing basin located in West Texas and parts of New Mexico) to facilities in Nederland, Texas, and is "aggressively" evaluating a further expansion of that line.[78]

# Acknowledgments

**Greenpeace USA and Waterkeeper Alliance are grateful to the following organizations for endorsing this report, and for their continued action in defense of water and the communities that depend on it.**

**Atchafalaya Basinkeeper**
www.basinkeeper.org

**Oil Change International**
www.priceofoil.org

**Earthworks**
www.earthworks.org

**Louisiana Crawfish Producers Association – West**
www.lcpawest.com

**Louisiana Bucket Brigade**
www.labucketbrigade.org

**Thunder Valley Community Development Corporation**
www.thundervalley.org

**International Indigenous Youth Council**
www.indigenousyouth.org

**Pipeline Safety Coalition**
www.pscoalition.org

**350.org New Orleans**
www.350.org

**Indigenous Peoples Power Project**
www.ip3action.org

**Seeding Sovereignty**
www.seedingsovereignty.org

**NDN Collective**
www.ndnaction.org

**West Virginia Headwaters Waterkeeper**
www.wvrivers.org

**Rainforest Action Network**
www.ran.org

**The Standing Rock Community Development Corporation**
www.standingrockcdc.org

**Michigan Residents Against ET Rover**

**Big Bend Defense Coalition of West Texas**

**HELP Association of Saint James**



Protest March in Washington D.C. Photo by ©Amanda J. Mason/Greenpeace

# Endnotes

1  Interactive map shows a total of 517 incidents due to 10 incidents in the PHMSA data with missing or unusable geolocation data. Shapefiles of the U.S. crude oil, petroleum product, and natural gas liquids pipeline network are compiled by the U.S. Energy Information Administration (EIA) [www.eia.gov/maps/layer_info-m.php].

2  Energy Transfer. Ownership Overview. www.energytransfer.com/ownership_overview.aspx

3  Hampton, L. & V. Volcovici. 2016. Top executive behind Dakota Access has donated more than $100,000 to Trump. Reuters, October 26. www.reuters.com/article/us-usa-election-trump-dakota-access/top-executive-behind-dakota-access-has-donated-more-than-100000-to-trump-idUSKCN12Q2P2

4  Cama, T. 2017. Energy companies donated millions to Trump's inauguration. The Hill, April 19. http://thehill.com/policy/energy-environment/329587-energy-companies-donate-millions-to-trumps-inauguration

5  Memorandum of January 24, 2017. Construction of the Dakota Access Pipeline. 82 FR 11129. www.federalregister.gov/documents/2017/02/17/R1-2017-02032/construction-of-the-dakota-access-pipeline

6  Energy Transfer. Recent History. www.energytransfer.com/company_history.aspx

7  Energy Transfer. 2012. Energy Transfer Partners and Sunoco Announce Successful Completion of Merger. October 5. http://ir.energytransfer.com/phoenix.zhtml?c=106094&p=irol-newsArticle&ID=1742166

8  Sunoco. About Us: A Legacy of Innovation. www.sunoco.com/about-us/heritage/

9  Energy Transfer. 2012. Energy Transfer Partners to Acquire Sunoco in $5.3 Billion Transaction. April 30. http://ir.energytransfer.com/phoenix.zhtml?c=106094&p=irol-newsArticle&ID=1688772

10  Energy Transfer. 2017. Sunoco Logistics Partners and Energy Transfer Partners Announce Successful Completion of Merger. April 28. http://ir.energytransfer.com/phoenix.zhtml?c=106094&p=irol-newsArticle&ID=2267001

11  Energy Transfer. Corporate Overview. www.energytransfer.com/company_overview.aspx

12  This quantity excludes a small number of biofuels and CO2 incidents. For this report we consider hazardous liquids spills from crude oil, refined petroleum products, and HVL pipelines. PHMSA reporting requirements changed in 2010, and this analysis merges PHMSA's 2002-2009 and 2010-present datasets.

13  ETP or Sunoco must hold at least a 25% stake in a joint venture for it to be included in this analysis.

14  See Appendix B.

15  Waterkeeper Alliance. 2017. Sunoco Logistics and Energy Transfer Partners Pipeline Incident Summary. http://stopetp.org/wp-content/uploads/2017/12/ETP-Violation-History-12-15-17.pdf

16  National Wildlife Federation. 2010. Assault on America: A Decade of Petroleum Company Disaster, Pollution, and Profit. www.motherjones.com/wp-content/uploads/NWF_OilSpillsExplosions_pages.pdf

17  Hampton, L. 2016. Sunoco, behind protested Dakota pipeline, tops U.S. crude spill charts. Reuters, September 23. www.reuters.com/article/us-usa-pipeline-nativeamericans-safety-i/sunoco-behind-protested-dakota-pipeline-tops-u-s-crude-spill-charts-idUSKCN11T1UW

18  Higgins, T. 2017. Energy Transfer's Pipeline Spill Problem Is Causing It Another Headache. The Street, June 22. www.thestreet.com/story/14178469/1/energy-transfer-has-a-problem-that-keeps-rearing

19  U.S. Department of Justice. 2005. United States Announces Clean Air Agreements With Valero and Sunoco. June 16. www.justice.gov/archive/opa/pr/2005/June/05_enrd_323.htm

20  Welborn, V. 2014. Pipeline breaks have cost Sunoco millions. Shreveport Times, November 1. www.shreveporttimes.com/story/news/local/louisiana/2014/11/01/pipeline-breaks-cost-sunoco-millions/18340559/

21  U.S. Department of Justice. 2006. Federal Government Reaches Settlement with Pipeline Companies Regarding Crude Oil Spills. August 15. www.justice.gov/archive/opa/pr/2006/August/06_enrd_534.html

22  U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration. 2007. Notice of Probable Violation and Proposed Civil Penalty. May 15. https://primis.phmsa.dot.gov/comm/reports/enforce/documents/120075001/120075001_notice%20letter_05152007.pdf

23  U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration. 2014. Corrective Action Order. March 25. p.3. https://primis.phmsa.dot.gov/comm/reports/enforce/documents/320145002H/320145002H_Corrective%20Action%20Order_03252014_text.pdf

24  U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration. 2010. Notice of Probable Violation, Proposed Civil Penalty and Proposed Compliance Order. March 11. https://primis.phmsa.dot.gov/comm/reports/enforce/documents/420105010/420105010_NOPV%20PCP%20PCO_03112010_text.pdf

25  U.S. Environmental Protection Agency. 2016. Sunoco Pipeline, L.P. Clean Water Act Settlement. July 11. www.epa.gov/enforcement/sunoco-pipeline-lp-clean-water-act-settlement

26  U.S. Environmental Protection Agency. E15601 - Mid Valley Pipeline Oil Spill. https://response.epa.gov/site/site_profile.aspx?site_id=9578

27  Reuters Staff. 2016. U.S. regulator orders inquiry, repairs after Sunoco's Permian leak. Reuters, September 15. www.reuters.com/article/us-pipeline-sunoco-logistics/u-s-regulator-orders-inquiry-repairs-after-sunocos-permian-leak-idUSKCN11L2CM

28  PHMSA classifies together highly-volatile liquids (HVL) or other flammable or toxic fluids which are a gas at ambient conditions (i.e. when spilled). Examples include ethane, propane and butylene.

29  Waterkeeper Alliance 2017.

30  Greenpeace USA. Natural Gas: Methane's contributions to global warming. www.greenpeace.org/usa/global-warming/issues/natural-gas/

31  Energy Transfer. Bakken. www.energytransfer.com/ops_bakken.aspx

32  Sack, C. 2016. A #NoDAPL Map. Huffington Post, November 2. www.huffingtonpost.com/entry/a-nodapl-map_us_581a0623e4b014443087af35

33  Dakota Access LLC. 2015. Draft Environmental Assessment Dakota Access Pipeline Project Crossings of Flowage Easements and Federal Lands. November. www.nwo.usace.army.mil/Missions/Civil-Works/Planning/Project-Reports/Article/633496/dakota-access-pipeline-environmental-assessment/

34  Earthjustice. Updates & Frequently Asked Questions: The Standing Rock Sioux Tribe's Litigation on the Dakota Access Pipeline. https://earthjustice.org/features/faq-standing-rock-litigation

Exhibit B_Page 408 of 583

35    Brown, A. 2018. Five Spills, Six Months in Operation: Dakota Access Track Record Highlights Unavoidable Reality — Pipelines Leak. *The Intercept*, January 9. https://theintercept.com/2018/01/09/dakota-access-pipeline-leak-energy-transfer-partners/

36    See Appendix B

37    Ibid.

38    Ramseur, J. 2017. *Oil Spills: Background and Governance.* Congressional Research Service. https://fas.org/sgp/crs/misc/RL33705.pdf

39    Perry, K. 2015. 2014 oil spill still mars nature preserve. *Cincinnati.com*, May 16. www.cincinnati.com/story/news/2015/05/16/sunoco-pipelineoak-glen-nature-preserve-hebron-colerain-township-oil-spill-crude-gallons/27399019/

40    PHMSA 2014.

41    Delaware County Daily Times. 2010. Editorial: Penalty for Sunoco has a foul smell. January 6. www.delcotimes.com/general-news/20100106/editorial-penalty-for-sunoco-has-a-foul-smell. Quoted in NWF 2010.

42    Rover Pipeline. The Facts on Rover Pipeline Project. www.roverpipelinefacts.com

43    FERC. 2017. Order On Clarification and Denying Rehearing. November 3. www.ferc.gov/CalendarFiles/20171130161519-CP15-93-002.pdf

44    Malik, N.S. & C. Traywick. 2017. Blackstone's New Pipeline Asset Is Wreaking Environmental Havoc, *Bloomberg News*, August 17. www.bloomberg.com/news/articles/2017-08-17/blackstone-s-new-pipeline-asset-is-wreaking-environmental-havoc

45    Sunoco Pipeline. Mariner East. https://marinerpipelinefacts.com/mariner-east/

46    Reuters Staff. 2018. ETP Mariner East liquids pipe spills more fluid in Pennsylvania. *Reuters*, March 27. www.reuters.com/article/us-energy-transf-sunoco-marinereast/etp-mariner-east-liquids-pipe-spills-more-fluid-in-pennsylvania-idUSKBN1H321A; see also Pennsylvania DEP. Pennsylvania Pipeline Portal: Mariner East Pipeline II www.dep.pa.gov/Business/ProgramIntegration/Pennsylvania-Pipeline-Portal/Pages/Mariner-East-II.aspx

47    Hurdle, J. 2017. Water problems persist along Mariner East pipeline route despite court intervention. State Impact (NPR). October 12. https://stateimpact.npr.org/pennsylvania/2017/10/12/water-problems-persist-along-mariner-east-pipeline-route-despite-court-intervention/

48    Jalbert, K. 2017. Mariner East 2 Drilling Fluid Spills – Updated Map and Analysis. FracTracker, July 26. www.fractracker.org/2017/07/me2-drilling-fluid-spills/; see also Pennsylvania DEP. 2018. Sunoco Mariner East II - Pipeline Construction Inadvertent Returns - Waters of the Commonwealth. Revised on March 30, 2018. http://files.dep.state.pa.us/ProgramIntegration/PA%20Pipeline%20Portal/MarinerEastII/Sunoco_Mariner_East_II-Pipeline_Construction_Inadvertent_Returns-Waters_of_the_Commonwealth_Revised.pdf

49    Pennsylvania DEP. 2018. Administrative Order. January 3. http://files.dep.state.pa.us/ProgramIntegration/PA%20Pipeline%20Portal/MarinerEastII/OrderSuspendingConstructionActivities010318.pdf

50    Cusick, M. 2018. Sunoco to resume work, pay $12.6 million for Mariner East 2 pipeline violations. *State Impact* (NPR), February 8. [ https://stateimpact.npr.org/pennsylvania/2018/02/08/sunoco-to-resume-work-pay-12-6-million-for-mariner-east-2-pipeline-violations/

51    Pennsylvania PUC. 2018. Emergency Order. March 7. www.puc.state.pa.us/pcdocs/1556680.pdf

52    Pennsylvania PUC. 2018. Petition of the Bureau of Investigation and Enforcement of the Pennsylvania Public Utility Commissions for the Issuance of an *Ex Parte* Emergency Order. March 7. www.puc.state.pa.us//pcdocs/1556676.pdf

53    Ibid.

54    U.S. Pipeline and Hazardous Materials Safety Administration. Pipeline Incident 20 Year Trends. www.phmsa.dot.gov/pipeline/library/data-stats/pipelineincidenttrends; see also Lee, M. 2016. Number of leaks and spills continued to grow in 2015. EnergyWire, August 22. www.eenews.net/energywire/2016/08/22/stories/1060041856

55    API & AOPL. 2017. Pipeline Safety Excellence: Performance Report & Strategic Plan 2017-2019. www.energyinfrastructure.org/~/media/energyinfrastructure/images/pipeline/related-docs/api-aopl-pipeline-safety-report-high.pdf; see also Mandel, J. 2017. Safety incidents on the rise after decade of decline. EnergyWire, April 26. www.eenews.net/energywire/stories/1060053574

56    U.S. Pipeline and Hazardous Materials Safety Administration. Inspections Overview. https://www.phmsa.dot.gov/pipeline/inspections/inspections-overview

57    Soraghan, M. 2017. Oil and gas industry leads in severe injuries. *EnergyWire*. May 2. www.eenews.net/energywire/2017/05/02/stories/1060053892

58    PHMSA. Pipeline Incident 20 Year Trends.

59    Stover, R. America's Dangerous Pipelines. Center for Biological Diversity. www.biologicaldiversity.org/campaigns/americas_dangerous_pipelines/

60    McGowan, E. & L. Song. 2012. The Dilbit Disaster: Inside The Biggest Oil Spill You've Never Heard Of, Part 1. *InsideClimate News*, June 26. https://insideclimatenews.org/news/20120626/dilbit-diluted-bitumen-enbridge-kalamazoo-river-marshall-michigan-oil-spill-6b-pipeline-epa

61    Douglas, E. 2015. Yellowstone Oil Spills Expose Threat to Pipelines Under Rivers Nationwide. *InsideClimate News*, February 6. https://insideclimatenews.org/news/06022015/yellowstone-oil-spills-expose-threat-pipelines-under-rivers-nationwide

62    There is no comprehensive database of all hazardous material spills in the U.S. with data scattered across numerous federal and state agencies, and lacking consistent reporting rules; see also King, P. & M. Soraghan. 2016. Spills dropped 8% in 2015 as new drilling slowed. *EnergyWire*, July 21. www.eenews.net/energywire/2016/07/21/stories/1060040567

63    Soraghan, M. & P. King. 2016. Drilling mishaps damage water in hundreds of cases. *EnergyWire*, August 8. www.eenews.net/energywire/stories/1060041279

64    Louisiana's Disappearing Wetlands, Louisiana's Oil, Understanding the Environmental and Economic Impact, southeastern.edu, July 12, 2010 www2.southeastern.edu/orgs/oilspill/wetlands.html; see also Atchafalaya Basin Floodway System, Louisiana Project, State Master Plan, at 3-2. www.dnr.louisiana.gov/assets/docs/Atchafalaya_Basin/StateMasterPlan.pdf

65    Permit for Wanda Petroleum, Inc., Aug. 21, 1969; Permit for Sorrento Pipeline Co., Sept. 4, 2001. The Bayou Bridge right-of-way follows a path of these two existing pipelines for which both permits prohibited the miles-long spoil banks that were created during construction and that remain today. Permits for Florida Gas Transmission, Dec. 14, 1962 & Feb. 13, 1963. The permits for this 5,325-mile interstate natural gas pipeline jointly owned by Energy Transfer Partners and Kinder Morgan running from Texas, through the Atchafalaya Basin, to south Florida, require the removal of dredged material that could interfere with navigation; see also Atchafalaya Basinkeeper, et al. 2018. Complaint for Declaratory and Injunctive Relief, at 60. https://earthjustice.org/sites/default/files/files/3430-Complaint.pdf

66    State of Louisiana Department of Natural Resources. 2018. Final Report: Senate Resolution No. 154 of the 2017 Regular Session. January. http://www.dnr.louisiana.gov/assets/OCM/ABP/SR154.Study.Final.pdf



Stakes mark the path of part of the Bayou Bridge pipeline through wetlands in Louisiana. Photo by ©Julie Dermansky/Greenpeace

67   Riegel, S. 2017. Swamp tale: A landman's long-running environmental whistleblower suit against the state speaks to larger issues about conflict, controversy and trust in the Atchafalaya Basin. *Business Report*, March 1. *www.businessreport.com/business/swamp-tale-local-landmans-long-running-environmental-whistleblower-suit-state-speaks-larger-issues-conflict-controversy-trust-atchafalaya-basin*

68   Public Accountability Initiative. 2018. The Power Behind the Pipelines: Bayou Bridge Pipeline. *https://public-accountability.org/2018/01/the-power-behind-the-pipelines-bayou-bridge-pipeline/*

69   Bayou Bridge Pipeline. Bayou Bridge Facts. *https://bayoubridge.com/*

70   Kunzelman, M. 2018. Judge hears testimony in request to halt Bayou Bridge pipeline. *Associated Press*, February 9. *www.nola.com/environment/index.ssf/2018/02/judge_hears_testimony_in_reque.html*

71   U.S. Army Corp of Engineers. 2017. Environmental Assessment: Section 408 Evaluation of Bayou Bridge Pipeline Project. *www.mvn.usace.army.mil/Portals/56/docs/Section%20408/BBP/Bayou%20Bridge%20408%20EA%2010-17-2017%20HL.pdf?ver=2018-01-29-122020-020*

72   Fractracker Alliance. 2017. Pipeline Under Debate in Louisiana Bayou. January 3. *www.fractracker.org/2017/01/pipeline-debate-louisiana-bayou/*

73   Gilmer, E. 2018. In rare move, court halts ETP oil pipeline. *EnergyWire*, February 26. *www.eenews.net/energywire/2018/02/26/stories/1060074731*

74   Hardy, S. 2018. Federal Appeals Court lifts stay blocking pipeline construction through Atchafalaya Basin. *The Advocate*, March 15. *www.theadvocate.com/baton_rouge/news/environment/article_6d0b7800-2898-11e8-95c0-cf0328d5178b.html*

75   Baurick, T. 2018. Bayou Bridge Pipeline's controversial construction begins. *The Times-Picayune*, January 29. *www.nola.com/environment/index.ssf/2018/01/bayou_bridge_pipeline_construc.html*

76   Bayou Bridge Pipeline, LLC's *Reply in Support of Emergency Motion for Stay Pending Appeal*, at 1-2 (discussing water level influence on construction) filed on Mar. 6, 2018, Case No. 18-30257, Fifth Cir. Court of Appeals.

77   Declaration of Dr. Ivor van Heerden, at Paragraph 4.

78   Reuters staff. 2018. ETP eyes new crude pipeline from Permian basin to Nederland, Texas. Reuters, February 22 *www.reuters.com/article/energy-transf-pipeline-oil/etp-eyes-new-crude-pipeline-from-permian-basin-to-nederland-texas-idUSL2N1QC0RC*

# Appendix A-C

## Appendix A: Research Methods

Available for download online at:
https://www.greenpeace.org/usa/wp-content/uploads/2018/04/Appendix-A-Research-Methods.pdf

## Appendix B: ETP & Sunoco, PHMSA Violations & Penalties

Available for download online at:
https://www.greenpeace.org/usa/wp-content/uploads/2018/04/Appendix-B-ETP-Sunoco-PHMSA-Violations-Penalties.pdf

## Appendix C: Energy Transfer Partners' Rover Pipeline Violations & Spills in Michigan, Ohio & West Virginia, February 2017-March 2018

Available for download online at:
https://www.greenpeace.org/usa/wp-content/uploads/2018/04/Appendix-C-Rover-Timeline-Violations.pdf

Construction work on the Bayou Bridge project continues in Louisiana. April 2018. Photo by ©Julie Dermansky/Greenpeace



**GREENPEACE** Reports    **WATERKEEPER® ALLIANCE**

**OIL AND WATER: ETP & SUNOCO'S HISTORY OF PIPELINE SPILLS**
APRIL 17, 2018

**Appendix A: Research Methods**

From the PHMSA website, we downloaded the Excel files "Hazardous Liquid Accident Data - January 2010 to present (ZIP)" and "Hazardous Liquid Accident Data - January 2002 to December 2009 (ZIP)" [link to both datasets] on 2/26/18. Full analysis conducted using pandas in a jupyter notebook, available upon request.

The 2010-present dataset contained 3212 records, of which 49 represented biofuels or CO2 spills, and were excluded. The remaining 3163 records were comprised of 1605 crude oil spills, 1063 refined petroleum product spills, and 495 HVL spills. The 2002-2009 dataset contained 3030 records, from which we excluded biofuels and CO2 spills, and any records where the 'SPILLED' field was 'NO.' Of the remaining 2962 records, 1360 were crude oil spills, 1172 were refined petroleum products spills, and 419 were HVL spills.

Using the PHMSA operator database [link] and the incidents databases, we identified 41 subsidiaries or joint ventures that were associated with ETP/Sunoco. These entities were identified by:
- Searching the incident file for reports submitted via email from the domains energytransfer.com, sunocologistics.com, and sunocoinc.com.
- Searching the operator database for operators containing the phrases "transfer", "ETP", "ETC", "ETE, "sunoco", "DAPL", "Dakota Access", etc.
- Cross-referencing lists of subsidiaries found in Form 10-K Ex 21.1 documents against the operator database. Lists of subsidiaries are available from the latest 10-K submissions for ETP, ETE, and Sunoco Logistics Partners.

Although ETP and Sunoco merged in 2012, we include all spills in the database starting in 2010 for both of those entities and subsidiaries that existed at that time. For other subsidiaries acquired after 2012, we only include spills that occurred after the acquisition.

The full list of hazardous liquid subsidiaries included in this analysis is as follows:
- **ENERGY TRANSFER COMPANY** [Operator ID 32099, link to PHMSA operator page, **23 incidents**] This exact name isn't a listed subsidiary but it does refer to the ETP/ETE family of companies. All records were submitted from energytransfer.com emails, all after June 2012. No records for this operator ID were found in the 2002-2009 data. This operator ID also has 16 incidents in PHMSA's 2002-present natural gas gathering/transmission database, all submitted form energytransfer.com emails.
- **DAPL-ETCO OPERATIONS MANAGEMENT, LLC** [Operator ID 39205, no PHMSA operator page, **7 incidents**] This entity is listed on Form 10-K as a subsidiary of Energy Transfer Partners, L.P. Collectively DAPL and ETCO make up the Bakken Pipeline. The project is a joint venture with MarEn Bakken Company LLC (Enbridge) and Phillips 66, with ETP holding a 38.25% interest. All spill records are from 2017. Submitted via energytransfer.com emails, except the first record submitted from sunocologistics.com. No records for this operator ID were found in the 2002-2009 data. This operator ID and company name appear in the incident database, but do not appear in the operator database.
- **SUNOCO PIPELINE L.P.** [Operator IDs 18718 and 31623, link to PHMSA operator page, **337 incidents**] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P., with more information at links here and here. In the 2002-2009 data we find 136 incidents under this operator ID plus an additional six from 2002-03 with similar names under ID 31623. (We exclude one record with SPILLED=NO). Date ranges for the two IDs overlap, and some early records were submitted from sunoil.com emails. ID 31623 does not appear in 2010-present data, but we find 195 records under ID 18718 in that data for a total of 337.
- **MID - VALLEY PIPELINE CO** [Operator IDs 12470, 12471, 30871, link to PHMSA operator page, **76 incidents**] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. which has a "controlling financial interest." Sunoco's interest in this pipeline has been 55.3% since at least the 2002 10-K, therefore we include all incidents in our analysis. In 2002-2009 data, we find 37 incidents under this ID, plus an additional 7 incidents dating from 2002-03 under two other IDs with similar names. The other IDs do not appear in the 2010-present data, but we do find 32 records under ID 12470 in that data for a total of 76. All records submitted via sunocologistics.com emails.
- **WEST TEXAS GULF PIPELINE CO** [Operator ID 22442, link to PHMSA operator page, **46 incidents**] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. which obtained 100% interest in the pipeline in 2015. As of 2006, the interest in the pipeline was 43.8%, therefore we include these incidents, which are all 2006 or later, in our analysis. In the 2002-2009 data, we find 13 incidents under this ID, while in the 2010-present data we find 33 incidents, all from sunocologistics.com emails. (We exclude one record with SPILLED=NO).
- **INLAND CORPORATION** [Operator ID 32683, link to PHMSA operator page, **7 incidents**] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. which acquired a "controlling

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

interest" in 2011. All spills in the database for this ID post-date this acquisition. No records for this operator ID were found in the 2002-2009 data.

- **PERMIAN EXPRESS TERMINAL LLC** (formerly **SUNVIT PIPELINE LLC**) [Operator ID 39131, link to PHMSA operator page, **2 incidents**] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. Sunoco Logistics purchased a 50% interest in the SunVit Pipeline from Vitol Group in September 2016, increasing their interest to 100% at that time. The project was renamed in December 2016. All spills in the database post-date this acquisition. No records for this operator ID were found in the 2002-2009 data.
- **SUNOCO MIDLAND GATHERING LLC** [Operator ID 39307, link to PHMSA operator page, **1 incident**] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. This is the same operator ID as **VITOL MIDSTREAM, LLC** [4 records, see this 2011 announcement for more information] which was acquired by Sunoco Logistics in November 2016. The four spills tallied under Vitol Midstream pre-date the closing of the acquisition, were submitted from vitol.com email addresses (except one, which seems to have been submitted a year later), and are therefore excluded from our analysis. The one post-acquisition spill is retained. No records for this operator ID were found in the 2002-2009 data.
- **PERMIAN EXPRESS PARTNERS LLC** [Operator ID 39596, no PHMSA operator page, **1 incident**] Listed in 10-K as a subsidiary of Sunoco Logistics Partners L.P. This is a joint venture with ExxonMobil, announced in November 2016, where Sunoco Logistics has an 85% stake. The only spill post-dates the partnership. No records for this operator ID were found in the 2002-2009 data. This operator ID and company name appear in the incident database, but do not appear in the operator database.
- **SUNOCO PARTNERS MARKETING & TERMINALS LP** [Operator ID 39706, no PHMSA operator page, **3 incidents**] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. All reports submitted from energytransfer.com emails, and all were in 2017. No records for this operator ID were found in the 2002-2009 data. This operator ID and company name appear in the incident database, but do not appear in the operator database.
- **WOLVERINE PIPELINE CO** [Operator ID 22830, link to PHMSA operator page, **11 incidents**] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. As of 2004, Sunoco Logistics held a 31.5% interest in this joint venture, the same percentage as today. In the 2002-2009 dataset, we find 7 incidents under this ID, and 4 incidents in the 2010-present data. (We exclude one record with SPILLED=NO). Since all incidents are 2004 or later we include all in our analysis.
- **HARBOR PIPELINE CO** [Operator ID 7063, link to PHMSA operator page, **6 incidents**] This entity is not listed in the latest 10-K as a subsidiary, however it does appear on this website as an asset of Sunoco Logistics Partners. The spill records in the database are from 2004-2012, were submitted from sunocologistics.com emails, and the Harbor Pipeline is mentioned in the 2004 10-K. In the 2002-2009 data, we find 3 incidents under this ID, one of which has the Sunoco Pipeline L.P name, submitted via sunocologistics.com emails.
- **SUNOCO, INC (R&M)** [Operator IDs 18779 and 31676, link to PHMSA operator page, **6 incidents**] Sunoco, Inc is the name of the pre-merger entity that was acquired by ETP. In the 2010-present data we find two spills date from 2010 and were submitted via sunocoinc.com emails. In 2002-2009 data, we find 2 incidents under ID 18779 plus 2 more under ID 31676. The names vary somewhat, but we cluster them here. (We exclude one record with SPILLED=NO)
- **WYNNEWOOD REFINERY COMPANY** [Operator ID 32096, link to PHMSA operator page, **1 incident**] This ID does not appear in the 2010-present data, but shows one incident in 2009 submitted from a sunocologistics.com email. The 2011 10-K notes that Sunoco Logistics acquired 100% interest in Excel in September 2009, which included a pipeline and a refinery in Wynnewood, OK. This incident is from July 2009, but the 10-K notes that Sunoco was "the operator of the pipeline prior to the acquisition" and so we include this incident.

The following hazardous liquids entities are excluded from this analysis:
- **EXPLORER PIPELINE CO** [Operator ID 4805, link to PHMSA operator page, **49 incidents**] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. This is a JV with Phillips 66, Marathon, and Shell, operated by Explorer. Sunoco Logistics holds a 15% stake. We exclude joint ventures where ETP/Sunoco has less than a 25% stake and is not the pipeline operator.
- **WEST SHORE PIPELINE CO** [Operator ID 22430, link to PHMSA operator page, **16 incidents**] THis entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. Sunoco Logistics holds a 17.1% stake in this JV, which is operated by Buckeye Partners. We exclude joint ventures where ETP/Sunoco has less than a 25% stake and is not the pipeline operator.
- **LONE STAR NGL REFINERY SERVICES LLC** [Operator ID 31673, link to PHMSA operator page, **2 incidents**] This entity is listed on Form 10-K as a subsidiary of Energy Transfer Partners L.P. This operator ID is inactive. In 2011 ETP purchased LDH Energy Asset Holdings LLC. In the 2002-2009 data, two records are found for this ID under the name **LOUIS DREYFUS OLEFINS, LLC**. The records are

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

**Exhibit B_Page 413 of 583**

submitted from louisdreyfus.com and ldhenergy.com emails. We exclude these 2006 incidents because they pre-date the acquisition. One additional spill record in the 2010-present data was submitted by an energytransfer.com email address for **LDH ENERGY PIPELINE L.P.** [Operator ID 32035, link to PHMSA operator page, **10 incidents**], which is likely the result of the same merger. Possibly the event was noticed and reported by an ETP contractor or possibly it was reported by ETP post-merger, but we do not include it in this assessment since it occurred in 2010 and pre-dates the merger.

- **REGENCY FIELD SERVICES LLC** [Operator ID 31852, link to PHMSA operator page, **1 incident**] This exact name does not appear in the most recent 10-K, but ETP seems to have acquired Regency Energy Partners in 2010 and then merged in 2015. This opid does not appear in the 2010-present data and is currently inactive, but 2002-09 data shows one incident HVL/liquid natural gas incident in 2007, submitted from a regencygas.com email. However, this incident pre-dates the acquisition and so is excluded.

The following are hazardous liquid subsidiaries that have a PHMSA operator ID, but did not record any incidents from 2010-present:
- **BAYOU BRIDGE PIPELINE, LLC** [Operator ID 39462, link to PHMSA operator page, 0 incidents] This entity is listed on Form 10-K as a subsidiary of Sunoco Logistics Partners L.P. This is a joint venture in which both ETP and Sunoco Logistics hold a 30% stake.
- **PHILADELPHIA ENERGY SOLUTIONS REFINING AND MARKETING, LLC** [Operator ID 38964, link to PHMSA operator page, 0 incidents] This entity is listed on Form 10-K as a subsidiary of Energy Transfer Partners L.P.
- **LIBERTY PIPELINE GROUP, LLC** [Operator ID 32582, link to PHMSA operator page, 0 incidents] This entity is listed on Form 10-K as a subsidiary of Energy Transfer Partners L.P. This operator ID is inactive.
- **REGENCY LIQUIDS PIPELINE LLC** [Operator ID 32355, link to PHMSA operator page, 0 incidents] This entity is listed on Form 10-K as a subsidiary of Energy Transfer Partners L.P. This operator ID is inactive.

The following are natural gas subsidiaries with PHMSA operator IDs that reported incidents from natural gas transmission pipelines:
- **ENERGY TRANSFER COMPANY** [Operator ID 32099, link to PHMSA operator page, **16 incidents**] This operator ID has 10 incidents in the 2010-present data, and 6 incidents in the 2002-2009 data, all submitted form energytransfer.com emails.
- **PANHANDLE EASTERN PIPELINE CO** [Operator ID 15105, link to PHMSA operator page, **11 incidents**] 11 incidents were found in the 2010-present dataset, all from energytransfer.com emails.
- **FLORIDA GAS TRANSMISSION CO** [Operator ID 5304, link to PHMSA operator page, **11 incidents**] 11 incidents were found in the 2010-present dataset, all from energytransfer.com emails.
- **SEA ROBIN PIPELINE CO** [Operator ID 18152, link to PHMSA operator page, **9 incidents**] 9 incidents were found in the 2010-present dataset, all from energytransfer.com emails.
- **TRUNKLINE GAS CO** [Operator ID 19730, link to PHMSA operator page, **5 incidents**] 4 incidents were found in the 2010-present dataset, and one incident was found in the 2002-2009 dataset, all submitted from energytransfer.com emails.
- **TRANSWESTERN PIPELINE COMPANY LLC** [Operator ID 19610, link to PHMSA operator page, **4 incidents**] 3 incidents were found in the 2010-present dataset, and one incident was found in the 2002-2009 dataset, all submitted from energytransfer.com emails.
- **REGENCY INTRASTATE GAS LP** [Operator ID 32335, link to PHMSA operator page, **1 incident**] 1 incident was found in the 2010-present dataset, submitted from an energytransfer.com email. Currently inactive ID.
- **HOUSTON PIPELINE CO** [Operator ID 7605, no PHMSA operator page, **1 incident**] 1 incident from 2003 was found in the 2002-2009 dataset, submitted from an energytransfer.com email. This operator ID and company name appear in the incident database, but do not appear in the operator database.

The following are natural gas operator IDs that are listed as ETP or Sunoco subsidiaries, but did not report any incidents or are otherwise excluded from the analysis:
- **MIDCONTINENT EXPRESS PIPELINE LLC** [Operator ID 32436, link to PHMSA operator page, 1 incident] This entity is listed as a subsidiary on the latest 10-K, but the incident dates to 2009 and was submitted from a kindermorgan.com email, and so is excluded.
- **ETC TIGER PIPELINE, LLC** [Operator ID 32467, link to PHMSA operator page, 0 incidents] See this link for more information.

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

- **PENNTEX MIDSTREAM PARTNERS, LLC** [Operator ID 39173, link to PHMSA operator page, 0 incidents] Inactive operator ID. This ID reports both natural gas and hazardous liquids mileage, but no incidents.
- **SOUTHERN UNION GAS SERVICES, LTD** [Operator ID 18526, link to PHMSA operator page, 0 incidents] Inactive operator ID. This ID reports both natural gas and hazardous liquids mileage, but no incidents.
- **CHALKEY TRANSMISSION COMPANY, LTD** [Operator ID 31211, link to PHMSA operator page, 0 incidents] Inactive operator ID.
- **FAYETTEVILLE EXPRESS PIPELINE, LLC** [Operator ID 32469, link to PHMSA operator page, 0 incidents]
- **GULF STATES TRANSMISSION CORPORATION** [Operator ID 32323, link to PHMSA operator page, 0 incidents]
- **LEE 8 STORAGE PARTNERSHIP** [Operator ID 30786, link to PHMSA operator page]
- **LOBO PIPELINE LP** [Operator ID 31735, link to PHMSA operator page, 0 incidents] Inactive operator ID.
- **PEI POWER CORP** [Operator ID 31453, link to PHMSA operator page, 0 incidents] Inactive operator ID.
- **PENNTEX PERMIAN, LLC** [Operator ID 39432, link to PHMSA operator page, 0 incidents] Inactive operator ID.
- **SOUTHERN UNION INTRASTATE GAS PIPELINE** [Operator ID 32256, link to PHMSA operator page, 0 incidents] Inactive operator ID.
- **WGP-KHC, LLC** [Operator ID 31730, link to PHMSA operator page, 0 incidents]

No incidents from ETP or its subsidiaries were found in PHMSA natural gas distribution incident data.

**Mapping the Data**

An interactive map of the ETP/Sunoco spill dataset was created in carto. The 2010-present PHMSA data is standardized with latitude and longitude expressed in decimal degrees. However, the 2002-2009 PHMSA data does not have a standard format for lon-lat data, particularly for the early years. Latitude and longitude were presented in a variety of formats, including D.d, DM.m and DMS. We converted all of these values to the standard D.d format. For a number of incidents, we changed the reported longitude from positive to negative values, under the assumption that the spills occurred in the western hemisphere. For 7 spills, no latitude-longitude was reported, and for 3 more spills, the data was reported in unknown formats. These 10 incidents are not shown on the map.

For comparison purposes, we display U.S. liquids pipelines using shapefiles compiled by the U.S. Energy Information Agency (EIA) [link], plus one shapefile of the Dakota Access Pipeline obtained from public sources. Where EIA identified ETP, Sunoco or one of their corporate entities as the pipeline operator we colored the pipeline red; all other pipelines are colored grey. The shapefiles used were 'Crude Oil Pipelines', 'Petroleum Product Pipelines' and 'HGL (hydrocarbon gas liquids) Pipelines.' EIA describes these files as being based on "publicly available data from a variety of sources with varying scales and levels of accuracy." This EIA pipeline dataset is likely not a complete set of U.S. liquids pipelines and may not fully reflect ETP/Sunoco's current or past pipeline assets.

