# Exhibit C

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CIVIL TRIAL DIVISION**

*Filed and Attested by the Office of Judicial Records 15 JAN 2026 03:01 pm S. GILLIAM*

**BERGER MONTAGUE PC**
Shanon Carson (Bar No. 85957)
Y. Michael Twersky (Bar No. 312411)
Joseph E. Samuel, Jr. (Bar No. 327645)
1818 Market Street, Suite 3600
Philadelphia, PA 19103

*Counsel for Plaintiffs and the Proposed Class*

| | |
|---|---|
| **DANIEL LA HART** and **KATHERINE LA HART** c/o Berger Montague PC 1818 Market Street, Suite 3600 Philadelphia, PA 19103; <br><br>**JERRY ZACHARATOS** and **JUSTINE ZACHARATOS** c/o Berger Montague PC 1818 Market Street, Suite 3600 Philadelphia, PA 19103; <br><br>**CHRISTOPHER GROVER** and **ANDREA GROVER** c/o Berger Montague PC 1818 Market Street, Suite 3600 Philadelphia, PA 19103, <br><br>Plaintiffs, <br><br>v. <br><br>**SUNOCO PIPELINE L.P.** 525 Fritztown Road Sinking Spring, Pennsylvania 19608; <br><br>**ENERGY TRANSFER LP** 8111 Westchester Drive Dallas, Texas 75225; | **PHILADELPHIA COUNTY COURT OF COMMON PLEAS TRIAL DIVISION** <br><br> MARCH TERM, 2025 <br><br> CASE NO. 250303655 |

**ENERGY TRANSFER (R&M) LLC**
1735 Market Street,
Philadelphia, Pennsylvania 19103;

**ENERGY TRANSFER MARKETING & TERMINALS L.P.**
100 Green Street
Marcus Hook, Pennsylvania 19061;

**DELTA AIR LINES, INC.**
1030 Delta Blvd, Dept 982
Atlanta, Georgia 30354;

**EPSILON TRADING, LLC**
1030 Delta Blvd, Dept 982
Atlanta, Georgia 30354;

**MONROE ENERGY, LLC**
4101 Post Road
Trainer, Pennsylvania 19061;

**PBF ENERGY INC.**
1 Sylvan Way
Parsippany, New Jersey 07054;

**PBF HOLDING COMPANY LLC**
1 Sylvan Way
Parsippany, New Jersey 07054;

**PRECISION PIPELINE LLC**
3314 56th Street
Eau Claire, Wisconsin 54703;

**MASTEC, INC.**
800 S Douglas Road, 10th Floor
Coral Gables, Florida 33134;

**NATURAL ENERGY FIELD SERVICES, LLC**
4101 Tates Creek Center Drive
Suite 150
Lexington, Kentucky 40517;

**SHAW PIPELINE SERVICES INC.**
1735 W Reno Street
Broken Arrow, Oklahoma 74012;

Case ID: 250303655

**CORRPRO COMPANIES, INC.**
470 Lapp Road
Malvern, Pennsylvania 19355;

**AZURIA WATER SOLUTIONS, INC.**
17988 Edison Avenue
St. Louis, Missouri 63005;

**BARR AIR PATROL, LLC**
1442 Airport Boulevard, Suite 11
Mesquite, Texas 75181;

**BAKER HUGHES COMPANY**
301 Saville Avenue
Eddystone, Pennsylvania 19022;

and

**ROSEN SWISS A.G. d/b/a
ROSEN USA**
14120 Interdrive East
Houston, Texas 77032,

              Defendants.

## NOTICE TO DEFEND

| NOTICE | AVISO |
|---|---|
| You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.<br><br>*You should take this paper to your lawyer at once.  If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.*<br><br>Philadelphia Bar Association<br>Lawyer Referral and Information Service<br>One Reading Center Philadelphia, Pennsylvania  19107<br>(215) 238-6333 TTY<br>(215) 451-6197 | Le han demandado a usted en la corte.  Si usted quiere defenderse de estas demandas expuestas en las páginas siguientes, usted tiene veinte (20) días de plazo al partir de la fecha de la demanda y la notificación.  Hace falta asentar una comparecencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona.  Sea avisado que, si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificación.  Además, la corte puede decidir a favor del demandante y requerir que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.<br><br>Lleve esta demanda a un abogado inmediatamente.  Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio.  Vaya en persona o llame por teléfono a la oficina cuya dirección se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.<br>Asociación De Licenciados De Filadelfia<br>Servicio De Referencia E Información Legal<br>One Reading Center<br>Philadelphia, Pennsylvania 19107<br>(215) 238-6333<br>TTY (215) 451-6197 |

Case ID: 250303655

## SECOND AMENDED CLASS ACTION COMPLAINT

## I.    INTRODUCTION

1.    Plaintiffs Daniel La Hart, Katherine La Hart, Jerry Zacharatos, Justine Zacharatos, Christopher Grover, and Andrea Grover ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Class" as further defined below), bring this Second Amended Class Action Complaint against Defendants Sunoco Pipeline L.P., Energy Transfer LP, Energy Transfer (R&M), LLC, Energy Transfer Marketing & Terminals, L.P. (collectively, the "Energy Transfer Defendants"), Delta Air Lines, Inc., Epsilon Trading LLC, Monroe Energy LLC (collectively, the "Delta Defendants"), PBF Energy Inc., PBF Holding Company LLC (collectively, the "PBF Defendants"), Precision Pipeline LLC, MasTec, Inc., Natural Energy Field Services, LLC, Shaw Pipeline Services, Inc., CorrPro Companies, Inc., Azuria Water Solutions, Inc., Barr Air Patrol, LLC, Baker Hughes Company, and Rosen Swiss A.G. d/b/a ROSEN USA (collectively, the "Contractor Defendants"), alleging that Defendants' reckless, negligent, and irresponsible use, ownership, oversight, operation, supervision, maintenance, and/or control of a hazardous petroleum pipeline (the "Twin Oaks Pipeline" or the "Pipeline") resulted in a massive and still unquantified leak of jet fuel and other petroleum products in a residential neighborhood, along with resulting toxins, pollutants, and contaminants (the "Pipeline Leak" or "Leak"), in Upper Makefield Township, Pennsylvania.[1]

---

[1] "Defendants" as used herein refers collectively to each of the Energy Transfer Defendants (Sunoco Pipeline L.P., Energy Transfer LP, Energy Transfer (R&M), LLC, Energy Transfer Marketing & Terminals, L.P.), Delta Defendants (Delta Air Lines, Inc., Epsilon Trading LLC, Monroe Energy LLC), PBF Defendants (PBF Energy Inc., PBF Holding Company LLC), and Contractor Defendants (Precision Pipeline LLC, MasTec, Inc., Natural Energy Field Services, LLC, Shaw Pipeline Services, Inc., CorrPro Companies, Inc., Azuria Water Solutions, Inc., Barr Air Patrol, LLC, Baker Hughes Company, Rosen Swiss A.G.), unless otherwise specified.

1

Case ID: 250303655

2.    Defendants' conduct in causing and/or allowing the Pipeline Leak to occur has unleashed a catastrophic environmental disaster on a previously idyllic Bucks County, Pennsylvania community, including the Mt. Eyre Manor community and surrounding neighborhoods that are subject to the plume caused by the Leak.

3.    It has been reported that the Energy Transfer Defendants already have the worst record for fuel spills in the United States before this latest disaster. That record is now even worse, as the Energy Transfer Defendants have caused serious physical and financial harm to a beautiful suburban neighborhood.

4.    The Delta Defendants and the PBF Defendants also bear responsibility for the Pipeline Leak, as it was these Defendants' petroleum products that contributed to the corrosion of the Pipeline and leaked into Plaintiffs' neighborhood and aquifer, causing substantial harm and a risk of ongoing injury.

5.    The Contractor Defendants undertook monitoring and/or maintenance obligations regarding the Pipeline and their failure to properly carry out these obligations was a substantial contributing factor in causing the Leak.

6.    The Leak arises from at least one crack in the Pipeline, causing a discharge into the underlying bedrock and groundwater of jet fuel, other unidentified petroleum products, and other hazardous and toxic chemicals that were transported through the Pipeline.

7.    Testing has identified various toxins in the local soil, air, and groundwater, including kerosene, benzene, ethylbenzene, isopropylbenzene, dichloroethane, trimethylbenzene ("TMB"), toluene, naphthalene, 1,2-dichloroethane ("EDC"), methyl tertiary-butyl ether ("MTBE"), and lead. These are substances so dangerous that their presence in the soil, water, and air presents a direct and immediate threat to Plaintiffs' and Class members' health and wellbeing.

2

Case ID: 250303655

8. The Pipeline Leak has caused severe harm and poses a serious ongoing and current danger to affected residents' physical health and mental and emotional wellbeing, the community's groundwater, soil, air quality, and ecosystem, and to property values. The Pipeline Leak has uprooted the affected community and has already rendered certain residences within the community unlivable, amounting to an effective taking of family homes.

9. The physical harm to persons and property that has been wrought by the Leak is palpable and concrete. As a direct result of the Leak, Plaintiffs now live on contaminated property and above a contaminated aquifer that provides them and the proposed Class with their drinking and potable water. This existing contamination, coupled with the significant risk that further contamination will continue to accrue on Plaintiffs' property, has ruined enjoyment of their property, has damaged the property's value, and some of the damage is permanent.

10. In the months after the Energy Transfer Defendants finally revealed the Leak, home values throughout the Mt. Eyre Manor community and surrounding neighborhoods plummeted. To date, few home sales have closed in the Mt. Eyre Manor community since the Leak was disclosed, despite the community previously being a highly sought-after neighborhood. The few homeowners who have sold their houses have been forced to accept significantly lower list prices and make other concessions after the existence of the Leak devastated interest from prospective home buyers who do not want to live in an area with environmental contamination from jet fuel.

11. Confirming that significant diminution in property values has occurred throughout the Mt. Eyre Manor community, local taxing authorities (including without limitation Upper Makefield Township) have reassessed the taxable value of numerous homes downwards by 10 to 15 percent.

Case ID: 250303655

12.    One home in the Mt. Eyre Manor community was so contaminated that the Energy Transfer Defendants themselves purchased it for the purpose of drilling monitoring and/or recovery wells, right in the middle of the neighborhood. This highly contaminated suburban residential home that the Energy Transfer Defendants now own (despite being for-profit oil companies) is in the middle of Plaintiffs' neighborhood. The Energy Transfer Defendants have also executed other contracts in connection with potential or actual residential home sales in the neighborhood.

13.    Environmental sampling and testing have confirmed that the Energy Transfer Defendants released jet fuel and unidentified other petroleum products, along with other and related pollutants, that contaminated private, residential wells in the affected community that provide water for drinking, bathing, cooking, and washing. Samples also show elevated levels of toxins in the air in certain houses in the impacted community, including with benzene multiple times higher than the statewide health standards.

14.    Defendants' conduct collectively has caused an exigent threat to the health and well-being of the community and has contaminated the environment and underground aquifer in the community.

15.    Defendants' conduct has also led to a constant and ongoing nuisance in this once peaceful and idyllic neighborhood for Plaintiffs and the Class. The Energy Transfer Defendants' purported remediation efforts have imposed a persistent, continuing, and significant disruption on the immediate neighborhood which has substantially violated Plaintiffs' and Class member's rights. After a long initial delay, the Energy Transfer Defendants have now dug *twenty-six* monitoring wells in the residential neighborhood, including two on the Zacharatos' owned property. The Energy Transfer Defendants' remediation efforts have also included the operation of

4

Case ID: 250303655

heavy machinery throughout the neighborhood, including at night, resulting in increases of dust, noise, odor, and light pollution on and within Plaintiffs' properties. These activities by the Energy Transfer Defendants have further infringed on Plaintiffs' peaceful enjoyment of their property and are the direct and proximate result of the Pipeline Leak.

16. The Mt. Eyre Manor community and surrounding neighborhoods, as with the area that includes and surrounds Upper Makefield Township generally, has long been a highly desirable residential neighborhood. The area had enjoyed strong property values and individuals have long sought to purchase homes in this idyllic and wonderful place to live and raise a family.

17. A notable feature of Mt. Eyre Manor and the surrounding neighborhoods in Upper Makefield Township is that the residences located there use and rely on private well water for domestic water needs, including for drinking water, cooking, bathing, washing clothes and dishes, and watering lawns and gardens.

18. Indeed, residents of Mt. Eyre Manor and other Upper Makefield neighborhoods have long believed that they had the best tasting water one could find because it contains naturally occurring minerals that give it a fresher taste and, typically, is free of the added chemicals that can be found in municipal water, such as chlorine and fluoride.

19. As a result of Defendants' Pipeline Leak, however, this is no longer the case. Defendants' conduct as alleged herein has devastated the community and caused significant contamination to the aquifers under the Mt. Eyre Manor community and surrounding neighborhoods. Defendants have created critical health and safety risks to the residents who live there and caused other consequential harms as detailed herein. Residents cannot safely rely on private well water without burdensome filtration systems that will require years of constant and expensive maintenance.

Case ID: 250303655

20.    The Energy Transfer Defendants control and operate the Twin Oaks Pipeline and, together with the Contractor Defendants, are responsible for maintaining the Pipeline and ensuring its safety. The Energy Transfer Defendants and the Contractor Defendants failed to uphold that responsibility, and violated their duties owed to residents.

21.    The Delta Defendants and the PBF Defendants regularly ship jet fuel and other petroleum products through the Pipeline. The Energy Transfer Defendants—specifically, Energy Transfer Marketing & Terminals LP—also, on occasion, ship gasoline through the Pipeline. On information and belief, these products over time contributed to the corrosion of the Pipeline, which was a substantial factor in causing the Leak to occur. These petroleum products then contaminated the air, soil and groundwater in Plaintiffs' neighborhood.

22.    The Delta Defendants, PBF Defendants, and Energy Transfer Defendants contracted to ship hazardous liquid products including jet fuel through the Pipeline knowing (or having reasonable cause to know) that the Pipeline was unsafe and that the Energy Transfer Defendants have an extensive and widely documented history of pipeline leaks and fuel spills. Despite this knowledge, the Delta Defendants, PBF Defendants, and Energy Transfer Defendants did not impose or require safeguards necessary to ensure that their products shipped through the Pipeline would arrive safely at their intended destination and appear to have either not detected or ignored the loss of their product from the Pipeline Leak.

23.    Another substantial factor in causing the Leak is that the Contractor Defendants, who undertake monitoring and/or maintenance duties for the Pipeline, failed to properly perform these duties. These duties include, but are not limited to, inspection, testing, evaluation, internal surveying, and right-of-way inspections.

6

Case ID: 250303655

24.    Defendants' Pipeline Leak was confirmed on January 31, 2025. The Energy Transfer Defendants, however, first received odor complaints from residents living in Mt. Eyre Manor as early as September 2023 – *16 months* earlier – but failed at that time to properly investigate, and as such failed to identify the Pipeline Leak at an early stage when more harm could have been prevented.

25.    Despite receiving numerous complaints from alarmed residents about strange odors since at least September 2023, thus indicating that the leak began at some time substantially prior to September 2023, Defendants failed to properly act for at least over 16 months after receiving actual notice of the problem through the odor complaint. The Energy Transfer Defendants failed to properly investigate the Pipeline Leak, failed to identify and contain the Pipeline Leak, and still to this day have not disclosed the full extent of the disaster, even after almost a year from actual discovery.

26.    Indeed, further evidencing the Energy Transfer Defendants' disregard for the Pipeline Leak, they have publicly asserted—despite the evidence demonstrating that the leak began at least as early as September 2023—that "the earliest the release from the pipeline could have begun was May or June 2024." Notably, if residents first smelled the Leak in September 2023, the Leak likely began far earlier. Defendants' statements are simply spin.

27.    The Delta Defendants and PBF Defendants, who each ship petroleum products through the Pipeline, were (or should have been) on notice of the Leak, given that they seemingly did not receive the expected volume of petroleum that they would have received if the Pipeline were not leaking. However, the Delta Defendants and PBF Defendants took no action to identify, investigate, or remediate the Leak.

Case ID: 250303655

28.     The full magnitude of the Pipeline Leak remains unknown and undisclosed. Defendants still cannot account for, or are choosing not to fully, accurately and publicly state, how much toxic petroleum product has spilled, exactly what leaked, or where it is moving, leaving Plaintiffs and Class members in constant and reasonable fear for their health and property.

29.     Numerous residents, including Plaintiffs, already have confirmed contamination within their private wells, well water, or monitoring wells on their property. The Energy Transfer Defendants do not dispute this and have publicly acknowledged that the Pipeline Leak is their fault. The test results confirming contamination of Plaintiffs' water include the sampling performed by the Energy Transfer Defendants' own agents.

30.     One household across the street from where the Pipeline Leak was discovered had approximately *fifteen gallons* of free jet fuel product found floating on top of the water in their private well, and petroleum product continues to significantly accrue at this home, even though it has been almost a year since the discovery of the Leak. Similarly, other residents of Mt. Eyre Manor also had significant amounts of jet fuel, and/or other petroleum products and constituents in their private wells.

31.     As Defendants have not yet identified the size, scope, direction, or speed of the contamination plume, even residents whose well water currently does not show contamination are within, and will remain within, a zone of danger where contamination could be weeks or days away. Residents, accordingly, are forced to take appropriate precautions and incur time and expenses to attempt to mitigate their risk.

32.     Other sampling has confirmed the presence of toxic contaminants in the very air within some Plaintiffs' homes.

Case ID: 250303655

33.     Recent sampling has now also confirmed that vapors from the contaminated groundwater and soil have invaded homes in the neighborhood, placing residents at potential risk to these toxic chemicals in both the water they drink and the air that they breathe.

34.     With no clear answers or relief in sight, extensive contamination of the water, soil, and air in and around their homes, and property values plummeting, the residents of Mt. Eyre Manor and the surrounding neighborhoods have been left to grapple with the terror of irreparable environmental harm, uncertain whether they can trust the very air they breathe and the water they drink and concerned for their future safety from toxic exposures.

35.     This is not just an environmental tragedy caused by corporate malfeasance; it is a life-altering crisis for Plaintiffs and Class members that impacts them every day, and, for which, Defendants must be held accountable.

## II.    PARTIES

36.     Plaintiffs Daniel La Hart and Katherine La Hart (the "La Harts") reside at 114 Spencer Road, Washington Crossing, Pennsylvania, 18977.

37.     Plaintiffs Jerry Zacharatos and Justine Zacharatos (the "Zacharatos") reside at 126 Walker Road, Washington Crossing, Pennsylvania 18977.

38.     Plaintiffs Christoper Grover and Andrea Grover (the "Grovers") reside at 1004 Swayze Avenue, Washington Crossing, Pennsylvania 18977.