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

Appendix B: ETP & Sunoco, PHMSA Violations & Penalties

| Date | Operator | # of Probable Violations | Proposed or Assessed Civil Penalty | Case Status | Summary of Violations | PHMSA Citation |
|---|---|---|---|---|---|---|
| 01/11/2018 | SUNOCO PIPELINE L.P. | 1 | $0 | Open | 1 failure to insepct field bending pipe during construction | link |
| 01/18/2018 | SUNOCO PIPELINE L.P. | 3 | $163,700 | Open | 117 failures to inpect crosssings under waterways, valves and pipelines | link |
| 01/18/2018 | SUNOCO PIPELINE L.P. | 2 | $127,000 | Open | 6 failures to inspect pressure transmitters, pipelines | link |
| 08/14/2017 | SUNOCO PIPELINE L.P. | 8 | $129,800 | Open | Failure to repair unsafe pipe for 5 years, failures to maintain pipeline integrity in high consequence areas, failure to report unsafe condition, failure to do corrosion inspection | link |
| 05/04/2017 | SUNOCO PIPELINE L.P. | 1 | $25,900 | Closed | 1 failure to test pipeline using proper procedures | link |
| 05/03/2017 | MID - VALLEY PIPELINE CO | 1 | $88,400 | Open | 1 failure to inpect crosssings under waterways | link |
| 04/06/2017 | SUNOCO PIPELINE L.P. | 2 | $0 | Open | 2 failures to notifiy PHMSA of a spill, fire, injuries requiring hospitalization. | link |
| 02/06/2017 | INLAND CORPORATION | 1 | $55,220 | Open | Failure to cover pipe. | link |
| 12/09/2016 | MID - VALLEY PIPELINE CO | 2 | $0 | Open | Failure to properly notify emergency responders, public. | link |
| 10/27/2016 | WEST TEXAS GULF PIPELINE CO | 2 | $251,800 | Open | 2 failures to follow safety procedures causing 5 people to be injured. | link |
| 10/04/2016 | PERMIAN EXPRESS TERMINAL LLC | 1 | $0 | Open | Failure to follow procedures. | link |
| 07/07/2016 | WEST TEXAS GULF PIPELINE CO | 15 | $1,539,800 | Open | 15 violations of maintenace rules after a spill, fire and injuries requiring hosptilization. | link |
| 06/02/2016 | SUNOCO PIPELINE L.P. | 5 | $141,700 | Closed | 5 violations of safety, inspection, repair rules | link |
| 04/28/2016 | SUNOCO PIPELINE L.P. | 5 | $1,278,100 | Open | 5 violations of welding procedures and failure to use of qualified welders during constrution | link |
| 04/11/2016 | ENERGY TRANSFER COMPANY | 2 | $24,400 | Closed | Failure to insure qualified personal performed inspections, failure to maintain records | link |
| 04/27/2015 | WEST TEXAS GULF PIPELINE CO | 2 | $207,300 | Closed | Spill and failure to repair damaged pipeline. | link |
| 04/08/2015 | WEST TEXAS GULF PIPELINE CO | 2 | $141,000 | Closed | Failures to provide notice of a spill, fire and injury requiring hospitilation. | link |
| 10/02/2014 | SUNOCO PIPELINE L.P. | 1 | $22,300 | Closed | Failure to maintain corrosion protection. | link |
| 09/30/2013 | SUNOCO PIPELINE L.P. | 1 | $25,900 | Closed | Control room management failure. | link |
| 12/03/2012 | SUNOCO PIPELINE L.P. | 1 | $0 | Closed | Failure to update public notice procedures. | link |
| 11/06/2012 | SUNOCO PIPELINE L.P. | 1 | $22,500 | Closed | Failure to files supplemental spill report. | link |
| 07/16/2012 | HARBOR PIPELINE CO | 1 | $100,000 | Closed | Failure to follow procedures for cutting a pipeline and atmospheric monitoring. | link |
| 11/23/2010 | MID-VALLEY PIPELINE CO | 1 | $48,700 | Closed | Failure to correct deficiencies in corrosion control. | link |
| 03/11/2010 | WEST TEXAS GULF PIPELINE CO | 7 | $405,000 | Closed | Failure to follow procedures related to large spill, fire. | link |
| 09/17/2009 | SUNOCO INC (R&M) | 2 | $32,500 | Closed | Operating pressure and corrsion control violations. | link |
| 08/14/2009 | SUNOCO PIPELINE L.P. | 5 | $232,900 | Closed | Large gasoline spill into Turtle Creek, evacuation of homes, businesses, public road closure. | link |
| 03/11/2008 | SUNOCO PIPELINE L.P. | 1 | $34,000 | Closed | Failures to inpect right of ways and crosssings under waterways. | link |
| 11/19/2007 | SUNOCO PIPELINE L.P. | 2 | $200,000 | Closed | Failure to follow review procedures to ensure proper equipment use. | link |
| 11/13/2007 | SUNOCO PIPELINE L.P. | 12 | $119,000 | Closed | Failure to inspect ROWs, crossings under navigable waters, tanks, do valve maintenance, provide records, secure facilities, etc. | link |
| 05/15/2007 | SUNOCO PIPELINE L.P. | 1 | $150,000 | Closed | Failure to prevent and respond to a spill. | link |
| 02/12/2007 | SUNOCO PIPELINE L.P. | 2 | $0 | Closed | Leak detection and high consequence area monitoring failures. | link |
| 02/09/2006 | SUNOCO PIPELINE L.P. | 1 | $0 | Closed | Failure to install equipment. | link |
| 06/02/2005 | WOLVERINE PIPELINE CO | 2 | $11,750 | Closed | Failure to meet operator qualificaton requirements. | link |
| 03/30/2005 | SUNOCO PIPELINE L.P. | 2 | $40,000 | Closed | Failure to complete risk analysis requirements. | link |
| 02/24/2005 | SUNOCO PIPELINE L.P. | 1 | $11,000 | Closed | Failure to follow procedures. | link |
| 09/22/2004 | SUNOCO PIPELINE L.P. | 3 | $6,200 | Closed | Failure to inspect, maintain maps and mark pipelines. | |
| 08/26/2003 | MID - VALLEY PIPELINE CO | 3 | $35,000 | Closed | Failure to follow procedures to notify the public. | link |
| 07/03/2002 | SUNOCO PIPELINE LP | 1 | $5,000 | Closed | Failure to identfiy pipeline segments in high consequence areas. | |
| Totals: | | 106 | $5,675,870 | | | |

**Appendix C: Energy Transfer Partners' Rover Pipeline Violations & Spills in Michigan, Ohio & West Virginia, February 2017-March 2018[1]**

**February 3, 2017:** FERC gives final approval for the Rover Pipeline, must clear trees before March 31st bat roosting. FERC denied ET a blanket certificate for Rover after demolishing a house that was under consideration for a national registry of historic homes, without first telling FERC.[2]

**March 2, 2017:** FERC approves the start of pipeline construction.[3]

**April 5, 2017:** unauthorized pollution release impacting tributaries of Woodfield Reservoir in Monroe County, OH failure to control stormwater [4]

**April 8, 2017:** 1,000 gallons of drilling fluid pollution released into wetland near Indian Fork River, in Tuscarawas County, OH; covered 2500 square foot area of wetland [5]

**April 10, 2017:** 600 gallons of drilling fluid pollution released into stream, wetland and pond in Richland Township, Belmont County, OH [6]

**April 10, 2017:** unauthorized pollution release impacting tributaries of Woodfield Reservoir in Monroe County, OH failure to control stormwater [7]

**April 11, 2017:** unauthorized pollution release from failure to manage stormwater in Bloomdale, Wood County, OH [8]

**April 11, 2017:** Clean Air Act violation, open burning of site preparation material near a home in Toronto, Ohio [9]

**April 11, 2017:** Stormwater violations in Wood, Richland, and Crawford Counties, OH because of failure to manage vehicle tracking of drilling materials onto public roadways [10]

**April 12, 2017:** unauthorized pollution release into Bull Creek in Wood County, OH - failure to control stormwater [11]

---

[1] Much of this information was compiled and previously published as Sierra Club. 2017. Energy Transfer's Fracked Gas Pipeline Spills Six Times in Two Weeks, Has Seven Additional Violations. May 8. [link].
[2] U.S. Federal Energy Regulatory Commission (FERC). 2017. Order Issuing Certificates. February 2. [link]
[3] 2017. FERC Green Lights Rover Pipeline Construction. *Marcellus Drilling News*, March 6. [link]
[4] Ohio Environmental Protection Agency (EPA). 2017. Director's Final Findings and Orders. July 7. [link]
[5] Ohio EPA. 2017, p. 3.
[6] Ohio EPA. 2017, p. 3-4.
[7] Ohio EPA. 2017, p. 6.
[8] Ohio EPA. 2017, p. 7.
[9] Ohio EPA. 2017, p. 12.
[10] Ohio EPA. 2017, p. 7.
[11] Ohio EPA. 2017, p. 7.

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

**April 13, 2017:** 2 million gallons of drilling fluid pollution accumulating in high quality wetland adjacent to Tuscarawas River in Navarre Township, Stark County; covered 500,000 sq foot area of the category 3 wetland [12]

**April 14, 2017:** 50,000 gallons of drilling fluid pollution released into wetland in Mifflin Township, Richland County, OH [13]

**April 17, 2017:** 200 gallons of drilling fluid pollution released into a pond in Monroe Township, Harrison County, OH [14]

**April 22, 2017:** 200 gallons of drilling fluid pollution released into stream in Wooster Township, Wayne County, OH [15]

**April 26, 2017:** During a West Virginia DEP inspection, 6 violations are found related to Storm Water Pollution Prevention Plan (SWPPP)  and stream sediment deposits.[16]

**May 2, 2017:** unauthorized pollution release from failure to manage stormwater in Bloomdale, Wood County, OH [17]

**May 3, 2017:** unauthorized pollution release into Brushy Fork Creek, Cadiz, Harrison County, OH - failure to control stormwater[18]

**May 8, 2017:** approx. 10,000 gallons of bentonite slurry released during a pipeline installation. The drilling fluids surfaced in a pond and stream in Monroe Township, Harrison County and affected water quality.[19]

**May 8, 2017:** The Ohio EPA fines ETP $431,000 for "18 incidents involving mud spills from drilling, stormwater pollution and open burning at Rover pipeline construction sites have been reported between late March and Monday."[20]

**May 10, 2017:** FERC bans ETP from starting new horizontal directional drilling under waterways and roads.[21]

---

[12] Ohio EPA. 2017, p. 4.
[13] Ohio EPA. 2017, p. 5.
[14] Ohio EPA. 2017, p. 5.
[15] Ohio EPA. 2017, p. 5.
[16] West Virginia Department of Environmental Protection (DEP). 2017. Order Issued Under the Water Pollution Control Act, West Virginia Code, Chapter 22, Article 11. July 17. [link]
[17] Ohio EPA. 2017, p. 7.
[18] Ohio EPA. 2017, p. 7.
[19] Ohio EPA. 2017 p. 5.
[20] Renault, M. 2017. Ohio EPA orders Rover pipeline builder to pay $431,000 for violations. *The Columbus Dispatch*, May 8. [link]
[21] DiSavino, S. 2017. ETP's $4 billion Rover line hits another snag, this time in West Virginia. *Reuters*, July 24. [link]

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

**May 19, 2017:** ETP acknowledges heavy rain causing pipeline trenches and work spaces to fill with water and spill onto fields of Ohio farmers.[22]

**May 24, 2017:** During a West Virginia DEP inspection, 6 violations are found related to Storm Water Pollution Prevention Plan (SWPPP), erosion control and stream sediment deposits.[23]

**May 25, 2017:** FERC rejects ETP request to resume drilling in Captina Creek and Middle Island Creek.[24]

**June 2 & 6, 2017:** During a West Virginia DEP inspection, 5 violations are found related to silt fences, erosion control and stream sediment deposits.[25]

**July 2, 2017:** 5,000 more gallons of drill slurry released into a Stark County area where the company was working on a five-foot borehole that would go under the Tuscarawas River. Work was already underway to deal with a previous spill in that area.[26]

**July 3, 2017:** 1,500 to 2,500 gallons of drilling mud took place at a nearby area ten feet from Tuscarawas River.[27]

**July 7, 2017:** Rover Pipeline LLC pays $1.5 million to the Ohio History Connection Foundation in an effort to mitigate harm after demolishing a building they had promised not to.[28]

**July 12, 2017:** During a West Virginia DEP inspection, 8 violations are found including sediment laden water depositing in nearby creeks and runs.[29]

**July 13, 2017:** FERC also issues a notice of violation claiming that ETP "did not fully and forthrightly disclose all relevant information" before demolishing a historic home.[30]

**July 17, 2017:** West Virginia's DEP issues a cease-and-desist order to stop work in the WV segment of the pipeline.[31]

---

[22] Hendrix, S. & M. Renault. 2017. Stormwater overflow from Rover pipeline construction affecting farms. *The Columbus Dispatch*, May 20. [link]
[23] West Virginia DEP. 2017.
[24] Henry, M. 2017. Rover Pipeline: Feds reject company's bid to restart drilling. *The Columbus Dispatch*, May 26. [link]
[25] West Virginia DEP. 2017.
[26] Ohio EPA. 2017, p. 6.
[27] Ohio EPA. 2017, p. 6.
[28] Gatehouse Ohio Media. 2017. Rover Pipeline settles dispute with state historical foundation for $1.5 million. *The Columbus Dispatch*, June 16. [link]
[29] West Virginia DEP. 2017.
[30] U.S. Federal Energy Regulatory Commission. 2017. Staff Notice of Alleged Violations, July 13. [link]
[31] West Virginia DEP. 2017; Ward Jr., K. 2017. DEP orders halt to Rover Pipeline construction. *Charleston Gazette-Mail*, July 25. [link]

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

**July 18, 2017:** ETP pushes stage-1 deadline from July to "late summer."[32]

**July 28, 2017:** Pipeline drilling causes landslides in Jefferson County, Ohio. According to township trustees, it's a result of drilling near old underground mines.[33]

**July 31, 2017:** Inspectors find failure to properly control erosion and incorrectly-installed sediment control devices in Hancock County, WV.[34]

**August 3, 2017:** Inspectors find failure to properly control erosion and incorrectly-installed sediment control devices in Marshall County, WV.[35]

**August 9, 2017:** West Virginia DEP lifts 7/17/17 cease and desist order.[36]

**August 31, 2017:** FERC approves ETP request to put Phase 1A of Rover Pipeline into service.[37]

**September 18, 2017:** Rover Pipeline, LLC receives permission from the Federal Energy Regulatory Commission to resume drilling construction.[38]

**September 20, 2017**: The Ohio EPA asked the state Attorney General to "hold pipeline officials financially responsible for $2.3 million in fines related to numerous environmental violations."[39]

**September 21, 2017:** Soap wastewater used in boring operations and soil/sediment discharged into approximately 500 feet of waterway requiring 6,000 gallons of water to be recovered by vacuum truck. OH [40]

**September 26, 2017:** Approx 30 gallons of drilling fluids discharged into waters, wetlands in Washington Township, Belmont County, Ohio.[41]

---

[32] 2017. Rover Pipeline's Phase 1 In-Service Date Slips to "Late Summer". *Marcellus Drilling News*, July 18. [link]

[33] Conn, A. 2017. Pipeline drilling causing landslides in Jefferson County. WTOV9, July 31. [link]

[34] West Virginia DEP, Environmental Enforcement. 2017. Notice of Violation. July 31. [link]

[35] West Virginia DEP, Environmental Enforcement. 2017. Notice of Violation. August 3. [link]

[36] West Virginia DEP. 2017. August 9. [link]; Ward Jr., K. 2017. More water violations found on Rover Pipeline construction sites. *Charleston Gazette-Mail*, August 19. [link]

[37] Energy Transfer Partners. 2017.  Energy Transfer Announces FERC Approval to Put Phase 1A of the Rover Pipeline in Service. August 31. [link]

[38] Ohio EPA. 2017b. Rover Pipeline Resumes Construction, Immediately Spills Contaminants in Ohio Stream. September 22. [link]

[39] Renault, M. 2017. Ohio agency wants troubled Rover Pipeline to pay $2.3 million in fines. *The Columbus Dispatch*, September 20. [link]

[40] Ohio EPA. 2017b.

[41] Ohio EPA. 2017c. Subject: Violations from Inadvertent Returns by Rover Pipeline LLC Since September 8, 2017. November 22. [link]

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

**October 11, 2017:** Approx. 1200 gallons of drilling fluids discharged to waters, wetlands in Washington Township, Belmont County, Ohio.[42]

**October 14, 2017:** Rover Pipeline Spills Water Allegedly Containing Gasoline Into Michigan Wetlands[43]

**November 3, 2017**: Ohio Attorney General Mike DeWine files a lawsuit against Rover Pipeline LLC seeking "a court order requiring Rover to apply for state permits, to comply with environmental plans approved and ordered by the Ohio EPA, and to pay civil penalties of $10,000 per day per violation."[44]

**November 9, 2017:** Approx. 60 gallons of drilling fluids discharged to waters, wetlands in Ashland Township, Ashland County.[45]

**November 14, 2017:** Approx. 30 gallons of drilling fluids discharged to waters, wetlands in Milton Township, Ashland County, Ohio.[46]

**November 16, 2017:** Approx. 200 gallons of drilling fluids discharged into Black Fork Mohican River in Milton Township, Ashland County.[47]

**December 14, 2017:** FERC Gives Rover clearance to restart all outstanding underground horizontal directional drilling (HDD) projects, including the location at Tuscarawas River.[48]

**January 17, 2018:** Rover Pipeline Spills Another 150,000 Gallons of Drilling Fluid Into Ohio Wetlands **at same 4/14/2017 site.**[49]

**January 24, 2018:** FERC again orders ETP to halt horizontal directional drilling under the Tuscarawas River in Ohio.[50]

---

[42] Ohio EPA. 2017c.
[43] Chow, L. 2017. Rover Pipeline Spills Water Containing Gasoline Into Michigan Wetlands. *EcoWatch*, October 14. [link]
[44] Ohio Attorney General. 2017. Ohio Files Lawsuit Against Rover Pipeline for Environmental Violations. November 3. [link]
[45] Ohio EPA. 2017c.
[46] Ohio EPA. 2017c.
[47] Ohio EPA. 2017c.
[48] 2017. FERC Gives Rover OK to Resume All HDD Work, Incl. Tuscarawas River. *Marcellus Drilling News*, December 15. [link]
[49] Chow, L. 2018. Rover Pipeline Spills Another 150,000 Gallons of Drilling Fluid Into Ohio Wetlands. *EcoWatch*, January 17. [link]
[50] Chow, L. 2018. FERC Again Orders Drilling Halt on Rover Pipeline Site After Another Spill. EcoWatch, January 25. [link]; Kooistra, R. & J. Hites. 2018. FERC Staff Directs Rover Pipeline to Cease HDD Activity at the Tuscarawas River Site. *Washington Energy Report*, January 29. [link]

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

**January 29, 2018:** "Rover **is frustrated** by the inaccurate central premise underlying the letter received from the Federal Energy Regulatory Commission (FERC) ... directing operations to cease at the Tuscarawas River."[51]

**February 6, 2018:** FERC Gives Rover Pipeline permission to Restart Drilling Under Tuscarawas River[52]

**February 14, 2018:** Sen. Maria E. Cantwell (D-Wash.) and Rep. Frank Pallone Jr. (D-NJ) ask FERC for a briefing on the Rover Pipeline project **no later than 2/28/18.** [53]

**February 21, 2018:** Ohio EPA files a letter with FERC claiming the presence of toxic chemical tetrachloroethene at Rover's underground drilling site at the Tuscarawas River in southern Stark County.[54]

**March 5, 2018:** West Virginia Department of Environmental Protection orders a halt to construction after finding multiple water pollution violations.[55]

---

[51] Reuters staff. 2018. ETP says frustrated by order to stop Rover pipeline drilling in Ohio. *Reuters*, January 29. [link]

[52] 2018. FERC Gives Rover Pipe OK to Restart Drilling Under Tuscarawas River. *Marcellus Drilling News*, February 7. [link]

[53] Snow, N. 2018. US Congressional committees request FERC for Rover gas line briefing. Oil & Gas Journal, February 16. [link]; Pallone, F. & M. Cantwell. 2018. Letter to Kevin J. McIntyre. February 14. [link]

[54] 2018. Ohio EPA Continues to Target Rover Pipe in New FERC Letter. *Marcellus Drilling News*, February 21. [link]

[55] Mishkin, K. 2018.  WV DEP orders Rover Pipeline to stop construction, citing multiple violations. *Charleston Gazette-Mail*, March 13. [link]; West Virginia DEP. 2018. Order Issued Under the Water Pollution Control Act, West Virginia Code, Chapter 22, Article 11. March 5. [link]

**Oil and Water: ETP & Sunoco's History of Pipeline Spills**
Greenpeace USA and Waterkeeper Alliance

# EXHIBIT B

**BRIAN K. FITZPATRICK**
1ST DISTRICT, PENNSYLVANIA

**PROBLEM SOLVERS CAUCUS**
CO-CHAIRMAN

271 CANNON HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
(202) 225-4276

1717 LANGHORNE-NEWTOWN RD.
SUITE 225
LANGHORNE, PA 19047
(215) 579-8102



**Congress of the United States**
**House of Representatives**
**Washington, DC 20515**

**COMMITTEES**

**INTELLIGENCE**
NATIONAL INTELLIGENCE
CHAIRMAN
DEFENSE INTELLIGENCE

**WAYS AND MEANS**
OVERSIGHT AND INVESTIGATIONS
HEALTH

**FOREIGN AFFAIRS**
INTELLIGENCE LIAISON

**NATO PARLIAMENTARY ASSEMBLY**

March 11, 2025

Acting Administrator Ben Kochman
Pipeline and Hazardous Materials Safety Administration
U.S. Department of Transportation
1200 New Jersey Ave, SE
Washington, DC 20590

Dear Acting Administrator Kochman,

I am writing to continue our ongoing dialogue concerning the Sunoco Pipeline that runs through Upper Makefield Township, which is operated by Energy Transfer. With each passing day, new evidence continues to surface, yet the questions raised months ago remain unanswered. Last week, I had the opportunity to meet in person with the resident Task Force that has been leading the advocacy efforts in the wake of the pipeline leak. As reflected in these persistent letters, the direct comments from constituents to your staff, and the shared anecdotes, it is clear that the community needs answers. Our community seeks assurances that the pipeline beneath their homes poses no threat to their safety or the environment. During our meeting, the Task Force presented several questions directed at both Energy Transfer and PHMSA, which I am passing along  and hope you will consider addressing with urgency and providing all documentation requested in the below questions. I believe these questions are crucial for the continued protection of our residents and the environment.

**Questions for PHMSA regarding Energy Transfer:**

1. What event or series of events triggered Sunoco to install Type A sleeves in the 1990s on the Twin Oaks pipeline?

2. What loss tolerance thresholds were established for the Twin Oaks pipeline before January 2025? Specifically, at what volumetric discrepancy levels does your agency's protocol mandate investigation until the cause is identified and remediated? What is the documented discrepancy between shipped and received petroleum volumes on the Twin Oaks pipeline since 2015, especially concerning volumetric losses not officially reported as releases to PHMSA?

3. Can PHMSA provide evidence that Sunoco has comprehensive and effective emergency response plans to adequately protect densely populated residential areas and critical natural resources in the event of a major pipeline failure? What enhanced preventative measures have been specifically implemented in the Mt. Eyre Manor neighborhood compared to lower-risk sections of the Twin Oaks pipeline? Please provide details on community engagement, inspection methodologies (internal and external), and specialized training for personnel responsible for this segment.

4. According to capital investment plans made before January 2025, what is the projected timeline for the complete replacement or major rehabilitation of the Twin Oaks pipeline infrastructure?

5. Can PHMSA provide the size, geographic location, and specific location on the pipe of any known dents on the Twin Oaks to Newark pipeline? Does the most recent inspection data indicate any metal loss, cracking, or stress risers at these dent locations, including the bottom dent associated with the leak in Upper Makefield?

6. Has Sunoco determined the age of the petroleum products recovered thus far? Please provide a chronological list of all hazardous liquids transported through the Twin Oaks to Newark pipeline from 2017 (the last known crack tool date) to present, including material safety data sheets and any additives such as corrosion inhibitors.

7. Can PHMSA provide the maintenance records and inspection data for inspections conducted after the earthquake on April 5th, 2024, and flooding on July 15th, 2023? How many near-miss incidents have been documented on the Twin Oaks pipeline system since 1980, according to your internal records maintained under API 1173 standards?

8. Many pipeline markers have been found missing, damaged, or decayed. What is Sunoco's plan for maintaining proper safety markers to ensure that residents and emergency response personnel have the necessary information? It has been years since emergency services in Upper Makefield have received pertinent pipeline information from Sunoco.

## General Questions for PHMSA:

1. What threshold of evidence or severity of incidents must be met for PHMSA to recommend or mandate the immediate shutdown of a hazardous liquids pipeline, and how close is Sunoco's pipeline to reaching that threshold?

2. PHMSA has previously mandated pipeline shutdowns due to Type A sleeve failures and related integrity concerns. Given Sunoco's pipeline has experienced similar or equally serious issues, why has PHMSA not enforced the same action and mandated an immediate shutdown?

3. Has PHMSA independently verified Sunoco's pipeline inspection data and confirmed the absence of similar conditions to those that led to prior shutdowns, or has PHMSA primarily relied on self-reporting by Sunoco?

4. What specific criteria does PHMSA use to determine when a pipeline poses an unacceptable risk and must be immediately shut down, considering Sunoco's documented history of spills, leaks, regulatory violations, and ongoing safety concerns?

5. Can PHMSA provide full transparency regarding how it evaluates and compares pipeline integrity violations, such as Type A sleeve failures, to ensure fair and consistent application of pipeline safety enforcement, including decisions around shutdowns or continued operation?

As of 2023, 40.2% of hazardous liquid pipeline miles and 54.4% of gas transmission miles were installed before 1970. In November 2024, PHMSA issued an Advisory Bulletin identifying 9 pre-1970 pipe manufacturers, including National Tube Supply, whose pipes may have issues with hard spots that lead to cracks. Despite offering 6 safety actions for pipeline operators, Energy Transfer representatives were unaware of National Tube Supply's inclusion on PHMSA's list or any related safety actions. Given the high percentage of older pipelines, the final question to the agency is: Why are PHMSA's actions not mandatory?

Our community deserves to know that safety is a priority, and their concerns are being addressed with the urgency and seriousness they warrant. I respectfully ask that these questions raised by our constituents receive full and fair consideration as I believe this information is necessary information to protect our community.

Thank you for your prompt attention to this matter and I eagerly look forward to your response.

Sincerely,

Brian K. Fitzpatrick (PA-1)
*Member of Congress*

# EXHIBIT C

**Exhibit B_Page 426 of 583**



U.S. Department of Transportation
**Pipeline and Hazardous Materials**
**Safety Administration**

8701 S. Gessner, Suite 630
Houston TX 77074

**VIA ELECTRONIC MAIL TO: tom.long@energytransfer.com**

February 13, 2025

Thomas Long
Chief Executive Officer
Energy Transfer LP
8111 Westchester Drive
Dallas, TX 75225

**CPF No. 4-2025-054-NOPSO**

Dear Mr. Long:

Enclosed is a Notice of Proposed Safety Order (Notice) issued in the above-referenced case. The Notice proposes that Sunoco Pipeline, LP, take certain measures with respect to the Sunoco Twin Oaks Discharge pipeline system to ensure pipeline safety. Your options for responding are set forth in the Notice. Service of this Notice by electronic mail is deemed effective upon the date of transmission, or as otherwise provided under 49 CFR § 190.5.

We look forward to a successful resolution to ensure pipeline safety. Please direct any questions on this matter to me at (713) 773-7215.

Sincerely,

BRYAN JEFFERY
LETHCOE

Digitally signed by BRYAN
JEFFERY LETHCOE
Date: 2025.02.13 10:42:22 -06'00'

Bryan Lethcoe
Director, Southwest Region, Office of Pipeline Safety
Pipeline and Hazardous Materials Safety Administration

Enclosure:    Notice of Proposed Safety Order
              Copy of 49 C.F.R. § 190.239

Cc:           Ms. Linda Daugherty, Deputy Associate Administrator for Field Operations, OPS
              Greg McIlwain, Executive Vice President, Operations, Energy Transfer LP
              Eric Amundsen, Senior Vice President, Operations, Energy Transfer LP
              Todd Stamm, Senior Vice President, Operations, Energy Transfer LP
              Jennifer Street, Senior Vice President, Operations Services, Energy Transfer LP
              Keegan Pieper, Assistant General Counsel, Energy Transfer LP
              Mr. Matthew Stork, Vice President, Technical Services, Energy Transfer LP

Mr. Todd Nardozzi, Director – DOT Compliance, Energy Transfer LP
Ms. Susie Sjulin, Director – DOT Compliance, Energy Transfer LP
Mr. Vince Murchison, Murchison O'Neill PLLC

**DEPARTMENT OF TRANSPORTATION**
**PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION**
**OFFICE OF PIPELINE SAFETY**
**SOUTHWEST REGION**
**HOUSTON, TEXAS**

|  |  |  |
|---|---|---|
| **In the Matter of** | ) | |
| | ) | |
| **Sunoco Pipeline LP,** | ) | **CPF No. 4-2025-054-NOPSO** |
| | ) | |
| **Respondent** | ) | |

**NOTICE OF PROPOSED SAFETY ORDER**

**Introduction and Purpose**

The Pipeline and Hazardous Materials Safety Administration (PHMSA), Office of Pipeline Safety (OPS), is issuing this Notice of Proposed Safety Order (NOPSO or Notice) to Sunoco Pipeline LP (Sunoco or Respondent)[1] pursuant to the authority provided in 49 U.S.C. § 60117 and 49 CFR § 190.239. As explained in more detail below, PHMSA has initiated an investigation of the safety of Sunoco's Twin Oaks Discharge pipeline system (Twin Oaks Pipeline or Pipeline) in Upper Makefield Township, Bucks County, Pennsylvania. PHMSA initiated the investigation in response to a release on the Twin Oaks Pipeline that Sunoco discovered on January 31, 2025 (Failure).[2] The Twin Oaks Pipeline is a hazardous liquid pipeline facility that is subject to PHMSA's jurisdiction pursuant to the Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.*, and Pipeline Safety Regulations, 49 CFR Parts 190 to 199.

PHMSA's ongoing investigation indicates that conditions may exist on the Twin Oaks Pipeline that pose a pipeline integrity risk to public safety, property, or the environment. Specifically, PHMSA's preliminary investigation indicates that the Pipeline experienced a leak in a high consequence area for at least 16 months, resulting in the release of jet fuel that has migrated into several adjacent water wells and caused additional impacts to property and the environment. PHMSA's preliminary investigation also indicates that the leak originated at a sleeve installed in the mid-1990s, that there are at least 44 other sleeves of a similar vintage installed at other locations on the Pipeline, and that these locations may be at risk of experiencing a similar leak in the future. For these reasons, it appears that the continued operation of the Twin Oaks Pipeline without corrective measures would pose a pipeline integrity risk to public safety, property, or the environment.

---

[1] Sunoco is a subsidiary of Energy Transfer LP.
[2] Sunoco became aware of the release on January 31, 2025, however, the first day of the release is unknown.

This NOPSO notifies Sunoco of the preliminary findings of the investigation and proposes that Sunoco take measures to ensure that the public, property, and the environment are protected from the potential risk.

**Background**

On September 25, 2023, the Pennsylvania Public Utilities Commission (PAPUC) notified PHMSA of an odor complaint that a resident at 128 Walker Road, Upper Makefield Township, Pennsylvania, previously reported to the Pennsylvania Department of Environmental Protection (PADEP). The resident's report indicated that there was a strange taste and the smell of gasoline in their well water.

After being notified of the odor complaint, PHMSA directed Sunoco to conduct an investigation. Sunoco responded by testing additional local wells, performing soil testing, and excavating a 25-foot section of the Twin Oaks Pipeline. Sunoco did not discover a leak at that time, and all samples indicated a negative result for hydrocarbons.

On January 21, 2025, PADEP informed PHMSA that samples obtained from a well at the property located at 107 Spencer Road, Upper Makefield Township, Pennsylvania, indicated the presence of kerosene (a major component of JP-8 jet fuel). PHMSA Accident Investigation Division (AID) notified Sunoco of these results and directed Sunoco to conduct another investigation.

On January 31, 2025, Sunoco identified a leak on the Twin Oaks Pipeline after excavating a previously repaired location adjacent to 121 Glenwood Drive, at pipeline station 52/4170 (2787+30). The leak appeared to be a slow drip from a sleeved portion of the pipeline. The sleeve had been installed in 1995 to reinforce a dent.

After locating the leak, Sunoco shut-in a segment of the Twin Oaks Pipeline by closing valves at Bucks pump Station, Delaware River (West), Delaware River (East), and Hopewell. High and low point vent and extraction vent thread-o-ring fittings (TORs) were installed to drain the jet fuel product to vacuum trucks and tankers at the extraction points. Sunoco cut out the failed section without removing the Type A sleeve and transported that section to Columbus, Ohio, for inspection and metallurgical analysis by a third party, DNV.

Sunoco notified the National Response Center (NRC) of the release on the Twin Oaks Pipeline at 16:25 Eastern Time on January 31, 2025. Sunoco made a second report to the NRC on February 2, 2025, at 16:03 Eastern Time and provided an estimated release amount of 156 barrels. Sunoco also notified PADEP.

On February 2, 2025, Sunoco completed its repair of the failed section and returned the Twin Oaks Pipeline to service. The Twin Oaks Pipeline is currently operating at a reduced pressure of 880 pounds per square inch gauge (psig), which is 20 percent below the operating pressure at the time Sunoco discovered the failure.

The preliminary findings of PHMSA's ongoing investigation are as follows:

3

**Preliminary Findings:**

- The Twin Oaks Pipeline is a 14-inch diameter pipeline that transports petroleum products, including jet fuel, diesel, and gasoline, from the Twin Oaks Terminal in Aston, Pennsylvania, to the Newark Terminal in Newark, New Jersey. The Twin Oaks Pipeline includes one break out tank in the Newark Terminal, and one pump station in Bucks County, Pennsylvania.

- The Twin Oaks Pipeline was originally constructed in 1958. The pipe at the failure location is 0.25 inches thick, API 5L grade X-52, seamless, and was manufactured by National Tube Supply Company. The pipeline has a somastic (asphalt mastic) coating and cathodic protection. The maximum operating pressure (MOP) of the Twin Oaks Pipeline is 1200 psig. When Sunoco discovered the failure, the operating pressure was 1100 psig.

- On September 25, 2023, PHMSA notified Sunoco of an odor complaint that PADEP received from a resident at 128 Walker Road. Sunoco investigated the complaint as follows:

  o Respondent dispatched a pipeline technician to probe with a photoionization detector (PID) Gas detector along the pipeline behind 121 Glenwood and in front of 128 Walker and 123 Glenwood; all results were reported as non-detect.

  o Respondent hired a contractor to test the well water at 128 Walker Road; results were reported as non-detect. The contractor also tested the well water for 121 and 123 Glenwood Drive, and 126 Walker Road; all results were reported as non-detect.

  o Respondent excavated about 25 feet of the pipeline located behind 121 Glenwood Drive with no issues or concerns detected. Respondent performed soil testing in the excavation and those results were reported as non-detect.

  o The operator performed a 4-hour static pressure test to check for lowering pressure indicative of a pipeline leak; Respondent has indicated that the results were reported to be within acceptable limits.

- On June 28, 2024, Respondent received an odor complaint from 108 Spencer Road. Respondent investigated the complaint as follows:

  o Respondent dispatched a pipeline technician with a 4 - Gas detector to the site; all results were reported as non-detect. No dead vegetation or anything out of the ordinary was observed above the pipeline.

  o Respondent did not report this odor complaint to PHMSA.

**Exhibit B_Page 431 of 583**

4

- On July 21, 2024, Respondent received an odor complaint from 121 Glenwood Drive. Respondent investigated the complaint as follows:

  o Respondent dispatched a pipeline technician to the site and probed with a 4 - Gas detector; all results were reported as non-detect. No dead vegetation or anything out of the ordinary was observed above the pipeline.

  o Respondent did not report this odor complaint to PHMSA.

- On November 21, 2024, Respondent received an odor complaint from 107 Spencer Road. Respondent investigated the complaint as follows:

  o Respondent dispatched a pipeline technician and probed with a 4 - Gas detector to the site; all results were reported as non-detect. No dead vegetation or anything out of the ordinary was observed above the pipeline.

  o Respondent performed a 4-hour static pressure test to check for lowering pressure indicative of a pipeline leak; the results were reported to be within acceptable limits (although acceptance criteria were not reported by the operator).

  o Respondent did not report this odor complaint to PHMSA.

- On January 21, 2025, PADEP informed PHMSA that samples obtained from a well at 107 Spencer Road indicated the presence of kerosene (a major component of JP-8 jet fuel). PHMSA AID notified Sunoco of the test results and directed Sunoco to investigate.

- From January 22 through January 31, 2025, Respondent proceeded to probe the entire pipeline from 121 Glenwood Drive to 155 Glenwood Drive using a PID Gas detector; all results were non-detect. Respondent had a contractor sample about twenty-five (25) landowners' well water for hydrocarbons. Three (3) landowners' wells were identified as having positive results for hydrocarbons at 107 Spencer Road, 108 Spencer Road, and 128 Glenwood Drive.

- On January 31, 2025, Respondent identified the leak location after excavating a previously repaired location on the pipeline adjacent to 121 Glenwood Drive, at station 52/4170 (2787+30). Visual inspection revealed that the leak was a slow drip from a Type A sleeve originally installed in 1995. Type A sleeves are used to reinforce a portion of pipe with a non-leaking defect, with the goal of restoring the pipeline's original strength.