39.     Defendant Sunoco Pipeline L.P. ("SPLP") is a limited partnership formed under the laws of Texas. SPLP contends that it maintains a principal place of business located at 8111 Westchester Drive, Dallas, Texas 75225. SPLP, however, also maintains addresses at 535 Fritztown Road, Sinking Spring, PA 19608 and 3807 West Chester Pike, Newtown Square, PA 19073, conducting substantial business and making corporate decisions from these locations in

9

Case ID: 250303655

Pennsylvania. The Sinking Springs address is among SPLP's principal locations from where its corporate officers make high-level decisions and direct, control, and coordinate its activities.

40.     Defendant Energy Transfer LP ("ETLP") is a limited partnership formed under the laws of Delaware with a principal place of business located at 8111 Westchester Drive, Dallas, Texas 75225.

41.     Defendant Energy Transfer (R&M), LLC ("R&M") is a limited liability company formed under the laws of Pennsylvania. Until recently, R&M listed its principal place of business at 1735 Market Street, Philadelphia, Pennsylvania 19103, and this is still the address it has on file with the Pennsylvania Department of Environmental Protection ("PADEP"). R&M was previously known as Sunoco (R&M), LLC.

42.     Energy Transfer Marketing & Terminals L.P. ("ETMT") is a limited partnership formed under the laws of Texas. ETMT conducts substantial business and makes high-level corporate decisions at the Marcus Hook Terminal, 100 Green Street, Marcus Hook, Pennsylvania 19061.

43.     SPLP, ETLP, R&M, and ETMT, collectively, are referred to as the Energy Transfer Defendants. SPLP, R&M, and ETMT are wholly owned subsidiaries of ETLP.

44.     SPLP owns and operates the Pipeline, has been deemed administratively responsible for the Leak and, with ETLP, has publicly accepted responsibility for the Leak.

45.     R&M, which prior to 2011 was one of the largest independent refiners and fuel marketers in the country, owned and operated multiple refineries, including the Philadelphia Refinery at Point Breeze and the Marcus Hook Refinery, from which petroleum product was shipped through the Twin Oaks Pipeline. R&M has been deemed administratively responsible for the Pipeline Leak.

10

Case ID: 250303655

46.    ETMT now owns and operates the Marcus Hook facility previously operated by R&M (now known as the Marcus Hook Industrial Complex) and, during the relevant time period, shipped petroleum product through the Twin Oaks Pipeline. ETMT's petroleum product has contaminated Plaintiffs' properties and neighborhood.

47.    Delta Air Lines, Inc. ("Delta") is a publicly traded corporation formed under the laws of Delaware with its principal place of business at 1030 Delta Boulevard, Department 982, Atlanta, Georgia 30354.

48.    Epsilon Trading, LLC ("Epsilon") is a limited liability company formed under the laws of Delaware with its principal place of business at 1030 Delta Boulevard, Department 982, Atlanta, Georgia 30354.

49.    Monroe Energy, LLC ("Monroe") is a limited liability company formed under the laws of Delaware with its principal place of business at 4101 Post Road, Trainer, Pennsylvania 19061.

50.    Delta, Epsilon, and Monroe, collectively, are referred to as the Delta Defendants. Epsilon and Monroe are wholly owned subsidiaries of Delta. During the relevant time period, the Delta Defendants shipped petroleum product through the Twin Oaks Pipeline. The Delta Defendants' petroleum product has contaminated Plaintiffs' properties and neighborhood.

51.    PBF Energy Inc. ("PBF") is a publicly traded corporation formed under the laws of Delaware with its principal place of business at 1 Sylvan Way, Parsippany, New Jersey 07054.

52.    PBF Holding Company LLC ("PBFHC") is a limited liability company formed under the laws of Delaware with its principal place of business at 1 Sylvan Way, Parsippany, New Jersey 07054.

11

Case ID: 250303655

53. PBF and PBFHC, collectively, are referred to as the PBF Defendants. PBFHC is a wholly owned subsidiary of PBF. During the relevant time period, the PBF Defendants shipped petroleum product through the Twin Oaks Pipeline. The PBF Defendants' petroleum product has contaminated Plaintiffs' properties and neighborhood.

54. Precision Pipeline LLC ("Precision Pipeline") is a limited liability company formed under the laws of Wisconsin with its principal place of business at 3314 56th Street, Eau Claire, Wisconsin 54703.

55. MasTec, Inc. ("MasTec") is a publicly traded corporation formed under the laws of Florida with its principal place of business at 800 S Douglas Road, Suite 1200, Coral Gables, Florida 33134. MasTec is the corporate parent of and actively exercises dominion and control over Precision Pipeline.

56. Natural Energy Field Services, LLC ("NEFS") is a limited liability company formed under the laws of Kentucky with its principal place of business at 4101 Tates Creek Center Drive, Suite 150, Lexington, Kentucky 40517.

57. Shaw Pipeline Services Inc. ("Shaw Pipeline") is a privately held corporation formed under the laws of Texas with its principal place of business at 1735 W Reno Street, Broken Arrow, Oklahoma 74012.

58. CorrPro Companies, Inc. ("CorrPro") is a privately held corporation formed under the laws of Ohio. On information and belief, CorrPro maintains a regular place of business at 470 Lapp Road, Malvern, Pennsylvania 19355.

59. Azuria Water Solutions, Inc. ("Azuria") is a privately held corporation formed under the laws of Delaware with its principal place of business at 17988 Edison Avenue, St. Louis,

12

Case ID: 250303655

Missouri 63005. Azuria is the corporate parent of and actively exercises dominion and control over CorrPro.

60.     Barr Air Patrol, LLC ("Barr") is a limited liability company formed under the laws of Delaware with its principal place of business at 1442 Airport Boulevard, Mesquite, Texas 75181.

61.     Baker Hughes Company ("Baker Hughes") is a publicly traded corporation formed under the laws of Delaware with its principal place of business at 301 Saville Avenue, Eddystone, Pennsylvania 19022.

62.     Rosen Swiss A.G. d/b/a ROSEN USA ("ROSEN") is a Swiss joint-stock company (*aktiengesellschaft*) formed under the laws of Switzerland with a principal place of business at 14120 Interdrive East, Houston, Texas 77032.

63.     Precision Pipeline, MasTec, NEFS, Shaw Pipeline, CorrPro, Azuria, Barr, Baker Hughes, and ROSEN, collectively, are referred to as the Contractor Defendants. During the relevant time period, the Contractor Defendants undertook monitoring and/or maintenance obligations regarding the Pipeline.

### III.    JURISDICTION AND VENUE

64.     This Court has subject matter jurisdiction pursuant to 42 Pa. C.S. § 931. The Energy Transfer Defendants removed this civil action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), and the federal district court remanded the case based on the "local controversy" exception to CAFA. No federal court has authority to exercise subject matter jurisdiction over this case.

65.     This Court has personal jurisdiction over each of the Defendants because they purposefully availed themselves of the privilege of conducting business in Pennsylvania and

13

Case ID: 250303655

Plaintiffs' causes of action arise out of the business that Defendants conduct in Pennsylvania; namely, the Pipeline Leak which occurred in Upper Makefield Township, Pennsylvania.

66.    Venue is proper under the Pennsylvania Rules of Civil Procedure because one or more Defendants regularly conduct business in Philadelphia, including but not limited to each of the following:

a.  SPLP owns and operates one or more pipelines and regularly transports petroleum in and through Philadelphia.

b.  SPLP supplies petroleum product to the Philadelphia International Airport.

c.  SPLP operates the Point Breeze Pump Station in Philadelphia that is necessary to SPLP's pipeline operations.

d.  SPLP owns and pays (or is obligated to pay[2]) Philadelphia property taxes on the property on which the Point Breeze Pump Station is situated.

e.  SPLP calculates tariffs for the petroleum products using multiple locations in Philadelphia as the point of origin or point of destination and publicly indicates to the Federal Energy Regulatory Commission that it delivers product to and from Philadelphia.

f.  SPLP earns revenue on the shipment of petroleum products to and from several locations in Philadelphia (including Point Breeze and Philadelphia Junction).

g.  ETLP employees perform work in Philadelphia, including at the Point Breeze Pump Station.

---

[2] On January 13, 2026, the City of Philadelphia filed a real estate tax lien pursuant to 53 P.S. § 7101 against Defendant SPLP for failure to pay property taxes on the 6460 W Passyunk Avenue location where the Point Breeze Pump Station is located. *See* No. 2601R25007913 (Phila. Muni.).

14

Case ID: 250303655

h. ETLP has direct supervisory control over a robust business providing gasoline and other petroleum products to consumers at Sunoco-branded retail locations in Philadelphia.

i. ETLP is the ultimate owner of SPLP and closely directs its operations through individuals who run SPLP's business but are also employed by ETLP; as such, all of SPLP's regularly conducted business in Philadelphia is also ETLP's business.

j. ETLP facilitates the delivery of jet fuel to the Philadelphia International Airport.

k. ETLP oversees and/or conducts cleanup and remediation efforts at polluted areas within Philadelphia.

l. Historically, R&M jointly has owned with SPLP various right-of-way easements for pipelines operated by SPLP in Philadelphia.

m. R&M formerly operated a refinery in Philadelphia and bears financial and legal responsibility for cleanup and remediation efforts at polluted areas within Philadelphia, and R&M funds these efforts through another wholly owned ETLP subsidiary, Evergreen Resources Group, LLC.

n. R&M is party to treasury services agreements with the Sunoco family of companies whereby R&M manages consolidated bank accounts and advances cash to the affiliates and provides other internal administrative and support services, in connection with these Sunoco entities' Philadelphia operations.

o. ETMT distributes petroleum products in Philadelphia and contracts for the use of pipelines to ship petroleum products through Philadelphia.

15

Case ID: 250303655

p.  Delta conducts substantial operations at the Philadelphia International Airport, primarily through Terminal D, which is situated in Philadelphia.

q.  Delta contracts for the use of pipelines to ship petroleum products through Philadelphia.

r.  Epsilon contracts for the use of pipelines to ship petroleum products through Philadelphia.

s.  Monroe owns and operates one or more pipelines in and regularly transports petroleum in and through Philadelphia.

t.  Monroe earns revenue on the shipment of petroleum products to and from several locations in Philadelphia.

u.  The PBF Defendants contract for the use of pipelines to ship petroleum product through Philadelphia.

v.  Until September 2025, the PBF Defendants owned and operated facilities in Philadelphia.

w.  On information and belief, Precision Pipeline performs general pipeline contractor work in Philadelphia.

x.  Precision Pipeline and MasTec are members and/or sponsors of the Philadelphia chapter of the Association for Materials Protection and Performance.

y.  MasTec operates in Philadelphia and regularly advertises that it is hiring for roles in communications, power, and energy infrastructure in Philadelphia.

z.  On information and belief, NEFS performs inspection and non-destructive testing on pipelines in Philadelphia.

16

Case ID: 250303655

aa. On information and belief, Shaw Pipeline performs non-destructive evaluation work on pipelines in Philadelphia.

bb. On information and belief, CorrPro performs close-internal survey work on pipelines in Philadelphia.

cc. CorrPro regularly contracts with Philadelphia Gas Works ("PGW") to perform work and earn revenue in Philadelphia.

dd. CorrPro is a member and/or sponsor of the Philadelphia chapter of the Association for Materials Protection and Performance.

ee. Azuria regularly performs or contracts to perform water infrastructure services in Philadelphia.

ff. On information and belief, Barr performs aerial right-of-way inspections relating to pipelines in Philadelphia, including from the Northeast Philadelphia Airport.

gg. On information and belief, Baker Hughes performs in-line inspections on pipelines in Philadelphia.

hh. On information and belief, ROSEN performs in-line inspections on pipelines in Philadelphia.

## IV.    FACTUAL ALLEGATIONS

### A.  The Energy Transfer Defendants' History of Leaking Pipelines and Failures to Report

67.    Defendant ETLP, through its complex network of subsidiaries, limited partnerships, and joint ventures, including Defendants SPLP, R&M, and ETMT, owns one of the nation's largest networks of natural gas, crude oil, and petroleum product pipelines.

17

Case ID: 250303655

68.     ETLP primarily operated in the natural gas sector prior to its acquisition of the Sunoco family of entities' significant oil and petroleum product assets in 2012. Together, the Energy Transfer Defendants now own and operate over 125,000 miles of pipelines across the United States.

69.     The Energy Transfer Defendants' network of pipelines is not only among the largest in the country; it is also among the leakiest.

70.     According to the Pipeline and Hazardous Materials Safety Administration ("PHMSA")'s database, between 2002 and 2017, the Energy Transfer Defendants experienced at least 527 leakage incidents—approximately one incident from an existing facility every eleven days in the pipelines that they own and operate.

71.     Those incidents accounted for reported releases of over 3.6 million gallons of petroleum product. That figure likely substantially underestimates the true number of incidents and amount of product lost, as it primarily relies on self-reported incidents and estimates.

72.     Between 2002 and 2017, PHMSA issued 106 safety violations to the Energy Transfer Defendants for failing to comply with federal regulations designed to ensure the safe operation of hazardous liquid pipelines.

73.     These violations included failures to notify PHMSA of spills, failures to repair identified unsafe pipes for five years, failures to perform regular corrosion inspections, failures to report known unsafe operating conditions, and failures to properly notify emergency responders and the public in the event of a leak.

74.     Federal regulators have not deterred the Energy Transfer Defendants' egregious conduct in failing to properly maintain their pipelines transporting hazardous petroleum products to make them safe.

Case ID: 250303655

75.    In 2022, SPLP and affiliate ETC Northeast Pipeline LLC were convicted by the Commonwealth of Pennsylvania of *57 charges* of criminal conduct associated with the construction and operation of two other pipelines Pennsylvania. The Commonwealth of Pennsylvania convicted SPLP on counts involving multiple instances of failure to report discharges of hazardous substances into the surrounding environment, the use of unapproved additives and release of those additives into drinking water, and failure to implement legally required safety measures. The use of unapproved additives is potentially relevant here as one of the chemicals found in recent sampling in the Mt. Eyre Manor neighborhood is MTBE, which was supposed to have been phased out of use in the early 2000s.

76.    48 of the 57 criminal charges related to SPLP's conduct during the construction of the Mariner East 2 Pipeline, which crosses 17 counties in the southern tier of Pennsylvania, while the other 9 charges related to SPLP's conduct during the construction of the Revolution Pipeline, a 42.5 mile pipeline that starts in Butler County, is routed through Beaver and Allegheny counties, and connects to a gas processing plant in Washington County.

77.    In February 2025, Bloomberg reported that the Twin Oaks Pipeline Leak in Upper Makefield Township "highlight[ed]" Energy Transfer's "worst fuel spill record" in the United States. The Bloomberg article reported that SPLP was responsible for spilling over 1,400 barrels of fuel in 2024 alone, and this is only accounting for the volume of fuel spills that Defendants were both aware of *and* willing to publicly report.[3]

---

[3] Bloomberg, *Energy Transfer Leak Highlights Worst Fuel Spill Record in US* (Feb. 18, 2025), available at https://www.bloomberg.com/news/articles/2025-02-18/energy-transfer-leak-highlights-worst-fuel-spill-record-in-us?embedded-checkout=true (last accessed Mar. 14, 2025).

Case ID: 250303655

78. The Twin Oaks Pipeline Leak further demonstrates that the Energy Transfer Defendants are not fully forthcoming about the volume of or even the existence of fuel spills into residential neighborhoods.

79. The Energy Transfer Defendants' conduct, as alleged herein, is reflective of and consistent with their history of failing to safely operate and maintain pipelines, as well as their failing to detect and report leaks from their pipelines and appropriately respond to and remediate leaks with the expediency and transparency that such incidents require.

**B.     The Energy Transfer Defendants' Twin Oaks Pipeline That Runs Through Upper Makefield, PA**

80. The Energy Transfer Defendants own and operate the Twin Oaks Pipeline, a 14-inch diameter pipeline that transports petroleum products, including but not limited to jet fuel (JP-8), diesel, and gasoline, from the Twin Oaks Terminal in Aston, Pennsylvania to the Newark Terminal in Newark, New Jersey. The Pipeline is considered a "hazardous liquid pipeline facility" under federal law. 49 U.S.C. § 60101(a).

81. The Twin Oaks Pipeline was originally installed in 1956 and has operated as a hazardous liquid pipeline facility now for close to 70 years.

82. National Tube Supply Company manufactured the Pipeline.

83. As originally installed, the Twin Oaks Pipeline was 8 inches in diameter and ran through a different trench than its current pathway under the Mt. Eyre Manor neighborhood. At the time, this 8-inch pipeline ran under farmland that existed prior to the development of the neighborhood.

20

Case ID: 250303655



84.    The above photo (Figure 1) is taken from the Energy Transfer Defendants' Interim Remedial Action Plan submitted to the PADEP on March 19, 2025. It depicts both the original 8-inch pipeline trench with its more directly diagonal northeasterly pathway and the more recent 14-inch pipeline trench, which abruptly turns north as it reaches the Mt. Eyre Manor neighborhood, then curves east, before ultimately resuming its diagonal northeasterly pathway.

85.    This alternate trench path around what is now the Mt. Eyre Manor neighborhood closely follows modern Glenwood Drive, as depicted below, and the abrupt northward turn onto Glenwood Drive corresponds precisely with the location where the Leak was detected at 121 Glenwood Drive.

21

Case ID: 250303655



Fig. 2: The Mt. Eyre Manor neighborhood, retrieved from Google Maps, with the approximate location of the Twin Oaks Pipeline overlaid, running parallel to Glenwood Drive, and the later-discovered Leak location indicated with a blue star.

86.    On a daily basis, the Energy Transfer Defendants transport massive quantities of petroleum products through the Pipeline at high pressure under the Mt. Eyre Manor community and surrounding neighborhoods.

87.    This product, which ETMT, the Delta Defendants, and the PBF Defendants supplied during the relevant time period, is forced through an abrupt northward turn at 121 Glenwood Drive, subjecting the Pipeline at that location to significant pressure and mechanical stress.

88.    The Energy Transfer Defendants contract with the Contractor Defendants to perform monitoring and/or maintenance work on the Pipeline.

89.    Specifically, Precision Pipeline serves or served as a general contractor for the Pipeline.

22

Case ID: 250303655

90.    NEFS performs or performed inspection and non-destructive testing work on the Pipeline.

91.    Shaw Pipeline performs or performed non-destructive evaluation work on the Pipeline.

92.    CorrPro performs or performed close-internal survey work on the Pipeline.

93.    Barr performs or performed aerial right-of-way inspections on the Pipeline.

94.    Baker Hughes and ROSEN perform or performed in-line inspections on the Pipeline.

95.    Despite the Contractor Defendants' responsibility to perform each of these roles, the Pipeline leaked, and the Leak was not detected until months or years after its initial occurrence.

96.    On November 18, 2024, PHMSA issued an Advisory Bulletin notifying pipeline owners and operators of potential threats to the integrity of the body of certain pipelines.[4] The Advisory Bulletin stated that pipes constructed by National Tube Supply Company before 1970, like the Twin Oaks Pipeline, were particularly susceptible to hard spots. Hard spots are defects created during the pipe manufacturing process because of localized cooling and hardening. Hard spots can become unstable over time due to changes in their conditions, including degradation and erosion of the coating surrounding the hard spot, and result in cracking of the pipe.