- The Failure occurred adjacent to 126 Walker Rd, Upper Makefield Township, Bucks County, Pennsylvania. The exact start date of the Failure is unknown. The failure occurred in a High Consequence Area (HCA) as defined in 49 CFR § 195.450, located in a residential subdivision just to the west of the Delaware River. The Twin Oaks

Pipeline runs through mostly suburban areas. It travels in a northeast direction from Philadelphia, Pennsylvania, to Newark, New Jersey. The pipeline crosses numerous rivers and waterways and runs adjacent to numerous state and local parks.

- Sunoco notified the National Response Center (NRC) of the Failure at 16:25 Eastern Time on January 31, 2025, and reported a release of 156 barrels of jet fuel.

- After locating the leak, Sunoco shut in a segment of the Twin Oaks Pipeline, closing valves at Bucks pump Station, Delaware River (West), Delaware River (East), and Hopewell. High and low point vent and extraction vent thread-o-ring fittings (TORs) were installed to drain the jet fuel product to vacuum trucks and tankers at the extraction points.

- Sunoco cut out the failed section of the Twin Oaks Pipeline without removing the Type A sleeve and transported the pipe to DNV in Columbus, Ohio, for inspection and metallurgical analysis.

- On February 2, 2025, PHMSA Southwest Region Director by email informed Sunoco he did not object to the repair plan and return to service plan for the pipeline.

- Sunoco completed the repairs and returned the pipeline to service on February 2, 2025.

- Local drinking water wells are contaminated with JP-8 jet fuel to varying degrees. Jet fuel apparently has entered the aquafer and is detected in various quantities in surrounding drinking water wells to the east of the Failure location.

- The release of jet fuel poses a risk to public safety, property, or the environment. Jet fuel is a colorless flammable liquid that ignites at certain temperatures; jet fuel exposure can lead to skin irritation and drowsiness or dizziness in affected populations; and jet fuel ingestion may cause harm to the respiratory tract, gastrointestinal tract, and nervous systems.[3]

- During a public meeting held on February 6, 2025, residents of other neighborhoods located in the vicinity of the Failure reported a gasoline smell in their water.

- On February 8 and February 10, 2025, Sunoco excavated five (5) locations immediately upstream of the Failure location to evaluate the condition of six (6) Type A sleeves that had been installed in 1989 to reinforce a variety of defect types. These excavations discovered no additional leaks and no abnormal conditions were noted.

- On February 12, 2025, PHMSA investigators witnessed the preliminary phase of the metallurgical testing of the portion of the pipeline that Sunoco sent to DNV for further

---

[3] "Public Health Statement: JP-5, JP-8, and Jet A Fuels," Agency for Toxic Substances and Disease Registry, Division of Toxicology and Human Health Services, March 2017, https://www.atsdr.cdc.gov/ToxProfiles/tp121-c1-b.pdf. These hazards are confirmed by the Safety Data Sheets (SDS) for the JP-8 jet fuel transported in the Twin Oaks Pipeline.

analysis. The preliminary testing indicates that the failure occurred as a result of a 2.5-inch axial crack associated with a bottom-side dent.

- Sunoco has advised PHMSA that there are at least forty-four (44) other Type A sleeves on the Twin Oaks Pipeline that were installed in the late 1980s and early 1990s. PHMSA understands some of those Type A sleeves were installed to reinforce dents.

- PHMSA is aware of a gasoline release in Huntersville, North Carolina, discovered on August 14, 2020, in which 28,571 barrels were released through a through-wall crack which developed in a shallow dent reinforced with a Type A sleeve. The release was also not detected by the pipeline operator's leak detection system.

- Prior to this Failure, there have been two (2) reportable failures on the Twin Oaks Pipeline since 1986.

  o On October 7, 1986, a failure occurred in Montgomery County, Pennsylvania, which was caused by a crack in the pipeline, resulting in the release of 5260 barrels of refined product.

  o On March 19, 2004, a failure occurred in Delaware County, Pennsylvania, which was caused by external corrosion, resulting in the release of 50 barrels of refined product.

- The investigation of the Failure is on-going, and information could change. These preliminary findings may be amended based on further findings during the investigation.

**Proposed Issuance of Safety Order**

Section 60117(m) of Title 49, United States Code, provides for the issuance of a safety order, after reasonable notice and the opportunity for a hearing, requiring corrective measures, which may include physical inspection, testing, repair, or other action, as appropriate. The basis for making the determination that a pipeline facility has a condition or conditions that pose a pipeline integrity risk to public safety, property, or the environment is set forth both in the above-referenced statute and 49 CFR § 190.239, a copy of which is enclosed.

After evaluating the foregoing preliminary findings of fact, and having considered the characteristics of the pipeline, including prior Type-A sleeve repairs involving dents and other defects; the prior failures of the pipeline; the hazardous nature of the petroleum products, including jet fuel, transported; the uncertainty as to the root cause(s) of the failure; the proximity of the pipeline to residential dwellings and water wells; the existing and potential additional impacts to property, the environment, and wildlife; and the possibility that the same condition(s) that may have caused the failure remain present in the pipeline and could lead to additional failures; it appears that the continued operation of the Twin Oaks Discharge pipeline system without corrective measures would pose a pipeline integrity risk to public safety, property, or the environment. The conditions and threats described above potentially exist throughout the Twin

Oaks Pipeline.  Further, Sunoco's apparent inability to effectively detect the leak has potentially exacerbated the impacts of the release over an extended period of time.  Accordingly, corrective measures are necessary to mitigate the pipeline integrity risk of the pipeline system to protect public safety, property, and the environment.

Accordingly, PHMSA issues this Notice of Proposed Safety Order to notify Respondent of the proposed issuance of a safety order and to propose that Respondent take measures specified herein to address the potential risk.

**Proposed Corrective Measures**

Pursuant to 49 U.S.C. § 60117(m) and 49 CFR § 190.239, PHMSA proposes to issue to Sunoco a safety order incorporating the following remedial requirements with respect to the affected pipeline.

For the purposes of this Notice, "Director" means the Director, PHMSA, Office of Pipeline Safety, Southwest Region.  "*Affected Pipeline*" refers to the entire Twin Oaks Pipeline, which is approximately 105.5 miles in length from the Twin Oaks Terminal in Aston, Pennsylvania, to the Newark Terminal in Newark, New Jersey.

1. **Operating Pressure Restriction.**  Sunoco must reduce and maintain a twenty percent (20%) pressure reduction in the actual operating pressure along the entire length of the *Affected Pipeline*, such that the operating pressure does not exceed eighty percent (80%) of the actual operating pressure in effect immediately prior to the Failure discovered on January 31, 2025.

   a. This pressure restriction is to remain in effect until written approval to increase the pressure or return the pipeline to its pre-Failure operating pressure is obtained from the Director.

   b. Within 15 days of receipt of the Safety Order, Sunoco must provide the Director the actual operating pressures of each pump station and each main line pressure regulating station on the *Affected Pipeline* at the time of the Failure discovered on January 31, 2025, and the reduced pressure restriction set-points at these same locations.

   c. This pressure restriction requires any relevant remote or local alarm limits, software programming set-points or control points, and mechanical over-pressure devices to be adjusted accordingly.

   d. When determining the pressure restriction set-points, Sunoco must take into account any in-line inspection (ILI) features or anomalies present in the *Affected Pipeline* to provide for continued safe operation while further corrective actions are completed.

   e. Sunoco must review the pressure restriction monthly by analyzing the operating pressure data, taking into account any ILI features or anomalies present in the *Affected Pipeline.*  Sunoco must immediately reduce the operating pressure to maintain the safe operations of the *Affected Pipeline*, if warranted by the monthly review.  Further, Sunoco must submit the results of the monthly review to the Director including, at a

minimum, the current discharge set-points (including any additional pressure reductions), and any pressure exceedance at discharge set-points.

2. **Type A Sleeve Integrity Plan**.  Within 90 days of receipt of the Safety Order, Sunoco must provide to the Director for approval a plan to evaluate the integrity of each Type A sleeve on the *Affected Pipeline*.  In preparing that plan, Sunoco must consider type, characteristics (size, depth, orientation), and other integrity considerations of the anomaly(ies) or defect(s) reinforced by the sleeve; sleeve characteristics (age, grade, length, thickness, coating, wrap, use of epoxy); cathodic protection; inline inspection results; nondestructive evaluation or testing records; and any other relevant factors in evaluating the integrity of a Type A sleeve.  The plan must also provide for the removal of each Type A sleeve on the *Affected Pipeline* whose integrity cannot be reasonably assured.  The plan must be part of the Remedial Work Plan developed in Item 3 below.  For any sleeve not removed, the plan must provide a technical justification for the Type A Sleeve remaining on the *Affected Pipeline* and describe the additional pipeline integrity management measures to be implemented to ensure the safety and integrity of the *Affected Pipeline* in light of any integrity risk related to the sleeve.

3. **Remedial Work Plan (RWP).**

   a.  Within 90 days of receipt of the Safety Order, Sunoco must submit a Remedial Work Plan (RWP) to the Director for prior approval.

   b.  The Director may approve the RWP incrementally without approving the entire RWP.

   c.  Upon approval by the Director, the RWP becomes incorporated by reference into the Safety Order.

   d.  The RWP must specify the tests, inspections, assessments, evaluations, and remedial measures Respondent will use to verify the integrity of the *Affected Pipeline*. It must address all known or suspected factors and causes of the Failure discovered on January 31, 2025.  Sunoco must consider the risks and consequences of another failure to develop a prioritized schedule for RWP-related work along the *Affected Pipeline*.

   e.  The RWP must include a procedure or process to:

      i.  Identify pipe in the *Affected Pipeline* with characteristics similar to the contributing factors identified for the Failure discovered on January 31, 2025.

      ii.  Gather all data necessary to review the failure history (in service and pressure test failures) of the *Affected Pipeline* and to prepare a written report containing all the available information such as the locations, dates, and causes of leaks and failures.

      iii.  Integrate the results of the metallurgical testing, root cause failure analysis, and other corrective actions required by this Order with all relevant pre-existing operational and assessment data for the *Affected Pipeline*.  Pre-existing operational data includes, but is not limited to, design, construction, operations, maintenance, testing, repairs, prior metallurgical analyses, and any third-party consultation information.  Pre-existing assessment data includes, but is not limited to, ILI tool runs, hydrostatic pressure testing, direct assessments, close interval surveys, and

DCVG/ACVG surveys.

iv. Determine if conditions similar to those contributing to the Failure discovered on January 31, 2025, are likely to exist elsewhere on the *Affected Pipeline.*

v. Conduct additional field tests, inspections, assessments, and evaluations to determine whether, and to what extent, the conditions associated with the Failure discovered on January 31, 2025, and other failures from the failure history (see (e)(ii) above) or any other integrity threats are present elsewhere on the *Affected Pipeline*.   At a minimum, this process must consider all failure causes and specify the use of one or more of the following:

1) ILI tools that are technically appropriate for assessing the pipeline system based on the cause of Failure discovered on January 31, 2025, and that can reliably detect and identify anomalies,

2) Hydrostatic pressure testing,

3) Close-interval surveys,

4) Cathodic protection surveys, to include interference surveys in coordination with other utilities (e.g., underground utilities, overhead power lines, etc.) in the area,

5) Coating surveys,

6) Stress corrosion cracking surveys,

7) Selective seam corrosion surveys; and

8) Other tests, inspections, assessments, and evaluations appropriate for the failure causes.

Note: Sunoco may use the results of previous tests, inspections, assessments, and evaluations if approved by the Director, provided the results of the tests, inspections, assessments, and evaluations are analyzed with regard to the factors known or suspected to have caused the January 31, 2025 Failure.

vi. Describe the inspection and repair criteria Sunoco will use to prioritize, excavate, evaluate, and repair anomalies, imperfections, and other identified integrity threats. Include a description of how any defects will be graded and a schedule for repairs or replacement.

vii. Based on the known history and condition of the *Affected Pipeline,* describe the methods Sunoco will use to repair, replace, or take other corrective measures to remediate the conditions associated with the pipeline failure on January 31, 2025, and to address other known integrity threats along the *Affected Pipeline*.   The repair, replacement, or other corrective measures must meet the criteria specified in (e)(vi) above.

viii. Evaluate the effectiveness and capability of Sunoco's leak detection system on the *Affected Pipeline*, including main lines, stub lines, and delivery lines.  At a minimum, Sunoco's evaluation must consider the following factors—length and size of the pipeline, type of product carried, the swiftness of leak detection, limitations on detectable quantities, location of nearest response personnel, and

leak history.  This evaluation must also consider maximum operating pressure (MOP), normal operating pressures, flow rates (or throughput), and impacts from any pressure cycles or operational changes.  For mainline segments that could affect high consequence areas (HCAs), Sunoco's evaluation must consider the pipeline's proximity to the HCA and risk assessment results.

    ix. Based on the findings of the evaluation pursuant to paragraph viii of this subparagraph, determine corrective measures to improve the effectiveness of Sunoco's leak detection system. Sunoco must consider latest advancements in technology that present the potential to improve the capability of its leak detection system to detect the type of leak that occurred.  The corrective measures must result in improving the capability of the leak detection system to detect leaks that could potentially affect public safety, property, or the environment, similar to (but not limited to) leaks with characteristics common to those referenced above.

    x. Evaluate Sunoco's written plans and procedures for inspection and maintenance that address leak detection, right-of-way inspection and repairs and determine the extent to which the written plans contribute to the elimination of hazardous leaks. Based on the findings, determine appropriate amendments to improve the extent to which the plans contribute to the elimination of hazardous leaks.

    xi. Evaluate the effectiveness of Sunoco's ROW inspection program as it pertains to leak detection.  This evaluation must consider any geographic regions or features (i.e., HCAs and other sensitive areas) that may require specific or additional means of patrol. Based on the findings, determine corrective measures to improve the effectiveness of Sunoco's ROW inspection program relative to leak detection.

    xii. Implement continuing long-term periodic testing and integrity verification measures  to ensure the ongoing safe operation of the *Affected Pipeline* considering the results of the analyses, inspections, evaluations, and corrective measures undertaken pursuant to the Order.

  f. Include a proposed schedule for completion of the RWP.

  g. Sunoco must revise the RWP as necessary to incorporate new information obtained during the failure investigation and remedial activities, to incorporate the results of actions undertaken pursuant to the Safety Order, and/or to incorporate modifications required by the Director.

    i. Submit any plan revisions to the Director for prior approval.

    ii. The Director may approve plan revisions incrementally.

  h. Implement the RWP as it is approved by the Director, including any revisions to the plan.

4. **Third-Party Facilitator**. Paragraphs (e)(viii) through (e)(xi) of the Work Plan must be facilitated by an independent third-party with relevant expertise approved by the Director.

Any documentation from the third-party facilitator must be included in each required submission to the Director.

5. **Instrumented Leakage Survey.** Within 30 days after the Safety Order is issued, Sunoco must perform a ground instrument leakage survey of the *Affected Pipeline*. Sunoco must investigate all leak indications and remedy all leaks discovered. Sunoco must submit documentation of this survey to the Director within 45 after the Safety Order is issued.

6. **Review of Prior In-line Inspection (ILI) Results.**

   a. Within 30 days after the Safety Order is issued, Respondent must conduct a review of any previous ILI results of the *Affected Pipeline*. In its review, Sunoco must re-evaluate all ILI results from the past 10 calendar years, including a review of the ILI vendors' raw data and analysis. Sunoco must determine whether any features were present in the failed pipe joint and any other pipe removed. Also, Respondent must determine if any features with similar characteristics are present elsewhere on the *Affected Pipeline*. Sunoco must submit documentation of this ILI review to the Director within 45 days after the Safety Order is issued as follows:

      i. List all ILI tool runs, tool types, and the calendar years of the tool runs.

      ii. List, describe (type, size, wall loss, etc.), and identify the specific location of all ILI features present in the failed joint and other pipe removed.

      iii. List, describe (type, size, wall loss, etc.), and identify the specific location of all ILI features with similar characteristics present elsewhere on the *Affected Pipeline*.

      iv. Explain the process used to review the ILI results and the results of the reevaluation.

7. **Mechanical and Metallurgical Testing**. Within 45 days after the Safety Order is issued, Sunoco must complete mechanical and metallurgical testing and failure analysis of the failed pipe, including an analysis of soil samples and any foreign materials. Mechanical and metallurgical testing must be conducted by an independent third-party acceptable to the Director and must document the decision-making process and all factors contributing to the failure. Respondent must complete the testing and analysis as follows:

   a. Document the chain-of-custody when handling and transporting the failed pipe section and other evidence from the Failure site.

   b. Within 10 days of receipt of this Order, develop and submit the testing protocol and the proposed testing laboratory to the Director for prior approval.

   c. Prior to beginning the mechanical and metallurgical testing, provide the Director with the scheduled date, time, and location of the testing to allow for an OPS representative to witness the testing.

   d. Ensure the testing laboratory distributes all reports whether draft or final in their entirety to the Director at the same time they are made available to Respondent.

8. **Root Cause Failure Analysis.** Within 90 days after the Safety Order is issued, complete a root cause failure analysis (RCFA) and submit a final report of this RCFA to the

12

Director.  The RCFA must be supplemented or facilitated by an independent third-party acceptable to the Director and must document the decision-making process and all factors contributing to the Failure.  The final report must include findings and any lessons learned and whether the findings and lessons learned are applicable to other locations within Sunoco's pipeline system.

9. **Leak Detection Plan.** Within 90 days after the Safety Order is issued, Sunoco must perform a review and submit to the Director a written plan to improve the leak detection capability on the *Affected Pipeline*.  This review must include a comprehensive analysis of any SCADA, leak detection, surveillance, and other monitoring systems on the *Affected Pipeline*.  The written plan must include a schedule for improving the leak detection capability of the *Affected Pipeline* through additional instrumentation, updated hardware or software, installation of a computational pipeline monitoring system and associated software programming, additional surveillance, pipeline control staffing, ongoing leak surveys, and any other appropriate measures.

10. **Emergency Response Plan and Training Review.** Within 90 of receipt of the Safety Order, Sunoco must review and assess the effectiveness of its emergency response plan with regards to the Failure.  Sunoco must include in the review and assessment the on-scene response and support, coordination, and communication with emergency responders and public officials.  Sunoco must also include a review and assessment of the effectiveness of its emergency training program. Sunoco must amend its emergency response plan and emergency training, if necessary, to reflect the results of this review.  The documentation of this *Emergency Response Plan and Training Review* must be available for inspection by OPS or provided to the Director, if requested.

11. **Public Awareness Program Review.**  Sunoco must review and assess the effectiveness of its Public Awareness program with regards to the Failure. Sunoco must amend its Public Awareness Program, if necessary, to reflect the results of this review.  The documentation of this *Public Awareness Plan Program Review* must be available for inspection by OPS or provided to the Director, if requested.

**Other Requirements:**

12. **Approvals.** With respect to each submission under the Safety Order that requires the approval of the   Director, the Director may: (a) approve, in whole or part, the submission; (b) approve the submission on specified conditions; (c) modify the submission to cure any deficiencies; (d) disapprove in whole or in part, the submission, directing that Respondent modify the submission, or (e) any combination of the above. In the event of approval, approval upon conditions, or modification by the Director, Respondent shall proceed to take all action required by the submission as approved or modified by the Director. If the Director disapproves all or any portion of the submission, Respondent must correct all deficiencies within the time specified by the Director and resubmit it for approval.

13. **Extensions of Time.**  The Director may grant an extension of time for compliance with any of the terms of the Safety Order upon a written request timely submitted

**Exhibit B_Page 440 of 583**

demonstrating good cause for an extension.

14. **Reporting.** Submit quarterly reports to the Director that: (1) include all available data and results of the testing and evaluations required by this Order; and (2) describe the progress of the repairs or other remedial actions being undertaken. The first quarterly report is due on April 1, 2025. The Director may change the interval for the submission of these reports.

15. **Documentation of the Costs.** It is requested that Respondent maintain documentation of the costs associated with implementation of the Safety Order. Include in each monthly report submitted, the to-date total costs associated with: (1) preparation and revision of procedures, studies and analyses; (2) physical changes to pipeline infrastructure, including repairs, replacements and other modifications; and (3) environmental remediation.

The actions proposed by this Notice of Proposed Safety Order are in addition to and do not waive any requirements that apply to Respondent's pipeline system under 49 CFR Parts 190 through 199, under any other order issued to Respondent under authority of 49 U.S.C. § 60101 *et seq.*, or under any other provision of Federal or state law.

After receiving and analyzing additional data in the course of this proceeding and implementation of the corrective measures, PHMSA may identify other safety measures that need to be taken. In that event, Respondent will be notified of any proposed additional measures and, if necessary, amendments to the Safety Order.

**Response to this Notice**

In accordance with § 190.239, you have 30 days following receipt of this Notice to submit a written response to the official who issued the Notice. If you do not respond within 30 days, this constitutes a waiver of your right to contest this Notice and authorizes the Associate Administrator for Pipeline Safety to find facts as alleged in this Notice without further notice to you and to issue a Safety Order. In your response, you may notify that official that you intend to comply with the terms of the Notice as proposed, or you may request that an informal consultation be scheduled (you will also have the opportunity to request an administrative hearing before a safety order is issued). Informal consultation provides you with the opportunity to explain the circumstances associated with the risk condition(s) alleged in the notice and, as appropriate, to present a proposal for a work plan or other remedial measures, without prejudice to your position in any subsequent hearing.

If you and PHMSA agree within 30 days of informal consultation on a plan and schedule for you to address each identified risk condition, we may enter into a written consent agreement (PHMSA would then issue an administrative consent order incorporating the terms of the agreement). If a consent agreement is not reached, or if you have elected not to request informal consultation, you may request an administrative hearing in writing within 30 days following receipt of the Notice or within 10 days following the conclusion of an informal consultation that did not result in a consent agreement, as applicable. Following a hearing, if the Associate Administrator finds the facility to

14

have a condition that poses a pipeline integrity risk to the public, property, or the environment in accordance with § 190.239, the Associate Administrator may issue a safety order.

Be advised that all material you submit in response to this enforcement action is subject to being made publicly available. If you believe that any portion of your responsive material qualifies for confidential treatment under 5 U.S.C. 552(b), along with the complete original document you must provide a second copy of the document with the portions you believe qualify for confidential treatment redacted and an explanation of why you believe the redacted information qualifies for confidential treatment under 5 U.S.C. 552(b).

In your correspondence on this matter, please refer to **CPF No. 4-2025-054-NOPSO** and for each document you submit, please provide a copy in electronic format whenever possible.

BRYAN JEFFERY
LETHCOE

Digitally signed by BRYAN
JEFFERY LETHCOE
Date: 2025.02.13 14:32:28
-06'00'

February 13, 2025

Bryan Lethcoe

Date issued

Director, Southwest Region, Office of Pipeline Safety
Pipeline and Hazardous Materials Safety Administration

**Exhibit B_Page 442 of 583**

# EXHIBIT D

**Exhibit B_Page 443 of 583**



Pennsylvania
**Department of
Environmental Protection**

**SENT VIA ELECTRONIC MAIL ONLY**

February 18, 2025

## NOTICE OF VIOLATION

To:     Matthew Gordon, Vice President Operations
        Energy Transfer
        535 Fritztown Road
        Sinking Springs, PA 19333
        matthew.gordon@energytransfer.com

Re:     Mount Eyre Neighborhood
        Washington Crossing LNAPL Incident and Investigation
        Pennsylvania Pipeline (a.k.a. Twin Oaks–Newark Pipeline)
        Upper Makefield Township
        Bucks County

Dear Mr. Gordon:

On January 31, 2025, Energy Transfer notified the Department of Environmental Protection
(DEP) of a discharge from their 14" pipeline located in the Mt. Eyre neighborhood in
Washington Crossing, Bucks County.

This discovery came after investigation by DEP and Energy Transfer and after both
organizations communicated with residents and Upper Makefield Township regarding ongoing
reports of petroleum odors in residential wells.

Energy Transfer has described the discharge as emanating from the sleeved portion of the 14" Jet
Fuel Line.  To date this release has caused free product and dissolved concentrations of
petroleum-related chemicals in potable wells in the neighborhood, with some properties having
contamination exceeding DEP's Statewide health standard medium specific concentrations in
their drinking water.

The above referenced discharge to Waters of the Commonwealth constitutes a violation of
Section 401 of the Clean Streams Law, 35 P.S. § 691.401 (Clean Streams Law).  Such violation
also constitutes unlawful conduct under Section 611 of the Clean Streams Law, 35 P.S. §
691.611, and is subject to the enforcement provisions of Section 605 of the Clean Streams Law,
35 P.S, § 691.605, which includes the assessment of civil penalties.

Matthew Gordon

2                                      February 18, 2025

DEP requests the following information be provided within 15 days of the date of this letter at a minimum:

1.    A description of the circumstances causing the incident and how the circumstances were determined, including historical investigations of the pipeline in this area.

2.    Description and estimated quantity, by weight, volume, or measurement of materials or wastes involved.

3.    An assessment of any contamination of land, surface water, groundwater, or air that has occurred since January 1, 2023.

4.    Estimated quantity and disposition of all recovered materials or wastes that resulted from the incident and plans for ultimate disposal.

5.    A detailed description of response actions, and remedial actions that were taken or are intended to be implemented (date and time of implementation), and how these actions will prevent a similar occurrence in the future.

6.    A copy of any geotechnical, potholing, vapor monitoring, exploratory excavations, soil sampling, or other investigations done since January 1, 2023.

7.    Any and all soil, groundwater, surface water or other sample or screening data collected in the impacted area. This data should be provided from January 1, 2023.

8.    An outline of the steps Energy Transfer will take, including action items, if an actual or suspected pollution event was to happen in the future.

This Notice of Violation is neither an order nor any other final action of DEP.  It neither imposes nor waives any enforcement action available to DEP under any of its statutes.  If DEP determines that an enforcement action is appropriate, you will be notified of the action.

If you have any questions, please contact me at tmagge@pa.gov or 484.250.5136.

Sincerely,

Thomas L. Magge
Environmental Program Manager
Clean Water Program

Matthew Gordon

3                                      February 18, 2025


cc:    Bradford L Fish, Energy Transfer (via email) bradford.fish@energytransfer.com
       Carl G. Borkland, Energy Transfer (via email) carl.borkland@energytransfer.com
       Yvette Taylor, Upper Makefield Township (via email) ytaylor@uppermakefield.org
       David Nymnan, Upper Makefield Township (via email) manager@uppermakefield.org
       Bryan Lethcoe, (PHMSA); bryan.lethcoe@dot.gov
       DEP Environmental Cleanup and Brownfields
       File

# EXHIBIT E

**Exhibit B_Page 447 of 583**



| | 325 North St. Paul Street | 214-716-1923 | PipelineLegal.com |
| --- | --- | --- | --- |
| | Suite 2700 | | |
| | Dallas, Texas 75201 | | |

February 19, 2025

Mr. Bryan Lethcoe                                   Via Email: bryan.lethcoe@dot.gov
Director, Southwest Region
Pipeline and Hazardous Materials Safety Administration
Office of Pipeline Safety
US Department of Transportation
8701 South Gessner, Suite 630
Houston, Texas 77074

**Re:     CPF No. 4-2025-054-NOPSO**
**         Notice of Proposed Safety Order**

Dear Mr. Lethcoe:

The Pipeline and Hazardous Materials Safety Administration's (PHMSA) Notice of Proposed Safety Order (Notice) dated February 13, 2025, was received by Sunoco Pipeline, L.P. (Sunoco) via electronic mail on the same date. This letter constitutes Sunoco's initial response to the Notice and, in addition, clarifies a number of Preliminary Findings presented in the Notice. Capitalized terms not defined herein shall take the meanings ascribed to them by the Notice.

The Notice contained a list of Preliminary Findings and numerous Proposed Corrective Measures to be applied to the Affected Pipeline. The Affected Pipeline is the entirety of the Twin Oaks to Newark 14-inch refined products pipeline. Sunoco contests all of the Preliminary Findings and Proposed Corrective Measures. While Sunoco desires a positive relationship with PHMSA, Sunoco also does not agree with certain alleged factual statements, certain "rush to judgment" conclusions, and the recitation of alleged events involving other operators. Sunoco offers the following initial clarifications:

1.  PHMSA alleges in the Notice, Introduction and Purpose, that "the Pipeline experienced a leak in a high consequence area for at least 16 months."

    **Sunoco Clarification:  There is not sufficient evidence at this time to conclude how long the Affected Pipeline was leaking. Therefore, it cannot be stated with any degree of certainty that the "Pipeline experienced a leak in a high consequence area for at least 16 months". It may turn out, through the investigation and analysis that Sunoco is undertaking, that the leak was effectively detected shortly after it began.**

    **In September 2023, Sunoco responded to an odor complaint in the vicinity of the pipeline, probed the location with a PID gas detector, tested the well water at multiple locations in the area, performed excavations and initiated and completed a static pressure test on the pipeline, which was inclusive of the excavated sections of the pipeline.  No leak was identified.  Subsequent investigations and testing were performed in June, July, and November 2024, following additional odor complaints,**

THE PIPELINE AUTHORITY



**Exhibit B_Page 448 of 583**



PipelineLegal.com

Mr. Bryan Lethcoe
February 19, 2025
Page 2 of 4

but likewise no leak was identified.  This most recent event will be fully investigated, and subsequent reporting and expert analysis will be conducted as part of Sunoco's evaluation, including, where possible and appropriate, the cause and duration of any leak.

2.   PHMSA alleges in the Notice, Introduction and Purpose, that "it appears that the continued operation of the Twin Oaks Pipeline without corrective measures would pose a pipeline integrity risk to public safety, property, or the environment."

**Sunoco Clarification: On January 31, 2025, Sunoco discovered a leak on the Affected Pipeline.  Sunoco cut out the affected section of the pipeline. On February 2, 2025, after receiving approval from PHMSA's Southwest Region Director of its repair plan and intent to return the pipeline to service, Sunoco replaced that affected section of pipe and returned the pipeline to service. There is no evidence of an ongoing leak on the Affected Pipeline.**

3.   PHMSA alleges in the Notice, Preliminary Findings, that "PHMSA is aware of a gasoline release in Huntersville, North Carolina, discovered on August 14, 2020, in which 28,571 barrels were released through a through-wall crack which developed in a shallow dent reinforced with a Type A sleeve.  The release also not detected by the pipeline operator's leak detection system."

**Sunoco Clarification: The gasoline release in Huntersville, North Carolina discovered on August 14, 2020 did not involve a Sunoco pipeline.  This 2020 release involved a third-party operator wholly unrelated to Sunoco or Energy Transfer.**

4.   PHMSA alleges in the Notice, Proposed Issuance of Safety Order, that "Sunoco's apparent inability to effectively detect the leak has potentially exacerbated the impacts of the release over an extended period of time."

**Sunoco Clarification:  As noted above, there is not sufficient evidence at this time to conclude how long the Affected Pipeline was leaking. Therefore, it cannot be stated with certainty that there was an "apparent inability to effectively detect the leak"; it may turn out, through investigation and analysis, that the leak was effectively detected shortly after it began.**

**It cannot reasonably be asserted that Energy Transfer and Sunoco have an "apparent inability to effectively detect" the leak.  Energy Transfer and Sunoco maintain robust leak detection programs on their pipelines as part of their O&M and Integrity Management Plan that surpasses regulatory requirements in various critical aspects,**



PipelineLegal.com

Mr. Bryan Lethcoe
February 19, 2025
Page 3 of 4

including the general practice to inspect pipelines even when inspection may not be required by regulation. Further, Energy Transfer maintains a Company-wide Organizational Excellence ("OE") Program, that applies to Sunoco, which is an initiative aimed at continuous improvement of corporate culture and practices, with an emphasis on safety and compliance. The OE Program, which incorporates the ten elements of American Petroleum Institute's Recommended Practice 1173, has fostered a Company culture that emphasizes identifying and addressing areas for improvement and applying lessons learned from one project to future projects Company-wide. These ongoing compliance-focused efforts have resulted in quantifiable benefits. For example, the total release frequency history for Energy Transfer-owned pipelines is better than the industry average for U.S. crude oil pipelines.

5.  PHMSA alleges in the Notice, Preliminary Findings, Pages 3 and 4, certain limited descriptions of Sunoco's response and investigation efforts related to this incident.

    **Sunoco Clarification:   The description of Sunoco's investigations is materially understated in the Notice.  A true and accurate description and summary of Sunoco's investigations will be provided to PHMSA.**

As provided by 49 C.F.R. § 190.239(b)(2), Sunoco hereby seeks to promptly engage with PHMSA in informal consultation meetings toward ultimately resolving this matter by way of a Consent Agreement.  Although the informal consultation process shall commence within 30 days of the Operator's request for same, Sunoco requests that a meeting be set as soon as possible. Additionally, 49 C.F.R. § 190.239(b)(2) provides that PHMSA may extend the 30-day informal consultation period by request or otherwise for good cause.  Sunoco requests that PHMSA exercise its discretion to extend this period as may be needed during the course of the informal consultation process.

Sunoco hereby reserves its right to request a hearing within 10 days following the conclusion of the informal consultation process, as provided by 49 C.F.R. § 190.239(b)(3), should the parties be unable to reach a conclusion that results in a Consent Agreement.

Finally, pursuant to 49 U.S.C. § 60117(b)(1)(C) and 49 C.F.R. § 190.209(a), Respondent hereby requests all materials in the case file, which shall include all agency records pertinent to the matters of fact or law asserted in the Notice.

**Exhibit B_Page 450 of 583**



Mr. Bryan Lethcoe
February 19, 2025
Page 4 of 4

Sunoco looks forward to working towards a Consent Agreement that would appropriately ensure the safe operation of the Affected Pipeline. Please address any questions or requests for further information to the undersigned.

Sincerely,

Haley O'Neill
Counsel for Sunoco

cc:     Keith Coyle, Chief Counsel, PHMSA
        Benjamin Fred, Assistant Chief Counsel, Pipeline Safety Law Division, PHMSA
        Timothy O'Shea, Attorney Advisor Southwest Region, PHMSA
        Todd Stamm, Senior Vice President, Operations, Energy Transfer, LP
        Eric Amundsen, Senior Vice President, Operations, Energy Transfer, LP
        Curtis Stambaugh, Assistant General Counsel, Energy Transfer, LP
        Keegan Pieper, Deputy General Counsel, Energy Transfer, LP
        Todd Nardozzi, Director DOT Compliance, Energy Transfer, LP
        Vince Murchison, Murchison O'Neill, PLLC
        Roina Baker, Murchison O'Neill, PLLC

# EXHIBIT F

Exhibit B_Page 452 of 583



# GOVERNOR JOSH SHAPIRO

February 28, 2025

Secretary Sean Duffy
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590

Dear Secretary Duffy:

I am writing to request expedited action from the federal government and your agency to ensure public safety following the jet fuel leak from the Twin Oaks Pipeline in the Mount Eyre neighborhood of Upper Makefield Township, Bucks County. Reports show the leak was caused by a sleeve installed over 30 years ago and went undetected by pipeline operators for 16 months, resulting in a jet fuel leak affecting Pennsylvanians' homes and businesses and contaminating local water sources. According to pipeline operator Energy Transfer, there are several dozen similar sleeves at other locations along the pipeline, raising questions about the integrity of the entire pipeline.

This is the latest incident in a long pattern of safety concerns with Sunoco and Energy Transfer pipelines in Pennsylvania — a pattern including activity I brought criminal charges against while serving as Attorney General of Pennsylvania.

As you know, the Pipeline Safety Act puts interstate hazardous liquid pipeline facilities under federal jurisdiction through PHMSA. In your role as Acting Administrator, I urge you to exercise every authority within your discretion to expedite the process of thoroughly testing the Twin Oaks pipeline and confirming it to be safe for continued operation.

I understand that PHMSA has directed Sunoco to reduce the pipeline's pressure by 20 percent, and that Sunoco has also completed a series of excavations under PHMSA's supervision in order to visually inspect other sleeves in the vicinity of the leak. I encourage you to push Sunoco to immediately conduct additional testing and inspection — including inspecting the other sleeves that are present elsewhere on the pipeline — to identify any threats to the integrity of the pipeline which you directed in your February 13, 2025, Proposed Safety Order.

I also request that your agency be stringent in your review of Sunoco's Remedial Work Plan, which was also directed in your Proposed Safety Order. The steps required in the Work Plan — including root cause analysis, further repair activities, and assessments of Sunoco's leak detection, inspection and maintenance programs — are critical to providing both near term confidence in the safety of the line, and assurances that similar incidents will be avoided in the future.

Office of the Governor | Harrisburg, PA | www.pa.gov

**Exhibit B_Page 453 of 583**

Secretary Duffy
U.S. Department of Transportation
Page 2

Pennsylvanians are rightfully concerned about the integrity of the pipeline and Sunoco has not demonstrated adequate ability to detect leaks and take appropriate actions, given what appears to have been a significant delay between the initial indications of a leak and the response. We need the federal government, and your agency, to partner with us and work quickly to alleviate those concerns.

As you are aware, the federal government has primary jurisdiction related to the operation of interstate pipelines under the Pipeline Safety Act. That said, my Administration, particularly the Pennsylvania Department of Environmental Protection, has been closely involved with the site investigation, characterization, and remediation process and will continue to stand with residents until the cleanup is complete. At my direction, DEP has ensured every residence with elevated testing levels in their water are being provided with water treatment systems.