97.    PHMSA provided in its Advisory Bulletin six recommended safety actions for pipeline operators to take in order to identify potential hard spots. Despite this Advisory Bulletin, and their own independent knowledge and experience concerning these issues, the Energy Transfer

---

[4] Pipeline and Hazardous Materials Safety Administration, Pipeline Safety: Identification and Evaluation of Potential Hard Spots—In-Line Inspection Tools and Analysis, 89 Fed. Reg. 90827 (Nov. 18, 2024).

Case ID: 250303655

Defendants' representatives have stated that they were unaware of any safety actions recommended by PHMSA related to the Twin Oaks Pipeline.

98.    Furthermore, the inner walls of a petroleum pipeline can erode over time due to the corrosive environment created by the materials and chemicals transported through it. The exterior of a petroleum pipeline is also subject to external corrosion, due to the presence of moisture and chemicals in the surrounding soil. While several factors can influence the rate and extent of both internal and external corrosion, corrosion of a petroleum pipeline over time is inevitable, and again, well-known. Consequently, proper care, maintenance, supervision, and oversight of pipelines is critical to public safety.

99.    Despite this knowledge, the Energy Transfer Defendants have made several incredulous statements to members of the affected community in Upper Makefield, Pennsylvania, including Plaintiffs, that the lifespan of the Twin Oaks Pipeline is "indefinite."

100.    The Contractor Defendants were responsible, in part, for monitoring and/or maintenance of the Pipeline in light of these known corrosion risks, but they failed to adequately perform these duties as evidenced by the Leak, and their failure to timely prevent and detect it.

101.    The Twin Oaks Pipeline specifically has experienced reported failures in Pennsylvania on at least two prior occasions, and these are only instances that the Energy Transfer Defendants have reported to the public. It is possible that the Twin Oaks Pipeline has experienced additional unreported failures that the Energy Transfer Defendants did not report to the public.

102.    On October 7, 1986, a crack in the Twin Oaks Pipeline caused the release of at least 5,260 barrels of refined product in Montgomery County, Pennsylvania.

103.    On March 19, 2004, external corrosion caused a leak in the Twin Oaks Pipeline, resulting in the release of at least 50 barrels of refined product in Delaware County, Pennsylvania.

24

Case ID: 250303655

104.    The Energy Transfer Defendants also renovated a major portion of the Twin Oaks Pipeline—the portion that crosses the Delaware River, right next to the residential Mt. Eyre Manor neighborhood—in June and July 2023. The Energy Transfer Defendants installed approximately 2,500 feet of new pipeline underneath the Delaware River using the process of horizontal directional drilling and tied this new stretch of pipeline into the existing Twin Oaks Pipeline at a location on Oakdale Avenue near the Mt. Eyre Manor neighborhood.

**C.    The Geographic Area Affected by the Twin Oaks Pipeline Leak**

105.    The Twin Oaks Pipeline Leak occurred at a section of the Pipeline that runs directly under the residential Mt. Eyre Manor neighborhood in Washington Crossing, Bucks County, Pennsylvania.

106.    The Mt. Eyre Manor neighborhood is located in Upper Makefield Township, a municipality within Bucks County, Pennsylvania and covers the residential homes on Glenwood Drive, Walker Road, Spencer Road, Crestwood Road, Beechwood Drive, and Bruce Road.

107.    Figure 3 below shows the geographic location of the Twin Oaks Pipeline within a portion of Upper Makefield Township. The red line in Figure 3 shows the Pipeline.

25

Case ID: 250303655



Fig. 3: Location of the Pipeline within Upper Makefield Township, retrieved from the National Pipeline Mapping System Public Viewer. *See* pvnpms.phmsa.dot.gov/PublicViewer (last accessed Feb. 26, 2025).

108. There is no gas station or other potential source of petroleum byproduct contamination within two miles of the Mt. Eyre Manor neighborhood. Yet constituents—including EDC and MTBE—that the Energy Transfer Defendants have stated have not been present in gasoline for decades, and, in the case of EDC, not present in leaded jet fuel since 2018, have nevertheless been detected via testing since the Leak.

109. Residents of the Mt. Eyre Manor neighborhood rely on private well water for their water supply, including water used for drinking, bathing, cooking, washing, and gardening, among other uses.

110. An underground aquifer, which the Energy Transfer Defendants, Delta Defendants, and PBF Defendants have now permanently polluted, supplies the water used by residents of the neighborhood, including Plaintiffs.

Case ID: 250303655

111.    The same is true for residents of the immediately surrounding area, including, but not limited to, residences on Mt. Eyre Road, Valley View Drive, Old Barn Court, Taylorsville Road, River Road, Oakdale Avenue, Maple Shade Avenue, West Street, Cross Street, Swayze Avenue, Pondview Drive, Heron Court, Belamour Drive, Aqueduct Road, and additional surrounding roads, which run through other nearby Upper Makefield Township neighborhoods that the Twin Oaks Pipeline also runs underneath.

112.    Upper Makefield Township sits in a floodplain, and the Mt. Eyre Manor neighborhood is surrounded on three sides by "Flood Hazard Areas" as defined by the Federal Emergency Management Agency ("FEMA").

113.    The Mt. Eyre Manor neighborhood is considered a High Consequence Area ("HCA") pursuant to 49 C.F.R. § 195.450, due to its concentrated population, its proximity to a commercially navigable waterway (the Delaware River), the lack of an adequate alternative drinking water source to the underlying aquifer, and its proximity to ecological resources.

**D.    Known and Reported Odor Complaints Started in September 2023**

### i.    September 2023 Odor Complaint

114.    On September 20, 2023, the Energy Transfer Defendants were notified directly by the owner-residents of 128 Walker Road of an overwhelming smell and taste of gasoline in their water. The Energy Transfer Defendants were also notified of this complaint separately on September 25, 2023, when PHMSA notified the Energy Transfer Defendants of an odor complaint referred by the PADEP.

115.    The residents of 128 Walker Road live directly across the street from the site where the Twin Oaks Pipeline Leak occurred and was eventually discovered (121 Glenwood Drive),

27

Case ID: 250303655

though the Energy Transfer Defendants did not confirm discovery of the Leak until *16 months later* after this complaint.

116. The La Hart Plaintiffs and the Zacharatos Plaintiffs each live less than 500 feet of 128 Walker Road, downgradient of the Leak's release point. Only one property sits between 128 Walker and the La Hart residence, while the Zacharatos are the next-door neighbors of the residents of 128 Walker Road.

117. In the two months prior to the above first odor complaint in September 2023, Upper Makefield Township had experienced multiple severe weather events. These weather events included severe flash flooding that occurred in July 2023 and that resulted in the deaths of seven people and forced month-long road closures near the Mt. Eyre Manor neighborhood.

118. The weather events also included substantial rains and heavy winds from Tropical Storm Ophelia that hit Bucks County, Pennsylvania on September 23, 2023.

119. Each of these severe weather events should have triggered full proper inspections of the Twin Oaks Pipeline by the Energy Transfer Defendants pursuant to 49 C.F.R. § 195.414. The Energy Transfer Defendants, however, did not conduct inspections sufficient to discover any resulting leaks as required by law, nor did the Energy Transfer Defendants notify PHMSA about their failure to conduct such inspections, which was reckless and negligent.

120. The Energy Transfer Defendants investigated the September 2023 odor complaint by simply dispatching a technician and a contractor to test for indications of a leak, but the investigation was improperly performed and conducted without reasonable care or diligence.

121. Specifically, the Energy Transfer Defendants' investigation included only testing of the well water of the complainant's residence and three nearby residences, probing the immediately adjacent segment of the pipeline with a photoionization ("PID") gas detector, excavating a single

Case ID: 250303655

25-foot segment of nearby pipeline that ran through nearby 121 Glenwood Drive, testing the excavated soil, and performing a static pressure test.

122. Sadly, the excavation stopped short of uncovering the portion of the Pipeline mere feet away where the Pipeline Leak was eventually discovered many months later.

123. When the Energy Transfer Defendants did not immediately uncover evidence of a leak based on this initial deficient investigation, Defendants simply and improperly ceased their investigative efforts. The Energy Transfer Defendants recklessly and negligently did not ascertain the source of the odor, and did not conduct any continued monitoring or observation of the area.

124. The Energy Transfer Defendants then contacted the owners of 128 Walker Road and falsely told them they were "happy to report" that there was no oil or gas contamination in their water.

125. When the owners of 128 Walker Road stated to Defendants' representative that this finding was impossible, the Energy Transfer Defendants' representative claimed that "it was probably some bacteria."

126. As history bears out, the Pipeline Leak would eventually be discovered 16 months later across the street from the complainants' home.

127. Starting at least as early as this September 2023 time frame when evidence of the Leak was first observed by residents, the Delta Defendants and PBF Defendants were or should have been on notice that the expected volume of product that they contracted to ship through the Twin Oaks Pipeline was not in fact being delivered at the point of destination of their shipment, because a portion of the pipeline's volume was instead leaking into Plaintiffs' neighborhood. Neither the Delta Defendants nor PBF Defendants took any action to identify, investigate, or remedy the Leak despite being on reasonable notice that the Leak had begun.

Case ID: 250303655

128. Moreover, the Contractor Defendants, including but not limited to Precision Pipeline and Barr, were performing work on the Pipeline and should have, but did not, take action with respect to the Leak.

### ii.    *June 2024 Odor Complaint*

129. On June 28, 2024, the Energy Transfer Defendants received yet another odor complaint from a different resident, this time at 108 Spencer Road in the Mt. Eyre Manor neighborhood. The resident called the Energy Transfer Defendants' so-called "emergency" phone number to alert the Energy Transfer Defendants about the petroleum smell.

130. 108 Spencer Road is just two properties to the east from the La Harts' home. Indeed, the La Harts are located *in between* 108 Spencer Road and the location where the Leak was ultimately detected at 121 Glenwood Drive.

131. The Energy Transfer Defendants responded to this second odor complaint in an even more careless manner than they did to the first complaint when, in fact, their response should have been more robust since they had already received the prior complaint. The Energy Transfer Defendants dispatched a single technician to examine the site using a portable 4-gas detector. The technician's equipment did not record a gas detection, and the technician did not observe dead vegetation above the Pipeline.

132. Based on the technician's report and limited inspection, and nothing else, the Energy Transfer Defendants recklessly and negligently ceased their investigative efforts. The Energy Transfer Defendants did not ascertain the source of the odor and did not conduct any continued monitoring or observation of the area.

133. Inexplicably, the Energy Transfer Defendants also failed to report this odor complaint to PHMSA.

Case ID: 250303655

134.    The Energy Transfer Defendants also sent an individual to speak with the residents of 108 Spencer Road at their home in response to this odor complaint. This representative stated that there was no leak and that the Energy Transfer Defendants would know immediately if a leak ever occurred because they would detect either a pressure drop or a loss of product in the Pipeline—a fact that, absent negligence, should reasonably have been known to the Delta Defendants and the PBF Defendants as well.

135.    Unsatisfied with this limited response (which of course turned out to be incorrect), the residents of 108 Spencer Road also contacted Sue Erickson, a right-of-way specialist and public-facing representative for the Energy Transfer Defendants. Erickson assured these residents that there was no issue with the Pipeline, that it had been "probed," and that there was no loss of pressure indicating any leak. This response further demonstrates the unreliability and defective nature of the Energy Transfer Defendants' leak-monitoring and detection methods.

### iii.        July 2024 Odor Complaint

136.    The following month, on or about July 21, 2024, the Energy Transfer Defendants received a third odor complaint from a resident at 121 Glenwood Drive in the Mt. Eyre Manor neighborhood, which is immediately across the street from the complainants who lived at 128 Walker Road who made the first complaint detailed above, *and* the precise address where the Energy Transfer Defendants had excavated a segment of the Twin Oaks Pipeline in September 2023.

137.    The complainants from 121 Glenwood Drive reported not only a smell of gasoline or kerosene in their water but also noted a visual change in how their water looked.

31

138.    Again, the Energy Transfer Defendants' response was improper and lackadaisical, especially accounting for the fact that this was now the third complaint received in a short period of time.

139.    In response to this July 2024 odor complaint, the Energy Transfer Defendants again dispatched only a single technician to examine the site using a portable 4-gas detector. The technician's equipment did not record a gas detection, and the technician did not observe dead vegetation above the pipeline.

140.    Based on the technician's report, the Energy Transfer Defendants recklessly and negligently ceased their investigative efforts. The Energy Transfer Defendants did not ascertain the source of the odor and again failed to implement or conduct any proper continued monitoring or observation of the area.

141.    Moreover, yet again, the Energy Transfer Defendants failed to report this odor complaint to PHMSA.

142.    Furthermore, the Energy Transfer Defendants represented to the residents of 121 Glenwood Drive that there was no petroleum in their water, notwithstanding the absence of proper testing to verify that claim.

143.    The Energy Transfer Defendants also claimed to the PADEP that "iron bacteria" was the likely explanation for the smell of gasoline or kerosene and this information was then passed on by PADEP to the residents at 121 Glenwood Drive.

### iv.        *November 2024 Odor Complaint*

144.    Four months later, on November 21, 2024, the Energy Transfer Defendants received a fourth known odor complaint from a resident of 107 Spencer Road in the Mt. Eyre Manor

32

Case ID: 250303655

neighborhood, immediately across the street from the prior complainants that lived at 108 Spencer Road.

145. The homeowners at 107 Spencer Road, who bought their home in 1978, raised their family in the Mt. Eyre Manor community, and lived in the neighborhood for over 45 years, complained that they smelled gasoline in their water. They also noticed that their brand-new drinking glasses had a sheen resembling oil or gasoline after taking them out of the dishwasher.

146. The residents at 107 Spencer Road asked their well company, Bucks County Well Drilling Co. ("BCWD"), to investigate. BCWD and the residents of 107 Spencer Road observed a sheen in the well water.

147. Disturbed by this discovery, the residents at 107 Spencer Road had samples taken and sent them to an independent laboratory. The samples came back *positive* on October 24, 2024, for diesel range organics (C10-C28) at 3,920 milligrams per liter and gasoline range organics at 573 milligrams per liter.

148. The residents at 107 Spencer Road notified the Energy Transfer Defendants of this result. Once again, and despite these now positive test results, the Energy Transfer Defendants' response was insufficient and neglectful.

149. Soon after receiving this alarming test result, in November 2024, an individual purporting to be an agent of the Energy Transfer Defendants appeared at 107 Spencer Road in the evening after dark, and denied that the Energy Transfer Defendants were responsible for the petroleum product present in the water at 107 Spencer Road, but agreed to continue monitoring the situation.

150. Despite this now being the fourth known odor complaint by a resident in the direct vicinity of where the Pipeline Leak was eventually discovered, the Energy Transfer Defendants

33

Case ID: 250303655

again dispatched a single technician to examine the site using a portable 4-gas detector. The technician's equipment did not record a gas detection, and the technician did not observe dead vegetation above the pipeline.

151.    The Energy Transfer Defendants performed a four-hour static pressure test to check for lowering pressure indicative of a pipeline leak. The operator reported to the Energy Transfer Defendants that the results were within acceptable limits, although the operator did not report the acceptance criteria used or the results of the pressure test.

152.    Based on the reports of the technician and operator, the Energy Transfer Defendants ceased their investigative efforts, notwithstanding that there had now been at least four similar complaints reported since September 2023. The Energy Transfer Defendants did not ascertain the source of the odor, and did not conduct any continued monitoring, observation, or testing of the neighborhood.

153.    In what was now clearly a systemic pattern, the Energy Transfer Defendants again did not report this odor complaint to PHMSA.

154.    Unlike the Energy Transfer Defendants, the owners at 107 Spencer Road continued to investigate their disturbing test results. They alerted their homeowners' insurance company, who retained environmental firm Phoenix Consulting, LLC.

155.    Phoenix began interfacing directly with PADEP, which stated that it had received multiple complaints from concerned residents over the last year, but that the water at 107 Spencer Road was the first instance of failing laboratory results.

156.    Phoenix collected samples directly from the well at 107 Spencer Road on December 17, 2024. These samples contained a very observable yellow petroleum product in the well water:

Case ID: 250303655





157.    Phoenix had the water from these jars tested and communicated the results of those

tests to the PADEP, whose representative Richard Staron indicated that a jet fuel release from the

Twin Oaks Pipeline was a likely source. In other words, the Delta Defendants' and PBF

Case ID: 250303655

Defendants' jet fuel product had contaminated a property that was further downgradient from the Leak location than the La Harts' property.

158. These results indicated the presence of benzene, toluene, ethylbenzene, isopropylbenzene, chloroform, naphthalene, xylenes, 1,2,4-trimethylbenzene, 1,3,5-trimethylbenzene, and lead.

159. Subsequently, the Energy Transfer Defendants finally performed testing of the well at 107 Spencer Road themselves on January 24, 2025, through a contractor, Groundwater & Environmental Services, Inc. ("GES"), as described in more detail below.

160. The Energy Transfer Defendants' responses to the odor complaints described above fell far below the applicable standard of care and the duties owed to residents of Mt. Eyre Manor and the surrounding communities, including with respect to the urgency of the situation, the actions taken or not taken, and the failure to conduct meaningful follow-up, monitoring, and testing to determine whether the Pipeline was leaking and contaminating the community, including the aquifer relied upon by Plaintiffs and other members of the proposed Class.

161. Because of each of the Defendants' lack of a proper response, Defendants never timely identified a cause of the taste and odor complaints, until the Twin Oaks Pipeline Leak was discovered only much later in January 2025. In short, Defendants failed to prevent and detect the Leak.

**E.    The Twin Oaks Pipeline Leak is Discovered in January 2025**

162. On January 21, 2025, PADEP informed PHMSA that samples obtained from a well at 107 Spencer Road had indicated the presence of kerosene, a major component of JP-8 jet fuel. The Delta Defendants and PBF Defendants were the primary entities shipping jet fuel through the Pipeline during the relevant time period.

36

Case ID: 250303655

163.    PHMSA notified the Energy Transfer Defendants of the test results and directed the Energy Transfer Defendants to investigate the origin of the kerosene.

164.    On or about January 22, 2025, a representative of the Energy Transfer Defendants, Wassim Saad, parked in the La Harts' driveway in an unmarked truck with a New Jersey license plate, and knocked on their door to offer "free water testing" with no explanation why. Shockingly, Mr. Saad did not identify himself to the La Harts at this time as a representative of the Energy Transfer Defendants or tell the La Harts about the presence of kerosene at 107 Spencer Road, even though that property's well is mere feet from the La Harts' property line. Indeed Mr. Saad's, business card indicated that he worked for a company called "Wood PLC."

165.    The La Harts declined the offer for "free water testing" because they thought, based upon the lack of information and material omissions provided, that Mr. Saad was a door-to-door salesman offering unneeded services.

166.    Shortly thereafter, the La Harts noticed that trucks labeled "Energy Transfer" were present in the neighborhood, and the La Harts then realized that their community was likely facing a significant issue, although at this time the scope of the issue was unknown to them.