To date, third party environmental consultants working under the oversight of DEP have conducted over 332 water tests at residences in the affected area and treatment systems have been installed at any residences at which results have indicated constituents above statewide health standards. DEP is also overseeing hydrology testing to characterize the subsurface affected area and better understand groundwater flow, which will help inform the longer-term remediation plan.

As you continue your agency's response to this incident, I also urge you to continue to be transparent with impacted residents, who deserve to know how this leak occurred, why it went undetected for so long, and how they can feel safe in their community moving forward.

Please don't hesitate to reach out if my Administration can assist further — we offer you every resource at our disposal to ensure this does not happen again.

Thank you,

Governor Josh Shapiro

# EXHIBIT G

**Exhibit B_Page 455 of 583**



SUNOCO PIPELINE
An **ENERGY TRANSFER** Partnership

March 5, 2025

<u>**Via Electronic Mail**</u> – tmagee@pa.gov

Thomas L. Magge
Environmental Program Manager
Clean Water Program
Pennsylvania Department of Environmental Protection
Southeast Regional Office
2 East Main Street
Norristown, PA 19401

**Re:    Mount Eyre Neighborhood**
**Washington Crossing LNAPL Incident Investigation**
**Twin Oaks – Newark 14"-Diameter Pipeline**
**Upper Makefield Township, Bucks County**

Dear Mr. Magge:

On February 18, 2025 Energy Transfer, on behalf of its affiliate, Sunoco Pipeline L.P. ("SPLP"), received a Notice of Violation ("NOV") from the Department concerning a release of petroleum products from the 14"-diameter Twin Oaks – Newark Pipeline, which is owned and operated by SPLP.  This response is being provided by SPLP.  As the Department is aware, on February 13, 2025, SPLP submitted a Notice of Intent to Remediate ("NIR") under Pennsylvania's Land Recycling Program, known and referred to as "Act 2," to perform cleanup efforts to achieve the statewide health standards for soils and groundwater, which the Department acknowledged informally on February 15, 2025, and by letter dated February 19, 2025.

The NOV asserts that the release resulted in violations of Section 401, 35 P.S. § 691.401, and is alleged to constitute unlawful conduct under and 611 of the Clean Streams Law, 35 P.S. § 691.611, and subject to enforcement under Section 605 of the Clean Streams Law, 35 P.S. § 691.605.  The Department requested specific information be provided within fifteen (15) days of the NOV.  Energy Transfer responds to each of the Department's requests for information, as follows:

1. **A description of the circumstances causing the incident and how the circumstances were determined, including historical investigations of the pipeline in this area.**

   *Response:* On September 25, 2023, SPLP responded to an odor complaint near the location of the pipeline along Glenwood Drive in Upper Makefield Township.  Five (5) employees of SPLP probed the location of the pipeline with a photo ionization detector ("PID") (*see* **Attachment 1**), and SPLP's consultant performed water testing at multiple locations in the immediate vicinity of the odor complaint (*see* **Attachment 2**).  SPLP returned the

2968387_1

**Exhibit B_Page 456 of 583**

Twin Oaks-Newark 14"-Diameter Pipeline
NOV Response
March 5, 2025
Page 2

following day on September 26, 2023, and performed an excavation of the pipeline near Glenwood Drive, and no sheens or odors were observed in the excavation area by the eight (8) employees and one (1) contractor present during the excavation. The soils in this location were also sampled, and laboratory results were non-detect for petroleum-related compounds (*see* **Attachment 3**). SPLP also initiated and completed a static pressure test on the pipeline, which included the section in the Upper Makefield area, and the results were within established criteria.

On June 28, 2024 and July 21, 2024, SPLP staff responded to two separate odor complaints at two separate properties and inspected the pipeline right-of-way ("ROW") for the appearance of any visual indications of a potential leak, and none were observed. SPLP staff also used a gas detector while inspecting the pipeline ROW and to sniff the water at the two properties; there were no readings on the gas detector.

On November 21, 2024, SPLP received an odor complaint, to which SPLP staff responded during nighttime hours and inspected the pipeline ROW. During the response to that complaint, the landowner provided the SPLP staff member with a copy of water sampling that was completed at that residence by the Department. The SPLP staff member then returned to the location the following morning, and again inspected the pipeline ROW for the appearance of any visual indications of a potential leak, and none were observed. At that time, SPLP performed an additional static pressure test on the pipeline, which included the section in the Upper Makefield area, and the results were within established criteria.

Beginning the week of January 20, 2025, and continuing throughout the week of January 27, 2025, SPLP continued to respond to odor complaints in coordination with the Department and the federal Pipeline and Hazardous Material Safety Administration ("PHMSA"). SPLP staff inspected the pipeline ROW, located the pipeline center line, and used a T-bar that was inserted to the depth on the top and on both sides of the pipeline, creating a hole through which a photo ionization detection ("PID") monitor/probe is inserted to obtain a reading for the presence of volatile organic compounds ("VOCs") (*see* **Attachment 4**). This probing and use of PID monitor/probe was completed in over 1,000 locations, at intervals of approximately ten (10) feet, which included not only vegetated areas of the pipeline ROW but also areas where the ROW was beneath pavement, where holes were drilled to perform the work.

On January 21, 2025, PHMSA advised SPLP that free product was observed in one (1) well along Spencer Drive. On January 22, the Department also advised SPLP of the observation of free product in one (1) well at a residential property on Spencer Drive. On January 23, 2025, SPLP's consultant, Groundwater & Environmental Services ("GES")

Twin Oaks-Newark 14"-Diameter Pipeline
NOV Response
March 5, 2025
Page 3

collected samples of the free product together with the Department who performed a split-sample, and the samples were submitted for laboratory analysis (*see* **Attachment 5**).[1]

Beginning on January 23, 2025, SPLP's consultant, GES, collected water samples from residences in the Mt. Eyre neighborhood. Approximately thirty (30) homes had water sampling performed between January 23-31, 2025, with all samples submitted for laboratory analysis (*see* **Attachment 6**). SPLP provided bottled water to residences during this time period.

On January 29, 2025, GES and a SPLP staff member collected samples of free product from two (2) wells on Spencer Drive (which included a repeat sample from the location sampled on January 23, 2025), which samples were also submitted for laboratory analysis (*see* **Attachment 5**).

On January 23, 29, and 30 2025, SPLP performed additional static pressure tests on the pipeline.

On January 30, 2025, SPLP excavated the pipeline at a location near Bruce Road and Glenwood Drive within the pipeline ROW, but did not observe any leaks at that location.

On January 31, 2025, SPLP excavated the pipeline along Glenwood Drive near the intersection with Walker Road and discovered the release. On February 2, 2025, SPLP cut out the affected section of the pipeline and removed impacted soils from the immediate vicinity of the release location. Samples of the soil were taken within the excavation area, which were submitted for laboratory analysis (*see* **Attachments 7-8**). The stockpiled soils were also sampled for the purposes of characterization for off-site disposal, and submitted for laboratory analysis (*see* **Attachment 9**).

2. **Description and estimated quantity, by weight, volume, or measurement of materials or wastes involved.**

*<u>Response</u>:* It is unclear what the Department is requesting regarding an estimated quantity of "materials or wastes involved." To the extent that the Department is requesting an estimate of the volume of petroleum products released from the pipeline, the precise volume is still in the process of being determined. On January 31, 2025 SPLP made an initial notification to the National Response Center ("NRC") of an estimated volume of the release of 50 barrels of product, based on the limited information available to SPLP immediately after the discovery of the release. This was a conservatively estimated volume for the purpose of the immediate reporting requirement to NRC, which requires a pipeline operator to place a call within one hour of discovery of a release. Within 48 hours of the

---

[1] Note, the date on the report for the January 23, 2025 sample contains a typographical error on the sample date, which lists in the heading "Date Sampled" as 1/24/25, but below the "Sample ID, Type & Description" reflects "01.23.2025 Submitted," which is the correct date.

Twin Oaks-Newark 14"-Diameter Pipeline
NOV Response
March 5, 2025
Page 4

initial notification to NRC, on February 2, 2025, SPLP revised the release volume to an estimated 156 barrels, based on the observed leak rate once the soil surrounding the pipeline was removed.

As of March 3, 2025, SPLP has recovered a total of 58.76 gallons (1.38 bbls) of free product (i.e., light non-aqueous phase liquid, "LNAPL") from residential wells in the Mt. Eyre neighborhood.  Additional de minimis amounts of LNAPL are continuing to be recovered from residential wells each day, and which volume is being reported to the Department (*see* **Attachment 10**).

Further, approximately 400 cubic yards soil were removed from the excavation at the release location, as well as in areas laterally down the pipeline for further inspections of the coating of the pipeline.  This soil was removed for off-site disposal (*see* **Attachments 7-9**).

An estimate was performed using industry-accepted methodologies[2] to determine the potential petroleum hydrocarbons entrained in soil and removed during excavation activities, based on the results from the waste characterization analysis, coupled with the contemporaneous site sketches of the extent of excavation. This analysis resulted in a conservative estimate of a maximum recovered volume of 644 gallons (15.33 bbls) of petroleum product in the excavated soil.

3.  **An assessment of any contamination of land, surface water, groundwater, or air that has occurred since January 1, 2023.**

*Response:* Regarding the assessments performed in 2023 and 2024, and immediately upon discovery of the release from January 31, 2025 to February 2, 2025, *see* Response to No. 1 above and the identified documents, which is incorporated by reference.

As the Department is aware, both before and since the discovery of the release, SPLP's environmental consultants have been performing potable water sampling at residences throughout Upper Makefield within one (1) mile of the release location, and at locations beyond the 1-mile radius upon request, the results of which have also been shared with the particular resident(s), and also with the Department daily, Mondays-Saturdays (*see* **Attachment 6**).

---

[2] Recovered liquid volume was not included in this estimate, which aligns with field observations taken at the time of the excavation.  Because stockpiled soils were staged and quickly sampled, evaporation models for the amount of product recovered but subsequently volatilized were also not included in this estimate.  The samples were analyzed for Total Petroleum Hydrocarbons (TPH) by USEPA Method 8015D for gasoline range organics (GRO) and diesel range organics (DRO), C6 to C10 with a boiling range of 60C-170C, and C10 to C28 with a boiling range of approximately 170C, respectively.  Product components outside this range were not included in this estimate.

2968387_1

Twin Oaks-Newark 14"-Diameter Pipeline
NOV Response
March 5, 2025
Page 5

On February 3, 2025, SPLP performed a geoprobe evaluation of the area in the immediate vicinity of the release location.  SPLP also performed ground penetrating radar (GPR) at eight (8) locations on Spencer Road and Glenwood Drive.  No GPR anomalies that would be classified as free product or petroleum saturated soil were found.

On February 5, 2025, SPLP performed product recovery testing at a location along Glenwood Drive.

On February 10, 2025, SPLP's environmental consultants performed downhole geophysical analyses at one (1) location in the immediate vicinity of the release location (*see* **Attachment 11**).  The results for the first downhole geophysical analysis were previously shared with the Department.  A second downhole geophysical analysis was performed on February 17-18, 2025, and the results from the second location will also be shared with the Department when the corresponding report is finalized.

On February 25, 2025, SPLP's environmental consultants performed indoor air sampling at five (5) residences near the immediate vicinity of the release location.  SPLP will share the results of the indoor air sampling with the Department once results are received.

On February 28, 2025, SPLP's environmental consultants performed a GPR survey along Spencer Road, as part of SPLP's efforts to locate and install product recovery wells (*see* **Attachment 12**).

SPLP's environmental consultants are also in the process of completing electrical resistivity imaging (ERI) (*see* **Attachment 13**), and near soil gas sampling throughout the Mt. Eyre neighborhood (*see* **Attachments 14-15**), the results of which will be shared with the Department when complete.

SPLP's environmental consultants are also performing visual assessments of any potential impacts to surface water on a daily basis.

Moreover, as the Department is aware, on February 13, 2025, SPLP submitted a Notice of Intent to Remediate to begin the Act 2 process, and which reflects that SPLP will perform cleanup efforts to achieve the statewide health standards for soils and groundwater (*see* **Attachments 16-18**).  SPLP will continue to perform additional site characterization and environmental investigation efforts as part of the Act 2 process, including, but not limited to, installation of product recovery wells and monitoring wells, and will share the results of those investigations with the Department.

SPLP has also developed and is implementing several plans to perform investigation, response, and site characterization work, which include the following Plans and Standard Operating Procedures ("SOPs"), copies of which are attached to this Response:

2968387_1

Twin Oaks-Newark 14"-Diameter Pipeline
NOV Response
March 5, 2025
Page 6

- Potable Water Well Sampling and Analysis Plan (CTEH) (**Attachment 19**)
- Visual Assessment Plan (CTEH) (**Attachment 20**)
- Drilling Protocol SOP (GES) (**Attachment 21**)
- Soil Sampling in Test Pits and Trenches SOP (GES) (**Attachment 22**)
- Indoor Air Sampling & Analysis Plan (CTEH) (**Attachment 23**)
- Waste Management Plan (CTEH) (**Attachment 24**)
- Use of Passive Soil Gas for Identifying Fuel in the Subsurface (GES) (**Attachments 14-15**)
- Electrical Resistivity Imaging Workplan for Washington Crossing (RETTEW) (**Attachment 13**)

4. **Estimated quantity and disposition of all recovered materials or wastes that resulted from the incident and plans for ultimate disposal.**

   ***Response***: It is unclear what the Department is requesting regarding "all recovered materials or wastes" related to the pipeline release. As noted in Response No. 3 above, which is incorporated by reference, impacted soils from the immediate vicinity of the release location were excavated and transported for off-site disposal. During the investigation and excavation work activities, investigative-derived waste ("IDW") was containerized and collected for off-site disposal. The LNAPL that has been removed from residential wells has been containerized each day, and will be taken for off-site disposal. SPLP has developed a Waste Management Plan that applies to all wastes generated during the investigation and remediation efforts (*see* **Attachment 24**).

5. **A detailed description of response actions, and remedial actions that were taken or are intended to be implemented (date and time of implementation), and how these actions will prevent a similar occurrence in the future.**

   ***Response***: *See* Responses No. 1 and No. 3 above, which are incorporated by reference. Furthermore, as the Department is aware, SPLP has submitted a Notice of Intent to Remediate under the Act 2 program that reflects SPLP will perform cleanup efforts to achieve the statewide health standards for soils and groundwater (*see* **Attachments 16-18**). Investigations into the cause of the pipeline release and any further evaluations of the pipeline that may be necessary will occur under the oversight and guidance of PHMSA.

6. **A copy of any geotechnical, potholing, vapor monitoring, exploratory excavations, soil sampling, or other investigations done since January 1, 2023.**

   ***Response***: The investigations and sampling that has been performed since 2023 are described in detail in Responses No. 1 and 3 above, which are incorporated by reference, and copies of which are attached to this Response

2968387_1

Twin Oaks-Newark 14"-Diameter Pipeline
NOV Response
March 5, 2025
Page 7

7. **Any and all soil, groundwater, surface water or other sample or screening data collected in the impacted area. This data should be provided from January 1, 2023.**

   *Response: See* Responses to No. 1, 3, and 6 above, which are incorporated by reference, as well as the attachments provided with this Response.

8. **An outline of the steps Energy Transfer will take, including action items, if an actual or suspected pollution event was to happen in the future.**

   *Response:* Investigations into the cause of the pipeline release and any further evaluations of the pipeline that may be necessary will occur under the oversight and guidance of PHMSA. Regarding SPLP's response to actual or suspected pollution events, an incident involving the Twin-Oaks to Newark pipeline is included within the Philadelphia District - Trenton Warehouse Response Zone Facility Response Plan ("FRP") (March 2023) (*see* **Attachment 25**),[3] which is a component of SPLP's emergency preparedness and response protocols and complies with 49 C.F.R. Part 194. PHMSA reviewed and approved the FRP, and SPLP will implement the FRP for any event that occurs in the future.

<p style="text-align:center">*********</p>

   Please note that nothing in this response should be construed either as an admission of any of the legal conclusions set forth by the Department in the NOV or as a waiver of any legal defenses Energy Transfer may possess.

   If you have any questions or need additional information regarding this response and the attached documents, please contact me via email at matthew.gordon@energytransfer.com.

<p style="text-align:center">Thank you,</p>

Matthew Gordon
Vice President of Operations
Energy Transfer

---

[3] The FRP Contains Confidential Security Information not subject to disclosure to third parties under the provisions and procedures specified in the "The Public Utility Confidential Security Information Disclosure Protection Act" (35 P.S. §2141.1 to 2141), and the Pennsylvania Public Utility regulations implementing such Act at 52 Pa. Code §§102.1-102.4.

2968387_1

Twin Oaks-Newark 14"-Diameter Pipeline
NOV Response
March 5, 2025
Page 8

**List of Attachments:**

1. September 2023 PID Results
2. September 25, 2023, September 26, 2023, and September 28, 2023 Water Well Sampling (Laboratory Analytical Reports)
3. September 28, 2023 Post-Excavation Soil Sampling (Laboratory Analytical Reports, Summary Table of Results, and Figure of Sampling Locations)
4. January 2025 PID Results
5. January 23, 2025 AMSPEC Sampling Report; January 29, 2025 Texas Oil Tech Laboratories Sampling Report
6. Summary Table of Water Sampling (updated through 3/3/2025)
7. Lab Data Report – Post-Excavation Soil Sampling (2/10/2025)
8. Summary Table of Post-Excavation Soil Sampling (2/4/2025 and 2/11/2025) and Figure
9. Lab Data Report – Waste Characterization Sampling (2/5/2025)
10. Summary Table of Gauging and Recovery (updated through 3/3/2025)
11. Geophysical Analysis Report – Borehole Logging (2/10/2025)
12. GPR Summary (2/28/2025)
13. Electrical Resistivity Imaging Workplan for Washington Crossing (RETTEW)
14. Use of Passive Soil Gas for Identifying Fuel in the Subsurface (GES)
15. Passive Soil Gas Sampling Location Plan (GES)
16. Notice of Intent to Remediate (2/13/2025)
17. PADEP Acknowledgement of Notice of Intent to Remediate (2/19/2025)
18. Upper Makefield Township Letter to PADEP re: Notice of Intent to Remediate (2/26/2025)
19. Potable Water Well Sampling and Analysis Plan (CTEH)
20. Visual Assessment Plan (CTEH)
21. Drilling Protocol SOP (GES)
22. Soil Sampling in Test Pits and Trenches SOP (GES)
23. Indoor Air Sampling & Analysis Plan (CTEH)
24. Waste Management Plan (CTEH)
25. Philadelphia District - Trenton Warehouse Response Zone Facility Response Plan[4]

---

[4] The FRP Contains Confidential Security Information not subject to disclosure to third parties under the provisions and procedures specified in the "The Public Utility Confidential Security Information Disclosure Protection Act" (35 P.S. §2141.1 to 2141), and the Pennsylvania Public Utility regulations implementing such Act at 52 Pa. Code §§102.1-102.4.

2968387_1

**Exhibit B_Page 463 of 583**

# EXHIBIT H

**Exhibit B_Page 464 of 583**

**verdantas**

# SITE CHARACTERIZATION WORK PLAN

Sunoco Pipeline LP Twin Oaks-Newark 14" Diameter Pipeline Release
Upper Makefield Township, Bucks County, Pennsylvania

**Prepared for:**
Sunoco Pipeline LP
525 Fritztown Road
Sinking Spring, PA 19608

**Prepared by:**
Verdantas LLC
2550 Interstate Drive, Ste #303
Harrisburg, PA 17110

**Verdantas Project No: 34328**

**April 18, 2025**

This page intentionally left blank.

▶ **Site Characterization Work Plan / 34328**
Sunoco Pipeline LP Twin Oaks-Newark 14" Diameter Pipeline Release
April 18, 2025

# Table of Contents

1.  Introduction and Purpose                                                           1

2.  Preliminary Source Characterization and Conceptual Site Model                     2

    2.1    Release mechanism                                                         2

    2.2    Estimated Volume of Release                                               2

    2.3    Soil impacts                                                              2

    2.4    Bedrock Geology and Hydrogeology                                          3

    2.5    Depth to Groundwater                                                      3

    2.6    Extent of Separate-Phase Liquid                                           4

    2.7    Extent of Groundwater Impacts                                             4

    2.8    Summary of Preliminary CSM                                                5

3.  Proposed Site Characterization Tasks                                              6

    3.1    Compile Available Property Information                                     6

    3.2    Additional Surficial Geophysical Investigations                           6

        3.2.1    Supplemental ERI Survey                                          6

        3.2.2    Perform Seismic Refraction Survey                                7

    3.3    Soil Characterization                                                     7

    3.4    Groundwater Characterization                                              8

        3.4.1    Monitoring Well Installation                                     8

        3.4.2    Groundwater Monitoring and Sampling                              9

    3.5    Evaluation of Potential Vapor Intrusion Pathways                          10

4.  Interim Site Characterization Report                                              10

## Figures *(Provided Under Separate Cover)*

Figure 1      Site location Map - USGS Topographic Map

Figure 2      Site Area Layout Map

Figure 3      Post-Excavation Sample Location Map

Figure 4      LNAPL Detections in Water Supply Wells

Figure 5      Dissolved Phase Detections in Water Supply Wells-April 2025

Figure 6      Inferred Fracture Traces

Figure 7      Preliminary Conceptual Site Model Schematic

Figure 8      Proposed additional Electrical Resistivity Imaging Survey and Seismic Refraction
              Survey Line Map

Figure 9      Soil Characterization – Proposed Soil Borings



i

▶ **Site Characterization Work Plan / 34328**
Sunoco Pipeline LP Twin Oaks-Newark 14" Diameter Pipeline Release
April 18, 2025

# 1. Introduction and Purpose

This work plan was prepared by Verdantas LLC ("Verdantas") on behalf of Sunoco Pipeline LP ("Sunoco Pipeline") in relation to the release of petroleum products from the 14-inch diameter Twin Oaks – Newark Pipeline ("pipeline"). The location of the release is in the Mt. Eyre neighborhood of Upper Makefield Township ("Township"), Bucks County, Pennsylvania (the "Project Area"). A USGS Topographic Map is provided as Figure 1 and Figure 2 is a Project Area Layout Map.

The purpose of the work plan is to detail the initial tasks planned to characterize the nature, extent, direction, rate of movement, volume, and composition of the petroleum products released from the pipeline. This work plan in intended to satisfy obligations established by the Administrative Order issued to Sunoco Pipeline by the Pennsylvania Department of Environmental Protection ("PADEP") on March 6, 2025.  Specifically, this work plan addresses Paragraph 2(b)(i) of the Administrative Order and includes details of the planned report to address Paragraph 2(b)(ii) of the Administrative Order.  These two obligations were also discussed as Items (i) and (ii) of the March 14, 2025, Proposed Implementation Schedule prepared by Sunoco Pipeline and submitted to the PADEP.

This work plan includes discussions of information previously provided to the PADEP in meetings, daily and weekly reports, the Interim Remedial Action Plan, and other submitted documents.  This information is included in the work plan only to support the preliminary conceptual site model ("CSM") and selection of the planned characterization activities.  This work plan is not intended to be a comprehensive report documenting the results of interim remedial actions.



**Exhibit B_Page 468 of 583**

▶ **Site Characterization Work Plan / 34328**
Sunoco Pipeline LP Twin Oaks-Newark 14" Diameter Pipeline Release
April 18, 2025

# 2. Preliminary Source Characterization and Conceptual Site Model

The following information presents the CSM.  The purpose of including the preliminary CSM in this work plan is to provide the current understanding of the site environmental system and the processes that appear to control the transport and movement of regulated substances through environmental media.  This preliminary CSM has been prepared to organize the data collected during implementation of the interim remedial activities and will be refined as additional data are collected.  A revised CSM will be presented in the interim site characterization report to be submitted to the PADEP by Sunoco Pipeline and the Act 2 Final Report will include the final CSM.  As stated previously, this work plan is not intended to be a comprehensive report documenting the results of the interim remedial activities.

## 2.1  Release mechanism

A release of petroleum products from the pipeline was discovered on January 31, 2025.  The pipeline predominantly transports jet fuel but occasionally transports unleaded gasoline and diesel fuel

The release occurred from the pipeline in a location within the pipeline right-of-way at a property along Glenwood Drive near the intersection with Walker Road ("Release Location") is identified on Figures 2 and 3.

Impacted soils around the pipeline at the Release Location were excavated and properly disposed of at an off-site facility as documented in prior submissions to PADEP.  Excavation of the impacted soils extended to or beneath the top of the weathered bedrock surface.

The pipeline was repaired, tested, and returned to service on February 2, 2025.

## 2.2  Estimated Volume of Release

Based on the observed leak rate, Sunoco Pipeline estimates that the volume of the released petroleum product to be 156 barrels (6,552 gallons).  Petroleum products were recovered by the excavation of soil and are being recovered by ongoing well bailing activities.

## 2.3  Soil impacts

Post-excavation soil samples collected on February 2 and February 10, 2025 were analyzed for the substances on the PADEP Short Lists of Petroleum Products ("Short Lists"). Analytical results indicate that low concentrations of certain regulated substances may remain in soil at the base of the excavation, which is within the weathered/rippable bedrock.  See Figure 3 for post- excavation sample locations. Penetrometer measurements of the excavation sidewalls and floor prior to backfilling support that the floor of the excavation was in weathered bedrock.



Verdantas.com    2

► **Site Characterization Work Plan / 34328**
Sunoco Pipeline LP Twin Oaks-Newark 14" Diameter Pipeline Release
April 18, 2025

Other interim investigation activities conducted to date provide additional lines of evidence to support preliminary CSM related to soil impacts.  These additional lines of evidence are:

- The pipeline inspection conducted between January 20, 2025 and January 27, 2025 including over 1,000 photo-ionization detector ("PID") measurements along the pipeline did not identify widespread petroleum impact along the pipeline.

- The advancement of eight direct-push borings along Glenwood Drive (understood to be downgradient from the release location) did not identify widespread petroleum impacts in soil.

- The preliminary results of the passive soil gas survey conducted between March 13 and March 20, 2025, do not support the existence of widespread petroleum impacts to soils in the area of the survey.

## 2.4  Bedrock Geology and Hydrogeology

According to Pennsylvania Geologic Survey mapping of the area, the bedrock formation beneath the Project Area is the Triassic-aged Lockatong Formation.  The Lockatong Formation is described in literature as dark gray to black argillite (weakly metamorphosed mudstone or shale) having some zones of black shale and locally, thin layers of impure calcareous shale. The primary porosity and permeability of the weathered and un-weathered rock in the Lockatong Formation are described as low with joint openings providing secondary porosity.

The depth to bedrock based on observations and direct-push refusal is between four and seven feet below the ground surface.  The boring log from the first recovery well installed at a property on Spencer Drive described the bedrock as argillite.  Bedrock was encountered at approximately 11 feet below ground surface during the recovery well boring advancement.

Fracture/joint porosity appears to be the major source of groundwater yield in water supply wells and appears to be the predominant factor for shallow groundwater flow.  Borehole geophysical logging and imaging confirmed this general interpretation.

Water supply wells are used as the potable water supply in vicinity of the release.  Reported water supply well depths are generally between 100 and 700 feet below ground surface.  The depth of the water supply wells appears to provide borehole storage for the water supply due to the relatively low formation yields in the area.

Regional groundwater flow is expected to be generally eastward.

## 2.5  Depth to Groundwater

Ongoing gauging of domestic water supply wells and the recovery well indicates that the depth to water in the water supply wells is variable based on water usage (e.g., pumping of the well). Recently measured depths to water in the water supply wells generally range from approximately



► **Site Characterization Work Plan / 34328**
Sunoco Pipeline LP Twin Oaks-Newark 14" Diameter Pipeline Release
April 18, 2025

25 feet to 70 feet below ground surface.  Observed variations in the depth to water may be attributed to topography, construction, seasonality, and operation of the well.  Groundwater was not encountered during the interim remedial excavation of impacted soils or direct-push activities described above.

Bedrock depths are estimated to be between four and eleven feet below ground surface. Therefore, groundwater beneath the site is located within the bedrock unit and there does not appear to be a hydraulically saturated unconsolidated (soil) interval.

## 2.6  Extent of Separate-Phase Liquid

Sampling of private water supply wells conducted to date has indicated the presence of floating separate phase liquid (light non-aqueous phase liquid ("LNAPL")) at five locations. These are:

- Two properties on Glenwood Drive, including the Release Location and a property northeast of the Release Location;

- One property on Walker Road, adjoining and to the east of the Release Location;

- Two properties on Spencer Road, approximately 1,000 feet east-northeast of the Release Location.

LNAPL was also observed at an additional property on Spencer Road, but the LNAPL did not appear to be jet fuel. Rather the LNAPL appears to be a different petroleum product. Also, LNAPL at that location has not been observed since January 29, 2025. Figure 4 depicts the locations of water supply wells and LNAPL observations.

## 2.7  Extent of Groundwater Impacts

The analytical results for the most recent samples collected from water supply wells on April 2, 2025 are depicted on Figure 5. Water supply well sample results where low-level dissolved phase volatile organic compounds were detected at concentrations greater than the Statewide health standard ("SHS") medium-specific concentrations ("MSCs") for Organic Regulated Substances in Groundwater, Residential, Used Aquifers (TDS ≤ 2500) are also depicted on Figure 5.

A fracture trace analysis along with an electrical resistivity imaging ("ERI") survey in the Mt. Eyre neighborhood were completed between February 20 and March 7, 2025 and results were provided to the PADEP. The ERI survey was conducted to detect and delineate underground electrically conductive semi-planar features that could represent water-bearing fractures or bedding plane partings. These assessments along with literature reviews and LNAPL gauging and analytical results led to the development of Figure 6, which depicts inferred water-bearing fractures along with LNAPL observations. Fracture sets are interpreted to strike approximately North 50° and south dipping, greater than 60°. As shown on this figure, an inferred fracture passes very close to two wells on Spencer Road where LNAPL has been observed.  Extrapolation of this



**Exhibit B_Page 471 of 583**

▶ **Site Characterization Work Plan / 34328**
Sunoco Pipeline LP Twin Oaks-Newark 14" Diameter Pipeline Release
April 18, 2025

---

feature captures the property on Walker Road where LNAPL was also observed, and the property on Glenwood Drive (Release Location).

## 2.8  Summary of Preliminary CSM

The preliminary CSM is that petroleum products released from the pipeline migrated primarily downward through a thin layer of soil beneath the pipeline to the bedrock surface at approximately eight to eleven feet below ground surface.  Impacted soil material beneath the pipeline at the Release Location was removed during the interim remedial excavation.  There is no evidence of residual petroleum products in soils at the Release Location except for potential low-level concentrations at the base of the interim remedial excavation in weathered bedrock.

The released petroleum products migrated downward through the weathered bedrock and into bedrock fractures.  Downward migration continued to the (unconfined) water table at a depth of approximately 25 to 35 feet.  The variable pumping of domestic water supply wells in the Project Area creates dynamic hydraulic gradients in the water bearing bedrock fractures which are the predominant pathways for groundwater movement.  Separate- and dissolved-phase petroleum has migrated along the bedrock fractures in response to these gradients and the eastwardly regional groundwater gradient.

A schematic cross-section illustrating the preliminary CSM is included as Figure 7.



Verdantas.com    5

▶ **Site Characterization Work Plan / 34328**
Sunoco Pipeline LP Twin Oaks-Newark 14" Diameter Pipeline Release
April 18, 2025

# 3.  Proposed Site Characterization Tasks

Site characterization is an iterative process with the results of each characterization activity being used to refine and shape the scope of future activities.  As such, the scope of characterization work presented in this work plan represents the most-likely initial site characterization activities based on the preliminary CSM.  Changes to the planned activities and the performance of additional activities are expected.  These changes will be communicated to the PADEP in the required 90-day updates or other written communications.

Planned activities are located in public rights-of-way to the greatest extent possible to minimize disruption to local residents and simplify the logistics of property access.  Activities planned on public and private property not owned by Sunoco Pipeline will require permission for access from the property owners.  Sunoco Pipeline may request assistance from the PADEP during access discussions with property owners.

Standard operating procedures ("SOPs") are not included in this work plan.  Existing SOPs will be used if applicable and new SOPs will be prepared as necessary.  SOPs will account for conditions associated with negotiated access to properties.  These SOPs will be identified or prepared and provided to the PADEP prior to the performance of characterization activities.

## 3.1  Compile Available Property Information

Publicly available and observable information regarding the location and construction of the water supply wells, septic systems and sand mounds, and sub-grade structures (basements and crawl spaces, sumps, and radon systems) in the Project Area will be reviewed and compiled.  The review will include the Pennsylvania Groundwater Well Information System, County and Township land development and property records, and information obtained by visual observation from public rights-of-way.  Sunoco Pipeline's consultants will also obtain additional property-specific data and information during field activities at private properties in the Project Area as permitted by property owners.  This information will be used to refine the CSM specifically related to potential shallow groundwater flow and vapor intrusion preferential pathways.

## 3.2   Additional Surficial Geophysical Investigations

As stated above, ERI has been used in the project area during interim remedial and initial investigation activities.  A supplemental ERI survey and a seismic refraction survey are planned to provide additional information regarding the inferred bedrock fractures and the nature of the soil/bedrock interface.

### 3.2.1 Supplemental ERI Survey

A supplemental ERI survey is planned in the area to the west and east of the previous ERI survey area to facilitate mapping of inferred fracture traces across the segment of the pipeline where the



Verdantas.com   6

▶ **Site Characterization Work Plan / 34328**
Sunoco Pipeline LP Twin Oaks-Newark 14" Diameter Pipeline Release
April 18, 2025

release occurred.  The planned survey will be to the west of the pipeline in the Township-owned property that extends northward from Walker Road along the western edge of the Mt. Eyre neighborhood and between the eastern-most ERI line and Bruce Road. The proposed location of the supplemental ERI survey is depicted on Figure 8.  The performance of the supplemental survey requires the granting of access by the owners of the properties where the supplemental survey is planned.

### 3.2.2 Perform Seismic Refraction Survey

A seismic refraction survey is planned in the area of the original and planned supplemental ERI survey.  The purpose of the seismic refraction survey is to refine the understanding of the depth to, and nature of, the soil/bedrock interface within the survey area.  Performance of this survey will require access to the locations used for the previous and planned supplemental ERI survey discussed above.  The proposed location of the seismic refraction survey is depicted on Figure 8. The performance of the survey requires the granting of access by the owners of the properties where the survey is planned.

## 3.3  Soil Characterization

Soil characterization is planned in the vicinity of the Release Location to delineate the horizontal and vertical extent of petroleum impact including the identification and delineation of soil or LNAPL that may be a potential vapor intrusion source.  As stated above, results from sampling at the extent of the interim remedial excavation showed relatively low concentrations of PADEP Short List substances.  However, laboratory reporting limits for some PADEP Short List substances were elevated above the PADEP SHS MSCs and/or soil vapor intrusion screening values.

Direct-push borings are planned within the Sunoco Pipeline right-of-way in the area around the interim remedial excavation.  Twelve borings will be positioned at a 15-foot spacing along  the perimeter of the interim remedial excavation (Figure 9).  The borings are planned to be approximately ten feet to the north and south of the pipeline.

Borings will be advanced to direct-push refusal which is expected to be within the weathered bedrock at depths between seven and eleven feet below ground surface.  Recovered soil will be screened with a PID using a headspace technique which can minimize variability in PID responses due to differences in grain size and soil moisture.  Recovered soil will also be scanned with ultraviolet light to screen for the presence of separate-phase petroleum products.

At least one laboratory analytical sample will be collected from each soil boring.  The depth of the sampling interval will be based on the preliminary CSM and observations made during the boring advancement.  Samples will generally be collected at the interval with the greatest PID response or the interval identified as containing petroleum products by ultraviolet light scanning.  If there are no indications of petroleum impact, the laboratory analytical sample will be collected from the deepest soil interval recovered from the boring.



▶ **Site Characterization Work Plan / 34328**
Sunoco Pipeline LP Twin Oaks-Newark 14" Diameter Pipeline Release
April 18, 2025

The laboratory analytical samples will be analyzed for the PADEP Short List substances and Sunoco Pipeline and its contractors will work with the analytical laboratory to attempt to obtain laboratory reporting limits that are below the SHS MSCs and SHS soil vapor intrusion screening values.

Logs for each soil boring will be prepared by, or under the direct supervision of a professional geologist licensed in the Commonwealth of Pennsylvania using a standard classification system (e.g., Unified Soil Classification System or modified Burmister).

## 3.4  Groundwater Characterization

Installation and sampling of groundwater monitoring wells is planned to delineate the horizontal and vertical extent of petroleum impacts to groundwater including the identification and delineation of groundwater and LNAPL that may be a potential vapor intrusion source.  As stated above, the preliminary CSM is that the water table is within the fractured bedrock system beneath the Project Area.  Results of water sampling conducted in water supply wells identified wells with LNAPL and dissolved-phase concentrations of PADEP Short List substances greater than the SHS MSCs.  The planned location of the monitoring wells is based on the locations of identified LNAPL and dissolved-phase concentrations greater than the SHS MSCs and the distribution of fracture traces identified by the ERI survey.

The locations of the planned monitoring wells may be adjusted based on the results of the currently ongoing and planned interim remedial activities including the reconnaissance groundwater sampling of the water-supply wells (external well water sampling), ongoing recovery well installation and sampling, continued water supply well monitoring, and the location of underground utilities.  Results from the planned ERI survey, seismic refraction survey, and soil characterization will also be evaluated and used to modify the locations of the planned monitoring wells.  Additional monitoring wells may be required to complete the groundwater characterization. Installation of the planned monitoring wells requires the granting of access by the Township and the other owners of the properties where the well installations are planned.