167.    The La Harts then contacted Mr. Saad and the Energy Transfer Defendants took a purported test of the La Harts' water on January 24, 2025, but only by sampling water taken from the La Harts' faucet and not, as should have been done, also from their well.

168.    At this time, the neighbors in the Mt. Eyre Manor neighborhood began to talk with each other about the activity involving the Energy Transfer Defendants, and the La Harts encouraged other residents to get their water tested.

37

Case ID: 250303655

169.     From January 22, 2025, through January 31, 2025, the Energy Transfer Defendants had GES, acting on behalf of and as an agent of the Energy Transfer Defendants, sample the private wells of approximately twenty-five other nearby residences in the neighborhood.

170.     GES confirmed the presence of hydrocarbons in well water at multiple properties in the neighborhood including 107 Spencer Road, 108 Spencer Road, and 128 Glenwood Drive, each of which surround the La Hart property.

171.     From January 22, 2025, through January 31, 2025, the Energy Transfer Defendants proceeded to probe the length of the Twin Oaks Pipeline between 121 Glenwood Drive and 155 Glenwood Drive (approximately 0.7 miles) with a PID gas detector. As with the Energy Transfer Defendants' prior investigations, the gas detector results were reported as "non-detect."

172.     Despite the repeated failures of the Energy Transfer Defendants' PID gas detector to identify a leak, eventually on January 31, 2025, the Energy Transfer Defendants visually observed and finally confirmed a substantial leak in the Twin Oaks Pipeline when they excavated a portion of the Pipeline located on the property at 121 Glenwood Drive, in the backyard of the home, next to the swimming pool where the residents' family swam prior to the discovery of the Leak.

173.     The Pipeline Leak was discovered at 121 Glenwood Drive, the residence directly across the street from 128 Walker Road in the Mt. Eyre Manor neighborhood, where the residents lived who reported the first odor complaint – *16 months prior* – detailed above as the smell of gasoline.

174.     The Energy Transfer Defendants had finally decided to excavate a portion of the Twin Oaks Pipeline located on the property at 121 Glenwood Drive after they went back and reviewed old maintenance records that had long been available to them. It is currently still not

38

Case ID: 250303655

known why the Energy Transfer Defendants did not take this step earlier, or what else these old maintenance records might show once they are produced in this litigation.

175. Video of the Pipeline Leak was recorded by one of the residents at 121 Glenwood Drive.

176. The Pipeline Leak would later be characterized as a "slow drip" from a Type A sleeve installed in 1995, and that had not been properly maintained since.

177. Type A sleeves are typically used to reinforce pipeline segments or areas of a pipeline that exhibit non-leaking defects such as corrosion or observable dents.

178. The Twin Oaks Pipeline is reinforced in at least 44 other segments by Type A sleeves installed during the late 1980s and early 1990s, and which are also all at risk of failing, especially if they are not continually and properly monitored and maintained.

179. Defendants failed to continually and properly monitor and maintain the Type A sleeve that was underground at 121 Glenwood Drive in the Mt. Eyre Manor residential neighborhood in Upper Makefield Township, Pennsylvania.

180. The Energy Transfer Defendants, Delta Defendants, and PBF Defendants all knew or should have known that Type A sleeves have a propensity to fail, and yet they shipped petroleum product through the Twin Oaks Pipeline anyway.

181. Similarly, the Contractor Defendants were or should have been aware of the risks of Type A sleeves—several of the Contractor Defendants' specific expertise is in pipeline corrosion—yet they failed to properly monitor or maintain the Pipeline.

182. The pipeline industry knows or should know that Type A sleeves are ineffective at preventing leaks and an insufficient mechanism to reinforce an aging pipeline in danger of leaking. The corrosive nature of petroleum products moving at high pressure inside a pipeline means that

39

dents over time can become cracks through which product can escape, and a sleeve reinforcing the exterior of the pipeline will not prevent leaks in such a scenario.

183.    For example, in August 2020, a dent in the Colonial Pipeline near Huntersville, North Carolina, which had been previously reinforced in 2004 with a Type A sleeve, developed into an approximately five-foot crack. As here, the operators of the Colonial Pipeline failed to properly monitor and maintain the pipeline and Type A sleeve and its detection systems failed to detect the crack or the release of any product.

184.    In that instance, an estimated 2,000,000 gallons of product were discharged into the surrounding environment before the pipeline's operators, alerted to the Leak by local residents, were able to identify and repair the crack. That pipeline's operator initially reported the release as involving 63,000 gallons (3 percent of the actual volume lost).

185.    Based on this and other similar incidents, together with their specialized knowledge and experience concerning pipeline operations and the strengths and limitations of standard operating procedures and repair equipment, the Energy Transfer Defendants knew or should have known that the approximately thirty-year-old Type A sleeve installed at the residential property at 121 Glenwood Drive was inadequate to prevent a discharge from the Pipeline, especially given its location beneath or adjacent to a residential neighborhood.

186.    On January 31, 2025, the Energy Transfer Defendants notified the National Response Center ("NRC") of the Twin Oaks Pipeline Leak and inexplicably and without good basis reported a release of 156 barrels of jet fuel, which is 6,552 gallons.

187.    Despite this initial report that there were 6,552 gallons of jet fuel spilled into a residential neighborhood in Bucks County, Pennsylvania that relies on well water, the Energy Transfer Defendants have since maintained in statements made to residents and regulatory

Case ID: 250303655

authorities after January 31, 2025, that in fact, the Energy Transfer Defendants do not know how much product has been released into the environment.

188. Still, the Energy Transfer Defendants have continued to repeat the 6,552 gallons figure at other times to regulatory authorities, including to the PADEP on April 18, 2025.

189. It is highly likely because of the amount of time that the Leak was occurring, the size of the Leak, the pressure utilized for the Twin Oaks Pipeline, the odor complaints dating back to September 2023, and other evidence, that significantly more than 6,552 gallons of jet fuel and petroleum products was released by Defendants into the environment.

190. As a result of Defendants' insufficient, improper, negligent, and reckless conduct alleged herein with respect to their use, oversight, operation, supervision, maintenance, monitoring, and testing of the Twin Oaks Pipeline—and despite now claiming that "the earliest the release from the Pipeline could have begun was May or June 2024" (despite the prior odor complaints as detailed above), Defendants appear to have no reliable knowledge of when the Pipeline began leaking.

191. The Twin Oaks Pipeline's maximum operating pressure is 1,200 psig (pounds per square inch gauge). On January 31, 2025, when the Energy Transfer Defendants discovered the Leak at 121 Glenwood Drive in the Mt. Eyre Manor neighborhood, it was reported that the Pipeline had been operating at 1,100 psig, *i.e.*, approximately 91.6% operating pressure.

192. PHMSA conducted a preliminary investigation of the Pipeline Leak after it was reported. Based on its investigation, PHMSA concluded that "the Pipeline experienced a leak in a high consequence area for at least 16 months, resulting in the release of jet fuel that has migrated into several adjacent water wells and caused additional impacts to property and the environment."

41

Case ID: 250303655

193.    It is probable that the Twin Oaks Pipeline was leaking for a significant period of time prior to the first known odor complaint being made to the Energy Transfer Defendants in September 2023.

194.    Indeed, Defendants appear to have operated the Twin Oaks Pipeline under a run-to-failure business model, continuously pumping petroleum products through the Pipeline with disregard for the foreseeable consequences as alleged herein, and taking action only after it became unmistakably clear that a leak had occurred or that the Pipeline had otherwise suffered a complete loss of integrity at a particular location.

195.    As indicated by the facts set forth in this Complaint, Defendants' methods for detecting leaks are woefully inadequate. For example, Defendants rely on Defendant Barr to perform *aerial* inspections of an *underground* pipeline to determine whether it is leaking. Barr performed monthly patrols of the Pipeline, sometimes as many as three or four patrols per month, but never discovered any evidence of the Leak.

196.    For several months after confirming the Leak, the Energy Transfer Defendants repeatedly advised both residents and regulatory authorities that they did not know whether the Twin Oaks Pipeline was still leaking.

197.    The Energy Transfer Defendants have still not excavated the entire Twin Oaks Pipeline to conduct a visual examination of the Pipeline to determine that it is not leaking, or even excavated the Pipeline sufficient to examine all the Type A sleeves along the Pipeline. However, the Energy Transfer Defendants have discovered additional "anomalies" along the Pipeline since the Leak and have been forced to conduct excavation digs to inspect and remedy these anomalies.

**F.    The Energy Transfer Defendants' Response and Actions Following Discovery of the Pipeline Leak**

Case ID: 250303655

198.    On January 31, 2025, the Energy Transfer Defendants shut down the segment of the Pipeline where the Leak had been identified and submitted a repair plan to PHMSA. They then removed the leaking segment in the middle of the night without notice to residents or regulators, notwithstanding their repeated assertions that shutting down the Pipeline would cause significant economic damage.

199.    Plaintiffs and the Class members demand, and have demanded, immediate access to review and examine the leaking segment of the Twin Oaks Pipeline and expect Defendants to preserve all aspects of the Pipeline that they have removed.

200.    On February 1, 2025, Energy Transfer's Lead Specialist for Public Affairs, Joseph Massaro, issued a written statement confirming the Energy Transfer Defendants had discovered "product loss" and stating that the Pipeline was "inactive" at the time the Leak was discovered.

201.    This statement means, among other things, that the video of the Pipeline that shows the Pipeline Leak is not indicative of the actual full Pipeline Leak under usual operating pressure conditions.

202.    On February 2, 2025, after receiving approval from PHMSA's Southwest Region Director, the Energy Transfer Defendants replaced the removed segment of the Pipeline and, without conducting further work to ensure that no other parts of the Pipeline were currently leaking, shockingly rushed to return the Pipeline to service.

203.    The Energy Transfer Defendants subsequently began an inadequate and neglectful investigation of the effects of the known Pipeline Leak in a high consequence, residential area.

204.    The Energy Transfer Defendants began conducting "exposure" testing for the water of nearby residences. But rather than testing the actual tops of all residents' wells to determine whether any free product – also known as light non-aqueous phase liquid or "LNAPL" – was

43

present, the Energy Transfer Defendants' exposure testing relied on inadequate PID readings and samples taken from faucets inside the residences post-treatment.

205. In at least one instance, when the Energy Transfer Defendants' retained testing agents, discovered that they had taken a sample directly from a well for testing by mistake, ***they threw out the sample and erased the results***.

206. The Energy Transfer Defendants' method of exposure testing thus often deviated from the standard protocols for testing groundwater, which require testing pre-treatment, and was seemingly designed to limit the Energy Transfer Defendants' ability to identify the scope and location of the contamination plume resulting from the Pipeline Leak.

207. The Energy Transfer Defendants failed to test samples directly from residents' wells for the presence of free product. This is true even though the Energy Transfer Defendants later began, at the behest of Plaintiffs and other residents, to conduct bailer tests of residents' wells to screen for the presence of LNAPL.

208. Indeed, even in situations where the Energy Transfer Defendants' agents *visually observed* the presence of LNAPL, they did not consistently retain the water from the bailer for testing and have instead in instances deposited this contaminated water back into the well.

209. Since the discovery of the Pipeline Leak, and following the institution of this litigation, Defendants have undertaken various environmental assessment and remediation activities in the neighborhood. Based on information presently available, it is not clear that all physical materials, samples, or other evidence generated or handled during those activities— including materials inserted into or removed from residents' wells—were fully cataloged and/or preserved. Plaintiffs and members of the proposed Class therefore reserve their rights with respect to any evidentiary issues that may arise from the preservation of such materials.

Case ID: 250303655

210. On February 4, 2025, Energy Transfer's Joseph Massaro appeared at the regularly scheduled Upper Makefield Township Board of Supervisors meeting, along with the Energy Transfer Defendants' other representatives including Carl Borkland, Susan Ericson, David Kerwood, and Rahn Monreal. Massaro confirmed the product release and purported to provide an "update" on Defendants' remedial efforts.

211. On February 6, 2025, at 7:30 p.m., a townhall meeting was held at the Upper Makefield Township Office, where affected residents who live in Mt. Eyre Manor and the surrounding neighborhoods, including Plaintiffs, representatives from PHMSA and the Defendants also were present.

212. At this townhall meeting, the Energy Transfer Defendants provided an update on their efforts to monitor and contain the Pipeline Leak, in which they admitted that their exposure testing had detected hydrocarbons in six neighborhood wells as of that time.

213. The Energy Transfer Defendants admitted during the meeting that they did not know how much product had been lost or when the Pipeline Leak had begun.

214. The Energy Transfer Defendants further stated that because the release occurred "in the headwaters" of the Delaware River, it would make sense for any groundwater carrying spilled product to be moving in a northeasterly direction toward the Delaware River. This was the Energy Transfer Defendants' best estimation at the time concerning the direction of the plume caused by the Pipeline Leak of unknown quantities of jet fuel and other petroleum products.

215. At the town hall meeting, the Energy Transfer Defendants offered only to pay for the installation of carbon filtration systems for any wells where their product was detected, and to pay for the maintenance of such a system for as long as the product is detected in the well.

Case ID: 250303655

216.    However, even this promise has not been properly fulfilled by the Energy Transfer Defendants. For example, even though petroleum product has been found in the Grovers' well, the Energy Transfer Defendants refuse to pay for the installation of a carbon filtration system for the Grover residence. The Grovers are just one of multiple families in the affected area for whom the Energy Transfer Defendants have refused to install a carbon filtration system, despite their private well water having tested positive for contaminants associated with the Leak.

217.    During this townhall meeting, officials from PHMSA stated that they had no confidence in the Energy Transfer Defendants' ability to identify leaks in the Twin Oaks Pipeline, considering the circumstances surrounding the Pipeline Leak. Residents of the Mt. Eyre Manor neighborhood, including the La Harts, called on the Energy Transfer Defendants to shut down the Pipeline, or to do so for a period of time sufficient to examine the Pipeline and make all reasonable repairs.

218.    The Energy Transfer Defendants refused (and still refuse) to even temporarily shut down the Pipeline.

219.    On February 7, 2025, the day after the town hall meeting, the Energy Transfer Defendants provided a written public update on the Upper Makefield Township website in which they stated that, rather than shutting down operations, they would reduce the Twin Oaks Pipeline's operating pressure to 80%.

220.    On February 13, 2025, PHMSA issued a Notice of Proposed Safety Order ("NOPSO") to the Energy Transfer Defendants. In the NOPSO, PHMSA wrote:

> After evaluating the foregoing preliminary findings of fact, and having considered the characteristics of the pipeline, including prior Type-A sleeve repairs involving dents and other defects; the prior failures of the pipeline; the hazardous nature of the petroleum products, including jet fuel, transported; the uncertainty as to the root cause(s) of the failure; the proximity of the pipeline to residential dwellings and water wells; the existing and potential additional impacts to property, the

46

Case ID: 250303655

environment, and wildlife; and the possibility that the same condition(s) that may have caused the failure remain present in the pipeline and could lead to additional failures; it appears that the continued operation of the Twin Oaks Discharge pipeline system without corrective measures would pose a pipeline integrity risk to public safety, property, or the environment. The conditions and threats described above potentially exist throughout the Twin 7 Oaks Pipeline. Further, Sunoco's apparent inability to effectively detect the leak has potentially exacerbated the impacts of the release over an extended period of time. Accordingly, corrective measures are necessary to mitigate the pipeline integrity risk of the pipeline system to protect public safety, property, and the environment.

221.    PHMSA, thereafter, issued proposed remedial requirements including reducing operating pressure, implementing plans to assess the integrity of the pipe and of the Type A sleeves along it, conducting a leakage survey and conducting a root cause failure analysis.

222.    On the evening of February 13, 2025, a second town hall meeting was held at Sol Feinstone Elementary School, Newtown, PA at 7:30 p.m. Affected residents including several Plaintiffs, representatives from the Energy Transfer Defendants, and representatives from PHMSA and state regulators attended the meeting.

223.    During this meeting, residents, including the La Harts, demanded that the Twin Oaks Pipeline be shut down. Plaintiff Daniel La Hart provided an opening statement on behalf of Mt. Eyre Manor residents at this meeting.

224.    The Energy Transfer Defendants then showed residents a map of what they considered to be the geographic area affected by the Pipeline Leak. This map included a line of arrows pointing in the northeastern direction, which were labeled as the "*inferred* groundwater flow direction." (emphasis added).

225.    The Energy Transfer Defendants stated that areas west and south of the Pipeline Leak were not of concern based on the flow of the groundwater toward the Delaware River. The Energy Transfer Defendants, however, then admitted that (at the time) they had not yet installed a

47

Case ID: 250303655

single monitoring well or taken any steps to identify the accurate directional flow of groundwater in the area.

226. The Energy Transfer Defendants' affirmative statements to residents about the identified affected geographic area resulting from the Pipeline Leak at the town hall meetings on February 6 and February 13 were at best misleading. At the time the Energy Transfer Defendants made these statements, in fact, the Energy Transfer Defendants had no idea when the Pipeline Leak first occurred, how long the Pipeline had been leaking into the residential neighborhood, how much product had been discharged into the surrounding underground aquifer and bedrock, whether additional points along the Pipeline were continuing to leak, or the actual direction or flow rate of the groundwater underlying the point or points of discharge.

227. The Energy Transfer Defendants intended their statements to induce a false sense of security and confidence in residents, particularly for residents whose homes were not within Defendants' arbitrarily delineated affected geographic area that was not based on adequate investigation or evidence.

228. During the February 13, 2025, town hall meeting, one resident who resided at 128 Walker Road in the affected area and across the street from where the Pipeline Leak was discovered described her experience with her well. Since 2023, she had repeatedly complained to the Energy Transfer Defendants about her concerns of contamination resulting from the Twin Oaks Pipeline, and the Energy Transfer Defendants' representatives had repeatedly stated that any oil could not have been coming from the Twin Oaks Pipeline.

229. After the discovery of the Pipeline Leak, when the Energy Transfer Defendants finally sent a contractor to inspect her well, they discovered *over twelve feet of jet fuel on top of the water in her well, and after pumping the water, estimated that fifteen feet of jet fuel had been*

48

*accumulating in the well since 2023*. The resident stated that according to the Energy Transfer Defendants' contractor, over 22 inches of jet fuel had accumulated in her well in the past week alone. Indeed, significant product continues to accrue daily in this well.

230.    Residents asked the Energy Transfer Defendants for a guarantee during the February 13, 2025, town hall meeting that the Twin Oaks Pipeline was not still leaking. The Energy Transfer Defendants responded that they were not able to provide such a guaranty at that time.

231.    The Energy Transfer Defendants did make one guarantee at the February 13 town hall: they confirmed that they would provide medical monitoring to the Mt. Eyre Manor community and surrounding neighborhoods as a result of the Leak. The Energy Transfer Defendants' representative, Matt Gordon—a Vice President of Operations and the individual whom the Energy Transfer Defendants put forward as the authority figure speaking on their behalf at the town hall—confirmed the Energy Transfer Defendants' commitment to medical monitoring. This admission is recorded on video, but to Plaintiffs' knowledge, no such medical monitoring has been conducted or offered to residents.