### 3.4.1 Monitoring Well Installation

Eight groundwater monitoring well locations are planned at locations  primarily along the inferred traces of bedrock fractures shown on Figures 6 and 8 that have indications of impact based on interim remedial activities.  Planned recovery wells near the Release Location will be used to characterize groundwater adjacent to the Release Location should access be granted by the landowner.

The completion procedures are being evaluated for the monitoring well installations.  These different procedures are being evaluated because of the hydrogeological setting described in the preliminary CSM.  The well completion procedure will be selected from these methods based on results of the ongoing interim remedial actions including recovery well installation and sampling and the reconnaissance well water sampling.  In this hydrogeologic setting, it can be difficult to



**Exhibit B_Page 475 of 583**

▶ **Site Characterization Work Plan / 34328**
Sunoco Pipeline LP Twin Oaks-Newark 14" Diameter Pipeline Release
April 18, 2025

install monitoring wells at different locations that monitor the same aquifer interval and also have sufficient water for monitoring and sampling.

- The first completion procedure is to construct a single monitoring well to a depth of approximately 75 feet with the screened interval extending from approximately 20 feet to the bottom of the well.

- The second completion procedure is to install two separate monitoring wells at each location. The first well will be installed to a total depth of approximately 75 feet with the screened interval extending from approximately 50 feet below ground surface to 75 feet below ground surface. Solid casing may be used to isolate the screened interval from the overlying interval in these deep wells. The second well at each location would be installed with a screened interval from approximately 20 to 40 feet below ground surface.

- The third completion technique is to install a boring to approximately 75 feet and perform borehole geophysics on the open borehole. The completion of the well will be determined on the results of the geophysics and may include the use of multi-level monitoring materials (e.g., Solinst® Flute or Waterloo Multilevel system).

The SOP for the advancement of the monitoring well borings and completion of the monitoring wells will be developed after the procedure is selected based on the results of the recovery well installation and sampling and reconnaissance well water sampling. The SOP will be provided to the PADEP for review prior to the initiation of the monitoring well installation activities. Monitoring wells will be installed and developed in general accordance with the current PADEP Land Recycling Program Technical Guidance Manual ("TGM"). Logs for the monitoring well borings will be prepared by, or under the direct supervision of, a professional geologist licensed in the Commonwealth of Pennsylvania. The top of casing for each monitoring well will be professionally surveyed by a surveyor licensed in the Commonwealth of Pennsylvania to allow for the calculation of water level elevations and the preparation of a potentiometric surface or water table contour map.

## 3.4.2 Groundwater Monitoring and Sampling

Two rounds of groundwater monitoring and sampling will be conducted. This will include the measurement of water levels in the monitoring and recovery wells, purging of the monitoring wells, and the collection of analytical samples from the monitoring wells. The first round of monitoring and sampling will occur at least two weeks after the monitoring wells are developed.

The depth of water will be measured in each monitoring and recovery well using an electronic conductance-type water level indicator capable of discerning LNAPL. If LNAPL is encountered, the depth to the LNAPL and the depth to water in the well will both be measured to allow for the calculation of LNAPL thickness. The monitoring wells will then be purged, and analytical samples will be collected for the PADEP Short List substances. As stated previously, to the extent possible, existing SOPs will be used for groundwater monitoring and sampling activities. If



**Exhibit B_Page 476 of 583**

▶ **Site Characterization Work Plan / 34328**
Sunoco Pipeline LP Twin Oaks-Newark 14" Diameter Pipeline Release
April 18, 2025

necessary, alternative SOPs will be developed and provided to the PADEP prior to performance of the characterization activity, including SOPs for purging and sampling of monitoring wells with LNAPL

## 3.5  Evaluation of Potential Vapor Intrusion Pathways

Following completion of the planned soil and groundwater characterization work described above, potential vapor intrusion pathways from soil and groundwater impact (including LNAPL) will be evaluated in accordance with the current PADEP TGM.  The first step in the evaluation will be the identification of potential vapor intrusion sources.  There are two components that define a potential vapor intrusion source. The first component is the presence of soil or groundwater at concentrations above the applicable SHS screening value or the presence of LNAPL.  The second component is that the location(s) identified in the first component are within a proximity distance of an inhabited space or a potential preferential vapor migration pathway.

Identified potential vapor intrusion sources will be further evaluated using either additional soil and groundwater sampling or vapor intrusion-specific sampling (near-source soil gas, sub-slab soil gas, or indoor air).  Alternatively, mitigation of the potential vapor intrusion pathway may be implemented prior to vapor intrusion sampling in accordance with the current PADEP TGM.

Existing SOPs for vapor intrusion sampling will be used or new SOPs will be created and provided to the PADEP prior to sampling.  An SOP for mitigation will be prepared and provided to the PADEP prior to implementation of any mitigation measures.

## 4.  Interim Site Characterization Report

An Interim Site Characterization Report ("ISCR") that provides the results of the completed interim remedial and characterization activities will be prepared.  In accordance with the obligations of the Administrative Order Paragraph 2(b)(ii), which established a Proposed Implementation Schedule of Act 2 deliverables, the ISCR will be submitted to the PADEP on or before September 2, 2025.

Neither the PADEP TGM or the 25 PA Code Chapter 250 Regulations reference or require a site characterization report or an interim site characterization report.  However, in accordance with the Administrative Order, the ICSR will describe the interim characterization of the nature, extent, direction, rate of movement, volume and composition of regulated substances released in the environment from the release in accordance with the SHS. The ISCR will present the data generated during the implementation of this work plan as well as the results of the interim activities undertaken and completed to address the release. The ISCR will include an updated CSM and additional characterization activities will be proposed, if appropriate.



Verdantas.com    10

# EXHIBIT I

**Exhibit B_Page 478 of 583**

| Administrative Order Paragraph Reference | Daily Summary Progress Report: 05/09/2025* | Result |
|---|---|---|
| 1.e.i. | Potable Wells Sampled | 362 |
| | Total Water Sampling Events (including 1st Round, 2nd Round, and subsequent rounds, and post-treatment) | 1,049 |
| | Laboratory Results Received (including 1st Round, 2nd Round, and subsequent rounds, and post-treatment) | 1,036 |
| | Potable Wells Samples Scheduled - Total (including 1st Round, 2nd Round, and subsequent rounds, and post-treatment) | 25 |
| | Potable Wells Samples Scheduled - 1st Rd | 0 |
| | Potable Wells Samples Scheduled - 2nd or Subsequent Rounds or post-treatment | 25 |
| 1.e.ii. | Total tested potable wells that exceed statewide MSCs for VOCs or presence of LNAPL (historic aggregate) | 7 |
| | LNAPL and dissolved VOC exceedences (historic aggregate) | 4 |
| | LNAPL with no VOCs (historic aggregate) | 2 |
| | Dissolved VOC exceedence only (historic aggregate) | 1 |
| | Total tested potable wells that exceed statewide MSCs for VOCs or presence of LNAPL (as of current date) | 4 |
| | LNAPL and dissolved VOC exceedences (as of current date) | 3 |
| | LNAPL with no VOCs (as of current date) | 1 |
| | Dissolved VOC exceedence only (as of current date) | 0 |
| | Total tested Potable Wells with Detections of VOCs that do not exceed Statewide MSCs for VOCs (historic aggregate) | 13 |
| | Total tested Potable Wells with Detections of VOCs that do not exceed Statewide MSCs for VOCs (as of current date) | 5 |
| | Total tested Potable Wells with Detections of VOCs below standards but above Method Detection Limit "J Value" (historic aggregate) | 23 |
| | Total tested Potable Wells with Detections of VOCs below standards but above Method Detection Limit "J Value" (as of current date) | 10 |
| 1.e.iii. | Total Number of Properties with POET Installed | 176 |
| | POET Installed by Energy Transfer | 93 |
| | POET Installed by Others that are known to Energy Transfer | 65 |
| | POET Systems or other treatment systems for VOCs that were pre-existing | 18 |
| | Total NumberPOET Systems Planned | 16 |
| | Total POET Systems Planned - Energy Transfer | 10 |
| | Total POET Systems Planned - Land Owners | 6 |
| 1.e.iv. (See detail on Tab 1.e.iv) | List of properties to date with operating POET or other treatment systems for VOCs | 176 |
| | List of properties to date with VOC detections that do not have a POET or other treatment system for VOCs (includes J value properties). | 4 |
| | List of properties to date with planned POET | 16 |
| | List of properties to date with VOC detections where Energy Transfer does not know whether the property has a POET | 0 |
| 1.e.v. | Properties that have requested POET and where Energy Transfer has declined to install or pay for the installation of POET | 39 |
| 1.e.vi. | List of properties that have requested POET but Energy Transfer has declined to install/pay; reason for declining | See Tab 1.e.vi. |
| 1.e.vii | Tables of all property well sampling analytical results, property well gauging results, and wellhead field screening results | See Attached Tables. |
| 1.e.viii | Site characterization activities performed | See Tab 1.e.viii. |
| 1.e.ix | Site remediation activities performed | See Tab 1.e.ix. |

*Note the information summarized herein reflects data recorded thru the previous day.

# EXHIBIT J

**Exhibit B_Page 480 of 583**



Pennsylvania
**Department of Environmental Protection**

May 13, 2025

Mr. Gus Borkland
Energy Transfer
100 Green Street
Marcus Hook, PA 19061

Re:    Letter of Deficiency for Site Characterization Work Plan
       SPLP Pipeline Release
       eFACTS PF No.  881609
       eFACTS Activity No. 60986
       Glenwood Drive and Walker Road
       Upper Makefield Township
       Bucks County

Dear Mr. Borkland:

The Department of Environmental Protection (DEP) has received and reviewed the April 18, 2025, document titled "Site Characterization Work Plan", written by Verdantas LLC, for the Sunoco Pipeline, LP (SPLP) Twin Oaks – Newark 14"-diameter pipeline release response. The work plan was submitted in accordance with DEP's March 6, 2025, administrative order.

Upon initial review, DEP finds the submission is deficient and offers the following comments:

1.  <u>General</u>: For DEP and other reviewers to effectively review this and other project plans, all relevant tables, figures, and attachments should be included with the document or referenced appropriately. This includes references to previously submitted documents, where appropriate, and all relevant tables, figures, and attachments. Furthermore, SPLP provided a Figure 10 showing proposed well locations under a separate cover. Figure 10 is not referenced within the text of the Site Characterization Work Plan, so it appears to reviewers without access to this figure that proposed well locations have not been selected.

2.  <u>General</u>: No information was included in this work plan describing how the potential migration of contaminants related to the pipeline release into residential septic systems will be evaluated. A proposed approach to characterizing this migration pathway must be described in the plan.

3.  <u>Section 2.4 Bedrock Geology and Hydrogeology</u>: Please provide references for the geological and hydrogeological information discussed in this section.

Southeast Regional Office
2 East Main Street | Norristown, PA  19401-4915 | 484.250.5960 | Fax 484.250.5961 | www.dep.pa.gov

**Exhibit B_Page 481 of 583**

Mr. Gus Borkland                           - 2 -                          May 13, 2025

4. Section 2.6, Extent of Separate-Phase Liquid, 2nd Paragraph: This paragraph notes that the LNAPL observed at an additional property on Spencer Road did not appear to be jet fuel, but a different petroleum product. Please briefly discuss why the product at the additional property on Spencer Road does not appear to be jet fuel.

5. Section 3.2.1, Supplemental ERI Survey: Please identify the subcontractor to be used during supplemental electrical resistivity imaging (ERI) survey activities, as well as a brief description of the equipment and procedures that will be utilized during this survey.

6. Section 3.2.2, Perform Seismic Refraction Survey: Please identify the subcontractor to be used during seismic refraction survey activities, as well as a brief description of the equipment and procedures that will be utilized during this survey.

7. Section 3, Proposed Site Characterization Tasks, 3rd Paragraph: This paragraph indicates that standard operating procedures (SOPs) were intentionally not included in the workplan, noting that existing SOPs will be used or, if new SOPs are required, they will be "provided to the PADEP prior to the performance of characterization activities." The activities described in this work plan are common industry practice, and SPLP and/or its subcontractors should have SOPs readily available for these activities. All SOPs for work described in the work plan should be included as an attachment to the work plan, or proper references to previously submitted documents including those SOPs should be included in the work plan.

8. Section 3.3, Soil Characterization: Please provide the information and certifications for the analytical laboratory to be used for the soil sampling activities described in this section and describe the analytical methods to be used for sample analysis.

9. Section 3.3, Soil Characterization: Please identify the drilling subcontractor to be used during soil characterization activities as well as a brief description of the equipment and procedures that will be utilized during these activities.

10. Section 3.3, Soil Characterization, 1st Sentence: The residual contamination in the unsaturated zone near the release area is a potential continued source of dissolved phase groundwater contamination, not just a potential vapor intrusion source, as indicated in this sentence.

11. Section 3.4.1, Monitoring Well Installation: Given that the preliminary conceptual site model (CSM) relies heavily on the assumption that contaminants from the pipeline release are migrating through inferred water-bearing fracture sets identified in the ERI survey, as stated in Section 2.7, borehole geophysical logging, and potentially UV logging and packer testing, should be conducted at each monitoring well location to identify fractures and water bearing zones. Selected depth intervals for any permanent well materials should be based on the results of downhole logging and testing.

**Exhibit B_Page 482 of 583**

Mr. Gus Borkland                          - 3 -                          May 13, 2025

12. Section 3.4.1, Monitoring Well Installation: Please describe how domestic potable wells will be monitored during installation and development activities to ensure that there are no adverse effects to residents due to installation activities.

13. Section 3.4.1, Monitoring Well Installation: Please describe the containment procedures to be used during drilling and the procedures for the storage and disposal of investigation derived waste (IDW) generated during monitoring well installation activities.

14. Section 3.4.1, Monitoring Well Installation: Please identify the drilling subcontractor to be used during monitoring well installation activities as well as a brief description of the equipment and procedures that will be utilized during these activities.

15. Section 3.4.1, Monitoring Well Installation: Please denote the reference datum(s) to be used during well survey activities.

16. Section 3.4.2, Groundwater Monitoring and Sampling: This section is intended to describe the plan for groundwater sampling and indicates that two rounds of groundwater monitoring and sampling will be conducted. However, there is no information as to how the well headspace will be evaluated for the presence of VOCs, how sample depths will be determined, what method(s) will be used for the purging and sampling of monitoring wells, what laboratory will be used to conduct the analyses of groundwater samples, what analytical method(s) will be used for sample analysis, how the quality of the analytical data will be evaluated following receipt from the analytical laboratory, or how IDW generated during monitoring well sampling will be handled. Please provide a detailed plan for groundwater monitoring and sampling.

17. Section 3.5, Evaluation of Potential Vapor Intrusion Pathways: This section discusses the general steps for conducting evaluations of potential vapor intrusion pathway(s), and notes that additional sampling will be performed, if necessary, to fully evaluate the potential vapor intrusion pathway(s) to properties within the proximity distance of soil and groundwater containing concentrations of contaminants greater than vapor intrusion screening values. This section should summarize vapor intrusion pathway evaluation activities completed to date and briefly discuss planned sub-slab soil vapor sampling activities.

Pursuant to DEP's order, SPLP must correct the deficiencies and submit a revised Site Characterization Work Plan no later than June 27, 2025. Note that the Site Characterization Work Plan is also subject to public review and comment through May 18, 2025, and a revised plan must address any public comments received through that date. We are willing to work with you to develop an approvable submittal.

If you have any questions or would like to meet regarding this matter, please contact me by email at cdbrown@pa.gov or by telephone at 484.250.5792.

**Exhibit B_Page 483 of 583**

Mr. Gus Borkland                                  - 4 -                                  May 13, 2025

Any person aggrieved by this action may appeal the action to the Environmental Hearing Board (Board), pursuant to Section 4 of the Environmental Hearing Board Act, 35 P.S. § 7514, and the Administrative Agency Law, 2 Pa.C.S. Chapter 5A.  The Board's address is:

> Environmental Hearing Board
> Rachel Carson State Office Building, Second Floor
> 400 Market Street
> P.O. Box 8457
> Harrisburg, PA 17105-8457

TDD users may contact the Environmental Hearing Board through the Pennsylvania Relay Service, 800.654.5984.

Appeals must be filed with the Board within 30 days of receipt of notice of this action unless the appropriate statute provides a different time.  This paragraph does not, in and of itself, create any right of appeal beyond that permitted by applicable statutes and decisional law.

A Notice of Appeal form and the Board's rules of practice and procedure may be obtained online at http://www.ehb.pa.gov or by contacting the Secretary to the Board at 717.787.3483. The Notice of Appeal form and the Board's rules are also available in braille and on audiotape from the Secretary to the Board.

IMPORTANT LEGAL RIGHTS ARE AT STAKE.  YOU SHOULD SHOW THIS DOCUMENT TO A LAWYER AT ONCE.  IF YOU CANNOT AFFORD A LAWYER, YOU MAY QUALIFY FOR FREE PRO BONO REPRESENTATION.  CALL THE SECRETARY TO THE BOARD AT 717.787.3483 FOR MORE INFORMATION.  YOU DO NOT NEED A LAWYER TO FILE A NOTICE OF APPEAL WITH THE BOARD.

IF YOU WANT TO CHALLENGE THIS ACTION, YOUR APPEAL MUST BE FILED WITH AND RECEIVED BY THE BOARD WITHIN 30 DAYS OF RECEIPT OF NOTICE OF THIS ACTION.

Sincerely,

C. David Brown, P.G.    Digitally signed by C. David Brown, P.G.
                        Date: 2025.05.13 09:31:45 -04'00'

C. David Brown, P.G.
Regional Manager
Environmental Cleanup and Brownfields

Mr. Gus Borkland                                    - 5 -                                    May 13, 2025

cc:    Mr. Gordon, Energy Transfer
       Upper Makefield Township
       Bucks County Health Department
       Mr. Langan, Esq.
       Mr. Devan, P.G.
       Mr. Lipik, P.G.
       Ms. Budnovitch

~~IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY~~
~~FIRST JUDICIAL~~ UNITED STATES DISTRICT COURT
**EASTERN** DISTRICT OF PENNSYLVANIA
~~CIVIL TRIAL DIVISION~~

~~BERGER MONTAGUE PC~~
~~Shanon Carson (Bar No. 85957)~~
~~Y. Michael Twersky (Bar No. 312411)~~
~~Joseph E. Samuel, Jr. (Bar No. 327645)~~
~~1818 Market Street, Suite 3600~~
~~Philadelphia, PA 19103~~

~~*Counsel for Plaintiffs and the Proposed Class*~~

| | |
|---|---|
| DANIEL LA HART and KATHERINE LA HART, individually and on behalf of those similarly situated, ~~c/o Berger Montague PC~~ ~~1818 Market Street, Suite 3600~~ ~~Philadelphia, PA 19103~~ <br><br> *Plaintiffs*, <br><br> v. <br><br> SUNOCO PIPELINE L.P~~.,~~ ~~525 Fritztown Road, Sinking Spring,~~ ~~Pennsylvania 19608,~~ <br><br> ENERGY TRANSFER LP, and ~~8111 Westchester Drive, Dallas,~~ ~~Texas 75225, and~~ <br><br> ENERGY TRANSFER (R&M) LLC ~~1735 Market Street, Philadelphia,~~ ~~Pennsylvania 19103,~~ <br><br> *Defendants*. | ~~PHILADELPHIA COUNTY~~ ~~COURT OF COMMON PLEAS~~ ~~TRIAL DIVISION~~ <br><br> ~~_____ 2025 TERM~~ <br><br> CIVIL <br> ~~No.~~ _____ <br><br> ~~CLASS~~ ACTION ~~COMPLAINT~~ <br><br> **JURY TRIAL DEMANDED** <br> No. 25-2072 |

Inserted Cells

## ~~NOTICE TO DEFEND~~

| ~~NOTICE~~ | ~~AVISO~~ |
|---|---|
| ~~You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.~~ | ~~Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las páginas siguientes, usted tiene veinte (20) días de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparecencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que, si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requerir que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.~~ |
| ~~*You should take this paper to your lawyer at once. If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.*~~ | ~~Lleve esta demanda a un abogado inmediatamente. Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio. Vaya en persona o llame por teléfono a la oficina cuya dirección se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.~~ |
| ~~Philadelphia Bar Association Lawyer Referral and Information Service One Reading Center Philadelphia, Pennsylvania 19107 (215) 238-6333 TTY (215) 451-6197~~ | ~~Asociación De Licenciados De Filadelfia Servicio De Referencia E Información Legal One Reading Center Philadelphia, Pennsylvania 19107 (215) 238-6333 TTY (215) 451-6197~~ |

1

**AMENDED CLASS ACTION COMPLAINT**

2

## I.     INTRODUCTION

1.      Plaintiffs Daniel La Hart and Katherine La Hart ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Class" as further defined below), bring this Class Action Complaint against Defendants Sunoco Pipeline L.P. ("Sunoco"), Energy Transfer LP, and Energy Transfer (R&M), LLC (collectively, "Defendants"), alleging that Defendants' reckless, negligent, and irresponsible ownership, oversight, operation, supervision, maintenance, and control of a hazardous petroleum pipeline —(the "Twin Oaks Pipeline—" or the "Pipeline") has resulted in a massive and still unquantified leak of jet fuel and other petroleum products, andalong with resulting toxins, pollutants, and contaminants, (the "Pipeline Leak" or "Leak"), in Upper Makefield Township, Pennsylvania.

2.      Defendants' conduct in permitting and allowing the pipeline leakPipeline Leak to occur has unleashed a catastrophic environmental disaster on a previously idyllic Bucks County, Pennsylvania community, including the Mt. Eyre Manor community and surrounding neighborhoods that are subject to the plume caused by the leakLeak.

3.      It has been reported that Defendants already have the worst record for fuel spills in the United States before this latest disaster. That record is now even worse, as Defendants have caused serious physical and financial harm to a beautiful suburban neighborhood.

4.      The Leak arises from a crack in the Pipeline, causing a discharge into the underlying bedrock and groundwater of jet fuel, other unidentified petroleum products, and other hazardous and toxic chemicals that the Pipeline was used to transport (the "Pipeline Leak" or "Leak"). These toxins include kerosene, benzene, ethylbenzene, isopropylbenzene, dichloroethane, trimethylbenzene ("TMB"), toluene, naphthalene, methyl tertiary-butyl ether ("MTBE"), and lead.

These are substances so dangerous that their presence in the soil, water, and air presents a direct and immediate threat to Plaintiffs' and Class members' health and wellbeing.

3.5.    Defendants' ~~pipeline leak~~Pipeline Leak has caused severe harm and poses a serious ongoing and current danger to affected residents' physical health and mental and emotional wellbeing, the community's groundwater, soil, air quality, and ecosystem, and to property values. The ~~pipeline leak~~Pipeline Leak has uprooted the affected community and has already caused certain residences within the community to be unlivable, amounting to an effective taking of family homes by Defendants.

6.    ~~Defendants have already purchased one home in the residential Mt. Eyre Manor neighborhood~~The physical harm to person and property that has been wrought by the Leak is palpable and concrete. As a direct result of the Leak, Plaintiffs now live on contaminated property and above a contaminated aquifer that provides them and the proposed Class with their drinking water. This existing contamination, coupled with the significant risk that further contamination will continue to accrue on Plaintiffs' property, has ruined enjoyment of their property, has damaged the property's value, and at least some and potentially all of that damage is permanent.

7.    In the weeks and months since Defendants finally revealed the Leak, home values throughout the Mt. Eyre Manor community and surrounding neighborhoods have plummeted. To date, not a single public home sale has closed in the Mt. Eyre Manor community since the Leak was disclosed, despite numerous homes being on the market in what was previously a highly sought-after neighborhood. Homeowners have been forced to repeatedly lower list prices and make other concessions after the existence of the Leak utterly devastated any interest from prospective home buyers.

4

**Exhibit B_Page 490 of 583**

4.8.    One home in the Mt. Eyre Manor community has been sold since the Leak, but *not to a prospective home buyer: the residential well was so contaminated that Defendants themselves purchased it* for the purpose of drilling monitoring and/or recovery wells, right in the middle of the neighborhood, and seek to drill more wells and conduct more disruptive activities in the neighborhood for remediation purposes. This highly contaminated suburban residential home that Defendants now own (despite being for-profit oil companies) is just two doors down the road from Plaintiffs' home.

5.    Testing showshas confirmed that Defendants' released jet fuel and unidentified other petroleum products, along with other and related pollutants, has contaminated private wells in the affected community, including Plaintiffs' well, that provide water for drinking, bathing, cooking, and washing, in the affected community.

6.9.    . Testing also shows elevated levels of toxins in the air as wellin certain houses in the impacted community, including one with benzene multiple times the statewide health standards.

7.10.    Defendants' conduct has caused an exigent threat to the health and well-being of the community and has contaminated the environment and underground aquifer in the community.

8.    It has been reported that Defendants already have the worst record for fuel spills in the United States even before this latest disaster.

9.    This case arises from a crack in Defendants' Twin Oaks Pipeline (the "Twin Oaks Pipeline" or "Pipeline") in the Mt. Eyre Manor community in Upper Makefield Township, Bucks County, Pennsylvania, which caused a discharge into the underlying bedrock and groundwater of petroleum, jet fuel, gasoline, and hazardous and toxic chemicals that the Pipeline was used to transport (the "Pipeline Leak" or "Leak"). These toxins include kerosene, benzene, ethylbenzene,

5

isopropylbenzene, dichloroethane, trimethylbenzene ("TMB"), toluene, naphthalene, methyl tertiary-butyl ether ("MTBE"), and lead. These are substances so dangerous that their presence in the soil and water presents a direct and immediate threat to Plaintiffs' and Class members' health and wellbeing.

10.11.  The Mt. Eyre Manor community and surrounding neighborhoods, as with the area that includes and surrounds Upper Makefield Township generally, has long been a highly desirable residential neighborhood that had strong property values and has been sought-after as an idyllic and wonderful place to live and raise a family.

11.12.  One of the notable features of Mt. Eyre Manor and the surrounding neighborhoods in Upper Makefield Township is that the residences located there use and rely on private well water for domestic water needs, including for drinking water, cooking, bathing, washing clothes and dishes, and watering lawns and gardens.

12.13.  Indeed, Mt. Eyre Manor and other Upper Makefield residents have long believed that they had the best tasting water one could find because it contains naturally occurring minerals that give it a fresher taste and, typically, is free of the added chemicals that can be found in municipal water, such as chlorine and fluoride.

13.14.  As a result of Defendants' Pipeline Leak, however, this is no longer the case. Defendants' conduct as alleged herein has devastated the community and caused significant contamination to the groundwateraquifers under the neighborhoodMt. Eyre Manor community and surrounding neighborhoods, creating critical health and safety risks to the residents who live there, and causing other consequential harms as detailed herein.

6

14.15. Defendants control and operate the Twin Oaks Pipeline and are responsible for maintaining the Pipeline and ensuring its safety. Defendants entirely failed to uphold that responsibility.

15. Defendants' Pipeline Leak was confirmed on January 31, 2025.

16. Defendants, however, first received odor complaints from residents living in Mt. Eyre Manor as early as September 2023 – *16 months* earlier – but utterly failed at that time to properly investigate, and as such failed to identify the Pipeline Leak at an early stage when more harm could have been prevented.

17. Despite receiving numerous complaints from alarmed residents about strange odors in the air since at least September 2023, Defendants failed to properly act for at least over 16 months. Defendants failed to properly investigate the Pipeline Leak, failed to identify and contain the Pipeline Leak, and have still to this day have not disclosed the full extent of the disaster.

18. The full magnitude of the Pipeline Leak remains unknown and undisclosed to this day. Defendants still cannot account for or are choosing not to publicly state how much toxic petroleum product has spilled, exactly what leaked, or where it is moving, nor can they guarantee that the Twin Oaks Pipeline is safe, leaving Plaintiffs and Class members in constant and reasonable fear for their health and property.

19. Numerous residents already have confirmed contamination within their private wells and well water, including Plaintiffs, which contamination is not disputed by Defendants who have already publicly stated that the Pipeline Leak is their fault. The test results confirming contamination of Plaintiffs' water come from Defendants' own agents.

20. One household across the street from where the Pipeline Leak was eventually discovered had approximately *twelve feetfifteen gallons* of free jet fuel product found flowing on

7

top of the water in their private well., and petroleum product has continued to significantly accrue at this home every day for the past *four months*. Indeed, as recently as today, June 4, 2025, the PADEP noted 0.5 feet of new product in the well. Similarly, other residents of Mt. Eyre Manor also had significant amounts of jet fuel, and/or other petroleum products and constituents in their private wells.

21.     As Defendants have not yet identified the size, scope, direction, or speed of the contamination plume, even residents whose well water currently does not show contamination yet are within and will remain within a zone of danger where contamination could be mere weeks or days away, and therefore are forced to take appropriate precautions and incur time and expenses to attempt to mitigate their risk.

22.     Recent testing has now also confirmed that vapors from the contaminated groundwater has invaded homes in the neighborhood placing residents at potential risk to these toxic chemicals in both the water they drink and the air that they breathe.

23.     With no clear answers, no relief in sight, water in the underground aquifer and bedrock, private wells that have been contaminated, soil that has been contaminated, air that has been contaminated, property values plummeting, odors of jet fuel contamination within homes and in the neighborhood, and the prospect of having ingested, bathed, and used contaminated well water, the residents of Mt. Eyre Manor and the surrounding neighborhoods are left to grapple with the terror of irreparable environmental harm, uncertain whether they can trust the very air they breathe and the water they drink, and concerned for their future safety from disease.

24.     This is not just an environmental tragedy caused by corporate malfeasance; it is a life-altering crisis for Plaintiffs and Class members for which Defendants must be held accountable.

8

## II.    PARTIES

25.    Plaintiffs Daniel La Hart and Katherine La Hart reside in the Mt. Eyre Manor neighborhood at 114 Spencer Road, Washington Crossing, Pennsylvania, 18977.

26.    Defendant Sunoco Pipeline L.P. ("SPLP") is a limited partnership formed under the laws of Texas ~~with~~. SPLP contends that it maintains a principal place of business located at 8111 Westchester Drive, Dallas, Texas 75225. ~~Sunoco Pipeline, L.P.~~SPLP also maintains ~~an address~~addresses at 535 Fritztown Road, Sinking Spring, PA 19608 and 3807 West Chester Pike, Newtown Square, PA 19073.

27.    Defendant Energy Transfer LP is a limited partnership formed under the laws of Delaware with a principal place of business located at 8111 Westchester Drive, Dallas, Texas 75225.

28.    Defendant Energy Transfer (R&M), LLC is a limited liability company formed under the laws of Pennsylvania with a principal place of business located at 1735 Market Street, Philadelphia, Pennsylvania 19103.

29.    Defendants John Does 1-100 (the "John Doe Defendants"), are persons or entities that are responsible for the conduct and/or injuries alleged in this Complaint, and accordingly are liable for the relief sought. Their identities are currently unknown to Plaintiffs, who consequently sue the John Doe Defendants by their fictitious names, but the John Doe Defendants will be ascertained through investigation and discovery. Plaintiffs will seek leave to amend this Complaint to state the true names and capacities of the fictitiously named John Doe Defendants when they have been ascertained.

~~30.    At all times material hereto, Defendants purposefully established significant contacts in Pennsylvania and Philadelphia County, and carried out, and continue to carry out,~~

9

substantial, continuous, and systematic business activities in Pennsylvania and Philadelphia County.

### III.     JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction pursuant to 42 Pa. C.S. § 931.

30.     Defendants removed this civil action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). Plaintiffs have moved to remand the action to the Philadelphia County Court of Common Pleas based on the "local controversy" exception to CAFA.

32.31.  This Court has personal jurisdiction over each of the Defendants under 42 Pa. C.S. § 5301, *et seq.*, because Defendantsthey purposefully availed themselves of the privilege of conducting business in Pennsylvania and Plaintiffs' causes of action arise out of the business that Defendants conduct in Pennsylvania; namely, the Pipeline Leak from Defendants' Pipeline which occurred in Upper Makefield Township, Pennsylvania.

33.32.  VenueDefendants contend that venue is proper under Pennsylvania Rules of Civil Procedure 1006 and 2179 because Defendants regularly conduct businessa substantial part of the events or omissions giving rise to the claim occurred in this District. Plaintiffs contend that while that is true, venue is proper in Plaintiffs' chosen forum in the Philadelphia County Court of Common Pleas.

### IV.     FACTUAL ALLEGATIONS

#### A. Defendants' History of Leaking Pipelines and Failures to Report

34.33.  Defendant Energy Transfer LP, through its complex network of subsidiaries, limited partnerships, and joint ventures, including Defendant Sunoco and Defendant Energy Transfer (R&M), LLC, owns one of the nation's largest networks of natural gas, crude oil, and petroleum product pipelines.

10

35.34. Energy Transfer LP primarily operated in the natural gas sector prior to its acquisition of Sunoco, and Sunoco's significant oil and petroleum product assets, in 2012. Together, Defendants now own and operate over 125,000 miles of pipelines across the United States.

36.35. Defendants' network of pipelines is not only among the largest in the country; it is also among the leakiest.

37.36. According to the Pipeline and Hazardous Materials Safety Administration ("PHMSA")'s database, between 2002 and 2017, Defendants experienced at least 527 leakage incidents—approximately one incident from an existing facility every eleven days in the pipelines that they own and operate.[1]

38.37. Those incidents accounted for reported releases of over 3.6 million gallons of petroleum product. That figure likely substantially underestimates the true number of incidents and amount of product lost, as it primarily relies on self-reported incidents and estimates.

39.38. Between 2002 and 2017, PHMSA issued 106 safety violations to Defendants for failing to comply with federal regulations designed to ensure the safe operation of hazardous liquid pipelines.[2]

40.39. These violations included failures to notify PHMSA of spills, failures to repair identified unsafe pipes for five years, failures to perform regular corrosion inspections, failures to report known unsafe operating conditions, and failures to properly notify emergency responders and the public in the event of a leak.

---

[1] Exhibit A, Oil and Water: ETP & Sunoco's History of Pipeline Spills, Greenpeace USA and Waterkeeper Alliance (Apr. 17, 2018).
[2] Exhibit A (summarizing PHMSA records).

11

41.40.  Federal regulators have not deterred Defendants' egregious conduct in failing to properly maintain their pipelines transporting hazardous petroleum products to make them safe. In ~~Pennsylvania in~~ 2022, ~~Defendants Sunoco~~SPLP and affiliate ETC Northeast Pipeline ~~L.P. and Energy Transfer LP~~LLC were convicted by the Commonwealth of Pennsylvania of *57 charges* of criminal conduct associated with the construction and operation of two other pipelines ~~in nearby Chester County,~~ Pennsylvania. The Commonwealth of Pennsylvania convicted Defendants on counts involving multiple instances of failure to report discharges of hazardous substances into the surrounding environment, the use of unapproved additives and release of those additives into drinking water, and failure to implement legally required safety measures. The use of unapproved additives is potentially relevant here as one of the chemicals found in recent testing in the Mt. Eyre Manor neighborhood is MTBE, which was supposed to have been phased out of use in the early 2000s.

41.    48 of the 57 criminal charges related to Defendants' conduct during the construction of the Mariner East 2 Pipeline, which crosses 17 counties in the southern tier of Pennsylvania, while the other 9 charges related to Defendants' conduct during the construction of the Revolution Pipeline, a 42.5 mile pipeline that starts in Butler County, and is routed through Beaver and Allegheny counties, and connects to a gas processing plant in Washington County.

42.    In February 2025, Bloomberg reported that the Twin Oaks Pipeline Leak in Upper Makefield Township "highlight[ed]" Energy Transfer's "worst fuel spill record" in the United States. The Bloomberg article reported that Sunoco Pipeline LP was responsible for spilling over 1,400 barrels of fuel in 2024 alone,[3] and this is only accounting for the volume of fuel spills that

---

[3] ~~Bloomberg, *Energy Transfer Leak Highlights Worst Fuel Spill Record in US* (Feb. 18, 2025), available at https://www.bloomberg.com/news/articles/2025-02-18/energy-transfer-leak-highlights-worst-fuel-spill-record-in-us?embedded-checkout=true (last accessed Mar. 14, 2025).~~

**Exhibit B_Page 498 of 583**

Defendants were both aware of *and* willing to publicly report. ~~A copy of the Bloomberg article is attached hereto as Exhibit B.~~[4]

43.    The Twin Oaks Pipeline ~~leak~~Leak demonstrates that Defendants are not forthcoming about the volume of or even the existence of fuel spills into residential neighborhoods.

44.    Defendants' conduct, as alleged herein, is reflective of and consistent with their history of failing to safely operate and maintain pipelines, as well as their failing to detect and report leaks from their pipelines, and appropriately respond to and remediate leaks with the expediency and transparency that such incidents require.

**B.    Defendants' Twin Oaks Pipeline That Runs Through Upper Makefield, PA**

45.    Defendants own and operate the Twin Oaks Pipeline ~~("the Pipeline"),~~ a 14-inch diameter pipeline that transports petroleum products, including but not limited to jet fuel (JP-8), diesel, and gasoline, from the Twin Oaks Terminal in Aston, Pennsylvania to the Newark Terminal in Newark, New Jersey. The Pipeline is considered a "hazardous liquid pipeline facility" under federal law. 49 U.S.C. § 60101(a).

46.    The Twin Oaks Pipeline was originally installed in 1956 and has operated as a hazardous liquid pipeline facility now for close to 70 years.