232.    On February 18, 2025, PADEP sent the Energy Transfer Defendants a Notice of Violation. In the Notice, PADEP stated that the release identified on January 31, 2025, has "caused free product and dissolved concentrations of petroleum-related chemicals in potable wells in the neighborhood, with some properties having contamination exceeding DEP's Statewide health standard medium specific concentrations in their drinking water." The Notice advised that the discharge constitutes a violation of the Pennsylvania Clean Streams Law, 35 P.S. § 691.401, and that such a violation amounts to unlawful conduct within the definition of the law and is subject to civil enforcement.

Case ID: 250303655

233.    On February 19, 2025, counsel for the Energy Transfer Defendants responded to the NOPSO issued by PHMSA. The Energy Transfer Defendants denied and disputed several of the preliminary factual findings contained in the NOPSO. In doing so, the Energy Transfer Defendants admitted that "there is not sufficient evidence at this time to conclude how long the Affected Pipeline was leaking." The Energy Transfer Defendants stated that they did not have evidence of an ongoing leak, but also that their investigation was ongoing. The Energy Transfer Defendants did *not* state that they had sufficient information to rule out a continuing release of aviation fuel and other contaminants from the Pipeline into the local environment.

234.    On February 27, 2025, a third town hall meeting was held again at the Sol Feinstone Elementary School at 7:30 p.m. Affected residents including Plaintiffs, regulators, local officials, and representatives of the Energy Transfer Defendants were present at the meeting.

235.    During the February 27 town hall meeting, Defendant Energy Transfer's Joe McGinn, Vice President of Public Affairs, stated: "**This release happened, and it's our fault that it happened. This was not a third-party damage issue. We recognize that. We apologize for it.**" He further stated that Energy Transfer's "**focus and goal is to restore the community to its original state**."

236.    The Energy Transfer Defendants' representatives stated at the February 27 town hall meeting that their initial estimate of 156 barrels lost was based on their understanding that federal law required reporting within 48 hours of discovering a leak. They admitted that, at the time of their representation to PHMSA, they had no evidence-based factual basis for the reported amount and that they still lacked a reliable estimate of the volume discharged into the bedrock and aquifer beneath the Mt. Eyre Manor neighborhood in Upper Makefield Township.

Case ID: 250303655

237. This demonstrates that Defendants—including the Delta Defendants and PBF Defendants—fail to maintain proper and adequate leak detection and monitoring systems for the Twin Oaks Pipeline and the petroleum products transported through it.

238. On February 28, 2025, Pennsylvania Governor Josh Shapiro wrote a letter to U.S. Transportation Secretary Sean Duffy, requesting expedited action from PHMSA in response to the Pipeline Leak. In his letter, Governor Shapiro noted that "Sunoco has not demonstrated adequate ability to detect leaks and take appropriate actions, given what appears to have been a significant delay between the initial indications of a leak and the response."

239. Governor Shapiro further described the Leak as "the latest incident in a long pattern of safety concerns with Sunoco and Energy Transfer pipelines in Pennsylvania."

240. On March 4, 2025, the Energy Transfer Defendants also sent to the PADEP a revised Notice of Intent to Remediate indicating that they intended only to remediate "Jet Fuel and unleaded gasoline parameters (benzene, toluene, ethylbenzene, total xylenes, methyl tertbutyl ether, isopropylbenzene, naphthalene, 1,2,4-trimethylbenzene, 1,3,5-trimethylbenzene, 1,2-dichloroethane, 1,2-dibromoethane, and lead) for Residential Statewide Health Standards in soil and groundwater." By selecting the Statewide Health Standards as their chosen cleanup standard, the Energy Transfer Defendants have confirmed that their plan is to leave their contamination in place to continue polluting Plaintiffs' and the neighborhood's water, soil, and air.

241. The Energy Transfer Defendants, accordingly, were already backtracking from their express promise and representation to the community that it is Energy Transfer's "focus and goal is to restore the community to its original state."

242. On March 5, 2025, the Energy Transfer Defendants responded to the Notice of Violation previously issued by the PADEP. Despite having been told by the PADEP to describe

51

Case ID: 250303655

"the circumstances causing the incident and how the circumstances were determined, including historical investigations of the pipeline in this area," Defendants' response was devoid of any of this information.

243.    Instead, the Energy Transfer Defendants simply recited the same limited history of inadequate responses to resident complaints that are described herein, starting in September 2023. The response did not in any meaningful way describe "the circumstances causing the incident" and has no information regarding "historical investigation of the pipeline in this area." *Id.*

244.    On March 6, 2025 (the next day), PADEP issued an Administrative Order to Defendants R&M and SPLP, directing them to respond to the Pipeline Leak and implement certain remedial actions, including the supply of bottled water and the installation of point-of-entry treatment ("POET") systems for certain residents in Upper Makefield Township, Pennsylvania.

245.    PADEP addressed its correspondence attaching the Administrative Order to Mr. Matthew Gordon, whom PADEP identified as SPLP's Vice President of Operations, and Mr. C. Gus Borkland, whom PADEP identified as Senior Director for Environmental Compliance, Emergency Planning & Asset Security at R&M. These individuals' roles and responsibilities at the respective Defendants were apparently gleaned from PADEP's prior dealings with the Energy Transfer Defendants, including prior remediation efforts in which Mr. Borkland was identified as being affiliated with R&M.

246.    PADEP's Order limited the requirement to supply bottled water to only those properties with potable groundwater wells within the Mt. Eyre Manor neighborhood topographic watershed, plus a minimum 500-foot buffer, that have concentrations of VOCs above background concentrations in the area, and limited the requirement to install POET systems to only those properties with potable groundwater wells within the Mt. Eyre Manor neighborhood topographic

52

Case ID: 250303655

watershed, plus a minimum 500-foot buffer, that have concentrations of VOCs exceeding the Maximum Contaminant Levels ("MCLs") under Pennsylvania state regulations.

247.    On March 19, 2025, the Energy Transfer Defendants submitted an Interim Remedial Action Plan ("IRAP") to the PADEP. The IRAP contained numerous exhibits with test results and other characterizations of the state of the neighborhood in the weeks following the Leak, including but not limited to the following:

    a.    Soil testing at 121 Glenwood Drive, the property where the Leak was detected, confirmed the presence of many dangerous constituents of jet fuel and other harmful contaminants, including toluene, ethylbenzene, isopropylbenzene, xylenes, phenanthrene, naphthalene, arsenic, barium, beryllium, and lead; the results were also positive for significant quantities of total hydrocarbons in the diesel range (C10-C28). *See* IRAP Attachment 4.

    b.    A summary table indicated that: at least six (6) residences had tested positive for volatile organic compounds ("VOCs") above statewide health standards or positive for the presence of LNAPL, and an additional nineteen (19) residences had tested positive for VOCs but were below the statewide health standards or had "J-value" results indicating the presence of VOCs.[5]

248.    The IRAP also included an attachment indicating the inferred general trend of bedrock features based on the Energy Transfer Defendants' analysis to date:

---

[5] In environmental testing, a "J-value" indicates that a result, while positively detected, is an estimated value.

Case ID: 250303655



IRAP, Attachment 14.

249.    The diagram identifies five residential properties, highlighted with a surrounding yellow box, where LNAPL was discovered in the private wells.

250.    As this figure demonstrates, Plaintiffs and their neighbors are directly within the zone of danger to experience ongoing and future contamination because of the Leak. Indeed, as indicated by the red lines, one of the bedrock features runs directly from 121 Glenwood Drive (the Leak location) through 114 Spencer Road, which is the La Harts' property.

251.    This bedrock trend figure also publicly revealed for the first time that LNAPL had been detected at 110 Spencer Road adjacent to the La Hart property.

252.    In the IRAP, SPLP indicated that "SPLP has installed POET systems or reimbursed landowners for the installation of POET systems throughout the Mt. Eyre neighborhood topographic watershed plus 500-foot buffer, and beyond, even though to date there are no

54

Case ID: 250303655

additional properties with sample results reflecting VOCs above the MSCs." Significantly, despite this representation, SPLP has refused to provide the Grovers with a POET.

253. On April 18, 2025, the Energy Transfer Defendants submitted a Site Characterization Work Plan ("SCWP") to the PADEP.

254. The SCWP confirmed that the Pipeline transports not just jet fuel but also "occasionally transports unleaded gasoline and diesel fuel." *Id.* at 2.

255. In the SCWP, the Energy Transfer Defendants again "estimate[d]" without factual basis that the extent of the Leak's volume was 156 barrels but did not classify what petroleum product this constituted. *Id.*

256. Defendants revealed that in addition to jet fuel LNAPL being observed at several homes in the community, additional LNAPL that "appears to be a different petroleum product" was observed at "an additional property on Spencer Road," where the La Harts reside.

257. While the Energy Transfer Defendants referenced figures and maps that purportedly revealed the locations of LNAPL observations and other important data, Defendants inexplicably redacted most of the relevant information from the SCWP, and its exhibits.

258. After receiving a Letter of Deficiency from the DEP, the Energy Transfer Defendants ultimately submitted a revised SCWP, which was not approved by the DEP until August 29, 2025.

259. On May 2, 2025, PHMSA executed a Consent Order and Consent Agreement with Defendant SPLP, directing SPLP to take specific corrective actions following PHMSA's investigation into to the Leak. These corrective actions include: (i) verification of the integrity of every Type A sleeve installed on the Twin Oaks Pipeline; (ii) submission to PHSMA within 90 days of a comprehensive plan for identifying, evaluating, and removing any Type-A sleeves whose

Case ID: 250303655

integrity cannot be assured, as well as a technical justification for any Type-A sleeves that remain on the line and a plan to implement additional integrity management measures to minimize any risks associated with their continued use; (iii) continuation of an imposed pressure restriction prohibiting SPLP from operating the Pipeline at a pressure greater than 880 psig without express written approval from PHMSA; (iv) submission within 45 days of mechanical and metallurgical testing results; submission within 120 days of a failure history evaluation and a root cause failure analysis; and (v) evaluation and improvement of the effectiveness and capabilities of Defendants' leak detection system to ensure that any future leaks of this nature are identified immediately.

260.    On May 9, 2025, the Energy Transfer Defendants updated their summary table of results of the water testing performed, up to that time, in Mt. Eyre Manor and the surrounding neighborhoods. This updated table indicated at least 7 residences had tested positive for volatile organic compounds ("VOCs") above statewide health standards or positive for the presence of LNAPL, up from 6 in the March 19th version of the table. *Id.* An additional 36 residences also tested positive for VOCs but were below the statewide health standards or had "J-value" results indicating the presence of VOCs. The number of impacted residential wells was almost double the 19 residences in these categories in the March 19th IRAP. *Id.* The increasing number of impacted homes in just seven weeks demonstrates that the magnitude and scope of contamination is only getting worse.

261.    On May 13, 2025, the PADEP responded to the Energy Transfer Defendants' SCWP and found that the submission was "deficient." PADEP requested more information on the LNAPL believed to be a different petroleum product and otherwise requested more complete information from Defendants. PADEP also faulted the Energy Transfer Defendants for their excessive and improper redaction of the figures and attachments to the SCWP.

Case ID: 250303655

262. On June 27, 2025, the Energy Transfer Defendants issued a revised SCWP. The revised SCWP failed to take into account that water table drawdowns that have been observed in residential wells in Plaintiffs' neighborhood—potentially induced by the pumping of the Energy Transfer Defendants' recovery wells—have the potential to move LNAPL from shallow to deeper levels within fractured bedrock. Instead, the revised SCWP claims that LNAPL will always only "float on the top of the water column as the well recovers from any draw down."

263. Since that time, the evidence confirms that the contamination continues to spread and has not been delineated. The most recent summary table from PADEP, dated December 26, 2025, indicates that there are now eight properties that have had their drinking water exceed statewide health standards or have had positive LNAPL detections. Moreover, now 50 residences (beyond those eight) have tested positive for VOCs within their well water, although the levels were below statewide health standards or had J-value results. As such, the magnitude and scope of contamination is only getting worse, and not better.

264. Significantly, the information produced to date confirms that Defendants' actions have inflicted harm on Plaintiffs and their community beyond the contamination of certain limited residences above MCLs under Pennsylvania state regulations.

265. Plaintiffs and every Class member have the right to clean drinking water and clean soil that are completely free of any contaminant that is found in jet fuel or the other petroleum products. Further, the 500-foot buffer, *see supra* at ¶ 246, is insufficient to safeguard Class members from injuries that Defendants have caused, as contamination has already been detected beyond this 500-foot buffer.

Case ID: 250303655

266. It is also unclear whether the figures reported on by PADEP are limited geographically by the so-called "buffer zone" to which the Energy Transfer Defendants have limited their investigation.

267. Specifically, testing has confirmed petroleum product in the Grovers' well, even though the Grovers live outside the buffer zone. Samples collected on September 11, 2025, and tested on September 20, 2025, had positive results for diesel range organics in the C10-C44 range. Sample results collected from the Grovers' residence by contractors for the Energy Transfer Defendants also had positive results for toluene.

268. There is no other plausible source for the presence of these petroleum products and constituents than the Pipeline (and, specifically, the product shipped by the Delta Defendants and/or the PBF Defendants). Indeed, the Grovers live on Swayze Road, which is to the northeast of the Leak location, in the same direction that the Energy Transfer Defendants have suggested the plume is moving.

269. Judicial intervention is necessary to impose appropriate and reasonable full protective measures and obligations on Defendants beyond the regulatory measures ordered by the PADEP, including beyond the arbitrary buffer zone.

270. Testing has now indicated that ***over 50 residences***, including Plaintiffs' residences, have already been affected and demonstrably contaminated by the Leak. The Energy Transfer Defendants' investigation is ongoing, and the number of wells that the Energy Transfer Defendants know to be impacted continues to only increase.

271. Despite this knowledge, to date, the Energy Transfer Defendants have not admitted publicly to the full scope of contamination in the Mt. Eyre Manor neighborhood and instead continue to attempt to only minimize it.

Case ID: 250303655

272.    Notably, the Energy Transfer Defendants' agents have been collecting sample in a manner which diminishes the validity of their results, and calls into question how comprehensive the testing has been.

273.    In multiple known incidences, for example, residents have requested that GES technicians taking post-treatment samples from their faucets also take samples from their wells for testing. GES technicians have responded to residents that they had instructions from the Energy Transfer Defendants not to conduct any testing of well water.

274.    On multiple occasions, water samples have tested positive for contamination, only for the Energy Transfer Defendants to dispute those results because they conflict with its narrative. For example, after sampling on November 6, 2025 indicated that multiple monitoring wells contained benzene and lead above Medium Specific Concentrations, the Energy Transfer Defendants refused to acknowledge the issue and instead conducted resampling. Following that resampling, they asserted that "the November 6, 2025 sampling results were not indicative of actual site conditions and were the result of elevated turbidity observed by the field team during the November 6, 2025 sampling event." *See* https://uppermakefield.incidentupdates.com/wp-content/uploads/sites/2/2025/12/Dec2025_RAPR_3_AUM_12-19-2025_NFT-Redacted.pdf.

275.    This repeated downplaying of positive contamination results reflects a clear and troubling pattern in the Energy Transfer Defendants' remediation approach.

**G.    Environmental Contamination Resulting from the Pipeline Leak**

276.    The Pipeline Leak has resulted in the dispersion of multiple known toxic chemicals into the surrounding environment. The full extent and make-up of the contamination is presently unknown but appear to only be increasing.

Case ID: 250303655

277. Free standing petroleum or jet-fuel product has been found on the top of the water in some residents' private wells and, as the Energy Transfer Defendants recently revealed, a petroleum product other than jet fuel was found in at least one well on Spencer Road.

278. Over twelve feet of free product was found on top of the water in the well at 128 Walker Road, directly across the street from the location of the Pipeline Leak. The Energy Transfer Defendants' contractors estimated that over fifteen feet of jet fuel had accumulated in the well since 2023. Moreover, product continues to accumulate in this well—up to the present day—despite the Energy Transfer Defendants' efforts to remove it.

279. Free-standing petroleum or jet fuel product manufactured and/or shipped by the Delta Defendants and/or the PBF Defendants was also found accumulated on top of the water in several other wells near the site of the Leak, including nearly six feet of product in the well at 121 Glenwood Drive and over three feet of product at 107 Spencer Road.

280. In addition to direct observation of product in their wells, residents continue to report detecting the odor of gasoline in their wells and in their tap water, which is a substantial nuisance that interferes with the residents' enjoyment and use of their properties.

281. For example, the residents at 105 Spencer Road smelled gasoline on their property since June 2024 and have tasted gasoline in their water.

282. The owner of the residence at 103 Spencer Road also reports having smelled gasoline on his property for a long time and has been able to smell and taste gasoline in his water used to drink, cook, and shower.

283. Residents in the affected community acutely feel the stress and anxiety associated with having detectable levels of gasoline taste and odor on their properties and their neighbors'

60

Case ID: 250303655

properties. As one resident stated, "every morning, when I turn on my water, it's a concern of mine. Is it my turn to smell fuel and taste it in my water?"[6]

284.    Other indicia of contamination, including the presence of chemicals and particulates known to be byproducts of petroleum and jet fuel, have been found in the well water and tap water of many residences in the neighborhood.

285.    Toxic chemicals and particulates resulting from Defendants' Pipeline Leak have infiltrated the aquifer and bedrock in sufficient quantities to be detected in the water of neighborhood residences, including but not limited to kerosene, benzene, ethylbenzene, isopropylbenzene, dichloroethane, trimethylbenzene ("TMB"), toluene, naphthalene, methyl tertiary-butyl ether ("MTBE"), and lead.

286.    The Twin Oaks Pipeline and the product shipped through it by the Energy Transfer, PBF, and Delta Defendants is the only potential source of these substances in the surrounding area.

287.    Kerosene is one of the most common fuel oils and a major component of jet fuel. Exposure to kerosene can lead to a wide variety of human health consequences, including respiratory issues, vision loss, liver failure, gastrointestinal issues, heart collapse, and skin burning and irritation. Kerosene exposure can also affect the central nervous system, resulting in seizures, comas, migraines, depressions, and other neurological impacts. The International Agency for Research on Cancer ("IARC") considers kerosene a possible carcinogen.

288.    Benzene is natural and a highly toxic constituent of petroleum. Due to its high odor recognition threshold, people can be exposed to excessive amounts of benzene in the air or in tap

---

[6] Energy Transfer Begins Drilling Recovery Wells on Pennsylvania Street After Fuel Leak Sparked Water, Air Safety Concerns, CBS News (Mar. 19, 2025) (available at https://www.cbsnews.com/amp/philadelphia/news/sunoco-fuel-leak-upper-makefield-pennsylvania/).

Case ID: 250303655

water without knowledge of the exposure. Benzene is a known human carcinogen according to both IARC and the U.S. Environmental Protection Agency ("EPA"). In addition to cancer, benzene exposure can result in the disruption of hematopoiesis (the body's production of blood), suppression of the immune system, and result in both skeletal and neurodevelopmental defects.