47.    ~~The Twin Oaks Pipeline was manufactured by~~ National Tube Supply Company manufactured the Pipeline.

48.    As originally installed, the Twin Oaks Pipeline was 8 inches in diameter and ran through a different trench than its current pathway under the Mt. Eyre Manor neighborhood. At

---

[4] Bloomberg, *Energy Transfer Leak Highlights Worst Fuel Spill Record in US* (Feb. 18, 2025), available at https://www.bloomberg.com/news/articles/2025-02-18/energy-transfer-leak-highlights-worst-fuel-spill-record-in-us?embedded-checkout=true (last accessed Mar. 14, 2025).

13

the time, this 8-inch pipeline ran under farmland that existed prior to the development of the neighborhood:



49.     The above photo (Figure 1) is taken from Defendants' Interim Remedial Action Plan submitted to the PADEP on March 19, 2025. It depicts both the original 8-inch pipeline trench with its more directly diagonal northeasterly pathway and the more recent 14-inch pipeline trench, which abruptly turns north as it reaches the Mt. Eyre Manor neighborhood, then curves east, before ultimately resuming its diagonal northeasterly pathway.

50.     This alternate trench path around what is now the Mt. Eyre Manor neighborhood closely tracks the modern Glenwood Drive, as depicted below, and the abrupt turn northwards onto what is now Glenwood Drive matches the exact point at which the Leak was detected at 121 Glenwood Drive:

14

**Exhibit B_Page 500 of 583**



Fig. 2: The Mt. Eyre Manor neighborhood, retrieved from Google Maps, with the approximate location of the Twin Oaks Pipeline overlaid, running parallel to Glenwood Drive, and the later-discovered Leak location indicated with a blue star.

51.    On a daily basis, Defendants move massive quantities of petroleum products through the Pipeline, at pressures over 1000 psi, under the Mt. Eyre Manor community and surrounding neighborhoods. This product runs up against the abrupt northward turn at 121 Glenwood Drive with significant force.

48.52.  On November 18, 2024, PHMSA issued an Advisory Bulletin notifying pipeline owners and operators of potential threats to the integrity of the body of certain pipelines.[5] The Advisory Bulletin stated that pipes constructed by National Tube Supply Company before 1970, like the Twin Oaks Pipeline, were particularly susceptible to hard spots. Hard spots are defects

---

[5] Pipeline and Hazardous Materials Safety Administration, Pipeline Safety: Identification and Evaluation of Potential Hard Spots—In-Line Inspection Tools and Analysis, 89 Fed. Reg. 90827 (Nov. 18, 2024).

15

created during the pipe manufacturing process because of localized cooling and hardening. Hard spots can become unstable over time due to changes in their conditions, including degradation and erosion of the coating surrounding the hard spot, and result in cracking of the pipe. PHMSA provided in its Advisory Bulletin six recommended safety actions for pipeline operators to take in order to identify potential hard spots.

49.53.  Despite this Advisory Bulletin, Defendants' representatives have stated that they were unaware of any safety actions recommended by PHMSA related to the Twin Oaks Pipeline.[6]

50.54.  Furthermore, it is well known that the inner walls of a petroleum pipeline can erode over time due to the corrosive environment created by the materials and chemicals transported through it. The exterior of a petroleum pipeline is also subject to external corrosion, due to the presence of moisture and chemicals in the surrounding soil. While several factors can influence the rate and extent of both internal and external corrosion, corrosion of a petroleum pipeline over time is inevitable, and again, well-known. Consequently, proper care, maintenance, supervision, and oversight of pipelines is critical, including, without limitation, to public safety.

51.55.  Despite this knowledge, Defendants have made several incredulous statements to members of the affected community in Upper Makefield, Pennsylvania, including Plaintiffs, that the lifespan of the Twin Oaks Pipeline is "indefinite."

52.56.  The Twin Oaks Pipeline specifically has experienced reported failures in Pennsylvania on at least two prior occasions, and these are only instances that Defendants have reported to the public. It is possible that the Twin Oaks Pipeline has experienced additional unreported failures.

---

[6] Exhibit CB, Letter from U.S. Representative Brian K. Fitzpatrick to Acting Administrator Ben Kochman (March 11, 2025).

Exhibit B_Page 502 of 583

53.57.  On October 7, 1986, a crack in the Twin Oaks Pipeline caused the release of at least 5,260 barrels of refined product in Montgomery County, Pennsylvania.

54.58.  On March 19, 2004, external corrosion caused a leak in the Twin Oaks Pipeline, resulting in the release of at least 50 barrels of refined product in Delaware County, Pennsylvania.

59.    Defendants also renovated a major portion of the Twin Oaks Pipeline—the portion that crosses the Delaware River, right next to the residential Mt. Eyre Manor neighborhood—in June and July 2023. Defendants installed approximately 2,500 feet of new pipeline underneath the Delaware River using the process of horizontal directional drilling and tied this new stretch of pipeline into the existing Twin Oaks Pipeline at a location on Oakdale Avenue near the Mt. Eyre Manor neighborhood.

**C.    The Geographic Area Affected by the Twin Oaks Pipeline Leak**

55.60.  The Twin Oaks Pipeline Leak occurred at a section of the Pipeline that runs directly under the residential Mt. Eyre Manor neighborhood in Washington Crossing, Bucks County, Pennsylvania.

56.61.  The Mt. Eyre Manor neighborhood is located in Upper Makefield Township, a municipality within Bucks County, Pennsylvania and covers the residential homes on Glenwood Drive, Walker Road, Spencer Road, Crestwood Road, Beechwood Drive, and Bruce Road.

57.62.  Figure 13 below shows the geographic location of the Twin Oaks Pipeline within a portion of Upper Makefield Township. The red line in Figure 13 shows the Pipeline.

17



Fig. ~~1~~3: location of the Pipeline within Upper Makefield Township, retrieved from the National Pipeline Mapping System Public Viewer. *See* pvnpms.phmsa.dot.gov/PublicViewer (last accessed Feb. 26, 2025).

58.    ~~Figure 2 below shows the location of the Twin Oaks Pipeline as it runs through and along a portion of the Mt. Eyre Manor neighborhood in Upper Makefield Township, Pennsylvania.~~

18

**Exhibit B_Page 504 of 583**



Fig. 2: The Mt. Eyre Manor neighborhood, retrieved from Google Maps, with the approximate location of the Twin Oaks Pipeline overlaid, running parallel to Glenwood Drive.

59.63. There is no gas station or other potential source of petroleum byproduct contamination within two miles of the Mt. Eyre Manor neighborhood.

60.64. Residents of the Mt. Eyre Manor neighborhood rely on private well water for their water supply, including water used for drinking, bathing, cooking, washing, and gardening, among other uses.

61.65. An underground aquifer, which the Twin Oaks Pipeline Leak hasDefendants have now polluted, supplies the water used by residents of the neighborhood., including Plaintiffs.

62.66. The same is true for residents of the immediately surrounding area, including, but not limited to, residences on Mt. Eyre Road, Valley View Drive, Mt. Eyre RoadOld Barn Court, Taylorsville Road, River Road, Oakdale Avenue, and Maple Shade Avenue, West Street, Cross Street, Swayze Avenue, Pondview Drive, Heron Court, Belamour Drive, Aqueduct Road, and

19

additional surrounding roads, which arerun through other nearby Upper Makefield Township neighborhoods that the Twin Oaks Pipeline also runs underneath.

63.67. Upper Makefield Township sits in a floodplain, and the Mt. Eyre Manor neighborhood is surrounded on three sides by "Flood Hazard Areas" as defined by the Federal Emergency Management Agency ("FEMA").

64.68. The Mt. Eyre Manor neighborhood is considered a High Consequence Area ("HCA") pursuant to 49 C.F.R. § 195.450, due to its concentrated population, its proximity to a commercially navigable waterway (the Delaware River), the lack of an adequate alternative drinking water source to the underlying aquifer, and its proximity to ecological resources.

### D.     Known and Reported Odor Complaints Started in September 2023

#### i.     September 2023 Odor Complaint

65.69.  On September 25, 2023,20, 2023, Defendants were notified directly by the owner-residents of 128 Walker Road of an overwhelming smell and taste of gasoline in their water. Defendants were also notified of this complaint separately on September 25, 2023, when PHMSA notified Defendants of an odor complaint referred by the Pennsylvania Department of Environmental Protection ("PADEP"). The original complainants were residents of 128 Walker Road in the Mt. Eyre Manor neighborhood who detected an overwhelming smell that they reported distinctly resembled the smell of gasoline.

66.70.  The residents of 128 Walker Road live directly across the street from the site where the Twin Oaks Pipeline Leak occurred and was eventually discovered (121 Glenwood Drive), though Defendants did not discoverconfirm discovery of the leakLeak until 16 months later.

20

67.71. Plaintiffs live at 114 Spencer Road, ~~approximately~~around only 500 feet to the approximate northeast of 128 Walker Road. The location is downgradient of the Leak's release point.

68.72. In the two months prior to the odor complaint, Upper Makefield Township had experienced multiple severe weather events. These weather events included severe flash flooding that occurred in July 2023 and that resulted in the deaths of seven people and forced month-long road closures near the Mt. Eyre Manor neighborhood.

69.73. The weather events also included substantial rains and heavy winds from Tropical Storm Ophelia that hit Bucks County, Pennsylvania on September 23, 2023.

70.74. Each of these severe weather events should have triggered full proper inspections of the Twin Oaks Pipeline by Defendants pursuant to 49 C.F.R. § 195.414. Defendants, however, did not conduct inspections sufficient to discover any resulting leaks as required by law, nor did Defendants notify PHMSA about their failure to conduct such inspections, which was reckless and negligent.

71.75. Defendants investigated the September 2023 odor complaint by simply dispatching a technician and a contractor to test for indications of a leak, but the investigation that was conducted was improperly performed in a lackadaisical fashion.

72.76. Specifically, Defendants' investigation included only testing of the well water of the complainant's residence and three nearby residences, probing the immediately adjacent segment of the pipeline with a photoionization ("PID") gas detector, excavating a single 25-foot segment of nearby pipeline that ran through nearby 121 Glenwood Drive, testing the excavated soil, and performing a static pressure test.

21

73.77.  Sadly, the excavation stopped short of uncovering the portion of the Pipeline mere feet away where the Pipeline Leak was eventually discovered.

74.78.  When the initial investigation did not result in evidence of a leak, Defendants simply and improperly ceased their investigative efforts. Defendants did not ascertain the source of the odor, and did not conduct any continued monitoring or observation of the area.

79.     Defendants then contacted the owners of 128 Walker Road and falsely told them they were "happy to report" that there was no oil or gas contamination in their water.

80.     When the owners of 128 Walker Road stated to Defendants' representative that this finding was impossible, Defendants' representative claimed that "it was probably some bacteria."

75.81.  As history bears out, the Pipeline Leak would eventually be discovered 16 months later across the street from the complainants' home.

### ii.     *June 2024 Odor Complaint*

76.82.  On June 28, 2024, Defendants received yet another odor complaint from a different resident, this time at 108 Spencer Road in the Mt. Eyre Manor neighborhood, who called Defendants' so-called "emergency" phone number to alert Defendants about the smell.

83.     108 Spencer Road is just two properties to the east from Plaintiffs' home. Indeed, Plaintiffs' property at 114 Spencer Road is located *in between* 108 Spencer Road and the location where the Leak was ultimately detected at 121 Glenwood Drive.

77.84.  In response to the odor complaint, Defendants responded in an even more lackadaisical careless manner than it did to the first complaint when, in fact, the response should have been more robust since a prior complaint had already been received. Defendants dispatched a single technician to examine the site using a portable 4-gas detector. The technician's equipment

22

did not record a gas detection, and the technician did not observe dead vegetation above the Pipeline.

78.85. Based on the technician's report and limited inspection, and nothing else, Defendants ceased their investigative efforts. Defendants did not ascertain the source of the odor, and did not conduct any continued monitoring or observation of the area.

79.86. Inexplicably, Defendants also neglectedfailed to report this odor complaint to PHMSA.

87.    Defendants also sent an individual to speak with the residents at 108 Spencer Road at their home in response to this odor complaint. This representative of Defendants stated that there was no leak, and that Defendants would know right away if there ever was such a leak, because Defendants would notice either a pressure drop or a loss of product in the Pipeline.

88.    Unsatisfied with this limited response (which of course turned out to be incorrect), the residents of 108 Spencer Road also contacted Sue Erickson, a right-of-way specialist and public-facing representative for Defendants. Erickson assured Plaintiffs that there was no issue with the Pipeline, that it had been "probed," and that there was no loss of pressure indicating any leak. This response ultimately demonstrates the unreliability and defective nature of Defendants' methods for monitoring and detecting leaks.

### iii.    July 2024 Odor Complaint

80.89. The following month, on or about July 21, 2024, Defendants received a third odor complaint from a resident at 121 Glenwood Drive in the Mt. Eyre Manor neighborhood, which is immediately across the street from the complainants who lived at 128 Walker Road and made the first complaint detailed above, *and* the precise address where Defendants had excavated a segment of the Twin Oaks Pipeline in September 2023.

23

81.90.  The complainants from 121 Glenwood Drive reported not only a smell of gasoline or kerosene in their water but also noted a visual change in how their water looked.

82.91.  Again, Defendants' response was improper and lackadaisical, especially accounting for the fact that this was now the third complaint received in a short period of time.

83.92.  In response to this July 2024 odor complaint, Defendants again dispatched only a single technician to examine the site using a portable 4-gas detector. The technician's equipment did not record a gas detection, and the technician did not observe dead vegetation above the pipeline.

84.93.  Based on the technician's report, Defendants ceased their investigative efforts. Defendants did not ascertain the source of the odor and again failed to implement or conduct any proper continued monitoring or observation of the area.

85.94.  Moreover, yet again, Defendants did notfailed to report this odor complaint to PHMSA.

86.95.  Furthermore, Defendants told the residents at 121 Glenwood Drive at the time that there was no petroleum in their water, without conducting proper tests to ascertain this as a fact.

87.96.  Defendants also claimed to the PADEP that "iron bacteria" was the likely explanation for the smell of gasoline or kerosene and this information was then passed on by PADEP to the residents at 121 Glenwood Drive.

### iv.    November 2024 Odor Complaint

88.97.  Four months later, on November 21, 2024, Defendants received a fourth known odor complaint from a resident of 107 Spencer Road in the Mt. Eyre Manor neighborhood, immediately across the street from the prior complainants that lived at 108 Spencer Road, and only a few houses away from Plaintiffs' home.

24

89.98.  The homeowners at 107 Spencer Road, who bought their home in 1978, raised their family in the Mt. Eyre Manor community, and lived in the neighborhood for over 45 years, complained that they smelled gasoline in their water. They also noticed that their brand-new drinking glasses had a sheen resembling oil or gasoline after taking them out of the dishwasher.

99.    Startled by this discovery, the homeownersThe residents at 107 Spencer Road asked their well company, Bucks County Well Drilling Co.,. ("BCWD"), to takeinvestigate. BCWD and the residents of 107 Spencer Road could clearly observe a sheen in the water.

90.100.    Disturbed by this discovery, the residents at 107 Spencer Road had samples taken and send them to an independent laboratory. The samples came back *positive* on October 24, 2024, for diesel range organics (C10-C28) at 3,920 milligrams per liter and gasoline and kerosenerange organics at 573 milligrams per liter.

91.101.    Nonetheless, onceThe residents at 107 Spencer Road notified Defendants of this result. Once again, and despite these now positive test results, Defendants' response was more than insufficient and neglectful.

102.    In response toSoon after receiving this alarming test result, in November 2024, an individual purporting to be an agent of Defendants appeared at 107 Spencer Road in the dark at night. He denied that Defendants were responsible for the petroleum product present in the water at 107 Spencer Road but agreed to continue monitoring the situation.

92.103.    Despite this now being the fourth known odor complaint received from a neighborresident in the direct vicinity of where the Pipeline Leak was eventually discovered, Defendants again dispatched a single technician to examine the site using a portable 4-gas detector. The technician's equipment did not record a gas detection, and the technician did not observe dead vegetation above the pipeline.

25

93.104.      Defendants performed a four-hour static pressure test to check for lowering pressure indicative of a pipeline leak. The operator reported to Defendants that the results were within acceptable limits, although the operator did not report the acceptance criteria used or the results of the pressure test.

94.105.      Based on the reports of the technician and operator, Defendants ceased their investigative efforts, notwithstanding that there had now been at least four complaints reported since September 2023. Defendants did not ascertain the source of the odor, and did not conduct any continued monitoring, observation, or testing of the neighborhood.

95.106.      In what was now clearly a systemic pattern, Defendants again did not report this odor complaint to PHMSA.

107.    Unlike Defendants, the owners at 107 Spencer Road continued to investigate their disturbing test results. They alerted their homeowners' insurance company, who retained environmental firm Phoenix Consulting, LLC.

108.    Phoenix began interfacing directly with PADEP, which stated that it had received multiple complaints from concerned residents over the last year but that the water at 107 Spencer Road was the first instance of failing laboratory results.

109.    Phoenix collected samples directly from the well at 107 Spencer Road on December 17, 2024. These samples contained a very clearly observable yellow petroleum product in the groundwater:





27

110.   Phoenix had the water from these jars tested and communicated the results of those tests to the PADEP, whose representative Richard Staron indicated that a jet fuel release from the Twin Oaks Pipeline was a likely source.

111.   These results indicated the presence of benzene, toluene, ethylbenzene, isopropylbenzene, chloroform, naphthalene, xylenes, 1,2,4-trimethylbenzene, 1,3,5-trimethylbenzene, and lead.

112.   Defendants finally performed testing of the well at 107 Spencer Road themselves on January 24, 2025, through a contractor, Groundwater & Environmental Services, Inc. ("GES"), as described in more detail below.

96.113. Discovery and expert testimony will show that Defendants' responses to all of the odor complaints detailed above were far below the standard of care and duties that Defendants owed to the residents of Mt. Eyre Manor and the surrounding neighborhoods, both with respect to the urgency of the situation, the actions that were taken, and the lack of any substantive follow-up., monitoring, and testing, monitoring, and testing to determine that the Pipeline was leaking and contaminating the community including the aquifer used by Plaintiffs and other members of the proposed Class.

97.114. Because of Defendants' lack of a proper response, Defendants never timely identified a cause of the taste and odor complaints, that is, until the Twin Oaks Pipeline Leak was discovered only much later in January 2025.

**E.    The Twin Oaks Pipeline Leak is Discovered in January 2025**

98.115. On January 21, 2025, PADEP informed PHMSA that samples obtained from a well at 107 Spencer Road had indicated the presence of kerosene, a major component of JP-8 jet fuel.

28

**Exhibit B_Page 514 of 583**

PHMSA notified Defendants of the test results and directed Defendants to investigate the origin of the kerosene.

99.116.On or about January 22, 2025, a representative of Defendants, Wassim Saad, parked in Plaintiffs Daniel and Katherine La Hart's driveway in an unmarked truck with a New Jersey license plate and knocked on their door to offer "free well testing" with no explanation why. Shockingly, Mr. Saad did not identify himself to Plaintiffs at this time as a representative of Defendants or tell Plaintiffs about the presence of kerosene at 107 Spencer Road., even though that property's well is mere feet from Plaintiffs' property line. Indeed Mr. Saad's, business card indicated that he worked for a company called "Wood PLC."

100.117.    Plaintiffs declined the offer for "free well testing" because they thought, based upon the lack of information and material omissions provided, that Mr. Saad was a door-to-door salesman offering unneeded services.

101.118.    Shortly thereafter, Plaintiffs noticed that trucks labeled "Energy Transfer" were present in the neighborhood, and Plaintiffs then realized that their community was likely facing a significant issue, although at this time the scope of the issue was unknown.

102.119.    Plaintiffs then contacted Mr. Saad and Defendants took a purported test of Plaintiffs' water on January 24, 2025, but only by collecting water only from Plaintiffs' faucet and not their well.

103.120.    At this time, the neighbors in the Mt. Eyre Manor neighborhood began to talk with each other about the activity involving Defendants, and Plaintiffs encouraged other residents to get their water tested.

104.121.    From January 22, 2025, through January 31, 2025, Defendants had a contractor, Groundwater & Environmental Services, Inc. ("GES"), acting on behalf of and as an

29

agent of Defendants, sample the private wells of approximately twenty-five other nearby residences in the neighborhood.

105.122.	GES confirmed the presence of hydrocarbons in well water at certain properties in the neighborhood including 107 Spencer Road, 108 Spencer Road, and 128 Glenwood Drive, each of which surround Plaintiffs' property.

106.123.	From January 22, 2025, through January 31, 2025, Defendants proceeded to probe the length of the Twin Oaks Pipeline between 121 Glenwood Drive and 155 Glenwood Drive (approximately 0.7 miles) with a PID gas detector. As with Defendants' prior investigations, the gas detector results were reported as "non-detect."

107.124.	Despite the failurerepeated failures of Defendants' PID gas detector to identify a leak, eventually on January 31, 2025, Defendants visually observed and finally confirmed a substantial leak in the Twin Oaks Pipeline when they finally excavated a portion of the Pipeline located on the property at 121 Glenwood Drive, in the backyard of the residents who live there, next to the swimming pool where the residents' family swam prior to the discovery of the leakLeak.

108.125.	The Pipeline Leak was discovered at 121 Glenwood Drive, the residence directly across the street from 128 Walker Road in the Mt. Eyre Manor neighborhood, where the residents lived who reported the first odor complaint – *16 months prior* – detailed above as the smell of gasoline.

109.126.	Defendants had finally decided to excavate a portion of the Twin Oaks Pipeline located on the property at 121 Glenwood Drive after they went back and reviewed old maintenance records that had long been available to them. It is not currently known why

30

Defendants did not take this step earlier, or what else these old maintenance records might show once they are produced in this litigation.

110.127.     Video of the ~~pipeline leak~~Pipeline Leak was recorded by one of the residents at 121 Glenwood Drive.

111.128.     The Pipeline Leak would later be characterized as a "slow drip" from a Type A sleeve installed in 1995, and that had not been properly maintained since.

112.129.     Type A sleeves are typically used to reinforce pipeline segments or areas of a pipeline that exhibit non-leaking defects such as corrosion or observable dents.

113.130.     The Twin Oaks Pipeline is reinforced in at least 44 other segments by Type A sleeves installed during the late 1980s and early 1990s, and which are also all at risk of failing, especially if they are not continually and properly monitored and maintained. Defendants failed to continually and properly monitor and maintain the Type A sleeve that was underground at 121 Glenwood Drive in the Mt. Eyre Manor residential neighborhood in Upper Makefield Township, Pennsylvania.

114.131.     The pipeline industry views Type A sleeves as ineffective at preventing leaks and an insufficient mechanism to reinforce an aging pipeline in danger of leaking. The corrosive nature of petroleum products moving at high pressure inside a pipeline means that dents over time can become cracks through which product can escape, and a sleeve reinforcing the exterior of the pipeline will not prevent leaks in such a scenario.

115.132.     For example, in August 2020, a dent in the Colonial Pipeline near Huntersville, North Carolina, which had been previously reinforced in 2004 with a Type A sleeve, developed into an approximately five-foot crack. As here, the operators of the Colonial Pipeline

31

failed to properly monitor and maintain the pipeline and Type A sleeve, and its detection systems failed to detect the crack or the release of any product.

116.133.    In that instance, an estimated 2,000,000 gallons of product were discharged into the surrounding environment before the pipeline's operators, alerted to the leakLeak by local residents, were able to identify and repair the crack. That pipeline's operator initially reported the release as involving 63,000 gallons (3 percent of the actual volume lost).

117.134.    In light of this and other similar incidents and their own knowledge and experience as to pipelines and the advantages and drawbacks of certain standard operating procedures and repair equipment, Defendants here knew or should have known that the approximately thirty year-old Type A sleeve situated on the residential property at 121 Glenwood Drive in the Mt. Eyre Manor neighborhood, a community where residents rely on well water for their water needs, was insufficient reinforcement to prevent a discharge from occurring from the Pipeline and especially under or near a residential property and neighborhood.

118.135.    On January 31, 2025, Defendants notified the National Response Center ("NRC") of the Twin Oaks Pipeline Leak and inexplicably and falselywithout good basis reported a release of 156 barrels of jet fuel, which is 6,552 gallons.

119.136.    Despite this initial report that there were 6,552 gallons of jet fuel spilled into a residential neighborhood in Bucks County, Pennsylvania that relies on well water, Defendants have maintained in statements made to residents and regulatory authorities after January 31, 2025, that in fact, Defendants do not know how much product has been released into the environment.

137.    Still, Defendants have also repeated the 6,552 gallons figure at other times to regulatory authorities, including to the PADEP on April 18, 2025.

120.138.    It is highly likely because of the amount of time that the ~~leak~~Leak was occurring, the size of the ~~leak~~Leak, the pressure utilized for the Twin Oaks Pipeline, the odor complaints dating back to September 2023, and other evidence, that significantly more than 6,552 gallons of jet fuel and petroleum products was released by Defendants into the environment.

121.139.    Due to Defendants insufficient, improper, negligent, and reckless conduct alleged herein with respect to their oversight, operation, supervision, maintenance, monitoring, and testing of the Twin Oaks Pipeline, Defendants have no idea when the Pipeline began leaking. ~~It is highly probable that the Pipeline began leaking long before the first odor complaints were reported in September 2023, for the odors to have even been detectable at that time.~~

122.140.    The Twin Oaks Pipeline's maximum operating pressure is 1,200 psig (pounds per square inch gauge). On January 31, 2025, when Defendants discovered the ~~leak~~Leak at 121 Glenwood Drive in the Mt. Eyre Manor neighborhood, it was reported that the Pipeline was operating at 1,100 psig, *i.e.*, approximately 91.6% operating pressure.

123.141.    PHMSA conducted a preliminary investigation of the Pipeline Leak after it was reported. Based on its investigation, PHMSA concluded that "the Pipeline experienced a leak in a high consequence area for at least 16 months, resulting in the release of jet fuel that has migrated into several adjacent water wells and caused additional impacts to property and the environment."[7]

124.142.    Defendants have ~~stated~~represented repeatedly, in statements to both residents and regulatory authorities, that despite their investigation since discovering the ~~leak~~Leak, they still do not know when the Pipeline Leak truly began.

---

[7] Exhibit ~~D~~C, Notice of Proposed Safety Order, Pipeline and Hazardous Materials Safety Administration, CPF No. 4-2025-054-NOPSO (Feb. 13, 2025).

125.143.    It is probable that the Twin Oaks Pipeline was leaking for a significant period of time, even prior to the first known odor complaint being made to Defendants in September 2023.

126.144.    Defendants have stated repeatedly in statements to both residents and regulatory authorities that they do not know whether the Twin Oaks Pipeline is still leaking.

127.145.    Defendants have not excavated the entire Twin Oaks Pipeline to conduct a visual examination of the Pipeline to determine that it is not leaking, or even excavated the Pipeline sufficient to examine all the Type A sleeves along the Pipeline.

F.    **Defendants' Response and Actions Following Discovery of the Pipeline Leak**

128.146.    On January 31, 2025, Defendants cut off the segment of the Pipeline where the Leak had been discovered and submitted a repair plan to PHMSA. Defendants had their workers arrive and remove the leaking segment in the middle of the night, without giving notice to residents or to local, state, or federal regulators.

129.147.    Plaintiffs and the Class members demand immediate access to review and examine the leaking segment of the Twin Oaks Pipeline and expect Defendants to preserve all aspects of the Pipeline which they removed.

130.148.    On February 1, 2025, Energy Transfer's Lead Specialist for Public Affairs, Joseph Massaro, issued a written statement confirming they had discovered "product loss" and claiming that the Pipeline was "inactive" at the time the leakLeak was discovered.

131.149.    This statement means, among other things, that the video of the Pipeline that shows that Pipeline Leak is not indicative of the actual full Pipeline Leak under fullusual operating pressure conditions.

34

132.150.    On February 2, 2025, after receiving approval from PHMSA's Southwest Region Director, Defendants replaced the removed segment of the Pipeline and, without conducting further work to ensure that no other parts of the Pipeline arewere currently leaking, shockingly rushed to return the Pipeline to service.

133.151.    Defendants subsequently began an inadequate and neglectful investigation of the effects of the known Pipeline Leak in a high consequence, residential area.

134.152.    Defendants began conducting "exposure" testing for the water of nearby residences. But rather than testing the actual tops of all residents' wells to determine whether any free product – also known as light non-aqueous phase liquid or "LNAPL" – was present, Defendants' exposure testing relied on samples taken from faucets inside the residences post-treatment, and inadequate PID readings.

135.153.    In at least one instance, when Defendants' retained testing agents, hired by and working on behalf of Defendants, discovered that they had taken a sample directly from a well for testing by mistake, *they threw out the sample and erased the results*.

136.154.    Defendants' method of exposure testing thus deviated from the standard protocols for testing groundwater, which universally require testing pre-treatment, and was seemingly designed to limit Defendants' ability to identify the scope and location of the contamination plume resulting from the Pipeline Leak.

137.155.    Defendants failed to test samples directly from residents' wells for the presence of free product. This is true even though Defendants recently have, at the behest of Plaintiffs and other residents who have retained the undersigned counsel, finally begun to conduct bailer tests of residents' wells to screen for the presence of LNAPL.

35

138.156.    ~~Even~~Indeed, even in situations where Defendants' agents have *visually observed* the presence of LNAPL, they have not universally retained the water from the bailer for testing and have instead in instances deposited ~~it~~this contaminated water back into the well.

139.157.    Defendants, moreover, despite being well-aware that their conduct as alleged herein would give rise to residents' legal claims, have failed to properly preserve all evidence of environmental contamination that they have found during their activities, including by, for example, failing to properly catalog and store all physical materials and things that they have inserted into or withdrawn from residents' wells.

140.158.    Defendants have not ensured that they and their agents have properly preserved all evidence gathered as a result of Defendants' and GES's activities in the neighborhood following the discovery of the Pipeline Leak. Therefore, Plaintiffs and Class members are entitled to all reasonable adverse inferences that may arise as the result of any failure to properly preserve evidence.

141.159.    On February 4, 2025, Energy Transfer's Joseph Massaro appeared at the regularly scheduled Upper Makefield Township Board of Supervisors meeting, along with Defendants' other representatives Carl Borkland, Susan Ericson, David Kerwood, and Rahn Monreal. Massaro confirmed the product release and purported to provide an "update" on Defendants' remedial efforts.

142.160.    On February 6, 2025, at 7:30 p.m., a townhall meeting was held at the Upper Makefield Township Office, where affected residents who live in Mt. Eyre Manor and the surrounding neighborhoods, including Plaintiffs~~, representatives~~. Representatives from PHMSA and the Defendants~~, and representatives from PHMSA,~~ also were present.

36

143.161.     At this townhall meeting, Defendants provided an update on their efforts to monitor and contain the Pipeline Leak, in which they admitted that their exposure testing had detected hydrocarbons in six neighborhood wells so farto that time.

144.162.     Defendants also admitted during the meeting that they did not know how much product had been lost or when the Pipeline Leak had begun.

145.163.     Defendants further stated that because the release occurred "in the headwaters" of the Delaware River, it would make sense for any groundwater carrying spilled product to be moving in a northeasterly direction toward the Delaware River. This was the Defendants' best estimation at the time concerning the plume caused by the Pipeline Leak of unknown quantities of jet fuel and other petroleum products.

146.164.     At the town hall meeting, Defendants offered only to pay for the installation of carbon filtration systems for any wells where their product was detected, and to pay for the maintenance of such a system for as long as the product is detected in the well.

147.165.     During this townhall meeting, officials from PHMSA stated that they had no confidence in Defendants' ability to identify leaks in the Twin Oaks Pipeline, considering the circumstances surrounding the Pipeline Leak. Residents of the Mt. Eyre Manor neighborhood, including Plaintiffs, called on Defendants to shut down the Pipeline.

148.166.     Defendants refused (and still refuse) to shut down the Pipeline.

149.167.     On February 7, 2025, the day after the town hall meeting, Defendants provided a written public update on the Upper Makefield Township website in which they stated that, rather than shutting down operations, they would reduce the Twin Oaks Pipeline's operating pressure to 80%.

150.168.    On February 13, 2025, PHMSA issued a Notice of Proposed Safety Order ("NOPSO") to Defendants. In the NOPSO, PHMSA wrote:

> After evaluating the foregoing preliminary findings of fact, and having considered the characteristics of the pipeline, including prior Type-A sleeve repairs involving dents and other defects; the prior failures of the pipeline; the hazardous nature of the petroleum products, including jet fuel, transported; the uncertainty as to the root cause(s) of the failure; the proximity of the pipeline to residential dwellings and water wells; the existing and potential additional impacts to property, the environment, and wildlife; and the possibility that the same condition(s) that may have caused the failure remain present in the pipeline and could lead to additional failures; it appears that the continued operation of the Twin Oaks Discharge pipeline system without corrective measures would pose a pipeline integrity risk to public safety, property, or the environment. The conditions and threats described above potentially exist throughout the Twin 7 Oaks Pipeline. Further, Sunoco's apparent inability to effectively detect the leak has potentially exacerbated the impacts of the release over an extended period of time. Accordingly, corrective measures are necessary to mitigate the pipeline integrity risk of the pipeline system to protect public safety, property, and the environment.

151.169.    PHMSA thereafter issued proposed remedial requirements including reducing operating pressure, implementing plans to assess the integrity of the pipe and of the Type A sleeves along it, conducting a leakage survey, and conducting a root cause failure analysis.

152.170.    On the evening of February 13, 2025, a second town hall meeting was held at Sol Feinstone Elementary School, Newtown, PA at 7:30 p.m. Affected residents including Plaintiffs, representatives from Defendants, and representatives from PHMSA and state regulators attended the meeting.

153.171.    During this meeting, residents, including Plaintiffs, demanded that the Twin Oaks Pipeline be shut down. Plaintiff Daniel La Hart provided an opening statement on behalf of Mt. Eyre Manor residents at this meeting.

154.172.    Defendants then showed residents a map of what they considered to be the geographic area affected by the Pipeline Leak. This map included a line of arrows pointing in the

38

northeastern direction, which were labeled as the "*inferred* groundwater flow direction." (emphasis added).

155.173.    Defendants stated that areas west and south of the Pipeline Leak were not of concern based on the flow of the groundwater toward the Delaware River. Defendants, however, then admitted that they had not yet installed a single monitoring well or taken any steps to identify the accurate directional flow of groundwater in the area.

156.174.    Defendants' affirmative statements to residents about the identified affected geographic area resulting from the Pipeline Leak at the town hall meetings on February 6 and February 13 were (at best) misleading. At the time Defendants made these statements, in fact, Defendants had no idea when the Pipeline Leak first occurred, how long the Pipeline had been leaking into the residential neighborhood, how much product had been discharged into the surrounding underground aquifer and bedrock, whether additional points along the Pipeline were continuing to leak, or the actual direction or flow rate of the groundwater underlying the point or points of discharge.

157.175.    Defendants intended their statements to induce a false sense of security and confidence in residents, particularly for residents whose homes were not within Defendants' arbitrarily delineated affected geographic area that was not based on adequate investigation or evidence.

158.176.    During the February 13, 2025, town hall meeting, one resident who resided at 128 Walker Road in the affected area and across the street from where the Pipeline Leak was discovered described her experience with her well. Since 2023, she had repeatedly complained to Defendants about her concerns of contamination resulting from the Twin Oaks Pipeline, and

Defendants' representatives had repeatedly stated that any oil could not have been coming from the Twin Oaks Pipeline.

159.177.    After the discovery of the Pipeline Leak, when Defendants finally sent a contractor to inspect her well, they discovered *over **twelve feet of jet fuel** on top of the water in her well*, and after pumping the water, *estimated that **fifteen feet of jet fuel** had been accumulating in the well since 2023*. The resident stated that according to Defendants' contractor, *over 22 inches of jet fuel had accumulated in her well **in the past week alone***. Indeed, significant product continues to accrue daily in this well.

160.178.    Residents asked Defendants for a guarantee during the February 13, 2025. town hall meeting that the Twin Oaks Pipeline was not still leaking. Defendants responded that they were not able to provide such a guaranty at that time.

179.    Defendants did make one guarantee at the February 13 town hall: they confirmed that they would provide medical monitoring to the Mt. Eyre Manor community and surrounding neighborhoods as a result of the Leak. Defendants' representative Matt Gordon, a vice president of operations and the individual who Defendants put forward as the authority figure speaking on Defendants' behalf at the town hall, confirmed Defendants' commitment to medical monitoring. This admission is recorded on video, but to Plaintiff's knowledge no such medical monitoring has been conducted.

161.180.    On February 18, 2025, PADEP sent Defendants a Notice of Violation.[8] In the Notice, PADEP stated that the release identified on January 31, 2025, has "caused free product and dissolved concentrations of petroleum-related chemicals in potable wells in the neighborhood, with some properties having contamination exceeding DEP's Statewide health standard medium

---

[8] Exhibit ED, Notice of Violation, Pa. Dep't Envt'l Protection (Feb. 18, 2025).

40

specific concentrations in their drinking water." The Notice advised that the discharge constitutes a violation of the Pennsylvania Clean Streams Law, 35 P.S. § 691.401, and that such a violation amounts to unlawful conduct within the definition of the law and is subject to civil enforcement.

162.181.    On February 19, 2025, counsel for Defendants responded to the NOPSO issued by PHMSA.[9] Defendants denied and disputed several of the preliminary factual findings contained in the NOPSO. In doing so, Defendants admitted that "there is not sufficient evidence at this time to conclude how long the Affected Pipeline was leaking." Defendants stated that it did not have evidence of an ongoing leak, but also that its investigation was ongoing. Defendants did *not* state that it had sufficient information to rule out a continuing release of aviation fuel and other contaminants from the Pipeline into the local environment.