289.    TMB isomers are produced during petroleum refining processes and are used as a fuel additive in gasoline. TMB is a neurotoxin and is readily absorbed into the human bloodstream following exposure. TMB exposure can negatively impact a person's short-term memory and motor skills, induce vertigo, and cause nervousness and anxiety. TMB exposure can also cause issues with blood clotting and respiratory function.

290.    Toluene is a natural and highly toxic constituent of crude oil of products made from crude oil, including petroleum and gasoline. People can be exposed to toluene via air, water, or soil. Regardless of the exposure pathway, toluene easily passes through skin and lung barriers into the bloodstream, and can accumulate in fat tissue in the body. Toluene exposure can cause permanent nervous system damage, including incoordination, cognitive impairment, and loss of vision and hearing. Toluene exposure can also cause permanent damage to the immune system, kidneys, liver, and reproductive organs.

291.    MTBE, in contrast to other fuel and gasoline constituents, has a strong affinity for water. MTBE dissolves easily into groundwater and can migrate rapidly a great distance from the source of release, meaning it is likely to have a distinct contamination plume from other toxic chemicals released from the Twin Oaks Pipeline. MTBE does not readily biodegrade in water and will persist in the environment until remediated. MTBE at very low concentrations can affect the taste and odor of water and IARC considers it a likely carcinogen. MTBE as a fuel additive was

Case ID: 250303655

phased out of gasoline in the United States by 2006, due to its associated environmental and health concerns, and as such it is not clear why wells are testing positive after the Pipeline Leak.

292.    Lead is a neurotoxin that easily permeates the blood-brain barrier after exposure and often is difficult to detect in a person until dangerous amounts have accumulated. In adults, lead exposure through drinking water can cause reduced memory, headaches, mood disorders, joint and muscle pains, abdominal pains, and high blood pressure. Lead exposure also negatively affects the reproductive organs and can cause reduced or abnormal sperm counts and increase the risk of miscarriage, stillbirth, or premature births in pregnant women.

293.    The Energy Transfer Defendants have publicly admitted that the product shipped through the Pipeline contained lead.

294.    Symptoms and ailments resulting from exposure to these toxic chemicals and other harmful chemicals released from the Twin Oaks Pipeline can take a long time to manifest. Residents of the Mt. Eyre Manor neighborhood and surrounding communities will have to closely monitor their health, potentially indefinitely, and have and will continue to experience the accompanying fear and anxiety that comes from not being able to trust the safety of the water they drink or the air that they breathe because of Defendants' Pipeline Leak.

### H.    The Energy Transfer Defendants' Messaging Since the Pipeline Leak Has Not Matched Reality

295.    The Energy Transfer Defendants have been engaged in a multifaceted public relations campaign to downplay the severity of the Pipeline Leak and its actual and potential harms. The Energy Transfer Defendants' messaging, however, has not matched reality.

296.    For example, the Energy Transfer Defendants have now suggested that the Pipeline Leak happened in June 2024, despite residents smelling and reporting the odor of gasoline since at least September 2023.

63

Case ID: 250303655

297.    The Energy Transfer Defendants have also suggested that the Pipeline Leak was a "pinhole" and that it spilled 156 barrels or less. In reality, the Energy Transfer Defendants have admitted that they lacked a valid basis for their initial estimate of 156 barrels and have conceded that they rushed to provide a number to the government without the applicable information necessary to determine the actual volume of lost aviation fuel and other petroleum products.

298.    Because of Defendants' failure, negligence, and recklessness in failing to have a proper leak detection and monitoring system in place for the Twin Oaks Pipeline, Defendants seemingly have no known way to accurately measure the amount of product that spilled into the environment from the Twin Oaks Pipeline in the Mt. Eyre Manor neighborhood or means to determine when the Leak started.

299.    Moreover, the Pipeline Leak, when discovered, showed visibly that the Leak did not result from a "pinhole" as the Energy Transfer Defendants suggested, but rather, evidenced a leak such as from a water fountain, and that was with substantially reduced or no pressure applied to the Pipeline at the time indicating it was likely much stronger when the Pipeline was operated with full pressure.

300.    The Energy Transfer Defendants further represented to residents in the Mt. Eyre Manor neighborhood when they purchased their homes that the Energy Transfer Defendants had instituted state-of-the-art leak detection equipment with respect to the Pipeline, such that a leak like the Pipeline Leak here could never occur. These representations by the Energy Transfer Defendants to residents were false and misleading as demonstrated by the occurrence of the Pipeline Leak and the Energy Transfer Defendants' actions and follow up (or lack thereof) in response to multiple odor complaints that began at least as early as September 2023.

Case ID: 250303655

301.    In fact, the Defendants responsible for leak detection failed to have proper leak detection and monitoring systems in place or otherwise failed to ensure that one was present, with respect to the Twin Oaks Pipeline.

302.    The Energy Transfer Defendants claimed that their leak detection systems for the Pipeline were functional; but, despite residents pointing out an issue for 16 months and making numerous odor complaints, no computer system or ground testing employed by Defendants detected any leak.

303.    The Energy Transfer Defendants only finally detected and located the Pipeline Leak when they went back to review old maintenance records and then happened to excavate the portion of the Twin Oaks Pipeline where the leak occurred.

304.    The Energy Transfer Defendants have claimed that Type A sleeves are structurally sound and that they visually inspected six such sleeves, but at least 44 Type A sleeves exist on the Twin Oaks Pipeline. The Energy Transfer Defendants have still yet to physically inspect, through excavation, many of these patches on the Pipeline.

305.    Crucially, the Energy Transfer Defendants also claimed to have made a commitment to future public engagement, community, outreach, and continued participation in public meetings in Upper Makefield Township. The Energy Transfer Defendants, however, have disingenuously invoked "confidentiality" and vague "national security" concerns to deny affected residents with access to basic information and facts about the Pipeline Leak and the proposed remediation plans. The Energy Transfer Defendants' failure to engage has only increased since the residents have hired legal counsel to protect their interests, and public meetings are now only through "tele-townhalls" during which the Energy Transfer Defendants tightly control the questions presented.

Case ID: 250303655

306. The Energy Transfer Defendants' conflict between its public representations and its internal policy or preference to withhold information came to a head at the town hall meeting that took place on March 11, 2025. At this meeting, the Energy Transfer Defendants shut down any attempt to receive questions from the public, claiming that they could no longer continue to provide information merely because some residents had retained legal counsel. The Energy Transfer Defendants went so far as to offer one-on-one meetings only with residents that were *not* represented by counsel. This was a transparent scare tactic to discourage unrepresented residents from retaining legal counsel and further reflects the Energy Transfer Defendants' insensitivity to the crisis unfolding in the affected community, and their failure to take responsibility.

307. The breach in the Pipeline and resulting Pipeline Leak is the direct consequence of Defendants' reckless and negligent actions with respect to the use, oversight, operation, supervision, maintenance, monitoring, and testing of the Twin Oaks Pipeline.

308. Moreover, the Energy Transfer Defendants have continued to transport the Delta Defendants' and PBF Defendants' highly corrosive and toxic products at extremely high pressures through the Twin Oaks Pipeline. The Energy Transfer Defendants adherence to this approach, despite their knowledge that: (a) the Pipeline is nearly 70 years old and had a history of cracks; (b) there was a previously identified dent in the Pipeline at the location of the crack which was reinforced only by an approximately 30-year-old exterior sleeve which has been known to have problems from past experience; and (c) they did not have a proper monitoring and leak detection system, was a direct and proximate cause of the Pipeline Leak.

309. *For over 16 months*, despite their knowledge that the Pipeline faced a danger of corrosion and cracking, the Energy Transfer Defendants failed to properly respond to nearby odor complaints in a manner reasonably likely to detect a leak and had no sophisticated leak detection

Case ID: 250303655

equipment in place to do so, notwithstanding that the Energy Transfer Defendants were operating the Twin Oaks Pipeline in a residential neighborhood and the other Defendants were shipping petroleum products through it.

310.   In response to multiple odor complaints, the Energy Transfer Defendants presumed that no breach in their Pipeline existed based solely on a lack of abnormal dead vegetation around the Pipeline and the failure of portable gas monitors to detect fuels in the surrounding air.

311.   Facts, however, confirm the neglectful inadequacy of Defendants' leak-detection measures as they employed the above insufficient measures and concluded a non-detect based on them immediately prior to excavating the Twin Oaks Pipeline in the Mt. Eyre Manor neighborhood and visually confirming the crack and Pipeline Leak.

312.   Since discovering the Pipeline Leak in January 2025, Defendants have failed to take proper and reasonable actions to facilitate an understanding of the extent and nature of the discharge and resulting contamination. For example, Defendants, who have vast resources, failed generally to test samples of water taken directly from the wells of nearby residents for the presence of hazardous substances, and waited months to install monitoring wells.

313.   The Energy Transfer Defendants directed their contractors, generally, to avoid taking full and broad testing measures, despite knowing that such measures are reasonably necessary to identify the scope of the contamination plume and to ultimately protect the health, safety, and welfare of nearby residents.

314.   Despite failing to determine whether any ongoing leaks persist in the Pipeline, the Energy Transfer Defendants restarted operation of the Twin Oaks Pipeline on February 2, 2025, and have continuously operated the Pipeline since that date.

**I.     Recent Events and Public Statements by the Energy Transfer Defendants**

67

Case ID: 250303655

315.    The situation in Plaintiffs' neighborhood has continued to deteriorate since the La Harts filed their First Amended Complaint in June 2025.

316.    Starting in early June 2025, after drilling and installing three recovery wells directly in the middle of Mt. Eyre Manor, the Energy Transfer Defendants routinely performed work on these recovery wells, including geophysical logging and imaging, as well as routine bailing of petroleum out of the wells. This work, along with the other necessary remediation work by the Energy Transfer Defendants, has caused a significant, ongoing, and continuing nuisance to Plaintiffs and the Class.

317.    In July and August 2025, the Energy Transfer Defendants installed numerous monitoring wells throughout the Mt. Eyre Manor community.

318.    In September 2025, the Energy Transfer Defendants selected two additional properties for the installation of additional monitoring wells. The owners of one of the two residences were then shocked to learn that testing results from the newly installed wells revealed measurable values of benzene, xylenes, and naphthalene, confirming that the property is contaminated as a result of the Leak.

319.    The Energy Transfer Defendants' activities in Plaintiffs' neighborhood, including the installation of these recovery and monitoring wells, has substantially disrupted the soil, groundwater, and other conditions in Plaintiffs' neighborhood.

320.    Notably, after the recent rounds of monitoring well installations and continued operation of recovery wells, Plaintiffs and Class members have reported a substantial loss in water pressure in their homes.

Case ID: 250303655

321.    Indeed, due to a severe loss in water pressure, the La Harts were required to replace their water tank. Upon replacing the tank, the La Harts discovered the tank was contaminated with green and black materials:



322.    Subsequent water tests have revealed significant levels of Manganese contamination, which was not present before, and 1,3,5-trimethylbenzene. Additionally, the PADEP has suggested that this observed "dark particulate" is the same as that found in water and drill cuttings during the installation of monitoring wells by the Energy Transfer Defendants.

323.    Since June 2025, the La Hart residence has also been selected for sub-slab testing to determine whether any VOCs are present in the soil gas under these Plaintiffs' residences.

324.    This sub-slab testing revealed that the La Hart home had positive values for VOCs that are intruding the air in their homes in the form of soil vapors. The La Harts have also experienced increased radon levels since this soil gas testing was performed.

325.    The Energy Transfer Defendants have publicly revealed that one or more additional "anomalies" exist on the Twin Oaks Pipeline, including within the radius of the proposed Class as

Case ID: 250303655

alleged herein. Specifically, during a July 31, 2025, meeting with Upper Makefield Township, Energy Transfer's Matt Gordon revealed that certain anomalies would require *excavation* of the Pipeline but initially suggested that he did not believe that any excavations would occur within Upper Makefield Township. However, on August 5, 2025, the Energy Transfer Defendants revealed that they needed to undertake multiple "dig sites" in Upper Makefield.

326.    On August 6, 2025, PHMSA confirmed that there would be *twelve* excavations east of the Energy Transfer Defendants' Bucks pump station, including several in Upper Makefield.

327.    Some of this excavation work was performed near Taylorsville Road, towards the direction of the Delaware River. A dig lasting several days was performed in October, resulting in a temporary shutdown of the Pipeline. The excavation work was completed, with the Pipeline then reactivated, in early to mid-November 2025.

328.    Much of the excavation work near Taylorsville Road, including the operation of heavy machinery and removal of segments of the pipeline, was performed at night.

329.    These excavations are close to the Grover residence where petroleum product was found around the time the excavation work was performed.

330.    The Grovers suspect a link between the "anomalies" that required excavation and repair, and the petroleum product found at their property.

331.    Meanwhile, on September 2, 2025, the Energy Transfer Defendants issued their Interim Site Characterization Report ("ISCR").

332.    The ISCR does not answer several critical questions, much like the Energy Transfer Defendants' other conduct throughout this entire episode. These issues include at least the following:

Case ID: 250303655

a. The ISCR does not indicate full horizontal delineation of the Leak's impact or provide any timeline for this delineation to be completed.

b. The ISCR does not provide any indication of the full horizontal or vertical extent of dissolved VOCs.

c. The ISCR does not provide any map of the known plume or identify its rate of movement.

d. The ISCR does not provide a revised spill volume.

e. The ISCR does not describe the means, methods, and procedures used to determine the volume of the release.

f. The ISCR does not identify an estimated actual start date of the Leak.

g. The ISCR does not identify the amount of product put into the Pipeline prior to the Leak or the amount retrieved after the Leak.

h. The ISCR does not include a forensic hydrocarbon analysis of the Light, Non-Aqueous Phase Liquids, LNAPL, obtained from recovery wells adjacent to the release area or from residential wells.

i. The ISCR does not evaluate the impact of pumping domestic wells on the extent, direction, and rate of movement of the regulated substances released into the environment from the pipeline release.

j. The ISCR does not address the worsening water pressure issues that are plaguing the community.

k. The ISCR appears to cherry pick data regarding how much petroleum product is being bailed from the well at 128 Walker Road, isolating certain dates of recovery data to artificially suggest that no more product is present.

Case ID: 250303655

333. And while the Energy Transfer Defendants' have provided a Comment-Response Document, this document also does little other than deflect and delay fulsome responses to the above issues.

334. On November 21, 2025, the PADEP issued a Letter of Deficiency in response to the ISCR. The Letter indicated the agency's concerns that, among other things:

    a. SPLP still has yet to share its assessment of the date the Leak began.

    b. Despite SPLP's representations, "SPLP does not yet have an adequate data set to determine the lateral extent of LNAPL is shrinking, as the full lateral extent of LNAPL is not known."

    c. "The existing monitoring well network is insufficient to characterize the nature and extent of dissolved-phase VOC contamination related to the pipeline release."

    d. The ISCR does not sufficiently characterize the horizontal extent of groundwater contamination.

    e. SPLP's assumptions of the groundwater flow direction are based on an insufficient and contradictory data set, and "SPLP has not generated an adequate dataset to make informed interpretations" as to the flow of groundwater in and around the affected area.

335. These severe gaps in the ISCR confirm that the Energy Transfer Defendants are not and have not adequately and fully remediated Plaintiffs' properties and neighborhood. Indeed, now almost a year since confirming the presence of the Leak, the Energy Transfer Defendants still do not know when the Leak began, the size and scope of the contamination plume, or the direction or migration routes of the plume.

Case ID: 250303655

336. Confirming these gaps exist, on January 5, 2026, the Energy Transfer Defendants issued a response to the PADEP's Letter of Deficiency, wherein the Energy Transfer Defendants stated it would perform additional testing to laterally delineate the scope of the Leak, including through forthcoming "mise-a-la-masse" geophysical testing and installation of additional wells. However, this January 5 response largely fails to remedy the many deficiencies in the ISCR. The Energy Transfer Defendants' January 5 response also acknowledges that "the hydrogeological flow conditions in the area of the Mt. Eyre Manor neighborhood are complex" and that therefore the Energy Transfer Defendants still do not understand the full scope of how the Leak has migrated.

**J.        Harm to Plaintiffs and Class Members**

337. As described throughout this Complaint, Plaintiffs and Class members have been severely and negatively impacted and harmed by Defendants' conduct.

338. The entire impacted community relies on well water drawn from the underlying aquifer for their water needs. This aquifer is now contaminated. As such, the entire community, including Plaintiffs, has suffered tangible, physical environmental injury as a result of the Pipeline Leak, for which damages, including punitive damages, are owed.

339. Confirming that the aquifer is contaminated, numerous residents have found Defendants' product, jet fuel, or other petroleum products, floating on top of and contaminating their private wells, with multiple residents having significant amounts of jet fuel accumulated in their wells, and other houses testing positive for contamination related to jet fuel, petroleum products, and/or cleanup efforts.

340. Indeed, the Energy Transfer Defendants have admitted to being responsible for the Leak and the resulting release of jet fuel and other petroleum products into the environment and represented that they would restore the local environment back to its original condition. In fact,

Case ID: 250303655

given the extent and circumstances of the Leak, it is likely not possible for Defendants to restore the environment back to its original condition.

341. Testing has shown that water samples collected from Plaintiffs' homes or monitoring wells on their property, and from nearby homes, have tested positive for petroleum hydrocarbons and/or other chemicals commonly found in jet fuel and petroleum products.

342. The Pipeline Leak has and will continue to cause financial harms to Plaintiffs and Class members, including the expenditure of out-of-pocket costs resulting from the Pipeline Leak that must be reimbursed by Defendants.

343. Examples of these out-of-pocket costs include, without limitation:

    a.    the costs to engage and pay contractors, testing companies, and inspectors;

    b.    the costs of installation of remedial or additional water treatment systems;

    c.    the costs of maintenance of water treatment systems, including purchasing and maintaining filters associated with water treatment systems;

    d.    the costs of damage and remediation to private wells;

    e.    the costs of remediation of soil;

    f.    the costs of remediating other damages caused by the Pipeline Leak;

    g.    the costs of remediating and/or replacing pipes and fixtures that have been contaminated as a result of the Pipeline Leak;

    h.    the costs of temporary housing;

    i.    the costs of commuting to other locations for the purpose of showering or doing laundry;

    j.    reimbursement of mileage associated with attending meetings concerning the Pipeline Leak;

Case ID: 250303655

k.   the cost of any increased insurance premiums;

l.   the cost of lost time-value from having to take off work due to the Pipeline Leak;

m.   the cost of childcare while attending meetings related to the Pipeline Leak; and

n.   the cost of any medical costs incurred by Plaintiffs related to the Pipeline Leak.

344.   Defendants are responsible to pay all past and future costs associated with complete environmental restoration and remediation of all contamination caused by the Leak to the greatest extent possible, and to all property, water, and air, including, without limitation, to the environment, to Plaintiffs' and Class members' real and personal property, to wells that have been contaminated, to pipes that have been contaminated and need to be replaced, to fixtures that have been contaminated and need to be replaced, to soil that has been contaminated, to gardens that have been contaminated, and to all other property belonging to Plaintiffs and Class members that has been affected by the Pipeline Leak.