163.182.    On February 27, 2025, a third town hall meeting was held again at the Sol Feinstone Elementary School at 7:30 p.m. Affected residents including Plaintiffs, regulators, local officials, and representatives of the Defendants were present at the meeting.

164.183.    During the February 27 town hall meeting, Defendant Energy Transfer's Joe McGinn, Vice President of Public Affairs, stated: "**This release happened, and it's our fault that it happened. This was not a third-party damage issue. We recognize that. We apologize for it.**" He further stated that Energy Transfer's "**focus and goal is to restore the community to its original state**."

165.184.    Defendants' representatives also stated during the February 27 town hall meeting that they provided their initial estimate of 156 barrels of product lost based on their understanding that federal law required a reporting of the amount of product lost within 48 hours of discovery of a leak. Defendants *admitted* that at the time they made the representation to

---

[9] Exhibit FE, Letter from Haley O'Neill to Bryan Lethcoe (Feb. 19, 2025).

41

PHMSA, they had no factual basis upon which to assert the amount of product lost, and that they continue to lack an evidence-based estimate of the amount of product that has been discharged into the underlying bedrock and aquifer beneath the Mt. Eyre Manor neighborhood, in Upper Makefield Township.

166.185.     This signifies and demonstrates that Defendants do not maintain proper and adequate leak detection and monitoring systems with respect to the Twin Oaks Pipeline.

167.186.     On February 28, 2025, Pennsylvania Governor Josh Shapiro wrote a letter to U.S. Transportation Secretary Sean Duffy, requesting expedited action from PHMSA in response to the Pipeline leakLeak.[10] In his letter, Governor Shapiro noted that "Sunoco has not demonstrated adequate ability to detect leaks and take appropriate actions, given what appears to have been a significant delay between the initial indications of a leak and the response."

168.187.     Governor Shapiro further described the leakLeak as "the latest incident in a long pattern of safety concerns with Sunoco and Energy Transfer pipelines in Pennsylvania."

188.     On March 4, 2025, Defendants also sent to the PADEP a revised Notice of Intent to Remediate indicating that they intended only to remediate "Jet Fuel and unleaded gasoline parameters (benzene, toluene, ethylbenzene, total xylenes, methyl tertbutyl ether, isopropylbenzene, naphthalene, 1,2,4-trimethylbenzene, 1,3,5-trimethylbenzene, 1,2-dichloroethane, 1,2-dibromoethane, and lead) for Residential Statewide Health Standards in soil and groundwater." By selecting the Statewide Health Standards as their chosen cleanup standard, Defendants have confirmed that their plan is to leave their contamination in place to continue polluting Plaintiffs' and the neighborhood's water, soil, and air.

---

[10] Exhibit GF, Letter from Governor Josh Shapiro to Secretary Sean Duffy (Feb. 28, 2025).

42

189.   On March 5, 2025, Defendants responded to the Notice of Violation previously issued by the PADEP. Despite having been told by the PADEP to describe "the circumstances causing the incident and how the circumstances were determined, including historical investigations of the pipeline in this area," Defendants' response was devoid of any of this information. *See* Exhibit G.

190.   Instead, Defendants simply recited the same limited history of inadequate responses to resident complaints that are described herein, starting in September 2023. The response did not in any meaningful way describe "the circumstances causing the incident" and has no information regarding "historical investigation of the pipeline in this area." *Id.*

~~169.~~191.   On March 6, 2025~~,~~ (the next day), PADEP issued an Administrative Order to Defendants Energy Transfer (R&M), LLC and Sunoco Pipeline, L.P., directing Defendants to respond to the Pipeline Leak and implement certain remedial actions, including the supply of bottled water and the installation of point-of-entry treatment ("POET") systems for certain residents in Upper Makefield Township, Pennsylvania.

~~170.~~192.   PADEP's Order limited the requirement to supply bottled water to only those properties with potable groundwater wells within the Mt. Eyre Manor neighborhood topographic watershed, plus a minimum 500-foot buffer, that have concentrations of VOCs above background concentrations in the area, and limited the requirement to install POET systems to only those properties with potable groundwater wells within the Mt. Eyre Manor neighborhood topographic watershed, plus a minimum 500-foot buffer, that have concentrations of VOCs exceeding the Maximum Contaminant Levels ("MCLs") under Pennsylvania state regulations.

193.   ~~The~~On March 19, 2025, Defendants submitted an Interim Remedial Action Plan ("IRAP") to the PADEP. The IRAP contained numerous exhibits with test results and other

43

characterizations of the state of the neighborhood in the weeks following the Leak, including but not limited to the following:

    a.  Soil testing at 121 Glenwood Drive, the property where the Leak was detected, confirmed the presence of many dangerous constituents of jet fuel and other harmful contaminants, including toluene, ethylbenzene, isopropylbenzene, xylenes, phenanthrene, naphthalene, arsenic, barium, beryllium, and lead; the results were also positive for significant quantities of total hydrocarbons in the diesel range (C10-C28). *See* IRAP Attachment 4.

    b.  A summary table indicated that: at least 6 residences had tested positive for volatile organic compounds ("VOCs") above statewide health standards or positive for the presence of LNAPL, and an additional 19 residences had tested positive for VOCs but were below the statewide health standards or had "J-value" results indicating the presence of VOCs.[11]

194.    The IRAP also included an attachment indicating the inferred general trend of bedrock features based on Defendants' analysis to date:

---

[11] In environmental testing, a "J-value" indicates that a result is an estimated value.

44



IRAP, Attachment 14.

195.   As this figure demonstrates, Plaintiffs and their neighbors are directly within the zone of danger to experience ongoing and future contamination because of the Leak. Indeed, as indicated by the red lines, one of the bedrock features runs directly from 121 Glenwood Drive (the Leak location) through 114 Spencer Road, which is Plaintiffs' property.

196.   This bedrock trend figure also publicly revealed for the first time that LNAPL had been detected at 110 Spencer Road, directly next door to Plaintiffs' property.

197.   On April 18, 2025, Defendants submitted a Site Characterization Work Plan ("SCWP") to the PADEP.  *See* Exhibit H.

198.   The SCWP confirmed that the Pipeline transports not just jet fuel but also "occasionally transports unleaded gasoline and diesel fuel." *Id.* at 2.

199.   In the SCWP, Defendants again falsely "estimate[d]" that the extent of the Leak's volume was 156 barrels but did not classify what petroleum product this constituted. *Id.*

45

200.    Defendants revealed that in addition to jet fuel LNAPL being observed at several homes in the community, additional LNAPL that "appears to be a different petroleum product" was observed at "an additional property on Spencer Road," where Plaintiffs reside.

201.    While Defendants referenced figures and maps that purportedly revealed the locations of LNAPL observations and other important data, Defendants inexplicably redacted most of the relevant information from the SCWP, and its exhibits.

202.    On May 2, 2025, PHMSA executed a Consent Order and Consent Agreement with Defendant SPLP, directing SPLP to take specific corrective actions following PHMSA's investigation into to the Leak. These corrective actions include: (i) verification of the integrity of every Type A sleeve installed on the Twin Oaks Pipeline; (ii) submission to PHMSA within 90 days of a comprehensive plan for identifying, evaluating, and removing any Type-A sleeves whose integrity cannot be assured, as well as a technical justification for any Type-A sleeves that remain on the line and a plan to implement additional integrity management measures to minimize any risks associated with their continued use; (iii) a requirement that the Pipeline continue to operate at a 20 percent reduction in pressure; (iv) submission within 45 days of mechanical and metallurgical testing results; submission within 120 days of a failure history evaluation and a root cause failure analysis; and (v) evaluation and improvement of the effectiveness and capabilities of Defendants' leak detection system to ensure that any future leaks of this nature are identified immediately.

203.    On May 9, 2025, Defendants updated their summary table of results of the water testing performed in Mt. Eyre Manor and the surrounding neighborhoods. *See* Exhibit I. This updated table indicated at least 7 residences had tested positive for volatile organic compounds ("VOCs") above statewide health standards or positive for the presence of LNAPL, up from 6 in

46

the March 19th version of the table. *Id.* An additional ***36 residences*** also tested positive for VOCs but were below the statewide health standards or had "J-value" results indicating the presence of VOCs, almost double the 19 residences in these categories in the March 19th version. *Id.* Clearly the magnitude and scope of contamination is only getting worse, and not better.

204.    On May 13, 2025, the PADEP responded to Defendants' SCWP and found that the submission was "deficient." PADEP requested more information on the LNAPL believed to be a different petroleum product and otherwise requested more complete information from Defendants. PADEP also faulted Defendants for their excessive and improper redaction of the figures and attachments to the SCWP. *See* Exhibit J.

205.    As the results from the March 19 and May 9 tables indicate, the harm caused by Defendants' actions as alleged herein and the Pipeline Leak is not limited to the contamination of certain limited residences above MCLs under Pennsylvania state regulations. To the contrary,

171.206.    Plaintiffs and every Class member have the right to clean drinking water and clean soil that are completely free of any contaminant that is found in jet fuel, or at least to background concentrations. Equally. Further, the 500-foot buffer required by the PADEP is insufficient to remedy the damages andsafeguard Class members from injuries that Defendants have caused as a result of the Pipeline Leak, as contamination has already been detected beyond this 500-foot buffer.

172.207.    Judicial intervention is necessary to impose appropriate and reasonable full remedialprotective measures and obligations on Defendants beyond the regulatory measures ordered by the PADEP.

47

173.    According to Defendants' own contracted testing firm, GES, hydrocarbons have been detected in the wells of numerous residences in the Mt. Eyre Manor neighborhood in addition to the six residences that were initially reported.

174.208.    At least five residences have already shown detectable amounts of hydrocarbons above background conditions but below the MCLs for a given hydrocarbon.Testing has indicated that at least *43 residences*, including Plaintiffs', have already been affected and demonstrably contaminated by the Leak. Defendants' investigation is ongoing, and the number of wells that Defendants know to be impacted continues to increase.

175.209.    Despite this knowledge, to date Defendants have not admitted publicly to the discoveryfull scope of hydrocarbons in more than six wellscontamination in the Mt. Eyre Manor neighborhood, and instead continue to attempt to only minimize it.

176.210.    In multiple incidences, residents have requested that GES technicians taking post-treatment samples from their faucets also take pre-treatment samples from their wells for testing. GES technicians repeatedly have responded that they had strict instructions from Defendants not to conduct any testing of well water pre-treatment, and to only take samples from faucets in the residents' homes.

G.    **Environmental Contamination Resulting from the Pipeline Leak**

177.211.    The Pipeline Leak has resulted in the dispersion of multiple known toxic chemicals into the surrounding environment. The full extent and make-up of the contamination is presently unknown.

178.212.    Free standing petroleum or jet-fuel product has been found on the top of the water in some residents' wells and, as Defendants recently revealed, a petroleum product other than jet fuel was found in at least one well on Spencer Road.

48

179.213.    Over twelve feet of free product was found on top of the water in the well at 128 Walker Road, directly across the street from the location of the Pipeline Leak. Defendants' contractors estimated that over fifteen feet of jet fuel had accumulated in the well since 2023. Moreover, product is still continuing to accumulate in this well despite Defendants' efforts to remove it. Every day since the contamination was initially discovered by Defendants' contractors, more of Defendants' hazardous product has seeped into the well.

180.214.    Free-standing petroleum or jet fuel product was found accumulated on top of the water in several other wells near the site of the leakLeak, including nearly six feet of product in the well at 121 Glenwood Drive and over three feet of product at 107 Spencer Road. Product has been observed on top of the water in the wells of at least fifteen other nearby residences to date.

181.215.    In addition to direct observation of product in their wells, residents continue to report detecting the odor of gasoline in their wells and in their tap water, which, at the very least, is a substantial nuisance that interferes with the residents' enjoyment and use of their properties.

182.216.    For example, the residents at 105 Spencer Road have been smelling gasoline on their property since June of 2024, and at times have been able to taste gasoline in their water.

183.217.    The owner of the residence at 103 Spencer Road also reports having smelled gasoline on his property for a long time and has been able to smell and taste gasoline in his water at various points in the water he uses to drink, cook, and shower.

184.218.    Residents in the affected community feel the stress and anxiety associated with having detectable levels of gasoline taste and odor on their properties and their neighbors'

49

properties. As one resident stated, "every morning, when I turn on my water, it's a concern of mine. Is it my turn to smell fuel and taste it in my water?"[12]

185.219.    Other indicia of contamination, including the presence of chemicals and particulates known to be byproducts of petroleum and jet fuel, have been found in the well water and tap water of moremany residences in the neighborhood.

186.220.    Toxic chemicals and particulates resulting from Defendants' Pipeline Leak have infiltrated the aquifer and bedrock in sufficient quantities to be detected in the water of neighborhood residences, including but not limited to kerosene, benzene, ethylbenzene, isopropylbenzene, dichloroethane, trimethylbenzene ("TMB"), toluene, naphthalene, methyl tertiary-butyl ether ("MTBE"), and lead.

187.221.    There is no potential source of these substances in the surrounding area other than the Twin Oaks Pipeline.

188.222.    Kerosene is one of the most common fuel oils and a major component of jet fuel. Exposure to kerosene can lead to a wide variety of human health consequences, including respiratory issues, vision loss, liver failure, gastrointestinal issues, heart collapse, and skin burning and irritation. Kerosene exposure can also affect the central nervous system, resulting in seizures, comas, migraines, depressions, and other neurological impacts. The International Agency for Research on Cancer ("IARC") considers kerosene a possible carcinogen.

189.223.    Benzene is natural and a highly toxic constituent of petroleum. Due to its high odor recognition threshold, people can be exposed to excessive amounts of benzene in the air

---

[12] Energy Transfer Begins Drilling Recovery Wells on Pennsylvania Street After Fuel Leak Sparked Water, Air Safety Concerns, CBS News (Mar. 19, 2025) (available at https://www.cbsnews.com/amp/philadelphia/news/sunoco-fuel-leak-upper-makefield-pennsylvania/).

or in tap water without knowledge of the exposure. Benzene is a known human carcinogen according to both IARC and the U.S. Environmental Protection Agency ("EPA"). In addition to cancer, benzene exposure can result in the disruption of hematopoiesis (the body's production of blood), suppression of the immune system, and result in both skeletal and neurodevelopmental defects.

190.224.     TMB isomers are produced during the petroleum refining processes and are used as a fuel additive in gasoline. TMB is a neurotoxin and is readily absorbed into the human bloodstream following exposure. TMB exposure can negatively impact a person's short-term memory and motor skills, induce vertigo, and cause nervousness and anxiety. TMB exposure can also cause issues with blood clotting and respiratory function.

191.225.     MTBE, in contrast to other fuel and gasoline constituents, has a strong affinity for water. MTBE dissolves easily into groundwater and can migrate rapidly a great distance from the source of release, meaning it is likely to have a distinct contamination plume from other toxic chemicals released from the Twin Oaks Pipeline. MTBE does not readily biodegrade in water and will persist in the environment until remediated. MTBE at very low concentrations can affect the taste and odor of water and IARC considers it a likely carcinogen. MTBE as a fuel additive was phased out of gasoline in the United States by 2006, due to its associated environmental and health concerns., and as such it is not clear why wells are testing positive after the Pipeline Leak.

192.226.     Lead is a neurotoxin that easily permeates the blood-brain barrier after exposure, and often is difficult to detect in a person until dangerous amounts have accumulated. In adults, lead exposure through drinking water can cause reduced memory, headaches, mood disorders, joint and muscle pains, abdominal pains, and high blood pressure. Lead exposure also

negatively affects the reproductive organs and can cause reduced or abnormal sperm counts and increase the risk of miscarriage, stillbirth, or premature births in pregnant women.

193.227.     Symptoms resulting from exposure to these toxic chemicals and other harmful chemicals released from the Twin Oaks Pipeline can take a long time to manifest. Residents of the Mt. Eyre Manor neighborhood and surrounding communities will have to closely monitor their health, potentially indefinitely, and have and will continue to experience the accompanying fear and anxiety that comes from not being able to trust the safety of the water they drink or the air that they breathe because of Defendants' Pipeline Leak.

**H.     Defendants' Messaging Since the Pipeline Leak Has Not Matched Reality**

194.228.     Defendants have been engaged in a multifaceted public relations campaign to downplay the severity of the Pipeline Leak and its actual and potential harms. Defendants' messaging, however, has not matched reality.

195.229.     For example, Defendants have now suggested that the Pipeline Leak may have happened right before it was discovered in January 2025, despite residents smelling and reporting the odor of gasoline since at least September 2023, 16 months earlier.

196.230.     Defendants have also now suggested that the Pipeline Leak was a "pinhole" and that it spilled 156 barrels or less. In reality, Defendants have admitted that they lacked a valid basis for their initial estimate of 156 barrels and have conceded that they rushed to provide a number to the government without the applicable information necessary to determine the actual volume of lost aviation fuel and other petroleum products.

197.231.     Because of Defendants' failure, negligence, and recklessness in failing to have a proper leak detection and monitoring system in place for the Twin Oaks Pipeline, Defendants have no known way to accurately measure the amount of product that spilled into the

52

environment from the Twin Oaks Pipeline in the Mt. Eyre Manor neighborhood or means to determine when the Leak started.

198.232.    Moreover, the Pipeline Leak, when discovered, showed visibly that the Leak did not result from a "pinhole" as Defendants suggested, but rather, evidenced a leak such as from a water fountain, and that was with substantially reduced or no pressure applied to the Pipeline at the time indicating it was likely much stronger when the Pipeline was operated with full pressure.

199.233.    Defendants further represented to residents in the Mt. Eyre Manor neighborhood when they were purchasing their homes that Defendants had instituted state-of-the-art, leak detection equipment with respect to the Pipeline, such that a leak like the Pipeline Leak here could never occur. These representations by Defendants to residents were false and misleading as demonstrated by the occurrence of the Pipeline Leak and Defendants' actions and follow up (or lack thereof) in response to multiple odor complaints that began at least as early as September 2023.

200.234.    In fact, Defendants failed to have proper leak detection and monitoring systems in place with respect to the Twin Oaks Pipeline.

201.235.    Defendants claimed that their leak detection systems for the Pipeline were functional, but in reality, and despite residents pointing out an issue for 16 months, making numerous odor complaints, no computer system or ground testing employed by Defendants detected any leak, and the Pipeline Leak was. Defendants only detected and located the Pipeline Leak when Defendantsthey went back to review old maintenance records and then happened to excavate the portion of the Twin Oaks Pipeline where the leak occurred. Defendants would not

Exhibit B_Page 539 of 583

have identified the Pipeline Leak except by ~~actually~~ digging up the Pipeline, which facts do not suggest or support that Defendants had an adequate leak detection and monitoring system in place.

~~202.~~236.      Defendants have claimed that Type A sleeves are structurally sound and that they visually inspected six such sleeves, but at least 44 Type A sleeves exist on the Twin Oaks Pipeline, and many more are believed to have not been physically inspected by way of excavation.

~~203.~~237.      Crucially, Defendants also claimed to ~~make~~have made a commitment to future public engagement, community, outreach, and continued participation in public meetings in Upper Makefield Township. ~~In reality,~~ Defendants, however, have invoked "confidentiality" and vague "national security" concerns to deny affected residents with access to basic information and facts about the Pipeline Leak. ~~Defendant~~ and the proposed remediation plans. Defendants' failure to engage has only increased since the residents have hired legal counsel to protect their interests~~.~~ and all public meetings are now only through "tele-townhalls" during which Defendants tightly control the questions presented.

~~204.~~238.      Defendants' conflict between its public representations and its internal policy or preference to withhold information came to a head at the ~~latest~~ town hall meeting that took place on March 11, 2025. At this meeting, Defendants shut down any attempt to receive questions from the public, claiming that Defendants could no longer continue to provide information because some residents had retained legal counsel. Defendants went so far as to offer one-on-one meetings only with residents that were *not* represented by counsel. This was a transparent scare tactic to discourage unrepresented residents from retaining legal counsel, and further reflects Defendants' insensitivity to the crisis unfolding in the affected community, and the failure to take responsibility.

54

205.239.     The breach in the Pipeline and resulting Pipeline Leak is the direct consequence of Defendants' reckless and negligent actions with respect to the oversight, operation, supervision, maintenance, monitoring, and testing of the Twin Oaks Pipeline.

206.240.     Moreover, Defendants have continued to transport highly corrosive and toxic products at extremely high pressures through the Twin Oaks Pipeline – which when installed was not designed for those pressures – in spite of their knowledge that (a) the Pipeline is nearly 70 years old and had a history of cracks; (b) that there was a previously identified dent in the Pipeline at the location of the crack which was reinforced only by an approximately 30-year-old exterior sleeve which has been known to have problems from past experience; and (c) that did not have a proper monitoring and leak detection system.

207.241.     *For over 16 months*, despite their knowledge that the Pipeline was infaced a danger of corrosion and cracking, Defendants failed to properly respond to nearby odor complaints (meaning within hundreds of feet) in a manner reasonably likely to detect a leak and had no sophisticated leak detection equipment in place to do so, notwithstanding that Defendants were operating the Twin Oaks Pipeline in a residential neighborhood.

208.242.     In response to multiple odor complaints, Defendants presumed that no breach in their Pipeline existed based solely on a lack of abnormal dead vegetation around the Pipeline and the failure of a portable gas monitormonitors to detect fuels in the surrounding air.

209.243.     Facts, however, confirm the neglectful inadequacy of Defendants' leak-detection measures as they employed the above insufficient measures and concluded a non-detect based on them immediately prior to excavating the Twin Oaks Pipeline in the Mt. Eyre Manor neighborhood and visually confirming the crack and Pipeline Leak.

55

210.244.    Since discovering the Pipeline Leak in January 2025, Defendants have failed to take proper and reasonable actions to facilitate an understanding of the extent and nature of the discharge and resulting contamination. For example, Defendants, who have vast and virtually unlimited resources, failed to test samples of water taken directly from the wells of nearby residents for the presence of hazardous substances.

211.245.    Defendants have further directed their contractors, generally, to avoid taking full and broad testing measures, despite knowing that such measures are reasonably necessary to identify the scope of the contamination plume and to ultimately protect the health, safety, and welfare of nearby residents.

212.246.    Despite failing to determine whether any ongoing leaks persist in the Pipeline, Defendants restarted operation of the Twin Oaks Pipeline on February 2, 2025, and have continuously operated the Pipeline since that date.

### I.    Harm to Plaintiffs and Class Members

213.247.    Plaintiffs and Class members have been severely and negatively impacted and harmed by Defendants' conduct.

248.    The entire impacted community relies on well water drawn from the underlying aquifer for their water needs. NumerousThis aquifer is now contaminated. As such, the entire community, including Plaintiffs, has suffered tangible, physical injury as a result of the Pipeline Leak.

214.249.    Confirming that the aquifer is contaminated, numerous residents have found Defendants' product, jet fuel, or other petroleum products, floating on top of and contaminating their private wells, with multiple residents having significant amounts of jet fuel accumulated in their wells.

56

215.250.    Preliminary testing has shown that water samples collected from nearby homes have tested positive for petroleum hydrocarbons and/or other chemicals commonly found in jet fuel and petroleum products.

216.251.    The Pipeline Leak has and will continue to cause financial harms to Plaintiffs and Class members, including the expenditure of all out-of-pocket costs resulting from the Pipeline Leak that must be reimbursed by Defendants.

217.252.    Examples of these out-of-pocket costs include, without limitation:

   a.    the costs to engage and pay contractors, testing companies, and inspectors;

   b.    the costs of installation of remedial or additional water treatment systems;

   c.    the costs of purchasing and maintaining filters associated with water treatment systems;

   d.    the costs of damage and remediation to private wells;

   e.    the costs of remediation of soil;

   f.    the costs of remediating other damages caused by the Pipeline Leak;

   g.    the costs of remediating and/or replacing pipes and fixtures that have been contaminated as a result of the Pipeline Leak;

   h.    the costs of temporary housing;

   i.    the costs of commuting to other locations for the purpose of showering or doing laundry;

   j.    reimbursement of mileage associated with attending meetings concerning the Pipeline Leak;

   k.    the cost of any increased insurance premiums;

l.       the cost of lost time-value from having to take off work due to the Pipeline Leak;

m.      the cost of childcare while attending meetings related to the Pipeline Leak; and

n.      the cost of any medical costs incurred by Plaintiffs related to the Pipeline Leak.

218.253.    Defendants are responsible to pay all past and future costs associated with complete environmental restoration and remediation of all contamination caused by their Pipeline Leak, and to all property, water, and air, including, without limitation, to the environment, to Plaintiffs' and Class members' real and personal property, to wells that have been contaminated, to pipes that have been contaminated and need to be replaced, to fixtures that have been contaminated and need to be replaced, to soil that has been contaminated, to gardens that have been contaminated, and to all other property belonging to Plaintiffs and Class members that has been affected by the Pipeline Leak.

219.254.    Plaintiffs and Class members who own their homes have also suffered from diminution of the value of their residences caused by the Pipeline Leak.

220.255.    Some Class members have already had potential buyers walk away from a potential sale as a result of the Pipeline Leak.because of the Pipeline Leak and, as a result, have had to substantially lower the list prices of homes currently on the market. Not a single public home sale has closed in Mt. Eyre Manor since the Leak was revealed and the only home sale that has taken place is the purchase of 108 Spencer Road by Defendants.

58

221.256.     Plaintiffs and Class members have suffered from the loss of use and enjoyment of their real and personal property caused by the Pipeline Leak. Plaintiffs and Class members cannot enjoy their property in the same manner as prior to the Pipeline Leak.

257.   As a direct and proximate result of Defendants' negligent, reckless, and willful conduct in causing and/or failing to prevent the Leak of jet fuel into the ground and groundwater supply, Plaintiffs and the proposed Class members have suffered increasedand continue to suffer severe emotional distress. Plaintiffs reside in a community that is entirely dependent on well water drawn from a shared aquifer, which is now contaminated by toxic substances including hydrocarbons, volatile organic compounds, and known carcinogens present in jet fuel.

258.   Since the revelation of the Leak and subsequent confirmation of groundwater contamination, Plaintiffs and the proposed Class members have experienced profound anxiety, fear, and uncertainty regarding the safety of their homes, their health, and the wellbeing of their families. Some residents have reported symptoms potentially linked to exposure to contaminated water, further exacerbating psychological distress. Plaintiffs live with the daily trauma of having to use bottled water for drinking, cooking, and hygiene, and the persistent fear that they or their loved ones may suffer long-term health consequences due to ingestion or exposure to toxic chemicals.

259.   In addition to the tangible disruption of daily life, Plaintiffs experience ongoing emotional harm from the loss of security, trust, and peace of mind in their environment. The knowledge that their community has been poisoned — and that this contamination may persist for years or decades — has caused deep emotional anguish. Plaintiffs and members of the proposed Class report symptoms of depression, sleeplessness, and post-traumatic stress, as they previously viewed their homes as safe havens now rendered unsafe by Defendants' conduct.

59

222.260.     Plaintiffs live less than 500 feet from the location where the Leak was detected and are in between that location and the confirmed highly contaminated homes on Spencer Road. Indeed, Plaintiffs themselves live on contaminated property that sits above a contaminated aquifer. As such, Plaintiffs are at immediate risk of physical injury and are clearly within the zone of danger presented by the Pipeline Leak.

223.261.     Exposure to the substances released from the Pipeline, whether through ingestion, inhalation, or dermal exposure, places all affected residents at increased risk of severe health impacts, including cancer, thus necessitating medical monitoring.

**J.     Harm Suffered by Plaintiffs Daniel and Katherine La Hart**

224.262.     Plaintiffs Daniel La Hart and Katherine La Hart moved to the Mt. Eyre Manor neighborhood in 2016 and live in their home with their two young children.

225.263.     As such, Plaintiffs are Pennsylvania residents.

226.264.     Plaintiff Daniel La Hart, in addition to being Katherine's husband and father to their children, is a highly educated individual who works in the intelligence community, serving as an Intelligence Superintendent (Chief Master Sergeant rank) for the New Jersey Air National Guard and as a director of data science for a company in the private sector. Daniel is also a former member of the U.S. Air Force Reserve and a former firefighter.

227.265.     Plaintiff Katherine La Hart, in addition to being Daniel's wife and mother to their children, has a Ph.D. in business administration and works in sales recruitment and onboarding at a Fortune 500 insurance and financial services company.

228.266.     Prior to learning of the Pipeline Leak, Plaintiffs were in love with their community and felt that their home located at 114 Spencer Road was their "forever home" where they would live for a lifetime.

60

229.267.   Plaintiffs and their young children used their well water for everything including drinking, cooking, washing dishes and clothes, showering (indoors and outdoors), baths for their children and animals, watering their gardens, cleaning the cars, filling their pool, letting their children run in the hose water and down their water slide, and providing water to their dog, cat, and chickens to drink.

230.268.   In late 2024, Plaintiffs invested approximately $150,000.00 to pay for a series of renovations to their home that they scheduled to start in April 2025, including the installation of new windows, siding, doors, replastering the pool, and more, because they wanted to invest in their forever home and their community that they loved.

231.269.   The Pipeline Leak has caused Plaintiffs to suffer out-of-pocket economic losses including, among other things, significant childcare costs, mileage associated with attending meetings concerning the Pipeline Leak, and significant lost time-value from having to take off work to attend meetings, be present for testing, and to perform community outreach due to the Pipeline Leak.

232.270.   The Pipeline Leak and resulting contamination has caused Plaintiffs to suffer diminution to the value of their real property. The presence of the Pipeline Leak and resulting environmental contamination has placed a stigma on the Mt. Eyre Manor and surrounding affected communities that hastangibly decreased the value of theirPlaintiffs' property and that of the surrounding affected community.

233.271.   It is likely that Plaintiffs (and Class members) are now overpaying property taxes as a direct result of the diminution of value to their property caused by Defendants' conduct.

234.272.   The Pipeline Leak has caused 114 Spencer Road to go from being Plaintiffs' idyllic forever home to an albatross that Plaintiffs will struggle to sell for close to its fair market

61

value, which was over $1 million prior to Defendants' Pipeline Leak. Plaintiffs estimate that they have suffered diminution of value of their home in the tens of thousands or hundreds of thousands of dollars. Who would want to purchase a home in the Mt. Eyre Manor neighborhood given the known existence of the Pipeline Leak and resulting contamination?

235.273.    But at the same time, as a direct result of the Pipeline Leak, Plaintiffs, like other Class members, have been forced to consider the possibility of selling what they thought was their forever home and moving to another location that has not experienced the type of harms that have devastated Mt. Eyre Manor. Plaintiffs do not want to confront or deal with the risk that the water in their neighborhood and their home is dangerous and putting them and their family, children, and guests at risk, and have been unfairly forced by Defendants to think about this every day, which is causing Plaintiffs severe mental anguish.

236.274.    Moving would cause significant hardship to Plaintiffs and their young children. Plaintiffs would also incur significant expenses by having to uproot themselves and move to a comparable home in a comparable community.

237.275.    With respect to Plaintiffs' private well, the Pipeline Leak has caused irreparable damage to Plaintiffs' faith in their ability to fully use and enjoy their water.

238.276.    Plaintiffs' well water has already tested positive for MTBE and lead above background concentration levels and Plaintiffs are awaiting additional testing results.

277.    Like each of the other residents throughout Mt. Eyre Manor, Plaintiffs now also live above a contaminated aquifer that continues to migrate and further contaminate the groundwater, soil, and air. This contaminated aquifer constitutes a presently existing physical harm to Plaintiffs' real property.

278. Defendants' own inferences about the composition of the fractured bedrock beneath Plaintiffs' property indicate that a pathway for groundwater flow exists that runs from 121 Glenwood Drive, the site of the Leak, directly through Plaintiffs' property.

279. Plaintiffs are directly within the zone of danger presented by the Leak given that their property at 114 Spencer is located directly in between properties with confirmed free petroleum product or LNAPL found in wells (such as 110 and 108 Spencer). Indeed, it is difficult to reach any inference other than that Defendants' petroleum product contaminated and traveled through or below Plaintiffs' land to reach these other contaminated properties.

280. Additionally, Plaintiffs and their neighbors on Spencer Road live directly above the trench for the former 8-inch version of the Pipeline. To the extent the existence of this alternate trench has contributed to the direction the plume has traveled, Defendants' petroleum product traveled directly through Plaintiffs' land.

239. 281. It will always be on the forefront of Plaintiffs' minds that the plume of the Pipeline Leak could affect their property at any time, or that the Pipeline could leak again at any point in time, and/or that the Pipeline could have additional undiscovered leaks, and so Plaintiffs could be putting the health of their family, children, friends, guests, and pets at risk merely by continuing to live at 114 Spencer Road.

240. 282. Worsening the situation, Defendants have begun buying residential homes in the Mt. Eyre Manor neighborhood, starting with 108 Spencer Road which is only two houses away from Plaintiffs' home, for the purpose of drilling additional monitoring and/or recovery wells as a direct result of the Pipeline Leak. These activities by Defendants are a nuisance to Plaintiffs and Class members in the neighborhood and are interfering with their use and enjoyment of their property, as well as further depreciating the affected geographic area.

**Exhibit B_Page 549 of 583**

241.283.    Defendants' activities at 108 Spencer Road will soon become thebecame an epicenter for noisy, odorous, and highly bothersome activity that will disturb and disrupt the daily lives of the Plaintiffs and Class members, all as a result of Defendants' Pipeline Leak.:



242.284.    Defendants are currently attempting to purchase additional homes in the Mt. Eyre Manor neighborhood to conduct monitoring and recovery activities with respect to the Pipeline Leak, which (while perhaps necessary) will further cause nuisance and further diminish the value of the neighborhood.

243.285.    Plaintiffs are fearful that Defendants will continue to buy additional nearby homes and that any home bought by Defendants will eventually lay vacant and be a nuisance to the community, further driving down property values.

286.    Confirming that Plaintiffs and the proposed Class have suffered concrete, particularized, and significant loss of property value, Defendants have recently taken affirmative steps to obscure the market impact of the diminution of value Defendants have caused. With

64

**Exhibit B_Page 550 of 583**

respect to at least one property in Mt. Eyre Manor that is currently for sale, Defendants have acquired a "right of first option and right of rejection" over the property, defined as follows:

> This property is subject to a right of first option and right of rejection held by Sunoco Pipeline L.P. ("SPLP"). Under this agreement, if the Seller receives a bona fide offer to purchase the property, the Seller must notify SPLP of the terms of the offer. If the offer is below a certain price SPLP shall then have the right to (i) direct the Seller to reject the offer; or (ii) make an offer to purchase the Property for an amount greater than the amount contained in the offer. If the offer is above a certain price, SPLP shall only have the right to make an offer to purchase the Property for an amount greater than the amount contained in the offer. SPLP has two (2) business days from receipt of the offer or any counter-offer to exercise its rights. SPLP's rights under this agreement are valid until January 19, 2026. Note that nothing in the agreement prevents a counter-offer(s) from the original offeror.

While the full contours of the agreement are unclear because they reference an unspecified "certain price" against which offers are compared, Defendants' right to *unilaterally* "direct the Seller to reject" any offer below that price—a right Defendants undoubtedly paid the subject homeowner for—could be used by Defendants in an attempt to mask the true current market value of the property. That Defendants were willing to pay to acquire this right confirms that significant, quantifiable diminution of value has taken place throughout Mt. Eyre Manor and the surrounding neighborhoods.

287.   Additionally, Defendants have installed recovery wells in the street on Glenwood Drive, which is one of the roads Plaintiffs use to access their home. The installation and use of these wells, which are less than 500 feet from Plaintiffs' property, have created yet another epicenter for noisy, odorous, and highly bothersome activity that will disturb and disrupt the daily lives of the Plaintiffs and Class members, as Defendants use heavy machinery, like sonic and air rotary drill rigs, producing sound levels up to 99 decibels:

65

**Exhibit B_Page 551 of 583**



288.    While installation of some recovery wells is likely necessary given the magnitude of the Leak, Defendants have inexplicably chosen to drill such wells to a depth of only 70 feet, even though the contamination to date suggests that petroleum product exists deeper underground.

289.    Moreover, Defendants have failed to delineate the scope and direction of the plume. While Defendants have now placed these recovery wells in the neighborhood, including in the middle of Glenwood Drive, they have begun these efforts despite not having installed proper monitoring wells. Indeed, while Defendants have stated that they intend to ultimately install eight monitoring wells, they did not reveal their proposed location until yesterday, June 3, 2024, and seemingly plan to inappropriately limit their depths to just 70 feet, despite possible pathways for contaminants to migrate along much deeper fractures. The proposed locations of the monitoring wells confirm that even Defendants understand there is contamination and a grave risk of ongoing

66

contamination both at Plaintiffs' property (114 Spencer Road, next to one of the two proposed well locations on Spencer Road) and throughout the community:



290.    Defendants have also relied heavily on electrical resistivity imaging ("ERI") to determine where the contamination may be by identifying inferred fractures. However, the validity of the inferred fractures is highly questionable. Interpretation of fractures within bedrock from ERI models are commonly based on low resistivity features in the bedrock (because fractures within bedrock typically contain more water than surrounding rock and, therefore, conduct electricity relatively better). Interpreting low resistivity zones in bedrock as fractures may be appropriate if data quality is good and there is no infrastructure (such as buried metallic pipes) distorting the data. However, as is common in urban or suburban settings, the ERI models collected in the Mt. Eyre Manor neighborhood show numerous "low resistivity anomalies" that are consistent with the anomalies produced by buried metallic pipes or electrically grounded equipment/powerlines.