345.   While the Energy Transfer Defendants have paid for some carbon filtration systems for some residential wells, it has not been sufficient.

346.   Indeed, there has been positive detection of petroleum at the Grover residence, yet Defendants refuse to reimburse them for a carbon filtration system based on an arbitrary "buffer zone" that has no valid basis.

347.   All three of Plaintiffs' properties have suffered from contamination that has been confirmed by testing results.

75

Case ID: 250303655

348. Plaintiffs and Class members have also suffered additional contamination and nuisance from Defendants' remediation activities, evidenced in part by the La Harts' and other Class members' water pressure issues, and contaminated water tank.

349. The contamination of the aquifer and private wells throughout Mt. Eyre Manor and the surrounding area is to such a significant degree that relevant governmental authorities, including Upper Makefield Township, have begun exploring options for the long-term replacement of private wells by an alternative water source.

350. This feasibility study, released to residents during a meeting on December 15, 2025, indicated that a municipal well and distribution system was estimated to cost approximately $9 million, with that cost directly passed on to roughly 150 households in the community (whose residents are all members of the proposed Class), for a total cost of approximately $60,000 each. Even if this cost was financed and annualized over 30 years through municipal bonds or some similar funding source, an approximate annual cost to these households would be $3,921 or more.

351. Even the more affordable options investigated by the feasibility study, such as a connection to an existing water source or the extension of a franchise held by a private water company, would still result in annual costs to each household of at least $1,000.

352. These costs are directly attributable to the conduct of Defendants, who should be liable to these households and directly pay the cost of this alternative water source. Indeed, while a range of options were explored, Upper Makefield Township officials explained at the December 15, 2025 meeting that the least expensive option (extension of a private water company's PUC franchise) runs the risk that the application will be denied because an alternative funding source exists to provide safe drinking water to the community. As Upper Makefield Township officials indicated at the meeting, Defendants are that alternative funding source.

Case ID: 250303655

353.    Plaintiffs' and Class members' properties have also suffered from offensive and disagreeable odors and noise that have pervaded the neighborhood and permeated their properties.

354.    Plaintiffs and Class members have also suffered from the invasive and near constant sound and light pollution that attends Defendants' remediation efforts. The Energy Transfer Defendants' contractors operate heavy machine equipment throughout the neighborhood, including at night and during weekends. The constant presence of these contractors, and the lights and sounds of their machinery, materially disrupt Plaintiffs' and Class members privacy and ability to enjoy their homes in peace.

355.    Plaintiffs and Class members have suffered loss of sleep, disrupted daily routines, loss of privacy, and increased stress and anxiety as a direct result of Defendants' ongoing remediation activities, none of which would be necessary but for Defendants' negligence that resulted in the Pipeline Leak.

356.    Plaintiffs and Class members' properties have also consistently experienced a loss of water pressure in their homes since the Energy Transfer Defendants' contractors began installing and operating dozens of new wells throughout the neighborhood.

357.    Plaintiffs and Class members who own their homes have also suffered from diminution of the value of their residences caused by the Pipeline Leak.

358.    Certain Class members who have attempted to sell their properties have already had potential buyers walk away from a potential sale because of the Pipeline Leak and, as a result, have had to substantially lower the list prices of homes currently on the market.

359.    Plaintiffs and Class members have suffered from the loss of use and enjoyment of their real and personal property caused by the Pipeline Leak. Plaintiffs and Class members cannot enjoy their property in the same manner as prior to the Pipeline Leak.

Case ID: 250303655

360.    As a direct and proximate result of Defendants' negligent, reckless, and willful conduct in causing and/or failing to prevent the Leak of jet fuel into the ground and groundwater supply, Plaintiffs and the proposed Class members have suffered and continue to suffer ongoing severe emotional distress. Plaintiffs reside in a community that is entirely dependent on well water drawn from a shared aquifer, which is now contaminated by toxic substances including hydrocarbons, volatile organic compounds, and known carcinogens present in jet fuel.

361.    Since the revelation of the Leak and subsequent confirmation of groundwater contamination, Plaintiffs and the proposed Class members have experienced profound anxiety, fear, and uncertainty regarding the safety of their homes, their health, and the wellbeing of their families. Some residents have reported symptoms potentially linked to exposure to contaminated water, further exacerbating psychological distress. Plaintiffs live with the daily trauma of having to use bottled water (or water they are not confident is safe) for drinking, cooking, and hygiene, and the persistent fear that they or their loved ones may suffer long-term health consequences due to ingestion or exposure to toxic chemicals.

362.    In addition to the tangible disruption of daily life, Plaintiffs experience ongoing emotional harm from the loss of security, trust, and peace of mind in their environment. The knowledge that their community has been poisoned — and that this contamination may persist for years or decades — has caused deep emotional anguish. Plaintiffs and members of the proposed Class report symptoms of depression, sleeplessness, and post-traumatic stress, as they previously viewed their homes as safe havens now rendered unsafe by Defendants' conduct.

363.    The La Harts live less than 500 feet from the location where the Leak was detected and are in between that location and the confirmed highly contaminated homes on Spencer Road. Indeed, Plaintiffs themselves each live on contaminated property that sits above a contaminated

78

Case ID: 250303655

aquifer. As such, Plaintiffs are at immediate risk of physical injury and are clearly within the zone of danger presented by the Pipeline Leak.

364.    Exposure to the substances released from the Pipeline, whether through ingestion, inhalation, or dermal exposure, places all affected residents at increased risk of severe health impacts, including cancer, thus necessitating medical monitoring.

**K.    Harm Suffered by Named Plaintiffs**

365.    Plaintiffs Daniel La Hart and Katherine La Hart moved to the Mt. Eyre Manor neighborhood in 2016 and live in their home with their two young children.

366.    Plaintiff Daniel La Hart, in addition to being Katherine's husband and father to their children, is a highly educated individual who works in the intelligence community, serving as an Intelligence Superintendent (Chief Master Sergeant rank) for the New Jersey Air National Guard and as a director of data science for a company in the private sector. Daniel is also a former member of the U.S. Air Force Reserve and a former firefighter.

367.    Plaintiff Katherine La Hart, in addition to being Daniel's wife and mother to their children, has a Ph.D. in business administration and works in sales recruitment and onboarding at a Fortune 500 insurance and financial services company.

368.    Prior to learning of the Pipeline Leak, the La Harts were in love with their community and felt that their home located at 114 Spencer Road was their "forever home" where they would live for a lifetime.

369.    The La Harts and their young children used their well water for everything including drinking, cooking, washing dishes and clothes, showering (indoors and outdoors), baths for their children and animals, watering their gardens, cleaning the cars, filling their pool, letting

Case ID: 250303655

their children run in the hose water and down their water slide, and providing water to their dog, cat, and chickens to drink.

370.    In late 2024, the La Harts invested approximately $150,000.00 to pay for a series of renovations to their home that they scheduled to start in April 2025, including the installation of new windows, siding, doors, replastering the pool, and more, because they wanted to invest in their forever home and their community that they loved.

371.    The La Harts, like many residents of the Mt. Eyre community, have experienced a significant loss in water pressure as a result of the Leak, to the extent that the La Harts now need to replace their submersible well pump. The cost estimate for this replacement is nearly $15,000.

372.    Plaintiffs Jerry and Justine Zacharatos have lived in the Mt. Eyre Manor neighborhood since 2019.

373.    The Zacharatos moved to Mt. Eyre Manor with the expectation they could raise young children in what they thought was an ideal residential community and on an ideal property. They similarly felt that their home located at 126 Walker Road was their "forever home" where they would live for a lifetime.

374.    Two of the Zacharatos' three children were born during the time that the Zacharatos have lived in Mt. Eyre Manor.

375.    However, with no firm information on the extent of the plume or the scope of potential contamination, the Zacharatos live in constant fear that the water they drink, cook with, and bathe in or the air they breathe is contaminated. The Zacharatos also fear for any health effects they may have suffered, especially their young children. The Zacharatos used their private well water for all of their daily water needs, including making baby formula for their young children and filling up an inflatable pool during summers.

Case ID: 250303655

376.    The Zacharatos' fear increased when the Energy Transfer Defendants contacted them in order to install two monitoring wells on the Zacharatos' property (in addition to other monitoring wells the Energy Transfer Defendants had already installed in the street adjacent to the Zacharatos' property).

377.    These monitoring wells have confirmed that the Zacharatos' property is contaminated.

378.    The Grovers have lived in their home on Swayze Avenue since 2001; the home is by the Delaware River, approximately a mile from the release point of the Leak. The Grovers only learned of the petroleum product present on their property recently, around the same time that the Energy Transfer Defendants were performing excavation work to investigate so-called "anomalies" in the late summer and early fall of 2025.

379.    The Grovers contacted the Energy Transfer Defendants immediately after learning that their water had tested positive for the presence of petroleum products. Fearing for their health and safety, the Grovers asked the Energy Transfer Defendants to install a POET carbon filtration system for their residential water, or to at least provide them with consistent access to bottled water.

380.    On November 6, 2025, one of the Energy Transfer Defendants' employees called Christopher Grover to inform him that the request for a POET system and bottled water, inexplicably, had been denied, and that any measures the Grovers took to protect themselves from their contaminated water would have to be at their own expense.

381.    The Pipeline Leak has caused these Plaintiffs and the proposed Class to suffer out-of-pocket economic losses including, among other things, significant childcare costs, mileage associated with attending meetings concerning the Pipeline Leak, and significant lost time-value

81

Case ID: 250303655

from having to take off work to attend meetings, be present for testing, and to perform community outreach due to the Pipeline Leak.

382. The Pipeline Leak and resulting contamination has caused Plaintiffs to suffer diminution to the value of their real property. The presence of the Pipeline Leak and resulting environmental contamination has tangibly decreased the value of Plaintiffs' property and that of the surrounding affected community.

383. It is likely that Plaintiffs and the Class are now overpaying property taxes as a direct result of the diminution of value to their property caused by Defendants' conduct.

384. Confirming that significant diminution in property values has occurred throughout the Mt. Eyre Manor community, local taxing authorities (including without limitation Upper Makefield Township) have reassessed the taxable value of numerous homes downwards by 10 to 15 percent.

385. The Pipeline Leak has caused Plaintiffs' properties to go from being Plaintiffs' idyllic forever homes to albatrosses that Plaintiffs will struggle to sell for close to their fair market values but for the Leak. Plaintiffs estimate that they each have suffered diminution of value of their home in the hundreds of thousands of dollars. Who would want to purchase a home in the Mt. Eyre Manor neighborhood given the known existence of the Pipeline Leak and resulting contamination?

386. But at the same time, as a direct result of the Pipeline Leak, Plaintiffs, like other Class members, have been forced to consider the possibility of leaving what they thought was their forever home and moving to another location that has not experienced the type of harms that have devastated Mt. Eyre Manor. Plaintiffs do not want to confront or deal with the risk that the water in their neighborhood and their home is dangerous and putting them and their family, children, and

Case ID: 250303655

guests at risk, and have been unfairly forced by Defendants to think about this every day, which is causing Plaintiffs severe mental anguish.

387.    Moving would cause significant hardship to Plaintiffs, including the La Harts and Zacharatos who have young children. Plaintiffs would also incur significant expenses by having to uproot themselves and move to a comparable home of comparable square footage, acreage, amenities, neighborhood, and school district, all of which is exceedingly difficult to replicate for what was previously an idyllic, much desired community.

388.    With respect to Plaintiffs' private wells, the Pipeline Leak has caused irreparable damage to Plaintiffs' faith in their ability to fully use and enjoy their water.

389.    The La Harts' property, like several other members of the proposed Class, has already tested positive for MTBE and lead above background concentration levels, while the Zacharatos' property has tested positive for MTBE, lead, benzene, toluene, and other hydrocarbons. The Grovers' well water has also tested positive for petroleum hydrocarbons.

390.    Like each of the other residents throughout Mt. Eyre Manor, Plaintiffs now also live above a contaminated aquifer that continues to migrate and further contaminate the groundwater, soil, and air. This contaminated aquifer constitutes a presently existing physical harm to Plaintiffs' real property.

391.    Defendants' own inferences about the composition of the fractured bedrock beneath Plaintiffs' properties indicate that a pathway for groundwater flow exists that runs from 121 Glenwood Drive, the site of the Leak, directly through the La Harts' property.

392.    The Zacharatos and La Harts are directly within the zone of danger presented by the Leak given that their properties are located directly in between properties with confirmed free petroleum product or LNAPL found in wells (such as 110 and 108 Spencer).

Case ID: 250303655

393.    Indeed, it is difficult to reach any inference other than that Defendants' petroleum product contaminated and traveled through or below Plaintiffs' land to reach these other contaminated properties.

394.    The Grovers are also within the zone of danger based on the Energy Transfer Defendants' inferences about the pathway for plume movement, which would lead directly towards the Grover residence, and that residence has now indeed tested positive for petroleum.

395.    Additionally, the La Harts and their neighbors on Spencer Road live directly above the trench for the former 8-inch version of the Pipeline. To the extent the existence of this alternate trench has contributed to the direction the plume has traveled, Defendants' petroleum product traveled directly through Plaintiffs' land.

396.    It will always be on the forefront of Plaintiffs' minds that the plume of the Pipeline Leak could affect (or is affecting) their property at any time, or that the Pipeline could leak again at any point in time, and/or that the Pipeline could have additional undiscovered leaks, and so Plaintiffs could be putting the health of their family, children, friends, guests, and pets at risk merely by continuing to live at their current residences.

397.    Worsening the situation, the Energy Transfer Defendants have bought residential homes in the Mt. Eyre Manor neighborhood, starting with 108 Spencer Road, which is only two houses away from the La Harts, for the purpose of drilling additional monitoring and/or recovery wells as a direct result of the Pipeline Leak.

398.    Plaintiffs and the Class are concerned that the Energy Transfer Defendants will continue to buy additional homes in the community and that any home bought by the Energy Transfer Defendants will eventually lay vacant and be a further nuisance, further driving down property values.

84

Case ID: 250303655

399.    The Energy Transfer Defendants' activities at 108 Spencer Road (one of the homes they purchased) became an epicenter for noisy, odorous, and highly bothersome activity that continuously disturb and disrupt the daily lives of the Plaintiffs and Class members, all as a result of Defendants' Pipeline Leak:



400.    Confirming that Plaintiffs and the proposed Class have suffered concrete, particularized, and significant loss of property value, the Energy Transfer Defendants have also taken affirmative steps to obscure the market impact of the diminution of value Defendants have caused. With respect to at least one property in Mt. Eyre Manor that sold, the Energy Transfer Defendants acquired a "right of first option and right of rejection" over the property, defined as follows:

> This property is subject to a right of first option and right of rejection held by Sunoco Pipeline L.P. ("SPLP"). Under this agreement, if the Seller receives a bona fide offer to purchase the property, the Seller must notify SPLP of the terms of the offer. If the offer is below a certain price SPLP shall then have the right to (i) direct the Seller to reject the offer; or (ii) make an offer to purchase the Property for an amount greater than the amount contained in the offer. If the offer is above a certain price, SPLP shall only have the right to make an offer to purchase the Property for

Case ID: 250303655

an amount greater than the amount contained in the offer. SPLP has two (2) business days from receipt of the offer or any counter-offer to exercise its rights. SPLP's rights under this agreement are valid until January 19, 2026. Note that nothing in the agreement prevents a counter-offer(s) from the original offeror.

While the full contours of the agreement are unclear because they reference an unspecified "certain price" against which offers are compared, the Energy Transfer Defendants' right to *unilaterally* "direct the Seller to reject" any offer below that price—a right the Energy Transfer Defendants undoubtedly paid the subject homeowner for—could be used by the Energy Transfer Defendants in an attempt to mask the true current market value of the property. That the Energy Transfer Defendants were willing to pay to acquire this right confirms that significant, quantifiable diminution of value has taken place throughout Mt. Eyre Manor and the surrounding neighborhoods.

401.    Additionally, the Energy Transfer Defendants have installed recovery wells and monitoring wells on the street on Glenwood Drive and elsewhere throughout the neighborhood (in addition to on the Zacharatos property). The installation and use of these wells have created yet more epicenters for noisy, odorous, and highly bothersome activity that will and have disturbed and disrupted the daily lives of the Plaintiffs and Class members, as the Energy Transfer Defendants use heavy machinery, like sonic and air rotary drill rigs, producing sound levels up to 99 decibels:

86



402.    While installation of some monitoring and recovery wells may be necessary given the magnitude of the Leak, the Energy Transfer Defendants have inexplicably chosen to drill such wells to a depth of only approximately 70 feet, even though the contamination to date suggests that petroleum product exists far deeper underground.

403.    Even after their installation, the Energy Transfer Defendants have not properly maintained the recovery and monitoring wells they installed in Plaintiffs' neighborhood. They frequently leave the wells uncapped, causing a significant annoyance and dangerous eyesore and to Plaintiffs and Class members:

Case ID: 250303655



404.    Moreover, the Energy Transfer Defendants, to date, have still failed to delineate the scope and direction of the plume, even though they have now installed over 20 monitoring wells, including two on the Zacharatos property. The locations of the monitoring wells confirm that even Defendants understand there is contamination and a grave risk of ongoing contamination to Plaintiffs' properties.

405.    The Energy Transfer Defendants have also relied heavily on electrical resistivity imaging ("ERI") to determine where the contamination may be by identifying inferred fractures. However, the validity of the inferred fractures is highly questionable. Interpretation of fractures within bedrock from ERI models are commonly based on low resistivity features in the bedrock

Case ID: 250303655

(because fractures within bedrock typically contain more water than surrounding rock and, therefore, conduct electricity relatively better). Interpreting low resistivity zones in bedrock as fractures may be appropriate if data quality is good and there is no infrastructure (such as buried metallic pipes) distorting the data. However, as is common in urban or suburban settings, the ERI models collected in the Mt. Eyre Manor neighborhood show numerous "low resistivity anomalies" that are consistent with the anomalies produced by buried metallic pipes or electrically grounded equipment/powerlines. Based on the limited public data available, a number of these anomalies have wrongly been interpreted as inferred fractures based on utility interference.

406.   For the reasons alleged herein, the Pipeline Leak has devastated the Mt. Eyre Manor neighborhood and surrounding affected communities.

## CLASS ACTION ALLEGATIONS

407.   Plaintiffs bring the class action allegations in this Complaint for all environmental restoration and remediation, economic losses suffered by Plaintiffs and Class members, medical monitoring, injunctive relief, and declaratory relief.