**Exhibit B_Page 553 of 583**

Based on the limited public data available, a number of these anomalies have wrongly been interpreted as inferred fractures based on utility interference.

244.291.    For the reasons alleged herein, Defendants' Pipeline Leak has devastated the Mt. Eyre Manor neighborhood and surrounding affected communities. While Defendants have publicly accepted responsibility for the Pipeline Leak, they have not accepted their corresponding responsibilities to compensate Plaintiffs and Class members for all the harms that they have suffered as a direct result of Defendants' conduct.

**CLASS ACTION ALLEGATIONS**

245.292.    Plaintiffs bring the class action allegations in this Complaint for all environmental restoration and remediation, economic losses suffered by Plaintiffs and Class members, medical monitoring, injunctive relief, and declaratory relief.

246.293.    Plaintiffs bring this action on behalf of themselves and on behalf of the following Class pursuant to Pennsylvania Rules of Civil Procedure 1702, 1708 and 1709:

> All Pennsylvania citizens who owned, rented, and/or resided in real properties in Pennsylvania within a one mile radius of 121 Glenwood Drive, Washington Crossing, Pennsylvania (40.271265, -74.876153), as represented in Figure 3 below, during the time period from September 1, 2023 to the present (the "Class").

68



Figure 3.

247.294.        Excluded from the Class are Defendants and their subsidiaries or affiliated

entities, as well as any individuals who resided at the following addresses in Upper Makefield

69

Township since September 1, 2023: 121 Glenwood Drive; 128 Glenwood Drive; 128 Walker Road; 105 Spencer Road; 107 Spencer Road; and 108 Spencer Road.

248.295.          Plaintiffs reserve the right to further define and modify the definition of the Class following further factual investigation and discovery.

249.296.          **Numerosity.** Members of the Class are so numerous that joinder is impracticable. Plaintiffs estimate there are at least one thousand members of the Class. As such, a class action is superior to other methods of adjudication due to its capacity for efficiency and judicial economy.

250.297.          **Typicality.** Plaintiffs' claims for environmental restoration and remediation, economic damages, medical monitoring, injunctive relief, and declaratory relief are typical of the claims of the Class members. Plaintiffs and all Class members have been damaged by the same wrongful conduct by Defendants.

251.298.          Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiffs coincide with, and are not antagonistic to, those of the Class. Accordingly, and by proving their own claims, Plaintiffs will prove other Class members' claims as well.

252.299.          **Adequacy of Representation.** Plaintiffs are members of the Class. Plaintiffs are represented by the undersigned counsel who are experienced and competent in the prosecution of class actions involving chemical/toxin contamination. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiffs can and will fairly and adequately represent the interests of the Class and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

253.300.    **Commonality and Predominance.** There are numerous questions of law and fact common to the Class that predominate over any individual issue, including, but not limited to:

a.    Whether Defendants' conduct as alleged herein violates the law as stated in the Causes of Action set forth below that are applicable to the Plaintiffs and the Class;

b.    Whether Defendants owed a duty to the Class;

c.    Whether Defendants breached any duties owed to the Class;

d.    Whether Defendants were negligent and/or reckless in failing to properly and safely oversee the operation, supervision, maintenance, monitoring, and testing of the Pipeline;

e.    Whether Defendants allowed a release of toxic and hazardous substances from the Pipeline into the underlying bedrock and aquifer under where the Pipeline Leak occurred or within the plume area of the Pipeline Leak;

f.    Whether the release or threat of release of toxic and hazardous substances from Defendants' Twin Oaks Pipeline reduced or diminished the value of the Class members' real property;

g.    Whether the release or threat of release of toxic and hazardous substances from Defendants' Twin Oaks Pipeline deprived the Class of the rights to use and benefit from their real property interest, free of interference; and

h.    The appropriate measure of restitution and/or measure of damages to the Class members.

254.301.    The questions of law and fact common to the Class predominate over any questions of law that may affect only individual class members, because Defendants acted on grounds generally applicable to the entire Class.

71

255.302.    **Superiority**. Class treatment is a superior method for the fair and efficient adjudication of the economic damages associated with this controversy because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a similar forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense. The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that likely would be impracticable to pursue individually, substantially outweigh any difficulties that may arise in the management of the class aspects of this action.

## CAUSES OF ACTION

256.303.    All of Plaintiffs' causes of action, whether asserted individually or on behalf of the Class, are brought against all Defendants.

### COUNT I
### NEGLIGENCE
### (Individually and on Behalf of the Class)

257.304.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

258.305.    Defendants' actions as alleged herein were negligent.

259.306.    Defendants are responsible for owning, overseeing, operating, supervising, and maintaining the Twin Oaks Pipeline, and are responsible for its safe operations, including, without limitation, by incorporating an appropriate monitoring and leak detection system.

260.307.    Defendants failed to use reasonable care in the oversight, operation, maintenance, hiring, monitoring, and repair of the Twin Oaks Pipeline and continued to transport

hazardous and toxic substances through the Pipeline without ensuring that it was operating in a safe condition.

261.308.    Defendants failed to use reasonable care in responding to multiple odor complaints over a period of at least 16 months and detecting whether a leak in the Pipeline had occurred.

262.309.    Defendants failed to use reasonable care in identifying the scope of the leakLeak or of the resulting pollution plume once the Pipeline Leak had been identified.

263.310.    Defendants failed to use reasonable care to contain the plume and resulting damages caused by the Pipeline Leak.

264.311.    Defendants failed to use reasonable care in employing a safe and reliable monitoring and leak detection system with respect to the Pipeline.

265.312.    Defendants knew or should have known that their failure to properly operate, maintain, and repair the Pipeline, and to respond to the Pipeline Leak, would allow the release of dangerous and toxic substances into the environment in a residential neighborhood, and, as a result, contaminate the environment and cause the residents of the affected geographic area to suffer damages as alleged herein.

266.313.    Defendants knew or should have known that their failure to exercise reasonable care in responding to the Pipeline Leak would impede the ability of regulators and affected residents to understand the scope of the danger and to effectively mitigate its impacts.

267.314.    Defendants' negligence was a substantial factor in bringing about real and personal property damage, environmental contamination, economic losses, and diminution of property values, to Plaintiffs and the Class members.

73

268.315.     Defendants' negligence was a substantial factor in bringing about physical personal injury and emotional distress and anxiety to Plaintiffs individually. Plaintiffs' claims for emotional distress damages are brought individually on behalf of Plaintiffs.

269.316.     Defendants' negligence was a substantial factor in bringing about the need for medical monitoring for residents affected by the Pipeline Leak.

270.     As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs and the Class members have suffered damages as alleged herein.

**COUNT II**
**GROSS NEGLIGENCE**
**(Individually and on Behalf of the Class)**

271.     Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

272.     Defendants owed a legal duty to Plaintiffs and the Class, and Defendants breached that duty.

273.317.     Defendants' breaches as described herein demonstrate an extreme departure from the standard of care for ensuring the safe operation of a hazardous liquids pipeline.

274.318.     Defendants' efforts to prevent the Pipeline Leak and to respond to the Pipeline Leak once identified, as alleged herein, including but not limited to Defendants' misrepresentations as to the amount of product lost and the continuing safety of the Pipeline, demonstrate a gross failure to exercise even scant care with respect to the safety of nearby residents and their property.

275.     As a result, Plaintiffs and the Class have been damaged as alleged herein.

**COUNT III**
**NEGLIGENCE PER SE**
**(Individually and on Behalf of the Class)**

276.     Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

74

277.319.    The actions of Defendants as set forth herein also constitute negligence per se.

278.320.    Defendants had a duty to comply with numerous statutes and regulations designed to prevent a public harm and failed to do so. The statutes that Defendants did not comply with include, without limitation, 35 P.S. § 691.401 (Clean Streams Law), and 49 U.S.C. § 60101 et seq. (Pipeline Safety Act).

279.321.    The purpose of the Pennsylvania Clean Streams Law is the "prevention and elimination of water pollution" in order to promote the "economic future of the Commonwealth." 35 P.S. § 691.4.

280.322.    Defendants breached their duty under the Clean Streams Law when they allowed the discharge of toxic substances from the Pipeline into the waters of the Commonwealth. 35 P.S. § 691.401.

281.323.    The purpose of the Pipeline Safety Act, and of regulations promulgated pursuant to the Act, is to "provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities." 49 U.S.C. § 601012(a). The Secretary of Transportation promulgates minimum safety standards pursuant to the Act, which apply to any and all owners and operators of pipeline facilities. Id.

282.324.    Defendants breached their duties under the Pipeline Safety Act when they failed to comply with the minimum safety standards proscribed by the Secretary of Transportation pursuant to the Act. Specifically, Defendants' breaches include, without limitation, the fact that they: (a) failed to maintain an effective system for detecting leaks in violation of 49 C.F. R. § 195.444; (b) failed to take measures necessary to prevent and mitigate the consequences of a pipeline failure that could affect a high consequence area in violation of 49 C.F.R. § 195.452; and

(c) failed to detect conditions that could adversely affect the safe operation of the Pipeline within 72 hours of an extreme weather event in violation of 49 C.F.R. § 195.414.

283.325.     The purposes of the aforementioned statutes are to protect the interests of Plaintiffs and the Class.

284.326.     As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs and the Class members have suffered damages as alleged herein.

**COUNT IVII**
**STRICT LIABILITY – ABNORMALLY DANGEROUS**
**OR ULTRAHAZARDOUS ACTIVITY**
**(Individually and on Behalf of the Class)**

285.327.     Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

286.328.     Defendants' actions as alleged herein constitute an abnormally dangerous and/or ultrahazardous activity.

287.329.     Defendants' transportation of petroleum products through a pipeline that was poorly reinforced by thirty-year old A sleeves involves a high degree of risk and the exercise of reasonable care cannot eliminate the risk inherent in operating the Pipeline.

288.330.     Defendants' transportation of petroleum products was solely for Defendants' business purposes.

289.331.     Defendants knew and understood that there was a high risk that their petroleum products and other chemicals, toxins, and particulates could contaminate the environment of the nearby neighborhoods, including the risk of contaminating the only source of clean water for residents, and, thereby, cause residents to suffer personal injuries, property damage, environmental contamination, economic losses, diminution of property value, the need for medical monitoring, and other harms as fully alleged herein.

76

290.332.    Defendants' transportation of petroleum products, toxins, and particulates through a pipeline that was poorly reinforced by thirty-year old A sleeves caused serious harm to Plaintiffs' and Class members' persons, chattel, and property, including both real and personal property, as alleged herein.

291.333.    As such, Defendants are strictly liable to Plaintiffs and the members of the Class.

292.334.    As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff and the Class have suffered damages as alleged herein.

**COUNT VIII**
**PUBLIC NUISANCE**
**(Individually and on Behalf of the Class)**

293.335.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

294.336.    Defendants' conduct constitutes a public nuisance pursuant to 35 P.S. 691.401.

295.337.    Specifically, the discharge of toxic substances, odors, and gases from the Twin Oaks Pipeline as alleged herein into underlying bedrock and aquifer, as well as to groundwater, air, soil, private wells, homes, and other property, have caused particular injuries to Plaintiff and the Class as alleged herein.

296.338.    Plaintiffs and the Class are entitled to damages as a result thereof.

**COUNT VIIV**
**PRIVATE NUISANCE**
**(Individually and on Behalf of the Class)**

297.339.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

77

**Exhibit B_Page 563 of 583**

298.340.    Defendants' conduct allowed toxic substances to invade the private use and enjoyment of Plaintiffs' land and property.

299.341.    Defendants' conduct allowed offensive odors and gases to invade and disrupt the private use of Plaintiffs' land and property.

300.342.    The invasion of Plaintiffs' land by Defendants' product, toxic substances, and resulting odors was the foreseeable and proximate result of Defendants' negligent and reckless conduct.

301.343.    Plaintiffs have suffered injury to the use and enjoyment of their home due to the presence of toxic substances in the water and soil on Plaintiffs' land and the substantial risk of the future presence of such substances.

302.344.    Plaintiffs are entitled to damages as a result thereof.

**COUNT VIIV**
**TRESPASS**
**(Individually and on Behalf of the Class)**

303.345.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

304.346.    Defendants' conduct caused their hazardous and toxic product to intrude into the water and onto the land of Plaintiffs' property. Defendants further failed to take actions to identify the scope of the intrusion and to remove their product from Plaintiffs' property.

305.347.    Defendants knew or should have known that their failure to maintain safe operations of the Twin Oaks Pipeline and to effectively investigate odor complaints for possible leaks would result in the intrusion of their product on Plaintiffs' property.

306.348.    Defendants' failure to identify and remove their product from Plaintiffs' property after being made aware of the intrusion constitutes a separate and continuing trespass.

78

307.349.    Plaintiffs are entitled to damages as a result thereof.

**COUNT ~~VII~~VI**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**(Individually)**

308.350.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

309.351.    Defendants' conduct negligently inflicted emotional distress on Plaintiffs.

310.352.    Defendants owed Plaintiffs a duty of care to ensure that they did not suffer from serious emotional distress and mental anguish.

311.353.    Defendants breached their duty to Plaintiffs by both their actions and inactions.

312.354.    As a direct and proximate result of Defendants' breach, Plaintiffs have suffered severe emotional injury.

313.355.    As a result, Plaintiffs have been damaged as alleged herein.

**COUNT ~~IX~~VII**
**MEDICAL MONITORING**
**(Individually and on behalf of the Class)**

314.356.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

315.357.    Plaintiffs and their children were significantly exposed to toxic and hazardous substances, and they bear a substantial risk of future exposure to such substances because of Defendants' repeated failures to prevent the discharge of the same substances into Plaintiffs' soil, water, and property (both real property and personal property).

79

316.358.     The exposure to these dangerous substances is such that Plaintiffs and their children have been placed at an increased risk of contracting latent illness and disease, including but not limited to cancer and other serious diseases and illnesses, and as such requires medical monitoring which Defendants are responsible for providing and paying for.

317.359.     Monitoring and testing procedures exist for cancer and other diseases and illnesses associated with exposure to the aforementioned hazardous substances, making the early detection and treatment of the diseases possible and beneficial.

360.     Additionally, Defendants have publicly admitted that they are liable for medical monitoring and have committed to providing medical monitoring in response to the Leak.

318.361.     As a result, the Court should establish a Court-supervised and administered trust fund and medical monitoring regime to compensate Plaintiffs for their economic damages.

## PRAYER FOR RELIEF

319.362.     Plaintiffs and Class members seek the following relief:

    a.     All compensatory damages and other damages as alleged herein;

    b.     Medical monitoring for Plaintiffs and the Class members;

    c.     Punitive damages where allowable;

    d.     Pre- and post-judgment interest as allowed by law;

    e.     A declaratory judgment that Defendants are responsible for the Pipeline Leak, and responsible for all past and future costs to fully restore and remediate all environmental and other harms caused by Defendants to Plaintiffs and the Class;

    f.     Attorneys' fees and costs pursuant to any applicable statutes and/or regulations;

    g.     Equitable and injunctive relief including:

i.      Notice to all affected persons of the Pipeline Leak and potential dangers and risks presented by the Pipeline Leak;

ii.      The enjoinment of further operations of the Twin Oaks Pipeline until Defendants are able to fully guarantee its safe operation;

iii.      Provision of full water supply for all homes in the Class;

iv.      Provision of temporary housing and all associated costs to those who reasonably request it as a result of the Pipeline Leak;

v.      Installation of a best-in-class leak detection system for the Twin Oaks Pipeline that can actually detect – and guarantee that it will detect – problems in real time;

vi.      Full restoration and remediation of all environmental contamination including but not limited to groundwater, soil, and air, to background concentrations; and

h.      All other relief this Court deems necessary, just and proper.

**DEMAND FOR TRIAL BY JURY**

~~320.~~363.      Plaintiffs hereby demand a jury trial for all claims so triable.

Dated: ~~March 26~~June 4, 2025      Respectfully submitted,

_____

*/s/ Shanon J. Carson*

Shanon J. Carson (Bar No. 85957)
Y. Michael Twersky (Bar No. 312411)
Joseph E. Samuel, Jr. (Bar No. 327645)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: 215-875-4656
~~Email: scarson@bm.net~~

81

Email: ~~mitwersky@bm.net~~
Email: ~~jsamuel@bm.net~~

Email: scarson@bm.net
Email: mitwersky@bm.net
Email: jsamuel@bm.net

82

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this day a true and correct copy of the foregoing was filed with the Court's ECF system, which served all counsel of record.

Dated: June 4, 2025                    Respectfully submitted,


_____    /s/ Shanon J. Carson_____
_____    Shanon J. Carson

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DANIEL LA HART, *et al.*, individually and on behalf of all others similarly situated, | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| SUNOCO PIPELINE L.P., *et al.*, | : | NO. 25-2072 |
| | : | |
| Defendants. | : | |

## **ORDER**

**AND NOW,** this 10th day of June, 2025, upon consideration of Plaintiffs' Motion for

Preliminary Injunction (ECF No. 22), it is hereby **ORDERED** as follows:

1.  A preliminary injunction hearing is scheduled for Monday, June 16, 2025 at 10:30 a.m. in

    Courtroom 6-A , U.S. Courthouse, 601 Market Street, Philadelphia, PA; and

2.  Defendants shall file their response(s) to Plaintiff's motion no later than Thursday, June

    12, 2025 end of day.

BY THE COURT:

_____

HON. MIA R. PEREZ

**Exhibit B_Page 570 of 583**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

DANIEL LA HART and
KATHERINE LA HART, individually
and on behalf of those similarly situated,

      v.

SUNOCO PIPELINE L.P.,
ENERGY TRANSFER LP, and
ENERGY TRANSFER (R&M) LLC,

Case Number: 2:25-cv-02072-MRP

## ORDER

AND NOW, this 12th day of June, 2025, it is hereby

ORDERED that the motion to practice in this court pursuant to Local Rule of Civil Procedure

83.5.2(b) is

    ☒ GRANTED. The Clerk is DIRECTED to add Jordan Hughes , Esquire as counsel for

Plaintiffs . Jordan Hughes is DIRECTED to request ECF filing access

using their PACER Account[1]

    ☐ DENIED.

_____
HON. MIA R. PEREZ    , J.

---

[1] Instructions to request electronic filing access can be found on this court's website at For Attorneys | Eastern District of Pennsylvania | United States District Court (uscourts.gov).

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

DANIEL LA HART and
KATHERINE LA HART, individually :      Case Number: 2:25-cv-02072-MRP
and on behalf of those similarly situated,:
                             :
        v.                  :
SUNOCO PIPELINE L.P.,        :
ENERGY TRANSFER LP, and     :
ENERGY TRANSFER (R&M) LLC,

ORDER

AND NOW, this <u>12th</u> day of <u>June,</u> 2025, it is hereby

ORDERED that the motion to practice in this court pursuant to Local Rule of Civil Procedure

83.5.2(b) is

☒    GRANTED.  The Clerk is DIRECTED to add <u>William Walsh</u>, Esquire as counsel for

<u>Plaintiffs</u>.  <u>William Walsh</u> is DIRECTED to request ECF filing access

using their PACER Account[1].

☐    DENIED.

_____
HON. MIA R. PEREZ    , J.

---

[1] Instructions to request electronic filing access can be found on this court's website at <u>For Attorneys | Eastern District of Pennsylvania | United States District Court (uscourts.gov).</u>

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DANIEL LA HART, *et al.*, individually and on behalf of all others similarly situated, | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| SUNOCO PIPELINE L.P., *et al.*, | : | NO. 25-2072 |
| | : | |
| Defendants. | : | |

### ORDER

**AND NOW,** this 13th day of June, 2025, upon consideration of Plaintiffs' Motion to

Remand to State Court (ECF No. 19) and Defendants' Response in Opposition (ECF No. 24), it is

hereby **ORDERED** that the motion is **GRANTED**. Accordingly, it is further **ORDERED** as

follows:

1. This matter is hereby remanded to the Philadelphia County Court of Common Pleas pursuant to the local controversy exception under the Class Action Fairness Act of 2005 ("CAFA"). *See* 28 U.S.C. § 1332(d)(4).

2. Plaintiffs' alternative request for limited jurisdictional discovery is **DENIED** as Moot.

3. The order scheduling this matter for a preliminary injunction hearing on June 16, 2025 (ECF No. 23) is hereby **VACATED** and the hearing is canceled.

Opinion to follow.

BY THE COURT:

_____
Hon. Mia R. Perez

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DANIEL LA HART, *et al.*, individually            :
and on behalf of all others similarly situated,   :
                                                  :
      Plaintiffs,                             :          CIVIL ACTION
                                                  :
      v.                                      :
                                                  :
SUNOCO PIPELINE L.P., *et al.*,                   :          NO. 25-2072
                                                  :
      Defendants.                             :

### MEMORANDUM

**Perez, J.**                                                      **June 16, 2025**

Plaintiffs filed this environmental class action in the Philadelphia County Court of Common Pleas, alleging injuries from a petroleum pipeline leak in Bucks County, Pennsylvania. Defendants Sunoco Pipeline L.P. ("Sunoco"), Energy Transfer LP ("Energy Transfer"), and Energy Transfer (R&M) LLC ("R&M") removed the action under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d). Plaintiffs now move to remand, invoking the local controversy exception to CAFA and disputing Defendants' claim that Defendant Energy Transfer (R&M) LLC ("R&M"), a Pennsylvania entity, was fraudulently joined. The Court concludes that Defendants have not met their burden to show fraudulent joinder, and that Plaintiffs have satisfied the criteria for the local controversy exception. Accordingly, the Court grants the motion to remand.

### I.     CASE BACKGROUND

This case arises from a breach of Defendants' Twin Oaks Pipeline ("Pipeline") in the Mount Eyre Manor residential community in Upper Makefield Township, in Bucks County Pennsylvania.[1] Plaintiffs filed a putative class action on March 27, 2025, in the Philadelphia

---

[1] ECF No. 1-1 at ¶ 9.

County Court of Common Pleas asserting claims for negligence, nuisance, trespass, and strict liability against Defendants Sunoco Pipeline L.P. ("Sunoco"), Energy Transfer LP ("Energy Transfer"), and Energy Transfer (R&M) LLC ("R&M"). Plaintiffs allege that Defendant Energy Transfer, "through its complex network of subsidiaries, limited partnerships, and joint ventures, including [Defendants Sunoco and R&M] owns one of the nation's largest networks of natural gas, crude oil, and petroleum product pipelines."[2] The pipeline leak at issue here has contaminated groundwater, private drinking wells, soil, and air in the community, causing damage to the environment, property values, and health of the residents.[3] Defendants publicly accepted responsibility for the leak and are remediating the affected area.[4] Below is a concise timeline of the events leading to this action and relevant procedural history.

On January 31, 2025, Sunoco identified and reported the pipeline leak to the Pennsylvania Department of Environmental Protection ("PADEP");[5] however, Plaintiffs assert that Defendants had received odor complaints from residents as early as September 2023.[6] On February 1, 2025, Energy Transfer issued a written statement confirming the discovery of the leak.[7] Following confirmation of the leak, Defendants removed and replaced the leaking segment, returned the pipeline to service, and began conducting testing of the water of nearby residences.[8] On February 13, 2025, the Pipeline and Hazardous Materials Safety Administration (PHMSA) issued a Notice of Proposed Safety Order and proposed remedial requirements to Defendants.[9] Defendants

---

[2] *Id.* at ¶ 34.
[3] *Id.* at ¶¶ 3, 5-6, 18-24.
[4] *Id.* at ¶ 244.
[5] ECF No. 24-5 at 2.
[6] ECF No. 1-1 at ¶ 16.
[7] *Id*. at ¶ 132.
[8] *Id.* at ¶¶ 128, 132, 134.
[9] ECF No. 21-3.

submitted a Notice of Intent to Remediate to PADEP on February 13 and, on the same day, formally notified the Township Manager of their remediation efforts.[10]

On February 18, 2025, the PADEP issued a Notice of Violation to Defendants.[11] During a town hall meeting on February 27, an Energy Transfer representative claimed responsibility for the release and apologized.[12] On March 6, 2025, PADEP issued an administrative order to Defendants R&M and Sunoco, requiring a response to the leak and the implementation of certain remedial efforts, including installing point-of-entry treatment systems, preparing daily reports, and providing bottled water.[13] In its administrative order, PADEP "found and determined" that "Energy Transfer (R&M), LLC is a Pennsylvania Business Corporation and . . . is a parent entity of Sunoco," and that R&M, along with [Sunoco] owns and operates the Pipeline at issue in this case.[14] The PADEP Administrative Order required Defendants to file an appeal within 30 days with the Environmental Hearing Board.[15] Defendants declined to file an appeal, but on March 31, a representative of Energy Transfer responded to the administrative order via email, asserting that R&M is not a proper party to the order since R&M does not own or operate the pipeline and has no ownership interest in Sunoco.[16]

On April 24, 2025, Defendants timely removed the action to this Court under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d), asserting minimal diversity, a putative class exceeding 100 members, and an amount in controversy exceeding $5 million.[17] Defendants also

---

[10] ECF No. 24-2.
[11] ECF No. 21-4.
[12] ECF No. 1-1 at ¶ 164.
[13] Ex. 4, ECF 24-5.
[14] ECF No. 1-1 at ¶ 5.
[15] Ex. 4, ECF 24-5.
[16] Ex. 5, ECF No. 1.
[17] ECF No. 1 at ¶ 22.

assert that R&M was fraudulently joined and should be disregarded for jurisdictional purposes.[18] On May 27, 2025, Plaintiffs filed the instant Motion to Remand, arguing that (1) R&M is a properly joined Pennsylvania defendant,[19] and (2) the case qualifies for the mandatory local controversy exception under CAFA.[20] Plaintiffs alternatively requested limited jurisdictional discovery if the Court determined that factual development was necessary to resolve jurisdiction.[21]

Defendants filed a consolidated opposition brief to the motion to remand on June 10, 2025, along with a declaration asserting that R&M had no operational role in the Pipeline or its breach, and that its inclusion in a PADEP administrative order was erroneous.[22] This matter is now ripe for disposition.[23]

## II.    LEGAL STANDARD

Removal of a civil action from state to federal court is proper only if the action initially could have been brought in federal court. 28 U.S.C. §1441(a). The removal statutes "are to be strictly construed against removal and all doubts should be resolved in favor of remand." *Boyer v. Snap-On Tools Corp.,* 913 F.2d 108, 111 (3d Cir. 1990). To ascertain jurisdiction, individuals are deemed to be citizens of the state wherein they reside, *Swiger v. Allegheny Energy, Inc.*, 540

---

[18] *Id.* at ¶ 55.

[19] ECF No. 19-1 at 11.

[20] *Id*.; *see also* 28 U.S.C. § 1332(d)(4)(A).

[21] ECF No. 19 at 1.

[22] ECF No. 24.

[23] Plaintiffs filed a Motion for Preliminary Injunction on June 9, 2025, for which this Court promptly scheduled an evidentiary hearing. *See* ECF No. 22. However, before proceeding to the merits, this Court must assess subject matter jurisdiction because "[w]ithout jurisdiction the court cannot proceed at all in any cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) (quoting *Ex parte McCardle*, 74 U.S. 506, 514 (1869) (internal quotations omitted)). It is a fundamental principle of American jurisprudence that jurisdiction is the first and foremost question resolved by the court. *Id.* at 94. As set forth in this memorandum, the Court lacks subject matter jurisdiction. The evidentiary hearing was therefore cancelled.

F.3d 179, 181 (3d Cir. 2008), while a corporation is deemed a citizen of every state in which it has been incorporated and where it has its principal place of business. 28 U.S.C. §1332(c)(1).

A district court must remand a case "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction." 28 U.S.C. § 1447(c); *see Liberty Mut. Ins. Co. v. Ward Trucking Corp.*, 48 F.3d 742, 750 (3d Cir. 1995). The removing party carries the "heavy burden of persuasion," and courts must resolve all doubts in favor of remand. *Steel Valley Auth. v. Union Switch and Signal Div.*, 809 F.2d 1006, 1010, 1012 n.6 (3d Cir. 1987) (citation omitted).

## IV.    FRAUDULENT JOINDER

Defendants, who removed this action pursuant to CAFA, argue that Defendant R&M, a Pennsylvania entity, was fraudulently joined by Plaintiffs in their initial state action in an effort to purposely destroy federal diversity jurisdiction. There is no dispute here over the actual citizenship of any of the parties for purposes of federal jurisdiction. Rather, the disagreement centers on whether R&M's Pennsylvania citizenship should even be considered at all—which hinges on the issue of fraudulent joinder rather that its underlying state of citizenship.

Fraudulent joinder is an exception to the complete diversity requirement for removal, allowing federal courts to assume jurisdiction over cases containing nondiverse defendants where it can be shown that they were joined "solely to defeat diversity jurisdiction." *In re Briscoe*, 448 F.3d 201, 215–16 (3d Cir. 2006). Joinder is fraudulent "if there is no reasonable basis in fact or colorable ground supporting the claim against the joined defendant, or no real intention in good faith to prosecute the action against the defendant or seek a joint judgment." *Id.* at 216 (quotations omitted). A claim is colorable if it is not "wholly insubstantial and frivolous." *Batoff v. State Farm Ins. Co.*, 977 F.2d 848, 852 (3d Cir. 1992). The removing party asserting fraudulent joinder has a "heavy burden of persuasion." *Bate v. State Farm Ins. Co.*, 977 F.2d 848, 851 (3d Cir. 1992). In

deciding whether a defendant has demonstrated fraud, district courts must "focus on the plaintiff's complaint at the time the petition for removal was filed," accept the complaint's factual allegations as true, and resolve uncertainties about the controlling substantive law in the plaintiff's favor. *Id.* at 851–52 (quotations omitted). Joinder is proper "[i]f there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants." *Id*. at 851 (quotations omitted).

A court should not find a joinder fraudulent "[s]imply because [it] come[s] to believe that, at the end of the day, a state court would dismiss the allegations against a defendant for failure to state a cause of action." *Kallman v. Aronchick*, 2013 WL 5964444, at *5 (E.D. Pa. Nov. 8, 2013) (quoting *Lyall v. Airtran Airlines, Inc.,* 109 F. Supp. 2d 365, 367–68 (E.D. Pa. 2000)). Rather, a finding of fraudulent joinder is usually reserved for situations where recovery from the non-diverse defendant is a clear legal impossibility. *West v. Marriott Hotel Servs., Inc*., 2010 WL 4343540, *3 (E.D. Pa. Nov. 2, 2010) (quotations omitted). "Fraudulent joinder should not be found simply because plaintiff has a weak case against a non-diverse defendant." *Id.*; *see Boyer*, 913 F.2d at 111.

Defendants argue that Plaintiffs joined R&M solely to defeat diversity and that R&M's inclusion in the PADEP Administrative Order was a "scrivener's error."[24] They support this assertion with a declaration stating R&M has no involvement with the Pipeline. However, the PADEP's March 2025 Administrative Order—issued to Sunoco and R&M—explicitly directed both companies to remediate the pipeline release, identifying R&M as a parent of Sunoco. That Order became final under Pennsylvania law after R&M and Sunoco declined to appeal it. *See* 35 P.S. § 7514(c). Defendants' characterization of the PADEP's findings as a clerical mistake is not

---

[24] ECF No. 24 at 5.

dispositive at this stage. Even if disputed, the order and the absence of appeal create a plausible basis for the claim that R&M was legally responsible or operationally involved in the events surrounding this litigation. The Court must resolve all doubts in favor of remand when evaluating fraudulent joinder. *See Batoff v. State Farm Ins. Co.*, 977 F.2d 848, 851–52 (3d Cir. 1992). Because there is a reasonable basis in fact and law for Plaintiffs' claims against R&M, the Court finds that R&M was not fraudulently joined.

## V.    THE LOCAL CONTROVERSY EXCEPTION TO CAFA

Having found that R&M was not fraudulently joined, the Court turns to whether an exception to CAFA applies. CAFA provides a broader avenue for removal of a case than traditional diversity jurisdiction. Relaxing the diversity of citizenship requirement to allow minimal diversity to suffice, CAFA grants federal courts subject-matter jurisdiction over state-filed class action suits where: (1) the putative class exceeds 100 members; (2) the amount in controversy exceeds $5 million, and (3) any class member is a citizen of a different state than any defendant. *See* 28 U.S.C. § 1332(d)(2); *Vodenichar v. Halcon Energy Properties*, 733 F.3d 497 (3d Cir. 2013). There is no dispute here that this matter fits the above criteria. However, CAFA jurisdiction is subject to the local controversy exception, under which federal district courts must decline jurisdiction if:

> (I)    greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;
>
> (II)    at least 1 defendant is a defendant—
>
> (aa)    from whom significant relief is sought by members of the plaintiff class;
>
> (bb)    whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and
>
> (cc)    who is a citizen of the State in which the action was originally filed; and

(III)    principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and

(ii)    during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons[.]

28 U.S.C. § 1332(d)(4)(A).

A party seeking to invoke this exception must show, therefore, that:

(1) greater than two-thirds of the putative class are citizens of the state in which the action was originally filed; (2) at least one defendant is a citizen of the state in which the action was originally filed (the "local defendant"); (3) the local defendant's conduct forms a significant basis for the claims asserted; (4) plaintiffs are seeking significant relief from the local defendant; (5) the principal injuries occurred in the state in which the action was originally filed; and (6) no other class action asserting the same or similar allegations against any of the defendants had been filed in the preceding three years.

*Vodenichar*, 733 F.3d at 506–07. As the moving party, Plaintiffs must demonstrate that the exception applies by a preponderance of the evidence. *Id*. at 503. "Even if a federal court has jurisdiction under CAFA, it must decline to exercise that jurisdiction if the class action involves a local controversy." *McLaren v. UPS Store Inc,* 32 F.4th 232, 241 (3d Cir. 2022). The local controversy exception "applies only where at least one defendant" is a citizen of the State in which the action was originally filed." *Erie Ins. Exch. by Stephenson v. Erie Indem. Co.*, 68 F.4th 815, 822 (3d Cir. 2023).

Here, there is no dispute that: the entire putative class is comprised of citizens of Pennsylvania; Defendant R&M is a citizen of Pennsylvania; Plaintiffs are seeking significant relief from R&M; the injuries caused by the pipeline leak occurred in Pennsylvania; and no other class actions asserting the same have been filed in the past three years. The question for the Court is whether Plaintiffs have shown that R&M forms a "significant basis" for their claims.

The Third Circuit has held that satisfying the "significant basis" provision, 28 U.S.C. § 1332(d)(4)(A)(i)(II), requires a "substantive analysis comparing the local defendant's conduct alleged to the alleged conduct of all defendants." *Kaufman v. Allstate N.J. Ins. Co.*, 561 F.3d 144, 156 (3d Cir. 2009).

This Court finds that, in the absence of any formal appeal by Defendants, the PADEP Administrative Order, which explicitly names R&M and directs it to undertake remedial action for the leak, satisfies the significant basis provision. The PADEP's directive to R&M to take active steps to correct the leak, not merely informational or reporting duties, suggests that PADEP viewed it as operationally or corporately responsible and not some nominal party. R&M was given notice of its right to appeal or challenge the administrative order, and its failure to do so renders it final and binding under Pennsylvania law. Defendants' arguments do nothing more than raise a factual dispute, not a jurisdictional bar. This Court cannot resolve factual disputes in Defendants' favor at the remand stage.

## VI.   CONCLUSION

This action involves a local environmental incident affecting only Bucks County, Pennsylvania residents, against at least one in-state defendant who was plausibly alleged to have played a significant role. CAFA's local controversy exception was designed for cases like this. *See Kaufman*, 561 F.3d at 149. Plaintiffs have met their burden, and Defendants have not shown fraudulent joinder. Accordingly, the Court lacks subject matter jurisdiction under CAFA, and this case will be remanded to Philadelphia County Court of Common Pleas.

BY THE COURT:

_____

Hon. Mia R. Perez

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **DANIEL LA HART,** *et al.*, individually and on behalf of all others similarly situated, | : : : | |
| **Plaintiffs,** | : : | **CIVIL ACTION** |
| **v.** | : : | |
| **SUNOCO PIPELINE L.P.,** *et al.*, | : : | **NO. 25-2072** |
| **Defendants.** | : : | |

## ORDER

    **AND NOW,** this 17ᵗʰ day of June, 2025, upon consideration of Defendants' Emergency

Motion to Stay (ECF No. 31), it is hereby **ORDERED** that the motion is **DENIED.**[1]

 

 

                                            **BY THE COURT:**

---

[1] On June 13, 2025, this Court issued an Order granting Plaintiffs' Motion to Remand (ECF No. 30) and subsequently filed a Memorandum detailing why this Court lacks subject matter jurisdiction to hear the matter. *See* ECF No. 34. Defendants now ask this Court to grant an emergency administrative stay of the remand order pending a *forthcoming* motion to stay pending appeal. Defendants clarify that they "are not asking to stay the case entirely, rather, they ask to stay mailing of the remand order to the Philadelphia Court of Common Pleas and, thus to stay the transfer of jurisdiction back to the state court." ECF No. 33 (emphasis omitted). This Court declines to delay transmission of the remand order in abeyance—even for a short period—because Defendants have not sufficiently demonstrated the necessity of a postponement, which will only serve to interfere with the efficient administration of justice. Moreover, this Court's jurisdiction over the case has already terminated upon certification to the state court clerk. *See* ECF No. 30-1.