408.   Plaintiffs bring this action on behalf of themselves and on behalf of the following Class pursuant to Pennsylvania Rules of Civil Procedure 1702, 1708 and 1709:

> **All Pennsylvania citizens who owned, rented, and/or resided in real properties in Pennsylvania within the following boundaries in Upper Makefield Township and Lower Makefield Township: West of Delaware River; East of Dolington Acres Road or Dolington Road; South of Aqueduct Road or Wilkes Street; and North of Dyers Creek or Kimbles Road, during the time period from September 1, 2023 to the present, as represented in Figure 3 below (the "Class").**

89

Case ID: 250303655



409.    Additionally, all Plaintiffs seek to represent a subclass (the "Contamination Subclass") defined as follows:

> **All members of the Class whose property has tested positive for the presence of LNAPL or for any volatile organic compounds, lead, or other constituents of any petroleum product (including J-value results) since January 1, 2025.**

410.    Additionally, the La Harts and Zacharatos seek to represent a subclass (the "Public Water Subclass") defined as follows:

> **All members of the Class whose property was deemed by the Upper Makefield Township Mt. Eyre Water Alternatives Study as a "ratepayer" that would bear a portion of the cost of an alternative water source to be installed in Mt. Eyre Manor.**

411.    Excluded from the Class are Defendants and their subsidiaries or affiliated entities. Also excluded from the Class is any judge or magistrate assigned to this case, along with their family members and the members of their respective staffs.

90

Case ID: 250303655

412.    Plaintiffs reserve the right to further define and modify the definition of the Class following further factual investigation and discovery.

413.    **Numerosity.** Members of the Class and each Subclass are so numerous that joinder is impracticable. Plaintiffs estimate there are at least one thousand members of the Class and several hundred members of each Subclass. As such, a class action is superior to other methods of adjudication due to its capacity for efficiency and judicial economy.

414.    **Typicality.** Plaintiffs' claims for environmental restoration and remediation, economic damages, medical monitoring, injunctive relief, and declaratory relief are typical of the claims of the Class members. Plaintiffs and all Class members have been damaged by the same wrongful conduct by Defendants.

415.    Plaintiffs will fairly and adequately protect and represent the interests of the Class and the proposed Subclasses. The interests of Plaintiffs coincide with, and are not antagonistic to, those of the Class. Accordingly, and by proving their own claims, Plaintiffs will prove other Class members' claims as well.

416.    **Adequacy of Representation.** Plaintiffs are members of the Class and Subclass they seek to represent. Plaintiffs are represented by the undersigned counsel who are experienced and competent in the prosecution of class actions involving chemical/toxin contamination. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiffs can and will fairly and adequately represent the interests of the Class and have no interests that are averse to, conflict with, or are antagonistic to the interests of the Class.

417.    **Commonality and Predominance.** There are numerous questions of law and fact common to the Class that predominate over any individual issue, including, but not limited to:

91

Case ID: 250303655

a.    Whether Defendants' conduct as alleged herein violates the law as stated in the Causes of Action set forth below that are applicable to the Plaintiffs and the Class;

b.    Whether Defendants owed a duty to the Class;

c.    Whether Defendants breached any duties owed to the Class;

d.    Whether Defendants were negligent and/or reckless in failing to properly and safely oversee the operation, supervision, maintenance, monitoring, and testing of the Pipeline;

e.    Whether Defendants allowed a release of toxic and hazardous substances from the Pipeline into the underlying bedrock and aquifer under where the Pipeline Leak occurred or within the plume area of the Pipeline Leak;

f.    Whether the release or threat of release of toxic and hazardous substances from Defendants' Twin Oaks Pipeline reduced or diminished the value of the Class members' real property;

g.    Whether the release or threat of release of toxic and hazardous substances from Defendants' Twin Oaks Pipeline deprived the Class of the rights to use and benefit from their real property interest, free of interference; and

h.    The appropriate measure of restitution and/or measure of damages to the Class members.

418.    The questions of law and fact common to the Class predominate over any questions of law that may affect only individual class members, because Defendants acted on grounds generally applicable to the entire Class.

419.    **Superiority**. Class treatment is a superior method for the fair and efficient adjudication of the economic damages associated with this controversy because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their

Case ID: 250303655

common claims in a similar forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense. The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that likely would be impracticable to pursue individually, substantially outweigh any difficulties that may arise in the management of the class aspects of this action.

## CAUSES OF ACTION

420. All of Plaintiffs' causes of action, whether asserted individually or on behalf of the Class, are brought against all Defendants.

### COUNT I
### NEGLIGENCE
### Against All Defendants
### (Individually and on Behalf of the Class)

421. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

422. Defendants' actions as alleged herein were negligent.

423. The Energy Transfer Defendants, including through the Contractor Defendants, are responsible for owning, overseeing, operating, supervising, and maintaining the Twin Oaks Pipeline, and are responsible for its safe operations, including, without limitation, by incorporating an appropriate monitoring and leak detection system.

424. The Energy Transfer Defendants and Contractor Defendants failed to use reasonable care in the oversight, operation, maintenance, hiring, monitoring, and repair of the Twin Oaks Pipeline and continued to transport their own and other Defendants' hazardous and toxic substances through the Pipeline without ensuring that it was operating in a safe condition.

425. The Energy Transfer Defendants failed to use reasonable care in responding to multiple odor complaints over a period of at least 16 months and detecting whether a leak in the Pipeline had occurred.

Case ID: 250303655

426.    The Energy Transfer Defendants and Contractor Defendants failed to use reasonable care in identifying the scope of the Leak or of the resulting pollution plume once the Pipeline Leak had been identified.

427.    The Energy Transfer Defendants failed to use reasonable care to contain the plume and resulting damages caused by the Pipeline Leak.

428.    The Energy Transfer Defendants and Contractor Defendants failed to use reasonable care in employing a safe and reliable monitoring and leak detection system with respect to the Pipeline.

429.    The Energy Transfer Defendants and Contractor Defendants knew or should have known that their failure to properly operate, maintain, and repair the Pipeline, and to respond to the Pipeline Leak, would allow the release of dangerous and toxic substances into the environment in a residential neighborhood, and, as a result, contaminate the environment and cause the residents of the affected geographic area to suffer damages as alleged herein.

430.    The Energy Transfer Defendants and Contractor Defendants knew or should have known that their failure to exercise reasonable care in responding to the Pipeline Leak would impede the ability of regulators and affected residents to understand the scope of the danger and to effectively mitigate its impacts.

431.    The Delta Defendants and the PBF Defendants owed a duty to Plaintiffs and the Class to exercise reasonable care in the handling, shipment, batching, scheduling, and transportation of their petroleum products through the pipeline.

432.    The Delta Defendants and the PBF Defendants owed a duty to evaluate and mitigate risks associated with the chemical, physical, and corrosive properties of its petroleum products when transported under expected pipeline conditions, including the use of Type A sleeves.

Case ID: 250303655

433.    The Delta Defendants and the PBF Defendants breached their duties by, *inter alia*, failing to exercise reasonable care in the shipment, handling, batching, and transportation of petroleum products; failing to evaluate or control the foreseeable risks associated with the interaction of its products and the Pipeline; and failing to take reasonable steps to prevent product releases.

434.    The Delta Defendants' and the PBF Defendants' breaches of duty were a direct and proximate cause of the release of petroleum product and the resulting contamination of Plaintiffs' properties.

435.    As a direct and proximate result of the Delta Defendants' and the PBF Defendants' negligence, Plaintiffs suffered property damage, loss of use and enjoyment, diminution in property value, and other harms.

436.    Defendants' negligence was a substantial factor in bringing about real and personal property damage, environmental contamination, economic losses, and diminution of property values, to Plaintiffs and the Class members.

437.    Defendants' negligence was a substantial factor in bringing about physical personal injury and emotional distress and anxiety to Plaintiffs individually.

438.    Defendants' negligence was a substantial factor in bringing about the need for medical monitoring for residents affected by the Pipeline Leak.

439.    Defendants' breaches as described herein demonstrate an extreme departure from the standard of care for ensuring the safe operation of a hazardous liquids pipeline.

440.    Defendants' efforts to prevent the Pipeline Leak and to respond to the Pipeline Leak once identified, as alleged herein, including but not limited to the Energy Transfer Defendants' misrepresentations as to the amount of product lost and the continuing safety of the Pipeline,

Case ID: 250303655

demonstrate a gross failure to exercise even scant care with respect to the safety of nearby residents and their property.

441.    The actions of Defendants as set forth herein also constitute negligence per se.

442.    Defendants had a duty to comply with numerous statutes and regulations designed to prevent a public harm and failed to do so. The statutes that Defendants did not comply with include, without limitation, 35 P.S. § 691.401 (Clean Streams Law), and 49 U.S.C. § 60101 *et seq.* (Pipeline Safety Act).

443.    The purpose of the Pennsylvania Clean Streams Law is the "prevention and elimination of water pollution" in order to promote the "economic future of the Commonwealth." 35 P.S. § 691.4.

444.    Defendants breached their duty under the Clean Streams Law when they allowed the discharge of toxic substances from the Pipeline into the waters of the Commonwealth. 35 P.S. § 691.401.

445.    The purpose of the Pipeline Safety Act, and of regulations promulgated pursuant to the Act, is to "provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities." 49 U.S.C. § 60102(a). The Secretary of Transportation promulgates minimum safety standards pursuant to the Act, which apply to any and all owners and operators of pipeline facilities. *Id.*

446.    The Energy Transfer Defendants and Contractor Defendants breached their duties under the Pipeline Safety Act when they failed to comply with the minimum safety standards proscribed by the Secretary of Transportation pursuant to the Act. Specifically, the Energy Transfer Defendants' and Contractor Defendants' breaches include, without limitation, the fact that they: (a) failed to maintain an effective system for detecting leaks in violation of 49 C.F. R. § 195.444;

96

Case ID: 250303655

(b) failed to take measures necessary to prevent and mitigate the consequences of a pipeline failure that could affect a high consequence area in violation of 49 C.F.R. § 195.452; and (c) failed to detect conditions that could adversely affect the safe operation of the Pipeline within 72 hours of an extreme weather event in violation of 49 C.F.R. § 195.414.

447. The purposes of the aforementioned statutes are to protect the interests of Plaintiffs and the Class.

448. As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs and the Class members have suffered damages as alleged herein.

### COUNT II
### STRICT LIABILITY – ABNORMALLY DANGEROUS
### OR ULTRAHAZARDOUS ACTIVITY
**Against the Energy Transfer Defendants, Delta Defendants, and PBF Defendants**
**(Individually and on Behalf of the Class)**

449. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

450. Defendants' actions as alleged herein constitute an abnormally dangerous and/or ultrahazardous activity.

451. Defendants' transportation of petroleum products through a pipeline that was poorly reinforced by thirty-year old A sleeves involves a high degree of risk and the exercise of reasonable care cannot eliminate the risk inherent in operating the Pipeline.

452. Defendants' transportation of petroleum products was solely for Defendants' business purposes.

453. Defendants knew and understood (or should have) that there was a high risk that their petroleum products and other chemicals, toxins, and particulates could contaminate the environment of the nearby neighborhoods, including the risk of contaminating the only source of clean water for residents, and, thereby, cause residents to suffer personal injuries, property damage,

97

Case ID: 250303655

environmental contamination, economic losses, diminution of property value, the need for medical monitoring, and other harms as fully alleged herein.

454.    Defendants' transportation of petroleum products, toxins, and particulates through a pipeline that was poorly reinforced by thirty-year old A sleeves caused serious harm to Plaintiffs' and Class members' persons, chattel, and property, including both real and personal property, as alleged herein.

455.    As such, Defendants are strictly liable to Plaintiffs and the members of the Class.

456.    As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff and the Class have suffered damages as alleged herein.

## COUNT III
## PUBLIC NUISANCE
### Against All Defendants
### (Individually and on Behalf of the Class)

457.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

458.    Defendants' conduct constitutes a public nuisance pursuant to Pennsylvania common law.

459.    Specifically, the discharge of toxic substances, odors, and gases from the Twin Oaks Pipeline as alleged herein into underlying bedrock and aquifer, as well as to groundwater, air, soil, private wells, homes, and other property, have caused particular injuries to Plaintiffs and the Class as alleged herein.

460.    Plaintiffs and the Class are entitled to damages as a result thereof.

## COUNT IV
## PRIVATE NUISANCE
### Against All Defendants
### (Individually and on Behalf of the Class)

461.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

98

Case ID: 250303655

462.    Defendants' conduct allowed toxic substances to invade the private use and enjoyment of Plaintiffs' land and property.

463.    Defendants' conduct allowed offensive odors and gases to invade and disrupt the private use of Plaintiffs' land and property.

464.    Defendants' conduct allowed intrusive lights, sounds, and sediments to invade and disrupt the private use of Plaintiffs' land and property.

465.    The invasion of Plaintiffs' land by Defendants' product, toxic substances, and resulting odors was the foreseeable and proximate result of Defendants' negligent and reckless conduct.

466.    The invasion of Plaintiffs' land by lights, sounds, sediments, and odors attendant to Defendants' remediation activities was an additional foreseeable and proximate result of Defendants' negligent and reckless conduct.

467.    Plaintiffs have suffered injury to the use and enjoyment of their home due to the presence of toxic substances in the water and soil on Plaintiffs' land and the substantial risk of the future presence of such substances.

468.    Plaintiffs are entitled to damages as a result thereof.

**COUNT V**
**TRESPASS**
**Against the Energy Transfer Defendants, PBF Defendants, and Delta Defendants**
**(Individually and on Behalf of the Class)**

469.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

470.    Defendants' conduct caused their hazardous and toxic product to intrude into the water and onto the land of Plaintiffs' property. Defendants further failed to take actions to identify the scope of the intrusion and to remove their product from Plaintiffs' property.

99

471. Defendants knew or should have known that their shipment of petroleum product, but failure to maintain safe operations of the Twin Oaks Pipeline and to effectively investigate odor complaints for possible leaks, would result in the intrusion of their product on Plaintiffs' property.

472. The entry of petroleum and/or its constituents constitutes an unauthorized physical invasion of land.

473. Defendants' failure to identify and remove their product from Plaintiffs' property after being made aware of the intrusion constitutes a separate and continuing trespass.

474. Plaintiffs are entitled to damages as a result thereof.

## COUNT VI
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### Against All Defendants
### (Individually and on Behalf of the Class)

475. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

476. Defendants' conduct negligently inflicted emotional distress on Plaintiffs.

477. Defendants owed Plaintiffs a duty of care to ensure that they did not suffer from serious emotional distress and mental anguish.

478. Defendants breached their duty to Plaintiffs by both their actions and inactions.

479. As a direct and proximate result of Defendants' breach, Plaintiffs have suffered severe emotional injury.

480. As a result, Plaintiffs have been damaged as alleged herein.

## COUNT VII
## MEDICAL MONITORING
### Against All Defendants
### (Individually and on behalf of the Class)

481. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

Case ID: 250303655

482.    Plaintiffs and their children were significantly exposed to toxic and hazardous substances, and they bear a substantial risk of future exposure to such substances because of Defendants' repeated failures to prevent the discharge of the same substances into Plaintiffs' soil, water, and property (both real property and personal property).

483.    The exposure to these dangerous substances is such that Plaintiffs and their children have been placed at an increased risk of contracting latent illness and disease, including but not limited to cancer and other serious diseases and illnesses, and as such requires medical monitoring which Defendants are responsible for providing and paying for.

484.    Monitoring and testing procedures exist for cancer and other diseases and illnesses associated with exposure to the aforementioned hazardous substances, making the early detection and treatment of the diseases possible and beneficial.

485.    Additionally, the Energy Transfer Defendants have publicly admitted that they are liable for medical monitoring and have committed to providing medical monitoring in response to the Leak.

486.    As a result, the Court should establish a Court-supervised and administered trust fund and medical monitoring regime to compensate Plaintiffs for their economic damages.

**PRAYER FOR RELIEF**

487.    Plaintiffs and Class members seek the following relief:

      a.    All compensatory damages and other damages as alleged herein;

      b.    Medical monitoring for Plaintiffs and the Class members;

      c.    Punitive damages where allowable;

      d.    Pre- and post-judgment interest as allowed by law;

Case ID: 250303655

e.  A declaratory judgment that Defendants are responsible for the Pipeline Leak, and responsible for all past and future costs to fully restore and remediate all environmental and other harms caused by Defendants to Plaintiffs and the Class;

f.  Attorneys' fees and costs pursuant to any applicable statutes and/or regulations;

g.  Equitable and injunctive relief including:

i.  Notice to all affected persons of the Pipeline Leak and potential dangers and risks presented by the Pipeline Leak;

ii.  The enjoinment of further operations of the Twin Oaks Pipeline until Defendants are able to fully guarantee its safe operation;

iii.  Provision of full water supply for all homes in the Class;

iv.  Provision of temporary housing and all associated costs to those who reasonably request it as a result of the Pipeline Leak;

v.  Installation of a best-in-class leak detection system for the Twin Oaks Pipeline that can actually detect – and guarantee that it will detect – problems in real time;

vi.  Full restoration and remediation of all environmental contamination including but not limited to groundwater, soil, and air, to background concentrations; and

h.  All other relief this Court deems necessary, just and proper.

## DEMAND FOR TRIAL BY JURY

488.  Plaintiffs hereby demand a jury trial for all claims so triable.

102

Case ID: 250303655

Dated: January 15, 2026

Respectfully submitted,

*/s/ Shanon J. Carson*

Shanon J. Carson (Bar No. 85957)
Y. Michael Twersky (Bar No. 312411)
Joseph E. Samuel, Jr. (Bar No. 327645)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: 215-875-4656
Email: scarson@bergermontague.com
Email: mitwersky@bergermontague.com
Email: jsamuel@bergermontague.com

103

Case ID: 250303655

## VERIFICATION

The undersigned plaintiff, KATHERINE LA HART, herein avers that the statements of fact contained in the foregoing SECOND AMENDED CLASS ACTION COMPLAINT are true and correct to the best of her information, knowledge, and belief, and are made subject to the penalties of 18 Pa. C.S.A. § 4904, relating to unsworn falsification to authorities.

Dated: 1/15/2026

DocuSigned by:

_K B La Hart_
F3A9B64FF74B46F...

KATHERINE LA HART

Case ID: 250303655

## VERIFICATION

The undersigned plaintiff, JUSTINE ZACHARATOS, herein avers that the statements of fact contained in the foregoing SECOND AMENDED CLASS ACTION COMPLAINT are true and correct to the best of her information, knowledge, and belief, and are made subject to the penalties of 18 Pa. C.S.A. § 4904, relating to unsworn falsification to authorities.

Dated: 1/15/2026

Signed by:

Justine Zacharatos
7015F3D8D2574FB...
JUSTINE ZACHARATOS

## VERIFICATION

The undersigned plaintiff, CHRISTOPHER GROVER, herein avers that the statements of fact contained in the foregoing SECOND AMENDED CLASS ACTION COMPLAINT are true and correct to the best of his information, knowledge, and belief, and are made subject to the penalties of 18 Pa. C.S.A. § 4904, relating to unsworn falsification to authorities.

Dated: 1/15/2026

Signed by:

CHRISTOPHER GROVER

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Second Amended Class Action Complaint was filed with the Court's electronic filing system, which then served all current counsel of record for the Energy Transfer Defendants. The additional Defendants will be served with original process in accordance with the Pennsylvania Rules of Civil Procedure.

Dated: January 15, 2026                          /s/ Joseph E. Samuel, Jr.
                                                 Joseph E. Samuel, Jr.